IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                           )
DIANE J. SCHROER,                          )
                                           )
            Plaintiff,                     )
                                           )      No. 05-cv-1090 (JR)
      v.                                   )
                                           )
JAMES H. BILLINGTON,                       )
   Librarian of Congress,                  )
                                           )
            Defendant.                     )
_____)


**PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS**


Sharon M. McGowan  (D.C. Bar No. 476417)
Kenneth Y. Choe
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
(212) 549-2627


Arthur B. Spitzer  (D.C. Bar No. 235960)
American Civil Liberties Union
  of the National Capital Area
1400 20th Street, N.W. #119
Washington, D.C. 20036
(202) 457-0800

ATTORNEYS FOR PLAINTIFF

## INTRODUCTION

After twenty-five years of military service defending our nation against threats of terrorism, Plaintiff Diane Schroer applied for a civilian position as a Terrorism Research Analyst with the Congressional Research Service of the Library of Congress ("Library").  After initially offering Plaintiff the position, the Library rescinded the offer when it learned that it was about to hire a woman.  That is sex discrimination and it is unlawful.

Defendant argues that neither Title VII, nor any other federal statute, nor even the federal Constitution protects Plaintiff from the denial of a job – one for which her military experience makes her exceptionally qualified – by the very government that she ably served for so long.  This is not true.

Title VII protects Plaintiff no less than any other individual from losing a job because of her sex, including the fact that she does not conform to sex stereotypes.  In the event that the Court finds that Title VII's protections do not extend to Plaintiff because she is transgender, she has stated an alternative claim that refusing to hire her because she is transgender violates the equal protection guarantee of the Fifth Amendment.

Plaintiff has also stated a claim under the Library of Congress Act, which prohibits the Library from disregarding the best candidates for a job for reasons having nothing to do with their merit.  As the Library of Congress Act is a distinct and independent source of rights and protections, which can be enforced through a private right of action, this claim is not precluded by Title VII.

Finally, Plaintiff has stated a claim against the government under the substantive due process guarantee of the Fifth Amendment for unconstitutionally burdening the exercise of a constitutionally protected liberty.  The Constitution ensures that individuals can make certain

1

private decisions – including highly personal medical decisions – without fear of undue interference or penalty by the government. When Defendant withdrew Plaintiff's offer of employment because she was undergoing a medically appropriate course of treatment for her gender identity disorder, it impermissibly burdened this constitutionally protected liberty interest. Plaintiff has stated a claim, and, at trial, the Library will need to demonstrate that its actions were tailored to promote an important government interest.

## STATEMENT OF FACTS

Plaintiff's Professional Experience and Qualifications

In August 2004, Plaintiff, a twenty-five year veteran of the U.S. Armed Services, applied for a position as a Terrorism and International Crime Research Analyst (hereinafter "Terrorism Research Analyst") with the Congressional Research Service of the Library of Congress. Compl. ¶¶ 1, 25. Plaintiff was exceptionally well-qualified for this position. Id. at ¶¶ 9-12. Over the course of her military career, Plaintiff served in a variety of critical command and staff positions, including those in Armored Cavalry, Airborne, Special Forces and Special Operations Units, and in combat operations such as those in Panama ("Operation Just Cause"), Haiti ("Operation Uphold Democracy"), and Rwanda. Id. at ¶ 9. Promoted to Colonel in May 1999, Plaintiff distinguished herself with numerous awards, decorations and qualifications over the course her career.[1] Id. at ¶ 10. She is a distinguished graduate of both the National War College and Army Command and General Staff College, and holds masters degrees in history and international relations. Id.

---

[1]     Her awards and decorations include the Defense Superior Service Medal, Meritorious Service Medal (3 Oak Leaf Clusters), Army Commendation Medal (with Oak Leaf Cluster), Army and Air Force Achievement Medals, Armed Forces Expeditionary Medal (with Oak Leaf Cluster), Joint Meritorious Unit Award (2nd Oak Leaf Cluster) and the National Defense Service Medal (with Oak Leaf Cluster). Her many qualifications include Master Parachutist Wings, the Ranger and Special Forces Tabs, Air Assault Wings, Jungle Expert Badge, Jumpmaster and Joint Staff Officer. Compl. ¶ 10.

From June 1997 until her retirement from the military on January 1, 2004, Plaintiff was stationed with the United States Special Operations Command (USSOCOM), which plans, directs, and executes special operations in the conduct of the War on Terrorism in order to disrupt, defeat and destroy terrorist networks that threaten the United States, its citizens and interests worldwide. Id. at ¶ 11. After the terrorist attacks of September 11, 2001, Plaintiff served as the Director of a 120-person classified organization with significant global responsibilities for the War on Terrorism, including the tracking and targeting of several high-threat international terrorist organizations. Id. In performing these duties, Plaintiff analyzed highly sensitive intelligence reports, planned for the full range of classified and conventional operations, and presented this information to high-ranking officials of the United States government, including the Vice President, the Secretary of Defense and the Chairman of the Joint Chiefs of Staff for the U.S. Armed Forces. Id.

Shortly before her retirement, Plaintiff took a civilian position with a Washington, D.C. firm that provides consulting services to agencies of the federal government, including the Department of Defense. Id. at ¶ 12. As a Senior Analyst and Program Manager, Plaintiff worked with the National Guard Bureau to assess the vulnerability of the nation's critical infrastructure, including major power production facilities, bridges, tunnels, ports and public safety networks, to terrorist attack. Id.

Plaintiff's Course of Medical Treatment for Gender Dysphoria

Gender identity is a person's internal psychological identification as a man or a woman. Id. at ¶ 15. Gender dysphoria, also known as gender identity disorder, is a medical condition in which a person's gender identity does not match his or her anatomical sex at birth. Id. Medical specialists in gender identity disorder agree that gender dysphoria establishes itself very early,

before a child is capable of making any conscious choice about his or her gender identity.  Id. at

¶ 16.  For people with gender dysphoria, the conflict between their gender identity and their

anatomy causes psychological distress and intense feelings of discomfort.[2]  Id.

At the time of her birth, Plaintiff's sex was classified as male.  Id. at ¶ 13.  Accordingly,

Plaintiff's parents gave her the traditionally male name "David John," and, from a young age,

Plaintiff was socialized to wear traditionally masculine attire.  Id.  Over time, however, Plaintiff

and the medical professionals working with her determined that the gender designation assigned

to her at birth does not conform with her gender identity.  Id. at ¶ 14.  Plaintiff was ultimately

diagnosed with gender identity disorder, and is now under the care of medical professionals,

including mental health professionals, consistent with the recognized standards of care for

treating this condition.  Id. at ¶ 23.

The Harry Benjamin International Gender Dysphoria Association (HBIGDA) is the

leading professional association for surgeons, doctors, medical researchers and others who

specialize in the medical treatment of people with gender dysphoria.  Id. at ¶ 18.  Based on

decades of clinical experience, HBIGDA has promulgated medical standards of care for

administering sex reassignment to patients with gender dysphoria.  Id.  The HBIGDA standards

recognize that some measure of sex reassignment is medically indicated for people with gender

dysphoria.  Id. at ¶ 19.  Sex reassignment often consists of three components:  living full-time as

the gender corresponding with the person's gender identity (the "real life" test / experience),

hormone therapy, and sex-reassignment surgery.  Id. at ¶ 20.

---

[2]    A person's gender identity cannot be changed.  Compl. ¶ 17.  In the past, some therapists tried to "cure"
people with gender dysphoria through aversion therapies, electro-shock treatments, medication and other
purportedly therapeutic techniques, but these efforts were not successful and often caused severe psychological
damage.  Id.  Contemporary medical knowledge and practice now reflects an understanding that attempts to change
a person's core gender identity are considered to be futile and unethical.  Id.

According to the HBIGDA standards of care, to begin hormone therapy, a patient must either have lived full-time presenting as the gender that matches his or her gender identity for a minimum of three months or have had a therapeutic relationship for a minimum of three months with a mental health specialist who recommends such therapy. Id. at ¶ 21. The hormones are prescribed by a physician. Id. To be eligible for any form of sex-reassignment surgery, a person with gender dysphoria must have lived full-time as the gender that matches his or her gender identity in every aspect of his or her life for a minimum of one year. Id. at ¶ 22. Consistent with these protocols, Plaintiff has recently changed her legal name to Diane, and lives full time as a woman. Id. at ¶¶ 41, 43.

Plaintiff's Application for a Position with Congressional Research Service

In October 2004, approximately two months after submitting her application for the Terrorism Research Analyst position, Plaintiff was invited to interview with three representatives of the Congressional Research Service -- Charlotte Preece, Steve Bowman and Francis Miko. Id. at ¶ 28. As Plaintiff had not yet changed her legal name or begun presenting as a woman at work, she had submitted her application under her legal name (David J. Schroer) and went to the interview dressed in traditionally masculine attire. Id. at ¶¶ 29, 41.

In early December 2004, Preece contacted Plaintiff to ask for three writing samples, which Plaintiff promptly sent. Id. at ¶ 30. A few days later, Preece contacted Plaintiff to ask for an updated list of references with current contact information. Id. at ¶ 31. Plaintiff had previously informed Preece that many of her references were moving back and forth between the United States and Iraq. Id. After sending this information to Preece, Plaintiff contacted her references to let them know that someone from the Library of Congress might be contacting them about her application. Id.

After the interview committee spoke to Plaintiff's references, Preece called Plaintiff to inform her that she had been selected for the position.  Id. at ¶ 33.  Before processing the administrative paperwork, Preece asked Plaintiff whether she would accept.  Id.  Plaintiff told Preece that she was very interested in the position, and that her only question concerned the position's salary.  Id. at ¶ 34.  After conferring with the Human Resources Department of the Library of Congress, Preece called Plaintiff and informed her that the Library would be able to offer her a salary comparable to the one that she was then earning.  Id. at ¶ 35.  With that issue resolved, Plaintiff accepted the position, and Preece informed Plaintiff that she would begin processing the administrative paperwork.  Id. at ¶ 36.

On December 20, 2004, Plaintiff met Preece at Preece's office in the Library of Congress to discuss Plaintiff's start date and other details about the position.  Id. at ¶¶ 37-38.  While they were in Preece's office, Preece mentioned that she had nearly completed the paperwork associated with the hiring process, and introduced Plaintiff to some of her future colleagues.  Id. at ¶¶ 38- 39.

Over lunch that afternoon, in addition to offering additional details about the position, Preece explained to Plaintiff why the selection committee believed that Plaintiff's skills and experience made her application superior to those of the other candidates.  Id. at ¶ 40.  Plaintiff recognized that, until this point, Preece had been interacting with someone who neither had a traditionally feminine name nor dressed in traditionally feminine attire.  Id. at ¶ 41.  As an integral part of her medical treatment, as discussed above, Plaintiff was about to change her legal name to a traditionally feminine name, begin dressing full-time in traditionally feminine attire, and otherwise begin living and presenting herself full-time as a woman.  Id.  Plaintiff explained to Preece that she was under a doctor's care for gender dysphoria and that, consistent with her

doctor's instructions, she would be using a traditionally feminine name, dressing in traditionally feminine attire and otherwise living and presenting herself full-time as a woman when she started work as the Terrorism Research Analyst.  Id.  In part to allay any concern about whether Plaintiff would dress in a workplace-appropriate manner, Plaintiff showed Preece photographs in which Plaintiff was dressed in traditionally feminine workplace-appropriate attire.  Id. at ¶ 44.

Although Preece did not say anything at their lunch to suggest that this information would impact the Library's hiring decision, id., Preece called Plaintiff the following day and explained that, after a "long, restless night," she had decided that, "for the good of the service," and "given [Plaintiff's] circumstances," Plaintiff would not be a "good fit" at the Library of Congress, or words to that effect.  Id. at ¶ 46.  On February 7, 2005, Plaintiff received what appeared to be a generic e-mail from the Library of Congress stating that the Terrorism Research Analyst position had been filled.  Id. at ¶ 49.

Plaintiff timely filed an administrative complaint with the Equal Employment Opportunity Office of the Library of Congress in which she alleged that the Library's decision to rescind its job offer because she is transgender constituted impermissible sex discrimination in violation of Title VII.  Id. at ¶ 6.  After exhausting her administrative remedies, Plaintiff timely filed this lawsuit.

## ARGUMENT

### I.    Plaintiff Has Stated a Claim of Sex Discrimination Under Title VII.

Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a).  As a remedial statute, Title VII does not merely

prohibit discrimination by men against women, nor is it limited to the specific manifestations of discrimination that Congress had most clearly in mind when it enacted Title VII. Rather, like all remedial statutes, Title VII has been and "should be construed broadly to effectuate its purposes." Tcherepnin v. Knight, 389 U.S. 332, 336 (1967) (discussing general principles of statutory construction with respect to remedial provisions). See also Nordell v. Heckler, 749 F.2d 47, 49 (D.C. Cir. 1984) (instructing that courts faced with claims under Title VII "must seek in every case an interpretation animated by the broad humanitarian and remedial purposes underlying the federal proscription on employment discrimination") (internal quotation omitted).

**A.    The Complaint States a Straightforward Claim of Sex Discrimination.**

Plaintiff has alleged that the Library was eager to employ David Schroer, but unwilling to employ Diane Schroer, who was equally qualified -- indeed, identical -- in every way except for her gender. See, e.g., Compl. ¶ 54. This is sex discrimination in its most basic form: willingness to hire a man but unwillingness to hire an equally qualified woman. As the Supreme Court has explained,

> In passing Title VII, Congress made the simple but momentous announcement that sex, race, religion, and national origin are not relevant to the selection, evaluation, or compensation of employees. . . . Congress' intent to forbid employers to take gender into account in making employment decisions appears on the face of the statute. . . . We take these words ["because of such individual's sex"] to mean that gender must be irrelevant to employment decisions.

Price Waterhouse v. Hopkins, 490 U.S. 228, 239-40 (1989). See also id. at 275 (O'Connor, J., concurring) ("the explicit consideration of . . . sex . . . in making employment decisions was the most obvious evil Congress had in mind when it enacted Title VII") (internal quotation omitted).

While it may not be garden variety, this case is not analytically difficult. If an employer hired a person thinking he was white, but fired him when the family photographs that appeared

on the new employee's desk disclosed that he was black, it would be a clear case of race discrimination. If an employer hired a man named Cohen thinking he was Jewish, but fired him when Cohen disclosed that he was a recent convert to christianity, it would be a clear case of discrimination based on religion. If an employer were to conduct a telephone interview with a deep-voiced candidate named Chris, and hire "him" on the belief that they had interviewed a man, only to turn around and fire her when a deep-voiced woman named Chris appeared for work, the employer's actions would unquestionably be viewed as sex discrimination.

In this case, the only aspect of Plaintiff's candidacy that changed between the time that Defendant's agents made the job offer and the time that they rescinded it was their perception of her sex. Plaintiff has therefore stated a claim of sex discrimination under Title VII and Defendant's motion to dismiss should be denied.

**B.      The Complaint Also States a Claim That Defendant Violated Title VII by Discriminating Against Plaintiff for Her Failure to Conform to Sex Stereotypes.**

Ever since the passage of Title VII, employers have attempted to limit the scope of its protection against sex discrimination. These attempts, however, have been rebuffed by the Supreme Court. Most importantly for purposes of this case, the Supreme Court has made clear that sex stereotyping is a form of sex discrimination prohibited by Title VII. Because this proscription against sex stereotyping protects all employees, including transgender individuals, Plaintiff has stated a claim under Title VII.

**1.      Title VII prohibits all types of sex discrimination regardless of whether or not they were specifically contemplated by Congress.**

Defendant argues that Title VII cannot protect transgender people from sex discrimination because Congress did not clearly express an intention to proscribe such conduct. Def. Mot. at 6. The Supreme Court, however, has repeatedly refused to limit Title VII to only

9

those types of discrimination that Congress presumably had in mind when enacting the law.  For

example, in the past, litigants have tried to suggest that some of Title VII's protections applied

only to women and not to men.  The Court rejected that argument, despite the fact that

discrimination against women was plainly the problem that the sex discrimination provision of

Title VII was enacted to combat.  See, e.g., Newport News Shipbuilding & Dry Dock Co. v.

EEOC, 462 U.S. 669, 679-81 (1983).

Similarly, in Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986), the defendant

argued that, due to the limited legislative history surrounding the expansion of Title VII to

include sex discrimination, courts should construe the statute as applying only to "tangible,

economic barriers" to equality rather than the "psychological aspects of the workplace

environment."  Id. at 64.  Rejecting this argument, the Court found that the language of Title VII

"evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and

women in employment.'"  Id. (quoting Los Angeles Dep't of Water and Power v. Manhart, 435

U.S. 702, 707 n.13 (1978)).  And in Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993), when

the defendant insisted that victims of sexual harassment needed to experience a nervous

breakdown in order to make out a claim of sex discrimination under Title VII, the Court found

no basis for adopting such an unduly restrictive understanding of what constitutes actionable

sexual harassment.  Id. at 22.

Finally, in Oncale v. Sundowner Offshore Servs., 523 U.S. 75 (1998), the Supreme Court

rejected the argument that Title VII did not prohibit same-sex sexual harassment because

Congress had not specifically indicated its intention to proscribe such conduct.  Id. at 79.

Focusing instead on what the language and purpose of the law reasonably could be construed to

cover, and noting that "statutory prohibitions often go beyond the principal evil to cover

reasonably comparable evils," the Court instructed lower courts to apply Title VII expansively to cover any situation in which a plaintiff can show discrimination because of sex.  Id.

These Supreme Court decisions all point in the same direction:  Title VII protects employees against sex discrimination in any form.  And, as discussed in greater detail below, sex discrimination unquestionably includes discrimination against employees for failing to conform to sex stereotypes.

> **2.    The Supreme Court has made clear that sex stereotyping is a form of sex discrimination prohibited by Title VII.**

In Price Waterhouse, the defendant insisted that the plaintiff's reliance on evidence about sex stereotyping was insufficient to make out a claim of sex discrimination under Title VII.  490 U.S. at 255-58.  The Supreme Court disagreed, and reiterated that, "'in forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.'"  Id. at 251 (quoting Manhart, 435 U.S. at 707 n.13).

The plaintiff in that case, a female senior manager in an accounting firm, was denied partnership in part because she was considered to be too "macho" for a woman.  Id. at 235.  Her employer advised her that she could improve her chances for partnership if she were "to take 'a course at charm school,'" "'walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry.'"  Id.

In ruling for the plaintiff, the Court made clear that punishment for perceived failure to conform to sex stereotypes, including stereotypical norms about dress and appearance, is a form of sex discrimination actionable under Title VII.  Id. at 251.  "In the specific context of sex stereotyping," the Court held, "an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender."  Id. at 250.

Likewise, the Court noted that it did not "require expertise in psychology to know that, if an employee's flawed 'interpersonal skills' can be corrected by a soft-hued suit or a new shade of lipstick, perhaps it is the employee's sex and not her interpersonal skills that has drawn the criticism." Id. at 256. Ultimately, the Court emphasized that "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group." Id. at 251.

Any question about whether Title VII prohibits sex stereotyping was put to rest by the Court's decision in Price Waterhouse. See Rene v. MGM Grand Hotel, Inc., 305 F.3d 1061, 1068 (9th Cir. 2002) (en banc) (Pregerson, J., concurring) ("More than a decade ago, the Supreme Court held that gender stereotyping is actionable under Title VII.").

### 3. Title VII protects all victims of sex stereotyping, including transgender people.

Defendant maintains that Title VII is inapplicable to Plaintiff because she is transgender.[3] Def. Mot. at 5-7. Defendant's argument is incorrect as a matter of law and inconsistent with the remedial purposes of Title VII.

Before the Supreme Court's decision in Price Waterhouse, some courts had held that Title VII did not cover discrimination against transgender people. See, e.g., Ulane v. Eastern Airlines, Inc., 742 F.2d 1081 (7th Cir. 1984); Sommers v. Budget Mktg., Inc., 667 F.2d 748, 750 (8th Cir. 1982) (per curiam); Holloway v. Arthur Andersen, 566 F.2d 659 (9th Cir. 1977). Defendant relies upon these old cases in support of its motion to dismiss, see Def. Mot. at 6-7.

---

[3]    The terms "transsexual" and "transgender" often are used interchangably to describe individuals whose innate sense of being a man or a woman differs from the sex that was assigned to that person at birth. See Stedman's Medical Dictionary 1865 (27th ed. 2000) (defining a transsexual person as "[a] person with the external genitalia and secondary sex characteristics of one sex, but whose personal identification and psychosocial configuration is that of the opposite sex").

In the wake of Price Waterhouse, however, courts have recognized that Title VII's prohibition of sex discrimination protects all employees who do not conform to society's expectations about gender, including transgender people.[4]  For example, in Doe v. City of Belleville, 119 F.3d 563 (7th Cir. 1997), the Seventh Circuit held that "Price Waterhouse makes clear that Title VII does not permit an employee to be treated adversely because his or her appearance or conduct does not conform to stereotypical gender roles." Id. at 580.  Specifically, in that case, the court explained that "a man who is harassed because his voice is soft, his physique is slight, his hair is long, or because in some other respect he . . . does not meet his coworkers' idea of how men are to appear and behave, is harassed 'because of' his sex."[5] Id. at 581.

Since then, numerous federal appellate and district courts have reaffirmed that Title VII provides a remedy for *any* employee who can prove that he or she was penalized for failing to conform to sex stereotypes.  See, e.g., Medina v. Income Support Div., 413 F.3d 1131, 1135 (10th Cir. 2005) ("[A] plaintiff may satisfy her evidentiary burden [in a Title VII case] by showing that the harasser was acting to punish the plaintiff's noncompliance with gender stereotypes."); Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 874-75 (9th Cir. 2001) ("Price Waterhouse sets a rule that bars discrimination on the basis of sex stereotypes. . . . To the extent

---

[4]    Even apart from the Price Waterhouse decision, courts have refused to credit the Ulane court's suggestion that Title VII incorporates an implicit "transgender exception."  See, e.g., Cox v. Denny's, Inc., No. 98-1085-CIV-J-16B, 1999 WL 1317785 at *2 (M.D. Fla. Dec. 22, 1999) (explaining that, regardless of whether the Ulane line of decisions can still be considered good law after Price Waterhouse, "what [they] do not hold . . . is that an individual who happens to be a transsexual can never establish an actionable Title VII claim").

[5]    Because the Seventh Circuit erroneously held that sexually-based comments alone are sufficient to show discrimination because of sex, the case was reversed and remanded for reconsideration in light of the Supreme Court's decision in Oncale.  City of Belleville v. Doe, 523 U.S. 1001 (1998); see Oncale, 523 U.S. at 80 (noting that "workplace harassment . . . is [not] automatically because of sex merely because the words used have sexual content or connotations").  The Seventh Circuit's understanding of gender non-conformity discrimination, however, remains good law.  See Jones v. Pac. Rail Servs., No. 00-C-5776, 2001 WL 127645, at *2 (N.D. Ill. Feb. 14, 2001) ("We see nothing in Oncale, or in the Court's decision to vacate and remand Doe for reconsideration in light of Oncale, to indicate that the Seventh Circuit's [gender non-conformity] rationale is no longer viable.").

[Ninth Circuit precedent] conflicts with Price Waterhouse, . . . [it] is no longer good law.");

Bibby v. Philadelphia Coca Cola Bottling Co., 260 F.3d 257, 262-63 (3d Cir. 2001) (holding that

claims of sex discrimination under Title VII can be based upon evidence that the "harasser's

conduct was motivated by a belief that the victim did not conform to the stereotypes of his or her

gender"); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 261 n.4 (1st Cir. 1999)

(emphasizing that both men and women can state a claim under Title VII if they are harassed for

failing to satisfy society's expectations about masculinity or femininity); Centola v. Potter, 183

F. Supp. 2d 403, 410 (D. Mass. 2002) (holding that Title VII prohibits harassment based on a

perception that a person does "not conform with . . . ideas about what 'real' men should look or

act like"); Heller v. Columbia Edgewater Country Club, 195 F. Supp. 2d 1212, 1224 (D. Or.

2002) (holding that Title VII prohibits harassment based on a perception that the person "did not

conform to [the defendant's] stereotype of how a woman ought to behave"); Ianetta v. Putnam

Invs., Inc., 142 F. Supp. 2d 131, 134 (D. Mass. 2001) (recognizing that claim of discrimination

"for failing to meet the male gender stereotype" cognizable under Title VII).

After Price Waterhouse, courts have also recognized that transgender people can state

claims for sex discrimination under civil rights laws where they are treated differently because

they fail to conform to sex stereotypes.  In doing so, they have rejected or repudiated older cases

holding that transgender people are not protected by Title VII.  For example, in Schwenk v.

Hartford, 204 F.3d 1187 (9th Cir. 2000), the Ninth Circuit considered the question of whether a

transgender prisoner targeted for abuse could bring a claim under the Gender Motivated

Violence Act.  The court ruled that she could, holding that the GMVA should be construed

consistently with Title VII, and noting that "[d]iscrimination because one fails to act in the way

expected of a man or woman is forbidden under Title VII."  Id. at 1202.  In reaching this

conclusion, the court repudiated its prior holding in Holloway v. Arthur Andersen, 566 F.2d 659 (9th Cir. 1977), which held that transgender people were precluded from bringing claims of sex discrimination:  "The initial judicial approach taken in cases such as Holloway has been overruled by the logic and language of Price Waterhouse."  Id. at 1201.  Applying the reasoning of Price Waterhouse to another remedial statute -- the Equal Credit Opportunity Act --  the First Circuit ruled that a man denied a credit application because he was dressed in traditionally feminine attire stated a claim of sex discrimination.  Rosa v. Park West Bank & Trust Co., 214 F.3d 213, 215-16 (1st Cir. 2000).

In a pair of recent cases involving transgender employees, both of which bear a striking resemblance to this case, the Sixth Circuit ruled that employees whose failure to conform to gender stereotypes was a result of transitioning from one gender to another could bring a claim for sex discrimination under Title VII.  See Smith v. City of Salem, 378 F.3d 566 (6th Cir. 2004), and Barnes v. City of Cincinnati, 401 F.3d 729 (6th Cir. 2005).  In Smith, the Sixth Circuit explained that, after Price Waterhouse, an employer violates Title VII just as much when it penalizes male employees for adopting traditionally feminine dress and mannerisms as when it penalizes female employees who do not, because in both cases, the discrimination would not occur but for the victim's sex.  378 F.3d at 574.  Price Waterhouse, which "eviscerated" the analysis used by the courts in Sommers, Holloway and Ulane, compelled this result.  Id. at 573. In Barnes, the Sixth Circuit reiterated that "'[s]ex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination, irrespective of the cause of that behavior; a label, such as 'transsexual,' is not fatal to a sex discrimination claim where the victim has suffered discrimination because of his or her gender non-conformity.'"  401 F.3d at 737 (quoting Smith, 378 F.2d at 575).  Thus, an employee who alleges that his failure to conform to sex

stereotypes concerning how a man should look and behave was the "driving force" behind his

employer's adverse employment actions "state[s] a claim for relief pursuant to Title VII's

prohibition of sex discrimination."  Id.

Numerous federal district courts likewise have refused to dismiss claims of sex

discrimination brought by transgender employees.  For example, the federal district court in

Arizona rejected a motion to dismiss that rested on many of the same arguments presented in

Defendant's motion:

> It is well settled that Title VII's prohibition on sex discrimination
> encompasses discrimination against an individual for failure to
> conform to sex stereotypes.   [citing Price Waterhouse, Nichols,
> and Schwenk]  "We are beyond the day when an employer could
> evaluate employees by assuming or insisting that they matched the
> stereotype associated with their group," Price Waterhouse, 490
> U.S. at 251, whether that stereotype relates to an individual's
> behavior, appearance, or anatomical features.  The presence or
> absence of anatomy typically associated with a particular sex
> cannot itself form the basis of a legitimate employment decision
> unless the possession of that anatomy (as distinct from the person's
> sex) is a bona fide occupational qualification (BFOQ).  Therefore,
> neither a woman with male genitalia nor a man with stereotypically
> female anatomy, such as breasts, may be deprived of a benefit or
> privilege of employment by reason of that nonconforming trait.

Kastl v. Maricopa County Community College Dist., No. Civ. 02-1531-PHX-SRB, 2004 WL

2008954, at *2 (D. Ariz. June 3, 2004).  Other federal courts have reached the same conclusion.

See, e.g., Tronetti v. TLC Healthnet Lakeshore Hosp., No. 03-CV-0375E(SC), 2003 WL

22757935, at *4 (W.D.N.Y. Sept. 26, 2003) (rejecting motion to dismiss transsexual plaintiff's

claim of discrimination "for failing to 'act like a man'" and noting that Price Waterhouse

undermined the reasoning of the Ulane line of decisions); Doe v. United Consumer Fin. Servs.,

No. 1:01-CV-1112, 2001 WL 34350174, at *3 - *5 (N.D. Ohio Nov. 9, 2001) (rejecting motion

to dismiss because transgender plaintiff had alleged facts supporting sex stereotyping theory, and

noting tension between Ulane line of cases and Price Waterhouse).

16

Likewise, many state courts have rejected the narrow definition of sex discrimination advocated here by the government when interpreting their state and local laws.  For example, in Maffei v. Kolaeton Industries, Inc., 626 N.Y.S.2d 391, 396 (N.Y. Sup. Ct. 1995), the court reiterated that "all courts agree [that] the anti-discrimination statutes are remedial and thus to be interpreted liberally to achieve their intended purposes."  Therefore, notwithstanding the old federal authority to the contrary, the Maffei court found that an employer who discriminates against an employee "because the person, as a result of surgery and hormone treatments, is now of a different sex has violated our City prohibition against discrimination based on sex."[6]  Id.

Similarly, a New Jersey appellate court rejected the "constricted" view of sex discrimination reflected in earlier decisions:

> A person who is discriminated against because he changes his gender from male to female is being discriminated against because he or she is a member of a very small minority whose condition remains incomprehensible to most individuals. . . . "[S]ex" embraces an individual's gender and is broader than anatomical sex.  Sex is comprised of more than a person's genitalia at birth.

Enriquez v. West Jersey Health Sys., 342 N.J. Super. 501, 513, 515 (N.J. App. Div. 2001) (internal quotations and citations omitted).  Recognizing that the Supreme Court's decision in Price Waterhouse "signaled a possible change in the federal approach to gender dysphoria," id. at 512, the court concluded that sex discrimination "includes gender discrimination so as to protect plaintiff from gender stereotyping and discrimination for transforming herself from a man to a woman."  Id. at 515-16.  Other state courts have agreed that laws prohibiting sex discrimination protect transgender people.  See, e.g., Lie v. Sky Publ'g Corp., 15 Mass. L. Rptr. 412, 2002 WL

---

[6]    Almost thirty years ago, New York state courts recognized that treating transsexual women different from other women was a form of sex discrimination.  Richards v. U.S. Tennis Ass'n, 400 N.Y.S. 2d 267 (N.Y. Sup. Ct. 1977).  See also Rentos v. Oce-Office Sys., No. 95 Civ. 7908 LAP, 1996 WL 737215, at *8 - *9 (S.D.N.Y. Dec. 24, 1996) (denying motion to dismiss sex discrimination claims brought by transsexual plaintiff under state and city human rights laws).

31492397, at *5 (Mass. Super. Ct. Oct. 7, 2002) (holding that a transgender plaintiff had stated a claim of sex discrimination where she alleged "that the defendant's conduct was based on stereotyped notions of 'appropriate' male and female behavior in the same manner as the conduct of the defendant in Price Waterhouse"); Doe v. Yuntis, No. 001060A, 2000 WL 33162199, at *6 (Mass. Super. Oct. 11, 2000) (accord), aff'd sub nom Doe v. Brockton Sch. Comm., No. 2000-J-638, 2000 WL 33342399 (Mass. App. Ct. Nov. 30, 2000).[7]

Defendant's citation to cases holding that "transsexuals" are not a "protected group" under Title VII, Def. Mot. at 6, does not answer the question presented in this case – i.e., whether transgender people who suffer discrimination because of their failure to conform to sex stereotypes may bring a claim for sex discrimination under Title VII.  As discussed above, Price Waterhouse and its progeny demonstrate that they may.

Moreover, Defendant's suggestion that transgender people are somehow too gender non-conforming to warrant protection under Title VII, Def. Mot. at 7, cannot be reconciled with the Supreme Court's clear instruction that Title VII addresses the "entire spectrum" of sex stereotypes.[8]  Price Waterhouse, 490 U.S. at 251.  The fact that medical professionals have

---

[7]      International tribunals have also adopted the approach espoused by the U.S. Supreme Court in Price Waterhouse and Oncale when determining how their sex discrimination laws apply to transgender people.  For example, in P v. S and Cornwall County Council, Case C-13/94, 1996 E.C.R. I-2143 (April 30, 1996) (available on LEXIS), the European Court of Justice ruled that, "[i]n view of its purpose and the nature of the rights" that the European Community's directive against sex discrimination sought to safeguard, the law should be construed broadly so as to apply not only to traditional forms of sex discrimination, but also "to discrimination arising, as in this case, from the gender reassignment of the person concerned." Id. at 10.  Like the Oncale court, the ECJ recognized that the drafters of the directive may not have specifically contemplated transsexuality, but noted that, "as the expression of a more general principle, on the basis of which sex should be irrelevant to the treatment everyone receives, the directive should be construed in a broader perspective, including therefore all situations in which sex appears as a discriminatory factor." Id. at 8.

[8]      Etsitty v. Utah Transit Authority, No. 2:04-CV-616 DS, 2005 WL 1505610 (D. Utah June 24, 2005), from which Defendant draws this argument, is currently on appeal to the Tenth Circuit.  Plaintiffs respectfully submit that the Utah district court's holding that "Price Waterhouse's prohibition against sex stereotyping should not be applied to transsexuals," id. at *4, is both incorrect as a matter of law and contrary to the increasing body of circuit and district court authority holding that transgender people are entitled to the protections of Title VII when they suffer discrimination because of their gender non-conformity, discussed supra.

18

recognized that, from a clinical perspective, transsexualism is something more than mere gender non-conformity, Def. Mot. at 7, does not mean that Title VII permits discrimination against transgender people <u>because of</u> their gender non-conformity.[9]  While not every adverse employment action against a transgender employee is necessarily sex discrimination, an employer who discriminates against a transgender employee because she departs from sex stereotypes violates Title VII.[10]

As these cases make clear, all employees – including transgender employees – may bring a claim of sex discrimination under Title VII when they suffer adverse employment action simply because of their failure to conform to sex stereotypes.

### 4.  The Complaint adequately states a claim of discrimination for failure to conform to sex stereotypes.

Plaintiff has alleged all necessary elements of a Title VII claim for failure to conform to sex stereotypes.  Plaintiff has alleged that she is a member of a protected class – she is woman

---

[9]    Logically, the fact that a person's gender non-conformity may be caused by a medical or genetic condition should have no bearing on whether the person is entitled to protection under Title VII.  For purposes of determining Title VII liability, the only relevant question is whether the person has been targeted for discrimination because of their actual or perceived non-conformity with sex stereotypes – not what caused the person's gender non-conformity. Otherwise, for example, a male employee who was singled out for gender-based harassment because he was short, slight-of-build, or had a high voice would not be protected under Title VII because those characteristics also are genetically determined.

[10]    A ruling by this Court that Plaintiff may bring a claim for sex discrimination under Title VII would in no way require employers throughout the land to abandon dress codes and integrate bathrooms, notwithstanding Defendant's suggestion to the contrary.  See Def. Mot. at 8.  The only question presented here is whether an allegation that an employer refused to hire an employee because of her gender non-conformity states a claim of sex discrimination cognizable by Title VII.  Moreover, Defendant's suggestion that a ruling in Plaintiff's favor would produce a torrent of litigation by men wishing to use the women's room (or vice-versa) ignores the fact that <u>Price Waterhouse</u>, decided over fifteen years ago, has produced no such effect.  Defendant's ominous prediction also ignores the obvious fact that most people are comfortable, and in fact, prefer to act and dress within the range that is considered to be appropriate for their gender, and only a very small percentage of people have gender identity disorder and would therefore desire to use a bathroom other than the one that corresponds with their biological sex. Because transgendered individuals do not seek to be arbitrary in their use of sex-segregated facilities, employers can respect the dignity of transgender employees while still enforcing reasonable rules about dress and restroom use to prevent disruption or misconduct.  In fact, many municipalities and companies have policies governing facility use that rely on the gender presentation of the individual rather than his or her biological gender.  <u>See generally</u> <www.hrc.org/worknet> (last visited Sept. 26, 2005) (providing information about public- and private-sector employers with transgender-inclusive non-discrimination policies).

who does not conform to gender stereotypes.  Compl. ¶¶ 50, 53.  She has also alleged that

Defendant may have perceived her to be a man who did not conform to gender stereotypes.  <u>Id.</u>

at ¶¶ 50, 53.  Plaintiff has alleged that she was qualified – in fact, she was the most qualified

applicant – for the position of Terrorism Research Analyst.  <u>Id.</u> at ¶ 51.

     Plaintiff has also alleged that Defendant withdrew its offer of employment because she

fails to conform to sex stereotypes.  <u>See id.</u> at ¶ 1.  Specifically, her Complaint states that

Defendant rescinded its offer of employment and otherwise refused to employ her after Plaintiff

told Defendant that, consistent with medical treatment for gender dysphoria, she would be

dressing in traditionally feminine attire and otherwise living and presenting herself as a woman.

<u>Id.</u> at ¶ 52.  Plaintiff has alleged that "Defendant took these actions either because it perceived

Plaintiff to be a man who did not conform with gender stereotypes associated with men in our

society or because it perceived Plaintiff to be a woman who did not conform with gender

stereotypes associated with women in our society."  <u>Id.</u> at ¶ 53.

     These allegations state a claim of impermissible sex stereotyping in violation of Title VII.

Under our notice pleading regime, Plaintiff has satisfied her burden.[11]  Accordingly, Defendant's

motion to dismiss should be denied.

## II.  Plaintiff Has Properly Alleged an Alternative Claim Under the Fifth Amendment's Equal Protection Clause in the Event that the Court Rules That Title VII's Prohibition of Sex Discrimination Does Not Apply to Her.

     If this Court finds that Title VII's protections against sex discrimination do not extend to

Plaintiff because she is transgender, Plaintiff states a claim under the equal protection clause of

the Fifth Amendment.

---

[11]     Defendant's argument that Plaintiff has not made out a prima facie case in her Complaint, Def. Mot. at 5, is neither accurate nor appropriate at this stage of the proceedings.  <u>See</u> <u>Sparrow v. United Air Lines, Inc.</u>, 216 F.3d 1111, 1115 (D.C. Cir. 2000) (holding that plaintiffs need not plead the elements of a prima facie case in their complaint).

A.    **Title VII Is the Exclusive Remedy Only for Claims of Discrimination on the Basis of Race, Color, Religion, Sex or National Origin.**

Defendant's argument that Brown v. General Services Administration, 425 U.S. 820 (1976), precludes Plaintiff from bringing an alternative constitutional claim is meritless.  The question answered by Brown was whether Title VII is "the exclusive individual remedy available to a federal employee complaining of job-related racial discrimination."  Id. at 825.[12] Accordingly, in a decision that is controlling here, the D.C. Circuit has ruled that Title VII is the exclusive remedy only with respect to those claims involving the kinds of discrimination covered by that statute.  Ethnic Employees of the Library of Congress v. Boorstin, 751 F.2d 1405, 1415-16 (D.C. Cir. 1985) ("We intimate no view as to the likelihood that the [plaintiffs'] will prevail on constitutional claims for which Title VII could not provide a remedy.  We do, however, hold that Congress did not intend for Title VII to displace those claims."); see also Clark v. Library of Congress, 750 F.2d 89 (D.C. Cir. 1984) (adjudicating Library of Congress employee's constitutional and employment discrimination claims without even suggesting that claims other than those that could be brought under Title VII were precluded under Brown).

As the D.C. Circuit explained:

> Brown's inquiry into the legislative history of section 717 focused on whether federal employees should be able to bring *parallel actions* under both Title VII and other provisions of federal law *to redress the same basic injury*.  Nothing in that history even remotely suggests that Congress intended to prevent federal employees from suing their employers for constitutional violations against which Title VII provides no protection at all.

---

[12]    Describing Brown's holding in later cases, the Supreme Court has confirmed that Title VII is the exclusive remedy only with respect to the categories protected by that statute.  See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 734 (1989) ("This Court affirmed [the lower court's ruling in Brown], holding that § 717 of Title VII constituted the exclusive remedy for allegations of racial discrimination in federal employment."); Great Am. Fed'l Savings & Loan Ass'n v. Novotny, 442 U.S. 366, 376 (1979) ("In Brown, the Court concluded that § 717 displaced other causes of action arguably available to assert substantive rights similar to those granted by § 717.").

Boorstin, 751 F.2d at 1415 (emphasis added).  Other courts have confirmed that federal employees may bring claims under the Constitution for types of discrimination that are not covered by other, more specific, statutes.  See, e.g., Ray v. Nimmo, 704 F.2d 1480, 1485 (11th Cir. 1983) (per curiam) (holding that Title VII and the ADEA were the exclusive mechanisms for addressing sex and age discrimination, but other types of constitutional violations could be addressed through "direct action under the equal protection 'component' of the Fifth Amendment due process clause").

Therefore, while Title VII provides the exclusive remedy for federal employees who suffer discrimination on one of the grounds identified in that statute, it does not preclude claims for other kinds of discrimination left unaddressed by Title VII.

**B.    Plaintiff Has Properly Pled an Alternative Claim Under the Equal Protection Clause in the Event That Title VII Is Found Not to Apply to Her.**

Should the Court find that Title VII's protection against sex discrimination does not extend to transgender employees penalized for their gender nonconformity, Plaintiff may bring a claim for injunctive relief under the Fifth Amendment for the government's violation of her constitutional right to equal protection of the laws.

Specifically, in the event that the Court believes that transgender discrimination is something different than sex discrimination, Plaintiff has alleged that Defendant purposefully and intentionally discriminated against her because she is transgender.  Compl. ¶ 68.  She has also alleged that Defendant's actions were arbitrary, irrational and without constitutionally sufficient justification.  Id.  Such government action would violate equal protection even under the lowest level of scrutiny, rational basis review.

Plaintiff can, of course, assert claims for relief in the alternative in her Complaint.  Fed. R. Civ. P. 8(e)(2).  This Court recognized as much in a remarkably similar case twenty years ago.

See <u>Doe v. U. S. Postal Serv.</u>, Civ. A. No. 84-3296, 1985 WL 9446, at *3 - *5 (D.D.C. June 12, 1985) (refusing to dismiss constitutional claim for transgender discrimination pled as an alternative to Title VII and Rehabilitation Act claims).

**III.    Plaintiff Has Stated a Claim Under the Library of Congress Act.**

The Library of Congress Act provides that "[a]ll persons employed in and about said Library of Congress . . . shall be appointed solely with reference to their fitness for their particular duties." 2 U.S.C. § 140. Defendant's suggestion that Title VII has essentially nullified the protections provided to Library of Congress employees and applicants cannot withstand scrutiny. Rather, as someone who clearly falls within the discrete class of people granted the protections of this Act, Plaintiff has a private right of action to enforce the statute.

**A.    Title VII Does Not Preempt Claims Under the Library of Congress Act.**

As noted above, Title VII is the exclusive avenue for resolving claims involving the kinds of discrimination *addressed by that statute*. <u>Jett</u>, 491 U.S. at 734. The Supreme Court has made clear that a plaintiff may rely upon the same set of facts to bring multiple claims – even when one of the claims is employment discrimination under Title VII – so long as there is an "independent" basis for each claim. <u>Alexander v. Gardner-Denver Co.</u>, 415 U.S. 36, 49-50 (1974). All that an employee may not do is avoid Title VII's requirements by using another statute, such as § 1985(3), to bring what amounts to a Title VII claim (e.g., sex discrimination) by another name. <u>See</u> <u>Novotny</u>, 442 U.S. at 378 (dismissing §1985(3) claim for conspiracy to violate constitutional right to equal protection because claim was, in essence, a constitutional claim for sex discrimination, which was preempted by Title VII).

Defendant's argument that <u>Brown</u> implicitly repealed the protections of the Library of Congress Act is simply untenable, therefore, because the Library of Congress Act does not

prohibit discrimination based on race, sex, religion or national origin; what it does is establish a merit employment system at the Library of Congress. And because Plaintiff's claim under the Library of Congress Act is not a discrimination claim but a claim that she was denied a job for reasons other than merit, she is entitled to pursue both her Title VII claim (or, in the alternative, her equal protection claim) and her Library of Congress Act claim.

**B.    Plaintiff Has a Private Right of Action Under the Library of Congress Act.**

Defendant's suggestion that there is no private cause of action under the Library of Congress Act is also misplaced. When faced with the question of whether a statute implies a private right of action, the court must apply the four-prong test articulated in <u>Cort v. Ash</u>, 422 U.S. 66, 78 (1975), to determine (1) whether plaintiff is "one of the class for whose especial benefit the statute was enacted;" (2) whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one; (3) whether implying a private cause of action is consistent with the underlying purpose of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law, in an area basically of concern to the States, so that it would be inappropriate to infer a cause of action based solely on federal law. <u>See</u> <u>Cannon v. Univ. of Chicago</u>, 441 U.S. 688 & n.9 (1979); <u>see</u> <u>id.</u> at 689-709 (finding private right of action under Title IX). All four elements of the <u>Cort v. Ash</u> test are easily satisfied here.

Because "the right- or duty- language of the statute has generally been the most accurate indicator of the propriety of implication of a cause of action," <u>Cannon</u>, 441 U.S. at 690, n.13, this first prong is dispositive of most cases. <u>See, e.g.</u>, <u>Alexander v. Sandoval</u>, 532 U.S. 275, 288-89 (2001) (finding no private right of action to enforce § 602 of the Civil Rights Act because statute was not phrased in terms of rights to individuals); <u>Suter v. Artist M.</u>, 503 U.S. 347, 363-64 (1992) (finding no private right of action to enforce Adoption Assistance and Child Welfare Act

provision requiring agencies receiving federal funds make "reasonable efforts" to avoid removing children from their home and to reunify families quickly).

Statutes like "Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 create individual rights because those statutes that are phrased 'with an *unmistakable focus* on the benefited class.'"  Gonzaga Univ. v. Doe, 536 U.S. 273, 284 (2002) (quoting Cannon, 441 U.S. at 691) (emphasis in original).  See also Sandoval, 532 U.S. at 288-89 (reiterating that language stating that "no person shall be subject to discrimination" demonstrates an unmistakable intent to create a private right of action, whereas language "phrased as a directive to federal agencies engaged in the distribution of public funds" does not); Cannon, 441 U.S. at 690 n.13 ("a statute conferring such a right will almost always have to be phrased in terms of the person benefited").  Like Title IX and Section 5 of the Voting Rights Act, the Library of Congress Act identifies the particular class of individuals whose rights are to be guaranteed by the statute.  ("All *persons employed in and about said Library of Congress . . . shall be appointed solely with reference to their fitness for their particular duties.") (emphasis added).  As an applicant for a position at the Library of Congress, Plaintiff is "one of the class for whose especial benefit the statute was enacted," Cort, 422 U.S. at 78.  Accordingly, Plaintiff has satisfied the first element of this test.

The second prong, which also deals with congressional intent, is related to the first because, as the Supreme Court has explained, where it is clear "'that federal law has granted a class of persons certain rights, it is not necessary to show an intention to create a private cause of action, although an explicit purpose to deny such a cause of action would be controlling.'" Cannon, 441 U.S. at 694 (quoting Cort, 422 U.S. at 82).  Consequently, rather than being fatal to Plaintiff's claim, the government's concession that "there is no Congressional debate regarding

the statute," Def. Mot. at 13-14 n.5, demonstrates that there is no explicit statement by Congress precluding a private right of action.[13]

Third, as the Court explained in <u>Cannon</u>, "when [a private] remedy is necessary or at least helpful to the accomplishment of the statutory purpose, the Court is decidedly receptive to its implication under the statute." 441 U.S. at 703. By way of comparison, the Supreme Court recognized that a private cause of action was appropriate under both the Voting Rights Act and the Securities Exchange Act – statutes with broad remedial purposes that were designed to protect the rights of specified individuals. <u>See id.</u> at 703 n.35 (citing <u>Allen v. State Bd. of Elections</u>, 393 U.S. 544 (1969) (Voting Rights Act), and <u>J.I. Case Co. v. Borak</u>, 377 U.S. 426, 434 (1964) (Securities Exchange Act)). In this case, inferring a private cause of action both would be consistent with the remedial purposes of the Library of Congress Act and would avoid an outcome rendering the statute wholly unenforceable.

Finally, the Library of Congress has never been regulated by state law and employment disputes at the Library, an arm of the federal government, are not an area of concern to the States. Accordingly the fourth factor presents no barrier in this case.

Under the test established by the Supreme Court, Plaintiff may bring a private cause of action under the Library of Congress Act.[14] She has alleged that Defendant rescinded its offer of employment to her and otherwise refused to hire her for reasons wholly unrelated to her fitness for the particular duties of Terrorism Research Analyst. Compl. ¶ 73. She has also alleged that she was not only fit for the duties of Terrorism Research Analyst but also the most qualified for

---

[13]   An obscure letter from the Librarian of Congress to the Senate that purportedly describes the factors the Librarian of Congress believed, in the year 1898, determined "fitness," Def. Mot. at 13-14 n.5, is irrelevant to the question of whether Congress intended to allow for a private cause of action under the Library of Congress Act.

[14]   In <u>Clark v. Library of Congress</u>, 750 F.2d 89 (D.C. Cir. 1984), the court did not need to determine whether there was a private cause of action under the Library of Congress Act because, in that case, the statute would have provided no greater relief than the First Amendment, which was the primary basis for the plaintiff's claim in that case. <u>Id.</u> at 102 n.28.

the position.  <u>Id.</u> at ¶ 72.  In a situation such as this, "where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done."  <u>Bell v. Hood</u>, 327 U.S. 678, 684 (1946).  For this reason, Defendant's motion to dismiss Plaintiff's claim under the Library of Congress Act should be denied.

**IV.    Plaintiff Has Stated a Claim Under the Due Process Clause by Alleging That the Government Has Unconstitutionally Burdened Her Protected Liberty Interest in Medical Decisionmaking.**

Defendant's motion suggests a fundamental misunderstanding of the nature of Plaintiff's due process claim.  Plaintiff does not argue that she has a property interest in the position with the Library of Congress that requires a particular level of procedural due process.  She also does not allege that she has suffered a constitutionally-cognizable harm to her reputation as a result of Defendant's decision to rescind its job offer.  Rather, Plaintiff has alleged that she has a constitutionally protected liberty interest in making personal medical decisions without suffering adverse consequences from the government.  The fact that the adverse consequence here was the withdrawal of a job offer does not transform this claim into a garden-variety public employment procedural due process claim or a reputational liberty claim.

As the Supreme Court explained in <u>Whalen v. Roe</u>, 429 U.S. 589 (1977), the Due Process Clause protects against violations of an individual's right to privacy, which has two components: (1) an "interest in avoiding disclosure of personal matters," and (2) an "interest in independence in making certain kinds of important decisions."  <u>Id.</u> at 599-600.  Because medical decisions are among the most important that a person can make, the Due Process Clause ensures that the government cannot burden an individual's right to make these decisions without constitutionally sufficient justification.  <u>See, e.g. Riggins v. Nevada</u>, 504 U.S. 127 (1992) (liberty interest in

avoiding unwanted administration of drugs); <u>Washington v. Harper</u>, 494 U.S. 210 (1990) (same); <u>Cruzan v. Missouri Dep't of Health</u>, 497 U.S. 261 (1990) (right to refuse life-saving treatment); <u>Planned Parenthood of Southeastern Pa. v. Casey</u>, 505 U.S. 833 (1992) (liberty interest in reproductive health choices); <u>Griswold v. Connecticut</u>, 381 U.S. 479 (1965) (privacy right to access and use contraception); <u>cf.</u> <u>Winston v. Lee</u>, 470 U.S. 753, 766 (1985) (suspect could not be forced to submit to surgical intrusion absent a "compelling need").

Only when significant government interests would otherwise be compromised may the government burden an individual's right to determine how to direct his or her medical treatment. <u>See</u> <u>Jacobson v. Massachusetts</u>, 197 U.S. 11, 26-39 (1905) (liberty interest in avoiding undesired medical treatment (i.e., smallpox vaccination) outweighed by compelling government interest in preserving public health); <u>Andrews v. U.S. Dep't of Health and Human Servs.</u>, Civ. Action No. 04-0307 (JR), 2005 U.S. Dist. LEXIS 5710, at *8 (D.D.C. Mar. 31, 2005) (recognizing that "certain rights pertaining to health-related and medical choices are protected by the Constitution," but finding that government ban on importation of specific drugs from Canada was related to important government interest in ensuring drug quality).[15]

In this case, Plaintiff has alleged that Defendant withdrew its offer of employment because she was exercising her constitutional right to direct her medical treatment in a particular way. Plaintiff's decision to transition from male to female is no different than other serious medical decisions that people often must make when faced with serious medical conditions. Just as a public employer cannot refuse to employ a woman because it becomes aware that she plans

---

[15] This right to avoid undue government interference does not depend on what course of treatment an individual ultimately decides to pursue. For example, courts have recognized female employees' right to make reproductive health decisions without government interference both where the woman decided to terminate her pregnancy, <u>Drake v. Covington County Bd. of Educ.</u>, 371 F. Supp. 974 (M.D. Ala. 1974), and where the woman decided not to do so, <u>Whitmore v. Bd. of Educ.</u>, No. 90-C-20143, 1991 WL 166910 (N.D. Ill. Feb. 12, 1991), and <u>Eckmann v. Bd. of Educ.</u>, 636 F. Supp. 1214 (N.D. Ill. 1986). <u>See</u> discussion <u>infra</u> at 30.

to have a prophylactic double mastectomy, Defendant may not penalize Plaintiff because of the medical decisions that she and her doctors have decided are appropriate for her.

For almost half a century, courts have recognized that the government impermissibly burdens a constitutionally protected liberty when it denies a benefit based solely on how an individual has exercised that liberty. Although this general principle has been applied in the context of tax exemptions, unemployment benefits and welfare benefits, the Supreme Court has "most often . . . applied the principle to denials of public employment," and has applied it "regardless of the public employee's contractual or other claim to the job." Perry v. Sindermann, 408 U.S. 593, 597 (1972). As the Supreme Court explained,

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests. . . . For if the government could deny a benefit to a person because of his constitutionally protected [conduct], his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to produce a result which [it] could not command directly. Such interference with constitutional rights is impermissible.

Id. at 597 (1972) (internal quotation and citation omitted). This decision logically followed from the Supreme Court's ruling in Pickering v. Board of Education, 391 U.S. 563, 572-73 (1968), that a government employee could not lose his job based on his exercise of his First Amendment rights absent some showing that the speech impeded his performance of his duties or otherwise disrupted the workplace. See also Clark, 750 F.2d at 98 (finding that the Library of Congress violated the plaintiff's rights by subjecting him, without "any permissible justification," to intrusive FBI background check because of how he had exercised his rights of association).

Although <u>Pickering</u>, <u>Perry</u> and <u>Clark</u> involve burdens on a public employee's speech and association rights, courts have likewise recognized that other constitutionally protected liberties may not be burdened by a public employer absent a significant government interest. For example, in <u>Eckmann v. Board of Education</u>, 636 F. Supp. 1214 (N.D. Ill. 1986), a government employer fired a school teacher because she exercised her constitutionally protected right to bear a child out of wedlock. Applying the test articulated in <u>Mount Healthy City Board of Education v. Doyle</u>, 429 U.S. 274 (1977), the court found that the teacher's decision, "[w]hile . . . not protected by a specifically enumerated constitutional right," was "covered by 'substantive due process.'" <u>Eckmann</u>, 636 F. Supp. at 1217. Accordingly, the court ruled that "plaintiff had a substantive due process right to conceive and raise her child out of wedlock without unwarranted state (School Board) intrusion." <u>Id.</u> at 1218. <u>See also</u> <u>Whitmore v. Bd. of Educ.</u>, No. 90-C-20143, 1991 WL 166939, at *5 (N.D. Ill. Feb. 12, 1991) (holding that female employee who was terminated by the school board because she decided to bear a child out of wedlock stated a claim "that Defendants deprived her of a recognized substantive due process right"). Likewise, in <u>Drake v. Covington County Board of Education</u>, 371 F. Supp. 974 (M.D. Ala. 1974), the court found that the school district's decision to fire a woman from her teaching job because she had an abortion was subject to strict scrutiny because it infringed her constitutionally protected right to privacy under the Due Process Clause. <u>Id.</u> at 979.

In other cases where the government, acting as employer, penalizes an employee because of how he or she has exercised a constitutionally protected liberty, courts have demanded some showing by the government that would justify burdening the employee's liberty. As the D.C. Circuit explained in <u>Norton v. Macy</u>,

> [While a federal employer] enjoys a wide discretion in determining
> what reasons may justify removal of a federal employee, . . . the

30

> discretion is not unlimited. . . . [The Due Process Clause] forbids
> all dismissals which are arbitrary and capricious . . . [and] may also
> cut deeper into the Government's discretion where a dismissal
> involves an intrusion upon that ill-defined area of privacy which is
> increasingly if indistinctly recognized as a foundation of several
> specific constitutional protections.

417 F.2d 1161, 1164 (D.C. Cir. 1969).  Accordingly, courts have been uncomfortable allowing

government employers to fire employees based solely on conduct that is wholly unrelated to their

ability to perform the job at issue.[16]

For example, in Mindel v. U.S. Civil Service Commission, 312 F. Supp. 485, 487-88

(N.D. Cal. 1970), the court found that the government violated a postal clerk's right to privacy

by firing him solely because he was living with a woman who was not his wife.  Similarly, in

Briggs v. North Muskegon Police Dep't, 563 F. Supp. 585 (W.D. Mich. 1983), the court ruled

that, in the absence of any showing that a married police officer's living with a married woman

who was not his wife had a negative effect on his ability to perform his job, the government

could not penalize him based only on how he exercised his privacy and associational rights:

> The Court rejects the notion that an infringement of an important
> constitutionally protected right is justified simply because of
> general community disapproval of the protected conduct.  The very
> purpose of constitutional protection of individual liberties is to
> prevent such majoritarian coercion . . . .  The government must
> tread lightly when it investigates and regulates the private activities
> of its employees.  Public employers must be careful not to
> transform anachronistic notions of unacceptable social conduct
> into law.

Id. at 590-91 (internal quotations omitted).

---

[16]    Some courts have attempted to avoid these problems by limiting the scope of policies or procedures that would unconstitutionally burden employees' privacy interests.  See, e.g., Thompson v. Southwest Sch. Dist., 483 F. Supp. 1170, 1180 (W.D. Mo. 1980) (construing state statute permitting termination of teachers for engaging in immoral conduct to apply only to conduct that adversely affects teacher's performance to avoid constitutional difficulty); Shuman v. City of Philadelphia, 470 F. Supp. 449, 459-61 (E.D. Pa. 1979) (invalidating police department policy requiring officers to answer questions about private conduct wholly unrelated to officer's job performance as unjustifiable invasion of constitutional privacy interests).

In Thorne v. City of El Segundo, 726 F.2d 459 (9th Cir. 1983), the Ninth Circuit ruled that a public employer had no right to deny an applicant a job with the police department based on the fact that she previously had a sexual relationship with a police officer in the department or on the fact that she had previously had an abortion.  Because the government's actions implicated "rights protected by the constitution's guarantee of privacy and free association," the court demanded that the public employer show that its actions were justified by "legitimate interests" and that its actions were "narrowly tailored to meet those legitimate interests."  Id. at 469.  As the court explained, "[t]he more fundamental the rights on which the state's activities encroach, the more weighty must be the state's interest in pursuing that course of conduct."[17]  Id. See also Mercure v. Van Buren Township, 81 F. Supp. 2d 814, 826 (E.D. Mich. 2000) ("The proper calibration of this balance depends upon the gravity of the employee's liberty interest, as well as the degree of the State's interest in governing a particular workplace.").

Judicial scrutiny of a government employer's actions does not automatically mean invalidation, because the state may be able to justify its actions and the resultant burden on the employee's constitutional liberty.  In other words, the balancing test that is constitutionally required will not prevent the government from taking action in response to an employee's conduct when that action is related to a legitimate government interest and calibrated to promote that interest.  Compare Via v. Taylor, 224 F. Supp. 2d 753, 762 (D. Del. 2002) (regulation prohibiting correctional officer's relationship with paroled former inmate implicated freedom of association and privacy rights, and government had to prove disruption), and Reuter v. Skipper, 832 F. Supp. 1420, 1423-24 (D. Or. 1993) (sheriff could not terminate female corrections officer

---

[17]     Even where the liberty interests at issue are not recognized as "fundamental" or considered to be within the core of due process concerns, courts are unwilling to allow government employers to impose completely arbitrary and irrational restrictions on public employment that are wholly unrelated to any legitimate interest.  See, e.g., Pence v. Rosequist, 573 F.2d 395, 399-400 (7th Cir. 1978) (holding that conservative community attitudes did not justify a rule prohibiting public bus driver from having mustache because "choice in appearance is an element of liberty").

solely because of her personal association with an ex-felon in the absence of any showing of negative impact on job performance), with Swank v. Smart, 898 F.2d 1247, 1252-53 (7th Cir. 1990) (discharging a policeman for giving civilian minor a ride on his motorcycle did not violate substantive due process interests in freedom of association and privacy), and Krzyzewski v. Metro. Gov't of Nashville, Civ. Action No. 75-415-NA-CV, 1976 WL 735, at *6 - *8 (M.D. Tenn. Oct. 20, 1976) (requiring employer to demonstrate that employee's relationship with married police officer would affect her ability to perform her job or the efficiency of those working with her, but ultimately finding employer's action adequately justified).

    In this case, Plaintiff has alleged that the government has burdened her exercise of a protected liberty interest without a constitutionally sufficient justification.  Compl. ¶¶ 59-63. Neither Plaintiff's gender dysphoria nor her decision to pursue the proper course of medical treatment for this condition negatively impacts her ability to perform the duties of Terrorism Research Analyst.  Id. at ¶ 24.  Moreover, Plaintiff's discussion of these issues with Ms. Preece was designed specifically to avoid any disruption in the workplace.  Id. at ¶¶ 41-44.  Defendant's motion to dismiss does not demonstrate a constitutionally sufficient justification as a matter of law – indeed, it makes no effort to do so.  Accordingly, Plaintiff has stated a claim under the Due Process Clause of the Fifth Amendment.

## **CONCLUSION**

For all of the foregoing reasons, Defendant's motion to dismiss should be denied.


Respectfully submitted,


/s/ Sharon M. McGowan
Sharon M. McGowan  (D.C. Bar No. 476417)
Kenneth Y. Choe
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
(212) 549-2627


Arthur B. Spitzer  (D.C. Bar No. 235960)
American Civil Liberties Union
  of the National Capital Area
1400 20th Street, N.W. #119
Washington, D.C. 20036
(202) 457-0800


ATTORNEYS FOR PLAINTIFF


Date:  September 27, 2005

34

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| DIANE J. SCHROER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 05-cv-1090 (JR) |
| v. | ) | |
| | ) | |
| JAMES H. BILLINGTON, | ) | |
| Librarian of Congress, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

**ORDER**

Upon consideration of Defendant's motion to dismiss and the legal authorities offered both in support of and in opposition to the motion, and having reviewed all other relevant legal authority, it is hereby ORDERED that Defendant's Motion to Dismiss is DENIED.

This _____ day of _____, 2005.

_____
James Robertson
United States District Judge