**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DIANE J. SCHROER,     :
            :
    Plaintiff,   :
            :
  v.          : Civil Action No. 05-1090 (JR)
            :
JAMES H. BILLNGTON, Librarian of :
Congress,        :
            :
    Defendant.   :

**MEMORANDUM ORDER**

Plaintiff Diane Schroer, a male-to-female transsexual, sues defendant Library of Congress for sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).  In the alternative, she asserts a claim under the Equal Protection Clause of the U.S. Constitution, and the Library of Congress Act, 2 U.S.C. § 140.  The defendant moves to dismiss for failure to state a claim.  Plaintiff's allegations of sex sterotyping do not state a claim under Title VII, but, because discrimination against a transsexual may nevertheless violate Title VII's proscription of discrimination "because of...sex," the motion to dismiss will be denied.

**Factual Background**

At birth, plaintiff was classified as male and christened "David John Schroer."  Pl.'s Opp. to Mot. to Dismiss at 4.  From a young age, she was socialized to wear traditionally masculine attire and to think of herself as a boy.  Id.  However,

this designation did not match her gender identity, defined as "a person's internal psychological identification as a man or a woman." Id. at 3. Schroer was ultimately diagnosed with gender dysphoria, a condition describing this disjunction between gender identity and anatomical sex. Id. at 4.

The leading organization for the study and treatment of gender dysphoria is the Harry Benjamin International Gender Dysphoria Association (HBIGDA). Id. HBIGDA has formulated standards of care for the treatment of patients with gender dysphoria. Id. For some patients with the condition, the standards recommend a process of sex-reassignment, in which steps are taken to conform the patients external manifestations of sex with his or her internal gender identity. Id. The process commonly involves three stages: presenting oneself full-time as the gender corresponding to one's identity (the "real life" test), hormone therapy, and sex-reassignment surgery. Id.

The stages of sex-reassignment are managed according to standards to ensure that they are appropriate for the individual patient and reflect an appropriate diagnosis of gender dysphoria. For example, to begin hormone therapy, HBIGDA standards require a patient to have lived full-time as the gender that matches his or her identity for three months, or have a therapeutic relationship of at least three months with a mental health professional who recommends such treatment. Id. at 5. To be eligible for sex-

reassignment surgery, HBIGDA standards require the patient to have lived full-time as the appropriate gender in every aspect of his or her life for at least one year.  _Id_.  Consistent with these standards, David Schroer changed her legal name to Diane Schroer, and she now lives full-time as a woman.  _Id_.

In August 2004, before she changed her name or began presenting as a woman, Schroer applied for a position as a terrorism research analyst with the Congressional Research Service (CRS), an arm of the Library of Congress ("Library").  _Id_.  She was highly qualified for the position.  Schroer is a twenty-five year veteran of the U.S. Armed Services, who held numerous critical command and staff positions in the Armored Calvary, Airborne, Special Forces and Special Operations Units, and in combat operations in Panama, Haiti, and Rwanda.  _Id_. at 2.  She is a graduate of the National War College and the Army Command and General Staff College, and has masters degrees in history and international relations.  _Id_.  Schroer spent the last seven and a half years of her military career with the United States Special Operations Command (USSOCOM), which "plans, directs, and executes special operations in the conduct of the War on Terrorism in order to disrupt, defeat, and destroy terrorist networks that threaten the United States...."  _Id_. at 3.

- 3 -

After the September 11, 2001 terrorist attacks, Schroer was appointed the director of a 120-person classified organization charged with tracking and targeting high-threat international terrorist organizations. Id. The role required her to analyze highly sensitive intelligence reports, plan operations, and brief top U.S. officials, including the Vice President, the Secretary of Defense, and the Joint Chiefs of Staff. Id. After retiring from the military, Schroer became a senior analyst and program manager at a private consultant firm, where she worked with the National Guard on infrastructure security issues. Id.

Not surprisingly given her background, Schroer was invited to interview with three representatives of the CRS, including Charlotte Preece, in October 2004. Id. at 5. Since Schroer had applied as David J. Schroer and had not yet begun presenting as a woman, she attended the interview dressed in traditionally masculine clothing. Id.

Shortly thereafter, Preece called Schroer to offer her the position. Id. at 6. When Schroer expressed a concern about the position's salary, Preece conferred with the Library's human resources department and called Schroer again to inform her that CRS would be able to offer her a salary comparable to the one she was earning as a private consultant. Id. Schroer then accepted the position, and Preece stated she would begin processing the

required paperwork.  Id.  On December 20, 2004, Preece invited Schroer to her office to discuss the administrative details of Schroer's start and to introduce her to some of her future colleagues.  Id.  Preece stated that the selection committee believed that Schroer's skills and experience made her application far superior to those of the other candidates.  Id.

Up to this point, Schroer had been using her traditionally masculine legal name, and she had interacted with Preece while wearing traditionally masculine clothing.  Id.  As part of her treatment for gender dysphoria, however, Schroer was about to begin the initial stages of the sex-reassignment protocol under the HBIGDA guidelines, as recommended by her physician.  Id.  This meant that she would be using a traditionally feminine name, dressing full-time in traditionally feminine attire, and begin living and presenting herself as a woman.  Id.

Recognizing that Preece had been interacting with someone she understood to be a man, Schroer decided to explain to Preece that she was under a doctor's care for gender dysphoria and that would be presenting herself as a woman when she started work as a terrorism research analyst.  Id. at 7.  To reassure Preece that she would dress in a workplace-appropriate manner, Schroer showed Preece photographs of herself dressed in traditionally feminine workplace-appropriate attire.  Id.

Although Preece did not indicate that Schroer's situation would be a problem, she left Schroer by saying that she had "really given [her] something to think about." Id.

Preece called Schroer the next day to inform her that, after "a long restless night," she had decided that "given [Schroer's] circumstances" and "for the good of the service," Schroer would not be a "good fit" at CRS. Id. She thanked Schroer for her honesty and the manner in which she had handled the situation. Complaint ¶48.

Schroer received a form e-mail on February 7, 2005 stating that the terrorism research analyst position had been filled. Id. at ¶49. Schroer timely filed an administrative complaint with the Equal Employment Office of the Library of Congress, alleging sex discrimination under Title VII. Pl.'s Opp. to Mot. to Dismiss at 7. After exhausting her appeals, Schroer filed this lawsuit.

## **Analysis**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) prohibits discrimination in employment "because of...sex." Applying these three simple words in the context of transsexuals is decidedly "complex." Etsitty v. Utah Transit Auth., 2005 WL 1505610, *3 (D.Utah June 24, 2005); Doe v. United Consumer Fin. Serv., No. 1:01-CV-1112, 2001 WL 34350174, *2 (N.D.Ohio Nov. 9, 2001). Until very recently, all federal courts

squarely facing the issue had held that Title VII does not prohibit discrimination on the basis of transsexualism or gender identity. See Ulane v. E. Airlines, Inc., 742 F.2d 1081, 1085 (7th Cir. 1984); Sommers v. Budget Mktg., Inc., 667 F.2d 748, 750 (8th Cir. 1982); Holloway v. Arthur Andersen & Co., 566 F.2d 659, 662-63 (9th Cir. 1977); Doe v. U.S. Postal Service, 1985 WL 9446, *2 (D.D.C. 1985). These cases based their reasoning on Congressional intent, finding that Congress "had a narrow view of sex in mind" and "never considered nor intended that this 1964 legislation apply to anything other than the traditional concept of sex." Ulane, 742 F.2d at 1085-86. Rather, according to these decisions, Title VII merely prohibits discrimination against men because they are men and women because they are women. Id. at 1085.

This narrow view of Title VII was challenged by the Supreme Court's discussion of sex stereotyping in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). The D.C. Circuit as not had occasion to apply its teaching, although Price Waterhouse originated here, but a number of other courts have abandoned Ulane after Price Waterhouse and ruled that Title VII protects transsexuals who do not conform to their employers' gender stereotypes. The jurisprudence emerging from the decisions of those courts presents three questions: (1) After Price Waterhouse, is all sex-stereotyping actionable under Title VII?

(2) If so, is a refusal to hire a person with gender dysphoria unlawful discrimination based on sex stereotyping?  (3) If not, notwithstanding Ulane, does Title VII prohibit discrimination against transsexuals?

## 1.  Sex-stereotyping under Title VII

        The plaintiff in Price Waterhouse was a female associate who was passed over for partnership.  The putative reason was her "aggressiveness" and lack of interpersonal skills, but the Supreme Court detected sexism in the comments of her evaluators.  For example, partners described her as "macho" and stated that she "overcompensated for being a woman."  Id. at 231-35.  One partner went so far as to say that the plaintiff could improve her chances of making partner if she would "walk more femininely, talk more femininely, dress more femininely, have her hair styled, and wear jewelry."  Id. at 235.  The Court stated that it did not "require expertise in psychology to know that, if an employee's flawed 'interpersonal skills' can be corrected by a soft-hued suit or a new shade of lipstick, perhaps it is the employee's sex and not her interpersonal skills that has drawn the criticism."  Id. at 256.

        In ruling for the plaintiff, the Court stated that Title VII reaches claims of discrimination based on "sex stereotyping."  Id. at 251.  The Court stated that "[i]n the specific context of sex stereotyping, an employer who acts on the

basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." Id. at 250. "We are beyond the day," the Court emphasized, "when an employer could evaluate employees by assuming or insisting that they matched the stereotypes associated with their group." Id. at 251. "[I]n forbidding employers to discriminate against individuals because of their sex," the Court held, "Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." Id.

After Price Waterhouse, courts recognized a cause of action under Title VII for discrimination based on failure to conform to gender stereotypes. See, e.g., Medina v. Income Support Div., 413 F.3d 1131, 1135 (10th Cir. 2005); Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 874-75 (9th Cir. 2001) (harassment "based upon the perception that [the plaintiff] is effeminate" is discrimination because of sex); Bibby v. Philadelphia Coca Cola Bottling Co., 260 F.3d 257, 262-63 (3d Cir. 2001); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 261 n.4 (1st Cir. 1999); Doe v. City of Belleville, 119 F.3d 563, 580 (7th Cir. 1997) ("[A] man who is harassed because his voice is soft, his physique is slight, his hair is long, or because in some other respect he...does not meet his coworkers' idea of how men are to appear and behave, is harassed 'because of' his sex."); Centola v. Potter, 183 F. Supp. 2d 403, 410 (D.

Mass. 2002) (Title VII prohibits harassment based on belief that a person does "not conform with...ideas about what 'real' men should look or act like."). This is the interpretation of Price Waterhouse employed by most, if not all, of the courts that have applied the case.

Neither the logic nor the language of Price Waterhouse establishes a cause of action for sex discrimination in every case of sex stereotyping, however. What the Supreme Court recognized is a Title VII action for disparate treatment based on sex sterotyping. Sex stereotyping that does not produce disparate treatment does not violate Title VII.

That this is so is evident from two lines of cases that are in tension with the post-Price Waterhouse approach to sex stereotyping. First, post-Price Waterhouse courts have consistently held that Title VII does not prohibit discrimination based on sexual orientation or sexual preference. See, e.g., Dawson v. Bumble & Bumble, 398 F.3d 211 (2d Cir. 2005) (stating that Title VII sex-stereotype claim should not be used to "boot-strap" claim based on sexual orientation discrimination); see also Schroeder v. Hamilton School Dist., 282 F.3d 946 (7th Cir. 2002); Bibby v. Philadelphia Coca Cola Bottling Co., 260 F.3d 257 (3rd Cir. 2001); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252 (1st Cir. 1999); Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 751-52 & n. 3 (4th Cir. 1996); Williamson v. A.G.

Edwards & Sons, 876 F.2d 69, 70 (8th Cir.1989).  The rationale, equally applicable to transsexual cases, is that such discrimination is based, not on sex, but on sexual orientation, and that discrimination based on sexual orientation is gender-neutral:  it impacts homosexual men and women alike.  But an employer who discriminates against lesbian women but not gay men would indeed violate Title VII, no less than any other employer who employs a practice that disadvantages women on some other basis.

        Second, courts before and after Price Waterhouse have found no Title VII violation in gender-specific dress and grooming codes, so long as the codes do not disparately impact one sex or impose an unequal burden.  See, e.g., Jespersen v. Harrah's Operating Co., Inc., 392 F.3d 1076 (9th Cir. 2004); Frank v. United Airlines, Inc., 216 F.3d 845 (9th Cir. 2000); Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385 (11th Cir. 1998); Tavora v. New York Mercantile Exchange, 101 F.3d 907 (2nd Cir. 1996).  Evenhanded and evenly applied grooming codes may be enforced even where the code is based on highly stereotypical notions of how men and women should appear.  In Jespersen, the defendant instituted a company-wide "Personal Best" grooming policy, which, in addition to gender-neutral standards of fitness and professionalism, required women to wear stockings and colored nail polish, wear their hair "teased,

curled, or styled," and wear make-up; it also prohibiting men
from wearing makeup, nail polish, or long hair.  Id. at 1077. The
plaintiff, a female, expressed that "wearing makeup made her feel
sick, degraded, exposed, and violated."  Id. She felt that
wearing makeup "forced her to be feminine" and to become "dolled
up" like a sexual object.  Id.  Despite the policy's gender-
specific requirements and the clearly gender-related toll they
imposed on Jespersen, the court ruled that the defendant did not
violate Title VII when it fired Jespersen for refusing to wear
make-up.  Id. at 1078.  Since, in the court's opinion, the
"Personal Best" policy did not impose unequal burdens on men or
women, but required each sex to conform to equally burdensome
stereotypical standards, there was no disparate treatment.  Id.

        Both of these lines of cases present claims of adverse
action that partake in some measure of sex stereotyping, and yet
the courts deciding them--rejecting claims of discrimination
based on sexual orientation or violations of grooming and dress
codes--have not clearly articulated what, if anything,
distinguishes any of the cases from Price Waterhouse.

        The answer, I think, is that the actual holding of
Price Waterhouse is considerably more narrow than its sweeping
language suggests.  The Court perceived that Price Waterhouse had
created an intolerable "Catch-22" for its female employees.  490
U.S. at 251.  The company set up a structure in which initiative,

- 12 -

effort, and aggressiveness were rewarded with partnership.  Id.
It then punished women, but not men, who exhibited these "macho"
traits.  Id. at 235.  In other words, "macho" women were
subjected to disparate treatment.  When it said, "[I]n forbidding
employers to discriminate against individuals because of their
sex, Congress intended to strike at the entire spectrum of
disparate treatment of men and women resulting from sex
stereotypes," id. at 251 (citations omitted), the Court meant no
more than that:  disparate treatment of men and women by sex
stereotype violates Title VII.  Adverse action taken on the basis
of an employer's gender stereotype that does not impose unequal
burdens on men and women or disadvantage one or the other does
not state a claim under Title VII.

**2.  Sex stereotyping and gender dysphoria**

        Some district courts have relied upon Ulane and its
progeny to reject discrimination claims of transsexuals as if
Price Waterhouse were irrelevant.[1]  However, a larger number of
district and appellate courts have treated discrimination against
transsexuals as sex discrimination based on gender non-conforming

---

[1] See e.g., Etsitty, 2005 WL 1505610; Oiler v. Winn-Dixie
Lousiana, Inc., 2002 WL 31098541 (E.D. La. 2002); Dobre v.
Nat'l R.R. Passenger Corp., 850 F.Supp. 284 (E.D. Pa. 1993);
Cox v. Denny's Inc., 1999 WL 1317785 (M.D. Fla. Dec. 22,
1999); Underwood v. Archer Management Services, Inc., 857
F.Supp. 96, 98 (D.D.C. 1994).

behavior.[2]  The Sixth Circuit neatly summarizes the perspective

of these cases:

> After _Price Waterhouse_, an employer who discriminates
> against women because, for instance, they do not wear
> dresses or makeup, is engaging in sex discrimination
> because the discrimination would not occur but for the
> victim's sex. It follows that employers who
> discriminate against men because they _do_ wear dresses
> and makeup, or otherwise act femininely, are also
> engaging in sex discrimination, because the
> discrimination would not occur but for the victim's
> sex.

Smith, 378 F.3d at 573 (emphasis in original).  Schroer's Title

VII claim invokes this reasoning.  She alleges that the defendant

decided not to hire her "either because it perceived Plaintiff to

be a man who did not conform with gender stereotypes associated

with men in our society or because it perceived Plaintiff to be a

woman who did not conform with gender stereotypes associated with

women in our society."  Complaint ¶53.

In disparate treatment cases under Title VII (as

opposed to disparate impact cases), what matters is the

motivation of the decision-maker.  The actionable discrimination

---

[2] See, e.g., Barnes v. City of Cincinatti, 401 F.3d 729, 737
(6th Cir. 2005); Smith v. City of Salem, 378 F.3d 566, 573
(6th Cir. 2004); Schwenk v. Hartford, 204 F.3d 1187, 1202 (9th
Cir. 2000); Rosa v. Park West Bank & Trust Co., 214 F.3d 213,
215-16 (1st Cir. 2000); Mitchell v. Axcan Scandipharm, Inc.,
No. Civ.A. 05-243, 2006 WL 456173 (W.D. Pa. Feb. 17, 2006);
Kastl v. Maricopa Cty. Community College Dist., No. 02-1531-
PHX-SRB, 2004 WL 2008954, at * 2 (D. Ariz. June 3, 2004);
Tronetti v. TLC Healthnet Lakeshore Hosp., No. 03-CV-
0375E(SC), 2003 WL 22757935 (W.D.N.Y. Sept. 26, 2003); Doe,
2001 WL 34350174, *2.

in Price Waterhouse proceeded from the opinion of the employer
that the plaintiff was not sufficiently feminine for her sex.
But there is a difference between "macho" women or effeminate
men, whether transsexual or not, and persons such as Schroer
whose adoption of a name and choice of clothing is part of an
intentional presentation of herself as a person of a different
sex than that of her birth.  This difference is not simply one of
degree.  Medical literature recognizes that:

> Gender Identity Disorder...is not meant to describe a
> child's nonconformity to stereotypic sex-role behavior
> as, for example, in "tomboyishness" in girls or
> "sissyish" behavior in boys. Rather, it represents a
> profound disturbance of the individual's sense of
> identity with regard to maleness or femaleness.

American Psychiatric Association, Diagnostic and Statistical
Manual of Mental Disorders, 564 (4th ed. 1994) (qtd. in Etsitty,
2005 WL 1505610, *3).

     To the extent that Title VII after Price Waterhouse
prohibits sex stereotyping alone, it does so to allow women such
as Ms. Hopkins to express their individual female identities
without being punished for being "macho," or for men to express
their individual male identities without reprisal for being
perceived as effeminate.  In other words, it creates space for
people of both sexes to express their sexual identity in non-
conforming ways.  Protection against sex stereotyping is
different, not in degree, but in kind, from protecting men,
whether effeminate or not, who seek to present themselves as

- 15 -

women, or women, whether masculine or not, who present themselves
as men.

        The difference is illustrated in this case.  Schroer is
not seeking acceptance as a man with feminine traits.  She seeks
to express her female identity, not as an effeminate male, but as
a woman.  She does not wish to go against the gender grain, but
with it.  She has embraced the cultural mores dictating that
"Diane" is a female name and that women wear feminine attire.
The problem she faces is not because she does not conform to the
Library's stereotypes about how men and women should look and
behave -- she adopts those norms.  Rather, her problems stem from
the Library's intolerance toward a person like her, whose gender
identity does not match her anatomical sex.

        A transsexual plaintiff might successfully state a
Price Waterhouse-type claim if the claim is that he or she has
been discriminated against because of a failure to act or appear
masculine or feminine enough for an employer, cf. Nichols, 256
F.3d at 874-75 (plaintiff stated Title VII claim for sex
stereotyping where he was harassed for walking and carrying his
lunch tray "like a woman"), but such a claim must actually arise
from the employee's appearance or conduct and the employer's
stereotypical perceptions.  Such a claim is not stated here,
where the complaint alleges that Schroer's non-selection was the
direct result of her disclosure of her gender dysphoria and of

her intention to begin presenting herself as a woman, or her display of photographs of herself in feminine attire, or both.[3] Even if Price Waterhouse has created a Title VII claim for discrimination against men solely because they "wear dresses and makeup," Smith, 378 F.3d at 573, as I do not believe it has, the logic of such a rule does not extend to situations where the dress and makeup are intended to express, and are understood by the employer to be expressing, a female identity.

## 3.  Gender dysphoria and the definition of "sex"

To say, as I do, that Price Waterhouse does not create a Title VII claim for sex stereotyping in the absence of disparate treatment, and that the allegations of Scroer's complaint do not assert a Price Waterhouse type of claim in any event, is not to say that Ms. Schroer has no protection under Title VII from discrimination based on her transsexuality.

All the courts that have treated Price Waterhouse as irrelevant to transsexual cases, see n.1, supra, have looked back to the Seventh Circuit's decision in Ulane, and from that vantage point have determined that transsexuals are not a protected class.  In Ulane, a male-to-female transsexual was discharged by Eastern Airlines after undergoing sex-reassignment surgery.  The

---

[3] "In some cases, it is possible for a plaintiff to plead too much: that is, to plead himself out of court by alleging facts that render success on the merits impossible."  Sparrow v. United Air Lines, Inc. 216 F.3d 1111, 1116 (D.C. Cir. 2000).

Northern District of Illinois, Grady, J., determined that she had been fired because she was a transsexual and ruled that discrimination against transsexuals violates Title VII.  Before issuing that decision, the court received expert testimony from a variety of witnesses on the nature of sex and gender.

After listening to the testimony, Judge Grady determined that "sex is not a cut-and-dried matter of chromosomes." Ulane v. Eastern Airlines, Inc., 581 F.Supp. 821, 825 (N.D. Ill. 1983) (Ulane I).  Rather, it encompasses "sexual identity," which "is in part a psychological question -- a question of self-perception; and in part a social matter -- a question of how society perceives the individual." Ulane, 742 F.2d at 1084.  The court distinguished "sexual identity" from "sexual preference," holding that "sex" under Title VII comprehends the former but not the latter.  Ulane I, 581 F.Supp. at 825.  Accordingly, the district court held that the term "sex" "literally and...scientifically" applies to transsexuals, but not to homosexuals or transvestites.[4]  Id.

_____

[4] The Seventh Circuit's Ulane decision explained its understanding of the differences among these groups:

   Transsexualism is a condition that exists when a physiologically normal person (i.e., not a hermaphrodite- a person whose sex is not clearly defined due to a congenital condition) experiences discomfort or discontent about nature's choice of his or her particular sex and prefers to be the other sex....To be distinguished are homosexuals, who are sexually attracted to persons of the same sex, and transvestites, who are

Vacating Judge Grady's decision, the Seventh Circuit relied on two arguments.  First, the court argued that the "total lack of legislative history supporting the sex amendment coupled with the circumstances of the amendment's adoption clearly indicates that Congress never considered nor intended that this 1964 legislation apply to anything other than the traditional concept of sex."  Ulane, 742 F.2d at 1083.  Second, the court pointed to numerous legislative attempts to include sexual orientation within Title VII's protection, all of which had failed.  Id.  According to the Seventh Circuit panel, this legislative rejection "strongly indicates" that "sex should be given a narrow, traditional interpretation."

Those arguments, perhaps persuasive when written, have lost their power after twenty years of changing jurisprudence on the nature and importance vel non of legislative history. Supreme Court decisions subsequent to Ulane, indeed, have applied Title VII in ways Congress could not have contemplated.  As Justice Scalia wrote for a unanimous court:

> [M]ale-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII. But statutory prohibitions often go beyond the principal evil to

---

generally male heterosexuals who cross-dress, i.e., dress as females, for sexual arousal rather than social comfort; both homosexuals and transvestites are content with the sex into which they were born.

Ulane, 742 F.2d at 1083.

- 19 -

cover reasonably comparable evils, and it is ultimately
the provisions of our laws rather than the principal
concerns of our legislators by which we are governed.

<u>Oncale v. Sundowner Offshore Services, Inc.</u>, 523 U.S. 75, 79
(1998).  Moreover, the failure of numerous attempts to broaden
Title VII to cover sexual <u>orientation</u> says nothing about Title
VII's relationship to sexual <u>identity</u>, a distinct concept that is
applicable to homosexuals and heterosexuals alike.  <u>Ulane I</u>, 581
F.Supp. at 825.  As the district court observed in <u>Oiler v. Winn-
Dixie Louisiana</u>, it appears that <u>no</u> bill has ever been introduced
in Congress to include or exclude discrimination based on sexual
identity.  2002 WL 31098541, *4 (E.D. La. 2002).  The silence of
forty years is simply that -- silence.

        Without good reasons to oppose it, and with numerous
courts now joining its conclusion -- albeit under the <u>Price
Waterhouse</u> framework -- it may be time to revisit Judge Grady's
conclusion in <u>Ulane I</u> that discrimination against transsexuals
<u>because they are transsexuals</u> is "literally" discrimination
"because of...sex."  <u>Ulane I</u>, 581 F.Supp. at 825.  That approach
strikes me as a straightforward way to deal with the factual
complexities that underlie human sexual identity.  These
complexities stem from real variations in how the different
components of biological sexuality -- chromosomal, gonadal,
hormonal, and neurological -- interact with each other, and in

turn, with social, psychological, and legal conceptions of
gender.[5]

Dealing with transsexuality straightforwardly, and
applying Title VII to it (if at all) as discrimination "because
of...sex," preserves the outcomes of the post-Price Waterhouse
case law without colliding with the sexual orientation and
grooming code lines of cases.  Twenty-plus years after Ulane I,
scientific observation may well confirm Judge Grady's conclusion
that "sex is not a cut-and-dried matter of chromosomes," 581
F.Supp. at 825.  However, the application of such an approach to
this case cannot be done on the pleadings.  A factual record is

---

[5] While the biological components of sex align together in the
vast majority of cases, producing a harmony between outward
appearance, internal sexual identity, and legal sex, variations
of this pattern that lead to intersexed individuals are real, and
cannot be ignored.  For example, androgen insensitivity syndrome
(AIH) appears in approximately 1 out of every 20,000 genetic
males.  Complete AIS can produce an individual with "male" (XY)
chromosomes and testes, but whose body does not respond to the
virilizing hormones the testes produce.  As a result, these
individuals typically have a female sexual identity, appear
feminine, and have female external genitalia, but lack female
reproductive organs.  See "The Necessity of Change: A Struggle
for Intersex and Transex Liberties," 29 Harv. J. L. & Gender 51,
n.2 (2006) (citing James E. Griffin, Androgen Resistance: The
Clinical and Molecular Spectrum, 326 New Eng. J. Med. 611
(1992)).  Discrimination against such women (defined in terms of
their sexual identity) because they have testes and XY
chromosomes, or against any other person because of an intersexed
condition, cannot be anything other than "literal[]"
discrimination "because of...sex."  Ulane I, 581 F.Supp. at 825.
If, as some believe, sexual identity is produced in significant
part by hormonal influences on the developing brain in utero,
this would place transsexuals on a continuum with other intersex
conditions such as AIS, in which the various components that
produce sexual identity and anatomical sex do not align.

required, one that reflects the scientific basis of sexual identity in general, and gender dysphoria in particular.

### Conclusion

A motion to dismiss for failure to state a claim must not be granted unless the "plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Browning v. Clinton, 292 F.3d 235, 241 (D.C. Cir. 2002) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  There are facts that Schroer could prove which would support her claim that the Library refused to hire her solely because of her sexual identity, and that in so doing, the Library discriminated against her "because of...sex."

Defendant's motion to dismiss [Dkt. # 7] is **denied.** The Clerk is directed to set a status conference, for the purpose of discussing and scheduling the next steps in this case.

JAMES ROBERTSON
United States District Judge

- 22 -