## EXPERT REPORT OF MARTHA L. HARRIS, LCSW

### Schroer v. Billington

Martha L. Harris, LCSW
Banyan Counseling Center, Inc.
2820 School Street
Alexandria, VA  22303
Phone:  (703) 717-0999

### Qualifications and Background

1.      I am the Founder of Banyan Counseling Center, and have almost exclusively served the mental health needs of the transgender community since opening my practice in 1995.

2.      I received my Bachelor of Science, With Distinction, Social Work degree from George Mason University (GMU) in Fairfax, Virginia, in 1987, and received my Masters in Social Work at The Catholic University of America (CUA), in Washington, D.C., in 1989.  At the time, CUA was considered one of the top three social work programs in the country.

3.      I was licensed by the Board of Social Work to practice as a Clinical Social Worker in the Commonwealth of Virginia on February 9, 1993.  In order to keep that license current, I have to fulfill a specified number of Continuing Education Units (CEUs), which I have consistently maintained.  I have also given numerous presentations regarding gender identity issues, which have been approved by the appropriate licensing entities for purposes of attendees earning CEUs.

4.      After graduating from college, from October 1989 until June 1990, I worked as the Clinical Coordinator of the Barney Neighborhood House

(BNH) Psychosocial Day Program, in Washington D.C. In June 1990, I was promoted to Director of that program. While at BNH, I worked with individuals who were experiencing chronic mental illness, such as schizophrenia, dissociative identity disorder, bipolar disorder, and various other depression and anxiety disorders.

5.      After leaving BNH in April 1992, I was employed by the Visiting Nurse Association of Northern Virginia (VNA), where I eventually helped start the hospice program, VNA Community Hospice (VNACH) for that organization. As the only clinical social worker on staff, I was responsible for evaluating the mental health needs of the dying patients and their families; I was involved in assessing potential negative mental health concerns for the patients and their families; and I was the Bereavement Coordinator.

6.      I left the VNACH in October 1995, and began my private practice, Banyan Counseling Center, Inc. (BCCI) in Alexandria, Virginia, with an intended focus of serving the mental health needs of the transgender community.

7.      Throughout the years prior to founding BCCI, I had been in constant discussions with E. Russell Lynn, Jr., LCSW, who served as my mentor in issues regarding gender variance and transsexuality. I had always had an interest in gender variance, and had wanted to pursue an education in that field while at CUA. However, gender variance was not a subject that social work programs were addressing at that time. As a result, I

depended on my mentor in order to learn about gender variance. Mr. Lynn had been working in the gender field since approximately 1985.

8.      As part of my learning process, I regularly attended the local support group for transgender people, the Mid-Atlantic Gender Identity Connection (MAGIC). While there, I learned a great deal about the psychosocial issues related to the family, the workplace and the friend relationships of transgender people.

9.      Since beginning my practice in 1995, I have worked with approximately 352 clients presenting gender identity-related issues, including related security clearance issues. As discussed in greater detail below, I assist clients through gender transition by following the Standards of Care (SOC) set forth by the Harry Benjamin International Gender Dysphoria Association (HBIGDA).

10.     I have been a guest lecturer for the social work programs for GMU and at Virginia Commonwealth University (VCU), in their Human Behavior in the Social Environment curricula. My lectures address gender identity and the life cycle of a transsexual.

11.     My work also entails a great deal of community education and outreach, since many of my clients are working toward transitioning while employed. I am a frequent invited speaker on gender identity issues throughout the DC metropolitan area for corporations which have employees who are transitioning such as America OnLine and KPMG, together with various government agencies such as the DC Parole Board

and the Department of Agriculture who were dealing with employees in transition..

12.    I have been a member of the National Association of Social Workers (NASW) since 1989.  From 1997-1999, I was selected to evaluate and grade the results of the Diplomate Social Work exam, the highest level of licensing a social worker can attain.

13.    I have also been a member of the DC and Virginia Chapters of NASW (NASW-DC and NASW-VA) since 1989.  During my time as a member of the NASW-VA, I have been asked to present at Virginia chapter meetings regarding gender issues.  I also have served as a clinical resource for the NASW-VA in helping other Virginia-based social workers work with their clients who have gender identity-related issues.

14.    Since 1995, I have been a member of the International Federation for Gender Education, which is a national education outreach program regarding transgender issues.   I am also a member of HBIGDA, the organization which sets the standard for the treatment of people who deal with gender variance.

15.    I am a contributing author for the book *Trans Forming Families: Real Stories About Transgendered Loved Ones* (February 2003).  The chapter I authored was entitled Issues for Transgenders in Therapy.  I am also a co-author of a publication titled *New Models for Ministry: Serious Mental Illness and the Faith Community* (May 1989), together with Diane Engster, Esq., and Paul Dornan.

4

16.    More detailed information about my background and experience may be found in my Curriculum Vitae, a copy of which is attached as Exhibit A to this report.  Exhibit A also includes a list of my publications.

17.    I am receiving reimbursement for my services for Ms. Schroer at a rate of $200 per hour for testimony by deposition or at trial, and a rate of $75 per hour for record review, report preparation and other non-testifying services.

18.    I have not prepared an expert report or been called to testify in connection with any other litigation within the past four years.

### Summary of Opinions

19.    In this litigation, I have been asked to render opinions about the gender identity of Diane J. Schroer, her course of treatment for gender identity-related issues, her transition to life as a fully-accepted, well-integrated woman, and her overall mental health.

20.    In forming my opinions, I relied on (a) my clinical notes from the sessions I had with Ms. Schroer (Exhibit B), (b) the HBIGDA SOC, (c) the relevant sections of the Diagnostics and Statistics Manual IV-Revised (DSM IV-R), (d) my research and clinical experience in working with gender variant people and with individuals who present with serious non-gender related mental health illness, and (e) my knowledge of the literature in the pertinent fields.

21.     I have also reviewed the Complaint in this case, and the Decision and

Order issued by the Court on March 31, 2006.  Since I had never prepared

an expert report, I also reviewed a report prepared by an expert in another

case on an unrelated subject to get a sense of what an expert report should

look like.  These materials were provided to me by Ms. Schroer's attorney,

Sharon McGowan, Esq.

22.     Based on my review of the foregoing, and for the reasons set forth in more

detail below, my opinions include the following:

a.  Diane J. Schroer has a female gender identity and is a woman.

b.  I have evaluated Diane J. Schroer for a diagnosis of Gender Identity

Disorder (DSM IV-R Diagnosis 302.85) (GID).  She is currently under

my care consistent with the HBIGDA SOC, and I am helping her learn

to live her life as the woman she was meant to be.

c.  Diane J. Schroer does not express any clinically disabling

psychological problems.  For example, she does not have

schizophrenia; she does not have dissociative identity disorder; she

does not have severe debilitating depression or anxiety.

d.  Based on my experience with other transsexual clients who required

the highest level of security clearances for their jobs, and having been

interviewed as part of the security clearance reviews for these clients, I

have no reason to believe that an individual like Ms. Schroer who is

undergoing a gender transition and does not have any impairing

psychological conditions, would lose her security clearance status, or

have her status negatively affected, as a result of her gender transition.

e.  Based on my observations of her demeanor, Ms. Schroer's ability to

mentally focus has not been at all hindered by her gender transition.

### Clinical Bases for Opinions

23. 

24.     At that time, my assessment was that Ms. Schroer met the criteria for a

diagnosis of GID (DSM IV-R, 302.85) which is the clinical diagnosis for a

person who experiences feeling uncomfortable in the birth gender.  I then

explained to her that I followed the HBIGDA SOC, and that if she met all

of the criteria, I would be able to assist her in obtaining hormone therapy, and eventual sex reassignment surgery.

25.    The protocol for clinicians who are presented with these issues are the HBIGDA SOC. The SOC, by definition, are the ethical guidelines for therapists who are working with gender-variant people. The SOC provide the protocol for gender-variant people to follow, together with their therapists, to address their gender dissonance. The process begins with intensive weekly therapy sessions over a three-month initial evaluation period, commonly ending with a referral for hormone therapy. The next stage is the Real-Life Test (RLT) phase, in which the client begins the process of living his or her life in the desired sex role. For some clients, during or after completion of the RLT, a client may pursue facial feminization and breast augmentation surgeries (for male-to-female clients), breast reduction (for female-to-male clients), and/or sex reassignment surgery (SRS). A copy of the HBIGDA SOC is attached to this Report as Exhibit C.

26.    In Ms. Schroer's case, by following the SOC, my goal was to continually assess her female feelings and expression. By doing so, I could be assured that my initial diagnosis would be confirmed or denied. Also, I felt that following the counseling requirements of the SOC would assist Ms. Schroer in making the healthiest decisions for herself in her transition.

27.    A diagnosis of GID begins with a life assessment. Often people with gender identity issues have expressed cross-gender ideation from an early

childhood.  Additionally, people with gender identity issues need to express the sexual identity they feel inside, and their attempts at expressing that identity has caused them stress throughout their lives.

28. 

29.    Part of the process of diagnosing GID is determining whether there are other mitigating factors that might be triggering gender identity issues. For example, gender dysphoria can be a result of early childhood sexual abuse and other psychological issues which may have a client pursuing a feminine persona to avoid other problems in her life. Consequently, I directed my conversations with Ms. Schroer in such as way as to rule out the above factors and other serious mental health issues such as Dissociative Identity Disorder to make certain that her female feelings were mentally intact and a part of her well-integrated personality.

30.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ As a result, I can and do conclude that Ms. Schroer can handle stressful work situations and her female identity would not negatively affect any future work situation.

31.     During the first three months of my evaluation period with Ms. Schroer, I felt that it was important for her to continue to develop her relationship with a mentor who had undergone gender transition and to build other contacts within the local transgender community for support. Accordingly, I referred Ms. Schroer to a local support group for people who are dealing with gender issues, the Mid-Atlantic Gender Identity Connection (MAGIC). MAGIC provided initial support for her as she was learning about some of the social issues for people seeking a gender change. She made friends in that group and, eventually, those friends became a major support for her.

32.     As a result of my work with Ms. Schroer and evaluating her life experiences during this initial three-month evaluation period, I got a concrete sense of her integrity and honesty, her straight-forward nature, and her ability to handle high-stress situations. All of these factors led me to conclude that Ms. Schroer was on a healthy path in her life and that she could handle the massive changes that she was facing in connection with her gender transition.

33.     ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████
██████████████████████████████████



34.

35.    ███████████████████████████████████████████

███████████████████████████████ she was ready officially to

begin the Real-Life-Test (RLT) portion of the transition process. The

purpose of the RLT is to allow people actually to live in the gender role

that they have been seeking all of their lives. The RLT can cause a myriad

of emotional feelings, including deep, inner happiness, distress about not

being seen a fully female (for male-to-female clients) by others in society,

and deep levels of comfort. Because of society's judgments about gender,

it can be very difficult for a person to feel confident about his or her new

role.

36.    When clients transition, they often experience economic consequences

associated with the fact that men and women are not necessarily treated

equally in the workplace. For example, I have had female-to-male clients

tell me that they have received payroll increases after transitioning to

male, and male-to-female clients who have experienced a loss in pay after

transitioning to female. The experience of placing oneself out in the world

in a new gender can cause discrimination, and it is important during the

RLT that clients work through the feelings associated with that

discrimination.

37.    ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████





████████████████████████████████████████

████████████████████████████

40.     I have continued to meet with Ms. Schroer on a monthly basis, consistent

with the HBIGDA SOC, to provide support and assess her overall mental

health as she meets the demands of her job and continues to live her life as

a woman in the world.  During these sessions, in addition to discussing her

gender identity issues, we have discussed ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████  Throughout these discussions, Ms. Schroer showed an

ability to cope by accepting the fact that not all people are going to

understand her need to transition.  Ms. Schroer has a clever way of coping

by using humor to alleviate stress.  Her humor is not used in a negative

way, but as a way of releasing tension she holds inside.  Being able to see

the humorous side of life is a skill she has honed even in the midst of

feeling deep rejection by some of those who do not understand her life

issues.

41.     As someone who has assisted many clients through the gender transition

process, I have been struck by Ms. Schroer's thoughtfulness and

sensitivity to others, particularly with respect to how she tells people about

her gender change.  She has seriously thought through every situation

imaginable in an attempt to be prepared for each conversation about the

subject.  For instance, the issue of telling family members about the

concept that their brother is now a sister could have been very difficult if Ms. Schroer had not taken time to think through and plan how she was going to relay that information to them.

42.    At the time Ms. Schroer applied for the job at the Library of Congress, she did not have any stressors which would have hindered her from working at her highest level of performance.  Based on our therapy sessions, I did not note anything in her life that would indicate that she could not handle the job for which she was applying.  She was beginning to experience and looking forward to a healthy personal and professional life as a female.

43.    In the course of my practice, I have had 16 clients who are or were undergoing the process of gender transition while they were being reviewed for high security clearances.  As their treating therapist, I was interviewed as a part of their security clearance process.   Based on my follow-up discussions with these clients, I learned that none of these clients lost their clearance status or had their clearances negatively affected due to their transgender concerns.  There is nothing about Ms. Schroer's case which would lead me to think she would or should be treated differently from them ███████████████████████

44.    From a clinical perspective, an individual's gender identity is the guiding force behind one's sex and should be given greater weight than her bodily appearance.  For this reasons, the SOC acknowledge that, for many clients, SRS is an appropriate step to bring their body into alignment with their brain sex.

45.    Ms. Schroer has demonstrated her commitment to the process of gender transition by staying committed to the therapy process and heeding my advice as a clinician. When Ms. Schroer has finished the RLT portion of her care, I will assist her in the process of obtaining SRS. The process for doing so includes two steps. First, I will refer her to a psychiatrist or a psychologist who will reevaluate Ms. Schroer's appropriateness for SRS. If that clinician's assessment confirms my diagnosis, then we will each write a letter referring Ms. Schroer to a surgeon who is qualified to perform SRS. In my experience, clients take two to four weeks to recover from SRS.

**Conclusions**

46.    In my professional opinion and based on my training and expertise, Ms. Schroer does, in fact, have a diagnosis of Gender Identity Disorder and is a woman.

47.    In my professional opinion and based on my training and expertise, Ms. Schroer is a mentally healthy, emotionally stable woman who is addressing a very difficult psychosocial, emotional and physical problem in her life with maturity and stable mental health. By addressing the issue of her gender variance with integrity and honesty, she is finding a deeper level of peace in her life. She does not feel the internal struggle of seeing herself as a person the world sees as someone else. As a result, she is even more focused in her work and daily life. She had learned how to function

in her male identity, but her ability to focus has become more natural as she has continued to express her female identity. Life for her is more natural and much easier because she is not struggling internally with trying to fit into a socially acceptable male persona which she did not feel was a genuine expression of herself. She has become even more productive at work and at home. She continues to work in the intelligence field and finds wide acceptance throughout.

48.     In my professional opinion and based on my training and expertise, Ms. Schroer's desire to transition is a product of her personal integrity. Living as she did for many years as a man felt dishonest to her and that fact caused major distress in her psyche prior to beginning the gender transition process. Ms. Schroer had reached a point of no return with respect to her need to live as a woman when she first met with me. She was not desperate; rather, she was ready to take on the task of defining her life the way she needed to in order to feel whole as a person. She knew that in order to get her internal integrity back, she needed to follow through with discovering who she really was – a strong, confidant woman. Ms. Schroer's life experience molded her intellect and ideals, but through this process, she realized that she did not have to give up her life experience, including her intellect and ideals, to live as a woman.

49.     In my professional opinion and based on my training and expertise, it is my opinion that there is no reason why Ms. Schroer would have been unable to satisfy the demands of the position with the Library of Congress

either because of her gender identity or due to any mental health reason or concern.

50.    I may wish to supplement these opinions in response to statements or issues that may arise in my area of expertise by Defendant's expert witnesses, through their expert reports or in their depositions or other testimony.

September 15, 2006

Martha L. Harris, LCSW