IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DIANE J. SCHROER,<br><br>   Plaintiff,<br><br>   v.<br><br>JAMES H. BILLINGTON,<br> Librarian of Congress,<br><br>   Defendant. | No. 05-cv-1090 (JR) |

## DECLARATION OF SHARON M. McGOWAN

Pursuant to 28 U.S.C. § 1746, I, Sharon M. McGowan, declare as follows:

  1.  I am a Staff Attorney at the ACLU's Lesbian Gay Bisexual Transgender Rights Project, and I am counsel for Plaintiff in this case.

  2.  Attached as Exhibit A to this declaration is a true and correct copy of excerpts from the deposition of Charlotte Preece, taken in this action on January 11, 2007.

  3.  Attached as Exhibit B to this declaration is Plaintiff's proposed Amended Complaint.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 7, 2007

           _Sharon M. McGowan_
           Sharon M. McGowan

**Exhibit A**

Charlotte P. Preece                                          January 11, 2007
                        Washington, DC

Page 1

1              UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF COLUMBIA

2

    - - - - - - - - - - - - - - - - x

3   DIANE J. SCHROER,                  :

                                        :

4          Plaintiff,                  :

                                        :

5          v.                          :   CA No. 06-763

                                        :

6   JAMES H. BILLINGTON,               :

                                        :

7          Defendant.                  :

    - - - - - - - - - - - - - - - - x

8

9                          Washington, D.C.

10                         Thursday, January 11, 2007

11

12          Deposition of CHARLOTTE P. PREECE, called

13   for examination by counsel for Plaintiff, pursuant

14   to notice, at the Law Offices of 1875 Pennsylvania

15   Avenue, N.W., Washington, D.C., and commencing at

16   9:10 a.m., before Barbara a. Huber, Notary Public in

17   and for the District of Columbia, when were present

18   on behalf of the respective parties:

19

20

21

22

Charlotte P. Preece                                                           January 11, 2007
Washington, DC

---

Page 2

1  APPEARANCES:
2    On behalf of Plaintiff:
3      SHARON M. McGOWAN, ESQUIRE
       JAMES D. ESSEKS, ESQUIRE
4      American Civil Liberties Union Foundation
       125 Broad Street
5      18th Floor
       New York, New York 10004-2400
6      (212) 549-2593
       smcgowan@aclu.org
7
     On behalf of Defendant:
8
       BEVERLY M. RUSSELL, ESQUIRE
9      U.S. Department of Justice
       Judiciary Center Building
10     555 4th Street, N.W.
       Washington, D.C. 20001
11     (202) 307-0492
       beverly.russell@usdoj.gov
12
     Also Present:
13
       Jessie James, Jr.
14     Julia Douds
15
16
17        * * * * *
18
19
20
21
22

---

Page 4

1          P R O C E E D I N G S
2  Whereupon,
3          CHARLOTTE P. PREECE,
4  was called as a witness by counsel for Plaintiff,
5  and having been duly sworn, by the Notary Public,
6  was examined and testified as follows:
7      EXAMINATION BY COUNSEL FOR PLAINTIFF
8  BY MS. McGOWAN:
9      Q   Good morning, Ms. Preece.  My name is
10 Sharon McGowan.  And I'm here with my colleague,
11 James Esseks.  And we represent the Plaintiff in
12 Schroer versus Billington.  And we're here this
13 morning to take your deposition.
14         Have you ever been deposed before?
15     A   No.
16     Q   Okay.  So I'm just going to go through a
17 series sort of instructions and tips so that you
18 understand how things are going to proceed today,
19 and that the court reporter can take everything
20 down.  I will ask you a series of questions that
21 you will answer under oath, as you've just been
22 sworn.  And the court reporter will take it all

---

Page 3

1          C O N T E N T S
2  EXAMINATION BY:                    PAGE
3    Counsel for Plaintiff           4
4    Counsel for Defendant           314
5
6
7
8  DEPOSITION EXHIBITS:               PAGE
9    No. 19 - Vacancy Announcement           77
10   No. 20 - Crediting Plan Questionnaire   77
11   No. 21 - E-Mail, September 16, 2004     90
12   No. 22 - Listing of Scores for Candidates  90
13   No. 23 - Memo, September 17, 2004; Attachment  95
14   No. 24 - E-Mail, September 28, 2004     95
15   No. 25 - E-Mail, December 7, 2004       103
16   No. 26 - E-Mail, December 8, 2004       112
17   No. 27 - Beginning of a Recommendation  127
18   No. 28 - Letter, January 20, 2005; Attachments  286
19   No. 29 - Memo, January 24, 2005         292
20   No. 30 - Letter, March 7, 2005          306
21   No. 31 - E-Mail, March 23, 2005         306
22

---

Page 5

1  down.  Okay?
2      A   Okay.
3      Q   And it's important that you answer out
4  loud, because the court reporter cannot record a
5  nod of the head or a gesture.  Okay?
6      A   I understand.
7      Q   The court reporter also cannot -- or
8  it's difficult for her to record when two people
9  are talking at the same time.  And so I will
10 certainly try not to interrupt you.  And at the
11 same time, it's important for me to get the
12 question out so that the court reporter can have a
13 clear transcript.  Okay?
14     A   Okay.
15     Q   Okay.  And if you don't understand a
16 question, will you ask me to repeat it and to
17 clarify?
18     A   Yes.
19     Q   Okay.  And if you do answer a question,
20 I will assume that you understood it.  Okay?
21     A   Yes.
22     Q   I will take breaks throughout the day.

---

2 (Pages 2 to 5)

Schroer v. Billington,
No. 05-cv-1090 (JR)

Charlotte P. Preece                                                                January 11, 2007
Washington, DC

Page 142

1    Q   How did you feel when Ms. Schroer was
2  explaining to you what it meant to be transgender,
3  or what she meant by it when she told you that she
4  was transgender?
5    A   I was listening.  I was trying to
6  understand.  I've never known anyone who has
7  undergone the process, so I was listening.
8    Q   Were you phased at all by this
9  information?
10     MS. RUSSELL:  Objection to the form of
11 the question.  It's vague.
12     But you can answer if you understand it.
13     THE WITNESS:  If phased means shocked or
14 surprised, yes.
15 BY MS. McGOWAN:
16     Q   So this didn't strike you as just
17 run-of-the-mill lunch conversation?
18     A   No.
19     Q   Had you ever had a discussion like this
20 with anyone before?
21     A   No.
22     Q   So how did you respond?

Page 143

1    A   I think I asked him to tell me how he
2  came to that decision.  He pulled out a portfolio
3  and showed me some photographs on how he would
4  present as a woman.  I looked at those.
5    Q   And what did you think?
6    A   What did I think?
7    Q   Looking at the photos.
8    A   I thought he looked like a man dressed
9  in women's clothes.
10     Q   Anything else?  What else went through
11 your mind?
12     A   That was -- I mean, confusion, I guess.
13 At one point I think I asked him, David, how can I
14 hire you as a man and you start work as a woman.
15 We went on from there to talk about the security
16 clearance.  And he said that he knew he would be
17 required to get a psychiatric fitness for duty
18 determination.
19     Q   And did he say how he knew that?
20     A   He said that he knew other people who
21 had gone through this process who had gotten
22 security clearances.

Page 144

1    Q   And did he describe at all what he
2  understood their experience to be?
3    A   No.
4    Q   Did he tell you whether or not those
5  individuals had kept their clearance?
6    A   No.
7    Q   Did you talk at all about sort of what
8  all was involved in transitioning from male to
9  female?
10     A   We didn't get into bitty gritty details;
11 but, yes, I mean, we -- there would be surgeries
12 required, and physical changes.
13     Q   And did you talk at all about what kinds
14 of surgeries were going to be involved?
15     A   No.  I mean, not in detail.
16     Q   Do you remember talking at all about
17 Ms. Schroer's plans to have facial surgery?
18     A   He told me he wanted to complete the
19 process.  And by that I took it to mean that he
20 would need the electrolysis and implants and other
21 surgery.
22     Q   And did you talk at all about any plans

Page 145

1  for sort of full sex reassignment surgery?
2    A   Not plans, no.  I mean, nothing that I'm
3  going to do this in February, I'm going to do this
4  in December, no.
5    Q   Was there any conversation about how
6  this would impact on his ability to -- or her
7  ability to start at work?
8    A   No.  I would say we talked for maybe 15
9  or 20 minutes after this revelation.  And I think
10 because I was confused and taken aback, I said
11 that I would have to talk to people within my
12 organization, and I would get back to him within
13 24 hours.
14     Q   Did you ask Ms. Schroer who else knew
15 that she was transitioning?
16     A   I don't recall that.
17     Q   Did you ask her if any of her job
18 references knew that she was transitioning?
19     A   I don't believe I did.
20     Q   And did you have a conversation with
21 Ms. Schroer about what name to use on the
22 paperwork?

37 (Pages 142 to 145)

Charlotte P. Preece                                                              January 11, 2007

Washington, DC

Page 162

1    Q    Anything else?
2    A    That's -- that was pretty much the end
3  of the conversation.
4    Q    Okay. And before we end this part of
5  the conversation, I just want to go back and make
6  sure that I am clear about everything that you
7  discussed.
8         When you raised this issue with
9  Ms. Schroer of how can I hire you as David when
10 you want to show up as Diane, other than the name
11 on the form and other than the security clearance
12 concern that you identified, did you mean anything
13 else by that question?
14       MS. RUSSELL: I'm going to object to the
15 extent it mischaracterizes her testimony.
16       But you can go ahead and answer if you
17 understand the question.
18       THE WITNESS: Please repeat it.
19 BY MS. McGOWAN:
20   Q    Sure. We've talked about the concern
21 about the name that goes on the paperwork, whether
22 it should be David or whether it should be Diane.

Page 163

1  And also talked about your concern about the
2  security clearance issue.
3         I'm sort of wondering if there's
4  anything else that you were trying to convey when
5  you asked Ms. Schroer: How can I hire you as
6  David when you want to come to work as Diane?
7         MS. RUSSELL: It's the same objection.
8         But answer it if you understand it.
9         THE WITNESS: It was a practical
10 question. David Schroer applied. David Schroer
11 interviewed. I did reference checks on David
12 Schroer. He wants to start work as Diane. I
13 didn't hire Diane. I didn't recommend Diane. I
14 didn't interview Diane.
15 BY MS. McGOWAN:
16   Q    And in what ways were you concerned that
17 Diane would be different from David?
18       MS. RUSSELL: Objection to the form.
19 BY MS. McGOWAN:
20   Q    Or were there any ways in which you were
21 concerned that Diane would be different from David
22 in a way that would impact your decision about

Page 164

1  whether you wanted Diane when you had wanted
2  David?
3    A    Just the security clearance.
4    Q    Okay.
5    A    The contacts.
6    Q    Uh-huh. Anything else?
7    A    Those were the primary.
8    Q    Recognizing that these two were the
9  primary reasons, were there any other reasons,
10 even recognizing that they may have been less
11 important?
12   A    Credibility with members of Congress
13 went through my mind.
14   Q    And by credibility, what do you mean?
15   A    This position is a senior position. It
16 would likely be that -- or it was certainly
17 expected to be that this person would have close
18 contacts with committees, potentially be called to
19 testify. Generally when you testify they read a
20 bio about yourself. He would be testifying before
21 people who knew -- would know that only a man
22 could have those experiences.

Page 165

1    Q    And were you concerned that people would
2  react negatively?
3    A    Yes.
4    Q    And why is that?
5    A    That they might not be as tolerant, the
6  same reason as the contacts.
7    Q    And so with respect to the credibility
8  with members of Congress, is it fair to say that
9  you were concerned about bias against plaintiff by
10 individuals who disapproved of transgender people?
11   A    I thought it was possible.
12   Q    And did you -- were you concerned that
13 people might be less interested in what she had to
14 say because she was transgender?
15   A    Yes.
16       MR. ESSEKS: Why don't we take five
17 minutes.
18       MS. McGOWAN: We'll take a five-minute
19 break here, and be back at 2:00.
20       (Recess)
21 BY MS. McGOWAN:
22   Q    So we're back from our break. And we

42 (Pages 162 to 165)

Charlotte P. Preece                                                      January 11, 2007
Washington, DC

Page 170

1  was a woman?
2     A   Not about the individual, no.  I knew it
3  was going to create all kinds of complexities.
4  But as far as the way I felt toward David, no.
5     Q   And so from your perspective, nothing
6  about your interaction was any different after you
7  learned that Ms. Schroer was a transsexual woman?
8        MS. RUSSELL:  Objection to the form.
9        You can answer if you understand.
10       THE WITNESS:  I won't say nothing was
11  different.  My feelings about David's
12  competencies, his knowledge, his experience was --
13  was not different.  Yes, I was surprised, as I
14  stated.  And, yes, it did raise concerns about
15  whether he was going to be able to -- whether she
16  was going to be able to fill the institutional
17  needs that the organization had.
18  BY MS. McGOWAN:
19     Q   And so other than that, other than your
20  thinking through the impact of this information on
21  the job, you had no other personal reaction to the
22  news?

Page 171

1     A   No.  I mean -- no.  I didn't bear him
2  ill will as a result of it, no.
3     Q   And not even ill will.  Was there any
4  way in which you felt differently interacting with
5  Ms. Schroer after you learned this news?
6        MS. RUSSELL:  Same objection.  Form.
7        THE WITNESS:  Please repeat.
8  BY MS. McGOWAN:
9     Q   Sure.  You mentioned that you didn't
10  have any ill will.
11       And I was asking, putting aside sort of
12  any, you know, feelings of ill will towards
13  Ms. Schroer, was there anything about your
14  interaction with Ms. Schroer that felt different
15  after she tells you:  I'm a woman?
16     A   Just what -- what I was going to need to
17  do, but not about him as an individual.
18     Q   Did you have any concern that
19  Ms. Schroer wouldn't pass for a woman if she came
20  to the Library of Congress dressed as a woman?
21       MS. RUSSELL:  Objection to the form.
22       THE WITNESS:  That wasn't a

Page 172

1  consideration that crossed my mind.
2  BY MS. McGOWAN:
3     Q   Did you think individuals who had not
4  met David Schroer would see Diane Schroer and
5  suspect that this was a transsexual person?
6     A   Again, that was a fleeting thought in my
7  mind, if that.  These other real factors were.
8  The security clearance, by far the dominant, was
9  what I was focusing on.  When I came back and I
10  talked to the director, the first person I talked
11  to was Cynthia Wilkins.  That was my overriding
12  concern.
13     Q   And we'll definitely talk about what
14  happened when you got back to the office.
15       My question is, in light of what you saw
16  in the pictures that Ms. Schroer shared with you
17  and the concerns that you expressed about how she
18  looked, were you concerned that other people would
19  react to Ms. Schroer as a man in a dress?
20     A   I don't know if "concerned" is the right
21  word.  Yes, they probably would have.
22     Q   As far as the individuals who are in the

Page 173

1  specific unit where the terrorism specialist would
2  have worked -- and I believe that's Mr. Miko's
3  unit -- how many people are in that unit, if
4  that's the right term to describe the section?
5     A   Roughly 12, 13.
6     Q   And how many of those people are -- in
7  that unit are military veterans?
8     A   Only the person who was hired for the
9  position.
10       MR. ESSEKS:  Mr. Rollins?
11       THE WITNESS:  Yes.
12  BY MS. McGOWAN:
13     Q   And how many men and woman are in that
14  unit?
15     A   That may take me a minute.
16     Q   Okay.
17            (Whereupon at which time the
18            witness wrote on a piece of
19            paper.)
20       THE WITNESS:  And now that I am
21  composing this list, I now see that there is
22  another man who is -- had military experience, as

44 (Pages 170 to 173)

Charlotte P. Preece                                                                January 11, 2007

Washington, DC

Page 174

1  well, in that section.
2         Right now, I'm coming up with six women
3  and four men.
4  BY MS. McGOWAN:
5     Q   Okay.  And can you go through -- and I
6  don't necessarily need the names -- but tell me
7  which positions are held by the men, and then
8  which -- the titles of the positions that are held
9  by the women?
10        Or approximations, a description of
11 the --
12    A   Of what they do?
13    Q   Of what they do, by subject area or
14 however it takes.
15    A   Okay. I'll start with the men.  The
16 first one does foreign aid, would be Mr. Rollins,
17 who obviously does terrorism.  The third person
18 does international narcotics and crime.  And the
19 fourth is a new-hire who does the foreign policy
20 apparatus.
21    Q   Okay.
22    A   Do you want me to do the same thing for

Page 175

1  the women?
2     Q   Yes.  As to the women?
3     A   The first person does sanctions and
4  foreign policy legislation.
5     Q   I'm sorry.  Is that two or --
6     A   That's --
7     Q   -- that's one?
8     A   -- sanctions and foreign policy
9  legislation.  The next one does foreign policy
10 management, State Department.  The third person
11 does humanitarian relief and reconstruction.  The
12 fourth person does human rights and international
13 health.  The fifth person does foreign operations
14 appropriations.  The sixth person does the United
15 Nations and related agencies.
16    Q   Okay.
17    A   I could be omitting somebody.  That's
18 just the best of my recollection.
19    Q   Sure.  Can you explain to me a little
20 bit what foreign policy apparatus -- that was one
21 of the positions that you listed -- what does that
22 do?

Page 176

1     A   The institutions in the State
2  Department, International Broadcasting, what used
3  to be the U.S. Information Agency.
4     Q   And so this person provides research
5  support for those agencies?
6     A   Right, and programs conducted by those
7  agencies.  USAID.
8     Q   And how many of these positions interact
9  regularly with members of the military?
10    A   Certainly the terrorism position, the
11 narcotics position, the reconstruction and
12 humanitarian relief.  That's about half of them.
13    Q   And am I correct Mr. Miko is the
14 supervisor of all these people?
15    A   Yes.
16    Q   Okay.  So we are now at the point where
17 you're back at your office.  Tell me what's the
18 first thing you do.
19    A   Go down to the director.
20    Q   Did you encounter anyone --
21    A   Before that?  No.
22    Q   Okay.  So you go down to the director.

Page 177

1         And that's Mr. Mulhollan?
2     A   That's correct.
3     Q   Okay.  Tell me what happens.
4     A   I tell him about the lunch, and what
5  Mr. Schroer has revealed.
6     Q   And how do you describe this to him,
7  what happened?
8     A   I said, Dan, I just had a very unique
9  situation, experience in my life.  The candidate
10 that I was considering recommending for the
11 position of terrorism has informed me that he
12 would like to start work as a woman.  He said,
13 you're kidding.  I said, no.  I said, I need to
14 talk to some people.  I said, I would like to go
15 down and talk to Cynthia Wilkins, because I was
16 pretty sure this was going to have implications
17 for security clearance.
18        And he said, okay, I will let Kent know.
19 And that would be Kent Ronhovde, who is the
20 counselor to the director.
21    Q   Other than "you're kidding," did
22 Mr. Mulhollan say anything else to express, you

45 (Pages 174 to 177)

Schroer v. Billington,
No. 05-cv-1090 (JR)

Charlotte P. Preece                                                                January 11, 2007
Washington, DC

Page 186

1  going to tell me something which was going to
2  change my recommendation, and that that could
3  result in legal action against the Library.
4      Q   Do you think that Ms. Schroer knew that
5  this would change your recommendation, this
6  information would change your recommendation?
7      A   I have no way of knowing that.
8      Q   At that point, when you're outside
9  having probably a much-needed cigarette, were you
10  starting to formulate in your own mind a plan
11  about what you were going to do, how you were
12  going to deal with this situation?
13     A   I knew that we -- I needed to talk to
14  people, to more people, that this meeting with
15  Cynthia was going to become very important the
16  following day.
17     Q   At that point, did you still feel like
18  you wanted to hire Ms. Schroer?
19     A   I was leaning against it.  I really
20  didn't make up my mind until conversations with
21  people the subsequent day, the next day.
22     Q   And tell me why.

Page 187

1          Why were you leaning against it?
2      A   Well, I did sense that there would be
3  strong problems with the security clearance, then
4  the same issues that we discussed about before:
5  trust, and confidence, and credibility, and
6  contacts.  All these things were running through
7  my mind.
8      Q   And by credibility and contacts, that's
9  what we were talking about with respect to sort of
10  having, you know, negative interactions with the
11  military or members of Congress; is that right?
12     A   Right.
13     Q   And was that a concern that standing
14  alone was enough reason for you to decide you
15  didn't want to go forward with Ms. Schroer?
16     A   Absolutely not.  That was a minor
17  reason.
18     Q   And your concerns about her
19  trustworthiness, was that something that sort of
20  by itself was a reason why you were thinking that
21  you weren't going to go forward with her as --
22     A   It wasn't a reason alone, but it was --

Page 188

1  it was a reason.
2      Q   And if Cynthia Wilkins had come back to
3  you and said, no problem, this person's got a
4  clearance already, not a big deal, would you still
5  have gone forward with your recommendation for
6  Ms. Schroer?
7          MS. RUSSELL:  Calls for speculation.
8          But you can answer if you understand.
9          THE WITNESS:  I don't know the answer to
10  that question.
11  BY MS. McGOWAN:
12     Q   And what would have been the factors you
13  would have been weighing if the security clearance
14  timing issue had fallen away?
15         MS. RUSSELL:  Same objection.
16         But you can answer if you understand.
17         THE WITNESS:  Uh-huh.  I probably would
18  have gone back and done some serious reflection.
19  Because the second candidate also had extremely
20  good skills, and did very well in the interview,
21  and had glowing recommendations, as well.  I would
22  have weighed my decision.

Page 189

1  BY MS. McGOWAN:
2      Q   And in your mind, did this other
3  candidate just present fewer concerns with respect
4  to this credibility and contact point?
5      A   Yes.
6      Q   In part, because he was not transsexual;
7  is that right?
8      A   Yes.
9      Q   After -- well, let's -- we'll finish
10  that cigarette.
11         What else are you thinking?
12         I don't know how many you had, so -- I
13  doubt one would have been sufficient, so, you
14  know, what else were you thinking at that point?
15     A   I think that we've pretty much covered
16  it.
17     Q   Okay.  Walk me through sort of, you
18  know -- roughly what -- what time is it now at
19  this point?
20     A   Late afternoon.
21     Q   Okay.  Walk me through sort of what
22  happens between, you know, when you get back to

48 (Pages 186 to 189)

Charlotte P. Preece

January 11, 2007

Washington, DC

Page 194

```
1     A   She seemed enthusiastic before he told
2  me of his intention to complete the transgender
3  migration.  He certainly seemed enthusiastic in
4  our conversations at the restaurant and at the
5  interview.  So that's the only thing I can say.
6  He seemed to want the job.
7     Q   And did your impression about how much
8  Ms. Schroer seemed to want to job change after you
9  had had this conversation about her gender
10 transition?
11    A   Not necessarily.  I believe that part of
12 what he would like to achieve if he wins this suit
13 is to be reinstated, or to be hired in the first
14 place.
15    Q   Turning to the other people that you
16 spoke to that day.
17        Gary Pagliano, who is he?
18    A   Gary is another one of my defense
19 section heads.
20    Q   And tell me about your conversation with
21 him.
22    A   This, very similar, just described what
```

Page 195

```
1  happened.
2     Q   Now, to the extent that Mr. Pagliano had
3  not previously, you know, met Ms. Schroer or been
4  involved in the process, did you have to explain
5  to him in some greater detail sort of the
6  background of the situation?
7     A   No, I didn't, because he did know David
8  Schroer.
9     Q   He did?
10    A   Yes.  He and David were classmates at
11 the National War College.  And I had talked to
12 Gary, if he knew Mr. Schroer while he was at the
13 War College.  This was while I was doing
14 references.
15    Q   And how did he react to the news that
16 Ms. Schroer was transitioning from David to Diane?
17    A   He was shocked.
18    Q   How did you know that he was shocked?
19        Did he say something?  Was it in his
20 body language?  How did you know?
21    A   I would say both.  You're kidding?
22 Yeah.
```

Page 196

```
1     Q   And what else did he say?
2     A   I can't believe it.  I would have never
3  expected it.
4     Q   Did he say why, anything about why he
5  would never have expected it?
6     A   Well, he knew that he was in special
7  forces, knew of some of the operations that David
8  had led, I think had visited David and his wife at
9  their home.
10    Q   Did he say anything along the lines of
11 Dave being a macho or a masculine guy?
12    A   No.  He talked more about what an
13 intellectual he was.  He was a distinguished
14 graduate of the War College, David.
15    Q   Did Mr. Pagliano express any sadness or
16 disappointment at this news?
17    A   No.  I think more disbelief.
18    Q   Did Mr. Pagliano ask you what you were
19 going to do next?
20    A   I think he did ask me if I had a good
21 second candidate.
22    Q   And what did you say?
```

Page 197

```
1     A   Yes, I did.
2     Q   Did Mr. Pagliano say anything along the
3  lines of, or ask you whether or not you were
4  thinking about go ahead and hiring Ms. Schroer
5  anyway?
6     A   He might have asked me what I was going
7  to do.  If he did ask me that, I probably would
8  have said at this point I don't know.
9     Q   You mentioned everyone sort of
10 expressing some level of surprise at the news.
11        With respect to your feeling surprised
12 or shocked at this news, is one of the reasons you
13 were shocked because of sort of the most hyper,
14 masculine, macho background of this person?
15    A   That's certainly, I'm sure, lend itself
16 to it.
17    Q   In light of Ms. Schroer's background as
18 a special forces officer engaged in obviously very
19 macho stuff, macho tasks, did that make it harder
20 for you to visualize this person all of a sudden
21 becoming a woman and wearing a dress?
22    A   I think it did, yes.
```

50 (Pages 194 to 197)

Charlotte P. Preece                                                    January 11, 2007
Washington, DC

Page 198

1      Q    And were you concerned that if you
2   brought Ms. Schroer on, that there would be
3   problems resulting from the fact that Mr. Pagliano
4   had known Ms. Schroer as David?
5      A    No.
6      Q    And by problems, I mean sort of, you
7   know, awkwardness or any sort of difficulty in
8   stressors in the workplace?
9      A    That wasn't what was going through my
10  mind at the time.
11     Q    Is there anything else you recall from
12  that conversation with Mr. Pagliano?
13     A    No.
14     Q    And how long, roughly, did that
15  conversation last?
16     A    Five, ten minutes maybe.
17     Q    And was this a passing in the hallway
18  conversation, or a phone call?
19     A    I think I went into his office.
20     Q    Okay.  And then with respect to Ed
21  Bruner, your deputy, Mr. Bruner, tell me about
22  your conversation with him.

Page 199

1      A    I have no recollection if I even had a
2   conversation with him that day.
3      Q    Okay.
4      A    He certainly would have been a person I
5   would have been likely to tell at some point, but
6   I don't remember when.
7      Q    At any point during that afternoon did
8   you think about getting back on the phone with one
9   of Ms. Schroer's references to find out if they
10  had any clue that this was going on?
11     A    No.
12     Q    Were you curious about whether they
13  knew?
14     A    Yes.
15     Q    So why did you decide not to follow up
16  with any of them?
17        MS. RUSSELL:  Objection.  Calls for
18  speculation.
19  BY MS. McGOWAN:
20     Q    You can answer.
21     A    I wanted to hear first what the finding
22  was going to be from the office of personnel

Page 200

1   security.  It was kind of pointless to do anything
2   before I got advice from that office.
3      Q    And to the extent it would have been
4   pointless, why do you think it would have been
5   pointless?
6      A    Because given what Cindy told me the
7   subsequent day, I didn't need know any more
8   information.
9      Q    But at that moment in the afternoon,
10  before you had the meeting with Ms. Wilkins, did
11  it occur to you that you might be able to learn
12  something from these references that would be
13  relevant to your conversation the next day?
14     A    Not if -- the security clearance was,
15  you know, the big ball out there.  It was the
16  foremost consideration in my mind.  Until I had an
17  answer to that question, I was not going to pursue
18  anything else.
19     Q    Did you talk to any other Library
20  employees that afternoon about Ms. Schroer, or the
21  situation generally?
22     A    Not that I recall.

Page 201

1      Q    Did you call any family members or
2   friends to discuss what happened, either sort of
3   in general terms or perhaps more specifically?
4      A    Not from work.
5      Q    Did you talk to family members later
6   outside of work?
7      A    Uh-huh.
8      Q    Okay.  Who did you talk to?
9      A    My sons.
10     Q    Okay.  Tell me about those
11  conversations.
12        MS. RUSSELL:  I'm going to object on
13  relevance grounds.
14        But you can answer.
15        THE WITNESS:  On relevance grounds?
16        MS. RUSSELL:  You can answer.
17        THE WITNESS:  I think I said you're not
18  going to believe what happened to me today.  You
19  know the gentleman's whose resume I showed you
20  some time ago that you were quite impressed with?
21  He told me today that he wanted to start work as a
22  woman.

51 (Pages 198 to 201)

Charlotte P. Preece                                                                January 11, 2007
Washington, DC

Page 234

1   get information from the health services office?
2       A   The health service office would be
3   responsible for setting up and arranging the
4   fitness for duty.
5       Q   But with respect to the conversation you
6   were having there that morning at that meeting,
7   did anyone suggest a need to bring in someone from
8   the health services office?
9       A   No.
10      Q   Were there -- what else did Ms. Wilkins
11  say about the security clearance process that we
12  haven't yet discussed?
13      A   I've told you what I remember.
14      Q   Okay.  Were there -- well, what did
15  Ms. Alkisswani say during this meeting?
16          Did she react at all to this
17  information?
18      A   I really don't recall.  People were
19  asking questions.  And I don't recall specifically
20  what they were.  The message from Cindy is what I
21  took away from that meeting.
22      Q   Were there any discussions in the

Page 235

1   context of this meeting, about Ms. Schroer's
2   trustworthiness?
3       A   There could have been.  We discussed
4   other issues beyond security.
5       Q   What issues did you discuss?
6          Tell me about those conversations.
7       A   I think they're again limited to the
8   ones we talked about before:  Trust, contacts.
9       Q   And did you raise the trust and contacts
10  point, or did you someone else?
11      A   I can't remember.  I think we were all
12  thinking the same thing.
13      Q   And what did you say in that meeting
14  regarding this issue of trustworthiness?
15      A   Well, I did say that I felt set up, and
16  I didn't know if I could trust someone who tried
17  to deceive me.
18      Q   And what kind of reaction did you get to
19  that comment?
20      A   I understand.
21      Q   And do you recall in particular any
22  people specifically expressing that sentiment?

Page 236

1       A   No.
2       Q   And sort of how did you articulate this
3   concern about contacts in that meeting?
4       A   That I was concerned that by changing
5   sex and identity, that the contacts that he had,
6   particularly in the military, would not know who
7   he was to them; and they might -- they might not
8   be as helpful.
9       Q   And did you talk at all in that meeting
10  about the negative reaction of military people to
11  Diane, who is now this transgender person?
12      A   No, other than to say that some people
13  might be understanding and others might not.
14      Q   Was there any discussion about the
15  reaction or what the reaction might be of other
16  Library employees to the fact that Ms. Schroer was
17  transitioning from male to female?
18      A   No.  We talked about the bathroom
19  question a little bit.
20      Q   Okay.  And what did you say there?
21      A   That we would have to make special
22  accommodations for at least a period of time.

Page 237

1       Q   Do you remember who raised that point?
2       A   No.
3       Q   Was there any discussion at that point
4   about the example of the Department of the Army
5   that Ms. Deese had previously discussed?
6       A   I don't remember where the linkage was,
7   and if that's where it came up, or whether it came
8   up separately from what Kathy was talking about,
9   that she said there was special accommodation
10  made.
11      Q   And was there any discussion about how
12  easy or difficult it might be to accommodate this
13  bathroom concern?
14      A   No.  I mean, it was so minor.  We
15  realized there was much bigger issues.  We didn't
16  dwell on this one.
17      Q   Were there any discussions about how the
18  members of Congress might react if they figured
19  out they were interacting --
20      A   Right.
21      Q   -- with a transsexual --
22      A   Right.

60 (Pages 234 to 237)

Schroer v. Billington,
No. 05-cv-1090 (JR)

Charlotte P. Preece

January 11, 2007

Washington, DC

---

Page 238

1    Q    -- woman?
2    A    Yes.  That came up.
3    Q    Tell me about that.
4    A    Just raised, as I mentioned about -- a
5    couple of hours ago -- the issue of credibility.
6    Again, like the military, that some people may be
7    very tolerant of the knowledge and the
8    information, and other people may think that
9    damages the individual's credibility.
10   Q    Do you remember who else in the
11   conversation engaged in the discussion of this
12   point?
13   A    Well, Cindy pretty much stuck to
14   security, personnel security issues.  And Bessie,
15   Kent, and I were having more of a free ranging
16   discussion.  But I don't remember who raised what.
17   Q    Was there any discussion at this meeting
18   about things that one might be able to do to speed
19   up the security clearance process for Ms. Schroer
20   if you decided to go forward with her?
21   A    No.
22   Q    So, for example, did you propose that

---

Page 239

1    Ms. Wilkins have a meeting with Ms. Schroer?
2    A    No.
3    Q    Did you suggest that Ms. Schroer look at
4    David Schroer's security file?
5    A    Pardon?
6    Q    Did you suggest or did anyone suggest
7    that Ms. Wilkins pull and review the security file
8    for David Schroer?
9    A    No.
10   Q    Did you or anyone suggest that
11   Ms. Schroer meet with the health services office?
12   A    No.
13   Q    Did you or anyone else suggest
14   Ms. Schroer meet with any other member of the
15   Library staff?
16   A    No.
17   Q    Did you or anyone else ask whether or
18   not there was anyone at the Library who had dealt
19   with a similar situation regarding a transitioning
20   applicant?
21   A    No.
22   Q    Did anyone make any other suggestions

---

Page 240

1    along those lines of things that one might want to
2    do before moving on to the next step?
3    A    No.
4    Q    Okay.  Did you or anyone suggest calling
5    Ms. Schroer to get some more information to factor
6    into your decision-making process?
7    A    No.
8    Q    Did Ms. Wilkins or anyone else suggest
9    that they were interested in finding out whether
10   or not Ms. Schroer had reported any of this
11   information about her transition to the entity
12   currently holding her clearance?
13   A    No.
14   Q    So how were things left at the end of
15   the meeting?
16   A    Things were left that we should talk to
17   the general counsel's office.
18   Q    And who made that suggestion?
19   A    I don't know for sure, but probably
20   Kent.
21   Q    And was there any discussion at the end
22   of that meeting about the decision that was going

---

Page 241

1    to be made regarding Ms. Schroer?
2    A    No.  I think we wanted to -- I mean, my
3    decision was pretty close to -- my decision was
4    pretty final then.  I was ready to move on.
5    Q    And what were your reasons for deciding
6    that you wanted to move on?
7    A    The time, the uncertainty as to whether
8    the clearance would ultimately be granted.  That
9    was the 90 percent factor.
10   Q    The issue of credibility and contacts,
11   was that a reason?
12   A    They probably go about five each, yeah.
13   Q    Okay.  And I absolve you from the fact
14   that we have reached 100.
15       Are there any other reason, with
16   whatever percentage that you want to attach to
17   them, that factored into your --
18   A    Well, we discussed credibility before.
19   Q    Okay.  And by credibility, just to be
20   clear, we're talking about both being able to
21   interact with members of the military who might be
22   hostile to her as a transgender person, and

---

61 (Pages 238 to 241)

Charlotte P. Preece                                                                    January 11, 2007

Washington, DC

Page 242

1   credibility with members of Congress?
2       A   Primarily the latter.
3       Q   Primarily the latter?  Okay.
4       A   Right.  Contacts with the military,
5   credibility with the members.
6       Q   Okay.
7       A   But the operational needs of the
8   division were such that I needed to have someone
9   on board months before we are now, or where we
10  were at the present time, in December.
11      Q   And did you have in your mind, in that
12  meeting with Cynthia Wilkins, an amount of time
13  beyond which you were unwilling to go with respect
14  to how long the clearance would have taken?
15          For example, if Cynthia Wilkins said
16  it'd probably take about six months, sort of was
17  there an amount of time in your mind where beyond
18  which it was just not going to be worth your while
19  anymore?
20      A   I really wanted someone to start in
21  January.
22      Q   And how important was it for you that

Page 243

1   the person could start in January with full
2   clearance?
3       A   I wanted the person to be able to start
4   the new session of Congress, which beings at the
5   end of January.
6       Q   And so if Cindy had come back, or in
7   this meeting and said, you know, I actually think
8   it's not going to be a problem, but I need two
9   weeks to figure it out?
10          MS. RUSSELL:  Objection.  Calls for
11  speculation.
12          But you can answer it if you understand.
13          THE WITNESS:  I wouldn't have believed
14  it, but -- if she said that and it were two weeks,
15  we probably would have gone through the process.
16  BY MS. McGOWAN:
17      Q   Notwithstanding the residual concerns
18  about credibility and contacts?
19      A   I'm not saying I would have selected her
20  for the job, but -- I mean, at that point, knowing
21  what I did, it's foolish to speculate about two
22  weeks because.  That's totally unrealistic.  I

Page 244

1   probably would have gone with the other candidate,
2   who did not have any of those issues.
3       Q   And just to be clear, even if Cynthia
4   Wilkins had come back and said two weeks, you
5   probably would have gone with the other candidate?
6   Am I understanding you correctly?
7       A   Yes.  Yes.
8           MS. RUSSELL:  Same objection.  Calls for
9   speculation.
10          THE WITNESS:  I mean, I would have had
11  to do -- prepare the recommendation.  The PAR
12  would have had to be generated.  And then it would
13  have gone to Cindy's shop.  And then it would have
14  gone to the fitness for duty.  And then it would
15  have gone for the investigation.  So, no, at this
16  point I was -- at this point, I pretty much made
17  up my mind.
18  BY MS. McGOWAN:
19      Q   So recognizing that Cynthia Wilkins is,
20  you know, the person who was giving you her
21  assessment of how long it would take, I just want
22  to be sort of clear I understand, you know, where

Page 245

1   you were at that point.
2           If Cynthia Wilkins had come to the
3   meeting and said to you this is information that I
4   want to take a look at; but in light of the fact
5   this person's, you know, got a prior work-up, I
6   think that it'll take me about two weeks to figure
7   out whether or not, you know, this is a problem,
8   am I correct that you're saying that even if she
9   had said two weeks to you, you would not have gone
10  forward with Ms. Schroer?
11          MS. RUSSELL:  It's the same objection.
12          THE WITNESS:  I really feel you're
13  asking me to speculate on something that is
14  completely unrealistic.
15  BY MS. McGOWAN:
16      Q   Unrealistic or not, if that had been
17  what Ms. Wilkins, as the personnel security
18  officer, came back and said I can give you an
19  answer in two weeks --
20      A   I don't know what I would have done.
21          MS. RUSSELL:  Asked and answered.
22          But you can answer.

62 (Pages 242 to 245)

Schroer v. Billington,
No. 05-cv-1090 (JR)

Charlotte P. Preece

Washington, DC

January 11, 2007

Page 246

1  BY MS. McGOWAN:
2      Q   Well, actually, I haven't yet gotten an
3  answer out yet, so --
4      A   I don't know what I would have done.
5      Q   And as far as if Ms. Wilkins had come
6  back with the I can give you an answer about the
7  security clearance issue in two weeks, is part of
8  your uncertainty about whether or not you would
9  have gone forward with Ms. Schroer or not because
10 of these credibility and contact concerns that
11 were in your mind, as well?
12     A   It was the time and the operational
13 requirements.  She had given me an answer about
14 what would be required.  And based on that, I made
15 a decision to go to the other candidate.
16     Q   Right.  And I'm asking if she had said
17 that it would have taken only two weeks of time to
18 give you an answer on whether or not this person
19 could continue to maintain their top secret
20 security clearance, would the other concerns that
21 you had had about credibility and contacts led you
22 to still make the same decision to not go forward

Page 247

1  with Ms. Schroer?
2      MS. RUSSELL:  I'll object.  Asked and
3  answered.
4      But you can answer the question again if
5  you understand it.
6      THE WITNESS:  These other factors are
7  contributing factors.  The main reason was the
8  operational factor.  I don't know what I would
9  have done if she said that preposterous thing.
10 BY MS. McGOWAN:
11     Q   And so I recognize that we're talking
12 sort of in the hypothetical, but I'm trying to
13 sort of isolate this factor of the amount of time
14 that it would have taken, and take that out of the
15 equation.
16     In a world where Cynthia Wilkins told
17 you that it would not take a long amount of time
18 to resolve the security clearance issues, would
19 you have gone forward with Ms. Schroer as the
20 applicant for the terrorism specialist?
21     MS. RUSSELL:  Again, it calls for
22 speculation.  And it's been asked.  And it's been

Page 248

1  answered.
2      MR. ESSEKS:  No, I'm sorry.  It hasn't
3  been answered.
4      MS. RUSSELL:  It has been answered.
5      THE WITNESS:  It has been answered with
6  I don't know what I would have done.
7      MS. RUSSELL:  And that is an answer.
8  You may not get the answer that you want, but that
9  is the answer.  That is her answer.
10     MR. ESSEKS:  Why don't we just try this
11 again, and then see if we can get an answer on
12 this.
13     MS. RUSSELL:  Asked and answered.
14     MR. ESSEKS:  You can make the objection.
15 That's fine.  But once you make the objection, I'd
16 appreciate you be quiet so that the witness can
17 answer.
18     MS. RUSSELL:  She has answered the
19 question.
20     MR. ESSEKS:  I think this exchange is
21 done.  Thank you.
22     MS. RUSSELL:  I would prefer that you

Page 249

1  move on, because she has answered the question.
2  BY MS. McGOWAN:
3      Q   I actually think that the question is
4  still open.  And so this will be my attempts to
5  move on after this point.  You've identified four
6  factors.  And I'm asking if -- or three or four
7  factors, depending.
8      Once the factor of the amount of time
9  was taken out of the equation, would you have
10 decided to go forward with Ms. Schroer or not,
11 depending on these other two concerns that you've
12 identified?
13     MS. RUSSELL:  Calls for speculation,
14 asked and answered.
15     You can answer it a fourth or fifth
16 time.
17     THE WITNESS:  My answer is I don't know
18 what I would have done.
19 BY MS. McGOWAN:
20     Q   And is the reason you don't know because
21 you were not certain whether or not your anxiety
22 about the credibility and contact issue would have

Alderson Reporting Company
1-800-FOR-DEPO

Schroer v. Billington,
No. 05-cv-1090 (JR)

Charlotte P. Preece                                                      January 11, 2007
Washington, DC

Page 250

1  rendered Ms. Schroer less effective than
2  Mr. Rollins?
3        MS. RUSSELL:  Objection.  Calls for
4  speculation.  And it's confusing.
5  BY MS. McGOWAN:
6      Q   Do you understand my question?
7      Because I can ask it again.
8      A   Go ahead.
9      Q   Okay.  In a world where the timing issue
10 has been taken out of the equation because
11 Ms. Wilkins says to you in two weeks I can give
12 you an answer up or down about whether or not this
13 candidate can satisfy the top secret security
14 clearance, you thus far have said, in different
15 ways, although not consistently, that you're not
16 sure what you would have done in that situation.
17       And my question is, is what you are not
18 sure about the question of whether or not your
19 concern about Ms. Schroer's credibility with
20 members of Congress and her ability to maintain
21 contacts with the military due to their lack of
22 understanding about transgender issues made her a

Page 251

1  weaker candidate than Mr. Rollins?
2        MS. RUSSELL:  It's the same objection.
3  Also, I'm objecting to the extent that it
4  mischaracterizes your testimony, and it's
5  confusing.
6  BY MS. McGOWAN:
7      Q   Do you understand --
8      A   It certainly makes her a weaker
9  candidate, because it's -- there's so many
10 contributing factors.
11     Q   Okay.
12     A   So even if you take one and hold it in
13 isolation, these other factors were certainly
14 strong, would have influenced and factored into my
15 decision whether or not to proceed, or to offer it
16 to the other candidate.
17     Q   And where there would be absolutely no
18 difference in time between how long it would take
19 to run Ms. Schroer through the security clearance
20 process and Mr. Rollins, is it your testimony that
21 Mr. Rollins was a stronger candidate because he
22 did not present the same concerns about

Page 252

1  credibility with members of Congress, and contacts
2  in the military?
3        MS. RUSSELL:  It still calls for
4  speculation.
5        But you can answer if you understand.
6        THE WITNESS:  I don't understand.  I'd
7  like to stay with my previous answer, that even
8  holding time and security clearance out of the
9  question, I'm --
10 BY MS. McGOWAN:
11     Q   The other question is --
12     A   The question isn't just the time of the
13 clearance.  The question is ultimately could he
14 get the clearance.  We don't know that there's an
15 answer to that.  So it's not the whether it's two
16 weeks or two days or two years.  We have the
17 additional factor of, one, how long it's going to
18 take; and, two, the degree of certainty that he
19 might not be able to get that clearance.  So
20 that's a big unknown.
21     Q   Okay.  So that's how we had our four
22 factors.  There was the time factor and the

Page 253

1  uncertainty factor.
2        I'm saying holding those factors
3  constant --
4      A   I understand.
5      Q   -- as between Ms. Schroer and
6  Mr. Rollins, is it your testimony that Mr. Rollins
7  is -- was a stronger candidate because he would
8  not have presented credibility concerns or
9  concerns about his ability to maintain military
10 contacts?
11     A   He's looking a lot better, yeah.
12     Q   Do you recall what time you wrapped up
13 your meeting with Mr. Ronhovde and the others?
14     A   10:00 to 10:15.
15     Q   What did you do then?
16     A   Went out and smoked a cigarette.
17     Q   And what were you thinking at that
18 point?
19     A   What I was thinking was that given what
20 I had learned, I would like to offer the position
21 to Mr. Rollins.
22     Q   And why was that?

64 (Pages 250 to 253)

Charlotte P. Preece                                                                    January 11, 2007

Washington, DC

---

Page 254

1    A    Because of the length of time to take to
2  get a security check, because of the uncertainty
3  of the security check, because of the credibility
4  issue, because of the mistrust issue, all the
5  factors that we have listed time and time and time
6  again.
7    Q    And we've thus far broken out the
8  credibility issue being credibility with Congress
9  was --
10    A    The contacts.  And the contacts is the
11  other thing.
12        MS. McGOWAN:  I'm going to show you a
13  document that we can mark Exhibit 28.  Oh, I'm
14  sorry.  It was a document that was already
15  previously marked as Exhibit 14.
16        THE WITNESS:  (Witness examined
17  document).
18  BY MS. McGOWAN:
19    Q    Do you recognize -- well, actually, let
20  me identify the document.  It's a document that
21  was previously marked as Exhibit 14, Bates-stamp
22  number 206.  At the top says, Charlotte Preece

---

Page 255

1  draft re terrorism position.
2        Do you recognize this document?
3    A    Yes.
4    Q    Okay.  What is it?
5    A    At the end of the meeting with Bessie,
6  Kathy, Kent, and Cindy, Kent asked me to draft
7  something for the general counsel to look at of
8  what I would tell Mr. Schroer when I told him I
9  would not go forward with his recommendation.
10    Q    And did he explain to you why he wanted
11  you to draft up an e-mail?
12    A    To show to the general counsel's office.
13    Q    And when did you begin drafting this
14  e-mail?
15    A    Probably -- this has a 10:54 on it.
16  After the meeting.
17    Q    Do you have any idea of roughly how long
18  it took for you to type this e-mail?
19    A    Fifteen minutes.
20    Q    Did you talk with anyone as you drafted
21  the e-mail?
22    A    We had talked about it a little bit at

---

Page 256

1  the meeting.
2    Q    And had anyone offered you any
3  suggestions for how to phrase your comments to
4  Ms. Schroer?
5    A    No.  This was a very preliminary draft,
6  first cut.
7    Q    And how did you select the people that
8  you sent the e-mail to?
9    A    They were the people at the meeting.
10    Q    Did you send this to anyone else in a
11  separate message?
12    A    I don't think so.  I can't remember if
13  we took a paper copy, or if this was sent to the
14  general counsel's office.
15    Q    And did you get any e-mail responses
16  from anyone when you sent this e-mail?
17    A    No.
18    Q    Did you get any kind of feedback
19  regarding this e-mail?
20    A    Yes, when we went to the general
21  counsel's office.
22    Q    Do you recognize the handwritten

---

Page 257

1  comments on this paper?
2    A    Yes.
3    Q    Whose handwriting is that?
4    A    Mine.
5    Q    When did you write these comments?
6    A    Probably in the meeting with the general
7  counsels.
8    Q    And then I'm going to show you a
9  document that was previously marked 15.  In a
10  moment.  I'm sorry.
11        In this document, Exhibit 14, the last
12  line of that first paragraph you say here that, I
13  have concerns a that the transition you are in the
14  process of might divert your full attention away
15  from the mission of CRS.
16        Is this an issue that you discussed at
17  that meeting with Mr. Ronhovde and the others?
18    A    Yes, I believe it did come up.
19    Q    And what was that discussion?
20    A    That both the surgeries, the time off,
21  as well as undergoing such a complex and painful
22  process could divert his attention, full-time

---

65 (Pages 254 to 257)

Schroer v. Billington,
No. 05-cv-1090 (JR)

Charlotte P. Preece                                          January 11, 2007
Washington, DC

Page 266

1  ready to object then.  But you asked what she
2  said, you asked what Kent said, and you asked what
3  Ms. Preece said.  You never asked what --
4         MR. ESSEKS:  We didn't ask about what
5  the lawyers said?
6         MR. JAMES:  No.
7         MS. McGOWAN:  Okay.
8  BY MS. McGOWAN:
9      Q    And so what did everyone, other than
10  Mr. James and Ms. Dowd, say in the context of this
11  meeting, as part of recounting the conversation?
12         Sorry.  That's a little --
13         Going into this meeting -- let me start
14  there -- going into this meeting, was there any
15  discussion about the fact that you had more or
16  else less made up your mind what you thought you
17  were going to do?
18      A    I had pretty much made up my mind about
19  what I wanted to do.
20      Q    And so what was the point of this
21  meeting with the office of general counsel staff?
22      A    To find out if this situation could

Page 267

1  potentially get the Library into legal trouble.
2      Q    And was there any discussion about what
3  you should or should not say in the course of your
4  conversation with Ms. Schroer?
5      A    Again, to answer that question, I would
6  have to be saying what legal counsel told me.
7      Q    Well, putting aside what legal counsel
8  told you, were there any other conversations --
9  you know, did you ask, for example, you know,
10  should I say things in a certain way, and what
11  feedback would --
12      A    How should I phrase this?
13      Q    Uh-huh.
14      A    Yes.
15      Q    And did you get feedback from the
16  nonlawyers in the room, Ms. Alkisswani and
17  Mr. Ronhovde?
18      A    I had already gotten their input.
19      Q    Okay.  And so at some point in the
20  meeting did you announce that you knew what your
21  decision was going to be?
22      A    Yes.

Page 268

1      Q    And tell me how you communicated that
2  information.
3      A    Given the combination of all the factors
4  that we outlined, I do not feel comfortable going
5  ahead with recommendation with Mr. Schroer.  I
6  have another strong candidate.  And I would like
7  to move ahead with the recommendation on him as
8  quickly as possible.
9      Q    And did you, in this meeting, you know,
10  outline what each of those four factors were?
11      A    Yes.  We talked about all the factors.
12      Q    And was there any additional discussion
13  about each of the four factors that you
14  identified?
15      A    I think I was asked to elaborate what
16  did I mean by mistrust, what did I mean by
17  contacts.  So I would elaborate on those.
18      Q    And if you can tell me how you explained
19  what you meant.
20      A    I don't know that it's different than
21  what I've already told you.  The credibility had
22  to do with the members.  Contacts had to do with

Page 269

1  his ability to capitalize on the contacts he made
2  as a man in the armed services.  Trust was my
3  perception of would I be able to trust him after
4  this late in the day revelation on Monday.
5  Security clearance was based on Cynthia's advice.
6      Q    And how did you leave things at that
7  meeting?
8      A    That I would call Mr. Schroer later that
9  day and give him the news.
10      Q    Did anyone else agree to do anything at
11  the end of that meeting?
12      A    Do anything?  No.
13      Q    Do anything with respect to the Schroer
14  matter:  Write a memo?  Call anyone?
15         MR. JAMES:  And your question is anyone
16  other than the lawyers?
17         MS. McGOWAN:  Right.
18         THE WITNESS:  No.
19  BY MS. McGOWAN:
20      Q    And so what did you do between the end
21  of that meeting and when you ultimately spoke to
22  Ms. Schroer next?

68 (Pages 266 to 269)

Charlotte P. Preece

January 11, 2007

Washington, DC

Page 294

1  to this document?
2      A   No.  I was told to cease work on it.
3  And I did no more work on it.
4      Q   So this is the end of the document --
5      A   That's correct.
6      Q   -- as created by you?
7          And the instructions you received about
8  ceasing work on this, who did those instructions
9  come from?
10         MS. RUSSELL:  Objection.
11         MS. McGOWAN:  Okay.  That answers my
12  question.  I was trying to figure out who it was,
13  trying to figure out whether there was any more to
14  know.
15         MR. JAMES:  Just let you know --
16         MS. McGOWAN:  I could tell, as Jessie
17  and Julia started to perk up, I was getting an
18  answer to my question.
19  BY MS. McGOWAN:
20      Q   Did you prepare any other chronologies
21  or memoranda like this?
22      A   No.

Page 295

1      Q   Did you ever discuss this document with
2  anyone?
3      A   No.  I prepared this based on my
4  recollection.  Did I -- did I -- please repeat
5  your question.
6      Q   Sure.  I was asking if you discussed
7  this memo with anyone.  And I break it down into
8  two pieces.
9          One, did you discuss it with anyone in
10  the course of preparing it and actually putting
11  the information into the memo?
12         And then the other piece would be did
13  you say discuss the memo in general, your
14  preparation of it?
15         And if there are discussions that --
16  only discussions you had with legal counsel, then
17  I don't need to know that.  I'm only looking for
18  discussions that you may have had not with legal
19  counsel.
20      A   Just with legal counsel.
21      Q   Okay.  Thank you.
22         What is your view about whether

Page 296

1  Ms. Schroer is a man or a woman?
2          MS. RUSSELL:  Objection.  Lacks
3  foundation.
4          But you can answer.
5  BY MS. McGOWAN:
6      Q   Do you have a view about whether
7  Ms. Schroer is a man or a woman?
8      A   If I ran into Ms. Schroer today, I would
9  call her Ms. Schroer.  I would call her Diane.
10      Q   And would you consider Ms. Schroer a
11  woman?
12      A   I would consider her a person in
13  transition.
14      Q   On the day that you had lunch with
15  Ms. Schroer, on December 20th, on that day, what
16  did you consider Ms. Schroer to be, a man or a
17  woman?
18      A   A man.
19      Q   Okay.  And after your conversation at
20  lunch, did your view change about whether
21  Ms. Schroer was a man or a woman?
22      A   Well, he told me he was transitioning,

Page 297

1  so I probably still considered him as a man at
2  that point, because he hadn't changed his name
3  yet.
4      Q   And at what point would you feel that
5  Ms. Schroer was now a woman?
6      A   When the process is completed.
7      Q   And in your mind, based on the
8  information that you have, when is that point?
9      A   When his surgeries are completed.
10      Q   On December 20th, when -- at your
11  meeting with Ms. Schroer, who you viewed to be
12  man, did it seem strange to you that man would
13  want to dress in women's clothing?
14      A   Yes, it seems strange to me.  But a lot
15  of things seem strange to me.
16      Q   And at any point during -- between the
17  time when you learned about Ms. Schroer's
18  transition until the point at which you made your
19  decision to not go with -- not to recommend her
20  and to call her, you know, at any point did you
21  visualize, you know, Ms. Schroer, looking as she
22  did in the pictures she showed you, standing in

75 (Pages 294 to 297)

Charlotte P. Preece                                                    January 11, 2007

Washington, DC

Page 298

1    front of Congress and looking like a fool?
2        A    Looking like a fool? Why would you say
3    that?
4            MS. RUSSELL: I'm going to object to the
5    form of the question.
6            But you can answer if you understand.
7            THE WITNESS: I don't understand the
8    intent behind the question.
9    BY MS. McGOWAN:
10       Q    Sure. And my question is, you know,
11   at -- my recollection of your testimony was that
12   when you saw the pictures of Diane in that
13   portfolio, Ms. Schroer at that time looked like a
14   man in women's clothing.
15           And I'm wondering, you know, at any
16   point were you concerned about sort of what the
17   reaction would be of someone who looked like a man
18   in women's clothing standing in front of Congress
19   and trying to be taken seriously?
20       A    That did cross my mind.
21       Q    Did it strike you as strange that
22   someone like Ms. Schroer, with her military

Page 299

1    background, would want to wear makeup?
2            MS. RUSSELL: Objection. Relevance.
3            But you can answer if you understand.
4            THE WITNESS: It didn't surprise me that
5    someone who is in the process of transitioning
6    would want to wear makeup. That makes sense to
7    me.
8    BY MS. McGOWAN:
9        Q    But with respect to Ms. Schroer, who was
10   a man in your mind, did it feel strange to you to
11   think of Ms. Schroer as a man putting on makeup?
12       A    Not if he was trying to look like a
13   woman.
14       Q    Did it feel strange for you to imagine
15   Ms. Schroer wanting to wear pumps or high heel
16   shoes?
17       A    Again, not if he was transitioning to a
18   woman. I find it strange that anyone wants to
19   wear pumps.
20       Q    That, I can agree with, for sure.
21           Would you say that wearing makeup is a
22   masculine thing to do?

Page 300

1            MS. RUSSELL: Objection. Relevance.
2            But you can answer.
3            THE WITNESS: If you're an actor, if you
4    have got skin complex problems.
5    BY MS. McGOWAN:
6        Q    Outside of people wearing makeup for
7    professional or skin acne or other related
8    dermatological-related reasons, would you consider
9    wearing makeup to be a masculine or a feminine
10   thing?
11       A    A feminine thing.
12       Q    And wearing high heel shoes, would you
13   consider that to be a masculine or a feminine
14   thing?
15           MS. RUSSELL: It's the same objection.
16           But you can answer.
17           THE WITNESS: I've seen men in platform
18   shoes. High heels, if we're talking about spikes,
19   I associate that with a feminine thing.
20   BY MS. McGOWAN:
21       Q    And with respect to wearing long hair or
22   wigs, do you associate that as being or masculine

Page 301

1    or feminine?
2        A    Long hair I don't associate -- I
3    associate with both sexes. Wigs, men wear
4    toupees.
5        Q    And the hair style that Ms. Schroer was
6    wearing in the photos that you saw, am I correct
7    that that was a long hair style?
8        A    That was a wig, yes.
9        Q    And would you describe that as a
10   feminine style of hair?
11       A    Yes, it was. The style was feminine,
12   yes.
13       Q    And in that photo, am I right you saw
14   Ms. Schroer, who you knew to be and thought to be
15   a man, wearing what you considered to be a
16   feminine hairstyle?
17       A    Yes.
18       Q    And women's shoes; is that right?
19       A    I believe he had boots on, if I'm not
20   mistaken.
21       Q    Okay. And a feminine style of clothing;
22   is that right?

76 (Pages 298 to 301)

Alderson Reporting Company
1-800-FOR-DEPO

Schroer v. Billington,
No. 05-cv-1090 (JR)

Charlotte P. Preece

January 11, 2007

Washington, DC

Page 302

1    A   Yes.
2    Q   And makeup that would be described as
3  feminine makeup?
4    A   Yes.
5    Q   And how did you think others in CRS
6  would react to seeing those pictures?
7       MS. RUSSELL: Objection. Lacks
8  foundation.
9  BY MS. McGOWAN:
10    Q   For example, you know, what, in your
11  estimation, do you think Steven Bowman's reaction
12  would have been to that picture, those pictures?
13    A   I think people would have surmised that
14  it is a male dressed in women's clothing and
15  wearing makeup.
16    Q   Okay. With whom, if anyone, did you
17  speak in preparation for this deposition?
18    A   Primarily --
19       MS. RUSSELL: I'm sorry, Sharon, I
20  missed the question.
21       MS. McGOWAN: Oh, sure. That's okay.
22  BY MS. McGOWAN:

Page 303

1    Q   I was asking, did you speak with anyone
2  in preparation for your deposition?
3    A   Yes.
4    Q   And with whom?
5    A   These three people here.
6    Q   Okay. Anyone else?
7    A   For awhile, Evelio Rubiella.
8    Q   Okay. Anyone else?
9    A   Kent Ronhovde.
10    Q   And what did you and Kent talk about?
11    A   Mostly status reports, that would be
12  when -- general counsel's office would give us
13  status reports of where we are. And there were
14  others present for that, as well, those status
15  reports.
16    Q   And did you speak with Ms. Alkisswani?
17       MS. RUSSELL: Objection. Vague. Do you
18  mean --
19  BY MS. McGOWAN:
20    Q   I'm sorry. Did you speak with
21  Ms. Alkisswani in preparation for this deposition?
22    A   No. I mean, apart from some of these

Page 304

1  group status meetings, we didn't have one-on-one
2  conversations about this case.
3    Q   And did you review any documents in
4  preparation for this deposition?
5    A   Say that again, please.
6    Q   Sorry. Did you review any documents in
7  preparation for this deposition?
8    A   I skimmed over most of the documents
9  that I had in my possession.
10    Q   Okay. And what were those documents?
11    A   There was a chronology that was
12  prepared, a lot of the information that you
13  presented today, the interrogatories I looked at.
14    Q   And with respect to documents that
15  weren't discussed as exhibits today, can you tell
16  me what you looked at?
17    A   The structured interview guide.
18    Q   Okay. Anything else?
19    A   I did say the chronology of what
20  happened when.
21    Q   And by the chronology, are you referring
22  to this document in front of you, or a different

Page 305

1  document?
2       And by that, I mean Exhibit --
3    A   Exhibit 29.
4    Q   -- Exhibit 29.
5       Are you referring to that document, or a
6  different document?
7    A   That document, and there's a one-page
8  chronology that I believe was prepared by somebody
9  in workforce that had dates when the announcement
10  went up, when it went down.
11    Q   Okay. Any other documents that you
12  reviewed that we haven't discussed today?
13    A   Those sets of interrogatories, those
14  first EEO complaints.
15    Q   And did you review any deposition
16  transcripts in this case?
17    A   I don't have any.
18    Q   Okay. Anything else?
19    A   That's all I recall.
20    Q   Okay. Do you remember receiving a
21  letter from me asking you to preserve all
22  documents related to the Schroer matter?

77 (Pages 302 to 305)