IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DIANE J. SCHROER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 05-cv-1090 (JR) |
| ) | |
| JAMES H. BILLINGTON, ) | |
| in his official capacity as Librarian of Congress, ) | |
| ) | |
| Defendant. ) | |

**AMENDED COMPLAINT**

**NATURE OF THE ACTION**

1. In August 2004, Plaintiff Diane J. Schroer, a twenty-five year veteran of the U.S. Armed Services, applied for a position as a Terrorism and International Crime Research Analyst (hereinafter "Terrorism Research Analyst") with the Congressional Research Service of the Library of Congress. Although Defendant initially offered her the position, Defendant later rescinded the offer and refused to hire Plaintiff because she does not conform to sex stereotypes and otherwise because of her gender, and because she is undertaking the prescribed course of medical treatment for gender dysphoria, a recognized medical condition.

2. Plaintiff brings this claim pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, to remedy sex stereotyping and gender discrimination in employment. Defendant has also violated Plaintiff's right to due process of law and, in the alternative to her Title VII sex discrimination claim, her right to equal protection of the law, both of which are guaranteed by the Fifth Amendment to the United States Constitution. Finally, Defendant's actions in this case contravene the Library of Congress Act, 2 U.S.C. § 140.

## **JURISDICTION AND VENUE**

3. This case arises under the Constitution and laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution, 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. §§ 2000e-5(f) and 2000e-16.

4. Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the inherent equitable powers of this Court.

5. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) & (e) and 42 U.S.C. § 2000e-5(f) because (1) the Library of Congress is within this judicial district, (2) the events or omissions giving rise to Plaintiff's claim for relief occurred in this judicial district, (3) the unlawful acts are alleged to have been committed in this judicial district, (4) the records relevant to such acts are maintained and administered in this judicial district, and (5) Plaintiff would have worked in this judicial district but for Defendant's alleged unlawful acts.

6. Plaintiff has fulfilled all conditions precedent under Title VII prior to instituting this lawsuit, as necessary, and has otherwise exhausted her administrative remedies.

## **PARTIES**

7. Plaintiff Diane J. Schroer is a twenty-five year veteran of the U.S. Armed Services. She currently lives in Northern Virginia.

8. Defendant James H. Billington is the Librarian of Congress and as such heads the Library of Congress, a department within the Legislative Branch of the Government of the United States. As the Librarian of Congress, Mr. Billington is responsible for the personnel actions, omissions and practices there. He is sued in his official capacity. The Congressional

Research Service is the public policy research arm of the United States Congress and is an agency within the Library of Congress.

## FACTUAL ALLEGATIONS

Plaintiff's Professional Experience and Qualifications

    9.    In 1976, while in college, Plaintiff enlisted with the United States Army through the Reserve Officers Training Corps. Over the course of twenty-five years of military service, Plaintiff served in a variety of critical command and staff positions such as duty in Armored Cavalry, Airborne, Special Forces and Special Operations Units and including combat operations in Panama in 1989 ("Operation Just Cause") and Haiti in 1994 ("Operation Uphold Democracy"). From September 1994 until July 1996, Plaintiff was the Commander of the 3rd Battalion of the 3rd Special Forces Group (Airborne), stationed in Fort Bragg, North Carolina, where her duties involved combat operations in the Haitian Intervention and Rwanda.

    10.    Promoted to Colonel in May 1999, Plaintiff's many awards and decorations include the Defense Superior Service Medal, Meritorious Service Medal (3 Oak Leaf Clusters), Army Commendation Medal (with Oak Leaf Cluster), Army and Air Force Achievement Medals, Armed Forces Expeditionary Medal (with Oak Leaf Cluster), Joint Meritorious Unit Award (2nd Oak Leaf Cluster) and the National Defense Service Medal (with Oak Leaf Cluster). Her many qualifications include Master Parachutist Wings, the Ranger and Special Forces Tabs, Air Assault Wings, Jungle Expert Badge, Jumpmaster and Joint Staff Officer. She is a Distinguished Graduate of both the National War College and Army Command and General Staff College. She holds Masters Degrees in History and International Relations.

    11.    From June 1997 until her retirement from the military on January 1, 2004, Plaintiff was stationed with the United States Special Operations Command (USSOCOM), which

"plans, directs, and executes special operations in the conduct of the War on Terrorism in order to disrupt, defeat and destroy terrorist networks that threaten the United States, its citizens and interests worldwide."[1] After the terrorist attacks of September 11, 2001, Plaintiff served as the Director of a 120-person classified organization with significant, global responsibilities for the War on Terrorism, including the tracking and targeting of several high threat international terrorist organizations. In performing these duties, Plaintiff analyzed highly sensitive intelligence reports, planned for the full range of classified and conventional operations, and presented this information to high-ranking officials of the United States government, including the Vice President, the Secretary of Defense and the Chairman of the Joint Chiefs of Staff for the U.S. Armed Forces.

12. In October 2003, Plaintiff took a civilian position with a Washington, D.C. firm that provides consulting services to agencies of the federal government, including the Department of Defense. As a Senior Analyst and Program Manager, Plaintiff worked with the National Guard Bureau to assess the vulnerability of the nation's critical infrastructure, including major power production, bridges, tunnels, ports and public safety networks, to terrorist attack.

Plaintiff's Course of Medical Treatment for Gender Dysphoria

13. At the time of her birth, Plaintiff's sex was classified as male. Accordingly, Plaintiff's parents gave her the traditionally male name "David John," and, from a young age, Plaintiff was socialized to wear traditionally masculine attire.

14. Over time, however, Plaintiff and the medical professionals working with her determined that the gender designation assigned to her at birth does not conform with her gender identity.

---

[1] *See* <http://www.socom.mil/Docs/command_mission.pdf>.

15. Gender identity, which is an aspect of a person's sex, is a person's internal psychological identification as a man or a woman. "Gender dysphoria," also known as "gender identity disorder," is a medical condition in which a person's gender identity does not match his or her anatomical sex at birth.

16. Medical specialists in gender identity agree that gender dysphoria establishes itself very early, before a child is capable of making any conscious choice about his or her gender identity. For people with gender dysphoria, the conflict between their gender identity and their anatomy causes psychological distress and intense feelings of discomfort.

17. A person's gender identity cannot be changed. In the past, some therapists tried to "cure" people with gender dysphoria through aversion therapies, electro-shock treatments, medication and other therapeutic techniques. These efforts were not successful and often caused severe psychological damage. Based on contemporary medical knowledge and practice, attempts to change a person's core gender identity are considered to be futile and unethical.

18. The Harry Benjamin International Gender Dysphoria Association (HBIGDA) is the leading professional association for surgeons, doctors, medical researchers and others who specialize in the medical treatment of people with gender dysphoria. Based on decades of clinical experience, HBIGDA has promulgated medical standards of care for administering sex reassignment to patients with gender dysphoria.

19. The HBIGDA standards recognize that some measure of sex reassignment is medically indicated for people with gender dysphoria.

20. Sex reassignment often consists of three components: hormone therapy, living full-time presenting in the gender corresponding with the person's gender identity, and sex reassignment surgery.

21. According to the HBIGDA standards, to begin hormone therapy, a patient must either have lived full-time presenting as the gender that matches his or her gender identity for a minimum of three months or have had a therapeutic relationship with a mental health specialist for a minimum of three months. The hormones are prescribed by a physician, and the mental health provider must write a letter recommending the hormone therapy to the physician.

22. Before being eligible for any form of sex reassignment surgery, a person with gender dysphoria must live full-time for one year as the gender that matches his or her gender identity in every aspect of his or her life.

23. Plaintiff has a clinical diagnosis of gender identity disorder, and is under the care of medical and mental health professionals consistent with the HBIGDA Standards of Care.

24. Gender dysphoria is a treatable medical condition, and does not have any negative impact on a person's ability to be a productive member of society. Specifically, it does not have any negative impact on Plaintiff's fitness for the duties of Terrorism Research Analyst.

Plaintiff's Application for Position with Congressional Research Service

25. In August 2004, Plaintiff saw a posting for a position with the Congressional Research Service of the Library of Congress on the USA Jobs website, <www.usajobs.com>. Specifically, the position was CRS Vacancy 040196 – Specialist in Terrorism and International Crime, GS-0101-15 (hereinafter "Terrorism Research Analyst").

26. Using the form on the USA Jobs website, Plaintiff applied for this position, among others. She was most interested, however, in the Terrorism Research Analyst position.

27. In mid-October 2004, Plaintiff was called by a secretary at the Congressional Research Service to ask if she was still interested in the position. Plaintiff confirmed that she was and scheduled an interview date.

28. On October 27, 2004, Plaintiff was interviewed by three members of the Congressional Research Service whose names, upon information and belief, were Charlotte Preece, Steve Bowman and Francis Miko.

29. Upon information and belief, the members of the interview committee believed that Plaintiff was a man because, *inter alia*, the name on her application was "David J. Schroer" and because she was dressed in traditionally masculine attire during her interview.

30. In early December 2004, Preece contacted Plaintiff to ask for three writing samples, which Plaintiff promptly sent.

31. A few days later, Preece contacted Plaintiff to ask for an updated list of references with current contact information. Plaintiff had previously informed Preece that many of her references were moving back and forth between the United States and Iraq. Plaintiff sent this information to Preece, and contacted her references to let them know that someone from the Library of Congress might be contacting them about her application.

32. Upon information and belief, Preece, Bowman and Miko each spoke to at least one of Plaintiff's references.

33. On December 15, 2004, Preece called Plaintiff to inform her that she had been selected for the position. Before submitting the administrative paperwork, however, Preece asked Plaintiff whether she would accept the position.

34. Plaintiff told Preece that she was very interested in the position, and that her only question concerned the position's salary. Noting that she would prefer not to take a significant pay cut, Plaintiff informed Preece about the salary that she was earning at her consulting firm. Preece informed Plaintiff that there was a process by which the government step and grade classification for the position could be adjusted to ensure that she would not have to take a significant pay cut, and told Plaintiff that she would inquire into the matter.

35. Preece called Plaintiff the next day. Preece stated that she had spoken with the Human Resources Department and explained that, as long as Plaintiff could provide a written statement confirming her current salary, the Library of Congress would be able to pay her a comparable amount.

36. With that issue resolved, Plaintiff accepted the position. Preece informed Plaintiff that she would begin processing the paperwork.

37. Plaintiff proposed that they meet for coffee or lunch early the following week. Preece agreed, and noted that they could discuss Plaintiff's start date and other details about the position at that time.

38. On December 20, 2004, Plaintiff met Preece at her office in the Library of Congress. While they were in Preece's office, Preece mentioned to Plaintiff that she had nearly completed the paperwork associated with the hiring process, and motioned to some papers on her desk.

39. As Plaintiff and Preece were leaving for lunch, Preece pointed out other members of the Congressional Research Service with whom Plaintiff would be working, and introduced her to people whom Preece described as Plaintiff's future colleagues.

40. Over lunch, Preece explained to Plaintiff more about the job and why the selection committee believed that Plaintiff's skills and experience made her application superior to those of the other candidates. Preece asked Plaintiff about her availability, and Plaintiff noted that she could start within two weeks of receiving the appropriate paperwork from Human Resources. Preece noted that this timing would work well, as the new budget cycle was about to begin. Over lunch, they discussed various aspects of the position and the diverse group of people with whom Plaintiff would be working.

41. Plaintiff recognized that, until this point, Preece had been interacting with someone who neither had a traditionally feminine name (David) nor dressed in traditionally feminine clothing. As part of her medical treatment, discussed above, Plaintiff was about to change her name, begin dressing in traditionally feminine attire, and otherwise begin presenting full time as a woman. Therefore, Plaintiff explained to Preece that she was under a doctor's care for gender dysphoria and that, consistent with her doctor's instructions, she would be using a traditionally feminine name (Diane), presenting a traditionally feminine appearance and otherwise presenting as a woman when she started work as the Terrorism Research Analyst.

42. Preece responded by asking Plaintiff whether there was a need to change the name on the documents that Preece would be submitting to the Human Resources Department. Plaintiff stated that there was no need to change the name on the forms, as she had not yet changed her legal name. But Plaintiff indicated that she would go by the traditionally feminine name of Diane when she started with the Congressional Research Service.

43. Plaintiff has since changed her legal name to Diane.

44. In part to allay any concerns about whether Plaintiff would dress in a workplace-appropriate manner, Plaintiff showed Preece photographs in which Plaintiff was dressed in traditionally feminine attire. Preece did not say anything to indicate that what Plaintiff had told or shown her would be relevant to the hiring decision.

45. As they were preparing to leave the restaurant, Preece told Plaintiff that "[she had] really given [her] something to think about," or words to that effect. Preece indicated that she would need to think about the information that Plaintiff had shared and would get back to her.

46. Upon information and belief, Preece conferred with colleagues at the Library of Congress about Plaintiff's application and ultimately decided that she would not recommend Plaintiff for the position because, for among other reasons, when Preece saw the photographs of Plaintiff in female attire, she believed that Plaintiff looked like a man in women's clothing rather than what she believed a woman should look like, and because she believed that others would share her view.

47. Upon information and belief, Preece's decision was also based at least in part on her belief that Plaintiff would not be viewed as a credible authority on terrorism by members of Congress because, in Preece's view, (a) Plaintiff's appearance when presenting as a female would not conform to their social stereotypes regarding how women should look, and (b) members of Congress would not believe that a woman could, in fact, have the kind of life experiences that were part of Plaintiff's background.

48. The following day, Preece called Plaintiff and explained that, after a "long, restless night," she had decided that, "for the good of the service," and "given [Plaintiff's]

circumstances that [they] spoke of yesterday," Plaintiff would not be a "good fit" at the Library of Congress, or words to that effect.

49. Plaintiff told Preece that she was terribly disappointed to hear that Preece had made this decision.

50. Preece thanked Plaintiff for being "honest with [her]" and "telling [her]" about the "situation," or words to that effect.

51. On February 7, 2005, Plaintiff received what appeared to be a generic e-mail from the Library of Congress stating that the Terrorism Research Analyst position had been filled.

## COUNT I
### (Title VII – Sex Discrimination)

52. Plaintiff is a female, although Defendant perceived Plaintiff to be a male at the time she applied for the position of Terrorism Research Analyst.

53. Plaintiff was highly qualified for the position of Terrorism Research Analyst with the Congressional Research Service, as reflected in part by the fact that she was offered the position on December 15, 2004.

54. When Plaintiff told Defendant that, consistent with medical treatment for gender dysphoria, she would be dressing in traditionally feminine attire and otherwise presenting as a female, Defendant rescinded the offer of employment and otherwise refused to employ her.

55. By rescinding its offer of employment to Plaintiff and/or otherwise refusing to employ Plaintiff because of her gender identity, Defendant discriminated against Plaintiff because of sex.

56. Defendant took these actions because it believed that Plaintiff did not conform to the gender stereotypes associated with males in our society, including but not limited

to the kinds of gender presentation that would be appropriate for males, including males who once held traditionally masculine jobs (e.g., military service).

57.   Defendant took these actions because it believed that Plaintiff did not conform to the gender stereotypes associated with females in our society, including but not limited to stereotypes about how females look and the kinds of professional experiences that females have.

58.   By offering Plaintiff the position of Terrorism Research Analyst when it believed that Plaintiff was male, but rescinding the offer when it learned that Plaintiff is female, Defendant discriminated against Plaintiff because of sex.

59.   Sex is not a bona fide occupational qualification for the position of Terrorism Research Analyst.

60.   For all of the reasons described in this Complaint, Defendant's actions violated Title VII of the Civil Rights Act of 1964.

61.   Defendant's actions were done with either malice or with reckless indifference to Plaintiff's rights under law.

62.   As a result of Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

### COUNT II
### (Fifth Amendment – Due Process)

63.   The Due Process Clause protects, among other things, an individual's right to make certain private decisions without government penalty.

64.   Among the private decisions protected by the Due Process Clause are decisions related to medical treatment and the determination of one's gender identity.

65. With the assistance of medical professionals, Plaintiff is currently undertaking a course of medical treatment to address her gender dysphoria and to take the medically appropriate steps to bring her body into conformity with her gender identity.

66. Plaintiff's decision about how to direct her medical care is unrelated to her ability to perform the duties of the Terrorism Research Analyst position.

67. By rescinding the offer of employment with the Congressional Research Service and otherwise refusing to hire Plaintiff because of her decisions regarding her course of medical treatment for her gender dysphoria without constitutionally sufficient justification, and as otherwise described in this Complaint, Defendant violated rights guaranteed to the Plaintiff by the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

68. By purposefully and intentionally discriminating against Plaintiff because of her private decision to address her gender dysphoria by undergoing a course of medical treatment without constitutionally sufficient justification, Defendant violated clearly established constitutional rights of due process of which a reasonable person would have known.

69. As a result of Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT III
### (Fifth Amendment – Equal Protection)
### (Pled as an Alternative to Count I)

70. By discriminating against Plaintiff because she departs from sex stereotypes and otherwise because of her gender, Defendant has also engaged in impermissible sex discrimination in violation of the equal protection component of the Fifth Amendment's Due Process Clause. Under <u>Brown v. General Services Administration</u>, 425 U.S. 820 (1975),

however, Plaintiff is precluded from bringing a sex discrimination claim under the Constitution because Title VII is the exclusive remedy for that claim.

71.     Only in the event that this Court rules that Plaintiff cannot state a claim for sex discrimination under Title VII, Plaintiff alleges that, for all of the reasons described in this Complaint, Defendant's actions violate the equal protection guarantee of the Fifth Amendment's Due Process Clause.

72.     Defendant purposefully and intentionally discriminated against Plaintiff because she is transgender, and in doing so acted arbitrarily, irrationally and without constitutionally sufficient justification.

73.     By engaging in arbitrary and irrational discrimination, Defendant violated clearly established constitutional rights of equal protection of which a reasonable person would have known.

74.     As a result of Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT IV
### (Library of Congress Act)

75.     Under the Library of Congress Act, Plaintiff was entitled to have her application considered "solely with reference to [her] fitness for [the] particular duties" of the Terrorism Research Analyst position. 2 U.S.C. § 140.

76.     In offering her the position, Defendant demonstrated that Plaintiff was not only fit for the duties of Terrorism Research Analyst but also the most qualified for the position.

77. Defendant rescinded its offer of employment to Plaintiff and otherwise refused to hire her for reasons wholly unrelated to her fitness for the particular duties of Terrorism Research Analyst.

78. For all of the reasons described in this Complaint, Defendant's actions violated the Library of Congress Act, 2 U.S.C. § 140.

79. As a result of Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant, and award the following relief:

a. Declaratory relief, including but not limited to a declaration that Defendant's actions violate Title VII, the Fifth Amendment of the United States Constitution and the Library of Congress Act;

b. Appropriate injunctive relief, including but not limited to reinstatement, and an order restraining Defendant from engaging in further discriminatory conduct of the types of which Plaintiff complains herein;

c. Back pay, in amounts to be determined at trial, along with credit for job seniority since December 2004;

d. In the event reinstatement is not granted, front pay;

e. Compensatory and consequential damages, including for emotional distress;

f. Punitive damages;

g. Pre-judgment and post-judgment interest at the highest lawful rate;

h. Attorneys' fees and costs of this action; and

i. Any such further relief as justice allows.

Respectfully submitted,

/s/ Sharon M. McGowan
Sharon M. McGowan  (D.C. Bar No. 476417)
Kenneth Y. Choe
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
(212) 549-2627

Arthur B. Spitzer  (D.C. Bar No. 235960)
American Civil Liberties Union
   of the National Capital Area
1400 20th Street, N.W., #119
Washington, D.C. 20036
(202) 457-0800

*Counsel for Plaintiff*