IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

DIANE J. SCHROER,                            )
                                             )
                    Plaintiff,               )
                                             )        No. 05-cv-1090 (JR)
            v.                               )
                                             )
JAMES H. BILLINGTON,                         )
    Librarian of Congress,                   )
                                             )
                    Defendant.               )
_____)


## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND IN THE ALTERNATIVE FOR JUDGMENT ON THE PLEADINGS

Sharon M. McGowan  (D.C. Bar No. 476417)
Kenneth Y. Choe
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
(212) 549-2627

Arthur B. Spitzer  (D.C. Bar No. 235960)
American Civil Liberties Union
  of the National Capital Area
1400 20th Street, N.W., #119
Washington, D.C. 20036
(202) 457-0800

*Counsel for Plaintiff*

Date:  June 11, 2007                    ORAL HEARING REQUESTED

## **INTRODUCTION**

After twenty-five years of military service defending our nation against threats of terrorism, Plaintiff Diane Schroer applied for a civilian position as a Terrorism and International Crime Research Analyst ("Terrorism Research Analyst") with the Congressional Research Service ("CRS") of the Library of Congress ("Library"). After initially offering the position to Plaintiff, whom the Library believed to be male, the Library rescinded the offer when it learned that Plaintiff intended to start in the position as a female, consistent with her female gender identity.[1]

Pending before the Court is Defendant's second motion to dismiss Plaintiff's Complaint. (Rec. Doc. 30). In its decision adjudicating Defendant's previous motion to dismiss, the Court indicated that discrimination against Plaintiff due to the fact that she is transgender might well be considered discrimination "literally . . . because of . . . sex." Mem. & Order ("Mem. Op.") (Rec. Doc. 13) at 20. Rather than answering the question based solely on the facts alleged in Plaintiff's Complaint, however, the Court asked the parties to provide a factual record regarding "the factual complexities" that make up a person's sex – complexities that, the Court noted, "stem from real variations in how the different components of biological sexuality –

---

[1]     For purposes of clarity, Plaintiff sets out the following terms and corresponding definitions, which will be used throughout the brief:

- Plaintiff uses the terms "sex," "sexual identity," and "gender" interchangeably, and uses those terms to encompass the factors that reveal whether an individual is male or female.

- Plaintiff uses the term "gender identity" to refer to one component of an individual's sex – his or her internal sense of being either male or female.

- Plaintiff uses the terms "transsexual" and "transgender" interchangeably to refer to an individual whose gender identity is inconsistent with his or her sex assigned at birth.

- Plaintiff uses the terms "Gender Identity Disorder" and "gender dysphoria" interchangeably to refer to the medical diagnosis assigned to an individual who is transgender for which the course of treatment is gender transition from one gender to another.

- Plaintiff uses the terms "gender identity discrimination" and "discrimination on the basis of gender identity" to include discrimination based on the fact that an individual is transgender.

See also discussion infra Section I.A.

chromosomal, gonadal, hormonal, and neurological – interact with each other, and in turn, with social, psychological, and legal conceptions of gender." Id. at 20-21.

In response to the Court's request, the parties' experts have prepared reports regarding the scientific understanding of what constitutes an individual's sex and have been deposed regarding their respective opinions. The parties are now poised to present this evidence to the Court so that it may ground its determination of the meaning of the term "sex" in scientific fact.

Plaintiff offers the testimony of Dr. Walter Bockting, a renowned researcher and clinical practitioner in the fields of sexology, gender identity and gender identity disorders. As explained in his reports and his testimony, Dr. Bockting's opinion is that scientific observation and study have revealed that a person's sex is determined by more than just his or her chromosomal configuration, and in fact includes, among other things, a person's internally held sense of being male or female, i.e., his or her gender identity.

Defendant, on the other hand, has retained Dr. Chester Schmidt, a psychiatrist who has not been involved in the care and management of patients with gender identity disorders for over twenty years. Dr. Schmidt's view is that, because a person's gender identity is a social construct, not a biologic construct, it is not a part of his or her sex, and that a person's sex is defined simply by his or her chromosomal configuration.

In light of the dispute of fact between the parties' experts, which is explained in greater detail below, Defendant's motion to dismiss Plaintiff's Title VII claim may not be resolved on the papers. The parties should be given the opportunity to present the testimony of their experts to the Court at a hearing, so that the Court can probe their testimony to its own satisfaction before ruling on Defendant's motion.

Defendant asks this Court to dismiss not only Plaintiff's Title VII but also her other statutory and constitutional claims as well. As set forth in this opposition as well as in Plaintiff's opposition to Defendant's prior motion to dismiss, Defendant's argument are without merit. First, Plaintiff is entitled to bring an alternative claim pursuant to the Equal Protection Clause of the Fifth Amendment in the event that the Court disallows her Title VII claim. Second, Plaintiff states a claim pursuant to the Due Process Clause of the Fifth Amendment by alleging that, in denying her the position, the Library impermissibly penalized her exercise of her constitutionally protected liberty interest in the medical decision-making associated with her course of treatment for her gender dysphoria. Finally, Plaintiff states a claim for equitable relief pursuant to the Library of Congress Act by alleging that there was no merit-based reason for the Library's sudden reversal of its view of Plaintiff as its top candidate for the position.

## STATEMENT OF FACTS[2]

In August 2004, Plaintiff, a twenty-five year veteran of the U.S. Armed Services, applied for a position as a Terrorism Research Analyst with the Congressional Research Service of the Library of Congress. Complaint ("Compl.") at ¶¶ 1, 25. Plaintiff was exceptionally well-qualified for this position. Id. at ¶¶ 9-12. In addition to the numerous awards that she received and qualifications that she earned during her service in the U.S. Army,[3] Plaintiff was stationed

---

[2]    See also Mem. Op. at 1-6. Plaintiff notes that her motion to amend her complaint is pending before the Court. (Rec. Doc. 33). Because the only substantive amendment to Plaintiff's proposed Amended Complaint concerns her allegation of sex stereotyping, see discussion Section I.D infra, the statement of facts and the argument that follows would not materially change if the Court were to grant the motion.

[3]    Over the course of her military career, Plaintiff served in a variety of critical command and staff positions, including those in Armored Cavalry, Airborne, Special Forces and Special Operations units, and in combat operations such as those in Panama ("Operation Just Cause"), Haiti ("Operation Uphold Democracy"), and Rwanda. Compl. at ¶ 9. Promoted to Colonel in May 1999, Plaintiff distinguished herself with numerous awards, decorations and qualifications over the course of her career. Id. at ¶ 10 (listing Plaintiff's numerous medals, commendations and awards). Her many qualifications include Master Parachutist Wings, the Ranger and Special Forces Tabs, Air Assault Wings, Jungle Expert Badge, Jumpmaster and Joint Staff Officer. Id. She is also a distinguished graduate of both the National War College and Army Command and General Staff College, and holds masters degrees in history and international relations. Id.

from June 1997 until her retirement from the military on January 1, 2004, with the United States

Special Operations Command ("USSOCOM"), which plans, directs and executes special

operations in the conduct of the War on Terrorism in order to disrupt, defeat and destroy terrorist

networks that threaten the United States and its citizens and interests worldwide.  Id. at ¶ 11.

After the terrorist attacks of September 11, 2001, Plaintiff served as the Director of a 120-person

classified organization with significant global responsibilities for the War on Terrorism,

including the tracking and targeting of several high-threat international terrorist organizations.

Id.  In performing these duties, Plaintiff analyzed highly sensitive intelligence reports, planned

for the full range of classified and conventional operations, and presented this information to

high-ranking officials of the United States government, including the Vice President, the

Secretary of Defense and the Chairman of the Joint Chiefs of Staff for the U.S. Armed Forces.

Id.  After retiring from active duty, Plaintiff joined a private sector consulting firm that provided

strategic analysis to various federal agencies, including the Department of Defense.[4]

    In October 2004, approximately two months after submitting her application for the

Terrorism Research Analyst position, Plaintiff accepted an invitation to interview with three

representatives of the Congressional Research Service – Charlotte Preece, Steve Bowman and

Francis Miko.  Id. at ¶ 28.  Plaintiff, who is transgender, has a female gender identity, and has a

medical diagnosis of Gender Identity Disorder, was, at that time, in the early stages of her gender

transition from male to female.  Id. at ¶¶ 13-24.  Accordingly, she had not yet changed her legal

name to a traditionally feminine name or begun presenting as a female in workplace settings.  Id.

---

[4]     Shortly before her retirement, Plaintiff took a civilian position with a Washington, D.C., firm that provides consulting services to agencies of the federal government, including the Department of Defense.  Compl. at ¶ 12. As a Senior Analyst and Program Manager, Plaintiff worked with the National Guard Bureau to assess the vulnerability of the nation's critical infrastructure, including major power production facilities, bridges, tunnels, ports and public safety networks, to terrorist attack.  Id.

at ¶¶ 29, 41.  She therefore submitted her application under her then legal name, David Schroer, and went to the interview dressed in traditionally masculine attire.  Id. at ¶ 29.

Shortly thereafter, Preece called Plaintiff to offer her the position.  Id. at ¶ 33.  Before processing the administrative paperwork, Preece asked Plaintiff whether she would accept.  Id. Plaintiff told Preece that she was very interested in the position, and that her only question concerned the position's salary.  Id. at ¶ 34.  After receiving confirmation from Preece that the Library would be able to offer her a salary comparable to the one she was earning as a private consultant, Plaintiff accepted the position.  Id. at ¶¶ 35-36.

On December 20, 2004, Plaintiff met Preece at Preece's office at the Library to discuss Plaintiff's start date and other details about the position.  Id. at ¶¶ 37-38.  Over lunch that afternoon, in addition to offering additional details about the position, Preece explained to Plaintiff why the selection committee believed that Plaintiff's skills and experience made her application superior to those of the other candidates.  Id. at ¶ 40.  Plaintiff recognized that, until this point, Preece had been interacting with someone who neither had a traditionally feminine name nor dressed in traditionally feminine attire.  Id. at ¶ 41.  As an integral part of her medical treatment, Plaintiff was about to change her legal name to a traditionally feminine name, begin dressing full-time in traditionally feminine attire, and otherwise begin living and presenting herself as a female full-time, including in workplace settings.  Id. at ¶¶ 21, 41.  Plaintiff explained to Preece that she was under a doctor's care for gender dysphoria and that, consistent with her doctor's instructions, she would be using a traditionally feminine name, dressing in traditionally feminine attire, and otherwise living and presenting herself as a female when she started work as the Terrorism Research Analyst.  Id. at ¶ 41.  To allay any concern about whether

Plaintiff would dress in a workplace-appropriate manner, Plaintiff showed Preece photographs in which Plaintiff was dressed in traditionally feminine workplace-appropriate attire. Id. at ¶ 44.

Preece called Plaintiff the following day and explained that, after a "long, restless night," she had decided that, "for the good of the service," and "given [Plaintiff's] circumstances," Plaintiff would not be a "good fit" at the Library, or words to that effect. Id. at ¶ 46. On February 7, 2005, Plaintiff received what appeared to be a generic e-mail from the Library stating that the Terrorism Research Analyst position had been filled. Id. at ¶ 49. Plaintiff timely filed an administrative complaint with the Equal Employment Opportunity Office of the Library in which she alleged that the Library's decision to rescind its job offer because she is transgender constituted impermissible sex discrimination in violation of Title VII. Id. at ¶ 6. On June 2, 2005, after exhausting her administrative remedies, Plaintiff timely filed this lawsuit.

Defendant's previous motion to dismiss was filed on August 1, 2005. It was denied on March 31, 2006.

## APPLICABLE LEGAL STANDARDS

Defendant seeks to dismiss Plaintiff's Complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure[5] and, in the alternative, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. As Defendant acknowledges, on a Rule 12(b)(1) motion, the Court must accept as true all material factual allegations in Plaintiff's Complaint. Hohri v. United States, 782 F.2d 227, 241 (D.C. Cir. 1986), vacated on other grounds, 482 U.S. 64 (1987). The Court may also look to materials outside of the pleadings to satisfy itself that it has subject matter jurisdiction

---

[5] Although Defendant's motion indicates that the motion is made pursuant to Rule 12(b)(2), which deals with issues of personal jurisdiction, Defendant's memorandum in support of his motion clarifies that Defendant's motion is made pursuant to Rule 12(b)(1), which deals with issues of subject matter jurisdiction. See Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss and in the Alternative for Judgment on the Pleadings ("Def. Br.") at 2.

without converting the motion into a motion for summary judgment. See Flynn v. Ohio Bldg. Restoration, Inc., 260 F. Supp. 156, 161 (D.D.C. 2003).

On a Rule 12(c) motion for judgment on the pleadings, the Court similarly must accept as true all material factual allegations in Plaintiff's Complaint. See Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006). Although the Court is precluded from looking to extraneous material in adjudicating the motion, it may, with adequate notice, convert a Rule 12(c) motion into a motion for summary judgment. Fed. R. Civ. P. 12(c) ("If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.").[6]

In its prior ruling, the Court asked the parties to develop a factual record beyond the allegations of Plaintiff's Complaint regarding the complexities of human sexuality to enable the Court to determine whether Plaintiff's allegations of discrimination based on gender identity state a claim for discrimination "because of sex" under Title VII. Mem. Op. at 21-22. As this opposition makes clear, there is a colorable dispute of fact between the parties' experts regarding whether gender identity is a part of a person's sex. Thus, Defendant's motion to dismiss Plaintiff's Title VII claim may not be resolved on the papers pursuant to either Rule 12 or Rule 56.[7] An evidentiary hearing should be conducted to resolve the dispute between the parties

---

[6]    Even if this motion were converted into a motion for summary judgment, "all reasonable inferences must be drawn and all factual disputes resolved in favor of the non-movant [i.e., Plaintiff]." Glaxo Group Ltd. v. TorPharm, Inc., 153 F.3d 1366, 1370 (Fed. Cir. 1998).

[7]    For purposes of this motion, Plaintiff's allegation that the Library withdrew Plaintiff from consideration for the position of Terrorism Research Analyst because of Plaintiff's gender identity must be accepted as true. Plaintiff notes, however, that in Defendant's Answer and responses to Plaintiff's discovery requests, Defendant has asserted that the Library withdrew Plaintiff from consideration for the position for reasons that Defendant characterizes as unrelated to Plaintiff's gender identity. During a telephonic conference on March 27, 2007, the Court sustained

regarding what constitutes sex for purposes of Title VII.  See generally Jenkins v. Educ. Credit

Mgmt Corp., 212 Fed. Appx. 729, 733 (10th Cir. 2007) ("When a party challenges the

allegations supporting subject-matter jurisdiction, the court has wide discretion to allow

affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional

facts."); Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir. 1981) ("The unique power of district

courts to make factual findings which are decisive of jurisdiction is, therefore, not disputed. . . .

This means that the district court is not limited to an inquiry into undisputed facts. It may hear

conflicting written and oral evidence and decide for itself the factual issues which determine

jurisdiction.") (internal citations and quotations omitted).[8]

## ARGUMENT

**I.      Plaintiff's Complaint States a Claim for Relief Under Title VII.**

Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "[a]ll personnel

actions affecting employees or applicants for employment . . . [with] the Library of Congress

shall be made free from any discrimination based on . . . sex."  42 U.S.C. § 2000e-16(a).

Accordingly, the primary legal question presented by this case with respect to Plaintiff's Title

VII claim is whether discrimination against individuals because they are transsexual constitutes

discrimination "because of sex."[9]

---

Defendant's objections to Plaintiff's discovery requests aimed at demonstrating that these reasons are pretextual pending the resolution of this motion.

[8]      Plaintiff notes that it might serve the interests of judicial economy to conduct such a hearing in the context of a trial on the merits, as much of the testimony that Dr. Bockting would offer would also be relevant to Plaintiff's non-Title VII claims, which also should not be dismissed for the reasons set forth below.  In particular, Dr. Bockting's testimony would be relevant to Plaintiff's substantive due process claim as he is an expert regarding the medical decisions that one makes as part of a gender transition.  See infra Section III.  Dr. Bockting's testimony would also be relevant to the extent that Defendant attempts to suggest that Plaintiff's transsexuality was related to her merit for the position, thus making Dr. Bockting's expertise relevant with respect to Plaintiff's Library of Congress Act claim, see infra Section IV, and, if necessary, her alternative claim brought pursuant to the Equal Protection Clause, see infra Section II.

[9]      Section 2000e-16 of Title VII, the provision covering federal employees, is coextensive with the provision of Title VII covering non-federal employees.  See 42 U.S.C. § 2000e-2(a) ("It shall be an unlawful employment

In his first motion to dismiss, relying primarily on Ulane v. Eastern Airlines, Inc., 742 F.2d 1081 (7th Cir. 1984), and its progeny, Defendant argued that Title VII's proscription on sex discrimination does not include discrimination based on the fact that an individual's gender identity is incongruent with his or her sex assigned at birth.  The Court, however, rejected the notion that Ulane is dispositive on the issue of Title VII's scope of coverage, stating that "it may be time to revisit Judge Grady's conclusion in Ulane [v . Eastern Airlines, Inc., 581 F. Supp. 821 (N.D. Ill. 1983) ("Ulane I"), rev'd, 742 F.2d 1081 (7th Cir. 1984),] that discrimination against transsexuals *because they are transsexuals* is 'literally' discrimination 'because of sex.'"  Mem. Op. at 20 (quoting Ulane I, 581 F. Supp. at 825) (emphasis in original).  The Court noted that, "[t]wenty-plus years after Ulane I, scientific observation may well confirm Judge Grady's conclusion that 'sex is not a cut-and-dried matter of chromosomes.'"  Id. at 21 (quoting Ulane I).

In order to answer this question, the Court recognized that it needed a full factual record regarding "the factual complexities that underlie human sexual identity," complexities that "stem from real variations in how the different components of biological sexuality – chromosomal, gonadal, hormonal, and neurological – interact with each other, and in turn, with social, psychological, and legal conceptions of gender."  Id. at 20-21.  Accordingly, rather than relying solely on the pleadings, the Court directed the parties to develop an appropriate factual record, "one that reflects the scientific basis of sexual identity in general, and gender dysphoria in particular," id. at 21-22, to which the Court could look when making its legal determination as to whether Plaintiff states a claim for discrimination "because of sex."

Pursuant to the Court's request, the parties adduced testimony from experts, each of whom holds a different view about whether, as a scientific matter, a person's sex is a "cut-and-

---

practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex.").

dried matter of chromosomes." As explained below, Plaintiff's expert contends that scientists have concluded that sex is a multifaceted concept that includes not only chromosomal sex, but also gonadal sex, fetal hormonal sex, internal morphologic sex (i.e., internal genitals), external morphologic sex (i.e., external genitals), hypothalamic sex (i.e., the sex of the brain), gender identity and role, and sex of assignment and rearing. In contrast, Defendant's expert holds the view that only a person's chromosomal configuration determines his or her sex.

In light of the conflicting views of these experts, Defendant's motion to dismiss Plaintiff's Title VII claim may not be resolved in the absence of a hearing that enables the Court to probe and evaluate the experts' opinions. Plaintiff respectfully submits the argument that follows to provide the Court with a preview of what a hearing would reveal regarding the view of each expert and the degree of scientific support for each expert's opinion.

A.    **The Testimony at a Hearing Would Show That Experts Have Concluded That "Sex" Is More Than Just a Person's Chromosomal Configuration as a Matter of Scientific Fact.**

In denying Defendant's first motion to dismiss, the Court noted that, "[t]wenty-plus years after Ulane I, scientific observation may well confirm Judge Grady's conclusion that 'sex is not a cut-and-dried matter of chromosomes.'" Mem. Op. at 21. In response to the Court's request that the parties develop a factual record that reflects the scientific evidence informing the answer to the question of what constitutes a person's sex, id. at 22, Plaintiff offers the testimony Dr. Walter Bockting, a gender and gender identity expert from the University of Minnesota, who has conducted extensive scientific research regarding gender and gender identity issues and who has treated hundreds of patients with Gender Identity Disorder over the course of the last twenty years. Expert Report of Walter O. Bockting ("Bockting Report") at ¶¶ 1, 4-6 (attached as Attachment A to Declaration of Sharon M. McGowan ("McGowan Decl.")); Transcript of

Deposition of Walter Bockting ("Bockting Depo") (McGowan Decl. Attachment B) at 15; see also Bockting Report Exh. 1 (Curriculum Vitae of Walter Bockting ("Bockting CV")).  Dr. Bockting serves on the Board of Directors of the World Professional Association for Transgender Health ("WPATH") (formerly known as the Harry Benjamin International Gender Dysphoria Association) ("HBIGDA"), which is the internationally recognized interdisciplinary professional organization dedicated to the advancement of scientific knowledge, training, treatment, and advocacy in the area of gender identity disorders and transgender health. Bockting Report at ¶ 3; see also Transcript of Deposition of Chester Schmidt ("Schmidt Depo") (McGowan Decl. Attachment C) at 344-46 (acknowledging the stature of HBIGDA within the field of gender identity).[10]

     As Dr. Bockting would explain, scientific experts have long concluded that, rather than being "a cut-and-dried matter of chromosomes," a person's sex is a multifaceted concept that incorporates an amalgam of factors beyond mere chromosomal composition.  Bockting Report at ¶¶ 13, 33-36; Def. Br. Exh. 5 (Supplemental Expert Report of Walter Bockting ("Bockting Supp. Report")) at ¶¶ 2-4; Bockting Depo at 31 ("Sex is multifaceted . . . . Sex is not one thing, but has multiple components"); see also Schmidt Depo at 32, 75, 253 (admitting that most other gender and gender identity experts do not define sex merely by reference to chromosomal configuration).  As early as 1972, Dr. John Money, an international authority with respect to the study of gender identity and gender identity disorders,[11] recognized that sex was a multifaceted concept, which included not only chromosomal make-up but also gonadal sex, fetal hormonal

---

[10]     See <http://www.wpath.org> (last visited June 8, 2007).  Accordingly, any discussion of HBIGDA in Plaintiff's memorandum and supporting documents, such as deposition transcripts, should be understood as referring to the organization now known as WPATH.

[11]     See, e.g., Richards v. U.S. Tennis Ass'n, 93 Misc. 713, 720-21, 400 N.Y.S.2d 267, 271-72 (N.Y. Misc. 1977) (noting Dr. John Money's 26 years of professional experience as a psychoendocrinologist, and acknowledging him as an expert "who has written and edited extensively on the subject [of transsexuality]").

sex (prenatal hormones produced by the gonads), internal morphologic sex (internal genitalia, i.e., ovaries, uterus, testes), external morphological sex (external genitalia, i.e., penis, clitoris, vulva), hypothalamic sex (sex of the brain), sex of assignment and rearing, and pubertal hormonal sex, as well as, of particular significance to this case, gender identity and role. Bockting Supp. Report at ¶ 2 (citing Dr. Money's findings published in 1972 and republished in 1994).

Since that time, gender identity experts have conducted their scientific research by focusing on the various components that make up a person's sex. Bockting Report at ¶¶ 13, 33. One component is an individual's "natal sex," which is "typically the sex assigned at birth as male or female based on the appearance of the external genitalia." Id. at ¶ 13(a). Natal sex, or one's sex of assignment at birth, is usually made "on the basis of the appearance of the external genitalia *rather than on chromosomal configuration*." Bockting Supp. Report at ¶ 3 (emphasis in original). Only when the external genitalia appear ambiguous are other aspects of sex such as the gonads and internal reproductive structures (i.e., testes, ovaries, uterus), sex hormones and chromosomal configuration assessed, at which point a sex is assigned based on those findings. Bockting Report at ¶ 13(a). When it is still unclear what the sex of assignment at birth should be, the "most important criterion" is the "likelihood of the development of a gender identity that is congruent with the sex of assignment." Id. For this reason, the sex of assignment at birth may be provisional pending the outcome of the child's gender identity development, which cannot be determined until later. Id.

Gender identity is another component of an individual's sex upon which experts have focused their scientific research. Id. at ¶ 13(b). Gender identity, which scientific experts believe to be established early in life – usually by the age of 2-3 years – refers to a person's basic sense

of belonging to one sex or the other.  Id.  In most cases, gender identity is congruent with the sex assigned at birth; in the case of gender identity disorder, however, a child develops a gender identity that is inconsistent with the sex assigned at birth.  Id.

Yet another component of an individual's sex is social sex role, which refers to characteristics in personality, appearance, and behavior that, in a given culture or historical period, are designated as masculine or feminine, or more typical of the male or female social role.  Id. at ¶ 13(c).  Although one's social sex role may reflect one's gender identity, the two concepts are distinct.  Id.  Both men and women typically have masculine as well as feminine sex role characteristics to varying degrees.  Id.  Thus, the fact that a woman displays attributes that are not typically associated with the social sex role of females in society (e.g., aggressiveness) does not mean that the woman lacks a female gender identity (i.e., her internal sense of being female).  Id.[12]

Defendant would have the Court ignore decades of scientific research regarding the multifaceted nature of what constitutes a person's sex and adopt instead the outdated, overly simplistic, and ultimately incorrect definition of sex as merely referring to chromosomal configuration.  In an effort to bolster his argument, Defendant offers the testimony of Dr. Chester Schmidt.  Notably, however, Dr. Schmidt stopped treating or managing cases of Gender Identity Disorder in the mid-1980's, which is roughly the time that the Seventh Circuit decided Ulane.  See Def. Br. Exh. 1 (Expert Report of Chester Schmidt ("Schmidt Report")) at 2, ¶ 7; see also Def. Br. Exh. 2 (Curriculum Vitae of Chester Schmidt ("Schmidt CV")).  Moreover, as Dr.

---

[12]    Plaintiff's Complaint alleges that Plaintiff suffered discrimination based on her gender identity, which she argues is a part of her sex for purposes of her Title VII claim.  Plaintiff's Complaint does not allege that Plaintiff suffered discrimination based on her sexual orientation.  Therefore, notwithstanding the fact that some experts may take sexual orientation (i.e., an individual's attraction to people of a different sex, people of the same sex or both) into account when assessing an individual's sexual identity, Bockting Report at ¶ 36, Plaintiff does not argue that her sexual orientation is a part of her "sex" for purposes of her Title VII claim.

Schmidt has acknowledged, gender and gender identity issues are not his primary area of research[13] or clinical practice,[14] and, to the extent that they ever were, have not been so for more than two decades.[15]  Tellingly, Dr. Schmidt is not a member of the leading professional organization regarding gender identity disorders (i.e., HBIGDA).[16]

Dr. Schmidt's lack of direct involvement in the fields of gender identity and gender identity disorders since the mid-1980's manifests itself in the form of opinions that do not reflect the current state of scientific understanding of the multifaceted nature of sex.  When pressed to offer the basis for his opinion that the term "sex" refers only to chromosomal make-up, Dr. Schmidt has nothing to offer in support of his conclusion.  Specifically, Dr. Schmidt cannot point to any scientific evidence that would explain why chromosomes should be elevated above, and to the exclusion of, other aspects of sexual identity.  As set forth below, Dr. Schmidt's conclusion about the meaning of sex is based not on any research or study, but rather on Dr. Schmidt's

---

[13]    See Schmidt Report at 2 (¶ 8); Schmidt Depo at 332-39.  In fact, Dr. Schmidt has acknowledged that, prior to two years ago, only 5% of the literature that he regularly reviewed was in the area of gender identity and gender identity disorders.  Schmidt Depo at 342.  By contrast, gender identity and gender identity disorders have been Dr. Bockting's primary area of research over the last twenty years, as evidenced by the fact that Dr. Bockting has published 46 papers – 32 of which appeared in peer-reviewed journals – and four books regarding gender identity and transgender health issues.  Bockting Report at ¶ 6 and Bockting CV at 37-51.

[14]    By the mid-1980's, Dr. Schmidt explained, he no longer had the time to treat or manage individual cases of gender identity disorder due to the workload associated with his position as the Director of the Department of Psychiatry at the Johns Hopkins Bayview Medical Center, a position that did not focus on the treatment of gender identity disorders.  Schmidt Depo at 289-91.

[15]    Dr. Schmidt's current clinical practice in the realm of gender identity disorders consists solely of a Friday afternoon rotation in the Johns Hopkins Sexual Behavior Clinic, where he assists in the initial evaluation of patients who may have a gender identity disorder.  Schmidt Depo at 290.  He is not involved in the treatment or management of these patients.  Schmidt Report at 2 (¶ 7); Schmidt Depo at 86-87.  Even during the 1970's, when Dr. Schmidt was most directly involved in the care of patients with gender identity disorders, Dr. Schmidt cared for only 2-3 patients per year.  Id. at 87, 282-84.  Otherwise, his role has been confined to evaluating new cases.  Id. at 87.  By contrast, Dr. Bockting testified that he has treated an average of sixty patients per year at the gender identity clinic at the University of Minnesota for the last twenty years.  Bockting Depo at 16-18.

[16]    Dr. Schmidt testified that he does not attend HBIGDA conferences or otherwise attend any continuing medical education programs regarding developments in the field of gender identity and gender identity disorders offered either by HBIGDA or other associations focusing on these issues.  See Schmidt Depo at 344-46.

subjective belief.  The lack of any scientific basis for his opinion reveals that his opinion is actually unsupported personal belief masquerading as science.

In his report, Dr. Schmidt lists Dr. Money's 1972 book, *Man and Woman, Boy and Girl*, as support for his conclusion that chromosomal configuration is what constitutes a person's sex. See Schmidt Report at 2 (¶ 1), 7; see also Schmidt Depo at 24.  Yet, when asked how Dr. Money's work supported his conclusion, Dr. Schmidt admitted that he was "relying on [Dr.] Money more with regard to these other social constructs, such as gender identity, sexual identity, [and] gender role . . . as differentiated from . . . biologic sex." Id. at 23.  In other words, Dr. Schmidt does not actually rely on Dr. Money's scholarship for the specific proposition that chromosomal configuration constitutes one's sex – nor can he, in light of Dr. Money's longstanding conclusion that sex is a multifaceted concept.  See discussion supra at 11-12.[17]

It is not merely a question of Dr. Money addressing a different set of issues than Dr. Schmidt.  Rather, as Dr. Bockting would explain, Dr. Money's scientific research directly contradicts Dr. Schmidt's conclusion that sex is merely a question of chromosomal configuration.  Bockting Supp. Report at ¶ 2.  Later scholarship has only confirmed this understanding of sex from a scientific viewpoint.  See Bockting Report at ¶¶ 13, 33-37, 39-40; Bockting Supp. Report at ¶¶ 2-4.  Thus, not surprisingly, when presented at his deposition with the list of factors identified by Dr. Money and confirmed by Dr. Bockting as the factors that constitute a person's sex, Dr. Schmidt conceded that even he would consider an individual's hormones, internal genitalia, external genitalia and hypothalamic sex to be a part of an individual's "sex."  Schmidt Depo at 70; see also id. at 19-20, 27-28, 154-55.  Dr. Schmidt insisted, however, that neither altering one's hormones nor changing one's internal or external

---

[17]    Dr. Schmidt ultimately admitted that "he would need to go back and look at the specifics" of Dr. Money's work in light of the fact that Dr. Money included in his definition of sex concepts like gender identity, which Dr. Schmidt would exclude from his definition of sex.  See Schmidt Depo at 26-31.

genitalia would actually change a person's sex because none of those changes would affect the chromosomal composition.  Id. at 69-73, 180-85.

In reaching his conclusion about what constitutes a person's sex, however, Dr. Schmidt has not even applied his own criterion (i.e., immutability) consistently; rather, he has arbitrarily selected one immutable factor (chromosomal sex) over another (hypothalamic sex) as what defines sex.  As Dr. Schmidt acknowledged, an individual could have a female hypothalamic sex – an aspect of sex that also cannot be changed once fixed, id. at 118-19, 250 – but XY chromosomes, id. at 155-58.  Yet, notwithstanding the immutable nature of an individual's hypothalamic sex, Dr. Schmidt nevertheless insists that the chromosomal configuration overrides any other aspects of sex indicating otherwise, thus rendering the sex of any person with XY chromosomes male and XX chromosomes female without exception.  See also id. at 72-73.[18]

When asked *why* chromosomes trump everything else with respect to what constitutes a person's sex, Dr. Schmidt was hard pressed to provide an answer grounded in science, as opposed to normative views.  Id. at 251-53.  Dr. Schmidt first claimed to rely on the dictionary as support for his definition of sex as limited to chromosomes.  Id. at 22-23, 254-55.  However, even the dictionaries upon which Dr. Schmidt claimed to rely, id. at 254, do not support his opinion that one's chromosomal configuration is what constitutes one's sex.[19]  Moreover, Dr.

---

[18]      Dr. Schmidt acknowledged that not every person even has XX or XY chromosomes, as in the case of Klinefelter's syndrome, or other conditions involving aberrant chromosomal configurations (e.g., XXY, XXXY).  Schmidt Depo at 209-10.  Yet, as Dr. Schmidt stated, the fact that the XX / XY binary is not sufficient to classify the chromosomal configurations that exist in the world does not change his view that "there has to be an anchoring point to be called sex," and chromosomes, in his view, provide that anchoring point.  Id. at 252.  If, as Dr. Schmidt insists, sex is limited to XX equals female and XY equals male, individuals with Klinefelter's syndrome (XXY) or Turner's syndrome (unpaired X chromosomes or XO) would seem not to have a sex at all, a result that demonstrates the irrationality of Dr. Schmidt's position.  See generally Julie A. Greenberg, "Defining Male and Female: Intersexuality and the Collision Between Law and Biology," 41 Ariz. L. Rev. 265, 278 (1999).

[19]      See McGowan Decl. Attachment D (The Oxford English Dictionary (1989)) (defining "sex" as "either of the two divisions of organic beings distinguished as male and female respectively; the males of the females (of a species, etc.) viewed collectively," "the quality in respect of being male or female," and "the distinction between male and female in general . . . [I]n recent use often with more explicit notion: [t]he sum of

Schmidt conceded that he had not referred to any medical dictionaries in formulating his opinion. Id.  Had he looked at the leading medical dictionaries, he would have discovered that "sex" has not been defined as limited to chromosomal characteristics.  To the contrary, medical dictionaries recognize that sex is a multifaceted concept that includes not only chromosomal sex but also "psychological sex," i.e., gender identity.  See McGowan Decl. Attachment F (Taber's Cyclopedic Medical Dictionary (2005)) (defining "sex" as "the characteristics that differentiate males and females in most plants and animals," and then defining, *inter alia*, "chromosomal sex," "morphological sex," "nuclear sex," and "psychological sex," the last of which is defined as "[t]he individual's self-image of his or her gender, which may be at variance with the morphological sex").

Dr. Schmidt also claimed that another basis for his conclusion is his belief that his view is shared by other experts.  Schmidt Depo at 22, 73.  Yet, when asked to identify the experts who share his view that sex means only chromosomal configuration, Dr. Schmidt was able to offer the names of only three colleagues, and even with respect to these three colleagues, could not cite any research or publications by or any conversations with these colleagues to support his bald assertion that "everyone knows" that sex is chromosomal configuration.  See id. at 73-75, 255-257.

Ultimately, Defendant's expert has selected chromosomal configuration as the exclusive reference point in determining one's sex based not on scientific research and study but rather on his unsupported belief that, without chromosomes as an "anchor," sex becomes too relative a concept for his personal taste.  Dr. Schmidt's conclusion about the meaning of sex is based not

---

those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female and of the other physiological differences consequent on these; the class of phenomena with which these differences are concerned"), Attachment E (Merriam-Webster Collegiate Dictionary (2003)) (defining "sex" as "either of the two major forms of individuals that occur in many species and that are distinguished respectively as female or male esp. on the basis of their reproductive organs and structures").

on any research or study, but rather on Dr. Schmidt's need for an "anchoring point." Id. at 253 ("[T]here has to be some kind of anchoring point or you slip into a kind of relativity that makes things a terrific morass."); id. at 252-53 (same).  For this reason, rather than citing scientific evidence to support his conclusion, Dr. Schmidt is forced to fall back on notions of "common sense." Id. at 255-56; see also id. at 22-23.

Not surprisingly, Dr. Schmidt has admitted that most experts in the field of gender identity have not adopted his narrow definition of sex as chromosomal configuration.  Id. at 158-60 (admitting that his view is not the predominant view among gender identity experts); id. at 344, 346 (noting that HBIGDA does not adopt his definition, and that HBIGDA is the only professional association dedicated to the study of gender identity disorders and the treatment of those with GID); id. at 346 (estimating that at least a third to a half of the people practicing in the field of gender identity disorders are members of HBIGDA and most practitioners follow the HBIGDA Standards of Care).  Quite the contrary, most experts in the field believe that understanding an individual's gender identity is an integral part of ascertaining his or her sex, a point that Dr. Schmidt admitted.  Id. at 244 ("It's [i.e., gender identity is] an aspect of sex that has been developed in the field as an understanding of one aspect of sex."); id. at 246 ("The other things, the other aspects of sex are these aspects that have been developed [by "clinicians and scientists in the field"] that, as of yet, have no for sure biologic basis."); id. at 75 (acknowledging that other scholars do not define "sex" as merely chromosomal configuration); id. at 31 (discussing the fact that Dr. Schmidt is "narrowly defining" sex).

Plaintiff respectfully submits that, after a hearing, the Court, rather than crediting Dr. Schmidt's subjective notions of "common sense," id. at 255-56, will agree that the reasoned and

scientifically rigorous view is that of Dr. Bockting – namely, that sex is, in fact, a multifaceted concept that encompasses various elements, including gender identity.

**B.    Courts, Including the Supreme Court, Have Already Concluded That, as a Legal Concept, "Sex" Means More Than Just Chromosomal Configuration.**

As a remedial statute, Title VII does not merely prohibit discrimination by men against women, nor is it limited to the specific manifestations of discrimination that Congress had most clearly in mind when it enacted Title VII.  To the contrary, the language of Title VII "evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women in employment.'"  Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986) (quoting Los Angeles Dep't of Water & Power v. Manhart, 435 U.S. 702, 707 n.13 (1978)); see also Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 79 (1998) (noting that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils" and rejecting argument that Title VII does not prohibit same-sex sexual harassment because Congress had not specifically indicated its intention to proscribe such conduct).  For this reason, Title VII, like other remedial statutes, has been and "should be construed broadly to effectuate its purposes."  Tcherepnin v. Knight, 389 U.S. 332, 336 (1967) (discussing general principles of statutory construction with respect to remedial provisions); see also Nordell v. Heckler, 749 F.2d 47, 49 (D.C. Cir. 1984) (instructing that courts faced with claims under Title VII "must seek in every case an interpretation animated by the broad humanitarian and remedial purposes underlying the federal proscription of employment discrimination") (internal quotation omitted).

For this reason, just as scientists understand that there are multiple aspects of a person's sex as a matter of fact, so, too, have courts as a matter of law.  Specifically, in the context of Title VII, the Supreme Court has made clear that Title VII covers discrimination not only based on an individual's chromosomes, but also based on other aspects of a person's sex, such as

gender expression and his or her conformity (or lack thereof) with what is considered to be the appropriate social sex role.  See Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).  In fact, courts often look at aspects of sex other than chromosomes – such as social sex role or external morphologic sex (e.g., breasts) – when assessing whether there has been discrimination "because of sex."  See e.g., Oncale v. Sundowner Offshore Servs., 523 U.S. 75 (1998) (harassment by men of a man perceived as insufficiently masculine is discrimination "because of sex"); Harvill v. Westward Commc'ns, L.L.C., 433 F.3d 428, 435-36 (5th Cir. 2005) (fondling of employee's breasts and patting her buttocks is discrimination "because of sex"); Worth v. Tyler, 276 F.3d 249, 268 (7th Cir. 2001) (even one incident of supervisor touching employee's breast can be severe and pervasive harassment "because of sex").

In Price Waterhouse, for example, Ann Hopkins failed to receive a promotion to partnership because her personality, appearance and behavior were not consistent with the social sex role attributed to women, or were not otherwise deemed sufficiently feminine.  Id. at 251. The partners who discriminated against Ms. Hopkins presumably had no actual knowledge of her chromosomal make-up, but that did not prevent the Supreme Court from recognizing their conduct as a form of sex discrimination prohibited by Title VII:  "[A]n employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender."  Id. at 250.  Following the Supreme Court's lead, lower federal courts have recognized that sex discrimination means more than simply discrimination based on chromosomal aspects of sex.  See, e.g., Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 874 (9th Cir. 2001) (holding that harassment of male employee based upon the perception that he is effeminate is discrimination "because of sex"); Doe v. City of Belleville, 119 F.3d 563, 581 (7th Cir. 1997) ("[A] man who is harassed because his voice is soft, his physique is slight, his hair is

long, or because in some other respect he . . . does not meet his coworkers' idea of how men are to appear and behave, is harassed 'because of' his sex."), <u>vacated on other grounds</u>, 523 U.S. 1001 (1998).

Outside of the Title VII context, numerous courts have recognized that, as a legal matter, sex is more than simply chromosomal composition.  For example, the Board of Immigration Appeals recently rebuffed the government's argument that chromosomal configuration should be dispositive of a person's sex when determining whether a couple's marriage should be considered a same-sex or a different-sex union:

> [The government] asserts that these terms ["male" and "female"] can be conclusively defined by an individual's chromosomal pattern, i.e., XX for female and XY for male, because such chromosomal patterns are immutable.  However, this claim is subject to much debate within the medical community. According to medical experts, there are actually eight criteria that are typically used to determine an individual's sex. . . . [B]ecause a chromosomal pattern is not always the most accurate determination of an individual's gender, the DHS counsel's reliance on chromosomal patterns as the ultimate determinative factor is questionable.

<u>In re Lovo-Lara</u>, 23 I. & N. Dec. 746, 752 (2005)

Many state courts have likewise rejected the narrow definition of sex discrimination advocated here by Defendant when interpreting state and local sex discrimination laws.  For example, in <u>Richards v. U.S. Tennis Ass'n</u>, 93 Misc. 2d 713, 400 N.Y.S.2d 267 (N.Y. Sup. Ct. 1977), the court held that it would be "grossly unfair, discriminatory and inequitable" to use a chromosomal test as the sole indicator of a person's sex, particularly where other aspects of the person's sex, including gender identity, indicate a different result.  93 Misc. 2d at 721. Emphasizing that "all courts agree [that] the anti-discrimination statutes are remedial and thus to be interpreted liberally to achieve their intended purposes," New York courts have held on

numerous occasions that, the Seventh Circuit's holding in <u>Ulane</u> notwithstanding, an employer

that discriminates against an employee "because the person, as a result of surgery and hormone

treatments, is now of a different sex has violated our City prohibition against discrimination

based on sex." <u>Maffei v. Kolaeton Indus., Inc.</u>, 626 N.Y.S.2d 391, 396 (N.Y. Sup. Ct. 1995); <u>see</u>

<u>also</u> <u>Rentos v. Oce-Office Sys.</u>, No. 95 Civ. 7908 LAP, 1996 WL 737215, at *8 - *9 (S.D.N.Y.

Dec. 24, 1996) (denying motion to dismiss sex discrimination claims brought by transsexual

plaintiff under state and city human rights laws) (attached as McGowan Decl. Exhibit G).

 Similarly, a New Jersey appellate court rejected the "constricted" view of sex

discrimination reflected in earlier decisions:

> A person who is discriminated against because he changes his
> gender from male to female is being discriminated against because
> he or she is a member of a very small minority whose condition
> remains incomprehensible to most individuals . . . . "[S]ex"
> embraces an "individual's gender," and is broader than anatomical
> sex. Sex is comprised of more than a person's genitalia at birth.

<u>Enriquez v. West Jersey Health Sys.</u>, 777 A.2d 365, 372-73, 342 N.J. Super. 501, 513, 515 (App.

Div. 2001) (internal quotations and citations omitted). Recognizing that the Supreme Court's

decision in <u>Price Waterhouse</u> "signaled a possible change in the federal approach to gender

dysphoria," <u>id.</u> at 512, the court concluded that sex discrimination "includes gender

discrimination so as to protect plaintiff from gender stereotyping *and* discrimination for

transforming herself from a man to a woman." <u>Id.</u> at 515-16 (emphasis added). <u>See also</u> <u>In re</u>

<u>Heilig</u>, 816 A.2d 68, 79, 372 Md. 692, 710 (Md. 2003) (recognizing that "external genitalia are

not the sole medically recognized determinant of gender"); <u>Millett v. Lutco, Inc.</u>, 98 B.E.M.

3695, 2001 WL 1602800 at *3 (Mass. Comm'n Against Discrim. Oct. 21, 2001) (finding

transsexuality "sufficiently sex-linked to bring it within the ambit of the sex discrimination

laws") (attached as McGowan Decl. Exhibit H); <u>In re Dickinson</u>, 4 Pa. D. & C. 3d 678, 679-80

(Pa. Com. Pl. 1978) (granting change of legal gender to conform with acquired "emotional, psychological and physiological" gender of applicant).[20]

The fact that this Court previously ruled that the allegations in Plaintiff's Complaint did not state a claim of impermissible sex stereotyping, see discussion Section I.D infra, does not undermine the point that Plaintiff makes here, which is that, in Price Waterhouse and numerous other cases, courts – including the Supreme Court – have recognized that the term "sex" encompasses more than just one's chromosomal or biological make-up.  Accordingly, when weighing the testimony of the experts with respect to whether the term "sex" should be interpreted as simply reflecting chromosomal make-up or as something more complex, this Court should heed the guidance of these prior well-reasoned cases and should conclude that Title VII encompasses all of the aspects of an individual's sex, including gender identity, that might cause an individual to suffer discrimination.

> **C.    Even If the Term "Sex" Refers Only to Biologic Constructs, Testimony at a Hearing Would Show That Experts Have Concluded That Gender Identity Is Biologically Influenced.**

Dr. Schmidt insists on using terms like "biologic sex" because, in his view, the term "sex" refers only to biologic constructs.  See, e.g., Schmidt Report at 3 (¶ 3); Schmidt Depo at 22-23 (discussing what elements he deems part of "biologic sex").  As Dr. Bockting would explain at a hearing, Dr. Schmidt's view is out of the mainstream because the term "biologic

---

[20]    International tribunals have also adopted the approach espoused by the Supreme Court in Price Waterhouse and Oncale when determining how sex discrimination laws apply to transsexual people.  For example, in P v. S, Case C-13/94, 1996 E.C.R. I-2143 (Apr. 30, 1996) (McGowan Decl. Attachment N), the European Court of Justice ("ECJ") ruled that, "[i]n view of its purpose and the nature of the rights" that the European Community's directive against sex discrimination sought to safeguard, the law should be construed broadly so as to apply not only to traditional forms of sex discrimination, but also "to discrimination arising, as in this case, from the gender reassignment of the person concerned."  Id. at 10. Like the Oncale Court, the ECJ recognized that the drafters of the directive may not have specifically contemplated transsexuality, but noted that, "as the expression of a more general principle, on the basis of which sex should be irrelevant to the treatment everyone receives, the directive should be construed in a broader perspective, including therefore all situations in which sex appears as a discriminatory factor."  Id. at 8.

sex" is viewed by experts as an overly simplistic term that, if used at all, is usually a short-hand way of describing the sex assigned at birth based on the appearance of external genitalia. Bockting Depo at 35-36.  For this reason, rather than fixating on whether and to what degree various aspects of sex are social or biological constructs, experts focus instead on understanding the interaction of all of the various aspects identified by Dr. Money and his peers.  Id. at 35-36, 57.

But even if it were correct that the term "sex" refers only to biologic constructs – which it does not – at a hearing, Plaintiff would show that, as a matter of scientific fact, gender identity is in fact "biologically influenced."  Thus, even accepting Dr. Schmidt's framing of the question as "what constitutes a person's 'biologic sex,'" gender identity is still understood by experts as an aspect of "sex."

Notwithstanding Defendant's suggestions to the contrary, Def. Br. at 6-8, Dr. Bockting does not share Dr. Schmidt's opinion that gender identity is exclusively a social construct that lacks any biological explanation.  In fact, the scientific research conducted to date has produced results pointing in precisely the opposite direction.  Bockting Report at ¶ 39 ("Family dynamics, such as symbiosis with the mother, absence of the father, and the maternal wish for a daughter were thought to be responsible for the development of gender identity disorder, but no solid empirical support was found for these hypotheses (Cohen-Kettenis & Gooren, 1999; Green, 1987; Roberts, Green, Williams, & Goodman, 1987; Zucker et al., 1994).");  Bockting Depo at 29-30.

As Dr. Bockting would explain at a hearing, scientific study is currently focused on determining *which*, not *whether*, biological determinants explain, in whole or in part, the fact that some people have a gender identity that is not congruent with other aspects of their sex.

Bockting Report at ¶ 19 (noting that, while the precise cause of gender identity disorder remains unknown, "[c]urrent research on the etiology of gender identity disorder primarily focuses on biological factors, such as the role of prenatal and perinatal androgen exposure in sexual differentiation of the brain," citing research testing biological hypotheses for discrepancy between genital differentiation and brain sex differentiation, and citing study finding female brain structures in male-to-female transsexuals).  Dr. Bockting notes that

> [a]lthough scientific consensus is lacking as to exactly what factors determine gender identity, more recent research on the etiology of transsexualism points toward the role of sexual differentiation of the brain in gender identity development (e.g., Cohen-Kettenis & Gooren, 1999; Kruijver, et al., 2000; Swaab & Hofman, 1995; Zhou, Hofman, Gooren, & Swaab, 1995).  The findings of these studies suggest that gender identity is not wholly acquired as argued by Dr. Schmidt on page 4, paragraph 3 of his report.

Bockting Supp. Report at ¶ 4; see also Bockting Depo at 54 ("The evidence supports that there is a biological determinant involved in the development of gender identity disorder."); id. at 26-30, 54-56 (discussing the research that supports the view that there are biological determinants of gender identity and/or that explain the development of gender identity disorders).

Dr. Bockting's testimony would also refute Dr. Schmidt's assertion that there is absolutely no credible science regarding the etiology of gender identity or gender identity disorders.  Schmidt Depo at 129-142; Schmidt Report at 5 (¶¶ 7-8).  Indeed, the numerous references cited in Dr. Bockting's report are a testimony to the remarkable amount of scientific research that has already been conducted in this field, and which continues today:

> [S]ince the early 1970s, numerous studies have been conducted advancing our scientific knowledge in the area of gender identity disorders.  Today, a large body of research clearly supports GID's existence (see Cohen-Kettenis & Gooren, 1999, Cohen-Kettenis & Pfaefflin, 2003, and Pfaefflin & Junge, 1998, for a review).  This research includes not only case studies, but also qualitative and quantitative behavioral and biological studies conducted with large

> samples of transgender and transsexual individuals. Together, these studies have demonstrated that the various aspects of sex and components of sexual identity are not always in alignment, and that, for many transsexual individuals, sex reassignment is medically necessary and effective in alleviating the distress associated with the incongruence between their sex assigned at birth and their gender identity by bringing these components into alignment.

Bockting Supp. Report at ¶ 6; see generally Bockting Report at 20-23 (citing research); Bockting Supp. Report at 3-4 (citing research). When presented with the studies cited by Dr. Bockting in his report, Dr. Schmidt either expressed a lack of familiarity with the studies, or simply discounted them as not "speak[ing] to" him, without meaningful explanation. Schmidt Depo at 131; see also id. at 113-14, 129-39.

Ultimately, Dr. Schmidt conceded that there has been at least some significant research regarding the etiology of gender identity disorders, and the question is still very much an open one, with numerous avenues of research still to be explored. Id. at 133, 193; see also id. at 204-05 (acknowledging studies regarding brain differentiation and other possible biological explanations for gender identity disorder as "suggest[ing] the direction of the research," and noting that more research is needed).

Testimony at a hearing would show that the scientific consensus is that gender identity is a product, at least in part, of certain biological influences and developments such as hormonal exposure and brain differentiation. Consequently, even if the meaning of "sex" were unduly narrowed by a biological litmus test, gender identity would still be considered part of a person's sex, and therefore Plaintiff would still state a claim for sex discrimination under Title VII.

**D.    The Court Should Not Dismiss Plaintiff's Title VII Claim Because Plaintiff Can State a Claim of Impermissible Sex Stereotyping, a Distinct Theory of Liability Under Title VII.**

The Court also should not dismiss Plaintiff's Title VII claim because discovery has revealed that the decision-maker was motivated in part by Plaintiff's failure to conform to sex stereotypes, which is an independent basis for liability under Title VII.  At the time of filing her complaint, Plaintiff had not yet had the opportunity to ask Charlotte Preece, the decision-maker for the Library of Congress, what motivated her decision to withdraw Plaintiff from consideration for the position.  As a result, Plaintiff merely alleged that Defendant's decision constituted impermissible sex stereotyping.  Compl. at ¶ 53.  Since that time, Plaintiff has had the opportunity to conduct some discovery, and has ascertained facts that would support a claim of impermissible sex stereotyping by Defendant.  Mem. Op. at 16 ("a transsexual plaintiff might successfully state a Price Waterhouse-type claim if the claim is that he or she has been discriminated against because of a failure to act or appear masculine or feminine enough for an employer," but the claim "must actually arise from the employee's appearance or conduct and the employer's stereotypical perceptions").

Plaintiff respectfully submits that her factual allegation that Defendant's adverse employment decision was motivated by impermissible sex stereotypes was sufficient to state a claim for relief pursuant to this theory of liability under Title VII.  See Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 511-12 (2002) (no heightened pleading requirement in employment discrimination action brought pursuant to Title VII and Age Discrimination in Employment Act). Plaintiff has nevertheless sought to amend her complaint to bolster her allegation of impermissible sex stereotyping.  See Motion for Leave to Amend Complaint (Rec. Doc. 33) (filed June 7, 2007).  In light of Plaintiff's pending motion, Plaintiff submits that the Court

27

should not grant Defendant's motion to dismiss Plaintiff's Title VII claim in its entirety without

first considering Plaintiff's Motion for Leave to Amend Complaint.

**II.     Should the Court Hold that Plaintiff's Complaint Does Not State a Claim Under
         Title VII, Plaintiff's Complaint States an Alternative Claim Under the Fifth
         Amendment's Equal Protection Clause.**

The Federal Rules of Civil Procedure permit pleading in the alternative.  Fed. R. Civ. P.

8(e)(2).  If the Court holds that Title VII's protections against sex discrimination do not extend to

gender identity discrimination, Plaintiff's Complaint states an alternative claim under the Equal

Protection Clause of the Fifth Amendment.

**A.     Title VII Is the Exclusive Remedy Only for Claims of Discrimination on the
         Basis of Race, Color, Religion, Sex or National Origin.**

Defendant's argument that Brown v. General Services Administration, 425 U.S. 820

(1976), precludes Plaintiff from bringing an equal protection claim in the alternative to a Title

VII claim is meritless.  Brown held only that Title VII is the exclusive remedy available to a

federal employee complaining of discrimination of a type that falls within the scope of coverage

of Title VII.  See id. at 825; see also Great Am. Fed. Savings & Loan Ass'n v. Novotny, 442

U.S. 366, 376 (1979) ("In Brown, the Court concluded that § 717 displaced other causes of

action arguably available to assert substantive rights similar to those granted by § 717.").

Following the lead of the Supreme Court, the D.C. Circuit has also ruled that Title VII is

the exclusive remedy only with respect to those claims involving the kinds of discrimination

covered by that statute.  Ethnic Employees of the Library of Congress v. Boorstin, 751 F.2d

1405, 1415-16 (D.C. Cir. 1985) ("We intimate no view as to the likelihood that the [plaintiffs]

will prevail on constitutional claims for which Title VII could not provide a remedy.  We do,

however, hold that Congress did not intend for Title VII to displace those claims."); see also

Clark v. Library of Congress, 750 F.2d 89, 92-105 (D.C. Cir. 1984) (adjudicating Library of

Congress employee's constitutional and statutory claims without suggesting that claims other than those that could be brought under Title VII were precluded under <u>Brown</u>).  As the D.C. Circuit has explained:

> <u>Brown</u>'s inquiry into the legislative history of section 717 focused on whether federal employees should be able to bring parallel actions under both Title VII and other provisions of federal law to redress the same basic injury.  Nothing in that history even remotely suggests that Congress intended to prevent federal employees from suing their employers for constitutional violations against which Title VII provides no protection at all.

<u>Boorstin</u>, 751 F.2d at 1415.  Other courts have similarly confirmed that federal employees may bring claims under the Constitution for types of discrimination that are not covered by statute. <u>See, e.g.</u>, <u>Ray v. Nimmo</u>, 704 F.2d 1480, 1485 (11th Cir. 1983) (per curiam) (holding that Title VII and the ADEA are the exclusive mechanisms for addressing sex and age discrimination, but other types of discrimination may be addressed through "direct action under the equal protection 'component' of the Fifth Amendment due process clause").

Therefore, while Title VII provides the exclusive remedy for federal employees who suffer discrimination on one of the grounds identified in that statute, it does *not* preclude constitutional claims for other kinds of discrimination left unaddressed by Title VII.  Thus, should this Court agree with the government that, as a matter of law, the Library's discrimination against Plaintiff was not based on her sex, then it follows that her constitutional claim is not precluded by Title VII.

**B.    Plaintiff's Complaint States an Alternative Claim Under the Fifth Amendment's Equal Protection Clause.**

Except where preempted by statute, every governmental classification is subject to at least rational basis review under equal protection jurisprudence.  <u>U.S. Dep't of Agric. v. Moreno</u>, 413 U.S. 528, 534 (1973).  Plaintiff has alleged that Defendant intentionally discriminated

against her because she is transgender.  Compl. at ¶ 68.  She has also alleged that Defendant's

actions were arbitrary, irrational and otherwise without constitutionally sufficient justification.

Id.  Such government action violates the equal protection guarantee even under the lowest level

of scrutiny, rational basis review.  See, e.g., Romer v. Evans, 517 U.S. 620, 632 (1996); City of

Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 448 (1985); Quinn v. Nassau County Police

Dep't, 53 F. Supp. 2d 347, 356 (E.D.N.Y. 1999) (holding that, even under rational basis review,

government employer could not engage in discrimination against an employee simply because he

was part of a disfavored, albeit not suspect, class); Weaver v. Nebo Sch. Dist., 29 F. Supp. 2d

1279, 1287-89 (D. Utah 1998) (accord); Glover v. Williamsburg Local Sch. Dist., 20 F. Supp. 2d

1160, 1169 (S.D. Ohio 1998) (accord).

Thus, as this Court recognized in a remarkably similar case twenty years ago, facts like

those pleaded in Plaintiff's Complaint state an alternative claim under the Equal Protection

Clause of the Fifth Amendment.  See Doe v. U. S. Postal Serv., Civ. A. No. 84-3296, 1985 WL

9446, at *3-*5 (D.D.C. June 12, 1985) (refusing to dismiss constitutional claim for gender

identity discrimination pled in the alternative to Title VII and Rehabilitation Act claims)

(McGowan Decl. Attachment I).

**III.    Plaintiff's Complaint States a Claim Under the Fifth Amendment's Due Process
        Clause.**

Plaintiff has a constitutionally protected liberty interest in making medical decisions

without penalty by the government in the absence of constitutionally sufficient justification.

Where, as here, the government intentionally and substantially penalizes the exercise of a

fundamental right or other constitutionally protected liberty interest, the government's actions

implicate substantive due process protections and therefore merit heightened scrutiny.[21]

    **A.**    **Personal Decisions About Medical Treatment Fall Within the Privacy, Autonomy and Liberty Interests Protected by the Due Process Clause of the Fifth Amendment.**

As the Supreme Court explained in <u>Whalen v. Roe</u>, 429 U.S. 589 (1977), the substantive

due process guarantee protects against violations by the government of an individual's right to

privacy, which has two components:  (1) an "interest in avoiding disclosure of personal matters,"

and (2) an "interest in independence in making certain kinds of important decisions."  <u>Id.</u> at 599-

600.  With respect to the latter component of the right to privacy, medical decisions are among

the most important decisions that a person can make.  Accordingly, the substantive due process

guarantee ensures that the government may not burden an individual's right to make these

decisions without constitutionally sufficient justification.  <u>See, e.g.</u>, <u>Sell v. United States</u>, 539

U.S. 166 (2003) (liberty interest in avoiding unwanted administration of drugs);  <u>Riggins v.</u>

<u>Nevada</u>, 504 U.S. 127 (1992) (same); <u>Washington v. Harper</u>, 494 U.S. 210 (1990) (same);

<u>Planned Parenthood of Southeastern Pa. v. Casey</u>, 505 U.S. 833 (1992) (liberty interest in

reproductive health choices); <u>Cruzan v. Mo. Dep't of Health</u>, 497 U.S. 261 (1990) (right to

refuse life-saving treatment); <u>Griswold v. Connecticut</u>, 381 U.S. 479 (1965) (privacy right to

access and use contraception); <u>cf.</u> <u>Winston v. Lee</u>, 470 U.S. 753, 766 (1985) (suspect could not

be forced to submit to surgical intrusion absent a "compelling need").[22]

---

[21]    Plaintiff does not assert that Defendant's decision to rescind the job offer implicated procedural due process protections because she had a constitutionally protected property interest in the Terrorism Research Analyst position.  Plaintiff also does not assert that she has suffered a constitutionally cognizable harm to her reputation as a result of Defendant's decision to rescind his job offer.

[22]    This right does not depend on what course of treatment an individual ultimately decides to pursue.  For example, courts have recognized female employees' right to make reproductive health decisions without undue government interference both where the woman decided to terminate her pregnancy, <u>Drake v. Covington County Bd. of Educ.</u>, 371 F. Supp. 974 (M.D. Ala. 1974), and where the woman decided not to do so, <u>Whitmore v. Bd. of</u>

As one court eloquently explained, medical decisions are,

> to an extraordinary degree, intrinsically personal. It is the individual making the decision, and no one else, who lives with the pain and disease. It is the individual making the decision, and no one else, who must undergo or forego the treatment. And it is the individual making the decision, and no one else, who, if he or she survives, must live with the results of that decision. One's health is a uniquely personal possession. The decision how to treat that possession is of a no less personal nature . . . [I]t is impossible to discuss the decision to obtain or reject medical treatment without realizing its importance. The decision can either produce or eliminate physical, psychological, and emotional ruin. It can destroy one's economic stability. It is, for some, the difference between a life of pain and a life of pleasure. It is, for others, the difference between life and death.

Andrews v. Ballard, 498 F. Supp. 1038, 1047 (S.D. Tex. 1980).[23]

It is for precisely these reasons that courts have recognized that the "right of privacy" includes "the freedom to care for one's health and person." Id. at 1048 (citing, inter alia, Doe v. Bolton, 410 U.S. 179, 213 (1973) (Douglas, J., concurring)); see generally 16B C.J.S. Constitutional Law § 1041 (2007) ("The constitutional right of personal privacy protects the making of decisions vital to health care . . . . A decision to obtain or reject medical treatment is one which profoundly affects a person's development or life, and it is a constitutional right encompassed by the right of privacy."). Even New York State Opthalmological Society v. Bowen, cited by Defendant, see Def. Br. at 10, supports Plaintiff's argument that certain decisions regarding medical treatment "may . . . be entitled to constitutional privacy protection." 854 F.2d 1379, 1391 (D.C. Cir. 1988); see also Garlic v. U.S. Food & Drug Admin., 783 F. Supp. 4, 5 (D.D.C. 1992) ("Several courts, including the Supreme Court, have acknowledged

---

Educ., No. 90-C-20143, 1991 WL 166939 (N.D. Ill. Feb. 12, 1991) (McGowan Decl. Attachment J); Eckmann v. Bd. of Educ., 636 F. Supp. 1214 (N.D. Ill. 1986). See discussion infra at 34-35.

[23]    Unlike the issue in Ballard, which held that an individual's right to obtain acupuncture services trumped the state's ability to regulate who could provide acupuncture services, the issue in this case is not whether the government may restrict the pursuit of a course of treatment. Rather, the issue in this case is whether the government may penalize the pursuit of a course of treatment that does not violate any restriction.

that decisions regarding medical treatment are essentially personal, and therefore may affect an individual's right to liberty or privacy.") (citing, *inter alia*, <u>Bowen</u>).

Plaintiff has alleged that the personal decision burdened by the challenged government action was medical in nature.  Compl. at ¶¶ 13-24, 59-65.  Her course of treatment has certainly been medical.  <u>See id.</u> at ¶¶ 13-24; <u>see also</u> Def. Br. Exh. 6 (Expert Report of Martha Harris) at ¶¶ 19-45 (outlining medical decision-making associated with Plaintiff's gender transition); Bockting Report at ¶¶ 17-32 (outlining stages of gender transition); <u>id.</u> Exh. 3 (HBIGDA Standards of Care) (outlining the stages of gender transition).[24]  Plaintiff's medical decision to undergo a medically indicated transition from male to female is fundamentally no different than other serious medical decisions that people must make when faced with other serious medical conditions and therefore falls within the protections of the Due Process Clause.

### B.    A Government Penalty on the Exercise of a Protected Liberty Interest Is a Form of Burden on Constitutional Liberty That Triggers Judicial Scrutiny.

For almost half a century, courts have recognized that the government burdens a constitutionally protected liberty interest not only when it prohibits the exercise of the protected liberty but also when it denies a benefit based solely on how an individual has exercised that liberty.  <u>See, e.g.</u>, <u>Shapiro v. Thompson</u>, 394 U.S. 618, 629 (1969) (impermissible to penalize people who chose to move to a state by denying them welfare benefits); <u>Saenz v. Roe</u>, 526 U.S. 489, 504-05 (1999) (residency requirement improperly penalized interstate travelers by reducing their benefits).[25]  Although this general principle has been applied in the contexts of denials of

---

[24]    On a motion to dismiss or for judgment on the pleadings, Plaintiff's allegations with respect to her medical decision-making are presumed to be true.  The material outside the pleadings that has been introduced by Defendant in connection with this motion only confirms that Plaintiff has exercised her constitutionally protected liberty interest by undertaking a gender transition in consultation with her health care providers.  <u>See, e.g.</u>, Def. Br. Exh. 6 (Report of Martha Harris).

[25]    Thus, to the extent that Defendant is arguing that Plaintiff must plead that the challenged government action actually prevented her from exercising her constitutionally protected liberty interest in making medical

tax exemptions, unemployment benefits and welfare benefits, the Supreme Court has "most often

. . . applied the principle to denials of public employment," and has applied it "regardless of the

public employee's contractual or other claim to the job."  Perry v. Sindermann, 408 U.S. 593,

597 (1972).

As the Supreme Court explained in Perry:

> For at least a quarter-century, this Court has made clear that even
> though a person has no "right" to a valuable governmental benefit
> and even though the government may deny him the benefit for any
> number of reasons, there are some reasons upon which the
> government may not rely.  It may not deny a benefit to a person on
> a basis that infringes his constitutionally protected interests . . . .
> For if the government could deny a benefit to a person because of
> his constitutionally protected [conduct], his exercise of those
> freedoms would in effect be penalized and inhibited.  This would
> allow the government to produce a result which [it] could not
> command directly.  Such interference with constitutional rights is
> impermissible.

Id. at 597 (internal quotation and citation omitted).  The Supreme Court's ruling in Perry

logically followed from its ruling in Pickering v. Board of Education, 391 U.S. 563 (1968), that a

government employee may not lose his job based on his exercise of his rights of free speech

absent a showing that the speech impedes his performance of his duties or otherwise disrupts the

workplace.  Id. at 572-73; see also Clark, 750 F.2d at 98 (finding that the Library of Congress

violated the plaintiff's rights by subjecting him, without "any permissible justification," to an

intrusive FBI background check because of how he had exercised his rights of free association).

Although Pickering, Perry and Clark involve burdens on the exercise of a public

employee's speech and association rights, courts have recognized that the exercise of other

constitutionally protected liberty interests may not be burdened by a public employer by denying

---

decisions without penalty by the government in order to state a claim under the Due Process Clause of the Fifth
Amendment, Defendant is mistaken.  It is sufficient that Plaintiff has pled that the government took adverse action
against her because of how she was choosing to exercise her constitutionally protected liberty interest.

a position based solely on how a public employee has exercised such a liberty interest. For example, in Eckmann v. Board of Education, 636 F. Supp. 1214 (N.D. Ill. 1986), a government employer fired a school teacher because she had exercised her constitutionally protected right to bear a child out of wedlock. Applying the test articulated in Mount Healthy City Board of Education v. Doyle, 429 U.S. 274 (1977), the court found that the teacher's decision, "[w]hile . . . not protected by a specifically enumerated constitutional right," was "covered by 'substantive due process.'" Eckmann, 636 F. Supp. at 1217. Accordingly, the court ruled that "plaintiff had a substantive due process right to conceive and raise her child out of wedlock without unwarranted state (School Board) intrusion." Id. at 1218; see also Whitmore v. Bd. of Educ., No. 90-C-20143, 57 Fair. Empl. Prac. Cas. (BNA) 1740, 1991 U.S. Dist. LEXIS 19166 at *13 (N.D. Ill. May 20, 1991) (holding that female employee who was terminated by school board because she decided to bear a child out of wedlock stated a claim "that Defendants deprived her of a recognized substantive due process right") (McGowan Decl. Attachment J). Similarly, in Drake v. Covington County Board of Education, the court found that a school district's decision to fire a woman from her teaching job because she had an abortion was subject to strict scrutiny because it infringed her constitutionally protected right to privacy under the Due Process Clause of the Fourteenth Amendment. 371 F. Supp. 974, 978-79 (M.D. Ala. 1974).

Just as a public employer may not refuse to employ a woman because she, in consultation with her doctors, has decided that a prophylactic double mastectomy is a medically appropriate course of treatment, Defendant may not refuse to employ Plaintiff because she, in consultation with her doctors, has decided that a gender transition from male to female is a medically appropriate course of treatment. See Compl. at ¶¶ 13-24, 59-65. By withdrawing Plaintiff from

consideration for the position of Terrorism Research Analyst due to her gender transition, Defendant burdened Plaintiff's constitutionally protected liberty.

### C.    A Burden on the Exercise of a Constitutionally Protected Liberty Interest Is Subject to Heightened Scrutiny.

Whether subject to strict scrutiny, under which government action is justified only where it is narrowly tailored to further a compelling interest, or a lesser level of heightened scrutiny, under which government action is justified only where the government interest at issue is significant and tailored enough that it outweighs the individual interest at issue, government actions that burden the exercise of the constitutionally protected liberty interest in making medical decisions are subject to heightened scrutiny.

Judicial scrutiny of government action does not automatically mean invalidation.  See, e.g., Gonzales v. Carhart, 127 S. Ct. 1610, 1639 (2007) (holding that state interests promoted by law criminalizing certain abortion procedures outweighed liberty interest of doctors and women wishing to utilize such procedures to terminate a pregnancy); Jacobson v. Massachusetts, 197 U.S. 11, 26-39 (1905) (ruling that liberty interest in avoiding undesired medical treatment (i.e., smallpox vaccination) outweighed by compelling government interest in preserving public health); Andrews v. U.S. Dep't of Health & Human Servs., Civ. Action No. 04-0307 (JR), 2005 U.S. Dist. LEXIS 5710, at *8 (D.D.C. Mar. 31, 2005) (recognizing that "certain rights pertaining to health-related and medical choices are protected by the Constitution," but finding that government ban on importation of specific drugs from Canada was related to important government interest in ensuring drug quality) (McGowan Decl. Attachment K).

To the contrary, where protected liberties are implicated, the Constitution simply requires that the government demonstrate that its interests are sufficiently weighty and its actions sufficiently tailored to justify the infringement.  See, e.g., Sell v. United States, 539 U.S. 166,

180-81 (2003) (balancing individual's interest in refusing psychotropic drugs against government's interest in trying a competent criminal defendant for nonviolent crime); <u>Riggins</u>, 504 U.S. at 135-36 (balancing individual's interest in refusing psychotropic drugs against government's interest in trying a competent criminal defendant for violent crime); <u>Harper</u>, 494 U.S. at 223 (weighing individual prisoner's interest in refusing psychotropic drugs against government's interest in promoting safety of inmates); <u>Cruzan</u>, 497 U.S. at 278-79 (balancing individual's "protected liberty interest" in refusing unwanted medical treatment against government's interests in promoting life and protecting sick and vulnerable); <u>Youngberg v. Romeo</u>, 457 U.S. 307, 321 (1982) (balancing individual's interest in freedom from restraint against government's interest in the efficient operation of a home for the mentally ill); <u>Aptheker v. Sec'y of State</u>, 378 U.S. 500, 506-15 (1964) (balancing individual's due process right to travel against government's interest in national security); <u>see also</u> <u>Casey</u>, 505 U.S. at 846-49 (balancing individual's interest in making reproductive choices against various asserted government interests).

This is no less true in the public employment context. For example, in <u>Thorne v. City of El Segundo</u>, the Ninth Circuit ruled that a public employer had no right to deny an applicant a job with the police department based either on the fact that she had had a sexual relationship with a police officer in the department or on the fact that she may have had an abortion. 726 F.2d 459, 469-72 (9th Cir. 1983). Because the government's actions implicated "rights protected by the constitution's guarantee of privacy and free association," the court demanded that the public employer show that its actions were justified by "legitimate interests" and that its actions were "narrowly tailored to meet those legitimate interests." <u>Id.</u> at 469. As the court explained, "[t]he more fundamental the rights on which the state's activities encroach, the more weighty must be

the state's interest in pursuing that course of conduct." Id.; see also Mercure v. Van Buren

Township, 81 F. Supp. 2d 814, 826 (E.D. Mich. 2000) ("The proper calibration of this balance

depends upon the gravity of the employee's liberty interest, as well as the degree of the State's

interest in governing a particular workplace.").

Indeed, in cases where the government, acting as employer, penalizes an employee

because of how he or she has exercised a constitutionally protected liberty interest, courts have

demanded a showing by the government that the conduct triggering the penalty was related to the

employee's ability to perform his or her job.  As the D.C. Circuit has explained:

> [While a federal employer] enjoys a wide discretion in determining
> what reasons may justify removal of a federal employee[,] . . . this
> discretion is not unlimited . . . . [The Due Process Clause] forbids
> all dismissals which are arbitrary and capricious . . . [and] may also
> cut deeper into the Government's discretion where a dismissal
> involves an intrusion upon that ill-defined area of privacy which is
> increasingly if indistinctly recognized as a foundation of several
> specific constitutional protections.

Norton v. Macy, 417 F.2d 1161, 1164 (D.C. Cir. 1969).

Thus, a government employer may not burden an employee's constitutionally protected

liberty in the absence of any demonstration that the employee's actions are relevant to his or her

ability to perform the job.  For example, in Mindel v. U.S. Civil Service Commission, the court

found that the government violated a postal clerk's right to privacy by firing him solely because

he was living with a woman who was not his wife.  312 F. Supp. 485, 487-88 (N.D. Cal. 1970).

Similarly, in Briggs v. North Muskegon Police Department, the court ruled that, in the absence

of a showing that a married police officer living with a married woman who was not his wife had

a negative effect on his ability to perform his job, the government could not penalize him based

only on how he exercised his privacy and association rights:

> This Court rejects the notion that an infringement of an important
> constitutionally protected right is justified simply because of
> general community disapproval of the protected conduct. The very
> purpose of constitutional protection of individual liberties is to
> prevent such majoritarian coercion . . . . The government must
> tread lightly when it investigates and regulates the private activities
> of its employees. Public employers must be careful not to
> transform anachronistic notions of unacceptable social conduct
> into law.

563 F. Supp. 585, 590-91 (W.D. Mich. 1983) (internal quotations omitted). See also Bruns v. Pomerleau, 319 F. Supp. 58, 68 (D. Md. 1970) ("[W]here there is nothing to indicate that plaintiff is unqualified or incompetent to carry out the duties the job entails, he cannot be summarily excluded from consideration" based on his exercise of freedom of association).

Requiring the government to articulate the interests furthered by its actions ensures that the government is not merely burdening individual liberty for arbitrary reasons untethered to legitimate interests that the government as employer is entitled to pursue. Compare Via v. Taylor, 224 F. Supp. 2d 753, 762 (D. Del. 2002) (regulation prohibiting correctional officer's relationship with paroled former inmate implicated association and privacy rights, and therefore government had to prove disruption to workplace), and Reuter v. Skipper, 832 F. Supp. 1420, 1423-24 (D. Or. 1993) (sheriff could not terminate female corrections officer solely because of her personal association with ex-felon in the absence of a showing of negative impact on job performance), with Swank v. Smart, 898 F.2d 1247, 1252-53 (7th Cir. 1990) (discharging a policeman for giving civilian minor a ride on his motorcycle did not violate substantive due process interests in association and privacy), and Krzyzewski v. Metro. Gov't of Nashville, Civ. Action No. 75-415-NA-CV, 1976 WL 735, at *6-*8 (M.D. Tenn. Oct. 20, 1976) (requiring employer to demonstrate that employee's relationship with married police officer would affect

her ability to perform her job or the efficiency of those working with her, but ultimately finding employer's action adequately justified) (McGowan Decl. Attachment L).

In this case, Plaintiff has alleged that the government's burden on her exercise of a constitutionally protected liberty interest was without constitutionally sufficient justification. Compl. at ¶¶ 59-63. Her medical decision to undergo a gender transition to alleviate her Gender Identity Disorder is the kind of intimate decision so rooted in principles of autonomy and self-determination that, like medical decisions regarding abortion and sterilization, is entitled to constitutional protection.[26] Neither Plaintiff's gender dysphoria nor her medical decision to pursue a medically appropriate course of treatment for this condition would have negatively impacted her ability to perform the duties of Terrorism Research Analyst. Id. at ¶ 24. Moreover, Plaintiff's discussion of these issues with Preece was designed specifically to avoid any disruption to the workplace. Id. at ¶¶ 41-44.

Defendant's motion to dismiss does not demonstrate a constitutionally sufficient justification for the challenged government action as a matter of law – indeed, he makes no effort to do so. Accordingly, Plaintiff has stated a claim under the Due Process Clause of the Fifth Amendment.

**IV.    Plaintiff's Complaint States a Claim for Equitable Relief Against the Librarian of Congress Under the Library of Congress Act.**

The Library of Congress Act provides that "[a]ll persons employed in and about said Library of Congress . . . shall be appointed solely with reference to their fitness for their

---

[26]    It is worth noting that courts have been unwilling to allow government employers to burden employees' exercise of liberty in cases involving decisions far less weighty than Plaintiff's decision to undergo a medically indicated gender transition. See, e.g., Pence v. Rosequist, 573 F.2d 395, 399-400 (7th Cir. 1978) (holding that conservative community attitudes did not justify a rule prohibiting public bus driver from having mustache because "choice of appearance is an element of liberty").

particular duties." 2 U.S.C. § 140.  As explained below, Defendant's argument that Plaintiff may

not bring a claim for equitable relief pursuant to this statute is without merit.

### A.    Title VII Does Not Preempt Claims Under the Library of Congress Act.

To the extent that Defendant reasserts his argument that Title VII implicitly repealed the

protections of the Library of Congress Act, Defendant reasserts an untenable argument.  As

explained above, Title VII is the exclusive avenue for resolving claims involving the kinds of

discrimination *addressed by that statute*.  Novotny, 442 U.S. at 376.  Unlike Title VII, which

places certain characteristics off-limits with respect to hiring decisions, the Library of Congress

Act establishes a merit hiring system at the Library of Congress.  As courts have emphasized on

numerous occasions, non-discrimination statutes, which constrain hiring decisions only with

respect to certain protected categories,[27] are distinct from merit statutes, which require that

employment decisions rest on merit rather than arbitrary factors.[28]

The Supreme Court has made clear that a plaintiff may challenge the same adverse action

under both Title VII and another statute so long as there is an "independent" basis for each claim.

Alexander v. Gardner-Denver Co., 415 U.S. 36, 49-50 (1974).  The sole exception is a

circumstance in which Title VII preempts claims under the other statute.  Compare Novotny, 442

U.S. at 378 (dismissing §1985(3) claim for conspiracy to violate constitutional right to equal

---

[27]    See, e.g., Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984) ("Title VII addresses *discrimination*.  Title VII is not a shield against harsh treatment at the workplace. Nor does the statute require the employer to have good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.") (emphasis in original) (internal citation omitted).

[28]    See, e.g., N.L.R.B. v. Ohio New & Rebuilt Parts, Inc., 760 F.2d 1443, 1447 (6th Cir. 1985) (noting that the provisions of the Civil Service Reform Act, another merit-based hiring statute, "were designed to enforce the merit principle in the civil service by allowing civil servants to be fired, hired or rewarded on the basis of performance"). The Library of Congress Act uses language substantively identical to the Civil Service Reform Act.  Compare 2 U.S.C. § 140 ("[a]ll persons employed in and about said Library of Congress . . . shall be appointed solely with reference to their fitness for their particular duties") with 5 U.S.C. § 2301 ("selection and advancement should be determined solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity").

protection because claim was, in essence, constitutional claim for sex discrimination, which was preempted by Title VII), with Afshari v. Leavitt, Civ. Action No. 1:05-CV-127, 2006 WL 3030323 at *14-*15 (N.D. W. Va. 2006) (noting that, "although [Plaintiffs'] Title VII and First Amendment claims [arose] from the same facts, they are analytically distinct," and therefore Title VII did not preempt other claim) (McGowan Decl. Attachment M).

Plaintiff has alleged that the Library of Congress withdrew her from consideration for the position of Terrorism Research Analyst for a reason unrelated to her merit.  Compl. at ¶ 73. Should discovery reveal that the only reason why Defendant refused to recommend Plaintiff for employment was because of her sex, Title VII would be the appropriate vehicle for redressing Plaintiff's grievance.  But, should discovery reveal a different unrelated-to-merit reason why Defendant refused to recommend Plaintiff for employment, the Library of Congress Act would be an appropriate vehicle for redressing Plaintiff's grievance.  At this stage of the proceedings, Plaintiff has stated a claim pursuant to the Library of Congress Act by alleging that whatever reason Defendant had for disqualifying Plaintiff from consideration for the Terrorism Research Analyst position, that reason was unrelated to her merit.

### B.    Sovereign Immunity Poses No Bar to Plaintiff's Claim for Equitable Relief Against the Librarian of Congress.

Pursuant to the well-established doctrine of non-statutory review, Plaintiff has stated a claim for equitable relief against the Librarian of Congress in his official capacity by alleging that the Librarian acted in violation of his statutory authority by disqualifying Plaintiff from consideration for the position of Terrorism Research Analyst for reasons unrelated to her merit in contravention of 2 U.S.C. § 140.  Sovereign immunity poses no bar to a claim for relief of this nature because an official who is alleged to exceed his statutory mandate is by definition not acting in a sovereign capacity and therefore is stripped of any cloak of immunity that might

otherwise apply.  Larson v. Domestic & Foreign Corp., 337 U.S. 682, 689-90 (1949) ("[W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions.  The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden.  His actions are *ultra vires* his authority and therefore may be made the object of specific relief."); see also Dugan v. Rank, 372 U.S. 609, 621-22 (1963); Malone v. Bowdoin, 369 U.S. 643, 647 (1962).

The D.C. Circuit has explicitly held that "claims for non-monetary specific relief [against the Librarian of Congress] are not barred by sovereign immunity."  Clark v. Library of Congress, 750 F.2d at 102.  In Clark, the former Library employee brought claims for monetary and injunctive relief, alleging that the Library's actions violated the Library of Congress Act and the First Amendment.  While holding that Clark was precluded from bringing a claim for monetary damages against the Library,[29] the D.C. Circuit ruled that nothing precluded his claim for injunctive relief.  Id. ("It is well-established that sovereign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority.  Thus sovereign immunity presents no obstacle to Clark's claims for non-monetary relief.") (citing Dugan, 372 U.S. at 621-23; Malone, 369 U.S. at 646-48; Larson, 337 U.S. at 689-91).  Therefore, Defendant's argument that Plaintiff may not bring a claim for equitable relief against the Librarian due to the absence of a waiver of sovereign immunity is untenable.

---

[29]     Plaintiff recognizes that the waiver of sovereign immunity in the Administrative Procedure Act with respect to claims for monetary damages does not extend to the Library of Congress, Clark, 750 F.2d at 102, and for this reason seeks only equitable relief with respect to her Library of Congress Act claim.  The enactment of the waiver of sovereign immunity in the APA, however, did "not repeal the review of *ultra vires* action that was recognized long before."  Dart v. United States, 848 F.2d 217, 224 (D.C. Cir. 1988) (citing Am. Sch. of Magnetic Healing v. McAnnulty, 187 U.S. 94 (1902)).

Defendant's argument that the Library of Congress Act does not confer a private cause of action is likewise misplaced. The entire premise of non-statutory review is that an individual may seek equitable relief from the Court where an official acts in violation of his statutory duty even where the statute that the official is violating does not itself provide a vehicle for relief. See, e.g., Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group, 219 F. Supp. 2d 20, 42 (D.D.C. 2002) ("[T]he mandamus statute may provide an avenue to remedy violations of statutory duties even when the statute that creates the duty does not contain a private cause of action."), rev'd on other grounds sub nom. In re Cheney, 406 F.3d 723 (D.C. Cir. 2005).

As the D.C. Circuit recently explained:

> As we held in Chamber of Commerce v. Reich, "if a plaintiff is unable to bring his case predicated on either a specific or general statutory review provision, he may still be able to institute a non-statutory review action." 74 F.3d at 1327. Because "judicial review is favored when an agency is charged with acting beyond its authority," Dart v. United States, 848 F.2d 217, 221 (D.C. Cir. 1988), "even where Congress is understood generally to have precluded review, the Supreme Court has found an implicit but narrow exception, closely paralleling the historic origins of judicial review for agency actions in excess of jurisdictions." Griffith v. FLRA, 842 F.2d 287, 492 (D.C. Cir. 1988). Pursuant to this case law, "judicial review is available when an agency acts *ultra vires*," even if a statutory cause of action is lacking. Aid Ass'n for Lutherans v. United States Postal Serv., 321 F.3d 1166, 1173 (D.C. Cir. 2003).

Trudeau v. Fed.Trade Comm'n, 456 F.3d 178, 189-90 (D.C. Cir. 2006). Therefore, just as a litigant does not need to demonstrate a private cause of action to bring an injunctive claim pursuant to Ex Parte Young, 209 U.S. 123 (1908), the non-statutory review doctrine permits a litigant to bring a claim for equitable relief against a federal officer in his official capacity where the officer has acted in contravention of either his statutory or his constitutional authority. "The acts of all [government] officers must be justified by some law, and in case an official violates

the law to the injury of an individual the courts generally have jurisdiction to grant relief." <u>Am. Sch. of Magnetic Healing v. McAnnulty</u>, 187 U.S. 94, 108 (1902); <u>see also</u> <u>Bowen v. Mich. Acad. of Family Physicians</u>, 476 U.S. 667, 681 (1986); <u>Stark v. Wickard</u>, 321 U.S. 288, 310 (1944).

As none of Defendant's arguments for dismissing Plaintiff's Library of Congress Act claim has merit, Defendant's motion to dismiss this count of her Complaint should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, as well as the reasons set forth in Plaintiff's opposition to Defendant's first motion to dismiss, which are incorporated by reference, Defendant's motion to dismiss or, in the alternative, for judgment on the pleadings should be denied.

Respectfully submitted,

/s/ Sharon M. McGowan
Sharon M. McGowan  (D.C. Bar No. 476417)
Kenneth Y. Choe
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
(212) 549-2627

Arthur B. Spitzer  (D.C. Bar No. 235960)
American Civil Liberties Union
  of the National Capital Area
1400 20th Street, N.W., #119
Washington, D.C. 20036
(202) 457-0800

*Counsel for Plaintiff*

Date:  June 11, 2007