# Attachment G



Not Reported in F.Supp.                                                    Page 1

Not Reported in F.Supp., 1996 WL 737215 (S.D.N.Y.), 72 Fair Empl.Prac.Cas. (BNA) 1717, 23 A.D.D. 508
**(Cite as: Not Reported in F.Supp.)**

▷
Rentos v. Oce-Office Systems
S.D.N.Y.,1996.

United States District Court, S.D. New York.
Corrinne M. RENTOS, Plaintiff,
v.
OCE-OFFICE SYSTEMS, a division of OCE-USA,
Inc., Defendant.
**No. 95 CIV. 7908 LAP.**

Dec. 24, 1996.

Former employee, a postoperative transsexual, sued former employer in state court for sex discrimination and harassment under New York law. Action was removed to federal court based on diversity jurisdiction. On former employer's motion to strike complaint for failure to provide more definite statement, the District Court, Preska, J., held that transsexuals were protected from discrimination under New York State and New York City human rights laws, and thus complaint adequately identified protected class in which former employee claimed membership.

Motion denied.

*MEMORANDUM AND ORDER*
West Headnotes
**[1] Federal Civil Procedure 170A ⬤⟿941**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(J) Bill of Particulars; More Definite Statement
         170AVII(J)1 In General
            170Ak941 k. In General. Most Cited Cases
In determining motion for more definite statement, court must assess complaint in light of the very minimal requirements imposed by pleading rule, requiring only short and plain statement of claim.

Fed.Rules Civ.Proc.Rules 8, 12(e), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⬤⟿988.1**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(J) Bill of Particulars; More Definite Statement
         170AVII(J)2 Particular Cases
            170Ak988 Employees' Actions in General
               170Ak988.1 k. In General. Most Cited Cases
In her sex discrimination and harassment complaint brought under New York law, former employee, a postoperative transsexual, adequately identified protected class to which she allegedly belonged, as required to survive motion to strike for failure to provide more definite statement, based on her allegations that she was transgendered female, and that employer's conduct created discrimination based on employee's sex and created hostile work environment based on her sex. N.Y.McKinney's Executive Law § 290 et seq; Fed.Rules Civ.Proc.Rules 8, 12(e), 28 U.S.C.A.; N.Y.Comp. Codes R. & Regs. title 8, § 8-101 et seq.

**[3] Federal Civil Procedure 170A ⬤⟿674**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(B) Complaint
         170AVII(B)1 In General
            170Ak674 k. Theory of Claim. Most Cited Cases
Defendant has no entitlement to plaintiff's "theory of the case" at pleadings stage. Fed.Rules Civ.Proc.Rules 8, 12(e), 28 U.S.C.A.

**[4] Civil Rights 78 ⬤⟿1193**

78 Civil Rights
   78II Employment Practices
      78k1191 Discrimination by Reason of Sexual

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2

Not Reported in F.Supp., 1996 WL 737215 (S.D.N.Y.), 72 Fair Empl.Prac.Cas. (BNA) 1717, 23 A.D.D. 508
**(Cite as: Not Reported in F.Supp.)**

Orientation or Identity
        78k1193 k. Particular Cases. Most Cited Cases
    (Formerly 78k141)

**Civil Rights 78 &#9758;1218(3)**

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handicap, Disability, or Illness
            78k1218 Who Is Disabled; What Is Disability
                78k1218(3) k. Particular Conditions, Limitations, and Impairments. Most Cited Cases
    (Formerly 78k173.1)
Postoperative transsexual was not protected from employment discrimination under either Title VII or ADA. Americans with Disabilities Act, of 1990, § 511(b)(1), 42 U.S.C.A. § 12211(b)(1); Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[5] Civil Rights 78 &#9758;1193**

78 Civil Rights
    78II Employment Practices
        78k1191 Discrimination by Reason of Sexual Orientation or Identity
            78k1193 k. Particular Cases. Most Cited Cases
    (Formerly 78k141)
Postoperative transsexual was protected from employment discrimination under New York State and New York City human rights laws. N.Y.McKinney's Executive Law, § 296; N.Y.Comp. Codes R. & Regs. title 8, § 8-107.

PRESKA, District Judge:
*1 The plaintiff, presently a postoperative transsexual, has brought an action against her former employer, charging that she was subjected to discrimination in violation of the New York State Human Rights Law, N.Y. Exec. Law, §§ 290 et seq. (McKinney 1993) ("State HRL"), and the New York City Human Rights Law, New York City Administrative Code, Title 8, §§ 8-101 et seq. (" City HRL"). Plaintiff alleges, among other things, that she experienced an increasingly hostile work environment, received negative and inaccurate performance evaluations, culminating in her ultimate termination, and was denied reimbursement for the medical expenses associated with her sex reassignment. Defendant has made a "Renewed Motion To Strike the Complaint," pursuant to Fed. R. Civ. P. 12(e) and Fed. R. Civ. P. 41(b), on the grounds that plaintiff has flouted the court's order requiring her to provide a more definite statement of her claim. For the reasons that follow, the motion is denied.

BACKGROUND

Plaintiff Corinne M. Rentos, "a transgendered female," was born an anatomic male and was formerly known as Dino Rentos. (Amended Complaint, ¶ 1). On or about August 2, 1993, plaintiff (as Corinne M. Rentos) was hired by defendant as a Field Services Manager. (Amended Complaint, ¶ 3). Plaintiff had started, but had not completed, the process of changing her sex from male to female at the time of her hiring. (Amended Complaint, ¶ 6). Defendant was apparently unaware of plaintiff's sex change prior to her employment with defendant Oce-Office Systems (" Oce") and selected plaintiff based upon her qualifications and experience. (Amended Complaint, ¶ 8).

Defendant's ignorance, however, was doomed to be short-lived, because Oce was self-insured with respect to its employee health and medical benefit programs. (Amended Complaint, ¶ 4). Because of the ongoing treatment connected with her sex reassignment, plaintiff incurred continuing medical expenses after becoming employed by Oce. (Amended Complaint, ¶ 7). In or about February, 1994, plaintiff requested defendant to make payments for expenses connected with her sex change through its group insurance liaison. (Amended Complaint, ¶ 9). At that time, defendant first became aware that the plaintiff was undergoing sex reassignment. (Amended Complaint, ¶ 10).

Tension resulted almost immediately upon Oce's becoming aware of plaintiff's condition. Plaintiff's immediate manager attempted to place her on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                              Page 3

Not Reported in F.Supp., 1996 WL 737215 (S.D.N.Y.), 72 Fair Empl.Prac.Cas. (BNA) 1717, 23 A.D.D. 508
**(Cite as: Not Reported in F.Supp.)**

probation, pending termination. Plaintiff alleges that her manager was "without any basis in fact" in making this attempt, and that his action "creat[ed] discrimination based upon plaintiff's 'sex.'" (Amended Complaint, ¶ 11). Plaintiff received two written performance reviews that she alleges were negative and inaccurate, one in February, 1994 and one in June, 1994. (Amended Complaint, ¶¶ 12, 15-17).

Plaintiff also catalogues a variety of ways in which the defendant allegedly made performance of her job more difficult: by attempting to fire plaintiff's " right-hand person," reassigning the plaintiff from Long Island to New York City, and providing her with an inexperienced and unqualified team hired on a nepotistic basis. (Amended Complaint, ¶¶ 19, 21-23). All of these acts resulted in an increasingly hostile work environment. (Amended Complaint, ¶ 28). In addition, plaintiff charges that Oce held a management conference at its home office in Chicago in March, 1994, approximately one month after plaintiff's first request for payment of her medical expenses. Plaintiff was in attendance at that meeting, as were all managers. (Amended Complaint, ¶ 13). The plaintiff contends that she became the target of vicious jokes and comments " about her sex background[sic] and subsequent change" at that conference. *Id.*

*2 The precipitating event to this alleged hostility, the question of plaintiff's medical coverage, continued to be a source of controversy in itself. In March, 1994, defendant's Human Resources Department advised plaintiff that expenses associated with her sex change would not be covered. (Amended Complaint, ¶ 14). Plaintiff continued to pursue payment, however, until December, 1994 when Oce allegedly reversed itself and advised the plaintiff that it would cover the expenses associated with her sex change. (Amended Complaint, ¶¶ 14, 18, 20).

In February, 1995, the plaintiff advised her manager that she needed to take three weeks off in March for surgery. According to plaintiff, "[t]his request was met with continued hostility, with the plaintiff now being questioned on each and every issue of her job performance." (Amended Complaint, ¶ 26).

Plaintiff then received yet another negative performance review which was allegedly " completely inaccurate." *Id.* On March 10, 1995, plaintiff was terminated, her belongings were packed up, and employees of defendant were warned not to talk to the plaintiff any further. (Amended Complaint, ¶ 27).

Even after her termination, however, the plaintiff continued to request payment of medical bills relating to her sex change. (Amended Complaint, ¶ 27). Plaintiff claims that in connection with her requests for payment, she has been the "object of vicious and inappropriate remarks from various employees of defendant." *Id.* Plaintiff charges that defendant's conduct amounts to sexual harassment and sexual discrimination, in violation of the State HRL and City HRL. (Amended Complaint, ¶¶ 11, 13-15, 19, 26-30).

Plaintiff filed this action in the Supreme Court of the State of New York, New York County, on August 9, 1995, and defendant then removed the action on the basis of diversity jurisdiction. (Brief in Support of Renewed Motion to Strike the Complaints, p. 2). On October 4, 1995, defendant moved for a more definite statement pursuant to Fed. R. Civ. P. 12(e). *Id.* At a conference held on October 18, 1995, I agreed that the Complaint then extant was overly vague. Plaintiff then provided me with an Amended Complaint which I found similarly deficient. I particularly noted the plaintiff's failure to identify the protected class in which she claimed membership. I granted leave to file an Amended Complaint on or before November 17, 1996. *Id.* at 3.

On November 13, 1995, plaintiff filed an Amended Complaint, and defendant moved to strike it on the grounds that: (1) it failed to identify the protected class to which plaintiff allegedly belonged; (2) it failed to articulate a theory of impermissible conduct; and (3) it failed to identify the employment actions that plaintiff was challenging. *Id.* On December 8, 1995, I issued an Order dismissing the Amended Complaint for failure to allege jurisdiction. Recognizing that the action had been removed, however, I initiated a telephone conference with the parties in which plaintiff's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                    Page 4

Not Reported in F.Supp., 1996 WL 737215 (S.D.N.Y.), 72 Fair Empl.Prac.Cas. (BNA) 1717, 23 A.D.D. 508
**(Cite as: Not Reported in F.Supp.)**

counsel conceded that he did not challenge the court's diversity jurisdiction over the case. I then verbally ordered plaintiff to amend the Complaint and on December 11, 1995, issued a written Order memorializing the verbal order:
**\*3** Plaintiff will take a final opportunity to amend the complaint and will file such an amended complaint on or before January 12, 1996.

December 11, 1995 Order of the Court.

Somewhat surprisingly, plaintiff's counsel in response sent a letter to defendant's counsel indicating that plaintiff would not file an amended complaint, but would rely on the November 13 Amended Complaint. Plaintiff's counsel then failed to appear at a conference scheduled for January 19, 1996. I was, however, able to reach counsel by telephone and again ordered the filing of a further amended complaint, asserting diversity and identifying plaintiff's alleged protected status. On or about February 8, 1996, plaintiff filed the Amended Complaint that is the subject of the present motion. Defendant filed a renewed Motion to Strike on or about April 10, 1996. Because plaintiff's latest pleading is substantially in compliance with my most recent Order, because striking a complaint is a drastic and disfavored remedy, and because plaintiff alleges a colorable claim under the State HRL and City HRL, the motion is denied.

### DISCUSSION

*I. Striking a Complaint is a Drastic and Disfavored Remedy*

The courts have long recognized that to strike a complaint will derail the action at a very preliminary stage, well before any opportunity to reach the merits of the case. In *Seaboard Midland Petroleum Corp. v. Socony Vacuum Oil Co.,* 2 F.R.D. 150 (S.D.N.Y. 1941), for example, the defendant made a demand for a bill of particulars under a now defunct rule of procedure.[FN1] The court issued an order directing the service of the bill of particulars; the plaintiff had only partially complied with that order. *Id.* at 151. Noting that "

[t]he failure to comply with an order such as the one at bar may entail dismissal of the complaint," pursuant to Fed. R. Civ. P. 12(e), the court nonetheless held that it was "reluctant to invoke the drastic remedy sought by the defendant" and would "afford plaintiff another opportunity to comply" with the portions of the order that had not yet been satisfied. *Id.*

> FN1. The procedure was similar to a motion for a more definite statement, at least in its objective.

In 1957, in *Nagler v. Admiral Corporation,* 248 F.2d 319 (2d Cir. 1957), the Court of Appeals verified the wisdom of the *Seaboard* court's approach. There, defendants had moved the lower court for dismissal due to the plaintiffs' alleged failure to plead properly under Fed. R. Civ. P. 8(a) and 8(e). The lower court granted the motion; a unanimous Second Circuit panel reversed and remanded. The court castigated the district court for its formalism:
The drastic remedy here granted for pleading errors is unusual, since outright dismissal for reasons not going to the merits is viewed with disfavor in the federal courts [citing contemporary cases for the policy] ... And this has been true generally in both english [sic] and American law and legal history, for cases are not disposed of on mere points of pleading alone. Courts naturally shrink from the injustice of denying legal rights to a litigant for mistakes in the technical form of his attorney. Moreover, there are, or would be, serious questions of res judicata ....

**\*4** *Id.* at 321.

While it is difficult to locate a case that parallels the one at bar precisely, it is clear that more recent decisions are in accord with the long-standing principles set forth above. Numerous courts have held that analogous motions to strike "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" under Fed. R. Civ. P. 12(f) are disfavored for similar reasons. *See Federal Deposit Insurance Corp. v. Abel,* No. 92 Civ. 9175 (JFK), 1995 WL 716729, at \*12

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 5

Not Reported in F.Supp., 1996 WL 737215 (S.D.N.Y.), 72 Fair Empl.Prac.Cas. (BNA) 1717, 23 A.D.D. 508
**(Cite as: Not Reported in F.Supp.)**

(S.D.N.Y. December 6, 1995) (stating that " [m]otions to strike are not favored and should generally not be granted" and denying defendant's motion to strike) (citing *Salcer, Panfeld, Edelman, et al. v. Envicon Equities Corp.,* 744 F.2d 935, 939 (2d Cir. 1984), *vacated on other grounds,* 478 U.S. 1015 (1986); *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887 (2d Cir. 1976)).

Rule 12(e) of the Federal Rules of Civil Procedure provides:
If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a more responsive pleading, the party may move for a more definite statement before interposing a responsive pleading. The motion shall point out the defects complained of and the details desired. If the motion is granted and the order of the court is not obeyed within 10 days after notice of the order or within such other time as the court may fix, the court may strike the pleading to which the motion was directed or make such order as it deems just.

Fed. R. Civ. P. 12(e). Dismissal is thus never mandatory; rather, if the court feels that a party has not satisfied an order to provide a more definite statement, the court *may* order dismissal or such other remedy "as it deems just." *See Delta Education, Inc. v. Langlois,* 719 F. Supp. 42 (D.N.H. 1989); 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1377 (1990).

Sometimes it appears that courts and commentators have defined Rule 12(e) by exclusion: a substantial portion of the caselaw is devoted to what the rule is *not.* For example, Rule 12(e) is not to be used simply to ascertain a plaintiff's legal theories. *See Bryson v. Bank of New York,* 584 F. Supp. 1306, 1319 (S.D.N.Y. 1984); 5A Wright & Miller, Federal Practice and Procedure § 1377 ("Moreover, any attempt to use a motion for a more definite statement to tie the pleader down to a particular legal theory of his case will be rejected as contrary to the philosophy of the federal rules, which does not require the claimant to settle upon a theory of his case at the pleading stage.") Motions under Rule 12(e) are not a substitute for discovery. *FRA, S.p.A.*

*v. Surg-O-Flex of America, Inc.,* 415 F. Supp. 421 (S.D.N.Y. 1976). Further, a Rule 12(e) motion is not a fishing expedition to facilitate the filing of a later Rule 12(b)(6) motion. 5A Wright & Miller, Federal Practice & Procedure § 1376 ("[T]here should be a bias against the use of the Rule 12(e) motion as a precursor to a Rule 12(b)(6) motion or as a method for seeking out a threshold defense.").

**\*5** [1] Courts have recognized a tension between Rule 12(e) and Fed. R. Civ. P. 8, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8; *MTV Networks v. Curry,* 867 F. Supp. 202, 207 (S.D.N.Y. 1994). Thus, in determining a Rule 12(e) motion, the court must assess the complaint in the light of the very minimal requirements imposed by Rule 8. In the present case, for the reasons that will be discussed in the next section, the Amended Complaint, while far from a model of clarity, fulfills the minimal requirements of Rule 8 and of my December 11, 1995 Order and therefore, since no higher degree of specificity is required, is adequately constructed to withstand this motion to strike.

## II. *The Amended Complaint Complies with the December 11, 1995 Order*

[2] Defendant's main objection to the present complaint is that it "fails to identify the protected class to which Plaintiff allegedly belongs," as I ordered in December, 1995. (Brief in Support of Renewed Motion to Strike Complaints, p. 6). A cursory review of the Amended Complaint reveals that this is simply inaccurate.

Plaintiff's first paragraph identifies plaintiff as a " transgendered female." (Amended Complaint, ¶ 1). Throughout the Amended Complaint, plaintiff charges that Oce's various conduct "creat[ed] discrimination based upon plaintiff's 'sex'" and " creat[ed] a hostile work environment based on plaintiff's 'sex.'" (Amended Complaint, ¶¶ 11, 13, 15, 19, 26-30). As will be discussed more fully below, this identification is sufficient to raise a colorable claim under the State HRL and the City HRL.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 6

Not Reported in F.Supp., 1996 WL 737215 (S.D.N.Y.), 72 Fair Empl.Prac.Cas. (BNA) 1717, 23 A.D.D. 508
**(Cite as: Not Reported in F.Supp.)**

I find that the Amended Complaint thus clearly identifies plaintiff's claim as one for sex discrimination; moreover, any possible ambiguity is resolved by the confirmation contained in the Affidavit in Opposition submitted by Robert Ferris. Plaintiff's counsel states:
The amended complaint and the previous plaintiff [sic] pleadings set forth clearly and without any doubt that the plaintiff's protected class is that of her sex, through an operation changing her from a male to a female and that, as a result, this employer, over a protracted period of time, discriminated against her and created an ugly and hostile work environment, culminating in her illegal termination.

(Affidavit in Opposition, ¶ 21). This contention is framed in terms consistent with the current state of New York law, and is therefore sufficient to satisfy the minimal pleading requirements imposed by Rule 8 and my Order.

[3] In its Brief in Support of Renewed Motion to Strike Complaints, the defendant argues that " [d]efendant should not have to guess at Plaintiff's theory or why Plaintiff believes that Plaintiff is covered by the state and city statutes which Plaintiff claims were violated." (Brief in Support of Renewed Motion to Strike Complaints, p. 10). The law is clear, however, that defendant has no entitlement to plaintiff's "theory of the case" at the pleadings stage, *see Bryson v. Bank of New York,* 584 F. Supp. 1306, 1319 (S.D.N.Y. 1984); *Hylte Bruks Aktiebolag v. Babcock & Wilcox Co.,* 45 F.R.D. 357, 360 (S.D.N.Y. 1968), and plaintiff has alleged an adequate protected status under New York law.

### III. Plaintiff Has Alleged an Adequate Protected Status under New York Law

**\*6** Courts have faced great difficulty in conceptualizing claims for employment discrimination by transsexuals. As one commentator has noted, "[w]hile the law draws lines, a transsexual crosses lines." Debra Sherman Tedeschi, *The Predicament of the Transsexual Prisoner,* 5 Temp. Pol. & Civ. Rts. L. Rev. 27, 27 (Fall 1995). Further contributing to the confusion in

this area, the analysis under New York state and city law has diverged from the analysis of the question under federal law.

### A. The Nature of Transsexualism

Transsexualism is the enduring, pervasive, compelling desire to be a person of the opposite sex. Richard Green, *Spelling "Relief" for Transsexuals: Employment Discrimination and the Criteria of Sex,* 4 Yale L. & Pol'y Rev. 125, 125 (Fall 1985) (citing the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, III 263 (1980)). The Supreme Court has adopted a consistent definition: a transsexual is "one who has a rare psychiatric disorder in which a person feels persistently uncomfortable about his or her anatomical sex and who typically seeks medical treatment, including hormonal therapy and surgery, to bring about a permanent sex change." *Farmer v. Brennan,* 114 S. Ct. 1970, 1975 (1994) (quoting American Medical Association, Encyclopedia of Medicine 1006 (1989)).

The question that has perplexed the courts (and probably the layperson as well) is what is the sex or gender of a transsexual, both preoperatively and postoperatively? This is part of the dilemma inherent in defendant's demand that plaintiff definitively identify the protected class in which she claims membership. Complicating this question is the multitude of factors that the medical community has deemed to be relevant in identifying an individual's gender: sex chromosomes (XX configuration for females, XY for males); gonads (ovaries or testes); sex hormones (estrogen or androgen predominance); internal reproductive organs (uterus or sperm ducts); external genitalia (clitoris and labia or penis and scrotum); secondary sex characteristics (presence of breasts, body hair distribution, etc.); and psychological sex (also known as gender identity). In the preoperative transsexual, the final factor, gender identity, is contrary to the sex indicated by the other biological factors.

Physical treatments can harmonize some of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 7

Not Reported in F.Supp., 1996 WL 737215 (S.D.N.Y.), 72 Fair Empl.Prac.Cas. (BNA) 1717, 23 A.D.D. 508
**(Cite as: Not Reported in F.Supp.)**

other factors with the transsexual's psychological sex. Surgery can remove the gonads and internal reproductive organs and transform the external genitalia. Hormone therapy can alter the distribution of the secondary sex characteristics. Subsequent to these treatments, the postoperative transsexual has reconciled the biological factors with his or her subjective gender identity, with the crucial exception of the chromosomes. The transsexual's cellular structure, of course, is not subject to alteration.

Thus, even a postoperative transsexual still exhibits at least one inconsistency in gender identification: his or her chromosomal configuration is at war with the other factors contributing to a sexual identity. This inconsistency was at issue in *Richards v. United States Tennis Ass'n,* 400 N.Y.S.2d 267 (Sup. Ct. N.Y. Cty. 1977). Dr. Renee Richards, a professional tennis player who had undergone sex reassignment surgery to change her sex from male to female, sought an injunction to prevent various professional tennis associations from disqualifying her from playing in the U.S. Open on the basis of the Barr body test. *Id.* at 268. The Barr body test, or sex chromatin test, detects the presence of a second X chromosome in a female. Although Dr. Richards's Barr test results were ambiguous (apparently due to a failure to follow proper protocol in administration of the test), she would ordinarily register as a male under this test. Dr. Richards introduced a barrage of medical testimony, however, demonstrating that by every other known indicator she would be considered female. *Id.* at 271-72. Citing the " overwhelming medical evidence that this person is now female," the court held:

*7 the requirement of defendants that plaintiff pass the Barr body test in order to be eligible to participate in the women's singles of the U.S. Open is grossly unfair, discriminatory and inequitable, and violative of her rights under the Human Rights Law of this state. (Executive Law, Article 15, Sections 290, *et seq.*).

*Id.* The court thus rejected the chromosomal indicator in favor of the other factors. Declaring whether a transsexual is male or female, therefore, depends on the relative importance assigned to each indicator of sex.

This question of categorization is, of course, critical to the application of the federal, state, and local anti-discrimination laws. These laws have been applied to the problem of a transsexual claiming employment discrimination in different ways.

B. *Application of the Federal Anti-Discrimination Laws*

[4] Every federal court that has considered the question has rejected the application of the Civil Rights Act of 1964, 42 U.S.C. 2000e-2 (1982) ( " Title VII") to a transsexual claiming employment discrimination. *See, e.g., Ulane v. Eastern Airlines, Inc.,* 742 F.2d 1081 (7th Cir.), *cert. denied,* 471 U.S. 1017 (1984); *see also Sommers v. Budget Marketing, Inc.,* 667 F.2d 748 (8th Cir. 1982); *Holloway v. Arthur Andersen and Co.,* 566 F.2d 659 (9th Cir. 1977); *Dobre v. National R.R. Passenger Corp.,* 850 F. Supp. 284 (E.D.Pa. 1993); *Powell v. Read's Inc.,* 436 F. Supp. 369 (D.Md. 1977); *Voyles v. Ralph K. Davies Medical Center,* 403 F. Supp. 456 (N.D.Cal. 1975), *aff'd,* 570 F.2d 354 (9th Cir. 1978); *Grossman v. Bernards Township Board of Education,* 11 FEP Cases 1196 (D.N.J. 1975), *aff'd,* 538 F.2d 319 (3d Cir.), *cert. denied,* 429 U.S. 897 (1976). Most of these courts have followed the reasoning set forth by the *Ulane* decision. In *Ulane,* the Seventh Circuit found that the parameters of Title VII's prohibition against sex discrimination could not be stretched to cover the claim of a transsexual:

Although the maxim that remedial statutes should be liberally construed is well recognized, that concept has reasonable bounds beyond which a court cannot go without transgressing the prerogatives of Congress. In our view, to include transsexuals within the reach of Title VII far exceeds mere statutory interpretation. Congress had a narrow view of sex in mind when it passed the Civil Rights Act, and it has rejected subsequent attempts to broaden the scope of its original interpretation. For us to now hold that Title VII protects transsexuals would take us out of the realm of interpreting and reviewing and into the realm of legislating.

*Ulane,* 742 F.2d at 1086. Plaintiff's counsel

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 8

Not Reported in F.Supp., 1996 WL 737215 (S.D.N.Y.), 72 Fair Empl.Prac.Cas. (BNA) 1717, 23 A.D.D. 508
**(Cite as: Not Reported in F.Supp.)**

recognizes the uniformity of the federal courts' position in his Affidavit in Opposition, in which he states that he is "aware of the fact that Federal Law, under Title VII, precludes protection of transsexuals with respect to discrimination in the workplace." (Affidavit in Opposition, ¶ 4). Plaintiff's Amended Complaint therefore cannot hope to, and does not purport to, state a claim under Title VII.

**\*8** The Americans with Disabilities Act provides no more hospitable ground for plaintiff's claim. In passing the Act, Congress expressly defined "disability" in a way that excludes transsexualism. Americans with Disabilities Act, 42 U.S.C. § 12211(b)(1) (1990). Plaintiff therefore clearly lacks any recourse under federal law; the interpretation of the State HRL and the City HRL, however, is independent of the federal law analysis.

### C. Application of the State HRL and City HRL

**[5]** A review of *Maffei v. Kolaeton Industries, Inc.,* 164 Misc.2d 547, 626 N.Y.S.2d 391 (Sup. Ct. N.Y. Cty. 1995), the only case addressing the issue of employment discrimination against a transsexual under the New York State HRL and City HRL, reveals that plaintiff has framed her allegation of protected status in a manner consistent with the available interpretation of those laws. In *Maffei,* the plaintiff was a female to male postoperative transsexual, who sued his former employer under Title VII, the City HRL, and the State HRL.

The court quickly disposed of plaintiff's Title VII claim, pointing out that every federal court to have considered the issue had denied the application of Title VII to transsexuals. *Id.* at 393. Nonetheless, the court went on to hold that "the rulings in the aforesaid federal cases are unduly restrictive and should not be followed in interpreting our New York City statute." *Id.* at 394-95. Similarly, the court adverted to decisions by the New York Court of Appeals holding that although the state antidiscrimination statute is similar to Title VII, New York courts are not bound by interpretations of the federal law and that the overriding remedial purpose of the state statute "was by blanket description to eliminate all forms of discrimination,

those then existing as well as any later devised." *Id.* at 395 (citing *Brooklyn Union Gas Co. v. New York State Human Rights Appeal Board,* 41 N.Y.2d 84, 86, 89, 390 N.Y.S.2d 884, 359 N.E.2d 393 (1976)); *see also Nicolo v. Citibank,* 147 Misc.2d 111, 114, 554 N.Y.S.2d 795 (Sup. Ct. Monroe Cty. 1990) (" [T]here is nothing precluding a court of this state from making a more expansive interpretation" of state law than that given to Title VII).

The State HRL provides, in relevant part:
1. It shall be an unlawful discriminatory practice:
(a) For any employer or licensing agency, because of the age, race, creed, color, national origin, sex, or disability, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment.

N.Y. Exec. Law, § 296 (McKinney 1993). The City HRL is framed in similar terms, with two distinctions: the term "gender" replaces the word "sex," [FN2] and the City law includes a prohibition against discrimination on the basis of sexual orientation. New York City Administrative Code, Title 8, § 8-107.

> FN2. One federal court has hinted that if Title VII spoke in terms of "gender" rather than "sex," transsexuals might have a stronger claim for protection, stating that:
> The term "sex" in Title VII refers to an individual's distinguishing biological or anatomical characteristics, whereas the term "gender" refers to an individual's sexual identity.
> *Dobre v. National R.R. Passenger Corp.,* 850 F. Supp. 284, 286 (E.D.Pa. 1993).

**\*9** The plaintiff in *Maffei* had attempted an inversion of the reasoning of the *Ulane* and following courts by basing his argument on the City HRL's inclusion of sexual orientation as a protected status. In *Ulane,* the court had partially relied on the fact that Congress had rejected bills proposing the addition of the term "sexual orientation" to Title VII in determining that the legislative intent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                            Page 9

Not Reported in F.Supp., 1996 WL 737215 (S.D.N.Y.), 72 Fair Empl.Prac.Cas. (BNA) 1717, 23 A.D.D. 508
**(Cite as: Not Reported in F.Supp.)**

required a narrow construction of the term "sex," thereby excluding transsexuals. *Ulane,* 742 F.2d at 1086. The *Maffei* plaintiff pointed to the inclusion of "sexual orientation" in the City law as evidence that the City legislators intended to prohibit discrimination against transsexuals. The court, however, repudiated what it perceived as a false parallel between homosexuality and transsexualism, noting that sexual orientation deals with the sex of a person's partner while transsexualism is concerned with the person's own sexual identity. *Id.* at 393, 394.

The court nevertheless agreed with the plaintiff that the City HRL was subject to a broader interpretation than Title VII and concluded:
I find that the creation of a hostile work environment as a result of derogatory comments relating to the fact that as a result of an operation an employee changed his or her sexual status, creates discrimination based on "sex" ... Thus, an employer who harasses an employee because the person, as a result of surgery and hormone treatments, is now of a different sex has violated our City provision against discrimination based on sex.

*Id.* at 396. The plaintiff in the present case evidently tracked this language, quotation marks and all, in framing the present Amended Complaint. Any ambiguity as to the plaintiff's protected status is therefore merely reflective of the present state of the law, and the complaint clearly alleges membership in what at least one court has found to be a protected class under city and state law.[FN3]

> FN3. While the court spoke more clearly on the question of City law, I interpret its allusions to the more expansive application of the State law compared with Title VII, as well as its citation to the *Richards* case, as evidence of an equivalent conclusion that the State law similarly outlaws discrimination against transsexuals as a form of unlawful "sex" discrimination. *See Maffei,* 626 N.Y.S. 2d at 394, 395.

CONCLUSION

The motion to strike the complaint for failure to comply with my December 11, 1995 Order is denied for the reasons set forth above. While plaintiff's cross-motion for sanctions under Fed. R. Civ. P. 11 is also denied, I note that one reason that Rule 12(e) motions are disfavored is because of the attendant delay and the potential for harassment. *See, e.g., Michael v. Clark Equip. Co.,* 380 F.2d 351, 352 (2d Cir. 1967) (reversing a lower court's grant of a Rule 12(e) motion and noting that "time spent this way [polishing the pleadings] is usually wasted"). In the present case, the Amended Complaint at issue was filed on or about February 8, 1996. Now, over ten months later, I find that no reason readily appears why defendant could not have responded to that pleading. Accordingly, defendant has twenty days from the date hereof to answer, move, or otherwise respond to the Amended Complaint.

SO ORDERED.

S.D.N.Y.,1996.
Rentos v. Oce-Office Systems
Not Reported in F.Supp., 1996 WL 737215 (S.D.N.Y.), 72 Fair Empl.Prac.Cas. (BNA) 1717, 23 A.D.D. 508

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.