```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2
    - - - - - - - - - - - - - - - x
 3   DIANE J. SCHROER,              :
                                    :
 4        Plaintiff,                :
                                    :
 5             v.                   :   CA No. 06-763
                                    :
 6   JAMES H. BILLINGTON,           :
                                    :
 7        Defendant.                :
    - - - - - - - - - - - - - - - x
 8

 9                      Washington, D.C.

10                      Thursday, January 11, 2007

11

12         Deposition of CHARLOTTE P. PREECE, called

13   for examination by counsel for Plaintiff, pursuant

14   to notice, at the Law Offices of 1875 Pennsylvania

15   Avenue, N.W., Washington, D.C., and commencing at

16   9:10 a.m., before Barbara a. Huber, Notary Public in

17   and for the District of Columbia, when were present

18   on behalf of the respective parties:

19

20

21

22
```

Charlotte P. Preece                                          January 11, 2007

Washington, DC

Page 2

```
1  APPEARANCES:
2    On behalf of Plaintiff:
3      SHARON M. McGOWAN, ESQUIRE
       JAMES D. ESSEKS, ESQUIRE
4      American Civil Liberties Union Foundation
       125 Broad Street
5      18th Floor
       New York, New York 10004-2400
6      (212) 549-2593
       smcgowan@aclu.org
7
     On behalf of Defendant:
8
       BEVERLY M. RUSSELL, ESQUIRE
9      U.S. Department of Justice
       Judiciary Center Building
10     555 4th Street, N.W.
       Washington, D.C. 20001
11     (202) 307-0492
       beverly.russell@usdoj.gov
12
     Also Present:
13
       Jessie James, Jr.
14     Julia Douds
15
16
17           * * * * *
18
19
20
21
22
```

Page 3

**CONTENTS**

| EXAMINATION BY: | PAGE |
| --- | --- |
| Counsel for Plaintiff | 4 |
| Counsel for Defendant | 314 |

| DEPOSITION EXHIBITS: | PAGE |
| --- | --- |
| No. 19 - Vacancy Announcement | 77 |
| No. 20 - Crediting Plan Questionnaire | 77 |
| No. 21 - E-Mail, September 16, 2004 | 90 |
| No. 22 - Listing of Scores for Candidates | 90 |
| No. 23 - Memo, September 17, 2004; Attachment | 95 |
| No. 24 - E-Mail, September 28, 2004 | 95 |
| No. 25 - E-Mail, December 7, 2004 | 103 |
| No. 26 - E-Mail, December 8, 2004 | 112 |
| No. 27 - Beginning of a Recommendation | 127 |
| No. 28 - Letter, January 20, 2005; Attachments | 286 |
| No. 29 - Memo, January 24, 2005 | 292 |
| No. 30 - Letter, March 7, 2005 | 306 |
| No. 31 - E-Mail, March 23, 2005 | 306 |

Page 4

```
1           P R O C E E D I N G S
2  Whereupon,
3           CHARLOTTE P. PREECE,
4  was called as a witness by counsel for Plaintiff,
5  and having been duly sworn, by the Notary Public,
6  was examined and testified as follows:
7        EXAMINATION BY COUNSEL FOR PLAINTIFF
8  BY MS. McGOWAN:
9    Q   Good morning, Ms. Preece. My name is
10 Sharon McGowan. And I'm here with my colleague,
11 James Esseks. And we represent the Plaintiff in
12 Schroer versus Billington. And we're here this
13 morning to take your deposition.
14       Have you ever been deposed before?
15   A   No.
16   Q   Okay. So I'm just going to go through a
17 series sort of instructions and tips so that you
18 understand how things are going to proceed today,
19 and that the court reporter can take everything
20 down. I will ask you a series of questions that
21 you will answer under oath, as you've just been
22 sworn. And the court reporter will take it all
```

Page 5

```
1  down. Okay?
2    A   Okay.
3    Q   And it's important that you answer out
4  loud, because the court reporter cannot record a
5  nod of the head or a gesture. Okay?
6    A   I understand.
7    Q   The court reporter also cannot --- or
8  it's difficult for her to record when two people
9  are talking at the same time. And so I will
10 certainly try not to interrupt you. And at the
11 same time, it's important for me to get the
12 question out so that the court reporter can have a
13 clear transcript. Okay?
14   A   Okay.
15   Q   Okay. And if you don't understand a
16 question, will you ask me to repeat it and to
17 clarify?
18   A   Yes.
19   Q   Okay. And if you do answer a question,
20 I will assume that you understood it. Okay?
21   A   Yes.
22   Q   I will take breaks throughout the day.
```

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                    January 11, 2007
Washington, DC

| Page 6 | Page 8 |
|---|---|
| 1 But if you need a break, just let me know and I'll | 1 sometimes is used differently from "transsexual." |
| 2 find a place that we can stop for a few minutes. | 2 But for purposes of today, I will use the term |
| 3 Okay? | 3 synonymously. |
| 4   A   Fine. | 4   A   Okay. |
| 5   Q   Are you feeling well today? | 5   Q   And so if there's at any point where |
| 6   A   Sure, yes, uh-huh. | 6 you're unclear about what the definition is that |
| 7   Q   Are you taking any medication today that | 7 we're talking about, definitely please feel free |
| 8 would prevent you from being able to give complete | 8 to ask me that and I will try to clarify. |
| 9 and accurate testimony? | 9      And so is that okay? |
| 10   A   No.  I mean, I'm taking medication, but | 10   A   Yes. |
| 11 not that would. | 11   Q   This case involves a dispute about the |
| 12   Q   Okay.  Is there any other reason that | 12 hiring decision made for the position of |
| 13 you would not be able to give complete and | 13 specialist in terrorism and international crime. |
| 14 accurate testimony today? | 14 Over the course of this deposition I may refer to |
| 15   A   No. | 15 this as the terrorism specialist position.  Okay? |
| 16   Q   Okay.  Before we start with your | 16   A   Fine. |
| 17 questions, I wanted to just lay out a few terms | 17   Q   And, finally, the plaintiff in this case |
| 18 that we'll be talking about today.  The first term | 18 is Diane Schroer.  At the time of the events in |
| 19 or pair of terms is "transgender" and | 19 this case, Ms. Schroer went by the name of David |
| 20 "transsexual." | 20 Schroer.  So during this deposition when I talk |
| 21      What do you understand the term | 21 about Diane Schroer or Ms. Schroer, I'm also |
| 22 "transgender" to mean? | 22 referring to the person formerly known as David |

| Page 7 | Page 9 |
|---|---|
| 1   A   If someone is changing physical | 1 Schroer.  Okay? |
| 2 appearance from one sex to another. | 2   A   And is it appropriate for me to refer to |
| 3   Q   Okay.  And anything else? | 3 him as David during the period that I knew him as |
| 4   A   And becoming that sex, living as that | 4 such? |
| 5 sex. | 5   Q   That is fine.  If you want to use |
| 6   Q   Okay.  What do you understand the term | 6 Mr. Schroer, David Schroer, or Ms. Schroer, or |
| 7 "transsexual" to mean? | 7 Diane Schroer, we will understand, for purposes of |
| 8   A   I thought they were synonymous. | 8 the deposition, that we are talking about one |
| 9   Q   Okay.  For purposes of this deposition, | 9 person. |
| 10 when I talk about transgender or transsexual | 10   A   Okay. |
| 11 applicants, I'm referring to individuals who | 11   Q   Okay.  What is your title? |
| 12 intend to or have transitioned from living as the | 12   A   I'm the assistant director for foreign |
| 13 gender that they were assigned at birth; for | 13 affairs, defense, and trade. |
| 14 example, on their birth certificate, to living as | 14   Q   And where do you work? |
| 15 the gender that they feel they are on the inside. | 15   A   In the medicine building of the Library |
| 16 This includes individuals who have a formal | 16 of Congress. |
| 17 diagnosis of gender identity disorder. | 17   Q   And you are the assistant director of a |
| 18      And so in this case, for example, Diane | 18 service unit at the Congressional Research |
| 19 Schroer is a transsexual woman.  She was assigned | 19 Service; is that correct? |
| 20 the gender male at birth, on her birth | 20   A   Of a research division. |
| 21 certificate, but now lives and presents herself to | 21   Q   A research division.  Okay. |
| 22 the public as female.  The term "transgender" | 22      And what are your specific job |

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                           January 11, 2007
Washington, DC

---

Page 10

1  responsibilities?
2      A   I supervise about just shy of a hundred
3  people, probably about 85 research analysts, who
4  do work for the United States Congress on foreign
5  affairs, defense, and trade.
6      Q   And how many of those analysts are in
7  positions requiring security clearances?
8      A   Most of the trade people not. Most of
9  the foreign policy people do. All the defense
10 people do.
11     Q   And, roughly, the number of -- of the 85
12 research analysts, what number does that amount to
13 of analysts that have a security clearance
14 component of their job?
15     A   I'd say 75 to 80 percent have
16 clearances.
17     Q   Who do you report to?
18     A   The director of the Congresional
19 Research Center.
20     Q   Who is?
21     A   Dan Mulhollan.
22     Q   Okay. And who reports to you?

---

Page 11

1      A   The people that I supervise. I have six
2  intermediate managers, or seven rather section
3  heads. I have a deputy. I have an administrative
4  support person. I have two project management
5  coordinators. And the rest are analysts.
6      Q   And how long have you been with the
7  Library of Congress?
8      A   Since 1976.
9      Q   And when did you take over the position
10 that you currently hold?
11     A   I became acting division chief in late
12 1991. I became permanent division chief in early
13 1994. There was a reorganization roughly six
14 years ago. And trade people were moved into the
15 division. And then instead of being a division
16 chief, I became the assistant director for foreign
17 affairs, defense, and trade.
18     Q   And that was 2000 or 2001?
19     A   Roughly 2000, yes.
20     Q   Do the analysts that you report to
21 report directly to you?
22     A   No. They have a section head.

---

Page 12

1      Q   And for the position of terrorism
2  specialist, to whom would that analyst report?
3      A   The head of the foreign policy
4  management and global issues section. And that
5  would be Francis Miko, M-I-K-O.
6      Q   And Mr. Miko was the supervisor at the
7  time of the events in this case; is that right?
8      A   That's correct.
9      Q   Were you the person responsible for
10 hiring the terrorism specialist?
11     A   Yes, I was the security officer.
12     Q   Okay. Was the terrorism specialist
13 position a newly created position that you were
14 filling?
15     A   No.
16     Q   Okay. Who held the position previously?
17     A   Audrey Kurth Cronin.
18     Q   Can you spell that name?
19     A   Kurth is K-U-R-T-H. And Cronin is
20 C-R-O-N-I-N. Audrey is her first name.
21     Q   Oh, Audrey. Okay.
22     A   I saw you had it written down, so --

---

Page 13

1      Q   When did Ms. Kurth Cronin inform you
2  that she intended to leave the position?
3      A   In July of 2004.
4      Q   And did she inform you why she was
5  leaving the position?
6      A   Yes.
7      Q   And why was that?
8      A   She had accepted a teaching position, a
9  faculty position, at the National War College.
10     Q   And what was her last day on the job?
11     A   It was the last week of July. I can't
12 remember the specific date.
13     Q   Did you need to do anything to get
14 approval to begin the process of replacing
15 Ms. Kurth Cronin in the position?
16     A   I did.
17     Q   What did you do?
18     A   I had to make a special appeal to the
19 director.
20     Q   And what did that involve?
21     A   A short memo, going down to talk to him,
22 saying why we needed a person when we did, because

---

4 (Pages 10 to 13)

Charlotte P. Preece                                                      January 11, 2007
Washington, DC

Page 14

1  it was out of our hiring cycle.
2      Q   And what did you say in that memo?
3      A   Basically the exegesis of the job
4  requirements, particularly post 9/11, this
5  position was in high demand. It was important
6  that we fill it as soon as possible.
7      Q   And to whom did you send this memo?
8      A   I'm not even sure if it was a memo or a
9  conversation. It was just a discussion of going
10  down. And it was all very quick, because I didn't
11  have much timing from the time I think she was
12  going to take the position.
13     Q   Okay. And with whom did you speak or
14  with whom did you have this conversation?
15     A   The director.
16     Q   And can you tell me what you remember
17  from the conversation about how you described how
18  quickly you wanted to fill the position?
19     A   I think I said as soon as possible. We
20  only have two people, or had two people at the
21  time we who worked in terrorism. And so when one
22  left, we were very short-staffed and scrambling.

Page 15

1      Q   And how did the director respond to your
2  request?
3      A   Favorably.
4      Q   And by favorably, what does that mean?
5      A   That he said we'll work with our
6  workforce development people to get the posting up
7  as soon as possible.
8      Q   And did Mr. Mulhollan have to produce
9  any paperwork to get that process started?
10     A   I don't know.
11     Q   Okay. Do you remember seeing any memo
12  from Mr. Mulhollan, after your conversation, about
13  the fact that he had approved your request?
14     A   No.
15     Q   Okay. As part of your conversation with
16  Mr. Mulhollan, did you share any documents with
17  him?
18     A   No.
19     Q   Okay. Did you request permission to
20  conduct this hire on an expedited basis?
21     A   Not on an expedited basis, but out of
22  normal cycle. We normally have a quarterly

Page 16

1  sometimes only semiannual staffing call. And this
2  did not -- this timeframe did not coincide with
3  that staffing call. So in that sense it was
4  special.
5      Q   Other than being an out-of-cycle hire,
6  was there any other option that you had for
7  expediting the hire?
8      A   Just to stay on top of it and make sure
9  each stage of the process moved along as quickly
10  as it could.
11     Q   Do all employment vacancies in your unit
12  need to be filled on an urgent basis?
13     A   No.
14     Q   Okay. Which ones do not?
15     A   For example, we're in the process of
16  having a staffing call now. We just recently had
17  one, and positions were approved. I met yesterday
18  with the workforce development staffing people to
19  come up with a timeframe and set priorities of
20  which positions I wanted to fill first, which ones
21  I could afford to fill later in the fiscal year,
22  so --

Page 17

1      Q   Okay. And if you could explain sort of
2  which -- which positions did you consider more
3  urgent and which ones less so?
4      A   Okay. In this case, the urgent ones
5  were a specialist in weapons of mass destruction
6  proliferation, non-proliferation policy; a
7  specialist in military operations. Two less
8  urgent were an analyst in international trade and
9  finance. Oh, I cannot -- a fourth position,
10  excuse me. An analyst and a junior analyst in
11  international narcotics and crime.
12     Q   How many hires have you overseen?
13     A   I would dare say 40 to 50.
14     Q   And by overseeing, correct me if I'm
15  wrong, but that means that you were the selecting
16  official for those positions; is that correct?
17     A   That's correct.
18     Q   Okay. And how many of those hires were
19  for analyst positions?
20     A   95 percent of them.
21     Q   And how many of those positions did not
22  need to be filled on an urgent basis?

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece

January 11, 2007

Washington, DC

Page 18

1    A    Could you define urgency for me?
2    Q    Well, were there positions that you felt
3    needed to be filled on an urgent basis; and if so,
4    I would ask you to describe how you determined
5    that they were urgent?
6    A    By the workload.
7    Q    And what do you mean by workload?
8    A    CRS fields questions from members of
9    Congress. We also -- it's part of our job, as
10    well as to anticipate, to look out -- to have
11    products prepared on issues that we see coming
12    down the road. And so our analysts are both
13    reacting to requests they're receiving, as well as
14    looking ahead and trying to prepare.
15    Q    And of the 40 to 50 hires that you've
16    been involved in, how many were hires that you
17    requested to be filled out of cycle?
18    A    Very few. I'm trying to think if there
19    was -- I can't remember another time of going to
20    the director out of cycle and saying we need to
21    fill immediately, as soon as we can.
22    Q    So your testimony is that the terrorism

Page 19

1    specialist position was the first and only time
2    you've gone to the director with a request for a
3    hire out of cycle?
4    A    Since we started this process. We
5    didn't always have this staffing cycle. Back in
6    the day when I first became division chief, when
7    you wanted a position you would just go down and
8    talk to the director. There wasn't an organized
9    systematic staffing call like there is now.
10    Q    And do you need to fill out any
11    paperwork in order to request a hire out of cycle?
12    A    I just don't recall whether I did or
13    not. I may have.
14    Q    With respect to the terrorism specialist
15    position, if Mr. Mulhollan had not approved your
16    request to fill the position out of cycle, how
17    long would it have taken for you to be able to
18    fill that position?
19    MS. RUSSELL: Objection, to the extent
20    that a response calls for speculation.
21    But you can go ahead and answer if you
22    understand.

Page 20

1    THE WITNESS: I do understand it. I
2    don't know when the next staffing call was. I
3    think it was in the fall sometime of '04.
4    BY MS. McGOWAN:
5    Q    And when -- from the time in which this
6    staffing call takes place, what is the lag time
7    between when the staffing call happens and when
8    you can actually begin filling the positions that
9    you've identified during the staffing call?
10    A    Sometimes it's weeks, sometimes it's
11    months. In the case now, we're operating under a
12    CR, and uncertain about the budget. It can be
13    longer.
14    Q    And by CR you mean?
15    A    Continuing resolution. I'm sorry.
16    Q    Okay. And are requests to fill a
17    vacancy for a position that already exists
18    impacted by the continuing resolution?
19    A    I'm sorry. Please again.
20    Q    This is because in some part I'm
21    unfamiliar with how the --
22    A    Right.

Page 21

1    Q    -- continuing resolution works.
2    A    Right.
3    Q    My understanding is that under the
4    continuing resolution, the funding stays at the
5    same level. So bringing on new positions would
6    obviously be very difficult because no new money
7    would be coming.
8    My question is with respect to positions
9    that have already existed and it's simply filling
10    a vacancy in a pre-existing position, does the
11    continuing resolution impact your ability to fill
12    vacancies for pre-existing positions?
13    A    It could.
14    Q    Okay. How so?
15    A    As you said, the money wouldn't be there
16    to fund the position. It wouldn't affect staff on
17    board now. We don't anticipate that it will. But
18    instead of being allowed to say hire 20 people
19    across the service, they might decide we only have
20    a budget for ten people.
21    Q    And with respect to this question of
22    whether or not there would be any new funding

6 (Pages 18 to 21)

Charlotte P. Preece                                                January 11, 2007
Washington, DC

Page 22

1    there, I understand that.
2         I guess my question is more due to the
3    continuing resolution, are you inhibited in your
4    ability to fill vacancies for positions that have
5    already existed and for which funding had already
6    existed?
7         A    No. I should be able to fill these four
8    positions even if we're operating under CR.
9         Q    For the 40 to 50 positions that you were
10   the selecting official for, for any of those jobs
11   was a security clearance required?
12        A    Yes.
13        Q    How many?
14        A    I would say roughly at least half.
15        Q    And how long did the hires take from the
16   moment that the job announcement was posted until
17   the applicant actually began working at CRS?
18        A    Again, that can vary greatly.
19        Q    Okay. Give me a sense.
20        A    Posting normally goes up for 30 days.
21   Posting closes. The applications go to the
22   Library's human resources' office. They sort them

Page 23

1    by scores. You're -- have you talked to the
2    personnel people? You know how this works?
3         Q    We actually did speak with
4    Ms. Alkisswani on Monday, so you can --
5         A    Okay. So she explained the process?
6         Q    Sure. But you can go through in
7    shorthand. And if I have questions, I'll ask you
8    for clarification.
9         A    Okay. Please feel free to interrupt me
10   then as we go along.
11        Q    Okay. Thank you.
12        A    The personnel specialist in human
13   resources sorts them according to scoring, how
14   they score themselves. And this system is based
15   first on an applicant self-rating. As the
16   selecting officer, I then get a grid that shows
17   how many people fit into each one of those
18   cohorts, how many at 100, how many 99, on down.
19   There are no names tied to that. It's just a
20   number. You have six people at 100. You have
21   four people at 98, on down.
22        As the selecting officer, I then have to

Page 24

1    make a determination how many people I want to
2    interview. The system has changed somewhat since
3    then. But at the time, this was the system in
4    place. I said that I would like to top 18.
5         Do you want me to continue?
6         Q    Sure.
7         A    Okay.
8         Q    Because I'm asking sort of generally
9    with respect to all of your hires. So
10   certainly --
11        A    Okay.
12        Q    -- the experience with the terrorism
13   specialist position is part of that experience.
14   But you shouldn't feel constrained --
15        A    By it.
16        Q    -- by just that experience.
17        A    Okay. So I said I wanted the top 18.
18   And then human resources compiles their
19   application packages and gives us three copies,
20   myself and the two panelists on the hiring
21   selection process with me. Then I gave my staff
22   to my administrative assistant, Rita Banks, to set

Page 25

1    up interviews.
2         We began interviews for the position in
3    mid October. And finished those interviews mid
4    November.
5         Q    And a question I have about that is how
6    do you select the number of people -- and, again,
7    this is as a general question -- that you want to
8    interview for a position?
9         A    I'm required to take the top seven, plus
10   ties.
11        Q    How often do you interview more than
12   that?
13        A    At that time, I often did, during that
14   year or two. The process is now changed, whereby
15   we get the -- we can ask for applications. And we
16   can screen them. At that time, there was no
17   opportunity for screening. So most of all the
18   division chiefs would ask for a greater number
19   than we were required to take, because it was a
20   self-selection system, self-rating system. Glad
21   you find it equally as amusing.
22        Q    I'll remember that next time I'm

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                          January 11, 2007
Washington, DC

Page 26

1  applying for a government job, although apparently
2  the system doesn't work that way anymore.
3       How does your need to fill a position
4  quickly or not impact your decision about how many
5  people you were going to interview?
6    A  I try not to let it, because it's such a
7  serious responsibility. I want to make sure I get
8  the best person. So I'm not likely to
9  short-shrift, even though that position is very
10  important.
11    Q  And this may be obvious, but the more
12  people that you decide to interview impacts on how
13  long that stage of the process is going to take;
14  isn't that right?
15    A  That's true.
16    Q  Okay. Have there been any circumstances
17  where you have decided to interview perhaps a
18  smaller number of people in order to speed that
19  process up?
20    A  Under this new system, I feel quite
21  comfortable doing that.
22    Q  Before that, under the old system?

Page 27

1    A  No. I would say the average was to
2  interview between 15 and 20 people, depending on
3  where the cut fell.
4    Q  And in your experience, how long does it
5  take to get through 15 to 20 interviews?
6    A  I've done in as quickly as two weeks,
7  and as long as two months. Because all three
8  people in the panel must be there for all the
9  interviews, so somebody goes on vacation, or
10  another leave, it'll drag out.
11    Q  And just to be clear, we were talking
12  about the new system where you have greater
13  information, and then the old system that was a
14  pure self-selection process --
15    A  Right.
16    Q  -- for that preliminary stage?
17       Under the old system, did you ever
18  interview a smaller number of candidates in order
19  to speed up the process of hiring for a position?
20    A  I said I usually took between 15 and 20.
21          (Mr. James entered the
22          deposition.)

Page 28

1  BY MS. McGOWAN:
2    Q  I'm asking if there was ever --
3    A  Sometimes, I mean --
4    Q  -- a case?
5    A  -- sometimes there are smaller applicant
6  pools and sometimes there are larger applicant
7  pools. That can be another factor, but --
8    Q  And so do you remember in any case where
9  you went with a smaller number to speed up the
10  process?
11    A  No.
12    Q  Are you familiar with the process for
13  obtaining security clearance for new hires of
14  analysts?
15    A  I'm generally familiar with it. I'm not
16  an expert.
17    Q  And in your experience, how long does
18  that process take?
19    A  Again, there's no hard and fast rule.
20  It depends on how complicated your life was. It
21  depends on if the security office is backlogged.
22  It has to process a lot of applications. It's

Page 29

1  certainly been lengthier across government-wide
2  since 9/11.
3    Q  Thinking about your experience and the
4  number of hires that you've done where a security
5  clearance was involved, can you give me a range,
6  sort of the quickest through the longest, of how
7  long it took for those applicants?
8    A  Well, the quickest can be if someone
9  already holds a clearance at another government
10  agency.
11    Q  And what makes that so quick?
12    A  Because it basically can be transferred
13  and verified. If you're starting from scratch
14  with no security clearance, I would say minimum
15  six to nine months. Par for the course is a year.
16    Q  With respect to -- have you hired anyone
17  where they had a pre-existing security clearance
18  from another agency and all that was required was
19  transferring it?
20    A  Yes.
21    Q  How long did it take to transfer the
22  clearance?

8 (Pages 26 to 29)

Charlotte P. Preece                                                January 11, 2007
Washington, DC

| Page 30 |
|---|

1    A    I would have to defer that question to
2    Ms. Wilkins. She is the one who does that. She
3    works with other agencies, security officers to
4    transfer the clearance.
5    Q    With respect to hires that you have made
6    of individuals who already had a security
7    clearance --
8    A    Right.
9    Q    -- did you need to request any waiver of
10   the security clearance process for them?
11   A    Repeat, please.
12   Q    Sure. With respect to applicants that
13   you've selected for a position who already hold a
14   security clearance --
15   A    Right.
16   Q    -- or already held a security clearance
17   from a different agency, were they able to begin
18   immediately in the position with the security
19   clearance, or did you need to request a waiver --
20   A    A waiver.
21   Q    -- of the pre-appointment security
22   process?

| Page 31 |
|---|

1    A    I did not need to request a waiver for
2    them.
3    Q    Focusing still on applicants that you've
4    hired that had security clearances, I asked you
5    how long it took for those individuals' clearances
6    to be transferred over.
7        How are you informed when the applicant
8    for a position that you've hired has been fully
9    cleared?
10   A    I'm usually not. In this case I know,
11   for example, with the person we hired for this
12   position, he came from an agency where he had a
13   clearance. I do know that within a month that he
14   was here he was using that clearance. So I'm --
15   I'm assuming it happened very quickly.
16   Q    And during the month when he did not
17   have the clearance --
18   A    He may have had the clearance then. It
19   may have transferred immediately. I don't get
20   notified clearance date.
21   Q    How do you determine whether or not you
22   can share classified information with an analyst

| Page 32 |
|---|

1    if you don't know when their clearance has been
2    cleared?
3    A    We don't -- we're not originating
4    agencies of classified information. Most people
5    have clearances, so they can participate in
6    classified briefings, either in one of the
7    executive branch agencies or on a congressional
8    committee.
9        In the case where want to participate in
10   classified briefings on the Hill, our clearances
11   must be transferred from the Library of Congress
12   to say Senate Arms Service Committee. And, again,
13   that's worked through the Senate or House security
14   office and our personnel security office.
15   Q    Okay. And how long does it take when
16   you need to transfer the clearance from the
17   Library to the Senate agency?
18   A    It can happen in an hour.
19   Q    And so with respect to an applicant who,
20   for example, held their clearance at DHS, the
21   Department of Homeland Security --
22   A    Right.

| Page 33 |
|---|

1    Q    -- can their clearance be likewise
2    transferred that quickly to the Library so that
3    they can begin work fully class -- fully cleared?
4    A    I don't know. That's -- you'd have to
5    ask that question of Ms. Wilkins.
6    Q    So just to be clear, what information do
7    you have about the clearance status of the
8    analysts working for you?
9    A    I get a list on an annual basis. I
10   would add that I'm also informed if there is a
11   problem with an analyst getting a clearance.
12   Q    And how are you informed?
13   A    Usually a phone call.
14   Q    And who's that phone call from?
15   A    Cynthia Wilkins.
16   Q    And without naming analysts where this
17   has been a situation, describe to me what happened
18   in those circumstances.
19   A    She would call me to come down to the
20   office. And we would have a discussion of the
21   nature of the problem, the severity of the
22   problem, whether the clearance was not worth

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                January 11, 2007

Washington, DC

Page 34

1  pursuing.
2      Q    And how many times has this happened?
3      A    Twice.
4      Q    Okay. And so if we can go through each
5  example.
6          Can you tell me first with respect to
7  the analyst that was at issue, was this someone
8  who was a new-hire, or an existing employee?
9      A    Existing employee.
10     Q    And with respect to the employee, how
11  did the security clearance issue emerge?
12     A    I don't understand.
13     Q    Sure. With respect to each employee --
14  and we'll do each one separately -- how did
15  Ms. Wilkins come to inform you that they had a
16  security clearance concern?
17         So, for example, was it a case that they
18  were in the process of up-grading a clearance and
19  an issue came up?
20         I don't know what various options might
21  be, so if you could just explain to me how it came
22  up in each situation.

Page 35

1      A    One was every five years you have to
2  have your clearance re-upped. So one was in a --
3  as they were re-upping a clearance. The other
4  than one was employee who was trying to get a
5  clearance.
6      Q    Focusing first on the second employee,
7  the employee who was trying to get clearance, how
8  long had the employee been working with CRS at the
9  point when they began attempting to obtain a
10  clearance?
11     A    I'm not sure, because it predates when I
12  became a manager. Her hire predated. As I
13  recall, early in my tenure, she wanted to get a
14  clearance.
15     Q    Had she not originally needed a
16  clearance to begin in the position?
17     A    I think that's correct.
18     Q    And so tell me what happened.
19         The issue was brought to your attention,
20  and how was it addressed?
21     A    We decided not to pursue the clearance.
22     Q    And what did that mean with respect to

Page 36

1  this employee and her ability to perform her
2  duties at CRS?
3      A    It meant that she couldn't use
4  classified information.
5      Q    And what was the nature of the problem?
6          MS. RUSSELL: Objection. Vague.
7          THE WITNESS: The nature --
8  BY MS. McGOWAN:
9      Q    Do you understand my question?
10     A    I'm asking sort of what was the nature
11  of the problem that was preventing this employee
12  from getting the security clearance that she was
13  seeking?
14     A    She worked at a foreign embassy for a
15  number of years. She took a leave of absence.
16  And there's some questions about her behavior
17  while she was working overseas.
18     Q    And how -- how much time did you
19  spend -- or actually how much time was spent by
20  you and Ms. Wilkins and anyone else involved in
21  the process investigating this issue?
22     A    I can't speak for Ms. Wilkins. I can

Page 37

1  say that I probably spent two, three hours at
2  most. I didn't -- I don't do the investigations.
3  That's Ms. Wilkins' responsibility.
4      Q    When you learned that this analyst was
5  not going to be eligible for the security
6  clearance that she was seeking, how did that
7  impact on her job responsibilities?
8          For example, did you have to reassign
9  work that would have otherwise gone to her?
10     A    No. Because we don't do classified
11  work. We don't produce classified documents.
12     Q    Oh. Okay.
13         But if I'm right, CRS, while it does not
14  produce classified documents, has access to
15  classified documents in producing their work; is
16  that right?
17     A    If the analyst chooses to, yes.
18     Q    Is the decision whether or not to work
19  on classified -- you know, work on information
20  that involves access to classified documents
21  purely within the analyst's discretion?
22     A    Largely. I mean, it's more used in the

10 (Pages 34 to 37)

Charlotte P. Preece                                      January 11, 2007
Washington, DC

Page 38

1    defense field than it is in the foreign policy or
2    the trade areas.
3        Q    Is this employee still with CRS?
4        A    Yes.
5        Q    And with respect to the other employee
6    who had information come up as part of a -- I
7    believe the term is "periodic review"?
8        A    Uh-huh.
9        Q    What was the nature of the information
10   that came up during that security clearance
11   review?
12       A    It was a question of finances and not
13   paying taxes.
14       Q    And how was that matter resolved?
15       A    It was resolved between the individual
16   and the personnel security office.
17       Q    Were you brought in at all to those
18   discussions?
19       A    Not with the individua. Ms. Wilkins
20   briefed me separately.
21       Q    And how long did it take to resolve this
22   matter?

Page 39

1        A    It's a question that you would have to
2    ask Ms. Wilkins.
3        Q    How long did your involvement in this
4    matter last?
5        A    A couple of meetings. Again, not to
6    exceed two hours.
7        Q    While this issue was outstanding, was
8    this employee restricted in the work that he or
9    she could perform?
10       A    No.
11       Q    Are you familiar with the process for
12   requesting a waiver of the pre-appointment
13   security clearance investigation?
14       A    Yes.
15       Q    Can you explain that process to me, your
16   role in that process?
17       A    Yes. It's my responsibility to write to
18   the personnel security office a very short
19   two-line memo requesting a waiver.
20       Q    And what does that memo contain?
21       A    Basically that. I request that a waiver
22   be granted for the candidate's name, title, so

Page 40

1    they can begin work. I understand that this
2    person will not have access to classified
3    information until a security clearance review is
4    processed.
5        Q    And do you request a waiver in every
6    case involving a position that has a security
7    clearance component?
8        A    Where someone doesn't have a -- is not
9    already cleared, I would be likely to request that
10   waver, yes.
11       Q    How many times have you requested a
12   waiver?
13       A    I don't know. Maybe in 50 percent of
14   those cases, to be very general. It depends if
15   we're hiring new staff or more seasoned staff. If
16   you're trying to get students through the
17   presidential management fellowship program, for
18   example, they're unlikely to have had previous
19   government employees. And they're likely not to
20   have clearances.
21       Q    And what are the criteria for granting a
22   waiver?

Page 41

1        A    It's to -- personnel security still
2    would do a basic background check, as they do on
3    every new employee. And then they would --
4    personnel security would give the soughtee for the
5    position forms to fill out to begin the clearance
6    process.
7        Q    And at what point is a decision made
8    about whether a waiver will or will not be
9    granted?
10       A    It's always been granted.
11       Q    And so what are the criteria that must
12   be satisfied in order for a waiver to be granted?
13            I recognize that they've been granted in
14   every case, but what are the factors that must be
15   demonstrated?
16       A    They must pass the background check.
17       Q    And by "pass," what does that mean?
18       A    That nothing turns up that they have
19   previous criminal activity, they have -- again,
20   this is a Cynthia Wilkins question.
21       Q    Well, I'm curious, with respect to any
22   of the applicants where you've requested and

11  (Pages 38 to 41)

Charlotte P. Preece                                                January 11, 2007

Washington, DC

---

Page 42

1  gotten a waiver for them, have there been any
2  cases where something turned up in the background
3  check, but a waiver was nonetheless granted?
4     A   No.  Because this background check takes
5  place before the employee starts, before the
6  employee is even offered the job.
7     Q   Okay.  But with respect to any of the
8  applicants that you have sought a waiver for --
9     A   I wouldn't seek the waiver till after
10  they started.
11     Q   So at what point do you send an
12  applicant to the personnel security office for a
13  background check?
14     A   They don't go to the personnel security
15  office.
16     Q   Okay.  I'm trying to sort of get a sense
17  of how this waiver process works.  So if I'm
18  mixing up --
19     A   Let me explain it.  As the recommending
20  official, it is my job to write a recommendation
21  of who I think is the best candidate to my
22  director.  My director then approves that

---

Page 43

1  recommendation.  And a PAR, personnel -- I'm not
2  sure what PAR stands for -- a PAR is generated.
3  It's a work force document.  The paperwork then
4  goes to the office of personnel security, where a
5  preliminary background check is done.
6          I'm not informed of any of this process.
7  If it is completed successfully, it passes through
8  that office, then it goes to various offices in
9  the Library, who must sign off.  After it is
10  signed off at the highest Library level, it goes
11  back to the Library's office of work force.  And
12  someone in the office of workforce extends an
13  offer of employment to the applicant, so --
14     Q   All right.  In your experience, has
15  there ever been a case where the PAR was
16  generated, sent to the office of personnel
17  security, and the preliminary background check was
18  not successfully completed?
19     A   I can think of one.
20     Q   Okay.  Can you tell me about that case?
21     A   Yes.  The person was found in the
22  background check to have had previous criminal

---

Page 44

1  activity.
2     Q   Okay.  And then what happened?
3     A   I withdrew the offer.
4     Q   And why did you withdraw the offer?
5     A   Because I didn't think the person was a
6  trustworthy individual.  And he had not revealed
7  that information at any stage during the process.
8     Q   Did you have any conversations with any
9  officers from the personnel security office about
10  whether or not the information that had been
11  revealed by itself, sort of the nature of the
12  criminal activity for example, would render that
13  person ineligible for a security clearance?
14     A   It's a long time ago.  It's possible.  I
15  don't know.  I don't remember.
16     Q   Do you recall any conversations about
17  how long the security clearance process was going
18  to take for this person, in light of the fact that
19  this new information had emerged?
20     A   I don't recall.
21     Q   Did you have any conversations with
22  Ms. Wilkins, or whoever the appropriate person in

---

Page 45

1  the personnel security office was, about whether
2  or not a waiver, if requested for this applicant,
3  would be granted?
4     A   We never got to that point.  When -- no.
5     Q   I'm sorry.  I didn't mean to --
6     A   No, it just didn't get to that point,
7  because I withdraw -- the request was withdrawn.
8     Q   For any of your other hires involving a
9  security clearance, was there ever any other case
10  where you submitted a PAR and information that --
11  well, information emerged as a result of that
12  background investigation that had a security
13  clearance implication?
14     A   That's the only one I can think of.
15     Q   Does Ms. Wilkins or her employees in the
16  personnel security office inform you -- well,
17  actually, let me take that back.
18          With respect to this particular
19  candidate, where information emerged as a result
20  of the personnel security background check, how
21  were you informed that there was an issue that had
22  come up?

---

12 (Pages 42 to 45)

Charlotte P. Preece                                                    January 11, 2007
Washington, DC

Page 46

1    A    Ms. Wilkins called me.
2    Q    Okay.  And what did she say?
3    A    She told me the nature of the problem.
4    Q    Anything else?
5    A    No.
6    Q    Did she indicate to you that further
7    investigation was going to be necessary of this
8    person?
9    A    No.  Because I made the decision, as I
10   said, not to go forward with the hire, with the
11   recommendation.
12   Q    If you can basically tell me how the
13   conversation with Ms. Wilkins went, so that I
14   don't have to guess at did someone say this and
15   did someone say that.
16   A    She described the nature, what the
17   investigation turned up.  I called the applicant.
18   I said we have this information that has been
19   unearthed.  Is this true?  He said, yes, I should
20   have told you.  And I said I'm withdrawing your
21   name from consideration for the position.
22   Q    And what prompted you to call the

Page 47

1    applicant to discuss this information?
2    A    To see what his reaction would be.
3    Q    Was there something that the applicant
4    could have told you that would have made a
5    difference?
6        MS. RUSSELL:  Objection.  Calls for
7    speculation.
8        But you can answer if you understand the
9    question.
10       THE WITNESS:  I don't know.  That really
11   is speculation.
12   BY MS. McGOWAN:
13   Q    Well, let me ask this.  Is there -- at
14   that point, when you called the applicant, were
15   you simply informing this person that they were no
16   longer under consideration, or were you interested
17   in still obtaining information to decide whether
18   or not you would keep them in the running?
19   A    Yes, I wanted to call.  And I wanted to
20   hear what he had to say about it, to whether he
21   admitted it freely to -- he apologized.  He said
22   it was a mistake, that he should have told me.

Page 48

1    Not that it may have swayed my mind one way or
2    another, but --
3    Q    Are there any documents reflecting the
4    fact that this was an applicant for whom you had
5    submitted a PAR, who then had a problem emerge
6    during his background investigation?
7    A    Not that I'm aware of.
8    Q    Did you have to produce any documents
9    reflecting the fact that you were withdrawing the
10   PAR that you had submitted for that person?
11   A    No.  The posting was canceled.
12   Q    And by the posting being canceled, does
13   that mean that you did not go with any other
14   applicant for that position?
15   A    That's correct.
16   Q    Do you assess whether or not a candidate
17   is likely to receive a waiver of the
18   pre-appointment security investigation requirement
19   as part of your decision about who your top
20   applicant is?
21   A    Can you repeat, please?
22   Q    Sure.  Do you assess whether or not a

Page 49

1    candidate is likely to receive a waiver of the
2    pre-appointment security investigation process,
3    thus allowing them to begin work quickly, as part
4    of your decision regarding who your top applicant
5    for a position is?
6    A    Put that another way, at the end of each
7    interview question, a response or a question:  Is
8    there anything else you think we should know about
9    you that would be helpful to us, for us to know?
10   I listen to that response.  Certainly if the
11   person -- this has never happened -- but would say
12   I'm a convicted felon, or I was accused of
13   espionage five years ago, that would likely factor
14   into my decision.
15   Q    And is this a question you ask every
16   applicant?
17   A    Uh-huh.
18   Q    And so how do you assess the response to
19   that question with respect to your determination
20   of whether or not they -- the applicant would be a
21   top choice for you?
22   A    It's additional information that is

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                                    January 11, 2007
Washington, DC

Page 50

1  provided to me. If it -- sometime the person just
2  says I have nothing else to add. Sometimes people
3  will elaborate on previous experience. I weigh
4  that with their answers to the rest of the
5  questions.
6      Q   And, for example, marriage to a foreign
7  national is, am I right, something that
8  potentially has a security clearance implication?
9      A   Potentially.
10     Q   If someone did not reveal that
11 information to you during the interview or in
12 response to that question, but that information
13 came up in the course of a personnel -- of a
14 background check, how would that impact your
15 assessment of whether or not this person was your
16 top candidate?
17         MS. RUSSELL: Objection. Calls for
18 speculation.
19         THE WITNESS: Again, I think we're out
20 of order in sequence in what happens in the
21 process. I make a recommendation. It goes to
22 personnel security. If the person didn't tell me

Page 51

1  they were married to a foreign national, and in
2  the security clearance investigation -- now, let's
3  assume here that we have -- we're doing a person
4  who has a clearance. Okay. And they're married
5  to a foreign national.
6          I make a recommendation -- they don't
7  tell me they're married to a foreign national. It
8  goes to security clearance. If there are no
9  problems, I don't even know that the person is
10 married to a foreign national. I know if a
11 problem arrises in personnel security. Then
12 Cynthia will call me.
13         I had a case recently where I was
14 selecting an employee for a position. When I
15 asked that last question, said one thing you might
16 want to know about me is I am married to a foreign
17 national. He said I don't think this will cause a
18 problem with my security clearance. And I was
19 willing to make the recommendation and go forward.
20 The gentleman had previously held security
21 clearances. It may delay the time it takes to
22 process his clearance.

Page 52

1  BY MS. McGOWAN:
2      Q   And so just to be clear, in that case,
3  even though you knew that there was some
4  information about this person that might slow down
5  the security clearance process, you went forward
6  with the recommendation; is that right?
7      A   That's correct.
8      Q   And for that person, how long did it
9  take for them to complete the security clearance
10 process?
11     A   This is a very new employee, so I don't
12 know.
13     Q   And what kind of job was this?
14     A   It's an analyst.
15     Q   And in what --
16     A   It was --
17     Q   -- in the very --
18     A   -- in a regional area.
19     Q   Regional area.
20     A   The foreign policy regional area.
21     Q   What's the full title of the position?
22     A   I think it's specialist in European

Page 53

1  affairs. It's either analyst or specialist. I
2  can't remember what GS level it is. Special
3  confers a GS level, GS-15. The positions GS-14
4  and below are analysts.
5      Q   And was there any time sensitivity with
6  respect to filling that position?
7      A   We requested a waiver. And so the
8  analyst could start right away.
9      Q   But with respect to actually sort of
10 getting the final candidate into the position, was
11 this what you would have considered to be a more
12 urgent hire?
13         MS. RUSSELL: Objection to the form of
14 the question.
15         THE WITNESS: Not as urgent as the other
16 position. It was to replace someone who was not
17 yet retired.
18 BY MS. McGOWAN:
19     Q   But this was still a position that you
20 wanted to fill quickly; is that right?
21     A   Not quickly, no. I mean, this was to
22 replace a person who was not yet retired. We

14 (Pages 50 to 53)

Charlotte P. Preece                                                                January 11, 2007
Washington, DC

Page 54

1  often try to bring people in a year or two before
2  we anticipate someone retiring, to allow them to
3  work with them, to get up to speed, to learn the
4  culture, what we do.
5       So this was not a position like the
6  terrorist position, which was much more critical
7  to the nature of the work. And we had a person
8  who left. We had no one.
9    Q   Even though this wasn't a position where
10  you were filling a vacancy, you still requested a
11  waiver to expedite the process of bringing this
12  new-hire on; is that right?
13       MS. RUSSELL: Objection to the form of
14  the question.
15       But you can go ahead and answer.
16  BY MS. McGOWAN:
17    Q   Well, let me break that down.
18    A   You always request a waiver. The person
19  can start. It doesn't -- it's not to stall their
20  hiring. What it stalls is their ability to use
21  classified information. But they can still work
22  here. It doesn't --

Page 55

1    Q   Has there ever been a situation where
2  prior to filling out a personnel action form or a
3  PAR with respect to a position for which you were
4  the selecting official, where you called the
5  personnel security office to find out whether
6  there would be any problem getting a waiver for a
7  candidate if they were selected?
8    A   I can't think of any.
9    Q   Is that the kind of call you could make
10  if you wanted to get a preview of the personnel
11  security office's opinion about a candidate and
12  their eligibility for a waiver?
13    A   No. I mean, if I have a question, I can
14  call Cynthia at any time.
15    Q   Is the situation in this case involving
16  Ms. Schroer a case where you called the personnel
17  security office before filling out a PAR to find
18  out about whether or not information about that
19  applicant would affect anything with respect to
20  their security clearance?
21    A   There was never a PAR prepared for
22  Mr. Schroer.

Page 56

1    Q   Right. That's my question.
2       In this case, you called and had a
3  meeting with the personnel security office prior
4  to your filling out a PAR for this position?
5    A   I did not fill out the PAR. I write a
6  letter of recommendation to the director.
7    Q   And the letter of recommendation
8  precedes --
9    A   The filling out --
10    Q   -- the filling out of any PAR?
11    A   Correct.
12    Q   Okay. So in this case, just to make
13  sure we're on the same page, you had a
14  conversation with the personnel security office
15  about information regarding Ms. Schroer and her
16  security clearance that came prior to your filling
17  out any recommendation, and prior to your filling
18  out any PAR for the position; is that right?
19    A   Prior to my completing a letter of
20  recommendation. And as I said, the office of
21  workforce prepares the PAR. I do not.
22    Q   Okay. Is that the only case where you

Page 57

1  have had that kind of conversation with the
2  personnel security office?
3       MS. RUSSELL: Objection to the form,
4  but --
5       THE WITNESS: Again, please.
6  BY MS. McGOWAN:
7    Q   Is the case involving Ms. Schroer the
8  only case where you have had a conversation with
9  the personnel security office about information
10  that -- of -- that may involve security clearance
11  implications prior to your writing a
12  recommendation for a candidate?
13    A   I believe so.
14    Q   And so, for example, in this case that
15  we were just talking about with respect to the
16  specialist in European affairs, you did not reach
17  out to the personnel security office to find out
18  whether this individual's marriage to a foreign
19  national would have security clearance
20  implications; is that right?
21    A   This individual was savvy enough that he
22  requested a meeting, with the personnel security

15 (Pages 54 to 57)

Charlotte P. Preece                                                    January 11, 2007

Washington, DC

Page 58

1  office in my presence, to go over whatever
2  implications it might have.
3     Q    And when did he make that request?
4     A    I don't remember. I can't remember if
5  it was before he was hired or it was after he came
6  on board, but it was within a short period on
7  either side of that.
8     Q    But he did not make that request during
9  the interview, for example?
10    A    No.
11    Q    Okay. Did he make that request before
12 or after you had written your formal memo of
13 recommendation for him?
14    A    I can't remember.
15    Q    And did you have any conversations with
16 the personnel security office about how this
17 information might impact this applicant's security
18 clearance process?
19    A    No.
20    Q    And you said you did submit a waiver of
21 the pre-appointment security clearance
22 investigation for this employee; is that right?

Page 59

1     A    Yes.
2     Q    And it was granted, correct?
3     A    Yes.
4     Q    Are there any documents that reflected
5  what happened in that case with respect to your
6  request for a waiver?
7     A    My usual two-line request. That's --
8  and then if there are documents, personnel
9  security would have them. I don't.
10    MS. McGOWAN: I think we'll take a
11 break. So we'll convene back in five minutes.
12       (Recess)
13 BY MS. McGOWAN:
14    Q    So we're back on the record. And we
15 were discussing a number of different employees.
16 I just wanted to sort of run through them. We had
17 what I'll call employee A, which was the employee
18 that had the issue come up during their periodic
19 review. And we had employee B -- employee A was
20 the one who had the issue back sort of about the
21 tax issue. Employee B was the employee who had
22 some issues coming up with respect to their

Page 60

1  conduct while they were living overseas.
2     And then we had employee C, who was the
3  applicant for whom the PAR had been generated, and
4  then criminal -- information about their
5  background of a criminal nature came to light.
6  And then we had employee D, who was the employee
7  who has recently been hired at CRS who was married
8  to a foreign national. So we got those four
9  employees.
10    With respect to employee C, where there
11 had been a PAR generated and then you withdrew the
12 offer, you mentioned that you ultimately pulled
13 the posting and did not hire the position?
14    A    That's correct.
15    Q    Why --
16    MS. RUSSELL: Actually, I'm going to
17 object to the form of the question.
18    But you can go ahead and answer.
19 BY MS. McGOWAN:
20    Q    Well, am I correct that with respect to
21 the position that employee C had been applying
22 for, that once you learned this information from

Page 61

1  the employee, you withdrew your offer; is that
2  right?
3     A    He wasn't an employee. He was an
4  applicant.
5     Q    I'm sorry. The applicant for that
6  position, you withdrew the offer of employment; is
7  that right?
8     A    That's correct.
9     Q    Okay. And then you ultimately did not
10 fill that position; is that right?
11    A    That's correct.
12    Q    And why was that the case?
13    A    We thought it was cleaner to re-post.
14    Q    And did you ultimately re-post for that
15 position?
16    A    Yes, we did.
17    Q    And what was the lag time between
18 closing the posting or closing the process for the
19 first time and posting the second time?
20    A    I can't remember. It was 15 or more
21 years ago.
22    Q    Okay. And what was that position?

16 (Pages 58 to 61)

Charlotte P. Preece                                                          January 11, 2007
Washington, DC

Page 62

1     A     An analyst in intelligence.
2     Q     Did that position deal with terrorism at
3   all?
4     A     It dealt with the agencies who were
5   likely to oversee terrorist activities.
6     Q     So we've got employee A, B, C, and D
7   that we've just gone through?
8     A     Right.
9     Q     Are there any either employees or
10  current employees or applicants for employment
11  where information came up in the course of either
12  that candidate's application or the employee's
13  tenure of a security clearance concern?
14    A     Not of a security clearance concern.
15    Q     And you mentioned -- and I'm
16  paraphrasing here -- that you asked all of your
17  applicants whether there is anything else about
18  them that they should -- that you think that they
19  should tell you or that they should think that you
20  should want to know.  And we discussed employee D,
21  who mentioned, for example, that he was married to
22  a foreign national.

Page 63

1         Have there been other circumstances
2   where applicants have told you information in
3   response to that question that caused you to say,
4   huh, I wonder, this seems like it might have some
5   bearing on the security clearance requirement for
6   the position?
7     A     I'd say the only other case is if they
8   themselves are dual citizens.  And there, it would
9   have an affect.  Because if they were a dual
10  citizen, they would have to renounce their
11  citizenship from the other country to be eligible
12  to get a security clearance.
13    Q     And there been cases where individuals
14  have identified themselves as dual citizens?
15    A     Yes.
16    Q     And was there more than one case?
17    A     Yes.
18    Q     Roughly how many?  Do you remember?
19    A     Two that I can think of.
20    Q     Two.  Okay.  And what were the
21  positions -- I don't know if they were both
22  applying for the same position, or they were two

Page 64

1   different positions -- that these applicants were
2   applying for?
3     A     Can I make a correction first?
4     Q     Sure.
5     A     Employee D, I said that he was an
6   analyst or specialist in European affairs.
7     Q     Uh-huh.
8     A     He was an analyst in Middle Eastern
9   affairs.
10    Q     Okay.
11    A     A specialist in Middle Eastern affairs.
12        Now if I can ask you to repeat your
13  question, please.
14    Q     Sure.  Well, actually, let me -- with
15  respect to this analyst in Middle Eastern affairs,
16  is there any aspect of this job that involved
17  terrorism?
18    A     Well, certainly tracking terrorist
19  groups in the region, yes.
20    Q     Anything else?
21    A     No.
22    Q     And so we were talking about the two

Page 65

1   instances where applicants had identified
2   themselves as dual citizens.
3         My first question was what position or
4   positions were these applicants applying for?
5     A     The position for -- let's call this
6   person applicant E.  The first dual citizen did
7   not require a security clearance.
8     Q     Okay.
9     A     The second position with a dual citizen
10  was for an analyst in European affairs.  That did
11  require a security clearance.  And the individual
12  worked with the office of personnel security to
13  renounce the citizenship of the other country.
14    Q     And we'll call this person --
15    A     F.
16    Q     -- applicant F.
17    A     Got it.
18    Q     Okay.  And with respect to applicant E,
19  was that an analyst position?
20    A     Yes.
21    Q     Okay.  And what was the title, more or
22  less?

17 (Pages 62 to 65)

Charlotte P. Preece                                                    January 11, 2007
Washington, DC

| Page 66 | Page 68 |
|---|---|
| 1   A   Broadly, international affairs, United | 1   Q   Okay. And do you know whether or not |
| 2 Nations, humanitarian assistance, those kinds of | 2 this individual completed their renouncement of |
| 3 issues. | 3 their British citizenship prior to your |
| 4   Q   And I assume the citizen was U.S. and | 4 recommending their employment at CRS? |
| 5 something else? | 5   A   I don't know. |
| 6   A   British. | 6   Q   When did you -- |
| 7   Q   British. And how did this information | 7   A   Prior to their employment, yes. It |
| 8 affect your assessment of this candidate, if at | 8 would have been prior to the employment, yes, |
| 9 all? | 9 prior to the hiring. |
| 10   A   I made a determination that she didn't | 10   Q   And so at the time that you wrote your |
| 11 need a clearance to perform her work. And so it | 11 memorandum -- |
| 12 didn't affect my decision at all. | 12   A   My recommendation. |
| 13   Q   And was this applicant ultimately the | 13   Q   -- recommending their hire, am I right |
| 14 candidate that you recommended for the position? | 14 that at that point the individual had not yet |
| 15   A   Yes. | 15 renounced their citizenship, to your knowledge? |
| 16   Q   And at any point -- well, is this | 16   A   I don't know. I don't know the timing, |
| 17 applicant who's now an employee, still an employee | 17 the sequencing on that. |
| 18 of CRS? | 18   Q   Did you have any conversations with |
| 19   A   Yes, she is. | 19 Cynthia Wilkins about working through this dual |
| 20   Q   And during her tenure at CRS, has there | 20 citizenship issue for this applicant? |
| 21 come any point where she had need to apply for a | 21   A   Yes, I did. |
| 22 security clearance? | 22   Q   Okay. Tell me about that. |

| Page 67 | Page 69 |
|---|---|
| 1   A   No. | 1   A   I asked Cynthia what does he need to do. |
| 2   Q   Okay. With respect to applicant F, this | 2 She said he needs to come in and make an |
| 3 applicant was also a dual citizen. | 3 appointment with me, which he did. And I think I |
| 4       And so what were the duel citizenships | 4 got a subsequent call from Cynthia that everything |
| 5 involved? | 5 was okay. |
| 6   A   Again, U.S. and British. | 6   Q   And when did you make this contact with |
| 7   Q   Okay. And how, if at all, did this | 7 Cynthia Wilkins, sort of where in the process? |
| 8 information about the applicant being a duel | 8   A   Probably after the interviews were |
| 9 citizen impact your assessment of the candidate? | 9 concluded, but before I wrote a recommendation. |
| 10   A   Well, I asked the candidate -- made him | 10   Q   And did you have any conversation with |
| 11 aware, first of all, that to get a security | 11 Cynthia Wilkins about how long it would take to |
| 12 clearance he would have to renounce his foreign | 12 complete this process of renouncing a dual |
| 13 citizenship, and is this something he would be | 13 citizenship? |
| 14 willing to do. He said yes. And we proceeded to | 14   A   It was a matter of sitting down and |
| 15 hire him. | 15 having an appointment. It was not a protracted |
| 16   Q   And do you have an understanding of | 16 process. |
| 17 what's involved in the process of renouncing | 17   Q   And at any point between when you |
| 18 citizenship? | 18 recommended the hiring of this candidate in the |
| 19   A   The person goes down and has an | 19 memorandum and when they came on to the position |
| 20 appointment with Cynthia Wilkins. And Cynthia | 20 were there any other security clearance issues |
| 21 walks them through the process. I do not sit in | 21 other than the dual citizenship that came up? |
| 22 on that. | 22   A   No. |

18 (Pages 66 to 69)

Charlotte P. Preece                                                           January 11, 2007
Washington, DC

Page 70

1    Q    Okay.  Did you request a waiver of the
2  pre-appointment security clearance investigation
3  for this person?
4    A    Yes.
5    Q    And was it granted?
6    A    Yes.
7    Q    Okay.  So we now have applicant A
8  through F.
9        Are there any other applicants or
10  employees that had -- that brought to your
11  attention information that had a security
12  clearance dimension that you needed to address?
13    A    That's all I can think of.
14    Q    Okay.  Have you ever decided to go with
15  a candidate who -- for employment who perhaps
16  originally was your second or third choice over
17  the candidate who had been your first choice, due
18  to concerns that your first choice candidate might
19  take longer to go through the security clearance
20  process?
21    A    No.  I mean, if the interview is
22  completed and nothing comes up during the

Page 71

1  interview that would lead me to question, then
2  I -- I'm shooting kind of blind.
3    Q    Okay.
4    A    Do you understand what I mean?
5    Q    I'm not sure, actually.
6    A    If the person -- if two people come
7  through and interview -- and you're the first
8  choice and you're second choice --
9    Q    And you're referring to me and James,
10  as --
11    A    Exactly.
12    Q    -- hypothetical people?
13    A    I'm sorry.  Exactly.  Person A and
14  person B.  And nothing comes up to lead me to be
15  suspicious or questioning of your qualifications
16  or credentials, I would go with applicant A.  If
17  Cynthia Wilkins subsequently turned up something
18  in an investigation that would change our mind,
19  then I could switch to person B.
20    Q    Okay.  And am I right that the situation
21  that we were discussing with respect to employee
22  C, the individual who had information come up

Page 72

1  after the background check, is perhaps the closest
2  case to that, where this candidate had been your
3  top choice, you found information, didn't go with
4  them; but in that case, rather than going with a
5  second choice from that original pool, you decided
6  to re-post; is that correct?
7    A    That's correct.
8    Q    Okay.  And so thinking back through all
9  of your interviews with the various applicants,
10  has there ever been a situation where you had, you
11  know, applicant A and applicant B; and applicant A
12  was your top choice, based on everything you had
13  heard in the interview, but then at the end, in
14  response to your anything else question they
15  revealed some information that may or may not have
16  a security clearance component, might lead to a
17  delay or a more cumbersome security clearance
18  process?
19        Has there ever been a case like that,
20  where you've had an applicant reveal that
21  information, and then you said, you know, I'm
22  actually going to go with applicant B so I don't

Page 73

1  have to deal with the issues that applicant A, you
2  know, may or may not have, based on what they've
3  just told me?
4    A    I can't think of one.
5    Q    In the beginning, we started off talking
6  about the process for hiring the terrorism
7  specialist position.  So I just wanted to go back
8  to that.  You know, we were talking about sort of
9  how the vacancy first emerged.  And that, you
10  said, was due to someone leaving the position.
11        At that point, with respect to beginning
12  the process for filling the position, were you
13  involved in any processes for determining the
14  qualifications that would be necessary for someone
15  filling the terrorism specialist position?
16    A    Yes.
17    Q    Who else was involved?
18    A    Francis Miko, and Steven Bowman.
19    Q    And who are they?
20    A    Two of the seven section heads.  Francis
21  Miko holds -- is the section head where this
22  position resides, the specialist in terrorism.

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                    January 11, 2007

Washington, DC

Page 74

1   Steve Bowman is head one of one of our defense
2   sections that does special operations and military
3   operations connected with counterterrorism.
4       Q    How did they become part of the hiring
5   team?
6       A    I asked them to be.
7       Q    And what were the most important
8   qualifications for the terrorism specialist
9   position?
10      A    You're familiar with the term KSA's,
11  knowledges, skills, and abilities?
12      Q    I have become familiar with the terms,
13  yes.
14      A    Okay.  There were three critical
15  components: Knowledge, policy analysis, and
16  writing.
17      Q    Okay.  And how did you decide that --
18  well, let me back up.
19          Is it accurate to say that these three
20  things were the most important qualifications for
21  the job?
22      A    Right.  What it would mean is that if

Page 75

1   you didn't score at least to the minimally
2   successful in these three areas, you could be
3   disqualified from further consideration.
4       Q    Were there other qualifications for the
5   position?
6       A    Yes.
7       Q    Okay.  And what were they?
8       A    Research methodology, world
9   communications, leadership, ability to work
10  collaboratively with others, objectivity,
11  judgment, and discretion.  One, two, three, four
12  five, six, seven, eight.  I think there were nine.
13  There may be a tenth one, but I think those are
14  the ones.
15      Q    Okay.  And how did you -- I'm sorry.
16          That's the list?
17      A    Yes.
18      Q    Okay.  How did you decide that these
19  were the qualifications for the position?
20      A    They're the qualifications for every
21  position in CRS, with the exception of the
22  leadership that is only at the GS-15 level.

Page 76

1       Q    And to the extent that these are
2   qualifications for every CRS position, in addition
3   to these were there any other qualifications
4   unique to the terrorism specialist position?
5       A    What we do is the knowledge is
6   customized for the position, for each position.
7       Q    Okay.  Is there anything else regarding
8   the qualifications that -- either additional
9   qualifications or customized qualifications with
10  respect to the terrorism specialist position?
11      A    That it required a top secret clearance.
12      Q    Okay.  Now, was an active top secret
13  clearance a prerequisite for the job?
14      A    No.
15      Q    Okay.  So would you have considered
16  someone who did not already hold a top secret
17  security clearance?
18          Would you have considered someone like
19  that to be competitive for the position?
20      A    Yes, particularly if they had held a
21  clearance before.
22      Q    Okay.  How likely did you think it was

Page 77

1   that the top candidate for the position would not
2   have an active top secret clearance?
3           MS. RUSSELL: Objection to the form.  It
4   calls for speculation.
5           But you can answer if you understand it.
6   BY MS. McGOWAN:
7       Q    With respect to your thoughts about who
8   the likely top candidate or candidates would be,
9   did you expect that the top candidate or
10  candidates would probably be actively holding a
11  top secret security clearance?
12      A    Yes.  Yes.
13      Q    Okay.  I'm going to show you a document
14  that we will mark Exhibit 19.
15          (Deposition Exhibit No. 19
16          marked for identification.)
17  BY MS. McGOWAN:
18      Q    Actually, I'm handing you the wrong
19  document this is the one I meant to you give you.
20          (Deposition Exhibit No. 20
21          marked for identification.)
22  BY MS. McGOWAN:

20 (Pages 74 to 77)

Charlotte P. Preece                                                    January 11, 2007
Washington, DC

Page 78

1    Q    This is a document that was produced by
2    the Government in discovery. It is Bates-stamped
3    numbers 288 through 294. And at the top of the
4    page it says, Crediting Plan Questionnaire.
5         Do you recognize this document?
6    A    Yes. And based on this, I see I missed
7    one of the KSA's on — oh, wait. This is just a
8    KSA in the applicant questionnaire. This was not
9    a question for the interview. So, no, I don't
10   need to amend it.
11   Q    Okay. What is this document?
12   A    It's the crediting plan.
13   Q    What is a crediting plan?
14   A    It's meant to set a standard to be kind
15   of a benchmark against which to judge responses,
16   either the way the person ranks themselves in the
17   applicant questionnaire, or later in the interview
18   stage.
19   Q    Okay. There is — there are a series of
20   signatures —
21   A    Uh-huh.
22   Q    — on the upper right-hand corner?

Page 79

1    A    Yes.
2    Q    Do you recognize —
3    A    All those, yes.
4    Q    Okay. And am I right that your
5    signature is the third signature down, full
6    signature, with the date of August 5th?
7    A    Right.
8    Q    And are those your initials below that?
9    A    They are.
10   Q    Okay. Take a moment to flip through the
11   documents. And there are various marks, stars,
12   and checks next to checks throughout the
13   documents.
14        Do you know what those marks were meant
15   to signify?
16   A    Critical factors.
17   Q    Okay. And by critical factor, is
18   that — I don't know if that's a —
19   A    That's the —
20   Q    — term of art —
21   A    — term that — remember when I
22   mentioned the three critical factors that means if

Page 80

1    you didn't score at least minimally successful in
2    those areas, you could be disqualified from the --
3    further consideration.
4    Q    And so if a KSA is not starred or
5    checked, what did that mean? Did that have any --
6    A    It means -- the ones that are
7    double-starred are double-weighted in the scoring.
8    They get a weight of two. The other factors get a
9    weight of one.
10   Q    And did the panel have any discussions
11   about which of these KSA's to star?
12   A    Yes, we did.
13   Q    Okay.
14   A    It's up to the discretion of the panel.
15   For our research analysts, they're almost always
16   those three. Sometimes, depending on the
17   technical nature of the position, research
18   methodology becomes a fourth.
19   Q    Turn to page 291. There's a KSA listed
20   regarding the ability to build and maintain a
21   professional network?
22   A    Uh-huh.

Page 81

1    Q    Were there any discussions about whether
2    or not to select or star this KSA?
3    A    No.
4    Q    Okay. And on that first page, where
5    there are a series of signatures and then
6    initials, do you know what the signatures and
7    initials with the dates are reflecting?
8    A    The date would be the date that we
9    approved the crediting plan.
10   Q    Okay. So to the extent that you have
11   one date here that's your signature with the date
12   of August 5th, and then a second date with your
13   initials as August 10th, do you know what --
14   A    The first --
15   Q    -- what did you do on --
16   A    -- the first could --
17   Q    -- each of those days?
18   A    -- have been a draft. There could have
19   been some technical fixes in between. And we had
20   to initial the second date.
21   Q    Okay. So but your initials here by the
22   second date means that you sort of reviewed this

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                                    January 11, 2007
Washington, DC

**Page 82**

1  document and were --
2     A  -- signing off --
3     Q  -- signing off on?
4     A  -- exactly.
5     Q  Okay.  Great.  Thank you.
6        Either as part of your discussion with
7  respect to your crediting plan or at any other
8  point in the process, did you have any discussions
9  with Steve Bowman and Francis Miko about the kind
10  of candidate most likely to be qualified for the
11  position?
12     A  We had discussions about what question
13  to ask, how to customize that knowledge question
14  to get what we wanted.
15     Q  Okay.  And what were you looking to get
16  at?  What you kind of information were you looking
17  to get at by crafting the question in a particular
18  way?
19     A  Breadth and depth of expertise and
20  knowledge.
21     Q  Other than how to craft your interview
22  questions, did you have any other discussions

**Page 83**

1  about sort of the type of candidate most likely to
2  be qualified for the position?
3     A  No.  I mean, we didn't say we want
4  somebody from academia or somebody from the
5  military or somebody from the Defense Department.
6     Q  Did you have any conversations about
7  whether or not the top candidate was likely to be
8  a man or a woman?
9     A  No.
10     Q  Did you have any conversations about the
11  importance of a candidate being able to start in
12  the position quickly?
13     A  Yes.
14     Q  Okay.  Tell me about that, those
15  conversations.
16     A  They were just that, that we hoped to
17  get someone on board as quickly as possible.  That
18  was --
19     Q  Okay.  And did you communicate this to
20  the applicants?
21     A  Yes.
22     Q  Okay.  How so?

**Page 84**

1     A  That we would like to get through the
2  process as quickly as possible.  We were doing the
3  interviews in a timely way.  I would always let
4  the applicant know you were the seventh of 18
5  people interviewed, you were the fifth of 18
6  people; we're wrapping -- we hope to wrap up the
7  interviews by the middle of November and be making
8  a selection sometime in mid December.
9     Q  Okay.  In addition to those comments,
10  which I'm assuming would be made in the context of
11  an interview --
12     A  That's correct.
13     Q  -- with an applicant, were there any
14  ways in which you communicated to applicants
15  earlier on in process, either through the job
16  announcement or in some other way, that time was
17  really of the essence with respect to filling this
18  position?
19     A  No.
20     Q  Did you talk at all with the outgoing
21  terrorism specialist about the qualifications for
22  the position?

**Page 85**

1     A  No.
2     Q  And am I right that the outgoing
3  terrorism specialist was no longer at CRS when
4  these decisions were taking place; is that right?
5     A  That's correct.
6     Q  Okay.  Were you involved in the creation
7  of the job announcement for this position?
8     A  Yes.  I reviewed it.
9     Q  Other than reviewing it, what was your
10  involvement?
11     A  Reviewing it, and making suggestions
12  again to customize to add some language in that
13  describe the position.
14     Q  Okay.  I'll show you the document I
15  showed you before, which has been marked as
16  Exhibit 19.  And that document was produced by the
17  Government in discovery.  It has Bates-stamp
18  numbers 327 to 330.  And at the top it says,
19  Specialist in Terrorism and International Crime.
20        Do you recognize this document?
21     A  I do.
22     Q  What is it?

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                    January 11, 2007

Washington, DC

Page 86

1     A     It's the vacancy announcement.
2     Q     Okay.  And there are some marks on this
3   document.
4         Do you know who made those marks?
5     A     No.
6     Q     So, for example, the comment here to
7   Edith, JA documents, etc., was that written by
8   you?
9     A     No.
10    Q     Do you recognize that handwriting?
11    A     No.
12    Q     And looking on page 329 and 330, there
13  are stars placed after certain lines of text.
14        Did you make those marks?
15    A     No.
16    Q     Okay.  Do you know who did?
17    A     No.
18    Q     Do you know what those marks were
19  attempting to represent?
20    A     (Witness examined document).  I could
21  only speculate -- and it would be speculation --
22  that they were attempts to define critical

Page 87

1   competences.  But they're incorrect, if they are.
2   This may not be the final version.  Because I know
3   knowledge, for example, was a critical weight.
4   And that shows up as one star, so --
5     Q     Let me show you a document that was
6   previously marked as Exhibit 9.
7     A     (Witness examined document).  Well, this
8   did have a fourth critical competency.  This looks
9   more like it.
10    Q     Does this -- well, let me start first.
11  This is a document that was previously marked as
12  Exhibit 9.
13    A     Okay.
14    Q     And it has Bates-stamps number 136
15  through 139.  At the top it says, Specialist in
16  Terrorism International Crime.  This appears to be
17  the final version of the job announcement.
18        Do you recognize this document?
19    A     Yes.
20    Q     Okay.  Am I correct, does this reflect
21  the final posting?
22    A     It could.  I do not recall the ability

Page 88

1   to lead tasks and people effectively was a
2   critical competency, but I could be wrong.  It
3   definitely is closer than the previous one.  And
4   I'm not sure that the ability to design and
5   utilize research and analytical methods was a
6   critical competency.  So I do not know if this was
7   the final final, or just another version.
8     Q     Were you involved in the decision about
9   when the job would be posted?
10    A     To the extent that I asked that it be
11  posted as soon as possible.
12    Q     And on this document it says that the
13  opening date was August 12th, 2004.
14        Is that consistent with your
15  recollection of when the job was posted?
16    A     Yes.  Yes.
17    Q     Were you involved in the decision about
18  how long you would accept applications for the
19  position?
20    A     It's pretty traditional that vacancy
21  announcements are up for 30 days.
22    Q     And so on this document where it says

Page 89

1   close date of October 13th, 2004, am I right that
2   that's the last date on which you accepted
3   applications for this position?
4     A     Again, I didn't accept them personally.
5   They went to the Library's office of human
6   resources.  But it was the last date that
7   candidates could apply.
8     Q     And could you have requested for this
9   posting to be opened for less than 30 days?
10    A     Yes.
11    Q     Okay.  Why did you not?
12    A     It's a senior position.  Typically when
13  you do a nationwide search, you want a 30-day
14  posting, particularly given that we're in the
15  month of August, which is a vacation month.
16    Q     Did you have any discussions with either
17  the panel members or anyone else at CRS about
18  whether or not you would keep the position open
19  for less than 30 days?
20    A     No.
21    Q     Okay.  When did you first hear back
22  about what applications you had received for the

23  (Pages 86 to 89)

Charlotte P. Preece                                                    January 11, 2007
Washington, DC

|  | Page 90 |
|---|---|
| 1 | position? |
| 2 | A    Sometime in late September probably. |
| 3 | MS. McGOWAN:  I have a document here |
| 4 | that we're going to mark as Number 21. |
| 5 | (Deposition Exhibit No. 21 |
| 6 | marked for identification.) |
| 7 | MS. McGOWAN:  And I have a second |
| 8 | document we're going to mark as Exhibit 22, as |
| 9 | well, while we're at it. |
| 10 | (Deposition Exhibit No. 22 |
| 11 | marked for identification.) |
| 12 | BY MS. McGOWAN: |
| 13 | Q    The first document, that was marked |
| 14 | Exhibit Number 21, is a document that was produced |
| 15 | by the Government in discovery.  It's been |
| 16 | Bates-stamped number 161.  At the top it says, |
| 17 | Edith Friday, Re Applicants' Scores Point Spread. |
| 18 | And then the second document, which is marked |
| 19 | Exhibit 22, has Bates-stamp number 162.  And it |
| 20 | says, at the top, Specialist in Terrorism and |
| 21 | International Crime, GS-0101-1. |
| 22 | Do you recognize these documents? |

|  | Page 91 |
|---|---|
| 1 | A    I do. |
| 2 | Q    What are they? |
| 3 | A    This is Edith letting me know how the |
| 4 | applicants broke out, how they scored themselves. |
| 5 | And it's the breakdown.  One person scored |
| 6 | themself or herself at 100, two at 99, one at 98, |
| 7 | and so on down. |
| 8 | Q    And who is Edith Friday? |
| 9 | A    Edith was the HR person who was the |
| 10 | staffing specialist for this position. |
| 11 | Q    And turning to Exhibit 22, where there |
| 12 | is a circle around some of the scores. |
| 13 | Do you know who made that mark? |
| 14 | A    My guess is it would be Edith, based on |
| 15 | my e-mail on the previous page, that I talked to |
| 16 | the panelists, only will review the top 18.  If |
| 17 | you add those scores, it will be 18. |
| 18 | Q    Okay.  So this was not you who made this |
| 19 | mark on the document? |
| 20 | A    I don't know. |
| 21 | Q    And tell me, how did you decide that 18 |
| 22 | would be the number of people you would interview? |

|  | Page 92 |
|---|---|
| 1 | A    Well, I probably said I don't want to |
| 2 | interview another nine.  That would make the pool |
| 3 | too big.  I have to take the top seven, plus ties, |
| 4 | which would have meant I would have had to |
| 5 | interview down to 96 -- six, seven, eight, nine, |
| 6 | ten, eleven.  I choice to go with a larger pool. |
| 7 | Because as I said, as -- said at the time, we had |
| 8 | no prescreening mechanism.  We just had the |
| 9 | applicants' self-scores.  So I was generally going |
| 10 | for larger pools to interview during this |
| 11 | timeframe. |
| 12 | Q    At any point did you discuss any concern |
| 13 | about the amount of additional time it would take |
| 14 | to interview the additional seven candidates that |
| 15 | had the score of 95? |
| 16 | A    It was.  It was a factor.  I mean, we |
| 17 | did discuss among ourselves -- |
| 18 | Q    Okay. |
| 19 | A    -- as to where the cut should be, |
| 20 | whether the cut should be 96 or 95. |
| 21 | Q    Okay.  And describe those discussions. |
| 22 | A    Well, we'd have discussions about are |

|  | Page 93 |
|---|---|
| 1 | you going to be around, anybody have vacation |
| 2 | plans or leave plans that would prevent them from |
| 3 | sitting on the panel. |
| 4 | We had had some experience with this |
| 5 | process prior to this applicant's -- this |
| 6 | positions being filled.  And we were getting |
| 7 | candidates who were selecting themselves at a very |
| 8 | high score, and having absolutely no credentials |
| 9 | whatever to perform the job.  So we decided to go |
| 10 | with a larger pool. |
| 11 | Q    With respect to who you selected to be |
| 12 | on the interview panel with you, did you have any |
| 13 | discussions -- well, let me ask this. |
| 14 | Were Francis Miko and Steve Bowman the |
| 15 | two individuals that you intended to have on this |
| 16 | panel no matter what? |
| 17 | A    Yes.  They were the closest in knowledge |
| 18 | to what the job position entailed. |
| 19 | Q    And so did you have any discussions with |
| 20 | them, prior to bringing them on the panel, about |
| 21 | any scheduling conflicts that might have over the |
| 22 | next couple of months with respect to being able |

24 (Pages 90 to 93)

Charlotte P. Preece                                                                    January 11, 2007

Washington, DC

---

Page 94

1  to complete the hiring process?
2     A   I can't remember.
3     Q   So once you decided -- let me take those
4  documents back from you.
5     A   Okay.
6        (Handing document.)
7     Q   Once you decided how many candidates to
8  interview, what did you do next?
9     A   I gave my package of applications to my
10  administrative assistant, Rita Banks, who
11  scheduled the interviews.
12     Q   And did you give Ms. Banks any
13  particular instructions about when she should set
14  up interviews?
15     A   Yes.  I asked her to try to schedule
16  them as soon as possible.
17     Q   Okay.  And how many interviews per day
18  were you hoping to schedule?
19     A   Two.  Sometimes if a third one had to be
20  squeezed in, we squeezed in a third.
21     Q   And how long did it take Ms. Banks to
22  actually set up the interviews?

Page 95

1     A   I don't remember.  She would schedule
2  them piecemeal.  She would schedule one, and then
3  send us an updated list the next day.  And as she
4  got people, contacted people.  We started the
5  interviews in mid October.
6     Q   I'm going to show you two documents that
7  we'll mark as Exhibits 23 and 24.
8        (Deposition Exhibit No. 23
9         and 24 marked for
10         identification.)
11  BY MS. McGOWAN:
12     Q   And document 23 is a document that was
13  produced by the Government in discovery.  It's
14  been Bates-stamped number 158 to 160.  On the
15  front of the first page it says memorandum, dated
16  September 17th, 2004.  And then Exhibit 24 is a
17  document that has been produced by the Government
18  in discovery.  It's bates-stamped number 165.  And
19  at the top it says, Charlotte Preece, interview
20  update, 10/28/04.
21        Looking at Exhibit 23, pages 159 and 160
22  particularly, do you recognize this list?

Page 96

1     A   Yes.
2     Q   And what is it?
3     A   It is the list of the 18 people.
4     Q   Okay.  And then looking at Exhibit 24,
5  do you recognize this document?
6     A   Yes.
7     Q   And what is it?
8     A   It was from my administrative assistant
9  to the panel, letting us them know when the
10  interviews were scheduled.
11     Q   Was there any attempt to commence
12  interviews earlier than October 26th?
13     A   I don't know.
14     Q   Are you aware of anything that prevented
15  interviews from being scheduled prior to October
16  26th?
17     A   Not that I can be specific about.
18     Q   So vacations or anything like that come
19  to mind?
20     A   Vacations don't.  One of the panelists
21  travels in his job capacity quite a bit.  And I do
22  not know whether or not during that first period

Page 97

1  in October if he had any travel.  I do not know.
2     Q   And at the top of Exhibit 24, in the
3  beginning of the text, it says, Reply requested
4  when convenient.
5        Did you reply to this e-mail?
6     A   Yes.  That's basically to say that time
7  is okay for you.
8     Q   And so I'm sorry, just to be clear, you
9  sent a reply to this e-mail?
10     A   I may not have.  Generally, Rita works
11  from my calendar.  And she knows when I'm free or
12  not.  So I don't always have to reply.  But the
13  other candidates, Francis and Steve, would have --
14     Q   Okay.
15     A   -- presumably.
16     Q   And just to be clear, you mentioned one
17  of the other panel members traveled a lot.
18        Was that Mr. Miko, or Mr. Bowman?
19     A   Mr. Miko.
20     Q   Okay.  So looking at Exhibit 24, it has
21  the second candidate listed at October 27th at
22  9:00 a.m. as David Schroer.

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                    January 11, 2007

Washington, DC

Page 98

1       Were you involved in the interview with
2   Ms. Schroer?
3       A   I was involved in all the interviews.
4       Q   Okay.  Does anything stand out in your
5   mind regarding Ms. Schroer's interview, that you
6   remember?
7       A   I remember thinking very highly of him
8   and his qualifications.
9       Q   And why was that the case?
10      A   Lengthy military background; contacts at
11  the inner agency level, and NSC, the White House,
12  State Department.  He had a very good interview,
13  answered the questions cleanly, concisely.
14      Q   Okay.  Anything else?
15      A   It was -- as I said, he was one of my
16  top candidates.
17      Q   Did you have any -- well, before I go
18  there, were there any concerns that you had at all
19  about Ms. Schroer?
20      A   No.
21      Q   Any negatives that occurred in your mind
22  over the course of the interview?

Page 99

1       A   No.
2       Q   Did you discuss at all during the
3   interview whether Ms. Schroer had an active
4   security clearance?
5       A   I don't think so, but we could have.  It
6   wasn't one of the questions in the booklet.  And
7   if you've seen one of these structured interview
8   guides -- which I gather you have by now -- if
9   it's not a question in there, we generally don't
10  ask it.
11      Q   And did you discuss Ms. Schroer's
12  employment after leaving the military?
13      A   As part of the first question, he
14  volunteered -- the first question is a very broad
15  question:  Please provide any information,
16  knowledge, and experience that would contribute to
17  this job.  And I believe during the course of that
18  he told us what he was currently doing.
19      Q   And as part of this course of
20  conversation about Ms. Schroer's work experience,
21  did you have any discussions about whether or not
22  there had been any interruption in the period of

Page 100

1   time that she had held a security clearance?
2       A   No.
3       Q   When Ms. Schroer concluded the interview
4   in response to your question about is there
5   anything else we should know, do you recall what
6   she said?
7       A   No, I don't.  I would have to refer to
8   the interview guide.
9       Q   When Ms. Schroer left, after the
10  interview was over, did you and the other
11  panelists make any comments to each other?
12      A   Briefly.
13      Q   And what did people say?
14      A   How he was the second candidate
15  interviewed, and it's nice to know that you have
16  someone that you think can do the job early in the
17  process, rather than to have that person be your
18  17th or 18th person.
19      Q   That's true.
20          Did you make comments to that affect, or
21  did someone else?
22      A   I think we all thought he was a strong

Page 101

1   candidate.
2       Q   And looking at Exhibit 24, it lists the
3   first interview on October 26th and the last one
4   on November 16th.
5           Is that consistent with your
6   recollection of how long it took to complete the
7   interviews?
8       A   Uh-huh.  Yes.
9       Q   Upon completion of the final interview
10  on November 16th, what happened next as part of
11  the hiring process?
12      A   We each individually scored all 18
13  applicants, collected all the application packages
14  and materials.  They went back upstairs to Edith
15  Friday.  And then it's Edith's job to compile
16  those scores.  We see a spreadsheet usually of the
17  scores, how each one of us scored.
18          And then she sits us down for a meeting,
19  and calls to our attention where -- any instances
20  on any one of these factors we scored -- where the
21  point differential was two points or greater, and
22  asked if we want to talk about that factor and why

26 (Pages 98 to 101)

Charlotte P. Preece                                            January 11, 2007
Washington, DC

| Page 102 |
|---|
| 1   we scored that individual the way we did. |
| 2    Q   And do you recall any discussions of |
| 3   that nature happening with respect to these |
| 4   candidates? |
| 5    A   I'm sure there were. |
| 6    Q   Okay. |
| 7    A   I mean, given the 18 across nine, ten |
| 8   categories, there probably were areas where we did |
| 9   have discussions. And I don't remember which |
| 10   individuals or which factors, no. |
| 11    Q   Okay. Focusing on a couple of the |
| 12   applicants, do you remember any discussion about |
| 13   disparities in scoring with respect to |
| 14   Ms. Schroer's application? |
| 15    A   I really can't remember. |
| 16    Q   Okay. And similarly with respect to |
| 17   Mr. Rollins? |
| 18    A   I can't remember. |
| 19    Q   At any point -- and I'm referring to |
| 20   Exhibit 24, looking at the interview schedule -- |
| 21   at any point did you go back to Rita and point out |
| 22   that there was a gap of almost a week between |

| Page 103 |
|---|
| 1   November 8th and November 15th where no interviews |
| 2   were happening? |
| 3    A   I don't remember. |
| 4    Q   Do you know of any particular reason why |
| 5   there was this gap in the interviews? |
| 6    A   No, I don't. |
| 7    Q   Okay. When you saw this list and saw |
| 8   that the last interview was taking place on |
| 9   November 16th, were you concerned at all about the |
| 10   length of time the interviews were taking, or did |
| 11   this seem average to you? |
| 12    A   Seemed average to me. |
| 13    Q   I'll next show you a document which |
| 14   we'll mark as Number 25. |
| 15    (Deposition Exhibit No. 25 |
| 16    marked for identification.) |
| 17   BY MS. McGOWAN: |
| 18    Q   And then I'm also going to ask you to |
| 19   look at a document that has been previously marked |
| 20   Number 12. |
| 21    A   (Witness examined document). |
| 22    Q   Turning first to Exhibit 25, do you |

| Page 104 |
|---|
| 1   recognize this e-mail? |
| 2    A   Uh-huh. |
| 3    Q   What is it? |
| 4    Actually, I'm sorry. Before we go on, |
| 5   let me just identify what this document is for the |
| 6   record. This, which has been marked as Exhibit |
| 7   Number 25, is a document produced by the |
| 8   Government in discovery. It's Bates-stamped |
| 9   number 148. At the top says, Charlotte Preece |
| 10   references for terrorism position. |
| 11    And so, I'm sorry, if you can tell me |
| 12   what the e-mail is. |
| 13    A   It is letting my fellow panelists know |
| 14   that we would begin reference checks. And it's |
| 15   proposing who would do reference checks on each of |
| 16   these three people. |
| 17    Q   And how did you select these three |
| 18   people as the applicants that you would continue |
| 19   to pursue? |
| 20    A   I always like to talk to the current |
| 21   supervisor. These other people are people listed |
| 22   as choices. |

| Page 105 |
|---|
| 1    Q   Okay. I think my question was a little |
| 2   unclear. |
| 3    With respect to the fact that it was |
| 4   John Rollins, David Schroer, and Kel Britvec -- |
| 5    A   Yes. |
| 6    Q   -- that were the applicants for whom you |
| 7   were going to reference checks -- |
| 8    A   Yes. |
| 9    Q   -- how did you select these three |
| 10   applicants as individuals that you describe as |
| 11   your final list? |
| 12    A   Based on discussions among the three of |
| 13   us of who we thought our top candidates are, and |
| 14   to pursue reference checks, who we wanted to |
| 15   pursue reference checks with. We were free to |
| 16   select any of the applicants that scored above a |
| 17   three, three or above. So when you see this final |
| 18   referral list documents, 12, we could have |
| 19   selected any one of these individuals. |
| 20    Q   Okay. And how did you select the three |
| 21   that you did: Mr. Rollins, Ms. Schroer, and Kel |
| 22   Britvec, from the applicants here on this final |

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                                                      January 11, 2007
                                    Washington, DC

Page 106

1  referral list?
2      A  We thought those were the best
3  applicants. There was one woman who withdrew, or
4  she would have been in this mix, as well. That
5  was Dana Lesemann.
6      Q  I wasn't sure if Dana was a male or a
7  female, so -- okay. So Ms. Lesemann withdrew.
8          At what point did she inform you that
9  she was withdrawing?
10     A  Within a day or so, within a day or two.
11     Q  Within a day or two of what?
12     A  The interview.
13     Q  Okay. And staying with Exhibit 12 for a
14  moment. This is a document marked Bates-stamp
15  number 155. It's the final referral list that we
16  were referring to, with the number of applicants
17  names and their interview scores. And looking
18  here at the staffing specialist name where Edith
19  Friday has signed it -- well, first let me ask you
20  that.
21         Am I right that that's Edith Friday's
22  signature?

Page 107

1      A  I'm not sure I would know what --
2          MS. RUSSELL: Objection. Lacks
3  foundation.
4  BY MS. McGOWAN:
5      Q  Okay. Do you know who the staffing
6  specialist on --
7      A  I know Edith Friday --
8      Q  Okay.
9      A  -- but I'm not familiar with her
10  handwriting.
11     Q  Okay. With respect to this signature
12  here under the staffing specialist name and date,
13  do you know what it being signed and dated by the
14  staffing specialist means?
15     A  It means that's the day she signed it
16  and I received it.
17     Q  Is she the one who would have produced
18  this form?
19     A  Yes.
20     Q  Okay. And am I right that you received
21  the form on November 30th, 2004, the date that's
22  listed here under the staffing specialist's name?

Page 108

1      A  That was probably the case.
2      Q  Okay. Looking back in Exhibit 25, with
3  respect to these three applicants, was there an
4  order of preference with respect to these three
5  finalists?
6      A  No.
7      Q  How did you intend to decide what your
8  final order of preference was going to be for the
9  applicants on this list?
10     A  We were going to call a reference for
11  each of them, three references for each of them.
12  When I called -- first, the first thing that I do
13  is call or e-mail the applicants to let them know
14  that we are about to begin reference checks.
15  Because I would like to talk to their current
16  supervisor. They may want to first inform their
17  boss that they have applied for another position.
18  I always ask them to get back to me and let me
19  know if that's okay.
20         So obviously this e-mail was sent before
21  I had heard back from them. Also, in many cases
22  you need to ask them, even though they've

Page 109

1  initialed off on a reference check form, we need
2  to get more current information about the
3  whereabouts of these folks.
4          There's usually a fair bit of interplay,
5  or there can be, that if one of the references
6  they've listed is overseas or unavailable, can you
7  give me an additional reference so I can call. So
8  there's that kind of interchange that takes place.
9      Q  When was the next time you had contact
10  with Ms. Schroer after the interview?
11     A  Probably sometime within a couple of
12  weeks, ten days or two weeks of this, maybe even
13  sooner.
14     Q  And what was the purpose of that
15  contact?
16     A  Trying to get more current addresses for
17  people.
18     Q  Okay. Anything else?
19     A  Well, we did have one exchange I
20  remember, about Walt Chrietzberg, who was his
21  supervisor at the time. And I asked David if I
22  could -- if it was okay to call him. David

28 (Pages 106 to 109)

Charlotte P. Preece                                                    January 11, 2007
Washington, DC

Page 110

1   e-mailed back. And he said that he preferred that
2   I not call him, that I speak with two other
3   gentlemen instead.
4       Q   Okay.
5       A   That gave me some suspicion.
6       Q   What kind of suspicion?
7       A   It is -- it was unprecedent for me
8   never -- not to have spoken to a current
9   supervisor. So I had -- he said that this was
10  around the holiday time and this could potentially
11  affect his Christmas bonus, so he prefer that I
12  not speak with this gentleman.
13      Q   And so when you say that that was the
14  point at which you first suspected something, what
15  did you suspect?
16      A   Well, generally when someone tells you
17  they don't want you to speak to their supervisor,
18  you assume that their supervisor may say something
19  that's negative.
20      Q   Did you have any other suspicions about
21  why you were not being authorized to contact
22  Mr. Chrietznberg -- Chrietzberg?

Page 111

1       A   No. It just raised an eyebrow.
2       Q   Did you have any discussions with Steve
3   Bowman or Francis Miko about the fact that for
4   Ms. Schroer you did not have the okay to talk to
5   the current supervisor?
6       A   It was probably noted.
7       Q   By "noted," do you mean actually like a
8   physical notation made somewhere?
9       A   No. I probably said I was a little
10  leary that he didn't want me to talk to his
11  current supervisor.
12      Q   And did either Mr. Bowman or Mr. Miko
13  share your concern?
14      A   They thought it was unusual. But I
15  think they had conducted their reference checks
16  and got very glowing reference checks from the
17  other two folks.
18      Q   Do you know when Mr. Miko and Mr. Bowman
19  contacted the references that were assigned to
20  them?
21      A   No. I can't give you the dates.
22      Q   Do you know if the people that are

Page 112

1   listed here, Mr. Daley and Mr. Olsen, are the
2   people that Mr. Miko and Mr. Bowman respectively
3   actually contacted, or did they contact different
4   references?
5       A   I can't remember, but it's on the sheets
6   that you should have.
7           MS. McGOWAN: I'm going to show you a
8   document that we will mark Exhibit Number 26.
9               (Deposition Exhibit No. 26
10              marked for identification.)
11  BY MS. McGOWAN:
12      Q   This is a two-page document that has
13  been produced by the Government. It's been
14  Bates-stamped number 705 and 706. At the top it
15  says, Charlotte Preece, re: Updated references and
16  writing samples.
17          Do you recognize this document?
18      A   Uh-huh.
19      Q   And you should --
20      A   Yes. Yes.
21      Q   -- certainly take a moment to read it.
22      A   (Witness examined document).

Page 113

1       Q   What is it?
2       A   It is an e-mail exchange between David
3   and myself, with Dave giving me some additional
4   contact information, and then my response thanking
5   him for the information, and may I talk to his
6   current supervisor, and then David's response to
7   me indicating two alternative people who are
8   coordinators/supervisors on a job that he was also
9   working on.
10      Q   Did you, after receiving this e-mail
11  from Ms. Schroer, ever indicate either orally or
12  in writing to Ms. Schroer that her request that
13  you not contact her current supervisor was
14  unusual?
15      A   Well, I stated in my message that we
16  have a requirement to conduct a reference check
17  with the perspective employee's current
18  supervisor. But I didn't mention it further to
19  him, no.
20      Q   And to the extent that in this e-mail,
21  the fourth line of the text of the e-mail at the
22  top, where Ms. Schroer identifies Marc Alderman

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                              January 11, 2007

Washington, DC

Page 114

1  and Jeff Brady as her coordinators/supervisors, in
2  your view did that not satisfy the requirement to
3  talk to a current supervisor?
4      A   Yes.  I mean, that was the substitute.
5      Q   And so at any point did you tell
6  Ms. Schroer that you really wanted to talk to Walt
7  Chrietzberg, in order to consider the application?
8      A   Not beyond this.
9      Q   Were you satisfied that Marc Alderman
10  and Jeff Brady had sufficient experience with
11  Ms. Schroer to give you a reference that you
12  considered adequate?
13      A   Yes, in terms of fulfilling that
14  requirement to talk to a supervisor, yes.
15      Q   And did you speak to either or both --
16  or, actually, there's actually three:  Marc
17  Alderman, Jeff Brady, and Bill McRaven.
18          Did you speak to any of these references
19  identified by Ms. Schroer in this e-mail?
20      A   Marc Alderman, to my best -- Alderman to
21  my best of my recollection.
22      Q   And did either you or Mr. Miko or

Page 115

1  Mr. Bowman contact either Mr. Brady or I think
2  that's Rear Admiral McRaven?
3      A   I don't remember.  I remember we each
4  did one reference check on each.  So I don't know
5  if the folks listed here were the ones contacted,
6  or if McRaven was ever contacted.  I would have to
7  look at those sheets.
8      Q   How long after you received this
9  information from Ms. Schroer did you contact the
10  references for Ms. Schroer?
11      A   Between this date and over the next
12  week.
13      Q   Do you remember following up the same
14  day?
15      A   I don't remember.
16      Q   Okay.  And did you have any difficulty
17  reaching Marc Alderman?
18          MS. RUSSELL:  Objection to the form of
19  the question.
20  BY MS. McGOWAN:
21      Q   Well, actually, did you reach
22  Mr. Alderman the first time -- well, let me ask

Page 116

1  this.
2          How did you first try to contact
3  Mr. Alderman?  Did you call him?
4      A   Yes.
5      Q   Okay.  Did you reach him when you called
6  him --
7      A   I can't --
8      Q   -- the first time?
9      A   -- I can't remember.
10      Q   Okay.  At some point you had a telephone
11  conversation with Mr. Alderman; is that right?
12      A   I did.  It was very late.  I recall that
13  it was late.  It was one of the last ones, if not
14  the last one.
15      Q   And by late, just so I'm clear, do you
16  mean late in the day, late in the week, late --
17      A   Late --
18      Q   -- late relative to what?
19      A   The last reference call.
20      Q   Okay.  And what did you talk about?
21          Please describe that conversation to me.
22      A   Asked him about his qualifications, how

Page 117

1  he knows him.
2      Q   I'm sorry.  By "his," do you mean
3  Mr. Alderman's --
4      A   I'm sorry.  Mr. Schroer.
5      Q   Mr. Schroer's qualifications.  Okay.
6  I'm sorry.  Please continue.
7      A   Asked him about his writing, what did he
8  consider his strong points, what did he consider
9  his weak points.
10      Q   And what weak points did Mr. Alderman
11  identify?
12      A   If anything, he was an over-achiever and
13  worked too hard.
14      Q   That's a good reference.
15      A   It's a good weak point, yeah, a good
16  weak point to have.
17      Q   Did you discuss with Mr. Alderman the
18  fact that Ms. Schroer had asked you to not contact
19  Mr. Chrietzberg?
20      A   No.
21      Q   Why not?
22      A   I didn't think it was appropriate.

30 (Pages 114 to 117)

Charlotte P. Preece                                                            January 11, 2007
Washington, DC

---

Page 118

1      Q    Why not?
2          MS. RUSSELL: Objection to the form,
3     lacks foundation.
4     BY MS. McGOWAN:
5      Q    Why did you think it was not appropriate
6     to ask Mr. Alderman why Ms. Schroer didn't want
7     you talking to Mr. Chrietzberg?
8      A    Just thought it was personal
9     information.
10     Q    Okay. How did you wrap things up with
11    Mr. Alderman at the end of the conversation?
12     A    By this time, I was pretty certain who I
13    wanted to recommend. And so I appreciated the
14    call. I thanked him for spending the time. As I
15    did say, this was the last reference. And by that
16    time I probably told him that he was my top
17    candidate. Because by this time Mr. Schroer was
18    my top candidate.
19     Q    And do you recall saying anything to
20    Mr. Alderman along the lines of the fact that the
21    call was a formality?
22     A    Yes, I think I did say something like

---

Page 119

1     that. I had the reference checks I needed. The
2     fact that he finally got back to me or I finally
3     got back to him — I think he called me -- I --
4     you know we -- we included it, but I wouldn't have
5     had to include it.
6      Q    And so you mentioned that by that time
7     you had decided Ms. Schroer was your top
8     candidate.
9          When did you decide that?
10     A    We were formulating it all along. The
11    three of us were talking. We'd get reference
12    checks back. We'd share those references with one
13    another. We would sit down and talk. And
14    certainly by the middle of December Mr. Schroer
15    was my top candidate.
16     Q    And why?
17     A    I thought he had the best interview. He
18    impressed me the way he thought on his feet.
19     Q    Anything else?
20     A    It was difficult, because the
21    qualifications of the top three people were all
22    exceptional. I would have been happy to have any

---

Page 120

1     one of them.
2      Q    Okay.
3      A    In terms of their knowledge, the breadth
4     and depth of their knowledge, the level -- high
5     level positions of responsibility they were given.
6     Those were all good and equal. The distinguishing
7     factor that led Schroer to be my top candidate was
8     his performance at the interview.
9      Q    After talking with Marc Alderman, did
10    you -- well, let's ask this.
11         When did you next speak to Ms. Schroer?
12     A    I can't give you the date.
13     Q    Okay. Do you recall having a
14    conversation with Ms. Schroer sometime after this
15    last correspondence regarding references?
16     A    Yes.
17     Q    Okay.
18     A    And calling him up and asking him if he
19    were still interested in the position, and when he
20    might be available, letting him know that I was
21    about to write up a recommendation.
22     Q    And did you ever indicate to Ms. Schroer

---

Page 121

1     that you wanted to offer her the job, but only if
2     she was still interested?
3          MS. RUSSELL: Objection to the form.
4          But you can answer if you understand.
5          THE WITNESS: Please, again.
6     BY MS. McGOWAN:
7      Q    Sure. During the conversation, did you
8     ever make a statement to the affect of: I want to
9     hire you, but I only want to go forward with the
10    hiring if you actually want the job?
11     A    Usually I ask the person first are you
12    still interested in the position. And then I let
13    him know I would like to recommend him.
14     Q    Do you recall having any conversations
15    about the salary for that position during that
16    conversation?
17         Let me just back up for a moment. In
18    your last response you said that usually you ask
19    the person if they're still interested.
20         And so with respect to the conversation
21    that you actually had with Ms. Schroer, what did
22    you say?

---

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                    January 11, 2007
Washington, DC

Page 122

1    A   I don't remember exactly what I said.
2    But I probably said, David, you're my top
3    candidate. Are you still interested in the
4    position? And he said very much so. And I said,
5    well, then I'd like to begin preparing the
6    paperwork for the recommendation.
7        Q   Okay. And do you recall having any
8    discussions about the salary for that position at
9    that point?
10   A   We did. I can't remember whether it was
11   at that conversation or a subsequent conversation.
12       Q   And what was the nature of that
13   conversation?
14   A   The position was a GS-15 step one. And
15   Mr. Schroer claimed that he was making more money
16   than that in his current capacity, and was there
17   any room for negotiation. And I said I would have
18   to contact our personnel specialist, whose name is
19   Chuck Freyder, and get back to him with that
20   information. And I think I did the following day.
21   I can't remember whether I phoned him or sent him
22   an e-mail.

Page 123

1        Q   Who's the "him" in that sentence you
2    called?
3    A   David.
4        Q   David. Okay.
5        And so at some point did you follow up
6    with Ms. Schroer about what you had learned
7    from --
8    A   Yes. That's what I mean. I --
9        Q   -- what you had learned from your
10   conversation with Mr. Freyder?
11   A   Yes.
12       Q   And tell me about that conversation.
13   A   I can't remember whether it was a
14   conversation or an e-mail. But the response was
15   basically if he could provide proof of the salary
16   level, it'd be possible to bring him on as high as
17   a GS-15, step ten.
18       Q   After this correspondence about salary,
19   how did you leave things with Ms. Schroer, once
20   you had let her know that you had information
21   about the salary?
22   A   I told him that I would start processing

Page 124

1    the paperwork.
2        Q   And at any point did you have a
3    conversation where Ms. Schroer suggested that you
4    meet?
5    A   Yes.
6        Q   Okay.
7    A   We did.
8        Q   Tell me about that conversation.
9    A   He said that he would like to get
10   together for either coffee or lunch, to discuss
11   more about the job and to -- how did he phrase it?
12   There was something he wanted to tell me.
13       Q   Was there any additional description of
14   what that was?
15   A   No.
16       Q   Did you ask?
17   A   No.
18       Q   Did you have any suspicions about what
19   Ms. Schroer might want to discuss with you?
20   A   I wondered, yes. I mean, I wondered
21   enough to stop writing the recommendation about
22   four or five sentences into it. I thought I'll

Page 125

1    wait to see what he tells me on Monday.
2        Q   So with respect to the written
3    recommendation, when did you start writing those
4    first few lines that you were just describing?
5    A   After the conversation where I asked him
6    if he was interested in the job, and the salary
7    seemed to work out, resolve okay, seemed there was
8    no impediment from there.
9        Q   And was the discussion that you had
10   about the salary and the discussion in which
11   Ms. Schroer suggested that you meet, was that two
12   discussions, or one?
13   A   I think two, as I recall. I'm not sure.
14       Q   And so when did -- did you agree to
15   meet?
16   A   Yes. Uh-huh.
17       Q   And when did you agree that you would
18   meet?
19   A   The Friday before the Monday that we
20   met.
21       Q   Okay.
22   A   We agreed to meet for lunch on Monday.

32 (Pages 122 to 125)

Charlotte P. Preece                                              January 11, 2007
Washington, DC

Page 126

1    Q   Turning back briefly to our discussion
2  about what it was that made Ms. Schroer the top
3  candidate. You mentioned that the interview was
4  very important in your determination that
5  Ms. Schroer was the top candidate.
6        In what ways did the interview with
7  Mr. Rollins not go as well as the interview you
8  had had with Ms. Schroer?
9    A   I thought Mr. Schroer was a little more
10 insightful, particularly with response to the
11 first couple of questions on policy analysis
12 and -- "creative" I think is a word that I used
13 when I met with him on Monday.
14   Q   Okay. Anything else?
15   A   No.
16   Q   Okay.
17       THE WITNESS: Is this a good natural
18 break?
19       MS. McGOWAN: I think it probably is.
20 And so it seems like a time where we can begin our
21 narrative after lunch.
22            (Whereupon, at 11:58 a.m., a

Page 127

1              luncheon recess was taken.)
2         A F T E R N O O N   S E S S I O N
3                  (1:00 p.m.)
4  Whereupon,
5         CHARLOTTE P. PREECE,
6  was recalled as the witness and, having been
7  previously sworn, was examined and testified further
8  as follows:
9  EXAMINATION BY COUNSEL FOR PLAINTIFF CONTINUED
10 BY MS. McGOWAN:
11   Q   Okay. We're back from lunch. And we
12 left off where we were talking about an agreement
13 that you had with Ms. Schroer to meet. And my
14 understanding was that it was a Friday when you
15 agreed to meet, and then it was the following
16 Monday that you actually met.
17       I'm going to show you a document that we
18 will mark Exhibit 27.
19          (Deposition Exhibit No. 27
20           marked for identification.)
21 BY MS. McGOWAN:
22   Q   Do you recognize this document?

Page 128

1        Actually, sorry. But while you review
2  it, I will just identify it for the record. This
3  is a document that's been produced in discovery by
4  the Government. It's been Bates-stamp number 707.
5  And at the top it says, Specialist in terrorism
6  and international crime.
7    A   Yes, I do.
8    Q   And what is it?
9    A   It is the beginning of a recommendation
10 for Mr. Schroer.
11   Q   Okay. And when did you draft this
12 document?
13   A   Thursday or Friday morning prior to the
14 lunch.
15   Q   And we discussed this briefly before the
16 break.
17       Do you recall whether you began drafting
18 this e-mail, or actually this document, before or
19 after you agreed to have lunch with Ms. Schroer?
20   A   Before.
21   Q   Okay. And after you agreed to have
22 lunch, did you -- is any of what appears in this

Page 129

1  document text that you drafted after agreeing to
2  have lunch with Ms. Schroer?
3    A   No.
4    Q   Okay. Were there any other drafts of
5  this document?
6    A   No.
7    Q   One question that I had is were you
8  under any particular time constraints with respect
9  to when you needed to make your final selection of
10 the applicant for the terrorism specialist?
11   A   I wanted to do it before Christmas.
12   Q   And were there any particular rules or
13 regulations that set out a deadline for you, or
14 was that just an internal deadline for yourself?
15   A   Yes. I requested once to have the
16 vacancy announcement extended. You have to draft
17 the letter of recommendation within I think it's
18 five days of -- three or five days of when the
19 posting closes. And so I think the posting was
20 extended through the end of the month of December.
21   Q   And by extending the posting, did that
22 mean that applications could continue to come in

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                    January 11, 2007
                              Washington, DC

| Page 130 | Page 132 |
|---|---|
| 1 for -- <br> 2   A   No, no, no, no, no. <br> 3   Q   Okay. <br> 4   A   No. It just meant that we had longer to <br> 5 make the selection. <br> 6   Q   Okay. And what did you need to do, if <br> 7 anything, to request that extension? <br> 8   A   I needed to write a letter to the head <br> 9 of human -- an e-mail in this case to the head of <br> 10 human resources. <br> 11   Q   And who is that? <br> 12   A   I cannot remember. It's not the same <br> 13 person anymore. I can't remember the name of who <br> 14 it was at that time. <br> 15   Q   And do you recall roughly when you sent <br> 16 that e-mail? <br> 17   A   I believe it was early December. <br> 18   Q   And what did that e-mail say? <br> 19   A   Basically requested an additional <br> 20 two-week period to conduct reference checks and <br> 21 make the final -- make a recommendation. <br> 22   Q   And were you -- did you provide any | 1 that you were obligated to do? Is it to write <br> 2 the -- <br> 3   A   To prepare the recommendation, the <br> 4 director would have had to approve it, and the PAR <br> 5 would have been cut. <br> 6   Q   Okay. And is it possible to ask for <br> 7 more than one extension? <br> 8   A   You could ask for it. <br> 9   Q   If you ask for more than one extension, <br> 10 is your experience that you're then required to <br> 11 provide additional feedback -- <br> 12   A   I would have had to provide additional <br> 13 justification. <br> 14   Q   So I want to turn to Monday now, when -- <br> 15 and I can take that document back from you. <br> 16   A   (Handing document). <br> 17   Q   Monday is, if I'm right, when you were <br> 18 scheduled to meet with Ms. Schroer; is that <br> 19 correct? <br> 20   A   Yes. <br> 21   Q   And just so that we're clear, I believe <br> 22 that was Monday, December 20th, 2004. |

| Page 131 | Page 133 |
|---|---|
| 1 additional reasons or any reasons as to why you <br> 2 needed an additional two weeks? <br> 3   A   Just what I told you. They're very <br> 4 short memos, generally, just a couple sentences. <br> 5   Q   And did you receive any response back to <br> 6 that request? <br> 7   A   An e-mail back that said that my request <br> 8 was approved. <br> 9   Q   Prior to the request being approved, <br> 10 were there any requests for additional information <br> 11 about why you needed more time? <br> 12   A   No. <br> 13   Q   Okay. Is it a common occurrence to ask <br> 14 for this kind of extension? <br> 15   A   It's not uncommon. <br> 16   Q   How often have you done it? <br> 17   A   Maybe one out of every four, one out of <br> 18 every five. <br> 19   Q   And so as a result of the extension, you <br> 20 had until when to make -- <br> 21   A   I believe it was December 31st. <br> 22   Q   Okay. And by December 31st, what was it | 1      Tell me, on that day, when did you first <br> 2 either speak or encounter Ms. Schroer? <br> 3   A   Mr. Schroer came to my office around <br> 4 noon. <br> 5   Q   So and were you going to actually have <br> 6 lunch at the Library, or had you planned to have <br> 7 lunch somewhere else? <br> 8   A   Somewhere else. <br> 9   Q   Okay. Can you describe for me the part <br> 10 of your meeting that took place up until you left <br> 11 your office at the Library? <br> 12   A   We chatted very briefly, just to <br> 13 exchange pleasantries, and we left. I introduced <br> 14 him to one or two people who were in the hall. <br> 15   Q   Do you remember who you introduced him <br> 16 to? <br> 17   A   No. <br> 18   Q   Were they individuals in your division <br> 19 of -- <br> 20   A   Yes, yes -- <br> 21   Q   -- the CRS? <br> 22   A   -- we were walk -- just walking out of |

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                          January 11, 2007
                        Washington, DC

Page 134

1  my division.
2      Q   And do you recall what you said in
3  making this introduction?
4      A   This is David Schroer, we hope to have
5  him working with us on terrorism issues in the
6  not-too-distant future.
7      Q   Did you say anything to the affect of:
8  Here is the new guy that we're bringing on?
9      A   Here's the new guy that we're bringing
10 on? I don't remember using that terminology. But
11 certainly words to the affect that we had hoped to
12 bring Mr. Schroer on board, yes.
13     Q   At some point were you and Ms. Schroer
14 in your office?
15     A   Yes.
16     Q   And did you have any conversation while
17 you were in your office?
18     A   Other than to exchange pleasantries, I
19 don't recall an -- any conversation at all in my
20 office.
21     Q   Did you talk at all about your preparing
22 of the paperwork for Ms. Schroer?

Page 135

1      A   That's quite possible, that I said I was
2  in the process of preparing paperwork, yes,
3  uh-huh.
4      Q   Do you recall showing Ms. Schroer, you
5  know, paperwork regarding her application while
6  you were in your office?
7      A   No.
8      Q   On your way out to lunch, leaving your
9  office, did you encounter anyone?
10     A   Yes. There were a few people walking
11 by. And I introduced David to those people. I
12 can't remember who they were.
13     Q   Did you -- do you recall encountering
14 Francis Miko on the way out?
15     A   I don't recall.
16     Q   Do you recall anything about those
17 conversations on the way out?
18     A   Not other than what I told you. They
19 were very brief. We were -- I said from the time
20 that David arrived in my office, we were three or
21 four minutes until we left.
22     Q   And do you recall anything that these

Page 136

1  individuals to whom you were introducing
2  Ms. Schroer, do you recall what they said?
3      A   No.
4      Q   Did anyone say things to the affect of,
5  you know, welcome on board or --
6      A   Quite possibly. It would be good to
7  have you. I don't know. I assume people were
8  pleasant.
9      Q   Is there anything else about the part of
10 the meeting that happened while you were at the --
11 at your office at the Library?
12     A   No. It was very brief.
13     Q   Okay. Did you and Ms. Schroer converse
14 on the way to where you were having lunch?
15     A   I assume we chatted.
16     Q   Tell me what you remember about that
17 conversation.
18     A   Nothing. The restaurant is two minutes
19 from the Library.
20     Q   Did you talk about the job?
21     A   I do not recall.
22     Q   Do you recall having any conversation

Page 137

1  about the people who work at the Library?
2          MS. RUSSELL: Objection. Vague.
3          THE WITNESS: At the luncheon we did.
4  BY MS. McGOWAN:
5      Q   Okay. I'll hold off then for a second.
6  I'll get us to lunch.
7      A   Okay.
8      Q   And so anything else about your
9  conversation on your way to the restaurant that
10 you remember?
11     A   No.
12     Q   Okay. And once you're at lunch, can I
13 assume that conversation continued between you and
14 Ms. Schroer?
15     A   Yes.
16     Q   Okay. Describe what you remember about
17 that conversation.
18     A   I was talking about what it was like to
19 work at CRS. I was talking about our mission to
20 serve Congress, our values of objectivity and
21 nonpartisanship. I was describing how the
22 sections were laid out, and the organization of

35 (Pages 134 to 137)

Charlotte P. Preece                                                    January 11, 2007
Washington, DC

| Page 138 | Page 140 |
|---|---|
| 1 the office. I was describing how we do our work. | 1 about -- |
| 2 I described our research design and briefing | 2    A   The qualifications? |
| 3 process. I talked a little bit about what I call | 3    Q   Yes. |
| 4 the culture of the office. | 4    A   That's what I recall. |
| 5    Q   And how did you describe the culture? | 5    Q   At some point did Ms. Schroer tell you |
| 6    A   I remember telling him it was a very | 6 she had something she wanted to discuss with you? |
| 7 diverse and eclectic group of people, that we | 7    A   Yes. |
| 8 weren't stereotyped like many institutions are: | 8    Q   Okay. Describe that conversation. |
| 9 The State Department, or the Intelligence Agency | 9    A   He said that he had something personal |
| 10 or, God forbid, lawyers. | 10 that he wanted to talk to me about. And then he |
| 11    MS. RUSSELL: I guess I can't raise an | 11 asked me if I knew what transgender migration was |
| 12 objection to that. | 12 or what I knew about it. |
| 13    THE WITNESS: That people came from | 13    Q   And was that the precise term that -- |
| 14 different backgrounds: People from academia, | 14    A   That's the term I recall. |
| 15 people from the military, people from other | 15    Q   Okay. And what did you say when she |
| 16 executive agencies, people from think tanks, and | 16 asked you that? |
| 17 that I thought that that enriched the work of our | 17    A   Very little, if anything. |
| 18 division because people brought various | 18    Q   And then where did the conversation go |
| 19 perspectives to examining foreign and defense | 19 from there? |
| 20 policy issues. | 20    A   He proceeded to describe it, and -- |
| 21 BY MS. McGOWAN: | 21    Q   And how did he describe it? |
| 22    Q   Did you ever discuss why Ms. Schroer had | 22    A   Well, he talked about that he'd always |

| Page 139 | Page 141 |
|---|---|
| 1 emerged as your top candidate? | 1 felt uncomfortable, there was something -- a level |
| 2    A   He asked me that question. And I | 2 of discomfort in his life, and that he'd come to |
| 3 responded to it. And I told him pretty much what | 3 the realization over the years that he felt more |
| 4 I told you, that I thought his answers were a bit | 4 comfortable -- he would feel more comfortable |
| 5 more creative, that his contacts that he brought | 5 living life as a woman than a man. |
| 6 to bear, would bring to bear, would be useful in | 6    And he told me that he was under -- had |
| 7 his position. | 7 been consulting with a psychiatrist, and that was |
| 8    Q   Anything else? | 8 part of the process, and that he had been taking |
| 9    A   I think I told him that we had a very | 9 hormone treatment for about a year, and wanted to |
| 10 strong applicant pool, and we had another highly | 10 complete the other physical processes required for |
| 11 qualified candidate that we looked at very | 11 the migration, and that he would like to start |
| 12 carefully. | 12 work at CRS in January as a woman. |
| 13    Q   And did you have any conversation about | 13    Q   What was the first thing that went |
| 14 why Ms. Schroer had beaten out that other | 14 through your mind when you heard Ms. Schroer tell |
| 15 candidate? | 15 you that she wanted to start work as a woman? |
| 16    A   Yes. That was the conversation based on | 16    A   Wow, I can't believe this. I was |
| 17 the a little bit more creativity, imagination. | 17 stunned. |
| 18 Very strong interview, I told him he had a strong | 18    Q   And how did you feel? |
| 19 interview. | 19    A   Surprised, disbelieving. |
| 20    Q   Anything else? | 20    Q   Were you upset? |
| 21    A   In the conversation at lunch? | 21    A   Not initially. I think I was more just |
| 22    Q   About this part of the conversation | 22 shocked. |

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                    January 11, 2007
Washington, DC

| Page 142 | Page 144 |
|---|---|
| 1  Q  How did you feel when Ms. Schroer was | 1  Q  And did he describe at all what he |
| 2 explaining to you what it meant to be transgender, | 2 understood their experience to be? |
| 3 or what she meant by it when she told you that she | 3  A  No. |
| 4 was transgender? | 4  Q  Did he tell you whether or not those |
| 5  A  I was listening. I was trying to | 5 individuals had kept their clearance? |
| 6 understand. I've never known anyone who has | 6  A  No. |
| 7 undergone the process, so I was listening. | 7  Q  Did you talk at all about sort of what |
| 8  Q  Were you phased at all by this | 8 all was involved in transitioning from male to |
| 9 information? | 9 female? |
| 10  MS. RUSSELL: Objection to the form of | 10  A  We didn't get into bitty gritty details; |
| 11 the question. It's vague. | 11 but, yes, I mean, we -- there would be surgeries |
| 12  But you can answer if you understand it. | 12 required, and physical changes. |
| 13  THE WITNESS: If phased means shocked or | 13  Q  And did you talk at all about what kinds |
| 14 surprised, yes. | 14 of surgeries were going to be involved? |
| 15 BY MS. McGOWAN: | 15  A  No. I mean, not in detail. |
| 16  Q  So this didn't strike you as just | 16  Q  Do you remember talking at all about |
| 17 run-of-the-mill lunch conversation? | 17 Ms. Schroer's plans to have facial surgery? |
| 18  A  No. | 18  A  He told me he wanted to complete the |
| 19  Q  Had you ever had a discussion like this | 19 process. And by that I took it to mean that he |
| 20 with anyone before? | 20 would need the electrolysis and implants and other |
| 21  A  No. | 21 surgery. |
| 22  Q  So how did you respond? | 22  Q  And did you talk at all about any plans |

| Page 143 | Page 145 |
|---|---|
| 1  A  I think I asked him to tell me how he | 1 for sort of full sex reassignment surgery? |
| 2 came to that decision. He pulled out a portfolio | 2  A  Not plans, no. I mean, nothing that I'm |
| 3 and showed me some photographs on how he would | 3 going to do this in February, I'm going to do this |
| 4 present as a woman. I looked at those. | 4 in December, no. |
| 5  Q  And what did you think? | 5  Q  Was there any conversation about how |
| 6  A  What did I think? | 6 this would impact on his ability to -- or her |
| 7  Q  Looking at the photos. | 7 ability to start at work? |
| 8  A  I thought he looked like a man dressed | 8  A  No. I would say we talked for maybe 15 |
| 9 in women's clothes. | 9 or 20 minutes after this revelation. And I think |
| 10  Q  Anything else? What else went through | 10 because I was confused and taken aback, I said |
| 11 your mind? | 11 that I would have to talk to people within my |
| 12  A  That was -- I mean, confusion, I guess. | 12 organization, and I would get back to him within |
| 13 At one point I think I asked him, David, how can I | 13 24 hours. |
| 14 hire you as a man and you start work as a woman. | 14  Q  Did you ask Ms. Schroer who else knew |
| 15 We went on from there to talk about the security | 15 that she was transitioning? |
| 16 clearance. And he said that he knew he would be | 16  A  I don't recall that. |
| 17 required to get a psychiatric fitness for duty | 17  Q  Did you ask her if any of her job |
| 18 determination. | 18 references knew that she was transitioning? |
| 19  Q  And did he say how he knew that? | 19  A  I don't believe I did. |
| 20  A  He said that he knew other people who | 20  Q  And did you have a conversation with |
| 21 had gone through this process who had gotten | 21 Ms. Schroer about what name to use on the |
| 22 security clearances. | 22 paperwork? |

Charlotte P. Preece                                                                January 11, 2007

Washington, DC

---

Page 146

1      MS. RUSSELL: Objection. Lacks
2  foundation.
3      MS. McGOWAN: I'm sorry. Sure.
4  BY MS. McGOWAN:
5      Q   Did you have a conversation with
6  Ms. Schroer about the fact that you were filling
7  out paperwork for the position and needed to know
8  what name to use?
9      A   No. I asked him how I could hire him as
10  David and he would start work as Diane. And I was
11  confused about paperwork, as well.
12      Q   And tell me about that conversation.
13      Sort of what did Ms. Schroer say when
14  you posed this question to her?
15      A   I don't recall, other than he seemed to
16  think that it could be worked out.
17      Q   When you asked Ms. Schroer how could you
18  hire her as David and have her start work as
19  Diane, was it just a question of paperwork that
20  you were concerned about, or did you mean
21  something more?
22      A   Well, I certainly knew I needed to check

---

Page 147

1  on the security clearance. That was foremost in
2  my mind.
3      Q   And why did you think that?
4      A   Because David had a clearance. Diane
5  didn't.
6      Q   And what conversations, if any, did you
7  have with Ms. Schroer at the time about this
8  security clearance issue?
9      A   I asked him how this was likely to
10  affect his ability to get a security clearance.
11      Q   And did you, at the moment you're asking
12  Ms. Schroer the question, have a gut instinct
13  about what impact it would have?
14      A   I certainly had a feeling that it could
15  slow things down a great, great deal.
16      Q   Did you think that David Schroer would
17  lose his security clearance over this issue?
18      A   David, I didn't know about whether David
19  would, but I knew Diane didn't have one.
20      Q   Did you have any conversations at all
21  about what of this information David -- what
22  information, if any, David had already reported to

---

Page 148

1  the entity currently holding his security
2  clearance?
3      A   No.
4      Q   Why not?
5      MS. RUSSELL: Objection. Calls for
6  speculation.
7      But you can answer if you understand the
8  question.
9      THE WITNESS: I didn't think of it at
10  the time. You know, at this -- by this point, I
11  needed advice.
12  BY MS. McGOWAN:
13      Q   So I wanted to ask you, to the extent
14  that you are articulating a concern that David had
15  a clearance but Diane didn't, why did you think
16  that the clearance that Ms. Schroer held as David
17  would not apply to Diane, as well?
18      A   I just didn't think it would. But
19  that's why I ended the conversation, because I
20  needed to go back and get advice from the security
21  people.
22      Q   Did you think that David would become a

---

Page 149

1  different person as Diane?
2      MS. RUSSELL: I'm going to object to the
3  form of the question.
4      But you can answer if you understand.
5      THE WITNESS: Can you say what you mean
6  by a different person?
7  BY MS. McGOWAN:
8      Q   To the extent that David had a security
9  clearance and the concern was that Diane did not,
10  my question is did you think that David would be a
11  different person as Diane, such that the
12  information that they knew about David and that
13  formed the basis for his security clearance
14  decision would no longer be relevant for Diane?
15      A   I don't think I thought of him as
16  different in terms of what he knows. He would
17  still have the same experiences he had, to carry
18  with him as Diane. But how that affected the
19  security clearance, I had a lot of questions
20  about.
21      Q   And what were those questions?
22      What were you concerned about?

---

38 (Pages 146 to 149)

Charlotte P. Preece                                                   January 11, 2007
Washington, DC

|  | Page 150 |
|---|---|
| 1 | A    Was Diane going to be able to be |
| 2 | cleared; and, if so, in a timely fashion. |
| 3 | Q    And why were you concerned that Diane |
| 4 | might not be cleared? |
| 5 | A    Because the position required a top |
| 6 | secret clearance, and because it was needed |
| 7 | particularly to do this job. |
| 8 | Q    And understanding that the position |
| 9 | itself needed a clearance, why were you concerned |
| 10 | that Diane might not get that clearance -- |
| 11 | A    In a timely way? Because he, himself, |
| 12 | told me that he would likely have to have a |
| 13 | psychological fitness for duty prior to a |
| 14 | determination whether to proceed with the |
| 15 | clearance. |
| 16 | Q    Other than that information, was there |
| 17 | any other concern that you had; for example, with |
| 18 | regard to honesty? |
| 19 | A    Yes. I felt deceived, somewhat |
| 20 | deceived. |
| 21 | Q    And did you address that concern with |
| 22 | Ms. Schroer? |

|  | Page 151 |
|---|---|
| 1 | A    No. |
| 2 | Q    At any point did you say something along |
| 3 | the lines of: Why are you just telling me this |
| 4 | now? |
| 5 | A    I don't know if I -- I don't recall. I |
| 6 | may have. I may not have. I don't recall. |
| 7 | Q    When I asked you sort of your reaction |
| 8 | when you first heard this information, my |
| 9 | understanding is you said that you weren't upset |
| 10 | initially? |
| 11 | A    Yes. |
| 12 | Q    Is there a point at which you became |
| 13 | upset? |
| 14 | A    Not upset visibly. But as the |
| 15 | conversation went on, I thought -- I did think to |
| 16 | myself certainly why are you telling me this and |
| 17 | why are you telling me now? Why didn't you come |
| 18 | to the interview dressed as a woman? He had told |
| 19 | me, during the course of the conversation, that he |
| 20 | was presenting himself as a woman except in work |
| 21 | settings. |
| 22 | Q    And what did you think about that? |

|  | Page 152 |
|---|---|
| 1 | MS. RUSSELL: Lacks foundation. |
| 2 | But you can answer if you understand the |
| 3 | question. And it also -- no, I'll just stick with |
| 4 | the same objection. It lacks foundation. |
| 5 | But you can answer if you understand. |
| 6 | THE WITNESS: Certainly my personal |
| 7 | preference was that if he were open and honest |
| 8 | about this and come to the interview dressed as a |
| 9 | woman, at least I wouldn't have been -- felt |
| 10 | deceived. |
| 11 | BY MS. McGOWAN: |
| 12 | Q    And did you have any conversations with |
| 13 | Ms. Schroer about what her legal name was at that |
| 14 | point? |
| 15 | A    He told me that he would be changing his |
| 16 | name early in January to Diane. |
| 17 | Q    So up until that point, Ms. Schroer's |
| 18 | legal name was still David Schroer? |
| 19 | A    That's what he was using, yes. |
| 20 | Q    So what would you have thought if on |
| 21 | December 28th, I think it was, at 10:00 a.m., when |
| 22 | the person on your interview list named David |

|  | Page 153 |
|---|---|
| 1 | Schroer was scheduled to appear, a woman in a |
| 2 | dress showed up for the interview? |
| 3 | MS. RUSSELL: Calls for speculation. |
| 4 | But you can answer if you understand. |
| 5 | THE WITNESS: What would I -- I'm sorry? |
| 6 | BY MS. McGOWAN: |
| 7 | Q    What would you have thought? |
| 8 | A    I would have thought the person was a |
| 9 | transsexual. |
| 10 | Q    And how would that have impacted your |
| 11 | assessment of that applicant? |
| 12 | A    I would have probably consulted |
| 13 | personnel security to see if there were |
| 14 | implications for an individual's ability to get a |
| 15 | security clearance. |
| 16 | Q    Other than the security clearance issue |
| 17 | that you just identified, would you have thought |
| 18 | that this individual being transsexual impacted on |
| 19 | their KSA's, in knowledge, skills, and abilities, |
| 20 | for the position? |
| 21 | A    No, other than contacts. I did have |
| 22 | some concerns about whether his contacts knew, |

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                    January 11, 2007
Washington, DC

Page 154

1  whether they would be as forthcoming as they might
2  be had he not revealed this or undergone the
3  procedures.
4      Q    And would your concern about contacts
5  have been less if Ms. Schroer had come to the
6  interview dressed as a woman?
7      A    They would have been there under that
8  case, as well.
9      Q    Do you recall, when Ms. Schroer told you
10 that she was transitioning from male to female, do
11 you recall saying anything along the lines of, you
12 know: Why would you want to do something like
13 that, or words to that affect?
14     A    I think I did ask him how did you come
15 to this decision, why did you do that, yes.
16     Q    And what was his response? What was
17 Ms. Schroer's response?
18     A    To the best of my recollection, he said
19 that he had never felt comfortable in his body,
20 and that it was something that he -- probably came
21 to him as -- as -- when he was young, but it took
22 a long time for him to come to the realization

Page 155

1  that, yes, I would be more comfortable in a
2  female's body.
3      Q    And so you -- am I right you were told
4  by Ms. Schroer that this was something that she
5  had been dealing with for a long time; is that
6  right?
7      A    Yes. Uh-huh.
8      Q    And to the extent that this was
9  something that Ms. Schroer had been dealing with
10 for a long time, were you concerned at all about
11 how Ms. Schroer's decision to appear at work as a
12 woman may or may not distract her from her work
13 duties?
14     A    I'm sorry. Please repeat that.
15     Q    Sure. I'll make it a shorter question.
16         Were you concerned at all about
17 Ms. Schroer's transition as being a distraction?
18     A    I was concerned in terms of the
19 surgeries. And I knew nothing about how many
20 surgeries would be required, how long they would
21 take.
22     Q    And did you ask Ms. Schroer for any

Page 156

1  information that might give you a better sense
2  about that?
3      A    I don't recall that I did.
4      Q    What did you think about the fact that
5  Ms. Schroer had brought pictures of herself
6  dressed as a woman to this meeting?
7          MS. RUSSELL: Objection. Lacks
8  foundation.
9  BY MS. McGOWAN:
10     Q    Let me back up.
11         I think we discussed that at some point
12 in the meeting Ms. Schroer showed you pictures; is
13 that correct?
14     A    That's correct.
15     Q    And these were obviously pictures that
16 she had brought to the meeting to show you; is
17 that right?
18     A    That's right.
19     Q    Okay. What did you think about the fact
20 that she had brought these pictures to this
21 meeting?
22     A    I guess I thought David wants to see

Page 157

1  me -- wants to show me what he would look like as
2  a female. I don't think I thought anything beyond
3  that.
4      Q    Do you recall what you said first when
5  you saw the pictures?
6      A    I don't think I said much of anything.
7      Q    Do you recall saying "wow," or words to
8  that affect?
9      A    No.
10     Q    Did you think it was appropriate for
11 Ms. Schroer to show you those pictures?
12     A    I didn't know what was appropriate.
13         MS. RUSSELL: Objection to the form of
14 the question.
15         Go ahead.
16 BY MS. McGOWAN:
17     Q    I'm sorry?
18     A    I didn't know what was appropriate.
19     Q    So after hearing this information, did
20 you have any concern that the contacts that
21 Ms. Schroer had in the government and the military
22 would no longer want to associate with her because

40 (Pages 154 to 157)

Charlotte P. Preece                                                January 11, 2007
                              Washington, DC

| Page 158 | Page 160 |
|---|---|
| 1 she was undergoing a gender transition? | 1     A   I didn't ask that. |
| 2        MS. RUSSELL: Object to the form. | 2     Q   As you were hearing this information, |
| 3     But you can answer if you understand. | 3 what were you thinking with respect to |
| 4        THE WITNESS: Yes. I think I already | 4 Ms. Schroer's trustworthiness? |
| 5 mentioned that. | 5     A   As I said, I felt somewhat deceived. |
| 6 BY MS. McGOWAN: | 6     Q   And why did you think that? |
| 7     Q   Okay. And why did you think that? | 7     A   Because he waited for so late in the |
| 8     A   The military being the culture it is, | 8 game to talk to me about this. |
| 9 and particularly special forces, I thought it's | 9     Q   And when in the process do you think |
| 10 possible that some people would be understanding | 10 Ms. Schroer should have told you? |
| 11 and others would not. | 11    A   He could have told me at any time. He |
| 12    Q   And when you talk about the culture of | 12 could have told me at the interview or after the |
| 13 the military, what do you mean? | 13 interview. He could have told me when I contacted |
| 14    A   Combat lines, uniquely male profession. | 14 him to let him know that he was a top candidate |
| 15    Q   Did you think of the military as being a | 15 and that I would be starting reference checks. |
| 16 particularly unfriendly or unsympathetic place | 16    Q   And – I'm sorry. Continue. |
| 17 with respect to transgender people? | 17    A   He could have called me any time while |
| 18    A   I thought it was likely probably to have | 18 those reference checks were going on and we were |
| 19 a more conservative attitude than the general | 19 in fairly routine contact by phone or by e-mail. |
| 20 population at large. | 20    Q   And if at the point where you contacted |
| 21    Q   And in this context, by conservative, is | 21 Ms. Schroer regarding her reference checks she |
| 22 it fair to say that mean negative? | 22 told you this information about her intentions to |

| Page 159 | Page 161 |
|---|---|
| 1        MS. RUSSELL: I'm going to objection to | 1 transition, would you have gone forward and |
| 2 the form of the question. | 2 contacted her references, or would you have walked |
| 3     But you can answer if you understand. | 3 away at that point? |
| 4        THE WITNESS: Conservative in terms of | 4        MS. RUSSELL: Objection to the form. |
| 5 traditional values than is being seen as outside | 5 Calls for speculation. |
| 6 those traditional norms. | 6        THE WITNESS: I would have probably did |
| 7 BY MS. McGOWAN: | 7 the same thing I did in this circumstance, and go |
| 8     Q   Were you concerned about bias by | 8 back talk to my boss and talk to personnel |
| 9 military people against Ms. Schroer if she were in | 9 security to determine impact. |
| 10 the position? | 10 BY MS. McGOWAN: |
| 11    A   Yes. | 11    Q   Did you say anything to Ms. Schroer |
| 12    Q   And with respect to this concern about | 12 about feeling deceived, or your concerns about her |
| 13 her contacts with government and military people | 13 trustworthiness? |
| 14 and possible bias, did you express any of those | 14    A   I don't recall that I did. |
| 15 concerns to her? | 15    Q   Is there anything else that you remember |
| 16    A   No. I was to the point where I didn't | 16 discussing during this lunch? |
| 17 want to say anything more, because I needed to | 17    A   I remember saying something to the |
| 18 process it. I needed to go back to my agency, | 18 affect that, David, you've given me a lot to think |
| 19 talk to some people. | 19 about. I need to go back to my office and talk to |
| 20    Q   And so did you ask her if any of her | 20 some people. I do want to fill this position by |
| 21 special forces, you know, colleagues knew that she | 21 Christmas, and so I'll get back to you in a timely |
| 22 was transitioning? | 22 manner. |

                                                    41 (Pages 158 to 161)

Charlotte P. Preece                                                    January 11, 2007
Washington, DC

Page 162

1    Q    Anything else?
2    A    That's -- that was pretty much the end
3  of the conversation.
4    Q    Okay. And before we end this part of
5  the conversation, I just want to go back and make
6  sure that I am clear about everything that you
7  discussed.
8         When you raised this issue with
9  Ms. Schroer of how can I hire you as David when
10  you want to show up as Diane, other than the name
11  on the form and other than the security clearance
12  concern that you identified, did you mean anything
13  else by that question?
14       MS. RUSSELL: I'm going to object to the
15  extent it mischaracterizes her testimony.
16       But you can go ahead and answer if you
17  understand the question.
18       THE WITNESS: Please repeat it.
19  BY MS. McGOWAN:
20    Q    Sure. We've talked about the concern
21  about the name that goes on the paperwork, whether
22  it should be David or whether it should be Diane.

Page 163

1  And also talked about your concern about the
2  security clearance issue.
3         I'm sort of wondering if there's
4  anything else that you were trying to convey when
5  you asked Ms. Schroer: How can I hire you as
6  David when you want to come to work as Diane?
7       MS. RUSSELL: It's the same objection.
8       But answer it if you understand it.
9       THE WITNESS: It was a practical
10  question. David Schroer applied. David Schroer
11  interviewed. I did reference checks on David
12  Schroer. He wants to start work as Diane. I
13  didn't hire Diane. I didn't recommend Diane. I
14  didn't interview Diane.
15  BY MS. McGOWAN:
16    Q    And in what ways were you concerned that
17  Diane would be different from David?
18       MS. RUSSELL: Objection to the form.
19  BY MS. McGOWAN:
20    Q    Or were there any ways in which you were
21  concerned that Diane would be different from David
22  in a way that would impact your decision about

Page 164

1  whether you wanted Diane when you had wanted
2  David?
3    A    Just the security clearance.
4    Q    Okay.
5    A    The contacts.
6    Q    Uh-huh. Anything else?
7    A    Those were the primary.
8    Q    Recognizing that these two were the
9  primary reasons, were there any other reasons,
10  even recognizing that they may have been less
11  important?
12    A    Credibility with members of Congress
13  went through my mind.
14    Q    And by credibility, what do you mean?
15    A    This position is a senior position. It
16  would likely be that -- or it was certainly
17  expected to be that this person would have close
18  contacts with committees, potentially be called to
19  testify. Generally when you testify they read a
20  bio about yourself. He would be testifying before
21  people who knew -- would know that only a man
22  could have those experiences.

Page 165

1    Q    And were you concerned that people would
2  react negatively?
3    A    Yes.
4    Q    And why is that?
5    A    That they might not be as tolerant, the
6  same reason as the contacts.
7    Q    And so with respect to the credibility
8  with members of Congress, is it fair to say that
9  you were concerned about bias against plaintiff by
10  individuals who disapproved of transgender people?
11    A    I thought it was possible.
12    Q    And did you -- were you concerned that
13  people might be less interested in what she had to
14  say because she was transgender?
15    A    Yes.
16       MR. ESSEKS: Why don't we take five
17  minutes.
18       MS. McGOWAN: We'll take a five-minute
19  break here, and be back at 2:00.
20            (Recess)
21  BY MS. McGOWAN:
22    Q    So we're back from our break. And we

42 (Pages 162 to 165)

Charlotte P. Preece                                                January 11, 2007

Washington, DC

| Page 166 | Page 168 |
|---|---|
| 1   were just wrapping up our conversation about the | 1   was of tennis, was Rene Richards, when she played |
| 2   lunch meeting that you had with Ms. Schroer. | 2   with Billy Jean King. Yes, I am that old. |
| 3        Before I sort of move to what happened | 3        Q    And what did you know about Rene |
| 4   next, I'll just ask you is there anything else | 4   Richards? And how did that sort of inform what |
| 5   about that conversation that we haven't discussed? | 5   you knew about transgender people? |
| 6      A   Not that I recall at the moment. | 6      A   I just knew that there was a sex change. |
| 7      Q   And how did you wrap things up? | 7      Q   And have you ever interacted with anyone |
| 8      A   I think with that last statement that I | 8   who's transgender? |
| 9   said there, David, you've given me a lot to think | 9      A   I don't believe I have. It's possible |
| 10  about. I need to go back to the Library and talk | 10  that I may have, but not to my knowledge. |
| 11  to some officials, that I want to finish this | 11     Q   And this is sort of a subpart of this |
| 12  posting around the Christmas -- before Christmas, | 12  question, but have you ever interacted with |
| 13  and that I will be back to you -- I can't remember | 13  anybody at the Library of Congress who's |
| 14  whether I said the next day or in 24 hours, but | 14  transgender? |
| 15  soon. | 15     A   Not that I know of. |
| 16     Q   And at some point you and Ms. Schroer | 16     Q   And have you ever interacted with |
| 17  part ways; is that right? | 17  someone whom you didn't know at the time was |
| 18     A   Yes. | 18  transgender, but then later found out that they |
| 19     Q   Okay. So did you walk back to your | 19  were? |
| 20  office by yourself, or was Ms. Schroer still with | 20     A   No. |
| 21  you? | 21     Q   Are you familiar with the movie |
| 22     A   Well, we walked out of the restaurant | 22  "Trans-America"? |

| Page 167 | Page 169 |
|---|---|
| 1   together. I don't think he went back into the | 1      A   No. |
| 2   building with me. | 2      Q   Okay. Other than the television reports |
| 3      Q   Okay. What were you thinking as you | 3   you mentioned about Rene Richards, have you seen |
| 4   walked back to your office after lunch? | 4   any television documentaries or news shows about |
| 5      A   That was the most incredible experience | 5   transgender people? |
| 6   I ever had. | 6      A   No. |
| 7      Q   And what do you mean by incredible? | 7        MS. RUSSELL: Objection, to the extent |
| 8      A   Unbelievable. It's just not what I | 8   it that it mischaracterizes her testimony. |
| 9   expected at all. | 9        But you can answer if you understand. |
| 10     Q   Now, you mentioned -- and correct me if | 10       THE WITNESS: If I understand, you asked |
| 11  I'm wrong -- that you said that you had never | 11  me if I have seen any -- |
| 12  known a transgender person before; is that right? | 12  BY MS. McGOWAN: |
| 13     A   Yes. | 13     Q   Television -- |
| 14     Q   So how do you know whatever you knew at | 14     A   -- television shows or documentaries |
| 15  that point -- how did you know whatever you knew | 15  about transgender migration issues? No. |
| 16  at that point about what it meant to be | 16     Q   When you learned that Ms. Schroer is in |
| 17  transgender? | 17  the process of transitioning from male to female, |
| 18     A   From what David told me. | 18  did that make you feel uncomfortable at all? |
| 19     Q   Had you ever, you know, seen any | 19     A   I would say more curious than |
| 20  television shows or movies about transgender | 20  uncomfortable. I was trying to understand it. |
| 21  people? | 21     Q   Did you feel differently interacting |
| 22     A   No. The only recollection that I had | 22  with her once she told you that she felt like she |

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                                    January 11, 2007
Washington, DC

Page 170

1  was a woman?
2      A   Not about the individual, no. I knew it
3  was going to create all kinds of complexities.
4  But as far as the way I felt toward David, no.
5      Q   And so from your perspective, nothing
6  about your interaction was any different after you
7  learned that Ms. Schroer was a transsexual woman?
8          MS. RUSSELL: Objection to the form.
9          You can answer if you understand.
10         THE WITNESS: I won't say nothing was
11  different. My feelings about David's
12  competencies, his knowledge, his experience was --
13  was not different. Yes, I was surprised, as I
14  stated. And, yes, it did raise concerns about
15  whether he was going to be able to -- whether she
16  was going to be able to fill the institutional
17  needs that the organization had.
18  BY MS. McGOWAN:
19     Q   And so other than that, other than your
20  thinking through the impact of this information on
21  the job, you had no other personal reaction to the
22  news?

Page 171

1      A   No. I mean -- no. I didn't bear him
2  ill will as a result of it, no.
3      Q   And not even ill will. Was there any
4  way in which you felt differently interacting with
5  Ms. Schroer after you learned this news?
6          MS. RUSSELL: Same objection. Form.
7          THE WITNESS: Please repeat.
8  BY MS. McGOWAN:
9      Q   Sure. You mentioned that you didn't
10  have any ill will.
11         And I was asking, putting aside sort of
12  any, you know, feelings of ill will towards
13  Ms. Schroer, was there anything about your
14  interaction with Ms. Schroer that felt different
15  after she tells you: I'm a woman?
16     A   Just what -- what I was going to need to
17  do, but not about him as an individual.
18     Q   Did you have any concern that
19  Ms. Schroer wouldn't pass for a woman if she came
20  to the Library of Congress dressed as a woman?
21         MS. RUSSELL: Objection to the form.
22         THE WITNESS: That wasn't a

Page 172

1  consideration that crossed my mind.
2  BY MS. McGOWAN:
3      Q   Did you think individuals who had not
4  met David Schroer would see Diane Schroer and
5  suspect that this was a transsexual person?
6      A   Again, that was a fleeting thought in my
7  mind, if that. These other real factors were.
8  The security clearance, by far the dominant, was
9  what I was focusing on. When I came back and I
10  talked to the director, the first person I talked
11  to was Cynthia Wilkins. That was my overriding
12  concern.
13     Q   And we'll definitely talk about what
14  happened when you got back to the office.
15         My question is, in light of what you saw
16  in the pictures that Ms. Schroer shared with you
17  and the concerns that you expressed about how she
18  looked, were you concerned that other people would
19  react to Ms. Schroer as a man in a dress?
20     A   I don't know if "concerned" is the right
21  word. Yes, they probably would have.
22     Q   As far as the individuals who are in the

Page 173

1  specific unit where the terrorism specialist would
2  have worked -- and I believe that's Mr. Miko's
3  unit -- how many people are in that unit, if
4  that's the right term to describe the section?
5      A   Roughly 12, 13.
6      Q   And how many of those people are -- in
7  that unit are military veterans?
8      A   Only the person who was hired for the
9  position.
10         MR. ESSEKS: Mr. Rollins?
11         THE WITNESS: Yes.
12  BY MS. McGOWAN:
13     Q   And how many men and woman are in that
14  unit?
15     A   That may take me a minute.
16     Q   Okay.
17             (Whereupon at which time the
18             witness wrote on a piece of
19             paper.)
20         THE WITNESS: And now that I am
21  composing this list, I now see that there is
22  another man who is -- had military experience, as

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                                                      January 11, 2007
Washington, DC

Page 174

1   well, in that section.
2       Right now, I'm coming up with six women
3   and four men.
4   BY MS. McGOWAN:
5       Q   Okay.  And can you go through -- and I
6   don't necessarily need the names -- but tell me
7   which positions are held by the men, and then
8   which -- the titles of the positions that are held
9   by the women?
10      Or approximations, a description of
11  the --
12      A   Of what they do?
13      Q   Of what they do, by subject area or
14  however it takes.
15      A   Okay.  I'll start with the men.  The
16  first one does foreign aid, would be Mr. Rollins,
17  who obviously does terrorism.  The third person
18  does international narcotics and crime.  And the
19  fourth is a new-hire who does the foreign policy
20  apparatus.
21      Q   Okay.
22      A   Do you want me to do the same thing for

Page 175

1   the women?
2       Q   Yes.  As to the women?
3       A   The first person does sanctions and
4   foreign policy legislation.
5       Q   I'm sorry.  Is that two or --
6       A   That's --
7       Q   -- that's one?
8       A   -- sanctions and foreign policy
9   legislation.  The next one does foreign policy
10  management, State Department.  The third person
11  does humanitarian relief and reconstruction.  The
12  fourth person does human rights and international
13  health.  The fifth person does foreign operations
14  appropriations.  The sixth person does the United
15  Nations and related agencies.
16      Q   Okay.
17      A   I could be omitting somebody.  That's
18  just the best of my recollection.
19      Q   Sure.  Can you explain to me a little
20  bit what foreign policy apparatus -- that was one
21  of the positions that you listed -- what does that
22  do?

Page 176

1       A   The institutions in the State
2   Department, International Broadcasting, what used
3   to be the U.S. Information Agency.
4       Q   And so this person provides research
5   support for those agencies?
6       A   Right, and programs conducted by those
7   agencies.  USAID.
8       Q   And how many of these positions interact
9   regularly with members of the military?
10      A   Certainly the terrorism position, the
11  narcotics position, the reconstruction and
12  humanitarian relief.  That's about half of them.
13      Q   And am I correct Mr. Miko is the
14  supervisor of all these people?
15      A   Yes.
16      Q   Okay.  So we are now at the point where
17  you're back at your office.  Tell me what's the
18  first thing you do.
19      A   Go down to the director.
20      Q   Did you encounter anyone --
21      A   Before that?  No.
22      Q   Okay.  So you go down to the director.

Page 177

1       And that's Mr. Mulhollan?
2       A   That's correct.
3       Q   Okay.  Tell me what happens.
4       A   I tell him about the lunch, and what
5   Mr. Schroer has revealed.
6       Q   And how do you describe this to him,
7   what happened?
8       A   I said, Dan, I just had a very unique
9   situation, experience in my life.  The candidate
10  that I was considering recommending for the
11  position of terrorism has informed me that he
12  would like to start work as a woman.  He said,
13  you're kidding.  I said, no.  I said, I need to
14  talk to some people.  I said, I would like to go
15  down and talk to Cynthia Wilkins, because I was
16  pretty sure this was going to have implications
17  for security clearance.
18      And he said, okay, I will let Kent know.
19  And that would be Kent Ronhovde, who is the
20  counselor to the director.
21      Q   Other than "you're kidding," did
22  Mr. Mulhollan say anything else to express, you

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                      January 11, 2007

Washington, DC

Page 178

1  know, his surprise or other reaction to your news?
2      A   No. It was a short conversation,
3  probably lasting no more than two to three
4  minutes. And I did tell him that time was of the
5  essence, because I promised to get back to
6  Schroer.
7      Q   And so other than offering to contact
8  Mr. Ronhovde, did Mr. Mulhollan say that he would
9  do anything else?
10     A   No.
11     Q   And then did you go directly from that
12  meeting --
13     A   I think I went back to my office to call
14  Cynthia first to see if it was okay to come down,
15  if she were free.
16     Q   And did you explain at all to her what
17  you wanted to meet with her about, on that phone
18  call?
19     A   No.
20     Q   She was available?
21     A   She was available.
22     Q   And so what happened next?

Page 179

1      A   I went to her office. And I told her
2  the same thing, what had transpired. And I asked
3  her what ramifications this new information would
4  have that related to the candidate's ability to
5  get clearance.
6      Q   And when you told her what had happened
7  during your lunch meeting, what did you say?
8          How did you describe what had happened?
9      A   I said, Cynthia, I was considering
10  recommending a candidate for a position that
11  requires a top secret security clearance. During
12  the conversation, the gentleman told me that he
13  would like to start work as a woman, and that he
14  would like to -- how could I say it -- migrate --
15  transgender migration, was undergoing transgender
16  migration.
17     Q   And what was her reaction?
18     A   Her reaction was she had not dealt with
19  a case like this before. And she asked me a few
20  questions. And then she said that she would like
21  to check on the regulations before discussing this
22  with me any further, and that she would meet with

Page 180

1  us tomorrow, or soon thereafter.
2      Q   I'm interested to find out more about
3  the questions that she asked you.
4          Before we turn to that, as far as her
5  initial reaction, did she say anything along the
6  lines of "wow" or --
7      A   No.
8      Q   -- "holy smokes, that's wild"?
9      A   No.
10     Q   Okay. Other than saying that she hadn't
11  dealt with a case like this before, did she
12  provide any sort of initial indication about her
13  reaction to this piece of information?
14     A   No.
15     Q   And then you said that she asked you
16  some questions.
17         What questions did she ask you?
18     A   Was the -- did the job vacancy
19  announcement carry a TIS requirement.
20     Q   And your answer to that was?
21     A   Yes.
22     Q   Okay. What else?

Page 181

1      A   I don't recall.
2      Q   Did she ask whether or not the applicant
3  currently held a clearance?
4      A   She may have.
5      Q   Did she ask anything about when the
6  individual's most recent security investigation
7  had been conducted?
8      A   No.
9      Q   Did she ask you any questions about
10  break in service, or interruptions in service?
11     A   Not that I recall. She didn't ask me
12  about the individual. She was just trying to get
13  some facts before she did her research.
14     Q   At that point, having gone through the
15  application process with Ms. Schroer, did you know
16  whether there had been any interruption in
17  Ms. Schroer's holding of a security clearance?
18     A   No.
19     Q   And so at this point, am I right that
20  Ms. Wilkins asked for no information specifically
21  about the person involved?
22     A   I don't recall.

46 (Pages 178 to 181)

Charlotte P. Preece                                                                  January 11, 2007

Washington, DC

Page 182

1    Q    Did you offer any information about the
2  specific person involved for her to take into
3  account?
4    A    I think I did mention, yes, that he had
5  25-plus years of military service, told her his
6  MSO.
7    Q    I'm sorry. By --
8    A    That's military occupational specialist.
9    Q    Okay. Okay. What other information
10  about Ms. Schroer specifically did you share?
11    A    That he had showed me a portfolio.
12    Q    Did Ms. Wilkins ask any questions about
13  the portfolio?
14    A    No.
15    Q    Did she ask you to described the
16  pictures in the portfolio?
17    A    No.
18    Q    Did you describe what the pictures were?
19    A    I can't recall, other than to say he
20  showed me about half a dozen photos of what he
21  would look like as a woman.
22    Q    And how long did the meeting with

Page 183

1  Ms. Wilkins last?
2    A    Not long. Ten minutes, 10, 15 minutes.
3    Q    Did you discuss any of the specifics
4  that Ms. Schroer had shared with you about what
5  was involved in transitioning, either sort of
6  medical or psychological?
7    A    Other than to tell her that he intended
8  to go through the complete process.
9    Q    And did you --
10    A    And that he -- I do remember telling her
11  that he had mentioned that he would likely need a
12  psychiatric fitness for duty prior to a
13  determination whether or not to go ahead with a
14  security clearance investigation.
15    Q    And did Ms. Wilkins respond at all to
16  your use of the term psychiatric fitness for duty
17  evaluation?
18    A    No.
19    Q    Did she express, you know, any sentiment
20  agreeing or disagreeing with whether or not
21  Ms. Schroer's statement about a psychiatric
22  fitness for duty evaluation was accurate?

Page 184

1    A    No. She said she wanted to do her
2  homework. That's the kind of person she is.
3    Q    And so did you inform Ms. Wilkins that
4  Ms. Schroer was under the care of a therapist?
5    A    Possibly.
6    Q    And did you discuss any sort of specific
7  medical procedures that Ms. Schroer might be
8  contemplating?
9    A    No.
10    Q    Did you discuss at all with Ms. Wilkins
11  whether there was any information that would be
12  particularly helpful for her to have from the
13  applicant?
14    A    No.
15    Q    Is there anything else that you
16  discussed during that conversation?
17    A    Not that I recall.
18    Q    What did you do next?
19    A    I think I went outside and had a couple
20  of cigarettes.
21    Q    And what was going through your mind
22  when you were having those cigarettes?

Page 185

1    A    Wow, I can't believe this is happening
2  to me.
3    Q    And were you concerned at all that you
4  were implicated in a hire involving a transgender
5  person?
6    A    I was starting to feel set up. The
7  shock was winding down, and I was starting to
8  think, wow, have I been had?
9    Q    And I guess what do you mean by having
10  been had?
11         I mean, did you feel put upon, or sort
12  of -- how were you feeling?
13         I haven't been through this experience,
14  so how were you feeling?
15    A    I felt that am I being -- I was asking
16  myself the question: Am I being set up for a
17  legal suit?
18    Q    And in what way did you think that you
19  were being set up?
20    A    Well, that he had reeled me in with this
21  interest in the job, that he got me to admit that
22  I was going to recommend him, and then he was

47 (Pages 182 to 185)

Charlotte P. Preece                                                            January 11, 2007
Washington, DC

Page 186

1  going to tell me something which was going to
2  change my recommendation, and that that could
3  result in legal action against the Library.
4      Q   Do you think that Ms. Schroer knew that
5  this would change your recommendation, this
6  information would change your recommendation?
7      A   I have no way of knowing that.
8      Q   At that point, when you're outside
9  having probably a much-needed cigarette, were you
10 starting to formulate in your own mind a plan
11 about what you were going to do, how you were
12 going to deal with this situation?
13     A   I knew that we -- I needed to talk to
14 people, to more people, that this meeting with
15 Cynthia was going to become very important the
16 following day.
17     Q   At that point, did you still feel like
18 you wanted to hire Ms. Schroer?
19     A   I was leaning against it. I really
20 didn't make up my mind until conversations with
21 people the subsequent day, the next day.
22     Q   And tell me why.

Page 187

1      Why were you leaning against it?
2      A   Well, I did sense that there would be
3  strong problems with the security clearance, then
4  the same issues that we discussed about before:
5  trust, and confidence, and credibility, and
6  contacts. All these things were running through
7  my mind.
8      Q   And by credibility and contacts, that's
9  what we were talking about with respect to sort of
10 having, you know, negative interactions with the
11 military or members of Congress; is that right?
12     A   Right.
13     Q   And was that a concern that standing
14 alone was enough reason for you to decide you
15 didn't want to go forward with Ms. Schroer?
16     A   Absolutely not. That was a minor
17 reason.
18     Q   And your concerns about her
19 trustworthiness, was that something that sort of
20 by itself was a reason why you were thinking that
21 you weren't going to go forward with her as --
22     A   It wasn't a reason alone, but it was --

Page 188

1  it was a reason.
2      Q   And if Cynthia Wilkins had come back to
3  you and said, no problem, this person's got a
4  clearance already, not a big deal, would you still
5  have gone forward with your recommendation for
6  Ms. Schroer?
7          MS. RUSSELL: Calls for speculation.
8          But you can answer if you understand.
9          THE WITNESS: I don't know the answer to
10 that question.
11 BY MS. McGOWAN:
12     Q   And what would have been the factors you
13 would have been weighing if the security clearance
14 timing issue had fallen away?
15         MS. RUSSELL: Same objection.
16         But you can answer if you understand.
17         THE WITNESS: Uh-huh. I probably would
18 have gone back and done some serious reflection.
19 Because the second candidate also had extremely
20 good skills, and did very well in the interview,
21 and had glowing recommendations, as well. I would
22 have weighed my decision.

Page 189

1  BY MS. McGOWAN:
2      Q   And in your mind, did this other
3  candidate just present fewer concerns with respect
4  to this credibility and contact point?
5      A   Yes.
6      Q   In part, because he was not transsexual;
7  is that right?
8      A   Yes.
9      Q   After -- well, let's -- we'll finish
10 that cigarette.
11     What else are you thinking?
12     I don't know how many you had, so -- I
13 doubt one would have been sufficient, so, you
14 know, what else were you thinking at that point?
15     A   I think that we've pretty much covered
16 it.
17     Q   Okay. Walk me through sort of, you
18 know -- roughly what -- what time is it now at
19 this point?
20     A   Late afternoon.
21     Q   Okay. Walk me through sort of what
22 happens between, you know, when you get back to

Charlotte P. Preece                                                                 January 11, 2007
Washington, DC

## Page 190

1    your office and the end of your business day.
2        Who did you talk to?
3    A    Steve Bowman. I think Francis was on
4    leave that day. Gary Pagliano.
5    Q    Okay. Anyone else?
6    A    I may have talked to my deputy, my
7    acting --
8    Q    And who was that?
9    A    -- who was acting deputy at the time, Ed
10   Bruner.
11   Q    Anyone else?
12   A    Not that I recall.
13   Q    Okay. And let's just walk through each
14   one.
15       Steve Bowman, obviously Steve had been a
16   member of the interview panel; is that right?
17   A    Yes.
18   Q    So tell me about your conversation with
19   him.
20   A    Again, I told him what transpired.
21   Steve was shocked, as well.
22   Q    What did he say?

## Page 191

1    A    I can't remember exactly what.
2    Something -- some equivalent to "wow," as well.
3    "You're kidding," something like that.
4    Q    And after sort of his initial reaction
5    to what you shared with him, did you guys talk at
6    all about what it meant?
7    A    Well, said next step. I said next steps
8    we got to hear from personnel security. We got to
9    speak to the legal folks.
10   Q    Did Steve Bowman express a personal
11   opinion about what he thought about Ms. Schroer's
12   candidacy in light of this information?
13   A    Not that I recall.
14   Q    Did he ask you what you thought you were
15   going to do?
16   A    Well, that's why I said next step. We
17   got to hear from the personnel security folks and
18   the legal folks.
19   Q    Did Steve Bowman offer sort of his two
20   cents about what he would do if he were you?
21   A    No, because we didn't know enough at the
22   time.

## Page 192

1    Q    Did Mr. Bowman sort of make any comments
2    along the lines of, you know: I wonder who else
3    knew; I wonder if the reference I spoke to knew,
4    anything along those lines?
5    A    He may have. I don't recall these
6    conversations.
7    Q    Okay. Is there anything else from that
8    conversation that you recall?
9    A    No.
10   Q    When you talked about what the next
11   steps were going to be, in this conversation with
12   Steve Bowman, you mentioned that you were going to
13   be talking to the security clearance people. I
14   believe you also mentioned that you were going to
15   talk to the folks at legal.
16       While why were you going to talk to the
17   folks at legal?
18   A    Because, as I said, I thought there were
19   potential lawsuit ramifications.
20   Q    Did you talk at all about this concern
21   about being set up for a lawsuit with Steve
22   Bowman?

## Page 193

1    A    No.
2    Q    When you were sort of thinking about,
3    boy, have I been set up for a lawsuit here, were
4    you thinking that Ms. Schroer actually wanted the
5    job, or that she was just looking for some, you
6    know, test case for a discrimination lawsuit?
7        MS. RUSSELL: Objection to the form, and
8    to the extent that it might mischaracterize the
9    testimony.
10       But you can answer if you understand.
11       THE WITNESS: I don't know the answer to
12   that. I don't know what his motivations were.
13   BY MS. McGOWAN:
14   Q    But at that point, did you have any
15   doubt in your mind about whether or not
16   Ms. Schroer had actually ever really wanted the
17   job at all?
18   A    He was certainly well-qualified for the
19   job.
20   Q    But as far as whether or not she had
21   applied for the job because she actually wanted to
22   do the job, did you any --

Alderson Reporting Company
1-800-FOR-DEPO

Page 194

1    A   She seemed enthusiastic before he told
2  me of his intention to complete the transgender
3  migration. He certainly seemed enthusiastic in
4  our conversations at the restaurant and at the
5  interview. So that's the only thing I can say.
6  He seemed to want the job.
7    Q   And did your impression about how much
8  Ms. Schroer seemed to want to job change after you
9  had had this conversation about her gender
10 transition?
11   A   Not necessarily. I believe that part of
12 what he would like to achieve if he wins this suit
13 is to be reinstated, or to be hired in the first
14 place.
15   Q   Turning to the other people that you
16 spoke to that day.
17      Gary Pagliano, who is he?
18   A   Gary is another one of my defense
19 section heads.
20   Q   And tell me about your conversation with
21 him.
22   A   This, very similar, just described what

Page 195

1  happened.
2    Q   Now, to the extent that Mr. Pagliano had
3  not previously, you know, met Ms. Schroer or been
4  involved in the process, did you have to explain
5  to him in some greater detail sort of the
6  background of the situation?
7    A   No, I didn't, because he did know David
8  Schroer.
9    Q   He did?
10   A   Yes. He and David were classmates at
11 the National War College. And I had talked to
12 Gary, if he knew Mr. Schroer while he was at the
13 War College. This was while I was doing
14 references.
15   Q   And how did he react to the news that
16 Ms. Schroer was transitioning from David to Diane?
17   A   He was shocked.
18   Q   How did you know that he was shocked?
19      Did he say something? Was it in his
20 body language? How did you know?
21   A   I would say both. You're kidding?
22 Yeah.

Page 196

1    Q   And what else did he say?
2    A   I can't believe it. I would have never
3  expected it.
4    Q   Did he say why, anything about why he
5  would never have expected it?
6    A   Well, he knew that he was in special
7  forces, knew of some of the operations that David
8  had led, I think had visited David and his wife at
9  their home.
10   Q   Did he say anything along the lines of
11 Dave being a macho or a masculine guy?
12   A   No. He talked more about what an
13 intellectual he was. He was a distinguished
14 graduate of the War College, David.
15   Q   Did Mr. Pagliano express any sadness or
16 disappointment at this news?
17   A   No. I think more disbelief.
18   Q   Did Mr. Pagliano ask you what you were
19 going to do next?
20   A   I think he did ask me if I had a good
21 second candidate.
22   Q   And what did you say?

Page 197

1    A   Yes, I did.
2    Q   Did Mr. Pagliano say anything along the
3  lines of, or ask you whether or not you were
4  thinking about go ahead and hiring Ms. Schroer
5  anyway?
6    A   He might have asked me what I was going
7  to do. If he did ask me that, I probably would
8  have said at this point I don't know.
9    Q   You mentioned everyone sort of
10 expressing some level of surprise at the news.
11      With respect to your feeling surprised
12 or shocked at this news, is one of the reasons you
13 were shocked because of sort of the most hyper,
14 masculine, macho background of this person?
15   A   That's certainly, I'm sure, lend itself
16 to it.
17   Q   In light of Ms. Schroer's background as
18 a special forces officer engaged in obviously very
19 macho stuff, macho tasks, did that make it harder
20 for you to visualize this person all of a sudden
21 becoming a woman and wearing a dress?
22   A   I think it did, yes.

Charlotte P. Preece                                                                January 11, 2007

Washington, DC

---

Page 198

1     Q    And were you concerned that if you
2  brought Ms. Schroer on, that there would be
3  problems resulting from the fact that Mr. Pagliano
4  had known Ms. Schroer as David?
5     A    No.
6     Q    And by problems, I mean sort of, you
7  know, awkwardness or any sort of difficulty in
8  stressors in the workplace?
9     A    That wasn't what was going through my
10 mind at the time.
11    Q    Is there anything else you recall from
12 that conversation with Mr. Pagliano?
13    A    No.
14    Q    And how long, roughly, did that
15 conversation last?
16    A    Five, ten minutes maybe.
17    Q    And was this a passing in the hallway
18 conversation, or a phone call?
19    A    I think I went into his office.
20    Q    Okay. And then with respect to Ed
21 Bruner, your deputy, Mr. Bruner, tell me about
22 your conversation with him.

---

Page 199

1     A    I have no recollection if I even had a
2  conversation with him that day.
3     Q    Okay.
4     A    He certainly would have been a person I
5  would have been likely to tell at some point, but
6  I don't remember when.
7     Q    At any point during that afternoon did
8  you think about getting back on the phone with one
9  of Ms. Schroer's references to find out if they
10 had any clue that this was going on?
11    A    No.
12    Q    Were you curious about whether they
13 knew?
14    A    Yes.
15    Q    So why did you decide not to follow up
16 with any of them?
17         MS. RUSSELL: Objection. Calls for
18 speculation.
19 BY MS. McGOWAN:
20    Q    You can answer.
21    A    I wanted to hear first what the finding
22 was going to be from the office of personnel

---

Page 200

1  security. It was kind of pointless to do anything
2  before I got advice from that office.
3     Q    And to the extent it would have been
4  pointless, why do you think it would have been
5  pointless?
6     A    Because given what Cindy told me the
7  subsequent day, I didn't need know any more
8  information.
9     Q    But at that moment in the afternoon,
10 before you had the meeting with Ms. Wilkins, did
11 it occur to you that you might be able to learn
12 something from these references that would be
13 relevant to your conversation the next day?
14    A    Not if -- the security clearance was,
15 you know, the big ball out there. It was the
16 foremost consideration in my mind. Until I had an
17 answer to that question, I was not going to pursue
18 anything else.
19    Q    Did you talk to any other Library
20 employees that afternoon about Ms. Schroer, or the
21 situation generally?
22    A    Not that I recall.

---

Page 201

1     Q    Did you call any family members or
2  friends to discuss what happened, either sort of
3  in general terms or perhaps more specifically?
4     A    Not from work.
5     Q    Did you talk to family members later
6  outside of work?
7     A    Uh-huh.
8     Q    Okay. Who did you talk to?
9     A    My sons.
10    Q    Okay. Tell me about those
11 conversations.
12         MS. RUSSELL: I'm going to object on
13 relevance grounds.
14         But you can answer.
15         THE WITNESS: On relevance grounds?
16         MS. RUSSELL: You can answer.
17         THE WITNESS: I think I said you're not
18 going to believe what happened to me today. You
19 know the gentleman's whose resume I showed you
20 some time ago that you were quite impressed with?
21 He told me today that he wanted to start work as a
22 woman.

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                    January 11, 2007
Washington, DC

Page 202

1  BY MS. McGOWAN:
2      Q   And you have more than one son?
3      A   I have twin boys.
4      Q   Okay.  And were you having this
5  conversation with both of them together, or were
6  there different conversations with each of them?
7      A   I can't remember.
8      Q   And how old are your sons?
9          MS. RUSSELL:  Same objection.
10         But you can answer.
11 BY MS. McGOWAN:
12     Q   Are they adults, or are they under 18?
13 Are they minors?
14     A   They're adults.
15     Q   And are either of them anyway affiliated
16 with the military?
17     A   Yes.
18     Q   Okay.  How so?
19     A   Members of the Pennsylvania National
20 Guard.
21     Q   And I can do son A and son B, or I could
22 call them by their names, whichever you prefer.

Page 203

1      A   Son A and son B.
2      Q   Okay.  Son A --
3      A   I don't know which one is which.  That's
4  the problem.
5          MR. ESSEKS:  Pick one.  You can do
6  initials.
7  BY MS. McGOWAN:
8      Q   How did son A react?
9      A   They both reacted very strongly:  No
10 way.  How can someone who goes through that
11 experience decide that he wants to become a woman?
12 I said well, it's something I certainly don't
13 understand.
14     Q   And when you mentioned that you had
15 shared Ms. Schroer's resume with them, when had
16 you done that?
17     A   Probably over the Thanksgiving holiday.
18 They were college students at the time, so they
19 probably would have been home for Thanksgiving.
20     Q   And what had their reaction been to
21 Ms. Schroer's resume?
22     A   Wow, this looks like someone who had

Page 204

1  great experience, you know, both at an operational
2  level and a planning and strategic level.
3      Q   During your conversation with them at
4  that time over Thanksgiving, was there any
5  conversation about, you know, wow, what's he like?
6  You met him, you know, what kind of guy is he?
7      A   No.  I think they may have asked me how
8  he did in the interview.  And I said very well.
9      Q   Did you share any other resumes with
10 them?
11     A   Uh-huh.
12     Q   And is that something that you
13 frequently do when you're hiring a new position,
14 or was that --
15     A   No --
16     Q   -- unique to this one?
17     A   -- it was kind of unique to this
18 position, because of the military background of
19 several of the people, because they were
20 contemplating what kind of military occupation
21 especially they might want to go into.
22     Q   And did you share with them Mr. Rollins'

Page 205

1  resume?
2      A   Yes.
3      Q   And what was their reaction to
4  Mr. Rollins' resume?
5      A   Very solid, as well.
6      Q   Is it fair to say that they were more
7  impressed by --
8      A   Probably more wowed by the special
9  forces, although Rollins was in delta force, so --
10     Q   And the -- Ms. Schroer was in the
11 special forces, so it was her resume that you were
12 talking about as the one that they were more wowed
13 by; is that right?
14     A   Uh-huh.  I think because of his -- the
15 long duration of his career, whereas Mr. Rollins
16 had a shorter stint in the military.
17     Q   So when did you talk to them?
18         Going back to December, sort of --
19     A   I don't remember if it was that night or
20 if it was later.  I'm not sure when they got home
21 for Christmas break.
22     Q   Okay.  So just so I'm clear, was it a

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                          January 11, 2007
Washington, DC

Page 206

1  phone conversation, or was it an in-person
2  conversation?
3      A   I think it was in-person.
4      Q   And did this conversation take place
5  before your meeting with Ms. Wilkins?
6      A   I don't know.
7      Q   Do you remember if it took place before
8  you had made your decision about the application?
9      A   I think so, but I — I wouldn't swear by
10  that.
11      Q   I wanted to ask you as far as your sons'
12  reaction.
13          When they asked, you know, roughly more
14  or less how could someone who's been through all
15  these experiences turn into a woman, you know,
16  were you thinking something similar at that point?
17      A   Uh-huh.
18      Q   And did you talk at all about that with
19  your sons?
20      A   I said it's something that he obviously
21  has to feel very strongly about to do, because it
22  takes courage to do what he did, or is doing.  I

Page 207

1  said I don't know that I will ever understand the
2  reasons or at least to appreciate them, but he
3  obviously feels very strongly about it.
4      Q   And at any point between your lunch
5  meeting and when you left for the day, or even at
6  home I guess later, did you try and find out any
7  more information about transgender people, either
8  on the Internet or things like that?
9      A   I did.  I did look up some Internet
10  sites.
11      Q   So where did you look?
12          Did you go to Google or --
13      A   Yes.
14      Q   Okay.  And what did you find?
15      A   I found a couple of articles about the
16  process and some of the surgeries.
17      Q   And do you remember sort of who -- sort
18  of what the source was of the material that you
19  found on the Internet?  Was it an individual, or
20  an organization?
21      A   It was an organization, but I don't
22  remember what it was.

Page 208

1      Q   Okay.  How many different websites would
2  you say that you visited?
3      A   Just about two.
4      Q   Are you familiar with an organization
5  called the Harry Benjamin International Gender
6  Dysphoria Association?
7      A   No.
8      Q   Did you come across the acronym HBIGDA
9  H-B-I-G-D-A, in your Internet search about
10  transgender people?
11      A   I don't recall.
12      Q   Do you remember roughly sort of what --
13  if there was a title or a caption to the pages
14  that you looked at?
15      A   No.
16      Q   And so what did you learn from that
17  information?
18      A   That it could be a lengthy process, that
19  it was not something that was done lightly, that
20  it involves working with a psychological -- a
21  psychiatrist or psychologist who evaluates the
22  individual and is in constant or regular contact

Page 209

1  with them, that it involves hormone treatment
2  first, that typically if the individual wants to
3  complete the transgender migration the second step
4  would be to present full-time as a female for a
5  year.  And then the third stage would be the
6  various surgeries.
7      Q   Was this information on the Internet
8  sort of all in text form, or were there pictures
9  that you recall seeing?
10      A   I think the articles that I read, as I
11  said -- it was only a couple -- was all text.
12      Q   And before reading this information, how
13  did you feel about this whole idea of, you know,
14  having this surgery to change your body from male
15  to female?  Did it seem a little freaky to you?
16      A   As I said, I don't understand why
17  someone would do it.  But I respect him for what
18  he wants to do.
19      Q   Did reviewing this information make you
20  feel as though it was maybe less weird than you
21  might have initially thought?
22          MS. RUSSELL:  Objection to the form.

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece

Washington, DC

January 11, 2007

Page 210

1    You can answer if you understand.
2       THE WITNESS: It helped me understand
3  the process better.
4  BY MS. McGOWAN:
5    Q   Did reading that information make you
6  feel as though the treatment for transgender
7  people was perhaps more mainstream than you had
8  expected, or suspected?
9    A   If it made me feel anything, it was,
10  wow, this a long and ongoing process that could be
11  quite time-consuming.
12    Q   Did any of the information on the
13  website that -- the websites that you read talk
14  about sort of, you know, the clinical diagnosis
15  aspects for people who are transgender, either by
16  talking about gender identity disorder or gender
17  dysphoria?
18    A   I remember reading gender -- yes, the
19  identity disorder, yes. I remember reading
20  something about that.
21    Q   Prior to reading that information, did
22  you know that being transgender was something that

Page 211

1  actually had a medical term?
2    A   I did not.
3    Q   Did you think of it more as a lifestyle
4  concern at that point?
5    A   Probably, yes, to the extent I thought
6  about it.
7    Q   Okay. So that evening after leaving
8  work, other than your sons, did you speak with
9  anyone else about this situation with Ms. Schroer?
10    A   I can't remember.
11    Q   Okay. I'm going to turn now to the next
12  day.
13    A   Okay.
14    Q   Describe what happened the next day
15  with -- which is we're talking now about December
16  21st, 2004 -- with respect to any conversations or
17  meetings that you had about Ms. Schroer.
18    A   Okay. The previous day, I believe late
19  in the day before I went home, I got an e-mail
20  from Kent Ronhovde asking if I was available to
21  meet at 9:00 o'clock the following day with
22  Cynthia and Bessie Alkisswani.

Page 212

1    Q   Okay. Anything else?
2    A   At the meeting was also Bessie's deputy
3  Kathy Deese, and Kent.
4    Q   Up until this point, had you had any
5  interaction with Ms. Alkisswani?
6    A   Professionally?
7    Q   About the Schroer situation?
8    A   No.
9    Q   And did it strike you as unusual that
10  she had been asked to attend the meeting?
11    A   No. She's the head of our workforce
12  development. She's ultimately responsible for
13  postings.
14    Q   Did you have any conversation with
15  Mr. Ronhovde before the meeting about what
16  Ms. Alkisswani knew or might need to know in
17  advance of the meeting?
18    A   No.
19    Q   And so did the meeting take place at
20  9:00 a.m.?
21    A   Yes, it did.
22    Q   So I have the lineup of the meeting as

Page 213

1  you, Ms. Wilkins, Ms. Alkisswani, Ms. Deese, and
2  Mr. Ronhovde; is that correct?
3    A   Right.
4    Q   Anyone else?
5    A   Not to my recollection.
6    Q   How long did the meeting last?
7    A   Maybe an hour and 15 -- hour, hour and
8  15 minutes.
9    Q   So who started -- well, where was the
10  meeting, first of all?
11    A   In Kent's office.
12    Q   And so who started the discussion?
13       Did Mr. Ronhovde kick things off?
14    A   Uh-huh.
15    Q   Okay. And what did he say to start off
16  the conversation?
17    A   He said we're -- I don't recall exactly
18  what he said. He introduced the meeting. He said
19  these are the facts. Charlotte, why don't you lay
20  out what happened, which I briefly did at the
21  lunch the other day. And then I said and I went
22  down to Cynthia's office and Cynthia wanted to do

54 (Pages 210 to 213)

Charlotte P. Preece                                                        January 11, 2007
Washington, DC

---

Page 214

1  some homework yesterday afternoon and read up on
2  the ramifications for this for personnel security.
3  And what did you find, Cindy?
4      Q    What did you say by way of sort of the
5  background information?
6          Sort of what did you lay out as far
7  as --
8      A   I said we have a vacancy announcement.
9  We interviewed 18 people. We have a couple of
10 very good candidates. I was ready to select or to
11 make a recommendation that Mr. Schroer be the
12 position -- the person for that position. I said
13 I got a call from him last Friday asking me to get
14 together to have lunch or coffee, and that he
15 mentioned at the time that there was something
16 that he wanted to tell me.
17         So I stopped writing the recommendation
18 at that point. And we had lunch. And he revealed
19 to me that he would like to start work as a woman.
20 And so I said so that immediately raised concerns
21 to me about whether he could get a security
22 clearance in a timely fashion. And I went down to

---

Page 215

1  see Cindy. And, Cindy, what can you tell me?
2      Q    Did you ever indicate in this meeting
3  that Ms. Schroer was still your top choice for the
4  position, or did you describe it only in the past
5  tense that she had been, prior to your lunch, your
6  first choice?
7      A   In the past tense.
8      Q    So did you feel in any way as though you
9  were going into this meeting and going to bat for
10 Ms. Schroer?
11         MS. RUSSELL: Objection to the form.
12         THE WITNESS: No. I was there to seek
13 professional opinion.
14 BY MS. McGOWAN:
15     Q    So at no point did you make any comment
16 along the lines of the fact that, you know, you
17 really were trying to see if we could make this
18 work with Ms. Schroer?
19     A   No. I wasn't on one side or the other:
20 I want to make it work or I don't want to make it
21 work.
22     Q    What were people's reaction to your

---

Page 216

1  description of the situation?
2      A   I think they had heard it from someone
3  else prior to the meeting. I think probably Dan
4  had talked to Kent. I don't know. Because they
5  all seemed to be aware of it to some extent.
6      Q    Did everyone at the meeting seem
7  completely unphased, like this was a
8  run-of-the-mill conversation?
9      A   No. It was a new situation for each of
10 us.
11     Q    Did anyone suggest or say anything to
12 indicate that they were confused by, you know,
13 either what you had said or what Ms. Schroer meant
14 about her transitioning from male to female?
15     A   No, I don't recall that.
16     Q    Did anyone make any jokes, nervous jokes
17 about this strange situation you were finding
18 yourself in?
19         MS. RUSSELL: Objection to the form.
20         You can answer.
21         THE WITNESS: I don't recall jokes being
22 made.

---

Page 217

1  BY MS. McGOWAN:
2      Q    During the meeting, did anyone indicate
3  that they were familiar with transsexuality?
4      A   No.
5      Q    And during the meeting, did anyone
6  indicate that they knew who was transsexual?
7      A   I'd like to amend that. Kathy Deese.
8      Q    And what did she say?
9      A   When she was with a previous agency, she
10 had a situation in which someone who was already
11 hired had decided to undergo a transgender
12 migration, and that the agency had to accommodate
13     Q    And so the agency accommodated that
14 request?
15     A   Yes.
16     Q    What agency was that?
17         MS. RUSSELL: Relevance.
18         But if you know you can answer.
19         THE WITNESS: I'd be speculating. I'd
20 be guessing. I have a pretty good idea, but I'm
21 not sure.
22 BY MS. McGOWAN:

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                    January 11, 2007

Washington, DC

Page 218

1    Q    Recognizing that it may not be the right
2  one, what agency do you think it is?
3    A    Department of the Army.
4    Q    Did she mention how long ago this
5  situation was?
6    A    No.
7    Q    And did she describe at all what the
8  agency did to accommodate this person?
9    A    Special bathroom facilities.
10   Q    Did she mention at all whether this
11 employee was in a position involving a security
12 clearance?
13   A    No.
14   Q    And how did Ms. Deese present this
15 information?
16       And by which I mean did she say, hey,
17 I -- you know, I know people who dealt with this
18 before and it wasn't a problem, or did she convey
19 it in a different way?
20       Sort of how did she --
21   A    I would say in a neutral way.  It
22 just -- maybe a question was raised: Has anyone

Page 219

1  ever encountered a situation like this before?
2  And she described the situation.
3    Q    And so just to make sure I'm clear about
4  sort of this piece of the conversation, is there
5  anything else that Ms. Deese said about how that
6  situation had been handled?
7    A    Not that I can recall.
8    Q    Did anyone react to this information
9  with a comment about what relevance it might or
10 might not have for the situation you were
11 grappling with?
12   A    No.  As I recall, shortly after that
13 Cindy came in and we got into the personnel
14 security aspects.
15   Q    So this conversation with Ms. Deese
16 occurred when Ms. Wilkins was not in the room?
17   A    I believe so.
18   Q    And was it prior to the beginning of the
19 meeting, the formal beginning of the meeting?
20   A    I think it was 9:00 o'clock.  I think
21 maybe Cindy was late to the meeting.
22   Q    And at any point after Ms. Wilkins

Page 220

1  joined the meeting, did anyone make reference to
2  the transgender employee that Ms. Deese had
3  discussed?
4    A    Not that I recall.
5    Q    And did anyone else mention sort of any
6  knowledge that they had about transsexuality or
7  transgender people?
8    A    No.
9    Q    Did you mention at the meeting
10 describing the situation that Ms. Schroer had
11 shown you pictures of her dressed as a woman?
12   A    Yes.
13   Q    And did anyone ask what those pictures
14 looked like?
15   A    They may have.
16   Q    Do you remember how people asked?
17   A    No, I don't.
18   Q    Did anyone ask whether or not she
19 actually looked like a woman, in your opinion, in
20 those pictures?
21   A    Again, they may have but, I have no --
22   Q    Did anyone express any concern about

Page 221

1  whether or not Ms. Schroer would actually look
2  like a woman if she dressed as such?
3    A    I think that was about the furthest
4  thing from people's minds at that point.
5    Q    So after laying out sort of these
6  background facts, what happens next?
7       Is that when Ms. Wilkins begins to
8  speak?
9    A    Uh-huh.
10   Q    Okay.  So what did she say?
11   A    She tells us that she's done some
12 research into the regulations and findings.  She
13 said that she could not make a determination
14 whether -- at this time whether or not Diane
15 Schroer could get a clearance.
16       She did tell us that the requirement for
17 the psychological fitness for duty would be a
18 first step; that when that process was completed,
19 based on the results of the fitness test, a
20 determination would be made, A, to initiate a
21 security investigation or, B, not to go any
22 further.

56 (Pages 218 to 221)

Page 222

1    She also told us that given what Schroer
2  had told us, that she would not waive clearance
3  for him to start the job until a security
4  clearance determination were made.
5    Q   And what were the reasons she gave for
6  her determination that she would not waive the
7  pre-appointment security clearance investigation
8  requirement?
9    A   She just said under the circumstances of
10 what he told you.
11   Q   Did Ms. Wilkins indicate that she had
12 reason to believe that in light of this
13 information, Ms. Schroer now presented a threat to
14 national security?
15   A   No.
16   Q   Did she indicate that there were any
17 concerns about Ms. Schroer's psychological
18 stability?
19   A   No. That would have to be determined.
20   Q   And did Ms. Wilkins discuss the impact
21 or the significance of the fact that Ms. Schroer
22 was currently holding a top secret security

Page 223

1  clearance?
2    A   Well, she said that that would not be
3  relevant to Diane.
4    Q   And why did she say it would not be
5  relevant?
6    A   Because Diane doesn't have a clearance.
7    Q   And what --
8    A   Diane didn't exist in this point, in a
9  legal sense, or in a sense of security clearances.
10   Q   But to the extent that there was a
11 security clearance filed with respect to David
12 Schroer, did Ms. Wilkins explain why that file
13 would not provide her with sufficient information
14 to determine that a waiver was appropriate?
15   A   She just said that Diane Schroer would
16 need a separate clearance.
17   Q   Did she say that Diane Schroer would
18 need a separate clearance because the individual
19 had a different name?
20   A   I believe so. I mean, I think she used
21 that analogy at one point, that if I become
22 Charles Preece. I mean, it's not simply the name

Page 224

1  change. And when I got married, I didn't lose my
2  clearance when I changed my last name. But it was
3  the fact that he was transgendering.
4    Q   And so in Ms. Wilkins' view, Diane
5  Schroer was a completely different person upon
6  whom -- for whom there was in relevant security
7  information that she had available to her to
8  evaluate?
9    A   You'd have to ask Cindy that question.
10 She was basing her adjudgments based on the
11 regulations that she had familiarized herself
12 with.
13   Q   Is that the impression that she gave to
14 you during your conversations?
15   A   What was the impression?
16   Q   That Diane Schroer was a blank slate
17 about whom there was no information, such that she
18 couldn't look at the information about David
19 Schroer to make an assessment of the security
20 clearance concerns?
21       MS. RUSSELL: I'm going to object to the
22 form.

Page 225

1        But you can answer if you understand.
2        THE WITNESS: She didn't tell us whether
3  there's a connection or not. That was -- it was
4  the premise that the procedure would have to start
5  with scratch -- from scratch, and that it would
6  begin with a psychological fitness test.
7  BY MS. McGOWAN:
8    Q   Did anyone at the meeting ask why it
9  would need to start from scratch?
10   A   No.
11   Q   Did it make sense to you that it would
12 have to -- the process would have to start from
13 scratch?
14   A   It didn't surprise me at all, no.
15   Q   And why did it not surprise you?
16   A   Because changing sex is a pretty big
17 deal. And the fact of the psychological fitness
18 determination did not surprise me at all. In
19 fact, I knew that because David told me.
20   Q   The fact that changing gender is a big
21 deal still leaves me with the question of why did
22 you think that the prior security clearance

Charlotte P. Preece                                                    January 11, 2007
                              Washington, DC

Page 226

1    information about David Schroer would no longer be
2    relevant?
3        A   Because he was Diane Schroer, or
4    becoming Diane Schroer. And for all I know, it
5    may have been relevant at some point down the
6    line. I don't know the answer to that question.
7        Q   Did anyone -- or, well, what did
8    Ms. Wilkins say with respect to the timing of all
9    this?
10       And by "all this," I mean the security
11   clearance process that she was telling everyone
12   would be required?
13       A   She was not specific about how long it
14   would take, but she said it would be a lengthy
15   process.
16       Q   And when she said that she would not
17   waive the pre-appointment investigation for
18   Ms. Schroer, did anyone push back at all and ask
19   her why not?
20       A   She said under these circumstances, the
21   office would not waive. She's the expert in this
22   area, so --

Page 227

1        Q   And what were the consequences of
2    Ms. Wilkins saying that she would not waive the
3    pre-appointment security clearance investigation
4    requirement?
5        A   What were the consequences of that?
6        Q   Sure.
7        A   Pretty much sealing in my mind that I
8    would go with the other candidate. Because at the
9    time, it would very likely be taken to complete
10   this process.
11       Q   At any point, did anyone -- so with
12   respect to sort of -- with respect to Ms. Wilkins
13   saying that she would not grant the waiver, I want
14   to make sure that I understand sort of what that
15   means with respect to the position.
16       If Ms. Wilkins says, I'm not going to
17   grant a waiver, does that mean that this person
18   cannot be hired for the position, or did it mean
19   that were the person hired for the position, they
20   would not be allowed to have access to any
21   classified information?
22       A   It means the latter. But if I say that

Page 228

1    a TS clearance is required to do the position from
2    the outset, and the person does not have or cannot
3    get that clearance, then if -- if he failed the
4    clearance, if he were not given a clearance, he
5    could have been fired for failing to pass the
6    exam.
7        My determination not to go forward with
8    him was based on say he is successful, say he does
9    get through psychological fitness determination,
10   say a decision is made by the personnel security
11   office to go ahead and instigate a clearance.
12   When that is all done, if they grant him a
13   clearance, that was not going to happen, in my
14   judgment, within a year. And I did not want to
15   wait that long to bring somebody on board.
16       Q   And did Ms. Wilkins tell you that she
17   expected the process would take a year?
18       A   No.  She was never specific as far as
19   time.  She referred to it as lengthy.  It's based
20   on experience that I have, particularly post 9/11,
21   for how long it takes to get a TS clearance.
22       Q   Were there any responsibilities of the

Page 229

1    terrorism specialist position that could be
2    performed without a top secret clearance?
3        A   Yes.
4        Q   What percentage of the work can be done
5    without a top secret clearance?
6        A   A large percentage can be done.  The
7    question is at what level of sophistication.  And
8    for a GS-15 analyst, we're expecting them to be
9    out there in the public policy community, with the
10   movers and shakers, with the committees in
11   Congress.  And they're going to need a clearance
12   to talk in those circles on counterterrorism
13   policy.
14       Q   When you say that a large percentage can
15   be done, recognizing this is not a science, sort
16   of what --
17       A   Research --
18       Q   -- percentage --
19       A   -- their research.  They'll be
20   researching from open sources.  They'll also be
21   going out in their research to talk to people in
22   the policy community.  Some of those people they

58 (Pages 226 to 229)

Charlotte P. Preece                                                                    January 11, 2007

Washington, DC

Page 230

1  will be talking with on a classified level.
2      Q   So is it the case that 100 percent of
3  the work can be done without a clearance, but it
4  won't be as sophisticated as we would like, or
5  only 75 percent of the work can be done, and
6  there's this whole category of 25 percent that you
7  just can't do anything on without a clearance?
8      A   It's both. It's both of those things.
9  You won't get access to some meetings if you don't
10 have the clearance.
11     Q   And so I'm not a hundred percent sure
12 how you can --
13     A   You can do --
14     Q   -- have both --
15     A   -- research from secondary sources.
16     Q   Right. And so that's --
17     A   And those sources might not be
18 classified. So you can do some work. You can't
19 do it at the level as if you were interacting with
20 people in the policy community, if you were
21 talking to members of Congress, if you were
22 sitting in on classified briefings that were

Page 231

1  supplied by other agencies.
2      Q   So as between the two options I
3  presented, you'd say it's the first option, which
4  is the work can -- 100 percent of the work can be
5  done, but it would be done -- some of the work
6  would be done with less sophistication because an
7  individual did not have access to top secret -- or
8  access to classified information; is that right?
9      A   Yeah, I mean, you might be able to
10 produce GS-12 work. I don't know that you can
11 produce GS-15 work in this field.
12     Q   With respect to an applicant for a
13 position like this, that was the top choice but
14 had no prior security clearance history, would it
15 have also taken, in your estimation, a year for
16 them to have run through the process?
17     A   Probably a little bit shorter time,
18 because we're not talking about the psychiatric
19 fitness for duty. But I'm finding nine months is
20 pretty typical for new folks who are coming in who
21 don't have a clearance.
22     Q   So you think it would actually take --

Page 232

1  have taken less time for a candidate with no prior
2  security clearance than it would have taken for
3  someone like Ms. Schroer, which -- a person who
4  had a security clearance filed for a couple of
5  decades, but had the transgender information, as
6  well?
7      A   Well, if they were going to start from
8  scratch, yes.
9      Q   And did Ms. Wilkins specifically tell
10 you how long it took --
11     A   She was not specific at all.
12     Q   Just to get my question out.
13     A   Oh, sorry.
14     Q   Did she tell you how long it took -- or
15 she expected it would take to run someone through
16 the security clearance process from scratch?
17     A   She kept characterizing that it would be
18 a lengthy process. She was not specific.
19     Q   And did Ms. Wilkins actually use, you
20 know, roughly the equivalent terms of starting
21 from scratch?
22     A   The terms -- I can't remember the exact

Page 233

1  terms she used. She said first there would be the
2  fitness for duty. If a decision was made to go
3  ahead, we would initiate a background
4  investigation.
5      Q   And so you don't recall whether or not
6  she actually used the term "start from scratch"
7  with respect to what would be required for --
8      A   I doubt she did. That's more my
9  vernacular than it is hers.
10         MS. RUSSELL: Sharon, we've been going
11 for 90 minutes, I believe.
12         MS. McGOWAN: Okay. Do you want to
13 maybe take a five-minute break?
14         MS. RUSSELL: Is this a good time?
15         MS. McGOWAN: Sure. Let's take a break.
16             (Recess)
17 BY MS. McGOWAN:
18     Q   So now we're back from our break. And
19 we were talking about this meeting at 9:00 a.m. on
20 December 21st. We were talking about what Cynthia
21 Wilkins' report back was.
22         Did at any point she suggest a need to

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                January 11, 2007
Washington, DC

| Page 234 | Page 236 |
|---|---|

**Page 234**

1  get information from the health services office?
2    A   The health service office would be
3  responsible for setting up and arranging the
4  fitness for duty.
5    Q   But with respect to the conversation you
6  were having there that morning at that meeting,
7  did anyone suggest a need to bring in someone from
8  the health services office?
9    A   No.
10   Q   Were there -- what else did Ms. Wilkins
11 say about the security clearance process that we
12 haven't yet discussed?
13   A   I've told you what I remember.
14   Q   Okay. Were there -- well, what did
15 Ms. Alkisswani say during this meeting?
16       Did she react at all to this
17 information?
18   A   I really don't recall. People were
19 asking questions. And I don't recall specifically
20 what they were. The message from Cindy is what I
21 took away from that meeting.
22   Q   Were there any discussions in the

**Page 236**

1    A   No.
2    Q   And sort of how did you articulate this
3  concern about contacts in that meeting?
4    A   That I was concerned that by changing
5  sex and identity, that the contacts that he had,
6  particularly in the military, would not know who
7  he was to them; and they might -- they might not
8  be as helpful.
9    Q   And did you talk at all in that meeting
10 about the negative reaction of military people to
11 Diane, who is now this transgender person?
12   A   No, other than to say that some people
13 might be understanding and others might not.
14   Q   Was there any discussion about the
15 reaction or what the reaction might be of other
16 Library employees to the fact that Ms. Schroer was
17 transitioning from male to female?
18   A   No. We talked about the bathroom
19 question a little bit.
20   Q   Okay. And what did you say there?
21   A   That we would have to make special
22 accommodations for at least a period of time.

| Page 235 | Page 237 |
|---|---|

**Page 235**

1  context of this meeting, about Ms. Schroer's
2  trustworthiness?
3    A   There could have been. We discussed
4  other issues beyond security.
5    Q   What issues did you discuss?
6      Tell me about those conversations.
7    A   I think they're again limited to the
8  ones we talked about before: Trust, contacts.
9    Q   And did you raise the trust and contacts
10 point, or did you someone else?
11   A   I can't remember. I think we were all
12 thinking the same thing.
13   Q   And what did you say in that meeting
14 regarding this issue of trustworthiness?
15   A   Well, I did say that I felt set up, and
16 I didn't know if I could trust someone who tried
17 to deceive me.
18   Q   And what kind of reaction did you get to
19 that comment?
20   A   I understand.
21   Q   And do you recall in particular any
22 people specifically expressing that sentiment?

**Page 237**

1    Q   Do you remember who raised that point?
2    A   No.
3    Q   Was there any discussion at that point
4  about the example of the Department of the Army
5  that Ms. Deese had previously discussed?
6    A   I don't remember where the linkage was,
7  and if that's where it came up, or whether it came
8  up separately from what Kathy was talking about,
9  that she said there was special accommodation
10 made.
11   Q   And was there any discussion about how
12 easy or difficult it might be to accommodate this
13 bathroom concern?
14   A   No. I mean, it was so minor. We
15 realized there was much bigger issues. We didn't
16 dwell on this one.
17   Q   Were there any discussions about how the
18 members of Congress might react if they figured
19 out they were interacting --
20   A   Right.
21   Q   -- with a transsexual --
22   A   Right.

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                              January 11, 2007
Washington, DC

Page 238

```
 1     Q   -- woman?
 2     A   Yes.  That came up.
 3     Q   Tell me about that.
 4     A   Just raised, as I mentioned about -- a
 5  couple of hours ago -- the issue of credibility.
 6  Again, like the military, that some people may be
 7  very tolerant of the knowledge and the
 8  information, and other people may think that
 9  damages the individual's credibility.
10     Q   Do you remember who else in the
11  conversation engaged in the discussion of this
12  point?
13     A   Well, Cindy pretty much stuck to
14  security, personnel security issues.  And Bessie,
15  Kent, and I were having more of a free ranging
16  discussion.  But I don't remember who raised what.
17     Q   Was there any discussion at this meeting
18  about things that one might be able to do to speed
19  up the security clearance process for Ms. Schroer
20  if you decided to go forward with her?
21     A   No.
22     Q   So, for example, did you propose that
```

Page 239

```
 1  Ms. Wilkins have a meeting with Ms. Schroer?
 2     A   No.
 3     Q   Did you suggest that Ms. Schroer look at
 4  David Schroer's security file?
 5     A   Pardon?
 6     Q   Did you suggest or did anyone suggest
 7  that Ms. Wilkins pull and review the security file
 8  for David Schroer?
 9     A   No.
10     Q   Did you or anyone suggest that
11  Ms. Schroer meet with the health services office?
12     A   No.
13     Q   Did you or anyone else suggest
14  Ms. Schroer meet with any other member of the
15  Library staff?
16     A   No.
17     Q   Did you or anyone else ask whether or
18  not there was anyone at the Library who had dealt
19  with a similar situation regarding a transitioning
20  applicant?
21     A   No.
22     Q   Did anyone make any other suggestions
```

Page 240

```
 1  along those lines of things that one might want to
 2  do before moving on to the next step?
 3     A   No.
 4     Q   Okay.  Did you or anyone suggest calling
 5  Ms. Schroer to get some more information to factor
 6  into your decision-making process?
 7     A   No.
 8     Q   Did Ms. Wilkins or anyone else suggest
 9  that they were interested in finding out whether
10  or not Ms. Schroer had reported any of this
11  information about her transition to the entity
12  currently holding her clearance?
13     A   No.
14     Q   So how were things left at the end of
15  the meeting?
16     A   Things were left that we should talk to
17  the general counsel's office.
18     Q   And who made that suggestion?
19     A   I don't know for sure, but probably
20  Kent.
21     Q   And was there any discussion at the end
22  of that meeting about the decision that was going
```

Page 241

```
 1  to be made regarding Ms. Schroer?
 2     A   No.  I think we wanted to -- I mean, my
 3  decision was pretty close to -- my decision was
 4  pretty final then.  I was ready to move on.
 5     Q   And what were your reasons for deciding
 6  that you wanted to move on?
 7     A   The time, the uncertainty as to whether
 8  the clearance would ultimately be granted.  That
 9  was the 90 percent factor.
10     Q   The issue of credibility and contacts,
11  was that a reason?
12     A   They probably go about five each, yeah.
13     Q   Okay.  And I absolve you from the fact
14  that we have reached 100.
15         Are there any other reason, with
16  whatever percentage that you want to attach to
17  them, that factored into your --
18     A   Well, we discussed credibility before.
19     Q   Okay.  And by credibility, just to be
20  clear, we're talking about both being able to
21  interact with members of the military who might be
22  hostile to her as a transgender person, and
```

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                      January 11, 2007
Washington, DC

Page 242

1  credibility with members of Congress?
2     A   Primarily the latter.
3     Q   Primarily the latter?  Okay.
4     A   Right.  Contacts with the military,
5  credibility with the members.
6     Q   Okay.
7     A   But the operational needs of the
8  division were such that I needed to have someone
9  on board months before we are now, or where we
10  were at the present time, in December.
11    Q   And did you have in your mind, in that
12  meeting with Cynthia Wilkins, an amount of time
13  beyond which you were unwilling to go with respect
14  to how long the clearance would have taken?
15        For example, if Cynthia Wilkins said
16  it'd probably take about six months, sort of was
17  there an amount of time in your mind where beyond
18  which it was just not going to be worth your while
19  anymore?
20    A   I really wanted someone to start in
21  January.
22    Q   And how important was it for you that

Page 243

1  the person could start in January with full
2  clearance?
3     A   I wanted the person to be able to start
4  the new session of Congress, which beings at the
5  end of January.
6     Q   And so if Cindy had come back, or in
7  this meeting and said, you know, I actually think
8  it's not going to be a problem, but I need two
9  weeks to figure it out?
10        MS. RUSSELL:  Objection.  Calls for
11  speculation.
12        But you can answer it if you understand.
13        THE WITNESS:  I wouldn't have believed
14  it, but -- if she said that and it were two weeks,
15  we probably would have gone through the process.
16  BY MS. McGOWAN:
17    Q   Notwithstanding the residual concerns
18  about credibility and contacts?
19    A   I'm not saying I would have selected her
20  for the job, but -- I mean, at that point, knowing
21  what I did, it's foolish to speculate about two
22  weeks because.  That's totally unrealistic.  I

Page 244

1  probably would have gone with the other candidate,
2  who did not have any of those issues.
3     Q   And just to be clear, even if Cynthia
4  Wilkins had come back and said two weeks, you
5  probably would have gone with the other candidate?
6  Am I understanding you correctly?
7     A   Yes.  Yes.
8        MS. RUSSELL:  Same objection.  Calls for
9  speculation.
10        THE WITNESS:  I mean, I would have had
11  to do -- prepare the recommendation.  The PAR
12  would have had to be generated.  And then it would
13  have gone to Cindy's shop.  And then it would have
14  gone to the fitness for duty.  And then it would
15  have gone for the investigation.  So, no, at this
16  point I was -- at this point, I pretty much made
17  up my mind.
18  BY MS. McGOWAN:
19    Q   So recognizing that Cynthia Wilkins is,
20  you know, the person who was giving you her
21  assessment of how long it would take, I just want
22  to be sort of clear I understand, you know, where

Page 245

1  you were at that point.
2        If Cynthia Wilkins had come to the
3  meeting and said to you this is information that I
4  want to take a look at; but in light of the fact
5  this person's, you know, got a prior work-up, I
6  think that it'll take me about two weeks to figure
7  out whether or not, you know, this is a problem,
8  am I correct that you're saying that even if she
9  had said two weeks to you, you would not have gone
10  forward with Ms. Schroer?
11        MS. RUSSELL:  It's the same objection.
12        THE WITNESS:  I really feel you're
13  asking me to speculate on something that is
14  completely unrealistic.
15  BY MS. McGOWAN:
16    Q   Unrealistic or not, if that had been
17  what Ms. Wilkins, as the personnel security
18  officer, came back and said I can give you an
19  answer in two weeks --
20    A   I don't know what I would have done.
21        MS. RUSSELL:  Asked and answered.
22        But you can answer.

Alderson Reporting Company
1-800-FOR-DEPO

Page 246

1  BY MS. McGOWAN:
2      Q    Well, actually, I haven't yet gotten an
3  answer out yet, so --
4      A    I don't know what I would have done.
5      Q    And as far as if Ms. Wilkins had come
6  back with the I can give you an answer about the
7  security clearance issue in two weeks, is part of
8  your uncertainty about whether or not you would
9  have gone forward with Ms. Schroer or not because
10  of these credibility and contact concerns that
11  were in your mind, as well?
12      A    It was the time and the operational
13  requirements.  She had given me an answer about
14  what would be required.  And based on that, I made
15  a decision to go to the other candidate.
16      Q    Right.  And I'm asking if she had said
17  that it would have taken only two weeks of time to
18  give you an answer on whether or not this person
19  could continue to maintain their top secret
20  security clearance, would the other concerns that
21  you had had about credibility and contacts led you
22  to still make the same decision to not go forward

Page 247

1  with Ms. Schroer?
2      MS. RUSSELL:  I'll object.  Asked and
3  answered.
4      But you can answer the question again if
5  you understand it.
6      THE WITNESS:  These other factors are
7  contributing factors.  The main reason was the
8  operational factor.  I don't know what I would
9  have done if she said that preposterous thing.
10  BY MS. McGOWAN:
11      Q    And so I recognize that we're talking
12  sort of in the hypothetical, but I'm trying to
13  sort of isolate this factor of the amount of time
14  that it would have taken, and take that out of the
15  equation.
16      In a world where Cynthia Wilkins told
17  you that it would not take a long amount of time
18  to resolve the security clearance issues, would
19  you have gone forward with Ms. Schroer as the
20  applicant for the terrorism specialist?
21      MS. RUSSELL:  Again, it calls for
22  speculation.  And it's been asked.  And it's been

Page 248

1  answered.
2      MR. ESSEKS:  No, I'm sorry.  It hasn't
3  been answered.
4      MS. RUSSELL:  It has been answered.
5      THE WITNESS:  It has been answered with
6  I don't know what I would have done.
7      MS. RUSSELL:  And that is an answer.
8  You may not get the answer that you want, but that
9  is the answer.  That is her answer.
10      MR. ESSEKS:  Why don't we just try this
11  again, and then see if we can get an answer on
12  this.
13      MS. RUSSELL:  Asked and answered.
14      MR. ESSEKS:  You can make the objection.
15  That's fine.  But once you make the objection, I'd
16  appreciate you quiet so that the witness can
17  answer.
18      MS. RUSSELL:  She has answered the
19  question.
20      MR. ESSEKS:  I think this exchange is
21  done.  Thank you.
22      MS. RUSSELL:  I would prefer that you

Page 249

1  move on, because she has answered the question.
2  BY MS. McGOWAN:
3      Q    I actually think that the question is
4  still open.  And so this will be my attempts to
5  move on after this point.  You've identified four
6  factors.  And I'm asking if -- or three or four
7  factors, depending.
8      Once the factor of the amount of time
9  was taken out of the equation, would you have
10  decided to go forward with Ms. Schroer or not,
11  depending on these other two concerns that you've
12  identified?
13      MS. RUSSELL:  Calls for speculation,
14  asked and answered.
15      You can answer it a fourth or fifth
16  time.
17      THE WITNESS:  My answer is I don't know
18  what I would have done.
19  BY MS. McGOWAN:
20      Q    And is the reason you don't know because
21  you were not certain whether or not your anxiety
22  about the credibility and contact issue would have

Charlotte P. Preece                                                    January 11, 2007
Washington, DC

Page 250

1  rendered Ms. Schroer less effective than
2  Mr. Rollins?
3      MS. RUSSELL: Objection. Calls for
4  speculation. And it's confusing.
5  BY MS. McGOWAN:
6      Q   Do you understand my question?
7      Because I can ask it again.
8      A   Go ahead.
9      Q   Okay. In a world where the timing issue
10  has been taken out of the equation because
11  Ms. Wilkins says to you in two weeks I can give
12  you an answer up or down about whether or not this
13  candidate can satisfy the top secret security
14  clearance, you thus far have said, in different
15  ways, although not consistently, that you're not
16  sure what you would have done in that situation.
17      And my question is, is what you are not
18  sure about the question of whether or not your
19  concern about Ms. Schroer's credibility with
20  members of Congress and her ability to maintain
21  contacts with the military due to their lack of
22  understanding about transgender issues made her a

Page 251

1  weaker candidate than Mr. Rollins?
2      MS. RUSSELL: It's the same objection.
3  Also, I'm objecting to the extent that it
4  mischaracterizes your testimony, and it's
5  confusing.
6  BY MS. McGOWAN:
7      Q   Do you understand --
8      A   It certainly makes her a weaker
9  candidate, because it's -- there's so many
10  contributing factors.
11      Q   Okay.
12      A   So even if you take one and hold it in
13  isolation, these other factors were certainly
14  strong, would have influenced and factored into my
15  decision whether or not to proceed, or to offer it
16  to the other candidate.
17      Q   And where there would be absolutely no
18  difference in time between how long it would take
19  to run Ms. Schroer through the security clearance
20  process and Mr. Rollins, is it your testimony that
21  Mr. Rollins was a stronger candidate because he
22  did not present the same concerns about

Page 252

1  credibility with members of Congress, and contacts
2  in the military?
3      MS. RUSSELL: It still calls for
4  speculation.
5      But you can answer if you understand.
6      THE WITNESS: I don't understand. I'd
7  like to stay with my previous answer, that even
8  holding time and security clearance out of the
9  question, I'm --
10  BY MS. McGOWAN:
11      Q   The other question is --
12      A   The question isn't just the time of the
13  clearance. The question is ultimately could he
14  get the clearance. We don't know that there's an
15  answer to that. So it's not the whether it's two
16  weeks or two days or two years. We have the
17  additional factor of, one, how long it's going to
18  take; and, two, the degree of certainty that he
19  might not be able to get that clearance. So
20  that's a big unknown.
21      Q   Okay. So that's how we had our four
22  factors. There was the time factor and the

Page 253

1  uncertainty factor.
2      I'm saying holding those factors
3  constant --
4      A   I understand.
5      Q   -- as between Ms. Schroer and
6  Mr. Rollins, is it your testimony that Mr. Rollins
7  is -- was a stronger candidate because he would
8  not have presented credibility concerns or
9  concerns about his ability to maintain military
10  contacts?
11      A   He's looking a lot better, yeah.
12      Q   Do you recall what time you wrapped up
13  your meeting with Mr. Ronhovde and the others?
14      A   10:00 to 10:15.
15      Q   What did you do then?
16      A   Went out and smoked a cigarette.
17      Q   And what were you thinking at that
18  point?
19      A   What I was thinking was that given what
20  I had learned, I would like to offer the position
21  to Mr. Rollins.
22      Q   And why was that?

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                      January 11, 2007
Washington, DC

Page 254

1     A   Because of the length of time to take to
2  get a security check, because of the uncertainty
3  of the security check, because of the credibility
4  issue, because of the mistrust issue, all the
5  factors that we have listed time and time and time
6  again.
7     Q   And we've thus far broken out the
8  credibility issue being credibility with Congress
9  was —
10    A   The contacts.  And the contacts is the
11 other thing.
12       MS. McGOWAN:  I'm going to show you a
13 document that we can mark Exhibit 28.  Oh, I'm
14 sorry.  It was a document that was already
15 previously marked as Exhibit 14.
16       THE WITNESS:  (Witness examined
17 document).
18 BY MS. McGOWAN:
19    Q   Do you recognize -- well, actually, let
20 me identify the document.  It's a document that
21 was previously marked as Exhibit 14, Bates-stamp
22 number 206.  At the top says, Charlotte Preece

Page 255

1  draft re terrorism position.
2       Do you recognize this document?
3     A   Yes.
4     Q   Okay.  What is it?
5     A   At the end of the meeting with Bessie,
6  Kathy, Kent, and Cindy, Kent asked me to draft
7  something for the general counsel to look at of
8  what I would tell Mr. Schroer when I told him I
9  would not go forward with his recommendation.
10    Q   And did he explain to you why he wanted
11 you to draft up an e-mail?
12    A   To show to the general counsel's office.
13    Q   And when did you begin drafting this
14 e-mail?
15    A   Probably -- this has a 10:54 on it.
16 After the meeting.
17    Q   Do you have any idea of roughly how long
18 it took for you to type this e-mail?
19    A   Fifteen minutes.
20    Q   Did you talk with anyone as you drafted
21 the e-mail?
22    A   We had talked about it a little bit at

Page 256

1  the meeting.
2     Q   And had anyone offered you any
3  suggestions for how to phrase your comments to
4  Ms. Schroer?
5     A   No.  This was a very preliminary draft,
6  first cut.
7     Q   And how did you select the people that
8  you sent the e-mail to?
9     A   They were the people at the meeting.
10    Q   Did you send this to anyone else in a
11 separate message?
12    A   I don't think so.  I can't remember if
13 we took a paper copy, or if this was sent to the
14 general counsel's office.
15    Q   And did you get any e-mail responses
16 from anyone when you sent this e-mail?
17    A   No.
18    Q   Did you get any kind of feedback
19 regarding this e-mail?
20    A   Yes, when we went to the general
21 counsel's office.
22    Q   Do you recognize the handwritten

Page 257

1  comments on this paper?
2     A   Yes.
3     Q   Whose handwriting is that?
4     A   Mine.
5     Q   When did you write these comments?
6     A   Probably in the meeting with the general
7  counsels.
8     Q   And then I'm going to show you a
9  document that was previously marked 15.  In a
10 moment.  I'm sorry.
11       In this document, Exhibit 14, the last
12 line of that first paragraph you say here that, I
13 have concerns a that the transition you are in the
14 process of might divert your full attention away
15 from the mission of CRS.
16       Is this an issue that you discussed at
17 that meeting with Mr. Ronhovde and the others?
18    A   Yes, I believe it did come up.
19    Q   And what was that discussion?
20    A   That both the surgeries, the time off,
21 as well as undergoing such a complex and painful
22 process could divert his attention, full-time

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                    January 11, 2007
Washington, DC

| Page 258 | Page 260 |
|---|---|

**Page 258**

1  attention away from his duties on the job.
2     Q   Were you concerned about the time that
3  Ms. Schroer would need to be out of the office
4  exclusively, or also --
5     A   No, the time and the psychological
6  distraction.
7     Q   And why did you have this concern about
8  psychological distraction?
9     A   Because I assume it's a pretty traumatic
10  process, from what I've been led to believe.
11     Q   And did you think that Ms. Schroer would
12  be more distracted as a result of her undergoing
13  this process than she had been up until that point
14  in her life?
15     A   I have no way to make that comparison.
16     Q   And so what was your basis for thinking
17  that she would be distracted from her duties?
18     A   Well, I've had a couple of surgeries.
19  And I must say that it distracted me.  I spent
20  some time thinking about it, thinking how it would
21  go.
22     Q   Were you working at CRS at the time of

**Page 259**

1  those surgeries?
2     A   Yes.
3     Q   And do you feel as though you were not
4  able to perform your duties fully while you
5  were --
6     A   Well, I had to recover.  So I had to
7  take time off.
8     Q   Did you have a concern that Ms. Schroer
9  was going to need to take time off?
10     A   Yes.
11     Q   During your lunch meeting, did you have
12  any conversations with Ms. Schroer about her need
13  to take any time off for any surgeries she might
14  be completing?
15     A   No.  Not that I recall.
16     Q   During your meeting with Mr. Ronhovde
17  and the others, did anyone suggest following up
18  with Ms. Schroer to find out what her plans were
19  with regard to having surgeries?
20     A   No.
21     Q   Looking at now what was marked document
22  Exhibit 15 in a prior deposition.

**Page 260**

1     A   (Witness examined document).
2     Q   This document, again, document Number
3  15, Exhibit Number 15, Bates-stamped number 205
4  at the top says, Charlote Preece version two.
5       Are you familiar with this document?
6     A   Yes.
7     Q   What is it?
8     A   It is a draft of the response that I was
9  going to -- that I did give to Mr. Schroer later
10  that day.
11     Q   And when did you draft this response?
12     A   After our discussion with the general
13  counsel.
14     Q   And did you talk with anyone as you
15  drafted the e-mail?
16     A   Well, I drafted it, I believe, in my
17  office.
18     Q   And was anyone there with you as you
19  drafted --
20     A   In my office?
21     Q   Yes.
22     A   No.

**Page 261**

1     Q   Okay.  And other than Ms. Alkisswani and
2  Mr. Ronhovde, did you send the e-mail to anyone?
3     A   Well, if there's no one else in the "to"
4  line, I doubt it.
5     Q   And were there any other people at the
6  meeting with the Office of General Counsel besides
7  Ms. Alkisswani and Mr. Ronhovde?
8     A   Myself and the folks from the general
9  counsel's office.
10     Q   And why did you not send this e-mail to
11  the other participants of the discussion with the
12  general counsel?
13     A   I don't know.  I don't have a
14  recollection of whether I took a hard copy up,
15  whether I talked to somebody on the phone about
16  it.
17     Q   Do you recognize the writing, the
18  handwritten comments on this document?
19     A   Yes.
20     Q   Whose handwriting is it?
21     A   Mine.
22     Q   Okay.  And when did you write these

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                    January 11, 2007
Washington, DC

| Page 262 | Page 264 |
|---|---|

**Page 262**

1  comments?
2      A   I imagine this was based on feedback.
3      Q   Do you recall who the feedback was from?
4      A   No, but it sounds like Kent. But I'm
5  not positive of that.
6      Q   Did he call you with his feedback, or
7  did he send you an e-mail?
8      A   I don't know which. I assume he called
9  me. If I've written it down, I assume he called
10  me. Otherwise, if he'd sent me an e-mail, I would
11  have an e-mail copy of it.
12      Q   Why did you change "complexities" to
13  "responsibilities" in that first full line of text
14  in the e-mail?
15      A   Because I wanted to get at the seat --
16  the level of the position, that this was a GS-15
17  level, that the contacts were an important
18  component of the job, that being able to interact
19  at a sophisticated level with policymakers was an
20  important aspect for the job.
21      Q   Was this an edit that Mr. Ronhovde had
22  suggested, or was it an edit that you made

**Page 263**

1  spontaneously?
2      A   I believe it's an edit that I made.
3      Q   Looking at these two e-mails together,
4  were there any other e-mails in this chain?
5      A   Not that I'm aware of.
6      Q   Did you ever -- were you ever asked to
7  look for other e-mails that might have been part
8  of this chain?
9      A   I was asked to search my whole hard
10  drive.
11      Q   And when was that?
12      A   I think it was after the June lawsuit.
13      Q   Okay. And does your e-mail system
14  automatically save sent -- or save messages?
15      A   I don't know. I believe it does, but I
16  do not know. I'm not a -- you have to get a
17  computer person in for that.
18      Q   In this document here, which is Exhibit
19  15, you talk about -- you make reference to a
20  discussion with general counsel.
21          You can you tell me about that
22  discussion?

**Page 264**

1      A   Yes. I got a call from Kent, that he
2  and Bessie would be meeting in the general
3  counsel's office at 11:00, if I could join them.
4      Q   Okay. And what happened then?
5      A   We had a discussion of how I should let
6  the applicant know if I did not want to select
7  him.
8      Q   And at the --
9      A   And --
10      Q   I'm sorry. Go ahead.
11      A   Also talked about were there any legal
12  reasons that would put the Library in an awkward
13  position if I withdrew the recommendation of
14  Mr. Schroer.
15      Q   And what was that discussion?
16      A   What was that discussion? What was I
17  told?
18      Q   What was said?
19      A   That we could -- basically, that we
20  could -- we weren't under legal obligation to hire
21  Mr. Schroer.
22      Q   Anything else?

**Page 265**

1          MS. RUSSELL: Objection. This may be
2  privileged information. I believe you asked what
3  was she told at the meeting with the counsel's
4  office? Was that your question?
5          MS. McGOWAN: Yes. That's the question.
6          MS. RUSSELL: And I'm going to object on
7  privilege grounds.
8          MS. McGOWAN: This is a conversation
9  that we've already explored. And there are --
10  there's correspondence reflecting this
11  conversation. So I believe the privilege has been
12  waived with respect to this meeting.
13          MR. JAMES: No. You've never asked
14  about what advice she received. You did ask about
15  the meeting. You did ask what she -- each of the
16  people in those meetings said, and with regard to
17  everyone except the lawyers.
18          MS. McGOWAN: Okay.
19          MR. JAMES: You did not ask for the
20  advice.
21          MR. ESSEKS: Even with Ms. Alkisswani?
22          MR. JAMES: You did not. And we were

67 (Pages 262 to 265)

Charlotte P. Preece                                                          January 11, 2007
Washington, DC

Page 266

1   ready to object then. But you asked what she
2   said, you asked what Kent said, and you asked what
3   Ms. Preece said. You never asked what --
4           MR. ESSEKS: We didn't ask about what
5   the lawyers said?
6           MR. JAMES: No.
7           MS. McGOWAN: Okay.
8   BY MS. McGOWAN:
9       Q    And so what did everyone, other than
10  Mr. James and Ms. Dowd, say in the context of this
11  meeting, as part of recounting the conversation?
12          Sorry. That's a little --
13          Going into this meeting -- let me start
14  there -- going into this meeting, was there any
15  discussion about the fact that you had more or
16  else less made up your mind what you thought you
17  were going to do?
18      A    I had pretty much made up my mind about
19  what I wanted to do.
20      Q    And so what was the point of this
21  meeting with the office of general counsel staff?
22      A    To find out if this situation could

Page 267

1   potentially get the Library into legal trouble.
2       Q    And was there any discussion about what
3   you should or should not say in the course of your
4   conversation with Ms. Schroer?
5       A    Again, to answer that question, I would
6   have to be saying what legal counsel told me.
7       Q    Well, putting aside what legal counsel
8   told you, were there any other conversations --
9   you know, did you ask, for example, you know,
10  should I say things in a certain way, and what
11  feedback would --
12      A    How should I phrase this?
13      Q    Uh-huh.
14      A    Yes.
15      Q    And did you get feedback from the
16  nonlawyers in the room, Ms. Alkisswani and
17  Mr. Ronhovde?
18      A    I had already gotten their input.
19      Q    Okay. And so at some point in the
20  meeting did you announce that you knew what your
21  decision was going to be?
22      A    Yes.

Page 268

1       Q    And tell me how you communicated that
2   information.
3       A    Given the combination of all the factors
4   that we outlined, I do not feel comfortable going
5   ahead with recommendation with Mr. Schroer. I
6   have another strong candidate. And I would like
7   to move ahead with the recommendation on him as
8   quickly as possible.
9       Q    And did you, in this meeting, you know,
10  outline what each of those four factors were?
11      A    Yes. We talked about all the factors.
12      Q    And was there any additional discussion
13  about each of the four factors that you
14  identified?
15      A    I think I was asked to elaborate what
16  did I mean by mistrust, what did I mean by
17  contacts. So I would elaborate on those.
18      Q    And if you can tell me how you explained
19  what you meant.
20      A    I don't know that it's different than
21  what I've already told you. The credibility had
22  to do with the members. Contacts had to do with

Page 269

1   his ability to capitalize on the contacts he made
2   as a man in the armed services. Trust was my
3   perception of would I be able to trust him after
4   this late in the day revelation on Monday.
5   Security clearance was based on Cynthia's advice.
6       Q    And how did you leave things at that
7   meeting?
8       A    That I would call Mr. Schroer later that
9   day and give him the news.
10      Q    Did anyone else agree to do anything at
11  the end of that meeting?
12      A    Do anything? No.
13      Q    Do anything with respect to the Schroer
14  matter: Write a memo? Call anyone?
15          MR. JAMES: And your question is anyone
16  other than the lawyers?
17          MS. McGOWAN: Right.
18          THE WITNESS: No.
19  BY MS. McGOWAN:
20      Q    And so what did you do between the end
21  of that meeting and when you ultimately spoke to
22  Ms. Schroer next?

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                    January 11, 2007
                            Washington, DC

Page 270

1    A   I would have to look at my calendar.
2    Q   Was there anything preventing you from
3  calling Ms. Schroer right away?
4        How did you decide when you were going
5  to make that phone call?
6    A   I don't know. I said I would call him
7  sometime that day. I don't know if I wanted to
8  think about what I was going to say. I don't know
9  if I had a meeting intervene. I assume I ate
10  lunch.
11   Q   Did you talk to anyone --
12   A   But it --
13   Q   Oh, I'm sorry.
14   A   -- I didn't say, whatever time I called
15  him, that 3:48 was a magic number. It just --
16   Q   Did you talk to anyone between the
17  meeting and actually calling Ms. Schroer about how
18  you were feeling about the situation?
19   A   I think I may have talked to Steven.
20  And Francis may have been back by that time, as
21  well. At some point I talked to Francis. I don't
22  know exactly when.

Page 271

1    Q   And tell me what you remember about that
2  conversation.
3    A   That they thought it was the right
4  decision.
5    Q   And did they say why?
6    A   Well, given the needs of the
7  organization, that we needed somebody on board, we
8  needed them now.
9    Q   And in that conversation, did you
10  discuss each of the four or five -- I guess right
11  now five -- concerns that you had talked about in
12  your prior two meetings?
13   A   We discussed mostly what Cynthia Wilkins
14  had told me at the meeting, and the timing.
15   Q   Did you discuss at all your concern
16  about contacts or credibility?
17   A   I don't remember if I did or not. But,
18  again, the timing was the nail in the coffin, so
19  to speak.
20   Q   And with respect to the contacts and
21  credibility factors, did either Mr. Bowman or
22  Mr. Miko express, you know, their opinion about

Page 272

1  whether or not they shared your concern?
2    A   Yes, particularly in the contacts end,
3  uh-huh.
4    Q   And do you remember who?
5    A   Steve.
6    Q   And what did he say?
7    A   That he would be surprised if he were
8  able to utilize those contacts as Diane.
9    Q   Did he say why? Was it because of his
10  perception of how the military folks would react,
11  or --
12   A   That they wouldn't know who Diane
13  Schroer is, and would -- you know, presumably, he
14  would be open about it and say, oh, I used to be
15  David Schroer. As I said, some may have been
16  sympathetic, and said, oh. And others may have
17  said, I don't know you anymore.
18   Q   And what about Francis Miko?
19       Am I right, Francis Miko was potentially
20  going to be Ms. Schroer's supervisor?
21       And if I'm right, this is, you know,
22  probably the first time that you've talked about

Page 273

1  it with him since he was not in the office the
2  previous day.
3        What did he say to you?
4    A   He was equally surprised.
5    Q   And did he share his views with you
6  about your decision to not go forward with
7  Ms. Schroer as the applicant of choice for the
8  position?
9    A   Yes.
10   Q   What did he say?
11   A   He basically shared my views that,
12  certainly based on what Cindy told us, that we
13  needed somebody to do the work.
14   Q   Anything else that you guys discussed?
15   A   Not that I recall.
16   Q   Okay. And other than Steve and
17  Francis -- Steve Bowman and Francis Miko, do you
18  recall anyone else that you spoke to about
19  Ms. Schroer prior to calling her?
20   A   No.
21   Q   Okay. So roughly when did you call
22  Ms. Schroer?

69 (Pages 270 to 273)

Charlotte P. Preece                                                    January 11, 2007
Washington, DC

Page 274

1    A    I don't remember. I -- sometime in the
2    afternoon, 3:00 or 4:00.
3    Q    And tell me about that conversation.
4         How long did it last?
5    A    It was very brief.
6    Q    Okay.
7    A    Basically, it's the language in this
8    e-mail.
9         MR. ESSEKS: You're referring to
10   Exhibit --
11        THE WITNESS: Exhibit 15.
12        MR. ESSEKS: Thank you.
13        THE WITNESS: I mean, I did tell David
14   that it was a difficult decision. And then I
15   think I read this language.
16   BY MS. McGOWAN:
17   Q    And by "this language," can you read to
18   me --
19   A    The typed language, Given the level and
20   responsibilities of the position, I don't think
21   that this is a good fit. It's been a difficult
22   decision. But given the immediate needs of

Page 275

1    Congress, I've decided not to go forward with the
2    recommendation.
3    Q    And is that roughly what you said to
4    open the conversation?
5    A    Uh-huh.
6    Q    Actually, is your recollection that this
7    is basically verbatim what you said in the
8    conversation?
9    A    Uh-huh.
10   Q    How did Ms. Schroer respond on the
11   phone?
12   A    Well, a pause. And he said I'm very
13   disappointed. And I said it was a difficult
14   decision. I thanked him for his interest in the
15   position. And I said good-bye.
16   Q    At any point in the conversation did you
17   say anything about the amount of time that it
18   would take to complete the security clearance
19   process as part of why you had made your decision?
20   A    I didn't give him any reasons why I made
21   my decision.
22   Q    Okay. And do you recall, you know,

Page 276

1    thanking Ms. Schroer for her honesty?
2    A    Yes.
3    Q    Did you make any other comments or
4    express any other views to Ms. Schroer about, you
5    know, concerns that you had had about her
6    trustworthiness?
7    A    No.
8    Q    Did you mention anything to Ms. Schroer
9    about her -- the contacts and credibility concerns
10   that you'd had?
11   A    No.
12   Q    Did you say anything to her about her
13   gender transition being a distraction?
14   A    No.
15   Q    Why not?
16   A    I was advised not to elaborate on the
17   reasons behind my decision.
18   Q    And why not?
19   A    Pardon?
20   Q    Why not?
21        MS. RUSSELL: Objection.
22   BY MS. McGOWAN:

Page 277

1    Q    Okay. Were you advised not to give any
2    additional reasons by anyone other than legal
3    counsel?
4    A    No.
5    Q    Okay. Roughly, how long did the
6    conversation last?
7    A    A minute or less.
8    Q    How did you feel after you hung up the
9    phone?
10   A    I had empathy for David the person. I
11   do feel that he -- it takes courage to go through
12   what he's going to do. But I felt that I made the
13   right decision for the institution.
14   Q    And what did you do next?
15        MS. RUSSELL: Objection. Vague.
16   BY MS. McGOWAN:
17   Q    After hanging up the phone, what did you
18   do next with respect to the terrorism specialist
19   position?
20   A    I pulled Mr. Rollins' application. And
21   we had already done reference checks on him. We
22   did them simultaneous. And I called Mr. Rollins

70 (Pages 274 to 277)

Charlotte P. Preece                                          January 11, 2007
Washington, DC

## Page 278

1  and asked him if he were interested in the
2  position.
3      Q   And since he's working at CRS, I assume
4  he said yes; is that correct?
5      A   He did.
6      Q   Okay.  And as a result of that
7  conversation, what were your next steps with
8  respect to filling the position?
9      A   To write a recommendation for John
10 Rollins.
11     Q   And why was Mr. Rollins not originally
12 your first choice for the position?
13     A   I believe I told you.  During the
14 interview, with the things that made Mr. Schroer
15 special, I thought Mr. Schroer was a little more
16 creative and imaginative in his answers in the
17 interview.
18     Q   Did the reason you selected Mr. Rollins
19 over Ms. Schroer have anything to do with
20 Mr. Rollins' prior work experience being more
21 stronger or more relevant than Ms. Schroer's?
22     A   Both of the work experience was strong.

## Page 279

1  Mr. Rollins' experience was more diverse.
2      Q   And in being more diverse, was that a --
3  was that something about his application that made
4  it stronger than Ms. Schroer's, or was that
5  roughly a wash?
6      A   They were roughly equal, I would say.  I
7  think if you look at the scoring, you will see
8  that they scored very closely.
9      Q   I'm going to show you a document that
10 was previously marked 16.
11     A   (Witness examined document).
12     Q   And this is a document that was
13 Bates-stamped number 772.  It's a memorandum from
14 Cynthia Wilkins to Bruce Krafte.  And it's dated
15 January 4th, 2003, although I'd represent to you
16 that as a result of our conversation with
17 Ms. Alkisswani on Monday, she confirmed that that
18 was a typo and that that was actually a memo that
19 was likely January 4th, 2005.
20     A   Oh, yes.  I'm sorry.  Yes.
21     Q   This memo appears to be a memo to
22 Ms. Wilkins from Bruce Krafte requesting a waiver

## Page 280

1  of the full field background investigation of
2  Mr. Rollins.
3          Does that seem right to you?
4      A   Yes.  That's typical.
5      Q   Okay.  My question is, if Mr. Rollins --
6  well, do you know if Mr. Rollins, at the time he
7  applied, had a top secret security clearance?
8      A   Yes, he did.
9      Q   Okay.  If so, do you know why the
10 request for a waiver of the pre-employment
11 security clearance investigation was necessary in
12 his case?
13     A   It still takes some time when you're --
14 it's not a straight transfer.  It's not like the
15 agency, the home -- the hiring agency holding the
16 clearance and transferring it to the Senate for
17 the purpose of a briefing.  If it's for the
18 purpose of a hire, there is some time that it
19 takes the new agency to do that.  And I, again,
20 would defer to Cindy on the process.
21     Q   Okay.  And do you know roughly how long
22 it takes to transfer a clearance in a hiring

## Page 281

1  situation like that?
2      A   I don't.  But I do know that -- that he
3  was using his clearance fairly early on.  Within a
4  month or so he had his -- attended his first
5  classified briefing.
6      Q   And when you say within a month, is that
7  within a month of the day that he started work at
8  CRS, or is it within a month of when you hired
9  him?
10     A   It was within a month from when he
11 started.  It could have happened sooner.  He could
12 have been on board.  I just don't know.  I don't
13 have these dates.
14     Q   And do you know -- do you recall what
15 date Mr. Rollins started?
16     A   I believe it was the first week in
17 February, the end of the first week in February.
18     Q   I'm going to show you a document that
19 was previously marked Exhibit 8.
20     A   (Witness examined document).
21     Q   Do you recognize that document?
22     A   (Witness examined document).

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                    January 11, 2007
Washington, DC

Page 282

1    Q   Is this document the request for
2  personnel action for Mr. Rollins?
3    A   Yes, it is.
4    Q   Okay.  And where it says "effective
5  date" on that, on the document, under part B,
6  where there's a handwritten 2/6/05, is that
7  consistent with your recollection of when
8  Mr. Rollins started at CRS?
9    A   Yeah.  I think the 6th might have been a
10 Sunday, and the 7th was a Monday.  So he probably
11 would have started on a Monday.
12   Q   Other than filling out the PAR for
13 Mr. Rollins, what other paperwork did you need to
14 fill out to complete the hiring process for the
15 terrorism specialist position?
16   A   I just needed to draft the letter of
17 recommendation, and sign off on the referral list.
18   Q   Okay.  We talked about the referral list
19 before, but I just want to show it to you again to
20 ask you a question.
21      In this is Exhibit 12.
22   A   (Witness examined document).

Page 283

1    Q   Is this the final referral --
2    A   Yes.
3    Q   -- form?
4       Why did -- well, are you -- who filled
5  out the disposition codes on this form?
6    A   I did.
7    Q   And am I correct that you filled it out
8  on the 29th of December 2004?
9    A   Yes.
10   Q   Why did you choose the code NSWE for
11 David Schroer?
12   A   That's typically the code we use when we
13 don't select an applicant, unless they withdrew.
14   Q   To the extent that there are other codes
15 listed here, such as there's NSRC, NSORG, and NSO,
16 why did you decide not to use any of those codes
17 with respect to Mr. Schroer, David Schroer, Diane
18 Schroer?
19   A   Because I've never used them.  I mean, I
20 could have.
21   Q   And so with respect to NSWE, the fact
22 that that code reflects not selected due --

Page 284

1  because previous work experience not as relevant
2  as candidate selected, you felt as though that was
3  a appropriate code to use than any of the other
4  codes listed?
5    A   No.  I could have used another code.  I
6  just have never used another code before.  So this
7  was just habit.
8    Q   Okay.  And did you contemplate making a
9  notation in the comment form regarding your
10 concern about any of the issues that we've
11 discussed previously, whether timing, credibility,
12 or contacts?
13   A   No.
14   Q   Have you ever recommended a person whom
15 you knew was a transsexual for a position at CRS?
16   A   No.
17   Q   Do any transsexual people work for you
18 at CRS?
19   A   That work for me, no.
20   Q   And are you aware of any transsexual
21 people who work for CRS as a whole?
22   A   I'm not aware of any.

Page 285

1    Q   Would you ever hire a person whom you
2  knew to be a transsexual for a position involving
3  a security clearance?
4       MS. RUSSELL:  Objection.  Calls for
5  speculation.
6       But you can answer.
7       THE WITNESS:  I don't know.  I'd have to
8  weigh all the factors.  And I would have to get
9  advice from the same people that I sought it from
10 in this situation.
11 BY MS. McGOWAN:
12   Q   Do you know of any -- or have you ever
13 encountered any transsexual employees at the
14 Library of Congress as a whole?
15   A   The Library?  No.
16   Q   During your meeting with the Office of
17 General Counsel, did anyone make reference to the
18 fact that there were other transsexual employees
19 at the Library?
20   A   I believe that question was asked.
21   Q   And at -- do you recall what the --
22   A   Answer was?  Yes.

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                January 11, 2007
Washington, DC

Page 286

1    Q    And at any point did you or anyone
2    suggest contacting the supervisor of those
3    transsexual employees to find out, you know, how
4    they had dealt with any issues that might have
5    arisen?
6    A    No.
7    Q    Did you ask whether or not any of these
8    other transsexual employees at the Library of
9    Congress had security clearances?
10   A    No.
11   Q    I'm going to show you a document that we
12   will mark Number 28.
13           (Deposition Exhibit No. 28
14           marked for identification
15   BY MS. McGOWAN:
16   Q    And this is a document that we received
17   from the Government in discovery. And it's
18   Bates-stamped number 199 to 204. There's one page
19   which is a cover letter. And this next two pages
20   is the resume of David Schroer. And then page 202
21   and 203 is titled, Chronology and Discussion
22   Summary of Events. And then page 204 is a

Page 287

1    document that begins, Memorandum of Record, and
2    then has Marc Alderman's name at the bottom?
3    A    Uh-huh.
4    Q    Do you recognized these documents?
5    A    Yes.
6    Q    When have you seen them before?
7    A    I was mailed a copy by Mr. Schroer.
8    Q    The date on this letter is January 20th,
9    2005.
10          Do you recall receiving it roughly
11   around that time?
12   A    In general, yes.
13   Q    I want to turn to page at 202 and 203.
14   A    Uh-huh.
15   Q    I ask you to review it to refresh your
16   recollection of what it says.
17          And then if you can identify for me what
18   statements in this chronology do you disagree
19   with?
20   A    (Witness examined document).
21          MR. JAMES: Solely on this page?
22          MS. McGOWAN: On this page, and then on

Page 288

1    page 203.
2          THE WITNESS: (Witness examined
3    document). I have no problem with Tuesday,
4    December 7th. If I have a problem so far with 15,
5    it would be I would -- rather than say selected
6    for the position, I probably told him -- because
7    I'm very careful in my terminology -- that I was
8    prepared to recommend him for the position.
9    BY MS. McGOWAN:
10   Q    Okay.
11   A    (Witness examined document). The rest
12   of that paragraph for that day is fine.
13   Q    Okay. And then Thursday, December 16th?
14   A    (Witness examined document). Again,
15   processing paperwork, I probably said, begin
16   preparing the letter of recommendation. I don't
17   usually say two to three weeks. I usually say two
18   to four weeks, but I could have said two to three.
19   And he did ask if we could --
20   Q    Okay.
21   A    Yes. And I just would amplify that just
22   to discuss the job. And he also told me there was

Page 289

1    something he wanted to tell me.
2    Q    Okay. Anything else?
3    A    So something in between. There's
4    something I'd like to discuss with you.
5    Q    Anything else regarding the 16th of
6    December?
7    A    (Witness examined document). Uh-huh.
8    Q    Okay. Monday, December 20th, which is
9    on page 202 and 203?
10   A    (Witness examined document). The
11   creative thinker I agree with. The balanced in a
12   wider area of expertise, I don't know.
13   Q    When you say you don't know, is it you
14   don't --
15   A    Recall --
16   Q    -- you're not sure --
17   A    -- saying that, yes.
18   Q    Okay.
19   A    I told him I would like to finish doing
20   the recommendation, yes, preparing the
21   recommendation, that afternoon. But not with HR.
22   After I prepare the recommendation, it goes to the

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                                January 11, 2007

Washington, DC

Page 290

1   director. And then CRS prepares the PAR. And
2   then the PAR starts winding its way through the
3   office.
4       Q   Okay. Anything else?
5       A   (Witness examined document). That looks
6   good, okay, at least to the bottom of the page.
7       (Witness examined document). I think
8   that's pretty accurate.
9       Q   Okay.
10      A   (Witness examined document). I don't
11  know if those are the exact words, or if they're
12  closer to the words that appeared on the earlier.
13  But that's certainly the tenor of what I said and
14  the duration of what I said.
15      Q   And with regard to the "how do I hire
16  you," or are you also referring to the "for a
17  loop," and --
18      A   Certainly the --
19      Q   -- with regard to also the throwing you
20  "for a loop," or are you -- are we still talking
21  about December 20th at this point, or --
22      A   I'm okay with December 20th.

Page 291

1       Q   Okay. So it's December 21st, that's
2   what you were saying, you're generally okay with
3   this?
4       A   It's the tenor of that, yes. I think
5   it's probably closer to the language on --
6   whatever exhibit that was -- 15.
7       Q   The comment about a long and restless
8   night, does that --
9       A   Yeah, that rings true.
10      Q   Okay. Great. And then turning to the
11  next page, page 204. This is a paragraph by Marc
12  Alderman. And I ask you to just read that. And
13  let me know if there's anything in his narrative
14  that you take issue with.
15      A   (Witness examined document). That, yes,
16  they're accurate. I don't take issue with it.
17      Q   I'm sorry?
18      A   I don't take issue with it. Again, with
19  the exception of the language that she had already
20  offered Dave Schroer the job. That, I would take
21  issue with. I cannot, in my position, offer
22  anyone a job. I can recommend.

Page 292

1       Q   And what's your recollection of how you
2   might have communicated sentiments along those
3   lines to --
4       A   That I'm prepared to recommend David.
5       Q   -- how you would have communicated
6   sentiments along those lines to Mr. Alderman?
7       A   That I was prepared to write a
8   recommendation for Mr. Schroer's candidacy.
9           MS. McGOWAN:  We're very close to the
10  end. Can we take a five-minute break. And then
11  we'll wrap up. Is that okay?
12          THE WITNESS:  May I ask how close to the
13  end you think we --
14          MS. McGOWAN:  I would think that we're
15  within -- we can go off.
16          (Recess)
17          MS. McGOWAN:  I'd like to show you --
18  this is a document we'll mark as Exhibit 29.
19          (Deposition Exhibit No. 29
20          marked for identification
21  BY MS. McGOWAN:
22      Q   This is a document that was produced by

Page 293

1   the Government in discovery, Bates-stamped number
2   1 and 2. It's a memorandum from you, Charlotte
3   Preece, dated January 24, 2005.
4       Do you recognize this document?
5       A   Yes.
6       Q   What is it?
7       A   It was a response that I should keep
8   some kind of record of what I remembered from the
9   events.
10      Q   And I see there's a date on there of
11  January 24, 2005.
12      Is that when you prepared it, or did you
13  are prepare it over the source of a couple days?
14      A   I recall working on it a couple of days,
15  and then being advised to cease work on it.
16      Q   And why did you prepare this document?
17      A   Because the CRS legal counsel thought it
18  would be a good idea.
19      Q   And looking at the bottom of page 2, it
20  appears to cut off?
21      A   Yes.
22      Q   Is there -- are there additional pages

74 (Pages 290 to 293)

Charlotte P. Preece                                                                January 11, 2007
Washington, DC

Page 294

1   to this document?
2       A    No.  I was told to cease work on it.
3   And I did no more work on it.
4       Q    So this is the end of the document --
5       A    That's correct.
6       Q    -- as created by you?
7           And the instructions you received about
8   ceasing work on this, who did those instructions
9   come from?
10          MS. RUSSELL:  Objection.
11          MS. McGOWAN:  Okay.  That answers my
12  question.  I was trying to figure out who it was,
13  trying to figure out whether there was any more to
14  know.
15          MR. JAMES:  Just let you know --
16          MS. McGOWAN:  I could tell, as Jessie
17  and Julia started to perk up, I was getting an
18  answer to my question.
19  BY MS. McGOWAN:
20      Q    Did you prepare any other chronologies
21  or memoranda like this?
22      A    No.

Page 295

1       Q    Did you ever discuss this document with
2   anyone?
3       A    No.  I prepared this based on my
4   recollection.  Did I -- did I -- please repeat
5   your question.
6       Q    Sure.  I was asking if you discussed
7   this memo with anyone.  And I break it down into
8   two pieces.
9           One, did you discuss it with anyone in
10  the course of preparing it and actually putting
11  the information into the memo?
12          And then the other piece would be did
13  you say discuss the memo in general, your
14  preparation of it?
15          And if there are discussions that --
16  only discussions you had with legal counsel, then
17  I don't need to know that.  I'm only looking for
18  discussions that you may have had not with legal
19  counsel.
20      A    Just with legal counsel.
21      Q    Okay.  Thank you.
22          What is your view about whether

Page 296

1   Ms. Schroer is a man or a woman?
2           MS. RUSSELL:  Objection.  Lacks
3   foundation.
4           But you can answer.
5   BY MS. McGOWAN:
6       Q    Do you have a view about whether
7   Ms. Schroer is a man or a woman?
8       A    If I ran into Ms. Schroer today, I would
9   call her Ms. Schroer.  I would call her Diane.
10      Q    And would you consider Ms. Schroer a
11  woman?
12      A    I would consider her a person in
13  transition.
14      Q    On the day that you had lunch with
15  Ms. Schroer, on December 20th, on that day, what
16  did you consider Ms. Schroer to be, a man or a
17  woman?
18      A    A man.
19      Q    Okay.  And after your conversation at
20  lunch, did your view change about whether
21  Ms. Schroer was a man or a woman?
22      A    Well, he told me he was transitioning,

Page 297

1   so I probably still considered him as a man at
2   that point, because he hadn't changed his name
3   yet.
4       Q    And at what point would you feel that
5   Ms. Schroer was now a woman?
6       A    When the process is completed.
7       Q    And in your mind, based on the
8   information that you have, when is that point?
9       A    When his surgeries are completed.
10      Q    On December 20th, when -- at your
11  meeting with Ms. Schroer, who you viewed to be
12  man, did it seem strange to you that man would
13  want to dress in women's clothing?
14      A    Yes, it seems strange to me.  But a lot
15  of things seem strange to me.
16      Q    And at any point during -- between the
17  time when you learned about Ms. Schroer's
18  transition until the point at which you made your
19  decision to not go with -- not to recommend her
20  and to call her, you know, at any point did you
21  visualize, you know, Ms. Schroer, looking as she
22  did in the pictures she showed you, standing in

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                                      January 11, 2007
Washington, DC

| Page 298 | Page 300 |
|---|---|

Page 298

1  front of Congress and looking like a fool?
2      A   Looking like a fool? Why would you say
3  that?
4          MS. RUSSELL: I'm going to object to the
5  form of the question.
6          But you can answer if you understand.
7          THE WITNESS: I don't understand the
8  intent behind the question.
9  BY MS. McGOWAN:
10     Q   Sure. And my question is, you know,
11  at -- my recollection of your testimony was that
12  when you saw the pictures of Diane in that
13  portfolio, Ms. Schroer at that time looked like a
14  man in women's clothing.
15         And I'm wondering, you know, at any
16  point were you concerned about sort of what the
17  reaction would be of someone who looked like a man
18  in women's clothing standing in front of Congress
19  and trying to be taken seriously?
20     A   That did cross my mind.
21     Q   Did it strike you as strange that
22  someone like Ms. Schroer, with her military

Page 299

1  background, would want to wear makeup?
2          MS. RUSSELL: Objection. Relevance.
3          But you can answer if you understand.
4          THE WITNESS: It didn't surprise me that
5  someone who is in the process of transitioning
6  would want to wear makeup. That makes sense to
7  me.
8  BY MS. McGOWAN:
9      Q   But with respect to Ms. Schroer, who was
10  a man in your mind, did it feel strange to you to
11  think of Ms. Schroer as a man putting on makeup?
12     A   Not if he was trying to look like a
13  woman.
14     Q   Did it feel strange for you to imagine
15  Ms. Schroer wanting to wear pumps or high heel
16  shoes?
17     A   Again, not if he was transitioning to a
18  woman. I find it strange that anyone wants to
19  wear pumps.
20     Q   That, I can agree with, for sure.
21         Would you say that wearing makeup is a
22  masculine thing to do?

Page 300

1          MS. RUSSELL: Objection. Relevance.
2          But you can answer.
3          THE WITNESS: If you're an actor, if you
4  have got skin complex problems.
5  BY MS. McGOWAN:
6      Q   Outside of people wearing makeup for
7  professional or skin acne or other related
8  dermatological-related reasons, would you consider
9  wearing makeup to be a masculine or a feminine
10  thing?
11     A   A feminine thing.
12     Q   And wearing high heel shoes, would you
13  consider that to be a masculine or a feminine
14  thing?
15         MS. RUSSELL: It's the same objection.
16         But you can answer.
17         THE WITNESS: I've seen men in platform
18  shoes. High heels, if we're talking about spikes,
19  I associate that with a feminine thing.
20  BY MS. McGOWAN:
21     Q   And with respect to wearing long hair or
22  wigs, do you associate that as being or masculine

Page 301

1  or feminine?
2      A   Long hair I don't associate -- I
3  associate with both sexes. Wigs, men wear
4  toupees.
5      Q   And the hair style that Ms. Schroer was
6  wearing in the photos that you saw, am I correct
7  that that was a long hair style?
8      A   That was a wig, yes.
9      Q   And would you describe that as a
10  feminine style of hair?
11     A   Yes, it was. The style was feminine,
12  yes.
13     Q   And in that photo, am I right you saw
14  Ms. Schroer, who you knew to be and thought to be
15  a man, wearing what you considered to be a
16  feminine hairstyle?
17     A   Yes.
18     Q   And women's shoes; is that right?
19     A   I believe he had boots on, if I'm not
20  mistaken.
21     Q   Okay. And a feminine style of clothing;
22  is that right?

76 (Pages 298 to 301)

Charlotte P. Preece                                                    January 11, 2007
Washington, DC

| Page 302 |
|---|
| 1    A    Yes. |
| 2    Q    And makeup that would be described as |
| 3  feminine makeup? |
| 4    A    Yes. |
| 5    Q    And how did you think others in CRS |
| 6  would react to seeing those pictures? |
| 7        MS. RUSSELL: Objection. Lacks |
| 8  foundation. |
| 9  BY MS. McGOWAN: |
| 10   Q    For example, you know, what, in your |
| 11 estimation, do you think Steven Bowman's reaction |
| 12 would have been to that picture, those pictures? |
| 13   A    I think people would have surmised that |
| 14 it is a male dressed in women's clothing and |
| 15 wearing makeup. |
| 16   Q    Okay. With whom, if anyone, did you |
| 17 speak in preparation for this deposition? |
| 18   A    Primarily -- |
| 19       MS. RUSSELL: I'm sorry, Sharon, I |
| 20 missed the question. |
| 21       MS. McGOWAN: Oh, sure. That's okay. |
| 22 BY MS. McGOWAN: |

| Page 303 |
|---|
| 1    Q    I was asking, did you speak with anyone |
| 2  in preparation for your deposition? |
| 3    A    Yes. |
| 4    Q    And with whom? |
| 5    A    These three people here. |
| 6    Q    Okay. Anyone else? |
| 7    A    For awhile, Evelio Rubiella. |
| 8    Q    Okay. Anyone else? |
| 9    A    Kent Ronhovde. |
| 10   Q    And what did you and Kent talk about? |
| 11   A    Mostly status reports, that would be |
| 12 when -- general counsel's office would give us |
| 13 status reports of where we are. And there were |
| 14 others present for that, as well, those status |
| 15 reports. |
| 16   Q    And did you speak with Ms. Alkisswani? |
| 17       MS. RUSSELL: Objection. Vague. Do you |
| 18 mean -- |
| 19 BY MS. McGOWAN: |
| 20   Q    I'm sorry. Did you speak with |
| 21 Ms. Alkisswani in preparation for this deposition? |
| 22   A    No. I mean, apart from some of these |

| Page 304 |
|---|
| 1  group status meetings, we didn't have one-on-one |
| 2  conversations about this case. |
| 3    Q    And did you review any documents in |
| 4  preparation for this deposition? |
| 5    A    Say that again, please. |
| 6    Q    Sorry. Did you review any documents in |
| 7  preparation for this deposition? |
| 8    A    I skimmed over most of the documents |
| 9  that I had in my possession. |
| 10   Q    Okay. And what were those documents? |
| 11   A    There was a chronology that was |
| 12 prepared, a lot of the information that you |
| 13 presented today, the interrogatories I looked at. |
| 14   Q    And with respect to documents that |
| 15 weren't discussed as exhibits today, can you tell |
| 16 me what you looked at? |
| 17   A    The structured interview guide. |
| 18   Q    Okay. Anything else? |
| 19   A    I did say the chronology of what |
| 20 happened when. |
| 21   Q    And by the chronology, are you referring |
| 22 to this document in front of you, or a different |

| Page 305 |
|---|
| 1  document? |
| 2        And by that, I mean Exhibit -- |
| 3    A    Exhibit 29. |
| 4    Q    -- Exhibit 29. |
| 5        Are you referring to that document, or a |
| 6  different document? |
| 7    A    That document, and there's a one-page |
| 8  chronology that I believe was prepared by somebody |
| 9  in workforce that had dates when the announcement |
| 10 went up, when it went down. |
| 11   Q    Okay. Any other documents that you |
| 12 reviewed that we haven't discussed today? |
| 13   A    Those sets of interrogatories, those |
| 14 first EEO complaints. |
| 15   Q    And did you review any deposition |
| 16 transcripts in this case? |
| 17   A    I don't have any. |
| 18   Q    Okay. Anything else? |
| 19   A    That's all I recall. |
| 20   Q    Okay. Do you remember receiving a |
| 21 letter from me asking you to preserve all |
| 22 documents related to the Schroer matter? |

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                    January 11, 2007

Washington, DC

Page 306

```
 1    A   I certainly remember being told to do
 2  that; but, yes, I think I did.
 3        MS. McGOWAN:  I have two documents that
 4  we'll mark as 30 and 31.
 5              (Deposition Exhibit No. 30
 6              and 31 marked for
 7              identification.)
 8  BY MS. McGOWAN:
 9    Q   Document 30 -- well, document 31 is a
10  document that was produce by the Government in
11  discovery.  It's been Bates-stamped number 714,
12  and then document 30 is a copy of the text of a
13  letter that I represent to you that I sent on
14  March 7.
15    A   Uh-huh.
16    Q   Do you recall --
17    A   Yes --
18    Q   -- receiving --
19    A   -- I do recall.
20    Q   -- a letter to this affect from me?
21    A   Uh-huh.
22    Q   Okay.  And looking at Exhibit 31, there
```

Page 307

```
 1  is an e-mail where you make reference to receiving
 2  correspondence from me, Sharon McGowan.
 3    A   Uh-huh.
 4    Q   Is this letter, Exhibit 30, the
 5  correspondence to which you were referring?
 6    A   Yes.
 7    Q   Okay.  What did you do after receiving
 8  this March 7, 2005, letter from me?
 9        MS. RUSSELL:  I'm going to object,
10  vague.
11        But you can answer if you understand.
12  BY MS. McGOWAN:
13    Q   Did you communicate --
14    A   That to them, yes.  And I gave them a
15  copy of the letter.
16    Q   Okay.  In addition to Kent Ronhovde and
17  Dan Mulhollan, did you give this letter to anyone
18  else, a copy of this letter to anyone else?
19    A   I don't think so.
20    Q   Do you recall showing it to anyone else?
21    A   No.
22    Q   Do you recall having any conversations
```

Page 308

```
 1  with anyone about the letter, other than
 2  Mr. Mulhollan and Mr. Ronhovde?
 3    A   I do remember being advised not to
 4  destroy any documents that I had created.
 5    Q   And when was that?
 6    A   I don't know.
 7    Q   Do you recall if you had received that
 8  instruction prior to receiving this letter from me
 9  on March 7, 2005?
10    A   I think so, yes.
11    Q   Okay.  Did you hold onto a copy of this
12  letter from me?
13    A   I would have to go back and check.  I
14  don't know.
15    Q   Do you remember throwing it out?
16    A   No.
17    Q   Do you know who might have a copy of
18  this letter?
19    A   I could only speculate.
20    Q   And who do you think might have a copy
21  of the letter that I sent to you, the original?
22    A   The original?
```

Page 309

```
 1    Q   Yes.
 2    A   I would assume that the general
 3  counsel's office has copies of this.  I don't know
 4  that for a fact, but --
 5    Q   Did you retain the original, or did you
 6  hand the original over the someone?
 7    A   I don't know.
 8    Q   After you were informed not to destroy
 9  any documents, what steps did you take to preserve
10  documents?
11    A   I created a file.
12    Q   And what is in that file?
13        Well, first of all, is it a hard file,
14  or is there an electronic file that you're talking
15  about for --
16    A   A hard file.  I printed things out off
17  of my hard drive, and put them -- the few things
18  that I have in my hard drive in this file.
19    Q   And at that time, did you go into your
20  e-mail and do some kind of search?
21    A   Yes.
22    Q   Okay.  And how did you search?
```

78 (Pages 306 to 309)

Charlotte P. Preece                                         January 11, 2007

Washington, DC

Page 310

1        What did you search for?
2     A    Schroer, and I -- and terrorism analyst,
3  or terrorism position, something to the affect.
4     Q    And roughly how many documents did that
5  search produce?
6     A    Very few. I produced the chronology
7  that I started, with something memo to the record.
8  And it produced the beginnings of the draft of the
9  letter of recommendation. It produced some
10 exchanges with Mr. Schroer on providing
11 references.
12    Q    Okay. Did you go through all of your
13 e-mails?
14    A    Yes.
15    Q    And roughly how many e-mails did you
16 find when you looked?
17    A    Not many.
18    Q    Okay. And --
19    A    Three, four.
20    Q    And so --
21    A    With regard to exchange between
22 Mr. Schroer and myself.

Page 311

1     Q    Right. Were there other e-mails between
2  you and other Library employees about the
3  terrorism specialist hiring process?
4     A    Well, for example, the request for an
5  extension deposition.
6     Q    And did you save all of those documents,
7  as well?
8     A    No. I'm not sure I saved those.
9     Q    Were you asked to?
10    A    Specific -- no. I mean, I was asked to
11 save things that were pertinent to the case.
12    Q    Okay. And did you --
13    A    But --
14    Q    I'm sorry. Go ahead.
15    A    I was going to say, but it is on record
16 that I asked for an extension of the case.
17 Whether I personally have that one in my file, I
18 don't know.
19    Q    Did you get any explanation about what
20 documents might be pertinent to the case?
21       I don't know need to know what the
22 instructions are; but I'm wondering did anyone

Page 312

1  explain to you the kinds of documents that you
2  should be looking for?
3     A    Just all documents relevant to hiring
4  for this position.
5     Q    Okay. And at any point did you ask for
6  clarification of what that would encompass?
7     A    I think I discussed it with general
8  counsel's office a bit, yes.
9        MS. McGOWAN:  We've discussed some
10 hiring actions and matters of employees involving
11 security clearances. And Ms. Russell and I have
12 discussed determining whether or not there are any
13 documents sort of relating to those matters. And
14 our understanding is that we will submit those
15 requests to you.
16       And in the event that there are
17 documents responsive to that request, we can
18 discuss whether or not there is a need for having
19 just a brief discussion about what is in those
20 documents; but, otherwise, I have asked you all
21 the questions that I have for today. So thank
22 you, very much for being here.

Page 313

1        MS. RUSSELL:  Before we go off the
2  record -- well, we may have a few questions. But
3  can we just have a moment?
4        MS. McGOWAN:  Sure.
5        (Recess)
6        MR. ESSEKS:  I just want to put on the
7  record the fact that we had an exchange of
8  information with your witness. And I just want to
9  let you know.  Your witness asked if she needed to
10 keep the notes that she was taking. And we told
11 her --
12       MS. McGOWAN:  I suggested that she
13 should, but --
14       MR. ESSEKS:  And then we said you really
15 should talk to your counsel. So I just wanted
16 that to be on the record that we had that.  We
17 also said that in light of the fact that those
18 notes, your witness suggested, might well help to
19 remember who people A through B are, might be
20 helpful.
21       MS. McGOWAN:  Right.
22       MR. JAMES:  Off the record, please.

Charlotte P. Preece

Washington, DC

January 11, 2007

Page 314

1    (Discussion off the record)

2    EXAMINATION BY COUNSEL FOR DEFENDANT

3 BY MS. RUSSELL:

4    Q   I just have maybe one or two questions

5 about a question that Ms. McGowan posed to you

6 earlier, and that is the factors that went into

7 your decision to reconsider your recommendation

8 about Ms. Schroer. And you noted that using 100

9 as a guide, you said security clearance 90

10 percent, and then credibility 5 percent, and then

11 contacts 5 percent.

12    Now, isn't it true that you also were

13 concerned about Ms. Schroer's possibly deceiving

14 you or her deception?

15    A   Yes.

16    Q   And isn't it true that you were also

17 concerned about her ability to focus on the job?

18    A   Yes.

19    Q   Given her surgeries?

20    A   Yes.

21    MS. RUSSELL: Okay. I have no other

22 questions.

Page 315

1    MS. McGOWAN: Okay. So we're done.

2 Thank you.

3

4

5

6    (Whereupon at 5:40 p.m., the

7    deposition of CHARLOTTE P.

8    PREECE, was adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 316

1 A C K N O W L E D G E M E N T   O F   D E P O N E N T

2

3 I, CHARLOTTE P. PREECE, do hereby acknowledge I have

4 read and examined the foregoing pages of testimony, and

5 the same is a true, correct and complete transcription

6 of the testimony given by me.

7

8

9 _____    _____

10 Date            CHARLOTTE P. PREECE

11

12

13 SUBSCRIBED AND SWORN to before me

14 this _____ day of _____, 2007

15

16

17    _____

18    NOTARY PUBIC

19

20 My Commission Expires:

21

22

Page 317

1    CERTIFICATE OF NOTARY PUBLIC

2    I, BARBARA A. HUBER, CSR, the officer

3 before whom the foregoing deposition was taken, do

4 hereby certify that the witness whose testimony

5 appears in the foregoing deposition was duly sworn

6 by me; that the testimony of said witness was

7 taken by me in stenotypy and thereafter reduced to

8 print under my direction; that said deposition is

9 a true record of the testimony given by said

10 witness; that I am neither counsel for, related

11 to, nor employed by any of the parties to the

12 action in which this deposition was taken; and,

13 furthermore, that I am not a relative or employee

14 of any attorney or counsel employed by the parties

15 hereto, nor financially or otherwise interested in

16 the outcome of this action.

17

18

19    _____

20 BARBARA A. HUBER, CSR

21 Notary Public, in and for the District of Columbia

22 My Commission Expires: March 16, 2007

8(    s 314 to 317)