UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-----------------------------x
DIANE J. SCHROER, : VOLUME II
Plaintiff, :
vs. : Civil Action No.
JAMES H. BILLINGTON, : 05-1090(JR)
Defendants. :
-----------------------------x

TUESDAY, MARCH 13, 2007, 10:00 A.M.
DEPOSITION OF CHESTER W. SCHMIDT, JR., M.D.

Pursuant to notice, the deposition of CHESTER W. SCHMIDT, JR., M.D., Tuesday, March 13, 2007, commencing at 10:00 a.m., at the United States Attorney's Office, 36 South Charles Street, Fourth Floor, Baltimore, Maryland 21201, before Belinda D. Lomax, Notary Public.

Ref No.: 8869-6

Def.'s Ex. 7

APPEARANCES:

On behalf of Plaintiff:

SHARON M. MCGOWAN, ESQUIRE
KEN CHOE, ESQUIRE
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004-2400
(212) 549-2593 phone
(212) 549-2650 fax

On behalf of Defendant:

BEVERLY M. RUSSELL, ESQUIRE
JULIA K. DOUDS, ESQUIRE
U.S. Attorney's Office of the District of Columbia, Civil Division
555 4th Street, North West
Room E-4915
Washington, D.C. 20530
(202) 307-0492 phone
(202) 514-8789 fax

APPEARANCES (continued):

On behalf of the Library of Congress:

JESSIE JAMES, JR., ESQUIRE
CHARLES L. TETREAULT, ESQUIRE
Library of Congress
Office of the General Counsel
James Madison Memorial Building
Washington, D.C. 20540-1050
(202) 707-1595 phone
(202) 707-1594 fax

CONTENTS

EXAMINATION OF CHESTER W. SCHMIDT, JR., M.D.

| | PAGE |
|---|---|
| BY MS. MCGOWAN | 236 |

| EXHIBITS | MARKED |
|---|---|
| 41 - Curriculum vitae | 326 |
| 42 - Article | 353 |

PROCEEDINGS

CHESTER W. SCHMIDT, JR., M.D.

having been duly sworn, testified as follows:

EXAMINATION

BY MS. MCGOWAN:

Q Good morning, Dr. Schmidt. I'm here with my colleague, Ken Choe. We're continuing your deposition. As you have been sworn, your testimony today is under oath. We went through a series of instructions last time. Unless you feel that you would like me to go over them again, we can just proceed with our questions.

The only thing that I will just sort of remind you is that if you don't understand a question, please ask me and I will be happy to clarify it or ask it again. If you do answer the question, I will assume that you have understood the question. Is that okay?

A Yes.

Q And is there any reason that you would be unable to give complete and accurate testimony today?

A No.
Q I wanted to start off by going over a few items we discussed at the end of the first part of your deposition. I wanted to refer you to what was marked as Exhibit 40 last time previously.
MS. MCGOWAN: Do you have a copy? Do you need one? I have an extra one for you.
BY MS. MCGOWAN:
Q And the last time we were together I believe that we established that this is a list of cases where you have been offered as an expert. Just to clarify, in none of the cases on this list were you offered as an expert on issues of gender, gender identity, gender identity disorder, and/or transsexuality, correct?
A No.
Q And I believe that you testified that there are only two cases, which actually don't appear on this list, where you have served as an expert on issues related to gender, gender identity, gender identity disorder, and/or transsexuality, and those cases were the

transgender prisoner case in Massachusetts and a case involving the IRS regarding the question of whether sexual reassignment surgery is medically necessary or elective surgery; is that right?
A The Koselik case is on this list. Okay.
Q So in addition to the Koselik case, there is one other case not on this list where you have been offered as an expert on gender, gender identity disorder and transsexuality, correct?
A That's correct.
MR. CHOE: I'm sorry. May I clarify for the record? In response to Ms. McGowan's first question, you answered no. Did you mean that no, her characterization is not correct?
THE WITNESS: Yes, because there is a case on the list.
MS. MCGOWAN: Thank you. Ken.
BY MS. MCGOWAN:
Q So we have the Koselik case and the IRS case are the only two case where you have been offered an expert on issues of gender, general identity disorder and transsexuality, correct?

A Correct.
Q And with respect to each of those cases, do you recall the approximate date when you were retained as an expert?
A Koselik is now a year and a half, almost two years, I think, a year and a half at least in the process, and the IRS case is -- my guess is about eight months.
Q Thank you. I can take that back since we're done with that now. You mentioned that you were involved for a time preparing a monograph on gender identity disorders with Paul McCue and another person named Mr. Slavney; is that right?
A Dr. Slavney.
Q Can you spell that?
A S-L-A-V-N-E-Y.
Q Do you recall the name of the monograph that was ultimately published?
A No. I think you've got it wrong. I said I had started thinking about doing one myself.
Q Okay.
A But not in collaboration with them, but

using a model that they have developed for -- what's the right phrase? For formulating cases that are psychiatric. They have developed a model, and I was going to use that model as the framework for a monograph that I think I had told you that the more I got into it, the less sure I was of what I was going to say or do. I have not completed that monograph.
Q Okay. That's helpful. Thank you. So there was no ultimate publication actually produced?
A That's correct.
Q What was the framework that you were exploring as far as with respect to this monograph?
A Well, Dr. McCue and Slavney, the model that they have created parses psychiatric conditions into four categories: Disease, behavior, dimension, and life story. Those four components or aspects of any psychiatric case are at play in understanding that particular case with some -- for any one case, one or more of those four aspects can be predominant in understanding the

Page 241

case.

For example, schizophrenia is probably a neurodevelopmental disorder and falls into the disease model although there are behavioral, dimensional and life story issues associated with every case. The other cases, you know, that we call the walking wounded, relatively mentally healthy people who are stressed or anxious or depressed, it's more likely their life story is a predominant aspect of understanding their particular case and the disease.

There may be some disease. There may be some behavioral issues. There may be some personality/dimensional issues at play, but the life story is probably the predominant aspect of that model that helps to understand their particular case, or that particular case.

Q And why did you discontinue your work on this monograph?

A Well, I haven't really discontinued it. I just haven't -- I haven't completed it.

Q In your thinking about this monograph, do

Page 242

you agree with this four-point framework that was developed by Dr. McCue and Slavney?

A. It's really not a matter of agreement or disagreement. It's more a matter of finding an appropriate way to apply the model to gender identity disorders. I have had difficulty sorting that out. So that has been part of the delay in my completing that monograph.

Q And have you consulted with either Dr. McCue or Dr. Slavney in the course of your work on this monograph?

A No, not specifically about the monograph. They are both colleagues at Hopkins. I see them from time to time but I have not consulted with them specifically about the monograph.

Q Have you prepared any drafts of any sections or portions of the monograph so far?

A I have. I've got bits and pieces that I have collected. I'm not very happy with it.

Q During our discussion a few weeks ago, we were talking about the various conclusions in your report, and there were just a few I wanted to go

Page 243

over just to make sure that I am clear about your response. Then we will tackle some new material

First, you testified that gender identity is a social construct and not a biological fact; is that right?

A That is correct.

Q You also testified that there is no credible science either proving or disproving any biological explanation for gender identity; is that right?

A That's correct.

Q When I asked you whether you considered this to still be an open question, do you recall agreeing with me?

A I do.

Q So my question is if there is no credible science either proving or disproving any biological explanation for gender identity, then how are you so certain that gender identity is exclusively a social construct and in no way influenced by biology?

MS. RUSSELL: I'm going to object to the

Page 244

question. It misrepresents Dr. Schmidt's testimony. If you understand, you can go ahead and answer.

THE WITNESS: Because it is -- it's an aspect of sex that has been developed in the field as an understanding of one aspect of sex. Other aspects of things like gender role or sexual orientation, they are -- they are, if you will, made up of concepts that speak to the social aspect, I believe, of sex and are, you know, obviously have a relationship to sex but they are not -- they are not biologic in the sense that sex, I believe, is biological.

BY MS. MCGOWAN:

Q And when you say "it is an aspect of sex," what is the "it" you're referring to?

A In this case, it is gender identity disorder. I mean gender identity.

Q Okay. Do you believe that sexual orientation is exclusively a social construct, or do you believe that there is any biological influences with respect to sexual orientation?

MS. RUSSELL: Objection: Relevance. Go ahead and answer.

THE WITNESS: I think that has -- the same issue applies. There is no credible scientific support either for or against a biologic basis for sexual orientation or necessarily for it being a social construct. So that, to me, the question is just as open as it is for gender identity. But there has to be -- in my mind, there has to be some sort of anchoring point. Otherwise everything gets relative and then you get lost in the relatively.

The one thing that we do know that's biologically based is sex is determined by xx or xy chromosomes, and that, I think, is pretty well nailed down. The other things, the other aspects of sex are these aspects that have been developed as concepts that, as of yet, have no for sure biologic basis.

BY MS. MCGOWAN:

Q And when you say that these were concepts that have been developed, developed by whom?

A By people, by scientists, you know, clinicians and scientists in the field.

Q If a person's sex is their chromosomal configuration as xx or xy, then why aren't all children genetically tested at birth to ensure that the proper sex assignment is made?

A I think that's a cultural, social, legal issue.

Q What do you mean?

A Well, I don't know there is any precedent for doing that. It certainly could be done, but there is nothing that I know of that mandates that.

Q Do you think it should be done?

MS. RUSSELL: I'm going to object: Lacks foundation and relevance. You can answer if you understand.

THE WITNESS: Do I think all you children should be tested? Should be from what perspective? I mean what's the "should be?" What's the context in the "should be?"

BY MS. MCGOWAN:

Q In order to ensure that the proper -- let

me start again. In order to ensure that children are assigned the sex at birth that is consistent with their chromosomal configuration, do you feel that children should be tested to ensure that their medical records are an accurate reflection of what you said is their true sex?

MS. RUSSELL: Same objections.

THE WITNESS: I think that the only testing that needs to be done is when there is some ambiguity about the sex of the infant as manifested by the phenotypic morphology. That is if the genitals don't look right or there is something that raises suspicion about the chromosomes. Then I think testing is appropriate. But for the -- for all the rest of the 99 percent of humankind, I don't think it's necessary.

BY MS. MCGOWAN:

Q In the event of this ambiguity, should only the chromosomes be taken into account when assigning a gender to a child? Excuse me. Assigning a sex to a child?

MS. RUSSELL: Objection: Relevance, but

you can answer if you understand it.

THE WITNESS: Well, that's, as you know -- I assume you have done the reading. There is a real debate at this point. At one point in time, it was thought that if there was ambiguity, that the best option for the infant and child and later to be adult was to -- was to do -- was to use surgery and hormones to make the -- to make the person as outwardly -- what would be the right word? Would make it easy for the person to live and function in usually the female role because that's the way the surgery usually went, and that surgeons and parents at that time, at one point in time, felt very comfortable about doing that.

Now, as the literature has evolved, there is real discussion about whether that decision should be taken away from the child and that the child should be raised, even if you are doing whatever you can surgically with the genitalia, what has to be done for certain kinds of functions, principally elimination, and that even with ambiguity, that the person be allowed to grow up

and then make the decision as to how they want to have their genitalia, which is the principal issue, appear and what gender role or gender identity they wish to adopt as adults, and that they make the decision. So I think that people are -- some folks are of a different mind today than they were in the '60s, '70s, and maybe the '80s.

BY MS. MCGOWAN:

Q And recognizing that there are different views out there, what is your view with respect to whether or not chromosomes should be the determining factor in the assignment of a sex to a child?

A Well, that's not a field. That's not something that I do. So I don't -- I'm not going to speak authoritatively about it. I think that's probably, at this point, a decision that has to be made by the parents.

Q Do you agree that a child should be allowed to grow up and develop their own gender identity and be a participant in the decision about whether or not to engage in any surgical procedures

when they were born with ambiguous genitalia?

A That's the same question you just asked. You just asked it in a different way. I believe that's -- I don't believe that that's something that I feel -- that I feel -- I don't believe I have enough contact with that clinical field to take a position on that.

Q Is the fact that chromosomes can't be changed the reason, either in whole or in part, why you believe that a person's biological sex is what their chromosomal configuration would indicate?

A Yes.

Q I believe you testified earlier that a person's hypothalamic sex is also something that cannot be changed once there has been a differentiation; is that right?

A When you talk about the hypothalamus, you're talking about those parts of the brain that are affected by testosterone that then create what we call a male brain versus a female brain?

Q Yes.

A I don't think they change either.

Q So if hypothalamic sex is also something that cannot be changed, then why, in your view, does chromosomal configuration matter more than hypothalamic sex with respect to what an individual's sex is?

A Don't know that you I said that one is more. It's the chromosomes that determine the hypothalamic changes because the chromosomes are the ones that determine whether there is going to be testosterone or not, and it is the testosterone or testosterone-like substances that cause the neurodevelopmental changes that cause the male brain. So they are linked together.

Q My understanding was, when we discussed this last time, that I presented you with a hypo where the genes of an individual were xy but all other aspects, biological aspects of their sex, hormones, internal and external genitalia, and hypothalamic sex, were all female.

You described that as being phenotypically female but genotypically male, that in that case you would describe the sex of that individual as

male?

A Correct.

Q So my question is to the extent that only the one aspect, being chromosomes, is xy, is designated male, but all other aspects, including an aspect that likewise cannot be changed once developed, being the hypothalamic sex, when all of those are female, why, in your view, does chromosomes trump everything else with respect to what an individual's sex is?

A Because I believe that, again, there has to be an anchoring point from which you start when you say what sex is from a biologic point of view. So, in my opinion, the biologic configuration is that anchoring point.

The fact that there are errors of nature, you know, in very rare cases, that the hypothetical that you gave could be any one of the symptomatic deficiencies that don't allow the testosterone to do what it normally does, to me, does not mitigate the fact that there has to be an anchoring point to be called sex.

Page 253

The fact that we have other social constructs to understand gender identity, gender role, sexual identity, those kinds of things, are fine. They are very helpful constructs, but the biologic anchoring point for me is the chromosomal configuration.

Q And why do you find the immutability of the chromosomes to be the touchstone of sex?

A Because that's what the field has defined it as. I mean, that's what biologists consider sex to be. Again, there has to be some kind of anchoring point or you slip into a kind of relativity that makes things a terrific morass.

Q And are you aware of others in the field of gender identity disorders who would define sex more broadly than just chromosomes?

A Oh, absolutely, sure.

Q When we spoke during the first part of your deposition, you said that the bases for your definition of sex as chromosomal configuration were the following, and I want go through this list to make sure I have the complete list. The

Page 254

dictionary, your knowledge of the field of sexology, your years of usage of the term, the fact that your colleagues use the term sex in a similar way, and the 1972 publication of John Money listed in the references section of your report; is that right?

A Yes.

Q Is there anything else that belongs on that list?

A For the moment, no. I can't think of anything right at the moment.

Q With respect to the dictionary, I just want to clarify. Is there any particular dictionary upon whose definition you are relying for your conclusion that a person's sex is their chromosomal configuration?

A No, I don't think so. I think I looked at a couple of them.

Q Do you recall which ones you looked at?

A I think the Webster and Oxford.

Q Any others?

A No.

Page 255

Q Did you consult any medical dictionaries?

A No, I didn't but that would be a good one to look at, a medical dictionary. That's a good thought.

Q In your view, is there a definitive or a couple of definitive medical dictionaries to which you would look? I'm familiar with law dictionaries but less obviously --

A I think Coomb's, I think, is the principal one, but I'm not sure about that.

Q And with respect to the fact that you mentioned your colleagues use the term sex in a similar way, when I asked you which colleagues used the term sex to mean chromosomal configurations, you mentioned Dr. John Meyer, Dr. Tom Wise, Dr. Paul McCue, all of who are affiliated with John Hopkins; is that right? Do you recall that?

A Yes.

Q When I asked you if you were familiar with anyone else that shares your view that sex is chromosomal configuration, you said that at that time, you couldn't think of anyone specifically.

Page 256

Today do you want to add anyone else to that list?

A Well, I think if you ask any nonpsychiatric physician what is meant by sex, they are going to say that sex is male or female as determined by chromosomes.

Q And why do you think that?

A Well, I'd bet you at least a beer on it because I think it's common sense, I really do. I think it's what we are all taught in medical school by and large, and it's what the biology is.

Q So have you had any specific conversations that you're calling upon when you sort of make the statement that nonpsychiatric physicians would share your definition of the sex?

A No.

Q With respect to Dr. Meyer, has Dr. Meyer published any work specifically addressing the point that a person's sex is their chromosomal configuration?

A Not that I'm aware.

Q Has Dr. Wise?

A I don't think so.

Q Has Dr. McCue?
A I don't know he's done anything specifically to the biology, but some of his -- that piece that he did on surgical sex certainly, I think, speaks to his position about the biology of the issue that we're discussing, yeah.
Q What piece are you referring to?
A It is called "Surgical Sex."
Q What, his thesis in the article?
A Well, he thinks that the surgical reassignment surgery is unethical.
Q And as either a separate conclusion or part of that conclusion, does he discuss what we're talking about here, namely what is sex?
A I don't think specifically, but I think if you read the article, you can infer what his position is with regard to the logic, his logic. I don't want to -- my reading of his article is that the logic is that the biology is not altered in gender identity disorders, and that people are normal x or xy males or females, and that it's

medically unethical to be providing the surgery that destroys normal tissue, and that it's the only --
Although there are some stereotaxic surgeries that are available for very difficult cases or treatment resistant cases for obsessive compulsive disorders and there have been some stereotaxic brain surgeries for a couple other disorders that have been done, kind of refinements of the old lobotomies, which are, of course, discredited, it is one of the few, if only, psychiatric conditions that are treated by surgery, and that it is totally inappropriate from his point of view.
Q And we discussed last time the fact that you do not share Dr. McCue's view that it is unethical categorically to perform sex reassignment on individuals with gender identity disorders, correct?
MS. RUSSELL: Objection to the form. You can answer.
THE WITNESS: That's correct.

BY MS. MCGOWAN:
Q But with respect to the premises that you were discussing earlier with respect to the fact that biology is not altered notwithstanding sex reassignment, and that sex is chromosomes, those are some of Dr. McCue's conclusions that you do agree with, correct?
A Yes. If I'm reading him correctly and inferring correctly, I would agree with those, if in fact I am understanding his position correctly.
Q On your C.V. and in your expert report you state that you teach psychiatry at John Hopkins, correct?
A I do.
Q How long have you taught psychiatry?
A Probably 40 years now.
Q Do you teach specifically about gender identity in all of your courses?
A In all of my courses?
Q Right.
A No. The only place we teach medical students and house staff or residents about gender

identity is within the context of the sexual behavior consultation. We do do -- we are responsible -- and from time to time I do it and sometimes I don't do it -- we are responsible also for the year one and two courses, I think, in human sexuality in which there is, I think, one lecture on gender issues. But the bulk of my teaching experience with regard to gender identity disorders is within the clinic that I co-founded 36 years ago.
Q And is it accurate to describe the clinic as more of a specialized program within the psychiatry department?
A Absolutely, yeah. It is devoted to human sexual disorders.
Q When was the last time that you taught about gender identity?
A Two weeks ago.
Q And in the clinic setting, do you teach exclusively about gender identity disorder, or do you also discuss gender identity as a concept more generally?

MS. RUSSELL: Objection: Vague.
THE WITNESS: The teaching and instruction is done. Some of it is done -- is didactic. That is lecture. Most of it is done -- is done through the process of doing evaluations on patients in which the residents and medical students have a part.
The teaching is a, you know, classic master/apprentice style where you have one or two residents and a couple medical students and you work on a case together. Through the evaluation of the patient and discussion about that particular patient, you are able to talk specifically about the gender identity issues of that patient but then talk about gender identity in general.
Also, we use a case conferencing methodology to present cases of gender identity. Not infrequently I'm the case conference -- I'm responsible for the case conference. So the case is presented to me in front of a substantial group of people.
I hear the case. Then I examine the

patient in front of the group. I'm responsible for developing a discussion about that particular case and the issues related to that particular case and about gender identity issues in general. So it's very clinically oriented.
BY MS. MCGOWAN:
Q How many patients are presented or examined in the clinical setting in the course a semester?
A It's usually -- there are six-month rotations. I probably personally evaluate -- I tried to figure this out -- four or five such cases per year. Then I hear -- I'm part of the clinical conferencing on another four to six cases a year. So I have direct involvement in something like, you know, easily a dozen cases a year.
Q When we were talking about the setting in which you teach about gender identity disorders, are these evaluations and case conferences the setting where this teaching is taking place?
A Yes, it is.
Q Are there other settings -- I think you

described more lecture formats; is that right? Are there other settings where you teach about gender identity outside the clinical setting?
A Yes. We do presentations to the medical students and the residents on -- the afternoon clinic begins with a didactic presentation for about 45 minutes to an hour, and part of the series of presentations that are made for each six-month rotation are three or four presentations about gender issues.
Q So these presentations, are they made at the beginning of the six-month rotation, or is there an introduction to gender identity before students go into the clinical setting? I'm just trying to get a sense of how the more traditional teaching lecture model interacts with the hands-on clinical teaching that you do.
A I think in terms of the series of the lectures, that there is probably at least one of those lectures early on in that six-month rotation so there is some knowledge base for the residents because we can't determine how the cases are going

to come in. We have to give them some information because they are going to start seeing patients right away although they are third year residents. So they are not -- they are experienced.
But the gender identity disorders, the sexual dysfunctions and paraphilias, which are the three major groups of disorders that the clinic deals with, are really quite new to them despite having already logged two years, two and a half years of residency. So the lecture series is constructed in order to give them some base knowledge because they are going to start seeing these patients right away.
Q With respect to these lectures, are you the individual giving the lectures?
A I give some of them, yeah, and we rotate them. There are three or four of us who put these lectures together over the years and we modified them. It depends. Whoever is available to do the lectures does it, does the lecture.
Q Are there independent lectures given on each of the topics, like one lecture on sexual

disorders, one lecture on gender identity disorders, and one lecture on paraphilias?

A There is more than one and there are different aspects for each of those three major groups.

Q So to the extent that you discuss the different aspects, I guess I just am wondering whether or not one lecture would cover more than one of these subtopics. So would there be one lecture, for example, on sexual disorders and gender identity disorders in the context of one lecture, or are the subject areas broken out into the individual lectures?

A They are broken out into individual lectures.

Q Have you given lectures in each of these areas?

A Yes.

Q Is there one of the areas, sexual disorders, gender identity disorders, or paraphilias, that you have lectured on more than the other two?

A Probably more an gender identity disorder and human sexual dysfunction and a little less on the paraphilias.

Q Within the field of psychiatry, do you have any specializations?

A Well, the human sexual disorders is one.

Q And in part because I don't know the proper name for the specializations, can you tell me what are your specializations within psychiatry?

A Human sexual disorders, administrative psychiatry, general adult psychiatry, and I had a long experience, although I stopped sometime ago, but I consider myself reasonably expert in the area of suicide.

Q Anything else?

A That's enough.

Q What, in your view, is encompassed within the specialization of human sexual disorders? Are there subcategories within that specialization?

A Sure: Gender identity disorders, paraphilias, and sexual dysfunction. Those are the three major groups listed in the DSM.

Q In the context of the lectures that you give students on gender identity disorder, is it safe to assume that you review with students the DSM discussion of gender identity disorders?

A Yes, we do.

Q What other texts do you use with your students in the course of both the lectures and the clinical training?

A I don't know if I would say I use -- that we use specific texts.

Q So, for example, do you regularly ask your students to read peer reviewed articles in the field of gender identity disorder as a part of this course?

A We usually put together a reading list for any of the -- there is usually a reading list associated with each of the lectures, each of the presentations, one or two papers that are relevant to that particular lecture.

Q And do you recall any specific journal articles you asked students --

A I'm not prepared to do that today.

Q Of the three subspecialties within human sexual disorders that you identified: Sexual dysfunction, paraphilias, and gender identity disorders, do you consider yourself a specialist in each one of those three?

A Yes.

Q And do you have more experience in one of these three than the others, or would you say they are roughly equivalent?

MS. RUSSELL: Objection: Asked and answered.

MS. MCGOWAN: I don't know if it was asked and answered. So let's get it on the record just to be clear.

THE WITNESS: It's roughly equivalent.

BY MS. MCGOWAN:

Q In your report and on your C.V., you state that you co-founded the Sexual Behaviors Consultation Unit of Johns Hopkins Hospital in 1971. I assume that's right?

A Yes.

Q What background and training with respect

to gender identity disorders did you have prior to 1971 leading up to your co-founding of this clinic, or of this unit? Excuse me.

A The only -- well, the experience that my co-founders and I had was our general training in psychiatry and exposure to some cases that were coming through the out-patient clinic. So we didn't -- we had limited experience.

There wasn't -- there weren't any specific programs in our training programs at that time and there were very limited programs, if any, around the country. We did have -- we did have John Money and his group on-site within the department.

The gender identity program at Hopkins had already started. I think it started in '67 or '68, and it had been functioning for a couple years already. So there was some general interest in the department, but there was nothing organized specifically within the department of psychiatry.

Q Prior to your joining the Sexual Behavior Consultation Unit, were you involved in the gender identity program of Dr. Money you were just

discussing?

A Yeah. I was given one of the early cases to do an evaluation on, male to female. It was just passed down to me from the rest of the faculty and I ended up having to do the evaluation. I had, of course, no experience whatsoever. It was the first case that I was involved with. I had to do a lot of reading and trying to catch up.

Q Did you work with John Money in the course of evaluating this patient at all?

A No. The process was that -- the evaluation process was administratively and clinically independent of the gender identity group that John Money was the director of. So the work that I did on this particular case, and I think any other case as it came through whoever did the evaluations, was submitted to the committee, which consisted of John. I think there was a psychiatrist.

I think eventually John Meyer got on that committee when he came back from the National Institute of Mental Health after his training at

NIH and then came back. There were surgeons on the committee. I think there was a lawyer on the committee. I think there was a layperson on the committee. There was a group of people that would screen the people who wanted to have surgery and who ultimately got surgery at Hopkins.

So my limited early experience was I did the evaluation on this particular case and submitted my evaluation to that committee who then did whatever they were going to do. Then I followed that particular person for maybe -- I think two or three months while he was in the process of getting ready for the surgery.

Q So was your evaluation one that actually recommended this person as a candidate for surgery?

A No, that wasn't -- it's not an issue of recommendation. The people who recommended the surgery was the gender identity disorder group headed by Money. My role was to do an evaluation essentially to rule out any psychiatric contraindications for the surgery and to make sure the person wasn't severely depressed, they weren't

schizophrenic, there wasn't some other psychiatric condition that would have precluded the surgery.

Q So at some point, did the Sexual Behavior Consultation Unit merge with John Money's gender identity program, or did they remain distinct?

A Always was distinct. It was no more and no less than John Meyer, myself and a nurse that worked for us getting together one day and saying, "All of this stuff is going on. We have no focus for learning about this or teaching."

I was directing the outpatient department. I had control over space. I had control over resident time. I had control over staff. We said, "Why don't we suggest to our boss," who Joel Wilkeys was the chairman of the department, "propose to him that we put this program together and if it's supported, we will start it." That's exactly what happened and it's been running for 36 years.

Q So you co-founded this program with Dr. John Meyer; is that right?

A I did, and a nurse named Jane Lucas, who

Page 273

is now Jane Lucas Blaustein.
Q Did you and Dr. Meyer confer with Dr. Money about how your program might interact with his program?
A No. We were -- we saw our role in the department of psychiatry as being clinically and administratively distinct. We never had a formal discussion with John. Of course, both John Meyer and I saw John not infrequently. We're in the same building.
But we decided from the outset that certainly John Money and his group had no interest in the paraphilia or the sexual dysfunctions, and it was only around the issue of the gender identity disorders that we had to think about creating this arms and length relationship in order to have a clear administrative and clinical role for our group.
Q And when you say that the two programs were distinct, how were they kept distinct from each other?
A Different personnel, different functions,

Page 274

and different focus of clinical responsibility, and probably most importantly, the financial support. The financial support of the clinics were set up administratively separately.
Q And when you say that the programs had different -- each one had a different focus and different function, to the extent those are distinct concepts, what do you mean by "different focus?"
A Our focus is on clinical work, teaching and research. Money's program was developed solely to determine the suitability of candidates for surgery.
Q And anything else as far as distinctions between the focus of each group?
A I think that's it.
Q As far as the distinction between the functions of the different groups, different units?
A We were doing teaching of house staff officers and medical students and faculty. Our plan was to do clinical research, and we were a clinical resource for the patients who had any form

Page 275

of human sexual disorders.
Q The function of Dr. Money's group?
A Was specifically to screen candidates for surgery.
Q Now, with respect to the candidates that Dr. Money's group screened, once his unit decided that the candidate was an appropriate candidate for surgery, would your unit be involved at all in actually performing the surgery for these candidates?
A Are you crazy? We're not surgeons.
Q I didn't know if there were any surgeons affiliated with your unit.
A No, no.
Q So candidates who are approved for surgery would be referred to the Hopkins Hospital structure where the surgeons operate, correct?
A Well, those surgeons, some of those surgeons were on John's committee. There was a plastic surgeon, the guy who is the head of plastic surgery. I can't think of his name. Edgerton. Then there was at least one person from OB-GYN.

Page 276

So, you know, we're operating in separate worlds, you know. One is a surgical world and we're psychiatry. Quite separate.
Q And with respect to the clinical work that was done in your unit, the Sexual Behavior Consultation Unit, did you have any responsibility for screening patients for their suitability for surgery, or was that the exclusive domain of Dr. Money's unit?
A Our role, from time to time we were asked to do the evaluations on people who wrote to Hopkins and said, "I'd like to be considered for surgery." Some of those people, particularly the ones who were geographically close, would be referred to our group for the initial psychiatric screening. The screening, once again, was primarily to rule out other psychiatric conditions that would have been considered contraindications for going ahead with the surgery.
However, we never made the decisions about surgery. We would see the patients. We would evaluate them and send our evaluations to Dr. Money

and his group. Then they would use that. They would use that as they will, you know, as they would in their own deliberations.

Q Were there any members of the Johns Hopkins administration that were in a supervisory role to both your clinic and Dr. Money's clinic?

A The administrative hierarchy under which we worked was ultimately -- was the chairman of the department of psychiatry. That's who we were responsible to.

Dr. Money's group I think was multi-disciplinary. So it involved more than one department. So it involved the department of psychiatry because that's where Dr. Money worked, but it also involved the surgical departments that were involved, primarily plastic surgery, OB-GYN, and maybe urology. To the degree that those departments were part of the surgical sciences, they reported to the chairman, the overall chairman of the department of surgery and surgical sciences.

Q So where Dr. Money's unit reported both to the chairman of the department of psychiatry as

well as ultimately to the chairman of the department of surgery and surgical sciences, your unit was solely contained and solely reportable to the chairman of the department of psychiatry; is that right?

A That is correct. That's correct.

Q Did Dr. Money's unit ever perform evaluations of patients in the first instance along the lines that you described, evaluations to assess whether or not there were comorbidities that would make a candidate inappropriate for surgery?

A I don't think so. I think they always -- I think they always had someone else outside them do it. So that they were -- I think they relied on other people like us to do those evaluations.

Q So in your report you mentioned that during the 1970s, your experience with patients with gender identity disorder involved not only the initial evaluation and diagnosis, but also involved psychotherapy and the treatment of patients; is that right?

A That's correct.

Q So what did treatment of these patients involve?

A What it involves is assisting them in thinking through the series of decisions they have to make with regard to transitioning, and within that, setting up specific goals with regard to life issues, family, work, school, whatever, making whatever adjustments they need to make, thinking through the implications and consequences of how they manage relationships that are meaningful to them in the course of even considering the transition, communicating that information to other people, to those people who are important to them, helping them develop coping strategies, assessing their skills for coping, and if there are specific issues, helping them deal with those issues and pretty much thinking through all of the issues related to the -- to such a transition.

Q And when you discuss assisting patients with these issues, do you mean assisting them in the context of therapy sessions with the patients?

A Yes, yeah. For some of them, if there are

-- there are other comorbid conditions that also have to be dealt with if there is depression, alcohol use, substance abuse, other kinds of behavioral issues and problems. They all have to be worked with.

Q Then in the course of treating these patients, would there come a point with any of these patients where surgery became a viable option, in your view, for these patients?

A Sure, yeah.

Q Walk me through the steps of what would happen. What needs to happen in order for you to get to the point where you are satisfied that they are an appropriate candidate for surgery and what would happen next with respect to where they would be treated?

A At that time, the kind of standard, the gold standard was two years of living in the cross gender role while on hormones and successfully functioning in that role. Success is determined by holding down a job, going to school, living independently, having done the things necessary to

Page 281

pass in the cross gender role, and demonstrating pretty much to the person, because that's the person that counts, that they done get the job.

Q The person that you're referring to is the therapist?

A No, the patient.

Q Okay.

A Then if they fulfill that process or carried it off and they wanted surgery, then most of the patients don't ask for a referral. They know who they want to go to. My role in those cases was then to write a letter saying that the patient had worked with me, had met these criteria, and that there were no contraindications for the surgery.

I never recommended for or against and don't recommend for or against because, as I think we talked about in the previous part of the deposition, I strongly believe that this is an elective decision that has to be made by the patient, that the therapist and the care giver should take a completely neutral role in the

Page 282

decision making.

Q During that --

A Except when there are contraindications, either medical or psychiatric and/or medical.

Q During that period in the 1970s when you were involved in the treatment of the patients, roughly how many gender identity patients were under your direct care in the course of a year, say, on average?

A Probably no more than two or three a year because this was a specialty and it was only a part and today it's only a portion of what I do. It's not what I do 100 percent. So I never carried more than two or three patients at a time.

Q With respect to these patients, do you recall roughly how many patients for whom you ultimately wrote the letter that you were describing explaining that you were satisfied that there were no comorbidities?

A I probably only had to write maybe a half a dozen letters because, first of all, I never saw more than two or three patients a year, and many of

Page 283

the patients don't make it. They just don't have the wherewithal either emotionally, intellectually or financial, or a combination of those things to have met those criteria. It's not easy.

Q During the time in the '70s when you were treating patients, you mentioned that this was a portion of your overall workload. What percentage of your time were you spending on the treatment of gender identity patients as opposed to other areas of your work?

A Well, I think you want to put it in terms of the clinical, the clinical load that I did. So I think it would represent no more than 10 or 15 percent of my clinical activities. That is for the treatment side. The evaluation side would add another five or ten percent. So somewhere between 15 and 20 percent of clinical work, the other being general outpatient work and inpatient work.

Q Was your outpatient and inpatient work, this other roughly 80 to 85 percent, was that with gender identity patients?

A No. That's with general adult psychiatry

Page 284

Q Actually, I will take this out so you can refer to it if you need to. It's Exhibit 34, which is your report. I will direct you to Paragraph 7, is what I'm referring to.

In Paragraph 7 of your report you say that you have not treated or managed cases of GID since the mid 1980s, but as we discussed in the previous deposition and as you mentioned in your report, you continue to evaluate patients who come to the Sexual Behavior Consultation Unit. Do I have that correct?

A Yes, you do.

Q So during the period from the mid '80s, when you ceased managing cases, how many patients on average would you say you evaluated per year?

A As I said, it's probably -- as I said, I probably am involved with something in the range of 12 cases a year.

Q After making or -- in the cases where you are evaluating, are you ever being asked to provide a second opinion or confirm somebody else's diagnosis, or are you usually making the diagnosis

Page 285

in the first instance?

A I would say in most of the cases, the diagnosis in the first instance although some of the cases, you know, have been through the hands of other people or other institutions and have come to us for another opinion. It's not so much another opinion. I guess you can say another opinion, but they don't like what they got elsewhere or they are very concerned about what they got elsewhere.

We have seen cases that have been incredibly mishandled, and either the patients or frequently parents recognize that they are going down the wrong trail and have to change, you know, get other people involved because things are going terribly poorly. So I guess you could say that's a second opinion, but it's really -- it's more a matter of their dissatisfaction with what happened elsewhere.

Q What percentage of the cases that you see would fall into that category of people coming to you for additional guidance or a second opinion?

A Maybe 2 or 3 a year out of the 12.

Page 286

Q And is there a trend that you have noticed with respect to what the dissatisfaction is that leads people to Hopkins for a second opinion or additional guidance?

A A trend. I don't think with regard to this aspect, no. I don't think there has been a trend.

Q Are there certain types of dissatisfaction that you hear expressed more frequently than others?

A Generally two groups. One group of these patients tend to be younger people still close in with their family in which there is the -- either the patient and/or the family or both are very confused about the treatment that they are receiving elsewhere and are concerned about the recommendations, you know.

A very recent blatant one was a clinic in New England was pushing this kid through the process of hormones and surgery. He was schizophrenic. He was absolutely off the wall, and the parents realized that something really was

Page 287

going bad here. So they brought their son down. He was in his 20s, and is it was really unfortunate. There are cases like that, less extreme.

Then the other group are patients that have gotten into the hands of people, often psychiatrists, who don't know anything about gender identity disorder and they are completely at a loss as to what to do. They are getting nowhere with the psychiatrists and the therapists with regard to direction, focus or anything. Then they are just -- either the patient or the psychiatrist make the referral because they have kind of lost the thread of where they are going. So one group is a disaster and the others are not as disastrous as the therapy kind of stalled out.

Q After either making or confirming or reevaluating and providing a diagnosis of patients, I believe you testified that after that evaluation, you then refer patients to a provider either in Baltimore, if they are local, or in their home community; is that right?

Page 288

A Correct.

Q With respect to these patients, are you ever consulted in a follow-up way?

A Yeah. What we do is we suggest to both the patient and the person to whom we make the referral that, you know, that the patient come back every three, six months and just check in with us if they think that's going to be helpful to them, and we can then act as a resource for these patients going forward, both for them and for their therapist.

Q Are you ever consulted specifically about whether or not a candidate is an appropriate candidate for a sex reassignment surgery?

A Yeah. I'm in the midst of one of those right now. A patient came six years ago, started working with a therapist, came back recently, reevaluated him, and they are in the process of working with him to decide whether he wants to go forward with surgery or not.

Q With respect to the opinion that is sought from you, am I correct that you see your role as

one of identifying any potential co-morbidities or other disqualifying factors that might exist as opposed to actually recommending affirmatively that a patient go forward with the surgery; is that right?

A Well, it's a slightly different nuance to it. Yes. If there are contraindications, we will deal with them or work with them. If the patient, in my opinion, has no contraindications and wants a letter from me, then I would say what I have done with the patient.

The patients usually give me a release so that we can release their file to the person they want it to go to. We would send them all the information that we collected about the patient, and my letter would say that there are no contraindications for the surgery.

Q What sort of led to your discontinuing the direct treatment or management of cases of GID in the mid 1980s?

A It was mostly just time. By the mid '80s, I had -- I was directing the department of

psychiatry at Bayview, which had grown substantially, and I was also president of the faculty practice plan at Bayview, which was a substantial responsibility because along with the chairman of the medical board and president of the hospital, we were in the process of completely redoing the hospital. So I had a very, very heavy administrative load and responsibilities.

I had to make some cuts somewhere. So I cut down most of my outpatient work. The only inpatient work that I retained was a rotation on my inpatient services at Bayview, inpatient psychiatry, my continuance in the Sexual Behavior Consultation Unit on Friday afternoons, and my taking a rotation in the hospital doing consults for med surg. So I really cut back all my outpatient work that was not related to these functions.

Q Am I correct that the responsibility of heading the department of psychiatry at Bayview was not a gender identity specific responsibility?

A No.

Q Similarly with your responsibility as president of the faculty practice plan, that was more a general psychiatry responsibility; is that correct?

A It was the entire faculty, all the departments.

Q With respect to why you shifted your workload, you mentioned that it was mostly a function of time. Were there any other factors?

A No. It was time.

Q Was your discontinuation of the direct treatment or management of GID cases related in any way to the decision of Johns Hopkins to discontinue sex reassignment surgery for patients with GID?

A No.

Q And do you know why John Hopkins discontinued providing sex reassignment surgery as part of its services for GID patients?

A There was a very good article in one of the Baltimore magazines within the last couple months. I think it's called "Identity." It sets out the history.

I think it's a pretty accurate description of the beginning of the program, the individuals who were involved, the processes of the program, and what led to the discontinuance of the program. It's consistent with my understanding of the history. Of course, I had no direct involvement in those decisions.

The article suggests that the -- that the program ended because of the number of people that were actually getting the operation were relatively few, that there was growing discontent principally among the surgeons with regard to the how ethical this all was. Dr. McCue came on board as chairman of psychiatry and had, even from the outset of his chairmanship, had very definite views with regard to this surgery.

Then John Meyer wrote an article about the follow-up. He was able to find a handful, I think only 14 patients, that had been operated on at Hopkins. He did a follow-up study on them, and the follow-up study says generally that their level of satisfaction with the surgery was pretty good, but

with regard to both their pre-surgical and their post-surgical functions, socially and vocationally, that there wasn't any significant change in their function, and some of the folks that did get operated on had difficulty both socially and vocationally, and they were no better off than they were after surgery than they were before surgery.

So it was a combination of a change in attitude by the surgeons, a very definite position by Dr. McCue. This particular article sort of put the cap on the concerns that the institution was having with this whole process. All along there was a lot of criticism.

Dr. Edgerton, who was the head of plastic surgery, I think left to go to the University of Virginia. He was one of the proponents of the development of the program. So the support within surgery really diminished. It was on the way down anyway but when Milt left and went down to UVA, I think -- and he was already having second thoughts about his follow-up of these patients although he never published anything. So I think the weight of

all of this just led to an institutional decision that it was time to quit, and they did.

Q Before I move on, with respect to your understanding of why Hopkins discontinued its surgical program, is there anything you want to add to the mix?

A I think the only thing that I would add is that despite Dr. McCue's absolute misgivings with this whole field, he specifically allowed me to continue the SBCU knowing that we would continue to provide services to people with gender identity disorders even though, you know, as I said, he thought very strongly, he believed very strongly about surgery and hormones as a way of treating this disorder, if indeed it's a treatment. He allowed me to find a way to administratively and financially keep the SBCU alive and functioning under his -- still within his domain. I still answer to him as my chairman.

MS. RUSSELL: We have been going on for about 90 minutes. Is this a good time for a break?

THE WITNESS: I'm okay.

MS. MCGOWAN: We were trying to get you out of here by 2. We were going for a little bit, take a break, do a second set, and then done, is sort of the goal.

MS. RUSSELL: Okay.

BY MS. MCGOWAN:

Q Do you know why Dr. McCue would have allowed the SBCU to continue to function?

A Yeah. There are two reasons. One, it's one of the, you know, we give -- we have to rate our residents. We have to grade them as they go through. There is a formal process for watching their development and grading their development. We actually have a paper trail and a folder on each of the residents as to how they are doing and what their preceptors, their attendings and teachers think of them. Similarly, the residents rate us as teachers in this paper trail.

This clinic, year and year out, has some of the highest ratings. So it's quite valuable to his program. It was very valuable to his program. And I think out of respect for me and the other

faculty.

Q So just so --

A He is trusting our judgment.

Q So Dr. McCue allowed your unit to continue to operate, but am I correct did he -- was Dr. Money's unit allowed to continue to operate as well?

A No. There was no need for it.

Q Okay.

A I mean, the sole function was to screen patients for surgery. If the surgery isn't being offered, the function went away.

Q So who ultimately made the decision to dismantle Dr. Money's unit?

A I'm not sure. The article doesn't say who either, but I think it was probably John -- I mean Paul McCue and George Ditem, who was the chief of surgery. I think these two department heads, in collaboration with all of the people involved, reached a consensus to stop the program.

Q And as far as the reasons why Dr. McCue was comfortable allowing the SBCU to continue to

operate, is it your understanding that that decision was due in part to the fact that your unit was not involved in surgeries or recommending surgeries for gender identity patients?

A I don't know that he had the actual knowledge that we -- that we did not recommend, that we took a neutral position, but I believe the fact that we were not directly involved in the program itself was comforting to him in the prior program.

Q With respect to the decision by Dr. McCue and Dr. Ditem; is that right?

A Right.

Q To discontinue SRS at Hopkins, you mentioned that you were not directly involved in that decision. Were you indirectly involved in any way, either consulting or --

A No.

Q And other than Dr. McCue and Dr. Ditem, were there any other individuals who were responsible for the ultimate decision to discontinue Dr. Money's unit?

A I don't know whether those two had to talk to the dean of the medical school or not. That's who they ultimately report to, is the dean.

Q One of the facts that you mentioned as being part of the decision to discontinue SRS at Hopkins was this follow-up study by Dr. Meyer. I believe you said that you're familiar with the study?

A Yes.

Q Did you find the study to be methodologically sound?

A Well, there has been at least one book written about that article. It's, you know, it's in the eye of the beholder. At the time, it was one of the few follow-up studies. So the fact that folks found methodologic flaws, you know, they are entitled to their opinion, you know.

I thought then and I think now it's one study of relatively few good follow-up studies that -- well, relatively few follow-up studies. I don't think there are any great ones, including John's, but it's all we have.

Q And do you think that the ability of a patient or a patient's social and vocational function are the proper measure of whether or not SRS has been considered successful for a patient?

A I think it's certainly an important component of whether the surgery and the hormones have been effective, yes.

Q Do you think that reducing patient distress with respect to their gender identity disorder is an important factor in determining whether or not a surgery has been a success for that patient?

A It depends upon what you mean by distress. I don't know what you mean by distress.

Q I think we discussed last time that in the DSM, one of the elements that is part of the diagnosis of gender identity disorder is that an individual experiencing some level of distress or discomfort with the fact that their gender identity is not consistent with their anatomical.

So to the extent that my question is about reducing that stress, is the reduction of that

stress an appropriate indicator of whether or not a surgery has been successful for that patient?

A It's one indicator.

Q With respect to an individual's ability to function socially and vocationally, how does the existence of social discrimination against transgender people impact the viability of those factors with respect to assessing whether or not a patient has been successful as a result or whether or not sex reassignment surgery was successful for a patient?

MS. RUSSELL: Objection to the form.

THE WITNESS: It depends upon the case. In individuals, female to male patients, probably those issues -- there is probably not a lot of discrimination because they pass so successfully. Male to female, from a strictly physical point of view, they in general do not have the same level of success in passing that the female to males do.

BY MS. MCGOWAN:

Q And, Doctor -- I'm sorry.

A I'm not near done. You asked a big

question. This takes a lot of words.
Q Sure.
A So if there is a level of distress that is related to any issue of discrimination, it is often driven by the ability of the person to pass in a comfortable manner, which includes their social and vocational functioning. So usually if they are -- if they physically pass well and there is no challenge to that, and they are doing well in these other aspects of their lives of what anybody has to do, there is no discrimination and there is no distress associated with discrimination.
If, on the other hand, you have got somebody who transitions and is in everybody's face about it and draws attention to themselves constantly, there is discrimination and frustration and distress. So fortunately those are extremes, an extreme example.
But there are patients, particularly in the male to female, who are unstable characters before they get the surgery that remain unstable afterwards and behave in just incredibly outrageous

ways and draw a lot of attention to themselves, and are severely discriminated against because they are being outrageous, if nothing else. That causes them a lot of distress.
Q With respect to Dr. Meyer's study, do you recall the sampling of patients that he examined? Were they all male to female or was there a mix of female to male and male to female?
A I don't remember the specifics and I haven't studied it for today for that kind of query.
Q Are you familiar with -- do you agree with Dr. Meyer's conclusions in that study?
A Well, there is nothing to disagree about with regard to his particular sampling. Of course, as you know, he only got a portion of the total universe of patients that were operated on.
One of the concerns that people have about the paper is that it was, you know, selection bias and then his own biases crept into the paper. So, you know, as I said, it is what it is. That's all. It's not a matter of me disagreeing or agreeing.

He did something that, for the first time, provided a little factual information about those 14 patients. That's all you can say about it.
Q So to the extent that Dr. Meyer was purporting to conclude that surgery did not in fact actually benefit transgender patients, do you have an opinion with respect to that?
A I don't think he said that. I think he said that, you know, my reading of the paper was that the people presented themselves as they were. It was most of them were very satisfied about it, but in terms of his ability to get an assessment of their social and vocational function, that there were no significant changes pre-op and post-operatively.
I don't think he speaks to whether they were doing better or not better. They were doing pretty much the same. If you wish to interrupt that as not doing better, that's your interpretation.
Q But is it correct to say that Dr. Meyer's study was actually one of the factors, I believe

you said, that was involved in Hopkins deciding to discontinue its surgical program?
A Yeah, I think it was used politically.
Q Did you agree with that decision to discontinue surgery?
A I have no opinion about that.
Q At the time, were you asked to weigh in as far as your opinion one way or the other?
A No.
Q And just so that I'm clear as far as today, do you have an opinion about whether or not that was the right decision or whether or not you think Hopkins should resume surgical services?
A They are two different questions.
Q We can break that out. The first question is today, do you think that the decision of Hopkins to discontinue surgery in the late '70s or early 1980s was correct?
A Correct? What do you mean by correct?
Q If you had been the decision maker, would you have made the same decision?
MS. RUSSELL: Objection: Calls for

speculation.

THE WITNESS: As I said, I have no opinion about that.

BY MS. MCGOWAN:

Q Today, if you had the ability to resume SRS procedures at John Hopkins, do you think that you would do so if given that opportunity?

A You mean if I had control of the apparatus of the entire medical school?

Q Yes.

A Probably not.

Q Why not?

A Because I don't think that -- I don't think the culture of Johns Hopkins would be conducive to that surgery, to a program like that.

Q By culture, what do you mean?

A I mean the attitudes of the leadership of the medical school would not be supportive.

Q What are those attitudes that you are describing?

A I think Hopkins is a very conservative place, medically conservative place and politically

conservative place. Therefore, that's -- I think my speculation is that those attitudes would not be conducive to developing a surgical program again.

Q Other than the attitudes of individuals at John Hopkins, are there any other reasons why, if the decision were left to you, you would choose not to resume surgical services at Hopkins?

MS. RUSSELL: Again, objection: Calls for speculation and relevance.

THE WITNESS: No. I think that's sufficient, you know. I don't believe you can run upstream or swim upstream against those attitudes.

BY MS. MCGOWAN:

Q How did those attitudes influence the work of the SBCU to the extent that you are involved in nonsurgical treatment of patients with gender identity disorder?

MS. RUSSELL: Objection: Lacks foundation.

THE WITNESS: They really haven't. They have kind of left us alone. We're in the Department of psychiatry, which is not -- never a

major department within the medical school. We haven't caused anybody any trouble. The residents like the work and the medical students think it's a terrific experience, and the patients, for the most part, are pleased by what we do and, you know, are happy with what we can help them with.

So we haven't drawn a whole lot of attention to ourselves. We're not on anybody's radar screen. We just go about our business.

BY MS. MCGOWAN:

Q What percentage of the work done at the SBCU is specifically dealing with gender identity disorders as a percentage of the whole?

A Probably in terms of numbers of patients, probably about a quarter of the total number of evaluations during the course of any one year. That would be my best guess.

Q Is that translated into numbers? Twenty-five percent of? What's the overall number that we're drawing from?

A It's teaching and training. In effect, we do two to three patients each Friday afternoon.

Then the clinic itself, which runs during the rest of the week and is located elsewhere, Hopkins Greenspring, probably takes another two or four patients.

So if you said the range of new evaluations, something like I would say maybe five or six a week. You multiple that by 52 weeks. That would be the total number of evaluations done a year. That's the ball park.

(Ms. Russell left the room.)

Q Are there other institutions, academic institutions or medical institutions, that provide the sex reassignment services that Hopkins discontinued in the late 1970s, early 1980s?

A You have me confused. Provide the surgery?

Q Provide the surgery for a gender reassignment.

A I don't think there is any academic medical program doing it now. I'm not aware of any. There are -- there are, you know, there are people who are in the field in different academic

centers providing outpatient services: Eli Coleman's group up in Minnesota, Steve Levin in Cleveland. I don't know if they still have people at Stanford. Stanford had a very active program for a while. Crenshaw, I don't know where she is, maybe Oklahoma, maybe Nebraska.

There are experts in the department of psychiatry scattered all throughout all the medical schools in America, but I don't think anybody has the kind of program that we have that has a mandatory rotation for residents as a part of the program, as part of their residency training. Certainly no one has had it for 36 years. I don't think anybody has a program.

We had Eli Coleman in our place recently. He said he wished he had something like this and he's not aware of anything like it. Most of the exposure for residents in psychiatry is on an elective basis or a very limited basis. Having a built in six-month rotation like this is unique.

(Ms. Russell entered the room.)

Q So I believe you have identified

Minnesota, Cleveland, Stanford, and then the institution that Dr. Crenshaw is affiliated with as institutions that provide --

A Those are examples. That's not the full list. The Clark Institute has a lot of good folks working in human sexuality.

Q Are you aware of whether any of these institutions have discontinued or have eliminated sex reassignment surgery from the repertoire of services that they offer patients with gender identity disorder?

A I don't think any of them offer surgery. I don't know -- I know that Stanford formally did but I don't think Stanford does anymore, but I wouldn't bet the farm on it. Most of the surgeries are being done privately, private in the context of private practice and most of it being done by plastic surgeons.

Q Since Dr. McCue shut down Dr. Money's clinic --

A I don't think that's an accurate characterization.

MS. RUSSELL: I was going to object to form.

BY MS. MCGOWAN:

Q Since Dr. Money's clinic has discontinued operation at Johns Hopkins --

A That was not a clinic. That was a group.

Q It was a group. Okay.

A A screening group. Dr. Money did lots of other things besides that.

Q I'm trying to actually sort of start from the time it closed. Since the mid 1980s, are the professionals affiliated with the SBCU still permitted to write letters on behalf of patients seeking surgery?

A Yes.

Q Which we were talking, before I move on, we were talking about the fact that there has been some scholarship criticizing Dr. Meyer's study; is that right? Are you familiar with that?

A Some of it, yes.

Q. Are there any criticisms of Dr. Meyer's study that you agree with?

A Well, I think in general the criticism that it's a very limited study are true. It's 14 patients. That means a lot. I mean, it's only 14 patients. At the time, that was 14 more than anybody else had done, but it is what it is. It's 14 patients.

Q Are you familiar with any criticisms of the study with respect to Dr. Meyer's examination of social functioning and vocational functioning as measures of whether or not surgery actually produced any positive or negative effects for patients?

A Yeah. I think some of the critics have said that the measures he used weren't necessarily the best and questioned why he even chose to use that.

Q With respect to those criticisms, do you agree or disagree with those criticisms of Dr. Meyer's study?

A I don't agree with those criticisms. I think social and vocational functioning is a very important indicator of the success of

transitioning, whether it's with surgery or without surgery, with hormones, without hormones.

The ability of someone to live comfortably and function socially and vocationally, regardless of their gender identity or role, is what we usually measure people's general abilities and contentment on. It doesn't make any difference.

It's the same thing I do for managing someone who is severely depressed, you know. Getting them back into life and socially and vocationally functioning is one of the major criteria for success of any psychiatric treatment.

Q I just want to briefly make sure I understand what you have told me about your view of yourself as a person taking a neutral view with respect to an individual's decision about how to proceed with their gender identity transition.

When we talked last time, I believe that you said that you did not believe that it was ethical for providers to advocate either for or against a decision with respect to undergoing a course of treatment unless there are recognized

medical or psychiatric consequences to either taking the hormones, doing the surgeries, or attempting to live in the cross gender role. Is that an accurate statement of your view?

A Yes.

Q And as part of our discussion you said that you take a neutral view and believe that other providers who are involved with patients with gender dysphoria should also take a neutral position with regard to the decision making process and leave it solely in the hands of the individual patient. Do I have that right?

A Yes.

Q By neutral, you mean neither advocate for or against a course of treatment, correct?

A Correct.

Q Have you ever been specifically asked by a patient whether sex reassignment surgery has been shown to decrease the distress associated with gender dysphoria?

A You mean the patient asked that question?

Q Yes.

A No.

Q Do patients or have patients ever asked you specifically for your opinion about whether the potential benefits of undergoing a gender transition would outweigh the potential risks for them in a particular case?

A They would never phrase it that way.

Q Have they ever asked you that perhaps in a slightly different terminology for your specific opinion about whether or not you thought that the benefits for them outweighed any risk or side effects that might result in transitioning?

A No, because they universally demand it. One of the goals is to get them to do that examination. It's one of the goals of therapy, is to have them back off from their demands and look at the advantages or disadvantages for themselves for transitioning. I would fall out of my chair if I got a question like that from a patient.

Q Am I right that you're saying that no patient has ever asked you, "Doctor, what do you think? Do you think the benefits outweigh the

risks or side effects for me?"

A No patient has ever asked me that.

Q Do you offer patients your opinion about whether the benefits of gender transitioning outweigh the risks or side effects in their particular case?

A No, except when there are contraindications, when I think -- when I think that they need treatment for something else and until that's taken care of, that they are not in position -- I don't believe they are in position to make that decision or to do something or to make changes until they seem to -- whatever comorbid condition I believe needs to be taken care of first.

Q And have you ever affirmatively offered your opinion to a patient about whether or not you thought sex reassignment would decrease that patient's distress that they are experiencing as a result of their gender dysphoria?

A No, I never put it in the context of the surgery. I put it in the context of whether they

Page 317

want to transition. I mean, there are patients who transition very successfully without surgery. So the issue isn't the reduction of stress associated with hormones or surgery per se. That's in the service of transitioning. But it's the issue of transitioning, I think, is the key. That's the primary decision.

Q So taking a step back, with respect to the question of do you ever offer your opinion to patients about whether or not, in their particular case, you think that gender transition for them would actually reduce their distress?

A No. That is their decision. They have to make the decision. The cost benefit analysis that they have to do, that you try and position them to do, is part of the work of therapy. That's not their mind set.

They have already made up their minds by the time they come to see us. They are convinced, they are absolutely convinced that that's what they need and want. So part of the therapy is getting them to step back and take a look at what they are

Page 318

doing. Doing that cost benefit analysis, all I can do is act as a facilitator to try to get them to do that so they make the best decision for themselves.

Q So in helping the patient to work through what decision they want to make, in addition to advising the patient about what the side effects may be, for example, of undergoing the hormones, do you ever offer patients information about the positive aspects or the positive results that might come from their undergoing gender transition?

A Well, positive is in the eye of beholder. What do you mean by positive?

Q Well, for example, if a patient were to ask, "Will I no longer have these terrible feelings of hating my body if I undergo a gender transition," is that the kind of thing you talk about with a patient?

A I can't think of that being framed that way. It just doesn't happen that way clinically.

Q So are you saying that patients are so comfortable with what they think the benefits may be of gender reassignment that you only focus on

Page 319

the aspects of gender reassignment that they may not be taking into account as in sort of the side effects of hormones and other sort of potential down sides?

MS. RUSSELL: Objection to the form and to the extent that it mischaracterizes testimony. You can answer.

THE WITNESS: We certainly and I tell the patient, you know, what exactly the hormones do. So we try and give them a factual basis for what the effects of the hormones are going to be. For the most part, those effects are consistent with what the patient hopes for and is expecting. To that degree, you know, it's received as positive information.

The limited down sides pretty much are discounted by the patients, and the fact that for most of the overwhelming majority of the patients there are no serious medical consequences for taking the hormones. So with the exchange of information, it is almost always received as positive by the patient because it's exactly the

Page 320

direction that they are hoping for.

BY MS. MCGOWAN:

Q So just so that I'm clear, in your experience, there has never been a case where you have specifically told a patient that transitioning will decrease their psychological distress associated with their gender dysphoria?

A For some patients, the estrogens in particular have a calming effect. We talk about that, you know, we talk about that as one of the effects on the patients. Of course, the testosterone has the opposite effect. It revs people up and can make people a little on the angry side, on the aggressive side. We review some of those psychological effects.

Q Anything else?

A No.

Q In your view, are there any recognized medical or psychiatric benefits associated with taking hormones, having sex reassignment surgery, or living in the cross gender role for patients with GID?

A Sure. I think the patients who transition successfully feel much better about themselves.

Q And do you advise patients that this is one thing that may result from their undergoing a gender transition?

A No, because I think that would violate this position of neutrality. The patients, I believe, have to be convinced of that for themselves. The way they get convinced is by actually living, doing the real life test, living in that cross gender role and experiencing it firsthand. They don't need to hear it from me.

If I err, I err on the side of being conservative and not crossing over the line of advocacy. So I believe the patient has to discover that for themselves. They do it by actually succeeding and living in the cross gender role as part of the process.

Q In addition to patients feeling better about themselves, in your view, are there any other recognized medical or psychiatric benefits associated with taking hormones, having sex

reassignment surgery, and/or living in the cross gender role?

A I think there have been some studies that state that in addition to having high levels of satisfaction which lead to improvement in their social and vocational function and in their sexual function, but those studies are limited and the level of information particularly about the sexual function is pretty limited as to what people are actually doing. I mean, I certainly know firsthand of a few cases in which the people were doing exceedingly well.

Q Did you advise patients about these possible social, vocational, or sexual improvements in function that may result from their gender transition?

A What we usually do is, again, so that we can avoid being advocates for or against, we make referrals to the local transgender groups where, you know, the testimonials are easily available and they can actually -- the patients can actually have contact with people who are in various stages of

transitioning, some of whom have completed it, so they can see for themselves firsthand rather than, you know --

As you are -- they also try and put -- just as you are, they also try and put me a in position of having to speak about the advocacy issue. I just don't it. You can come at me 100 different ways and I will not change my position.

Q Do you think it is ever appropriate for a doctor to recommend a course of treatment to a patient, or do you believe that a doctor should simply provide the patient with information without offering a recommendation? I'm taking this outside the realm of gender identity disorders specifically.

A Of course we make recommendations with regard to courses of treatment.

Q So why do you take the view that it's not appropriate to recommend a course of treatment when it is a gender identity disorder that's at issue?

A Because, as I think I have testified before, I'm really on the fence as to the

legitimacy of the diagnosis and the condition itself, and am more inclined to see it as elective, not medically necessary, and therefore shifting the responsibility for doing any or all of this onto the patient because no one is going to die. No one is going to die of a gender identity disorder, whereas, if they have diabetes, they are going to die.

Q From a medical and mental health perspective, is it ever the case that it's more harmful for a patient not to undergo a gender transition than to undergo one?

A No, because I think that if a patient decides not to do it, if the patient decides not to do it, then your question doesn't make any sense to me. It doesn't have any context in terms of medical necessity.

Q So you would say that a gender transition is never medically necessary for a patient?

A That's correct, yep.

Q And do you believe that hormone therapy is ever medically necessary for a patient with GID?

A No, it's not.

Q And have you ever recommended hormone therapy as the medically appropriate treatment for someone with gender identity?

A How can you ask me that question when I keep telling you that I don't make recommendations? The decision to do that is the patient's decision. If I thought there was a contraindication, we, fortunately, at Hopkins have a good relationship with the division of endocrinology. The head of that division, Adrian Dobbs, is particularly interested in this.

So when we have people who we think there are no medical contraindications, we can send these folks to an expert who will do an endocrinological evaluation to rule out any problems. If they are placed on hormones, they will not only monitor the hormones appropriately, but will do all the relevant research studies. So we have a terrific advantage of having a division of endocrinology who will take real good care of these patients.

But we don't recommend it. We, again, we

take the position that we are neutral. If you choose to do this, we are going to put you in the hands of an expert.

Q Just to sort of run through the other courses of treatment for gender identity disorder, is it a fair statement that you believe that living in the cross gender role is never medically necessary for a patient with GID?

A That's correct, yes.

Q And similarly, sex reassignment surgery, in your view, is never medically necessary for a patient with GID?

A Correct.

MS. MCGOWAN: Do you want to take a five minute break?

THE WITNESS: Sure.

(Whereupon, a recess was taken and then the deposition continued as follows:)

(Schmidt Deposition Exhibit Number 41 was marked for identification.)

BY MS. MCGOWAN: (resumed)

Q I'm going to show you what we marked as

Exhibit 41. This is a document that was provided to me by the Government. This was bates stamped numbers 10702 through -- the numbers are a little off at the bottom -- 10728, I believe. Do you recognize this document?

A Yes.

Q What is it?

A My C.V.

Q I just want to go through some of the information in your C.V. In your C.V. you note that from 1988 through 1994, you were part of the Sexual Disorders Work Group for the DSM-IV?

A Correct.

Q What is a DSM work group?

A The process for revising DSM-III-R and producing DSM-IV was quite different than the process up to that point in time in any of the other DSMs starting with I up to I, II, III and III-R.

The decision was to make the process more scientifically rigorous and more transparent than the process had been in any of the previous DSMs

because the previous DSMs had been done essentially by an expert panel without any kind of paper trail as to the decision making. So there is no place anybody could go and say, "Well, show me what was done that led to your decision to introduce a new diagnosis or take a diagnosis out or make a modification of the criteria set for a diagnosis."

To do the work, a number of work groups were created. The work groups were given responsibility for specific diagnostic groups. The work group that I was the chair of was for sexual dysfunction and paraphilias. A different work group than my work group worked on GID. So we did not have GID as one of our responsibilities.

Our responsibility was to do literature reviews and to solicit -- to do literature reviews, solicit suggestions, criticisms of the diagnostic categories for which we were responsible, and then to, if we could, address the issues, concerns, criticisms, changes that were suggested to us or recommended to us and support them, if we could, from literature reviews. That is, that there be

some scientific basis for making a change. That's what my work group was responsible for, those two categories, the dysfunctions and the paraphilias.

Q Was there any overlap in membership between the sexual disorders work group and the gender identity disorders work group?

A No, no, there wasn't.

Q And how is one selected to be a participant in a DSM work group?

A The chairman of our work group was a person named Allen Francis. He worked with a number of other people. They just made it their decision by asking around and by getting a consensus as to who they thought had some capability in a particular area and who would, you know, who could function as a good chairman.

Q Do you have any sense of why you were asked to participate in one group as opposed to another, the sexual disorder work group as opposed to the gender identity disorder work group?

A The gender identities had been located in child developmental disorders, in a separate part

of the DSM, for quite a while although it had been moved by DSM-III, I believe. It had been moved into the section it now is in. But historically --

And these are the vagaries, and point directly to some of the criticisms about DSM. You know, I'm not sure why that decision was made but it was made, you know. I was asked to do what I did and I had no control over the decision as to not including the gender identity disorders, which would have made sense to me because they are all grouped together in one section of the DSM, but they weren't and I had no control over that decision.

Q So in 1988, when you were asked to, I believe, serve as the chair; is that right, of the DSM sexual disorders work group?

A Yes.

Q At that time, was your work focused more on questions of sexual dysfunction and paraphilias then gender identity disorder?

A No, no.

Q And today, what percentage of your work is

sexual disorders and what percentage of your work is gender identity disorders?

A Well, I think I already answered that question when you asked me as to the percentage split. In terms of the intake, it's about a quarter of the total evaluation load for the year. So that would be a fair representation of the amount of time spent, that I spend within the SBCU apportioning my time to those three general categories.

Q And of your overall workload, how much of your time is spent at the SBCU as a percentage of your overall responsibilities?

A Well, it's a five-hour block on Friday afternoons. So it's a little more than half a day a week if, you know, you base it on a 40-hour week which, of course, we're not, but if you took a 40-hour week, it's one-eighth. I never was real good at math.

Q Have you ever served on a DSM work group that was charged with addressing gender identity disorder as part of its subject area?

A No.

Q I want to look at your publications on your C.V., if we could, which I believe starts on what's marked Page 7 of your C.V., the bibliography that's listed. Looking at these publications, I'm hoping you can identify for me which publications relate to gender identity disorder or transsexuality?

A Let's start with Number 20. Number 20 has some relationship at least as far as the issue of transvestism or cross dressing. I haven't done much writing about it. Thirty-four has some elements of cross dressing. Fifty-one.

Now, since I gave you this, in the trial before the judge on the Koselik case, I realized I had admitted another article that, again, it more has to do with transvestism and it was really, really interesting. It was in collaboration with George Brown. You may know who George Brown is I'm sure you do.

George and Tom and I did a paper and it did not make it -- this C.V. is -- I'm a full

professor and I really don't care about my C.V. anymore. I made my bones and I don't have to prove myself to anybody anymore. So over the years I have had secretaries, different secretaries, and each secretary, this is an amalgam of the work of these secretaries, and there are mistakes on here.

They tried to absolutely pick me apart in that trial but they didn't get anywhere. But one of the interesting things that came up is that, and I since corrected it. So I can get you another copy. I believe it's corrected.

Q Okay.

A But there would only be one more article that relates to the issue of cross dressing. And because Brown is on that article, you can make of that what you will, that it's there or not there.

Q Then with respect to the other publications here, they appear to be chapters and books. Anything else on your C.V. that you would consider to be related to --

A Well, in those chapters, in the "Principals of Ambulatory Medicine." That's a

medical textbook.

Q That's Number 11 under the "Chapters" section?

A Yeah. It gets repeated over and over again because the book keeps being republished, you know, the next edition, the next edition. But in that chapter there is a certain section on gender identity disorders but it's pretty general.

Q Anything else?

A I think that's probably pretty much it. There may be, you know, maybe 41. Peter Fagan and I did a chapter on psychosexual disorders in clinical psychology for medical students. There is probably something about gender identity in that. In the book, the book that we edited out of the group, there was certainly several chapters on gender identity disorders that we all contributed to.

Q Is that Number 31 you are referring to on your C.V. the report of the work group?

A Yeah, that. No, no, no. That didn't have anything to do with GID.

Q Okay.

A It's all on Page 23. The first book, "Clinical Management of Sexual Disorders," there was material in there about gender identity disorders.

Q Okay.

A So it's scattered around a little bit.

Q Anything else?

A I think that's it.

Q Without going through obviously the entire list on your C.V., on what other topics have you focused your research on in addition to the work that you have done on gender identity disorders?

A You can see earlier on there was a lot about suicide. Most of my initial publications had something to do with suicide and other aspects of sexual disorders, sexual dysfunctions, and some about the paraphilias.

I contributed to a series of articles, you know, 31, 32, 35, 36, 37, on personality disorder issues associated with substance abuse and HIV use, collaborated with the folks in the burn unit on a

number of articles on psychiatric aspects of trauma and PTSD. So, you know, I'd say those are the major areas and there are other isolated things that are aren't on the list here.

Q And with respect to the articles that you identified as being related to gender identity disorders, which I think I have as Number 20, Number 28, Number 34, Number 51, and the articles that you mentioned with George Brown, Dr. Brown?

A Oh, it is in here.

Q Is it?

A Yeah, 38. It did get in here, 38, Page 15.

Q Okay.

MR. CHOE: May I ask to clarify the record? Is this your most current C.V.?

THE WITNESS: I think so. If it's in here, then it's current.

BY MS. MCGOWAN:

Q How would you describe your involvement in the research in these articles?

A I'm not sure what you mean by involvement.

Page 337

Q Not being a scientist, I'm not sure technically what the right terms are, but I understand that there is usually some significance as to being the first author or the second author as far as your role in actually conducting the research as opposed to being someone involved more in developing the analysis.

So with respect to these articles, I'm interested in finding out what your involvement was with respect to both the research and conclusions in the articles.

A Well, I have had various roles depending upon the particular piece that we were doing.

Q So for none of these articles you were first author?

A That's correct, yeah.

Q So, with any of these articles, were you actually involved in the assessment of the subjects of the studies?

A Yes.

Q Is that the case for all of these?

A No. The ones that I wasn't, the sample

Page 338

that George Brown had put together came from Texas. So Tom and I had nothing to do with that. The rest of us on the article helped with the analysis and with writing the paper itself, constructing the paper, thinking through the conclusions, the results and the conclusions sections, making contributions there.

The actual sample came from a sample that Dr. Brown had collected out in Texas. All of the others were from our own clinic.

Q Okay. With respect to your research and writing as opposed to your clinical practice, would you say that you currently had a focus of your research and writing?

A I'm not -- not right now. Except for this monograph I'm working on, I'm not doing a lot of writing. I just changed jobs. So I'm settling into a new position that is like another whole career. So I'm in the midst of a learning curve that I don't have much to contribute to the literature until I spend another year or two. Then what I will be doing is writing more population

Page 339

base and not health care and managed care.

Q You said you just underwent a job change. Just so that I'm clear, a change from what position to what position?

A I stepped down. That's the term that's used. I stepped out the chairmanship at Bayview and now I'm chief medical officer for Johns Hopkins Health Care and chairman of the medical board at John Hopkins Bayview Medicine. It's about two-thirds/one-third.

Q Are you currently formulating either research or article ideas in the area of population based health care, if I have that phrased right?

A Yes.

Q Are you currently formulating research or articles other than the monograph in the field of gender identity or gender identity disorder?

A No. I'd like to get that off my chest.

Q Would you agree that its important to keep up with the research and scholarship in one field?

A True.

Q How many hours a week do you spend

Page 340

reviewing literature in your areas of specialty?

A Well, it's something everyday. Of course, I have done an enormous amount of reading pursuant to these three cases.

Q How many articles per week would you say that you read?

A That have to do with any aspect of my medical work?

Q Yes, as the first part of the question.

A Right. If I had to average it out over the week, I would probably look at two or three articles a day. That does not include the "Wall Street Journal," which is turning out to be one of the better medical journals.

Q And do you read any journals or other publications on a regular basis?

A Well, pursuant to this, yeah. I get the "Archives of Sexual Disorders," and, of course, I read that cover to cover. I'm interested in the field and it's a good journal.

Q Anything else?

A Well, "The American Journal of

"Psychiatrists," "The Archives of Psychiatry," "JAMA," "New England Journal of Medicine," and occasionally "The Lancet."

Q Anything else?

A What will happen is that we -- I helped introduce the research arm into Johns Hopkins Health Care, and the folks who are now functioning in that role feed me articles about population based medicine and managed care medicine and then other articles that I had to do some reading on, pain management, and the substance -- the prescription substance abuse issues associated with pain management. That's been on my plate recently.

Q Of the reading that you do in the course of a week, what percentage would you say involves literature specifically in the area of gender identity and gender identity disorders?

A The last year since I have been first struggling with this monograph, to start with, and then with these three cases, you know, just reading constantly. Everyday I'm doing something. Not only do I have to write for this case, but I'm

writing for the other three cases.

So, you know, almost, you know, a half hour to an hour to three hours a day are consumed by some aspect of one or three of these cases. So I'm up to here with it right now (indicating).

Q As a percentage of your overall reading load?

A I'd say it's at least 30 percent, maybe more.

MR. CHOE: Can I clarify for the record? When the deponent said "up to here with it," he gestured to mid face level.

THE WITNESS: Mid face level, right.

BY MS. MCGOWAN:

Q You're free to amend your gesture if you feel that it's necessary to do so. So prior to getting involved in these three cases and commencing your work on the monograph, what percentage of your overall reading would you say was specifically focused on literature regarding gender identity?

A Probably five percent.

Q And your involvement in these three cases and in the monograph, just so I'm clear, you said that was roughly 18 months ago?

A No, no. The cases go back -- the first case started, I think it was about two years old now. The monograph I had started actually sort of laying out the architecture of it maybe three, maybe almost four years ago, I'm embarrassed to say.

Q Do you participate in any continuing medical education programs specifically regarding gender identity or general identity disorders?

A The only one I do is I do myself for the department of psychiatry on topics in medicine and I do a lecture workshop on GID annually.

Q How long is the lecture? Is it a day-long seminar or one-hour lecture?

A No. It's an afternoon presentation plus workshop probably about three hours, anywhere from 20 to 30 participants.

Q And are you always the presenter of the material?

A Yeah.

Q How long have you done that?

A Five years.

Q So in addition to that program that you put together for Johns Hopkins, are there any other continuing medical education programs that you participate in regarding gender identity and gender identity disorders?

A No.

Q We talked a little bit about the Harry Benjamin Gender Dysphoria Association during the first part of your deposition. We'll call it the Harry Benjamin Association to keep it from being too much of a mouthful. Am I right that you are familiar with the Harry Benjamin Association?

A Yes.

Q What is it?

A It's an organization that is devoted to the study and the care of gender identity disorders.

Q Are you familiar with this organization's work regarding gender identity disorders?

A Sure.
Q How would you describe its work?
A Well, one of the main -- one of its main products are the standards that have been around for a long time. The standards are a description of a model series of treatment and management principals and specifics that lay out, if you will, a course or courses of management and treatment of patients with GID, their evaluation and management of them from the beginning through the end into transition and, you know, conceivably beyond.
I think that's probably what they, you know, what they are best known for. But as a group, they sponsor. I think they encourage research. They encourage the development of clinical programs and in general act as a group of people who wish to take the field forward.
Q Have you ever attended any conferences or workshops sponsored by the Harry Benjamin Association?
A No, I haven't.
Q What is your estimate of the percentage of

people involved in the evaluation and treatment or management of patients with GID who are part of the Harry Benjamin Association?
A You mean across the country?
Q Yes.
A Who are actually dues paying members?
Q Yes.
A I don't know those numbers for sure. I'm going to guess at least a third to 50 percent.
Q Are there any other professional organizations for people who are involved in the evaluation, treatment or management of patients with GID other than the Harry Benjamin Association that you know of?
A Well, I don't know if they still exist. We went to a couple conferences years ago with the International Association for Gender Identity Disorders. I don't know if they are still in existence.
Then I think under the umbrella of sexual issues in general, there are a couple national societies that I belonged to from time to time and

attended their conferences. Again, on the basis of time, I'm not currently involved.
Q Recognizing that you may not be currently involved, do you recall which societies you have been involved in over the years?
A No. I mean there are two. I was a member for two and I can't remember the exact names right now.
Q And you mentioned --
A Maybe they are on here (indicating). I don't know if they are on here or not.
Q You mentioned attending conferences affiliated with some of these societies. Do you recall roughly how many such conferences you attended over the years?
A Well, there was one of the organizations that I went every year for maybe five or six years, but that's been at least ten years ago.
Q And it was an annual conference?
A Yeah, yeah.
Q Have you ever been a member of the Harry Benjamin Association?

A No.
Q Are there any specific reasons why you have decided not to join the Harry Benjamin Association?
A Not really.
Q Are you familiar with an organization known as the International Academy of Sex Research?
A No.
Q Are you familiar with "The Journal of the International Academy of Sex Research?"
A Well, through all this reading, yeah, I am.
Q Do you subscribe to this journal?
A No.
Q Are you familiar with any of the scholarship published by this journal?
A No. I think it's a pretty low impact journal.
Q So have you ever read an article published by the journal, to your knowledge?
A Yeah, I think, because some of the articles that I have had to wade through in the

last couple years associated with this work have come from that journal.
Q Are you familiar with an organization known as the Society for the Scientific Study of Sexuality?
A Yes. I think that's one of the ones I belonged to for a while. As a matter of fact, my colleague, Peter Fagan, I think he was the president. Peter was the director of the SBC for a long time. He made a career change and has now moved into Johns Hopkins Health Care. He's the guy who developed the research arm. But Peter, I think, was the president of that organization for two or three years.
Q What is the organization?
A What do you mean what is it?
Q What is it? As a society, what does it do? Are you familiar with its works?
A Yes. It's a group of dues paying professionals who get together and are interested in the clinical, teaching and research concerning human sexual disorders of all kinds.

Q And I believe you testified that you think that this was an organization that you were a member of at one time?
A I think so, yeah. I think that's one of the ones.
Q Is this the society that sponsored the annual conference that you recalled having attended five or six times?
A Yes.
Q That was roughly ten years ago, right?
A Yeah.
Q And to your knowledge, is the organization still in existence?
A I think so.
Q Okay. Are you currently a member?
A No.
Q Okay.
A No, no. I dropped the membership in the two that I belonged to.
Q What were your reasons for dropping your membership?
A Again, time. The organization, the

national organization, the medical organization that I'm deeply involved in is the American Psychiatric Association. That's another area of expertise, an area of coding, CPT coding and documentation. I have been very heavily invested in that.
I can only do so much in terms of national organizations and time away from work. So I made a choice, and my choice was to devote my time in that particular area.
Q Other than time constraints, were there any reasons why you specifically decided to no longer associate with either one of those organizations?
A It was entirely the time and the ability to devote the time and have a meaningful experience in terms of the time.
Q Other than the organizations listed in your C.V. --
A What page is that?
Q We are now on Page 5 of the C.V.
A Okay.

Q Bates stamp number 10706. Other than the memberships listed on your C.V., do you belong to any other professional organizations?
A No.
Q Do any of the organizations to which you belong specifically address issues of gender identity, gender identity disorder and/or transsexuality?
A Certainly the American Psychiatric Association does.
Q And in what context have you addressed issues of gender identity or gender identity disorders as part of your work with the American Psychiatric Association?
A I personally have not but the association certainly does.
Q Am I right that, the APA, the American Psychiatric Association, is the entity that issues the DSM?
A. The publication of the Abbey Press, meaning American psychiatric whatever. That is owned by the APA, some legal arms-length

relationship.
Q Other than the professional organizations that we have discussed, are you involved in any other type of organization that either deals with or takes a position on gender identity issues?
A No.
Q Are you involved in any organization that either deals with or otherwise takes a position on other sexual identity issues such as sexual orientation?
A No.
MS. MCGOWAN: I'm going to show you an article this we can mark Number 42.
(Schmidt Deposition Exhibit Number 42 was marked for identification.)
BY MS. MCGOWAN:
Q I direct your attention to Page 6 of this article. This is, just for the record, this is an article from the February to April 2003 edition of "Light Magazine," L-I-G-H-T, and the article that I'd like to discuss appears on Page 6 and it's titled "Transgender Sex Change Strategy."

A Okay.
Q In the second column of this article there is a quote that is attributed to you that I wanted to ask you about. In the article you're quoted as saying -- I will read the sentence before it just to give you the context.
The paragraph says, "Other surgeons say that the condition may be acknowledged but sex change operations are not valid." Then open quote, "'Some people consider it mutilating and, of course, the scientific side of it is pretty weak,' says Dr. Chester Schmidt, one of the founders of the Sexual Behavior Consultation Unit of Johns Hopkins School of Medicine in Baltimore." Do you recall giving this interview?
A No. That first sentence is not mine.
Q That's right. The sentence that begins "some people consider it mutilating" is in quotes. Are you saying that that sentence is not yours?
A No. The quotes are mine, because that's what I believe now. I mean that's what I recognize now and I do believe the science is weak.

Q With respect to your use of the word "mutilating" to describe some people's view about sex reassignment surgery, is that an accurate quote?
A Some people do consider it mutilating.
Q And did you have anyone specific in mind when you were referring to "some people?"
A I don't remember. This is in 2003, and I don't remember the interview. I'm pretty sure I was referencing people like McCue and I think it is Paul Federoff from the Clark Institute. And just generally in talking with people around the field over the years, there are people who, both in the field and surgeons and people who are nonsurgeons, who are very, very opposed to this stuff.
Q What percentage of people would you say consider sex reassignment surgery mutilation?
A I have no clue.
Q In your sense, is that a majority view or a minority view about sex reassignment surgery?
A It would depend upon the population of people you were asking.

Q How so? How would it vary among different populations of people, in your view?
A For those of us who are in the field, for those of us in the field and actually taking care of the patients, I don't think there would be anybody in the field who would consider it mutilating because I can't imagine somebody being in the field actually wanting to take care of patients who want to do something like this and actually go ahead and do it. I mean, how would you rationalize being in the field?
So my sense is that people outside the field who are not -- who believe -- who are either not in the field and therefore don't know much about it and the handful of people who are not in the field who know anything about it and have even, you know, allowed themselves to come into contact with these patients, that I believe -- I suspect that 50 percent or more of them would think that it's unethical and mutilating.
Q And what's your sense of the view of your colleagues at Johns Hopkins?

MS. RUSSELL: Objection: Vague.
THE WITNESS: We don't consider it mutilating or we wouldn't be in the field. How could I be doing something that I would have tha kind of thought about?
BY MS. MCGOWAN:
Q But is Dr. McCue still at Johns Hopkins?
A He's an emeritus professor, yeah.
Q Are there other subscribants to Dr. McCue's view that are still associated with Johns Hopkins?
A I don't know if I have ever had a conversation with any of the other faculty specifically about their opinions with regard to the surgery or the hormones.
Q But your view is that sex reassignment surgery not a form of self mutilation, correct?
A It's not self mutilation? If anything, it's physician mutilation. We certainly don't wan people operating on themselves, right?
Q Yes. I wholeheartedly agree with that. How often have you given interviews to religious

organizations or publications? Can you recall?
A Rarely. On this particular topic, rarely.
Q In addition to this interview, do you recall any other time where you have been contacted to offer your opinion about whether or not gender transition is an appropriate course of action?
MS. RUSSELL: Objection: Lacks foundation, but you can answer.
THE WITNESS: I can't -- there well may be other times but I can't remember them because I certainly don't seek these things out and generally try to avoid them because you can get mischaracterized so easily. You have no control over that.
BY MS. MCGOWAN:
Q Do you have a rough sense of how many times you have been; a dozen, less than a dozen?
A Less than a dozen.
Q And have you ever been asked to speak at an event or a conference sponsored by an organization that opposes the concept of gender transition?

A No.
Q Do you believe that individuals with gender identity disorder can learn, either with the help of a therapist or otherwise, to change their gender identity so that it is consistent with their sex assigned at birth?
A I think Steve Levin published a couple cases which he achieved that with psychotherapy. But other than those, you know, anecdotally, I don't know whether they are out there or not. I can't believe that somebody somewhere hasn't done some of it. Anything is possible.
Q But what's your view? Do you think that it's possible for someone to learn a gender identity that is consistent with their sex assigned at birth?
MS. RUSSELL: Objection to form.
THE WITNESS: Yes, I think it's possible. It's more often a matter of accommodation than it is than, if you will, learning. Before I back off the question, what do you mean by learning?
BY MS. MCGOWAN:

Q To the extent that you think the word "accommodating" makes more sense. I was just going to ask you what do you mean by accommodating?
A Accommodating means being content with whatever it is they can achieve with regard to their gender identity. That is if someone, for a period of time, is intensely interested in changing their gender identity and their life circumstances change or they have to deal with the reality of the work it takes to do it and the finances and whatever is motivating them shifts, they make accommodations to what they are and where they are in their life at that particular time, and their motivation for changing their gender identity can go away.
I don't know that you can ascribe that to therapy because there are folks who are in and out of therapy who reach that point. I don't know that it's the therapy that's done it. I think it's their actual life experience that has changed their motivation.
Now, they can still have to some degree

Page 361

the wish, you know. I wish I was a billionaire, but the reality is that I'm not and I just have to accommodate to that. They can have that wish as either from time to time or even every day, but the desire does not have sufficient affective punch to drive them to make change. So they accommodate to who they are and what they are and what their life situation is and go on about their life.

You know, you can have a desire for something and have it be relatively affectless. On the other hand, you can have a desire from it and it becomes all consuming, and the person who is likely to try and do something about is the one that has a lot of affect associated with the desire. So it can come and go and people do accommodate.

Q How often, in your view, is that outcome -- and by outcome I mean that ability of a patient to accommodate their gender identity to their sex assigned at birth -- how often is that outcome achieved or achievable from a medical perspective?

Page 362

MS. RUSSELL: Objection: Lack of foundation.

THE WITNESS: It's not a matter of medical achievability. It's a matter of personal choice and life circumstance. Far more people enter the pipeline than transition. So many people, since more enter the pipeline than eventually get the surgery and transition, people stop.

If you have a starting point here and the ends point is here (indicating), transition with everything, hormones and surgery, as sort of the final product, people find accommodation all along that spectrum. Like I say, there are far more people that enter than ever get out here.

BY MS. MCGOWAN:

Q With respect to those people who are able to achieve that accommodation without undertaking any aspect of gender transition, either hormones, living in the cross gender role, or surgery, how often is that achieved by patients?

A It's very hard to put numbers on that

Page 363

because what happens is people come and go. They enter and exit the system, the medical system, at different points of time.

Some enter and they are in it for a while and they will start hormones, say, and start living in the cross gender role, and then their life circumstances and motivation changes, and they drop off and they disappear. You never see them again. So you have no idea what happens when they reenter.

You know, this guy I'm working with now, he started six years ago all fired and ready to go to surgery. We said, "Well, this is the process that will give you the best outcome." He started it and he's been on and off the hormones and now he's consistently put a series of time together and been on therapy on a reasonably regular basis.

It's complicated because he has bipolar disorder which intermittently needs to be treated because he's gets manic or depressed. So it's a little complicated.

It is extremely heterogenous. Like I was telling you the last time, if you have seen one

Page 364

case, you have seen one case, you know, and that's it. The patients do have this, you know, they start, they stop, they start, they stop, they get forward, they go back, and it has little to do with what we're doing for them medically. It's all based upon what's going on within them and around them in terms of their life situation, their work, their relationships, you know, whatever.

So it's a very difficult -- it's very difficult to answer your question in terms of numbers. All I can do is tell you a lot more people start than ever get out here. What percentage gets this far or this far or this far (indicating), I don't think anybody has ever been able to do that study.

Q In your experience, have you had patients who have been able to, in your view, successfully adjust or accommodate their gender identity --

A Absolutely, sure.

Q -- without undertaking any of the stages of gender transition?

A Absolutely. We talked the last time about

the aging transvestites who are transvestitic their entire lives. They get into their 40s and 50s. They get severely depressed. They become suddenly suddenly, out of the blue, severely gender dysphoric, and you treat the depression and the gender dysphoria goes away and they go back to what their baseline level of function and gender identity was.

So that is one example. That's one clinical example of a group of people in whom there is the appearance of gender dysphoria, and at the time that we see them, you can make both diagnoses. They are both transvestitic and they are also gender identity disordered, and they have a third diagnosis. They have and many of them have a depressive illness that is severe enough to be characterized as a major depressive disorder.

In the midst of the depression, they are intensely interested in getting on hormones and getting surgery and living in the cross gender role. They have been married. They are married. They have children. Their whole life is

constructed around their former gender role and identity.

They change. They get depressed. You treat the depression and the dysphoria goes away and they go back to where they were. They get depressed again sometimes and back comes the general dysphoria. You treat it. It goes away.

Q So for individuals who are only presenting with GID and not other comorbidities like depression, is it your view that it is possible for patients with GID to be able, with the help of a therapist, to adjust their gender identity to an identity that's consistent with their sex assignment at birth?

A I'm going to take the therapist out of it because, as I said, I'm not going to ascribe it just to therapy. It's much more likely to be their own internal motivations and their life circumstances that drive their decisions along this pathway.

If they stop short anywhere along there and stay where they are, they accommodate. They

don't go crazy. They don't kill themselves, you know. From time to time they may be unhappy about not doing this but they work out some accommodation.

Q So by taking the therapist out of it, is it your view that the therapist has no role to play in assisting the patient in making that accommodation?

A Not at all. For the purposes of the deposition and trying to have an idea of where the influences come from, it would be a mischaracterization to say that it's the therapy because I don't think anybody has proven that.

As a matter of fact, most people in the field who are more advocates for hormones than surgery as a treatment are vehemently opposed to the notion that you can use therapy to either hold somebody in place or put them back comfortably in the gender role that's consistent with their anatomy and their biology.

That carries with it the same political heat that, you know, that's associated with

changing people's sexual orientation and putting them back. We're all familiar with that issue. So it carries with it that same – a lot of the same political heat and concerns, nonpolitical concerns.

So for the purposes of this, for this discussion, there has to be some bright line somewhere. I think it would be a mischracterization for me to agree with you that it's the therapy per se that can hold somebody – that leads to personal decisions that lead to accommodation short of hormones or short of surgery or even transitioning.

Q Because my question actually was either in the context of therapy or otherwise outside of the context of therapy. My question was is it possible for individuals to learn to accommodate their gender identity to their sex assigned at birth. I believe you're telling me your experience is yes, some patients can in fact make accommodation; is that right?

A Yeah. I take the word "learn" out of it. I don't know what you mean by "learn." The

patients make the accommodation. Pure and simple.
Q And in your clinical experience, how many patients have you seen have success in making that accommodation without undergoing any other stages of transition, either living in a cross gender role, hormones, or surgery?
MS. RUSSELL: I'm going to object to the form.
THE WITNESS: It's virtually impossible to answer that question because, as I told you, these folks disappear. It's impossible to do the follow ups.
BY MS. MCGOWAN:
Q Limiting it to individuals who have stayed under your care so that you're able to actually assess whether or not they have made such an adjustment.
A The clinic has had some long-term, you know, 10, 15, 20 plus year relationships with a few patients that come back and forth. Of those, there are a couple patients who have made accommodations short of surgery. These are patients that have

stopped and started the hormones multiple times throughout those 10, 15, or 20 years.
They never get themselves to the point where they become candidates for surgery because they never behaved consistently enough. It has nothing to do with the therapy per se. They are in and out of therapy. They are in and out of the hormones. They are in and out of cross dressing. They are in and out of cross gender living.
Q So, in your view, should people with gender identity disorder who can make that accommodation be encouraged to do so?
MS. RUSSELL: Objection to the form, relevance.
THE WITNESS: You're coming at me again with the same question. I take a neutral position. It's the patient's choice.
BY MS. MCGOWAN:
Q With respect to question of whether or not an individual could adjust from a same sex sexual orientation to a different sex sexual orientation, do you have a view on whether or not they should be

encouraged to do so?
A You have to repeat the question.
Q Sure. With respect to individuals -- well, do you believe individuals can make similar adjustments with respect to their sexual orientation and adjust to a different sexual orientation when at different points in their life they have --
MS. RUSSELL: Objection as to form and relevance.
THE WITNESS: I'm not going to answer any questions about sexual orientation. I'm not going to do it. If we're talking about gender identity disorder, the issue is not sexual orientation and I will not answer any questions about it. I'm not prepared to do so and I will not be prepared to do so.
MR. CHOE: Ms. Russell, you do understand that the deponent has an obligation to answer that question?
MS. RUSSELL: I'm not so sure. I think he already provided -- it's not relevant. He's not

being offered, as far as his testimony, on homosexuality. He's being offered as an expert for his opinions on GID. So I'm not quite sure.
MR. CHOE: As you know, relevance is not a proper ground for not answering a question in a deposition, and certainly we are entitled to know his views on issues in his area of expertise. We're here deposing an expert.
THE WITNESS: I'm not an expert. I'm not going to say I'm an expert in homosexuality.
MR. CHOE: But he's an expert in the field of psychiatry.
MS. RUSSELL: We're not presenting him as an expert in the field of psychiatry. We are presenting him as an expert --
MR. CHOE: He has represented himself to be. We are entitled to know what his credentials are as an expert.
MS. RUSSELL: Asking about his opinions on homosexuality is not asking about his credentials as a psychiatrist.
MR. CHOE: We're entitled to know what

Page 373

his views are and assess them against what the views are of others in the field. I can't imagine a basis for not answering this one question.

THE WITNESS: Well, I can tell you what my basis is. That it's a mine field because of the field's attempt to maintain some distance between the issue of GID and homosexuality. I will say it's artificial to some extent, but in order to have some clarity about GID, to pull homosexuality into a proximity on a clinical scientific basis with GID creates all kinds of problems.

BY MS. MCGOWAN:

Q Dr. Schmidt, the fact that it's a politically sensitive question is not a basis for not answering.

A I said scientific.

MR. JAMES: He said he's not qualified to answer. He said that he's not qualified. You keep forcing him to answer that. If he's not qualified, he can't answer. We're not offering him as an expert in that area and he has indicated he is not qualified.

Page 374

MS. RUSSELL: He also offered that he is not prepared.

MR. CHOE: But I think you're confusing the purpose of the question. We're not attempting to conflate issues of gender identity and sexual orientation. We're seeking to explore his general expertise as a psychiatrist. That is all.

So we're just asking for his view, whether expert or lay, on this question. And you are certainly welcome to qualify his answer in that way if he wishes.

MS. RUSSELL: I'm still going to object on relevance grounds and on the fact that he's not being presented to provide testimony nor did he prepare for purposes of providing testimony in this area.

MR. CHOE: If you wish to qualify the answer in that way, that is your prerogative to do. We certainly would concede that.

MS. MCGOWAN: And that objection is on the record.

BY MS. MCGOWAN:

Page 375

Q So the question still stands.

A And the question?

MS. RUSSELL: Why don't you ask the question again?

BY MS. MCGOWAN:

Q Do you believe that an individual with a same sex sexual orientation can adjust their orientation to a different sex sexual orientation?

MS. RUSSELL: It's the same objection.

MS. MCGOWAN: The objection is on the record.

THE WITNESS: I think some people say they have. There have been some recent – NPR is one of my sources. There was a very recent section on NPR about these faith based programs that do some sort of faith based psychotherapy or counseling.

On the section there were testimonials of I think two people who said that they had made the -- they had a homosexual orientation and they had made an accommodation to a heterosexual orientation as a result of their exposure to this faith based

Page 376

process. So my answer to the question is I guess some people who have a homosexual orientation can change that orientation, or at least they say they can.

MR. RUSSELL: That's based on your listening to?

THE WITNESS: To NPR.

BY MS. MCGOWAN:

Q Do you believe that those individuals who can change their orientation from a same sex to a different sex orientation should be encouraged to do so?

MS. RUSSELL: Objection: Relevance.

MS. MCGOWAN: The objection is noted on the record. We're close to the end. If you can answer our questions --

THE WITNESS: It's strictly up to the person. It's up to what the person wants for themselves.

MS. MCGOWAN: We're close to the end. So we will take a brief five-minute break and figure out what we need to do to wrap up.

THE WITNESS: Okay.

(Whereupon, a recess was taken and then the deposition continued as follows:)

BY MS. MCGOWAN: (resumed)

Q The first question I have is just to clarify an exchange that we just had before we went off the record briefly. When I was asking you about whether or not people can adjust their gender identity, I may not have necessarily said it but I was referring to people with gender identity disorder and whether or not they can adjust their gender identity. I just want to make sure that you understood that that's what I meant so we weren't talking in cross purposes.

A I did.

Q With respect to the monograph that you have been discussing today, my recollection during the first part of this depositions was that you indicated that you had discontinued working on the monograph and had found the project a little untenable. So I just wanted to get some clarification. Is this a project that you're still

working on or is it a project you're not working on anymore?

A I kind of stalled out but I'm still working away at it. The answer to your question is yes. It's still something that I would like to do.

Q Roughly how many hours a week would you say you devote to working on that project?

A Right now?

Q Right.

A If you count all the reading that I'm doing pursuant to these three cases, it's substantial, and that will be a beneficial side effect of this work.

Q It's always nice to be able to multi task.

A It is.

Q Have you served on any peer review panel for articles related to gender identity or gender identity disorder?

A Yeah, I have. The last one was in the "American Journal of Psychiatry." I think it's 203 or 204. It was done in Holland, a Dutch psychiatrist. If I remember the bottom line -- I

mean, I reviewed the paper and I had so many criticisms of it that I essentially helped them rewrite the paper.

Their findings had to do with they found an enormous amount of psychiatry comorbidity in the population sampled of gender identify disorder patients. The psychiatrists in general, I think, found that they were quite diverse in terms of their criteria for making the diagnosis, and that there was lots of disagreement as to the treatment.

I think one of the focuses was on -- I think it was on adolescence. Some aspect of the study dealt with adolescence. I think the psychiatrists were pretty much against doing anything with adolescence. So there were different aspects and different foci of the paper and it was kind of scattered around. But they eventually put it together well enough to get it published in the "American Journal of Psychiatry."

Q Do you remember who the lead author of the article was?

A I don't.

Q Do you remember roughly what the final title of the paper was?

A I don't know. Something like survey of a Dutch psychiatrist with gender identity disorder, something like that.

Q Other than serving as a peer review for this article, have you peer reviewed other articles relating to gender identity or gender identity disorder?

A Over the years, a couple, not many, but I don't remember them. I know I got some to do.

Q And when we were talking earlier about articles that you have worked on and been listed as an author for relating to gender identity, we were talking a little bit about the distinction between first author and other authors.

With respect to those papers, how would you describe the difference in your level of involvement in each of those projects as compared to the first author? Is that a meaningful distinction, or were all of the authors listed as equal participants in the project?

Page 381

A Generally the first author does most of the work and should do most of the work. That is not always the case but they should. Then the last author is usually reserved for the most senior person on the paper. Then everybody between makes varying levels of contribution.
So sometimes the idea, the idea can be any one of the author's but the first author takes responsibility for doing most of the work even though it was not his or her -- primarily their idea. So it really is quite variable.
Q As far as your daily routine, we talked a little bit about the fact that you spend, am I right, it's half a day or Fridays at the Sexual Behavior Consultation Unit?
A Yes.
Q And you work a five-day or more week. Would you say that you work a full-time schedule?
A Yes, I do.
Q How many hours per week do you spend serving as a retained expert witness in connection with litigation?

Page 382

A I get about anywhere from a low of maybe 8 to maybe a high of 15 cases per year, and it never represents more than about, at the max, 20 percent of my total income, and it fluctuates every year. Last year it was a very big year, as you can see. It was really busy.
Q As far as your percentage of your workload?
A I have to do it extra. I do get -- something like today, we at Hopkins get 22 days a year in which we can do outside consulting or this kind of work or anything that's independent of our direct responsibilities. So in terms of depositions and the one or two trials per year, I doubt if I consume those whole 22 days. So whatever. If you said I consumed the whole 22 days, it would be 22 of whatever our work year is minus vacations and holidays.
Q We talked briefly in the context of whether or not you would advocate for resuming surgical services at John Hopkins if the decision were yours. If I remember correctly, you said that

Page 383

one of the reasons why you would not push for that is because of the culture at Johns Hopkins is a conservative one. Is that a fair statement of your view?
A It's not a matter of pushing it. I just wouldn't take it on. I wouldn't do it. I wouldn't attempt it because I don't think it would work.
Q But was I right? Am I right that conservative was the word you used to describe the culture at Johns Hopkins?
A Yeah. Hopkins is medically conservative. By and large, if you don't have scientific proof for the efficacy of whatever you do to a patient, they generally don't do it.
Q In addition to being medically conservative, in your view, is Johns Hopkins a socially conservative place?
MS. RUSSELL: Objection: Relevance.
THE WITNESS: It used to be less so, much less so. For example, we're spending an enormous amount of energy in diversity issues now. Hopkins has become very socially aware of things like

Page 384

diversity, equal opportunity employment, disparities in health care, you know, head on, direct, very important social issues. I think the institution has come a long way.
BY MS. MCGOWAN:
Q And from a --
A Socially. It's always been at the top medically.
Q And as an institutional matter, are there -- how would you describe the social attitudes with respect to transgender people or people with gender identity disorder?
MS. RUSSELL: Objection: Lacks foundation.
THE WITNESS: Well, I can only speak to my own experience in which I and my clinic and our work has been tolerated for 36 years. The department of endocrinology, their work in terms of giving hormones and monitoring them has been tolerated. I think those facts speak for themselves.
BY MS. MCGOWAN:

Q And by tolerated, what do you mean?
A That we haven't been told to stop doing what we're doing.
Q And have either you personally or those associated with your clinic done anything at Johns Hopkins to raise awareness about issues affecting transgender people?
MS. RUSSELL: Objection: Relevance.
THE WITNESS: Sure. We give that course, and as part of the course that workshop is included. We also provide this educational program, you know, that is, I think, very unique for an American medical school, both training, the house staff training, and the SBCU itself is unique.
I think, you know, its presence -- every resident, every psychiatric resident has passed through our hands for 36 years. Every medical student spends a couple days with us in the clinic.
So we, you know, we wish we could do more with the medical students but it's a very crowded curriculum. To Hopkins' credit, they give us some

time in the curriculum, and to the department's credit, they devote a substantial portion of the residents' time to this when they could fill that time with many, many other things.
BY MS. MCGOWAN:
Q So would you describe Johns Hopkins as being a place that's supportive of the needs of transgender people?
MS. RUSSELL: Objection to the form.
THE WITNESS: The institution? The institution, if you're talking generalities, the institution is not on the radar screen. The track record of the clinic itself in terms of the high marks that it gets from the residents and the medical students goes a long way in maintaining the continuance of that clinic.
Its record is what it stands on, you know. Hopkins in general will accept that kind of record. If we were doing a poor job teaching and the residents gave us lousy marks, we would have been closed up a long time ago.
BY MS. MCGOWAN:

Q Putting aside your clinic work, do you have any personal experience with individuals who wish to undergo a gender transition?
MS. RUSSELL: Objection: Relevance.
THE WITNESS: Yes, I do.
BY MS. MCGOWAN:
Q Please describe that for me.
A I'm compelled to reveal personal things?
Q I'm not asking you to identify anyone by name. I'm just interested in knowing sort of your personal exposure as well as your professional exposure to the issue.
MS. RUSSELL: The objection is standing.
THE WITNESS: I have no protection in terms of my family? Are you going to force me to speak about my family?
BY MS. MCGOWAN:
Q We can, just so we're clear, we actually do have a standing protective order that's in place that covers material that actually implicates matters that may implicate the private interests of third parties. So that's something I believe that

will be covered by the protective order. To the extent that any information would be used in any way, it would be under seal.
A In all of these years, I have never been subjected to anything like this.
MS. RUSSELL: I'm going to instruct you not to answer.
MS. MCGOWAN: This is not your client. So you can't instruct him not to answer and this is very --
THE WITNESS: This is really dirty.
BY MS. MCGOWAN:
Q Putting aside any family members, do you have any personal experience with individuals undergoing or seeking to undergo or wishing to undergo a gender transition?
A I have had one experience with a colleague whose daughter transitioned.
Q And tell me about that, the nature of your experience with that person.
MS. RUSSELL: It's the same objection: Relevance.

MS. MCGOWAN: The objection is noted and this is part of what --

THE WITNESS: He wanted to talk to me about it and he asked if our clinic could be helpful, and we were.

BY MS. MCGOWAN:

Q You said "helpful" and you said they were. What do you mean?

A Well, his daughter came through our clinic as part of her evaluation.

Q Did you personally oversee her care?

A No, of course not.

Q Do you believe that laws prohibiting sex discrimination should protect individuals who are either undergoing or have already undergone a gender transition?

MS. RUSSELL: Objection: Relevance, calls for a legal conclusion.

BY MS. MCGOWAN:

Q I'm asking your opinion. Do you believe that they should, not whether or not the law does?

MS. RUSSELL: Same objection.

MS. MCGOWAN: Objection noted.

THE WITNESS: I really don't think I can offer an opinion in a general way.

MS. RUSSELL: Calls for a legal conclusion. I'm going to instruct you not to answer.

MS. MCGOWAN: Again, this is not your client. You can't instruct him not to answer.

MS. RUSSELL: He's being presented as Defendant's expert for a specific purpose, not to provide legal analysis.

BY MS. MCGOWAN:

Q I'm not asking you for a legal conclusion. I'm asking you as a lay person with respect to what the law should do. I'm asking you whether you have a lay opinion about whether or not laws prohibiting sex discrimination should protect individuals who are undergoing a gender transition or have undergone a gender transition?

MS. RUSSELL: It's the same objection. It lacks relevance. He's not being presented for his legal opinions as to the law.

MS. MCGOWAN: I'm not asking for a legal opinion.

MS. RUSSELL: You are asking for his personal opinion as to law. He's not being presented for that purpose.

MS. MCGOWAN: His personal opinions are part of what he brings to the table as an expert. He is not your client. You cannot instruct him not to answer. I have three questions left.

BY MS. MCGOWAN:

Q What is your view about whether or not laws prohibiting sex discrimination should cover people who have undergone or are undergoing a gender transition?

MS. RUSSELL: I'm going to instruct you not to answer.

BY MS. MCGOWAN:

Q That is not a valid instruction. I am instructing you to answer.

MS. RUSSELL: I'm going to instruct you not to answer.

BY MS. MCGOWAN:

Q Dr. Schmidt, it's not a valid instruction. Please answer.

THE WITNESS: You guys have got to square this away.

BY MS. MCGOWAN:

Q I can tell you --

A What happens if I don't answer it?

Q We call the judge. He will tell you that there is no basis for Ms. Russell instructing you not to answer and we have got to come back a third day.

A All right. Let's do it.

MS. RUSSELL: Yeah. Let's call the judge. Do you want to do it now?

MS. MCGOWAN: Let's go through a few more questions and we'll see if we can get those under our belt and then we can proceed.

BY MS. MCGOWAN:

Q Do you believe that the Government should be allowed to deny employment to people because they are transgender?

MS. RUSSELL: Same objection, same

Page 393

instruction.
BY MS. MCGOWAN:
Q I have a couple just wrap up questions about the Harry Benjamin Association. During the first part of the deposition you described the Harry Benjamin Association as being an on extreme position on one end of a spectrum that we discussed. Do you recall that discussion?
A I didn't say extreme. I don't believe I used the word "extreme" with regard to the Harry Benjamin Society. I believe it to be if there is a spectrum, it includes advocacy. I believe they are advocates period for treatment of gender identity disorders, and they are more likely than not, I think, their members, to advocate for the use of hormones than surgery. That's my personal opinion.
Q With respect to specialists in the field of gender identity disorder, what is your sense of the percentage of specialists who are associated with the Harry Benjamin Association?
A I think you asked me that.
MS. RUSSELL: Asked and answered.

Page 394

THE WITNESS: I think I made a stab at saying that in the whole field, I thought something in the range of 30 to 50 percent who have some association with them.
MS. MCGOWAN: I know I promised the last break would be the last one, but we have this outstanding issue. I'd like to take a break and then we will come back.
THE WITNESS: You have eight minutes and I'm out of here.
(Whereupon, a recess was taken and then the deposition continued as follows:)
BY MS. MCGOWAN: (resumed)
Q I'm going to try to frame these as limited questions and to not delve too deeply. So my first question is do you have any personal experience with individuals seeking to undergo or actually undergoing a gender transition?
MS. RUSSELL: Same objection: Relevance.
THE WITNESS: The answer is yes.
BY MS. MCGOWAN:

Page 395

Q In the context of those, that personal experience or experiences, singular or plural, whatever the case may be, did you offer any advice regarding what the individual in question should do that is in any way inconsistent with what you have outlined in your deposition as the sort of course of treatment you would undertake with other patients?
A No.
MS. MCGOWAN: We're done.
MS. RUSSELL: We don't have any questions.
(Whereupon, the deposition concluded at 2:00 p.m.)

-----------

Page 396

ACKNOWLEDGMENT OF DEPONENT

I, CHESTER SCMIDT, M.D., do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

__________________
(SIGNATURE)

__________________
(DATE)

CERTIFICATE OF NOTARY PUBLIC

I, BELINDA D. LOMAX, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in stenotypy and thereafter reduced to typewriting under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

________________________