# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

DIANE J. SCHROER, )
)
        Plaintiff, )
)
    v. )     Civil Action No. 05-1090 (JR)
)
JAMES BILLINGTON, )
    In his official capacity )
    as Librarian of Congress, )
)
        Defendant. )
)

---

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant, James Billington, Librarian of Congress, moves for summary judgment in this matter brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et. seq., because there are no genuine issues in dispute and Defendant is entitled to judgment as a matter of law.

Pursuant to Local Rules 7(a), (c) and (h) respectively, a memorandum of points and authorities supporting this motion, a statement of facts as to which there is no genuine dispute, and a proposed order consistent with the relief requested herein are attached.

Respectfully submitted,


/s/ Jeffrey A. Taylor /dvh
_____
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney


/s/ Rudolph Contreras
_____
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

/s/ Beverly M. Russell
_____
BEVERLY M. RUSSELL, D.C. Bar #454257
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia,
Civil Division
555 4th Street, N.W., Rm. E-4915
Washington, D.C.  20530
Ph:  (202) 307-0492
Fax: (202) 514-8780
E-mail: beverly.russell@usdoj.gov


/s/ Julia K. Douds /bmr
_____
JULIA K. DOUDS
Special Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia,
Civil Division
555 4th Street, N.W.
Washington, D.C.  20530
Ph:  (202) 514-5134
Fax: (202) 514-8780
E-mail: jdou@loc.gov

Of Counsel:
Evelio Rubiella,
Associate General Counsel
Library of Congress


-2-

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DIANE J. SCHROER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 05-1090 (JR) |
| | ) |
| JAMES BILLINGTON, | ) |
| In his official capacity | ) |
| as Librarian of Congress, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

After an ample discovery period, the record reflects that summary judgment should be granted to Defendant (or "the Library") in this suit brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., ("Title VII") because there are no genuine issues in dispute and Defendant is entitled to judgment as a matter of law.

Plaintiff, Diane Schroer, a male-to-female transsexual, alleges that the Library did not select her for a position based on her sex because it "believed that [she] did not conform to the gender stereotypes associated with males in our society. . . or because [Defendant] believed that [she] did not conform to the gender stereotypes associated with females in our society." Amended Complaint at ¶¶ 56-57.

First and foremost, transsexuals, like Plaintiff, are not a protected class under Title VII. In addition, Plaintiff's Gender Identity Disorder ("GID") or transsexuality is not in any way akin to a failure to conform to sex stereotypes, nor does an allegation that a transsexual does not

conform to sex stereotypes give rise to a cause of action under Title VII. Furthermore, even assuming that an individual's adoption of a name and choice of clothing which is part of an intentional attempt to present oneself as a member of the opposite sex is akin to a failure to conform to sex stereotypes, the record demonstrates that Plaintiff's claims regarding sex stereotyping lack any credible evidentiary basis. Specifically, there is no evidence in the record that the selecting official, Charlotte Preece, was in any way motivated by stereotypical notions of how men or women in the workplace should look or behave when she decided to not select Plaintiff for the position at the Library. More important, even assuming that any of Ms. Preece's actions could in any way be construed as based on sex stereotypes, Plaintiff cannot demonstrate that the Library relied on those supposed stereotypes to engage in disparate treatment based on sex. Accordingly, Defendant respectfully submits that summary judgment in its favor is warranted and that Plaintiff's claims arising under Title VII should be dismissed with prejudice.

## II.  PROCEDURAL HISTORY

On August 1, 2005, Defendant filed a Motion to Dismiss Plaintiff's complaint. R. 7. In its Motion, Defendant argued that Plaintiff failed to allege a *prima facie* case of employment discrimination under Title VII because transsexuals are not a protected group under Title VII.[1] Id. On March 31, 2006, the Court denied Defendant's Motion. R. 13, Schroer v. Billington, Civil Action No. 05-1090 (JR) (D.D.C. March 31, 2006). In its denial of Defendant's motion, the Court first rejected Plaintiff's argument that she could make out a claim under a theory of sex stereotyping inasmuch as Plaintiff does not seek "acceptance as a man with feminine traits," but

---

[1] Defendant also argued that Plaintiff had failed to state a claim under both the Fifth Amendment of the U.S. Constitution and the Library of Congress Act. R. 7.

rather "to express her female identity."  Id. at 16.  The Court then directed the parties to create a

factual record that "reflects the scientific basis of sexual identity in general and gender dysphoria

in particular."  Id. at 22.  After completing discovery consistent with the Court's Order of March

31, 2006, Defendant filed its second Motion to Dismiss Plaintiff's complaint on April 25, 2007.

R. 30.  However, on June 7, 2007, Plaintiff filed a Motion for Leave to Amend Her Complaint.

R. 33.  On July 3, 2007, the Court granted Plaintiff's Motion to Amend.  On July 5, 2007,

Plaintiff filed her Amended Complaint.  R. 39.  Thereafter, on August 6, 2007, Defendant filed a

Motion to Dismiss Plaintiff's Amended Complaint.  R. 41.

        On November 28, 2007, the Court denied, in part, Defendant's Motion to Dismiss

Plaintiff's Title VII claim.[2]    R. 44, Schroer v. Billington, Civil Action No. 05-1090 (JR)

(D.D.C. November 28, 2007).  The Court did not rely on the expert evidence that it had invited

the parties to submit, and it did not decide whether discrimination based on Gender Identity

Disorder or transsexualism is "literally . . . discrimination because of sex" and actionable under

Title VII.  Id. at 8.  Rather, the Court held that Plaintiff's Amended Complaint had stated an

actionable claim of sex stereotyping under Price Waterhouse v. Hopkins, 490 U.S. 228, 251

(1989).  Id. at 6.  Specifically, the Court stated that "[i]n [Schroer's] amended complaint, Schroer

invokes this line of sex stereotyping cases. . . Schroer does not claim that disclosure of her

gender dysphoria was the singular cause of her non-selection.  Instead, informed by the discovery

she has taken, Schroer now asserts that she was discriminated against because, when presenting

herself as a woman, she did not conform to Preece's sex stereotypical notions about women's

appearances and behavior."  Id. at 7-8.  The Court observed that while "Schroer's transsexuality

---

[2] The Court dismissed Plaintiff's due process and other statutory claims.

is not a bar to her sex stereotyping claim," a transsexual - like Plaintiff - could not support a sex-stereotyping claim under Title VII where her "non-selection resulted solely from her disclosure of her gender dysphoria and her intention to present herself as a woman." Id. at 8.

### III.  STATEMENT OF FACTS

The Congressional Research Service ("CRS") is a Service Unit within the Library of Congress.  Ex. 1.  The current Director of the CRS is Daniel Mulhollan.  Mulhollan Depo. at 12:11-13.  The mission of the CRS is to:  advise and assist any committee of the Senate or House of Representatives ("House") and any joint committee of Congress in the analysis, appraisal, and evaluation of legislative proposals within that committee's jurisdiction, or of any recommendations submitted to Congress; collect, classify and analyze data having a bearing on legislation and make the data available to committee and Members of the House and Senate; prepare and provide reference materials and other information to committees and Members of the House and Senate to assist them in their legislative functions; and prepare summaries and digests of bills and resolutions introduced in the Senate or House.  Ex. 2.

There are six divisions in the CRS including the Foreign Affairs, Defense and Trade division.  Id.  Charlotte Preece has worked at the Library since 1976 and in 1994 was selected, by Mr. Mulhollan, to be the Assistant Director of the Foreign Affairs, Defense and Trade Division. Preece Depo. at 11:6-9; Mulhollan Depo. at 36:20-22; 37:1-5.

In 2002, Congress gave the CRS additional money to create ten (10) new positions - including a GS-15 Specialist in Terrorism and International Crime position ("Specialist in Terrorism position").  Mulhollan Depo. 41:14-22; 42:1-12.  In 2003, Ms. Preece selected a female, Audrey Cronin, for the newly created Specialist in Terrorism position.  Exs. 3 and 4.  In

July 2004, Ms. Cronin announced that she had accepted another position outside the Library and that she would be resigning from the Library that same month.  Preece Depo. at 12:16-17; 13:1-12.  Particularly in the aftermath of the September 11th terrorist attacks, the CRS' client - the United States Congress ("Congress") - relied upon the expertise of the Specialist in Terrorism in the CRS.  Mulhollan Depo. at 40:13-22; 41:1-10; 43:18-22; 44:1-18; Preece Depo. 14:3-6.  Therefore, Ms. Preece appealed to the Director, Mr. Mulhollan, to allow her to fill the position out of CRS' normal hiring cycle.[3]  Preece Depo. at 14:8-22.  Mr. Mulhollan viewed terrorism as a high-profile and important issue and he was concerned that the CRS have the capacity to provide Congress any assistance it needed on this subject matter.  Mulhollan Depo. at 40:13-22; 41:1-10; 43:18-22; 44:1-18.  To that end, Mr. Mulhollan granted Ms. Preece's request to announce the position outside of CRS' normal hiring cycle and on August 12, 2004, the Library advertised the Specialist in Terrorism position which, as previously noted, had recently been vacated by Ms. Cronin.  Preece Depo. at 15:1-7; Ex.5.

Eighteen applicants, including Plaintiff, were granted interviews for the Specialist in Terrorism position.  Ex. 6.  The interview panel was comprised of three CRS managers - Ms. Preece (the selecting official), Francis Miko and Steve Bowman.  Preece Depo. at 73:5-22; 74:1-6.  After the interviews, three applicants emerged as the leading candidates for the position: Kel Britvec, John Rollins and Plaintiff (who had applied under the name "David Schroer" and

---

[3] To assist in succession planning, in the CRS there is a quarterly or semi-annual staffing call whereby CRS Managers establish hiring priorities and inform the CRS' Office of Workforce Development (i.e,. Human Resources in the CRS) of the positions that need to be filled.  Ms. Cronin's unexpected departure did not coincide with the "staffing call" therefore, to expedite the hiring process, Ms. Preece requested that the position be filled outside of the normal hiring cycle.  Preece Depo. at 15:21-22; 16:1-22; 18:15-20.

had at all times during the application and interview process presented himself as a male[4]).

Preece Depo. at 105:12-22; 106:1-5.  After conducting reference checks on Mr. Britvec, Mr.

Rollins and Plaintiff, Ms. Preece decided that she would recommend Plaintiff for the position

because he "had the best interview."[5]  Id. at 119:10-18.

Before Ms. Preece could recommend Plaintiff for the Specialist in Terrorism position,

Plaintiff requested a meeting with her (Ms. Preece).  Id. at 124:2-12.  On December 20, 2004,

during the meeting that Plaintiff had requested with Ms. Preece, Plaintiff informed Ms. Preece

that she (Plaintiff) was under a doctor's care for gender dysphoria and that she was in the process

of transitioning from male to female and that she intended to start her employment at the CRS as

a woman, "Diane." Id. at 140:5-22; 141:1-12.  Based on Plaintiff's revelation, Ms. Preece

expressed concerns about whether Plaintiff's transition from male to female might affect her

ability to obtain the security clearance that was required for the position.  Id. at 149:8-22; 150:1-

15.  To that end, Ms. Preece explained to Plaintiff that she (Ms. Preece) needed to further

consider what Plaintiff had just told her before she could make a final decision regarding her

(Ms. Preece's) selection recommendation.  Id. at 166:7-15.

When she returned to the Library from her meeting with Plaintiff, Ms. Preece decided that

she needed to speak to the Library's Personnel Security Officer, Cynthia Wilkins, regarding

---

[4] Plaintiff is a biological male.

[5] During her deposition Ms. Preece noted that deciding whether to recommend Mr. Britvec, Mr.
Rollins or Plaintiff was "difficult, because the qualifications of the top three people were all
exceptional. [She] would have been happy to have any one of them. . . In terms of their
knowledge . . . the level - - high level positions of responsibility they were given.  Those were all
good and equal.  The distinguishing factor that led Schroer to be my top candidate was his
performance during the interview."  Preece Depo. at 119:20-22; 120:1-8.

questions she (Ms. Preece) had related to the impact Plaintiff's revelation might have on her

ability to obtain a security clearance. Id. at 178:13-22; 179:1-5. Therefore, on the afternoon of

December 20, 2004, Ms. Preece contacted Ms. Wilkins and explained that there was an applicant

for a position who was undergoing a gender transition and that the position required a security

clearance. Id. at 179:9-16; 180:4-16. Ms. Preece asked Ms. Wilkins what impact, if any, the

applicant's revelation would have on the security clearance process. Id. at 179:1-5. Wilkins

Depo. at 128:19-22; 129:1-6. Because this was the first time Ms. Wilkins had ever been

confronted with this issue, she explained to Ms. Preece that she needed to research the matter and

could meet with Ms. Preece the next day, December 21, 2004. Preece Depo. at 179:18-22;

180:1.

      The next day, December 21, 2004, Ms. Preece met with Ms. Wilkins. Kent Ronhovde,

Counselor to the Director of the CRS, Bessie Alkisswani, Associate Director of Workforce

Development in the CRS, and Kathy Deese, Assistant Director of Workforce Development in the

CRS, also attended the meeting. Id. at 211:14-22; 212:1-3, 19-22; 213: 1-2. During the meeting,

based on her understanding of the "Adjudicative Guidelines," Ms. Wilkins explained to those

present at the meeting that the applicant's transsexuality was not *per se* disqualifying. Wilkins

Depo. 69:11-22, 70:1-2; Exs. 7 and 8. Ms. Wilkins also explained that because the applicant

voluntarily disclosed her transsexuality to Ms. Preece, Ms. Wilkins did not think that the threat of

blackmail or coercion was an issue. Id. at 134:3-17. Ms. Wilkins further explained, however,

that because of the applicant's disclosure of GID, as part of the security clearance process, the

applicant would need to be referred to the Library's Health Services Office ("HSO") and that the

HSO's evaluation could take some time. Id. at 69:11-22, 70:1-2; 135:7-15. Moreover, Ms.

Wilkins informed the CRS that she would probably not grant a "waiver"[6] for the applicant to

begin employment until HSO completed its evaluation, the evaluation was favorable, and Ms.

Wilkins completed any additional checks she deemed necessary.  Id. at 99:2-22; 100:1-13; 135:7-

19.

      Based on her discussion with Ms. Wilkins, and upon further reflection on Plaintiff's

revelation, Ms. Preece decided that she would not recommend Plaintiff for the Specialist in

Terrorism position.  Preece Depo at 227:1-22; 228:1-15; 253:17-22; 254:1-11; 268:3-22; 269:1-

5.  Specifically, Ms. Preece declined to recommend Plaintiff because she (Ms. Preece) believed

that Plaintiff, considering her transsexual status and transition from male to female, would be

required to undergo a lengthy background investigation process to acquire a security clearance.

Id. at 227:1-21; 228:1-22.  Ms. Preece was eager for the selectee to start at the beginning of the

new Congress (i.e., the end of January 2005) because, as discussed above, the sudden departure

of Ms. Cronin left a void in the CRS' ability to assist Congress in the area of terrorism.  Id. at

242:7-22; 243:1-5.  Ms. Preece believed that the amount of time it may have taken to process

Plaintiff's security clearance was incompatible with the needs of the CRS at the time.[7]  Id. at

227:1-22; 228:1-21.  Ms. Preece was additionally concerned that because of Plaintiff's transition

from male to female, Plaintiff might be unable to maintain the high-level contacts in the military

intelligence community she had developed in the past and such contacts were one of the required

---

[6] A "waiver" is waiving the Library's requirement that an investigation for appointment to a
critical-sensitive position be completed and favorably adjudicated prior to appointment.  Ex. 11.

[7] Ms. Preece communicated to Plaintiff that the CRS was "moving to hire someone very
quickly."  Schroer Depo. at 106:12-18.  Ms. Preece also told Plaintiff that she wanted the selectee
to start in mid-January because it would coincide with the Congress' new session.  Id. at 117:1-9.

Knowledge, Skills and Abilities of the position.  <u>Id</u>. at 153:16-22; 154:1-3; 157:19-22; 158:1-22.

Ms. Preece was also concerned that Plaintiff might not be viewed as credible by Members of

Congress given Plaintiff's transsexuality.  <u>Id</u>. at 164: 8-22; 165:1-15.  Further, Ms. Preece was

concerned that the transitioning process would divert Plaintiff's attention away from the mission

of the CRS.  <u>Id</u>. at 257:11-22; 258:1.  Finally, Ms. Preece was concerned about Plaintiff's future

trustworthiness, since after appearing at the interview--and in all subsequent contacts including

their December 20, 2004, meeting–Plaintiff presented herself as a male when Plaintiff had every

intention of starting work as a female.  <u>Id</u>. at 160:2-19; 314:12-20.

Accordingly, on December 21, 2004, Ms. Preece telephoned Plaintiff and informed her

that she (Ms. Preece) had decided to recommend another candidate for the position.  <u>Id</u>. at 274:1-

22; 275:1-2.  On December 29, 2004, Ms. Preece recommended John Rollins for the Specialist in

Terrorism position.[8]  Exs 9 and 10.  On February 6, 2005, Mr. Rollins was officially appointed

to the Specialist in Terrorism position.  <u>Id</u>.

## IV.  STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary

judgment if there is no genuine issue of material fact in dispute.  <u>Tao v. Freeh</u>, 27 F.3d 635, 638

(D.C. Cir. 1994).  Under the summary judgment standard, the moving party bears the "initial

responsibility of informing the district court of the basis for its motion, and identifying those

portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits which it believes demonstrate the absence of a genuine issue of material fact."

---

[8] The appointment of the selectee, John Rollins, was approved by the Library's Personnel
Security Office on January 12, 2005.  Ex. 10.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Plaintiff, in response to Defendant's motion, must identify for the Court specific facts showing that there is a genuine issue for trial. Id. at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the non-moving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. See Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 248 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. Laningham v. U.S. Navy, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); Liberty Lobby, 477 U.S. at 251-52 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249-50 (internal citations omitted).

"Mere allegations or denials in the adverse party's pleadings are not enough to prevent the issuance of summary judgment." Williams v. Callaghan, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

-10-

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of [his] obligation to support [his] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." Morgan v. Fed. Home Loan Mortgage Corp., 172 F.Supp.2d 98, 104 (D.D.C. 2001), aff'd, 328 F.3d 647 (D.C. Cir. 2003) and cert. denied, 540 U.S. 881 (2003)(quoting Calhoun v. Johnson, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998), aff'd, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 1999)). See also Marshall v. James, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases"). "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." Marshall, 276 F. Supp. 2d at 47 (quoting Celotex Corp., 477 U.S. at 327).

## V.  ARGUMENT

### A.    Transsexuals Are Not A Protected Class Under Title VII[9]

As previously delineated in Defendant's Motion to Dismiss (R. 7), every Federal court, including another district judge in this Circuit, that has dealt directly with this issue has held that transsexuals are not a protected class under Title VII.  See e.g., Ulane v. Eastern Airlines, Inc., 742 F. 2d 1081, 1085 (7th Cir. 1984)("The words of Title VII do not outlaw discrimination against a person who has a sexual identity disorder."); Sommers v. Budget Marketing, Inc., 667

---

[9] Defendant briefly reiterates its argument that transsexuals are not a protected class under Title VII inasmuch as the Court in its Order of November 28, 2007, did not "decide [at that time] on the alternative theory of [Plaintiff's] amended complaint, whether discrimination against transsexuals because they are transsexuals is "literally" discrimination "because of . . . sex."' Defendant respectfully refers the Court to Defendant's arguments on whether discrimination against transsexuals is discrimination "because of . . . sex," in its motion to dismiss (R. 7) and second motion to dismiss (R. 30).

F. 2d 748, 750 (8th Cir. 1982)("[W]e hold that discrimination based upon one's transsexualism

does not fall within the protective purview of [Title VII]."); Etsitty v. Utah Transit Authority, 502

F. 3d 1215, 1357 (10th Cir. 2007) ("In light of the traditional binary conception of sex,

transsexuals may not claim protection under Title VII from discrimination based solely on their

status as a transsexual"); Underwood v. Archer Management Services, Inc., 857 F. Supp. 96, 65

(D.D.C. 1994) ("In construing Title VII, district courts have ruled [that] discrimination on the

basis of transsexuality is outside [ ] Title VII's protection").

 Since the decision in Ulane, in 2007, certain members of Congress attempted to introduce

legislation that would prohibit discrimination based on sexual orientation and gender identity.[10]

H.R. 2015, 110 Cong., 1st Sess. (2007).  Those members ultimately abandoned H.R. 2015 and

instead introduced two separate bills, H.R. 3685, 110 Cong., 1st Sess. (2007) and H.R. 3686, 110

Cong., 1st Sess. (2007), which would prohibit discrimination based on sexual orientation and

gender identity, respectively.  The decision to abandon H.R. 2015 and introduce two separate

bills was based on the bills' sponsors' perception that including gender identity and sexual

orientation on the same bill might jeopardize the bill's chance for passage on the House floor.

H.R. REP. No. 110-406 at 44 (2007).  Thus, the legislative history of H.R. 2015, H.R. 3685 and

H.R. 3686, and the very fact that such bills have been introduced demonstrates that Congress

recognizes that there are no federal laws (including Title VII) that currently protect individuals

---

[10] As noted by the court in Oiler v. Winn-Dixie Louisiana, Inc., from 1981 through 2001, thirty-
one proposed bills were introduced in the United States House of Representatives and the United
States Senate attempting to expand Title VII to prohibit discrimination on the basis of sexual
orientation.  2002 WL 31098541 *4 n. 53 (E.D. La. Sept. 16, 2002) (listing proposed bills).
None of these proposals to broaden the classes protected under Title VII has been successful.  Id.

from discrimination based on gender identity/transsexuality.  Therefore, the law is clear - - by the

plain language of Title VII, court precedent, and the Congressional efforts to prohibit

discrimination on the basis of sexual orientation and gender identity - - that Title VII does not

cover transsexuals and therefore provides no cause of action for discrimination on the basis of a

person's status as a transsexual.[11]

**B.     An Allegation That a Transsexual Was Discriminated Against Because She Does
        Not Conform to Sex Stereotypes Does Not Give Rise To A Cause of Action Under
        Title VII**

As explained above, even though Title VII clearly does not include transsexuals as a

protected class under Title VII, Plaintiff contends she can nevertheless state a cognizable Title

VII claim by alleging that she was discriminated against because she failed to conform to sex

stereotypes.  Plaintiff's claim of sex stereotyping arises from the Supreme Court's decision in

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).  In Price Waterhouse, the Plaintiff - a female

accountant named Ann Hopkins - was denied partnership in an accounting firm because some

partners in the firm thought she did not conform to their beliefs of how women should behave

---

[11] Moreover, as demonstrated in Defendant's Second Motion to Dismiss, Defendant's and
Plaintiff's experts agree that there is no scientific evidence supporting a presumed etiology of
GID, and what causes GID remains unknown.  See R. 30; Schmidt report at ¶¶ 6,7, see also
Schmidt Depo. at 193:8-21, see also Bockting report at ¶ 19.  Hence, for lack of any scientific
basis for GID or one's sexual identity, there are no grounds to conclude that GID or sexual
identity is synonymous with one's biologic "sex," or that there is any causal relationship between
GID, or sexual identity and any pathologic, neuropathologic, psychopathologic, genetic or
congenital marker.  Thus, there is no scientific evidence that GID and sexual identity are rooted
in biology, but that it is likely a result of a person's psychological makeup or mental processes
which affect that person's behavior, preferences, and choices regarding how they view
themselves with respect to their gender identity.  It follows, therefore, that the word "sex" as
defined and encompassed by Title VII does not cover individuals who have GID or that claim
discrimination on the basis of their sexual identity.

and dress in the workplace.[12]  Plaintiff's transsexuality and the allegations she presents in this

matter are in no way akin to the situation faced by Ann Hopkins.   To say that there is no

distinction between Ms. Hopkins, who was perceived as not conforming to the stereotypical traits

associated with her biological sex, and Ms. Schroer - a male to female transsexual - stretches the

actual holding of Price Waterhouse too far.  There is a huge difference between Hopkins,

perceived by her employer as being "tomboyish," and Schroer, who because of a psychological

condition, believes she is a member of the opposite sex and seeks to present herself as a member

of the opposite sex.  This distinction is not lost on the field of psychiatry:  "Gender Identity

Disorder . . . is not meant to describe a child's non-conformity to stereotypic sex-role behavior

as, for example, "tomboyishness" behavior in girls or "sissyish" behavior in boys.  Rather, it

represents a profound disturbance of the individual's sense of identity with regard to maleness or

femaleness."  See American Psychiatric Association, Diagnostic and Statistical Manual of

Mental Disorders, 564 (4th ed. 1994).

     In fact, Plaintiff's own allegations demonstrate that she is not in any way similarly

situated to Ann Hopkins.  Plaintiff alleges that Defendant took its action because "it believes that

Plaintiff did not conform to the gender stereotypes associated with males in our society [and that]

Plaintiff did not conform to the gender stereotypes associated with females in our society."  See

---

[12] Ms. Hopkins was told by her employer that she could improve her chances of promotion if she
were to take "a course at charm school," and walk more femininely, talk more femininely, dress
more femininely, wear makeup, have her hair styled and wear jewelry.  Id. at 235.  Considering
these remarks, the Supreme Court held that:  "In the specific context of sex stereotyping, an
employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must
not be, has acted on the basis of gender."  Id. at 250.  Thus, Price Waterhouse stands for the
proposition that an employer cannot use stereotypical male traits such as "aggressiveness" as a
criteria for earning partnership status, but then punish a female employee like Ms. Hopkins - who
possesses those traits - just because such traits are considered typically "masculine."

Plaintiff's Complaint at ¶¶ 56-57.  Plaintiff's pleading of "sex discrimination" based on <u>both</u> genders does not fall under <u>Price Waterhouse</u> - it is something else entirely.  In fact, the juxtaposition of ¶¶ 56 and 57 in her Amended Complaint reflects that it is not sex discrimination Plaintiff complains about, but discrimination based on her status as a transsexual.  Given the facts as alleged it cannot be disputed that Plaintiff presented photographs of "himself" to Ms. Preece for the purpose of showing what he would look like in female attire as part of his transition.  Plaintiff did not present those photographs because he intended to cross-dress, thereby not conforming to stereotypes regarding masculinity.  Rather, he showed the photographs to Ms. Preece shortly after revealing his GID so that Ms. Preece would see what he (Plaintiff) would look like <u>as a woman</u>.  Thus, Defendant does not bring suit as "David Schroer," a man who merely seeks to cross-dress or assert his non-conforming male traits.  As such, Defendant would be dealing with a claim brought by "David Schroer," and "gender identity" and "transsexuality" would not be an issue at all.  Instead, Plaintiff brings suit as "Diane Schroer," a transsexual and person with GID who seeks recognition that the denial of employment because of her condition is actionable under Title VII.

Hence, Plaintiff's situation is entirely different from that recognized by the Court in <u>Price Waterhouse</u> in that she does not merely <u>not</u> conform to the social constructs of her biological sex, she wants to be a different sex entirely and believes that this Court should recognize such a cause of action.  Plaintiff's premise, however, is based on a fundamental misinterpretation of what the Court in <u>Price Waterhouse</u> held and on the facts of that case.  As such, this Court should not recognize that a transsexual, like Plaintiff, states a cause of action under Title VII in asserting that one's transsexualism is synonymous with a failure to conform to sex stereotypes.

-15-

**C.    There is No Evidence in the Record that "Sex Stereotypes" Motivated the Library's Decision-Maker**

In its decision of November 28, 2007, this Court stated that "an allegation by a male-to-female transsexual that she was discriminated against because of her failure to act or appear feminine enough states a claim under Title VII."  R. 44, <u>Schroer v. Billington</u>, Civil Action No. 05-1090 (JR) (D.D.C. November 28, 2007), at 3.  Even assuming that an individual's adoption of a name and choice of clothing, which is part of an intentional attempt to present oneself as a member of the opposite sex, is akin to a failure to conform to sex stereotypes, there is no evidence in the record that any "sex stereotypes" motivated the Library's decision-maker, Charlotte Preece.  And, as this Court opined, a transsexual - like Plaintiff - cannot state a Title VII claim where her "non-selection resulted solely from her disclosure of her gender dysphoria and her intention to present herself as a woman."  <u>Id</u>. at 8.

Here, Plaintiff cannot show that anything except for her disclosure of gender dysphoria may have motivated the Library to select another candidate for the Specialist in Terrorism position.  In her amended complaint, Plaintiff posits that her disclosure of gender dysphoria and the Library selecting official's "gender stereotypes associated with males in our society" and/or the Library's selecting official's "gender stereotypes associated with females in our society" motivated the decision of the Library to not select Plaintiff for the Specialist in Terrorism position.  Amended Complaint at ¶¶ 54-58.  Despite extensive discovery, Plaintiff has adduced no evidence that, other than possibly her disclosure of her gender dysphoria, the selecting official's decision was motivated by stereotypical notions of what men or women in the workplace should look or act like.  At most, Plaintiff adduced that the Library's selecting official

(Ms. Preece) was "shocked and surprised" by Plaintiff's revelation and that when Plaintiff

showed Ms. Preece pictures of, at that time, himself (Plaintiff) in female attire, Ms. Preece's

reaction was that Plaintiff, "looked like a man in women's clothing."  Preece Depo. at 143:8-9.

Nothing in these reactions by Ms. Preece evince any type of stereotype about how a man or

woman should look or act like "in society" but were merely the reaction of someone (in this case

Ms. Preece) confronted for the first time by the revelation that the person who they perceived to

be a male, and who had up to that point presented himself as a male in all respects, would be

reporting to work as a female and showed pictures of himself dressed in female attire.

As a matter of fact, Plaintiff at the time <u>was</u> a male[13], and his pictures to Ms. Preece (for

the very first time) showed him as "a man in women's clothing."  Absolutely nothing adduced

during discovery in any way shows that Plaintiff "did not conform to Ms. Preece's sex

stereotypical notions about women's appearance and behavior."  R. 44, <u>Schroer v. Billington</u>,

Civil Action No. 05-1090 (JR) (D.D.C. November 28, 2007) at 8.

Indeed, during discovery the selecting official explained what motivated her decision to

select another applicant for the Specialist in Terrorism position.  Specifically, Ms. Preece

declined to recommend Plaintiff because she (Ms. Preece) believed that Plaintiff, considering her

transsexual status and transition from male to female, would be required to undergo a lengthy

background investigation process to acquire a security clearance; the sudden departure of Ms.

Cronin had left a void in the CRS' ability to assist Congress in the area of terrorism, and Ms.

Preece was eager for the selectee to start at the beginning of the new Congress (i.e., the end of

January 2005); Ms. Preece believed that the amount of time it may have taken to process

---

[13] Although Plaintiff has completed her transition and now presents as a female, she remains a
biological male.

Plaintiff's security clearance was incompatible with the needs of the CRS at the time; Ms. Preece was concerned that because of Plaintiff's transition from male to female, Plaintiff might be unable to maintain the high level contacts in the military intelligence community she had developed in the past which was one of the required Knowledge, Skills and Abilities of the position; Ms. Preece was concerned that the transitioning process would divert Plaintiff's attention away from the mission of CRS; Ms. Preece was concerned that Plaintiff might not be viewed as credible by Members of Congress given Plaintiff's transsexuality; and Ms. Preece was concerned about Plaintiff's future trustworthiness, since after appearing at the interview--and in all subsequent contacts including their December 20, 2004, meeting–Plaintiff presented herself as a male when Plaintiff had every intention of starting work as a female.  Preece Depo. at 160:2-19; 163:9-22; 164:1-22; 165:1-15; 172:6-12; 187:2-7; 227:1-22; 228:1-15; 235:13-17; 237:17-22; 241:18-22; 242:1-10; 253:17-22; 254:1-11; 268:1-22; 269:1-5; 314:12-20.  None of the selecting official's reasons have <u>anything</u> to do with stereotypes about how men and women should look and/or behave in society.

In short, there is no evidence that any Library official was motivated by a perception or prejudice as to what Plaintiff was supposed to look and/or act like.  At most, the mere disclosure of Plaintiff's gender dysphoria led to the determination by the Library to select another candidate for the Specialist in Terrorism position.  Under these circumstances, Plaintiff has not shown that her non-selection was motivated by anything other than perhaps her disclosure of gender dysphoria and therefore, cannot show that her non-selection was a result of sex discrimination.  Therefore, Plaintiff's theory of sex discrimination premised on "sex stereotypes" should be dismissed.

**D.    There is No Evidence in the Record that the Library Has Relied on Any Alleged Sex Stereotypes to Engage in Disparate Treatment Based on Plaintiff's Sex**

As noted above, there is no evidence that the Library premised its decision to not hire Plaintiff because it believed that her appearance, background, or demeanor when presenting as either a male or female was either not masculine or feminine enough for its taste.  However, even assuming the Court could construe any of Ms. Preece's reasons for selecting another candidate for the Specialist in Terrorism position to be based on sex stereotypes, the Library has not relied on those stereotypes to engage in disparate treatment based on sex.

The critical issue under Title VII  "'. . .  is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'"  Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998).  However, there is no evidence in the record that Ms. Preece would have treated female-to-male transsexuals, more masculine looking males, more feminine appearing females, or any other comparative group or individuals any differently.  That is, Ms. Preece's concerns regarding a potential delay in processing Plaintiff's security clearance; loss of contacts in the miliary community; Plaintiff's inability to devote full attention to the position during her transition; and feelings that she (Ms. Preece) was deceived by Plaintiff would still be present if the applicant were from any of the above groups and who revealed during the final hiring stages that they were diagnosed with GID and would start work presenting as the opposite gender.  Thus, because there is no evidence that Ms. Preece's concerns would not have equally applied to all individuals (both male and female) in the process of transitioning to the opposite sex (like Plaintiff), Plaintiff cannot show that one sex is "exposed to disadvantageous terms or conditions of employment to

-19-

which members of the other sex are not." Id.  As this Court noted, the actual holding of Price

Waterhouse is "considerably more narrow than its sweeping language suggests. [And] adverse

action taken on the basis of an employer's gender stereotype that does not impose unequal

burdens on men and women or disadvantage one or the other does not state a claim under Title

VII."  R. 13, Schroer v. Billington, Civil Action No. 05-1090 (JR),(D.D.C. March 31,

2006)(Mem. Order at 12-13)(emphasis added).[14]

## VI. CONCLUSION

For the reasons stated herein, the Library respectfully requests that the Court grant its

Motion for Summary Judgment and that, based on such, Plaintiff's Amended Complaint be

dismissed in its entirety and with prejudice.

Date: May 14, 2008

---

[14] Unlike the facts in Price Waterhouse, Plaintiff cannot show that the Library imposed a burden on one sex that it did not impose on another.  In Price Waterhouse, Ms. Hopkins' aggressiveness was condemned by some of the decision-makers in her company, even though it was considered an essential trait for advancement in the case of men.  It was this conundrum faced by Ms. Hopkins that led the Supreme Court to find a Title VII violation:  "An employer who objects to aggressiveness in women but whose positions require this trait [for advancement] places women in an intolerable and impermissible Catch-22: out of a job if they behave aggressively and out of a job if they do not.  Title VII lifts women out of this bind."  490 U.S. at 251.  In the instant matter, however, there is no allegation, and there is no evidence in the record that the Defendant placed the Plaintiff, like the plaintiff in Price Waterhouse, in an "impermissible catch 22," penalizing her because she is a man presenting as a woman but not imposing the same standard on women who present themselves as men.

Respectfully submitted,


/s/ Jeffrey A. Taylor /dvh
_____
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney


/s/ Rudolph Contreras
_____
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

/s/ Beverly M. Russell
_____
BEVERLY M. RUSSELL, D.C. Bar #454257
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia,
Civil Division
555 4th Street, N.W., Rm. E-4915
Washington, D.C.  20530
Ph:  (202) 307-0492
Fax: (202) 514-8780
E-mail: beverly.russell@usdoj.gov


/s/ Julia K. Douds /bmr
_____
JULIA K. DOUDS
Special Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia,
Civil Division
555 4th Street, N.W.
Washington, D.C.  20530
Ph:  (202) 514-5134
Fax: (202) 514-8780
E-mail: jdou@loc.gov

Of Counsel:
Evelio Rubiella,
Associate General Counsel
Library of Congress


-21-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing *Defendant's Motion for Summary*

*Judgment* was made by the Court's Electronic Case Filing System on the <u>14th</u> day of May 2008

to:

Arthur B. Spitzer
American Civil Liberties Union
 of the National Capital Area
1400 20th Street, N.W., #119
Washington, D.C.  20036
Artspitzer@aol.com

Sharon M. McGowan/
Kenneth Y. Choe
American Civil Liberties Union Foundation
125 Broad Street
New York, New York 10004
Smcgowan@aclu.org


/s/ Beverly M. Russell
_____
BEVERLY M. RUSSELL
Assistant United States Attorney