# EXHIBIT 8

   

# Emotional, Mental
# & Personality Disorders

## *Relevance to Security*

Mental health is a security concern because it determines how a person reacts to the stresses and strains of daily life. The fact that an individual has had, or continues to have, an emotional, mental, or personality disorder does not, of itself, preclude granting access to classified information. The issue is whether the individual's condition causes, or may cause, a lapse in judgment or reliability.

Mental health problems may relate to security in the following ways:

- They may cause behavior that is unpredictable or not under conscious, rational control, thereby raising doubts about an individual's reliability, stability, or judgment under stress. The security relevance of specific disorders is discussed as part of the Nontechnical Descriptions of Selected Disorders.
- They may predispose an individual to undesirable or illegal behavior, including espionage. See Behavior Patterns Associated with Espionage.

In adjudicating mental health issues, we do not look only at an individual's past and current mental health and stability. We also look for potential future instability, unreliability, or untrustworthiness. How the individual actually behaves may be more relevant for security adjudication than the medical diagnosis.

Most Americans with a security clearance who have committed espionage were not disloyal or unstable at the time they gained their clearance. They became unreliable *after* they were cleared. Emotional or personality disorders or character weaknesses played a role in most of these cases. Problems frequently occur when individuals with personal weaknesses encounter highly stressful situations. They may react to such situations with actions that are self-destructive, counterproductive, or illegal.

CIA spy Aldrich Ames went through a divorce that shook his self-image and drained most of his money. He remarried a woman with extravagant spending habits. He was upset that his work was not highly valued, and his ambitions for career advancement were frustrated. His knowledge of CIA intelligence operations combined with his officially sanctioned contacts with Soviet intelligence officers presented a tempting, easy opportunity for illegal monetary gain. Ames sought to solve his financial and ego needs by offering his services to the Soviet KGB.

Many people, perhaps most people, experience some form of stress that threatens their self-image at some time in their lives. They experience failure to compete effectively with their peers; perceive injustice at the hands of a supervisor or employing organization; are terminated from a job under circumstances that prompt resentment; feel rejected or betrayed by a spouse; are tempted by an easy opportunity for illegal monetary gain; or confront serious financial problems.

Emotionally stable and well-adjusted individuals generally react to these experiences in positive ways: by learning from them, adjusting their expectations, working harder, or simply maintaining a stiff upper lip. Unstable or poorly adjusted individuals may react in ways that harm themselves or the organization. They may compound their problems by being less productive at work, turning to substance abuse or promiscuity, or attempting suicide. Or they may harm the organization by actions that range from absenteeism to self-serving decisions, theft, fraud, sabotage -- or espionage.

## *Potentially Disqualifying Conditions*

The *Diagnostic and Statistical Manual of Mental Disorders* published by the American Psychiatric Association describes several hundred emotional, mental, or personality disorders. Such disorders are relatively common.

The key issue, however, is not whether an individual has some disorder, or which disorder it is. The key issue is whether subject has behaved in a manner that suggests current or future unreliability, untrustworthiness, poor judgment, or any other reason for believing subject may be a poor security risk.

Adjudicators should not try to be amateur psychologists, but they should:

- Understand how to use professional diagnoses of mental health disorders, including their limitations.
- Recognize indicators that suggest a need for professional evaluation.
- Recognize behavior patterns associated with espionage and other illegal or unethical behavior.

The potential security significance of any disorder depends upon its severity (intensity and duration of symptoms), how destabilizing it is, how responsive to treatment, whether there has been appropriate treatment, and a professional judgment about possible recurrence and what else might happen in the future.

The following are potential security concerns:

- Behavior that indicates an individual may suffer from an emotional or mental problem. Relevant behaviors are listed under Indicators of Potential Emotional or Mental Problems.

- Personality disorders or character weaknesses that clinical and empirical research indicate are associated with white-collar crimes, including espionage. See Behavior Patterns Associated with Espionage.

- Any current emotional, mental, or personality disorder diagnosed by a mental health professional. Some of the most frequently encountered diagnoses are explained in Nontechnical Descriptions of Selected Emotional, Mental, and Personality Disorders.

- Taking any prescription drug intended to influence mental or emotional functioning. See Drugs for Emotional and Mental Disorders.

- Premature termination of mental health treatment, unsuccessful treatment, or noncompliance with treatment recommendations, e.g., failure to take prescribed medication.

- History of violent or abusive behavior toward spouse, children, elders, or work associates.

- Compulsive behaviors, such as compulsive gambling, eating disorders, paraphilias, compulsive sexual behavior, or compulsive lying. A behavior is compulsive when it is beyond a person's control, i.e., the person continues to engage in it despite adverse medical, legal, social, family, or work consequences.

- Abnormal preoccupation with or irresponsible use of weapons.

- Refusal to take medical/psychiatric tests when so directed by competent authority.

Many forms of short-term counseling (less than six months) have no relevance to security. This includes counseling for adolescent or school adjustment problems, bereavement counseling, or counseling for victims of rape, incest, or other trauma. Form 86 requires release of information on marital counseling only if violence is involved. Marital problems may also be relevant, however, if they are caused by financial irresponsibility, certain types of sexual behavior or any other behavior that would be of concern independent of the marital issues.

Executive Order 12968, dated August 4, 1995 states that no negative inference concerning eligibility for access to classified information may be made solely on the basis of mental health counseling. Counseling may be a positive factor if it facilitates an individual's ability to cope with or adapt to stressful circumstances. Mental health counseling may be a basis for initiating further inquiries to determine whether subject meets the appropriate standards.

## Understanding How to Use
## Professional Diagnoses

A diagnosis of emotional, mental or personality disorder is always a security concern. An appropriate mental health professional should be used in evaluating information about disorders and diagnoses in relation both to qualifying and disqualifying conditions.

A professional diagnosis is not necessarily required, however, in order to make an adverse decision based on emotional/mental grounds, and it is the adjudicator's responsibility to make the ultimate decision. If behavior suggests that an individual may be unreliable or untrustworthy, an adverse decision may be appropriate regardless of the presence or absence of a formal diagnosis. Under some circumstances, the subject may conceal information from the medical professional in order to avoid an adverse diagnosis. Under other circumstances, a private doctor may assign a relatively benign diagnosis in an effort to protect the patient's job. The medical diagnosis in the Jonathan Pollard case is discussed in the next section.

Emotional and mental disorders vary greatly in their symptoms, seriousness, relevance to security, and amenability to treatment. The descriptions of selected disorders under Nontechnical Descriptions of Selected Disorders do not distinguish degrees of severity. Whenever possible, the adjudicator should consult a credentialed mental health professional to gain greater understanding of a specific diagnosis and how it might relate to security, and to determine the likelihood of recurrence and amenability to treatment. It remains the adjudicator's responsibility, however, to judge based on all available information whether an individual meets appropriate standards of reliability, trustworthiness, and good judgment.

Diagnosis of an emotional, mental, or personality disorder does not necessarily mean an individual actually has a significant problem. Many persons seek regular psychiatric counseling for very minor problems. This is fashionable in some circles. The doctor may list a diagnosis for medical insurance purposes, or because the patient would be dissatisfied if the doctor failed to provide a "diagnosis" for whatever the patient perceived as a problem.

The fact that an individual has sought treatment or counseling for a mental health problem should not suggest that the individual's problem is more serious than one who has not. When self-initiated, treatment will often be a favorable indication that the subject recognizes the problem and is taking care of it.

For additional information, see:

- Glossary of Terms Used in Psychiatric Evaluations
- Five-Axis System of Psychiatric Evaluation
- Nontechnical Descriptions of Selected Disorders

## *Pollard Example*

Jonathan Pollard, the Naval Intelligence analyst who spied for Israel, once received approval from his supervisors to establish a back-channel contact with South African intelligence through a South African friend he had known in graduate school. Through a combination of circumstances, Pollard's story about his relationship with the South Africans began to unravel. After telling Navy investigators fantastic tales about having lived in South Africa and his father having been CIA Station Chief there, Pollard's security clearance was pulled and he was told to obtain psychiatric help. After the doctor concluded that Pollard was not mentally ill, Pollard filed a formal grievance and got his clearance and his job back.

The point is, that whether or not Pollard met the formal criteria for diagnosis of mental illness was irrelevant. Pollard's pervasive lying about official business demonstrated clearly that he failed to meet appropriate standards of reliability, trustworthiness, and good judgment. Ref 1 For additional information on Pollard, see the discussion of narcissistic personality disorder, Espionage Case Examples 2.

## Indicators of Potential Emotional or Mental Problem

The indicators listed below suggest the possibility of emotional or mental problems. When any of these indicators are present, additional inquiries should be made and a request for professional evaluation should be considered. Ref 2

- Sad or depressed mood lasting longer than a few days, not caused by any specific traumatic event.
- Sad or depressed mood lasting longer than two weeks, caused by a traumatic event such as divorce, death of close friend or family member, or some form of personal failure.
- Inability to form or maintain close personal relationships.
- Recurrent or persistent anxiety, nervousness, restlessness, or hyperactivity. Sudden mood swings from euphoric to irritable.
- Chronic fatigue, or difficulty sleeping.
- Suicidal threats or references.
- Displays of unwarranted anger.
- Any sudden and negative change in behavior, or atypical act or expression, including social withdrawal or change in appetite, sexual drive, emotional expressiveness, pattern of spending money, intellectual functioning.
- Seeing or hearing things that are not there.
- Any compulsive behavior such as bulimia, anorexia, compulsive washing or hoarding.
- Any obviously bizarre behavior.
- Extreme suspiciousness, or talk of being watched or followed. Abnormally secretive about one's behavior.
- Being frequently distracted, confused, or preoccupied.
- Difficulty comprehending or responding to questions or instructions, or jumping from topic to topic.
- Delayed reaction times.

## Behavior Patterns Associated with Espionage

There is no single profile of the employee who is likely to betray an employer's trust. However, clinical assessment of Americans arrested for espionage Ref 3 and academic research findings on white collar criminals in general Ref 4 do identify behavior patterns commonly found among such persons.

Individuals who betray their employer's trust tend to possess certain personality disorders or personal weaknesses. They may be impulsive or immature, and likely to do whatever feels good at the moment. They may engage in high risk activities without thinking about the consequences. They may have a propensity for violating rules and regulations. They may have drifted from one relationship or job to another, with little sense of purpose or loyalty to anyone or anything. They may have a grossly inflated view of their own abilities, so that disappointment and bitterness are inevitable. They may be inclined to regard criticism or disagreement as a personal insult that calls for revenge. It is important to recognize, though, that the same disorders and weaknesses may also be found in individuals who do not engage in espionage or any other serious illegal activity.

An almost limitless number of combinations of individual characteristics and complex situations might ultimately lead to betrayal. However, according to the studies referenced above, some combination of the following personality disorders and personal character is usually found in individuals who commit espionage as well as other white-collar crimes including theft, fraud, embezzlement and sabotage.

These three disorders are the ones most likely to be found in individuals who commit espionage, although not necessarily with a degree of severity to qualify as a disorder.

- Antisocial Personality Disorder
- Narcissistic Personality Disorder
- Paranoid Personality Disorder

In many cases, the pattern of observed behavior or of test results might be better described as indicating a personal weakness or undesirable character trait rather than a "disorder." These personal characteristics are associated with high risk, irresponsible, or emotionally unstable behavior:

- Impulsiveness/Immaturity
- Inability to Form a Commitment
- Vindictiveness
- Risk-Seeking

None of us is perfect, so personality quirks and character weaknesses are present in all of us to some degree. A security concern exists only when there is a pattern of problematic behavior, or when one or two traits are so severe that they contribute to interpersonal, occupational, or family problems.

Information on character weaknesses associated with betrayal may be used in the following ways:

- As a basis for disqualification if the evidence is sufficiently compelling. More often, it may be a yellow warning light that says slow down and check carefully before proceeding.

- As a *multiplier* that increases the significance of another issue. Financial problems, substance abuse and other issues are far more significant when accompanied by character weaknesses

typically found in persons who commit while-collar criminal offenses. Conversely, strong character may mitigate the risks associated with financial debt or alcohol abuse.

- As part of a pattern of unreliable or untrustworthy behavior evaluated under the Personal Conduct guideline. Information available in any one issue area may be below the threshold for a significant issue. When less-than-significant derogatory information is available for several issue areas, it may add up to a significant pattern.

- As a basis for requesting evaluation by a mental health professional.

## *Impulsiveness/Immaturity*

Impulsive and immature individuals lack self-control. They are a security concern because they may use poor judgment and or be irresponsible or unpredictable in their behavior. A person who is impulsive or immature should usually also be assessed under the Personal Conduct guideline, Pattern of Dishonest, Unreliable, or Rule-Breaking Behavior. Self-control, which is the opposite of impulsiveness or immaturity, is a favorable trait discussed under The Whole Person Concept in the Introduction.

Many of the immature, young military personnel who have volunteered their services to foreign intelligence services reported afterwards that they made an impulsive decision without thinking through the potential consequences. They did whatever gave them satisfaction or seemed to solve their financial problems at the moment, without considering how it would affect them or others in the long run.

Impulsive persons are motivated by the quick, easy gratification of desires and fail to consider the consequences of their actions. Goals or gains that can be achieved quickly are over-valued, while those that are more distant are undervalued. When a younger person exhibits this pattern, it is often described as immaturity.

Impulsive individuals may not be concerned about duties and obligations and may be careless or lazy. They can't tolerate boredom and often require constant stimulation. Inability to tolerate frustration may lead to a sudden outburst of hostility or violence.

Immaturity is also characterized by propensity to take risks, susceptibility to peer pressure, and belief that one is invincible so nothing bad could happen. Although immature persons may be ambitious, they seldom appreciate the connection between current performance and long-term rewards. Excessive fascination with intrigue and clandestine intelligence tradecraft may be a sign of immaturity.

One of the prominent current theories of criminality argues that low self-control is the only personal characteristic that differentiates offenders from nonoffenders. According to this view, the necessary conditions for criminal acts are too little self-restraint and a desirable and conveniently accessible target. Ref 5 Other persuasive theories of criminality focus on a wider range of social, biological and psychological variables.

Impulsiveness/immaturity and antisocial tendencies are a volatile mix. When combined with resentment, a desire for revenge, or judgment clouded by alcohol abuse, they comprise a recipe for trouble.

## *Inability to Form a Commitment*

Inability to maintain healthy, long-term personal or work relationships is a serious security concern as it indicates a low capacity for loyalty. Since emotional, mental, and personality disorders often become apparent through their impact on interpersonal relationships, inability to form a commitment is a surrogate measure for a wide variety of suitability and mental health issues. It is often found together with antisocial behavior and/or narcissism.

Inability to make a commitment is not identified by a single event, such as a divorce. It refers to a *pattern* of poor relationships and an aimless or erratic life style or work history. Employment history may show a pattern of frequent job changes without corresponding career advancement (e.g., three or more jobs in five years not explained by nature of job or economic or seasonal fluctuation; walking off several jobs without other jobs in sight). Relationships tend to be one-sided and often last less than one year. There may be a history of unhappy love affairs. Marriages are often unstable. After divorce, there may be no continuing contact with children. Inability to form enduring emotional commitments is often traced to abuse or neglect, split loyalties, or broken allegiances during childhood or adolescence.

Persons who are *unable* to form a commitment should be distinguished from the socially withdrawn individual who remains alone by choice. Most Americans who have been arrested for espionage were not loners. They had greater than average need for the attention, approval, and admiration of others, but many were *unable* to sustain long-term relationships because their behavior engendered resentment among family, friends, and co-workers.

## *Espionage Case Example 3*

### Christopher Boyce

Christopher Boyce compromised highly sensitive communications satellite programs to the former Soviet Union. He had been a model youth -- president of his middle school class and an altar boy who aspired to a career in the priesthood. In high school in the 1960s during the Vietnam War, he became deeply disillusioned with his religion and with the U.S. government. Ref 6

When Boyce was investigated and approved for special access program and cryptographic clearances at age 21, the only evidence of his inner turmoil was having dropped out of three colleges during the previous three years and holding six part-time jobs during the previous two years. Of the six positions, he left three positions without giving notice, being ineligible for rehire at one of them, eligible for rehire at the second, and questionable for rehire at the third. A former landlord indicated he failed to take care of his apartment and moved without notice. He was described as young, immature and unsettled, and his friends in his last college town were considered "hippies." His then-current supervisor questioned his abilities and initiative and believe he showed up for work on Mondays in a hung-over condition. Ref 7

This information might have indicated to an astute observer that Boyce was unable at that time to make any form of long-term commitment involving access to some of the nation's most sensitive secrets. His aimless lifestyle after high school was a manifestation of his changed values.

## *Vindictiveness*

Desire for revenge can trigger sabotage, espionage, violent attack, or other illegal behavior. Several

well-known spies are known to have had a strong propensity toward vindictiveness. They are discussed below, in the next section.

Vindictiveness is often found in narcissists whose self-esteem is based on a grossly inflated opinion of their own abilities. They interpret criticism, disagreement, or failure to recognize their special talents as a personal insult that merits retribution. The retribution is a means of restoring injured self-esteem.

Vindictive behavior should be reported. Implied threats of vindictive behavior should be taken seriously. They merit management attention and careful security evaluation. This includes statements such as "You haven't seen the last of me; I'll be back." "I'll get even for that." "They can't treat me like that and get away with it." "Don't worry, I'll find my own way to get what they owe me." "If he does that one more time I'll...." Even if the individual *seems* to be just blowing off steam, such statements indicate a level of frustration that should be dealt with proactively. Review of security and personnel files by a mental health professional may be an appropriate first step in some cases.

### *Espionage Case Example 4*

John Walker

Navy spy John Walker's daughter reported that he had books on revenge and on dirty tricks, such as putting epoxy glue into locks of cars and homes. Walker once told a friend: "You never confront a person face to face. You get even. Maybe three years from now." Ref 9

### *Risk-Seeking*

Risk-seeking is one particularly significant form of impulsive, irresponsible behavior. Risk-seekers ignore or gloss over risks (impulsiveness or immaturity) or think the risks don't apply to them because they are so clever or talented (grandiosity). They are inclined to become involved in reckless driving, gambling, fighting, vandalism, drugs such as LSD and PCP, holding up the local 7-11 convenience store, or becoming a spy.

When risk-seeking is combined with other weaknesses such as antisocial attitudes and inability to make a commitment, it may contribute to illegal behavior. Such persons may be attracted by the excitement of espionage rather than repelled by the risk. Examples from actual espionage cases are discussed below.

Risk-seekers often consider conventional lifestyles beneath them. They are restless and impetuous and can't tolerate boredom or inactivity. Since work is not always exciting, they find it hard to sustain consistent work behavior.

This type of person can't turn down a dare. They may think it's fun to see how close they can come to breaking the rules without getting caught. Sex is often just another way of getting kicks, so it is impersonal and devoid of emotional attachment.

It is important to distinguish thoughtless risk from calculated risk. Persons involved in the riskier hobbies or occupations, such as mountain climber, downhill ski racer, sky diver, or military specialties such as fighter pilot undergo considerable training. They learn to control their nerves and emotions, carefully calculate the level of risk, and take appropriate precautions to reduce the chances of adverse consequences. This is, in fact, good training in self-control.

## *Espionage Case Examples 5*

### Aldrich Ames

In his CIA work, Aldrich Ames demonstrated the inconsistent performance typical of many thrill-seekers. He displayed what the CIA Inspector General's report on this case called "selective enthusiasm." According to this report: "With the passage of time, Ames increasingly demonstrated zeal only for those few tasks that captured his imagination while ignoring elements of his job that were of little personal interest to him."

In his espionage activity, Aldrich Ames ignored risks by conspicuous spending of his illegal income, carrying large packages of money across international borders, and leaving evidence of his espionage on his home computer and hidden elsewhere in his home. Ref 10

### John Walker

Navy spy John Walker had a legendary reputation as a daredevil. For example, one night when returning to his submarine after some heavy drinking, he spotted a blimp tethered nearby. He led his colleagues in an effort to cut the blimp loose, but was scared off when a policeman shouted a warning and then fired a warning shot. Ref 11

## Controlling Disorders with Drugs

Many disorders are treated with medicines that either depress or stimulate emotional or mental functions. In most cases, drugs are administered only to alleviate symptoms or control behavior, not to cure the underlying problem. A cure generally requires prolonged and intensive therapy to reorganize the personality.

Mood-altering or mind-altering drugs have side effects that can be as much of a security risk as the condition the drug is intended to treat. Therefore, careful monitoring is important. Different individuals react to mood-altering or mind-altering drugs in different and unpredictable ways. It is not known what types of individuals are most susceptible to which side effects. Long-term consequences are also unknown.

Any mood-altering or mind-altering drug is a potential concern. When any individual is taking such medication, the following questions become relevant. What symptoms caused the psychiatrist to prescribe the drug, or caused the individual to start taking the drug on his or her own? How do these symptoms affect the subject's reliability and judgment? What is being done to resolve the underlying problems that cause these symptoms? How does the drug itself affect the person's reliability and judgment? What happens if subject fails to take the drug? Has subject ever failed to take the drug?

The field of psychopharmacology is highly technical, and adjudicators should rely in each case on the input of a mental health professional

## Disorders Are Common

The largest survey of emotional, mental, and personality disorders among American adults was conducted in the early 1980s. It found that almost 13% suffered from some disorder (other than substance abuse) during the previous month, and 22% have suffered at some point during their lifetime. The prevalence was higher for persons under age 45. Only about 10% of those who suffer

from an emotional or mental disorder seek treatment during any given year. Ref 13

# *Mitigating Conditions*

An emotional, mental, or personality disorder might be considered mitigated if:

- A temporary condition (less than six months) was caused by a traumatic personal circumstance which no longer exists and has minimal chance of recurring. Death of a loved one, serious illness, or marital breakup are examples of circumstances that might trigger temporary emotional instability.

- There is no indication of a current problem. Recent evaluation by a credentialed mental health professional finds that the previous emotional, mental, or personality disorder has been cured or is in remission with a low probability of recurrence.

- An ongoing emotional or mental disorder is (a) mild, or (b) has been controlled by the conscientious use of prescribed medication for a period of at least two years. Long-term continuation of the medication must be medically practical and must be expected to preclude recurrence of any condition that may affect judgment or reliability.

Emotional, Mental & Personality Disorders -- Continued<br>Reference Materials

## Footnotes

1. Blitzer, Wolf (1989). *Territory of Lies: The Rise, Fall, and Betrayal of Jonathan Jay Pollard.* New York: Harper & Row.

2. Information is mainly from a list compiled by CIA, Office of Medical Services.

3. Several government agencies have conducted comprehensive psychological assessments of their employees arrested for espionage, and an Intelligence Community project has interviewed and administered psychological tests to a number of Americans serving jail terms for espionage. Most interviews and tests were conducted after conviction and incarceration and were subject to agreements that protect the privacy of the offenders. Privacy and security considerations preclude public release of these studies.

4. Gottfredson, M. R., & Hirschi, T. (1990). *A General Theory of Crime.* Stanford, CA: Stanford University Press. Parker, J. P., & Wiskoff, M. F. (1992). *Temperament Constructs Related to Betrayal of Trust* (PERSEREC-TR-92-002). Monterey, CA: Defense Personnel Security Research Center. Collins, J. M., & Schmidt, F. L. (1993). Personality, integrity, and white collar crime: A construct validity study. *Personnel Psychology, 46,* 295-311. Brodsky, S. L., & Smitherman, H. O. (1983). *Handbook of Scales for Research in Crime and Delinquency.* New York: Plenum Press. Hogan, R., & Hogan, J. (1989). How to measure employee reliability. *Journal of Applied Psychology, 74,* 273-279. Collins, J. M., & Muchinsky, P. M. (1994). "Fraud in the Executive Offices: Personality Differentiation of White Collar Criminality among Managers." Presented at 23rd International Congress of Applied Psychology, Madrid, Spain. Submitted for publication to *Academy of*

*Management Journal.*

5. Gottfredson, M. R., & Hirschi, T. (1990). *A General Theory of Crime.* Stanford, CA: Stanford University Press.

6. Lindsey, R. (1980). *The Falcon and the Snowman.* New York: Pocket Books.

7. Declassified extracts from pre-employment security investigation of Christopher Boyce.

8. Deleted

9. Kneece, J. (1986). *Family Treason: The Walker Spy Case.* Briarcliff Manor, NY: Stein and Day Publishers.

10. *Unclassified Abstract of the CIA Inspector General's Report on the Aldrich H. Ames 1Case.*

11. Kneece, J. (1986). *Family Treason: The Walker Spy Case.* Briarcliff Manor, NY: Stein and Day Publishers.

12. Deleted

13. A five-city National Institute of Mental Health survey of 18,571 adults from 1980 to 1984 known as the Epidemiological Catchment Area Program (ECAP).

14. This glossary was prepared by Dr. Ted Sarbin, Defense Personnel Security Research Center.

15. American Psychiatric Association (1995). *Diagnostic and statistical manual of mental disorders, fourth edition (DSM-IV).* Washington, DC: Author.

16. Kneece, J. (1986). *Family Treason: The Walker Spy case.* Briarcliff Manor, NY: Stein and Day Publishers. And Earley, P. (1988). *Family of Spies: Inside the John Walker Spy Ring.* New York: Bantam Books.

17-19  Deleted

20. Blitzer, Wolf (1989). *Territory of Lies: The Rise, Fall, and Betrayal of Jonathan Jay Pollard.* New York: Harper & Row.

Case 1:05-cv-01090-JR    Document 48-10    Filed 05/14/2008    Page 15 of 46

   

# Sexual Behavior

# *Contents*

**Relevance to Security**

Past Espionage Cases

**Potentially Disqualifying Conditions**

Criminal Behavior

 Rape

 Incest

 Sexual Harassment

Indicator of Emotional Disorder

Compulsive or Addictive Behavior

 Concept of Sex Addiction

 Diagnosis of Sex Addiction

 Consequences of Sex Addiction

 Recovery from Sex Addiction

Vulnerability to Pressure or Coercion

Lack of Judgment or Discretion

**Mitigating Conditions**

**Reference Materials**

**Information About Sexual Practices**

Promiscuity - General

Group Sex and Swinging

Research on Swinging

Use of Prostitutes

Premarital & Extramarital Relations

Gender Identity Transpositions

Homosexuality

 Emotional Stability

 Prevalence

 Homosexual Lifestyles

 Vulnerability to Coercion

Bisexuality

Transsexualism

 Transsexuals in the Military

Transvestism

 Research on Transvestism

Paraphilia (Perversion)

Fetishism

Sadism and Masochism

Pedophilia

Voyeurism (Peeping Tom)

Exhibitionism

Obscene Phone Calls

Bestiality

Other Paraphilias

Sources of Additional Information

Footnotes

# *Relevance to Security*

The record of past espionage cases and the bulk of scientific research both suggest that the connection between sexual behavior and personnel security is far more complex than the simple notion that "normal" sex is acceptable but "nonconforming" sexual practices are a security risk. Self-control, social maturity, strength of character, and overall psychological adjustment are more important security indicators than the specific sexual practices in which people engage. Sexual orientation or preference may not be used as a basis for disqualification in adjudicating eligibility for security clearance.

A common error in thinking about sexuality is to reason that "since I'm normal, most other normal people must think and behave more or less the way I do." Actually, "normal" human sexual behavior is far more diverse than most people realize, and many seemingly unusual behaviors have little or no relationship to security.

Normality and abnormality or deviance are not the appropriate criteria for determining the security relevance of sexual behavior. Many unusual sexual fetishes are not "normal," but they are harmless unless carried to an extreme. There is no "normal" amount of frequency of sexual activity. Celibacy is unusual but is not by itself a concern to security clearance adjudicators. On the other hand, "normal" heterosexual relations can be a security problem if pursued in a compulsive or irresponsible manner, and any sexual conduct may be cause for concern if it is part of a pattern of emotional maladjustment.

To protect employee rights to privacy and civil liberties, adjudication of sexual behavior needs to be based on demonstrable security concerns, not on commonly accepted myths or the personal moral values of individual adjudicators. Case-by-case judgment is more appropriate than automatic disqualification for any particular variety of sexual behavior.

Sexual behavior is relevant to security if it:

- involves a criminal offense;
- is compulsive or out-of-control;
- indicates a personality or emotional disorder;
- subjects the individual to undue influence or coercion;
- reflects lack of judgment or discretion.

Adjudicators must take care to ensure that interpretation of these criteria is based on analysis of security risk and not on their personal approval or disapproval of the conduct being adjudicated. Given some inevitable subjectivity of judgments about sexual behavior, how can one ensure that adjudicators with different backgrounds and different sexual experiences will make consistent judgments on sexual issues? And how can one ensure that these judgments reflect appropriate concern for personal freedoms and individual choice while still protecting the security of the United States?

There are no easy answers to these questions, but judgments will be aided by a better understanding of sexual behavior and how it relates to security concerns. That is the goal of this Supplemental Information.

## Past Espionage Cases

The unclassified record of past espionage cases indicates that indiscreet sexual activity has led at least four Americans to become involved with foreign intelligence services.

Marine Sergeant Clayton Lonetree was recruited in Moscow in 1986 as a consequence of an affair with a Soviet woman who was under KGB control. Ref 1

American diplomat Irving Scarbeck was recruited in Warsaw in 1961 through his affair with a woman agent of Polish intelligence. Ref 2 Master Sergeant Roy Rhodes, assigned to the motor pool of the American Embassy in Moscow, was recruited by the KGB in 1952. After a one-night-stand with a Soviet woman, he was told several weeks later that she was pregnant and that, as the father of a Russian national, he would not receive a visa to leave the country unless he cooperated. Ref 3

There are many other cases of Americans in Moscow and other Eastern European capitals being approached by local intelligence services as a result of sexual affairs or indiscretions. In some cases, the indiscretions were frame-ups rather than real. All the Communist intelligence services maintained a stable of attractive, female "swallows" used in efforts to seduce Western officials.

The lure of love or sex has also been used effectively to assess or entrap female targets. Sharon Scranage, a CIA employee stationed in Ghana, was recruited in 1985 by her Ghanaian boyfriend, who was working for Ghanaian intelligence. Ref 4 She had emotional needs for love and affection that were stronger than her loyalty to country.

Until the collapse of the Communist regime, the East German Intelligence Service had a large and highly successful program of sending male agents to seduce, assess, and when appropriate recruit West German secretaries employed in sensitive positions.

The noteworthy point is that these individuals were engaging in normal rather than nonconforming or deviant sexual practices. But their emotional needs, or inability or unwillingness to control their sexual desires, led to poor judgment (i.e., promiscuity in Moscow). This sexual behavior exposed them to assessment and eventually pressure and recruitment by a hostile intelligence service.

A study of 117 Americans known from unclassified sources to have been involved in espionage against the United States between 1945 and 1990 identified six of the American spies who reportedly had a homosexual orientation. According to the available unclassified information, which is incomplete, the homosexuality is not known to have been directly related to the agent's recruitment in any of these cases. None was blackmailed or specifically targeted because of known homosexuality. Their motivation was primarily money or resentment. Ref 5

One pair of agents, Karl Koecher and his wife Hana, were swingers and are believed to have used this as a means of spotting other potential recruits. Koecher and his wife were Czech nationals dispatched to the U.S. by Czech Intelligence on a long-term mission to gain access to sensitive information. They became American citizens, and Karl Koecher eventually obtained a position as a CIA contract employee. At least once or twice a week, the Koechers had one or two couples over for dinner, or went to their homes, and exchanged spouses for sex. They also frequented sex clubs where upper middle class couples, reportedly including CIA and other government officials and their wives, engaged in partner swapping and group sex. It is not known if the Koechers were successful in exploiting a swinging lifestyle to assist in recruitment of other sources. Ref 5a

In general, not enough is known about the sexual behavior of spies, or how this may or may not have related to their decision to betray their country. What can be said for certain is that certain types of sexual behavior may bring an individual to the attention of an opposition service and make it more likely that the individual will be assessed and approached. To understand this risk, one has to understand how intelligence and security services operate, and the difficulties they encounter in

recruiting Americans.

For an intelligence service seeking to recruit Americans, the first step is to gain access to a potential target in a manner that permits meaningful assessment. The assessment aims to identify vulnerabilities that can be manipulated--need or desire for money, resentment of employer, ambition for career advancement, problems with a boss or wife or children, or personal secrets (relating to any immoral, illegal, or embarrassing activity) that one is at pains to conceal. Many potential targets may be assessed before one is found with the requisite vulnerabilities. After identifying the vulnerability, the opposition service needs to develop and implement a plan for manipulating that vulnerability to entice or pressure the target to start providing information or other services. Initial requests may be fairly innocent, gradually increasing in sensitivity until the target becomes hooked.

Recruitment of an agent is greatly facilitated if one has good access for assessment of what makes a person tick. Individuals who regularly engage in promiscuous sex, bar hopping, and certain types of gambling or drug use are more accessible to assessment by foreign intelligence or security services. This is especially true of those who have a problem with addiction to sex, alcohol, gambling or drugs. Addicts organize a part of their life and their circle of friends around their addiction. Intelligence and security services generally maintain sources in these circles, and it is easy for them to place an agent in contact with a potential target who attracts attention through these activities. Sexual activities are particularly interesting, as sex may lead to personal as well as physical intimacy. The bedroom is an ideal location to learn of an individual's resentment of a boss, problems with a spouse, or longing to be rich.

In summary, habitual behaviors that provide access opportunities to foreign intelligence and security services increase the risk that an individual will become a target and that any vulnerabilities that do exist will be discovered and exploited.

## *Potentially Disqualifying Conditions*

The question to be asked about many reports of sexual behavior is not "Are they true?" but "Are they relevant?" Sexual behavior is relevant and may be disqualifying when it:

- involves a criminal offense;
- indicates a personality or emotional disorder;
- is compulsive or addictive (a pattern of self-destructive or high-risk sexual behavior that the individual is unable to stop);
- creates vulnerability to pressure or coercion;
- reflects lack of judgment or discretion (sexual behavior is public or offensive to others).

Adjudication of issues relating to sexual behavior needs to be tied directly to security considerations, and everyone involved in the security clearance process is obliged to keep personal values and prejudices out of the process as much as possible.

Personal codes of sexual morality are not an appropriate criterion for adjudicating sexual behavior. As noted by one judge when overturning the termination of a homosexual federal employee,

> "The notion that it could be an appropriate function of the federal bureaucracy to enforce the majority's conventional codes of conduct in the private lives of its employees is at war with elementary concepts of liberty, privacy, and diversity." Ref 6

The security significance of questionable sexual behavior depends in part on recency, frequency, intent to continue the conduct, and whether force, violence or intimidation were involved. For background information on a number of specific sexual behaviors, and discussion of their relevance or irrelevance to security concerns, see Information About Specific Sexual Practices.

## Criminal Behavior

Some behaviors are not only technically illegal, but are almost universally condemned and prosecuted when sufficient evidence is available. These include rape, incest, sexual relations with children (pedophilia), voyeurism (Peeping Tom), exhibitionism, and making obscene phone calls. Sexual harassment may also be illegal, depending upon seriousness. For further information, see discussion of these specific behaviors. These behaviors should be assessed under Criminal Conduct as well as Sexual Behavior. They may also be evaluated under Personal Conduct if they are part of a pattern of unreliability, dishonesty, or poor judgment.

Sex offenders seldom limit the activity to a single offense. The behavior is likely to be repeated often. Such offenses usually indicate emotional problems, and treatment is often ineffective.

On the other hand, some common behaviors such as adultery between consenting adults or oral or anal sex are still on the books as crimes in some jurisdictions. These laws are seldom if ever enforced, but the behavior must be evaluated if an individual is charged with a criminal offense.

### *Rape*

Traditionally, the legal term "rape" has been defined as the forced carnal knowledge of a woman by a man. Like attitudes toward many aspects of human sexual behavior, however, the concept of rape is evolving.

Rape is defined by state statute, which means the definition of this crime differs somewhat from state to state. Many states now use the gender neutral term "sexual assault," which covers sexual crimes against men as well as women. More importantly, state statutes are gradually changing to put greater emphasis on absence of consent rather than use of force as the defining characteristic of sexual assault, including rape. The crime is aggravated if force is used, but can occur without it.

A fairly typical legal definition of Criminal Sexual Assault is that it is any genital, anal, or oral penetration, by a part of the accused's body or by an object, using force or without the victim's consent. Aggravated Criminal Sexual Assault occurs when any of the following circumstances accompany the attack:

- Use or display of a weapon
- The life of the victim or someone else's life is endangered or threatened
- The victim is over age 60, physically handicapped, or profoundly mentally retarded.
- The perpetrator causes bodily harm to the victim
- The attack occurs during the commission of another felony.
- Force is used, through physical violence or threat of bodily harm. Ref 7

Judicial interpretations may differ from state to state, or be ambiguous, as to whether "consent" to sexual intercourse requires an affirmative yes or may be inferred from a failure to say no. Intercourse with a person whose mental function has been impaired by alcohol and/or drugs, or who is asleep or unconscious, will usually be interpreted as without consent, and, therefore, as rape.

When rape is defined by absence of consent, rather than use of force, it becomes more difficult to determine when rape has occurred, especially when it is alleged to have occurred between friends or acquaintances. Within the context of a complex male-female dating or social relationship, absence of consent is sometimes hard to define and difficult to prove. For purposes of adjudicating security clearances, the precise legal interpretation of the behavior may be less important than what the behavior shows about a person's judgment, reliability, and willingness or ability to follow rules.

Owing to the frequency of acquaintance rape and date rape, many colleges and universities have adopted codes of conduct dealing with sexual behavior. These are not legally binding, but they may be a basis for disciplinary action. Many of these codes of conduct do not define specifically what is meant by consent, but some do. One of the more complete definitions of consent is provided in the student conduct code of the University of California, Berkeley. It states:

> "Consent is defined as positive cooperation in act or attitude pursuant to an exercise of free will. The individuals consenting must act freely and voluntarily and have knowledge of the nature of the act or transaction involved. It is a defense to the allegation of non-consent that a defendant held a reasonable and good faith belief that the complainant was consenting. A current or previous dating relationship is not sufficient to constitute consent. The determination regarding the presence or absence of consent should be based on the totality of circumstances, including the context in which the alleged incident occurred. The fact that an individual was intoxicated at the time may be considered in determining whether that person had consented to the act in question. Students should understand that consent may not be inferred from silence or passivity alone." Ref 8

Statutory rape generally refers to sexual intercourse or penetration, whether or not voluntary, with a person who is incapable of informed consent. That includes children under a specified age, with the age varying from 12 to 18 depending upon the state. Depending upon the state, it may also include mentally handicapped persons.

Most studies of persons convicted of forcible rape show that rapists do not lack available sexual partners. Forcible rape is a crime of violence, motivated by anger and the desire for power and control, not an act of sexual desire by an oversexed or sexually frustrated man. Ref 9

As rape is a crime rather than a medical diagnosis, most convicted rapists are sent to prison and there is little attempt at treatment. Three quarters of convicted rapists become repeat offenders. Counseling of rape offenders often fails to quell the inner compulsion to rape. A drug that causes a marked drop in the sex drive helps to control aggressive sexual impulses, but it is effective only for as long as the drug is taken. Ref 10

### *Incest*

Incest generally refers to sexual activity between blood relatives, but there is no agreement on a universal and precise definition of the term. The degree of relationship that makes it a crime is defined by law in each state. If stepfathers are counted along with natural fathers, incest is more prevalent, as stepfathers are five times more likely to abuse their daughters than natural fathers. Ref 11

Incest takes many forms ranging from fondling to intercourse, from a one-time event to continuing activity over many years, and from mutual consent to rape. It occurs in wealthy and well-educated families as often as in poorer families. As described in the title of one book, it is *The Best Kept Secret.* Ref 12

Two reviews of what is known about incest concluded that "current knowledge rests on a very insecure scientific basis," as there have been few empirical studies with large sample sizes, adequate comparison groups and objective measures. Ref 13

Although research results are inconsistent, one reviewer concluded that when incest is defined in terms of sexual intercourse, it occurs in less than 1% of the female population, but other forms of intrafamilial (including stepfathers) sexual activity may affect 10% of females before they are 16 years of age. Ref 14

One of the best empirical studies used a random household survey of 930 adult women in the San Francisco area who were interviewed in person by intensively trained female interviewers. The study found that 16% of the women had experienced at least one incident of intrafamilial sexual abuse prior to age 18, and 12% had at least one such experience prior to age 14. Further analysis of the 16% figure revealed the percentage of incestuous relationships with various relatives: biological fathers (2.5%), stepfathers (2%), uncles (4.9%), cousins (3%), and brothers (2%). The 2% figure for stepfathers is noteworthy, as most daughters don't have stepfathers; of those who were reared by stepfathers, 16.7% were abused. Ref 15

Mother-son incest is rare. Ref 18 Father-son incest is also rare, and is reportedly devastating in its impact. Ref 19

The incestuous brother-sister relationship is frequently the result of mutual sexual exploration and often leaves no scars. One study reports that about half of the participants perceive it as relatively harmless. In another survey of 796 college students, 15% of females and 10% of males reported sibling incest experiences; one quarter of the experiences were categorized as exploitive. Ref 20

Incest is often so traumatic that many children repress memory of it, while others are unable to admit incest because of the shame associated with it. As a result, surveys reporting the prevalence of incest are believed to understate its frequency.

Incest is a serious security concern as it indicates the perpetrator's sexual behavior is out of control.

## *Sexual Harassment*

Sexual harassment is broadly understood as uninvited and unwanted sexual attention that creates an unpleasant or unproductive work atmosphere. Whether or not a specific behavior falls within this definition is not always clear. All conduct commonly referred to as sexual harassment does not necessarily meet the more narrow legal definition of that term as established by the courts. For more information on regulations and legal decisions defining sexual harassment, see Legal Issues.

Sexual harassment is often a disciplinary issue best handled in a personnel management context. It becomes a security issue concerning the person responsible for the harassment if it meets one or more of the following criteria:

- It leads to criminal prosecution. The crime may serve as a basis for adverse action.

- It persists after due warning. This may indicate lack of judgment, gross immaturity, or inability to control one's sexual behavior. Any of these is a security concern.

- It is part of a broader pattern of unreliability, untrustworthiness, or poor judgment. In this case,

it should be assessed under Personal Conduct, <u>Pattern of Dishonest, Unreliable, or Rule-Breaking Behavior.</u>

The U.S. Merit Systems Protection Board conducted comprehensive surveys of sexual harassment in the federal workplace in 1980, 1987, and 1994. For the results of these surveys, see <u>Prevalence in the Federal Workplace.</u>

## Sexual Harassment - Legal Issues

Various kinds of workplace discrimination were first made illegal by Title VII of the Civil Rights Act of 1964. Appellate court decisions in the late 1970's determined that sexual harassment is a form of sex discrimination and is, therefore, subject to legal sanction under the Civil Rights Act. <u>Ref 21</u>

Acting on a growing body of judicial decisions, the U.S. Equal Employment Opportunity Commission issued guidelines in 1980, which continue in effect, that lay out the kinds of behavior and conditions that must be present for actions to constitute sexual harassment. According to the guidelines, unwelcome verbal or physical conduct of a sexual nature is sexual harassment when:

- An individual's rejection of such contact -- or submission to it -- is used as a basis for employment decisions that affect the employee; or

- The unwelcome conduct interferes with an employee's work performance or creates an intimidating, hostile, or offensive working environment. <u>Ref 22</u>

Conduct may be considered sexual harassment even if it does no concrete economic or psychological harm to the victim.

Supreme Court decisions in 1986 and 1993 <u>Ref 23</u> addressed the question of what is meant by creating an intimidating, hostile, or offensive working environment. The 1986 decision determined that to be a cause of legal action, the harassment must be severe enough to alter the conditions of the victim's employment. This requires statements or actions that are pervasive as well as offensive.

The 1993 Supreme Court decision stated that whether conduct is legally actionable depends upon all the circumstances including how often the conduct occurs, how serious the conduct is, whether the behavior physically threatens the victim or stops at offensive comments, and whether the behavior unreasonably interferes with work performance.

Many lower courts have used a "reasonable person" standard in determining whether sexual conduct is offensive. That is, sexual conduct may be judged offensive if a reasonable person would have found the alleged harassing behavior to be offensive.

There is still no unambiguous standard for determining when vulgar, demeaning, or offensive behavior crosses the line to become illegal sexual harassment. The line is probably destined to remain ambiguous as long as human relationships remain complicated and human behavior continues to be interpreted in so many different ways.

For purposes of adjudicating security clearances, the key issue is not the legality of the behavior, but what the behavior shows about a person's judgment, reliability, and willingness or ability to follow rules.

## Sexual Harassment
## Prevalence in the Federal Workplace

In a 1994 survey of almost 8,000 federal employees in 22 different federal departments or agencies, 44% of women and 19% of men reported they had experienced some form of unwanted sexual harassment during the preceding two years. The following table shows the different forms of sexual harassment as perceived by both men and women. Ref 24

| **Forms of Sexual Harassment**<br>Percentage of respondents who experienced the<br>indicated behaviors during the preceding 2 years. | | |
| --- | --- | --- |
| | Men | Women |
| Sexual teasing, jokes, remarks | 14% | 37% |
| Sexual looks, gestures | 9% | 29% |
| Deliberate touching, cornering, pinching | 8% | 24% |
| Pressure for dates | 4% | 13% |
| Suggestive letters, calls, materials | 4% | 10% |
| Stalking | 2% | 7% |
| Pressure for sexual favors | 2% | 7% |
| Actual/attempted rape, assault | 2% | 4% |

Many of the behaviors perceived as sexual harassment by the victims of those behaviors do not meet the criteria for legal action under the Civil Rights Act. In addition to the ambiguity of the law, individual government employees also differ in their opinion as to whether certain behaviors represent sexual harassment or simply crude and thoughtless conduct. For example, 77% of women and 64% of men respondents considered uninvited sexual teasing, jokes, remarks or questions by a co-worker as sexual harassment. Conversely, 23% of women and 36% of men either did not know or did not consider it sexual harassment.

Of those who experienced some form of what they perceived as sexual harassment, 8% of the men and 13% of the women reported the behavior to a supervisor or other official. The others did nothing or handled the matter themselves. Of those who did not report the harassment, a large majority did not think the situation was serious enough to warrant such action or were successful in handling the situation themselves. On the other hand, 20% to 30% did not report it because they thought reporting it would make their work situation more unpleasant, nothing would be done, and/or the situation would not be kept confidential.

### Sexual Behavior as Indicator of Emotional Disorder

"Sexual behavior is a barometer, and a highly sensitive barometer, of the 'whole person.' When things go awry, sexual behavior is one of the first places where we see it." Ref 25

Sexual behavior is, therefore, a good indicator of emotional stability or instability. Problems with sexual behavior may be clues to the existence of other problems that are not as readily apparent. For

example, inability to maintain a long-term emotional commitment (as indicated by a pattern of unsuccessful, short-term relationships) may indicate underlying emotional problems.

Obligations that accompany a security clearance involve a lifetime commitment to maintain secrecy. Loyalty involves making a commitment, or developing a sense of belonging, such that one places one's own needs and priorities as secondary to those of some other person, organization, or cause. A pattern of inability to maintain lasting commitments to either people or organizations reflects on the likelihood that one might maintain an enduring commitment to protect classified information. For further information, see The Whole Person Concept.

For background information on a number of specific sexual behaviors, and discussion of their relevance or irrelevance to security concerns, see Information About Specific Sexual Practices.

Unusual or problematic sexual behavior should be evaluated in a whole person context. In some cases, it may indicate emotional problems or personality or character weaknesses. In other cases, the specific sexual practices in which a person engages may be less important than positive evidence of self-control, ability to make a long-standing loving commitment, strength of character, and overall psychological adjustment. Qualified medical expertise will be required when making these judgments.

## Compulsive or Addictive Sexual Behavior

The emotionally healthy individual is able to exercise some control over his or her sexual urges. Whatever one's sexual needs or preferences, sexual behavior should be pursued at appropriate times and places and in a manner that does not cause problems with employment, health, marriage, social relationships, or the law, or cause a significant lowering of self-esteem.

Inability to do so suggests that sexual behavior is compulsive and out of control. This may result from a personality disorder or what is now described by some specialists as sexual addiction. Ref 26

Compulsive or addictive sexual behavior is a security concern because it may indicate emotional problems, lead to poor judgment or lack of discretion, open one to exploitation, manipulation, or extortion, or attract the attention of hostile intelligence or security services. Compulsive promiscuity may be a concern, as sexual intimacy often leads to personal intimacy that increases the risk of inadvertent disclosure or exploitation by a foreign intelligence service.

Indicators that sexual behavior may be out of control include: seeking sex as a means of coping with problems of loneliness, stress, anxiety, pain, or sleeplessness; an obsession with sex that dominates one's life, including sexual fantasies that interfere with work performance; so much time devoted to planning sexual activity that it interferes with other activities; strong feelings of shame about one's sexual behavior; a feeling of powerlessness or inability to stop despite predictable adverse consequences; inability to make a commitment to a loving relationship; extreme dependence upon a relationship as a basis for feelings of self-worth; or little emotional satisfaction gained from the sex act.

Compulsive or addictive sexual behavior may take various forms, including what many regard as "normal" heterosexual behavior. It is not the type of sexual activity or even the frequency or number of partners that is of greatest significance, but a pattern of self-destructive or high risk behavior that is unfulfilling and that subject is unable to stop.

Deviation from an assumed normal *frequency* of sexual activity is not an appropriate indicator of

addiction. Some individuals have a naturally stronger sex drive than others, and the range of human sexual activity is so broad that it is difficult to define "normal" frequency of any sexual activity.

The roots of out-of-control sexual behavior may be quite varied. It may be caused by an underlying personality disorder, an "addiction" to sex, or a physical disorder. The traditional disorders of exaggerated sexuality, nymphomania in the female and satyriasis in the male, are believed to be caused by a disorder of the pituitary gland or irritation of the brain cortex by a tumor, arteriosclerosis or epilepsy, but these physical disorders are rare. Ref 27

For additional background information on sexual addiction, see Concept of Sexual Addiction, Diagnosis of Sexual Addiction, Consequences of Sexual Addiction, and Recovery from Sexual Addiction.

## *Concept of Sexual Addiction*

The term "addiction" has become a popular metaphor to describe any form of excessive, self-destructive behavior that one feels powerless to stop. Scientists specializing in sexual behavior generally agree on what constitutes out-of-control sexual behavior, but they disagree over whether it is appropriately diagnosed as an addiction or as a symptom of an underlying obsessive-compulsive disorder. Ref 28 This discussion uses the terms "addiction" and "compulsion" interchangeably in a non-technical sense, not as medical diagnoses.

One might ask how sex can be an addiction when it does not involve abuse of a psychoactive substance. The scientific argument for addiction is based, in part, on recent advances in neurochemistry that suggest we carry within us our own source of addictive chemicals.

When pleasure centers in the human brain are stimulated, chemicals called endorphins are released into the blood stream. Experiments with hamsters have shown that the level of endorphins in their blood increases dramatically after several ejaculations. Experimental rats habituated to endorphins will go through much pain in order to obtain more. In rats, the addiction to endorphins is even stronger than to morphine or heroin. Endorphins are believed to be associated with the mood changes that follow sexual release. Any chemical that causes mood changes can be addictive, with repeated exposure altering brain chemistry to the point that more of the chemical is "required" in order to feel "normal." Ref 29

## *Diagnosis of Sexual Addiction*

A common element of all addictions is self-destructive behavior that one is unable to stop despite the adverse consequences. If sexual behavior repeatedly causes problems in the areas of employment, health, marriage, social relationships, finances, or the law, or if it causes a significant lowering of self-esteem, the behavior may be compulsive or addictive.

The sex addict uses sex as a quick fix, or as a form of medication for anxiety, pain, loneliness, stress, or sleep. Sex addicts often refer to sex as their "pain reliever" or "tension reliever." In a popular novel, the heroine describes sex as "the thinking women's Valium." Ref 30

The first major empirical study of sexual addiction was published Patrick Carnes in 1991. Ref 31 It was based on questionnaires filled out by 932 patients diagnosed as sex addicts, most of them admitted for treatment in the in-patient Sexual Dependency Unit of a hospital in Minnesota. Of the sex addicts in this survey, 63% were heterosexual, 18% homosexual, 11% bisexual, and 8% were

unsure of their sexual preference .

Respondents to Carnes' questionnaire were typically unable to form close friendships. Their feelings of shame and unworthiness made them unable to accept real intimacy. They were certain they would be rejected if others only knew what they were "really" like, so they found myriad obsessive ways to turn away a potential friend or loving partner. Despite a large number of superficial sexual contacts, they suffered from loneliness, and many developed a sense of leading two lives--one sexual, the other centered around their occupation or other "normal" activity.

In Carnes' survey, 97% responded that their sexual activity led to loss of self-esteem. Other reported emotional costs were strong feelings of guilt or shame, 96%; strong feelings of isolation and loneliness, 94%; feelings of extreme hopelessness or despair, 91%; acting against personal values and beliefs, 90%; feeling like two people, 88%; emotional exhaustion, 83%; strong fears about own future, 82%; and emotional instability, 78%.

Concurrent presence of other addictions is also indicative. Carnes found that 42% of sex addicts in his sample had a problem with chemical dependency and 38% had eating disorders.

## *Consequences of Sexual Addiction*

Out-of-control sexuality may have serious adverse consequences. In the Carnes survey of individuals in treatment, 38% of the men and 45% of the women contracted venereal diseases; 64% reported that they continued their sexual behavior despite the risk of disease or infection. Of the women, 70% routinely risked unwanted pregnancy by not using birth control, and 42% reported having unwanted pregnancies.

Many patients had pursued their sexual activities to the point of exhaustion (59%) or even physical injury requiring medical treatment (38%). Many (58%) pursued activities for which they felt they could be arrested and 19% actually were arrested. Sleep disorders were reported by 65%; they usually resulted from stress or shame connected with the sexual activity.

Of the survey respondents, 56% experienced severe financial difficulty because of their sexual activity. Loss of job productivity was reported by 80%, and 11% were actually demoted as a result. Many of these problems are, of course, encountered by persons whose sexuality is not out of control, but the percentages are much lower. Ref 32

## *Recovery Programs for Sex Addiction*

The concept of sexual addiction has spawned the rapid growth of four nationwide organizations for individuals trying to recover from compulsive sexual behavior. They are Sex Addicts Anonymous, Sex & Love Addicts Anonymous, Sexaholics Anonymous, and Sexual Compulsives Anonymous. All are 12-step recovery programs patterned after Alcoholics Anonymous.

An estimated 2,000 sexual addiction recovery groups were meeting weekly throughout the country in 1989. Ref 33 Sex & Love Addicts Anonymous alone reported 1,000 groups in 1991 with about 10,000 active members in 26 countries, but mainly in the United States. In a 1989 membership survey, the organization found that 58% of its members were male, 92% Caucasian, 44% in professional jobs, 24% with a postgraduate degree and 31% with a college degree. The sexual orientation of its members was 63% heterosexual, 11% bisexual, and 26% gay or lesbian. Ref 34

It is normal for recovery groups like this to have a disproportionate number of well-educated members. That is only because well-educated persons are more likely to seek out self-help programs. There is no evidence that well-educated persons are more likely than others to suffer from sexual problems.

## Vulnerability to Pressure or Coercion

Shame is one of the more powerful human emotions. People are sometimes ashamed of their sexual behavior if it deviates from their own or society's standards of what is normal or proper. Intense feelings of shame may make a person vulnerable to pressure or coercion.

If exposure of sexual behavior would cause acute embarrassment to the individual or severe problems with spouse, family, or employer, the individual may be vulnerable to pressure or coercion by someone who learns of that behavior. This can be a security risk, especially for persons serving in positions where they come into contact with others who might exploit such vulnerability if they became aware of it.

Vulnerability to coercion is difficult to assess, as it depends upon the circumstances, such as:

- how ashamed one is of the behavior,
- the lengths to which an individual has gone to keep the behavior secret,
- the magnitude of potential loss if the behavior were exposed -- for example, loss of job, financial loss, marital strain, or other serious personal problem.

The adjudicator may take into account the subject's own assessment of his or her vulnerability to pressure. For example, subject's assurance that he or she would respond to attempted coercion by advising spouse and/or family of the behavior may be considered as a mitigating condition.

For background information on a number of specific sexual behaviors, and discussion of their relevance or irrelevance to security concerns, see Information About Specific Sexual Practices.

Ironically, sanctions associated with the personnel security system may increase the vulnerability to pressure of those who engage in nonconforming sexual practices. If one believes that admission of homosexuality or transvestism, for example, would affect one's chances of security clearance, one is more likely to conceal this information and thus be more susceptible to threats of disclosure.

## Lack of Judgment or Discretion

Sexual behavior may indicate lack of judgment or discretion when it:

- occurs at an inappropriate time or place,
- is public or offensive to others or becomes notorious,
- involves high risk.

The security significance of poor judgment or indiscretion depends, in part, on the location of the subject's assignment, the nature and visibility of subject's position, and the openness of the behavior. Lack of judgment or discretion that is not serious enough for adverse action under the Sexual Behavior guideline should also be assessed under the Personal Conduct guideline. When combined with information about criminal behavior, substance abuse, financial irresponsibility, or other derogatory information, it may be part of a broad pattern of unreliability, untrustworthiness, or poor

judgment.

Foreign intelligence and security services actively provoke and exploit sexual indiscretions as a means of assessing and recruiting Americans traveling or assigned abroad. Sexual activity with a local national in a foreign country that conducts intelligence operations against the United States increases the potential for action by the foreign intelligence or security service. Sexual activity with a local national in a hostile country, where efforts to recruit Americans are likely to be more frequent and aggressive, demonstrates poor judgment and is a serious security concern. For further information, see Past Espionage Cases.

Sexual behavior is classified as notorious when it is sufficiently well known and noteworthy that it becomes the subject of talk among work colleagues and/or social contacts. Notorious sexual behavior is a security concern because it may attract attention of an opposition security or intelligence service, terrorist group, or criminal element. It increases the risk that an individual will be targeted for recruitment or unwitting exploitation, and it increases the chances that any other vulnerabilities that do exist will be discovered and exploited. The risk is greater for individuals whose job brings them into contact with foreign nationals who may be tasked to report on them to a foreign intelligence or security service.

In some cases, notorious sexual behavior may be a personnel issue as well as a security consideration.. The notoriety may reflect adversely on the U.S. Government or make it more difficult for an employee to accomplish his or her assigned tasks. For example, sexual harassment in the workplace or adultery with a consenting subordinate fall into this category.

Many foreign countries have laws and cultural standards regulating sexual behavior that differ from our own. Failure to recognize these different standards may bring one to the attention of local officials. A man who is accustomed to casual sexual relationships may encounter problems while working or traveling in a conservative Moslem country. Similarly, a homosexual may have problems in a country where homosexuality is repressed and the overt homosexual community is carefully monitored by the police. An American who violates local laws while in a foreign country becomes vulnerable to pressure or coercion.

## *Mitigating Conditions*

**Behavior During Adolescence:** Past behavior may be mitigated if it occurred on an isolated basis during adolescence and there is a clear indication that subject has no intention of participating in such behavior in the future. Sexual experimentation or indiscretion is not uncommon during adolescence. If the unacceptable behavior happened only once, it is unlikely to be repeated and is not a concern. If there was a pattern of unacceptable behavior, the question is how certain one can be that it is no longer continuing. Some criminal behaviors such as pedophilia, voyeurism and exhibitionism start during adolescence, are difficult to stop, and are commonly denied.

**Not Recent:** Even if the unacceptable behavior occurred after adolescence, it might be mitigated if it was not recent and there is no evidence of subsequent conduct of a similar nature. The amount of time that must elapse depends upon the nature and seriousness of the behavior and how certain one can be that it has not continued.

**No Evidence of Questionable Judgment or Emotional Instability:** Some unusual sexual behaviors, such as swinging, transvestism, and moderate fetishism, are not illegal and not necessarily associated with other emotional or behavioral problems. They might be mitigated if there is no other evidence of

questionable judgment, irresponsibility, or emotional instability, and the nature of the subject's position and other circumstances are such that subject's sexual behavior is unlikely to attract the attention of others who might wish to exploit this behavior.

**No Longer Vulnerable to Pressure:** Behavior that caused vulnerability to blackmail, coercion or pressure may be mitigated if subsequent developments have eliminated this vulnerability. This might happen, for example, if the information has already become public knowledge, subject has advised spouse or family or security personnel of the activity, or if subject has separated from spouse. A commitment to advise spouse or family of the behavior in the event of attempted pressure or coercion may also be considered as a mitigating factor. See Vulnerability to Pressure or Coercion.

**Successful Treatment:** Successful completion of professional therapy may mitigate past behavior if subject has been rehabilitated and diagnosed by competent medical authority as no longer likely to engage in the questionable behavior. The likelihood that treatment will be successful varies for different types of sexual behavior problems. When the ease or difficulty of treatment is known, this is noted under Information About Specific Sexual Practices.

Sexual Behavior -- Continued
Reference materials

# Reference Materials

# Information About Specific Sexual Practices

Please refer to Contents for list of specific behaviors discussed under this topic.

The purpose of this section is to provide greater understanding of many diverse forms of sexual behavior. This will facilitate adjudicative decisions based on demonstrable security concerns rather than commonly accepted myths or the personal moral values of individual adjudicators.

## Promiscuity - General

Promiscuity is a potential concern because it may create circumstances that leave an individual open to exploitation or manipulation. To the extent that it is concealed or the individual is ashamed of the behavior, it may create vulnerability to influence or coercion. Given the risk of sexually transmitted diseases, including AIDS, extreme promiscuity may indicate a propensity for high risk behavior, poor judgment, or that sexual behavior is out of control.

This section discusses heterosexual promiscuity under the following topics"

- Group sex and swinging
- Use of prostitutes
- Premarital and extramarital relations

Sexual addiction is discussed under Conditions that May Be Disqualifying. Homosexual promiscuity is discussed briefly under homosexuality.

### Group Sex and Swinging

Group sex takes various forms including threesomes, orgies, and partner-swapping or swinging. A common element of all group sex is that sexual activity is pursued as recreation, rather than as an expression of emotional commitment to another person. One study estimated that 24% of single males and 7% of single females have engaged in some form of group sex, although most did this only once. Ref 43

Wife or partner-swapping is a form of group sex often called swinging. Swinging is an attempt to reconcile two seemingly conflicting desires--the desire for sexual variety and the wish to maintain a stable marriage. As a general rule, it is an activity or lifestyle that couples engage in together as part of their relationship, although singles may also participate. Recreational sex of this type may take place only in private with close friends or with strangers at organized events held for that purpose. Some couples have rigid agreements as to when, where, and what is permissible, while other couples have mutual agreement on complete sexual freedom. For additional information, see Research on Swinging.

Group sex of all types raises moral issues for many people. Whether or not it raises security concerns depends upon the type, frequency, recency, and circumstances of the activity.

Depending upon recency and frequency, participation in any form of group sex may contribute to a decision against security approval if it is part of a pattern of dissolute behavior (drinking, drugs, gambling), high risk behavior, or emotional immaturity. It may not be a significant security concern if

pursued discretely, and if subject shows no other behavioral weaknesses and medical evaluation indicates no emotional instability.

Potential for influence or coercion may not be a significant security issue if the swinging is a consensual activity with one's spouse or primary partner, and if participants make no great investment in secrecy. Swinging in private with a few close friends is of less concern than attending a swinger's club or having a number of anonymous contacts.

Valid research on psychological attributes of swingers is very limited. What little research is available, combined with anecdotal evidence, suggests that swinging may be one of several unusual varieties of sexual preference that are not necessarily associated with emotional disorder. Psychological or psychiatric evaluation would be appropriate prior to approval of any case in which group sex is an issue.

### *Research on Swinging*

Some research suggests that 2% of all married couples, mainly middle class couples with children, have shared mates at least once during their marriage, Ref 44 but there are no valid data on how many couples do this regularly. The Kinsey Institute speculates that perhaps 0.5% of married couples engage in this practice on a regular basis. Ref 45 The North America Swing Club Association reported that as of 1990 there were about 200 swing clubs in the U.S., most of which were open to couples only. As many as 3,500 have attended a popular, annual swingers convention. Ref 46

To learn more about swingers, Dr. Brian Gilmartin compared 100 swingers in suburban Los Angeles with a matched control group of 100 non-swingers of the same age living in the same neighborhoods and with the same socioeconomic background. Ref 47 Similar studies have been done with swingers in the Chicago and New York areas.

Gilmartin found that swingers were three times as likely as non-swingers to come from broken homes, and they generally had a less happy childhood and adolescence. Their parents' child-rearing approach was either laissez-faire with no rules or authoritarian; in either case there was not much care, respect or compassion for the feelings, needs, or individuality of the children. Nevertheless, there was little evidence of loneliness or social isolation during the swingers' formative years or later. As children and later as adults, swingers regarded good friends as more important than family, and they interacted with their friends substantially more frequently than non-swingers.

Swingers in general, but especially the wives, were a great deal more alienated from their parents and other relatives than non-swingers. Up to age 25 or so, those who became swingers might have tended to be less stable and content than others, but after they successfully grappled with the problems of their youth, the swingers emerged with a sense of personal happiness, self-esteem and adjustment to life which at the very least was equal to that of the non-swingers. The swingers were considerably more outgoing than the non-swingers and more likely to rate their health as "excellent."

A strong finding of the Gilmartin study was that, as adolescents, swingers experienced all forms of erotic and romantic behavior at an earlier age than non-swingers. This generally correlates with a life-long, stronger-than-average sex drive. Swingers were far more likely to have experienced divorce; many married young and divorced soon thereafter. Swingers were as happy or happier with their current spouses than the non-swingers. Swingers considered themselves monogamous from the standpoint of emotional and psychological commitment to their spouses, and they had intercourse with their spouses a great deal more frequently than the non-swingers.

Many swingers (38%) first met their spouses at swinging singles gatherings; in other words, the swinging preceded the marriage. Almost as many swingers as non-swingers had children, and most swingers said they would be pleased if their children adopted the same lifestyle; in many cases the parents had already facilitated their children's introduction to swinging.

One serious problem with the Gilmartin and other studies of swingers is that the sample is limited to currently active swingers; the unsuccessful swingers had dropped out. One study found that about three quarters dropped the activity within one year. Ref 48 Another found that many couples tended to gradually expand from swinging, in which the couple participated together, to individual sexual involvements and long-term intimate relationships with others. Ref 49

## Use of Prostitutes

Use of prostitutes while traveling abroad on official business is a security concern, as it may attract attention from the local security service. Even within the United States, there is potential for arrest and embarrassment as police in many areas mount periodic crackdowns on prostitution. For many men who use prostitutes, this is a secret activity with substantial penalties (public embarrassment, marital problems) for exposure. Use of call girls at a cost of $200 to $500 per encounter can be a financial drain.

Frequent use of prostitutes may indicate personal characteristics that justify concern when adjudicating security clearance. It may reflect poor judgment, a propensity for irresponsible or high-risk behavior, adjustment problems, or that sexual behavior is out of control.

Prostitute patrons run a high risk of infection with potentially fatal sexually transmitted diseases. A 1990-1991 study that took blood tests of a probability sample of 638 street prostitutes in Los Angeles County found that 33.7% had been infected with syphilis at some point in their lives, 15.2% were probably infected at the time of the study, 32.6% were infected with Hepatitis-B, and 2.5% were infected with the AIDS virus. The percentage of prostitutes with AIDS is believed to be much higher in other areas; the low percentage in Los Angeles reflects the unusually low percentage of HIV virus among heterosexual drug users in that area. The rate of sexually transmitted disease among call girls is probably lower than among street prostitutes. Ref 50

There have been few systematic studies of men who patronize prostitutes. A 1984 study of 2,402 men over age 50 found that 34% had used a prostitute prior to age 50, but only 7% after age 50. Only 2.5% of the men over 50 reported even one encounter during the previous year. Other studies report lifetime use of prostitutes as low as 20%. The main conclusions that can be drawn from the available studies are that seeing prostitutes is more common in younger men than in older men, and that successive generations of men have been less and less likely to see prostitutes. Ref 51

### Premarital and Extramarital Relations

Premarital promiscuity is not a security concern unless it falls into some other category of concern, such as out-of-control or compulsive sexuality, or a pattern of immature behavior.

Cohabitation of unmarried persons is relevant to security only in that the partner must also be investigated.

Marital infidelity may be a security concern if it causes vulnerability to blackmail, creates financial pressures, or is sufficiently notorious to indicate poor judgment.

Most surveys of marital infidelity use an unrepresentative group of volunteers rather than a scientifically selected sample. This methodological weakness raises serious questions about the validity of the findings. One recent study that did use a scientifically selected sample of 3,432 respondents found that 80% of married women and 65% to 85% of married men, depending upon age, had had no sexual partner other than their spouse while they were married. Ref 52

Some of the most detailed information on marital infidelity, including the secrecy issue, comes from a 1983 study that obtained responses from 3,650 American married couples. The respondents who volunteered to participate in this study were disproportionately white and well-educated as compared with the population as a whole, so they may not be representative of other population segments. Ref 53

Although 75% of the husbands and 84% of the wives felt it was important that they themselves be monogamous, 26% of the husbands and 21% of the wives had had at least one extramarital sex partner at some time since their marriage. Many of these extra-marital relationships were no longer active at the time of the survey. For husbands, the number who had intercourse outside of marriage during the previous year ranged from 9% to 12%, depending upon length of marriage; for wives, 7% to 9% had had intercourse outside of marriage during the previous year.

For those who had had sexual intercourse outside of marriage, the number of extramarital sex partners was reported as shown in the table below.

| Number of Extramarital Sex Partners For Those Who Have Extramarital Sex | | |
|---|---|---|
|  | Husbands | Wives |
| Only 1 partner | 29% | 43% |
| 2 to 5 partners | 42% | 40% |
| 6 to 20 partners | 22% | 14% |
| over 20 partners | 7% | 3% |

Most married people eventually learn of any sexual experience their partner has outside the marriage, and there is very little difference between husbands and wives in this respect. Of those marriages in which either or both parties had had extramarital sexual intercourse, 64% of the husbands and 65% of the wives were aware of it; 9% of husbands and 7% of wives were unsure; and 27% of husbands and 28% of wives were unaware.

Unfortunately, the study does not distinguish between awareness of extramarital relations and more or less explicit consent for sex outside the marriage. Some couples do isolate sex from their feelings about each other and establish among themselves a variety of "rules" for sex outside the marriage.

When one or both partners give permission to the other to engage in extramarital sexual relations, this is sometimes referred to as an open marriage. One study of 4,246 persons over age 50 found that about 5% had the spouse's approval for extramarital relations. Ref 54 Such agreement may be reached when partners have incompatible sexual needs, one partner has a sexual dysfunction, when a marriage is continued for practical reasons without emotional commitment, or when there is mutual consent to separate sex from emotional commitment.

## Gender Identity or Role Transpositions

The term "gender transposition" signifies that one or more components of masculine or feminine identity is transposed so as to be opposite from the anatomical gender. Scientific understanding of gender transpositions is still limited, but there is a growing conviction among researchers that these conditions are, to a substantial degree, influenced prior to birth.

This section deals with:

- Homosexuality
- Bisexuality
- Transsexualism
- Transvestism

All fetuses start their development as females. It is sometimes said, for this reason, that nature has a bias toward creating females. If the male Y chromosome is present, it normally triggers the release of male sex hormones and neurohormonal chemicals which cause development of male organs during the first to fifth month of pregnancy.

Release of some hormones may be insufficient to clearly establish one or more aspects of the male identity. Based on experimental studies with animals, there is reason to suspect an anomaly in prenatal hormone function may influence sexual pathways in the central nervous system to remain sexually undifferentiated or potentially bisexual. If so, individuals affected by this would respond easily to postnatal influences that tip sexual orientation in one direction or the other. Ref 55

During gestation, complex chemical processes occur in the brain and throughout the body of the fetus. Because these processes operate over time, one or more of them may not continue to completion, which can cause either obvious or subtle and hidden results. Transpositions may take different forms and vary in degree of severity. The following transpositions may occur:

- Sexual anatomy may be incompletely formed, as in hermaphroditism and other physical anomalies.
- Sexual orientation, or the preference for sexual partners of one gender or another, may differ from what is commonly associated with the anatomical sex, as in homosexuality.
- Gender identity, or one's internal understanding of oneself as a man or woman, may differ from either anatomical sex or sexual orientation, as in transsexualism and perhaps, to a lesser degree, transvestism.
- Secondary sex characteristics such as voice, body hair, body type, and mannerisms may differ from anatomical sex, as in the effeminate male or the masculine female.

Sexual transpositions occur naturally in other mammals as well as in humans. Transpositions have also been induced in experiments with pregnant laboratory animals which then gave birth to homosexual offspring. For example, male offspring of female rats subjected to severe emotional stress during the last trimester of pregnancy are likely to be homosexual. This happens because stress reduces the level of testosterone in the mother's blood, which in turn affects development of the fetus. Ref 56

Researchers differ on whether prenatal developments only predispose to a given sexual orientation or rather firmly determine that orientation. Both could be true under different circumstances. "There may be different types of homosexuality, each of which originates in a different way." Ref 57

John Money, a leading researcher on the psychobiology of sex, writes that "with respect to orientation as homosexual or bisexual in the human species, there is no evidence that prenatal hormonalization alone,

independently of postnatal history, inexorably preordains either orientation." He explains that prenatal developments will facilitate subsequent development of a homosexual or bisexual orientation, but only if the postnatal determinants are also present. Money believes that one's "lovemap" is formed during late infancy and childhood prior to puberty, and that developments during puberty and adolescence play little role. Ref 58

On the other hand, Lee Ellis and Ashley Ames, after reviewing more than 300 research reports on this subject, conclude that:

> "...complex combinations of genetic, hormonal, neurological, and environmental factors operating prior to birth largely determine what an individual's sexual orientation will be, although the orientation itself awaits the onset of puberty to be activated, and may not entirely stabilize until early adulthood." Ref 59

Ellis and Ames believe one's early sexual experiences and other environmental factors also contribute to a homosexual or heterosexual orientation, but that these experiences after birth may only influence how, when, and where one expresses the basic sexual orientation formed in the womb.

## Homosexuality

Sexual orientation alone is not an appropriate basis for security concern. It may be a suitability issue for employment in some occupations. The circumstances of each case should be evaluated in the context of specific security risks and job suitability requirements.

Individual homosexuals, like heterosexuals, sometimes encounter emotional problems adjusting to their sexuality, and this may be considered under the Emotional, Mental, and Personality Disorders guideline. As a group, however, homosexuals do not differ from heterosexuals in their emotional stability or psychological adjustment. Homosexuality is not a mental or emotional disorder. For further information, see Homosexuality and Emotional Stability.

There is no evidence to support the belief that being homosexual predisposes one to unreliability, disloyalty, or untrustworthiness. Large individual differences in honesty and morality are found among homosexuals as well as heterosexuals. Ref 61

Homosexual lifestyles are as varied as heterosexual lifestyles. Some lifestyles raise security concerns while others do not. For example, the regular "cruising" associated with some homosexual lifestyles does involve a degree of promiscuity and sexual indiscretion that is difficult to reconcile with some security requirements, especially if the individual may travel or be assigned abroad. For further information, see Homosexual Lifestyles and Prevalence of Homosexuality.

Concealment of homosexuality may cause a person to be vulnerable to threats of exposure, but not necessarily more so than the adulterer or any other person who conceals an embarrassing personal secret. Increased openness and public acceptance of homosexuality have reduced the risk of blackmail, but the possibility remains and is strongest for individuals in positions where exposure of homosexuality may result in job loss. For more information, see Homosexual Vulnerability to Coercion.

### *Homosexuality and Emotional Stability*

Many studies have applied well-known psychological tests to both homosexuals and heterosexuals to determine if the two groups differed in emotional stability or psychological adjustment. This is an

important issue for security policy. If homosexuality were pathological or indicated maladjustment, then there would be security concerns to evaluate.

Two independent reviews of this research literature concluded that mental health and social adjustment are unrelated to sexual orientation. "Homosexuals as a group are not more psychologically disturbed on account of their homosexuality." Ref 62 In 1975, an American Psychological Association resolution declared that "homosexuality per se implies no impairment in judgment, stability, reliability or general social or vocational capabilities." Ref 63 The American Psychiatric Association, which had deleted homosexuality from its list of mental illnesses in 1974, passed a similar resolution in 1976.

This is the prevailing view among sex researchers, psychiatrists and psychologists, and it is the rationale that underlies court decisions dealing with the hiring and firing of homosexual personnel. Ref 64

Scientific findings on the origin of gender identity and role transpositions have contributed to significant changes in public perception of homosexuals. Attitudes toward homosexuals are considerably more positive among people who believe that homosexuals are "born that way" than among those who believe homosexuality is a conscious choice of lifestyle or an unnatural act. Ref 65

### Prevalence of Homosexuality

Statistics on the prevalence of homosexuality are not cited here as they are so hard to evaluate. Findings depend upon how homosexuality is measured. Ostensibly similar studies may not be comparable. The distinction between homosexuality and heterosexuality may be one of degree, not a sharp black-and-white difference.

It is easy to define a single homosexual act, but not so easy to define a homosexual person. Are individuals categorized on the basis of their sexual acts, their emotional feelings, or their self-identification as either heterosexual or homosexual? If categorized on the basis of sexual acts, how much homosexual activity is required before classifying a person as homosexual rather than heterosexual? How should one categorize persons whose sexual preference has changed over time? Some researchers believe bisexuals represent a distinct category often miscounted as homosexual.

Findings on prevalence of homosexuality may also be influenced by how the data are collected, as it is not possible to obtain a random sample of persons willing to talk honestly about sexual behavior that in some states is still illegal, though not often prosecuted.

### Classifying Homosexual Lifestyles

There is as much diversity among homosexuals as there is among heterosexuals. Statistical analysis of data collected in interviews of almost 1,000 male and female homosexuals in San Francisco suggested that homosexuals can be usefully grouped into five categories: Close-Coupled, Open-Coupled, Functional, Dysfunctional, and Asexual. Ref 66 These categories are useful when assessing the security risk that may or may not be associated with a homosexual's behavior. This study pre-dates the AIDS epidemic which encouraged coupling and discouraged cruising among homosexuals.

The following descriptions of the categories are from the above reference study. The comments on relevance to security are our own.

**Close-Coupled:** These homosexuals were similar to happily married heterosexuals. They were living together with a sexual partner in a quasi-marriage, and they looked to each other, rather than to

outsiders, for sexual and interpersonal satisfaction. They were able to integrate their emotional and their sexual needs. They tended to be better adjusted, have fewer sexual problems, have less regret about their homosexuality, and be more sexually active than the typical homosexual.

The Close-Coupled homosexual may be more trustworthy and less vulnerable to blackmail than the heterosexual who carefully conceals an illicit extramarital relationship.

**Open-Coupled:** Those in this group were also living with a special sexual partner but were not entirely happy and tended to seek sexual satisfaction with others as well. This group scored higher than average on number of sexual partners, number of sexual problems, and amount of cruising. This was the most common group for male homosexuals. Lesbians were found most frequently in the Close-Coupled category. Open-Coupled males were about average in their psychological and social adjustment, but Open-Coupled females tended to have difficulties. The Open-Coupled females were comparable to the Dysfunctional category on measures of happiness, self-acceptance, paranoia, tension, and depression. The infidelity associated with the Open-Coupled relationship appears to be symptomatic of emotional problems for many females but not for males.

For the Open-Coupled male homosexual, frequency of cruising may be a relevant security consideration; in the San Francisco study, 28% of the males cruised at least once a week. Some lesbians in this category may need to be evaluated for emotional stability.

**Functionals:** These homosexual men and women organized their lives around their sexual experiences. The closest heterosexual counterpart would be the "swinging single." This group reported more sexual activity, a greater number of partners, more cruising, and less regret at being homosexual than any other group. They were not interested in finding a special partner to settle down with. They tended to be younger, exuberant, very involved with their many friends, more open in their homosexual activity, and involved in the homosexual community. They are also the most likely to have been arrested for a homosexual offense. This group was better adjusted than average, although not quite as well adjusted as the Close-Coupled group.

Although rather well-adjusted emotionally, the Functional homosexual's promiscuity, cruising, and frequent lack of discretion in sexual activity may be a security concern. Of the Functional male homosexuals in the San Francisco study, 76% were cruising at least once a week. Cruising of homosexual bars was characteristic of 65%, while 40% cruised on the street. The study found that every one of the male Functional homosexuals had at least 20 different sexual partners during the previous year. Many had far more than that. For an employee assigned or traveling overseas, this type of activity is likely to attract the attention of a local security or intelligence service. On the other hand, Functional homosexuals tend to be somewhat more open about their homosexuality and, therefore, less vulnerable to blackmail. Female homosexuals are far less likely than males to be promiscuous or to engage in anonymous sexual contacts. Cruising was unusual among Functional lesbians, and only 10% of them had more than 20 different sexual partners during the previous year.

**Dysfunctionals:** This group resembled the stereotype of the tormented homosexual. They were not coupled, but scored high on level of sexual activity and number of partners. They were troubled people whose lives offered little gratification. They showed a poor adjustment sexually, socially, and psychologically. They were much more likely to regret their homosexuality. Among the men, they were the most likely to report robbery, assault, extortion, or job difficulties as a result of their homosexuality. They were a bit less likely than the open-coupled males to have been arrested for a homosexual offense, but more likely to have been arrested for some other offense. The women were more likely than other homosexual types to have needed long-term professional help for an emotional problem. About 20% of the homosexuals clearly fell into this Dysfunctional category.

About 66% of the Dysfunctional male homosexuals cruised at least once a week, 90% had at least 20 sexual partners during the previous year, 80% reported difficulty finding suitable sexual partners, about half reported problems of psychological adjustment, and 43% reported that their homosexuality had harmed their career.

Individuals of this type may be vulnerable to exploitation by others, including hostile security or intelligence services. Psychological evaluation of emotional problems may be appropriate.

**Asexuals:** The most prominent characteristic of this group was a low sex drive and relative lack of involvement with other people. They were not coupled but differed from the Dysfunctionals by scoring low on level of sexual interest and number of partners They had more sexual problems than other homosexuals and often complained of difficulty in finding a partner. They expressed more regret over their homosexuality, were less exclusively homosexual and more covert in their homosexual activity than other respondents. Female asexuals were more likely to rate themselves as bisexual and to have sought professional help concerning their sexual orientation.

Cruising was rare among the Asexual males, and none had more than 20 sexual partners during the previous year. On the other hand, Asexuals were more likely to conceal their homosexuality and, therefore, may be more vulnerable to blackmail. Almost half of this group reported problems of psychological adjustment. About 75% reported difficulty finding a suitable sexual partner, which may make an individual vulnerable to exploitation.

This vulnerability may be quite significant for an individual who travels or works in foreign countries. As with the Dysfunctionals, psychological evaluation of emotional problems may be appropriate.

### *Homosexual Vulnerability to Coercion*

A Security Practices Board of Review convened by the Federal Emergency Management Agency in 1992 concluded that "the evidence indicates that homosexuals, 'in or out of the closet,' are no more vulnerable to coercion or blackmail than heterosexuals." Ref 67 Most people have personal secrets they would prefer to keep private. A heterosexual adulterer may be just as vulnerable to coercion as a concealed homosexual.

Relevant considerations for assessing the vulnerability of both homosexuals and heterosexuals are:

- How ashamed they are of the behavior
- The lengths to which they have gone to keep the behavior secret
- The magnitude of potential loss if the behavior were exposed -- for example, loss of job, financial loss, marital strain, or other serious personal problem

Adjudicators may also consider whether an individual has character strengths or weaknesses that might influence how that person responds to coercion.

On the other hand, there are two studies that suggest homosexuals are vulnerable to blackmail. These studies are not recent, and it is not known whether the findings still apply. Homosexuality is less likely to be concealed today than when these studies were conducted, and some homosexual practices have been modified due to the AIDS epidemic. If more recent studies have covered this subject, they could not be identified.

A 1982 study of 1,556 gay men in the Chicago area found that 16% had been threatened with exposure

of their homosexuality. Of those who were threatened, 35% gave the extortionist something. Of this 35%, 79% made one-time payments and 13% made repeated payments. The amount of the payments was not reported in the study.

Those with mainly gay friends (and therefore more open about their homosexuality) were more likely to resist extortion than those whose friends were mainly or entirely straight. Of those in the former category, 25% acceded to the extortion, while 44% of those with mainly straight friends made one or more extortion payments.

The extortion was almost always an amateur effort by a lover, friend, acquaintance, relative, coworker, or neighbor of the homosexual. "The image of the gay person being blackmailed by professional extortionists seems rather mythical," according to this study. Ref 68

A 1979 study of almost 1,000 San Francisco area homosexuals determined that 15% of the white males and 23% of white females had been threatened with exposure at least once. Black males and females had been threatened somewhat less frequently, as shown in the table below.

Of those who threatened male homosexuals, about two thirds sought to extort money or material goods in return for their silence; others wanted sexual favors or to force a lover to continue a relationship. Statistics on the amount of money demanded were not reported, but several cited examples suggest the amounts were small. Close-Coupled homosexuals were blackmailed more frequently than others. With the female homosexuals, money or material goods was the motive only about 10% of the time. Lesbians were most likely to be threatened with exposure by a desperate lover intent on keeping the relationship from breaking up. The study did not question how many homosexuals yielded to the threat, but from the examples cited it appears that many did not. Ref 69

| Threatened Exposure of Homosexuals | | | |
|---|---|---|---|
|  | White Male N = 575 | Black Male N = 110 | White Female N = 229 | Black Female N = 64 |
| Never | 85% | 87% | 77% | 86% |
| More than once | 15% | 13% | 23% | 14% |

Sexual entrapment followed by threats of arrest or blackmail is one of the standard recruitment techniques used by foreign intelligence and security services. This occurs principally in hostile or potentially hostile countries that conduct aggressive intelligence operations against the United States. It is important to note, however, that experience in the Soviet Union and other communist countries indicates that heterosexuals engaging in sexual relations with local nationals have been just as vulnerable to recruitment as homosexuals. See Past Espionage Cases for information on recruitment of American *heterosexuals* through sexual entrapment.

## Bisexuality

Research on bisexuality has been quite limited, and scientists disagree on whether it is a distinct sexual orientation comparable to heterosexuality or homosexuality. There are three alternative theories: Ref 70

- There are no clearly defined sexual categories. Exclusive heterosexuality and exclusive homosexuality are polar extremes on a continuum with no sharp distinctions or categories in between.

- There are two distinct categories -- heterosexual and homosexual. Bisexual preference is only a "way-station" that one passes through when evolving from one to the other. When homosexuality appears in an otherwise heterosexual person, it tends gradually to replace heterosexuality.
- Bisexuality is a distinct sexual orientation that may be defined on the basis of sexual behavior, desire, or one's self-identification as bisexual.

Extensive interviews of persons who identified themselves as bisexuals have found that sexual behavior and lifestyle associated with those claims varies widely. Ref 71 Many are basically homosexual but married. Others grew up conforming to heterosexual social norms but later experienced homosexual desires as a reaction to stress or emotional conflict. Some are hedonists who "swing" both ways but have a clear understanding of their sexual identity as heterosexual or homosexual. Ref 72

Patterns of sexual behavior are so diverse that it seems inadvisable to think in terms of neat categories like heterosexual, homosexual and bisexual. The scientific debate over whether there is such a thing as bisexuality, or how to define it, is not relevant to personnel security decisions. What name one ascribes to those who fit between the extremes of exclusive heterosexuality or exclusive homosexuality is far less important than recognition of the immense variety of human sexual behavior, and the ability to deal with individuals as individuals rather than as members of any category.

## Transsexualism

Transsexualism, literally, means going from one sex to another. A transsexual experiences strong discomfort with his or her biological sex. There is a conviction that, mentally, one is a man trapped in a woman's body, or a woman trapped in a man's body. As with other gender and sexual anomalies, this occurs with varying degrees of severity. Prevalence of transsexualism is estimated at one per 30,000 for males and one per 100,000 for females. Ref 73

One might expect the U.S. military would be a very unlikely place to find transsexuals. Actually, there are circumstances when young transsexuals are attracted to military service as a means of demonstrating their masculinity. For further information, see Transsexuals in the Military.

Transsexuals often suffer from moderate to severe personality disturbance due to the stress caused by their inability to live in the role of the desired sex. They frequently report anxiety or depression. Ref 73 Any associated personality or adjustment problems would be a security concern.

In extreme cases, transsexualism may result in a request for a sex-change operation, which is usually granted only after the person has spent at least two years living as a member of the preferred sex. In the United States, several thousand people have undergone surgery to change (insofar as possible) their external genitalia to that of the opposite sex.

The wish to be a member of the opposite sex commonly dates back to one's earliest childhood memory. The young child may make very emotional assertions that he or she *is* the other sex. Cross-dressing normally begins early in life, as do play which is more typical of the opposite gender and choice of playmates exclusively of the opposite gender. Although transsexuals almost invariably report having these gender identity problems in childhood, most children who have these problems do not grow up to be transsexuals.

The transsexual tends to be asexual and may be so aversive to the genitals, for example, that there is a reluctance to touch them to masturbate. Attempted self-mutilation is not uncommon. Transsexuals are usually attracted sexually to members of the same biological gender, but they perceive themselves as

heterosexual as they are themselves in the wrong body. Ref 74

## Transsexuals in the Military

Young male transsexuals in the throes of adjusting to their situation appear to go through a hypermasculine phase. They try to purge the feminine side of their personality and prove their masculinity both to themselves and others. Transsexuals pass through this hypermasculine stage during late adolescence and early adult years, which coincides with the time when men consider military service.

An Air Force psychiatrist assigned to Wright-Patterson Air Force Base reported evaluating 11 male transsexuals during his 3-year tour there. Eight were current or former active duty military personnel, while three were civilians. Of the eight who had had extensive military service, seven had joined the service voluntarily at a time when no draft existed or other options were readily available. All were requesting either female hormones or sex change surgery. Ref 75

Quotes from taped interviews with military transsexuals are typical: "I tried to do things to make me feel more masculine, like joining the Navy and getting married." "I thought it would make a man out of me." "I joined the Navy hoping maybe the problem would go away." "I joined the Air Force as a cover. In uniform, my masculinity would not be questioned."

A civilian doctor advised one young man who had come to him for treatment of feminine feelings to "join the Army, go to boot camp, and learn how to run over trees with a tank." These military transsexuals tend to seek out the more macho military specialties. One who had been assigned as a lab technician volunteered for combat helicopter training during the peak of the Vietnam war; his hobbies were mountain climbing and race car driving. Another became a Green Beret.

These are natural choices for the young transsexual in the hypermasculine phase making a last ditch effort to adjust to what society expects from a male. This effort eventually fails in many cases, however, and transsexual urges return, although transsexuals have had successful military careers of 20 years or more. Ref 76

## Transvestism

Transvestism is cross-dressing. The transvestite is almost always a male, and usually a heterosexual male, who has an obsession for wearing women's clothes, usually as a means of reducing psychic stress or tension. To the extent that sexual arousal is a principal motive for wearing female garments, this is a type of fetish and is mentioned under fetishism; it is sometimes called transvestic fetishism. Cross-dressing by homosexuals is the exception rather than the rule. Ref 77

Transvestism takes a number of forms. It may involve occasional cross-dressing while alone in private, usually accompanied by masturbation; relaxing in women's attire while at home in the evening with a spouse; cross-dressing as an erotic turn-on during intercourse with a partner; wearing on a daily basis a single item of women's attire such as underwear or stockings under one's masculine clothes; dressing up in full women's regalia with wig and makeup for the excitement of venturing out in public alone as a woman; or participating in the subculture of transvestite support groups or transvestite bars.

The transvestite should be distinguished from the drag queen and the female impersonator. A drag queen is a male homosexual who dresses as a woman, often for the purpose of sexually stimulating other males. Although he may be a transvestite, in many cases he is not. The female impersonator is an

entertainer. He, too, may also be a transvestite, although in many cases he is not. The drag queen and female impersonator may have no psychological dependence on wearing feminine clothing as a form of tension release, nor do they necessarily gain sexual stimulation from the clothing.

The transvestite should also be differentiated from the male transsexual who seeks to change his gender identity. As discussed under transsexualism, the transsexual male feels like a woman trapped in a man's body, wishes to live as a woman, and experiences an insistent urge to change his anatomical sex. Although some cross-dressers evolve into transsexuals as young adults or in early middle age, most are quite happy with their gender and feel no urge to change it. Ref 78 There is also an intermediate condition called gynemimesis in males and andromimesis in females, where the person dresses and lives continuously as a person of the opposite sex but does not wish for any change in the anatomy.

Gynemimesis might be more common in the United States if there were not such strong societal constraints against its expression. Males who live as women are accepted and have well-defined and in some cases highly respected roles in a variety of cultures, including India, Burma, Oman, Polynesia, and among North American Indian tribes. In one small town in Oman where they were studied, the xanith, as they are known there, comprised 2% of the 3,000 adult males. Ref 79

Many transvestites are married and masculine in appearance. Most assume a female name and personality while they are cross-dressed. Cross-dressing often starts in childhood or early adolescence. The causes are not known, but some prenatal biological influence may be involved as well as later experiences during early childhood.

Cross-dressers are not dangerous. That is, they generally are not child molesters, voyeurs, exhibitionists or rapists. The practice does not generally interfere with work performance. If cross-dressers have difficulties with the law, it is generally because of society's inability to accept persons who do not behave in the "normal" way. Ref 80 A recent book on transvestism by one of the principal scholars in this field argues that gender impersonation (including cross-dressing) should not be classified as a mental illness or a pathology unless it becomes a compulsive behavior. Under those circumstances, it should be considered the same as any other compulsive behavior. Ref 81

Owing to lack of public acceptance, cross-dressers normally conceal their feelings and their secret life, and this creates a potential for extortion in exchange for keeping their secret. On the other hand, secret cross-dressing tends to be a solitary activity. Unlike homosexuality or adultery, it does not require a partner, so the risk of discovery and blackmail may be considerably less. According to the Prince and Bentler study, almost 50% of transvestites had told either no one or only one other person (often the wife). Most others were very limited in their disclosure; only 9% had told anyone who was "antagonistic," showing that transvestites "were quite adept in selecting individuals to talk with who would not respond negatively to the information." Ref 82

Transvestism is similar to homosexuality in that it is not illegal, and there is no empirical evidence that transvestites are, by nature, less trustworthy or loyal than other persons. Cross-dressing, by itself and in all circumstances, does not necessarily indicate poor judgment, unreliability, irresponsibility or emotional instability, although these disqualifying characteristics will be present in some cases. For additional information, see Research on Transvestism.

There is evidence that many cross-dressers lead successful lives with a high degree of personal and professional achievement. Each individual should be considered on a case-by-case basis. Appropriate medical authorities should determine whether there are other associated emotional problems or evidence of a progression toward other sexual disorders such as fetishism or transsexualism.

The adjudicative criteria that may apply to some cases of transvestism are the public nature of the behavior and susceptibility to blackmail or coercion. Going out in public dressed as a woman may indicate lack of discretion and would be an aggravating circumstance that may justify disqualification. Concealment of current cross-dressing behavior may indicate susceptibility to pressure. Admission of cross-dressing during a security interview may eliminate some of this susceptibility but is discouraged by the sanctions associated with current personnel security policies.

### *Research on Transvestism*

No valid statistics are available on the prevalence of transvestism. The Society for the Second Self is a support and social organization for heterosexual cross-dressers. In 1991 the group reported about 1,100 members organized into 27 chapters nationwide, with another 23 chapters in the process of formation. Other similar organizations also exist. The "second self" is the woman that the society believes "is buried within every man." The group's purpose is to create a safe environment for the heterosexual male membership "to express without fear, to speak without shame, and to act out without guilt the femininity that is within them." Members generally limit their cross-dressing to the privacy of their homes or cover of night and socialize "en femme" only at chapter meetings with their close confidants. Ref 83

The largest survey of transvestites was conducted in the late 1960s by V. Prince and P.M. Bentler. They received survey responses from 504 subscribers to a magazine for heterosexual cross-dressers. Ref 84 Prince, who was one of the founders of the Society for the Second Self, has almost 1,200 more responses from recirculating the same survey questionnaire during the late 1980s. Prince reports that the responses "come out pretty much the same as the original survey, which indicates that the phenomenon is pretty much the same over a 25-year period." Ref 85

The findings reported here are from the original Prince and Bentler survey. In response to a question about how they see themselves, 12% said they felt like a woman trapped in a male body; in other words, they may be transsexuals rather than transvestites. Another 12% reported they were a man with just a sexual fetish for feminine attire, which suggests they should be classified as transvestic fetishists. The classical transvestite response, that they feel themselves to be a man who has a feminine side seeking expression, was given by 69%. Only 28% reported ever having any homosexual experience, which is less than the number reported by some other studies for the male population as a whole.

Prince and Bentler report that 76% of their respondents had never had a psychiatric consultation for any reason. This is significant, as it indicates that many transvestites do not experience emotional problems of sufficient gravity to require treatment.

Most (64%) respondents were currently married, with another 14% either separated, divorced, or widowed. About one third of the married members described their wives as either cooperative or understanding, while 20% of the wives were completely unaware of their husbands' interests.

About one quarter had a college degree, while another 13% had earned an advanced degree. A remarkable 17% were either presidents or owners of a company or business, while 19% had played football in high school or college.

To some extent, these figures reflect the fact that people who join any type of support group tend to be well educated. The figures may also say something about transvestites, however.

A separate study of 51 members of the Society for the Second Self found that many were high achievers, driven to seek personal success in order to gain a sense of self-worth and positive recognition. Many

sought out particularly masculine occupations as a means of compensation, that is, to prove their masculinity both to themselves and to others despite their enjoyment of feminine things. Ref 86

Sexual Behavior -- Continued
Paraphilia (Sexual Perversion) - General