# PREECE
# DEPOSITION

```
 1                UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2
    - - - - - - - - - - - - - - x
 3   DIANE J. SCHROER,               :

 4          Plaintiff,              :

 5             v.                   :   CA No. 06-763
                                     :
 6   JAMES H. BILLINGTON,            :
                                     :
 7          Defendant.              :
    - - - - - - - - - - - - - - x
 8

 9                    Washington, D.C.

10                    Thursday, January 11, 2007

11

12          Deposition of CHARLOTTE P. PREECE, called

13   for examination by counsel for Plaintiff, pursuant

14   to notice, at the Law Offices of 1875 Pennsylvania

15   Avenue, N.W., Washington, D.C., and commencing at

16   9:10 a.m., before Barbara a. Huber, Notary Public in

17   and for the District of Columbia, when were present

18   on behalf of the respective parties:

19

20

21

22
```

Charlotte P. Preece                                                        January 11, 2007
                           Washington, DC

| Page 10 | Page 12 |
|---|---|
| 1  responsibilities? | 1    Q   And for the position of terrorism |
| 2    A  I supervise about just shy of a hundred | 2  specialist, to whom would that analyst report? |
| 3  people, probably about 85 research analysts, who | 3    A   The head of the foreign policy |
| 4  do work for the United States Congress on foreign | 4  management and global issues section. And that |
| 5  affairs, defense, and trade. | 5  would be Francis Miko, M-I-K-O. |
| 6    Q   And how many of those analysts are in | 6    Q   And Mr. Miko was the supervisor at the |
| 7  positions requiring security clearances? | 7  time of the events in this case; is that right? |
| 8    A  Most of the trade people not. Most of | 8    A   That's correct. |
| 9  the foreign policy people do. All the defense | 9    Q   Were you the person responsible for |
| 10  people do. | 10  hiring the terrorism specialist? |
| 11    Q   And, roughly, the number of -- of the 85 | 11    A   Yes, I was the security officer. |
| 12  research analysts, what number does that amount to | 12    Q   Okay. Was the terrorism specialist |
| 13  of analysts that have a security clearance | 13  position a newly created position that you were |
| 14  component of their job? | 14  filling? |
| 15    A   I'd say 75 to 80 percent have | 15    A   No. |
| 16  clearances. | 16    Q   Okay. Who held the position previously? |
| 17    Q   Who do you report to? | 17    A   Audrey Kurth Cronin. |
| 18    A   The director of the Congresional | 18    Q   Can you spell that name? |
| 19  Research Center. | 19    A   Kurth is K-U-R-T-H. And Cronin is |
| 20    Q   Who is? | 20  C-R-O-N-I-N. Audrey is her first name. |
| 21    A   Dan Mulhollan. | 21    Q   Oh, Audrey. Okay. |
| 22    Q   Okay. And who reports to you? | 22    A   I saw you had it written down, so -- |

| Page 11 | Page 13 |
|---|---|
| 1    A   The people that I supervise. I have six | 1    Q   When did Ms. Kurth Cronin inform you |
| 2  intermediate managers, or seven rather section | 2  that she intended to leave the position? |
| 3  heads. I have a deputy. I have an administrative | 3    A   In July of 2004. |
| 4  support person. I have two project management | 4    Q   And did she inform you why she was |
| 5  coordinators. And the rest are analysts. | 5  leaving the position? |
| 6    Q   And how long have you been with the | 6    A   Yes. |
| 7  Library of Congress? | 7    Q   And why was that? |
| 8    A   Since 1976. | 8    A   She had accepted a teaching position, a |
| 9    Q   And when did you take over the position | 9  faculty position, at the National War College. |
| 10  that you currently hold? | 10    Q   And what was her last day on the job? |
| 11    A   I became acting division chief in late | 11    A   It was the last week of July. I can't |
| 12  1991. I became permanent division chief in early | 12  remember the specific date. |
| 13  1994. There was a reorganization roughly six | 13    Q   Did you need to do anything to get |
| 14  years ago. And trade people were moved into the | 14  approval to begin the process of replacing |
| 15  division. And then instead of being a division | 15  Ms. Kurth Cronin in the position? |
| 16  chief, I became the assistant director for foreign | 16    A   I did. |
| 17  affairs, defense, and trade. | 17    Q   What did you do? |
| 18    Q   And that was 2000 or 2001? | 18    A   I had to make a special appeal to the |
| 19    A   Roughly 2000, yes. | 19  director. |
| 20    Q   Do the analysts that you report to | 20    Q   And what did that involve? |
| 21  report directly to you? | 21    A   A short memo, going down to talk to him, |
| 22    A   No. They have a section head. | 22  saying why we needed a person when we did, because |

4 (Pages 10 to 13)

Charlotte P. Preece

January 11, 2007

Washington, DC

Page 14

1  it was out of our hiring cycle.
2     Q   And what did you say in that memo?
3     A   Basically the exegesis of the job
4  requirements, particularly post 9/11, this
5  position was in high demand. It was important
6  that we fill it as soon as possible.
7     Q   And to whom did you send this memo?
8     A   I'm not even sure if it was a memo or a
9  conversation. It was just a discussion of going
10  down. And it was all very quick, because I didn't
11  have much timing from the time I think she was
12  going to take the position.
13     Q   Okay. And with whom did you speak or
14  with whom did you have this conversation?
15     A   The director.
16     Q   And can you tell me what you remember
17  from the conversation about how you described how
18  quickly you wanted to fill the position?
19     A   I think I said as soon as possible. We
20  only have two people, or had two people at the
21  time we who worked in terrorism. And so when one
22  left, we were very short-staffed and scrambling.

Page 15

1     Q   And how did the director respond to your
2  request?
3     A   Favorably.
4     Q   And by favorably, what does that mean?
5     A   That he said we'll work with our
6  workforce development people to get the posting up
7  as soon as possible.
8     Q   And did Mr. Mulhollan have to produce
9  any paperwork to get that process started?
10     A   I don't know.
11     Q   Okay. Do you remember seeing any memo
12  from Mr. Mulhollan, after your conversation, about
13  the fact that he had approved your request?
14     A   No.
15     Q   As part of your conversation with
16  Mr. Mulhollan, did you share any documents with
17  him?
18     A   No.
19     Q   Okay. Did you request permission to
20  conduct this hire on an expedited basis?
21     A   Not on an expedited basis, but out of
22  normal cycle. We normally have a quarterly

Page 16

1  sometimes only semiannual staffing call. And this
2  did not -- this timeframe did not coincide with
3  that staffing call. So in that sense it was
4  special.
5     Q   Other than being an out-of-cycle hire,
6  was there any other option that you had for
7  expediting the hire?
8     A   Just to stay on top of it and make sure
9  each stage of the process moved along as quickly
10  as it could.
11     Q   Do all employment vacancies in your unit
12  need to be filled on an urgent basis?
13     A   No.
14     Q   Okay. Which ones do not?
15     A   For example, we're in the process of
16  having a staffing call now. We just recently had
17  one, and positions were approved. I met yesterday
18  with the workforce development staffing people to
19  come up with a timeframe and set priorities of
20  which positions I wanted to fill first, which ones
21  I could afford to fill later in the fiscal year,
22  so --

Page 17

1     Q   Okay. And if you could explain sort of
2  which -- which positions did you consider more
3  urgent and which ones less so?
4     A   Okay. In this case, the urgent ones
5  were a specialist in weapons of mass destruction
6  proliferation, non-proliferation policy; a
7  specialist in military operations. Two less
8  urgent were an analyst in international trade and
9  finance. Oh, I cannot -- a fourth position,
10  excuse me. An analyst and a junior analyst in
11  international narcotics and crime.
12     Q   How many hires have you overseen?
13     A   I would dare say 40 to 50.
14     Q   And by overseeing, correct me if I'm
15  wrong, but that means that you were the selecting
16  official for those positions; is that correct?
17     A   That's correct.
18     Q   Okay. And how many of those hires were
19  for analyst positions?
20     A   95 percent of them.
21     Q   And how many of those positions did not
22  need to be filled on an urgent basis?

5 (Pages 14 to 17)

Charlotte P. Preece
Washington, DC

January 11, 2007

---

Page 70

1    Q   Okay.  Did you request a waiver of the
2    pre-appointment security clearance investigation
3    for this person?
4    A   Yes.
5    Q   And was it granted?
6    A   Yes.
7    Q   Okay.  So we now have applicant A
8    through F.
9         Are there any other applicants or
10   employees that had -- that brought to your
11   attention information that had a security
12   clearance dimension that you needed to address?
13   A   That's all I can think of.
14   Q   Okay.  Have you ever decided to go with
15   a candidate who -- for employment who perhaps
16   originally was your second or third choice over
17   the candidate who had been your first choice, due
18   to concerns that your first choice candidate might
19   take longer to go through the security clearance
20   process?
21   A   No.  I mean, if the interview is
22   completed and nothing comes up during the

---

Page 71

1    interview that would lead me to question, then
2    I -- I'm shooting kind of blind.
3    Q   Okay.
4    A   Do you understand what I mean?
5    Q   I'm not sure, actually.
6    A   If the person -- if two people come
7    through and interview -- and you're the first
8    choice and you're second choice --
9    Q   And you're referring to me and James,
10   as --
11   A   Exactly.
12   Q   -- hypothetical people?
13   A   I'm sorry.  Exactly.  Person A and
14   person B.  And nothing comes up to lead me to be
15   suspicious or questioning of your qualifications
16   or credentials, I would go with applicant A.  If
17   Cynthia Wilkins subsequently turned up something
18   in an investigation that would change our mind,
19   then I could switch to person B.
20   Q   Okay.  And am I right that the situation
21   that we were discussing with respect to employee
22   C, the individual who had information come up

---

Page 72

1    after the background check, is perhaps the closest
2    case to that, where this candidate had been your
3    top choice, you found information, didn't go with
4    them; but in that case, rather than going with a
5    second choice from that original pool, you decided
6    to re-post; is that correct?
7    A   That's correct.
8    Q   Okay.  And so thinking back through all
9    of your interviews with the various applicants,
10   has there ever been a situation where you had, you
11   know, applicant A and applicant B; and applicant A
12   was your top choice, based on everything you had
13   heard in the interview, but then at the end, in
14   response to your anything else question they
15   revealed some information that may or may not have
16   a security clearance component, might lead to a
17   delay or a more cumbersome security clearance
18   process?
19       Has there ever been a case like that,
20   where you've had an applicant reveal that
21   information, and then you said, you know, I'm
22   actually going to go with applicant B so I don't

---

Page 73

1    have to deal with the issues that applicant A, you
2    know, may or may not have, based on what they've
3    just told me?
4    A   I can't think of one.
5    Q   In the beginning, we started off talking
6    about the process for hiring the terrorism
7    specialist position.  So I just wanted to go back
8    to that.  You know, we were talking about sort of
9    how the vacancy first emerged.  And that, you
10   said, was due to someone leaving the position.
11       At that point, with respect to beginning
12   the process for filling the position, were you
13   involved in any processes for determining the
14   qualifications that would be necessary for someone
15   filling the terrorism specialist position?
16   A   Yes.
17   Q   Who else was involved?
18   A   Francis Miko, and Steven Bowman.
19   Q   And who are they?
20   A   Two of the seven section heads.  Francis
21   Miko holds -- is the section head where this
22   position resides, the specialist in terrorism.

19 (Pages 70 to 73)

Page 18

1    A    Could you define urgency for me?
2    Q    Well, were there positions that you felt
3  needed to be filled on an urgent basis; and if so,
4  I would ask you to describe how you determined
5  that they were urgent?
6    A    By the workload.
7    Q    And what do you mean by workload?
8    A    CRS fields questions from members of
9  Congress. We also -- it's part of our job, as
10  well as to anticipate, to look out -- to have
11  products prepared on issues that we see coming
12  down the road. And so our analysts are both
13  reacting to requests they're receiving, as well as
14  looking ahead and trying to prepare.
15    Q    And of the 40 to 50 hires that you've
16  been involved in, how many were hires that you
17  requested to be filled out of cycle?
18    A    Very few. I'm trying to think if there
19  was -- I can't remember another time of going to
20  the director out of cycle and saying we need to
21  fill immediately, as soon as we can.
22    Q    So your testimony is that the terrorism

Page 19

1  specialist position was the first and only time
2  you've gone to the director with a request for a
3  hire out of cycle?
4    A    Since we started this process. We
5  didn't always have this staffing cycle. Back in
6  the day when I first became division chief, when
7  you wanted a position you would just go down and
8  talk to the director. There wasn't an organized
9  systematic staffing call like there is now.
10    Q    And do you need to fill out any
11  paperwork in order to request a hire out of cycle?
12    A    I just don't recall whether I did or
13  not. I may have.
14    Q    With respect to the terrorism specialist
15  position, if Mr. Mulhollan had not approved your
16  request to fill the position out of cycle, how
17  long would it have taken for you to be able to
18  fill that position?
19    MS. RUSSELL: Objection, to the extent
20  that a response calls for speculation.
21    But you can go ahead and answer if you
22  understand.

Page 20

1    THE WITNESS: I do understand it. I
2  don't know when the next staffing call was. I
3  think it was in the fall sometime of '04.
4  BY MS. McGOWAN:
5    Q    And when -- from the time in which this
6  staffing call takes place, what is the lag time
7  between when the staffing call happens and when
8  you can actually begin filling the positions that
9  you've identified during the staffing call?
10    A    Sometimes it's weeks, sometimes it's
11  months. In the case now, we're operating under a
12  CR, and uncertain about the budget. It can be
13  longer.
14    Q    And by CR you mean?
15    A    Continuing resolution. I'm sorry.
16    Q    Okay. And are requests to fill a
17  vacancy for a position that already exists
18  impacted by the continuing resolution?
19    A    I'm sorry. Please again.
20    Q    This is because in some part I'm
21  unfamiliar with how the --
22    A    Right.

Page 21

1    Q    -- continuing resolution works.
2    A    Right.
3    Q    My understanding is that under the
4  continuing resolution, the funding stays at the
5  same level. So bringing on new positions would
6  obviously be very difficult because no new money
7  would be coming.
8    My question is with respect to positions
9  that have already existed and it's simply filling
10  a vacancy in a pre-existing position, does the
11  continuing resolution impact your ability to fill
12  vacancies for pre-existing positions?
13    A    It could.
14    Q    Okay. How so?
15    A    As you said, the money wouldn't be there
16  to fund the position. It wouldn't affect staff on
17  board now. We don't anticipate that it will. But
18  instead of being allowed to say hire 20 people
19  across the service, they might decide we only have
20  a budget for ten people.
21    Q    And with respect to this question of
22  whether or not there would be any new funding

6 (Pages 18 to 21)

Charlotte P. Preece

January 11, 2007

Washington, DC

Page 74

1  Steve Bowman is head one of one of our defense
2  sections that does special operations and military
3  operations connected with counterterrorism.
4      Q   How did they become part of the hiring
5  team?
6      A   I asked them to be.
7      Q   And what were the most important
8  qualifications for the terrorism specialist
9  position?
10     A   You're familiar with the term KSA's,
11  knowledges, skills, and abilities?
12     Q   I have become familiar with the terms,
13  yes.
14     A   Okay.  There were three critical
15  components:  Knowledge, policy analysis, and
16  writing.
17     Q   Okay.  And how did you decide that --
18  well, let me back up.
19         Is it accurate to say that these three
20  things were the most important qualifications for
21  the job?
22     A   Right.  What it would mean is that if

Page 75

1  you didn't score at least to the minimally
2  successful in these three areas, you could be
3  disqualified from further consideration.
4      Q   Were there other qualifications for the
5  position?
6      A   Yes.
7      Q   Okay.  And what were they?
8      A   Research methodology, world
9  communications, leadership, ability to work
10  collaboratively with others, objectivity,
11  judgment, and discretion.  One, two, three, four
12  five, six, seven, eight.  I think there were nine.
13  There may be a tenth one, but I think those are
14  the ones.
15     Q   Okay.  And how did you -- I'm sorry.
16         That's the list?
17     A   Yes.
18     Q   Okay.  How did you decide that these
19  were the qualifications for the position?
20     A   They're the qualifications for every
21  position in CRS, with the exception of the
22  leadership that is only at the GS-15 level.

Page 76

1      Q   And to the extent that these are
2  qualifications for every CRS position, in addition
3  to these were there any other qualifications
4  unique to the terrorism specialist position?
5      A   What we do is the knowledge is
6  customized for the position, for each position.
7      Q   Okay.  Is there anything else regarding
8  the qualifications that -- either additional
9  qualifications or customized qualifications with
10  respect to the terrorism specialist position?
11     A   That it required a top secret clearance.
12     Q   Okay.  Now, was an active top secret
13  clearance a prerequisite for the job?
14     A   No.
15     Q   Okay.  So would you have considered
16  someone who did not already hold a top secret
17  security clearance?
18         Would you have considered someone like
19  that to be competitive for the position?
20     A   Yes, particularly if they had held a
21  clearance before.
22     Q   Okay.  How likely did you think it was

Page 77

1  that the top candidate for the position would not
2  have an active top secret clearance?
3      MS. RUSSELL:  Objection to the form.  It
4  calls for speculation.
5      But you can answer if you understand it.
6  BY MS. McGOWAN:
7      Q   With respect to your thoughts about who
8  the likely top candidate or candidates would be,
9  did you expect that the top candidate or
10  candidates would probably be actively holding a
11  top secret security clearance?
12     A   Yes.  Yes.
13     Q   Okay.  I'm going to show you a document
14  that we will mark Exhibit 19.
15         (Deposition Exhibit No. 19
16          marked for identification.)
17  BY MS. McGOWAN:
18     Q   Actually, I'm handing you the wrong
19  document this is the one I meant to you give you.
20         (Deposition Exhibit No. 20
21          marked for identification.)
22  BY MS. McGOWAN:

20  (Pages 74 to 77)

Charlotte P. Preece
January 11, 2007
Washington, DC

| Page 102 | Page 104 |
|---|---|
| 1  we scored that individual the way we did. | 1  recognize this e-mail? |
| 2      Q.   And do you recall any discussions of | 2      A   Uh-huh. |
| 3  that nature happening with respect to these | 3      Q   What is it? |
| 4  candidates? | 4          Actually, I'm sorry. Before we go on, |
| 5      A   I'm sure there were. | 5  let me just identify what this document is for the |
| 6      Q   Okay. | 6  record. This, which has been marked as Exhibit |
| 7      A   I mean, given the 18 across nine, ten | 7  Number 25, is a document produced by the |
| 8  categories, there probably were areas where we did | 8  Government in discovery. It's Bates-stamped |
| 9  have discussions. And I don't remember which | 9  number 148. At the top says, Charlotte Preece |
| 10  individuals or which factors, no. | 10  references for terrorism position. |
| 11      Q   Okay. Focusing on a couple of the | 11          And so, I'm sorry, if you can tell me |
| 12  applicants, do you remember any discussion about | 12  what the e-mail is. |
| 13  disparities in scoring with respect to | 13      A   It is letting my fellow panelists know |
| 14  Ms. Schroer's application? | 14  that we would begin reference checks. And it's |
| 15      A   I really can't remember. | 15  proposing who would do reference checks on each of |
| 16      Q   Okay. And similarly with respect to | 16  these three people. |
| 17  Mr. Rollins? | 17      Q   And how did you select these three |
| 18      A   I can't remember. | 18  people as the applicants that you would continue |
| 19      Q   At any point -- and I'm referring to | 19  to pursue? |
| 20  Exhibit 24, looking at the interview schedule -- | 20      A   I always like to talk to the current |
| 21  at any point did you go back to Rita and point out | 21  supervisor. These other people are people listed |
| 22  that there was a gap of almost a week between | 22  as choices. |

| Page 103 | Page 105 |
|---|---|
| 1  November 8th and November 15th where no interviews | 1      Q.   Okay. I think my question was a little |
| 2  were happening? | 2  unclear. |
| 3      A   I don't remember. | 3          With respect to the fact that it was |
| 4      Q   Do you know of any particular reason why | 4  John Rollins, David Schroer, and Kel Britvec -- |
| 5  there was this gap in the interviews? | 5      A   Yes. |
| 6      A   No, I don't. | 6      Q   -- that were the applicants for whom you |
| 7      Q   Okay. When you saw this list and saw | 7  were going to reference checks -- |
| 8  that the last interview was taking place on | 8      A   Yes. |
| 9  November 16th, were you concerned at all about the | 9      Q   -- how did you select these three |
| 10  length of time the interviews were taking, or did | 10  applicants as individuals that you describe as |
| 11  this seem average to you? | 11  your final list? |
| 12      A   Seemed average to me. | 12      A   Based on discussions among the three of |
| 13      Q   I'll next show you a document which | 13  us of who we thought our top candidates are, and |
| 14  we'll mark as Number 25. | 14  to pursue reference checks with. We were free to |
| 15          (Deposition Exhibit No. 25 | 15  select any of the applicants that scored above a |
| 16          marked for identification.) | 16  three, three or above. So when you see this final |
| 17  BY MS. McGOWAN: | 17  referral list documents, 12, we could have |
| 18      Q   And then I'm also going to ask you to | 18  selected any one of these individuals. |
| 19  look at a document that has been previously marked | 19      Q   Okay. And how did you select the three |
| 20  Number 12. | 20  that you did: Mr. Rollins, Ms. Schroer, and Kel |
| 21      A   (Witness examined document). | 21  Britvec, from the applicants here on this final |
| 22      Q   Turning first to Exhibit 25, do you | 22  Britvec, from the applicants here on this final |

Charlotte P. Preece

Washington, DC

January 11, 2007

---

**Page 106**

1  referral list?

2      A   We thought those were the best

3  applicants. There was one woman who withdrew, or

4  she would have been in this mix, as well. That

5  was Dana Lesemann.

6      Q   I wasn't sure if Dana was a male or a

7  female, so -- okay. So Ms. Lesemann withdrew.

8      At what point did she inform you that

9  she was withdrawing?

10     A   Within a day or so, within a day or two.

11     Q   Within a day or two of what?

12     A   The interview.

13     Q   Okay. And staying with Exhibit 12 for a

14 moment. This is a document marked Bates-stamp

15 number 155. It's the final referral list that we

16 were referring to, with the number of applicants

17 names and their interview scores. And looking

18 here at the staffing specialist name where Edith

19 Friday has signed it -- well, first let me ask you

20 that.

21     Am I right that that's Edith Friday's

22 signature?

**Page 107**

1      A   I'm not sure I would know what --

2      MS. RUSSELL: Objection. Lacks

3  foundation.

4  BY MS. McGOWAN:

5      Q   Okay. Do you know who the staffing

6  specialist on --

7      A   I know Edith Friday --

8      Q   Okay.

9      A   -- but I'm not familiar with her

10 handwriting.

11     Q   Okay. With respect to this signature

12 here under the staffing specialist name and date,

13 do you know what it being signed and dated by the

14 staffing specialist means?

15     A   It means that's the day she signed it

16 and I received it.

17     Q   Is she the one who would have produced

18 this form?

19     A   Yes.

20     Q   Okay. And am I right that you received

21 the form on November 30th, 2004, the date that's

22 listed here under the staffing specialist's name?

**Page 108**

1      A   That was probably the case.

2      Q   Okay. Looking back in Exhibit 25, with

3  respect to these three applicants, was there an

4  order of preference with respect to these three

5  finalists?

6      A   No.

7      Q   How did you intend to decide what your

8  final order of preference was going to be for the

9  applicants on this list?

10     A   We were going to call a reference for

11 each of them, three references for each of them.

12 When I called -- first, the first thing that I do

13 is call or e-mail the applicants to let them know

14 that we are about to begin reference checks.

15 Because I would like to talk to their current

16 supervisor. They may want to first inform their

17 boss that they have applied for another position.

18 I always ask them to get back to me and let me

19 know if that's okay.

20     So obviously this e-mail was sent before

21 I had heard back from them. Also, in many cases

22 you need to ask them, even though they've

**Page 109**

1  initialed off on a reference check form, we need

2  to get more current information about the

3  whereabouts of these folks.

4      There's usually a fair bit of interplay,

5  or there can be, that if one of the references

6  they've listed is overseas or unavailable, can you

7  give me an additional reference so I can call. So

8  there's that kind of interchange that takes place.

9      Q   When was the next time you had contact

10 with Ms. Schroer after the interview?

11     A   Probably sometime within a couple of

12 weeks, ten days or two weeks of this, maybe even

13 sooner.

14     Q   And what was the purpose of that

15 contact?

16     A   Trying to get more current addresses for

17 people.

18     Q   Okay. Anything else?

19     A   Well, we did have one exchange I

20 remember, about Walt Chrietzberg, who was his

21 supervisor at the time. And I asked David if I

22 could -- if it was okay to call him. David

28  (Pages 106 to 109)

Charlotte P. Preece                                               January 11, 2007
                            Washington, DC

| Page 118 | Page 120 |
|---|---|

**Page 118**

1      Q   Why not?

2          MS. RUSSELL: Objection to the form,

3   lacks foundation.

4   BY MS. McGOWAN:

5      Q   Why did you think it was not appropriate

6   to ask Mr. Alderman why Ms. Schroer didn't want

7   you talking to Mr. Chrietzberg?

8      A   Just thought it was personal

9   information.

10     Q   Okay.  How did you wrap things up with

11   Mr. Alderman at the end of the conversation?

12     A   By this time, I was pretty certain who I

13   wanted to recommend.  And so I appreciated the

14   call.  I thanked him for spending the time.  As I

15   did say, this was the last reference.  And by that

16   time I probably told him that he was my top

17   candidate.  Because by this time Mr. Schroer was

18   my top candidate.

19     Q   And do you recall saying anything to

20   Mr. Alderman along the lines of the fact that the

21   call was a formality?

22     A   Yes, I think I did say something like

**Page 119**

1   that.  I had the reference checks I needed.  The

2   fact that he finally got back to me or I finally

3   got back to him -- I think he called me -- I --

4   you know we -- we included it, but I wouldn't have

5   had to include it.

6      Q   And so you mentioned that by that time

7   you had decided Ms. Schroer was your top

8   candidate.

9          When did you decide that?

10     A   We were formulating it all along.  The

11   three of us were talking.  We'd get reference

12   checks back.  We'd share those references with one

13   another.  We would sit down and talk.  And

14   certainly by the middle of December Mr. Schroer

15   was my top candidate.

16     Q   And why?

17     A   I thought he had the best interview.  He

18   impressed me the way he thought on his feet.

19     Q   Anything else?

20     A   It was difficult, because the

21   qualifications of the top three people were all

22   exceptional.  I would have been happy to have any

**Page 120**

1   one of them.

2      Q   Okay.

3      A   In terms of their knowledge, the breadth

4   and depth of their knowledge, the level -- high

5   level positions of responsibility they were given.

6   Those were all good and equal.  The distinguishing

7   factor that led Schroer to be my top candidate was

8   his performance at the interview.

9      Q   After talking with Marc Alderman, did

10   you -- well, let's ask this.

11          When did you next speak to Ms. Schroer?

12     A   I can't give you the date.

13     Q   Okay.  Do you recall having a

14   conversation with Ms. Schroer sometime after this

15   last correspondence regarding references?

16     A   Yes.

17     Q   Okay.

18     A   And calling him up and asking him if he

19   were still interested in the position, and when he

20   might be available, letting him know that I was

21   about to write up a recommendation.

22     Q   And did you ever indicate to Ms. Schroer

**Page 121**

1   that you wanted to offer her the job, but only if

2   she was still interested?

3          MS. RUSSELL: Objection to the form.

4          But you can answer if you understand.

5          THE WITNESS: Please, again.

6   BY MS. McGOWAN:

7      Q   Sure.  During the conversation, did you

8   ever make a statement to the affect of: I want to

9   hire you, but I only want to go forward with the

10   hiring if you actually want the job?

11     A   Usually I ask the person first are you

12   still interested in the position.  And then I let

13   him know I would like to recommend him.

14     Q   Do you recall having any conversations

15   about the salary for that position during that

16   conversation?

17          Let me just back up for a moment.  In

18   your last response you said that usually you ask

19   the person if they're still interested.

20          And so with respect to the conversation

21   that you actually had with Ms. Schroer, what did

22   you say?

31 (Pages 118 to 121)

Page 122

1    A    I don't remember exactly what I said.
2    But I probably said, David, you're my top
3    candidate. Are you still interested in the
4    position? And he said very much so. And I said,
5    well, then I'd like to begin preparing the
6    paperwork for the recommendation.
7    Q    Okay. And do you recall having any
8    discussions about the salary for that position at
9    that point?
10    A    We did. I can't remember whether it was
11    at that conversation or a subsequent conversation.
12    Q    And what was the nature of that
13    conversation?
14    A    The position was a GS-15 step one. And
15    Mr. Schroer claimed that he was making more money
16    than that in his current capacity, and was there
17    any room for negotiation. And I said I would have
18    to contact our personnel specialist, whose name is
19    Chuck Freyder, and get back to him with that
20    information. And I think I did the following day.
21    I can't remember whether I phoned him or sent him
22    an e-mail.

Page 123

1    Q    Who's the "him" in that sentence you
2    called?
3    A    David.
4    Q    David. Okay.
5         And so at some point did you follow up
6    with Ms. Schroer about what you had learned
7    from --
8    A    Yes. That's what I mean: I --
9    Q    -- what you had learned from your
10    conversation with Mr. Freyder?
11    A    Yes.
12    Q    And tell me about that conversation.
13    A    I can't remember whether it was a
14    conversation or an e-mail. But the response was
15    basically if he could provide proof of the salary
16    level, it'd be possible to bring him on as high as
17    a GS-15, step ten.
18    Q    After this correspondence about salary,
19    how did you leave things with Ms. Schroer, once
20    you had let her know that you had information
21    about the salary?
22    A    I told him that I would start processing

Page 124

1    the paperwork.
2    Q    And at any point did you have a
3    conversation where Ms. Schroer suggested that you
4    meet?
5    A    Yes.
6    Q    Okay.
7    A    We did.
8    Q    Tell me about that conversation.
9    A    He said that he would like to get
10    together for either coffee or lunch, to discuss
11    more about the job and to -- how did he phrase it?
12    There was something he wanted to tell me.
13    Q    Was there any additional description of
14    what that was?
15    A    No.
16    Q    Did you ask?
17    A    No.
18    Q    Did you have any suspicions about what
19    Ms. Schroer might want to discuss with you?
20    A    I wondered, yes. I mean, I wondered
21    enough to stop writing the recommendation about
22    four or five sentences into it. I thought I'll

Page 125

1    wait to see what he tells me on Monday.
2    Q    So with respect to the written
3    recommendation, when did you start writing those
4    first few lines that you were just describing?
5    A    After the conversation where I asked him
6    if he was interested in the job, and the salary
7    seemed to work out, resolve okay, seemed there was
8    no impediment from there.
9    Q    And was the discussion that you had
10    about the salary and the discussion in which
11    Ms. Schroer suggested that you meet, was that two
12    discussions, or one?
13    A    I think two, as I recall. I'm not sure.
14    Q    And so when did -- did you agree to
15    meet?
16    A    Yes. Uh-huh.
17    Q    And when did you agree that you would
18    meet?
19    A    The Friday before the Monday that we
20    met.
21    Q    Okay.
22    A    We agreed to meet for lunch on Monday.

32 (Pages 122 to 125)

Charlotte P. Preece
Washington, DC
January 11, 2007

Page 134

1. my division.

2. Q  And do you recall what you said in
3. making this introduction?

4. A  This is David Schroer, we hope to have
5. him working with us on terrorism issues in the
6. not-too-distant future.

7. Q  Did you say anything to the affect of:
8. Here is the new guy that we're bringing on?

9. A  Here's the new guy that we're bringing
10. on? I don't remember using that terminology. But
11. certainly words to the affect that we had hoped to
12. bring Mr. Schroer on board, yes.

13. Q  At some point were you and Ms. Schroer
14. in your office?

15. A  Yes.

16. Q  And did you have any conversation while
17. you were in your office?

18. A  Other than to exchange pleasantries, I
19. don't recall an -- any conversation at all in my
20. office.

21. Q  Did you talk at all about your preparing
22. of the paperwork for Ms. Schroer?

Page 135

1. A  That's quite possible, that I said I was
2. in the process of preparing paperwork, yes,
3. uh-huh.

4. Q  Do you recall showing Ms. Schroer, you
5. know, paperwork regarding her application while
6. you were in your office?

7. A  No.

8. Q  On your way out to lunch, leaving your
9. office, did you encounter anyone?

10. A  Yes. There were a few people walking
11. by. And I introduced David to those people. I
12. can't remember who they were.

13. Q  Did you -- do you recall encountering
14. Francis Miko on the way out?

15. A  I don't recall.

16. Q  Do you recall anything about those
17. conversations on the way out?

18. A  Not other than what I told you. They
19. were very brief. We were -- I said from the time
20. that David arrived in my office, we were three or
21. four minutes until we left.

22. Q  And do you recall anything that these

Page 136

1. individuals to whom you were introducing
2. Ms. Schroer, do you recall what they said?

3. A  No.

4. Q  Did anyone say things to the affect of,
5. you know, welcome on board or --

6. A  Quite possibly. It would be good to
7. have you. I don't know. I assume people were
8. pleasant.

9. Q  Is there anything else about the part of
10. the meeting that happened while you were at the --
11. at your office at the Library?

12. A  No. It was very brief.

13. Q  Okay. Did you and Ms. Schroer converse
14. on the way to where you were having lunch?

15. A  I assume we chatted.

16. Q  Tell me what you remember about that
17. conversation.

18. A  Nothing. The restaurant is two minutes
19. from the Library.

20. Q  Did you talk about the job?

21. A  I do not recall.

22. Q  Do you recall having any conversation

Page 137

1. about the people who work at the Library?

2. MS. RUSSELL: Objection. Vague.

3. THE WITNESS: At the luncheon we did.

4. BY MS. McGOWAN:

5. Q  Okay. I'll hold off then for a second.
6. I'll get us to lunch.

7. A  Okay.

8. Q  And so anything else about your
9. conversation on your way to the restaurant that
10. you remember?

11. A  No.

12. Q  Okay. And once you're at lunch, can I
13. assume that conversation continued between you and
14. Ms. Schroer?

15. A  Yes.

16. Q  Okay. Describe what you remember about
17. that conversation.

18. A  I was talking about what it was like to
19. work at CRS. I was talking about our mission to
20. serve Congress, our values of objectivity and
21. nonpartisanship. I was describing how the
22. sections were laid out, and the organization of

35 (Pages 134 to 137)

Charlotte P. Preece                                         January 11, 2007

Washington, DC

Page 138

1   the office. I was describing how we do our work.
2   I described our research design and briefing
3   process. I talked a little bit about what I call
4   the culture of the office.
5       Q   And how did you describe the culture?
6       A   I remember telling him it was a very
7   diverse and eclectic group of people, that we
8   weren't stereotyped like many institutions are:
9   The State Department, or the Intelligence Agency
10  or, God forbid, lawyers.
11          MS. RUSSELL: I guess I can't raise an
12  objection to that.
13          THE WITNESS: That people came from
14  different backgrounds: People from academia,
15  people from the military, people from other
16  executive agencies, people from think tanks, and
17  that I thought that that enriched the work of our
18  division because people brought various
19  perspectives to examining foreign and defense
20  policy issues.
21  BY MS. McGOWAN:
22      Q   Did you ever discuss why Ms. Schroer had

Page 139

1   emerged as your top candidate?
2       A   He asked me that question. And I
3   responded to it. And I told him pretty much what
4   I told you, that I thought his answers were a bit
5   more creative, that his contacts that he brought
6   to bear, would bring to bear, would be useful in
7   his position.
8       Q   Anything else?
9       A   I think I told him that we had a very
10  strong applicant pool, and we had another highly
11  qualified candidate that we looked at very
12  carefully.
13      Q   And did you have any conversation about
14  why Ms. Schroer had beaten out that other
15  candidate?
16      A   Yes. That was the conversation based on
17  the a little bit more creativity, imagination.
18  Very strong interview, I told him he had a strong
19  interview.
20      Q   Anything else?
21      A   In the conversation at lunch?
22      Q   About this part of the conversation

Page 140

1   about --
2       A   The qualifications?
3       Q   Yes.
4       A   That's what I recall.
5       Q   At some point did Ms. Schroer tell you
6   she had something she wanted to discuss with you?
7       A   Yes.
8       Q   Okay. Describe that conversation.
9       A   He said that he had something personal
10  that he wanted to talk to me about. And then he
11  asked me if I knew what transgender migration was
12  or what I knew about it.
13      Q   And was that the precise term that --
14      A   That's the term I recall.
15      Q   Okay. And what did you say when she
16  asked you that?
17      A   Very little, if anything.
18      Q   And then where did the conversation go
19  from there?
20      A   He proceeded to describe it, and --.
21      Q   And how did he describe it?
22      A   Well, he talked about that he'd always

Page 141

1   felt uncomfortable, there was something -- a level
2   of discomfort in his life, and that he'd come to
3   the realization over the years that he felt more
4   comfortable -- he would feel more comfortable
5   living life as a woman than a man.
6           And he told me that he was under -- had
7   been consulting with a psychiatrist, and that was
8   part of the process, and that he had been taking
9   hormone treatment for about a year, and wanted to
10  complete the other physical processes required for
11  the migration, and that he would like to start
12  work at CRS in January as a woman.
13      Q   What was the first thing that went
14  through your mind when you heard Ms. Schroer tell
15  you that she wanted to start work as a woman?
16      A   Wow, I can't believe this. I was
17  stunned.
18      Q   And how did you feel?
19      A   Surprised, disbelieving.
20      Q   Were you upset?
21      A   Not initially. I think I was more just
22  shocked.

36 (Pages 138 to 141)

Charlotte P. Preece

Washington, DC

January 11, 2007

Page 146

1    MS. RUSSELL: Objection. Lacks
2  foundation.
3    MS. McGOWAN: I'm sorry. Sure.
4  BY MS. McGOWAN:
5    Q  Did you have a conversation with
6  Ms. Schroer about the fact that you were filling
7  out paperwork for the position and needed to know
8  what name to use?
9    A  No. I asked him how I could hire him as
10  David and he would start work as Diane. And I was
11  confused about paperwork, as well.
12    Q  And tell me about that conversation.
13  Sort of what did Ms. Schroer say when
14  you posed this question to her?
15    A  I don't recall, other than he seemed to
16  think that it could be worked out.
17    Q  When you asked Ms. Schroer how could you
18  hire her as David and have her start work as
19  Diane, was it just a question of paperwork that
20  you were concerned about, or did you mean
21  something more?
22    A  Well, I certainly knew I needed to check

Page 147

1  on the security clearance. That was foremost in
2  my mind.
3    Q  And why did you think that?
4    A  Because David had a clearance. Diane
5  didn't.
6    Q  And what conversations, if any, did you
7  have with Ms. Schroer at the time about this
8  security clearance issue?
9    A  I asked him how this was likely to
10  affect his ability to get a security clearance.
11    Q  And did you, at the moment you're asking
12  Ms. Schroer the question, have a gut instinct
13  about what impact it would have?
14    A  I certainly had a feeling that it could
15  slow things down a great, great deal.
16    Q  Did you think that David Schroer would
17  lose his security clearance over this issue?
18    A  David, I didn't know about whether David
19  would, but I knew Diane didn't have one.
20    Q  Did you have any conversations at all
21  about what of this information David -- what
22  information, if any, David had already reported to

Page 148

1  the entity currently holding his security
2  clearance?
3    A  No.
4    Q  Why not?
5    MS. RUSSELL: Objection. Calls for
6  speculation.
7    But you can answer if you understand the
8  question.
9    THE WITNESS: I didn't think of it at
10  the time. You know, at this -- by this point, I
11  needed advice.
12  BY MS. McGOWAN:
13    Q  So I wanted to ask you, to the extent
14  that you are articulating a concern that David had
15  a clearance but Diane didn't, why did you think
16  that the clearance that Ms. Schroer held as David
17  would not apply to Diane, as well?
18    A  I just didn't think it would. But
19  that's why I ended the conversation, because I
20  needed to go back and get advice from the security
21  people.
22    Q  Did you think that David would become a

Page 149

1  different person as Diane?
2    MS. RUSSELL: I'm going to object to the
3  form of the question.
4    But you can answer if you understand.
5    THE WITNESS: Can you say what you mean
6  by a different person?
7  BY MS. McGOWAN:
8    Q  To the extent that David had a security
9  clearance and the concern was that Diane did not,
10  my question is did you think that David would be a
11  different person as Diane, such that the
12  information that they knew about David and that
13  formed the basis for his security clearance
14  decision would no longer be relevant for Diane?
15    A  I don't think I thought of him as
16  different in terms of what he knows. He would
17  still have the same experiences he had, to carry
18  with him as Diane. But how that affected the
19  security clearance, I had a lot of questions
20  about.
21    Q  And what were those questions?
22  What were you concerned about?

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                              January 11, 2007
Washington, DC

**Page 150**

1     A   Was Diane going to be able to be
2   cleared; and, if so, in a timely fashion.
3     Q   And why were you concerned that Diane
4   might not be cleared?
5     A   Because the position required a top
6   secret clearance, and because it was needed
7   particularly to do this job.
8     Q   And understanding that the position
9   itself needed a clearance, why were you concerned
10  that Diane might not get that clearance --
11    A   In a timely way? Because he, himself,
12  told me that he would likely have to have a
13  psychological fitness for duty prior to a
14  determination whether to proceed with the
15  clearance.
16    Q   Other than that information, was there
17  any other concern that you had; for example, with
18  regard to honesty?
19    A   Yes. I felt deceived, somewhat
20  deceived.
21    Q   And did you address that concern with
22  Ms. Schroer?

**Page 151**

1     A   No.
2     Q   At any point did you say something along
3   the lines of: Why are you just telling me this
4   now?
5     A   I don't know if I -- I don't recall. I
6   may have. I may not have. I don't recall.
7     Q   When I asked you sort of your reaction
8   when you first heard this information, my
9   understanding is you said that you weren't upset
10  initially?
11    A   Yes.
12    Q   Is there a point at which you became
13  upset?
14    A   Not upset visibly. But as the
15  conversation went on, I thought -- I did think to
16  myself certainly why are you telling me this and
17  why are you telling me now? Why didn't you come
18  to the interview dressed as a woman? He had told
19  me, during the course of the conversation, that he
20  was presenting himself as a woman except in work
21  settings.
22    Q   And what did you think about that?

**Page 152**

1          MS. RUSSELL: Lacks foundation.
2          But you can answer if you understand the
3   question. And it also -- no, I'll just stick with
4   the same objection. It lacks foundation.
5          But you can answer if you understand.
6          THE WITNESS: Certainly my personal
7   preference was that if he were open and honest
8   about this and come to the interview dressed as a
9   woman, at least I wouldn't have been -- felt
10  deceived.
11  BY MS. McGOWAN:
12    Q   And did you have any conversations with
13  Ms. Schroer about what her legal name was at that
14  point?
15    A   He told me that he would be changing his
16  name early in January to Diane.
17    Q   So up until that point, Ms. Schroer's
18  legal name was still David Schroer?
19    A   That's what he was using; yes.
20    Q   So what would you have thought if on
21  December 28th, I think it was, at 10:00 a.m., when
22  the person on your interview list named David

**Page 153**

1   Schroer was scheduled to appear, a woman in a
2   dress showed up for the interview?
3          MS. RUSSELL: Calls for speculation.
4          But you can answer if you understand.
5          THE WITNESS: What would I -- I'm sorry?
6   BY MS. McGOWAN:
7     Q   What would you have thought?
8     A   I would have thought the person was a
9   transsexual.
10    Q   And how would that have impacted your
11  assessment of that applicant?
12    A   I would have probably consulted
13  personnel security to see if there were
14  implications for an individual's ability to get a
15  security clearance.
16    Q   Other than the security clearance issue
17  that you just identified, would you have thought
18  that this individual being transsexual impacted on
19  their KSA's, in knowledge, skills, and abilities,
20  for the position?
21    A   No, other than contacts. I did have
22  some concerns about whether his contacts knew,

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece

Washington, DC

January 11, 2007

---

Page 154

1 whether they would be as forthcoming as they might
2 be had he not revealed this or undergone the
3 procedures.
4    Q. And would your concern about contacts
5 have been less if Ms. Schroer had come to the
6 interview dressed as a woman?
7    A. They would have been there under that
8 case, as well.
9    Q. Do you recall, when Ms. Schroer told you
10 that she was transitioning from male to female, do
11 you recall saying anything along the lines of, you
12 know, Why would you want to do something like
13 that, or words to that affect?
14    A. I think I did ask him how did you come
15 to this decision, why did you do that, yes.
16    Q. And what was his response? What was
17 Ms. Schroer's response?
18    A. To the best of my recollection, he said
19 that he had never felt comfortable in his body,
20 and that it was something that he -- probably came
21 to him as -- as -- when he was young, but it took
22 a long time for him to come to the realization

---

Page 155

1 that, yes, I would be more comfortable in a
2 female's body.
3    Q. And so you -- am I right you were told
4 by Ms. Schroer that this was something that she
5 had been dealing with for a long time; is that
6 right?
7    A. Yes. Uh-huh.
8    Q. And to the extent that this was
9 something that Ms. Schroer had been dealing with
10 for a long time, were you concerned at all about
11 how Ms. Schroer's decision to appear at work as a
12 woman may or may not distract her from her work
13 duties?
14    A. I'm sorry. Please repeat that.
15    Q. Sure. I'll make it a shorter question.
16       Were you concerned at all about
17 Ms. Schroer's transition as being a distraction?
18    A. I was concerned in terms of the
19 surgeries. And I knew nothing about how many
20 surgeries would be required, how long they would
21 take.
22    Q. And did you ask Ms. Schroer for any

---

Page 156

1 information that might give you a better sense
2 about that?
3    A. I don't recall that I did.
4    Q. What did you think about the fact that
5 Ms. Schroer had brought pictures of herself
6 dressed as a woman to this meeting?
7       MS. RUSSELL: Objection. Lacks
8 foundation.
9 BY MS. McGOWAN:
10    Q. Let me back up.
11       I think we discussed that at some point
12 in the meeting Ms. Schroer showed you pictures; is
13 that correct?
14    A. That's correct.
15    Q. And these were obviously pictures that
16 she had brought to the meeting to show you; is
17 that right?
18    A. That's right.
19    Q. Okay. What did you think about the fact
20 that she had brought these pictures to this
21 meeting?
22    A. I guess I thought David wants to see

---

Page 157

1 me -- wants to show me what he would look like as
2 a female. I don't think I thought anything beyond
3 that.
4    Q. Do you recall what you said first when
5 you saw the pictures?
6    A. I don't think I said much of anything.
7    Q. Do you recall saying "wow," or words to
8 that affect?
9    A. No.
10    Q. Did you think it was appropriate for
11 Ms. Schroer to show you those pictures?
12    A. I didn't know what was appropriate.
13       MS. RUSSELL: Objection to the form of
14 the question.
15       Go ahead.
16 BY MS. McGOWAN:
17    Q. I'm sorry?
18    A. I didn't know what was appropriate.
19    Q. So after hearing this information, did
20 you have any concern that the contacts that
21 Ms. Schroer had in the government and the military
22 would no longer want to associate with her because

---

40 (Pages 154 to 157)

Charlotte P. Preece                                                      January 11, 2007
Washington, DC

| Page 158 | Page 160 |
|---|---|
| 1   she was undergoing a gender transition? | 1   A   I didn't ask that. |
| 2       MS. RUSSELL: Object to the form. | 2   Q   As you were hearing this information, |
| 3       But you can answer if you understand. | 3   what were you thinking with respect to |
| 4       THE WITNESS: Yes. I think I already | 4   Ms. Schroer's trustworthiness? |
| 5   mentioned that. | 5   A   As I said, I felt somewhat deceived. |
| 6   BY MS. McGOWAN: | 6   Q   And why did you think that? |
| 7   Q   Okay. And why did you think that? | 7   A   Because he waited for so late in the |
| 8   A   The military being the culture it is, | 8   game to talk to me about this. |
| 9   and particularly special forces, I thought it's | 9   Q   And when in the process do you think |
| 10   possible that some people would be understanding | 10   Ms. Schroer should have told you? |
| 11   and others would not. | 11   A   He could have told me at any time. He |
| 12   Q   And when you talk about the culture of | 12   could have told me at the interview or after the |
| 13   the military, what do you mean? | 13   interview. He could have told me when I contacted |
| 14   A   Combat lines, uniquely male profession. | 14   him to let him know that he was a top candidate |
| 15   Q   Did you think of the military as being a | 15   and that I would be starting reference checks. |
| 16   particularly unfriendly or unsympathetic place | 16   Q   And -- I'm sorry. Continue. |
| 17   with respect to transgender people? | 17   A   He could have called me any time while |
| 18   A   I thought it was likely probably to have | 18   those reference checks were going on and we were |
| 19   a more conservative attitude than the general | 19   in fairly routine contact by phone or by e-mail. |
| 20   population at large. | 20   Q   And if at the point where you contacted |
| 21   Q   And in this context, by conservative, is | 21   Ms. Schroer regarding her reference checks she |
| 22   it fair to say that mean negative? | 22   told you this information about her intentions to |

| Page 159 | Page 161 |
|---|---|
| 1       MS. RUSSELL: I'm going to objection to | 1   transition, would you have gone forward and |
| 2   the form of the question. | 2   contacted her references, or would you have walked |
| 3       But you can answer if you understand. | 3   away at that point? |
| 4       THE WITNESS: Conservative in terms of | 4       MS. RUSSELL: Objection to the form. |
| 5   traditional values than is being seen as outside | 5   Calls for speculation. |
| 6   those traditional norms. | 6       THE WITNESS: I would have probably did |
| 7   BY MS. McGOWAN: | 7   the same thing I did in this circumstance, and go |
| 8   Q   Were you concerned about bias by | 8   back talk to my boss and talk to personnel |
| 9   military people against Ms. Schroer if she were in | 9   security to determine impact. |
| 10   the position? | 10   BY MS. McGOWAN: |
| 11   A   Yes. | 11   Q   Did you say anything to Ms. Schroer |
| 12   Q   And with respect to this concern about | 12   about feeling deceived, or your concerns about her |
| 13   her contacts with government and military people | 13   trustworthiness? |
| 14   and possible bias, did you express any of those | 14   A   I don't recall that I did. |
| 15   concerns to her? | 15   Q   Is there anything else that you remember |
| 16   A   No. I was to the point where I didn't | 16   discussing during this lunch? |
| 17   want to say anything more, because I needed to | 17   A   I remember saying something to the |
| 18   process it. I needed to go back to my agency, | 18   affect that, David, you've given me a lot to think |
| 19   talk to some people. | 19   about. I need to go back to my office and talk to |
| 20   Q   And so did you ask her if any of her | 20   some people. I do want to fill this position by |
| 21   special forces, you know, colleagues knew that she | 21   Christmas, and so I'll get back to you in a timely |
| 22   was transitioning? | 22   manner. |

41 (Pages 158 to 161)

Charlotte P. Preece

January 11, 2007

Washington, DC

---

Page 162

1    Q   Anything else?
2    A   That's -- that was pretty much the end
3  of the conversation.
4    Q   Okay.  And before we end this part of
5  the conversation, I just want to go back and make
6  sure that I am clear about everything that you
7  discussed.
8       When you raised this issue with
9  Ms. Schroer of how can I hire you as David when
10  you want to show up as Diane, other than the name
11  on the form and other than the security clearance
12  concern that you identified, did you mean anything
13  else by that question?
14       MS. RUSSELL:  I'm going to object to the
15  extent it mischaracterizes her testimony.
16       But you can go ahead and answer if you
17  understand the question.
18       THE WITNESS:  Please repeat it.
19  BY MS. McGOWAN:
20    Q   Sure.  We've talked about the concern
21  about the name that goes on the paperwork, whether
22  it should be David or whether it should be Diane.

Page 163

1  And also talked about your concern about the
2  security clearance issue.
3       I'm sort of wondering if there's
4  anything else that you were trying to convey when
5  you asked Ms. Schroer:  How can I hire you as
6  David when you want to come to work as Diane?
7       MS. RUSSELL:  It's the same objection.
8       But answer it if you understand it.
9       THE WITNESS:  It was a practical
10  question.  David Schroer applied.  David Schroer
11  interviewed.  I did reference checks on David
12  Schroer.  He wants to start work as Diane.  I
13  didn't hire Diane.  I didn't recommend Diane.  I
14  didn't interview Diane.
15  BY MS. McGOWAN:
16    Q   And in what ways were you concerned that
17  Diane would be different from David?
18       MS. RUSSELL:  Objection to the form.
19  BY MS. McGOWAN:
20    Q   Or were there any ways in which you were
21  concerned that Diane would be different from David
22  in a way that would impact your decision about

Page 164

1  whether you wanted Diane when you had wanted
2  David?
3    A   Just the security clearance.
4    Q   Okay.
5    A   The contacts.
6    Q   Uh-huh.  Anything else?
7    A   Those were the primary.
8    Q   Recognizing that these two were the
9  primary reasons, were there any other reasons,
10  even recognizing that they may have been less
11  important?
12    A   Credibility with members of Congress
13  went through my mind.
14    Q   And by credibility, what do you mean?
15    A   This position is a senior position.  It
16  would likely be that -- or it was certainly
17  expected to be that this person would have close
18  contacts with committees, potentially be called to
19  testify.  Generally when you testify they read a
20  bio about yourself.  He would be testifying before
21  people who knew -- would know, that only a man
22  could have those experiences.

Page 165

1    Q   And were you concerned that people would
2  react negatively?
3    A   Yes.
4    Q   And why is that?
5    A   That they might not be as tolerant, the
6  same reason as the contacts.
7    Q   And so with respect to the credibility
8  with members of Congress, is it fair to say that
9  you were concerned about bias against plaintiff by
10  individuals who disapproved of transgender people?
11    A   I thought it was possible.
12    Q   And did you -- were you concerned that
13  people might be less interested in what she had to
14  say because she was transgender?
15    A   Yes.
16       MR. ESSEKS:  Why don't we take five
17  minutes.
18       MS. McGOWAN:  We'll take a five-minute
19  break here, and be back at 2:00.
20       (Recess)
21  BY MS. McGOWAN:
22    Q   So we're back from our break.  And we

---

42 (Pages 162 to 165)

Charlotte P. Preece                                                January 11, 2007
                         Washington, DC

| Page 166 | Page 168 |
|---|---|

**Page 166**

1  were just wrapping up our conversation about the
2  lunch meeting that you had with Ms. Schroer.
3          Before I sort of move to what happened
4  next, I'll just ask you is there anything else
5  about that conversation that we haven't discussed?
6      A   Not that I recall at the moment.
7      Q   And how did you wrap things up?
8      A   I think with that last statement that I
9  said there, David, you've given me a lot to think
10  about. I need to go back to the Library and talk
11  to some officials, that I want to finish this
12  posting around the Christmas -- before Christmas,
13  and that I will be back to you -- I can't remember
14  whether I said the next day or in 24 hours, but
15  soon.
16      Q   And at some point you and Ms. Schroer
17  part ways; is that right?
18      A   Yes.
19      Q   Okay. So did you walk back to your
20  office by yourself, or was Ms. Schroer still with
21  you?
22      A   Well, we walked out of the restaurant

**Page 167**

1  together. I don't think he went back into the
2  building with me.
3      Q   Okay. What were you thinking as you
4  walked back to your office after lunch?
5      A   That was the most incredible experience
6  I ever had.
7      Q   And what do you mean by incredible?
8      A   Unbelievable. It's just not what I
9  expected at all.
10      Q   Now, you mentioned -- and correct me if
11  I'm wrong -- that you said that you had never
12  known a transgender person before; is that right?
13      A   Yes.
14      Q   So how do you know whatever you knew at
15  that point -- how did you know whatever you knew
16  at that point about what it meant to be
17  transgender?
18      A   From what David told me.
19      Q   Had you ever, you know, seen any
20  television shows or movies about transgender
21  people?
22      A   No. The only recollection that I had

**Page 168**

1  was of tennis, was Rene Richards, when she played
2  with Billy Jean King. Yes, I am that old.
3      Q   And what did you know about Rene
4  Richards? And how did that sort of inform what
5  you knew about transgender people?
6      A   I just knew that there was a sex change.
7      Q   And have you ever interacted with anyone
8  who's transgender?
9      A   I don't believe I have. It's possible
10  that I may have, but not to my knowledge.
11      Q   And this is sort of a subpart of this
12  question, but have you ever interacted with
13  anybody at the Library of Congress who's
14  transgender?
15      A   Not that I know of.
16      Q   And have you ever interacted with
17  someone whom you didn't know at the time was
18  transgender, but then later found out that they
19  were?
20      A   No.
21      Q   Are you familiar with the movie
22  "Trans-America"?

**Page 169**

1      A   No.
2      Q   Okay. Other than the television reports
3  you mentioned about Rene Richards, have you seen
4  any television documentaries or news shows about
5  transgender people?
6      A   No.
7          MS. RUSSELL: Objection, to the extent
8  it that it mischaracterizes her testimony.
9          But you can answer if you understand.
10          THE WITNESS: If I understand, you asked
11  me if I have seen any --
12  BY MS. McGOWAN:
13      Q   Television --
14      A   -- television shows or documentaries
15  about transgender migration issues? No.
16      Q   When you learned that Ms. Schroer is in
17  the process of transitioning from male to female,
18  did that make you feel uncomfortable at all?
19      A   I would say more curious than
20  uncomfortable. I was trying to understand it.
21      Q   Did you feel differently interacting
22  with her once she told you that she felt like she

43 (Pages 166 to 169)

Charlotte P. Preece                                    January 11, 2007
Washington, DC

---

Page 170

1   was a woman?
2        A   Not about the individual, no.  I knew it
3   was going to create all kinds of complexities.
4   But as far as the way I felt toward David, no.
5        Q   And so from your perspective, nothing
6   about your interaction was any different after you
7   learned that Ms. Schroer was a transsexual woman?
8        MS. RUSSELL:  Objection to the form.
9        You can answer if you understand.
10       THE WITNESS:  I won't say nothing was
11  different.  My feelings about David's
12  competencies, his knowledge, his experience --
13  was not different.  Yes, I was surprised, as I
14  stated.  And, yes, it did raise concerns about
15  whether he was going to be able to -- whether she
16  was going to be able to fill the institutional
17  needs that the organization had.
18  BY MS. McGOWAN:
19       Q   And so other than that, other than your
20  thinking through the impact of this information on
21  the job, you had no other personal reaction to the
22  news?

---

Page 171

1        A   No.  I mean -- no.  I didn't bear him
2   ill will as a result of it, no.
3        Q   And not even ill will.  Was there any
4   way in which you felt differently interacting with
5   Ms. Schroer after you learned this news?
6        MS. RUSSELL:  Same objection.  Form.
7        THE WITNESS:  Please repeat.
8   BY MS. McGOWAN:
9        Q   Sure.  You mentioned that you didn't
10  have any ill will.
11       And I was asking, putting aside sort of
12  any, you know, feelings of ill will towards
13  Ms. Schroer, was there anything about your
14  interaction with Ms. Schroer that felt different
15  after she tells you:  I'm a woman?
16       A   Just what -- what I was going to need to
17  do, but not about him as an individual.
18       Q   Did you have any concern that
19  Ms. Schroer wouldn't pass for a woman if she came
20  to the Library of Congress dressed as a woman?
21       MS. RUSSELL:  Objection to the form.
22       THE WITNESS:  That wasn't a

---

Page 172

1   consideration that crossed my mind.
2   BY MS. McGOWAN:
3        Q   Did you think individuals who had not
4   met David Schroer would see Diane Schroer and
5   suspect that this was a transsexual person?
6        A   Again, that was a fleeting thought in my
7   mind, if that.  These other real factors were.
8   The security clearance, by far the dominant, was
9   what I was focusing on.  When I came back and I
10  talked to the director, the first person I talked
11  to was Cynthia Wilkins.  That was my overriding
12  concern.
13       Q   And we'll definitely talk about what
14  happened when you got back to the office.
15       My question is, in light of what you saw
16  in the pictures that Ms. Schroer shared with you
17  and the concerns that you expressed about how she
18  looked, were you concerned that other people would
19  react to Ms. Schroer as a man in a dress?
20       A   I don't know if "concerned" is the right
21  word.  Yes, they probably would have.
22       Q   As far as the individuals who are in the

---

Page 173

1   specific unit where the terrorism specialist would
2   have worked -- and I believe that's Mr. Miko's
3   unit -- how many people are in that unit, if
4   that's the right term to describe the section?
5        A   Roughly 12, 13.
6        Q   And how many of those people are -- in
7   that unit are military veterans?
8        A   Only the person who was hired for the
9   position.
10       MR. ESSEKS:  Mr. Rollins?
11       THE WITNESS:  Yes.
12  BY MS. McGOWAN:
13       Q   And how many men and woman are in that
14  unit?
15       A   That may take me a minute.
16       Q   Okay.
17            (Whereupon at which time the
18            witness wrote on a piece of
19            paper.)
20       THE WITNESS:  And now that I am
21  composing this list, I now see that there is
22  another man who is -- had military experience, as

---

44 (Pages 170 to 173)

Charlotte P. Preece

January 11, 2007

Washington, DC

| Page 178 | Page 180 |
|---|---|
| 1· know, his surprise or other reaction to your news? | 1   us tomorrow, or soon thereafter. |
| 2     A   No. It was a short conversation, | 2     Q   I'm interested to find out more about |
| 3   probably lasting no more than two to three | 3   the questions that she asked you. |
| 4   minutes. And I did tell him that time was of the | 4       Before we turn to that, as far as her |
| 5   essence, because I promised to get back to | 5   initial reaction, did she say anything along the |
| 6   Schroer. | 6   lines of "wow" or -- |
| 7     Q   And so other than offering to contact | 7     A   No. |
| 8   Mr. Ronhovde, did Mr. Mulhollan say that he would | 8     Q   -- "holy smokes, that's wild"? |
| 9   do anything else? | 9     A   No. |
| 10     A   No. | 10     Q   Okay.  Other than saying that she hadn't |
| 11     Q   And then did you go directly from that | 11   dealt with a case like this before, did she |
| 12   meeting -- | 12   provide any sort of initial indication about her |
| 13     A   I think I went back to my office to call | 13   reaction to this piece of information? |
| 14   Cynthia first to see if it was okay to come down, | 14     A   No. |
| 15   if she were free. | 15     Q   And then you said that she asked you |
| 16     Q   And did you explain at all to her what | 16   some questions. |
| 17   you wanted to meet with her about, on that phone | 17       What questions did she ask you? |
| 18   call? | 18     A   Was the -- did the job vacancy |
| 19     A   No. | 19   announcement carry a TIS requirement. |
| 20     Q   She was available? | 20     Q   And your answer to that was? |
| 21     A   She was available. | 21     A   Yes. |
| 22     Q   And so what happened next? | 22     Q   Okay.  What else? |

| Page 179 | Page 181 |
|---|---|
| 1     A   I went to her office. And I told her | 1     A   I don't recall. |
| 2   the same thing, what had transpired. And I asked | 2     Q   Did she ask whether or not the applicant |
| 3   her what ramifications this new information would | 3   currently held a clearance? |
| 4   have that related to the candidate's ability to | 4     A   She may have. |
| 5   get clearance. | 5     Q   Did she ask anything about when the |
| 6     Q   And when you told her what had happened | 6   individual's most recent security investigation |
| 7   during your lunch meeting, what did you say? | 7   had been conducted? |
| 8       How did you describe what had happened? | 8     A   No. |
| 9     A   I said, Cynthia, I was considering | 9     Q   Did she ask you any questions about |
| 10   recommending a candidate for a position that | 10   break in service, or interruptions in service? |
| 11   requires a top secret security clearance.  During | 11     A   Not that I recall.  She didn't ask me |
| 12   the conversation, the gentleman told me that he | 12   about the individual.  She was just trying to get |
| 13   would like to start work as a woman, and that he | 13   some facts before she did her research. |
| 14   would like to -- how could I say it -- migrate -- | 14     Q   At that point, having gone through the |
| 15   transgender migration, was undergoing transgender | 15   application process with Ms. Schroer, did you know |
| 16   migration. | 16   whether there had been any interruption in |
| 17     Q   And what was her reaction? | 17   Ms. Schroer's holding of a security clearance? |
| 18     A   Her reaction was she had not dealt with | 18     A   No. |
| 19   a case like this before. And she asked me a few | 19     Q   And so at this point, am I right that |
| 20   questions. And then she said that she would like | 20   Ms. Wilkins asked for no information specifically |
| 21   to check on the regulations before discussing this | 21   about the person involved? |
| 22   with me any further, and that she would meet with | 22     A   I don't recall. |

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece

Washington, DC

January 11, 2007

### Page 186

1  going to tell me something which was going to
2  change my recommendation, and that that could
3  result in legal action against the Library.
4      Q   Do you think that Ms. Schroer knew that
5  this would change your recommendation, this
6  information would change your recommendation?
7      A   I have no way of knowing that.
8      Q   At that point, when you're outside
9  having probably a much-needed cigarette, were you
10 starting to formulate in your own mind a plan
11 about what you were going to do, how you were
12 going to deal with this situation?
13     A   I knew that we -- I needed to talk to
14 people, to more people, that this meeting with
15 Cynthia was going to become very important the
16 following day.
17     Q   At that point, did you still feel like
18 you wanted to hire Ms. Schroer?
19     A   I was leaning against it. I really
20 didn't make up my mind until conversations with
21 people the subsequent day, the next day.
22     Q   And tell me why.

### Page 187

1          Why were you leaning against it?
2      A   Well, I did sense that there would be
3  strong problems with the security clearance, then
4  the same issues that we discussed about before:
5  trust, and confidence, and credibility, and
6  contacts. All these things were running through
7  my mind.
8      Q   And by credibility and contacts, that's
9  what we were talking about with respect to sort of
10 having, you know, negative interactions with the
11 military or members of Congress; is that right?
12     A   Right.
13     Q   And was that a concern that standing
14 alone was enough reason for you to decide you
15 didn't want to go forward with Ms. Schroer?
16     A   Absolutely not. That was a minor
17 reason.
18     Q   And your concerns about her
19 trustworthiness, was that something that sort of
20 by itself was a reason why you were thinking that
21 you weren't going to go forward with her as --
22     A   It wasn't a reason alone, but it was --

### Page 188

1  it was a reason.
2      Q   And if Cynthia Wilkins had come back to
3  you and said, no problem, this person's got a
4  clearance already, not a big deal, would you still
5  have gone forward with your recommendation for
6  Ms. Schroer?
7          MS. RUSSELL: Calls for speculation.
8          But you can answer if you understand.
9          THE WITNESS: I don't know the answer to
10 that question.
11 BY MS. McGOWAN:
12     Q   And what would have been the factors you
13 would have been weighing if the security clearance
14 timing issue had fallen away?
15         MS. RUSSELL: Same objection.
16         But you can answer if you understand.
17         THE WITNESS: Uh-huh. I probably would
18 have gone back and done some serious reflection.
19 Because the second candidate also had extremely
20 good skills, and did very well in the interview,
21 and had glowing recommendations, as well. I would
22 have weighed my decision.

### Page 189

1  BY MS. McGOWAN:
2      Q   And in your mind, did this other
3  candidate just present fewer concerns with respect
4  to this credibility and contact point?
5      A   Yes.
6      Q   In part, because he was not transsexual;
7  is that right?
8      A   Yes.
9      Q   After -- well, let's -- we'll finish
10 that cigarette.
11         What else are you thinking?
12         I don't know how many you had, so -- I
13 doubt one would have been sufficient, so, you
14 know, what else were you thinking at that point?
15     A   I think that we've pretty much covered
16 it.
17     Q   Okay. Walk me through sort of, you
18 know -- roughly what -- what time is it now at
19 this point?
20     A   Late afternoon.
21     Q   Okay. Walk me through sort of what
22 happens between, you know, when you get back to

48 (Pages 186 to 189)

Charlotte P. Preece                                                January 11, 2007

Washington, DC

Page 210

1    You can answer if you understand.
2    THE WITNESS: It helped me understand
3    the process better.
4    BY MS. McGOWAN:
5    Q   Did reading that information make you
6    feel as though the treatment for transgender
7    people was perhaps more mainstream than you had
8    expected, or suspected?
9    A   If it made me feel anything, it was,
10   wow, this a long and ongoing process that could be
11   quite time-consuming.
12   Q   Did any of the information on the
13   website that -- you know, the clinical diagnosis
14   about sort of, you know, the clinical diagnosis
15   aspects for people who are transgender, either by
16   talking about gender identity disorder or gender
17   dysphoria?
18   A   I remember reading gender -- yes, the
19   identity disorder, yes. I remember reading
20   something about that.
21   Q   Prior to reading that information, did
22   you know that being transgender was something that

Page 211

1    actually had a medical term?
2    A   I did not.
3    Q   Did you think of it more as a lifestyle
4    concern at that point?
5    A   Probably, yes, to the extent I thought
6    about it.
7    Q   Okay. So that evening after leaving
8    work, other than your sons, did you speak with
9    anyone else about this situation with Ms. Schroer?
10   A   I can't remember.
11   Q   Okay. I'm going to turn now to the next
12   day.
13   A   Okay.
14   Q   Describe what happened the next day
15   with -- which is we're talking now about December
16   21st, 2004 -- with respect to any conversations or
17   meetings that you had about Ms. Schroer.
18   A   Okay. The previous day, I believe late
19   in the day before I went home, I got an e-mail
20   from Kent Ronhovde asking if I was available to
21   meet at 9:00 o'clock the following day with
22   Cynthia and Bessie Alkisswani.

Page 212

1    Q   Okay. Anything else?
2    A   At the meeting was also Bessie's deputy
3    Kathy Deese, and Kent.
4    Q   Up until this point, had you had any
5    interaction with Ms. Alkisswani?
6    A   Professionally?
7    Q   About the Schroer situation?
8    A   No.
9    Q   And did it strike you as unusual that
10   she had been asked to attend the meeting?
11   A   No. She's the head of our workforce
12   development. She's ultimately responsible for
13   postings.
14   Q   Did you have any conversation with
15   Mr. Ronhovde before the meeting about what
16   Ms. Alkisswani knew or might need to know in
17   advance of the meeting?
18   A   No.
19   Q   And so did the meeting take place at
20   9:00 a.m.?
21   A   Yes, it did.
22   Q   So I have the lineup of the meeting as

Page 213

1    you, Ms. Wilkins, Ms. Alkisswani, Ms. Deese, and
2    Mr. Ronhovde; is that correct?
3    A   Right.
4    Q   Anyone else?
5    A   Not to my recollection.
6    Q   How long did the meeting last?
7    A   Maybe an hour and 15 -- hour, hour and
8    15 minutes.
9    Q   So who started -- well, where was the
10   meeting, first of all?
11   A   In Kent's office.
12   Q   And so who started the discussion?
13   Did Mr. Ronhovde kick things off?
14   A   Uh-huh.
15   Q   Okay. And what did he say to start off
16   the conversation?
17   A   He said we're -- I don't recall exactly
18   what he said. He introduced the meeting. He said
19   these are the facts. Charlotte, why don't you lay
20   out what happened, which I briefly did at the
21   lunch the other day. And then I said and I went
22   down to Cynthia's office and Cynthia wanted to do

54 (Pages 210 to 213)

Charlotte P. Preece                                                    January 11, 2007

Washington, DC

| Page 226 | Page 228 |
|---|---|
| 1 information about David Schroer would no longer be | 1 a TS clearance is required to do the position from |
| 2 relevant? | 2 the outset, and the person does not have or cannot |
| 3   A   Because he was Diane Schroer, or | 3 get that clearance, then if -- if he failed the |
| 4 becoming Diane Schroer. And for all I know, it | 4 clearance, if he were not given a clearance, he |
| 5 may been relevant at some point down the | 5 could have been fired for failing to pass the |
| 6 line. I don't know the answer to that question. | 6 exam. |
| 7   Q   Did anyone -- or, well, what did | 7       My determination not to go forward with |
| 8 Ms. Wilkins say with respect to the timing of all | 8 him was based on say he is successful, say he does |
| 9 this? | 9 get through psychological fitness determination, |
| 10       And by "all this," I mean the security | 10 say a decision is made by the personnel security |
| 11 clearance process that she was telling everyone | 11 office to go ahead and instigate a clearance. |
| 12 would be required? | 12 When that is all done, if they grant him a |
| 13   A   She was not specific about how long it | 13 clearance, that was not going to happen, in my |
| 14 would take, but she said it would be a lengthy | 14 judgment, within a year. And I did not want to |
| 15 process. | 15 wait that long to bring somebody on board. |
| 16   Q   And when she said that she would not | 16   Q   And did Ms. Wilkins tell you that she |
| 17 waive the pre-appointment investigation for | 17 expected the process would take a year? |
| 18 Ms. Schroer, did anyone push back at all and ask | 18   A   No. She was never specific as far as |
| 19 her why not? | 19 time. She referred to it as lengthy. It's based |
| 20   A   She said under these circumstances, the | 20 on experience that I have, particularly post 9/11, |
| 21 office would not waive. She's the expert in this | 21 for how long it takes to get a TS clearance. |
| 22 area, so -- | 22   Q   Were there any responsibilities of the |

| Page 227 | Page 229 |
|---|---|
| 1   Q   And what were the consequences of | 1 terrorism specialist position that could be |
| 2 Ms. Wilkins saying that she would not waive the | 2 performed without a top secret clearance? |
| 3 pre-appointment security clearance investigation | 3   A   Yes. |
| 4 requirement? | 4   Q   What percentage of the work can be done |
| 5   A   What were the consequences of that? | 5 without a top secret clearance? |
| 6   Q   Sure. | 6   A   A large percentage can be done. The |
| 7   A   Pretty much sealing in my mind that I | 7 question is at what level of sophistication. And |
| 8 would go with the other candidate. Because at the | 8 for a GS-15 analyst, we're expecting them to be |
| 9 time, it would very likely be taken to complete | 9 out there in the public policy community, with the |
| 10 this process. | 10 movers and shakers, with the committees in |
| 11   Q   At any point, did anyone -- so with | 11 Congress. And they're going to need a clearance |
| 12 respect to sort of -- with respect to Ms. Wilkins | 12 to talk in those circles on counterterrorism |
| 13 saying that she would not grant the waiver, I want | 13 policy. |
| 14 to make sure that I understand sort of what that | 14   Q   When you say that a large percentage can |
| 15 means with respect to the position. | 15 be done, recognizing this is not a science, sort |
| 16       If Ms. Wilkins says, I'm not going to | 16 of what -- |
| 17 grant a waiver, does that mean that this person | 17   A   Research -- |
| 18 cannot be hired for the position, or did it mean | 18   Q   -- percentage -- |
| 19 that were the person hired for the position, they | 19   A   -- their research. They'll be |
| 20 would not be allowed to have access to any | 20 researching from open sources. They'll also be |
| 21 classified information? | 21 going out in their research to talk to people in |
| 22   A   It means the latter. But if I say that | 22 the policy community. Some of those people they |

58 (Pages 226 to 229)

Alderson Reporting Company
1-800-FOR-DEPO

Page 234

1  get information from the health services office?
2      A   The health service office would be
3  responsible for setting up and arranging the
4  fitness for duty.
5      Q   But with respect to the conversation you
6  were having there that morning at that meeting,
7  did anyone suggest a need to bring in someone from
8  the health services office?
9      A   No.
10     Q   Were there -- what else did Ms. Wilkins
11 say about the security clearance process that we
12 haven't yet discussed?
13     A   I've told you what I remember.
14     Q   Okay.  Were there -- well, what did
15 Ms. Alkisswani say during this meeting?
16         Did she react at all to this
17 information?
18     A   I really don't recall.  People were
19 asking questions.  And I don't recall specifically
20 what they were.  The message from Cindy is what I
21 took away from that meeting.
22     Q   Were there any discussions in the

Page 235

1  context of this meeting, about Ms. Schroer's
2  trustworthiness?
3      A   There could have been.  We discussed
4  other issues beyond security.
5      Q   What issues did you discuss?
6          Tell me about those conversations.
7      A   I think they're again limited to the
8  ones we talked about before: Trust, contacts.
9      Q   And did you raise the trust and contacts
10 point, or did you someone else?
11     A   I can't remember.  I think we were all
12 thinking the same thing.
13     Q   And what did you say in that meeting
14 regarding this issue of trustworthiness?
15     A   Well, I did say that I felt set up, and
16 I didn't know if I could trust someone who tried
17 to deceive me.
18     Q   And what kind of reaction did you get to
19 that comment?
20     A   I understand.
21     Q   And do you recall in particular any
22 people specifically expressing that sentiment?

Page 236

1      A   No.
2      Q   And sort of how did you articulate this
3  concern about contacts in that meeting?
4      A   That I was concerned that by changing
5  sex and identity, that the contacts that he had,
6  particularly in the military, would not know who
7  he was to them; and they might -- they might not
8  be as helpful.
9      Q   And did you talk at all in that meeting
10 about the negative reaction of military people to
11 Diane, who is now this transgender person?
12     A   No, other than to say that some people
13 might be understanding and others might not.
14     Q   Was there any discussion about the
15 reaction or what the reaction might be of other
16 Library employees to the fact that Ms. Schroer was
17 transitioning from male to female?
18     A   No.  We talked about the bathroom
19 question a little bit.
20     Q   Okay.  And what did you say there?
21     A   That we would have to make special
22 accommodations for at least a period of time.

Page 237

1      Q   Do you remember who raised that point?
2      A   No.
3      Q   Was there any discussion at that point
4  about the example of the Department of the Army
5  that Ms. Deese had previously discussed?
6      A   I don't remember where the linkage was,
7  and if that's where it came up, or whether it came
8  up separately from what Kathy was talking about,
9  that she said there was special accommodation
10 made.
11     Q   And was there any discussion about how
12 easy or difficult it might be to accommodate this
13 bathroom concern?
14     A   No.  I mean, it was so minor.  We
15 realized there was much bigger issues.  We didn't
16 dwell on this one.
17     Q   Were there any discussions about how the
18 members of Congress might react if they figured
19 out they were interacting --
20     A   Right.
21     Q   -- with a transsexual --
22     A   Right.

60 (Pages 234 to 237)

Page 238

1    Q    -- woman?
2    A    Yes.  That came up.
3    Q    Tell me about that.
4    A    Just raised, as I mentioned about -- a
5    couple of hours ago -- the issue of credibility.
6    Again, like the military, that some people may be
7    very tolerant of the knowledge and the
8    information, and other people may think that
9    damages the individual's credibility.
10    Q    Do you remember who else in the
11    conversation engaged in the discussion of this
12    point?
13    A    Well, Cindy pretty much stuck to
14    security, personnel security issues.  And Bessie,
15    Kent, and I were having more of a free ranging
16    discussion.  But I don't remember who raised what.
17    Q    Was there any discussion at this meeting
18    about things that one might be able to do to speed
19    up the security clearance process for Ms. Schroer
20    if you decided to go forward with her?
21    A    No.
22    Q    So, for example, did you propose that

Page 239

1    Ms. Wilkins have a meeting with Ms. Schroer?
2    A    No.
3    Q    Did you suggest that Ms. Schroer look at
4    David Schroer's security file?
5    A    Pardon?
6    Q    Did you suggest or did anyone suggest
7    that Ms. Wilkins pull and review the security file
8    for David Schroer?
9    A    No.
10    Q    Did you or anyone suggest that
11    Ms. Schroer meet with the health services office?
12    A    No.
13    Q    Did you or anyone else suggest
14    Ms. Schroer meet with any other member of the
15    Library staff?
16    A    No.
17    Q    Did you or anyone else ask whether or
18    not there was anyone at the Library who had dealt
19    with a similar situation regarding a transitioning
20    applicant?
21    A    No.
22    Q    Did anyone make any other suggestions

Page 240

1    along those lines of things that one might want to
2    do before moving on to the next step?
3    A    No.
4    Q    Okay.  Did you or anyone suggest calling
5    Ms. Schroer to get some more information to factor
6    into your decision-making process?
7    A    No.
8    Q    Did Ms. Wilkins or anyone else suggest
9    that they were interested in finding out whether
10    or not Ms. Schroer had reported any of this
11    information about her transition to the entity
12    currently holding her clearance?
13    A    No.
14    Q    So how were things left at the end of
15    the meeting?
16    A    Things were left that we should talk to
17    the general counsel's office.
18    Q    And who made that suggestion?
19    A    I don't know for sure, but probably
20    Kent.
21    Q    And was there any discussion at the end
22    of that meeting about the decision that was going

Page 241

1    to be made regarding Ms. Schroer?
2    A    No.  I think we wanted to -- I mean, my
3    decision was pretty close to -- my decision was
4    pretty final then.  I was ready to move on.
5    Q    And what were your reasons for deciding
6    that you wanted to move on?
7    A    The time, the uncertainty as to whether
8    the clearance would ultimately be granted.  That
9    was the 90 percent factor.
10    Q    The issue of credibility and contacts,
11    was that a reason?
12    A    They probably go about five each, yeah.
13    Q    Okay.  And I absolve you from the fact
14    that we have reached 100.
15        Are there any other reason, with
16    whatever percentage that you want to attach to
17    them, that factored into your --
18    A    Well, we discussed credibility before.
19    Q    Okay.  And by credibility, just to be
20    clear, we're talking about both being able to
21    interact with members of the military who might be
22    hostile to her as a transgender person, and

Charlotte P. Preece                                                          January 11, 2007
                              Washington, DC

| Page 242 | Page 244 |
|---|---|

**Page 242**

1  credibility with members of Congress?
2    A   Primarily the latter.
3    Q   Primarily the latter?  Okay.
4    A   Right.  Contacts with the military,
5  credibility with the members.
6    Q   Okay.
7    A   But the operational needs of the
8  division were such that I needed to have someone
9  on board months before we are now, or where we
10  were at the present time, in December.
11    Q   And did you have in your mind, in that
12  meeting with Cynthia Wilkins, an amount of time
13  beyond which you were unwilling to go with respect
14  to how long the clearance would have taken?
15    For example, if Cynthia Wilkins said
16  it'd probably take about six months, sort of was
17  there an amount of time in your mind where beyond
18  which it was just not going to be worth your while
19  anymore?
20    A   I really wanted someone to start in
21  January.
22    Q   And how important was it for you that

**Page 243**

1  the person could start in January with full
2  clearance?
3    A   I wanted the person to be able to start
4  the new session of Congress, which begins at the
5  end of January.
6    Q   And so if Cindy had come back, or in
7  this meeting and said, you know, I actually think
8  it's not going to be a problem, but I need two
9  weeks to figure it out?
10    MS. RUSSELL:  Objection.  Calls for
11  speculation.
12    But you can answer it if you understand.
13    THE WITNESS:  I wouldn't have believed
14  it, but -- if she said that and it were two weeks,
15  we probably would have gone through the process.
16  BY MS. McGOWAN:
17    Q   Notwithstanding the residual concerns
18  about credibility and contacts?
19    A   I'm not saying I would have selected her
20  for the job, but -- I mean, at that point, knowing
21  what I did, it's foolish to speculate about two
22  weeks because.  That's totally unrealistic.  I

**Page 244**

1  probably would have gone with the other candidate,
2  who did not have any of those issues.
3    Q   And just to be clear, even if Cynthia
4  Wilkins had come back and said two weeks, you
5  probably would have gone with the other candidate?
6  Am I understanding you correctly?
7    A   Yes.  Yes.
8    MS. RUSSELL:  Same objection.  Calls for
9  speculation.
10    THE WITNESS:  I mean, I would have had
11  to do -- prepare the recommendation.  The PAR
12  would have had to be generated.  And then it would
13  have gone to Cindy's shop.  And then it would have
14  gone to the fitness for duty.  And then it would
15  have gone for the investigation.  So, no, at this
16  point I was -- at this point, I pretty much made
17  up my mind.
18  BY MS. McGOWAN:
19    Q   So recognizing that Cynthia Wilkins is,
20  you know, the person who was giving you her
21  assessment of how long it would take, I just want
22  to be sort of clear I understand, you know, where

**Page 245**

1  you were at that point.
2    If Cynthia Wilkins had come to the
3  meeting and said to you this is information that I
4  want to take a look at; but in light of the fact
5  this person's, you know, got a prior work-up, I
6  think that it'll take me about two weeks to figure
7  out whether or not you, know, this is a problem,
8  am I correct that you're saying that even if she
9  had said two weeks to you, you would not have gone
10  forward with Ms. Schroer?
11    MS. RUSSELL:  It's the same objection.
12    THE WITNESS:  I really feel you're
13  asking me to speculate on something that is
14  completely unrealistic.
15  BY MS. McGOWAN:
16    Q   Unrealistic or not, if that had been
17  what Ms. Wilkins, as the personnel security
18  officer, came back and said I can give you an
19  answer in two weeks --
20    A   I don't know what I would have done.
21    MS. RUSSELL:  Asked and answered.
22    But you can answer.

62 (Pages 242 to 245)

Charlotte P. Preece                                                                                        January 11, 2007
                                    Washington, DC

|  | Page 250 |
|---|---|
| 1 | rendered Ms. Schroer less effective than |
| 2 | Mr. Rollins? |
| 3 | MS. RUSSELL: Objection. Calls for |
| 4 | speculation. And it's confusing. |
| 5 | BY MS. McGOWAN: |
| 6 | Q   Do you understand my question? |
| 7 | Because I can ask it again. |
| 8 | A   Go ahead. |
| 9 | Q   Okay. In a world where the timing issue |
| 10 | has been taken out of the equation because |
| 11 | Ms. Wilkins says to you in two weeks I can give |
| 12 | you an answer up or down about whether or not this |
| 13 | candidate can satisfy the top secret security |
| 14 | clearance, you thus far have said, in different |
| 15 | ways, although not consistently, that you're not |
| 16 | sure what you would have done in that situation. |
| 17 | And my question is, is what you are not |
| 18 | sure about the question of whether or not your |
| 19 | concern about Ms. Schroer's credibility with |
| 20 | members of Congress and her ability to maintain |
| 21 | contacts with the military due to their lack of |
| 22 | understanding about transgender issues made her a |

|  | Page 252 |
|---|---|
| 1 | credibility with members of Congress, and contacts |
| 2 | in the military? |
| 3 | MS. RUSSELL: It still calls for |
| 4 | speculation. |
| 5 | But you can answer if you understand. |
| 6 | THE WITNESS: I don't understand. I'd |
| 7 | like to stay with my previous answer, that even |
| 8 | holding time and security clearance out of the |
| 9 | question, I'm -- |
| 10 | BY MS. McGOWAN: |
| 11 | Q   The other question is -- |
| 12 | A   The question isn't just the time of the |
| 13 | clearance. The question is ultimately could he |
| 14 | get the clearance. We don't know that there's an |
| 15 | answer to that. So it's not the whether it's two |
| 16 | weeks or two days or two years. We have the |
| 17 | additional factor of, one, how long it's going to |
| 18 | take; and, two, the degree of certainty that he |
| 19 | might not be able to get that clearance. So |
| 20 | that's a big unknown. |
| 21 | Q   Okay. So that's how we had our four |
| 22 | factors. There was the time factor and the |

|  | Page 251 |
|---|---|
| 1 | weaker candidate than Mr. Rollins? |
| 2 | MS. RUSSELL: It's the same objection. |
| 3 | Also, I'm objecting to the extent that it |
| 4 | mischaracterizes your testimony, and it's |
| 5 | confusing. |
| 6 | BY MS. McGOWAN: |
| 7 | Q   Do you understand -- |
| 8 | A   It certainly makes her a weaker |
| 9 | candidate, because it's -- there's so many |
| 10 | contributing factors. |
| 11 | Q   Okay. |
| 12 | A   So even if you take one and hold it in |
| 13 | isolation, these other factors were certainly |
| 14 | strong, would have influenced and factored into my |
| 15 | decision whether or not to proceed, or to offer it |
| 16 | to the other candidate. |
| 17 | Q   And where there would be absolutely no |
| 18 | difference in time between how long it would take |
| 19 | to run Ms. Schroer through the security clearance |
| 20 | process and Mr. Rollins, is it your testimony that |
| 21 | Mr. Rollins was a stronger candidate because he |
| 22 | did not present the same concerns about |

|  | Page 253 |
|---|---|
| 1 | uncertainty factor. |
| 2 | I'm saying holding those factors |
| 3 | constant -- |
| 4 | A   I understand. |
| 5 | Q   -- as between Ms. Schroer and |
| 6 | Mr. Rollins, is it your testimony that Mr. Rollins |
| 7 | is -- was a stronger candidate because he would |
| 8 | not have presented credibility concerns or |
| 9 | concerns about his ability to maintain military |
| 10 | contacts? |
| 11 | A   He's looking a lot better, yeah. |
| 12 | Q   Do you recall what time you wrapped up |
| 13 | your meeting with Mr. Ronhovde and the others? |
| 14 | A   10:00 to 10:15. |
| 15 | Q   What did you do then? |
| 16 | A   Went out and smoked a cigarette. |
| 17 | Q   And what were you thinking at that |
| 18 | point? |
| 19 | A   What I was thinking was that given what |
| 20 | I had learned, I would like to offer the position |
| 21 | to Mr. Rollins. |
| 22 | Q   And why was that? |

64 (Pages 250 to 253)

Charlotte P. Preece                                          January 11, 2007
Washington, DC

Page 254

1    A    Because of the length of time to take to
2    get a security check, because of the uncertainty
3    of the security check, because of the credibility
4    issue, because of the mistrust issue, all the
5    factors that we have listed time and time and time
6    again.
7    Q    And we've thus far broken out the
8    credibility issue being credibility with Congress
9    was --
10   A    The contacts. And the contacts is the
11   other thing.
12       MS. McGOWAN: I'm going to show you a
13   document that we can mark Exhibit 28. Oh, I'm
14   sorry. It was a document that was already
15   previously marked as Exhibit 14.
16       THE WITNESS: (Witness examined
17   document).
18   BY MS. McGOWAN:
19   Q    Do you recognize -- well, actually, let
20   me identify the document. It's a document that
21   was previously marked as Exhibit 14, Bates-stamp
22   number 206. At the top says, Charlotte Preece

Page 255

1    draft re terrorism position.
2        Do you recognize this document?
3    A    Yes.
4    Q    Okay. What is it?
5    A    At the end of the meeting with Bessie,
6    Kathy, Kent, and Cindy, Kent asked me to draft
7    something for the general counsel to look at of
8    what I would tell Mr. Schroer when I told him I
9    would not go forward with his recommendation.
10   Q    And did he explain to you why he wanted
11   you to draft up an e-mail?
12   A    To show to the general counsel's office.
13   Q    And when did you begin drafting this
14   e-mail?
15   A    Probably -- this has a 10:54 on it.
16   After the meeting.
17   Q    Do you have any idea of roughly how long
18   it took for you to type this e-mail?
19   A    Fifteen minutes.
20   Q    Did you talk with anyone as you drafted
21   the e-mail?
22   A    We had talked about it a little bit at

Page 256

1    the meeting.
2    Q    And had anyone offered you any
3    suggestions for how to phrase your comments to
4    Ms. Schroer?
5    A    No. This was a very preliminary draft,
6    first cut.
7    Q    And how did you select the people that
8    you sent the e-mail to?
9    A    They were the people at the meeting.
10   Q    Did you send this to anyone else in a
11   separate message?
12   A    I don't think so. I can't remember if
13   we took a paper copy, or if this was sent to the
14   general counsel's office.
15   Q    And did you get any e-mail responses
16   from anyone when you sent this e-mail?
17   A    No.
18   Q    Did you get any kind of feedback
19   regarding this e-mail?
20   A    Yes, when we went to the general
21   counsel's office.
22   Q    Do you recognize the handwritten

Page 257

1    comments on this paper?
2    A    Yes.
3    Q    Whose handwriting is that?
4    A    Mine.
5    Q    When did you write these comments?
6    A    Probably in the meeting with the general
7    counsels.
8    Q    And then I'm going to show you a
9    document that was previously marked 15. In a
10   moment. I'm sorry.
11       In this document, Exhibit 14, the last
12   line of that first paragraph you say here that, I
13   have concerns a that the transition you are in the
14   process of might divert your full attention away
15   from the mission of CRS.
16       Is this an issue that you discussed at
17   that meeting with Mr. Ronhovde and the others?
18   A    Yes, I believe it did come up.
19   Q    And what was that discussion?
20   A    That both the surgeries, the time off,
21   as well as undergoing such a complex and painful
22   process could divert his attention, full-time

65  (Pages 254 to 257)

Page 258

1    attention away from his duties on the job.
2        Q    Were you concerned about the time that
3    Ms. Schroer would need to be out of the office
4    exclusively, or also --
5        A    No, the time and the psychological
6    distraction.
7        Q    And why did you have this concern about
8    psychological distraction?
9        A    Because I assume it's a pretty traumatic
10   process, from what I've been led to believe.
11       Q    And did you think that Ms. Schroer would
12   be more distracted as a result of her undergoing
13   this process than she had been up until that point
14   in her life?
15       A    I have no way to make that comparison.
16       Q    And so what was your basis for thinking
17   that she would be distracted from her duties?
18       A    Well, I've had a couple of surgeries.
19   And I must say that it distracted me. I spent
20   some time thinking about it, thinking how it would
21   go.
22       Q    Were you working at CRS at the time of

Page 259

1    those surgeries?
2        A    Yes.
3        Q    And do you feel as though you were not
4    able to perform your duties fully while you
5    were --
6        A    Well, I had to recover. So I had to
7    take time off.
8        Q    Did you have a concern that Ms. Schroer
9    was going to need to take time off?
10       A    Yes.
11       Q    During your lunch meeting, did you have
12   any conversations with Ms. Schroer about her need
13   to take any time off for any surgeries she might
14   be completing?
15       A    No. Not that I recall.
16       Q    During your meeting with Mr. Ronhovde
17   and the others, did anyone suggest following up
18   with Ms. Schroer to find out what her plans were
19   with regard to having surgeries?
20       A    No.
21       Q    Looking at now what was marked document
22   Exhibit 15 in a prior deposition.

Page 260

1        A    (Witness examined document).
2        Q    This document, again, document Number
3    15, Exhibit Number 15, Bates-stamped number 205
4    at the top says, Charlotte Preece version two.
5             Are you familiar with this document?
6        A    Yes.
7        Q    What is it?
8        A    It is a draft of the response that I was
9    going to -- that I did give to Mr. Schroer later
10   that day.
11       Q    And when did you draft this response?
12       A    After our discussion with the general
13   counsel.
14       Q    And did you talk with anyone as you
15   drafted the e-mail?
16       A    Well, I drafted it, I believe, in my
17   office.
18       Q    And was anyone there with you as you
19   drafted --
20       A    In my office?
21       Q    Yes.
22       A    No.

Page 261

1        Q    Okay. And other than Ms. Alkisswani and
2    Mr. Ronhovde, did you send the e-mail to anyone?
3        A    Well, if there's no one else in the "to"
4    line, I doubt it.
5        Q    And were there any other people at the
6    meeting with the Office of General Counsel besides
7    Ms. Alkisswani and Mr. Ronhovde?
8        A    Myself and the folks from the general
9    counsel's office.
10       Q    And why did you not send this e-mail to
11   the other participants of the discussion with the
12   general counsel?
13       A    I don't know. I don't have a
14   recollection of whether I took a hard copy up,
15   whether I talked to somebody on the phone about
16   it.
17       Q    Do you recognize the writing, the
18   handwritten comments on this document?
19       A    Yes.
20       Q    Whose handwriting is it?
21       A    Mine.
22       Q    Okay. And when did you write these

66 (Pages 258 to 261)

Charlotte P. Preece                                                    January 11, 2007

Washington, DC

Page 266

1   ready to object then. But you asked what she
2   said, you asked what Kent said, and you asked what
3   Ms. Preece said. You never asked what --
4       MR. ESSEKS: We didn't ask about what
5   the lawyers said?
6       MR. JAMES: No.
7       MS. McGOWAN: Okay.
8   BY MS. McGOWAN:
9       Q   And so what did everyone, other than
10  Mr. James and Ms. Dowd, say in the context of this
11  meeting, as part of recounting the conversation?
12      Sorry. That's a little --
13      Going into this meeting -- let me start
14  there -- going into this meeting, was there any
15  discussion about the fact that you had more or
16  else less made up your mind what you thought you
17  were going to do?
18      A   I had pretty much made up my mind about
19  what I wanted to do.
20      Q   And so what was the point of this
21  meeting with the office of general counsel staff?
22      A   To find out if this situation could

Page 267

1   potentially get the Library into legal trouble.
2       Q   And was there any discussion about what
3   you should or should not say in the course of your
4   conversation with Ms. Schroer?
5       A   Again, to answer that question, I would
6   have to be saying what legal counsel told me.
7       Q   Well, putting aside what legal counsel
8   told you, were there any other conversations --
9   you know, did you ask, for example, you know,
10  should I say things in this meeting, and what
11  feedback would --
12      A   How should I phrase this?
13      Q   Uh-huh.
14      A   Yes.
15      Q   And did you get feedback from the
16  nonlawyers in the room, Ms. Alkisswani and
17  Mr. Ronhovde?
18      A   I had already gotten their input.
19      Q   Okay. And so at some point in the
20  meeting did you announce that you knew what your
21  decision was going to be?
22      A   Yes.

Page 268

1       Q   And tell me how you communicated that
2   information.
3       A   Given the combination of all the factors
4   that we outlined, I do not feel comfortable going
5   ahead with recommendation with Mr. Schroer. I
6   have another strong candidate. And I would like
7   to move ahead with the recommendation on him as
8   quickly as possible.
9       Q   And did you, in this meeting, you know,
10  outline what each of those four factors were?
11      A   Yes. We talked about all the factors.
12      Q   And was there any additional discussion
13  about each of the four factors that you
14  identified?
15      A   I think I was asked to elaborate what
16  did I mean by mistrust, what did I mean by
17  contacts. So I would elaborate on those.
18      Q   And if you can tell me how you explained
19  what you meant.
20      A   I don't know that it's different than
21  what I've already told you. The credibility had
22  to do with the members. Contacts had to do with

Page 269

1   his ability to capitalize on the contacts he made
2   as a man in the armed services. Trust was my
3   perception of would I be able to trust him after
4   this late in the day revelation on Monday.
5   Security clearance was based on Cynthia's advice.
6       Q   And how did you leave things at that
7   meeting?
8       A   That I would call Mr. Schroer later that
9   day and give him the news.
10      Q   Did anyone else agree to do anything at
11  the end of that meeting?
12      A   Do anything? No.
13      Q   Do anything with respect to the Schroer
14  matter: Write a memo? Call anyone?
15      MR. JAMES: And your question is anyone
16  other than the lawyers?
17      MS. McGOWAN: Right.
18      THE WITNESS: No.
19  BY MS. McGOWAN:
20      Q   And so what did you do between the end
21  of that meeting and when you ultimately spoke to
22  Ms. Schroer next?

68 (Pages 266 to 269)

Page 274

1    A   I don't remember.  I -- sometime in the
2   afternoon, 3:00 or 4:00.
3    Q   And tell me about that conversation.
4       How long did it last?
5    A   It was very brief.
6    Q   Okay.
7    A   Basically, it's the language in this
8   e-mail.
9       MR. ESSEKS:  You're referring to
10  Exhibit --
11      THE WITNESS:  Exhibit 15.
12      MR. ESSEKS:  Thank you.
13      THE WITNESS:  I mean, I did tell David
14  that it was a difficult decision.  And then I
15  think I read this language.
16  BY MS. McGOWAN:
17   Q   And by "this language," can you read to
18  me --
19   A   The typed language, Given the level and
20  responsibilities of the position, I don't think
21  that this is a good fit.  It's been a difficult
22  decision.  But given the immediate needs of

Page 275

1   Congress, I've decided not to go forward with the
2   recommendation.
3    Q   And is that roughly what you said to
4   open the conversation?
5    A   Uh-huh.
6    Q   Actually, is your recollection that this
7   is basically verbatim what you said in the
8   conversation?
9    A   Uh-huh.
10   Q   How did Ms. Schroer respond on the
11  phone?
12   A   Well, a pause.  And he said I'm very
13  disappointed.  And I said it was a difficult
14  decision.  I thanked him for his interest in the
15  position.  And I said good-bye.
16   Q   At any point in the conversation did you
17  say anything about the amount of time that it
18  would take to complete the security clearance
19  process as part of why you had made your decision?
20   A   I didn't give him any reasons why I made
21  my decision.
22   Q   Okay.  And do you recall, you know,

Page 276

1   thanking Ms. Schroer for her honesty?
2    A   Yes.
3    Q   Did you make any other comments or
4   express any other views to Ms. Schroer about, you
5   know, concerns that you had had about her
6   trustworthiness?
7    A   No.
8    Q   Did you mention anything to Ms. Schroer
9   about her -- the contacts and credibility concerns
10  that you'd had?
11   A   No.
12   Q   Did you say anything to her about her
13  gender transition being a distraction?
14   A   No.
15   Q   Why not?
16   A   I was advised not to elaborate on the
17  reasons behind my decision.
18   Q   And why not?
19   A   Pardon?
20   Q   Why not?
21      MS. RUSSELL:  Objection.
22  BY MS. McGOWAN:

Page 277

1    Q   Okay.  Were you advised not to give any
2   additional reasons by anyone other than legal
3   counsel?
4    A   No.
5    Q   Okay.  Roughly, how long did the
6   conversation last?
7    A   A minute or less.
8    Q   How did you feel after you hung up the
9   phone?
10   A   I had empathy for David the person:  I
11  do feel that he -- it takes courage to go through
12  what he's going to do.  But I felt that I made the
13  right decision for the institution.
14   Q   And what did you do next?
15      MS. RUSSELL:  Objection.  Vague.
16  BY MS. McGOWAN:
17   Q   After hanging up the phone, what did you
18  do next with respect to the terrorism specialist
19  position?
20   A   I pulled Mr. Rollins' application.  And
21  we had already done reference checks on him.  We
22  did them simultaneous.  And I called Mr. Rollins

Charlotte P. Preece                                                          January 11, 2007

Washington, DC

| | |
|---|---|
| Page 314 | Page 316 |

Page 314

1       (Discussion off the record)
2       EXAMINATION BY COUNSEL FOR DEFENDANT
3   BY MS. RUSSELL:
4       Q   I just have maybe one or two questions
5   about a question that Ms. McGowan posed to you
6   earlier, and that is the factors that went into
7   your decision to reconsider your recommendation
8   about Ms. Schroer.  And you noted that using 100
9   as a guide, you said security clearance 90
10  percent, and then credibility 5 percent, and then
11  contacts 5 percent.
12      Now, isn't it true that you also were
13  concerned about Ms. Schroer's possibly deceiving
14  you or her deception?
15      A   Yes.
16      Q   And isn't it true that you were also
17  concerned about her ability to focus on the job?
18      A   Yes.
19      Q   Given her surgeries?
20      A   Yes.
21      MS. RUSSELL: Okay.  I have no other
22  questions.

Page 316

1   A C K N O W L E D G E M E N T   O F   D E P O N E N T
2
3   I, CHARLOTTE P. PREECE, do hereby acknowledge I have
4   read and examined the foregoing pages of testimony, and
5   the same is a true, correct and complete transcription
6   of the testimony given by me.
7
8
9   _____
10  Date            CHARLOTTE P. PREECE
11
12
13  SUBSCRIBED AND SWORN to before me
14  this _____ day of _____, 2007
15
16
17      _____
18              NOTARY PUBIC
19
20  My Commission Expires:
21
22

Page 315

1       MS. McGOWAN: Okay.  So we're done.
2   Thank you.
3
4
5
6           (Whereupon at 5:40 p.m., the
7           deposition of CHARLOTTE P.
8           PREECE, was adjourned.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 317

1       CERTIFICATE OF NOTARY PUBLIC
2       I, BARBARA A. HUBER, CSR, the officer
3   before whom the foregoing deposition was taken, do
4   hereby certify that the witness whose testimony
5   appears in the foregoing deposition was duly sworn
6   by me; that the testimony of said witness was
7   taken by me in stenotypy and thereafter reduced to
8   print under my direction; that said deposition is
9   a true record of the testimony given by said
10  witness; that I am neither counsel for, related
11  to, nor employed by any of the parties to the
12  action in which this deposition was taken; and,
13  furthermore, that I am not a relative or employee
14  of any attorney or counsel employed by the parties
15  hereto, nor financially or otherwise interested in
16  the outcome of this action.
17
18
19      _____
20  BARBARA A. HUBER, CSR
21  Notary Public, in and for the District of Columbia
22  My Commission Expires: March 16, 2007

81          s 314 to 317)