# WILKINS DEPOSITION

Cynthia Wilkens                                                    September 20, 2006
                              Washington, DC

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF COLUMBIA
 3      - - - - - - - - - - - x
 4     DIANE J. SCHROER           :
 5          Plaintiff,            : Civil Action No.
 6     v.                         : 05-1090(JR)
 7     JAMES H. BILLINGTON        :
 8          Defendant.            :
 9      - - - - - - - - - - - x
10                     Washington, D.C.
11                     Wednesday, September 20, 2006
12     Deposition of:
13                 CYNTHIA WILKINS,
14     called for oral examination by counsel for
15     Plaintiff, pursuant to notice, at Wilmer Hale,
16     1875 Pennsylvania Avenue, NW, Washington, D.C.,
17     20006, before Karen Geddes, Certified Shorthand
18     Reporter, of Alderson Court Reporting, beginning
19     at 9:35 a.m., when were present on behalf of the
20     respective parties:
21
22
```

Page 66

1  make that distinction for the word "evaluated."
2  BY MS. MCGOWAN:
3  Q. And in what context were you asked to
4  provide this guidance?
5  A. Are you asking me what occurred?
6  Q. What occurred? I don't know if it was a
7  memo, an e-mail or a meeting.
8  A. I was called and asked to come to a
9  meeting in CRS, and I was advised that the meeting
10 was to discuss any security clearance impact for an
11 applicant who had reported this information, and
12 then I went to the meeting and we discussed this.
13 Q. Who was at that meeting?
14 A. At the meeting were several individuals
15 from the Congressional Research Service. Do you
16 want me to name them?
17 Q. Yes, please.
18 A. Charlotte Preece, the Chief of the Foreign
19 Affairs, Defense, and Trade Division -- I might get
20 some of the titles slightly wrong -- Kent Ronhovde,
21 who I believe is counselor to the director of the
22 Congressional Research Service.

Page 67

1  Q. I'm sorry. Just to be clear, Charlotte
2  Preece is the chief for foreign affairs?
3  A. That's correct.
4  Q. And then Kent --
5  A. Ronhovde, R-o-n-h-o-v-d-e, and I believe
6  he is counselor to the director of CRS.
7  Q. Anyone else at that meeting?
8  A. Bessie Alkiswani.
9  Q. I'll definitely ask you to spell that.
10 A. Okay. That is Alkiswani, A-l-k-i-s -- I
11 never spell it out loud -- s-w-a-n-i, I believe.
12 She is the head of workforce development for CRS --
13 again, I may be off on some of the names -- and
14 there was another person, Cathy Dees, I'm not sure
15 about that. The name just went out of my head and
16 came back in, but another CRS management official.
17    Actually, I'd like to correct myself. I'm
18 not sure about that name at all.
19 Q. Okay.
20 A. I have absolutely gone blank on that.
21 It's either -- or Diane Duffy. I am totally
22 confused on that.

Page 68

1  Q. Who contacted you about attending this
2  meeting?
3  A. I believe it was Bessie Alkiswani.
4  Q. What information, if any, were you
5  provided in advance of the meeting?
6  A. Basically, what I just said, that they had
7  an applicant to a position that required a security
8  clearance, and the applicant had volunteered
9  transgender information. And my input was requested
10 about how, if at all, it would impact the security
11 clearance process.
12 Q. When was that meeting, if you remember?
13 A. I don't, exactly. It was late 2004, very
14 late.
15 Q. Was a meeting like this common as part of
16 the hiring process?
17    MS. RUSSELL: Objection, vague. You can
18 go ahead and answer.
19    THE WITNESS: I wouldn't characterize it
20 as common, but there are times in which information
21 is brought to a manager and they need guidance and
22 they will call for guidance from me.

Page 69

1  BY MS. MCGOWAN:
2  Q. And during this meeting, did anyone
3  indicate that this applicant was the preferred
4  applicant for the position?
5     MS. RUSSELL: Objection to the form of the
6  question. But you can answer, if you understand the
7  question.
8     THE WITNESS: I got the sense that yes,
9  that was the serious candidate for the position.
10 BY MS. MCGOWAN:
11 Q. Did you indicate that -- well, let me ask,
12 sort of, tell me what you said in the course of that
13 meeting as far as the advice that you gave.
14 A. I told them that I believed, based on my
15 reading of the adjudicative guidelines and
16 supplemental information, that it was something that
17 needed to be evaluated.
18 Q. Anything else?
19 A. I said that as part of the evaluation, it
20 would need to be referred to the health services
21 office; I told them that it was not disqualifying on
22 its face, standing alone, but needed to be

18 (Pages 66 to 69)

Cynthia Wilkens  
Washington, DC  
September 20, 2006

Page 70

1   evaluated; that it would take some time to go
2   through this process.
3     Q.  Did you discuss what that process would
4   entail at that meeting?
5     A.  Yes. They believed that the applicant had
6   prior service and prior security clearance status.
7   The break in service was not known, however.
8        I indicated that if the investigation had
9   been conducted some time ago, and I believe the
10  understanding was the break in service was about two
11  years, but that was not exactly clear, inasmuch as
12  the applicant was reporting this as a current
13  pending matter for him, most probably, a new
14  investigation would be needed because the prior
15  investigation would not reasonably have covered
16  something that was occurring right then.
17       So we discussed that health services would
18  have a role in reviewing medical information and
19  that additional investigation might probably be
20  needed.
21    Q.  At any time after that meeting, did you
22  attempt to ascertain whether or not the information

Page 71

1   had actually been part of Ms. Schroer's prior
2   security investigation?
3     A.  No. I never obtained -- I was never given
4   a copy of the application materials or any of the
5   paperwork that we used to go forward and conduct
6   that type of inquiry.
7     Q.  So now I will move onto Section 3.3(d),
8   actually not (d) as much as it is 3.3 generally.
9   Actually, let me focus on 3.3(d), specifically,
10  which is on page 376.
11       With respect to this provision, which
12  begins: Access eligibility shall be reapproved for
13  individuals who were determined to be eligible based
14  on a favorable adjudication, how -- if you can
15  explain to me, how does this provision apply in a
16  circumstance where an applicant has a prior security
17  clearance that has been completed within the last
18  five years?
19    A.  Well, Section (d) says, it provides for --
20  you used the word "reciprocity" earlier. It
21  provides, essentially, for reciprocity. If there is
22  a prior background investigation within five years

Page 72

1   that was favorably adjudicated, if the break in
2   service is not more than two years, and if there is
3   no indication of any change in status, in other
4   words, any new information that might warrant
5   evaluation, and procedurally, this section of the
6   order also asks for the individual to basically
7   submit an updated 86 to say that nothing has changed
8   in their background, appropriate record checks
9   referred to there, in the last line, refers to
10  basically an updated national agency check where the
11  security office is calling the investigative indices
12  to see if there's any additional information to
13  consider.
14    Q.  What does the library do or how does the
15  library attempt to ascertain the existence of new
16  information with respect to applicants who already
17  have a security clearance?
18    A.  When an individual applies for employment,
19  they submit their employment application and
20  whatever attachments they need to, and also a
21  declaration for federal employment form, OF-306.
22  That declaration form contains questions regarding

Page 73

1   criminal history, employment difficulties, federal
2   delinquency, et cetera.
3        So there are times that new information is
4   developed through that individual's 306. If you are
5   also asking what happened in this particular case?
6     Q.  That was my next question, yes.
7     A.  There are other times when an individual
8   may volunteer information, either during a selection
9   interview, information could be obtained during a
10  reference check or any interactions between the
11  applicant and the library, the individual may
12  provide information.
13    Q.  With respect to ascertaining or attempting
14  to ascertain new information, who at the library is
15  charged with the responsibility of determining
16  whether or not new information exists that may, for
17  example, not have been voluntarily disclosed by an
18  applicant?
19    A.  Well, again, the 306, but that would be a
20  voluntary disclosure. Selecting officials conduct
21  reference checks for employment selection purposes,
22  and then when an application is ultimately referred

19 (Pages 70 to 73)

Page 98

1   was necessary?
2   A. Okay. I think that is a two-part
3   question. The service unit identifies whether or
4   not to request a waiver based on their operational
5   need to fill the position without undue delay. We
6   determine whether the waiver process with our
7   inquiries needs to be completed when an individual
8   does not already meet requirements. So they are
9   either lacking in the investigation, it's untimely,
10  or there's no information that needs to be
11  considered.
12  Q. And so as far as that first piece, when
13  would the director of a service agency -- or how
14  would the director of the service agency ascertain
15  whether or not they need to ask for a waiver?
16  A. Based on their admission requirements.
17  It's their decision.
18  Q. Are there any factors specified that go
19  into that determination?
20  A. The service unit looks at the job that
21  needs to be filled, and it's my understanding,
22  typically they will look at what projects or duties

Page 99

1   that individual -- that incumbent must be performing
2   to meet mission objectives. If they conclude based
3   on the duties of that individual needs to perform
4   that they cannot wait the four months, to six
5   months, to eight months, to a year, for that
6   background investigation to be completed on a
7   pre-appointment basis, they, at that time, request
8   us to entertain the waiver, and then they certify
9   that although the person is being appointed without
10  the background investigation, the retention is
11  subject to the favorable completion of the
12  background investigation and that in a sensitive
13  position, that individual will not have access to
14  classified information until such time that they are
15  determined eligible.
16  Q. At any point were you asked to render an
17  opinion about whether or not Ms. Schroer would have
18  been eligible for a security clearance waiver?
19  A. I think that was part of the discussion.
20  CRS typically requests waivers because they must
21  fill their positions in order to do their work for
22  the Congress in a timely manner. And in our

Page 100

1   discussion about what we would have to do, that yes,
2   we would need to evaluate it from a security
3   clearance standpoint, it would involve, at a
4   minimum, a health services evaluation, I'm sure that
5   in the discussion of the time frame and the fact
6   that this was information that needed to be
7   evaluated, I communicated that the waiver would not
8   be the process.
9   Q. When you say "would not be the process"?
10  A. Would not be probably approved, because
11  waivers relate to cases where there's no information
12  that requires in-depth evaluation, additional
13  evaluation, without benefit of investigation.
14  Q. And with respect to the question of
15  whether or not the waiver would or would not have
16  been approved, had CRS requested a waiver in
17  Ms. Schroer's case, on the assumption that they had
18  offered her the position, who would have been the
19  person to make the determination of whether or not
20  to grant the waiver?
21  A. My boss, the director of security.
22  Q. And that is Mr. Lopez?

Page 101

1   A. Mr. Lopez. And he would be making that
2   decision based on a recommendation from me.
3   Q. At any time, did you discuss the matter of
4   a waiver for Ms. Schroer with Mr. Lopez?
5       MS. RUSSELL: Objection, lacks foundation.
6   But you can answer, if you understand.
7       THE WITNESS: I think I did. I report to
8   him; he is my boss. And I believe at some point
9   following the meeting, I let him know this had
10  occurred and that that had been my guidance.
11  BY MS. MCGOWAN:
12  Q. What else during the course of that
13  conversation with Mr. Lopez happened?
14      MS. RUSSELL: Objection to the form.
15      THE WITNESS: Nothing, to my recollection.
16  He seemed to agree with me.
17  BY MS. MCGOWAN:
18  Q. At any point, did you discuss
19  Ms. Schroer's eligibility for a security clearance
20  waiver with the head of the library health services
21  office?
22  A. Not on that day. But shortly thereafter,

26 (Pages 98 to 101)

Cynthia Wilkens
Washington, DC

September 20, 2006

Page 126

1  of her security clearance eligibility?
2       MS. RUSSELL: Objection, lacks foundation,
3  relevance. Also, objection to the form of the
4  question. But you can answer it, if you can
5  understand it.
6       THE WITNESS: No. No security clearance
7  determination was requested of the applicant. No
8  background investigation was conducted. No
9  determination was made.
10 BY MS. MCGOWAN:
11 Q.  Then, finally, with respect to 2024-8, is
12 there anything in this regulation that informs the
13 library's determination of whether an applicant for
14 employment should be deemed eligible for security
15 clearance?
16 A.  This Library of Congress regulation,
17 2024-8, is focused on employees of the library who
18 have been granted security clearance, and it
19 apprises them of their obligations to safeguard
20 information, execute a nondisclosure agreement,
21 comply with security requirements.
22      So it does not appear to relate to

Page 127

1  applicants for employment who have not been
2  processed for security clearance.
3       MS. MCGOWAN: I think this is a good time
4  for a lunch break. So I have ten to 1:00. Perhaps
5  we meet back here at a quarter till 2:00 with the
6  thought we have five minutes to get ourselves
7  reorganized and start an hour from now?
8       MS. RUSSELL: Actually, I'm going to
9  request we meet at 2:00, because I need to go back
10 to the office and submit something for review. Is
11 that okay?
12      MS. MCGOWAN: Yes, we can start at 2:00.
13      (Lunch Recess 12:49 p.m. to 2:05 p.m.)
14 BY MS. MCGOWAN:
15 Q.  Before we start in any new material, I
16 just want to close the loop on some of the issues we
17 discussed this morning.
18      The first issue that I wanted to make sure
19 I had the complete picture, was with respect to the
20 meeting that you discussed that you had with
21 Ms. Preece and some other individuals at the
22 library.

Page 128

1       So looking back on who you identified as
2  being at that meeting, I just wanted to make sure
3  that that was a complete lineup of who was at the
4  meeting. So if we could just run through again who
5  was there?
6  A.  Charlotte Preece, chief of the foreign
7  affairs division; Kent Ronhovde, counsel to the
8  director; Bessie Alkiswani, who is head of
9  workforce.
10      And then there was a name that I couldn't
11 quite remember. I think it's Diane Duffy; the other
12 name I said is someone that I work with currently in
13 CRS administration. So maybe that popped up, but
14 I'm still not 100 percent sure about that last name.
15 I worked with the others more frequently.
16 Q.  So in addition to you, there were four
17 people at the meeting?
18 A.  I think so.
19 Q.  What information was given to you prior to
20 coming to that meeting?
21 A.  As I recall, the information I was given
22 on the phone is that CRS had an applicant for this

Page 129

1  position, and the position would require a
2  top-secret security clearance, and that the
3  applicant had volunteered that he was about to
4  undergo transsexual surgery. And I was asked
5  whether that would have an impact and in what way on
6  the security clearance process.
7  Q.  And who was that phone conversation with?
8  A.  Again, I believe it was from Bessie.
9  Q.  Did you ask her for any additional
10 information for you to have at your disposal prior
11 to this meeting?
12 A.  I can't recall exactly if I asked for
13 anything additional on the phone. When we met in
14 the meeting, I might have asked her, they may have
15 volunteered, I don't know what form this took, but I
16 understood that the applicant had prior military
17 service, held a security clearance in the military
18 and had left, and it was unclear how long, but my
19 sense was that it was about two years. I don't know
20 if they were estimating or if they didn't even know;
21 I don't know.
22 Q.  What other information about the applicant

33 (Pages 126 to 129)

Page 134

1  time she was applying?
2  A. I don't recall.
3  Q. So what "advice," if that is the right
4  word, were you being asked to provide this group who
5  asked you to meet with them?
6  A. Generally speaking, they wanted to know
7  what impact that information, if any, would have on
8  a security clearance process.
9      Was the information disqualifying on its
10 face? Which I said, no.
11     What issues did it bring up?
12     Did it fall under the security clearance
13 guidelines?
14     I believe I was asked if this would have
15 been a source of leverage, and I said not
16 necessarily, inasmuch as the individual has told you
17 this.
18     I was asked to speculate whether this
19 would have been considered in a prior background
20 investigation, and I think I said: Probably not,
21 because if there's been a break, and the
22 investigation took place some time ago and this is a

Page 135

1  current matter, it probably would need more
2  investigation.
3      I was asked how long it would take to
4  determine whether he, the applicant, could be
5  appointed or cleared, or the length of time that the
6  evaluative or investigative process would take.
7  Q. What was your answer to that last question
8  about how long?
9  A. I informed them that I saw this as an
10 issue that would need to be referred to health
11 services for an evaluation, first of all, that that
12 could take weeks, but I didn't know exactly.
13     I told them that we, after that, might
14 have to do a background investigation, which could
15 take an additional lengthy time period.
16     CRS usually requests a waiver, and I said
17 in this case, because there was information that
18 really needed to be evaluated, it was unlikely that
19 the waiver would be approved.
20 Q. Is there anything else you said to them as
21 part of your feedback?
22 A. I think that is it.

Page 136

1  Q. Did you get any follow-up questions or
2  comments back after you shared that information with
3  the folks at the group, people at the meeting?
4  A. There was discussion about how long.
5  There's always discussion about how long something
6  will take, so a lot of discussion about that, and it
7  would depend on how things played out.
8  Q. And if you can, tell me as much as you
9  remember of that -- how the conversation about --
10 you know, what were people interested in finding out
11 more with respect to the issue of how long?
12 A. Basically, it was how long? How long
13 would it take to -- if they decided to go ahead, to
14 refer it to health services? What kind of an
15 evaluation would be needed; in other words, how long
16 it would take? Whether we would need to do the full
17 background investigation, how long it would take if
18 we had to do that.
19 Q. Now, in the event that the health services
20 investigation had come back with the recommendation
21 that this was not -- or it did not present a
22 security clearance process, would a further

Page 137

1  background investigation have been required at that
2  point?
3  A. I don't know for sure. It's speculative.
4  I think it might depend on whether Dr. Charles
5  wouldn't be able to -- what kind of conclusion she
6  made.
7      She could say: I have been able to fully
8  evaluate this information and there is absolutely no
9  relevance to a security clearance determination, or
10 she could conclude: I've been able to obtain some
11 information, and based on the information I have
12 now, there is no reason not to initiate the
13 background investigation to obtain the other
14 pertinent elements.
15     So I don't, exactly, know what the outcome
16 would have been.
17 Q. With respect to the first option that you
18 laid out, in which Dr. Charles said that there
19 was -- she was satisfied that she had enough
20 information to ascertain that there was no
21 relevance, if that were her determination, then
22 what, if any, additional investigation would be