# MULHOLLAN DEPOSITION

Daniel P. Mulhollan                                                           March 13, 2008
                            Washington, DC

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF COLUMBIA

 3   ----------------------------------X

 4   DIANE J. SCHROER,                 :

 5            Plaintiff,               :

 6        v.                           :  No. 05-CV-01090 (JR)

 7   JAMES H. BILLINGTON,              :

 8            Defendant.               :

 9   ----------------------------------X

10                     Washington, D.C.

11                     Thursday, March 13, 2008

12            Deposition of DANIEL P. MULHOLLAN, a witness

13   herein, called for examination by counsel for Plaintiff in

14   the above-entitled matter, pursuant to notice, the witness

15   being duly sworn by DENNIS A. DINKEL, a Notary Public in and

16   for the District of Columbia, taken at the offices of

17   WilmerHale, LLP, 1825 Pennsylvania Avenue, N.W., Washington,

18   D.C. at 9:32 a.m., Thursday, March 13, 2008, and the

19   proceedings being taken down by Stenotype by DENNIS A.

20   DINKEL, FAPR, CRR, and transcribed under his direction.

21

22
```

Daniel P. Mulhollan  
Washington, DC  
March 13, 2008

Page 10

1  refer to it as the terrorist specialist position.
2  Okay?
3          Finally, the plaintiff in this case is
4  Diane Schroer. At the time of the events in this
5  case, Ms. Schroer went by the name David Schroer. So
6  during this deposition, when I talk about Diane
7  Schroer or Ms. Schroer, I'm referring to the person
8  formerly known as David Schroer, okay?
9      A.   Yes. Uh-huh.
10     Q.   Did you review any documents in
11  preparation for this deposition?
12     A.   Not really.
13     Q.   Were there any documents that you even
14  glanced, if not spent any significant time on?
15     A.   No.
16     Q.   Did you create any notes in preparation
17  for this deposition?
18     A.   Let me see. Not to my recollection. I
19  may have at some point, but I don't recall anything
20  significant whatsoever.
21     Q.   But for -- in preparation for today's
22  deposition, did you prepare anything?

Page 11

1      A.   This (indicating.)
2      Q.   Okay. Is the information that's on this
3  sheet that you've just handed me information that
4  pertains to this case?
5      A.   No. These were just notes I was taking
6  for work going on today on the Hill.
7      Q.   Got it.
8      A.   Okay.
9      Q.   Did you speak with anyone in preparation
10  for this deposition?
11     A.   Yes. My counsel.
12     Q.   And who is that?
13     A.   Kent Ronhovde, my counsel, counsel to my
14  right from the Department of Justice, and counsel
15  from the Library of Congress.
16     Q.   Mr. Mulhollan is indicating Ms. Russell,
17  Ms. Douds, and Mr. Rubiella.
18     A.   I think there was a colleague, Lizanne
19  Kelley at CRS.
20     Q.   Anyone else?
21     A.   Well, there are two other counsels on our
22  legal team. They were present at one meeting. That

Page 12

1  was Diane Duffy and Douglas Warshof.
2      Q.   Did you speak with anyone else?
3      A.   Not to my recollection.
4      Q.   In particular, anyone who is not part of
5  your legal team?
6      A.   No.
7      Q.   Mr. Mulhollan, are you employed?
8      A.   On occasion, yes.
9      Q.   Who is your employer?
10     A.   The United States Congress.
11     Q.   And what is your title?
12     A.   Director of the Congressional Research
13  Service.
14     Q.   And what are your job responsibilities?
15     A.   To ensure the fact that Congress has
16  objective, nonpartisan analysis on the legislation
17  and deliberations before Congress.
18     Q.   Anything else?
19     A.   To ensure that, in fact, that the
20  Congressional Research Service as an institution is
21  there available to Congress, 24/7, in order to help
22  Congress in its -- in the difficult decisions it has

Page 13

1  to make on a daily basis, both at committee and on
2  the floor.
3      Q.   With respect to the internal
4  administration of the Congressional Research Service,
5  are any of those tasks part of your job
6  responsibilities?
7      A.   They are -- I am responsible for the
8  actions -- I mean, from -- that every person has with
9  interactions with the Congress. Day-to-day
10  operations are often the responsibility of my deputy
11  or the deputy director.
12     Q.   And who is that?
13     A.   Her name is Angela Evans.
14     Q.   Any other job responsibilities?
15     A.   Of the director of the Congressional
16  Research Service?
17     Q.   Yes.
18     A.   Well, the statute calls for maximum,
19  practical administrative independence within the
20  library, also calls for complete research
21  independence.
22          Within the library itself, there are the

Daniel P. Mulhollan
Washington, DC
March 13, 2008

## Page 34

1  I just -- my general recollection is there
2  have been security matters in the past, in the last
3  decade plus, where there have been security issues
4  arising. But I am afraid I can't give you any
5  specifics.
6  Q. Any general level of detail that you can
7  recall?
8  A. The one that just popped in my mind was --
9  had -- had to do with someone who was -- whose -- who
10  had family in an identified country that was
11  problematic as far as security was concerned.
12  Unless it's -- you know, you're squeezing
13  this out of the turnip. The selective elements I
14  really do think would distort whatever picture that
15  could be accurately provided, because I'm not
16  fortunate enough to know. There were some security
17  concerns somewhere down the line over the scores of
18  individuals we've done in the last, you know, 14
19  years.
20  Q. In the case of this individual with family
21  in a foreign country that raised concerns, was that
22  applicant ultimately accepted for the position?

## Page 35

1  A. No.
2  Q. Okay. With respect to these other cases
3  that you're recalling in a general way, are there any
4  documents that would refresh your recollection about
5  these cases?
6  A. Not that I can think of. I mean -- look,
7  if, in fact -- well, if you go through -- okay. This
8  was this hire. This was this hire. This was this
9  hire. But I don't see how fruitful that would be.
10  Q. In a case where an issue comes up in the
11  course of the security clearance process that leads
12  the selecting official to go with a different
13  candidate, are there any documents that are produced
14  to reflect that process?
15  A. They are may well be, but I'm not familiar
16  with them.
17  Q. Is there any -- are there any documents
18  that are created, to your knowledge, about the fact
19  that security clearance concerns have arisen at all
20  with respect to a leading candidate?
21  A. Again, I have to repeat my answer. There
22  may well be, but I'm not familiar with them.

## Page 36

1  Q. Who would be the person who would know
2  what those documents are?
3  MS. RUSSELL: Objection to the form of the
4  question. But you can answer.
5  THE WITNESS: Well, it would undoubtedly
6  be the office of workforce development.
7  BY MS. McGOWAN:
8  Q. Anyone else?
9  A. The director of human resources of the
10  Library of Congress.
11  Q. And who is that?
12  A. Dennis Hanratty. And presumably Cindy
13  Wilkins.
14  Q. And who is Cindy Wilkins?
15  A. She's the head of the library security
16  office.
17  Q. Anyone else?
18  A. I think those would be the appropriate
19  offices to have that kind of documentation.
20  Q. Do you know a library employee named
21  Charlotte Preece?
22  A. I mentioned her already, if you recall.

## Page 37

1  Q. So how -- tell me how you know her?
2  A. Well, I selected her to be the head of
3  foreign affairs, defense, and trade back in 1994.
4  Q. Were you the actual selecting official?
5  A. Correct.
6  Q. And what is your -- what is the nature of
7  your professional relationship with Ms. Preece?
8  A. I'm sorry. You have to be more specific.
9  The nature of the professional relationship --
10  Q. Do you interact with Ms. Preece in your
11  capacity as director of CRS?
12  A. Yes.
13  Q. What is the nature of that interaction?
14  A. You asked the same question again, and I
15  have to ask you to clarify it.
16  Q. In a day-to-day way, how do your work
17  responsibilities interact with Ms. Preece's work
18  responsibilities?
19  A. Well, if you recall, it would be on the
20  same pattern as with any of the other assistant
21  directors.
22  And that is that it can be -- a week can

10 (Pages 34 to 37)

Daniel P. Mulhollan                                      March 13, 2008
Washington, DC

Page 38

1  go by, where we wouldn't have any discussion, except
2  at the research policy council meeting. The research
3  policy council meeting usually meets on Friday and on
4  occasion -- with some regularity on Tuesdays as well.
5      Currently, we have a meeting about -- as
6  of today, here's the pattern. Because there's been a
7  change. Wasn't even called the research policy
8  council back in ancient days, 1994.
9      But the relationship between -- Charlotte
10 and my relationship is I don't believe any different
11 than any other assistant director.
12     And we would -- will now meet at 9:30 on
13 Monday to talk about what is happening in the
14 Congress this week, what measures are coming, what
15 hearings are we involved in. Everyone reports for
16 about seven minutes.
17     What hearings are involved, who's
18 testifying, if CRS staff is testifying, what's
19 happening on the floor, how are we engaged. And when
20 we are not engaged in a major hearing, why not. That
21 sort of thing.
22     Then we will meet on -- with regularity on

Page 39

1  Friday at 9:30, usually 9:30 to 11:30 on operational
2  issues on a whole range of matters. That's probably
3  the major -- on occasion, I will have a meeting of
4  about a half hour duration every couple of weeks with
5  all the assistant directors, talking about what
6  problems are going on in the division.
7      That's just recently started. I stopped
8  that for some hiring -- because we had some hiring
9  priorities. So -- a section research manager.
10 That's been put on hiatus until all those hires are
11 made.
12 Q.  Did you know her prior to 1994?
13 A.  Yes. Because she's been in CRS prior to
14 1994.
15 Q.  How did you know her?
16 A.  She was a colleague within the service.
17 Q.  Do you know what position she held prior
18 to becoming --
19 A.  She may have been a section head, I don't
20 recall.
21 Q.  Did she directly report to you prior to
22 her taking on her current position?

Page 40

1  A.  No. The division she was in was then
2  known as foreign affairs and national defense. Her
3  area of expertise was national defense.
4  Q.  Today we are talking about primarily the
5  hiring process for the terrorism specialist position
6  which took place roughly through the period July
7  through December of 2004.
8      During this period of time, did anyone
9  inform you that the terrorism specialist position
10 needed to be filled?
11 A.  Yes.
12 Q.  Who informed you of that?
13 A.  I can't remember, Sharon. You're not
14 asking, but I'll give you the context anyway. If you
15 recall, in July of 2004, the 9-11 Commission's
16 recommendations came out.
17 Q.  Uh-huh.
18 A.  By December of 2004, the first major
19 terrorism act and the government reform took place
20 with the national -- with the creation with the
21 creation of the National Director of Intelligence.
22     It was a very intense time. So I was

Page 41

1  paying attention to it -- not that position
2  specifically. But paying attention to the division's
3  capacity to deal with this.
4      In December of 2004, it was enacted.
5  Negroponte -- in April was the confirmation. CRS was
6  involved in writing questions for the committees and
7  helping them out on a continuing basis.
8      So I was just concerned that the service
9  had the capacity to help in a high profile important
10 issue. That's my recollection.
11 Q.  During this period of time, did Charlotte
12 Preece come to you and say, I need to fill the
13 terrorist specialist position?
14 A.  I do not recall if she came to me or this
15 was something through Bessie Alkisswani. I do have
16 vague recollection that this -- basically, telling
17 her get this position filled, and do what you need to
18 do to get it filled.
19     But not even -- I don't know if I was
20 that kind of dramatic about it. But at the same
21 time, there was -- it was -- Charlotte knew that this
22 was an important area to be filled. And there

11 (Pages 38 to 41)

Daniel P. Mulhollan  
Washington, DC  
March 13, 2008

### Page 42

1  were -- I had gone back in 2002 and asked for
2  actually 10 different kinds of competencies. Five
3  had to do with aging, like gerontology. The others
4  were aspects of cyberterrorism, epidemiology, and
5  one -- terrorism experts.
6      There was that competency that we had
7  asked for, so it had that sufficient profile. I
8  wanted to make sure -- Congress gave us additional
9  money to have that competency to be filled in. And
10  then there were those circumstances.
11      To that degree, I paid attention. I
12  relied upon Charlotte to fill those needs.
13    Q.  You mentioned that you have -- it says, I
14  do have a vague recollection of telling her that this
15  needed to be filled.
16    A.  I don't --
17    Q.  I just wanted to be sure I knew who the
18  "her" is.
19    A.  I'm not sure. I do not recall how that
20  priority was conveyed. It doesn't -- no offense to
21  anyone here. It doesn't take a rocket scientist to
22  understand, given the circumstances that was going on

### Page 43

1  at the time, that it was a priority position for the
2  service. And Charlotte knows her job.
3    Q.  Did you convey any of this in writing?
4    A.  I don't think so. I do not recall if
5  there was any documentation on this. I suspect not.
6  I suspect that it was, you know, just -- how it had
7  been conveyed, I have some recollection that it
8  was -- might have been to Bessie, that that would
9  be -- you know, there were other hires in places.
10  Add another hire. I don't know if I was the one who
11  said that, but I know that that occurred. I take
12  credit for good things.
13    Q.  Did you state anything specifically about
14  steps that could be taken to make sure that the
15  position was filled quickly?
16    A.  Not to my recollection. I traditionally
17  wouldn't get involved in that.
18    Q.  Other than what we talked about, what else
19  can you tell me about the need to fill this position?
20    A.  Other than what I just said?
21      I think that in addition, there was the
22  Homeland Security Department, the debate that was

### Page 44

1  going on with Homeland Security, the concept in one
2  form or the other.
3      We were just mindful of -- the priority
4  activities I had talked about -- because there were a
5  number of 9-11 Commission recommendations that were
6  not taken up in the December 2004 legislation.
7      And -- which are being discussed this
8  second session of the 110th, continue to be. There
9  were a lot of issues surrounding that, that we were
10  involved in as well.
11      And we got some unwanted but -- attention
12  with regard to, you know, the Patriot Act, the
13  service's legal analysis of that, but --
14  subsequently.
15      But what I just laid out, I think would
16  encompass the primary components of the -- my anxiety
17  with regard to ensuring that Congress had the help it
18  needed.
19    Q.  Did you have any discussion with anyone
20  about how quickly the position could be filled?
21    A.  No.
22    Q.  Is there a specific hiring cycle for CRS,

### Page 45

1  by which I mean certain rules about when positions in
2  normal circumstances can be posted?
3    A.  We have a hiring plan. And it ties in to
4  what I described earlier with regard to succession
5  planning.
6      So that if you have two of the six people
7  in natural resources saying they are going to retire
8  in April 2009, we are trying to fill those positions
9  to timeline it with when those people are departing.
10      And they may put up a hire -- but we have
11  always been open to placing a priority and what we --
12  you know, as the top priority when someone departs
13  that you hadn't expected, and they are in a high
14  profile issue.
15    Q.  Was that the case for the terrorism
16  specialist position?
17    A.  That's my understanding.
18    Q.  And anything else you can tell me about
19  how you came to that understanding about the
20  position?
21    A.  All I can tell you is that the average
22  tenure in CRS is 15.5 years. The average tenure of

12 (Pages 42 to 45)