IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————————
                                                    )
                                                    )
DIANE J. SCHROER,                                   )
                                                    )
                          Plaintiff,                )
                                                    )          No. 05-cv-1090 (JR)
               v.                                   )
                                                    )
JAMES H. BILLINGTON,                                )
   Librarian of Congress,                           )
                                                    )
                          Defendant.                )
———————————————————————————)

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Sharon M. McGowan  (D.C. Bar No. 476417)
Kenneth Y. Choe
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
(212) 549-2627

Arthur B. Spitzer  (D.C. Bar No. 235960)
American Civil Liberties Union
   of the National Capital Area
1400 20th Street, N.W., #119
Washington, D.C. 20036
(202) 457-0800

*Counsel for Plaintiff*

Date:  June 18, 2008                    ORAL HEARING REQUESTED

# INTRODUCTION[1]

After twenty-five years of military service defending our nation, Plaintiff Diane Schroer ("Plaintiff") applied to work as a civilian researcher on issues of terrorism and international crime with the Congressional Research Service ("CRS") of the Library of Congress ("Library"). When the selecting official, Charlotte Preece ("Preece"), believed that Plaintiff was a male, Plaintiff was Preece's top choice for the position.  When Preece learned that Plaintiff intended to start in the position as a female, consistent with her female gender identity,  Ms. Preece selected her second-choice candidate for the position instead.

There is ample evidence in the record from which a reasonable fact-finder could conclude that the Library's decision not to hire Plaintiff for the position of Specialist in Terrorism and International Crime ("Terrorism Specialist") was "because of sex."  The direct admissions of Preece, the statements and actions of the colleagues she consulted when making her decision, the documents created at the time of the decision, and the surrounding circumstances could all point a reasonable fact-finder to the conclusion that the Library's decision was motivated by impermissible sex stereotypes and/or gender identity discrimination, both of which constitute discrimination "because of sex" in violation of Title VII.  In light of the significant evidence in

---

[1] For purposes of clarity, Plaintiff sets out the following terms and corresponding definitions, which will be used throughout the brief:

- Plaintiff uses the terms "sex" and "gender" interchangeably, and uses those terms to encompass the factors that reveal whether an individual is male or female.

- Plaintiff uses the term "gender identity" to refer to one component of an individual's sex – his or her internal sense of being either male or female.

- Plaintiff uses the terms "transsexual" and "transgender" interchangeably to refer to an individual whose gender identity is inconsistent with his or her sex assigned at birth.

- Plaintiff uses the terms "Gender Identity Disorder" and "gender dysphoria" interchangeably to refer to the medical diagnosis assigned to an individual who is transgender for which the course of treatment is gender transition from one gender to another.

- Plaintiff uses the terms "gender identity discrimination" to include discrimination against transgender individuals due to the fact that their expressed gender identity does not conform with their sex assigned at birth.

the record, and the fact that all reasonable inferences from that evidence must be drawn in

Plaintiff's favor at this stage, Defendant's motion for summary judgment must be denied.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

In August 2004, Plaintiff, a twenty-five year veteran of the U.S. Armed Services, applied

for a position as a Terrorism Specialist with CRS.  Schroer Decl. ¶¶ 2-3, 8.  Plaintiff was

exceptionally well-qualified for this position.  Id. at ¶¶ 2-7.  Prior to her retirement from the

military in January 2004, Plaintiff was a full Colonel assigned to the U.S. Special Operations

Command and the Joint Special Operations Command.  Id. at ¶¶ 4-5.   Following the terrorist

attacks of September 11, 2001, Plaintiff served as the Director of a 120-person classified

organization with significant global responsibilities for the Global War on Terror, including the

tracking and targeting of several high-threat international terrorist organizations.  Id. at ¶ 6.  In

performing these duties, Plaintiff analyzed highly sensitive intelligence reports, planned for the

full range of classified and conventional operations, and presented this information to high-

ranking officials of the United States government, including the Vice President, the Secretary of

Defense and the Chairman of the Joint Chiefs of Staff.  Id.  After retiring from active duty,

Plaintiff joined a private sector consulting firm that provided strategic analysis to various federal

agencies, including the Department of Defense.  Id. at ¶ 7.

In October 2004, Plaintiff accepted an invitation to interview for the Terrorism Specialist

position with three CRS representatives – Preece, Steve Bowman and Francis Miko.  Id. at ¶ 10.

Plaintiff is transgender, has a female gender identity, and has a medical diagnosis of Gender

Identity Disorder.  Id. at ¶¶ 14-16; Harris Decl. Exh. A ("Harris Report") ¶¶ 22(a)-(b), 24, 46.  At

that time, she was in the early stages of her transition from male to female.  Schroer Decl. ¶ 16.

Accordingly, she had not yet changed her legal name to Diane or begun presenting as a female in

workplace settings.  Id.  She therefore submitted her application under her then-legal name, David Schroer, and went to the interview dressed in traditionally masculine attire.  Id.

Preece was the selecting official for the Terrorism Specialist position, McGowan Decl. Exh. M (Def.'s Combined Resp. to Pl.'s 1st Set of Discovery Request) at 2, and Plaintiff emerged from the hiring process as Preece's top choice.  Preece Depo. at 119, 122;[2] McGowan Decl. Exh. K (Final Referral List) (showing numerical scores for candidates).  In mid-December 2004, Preece called Plaintiff and told her that, if she was still interested, the job was hers. Schroer Decl. ¶ 12; Preece Depo. at 121-22.  Before processing the administrative paperwork, Preece asked Plaintiff whether she would accept.  Schroer Decl. ¶ 12; Preece Depo. at 122-24. After receiving confirmation from Preece that the Library could offer her a salary comparable to what she was earning, Plaintiff indicated that she would accept the position.  Schroer Decl. ¶ 13. Preece began drafting a hiring memorandum.  McGowan Decl. Exh. L (draft hiring memorandum); Preece Depo. at 128-29.

At this time, Plaintiff was preparing to commence the "real life experience" portion of her gender transition, in which she would begin dressing in traditionally feminine clothes and otherwise presenting as a female on a full-time basis.[3]  Schroer Decl. ¶ 16.  As Preece had told Plaintiff that she had the job, and had expressed great enthusiasm about Plaintiff's joining CRS, Plaintiff decided that she would begin presenting full-time as female when she began work.  Id. at ¶ 17.  Plaintiff proposed a meeting with Preece to explain to her that she was in the process of transitioning from male to female.  Id. at ¶¶ 17-18.  Plaintiff believed it would occasion less

---

[2]  Excerpts from transcripts of depositions are attached as exhibits to the accompanying declaration of Sharon M. McGowan.

[3]  There is no medically prescribed timeframe in which an individual who is diagnosed with gender identity disorder must begin the "real life experience" portion of his or her gender transition.  It is a personal decision that an individual makes when he or she believes that his or her life circumstances are best suited to taking the step.  See Bockting Decl. Exh. A ("Bockting Report") ¶ 28.

confusion if she started work presenting as a female than if she started work presenting as a male and subsequently began presenting as a female. <u>Id.</u> at ¶ 17.

On December 20, 2004, Plaintiff met Preece for lunch. <u>Id.</u> at ¶ 19. Preece offered additional details about the position, and explained why the selection committee believed that Plaintiff's insight into policy analysis, imagination, creativity and contacts made her application superior to those of the other candidates. <u>Id.</u> at ¶ 21; Preece Depo. at 98, 126, 138-39.

At that point in the conversation, Plaintiff asked Preece if she knew what it meant to be transgender. Schroer Decl. ¶ 22. When Preece said that she did not, Plaintiff told Preece that Plaintiff was a transgender woman, and explained to her what that meant – namely, that Plaintiff had a female gender identity, and would be transitioning from living as a male to living as a female on a full-time basis, consistent with her gender identity. <u>Id.</u> Plaintiff told Preece that she was under a health care provider's care for gender dysphoria, the clinical term used to describe the experience of being transgender, and that, consistent with her prescribed course of medical care, she would be using a traditionally feminine name (<u>i.e.</u>, Diane) and dressing in traditionally feminine clothes and otherwise presenting as a female when she started at CRS. <u>Id.</u>

In response, Preece asked Plaintiff why she would want to do a thing like that. <u>Id.</u> at ¶ 23; Preece Depo. at 154. Preece wondered how she could hire "David" when Plaintiff wanted to report for work as "Diane." Preece Depo. at 146, 163. When Preece asked whether she would need to change the name that she had used on the hiring paperwork from David to Diane, Plaintiff explained that there was no need to do that because Plaintiff had not yet changed her legal name. Schroer Decl. ¶ 23.

To allay any concern about whether she would present as a female in a workplace-appropriate manner, Plaintiff showed Preece photographs in which Plaintiff was dressed in

traditionally feminine clothes.  Id. at ¶ 24; Preece Depo. at 143.  Plaintiff also volunteered that she knew of other federal employees in positions requiring a security clearance who had undergone a gender transition without problem.  Schroer Decl. ¶ 25.  Plaintiff said she would be willing to speak with the Library's personnel security or health services office, or consent to having her health care provider do so, if the Library wished to confirm that her transition posed no security concern.  Id.  Preece did not ask whether Plaintiff had already reported this information to the security officer at her current employer (which Plaintiff had) or any other follow-up questions suggesting concern about this issue.  Id. at ¶ 27; Preece Depo. at 147-48.

When Preece asked Plaintiff what medical steps would be forthcoming as part of Plaintiff's transition, Plaintiff explained that she would be having facial feminization surgery prior to beginning at the Library, but would not be undertaking sexual reassignment surgery ("SRS") for at least a year.  Schroer Decl. ¶ 28.  She also emphasized that she could determine the timing of her SRS, and could schedule it in a manner consistent with the needs of CRS.  Id.

As they were preparing to leave the restaurant, Preece thanked Plaintiff for being honest with her.  Id. ¶ 30.  Preece then said that Plaintiff "[had] really given [her] something to think about," and that she would get back to her.  Id.; Preece Depo. at 161, 166.

As Preece walked back to her office, she felt simultaneously incredulous and concerned about what Plaintiff had told her.  Preece Depo. at 167, 170.  She was specifically concerned about the fact that people would suspect that Plaintiff was transgender when they saw Plaintiff because they would have the same reaction that Preece had when she saw the pictures Plaintiff had shared at lunch – namely, that, when dressed in feminine attire, Plaintiff looked like a "man in a dress."  Id. at 172.  She immediately went to the office of her colleague, Steve Bowman, shut the door, and told him what Plaintiff had disclosed to her at lunch.  Bowman Depo. at 84; Preece

5

Depo. at 190-91.  Visibly upset and tense, Preece expressed feeling stunned by the news.

Bowman Depo. at 84, 100.  Preece told Bowman that Plaintiff had shown her photographs of

Plaintiff dressed in traditionally feminine clothing, and described Plaintiff's appearance in the

photographs unfavorably.  Id. at 92-94.  Preece stated that she did not know what to do.  Id. at

87, 100.  Bowman raised the question of whether Plaintiff's gender transition might pose security

clearance concerns, and suggested that Preece speak with Cynthia Wilkins, the Library's

Personnel Security Officer.  Id. at 96; Preece Depo. at 191.  Shortly thereafter, Preece also spoke

with another CRS colleague, Gary Pagliano, who had known Plaintiff from the Army War

College, and told him that Plaintiff wanted to report to work in women's attire.  Pagliano Depo.

at 46.  Preece again expressed feeling "upset" and "shocked" by Plaintiff's disclosure, a

sentiment that Pagliano shared.  Id. at 43.

    That afternoon, Preece informed Wilkins that her top candidate for a position requiring a

security clearance was transitioning from male to female, and planned to begin work as a

woman.  Preece Depo. at 179.  Preece also mentioned that the candidate had shown her

photographs of what the candidate would look like presenting as female.  Id. at 182.  Preece

asked Wilkins what impact this information would have on the individual's ability to "get

clearance."  Id. at 179.  Wilkins said that she would look into the matter and report back.  Id. at

179-80, 183-84.

    At the time she posed her question to Wilkins, and without having any reason to believe

that Plaintiff would have difficulty maintaining a security clearance, Preece was already "leaning

against" hiring Plaintiff.  Id. at 186.  Consequently, at no time prior to Preece making her

decision did Preece contact Plaintiff to follow up with any questions or to discuss any issues of

purported concern.  Id. at 240, 259.  Nor did Preece follow up at any time with any of Plaintiff's

references.  Id. at 199-200.  Plaintiff had informed each of her references about her gender identity and plans to transition to living and working full-time as a female.  Schroer Decl. ¶ 29. Even though they knew this information, none of Plaintiff's references had volunteered any concern that Plaintiff would be less effective as Diane than she had been as David when they were contacted earlier in the hiring process.  Preece Depo. at 114-19; Bowman Depo. at 70-75; Miko Depo. at 66-68; McGowan Decl. Exh. S (reference check notes for Plaintiff).  Preece did not know that Plaintiff's references had recommended her with full knowledge of Plaintiff's gender identity because Preece never followed up with them.  Preece Depo. at 199-200.

That evening Preece discussed Plaintiff's disclosure with her two adult sons, who are in the National Guard and with whom Preece had previously shared information about Plaintiff's background and résumé.  Id. at 201-07.  The sons expressed shock and disbelief that someone with Plaintiff's background would want to be a woman, and Preece said that she did not understand it herself.  Id. at 203.

The next day, Preece met with Wilkins, Kent Ronhovde, the Associate Director of CRS, and two senior CRS Human Resources employees.  Id. at 211-13.  During the meeting, Preece explained to the others that Plaintiff had disclosed that she was transgender and intended to report to work as a woman.  Id. at 213.  Preece also informed them that Plaintiff had shown her photographs of Plaintiff dressed in traditionally feminine clothing.  Id. at 220.  At no point during the meeting did Preece or anyone else express any desire or interest in trying to find a way to continue to go forward with Preece's original selection of Plaintiff for the position notwithstanding the information Plaintiff had disclosed.  Id. at 215.

When asked for her assessment, Wilkins stated that Plaintiff's transsexuality did not disqualify her from eligibility for a security clearance.  Wilkins Depo. at 134.  She also stated

that there were no security concerns regarding blackmail, as Plaintiff was open about her gender identity and had voluntarily disclosed this information.  Id. at 134, 177.  Wilkins indicated that she would want to refer the matter to the Library's Health Services Office for its assessment of whether there were any mental health issues in Plaintiff's case that would pose any security clearance concerns before she decided what next steps would be appropriate.  Id. at 135.  Wilkins testified that what additional inquiry, if any, would have been necessary to evaluate Plaintiff's situation would have been contingent on the results of an evaluation by Dr. Sandra Charles, the Library's Health Services Officer.  Id. at 140-41.  A favorable evaluation from Dr. Charles could have been sufficient to put any security clearance concerns to rest.  Id. Dr. Charles, however, was not asked to attend this meeting, nor was she (or anyone else from her office) consulted at any time before Preece made her hiring decision.  Id. at 144; Charles Depo. at 94-95.

Wilkins did not specify how long it would take to evaluate Plaintiff's situation.  Wilkins Depo. at 135-37.  Preece testified that Wilkins conveyed that the Personnel Security Office would need to "start from scratch" in assessing Plaintiff because, even though there was a security clearance file on "David Schroer," there was no security clearance file on "Diane Schroer."  Preece Depo. at 223 (stating that the prior security clearance investigations for David Schroer "would not be relevant to Diane," because "Diane didn't exist in this point, in a legal sense, or in a sense of security clearances"); id. at 222-25, 232-33.  Wilkins, however, never said that she would need to "start from scratch."  Preece Depo. at 233 (admitting that "start from scratch" were Preece's words, not Wilkins').

At this meeting, there was no discussion of any steps that might be taken to expedite a security clearance assessment of Plaintiff, such as pulling Plaintiff's security clearance file, bringing in Plaintiff for a meeting with the Health Services or Personnel Security Office, or

calling Plaintiff to obtain more information that might be relevant to the security clearance assessment, such as whether or not she had already disclosed her female gender identity to the security officer at her current employer responsible for managing her clearance.  Id. at 239. Wilkins had never encountered a situation with a transgender applicant before, and informed Preece of that fact.  Id. at 179.  Yet at no time during this meeting did anyone suggest seeking the advice of others who had experience dealing with any security clearance issues regarding a transgender applicant or employee, id. at 239, even though it is common for personnel security officers to seek advice from colleagues on how the security clearance guidelines apply in particular situations.  Wilkins Depo. at 163-64; see also Nelson Decl. Exh. A ("Nelson Rpt.") ¶ 5 (providing example of such consultation).  The information from Wilkins that Plaintiff's situation would require evaluation had the effect of "sealing" in Preece's mind that she was not going to hire Plaintiff.  Preece Depo. at 227.

Preece circulated multiple e-mails with draft texts for the conversation in which Preece would inform Plaintiff that Preece was no longer going to select Plaintiff for the position. McGowan Decl. Exh. R (e-mails).  Preece called Plaintiff on December 21, 2004, and informed her that, after a long and restless night, she thought that Plaintiff was "not a good fit" for the Library.  Schroer Decl. ¶ 31; Preece Depo. at 274; Rec. Doc. 47 (Answer to Am. Compl.) ("Answer") ¶ 48.  Plaintiff expressed her disappointment at hearing that this was Preece's decision, and Preece once again thanked Plaintiff "for being honest with her."  Schroer Decl. ¶ 31; Preece Depo. at 275-76; Rec. Doc. 47 (Answer) ¶ 50.  Preece provided no specific reasons for her decision.  Schroer Decl. ¶¶ 31-32; Preece Depo. at 273-75.  In particular, she did not mention any concern about Plaintiff's security clearance.  Schroer Decl. ¶ 32; Preece Depo. at 275.  Preece selected her second-choice candidate, John Rollins, for the position.  Preece Depo.

at 277-78; Miko Depo. at 64, 66.  John Rollins is not transgender.  Preece Depo. at 189.

After exhausting her administrative remedies, Plaintiff filed this lawsuit, alleging *inter alia* that the Library's decision not to hire her constituted discrimination because of sex in violation of Title VII.  Rec. Doc. 1 (Compl.).  In denying Defendant's first motion to dismiss (Rec. Doc. 7), the Court held that Plaintiff had failed to allege sufficient facts to state a claim of sex stereotyping, but opined that Plaintiff might be able to state a claim on the ground that gender identity discrimination constitutes discrimination "because of sex."   Rec. Doc. 13 (Mem. & Order).  The Court invited the parties to build a factual record, including expert testimony, addressing that issue.  Id. at 21-22.

Defendant filed a second motion to dismiss (Rec. Doc. 30).  Plaintiff then sought and was granted leave to amend her complaint to include additional factual allegations demonstrating that Defendant's decision was motivated by sex-stereotyping as well as gender identity discrimination, both of which, Plaintiff argues, are forms of discrimination "because of sex." Rec. Doc. 33 (Pl. Motion for Leave to Amend Compl.), Minute Order (July 7, 2007) (granting motion).  Defendant filed a third motion to dismiss incorporating its previous arguments and addressing the additional sex stereotyping allegations in Plaintiff's amended complaint (Rec. Doc. 41).  Finding that Plaintiff's additional factual allegations clearly stated a claim of sex stereotyping, the Court denied Defendant's motion to dismiss, and postponed consideration of whether gender identity discrimination is also a form of discrimination "because of sex."  Rec. Doc. 44 (Mem. & Order).

## LEGAL STANDARD

Summary judgment may be granted only where the facts, viewed in the light most favorable to the non-moving party, show that there are no genuine issues of material fact in

dispute and that the moving party is entitled to judgment as a matter of law.  Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986).   A court must accept the evidence of the non-moving party as

true and must draw all reasonable inferences in its favor.  Anderson v. Liberty Lobby Inc., 477

U.S. 242, 255 (1986); Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003).

     Summary judgment is inappropriate where the non-moving party has come forward with

specific facts that, when viewed in the context of the record as a whole, could lead a rational

fact-finder to find for that party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 587-88 (1986).  Particularly in cases "where motive and intent play leading roles," summary

judgment is generally inappropriate. White Motor Co. v. United States, 372 U.S. 253, 259

(1963); see also Ashman v. Barrows, 438 F.3d 781, 784 (7th Cir. 2006) ("summary judgment is

notoriously inappropriate for determination of claims in which issues of intent, good faith, and

other subjective feelings play dominant roles"); Stumph v. Thomas & Skinner, Inc., 770 F.2d 93,

97 (7th Cir. 1985) ("summary judgment is improper in a discrimination case where a material

issue involves any weighing of conflicting indications of motive and intent").

## ARGUMENT

I.    **Because the Record Contains Direct Evidence That Defendant's Adverse Hiring Decision Was "Because of Sex," Defendant's Motion for Summary Judgment Must Be Denied.**

    "[I]f a plaintiff can provide direct evidence of 'discriminatory motive in carrying out its

employment decision' by an employer, that plaintiff can survive a motion for summary

judgment."  Dorchy v. WMATA, 45 F. Supp. 2d 5, 10 (D.D.C. 1999) (quoting Smith v. Chrysler

Corp., 155 F.3d 799, 805 (6th Cir. 1998)).  Direct evidence is "evidence of conduct or statements

that both reflect directly the alleged discriminatory attitude and that bear directly on the

contested employment decision."  Thomas v. NFL Players Ass'n, 131 F.3d 198, 204 (D.C. Cir.

1997). "The existence of such evidence in itself defeats the motion for summary judgment and takes the case to the jury," Lucas v. Paige, 435 F. Supp. 2d 165, 169 (D.D.C. 2006).

Although admissions are the most classic form of direct evidence, other statements short of admissions can, based on their context, timing (relative to the disputed decision) and substance, be deemed direct evidence of discriminatory intent. Id. at 170-72; see also Sheehan v. Donlen Corp., 173 F.3d 1039, 1044 (7th Cir. 1999) ("It would cripple enforcement of the employment discrimination laws to insist that direct evidence take the form of an employer's statement to the effect that 'I'm firing you because you're in a protected group.'"). For example, in Lucas, the Court found that the employer's comment about the applicant being an "old timer" was direct evidence that the adverse hiring decision was the product of age discrimination. 435 F. Supp. 2d at 170-71. The fact that a statement can be susceptible to more than one meaning does not disqualify it from classification as direct evidence of discrimination. Id. at 171. Rather, it simply indicates that there is a genuine issue of material fact as to what the employer meant when he or she said it, which is a question to be resolved by the fact-finder, and not on a motion for summary judgment. Id.

The key factual dispute in this case is why Defendant refused to hire Plaintiff. Defendant would have this Court impermissibly draw numerous inferences in its favor and accept its contention that its decision was made only for legitimate and non-discriminatory reasons. The record, however, contains direct evidence of discriminatory intent that creates a genuine dispute of material fact about whether Defendant's decision not to hire Plaintiff was because of Plaintiff's sex. In the face of this direct evidence, Defendant's motion for summary judgment must be denied.

12

**A.    There Is Direct Evidence That Defendant's Decision Was Motivated by Sex Stereotypes, Which Is a Form of Discrimination "Because of Sex."**

**1.  Anyone Who Has Been Discriminated Against for Failing to Conform to Gender Stereotypes May Bring a Claim Under Title VII.**

Ignoring well-established precedent, Defendant continues to insist that Plaintiff's transgender status precludes her from bringing a claim of sex discrimination under a sex stereotyping theory.  Yet this Court has already ruled that "[Plaintiff's] transsexuality is not a bar to her sex stereotyping claim.  Title VII is violated when an employer discriminates against any employee, transsexual or not, because he or she has failed to act or appear sufficiently masculine or feminine enough for an employer."  Rec. Doc. 44 (Mem. & Order) at 8.[4]  Thus, because there is direct evidence that Defendant's assessment of Plaintiff was negatively influenced by Preece's views (and her assumptions about others' views) regarding how men and women are supposed to look or act, Defendant has failed to carry its burden under Rule 56 and Plaintiff is entitled to take her case to trial.

Although Defendant insists that there is a "huge difference" between an employee who is gender non-conforming and one who is transgender, Def. Br. at 14, "[t]here is nothing in existing case law setting a point at which a man becomes *too* effeminate, or a woman becomes *too* masculine, to warrant protection under Title VII and Price Waterhouse," Lopez v. River Oaks

---

[4]  Numerous other courts have agreed that the Supreme Court's holding in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), that "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group," id. at 251, is no less applicable to a transgender person than a non-transgender person.  See, e.g., Barnes v. City of Cincinnati, 401 F.3d 729 (6th Cir. 2005); Smith v. City of Salem, 378 F.3d 566 (6th Cir. 2004); Lopez v. River Oaks Imaging & Diag. Group, Inc., 542 F. Supp. 2d 653, 660 (S.D. Tex. 2008); Creed v. Family Express Corp., No. 3:06-CV-465RM, 2007 WL 2265630 (N.D. Ind. Aug. 3, 2007); Mitchell v. Axcan Scandifarm, Inc., No. Civ. A. 05-243, 2006 WL 456173 (W.D. Pa. Feb. 17, 2006); Tronetti v. TLC HealthNet Lakeshore Hosp., No. 03-0375E(SC), 2003 WL 22757935 (W.D.N.Y. Sept. 26, 2003); Doe v. United Consumer Fin. Servs., No. 1:01 CV 1112, 2001 WL 34350174 (N.D. Ohio Nov. 9, 2001) (attached as McGowan Decl. Exhs. V-Y); see also Rosa v. Park W. Bank & Trust Co., 214 F.3d 213 (1st Cir. 2000); Schwenk v. Hartford, 204 F.3d 1187 (9th Cir. 2000).  For further explication, Plaintiff respectfully refers the Court to the arguments presented in her memoranda in opposition to Defendant's first and third motions to dismiss regarding the viability of sex stereotyping claims by transgender plaintiffs.  See Rec. Doc. 9, 42.

Imaging & Diag. Group, Inc., 542 F. Supp. 2d 653, 660 (S.D. Tex. 2008); "[t]o hold otherwise

would permit employers and courts to superimpose classifications such as 'transsexual' on a

plaintiff, and then legitimize discrimination based on the plaintiff's gender non-conformity by

formalizing the non-conformity into an ostensibly unprotected classification," id.

Defendant's argument rests on the premise that, if an employer's adverse hiring decision

is motivated by gender identity discrimination, then it is inconceivable that the employer could

also have discriminated against the transgender applicant because the employer believed that the

applicant did not conform to generally accepted social stereotypes about sex.[5] But the fact that

gender identity discrimination may have been a factor (or even the primary factor) motivating the

decision-maker does not preclude the possibility that sex stereotyping was a factor motivating

the decision-maker as well. Rene v. MGM Grand Hotel, Inc., 305 F.3d 1061, 1063-64 (9th Cir.

2002) (en banc) (holding that the fact that a harasser may be motivated by hostility based on

sexual orientation "neither provides nor precludes a cause of action" for discrimination because

of sex, including failure to conform to sex stereotypes). Indeed, the obvious fact that employers

have multiple motivations is explicitly reflected in Title VII. 42 U.S.C. § 2000e-2(m) (codifying

mixed motive liability). Thus, as the Court has already acknowledged, while Plaintiff's gender

identity may have been one basis for her non-selection, it was not necessarily the *only* basis for

her non-selection. Rec. Doc. 44 (Mem. & Order) at 8.

As discussed in the next subsection, the record contains ample evidence to support a

finding that sex stereotyping was a factor in Defendant's hiring decision. The fact that the record

also contains evidence that Defendant was motivated by Plaintiff's gender identity separate and

apart from Plaintiff's perceived failure to conform to social stereotypes about sex, see infra

---

[5]  Defendant goes so far as to say that transgender people are not protected by Title VII's prohibition on sex
discrimination at all. Def. Br. at  1, 11-13.

Section I.B.2, does not immunize Defendant from liability; rather, it simply demonstrates that there were multiple forms of discrimination "because of sex" at work in this case, see infra Section I.B.1.[6]

### 2. Disputed Facts Regarding Whether Defendant's Adverse Hiring Decision Was Due to Plaintiff's Perceived Failure to Conform to Sex Stereotypes Preclude Summary Judgment.

The record in this case is replete with evidence from which a reasonable fact-finder could conclude that Preece's view that Plaintiff did not conform with sex stereotypes about how women should look, as well as what kinds of life experiences women typically have, contributed to Preece's decision to select another candidate.[7]

With respect to Plaintiff's appearance, there is direct evidence showing that one reason Preece decided to select another candidate was that she did not believe Plaintiff looked enough like a woman when presenting as a female to be credible in the position.   Preece's reaction to seeing Plaintiff's photographs was that she looked like a "man dressed in women's clothing." Preece Depo. at 143.  This was a source of concern for her from the outset.  Id. at 298.  Preece admitted that among the first things going through her mind as she returned to her office after her lunch with Plaintiff was that others would suspect that Plaintiff was transgender because, like Preece, they would think that Plaintiff looked like a "man in a dress."  Id. at 172, 302.  Preece also stated that she was concerned about what the reaction of Members of Congress and their

---

[6]   The existence in the record of direct evidence that an employer's adverse employment action was because of an employee's gender identity, while not necessarily direct evidence that an employer engaged in sex stereotyping, is indirect evidence that, when viewed in the context of the record as a whole, may lead a reasonable fact-finder to conclude that the employer's adverse actions against a transgender applicant stemmed from the employer's stereotypical views about what makes someone a "real man" or a "real woman," i.e., stemmed from stereotypical views about sex.  See infra note 14 and accompanying text.

[7]   The kinds of stereotypical views that will trigger liability under Title VII are not limited to gender stereotypes about physical appearance.  In Price Waterhouse, for example, the plaintiff's colleagues' negative reactions stemmed more from her behavior (e.g., acting too "macho" and brusque) than from her appearance.  490 U.S. at 235.  Likewise, in this case, Defendant's sex stereotyping involved not only concerns about Plaintiff's appearance, but also concerns about whether Plaintiff's professional experiences were so different from those of other women that she would not be deemed credible by members of Congress or their staff.  See discussion infra Section I.A.2.

staff would be to a CRS analyst who, in Preece's view, looked like a man in women's clothing. Id. at 298 ("Q:  [A]t any point were you concerned about sort of what the reaction would be of someone who looked like a man in women's clothing standing in front of Congress and trying to be taken seriously?  A:  That did cross my mind.").

The record shows that the photographs of Plaintiff were frequently discussed in the conversations Preece had about her hiring decision.  In her conversation with Bowman, which occurred upon Preece's return to the office, Preece not only mentioned that Plaintiff had shown her photographs, but also described Plaintiff's appearance in a negative way.  Bowman Depo. at 92-94.  Then, in her conversation with Wilkins to discuss purported security concerns, Preece gratuitously mentioned that Plaintiff had shown her photographs of Plaintiff in feminine attire.  Preece Depo. at 182.  And again, during the December 21, 2004, meeting with Wilkins and senior CRS officials, Preece discussed the fact that Plaintiff showed her pictures.  Id. at 220.  In explaining the situation to Pagliano, Preece framed the concern in terms of Plaintiff wanting "to report to work in women's attire."  Pagliano Depo. at 46.  This record evidence showing how Preece's decision-making process was infused with concerns about Plaintiff's intent to report to work in women's attire, her view of how Plaintiff looked in feminine attire, and her concerns about others' reaction to Plaintiff's appearance in feminine attire could lead a reasonable fact-finder to conclude that Preece's decision not to hire Plaintiff was due to Plaintiff's perceived failure to conform with Preece's stereotypical views of how women look.

The evidence shows that Preece's sex stereotypical views created additional concerns in her mind about Plaintiff's gender non-conformity beyond Plaintiff's appearance.  Preece was concerned about the ability of Plaintiff to be viewed as a credible authority on terrorism when providing testimony to Congress because, in her view, no one would believe that a woman could

have the kind of life experience that would be part of Plaintiff's biography.  Preece Depo. at 164

("This position [i.e., Terrorism Research Analyst] is a senior position.  It would likely be that –

or it was certainly expected to be that this person would have close contacts with [Congressional]

committees, potentially be called to testify.  Generally when you testify they read a bio about

yourself.  [Plaintiff] would be testifying before people who knew – would know that only a man

could have those experiences.").  The record clearly shows that this was part of what motivated

Preece's decision.  Id. at 187, 237-38, 241-42, 250-51, 253, 268.  This is only bolstered by

Preece's own inability to see Plaintiff as a woman due to Plaintiff's "macho" and "hyper [ ]

masculine" military background.  Id. at 197.

Just as calling someone an "old timer" during a hiring process is direct evidence of age

discrimination, Lucas, 435 F. Supp. 2d at 170-71, so, too, are Preece's statements of concern

about Plaintiff's appearance and ability to be "credible" as a female direct evidence of sex

discrimination.  Defendant may dispute what these statements mean, but a motion for summary

judgment is not the proper vehicle for resolving such disputes.  This evidence demonstrates the

existence of a dispute of material fact over whether Defendant's adverse hiring decision was

negatively influenced by sex stereotypes, and therefore precludes the granting of Defendant's

motion for summary judgment.

> **B.     There Is Direct Evidence That Defendant's Decision Was Motivated by
> Gender Identity Discrimination, Which Is Also a Form of Discrimination
> "Because of Sex."**

The record contains clear evidence – including Defendant's own admissions – that

Defendant's decision was based on gender identity discrimination.[8]  See infra Section I.B.2.  But

---

[8]  As discussed supra note 1, when Plaintiff refers to gender identity discrimination, she includes discrimination
against her because her expressed gender identity does not conform with the sex assigned to her at birth.  Refusing
to hire Plaintiff because she wanted to start work as a female (named Diane), consistent with her gender identity, is
just as much discrimination because of her sex as it would be national origin or religious discrimination to refuse to

the record also reflects a dispute regarding whether, as a scientific matter, a person's gender identity constitutes part of a person's sex. In the face of this dispute of material fact regarding whether gender identity is part of sex, summary judgment for Defendant is inappropriate.

### 1. There Is Sufficient Evidence to Create a Triable Dispute Over Whether an Individual's Gender Identity Is Part of His or Her Sex.

In denying Defendant's first motion to dismiss, the Court stated that discrimination against Plaintiff due to the fact that she is transgender might well be considered discrimination "literally . . . because of . . . sex." Rec. Doc. 13 (Mem. & Order) at 20. In other cases posing the legal question of what constitutes a person's sex, courts have recognized the value in grounding their legal analysis in sound science. See, e.g., In re Lovo-Lara, 23 I. & N. Dec. 746, 752 (B.I.A. 2005) ("According to medical experts, there are actually eight criteria that are typically used to determine an individual's sex. . . . [B]ecause a chromosomal pattern is not always the most accurate determination of an individual's gender, the DHS counsel's reliance on chromosomal patterns as the ultimate determinative factor is questionable."). Likewise, in this case, in order to decide the foundational factual questions that may inform the Court's legal determination of the meaning of the term "sex" in Title VII, the Court asked the parties to make a record regarding "the factual complexities" that make up a person's sex – complexities that, the Court noted, "stem from real variations in how the different components of biological sexuality – chromosomal, gonadal, hormonal, and neurological – interact with each other, and in turn, with social, psychological, and legal conceptions of gender." Rec. Doc. 13 (Mem. & Order) at 20-21. Now that the record has been developed, the Court should afford the parties the opportunity to present testimony from scientific experts in the field, so that the Court may probe the experts'

---

hire an employee because she intended to start work using a name expressing her national origin or religion (e.g., an African tribal name or Hebrew name) as opposed to a name that she had been using previously.

opinions and the bases therefor to the Court's satisfaction.[9]

Plaintiff's evidence demonstrates that, as a matter of sound science, gender identity is part of a person's sex.[10]  Specifically, Plaintiff offers the expert testimony of Dr. Walter Bockting, a renowned researcher and clinical practitioner in the fields of sexology, gender identity and gender identity disorders.  As explained in his reports and testimony, Dr. Bockting's expert opinion is that scientific observation and study have shown that a person's sex is determined by more than just his or her chromosomal configuration, and in fact includes, among other things, a person's internally held sense of being male or female, i.e., his or her gender identity.  See Bocking Rpt. ¶¶ 13, 33-36; Bockting Decl. Exh. B ("Bockting Supp. Rpt.") ¶¶ 2-4; Bockting Depo. at 31 ("[S]ex is not one thing, but has multiple components").

As early as 1972, Dr. John Money, an international authority on gender identity and gender identity disorders,[11] recognized that sex was a multifaceted concept, which included not only chromosomal make-up but also gonadal sex, fetal hormonal sex (prenatal hormones produced by the gonads), internal morphologic sex (internal genitalia, i.e., ovaries, uterus, testes), external morphological sex (external genitalia, i.e., penis, clitoris, vulva), hypothalamic sex (sex of the brain), sex of assignment and rearing, and pubertal hormonal sex, as well as, of

---

[9]   Well-established principles of statutory construction provide that, particularly with remedial provisions like Title VII, a statute's terms "should be construed broadly to effectuate its purposes."  Tcherepnin v. Knight, 389 U.S. 332, 336 (1967); see also Nordell v. Heckler, 749 F.2d 47, 49 (D.C. Cir. 1984).  The fact that a bill was introduced in Congress to make the prohibition on gender identity discrimination explicit in federal anti-discrimination law in no way suggests that the term "sex" should *not* be properly understood as already encompassing elements recognized scientifically to be part of an individual's sex, including their gender identity.  See 2A Sutherland on Statutory Construction § 48:18 (Norman Singer, ed.) (2008) ("An amendment may have been adopted only because it better expressed a provision already embodied in the original bill . . . . Thus caution must be exercised in using the action of the legislature on proposed amendments as an interpretive aid.").

[10]   In this memorandum, Plaintiff offers a summary of the evidence and arguments presented previously to the Court, and also incorporates her prior argument by reference.  See Rec. Doc. 34 (Pl. Opp. to Def. Second Motion to Dismiss) at 10-26.

[11]   See, e.g., Richards v. U.S. Tennis Ass'n, 93 Misc. 2d 713, 720-21 (N.Y. Sup. Ct. 1977) (noting Dr. Money's then-26 years of professional experience as a psychoendocrinologist, and acknowledging him as an expert "who has written and edited extensively on the subject [of transsexuality]").

particular significance to this case, gender identity and role. Bockting Supp. Rpt. ¶ 2 (citing Dr. Money's findings published in 1972 and republished in 1994).

Since that time, gender identity experts have focused their scientific research on the various components that make up a person's sex. Bockting Rpt. ¶¶ 13, 33. One component is an individual's "natal sex," or one's sex of assignment at birth, which is usually made "on the basis of the appearance of the external genitalia *rather than on chromosomal configuration*." Bockting Supp. Rpt. ¶ 3 (emphasis in original); see also Bockting Rpt. ¶ 13(a). Only when the external genitalia appear ambiguous are other aspects of sex such as the gonads and internal reproductive structures (i.e., testes, ovaries, uterus), sex hormones and chromosomal configuration assessed, at which point a sex is assigned based on that assessment. Bockting Rpt. ¶ 13(a). When it is still unclear what the sex of assignment at birth should be, the "most important criterion" is the "likelihood of the development of a gender identity that is congruent with the sex of assignment." Id.

Gender identity refers to a person's basic sense of belonging to one sex or the other. Id. Scientific experts believe that gender identity is established early in life – usually by the age of 2-3 years. Id. In most cases, gender identity is congruent with the sex assigned at birth; in the case of gender identity disorder, however, an individual has a gender identity that is inconsistent with the sex assigned at birth. Id.

Defendant disputes that gender identity is part of a person's sex. The first iteration of Defendant's position is that a person's sex is limited to his or her chromosomes. Def. Br. at 11-13 & n.11 (incorporating prior arguments by reference); see also Rec. Doc. 30 (Def. Second Motion to Dismiss) at 5-6. But the only scientific evidence Defendant has ever offered in support of that position is the testimony of Dr. Chester Schmidt, who has not been involved in

the care and management of patients with gender identity disorders for over twenty years.  See Rec. Doc. 34 (Pl. Opp. to Def. Second Motion to Dismiss) at 13-14 (discussing Dr. Schmidt's lack of relevant experience).  Dr. Schmidt's views lack a sound scientific basis, and do not reflect the current state of knowledge that has been developed by experts in the field of gender identity.[12]  Id. at 13-19.  For present purposes, however, it is sufficient to note that Dr. Schmidt's views cannot outweigh Dr. Bockting's on a motion for summary judgment.

Defendant's alternative position is that gender identity is not part of sex because it lacks a definitive biological etiology.  Def. Br. at 11-13 & nn. 9, 11.  Again, Defendant's position rests on the opinions of Dr. Schmidt, who believes that gender identity is a social construct, and not a biologic construct, and therefore is not part of what constitutes a person's sex.  Id.  Because there is a dispute of fact between the parties' experts on this issue as well, summary judgment for Defendant must be denied.

As a preliminary matter, Defendant is incorrect in arguing that a person's sex consists only of those elements of sex that have a biological source.  See Def. Br. at 13, n.11.  As Plaintiff's expert will explain, one component of an individual's sex from a scientific perspective is his or her social sex role, which involves characteristics in personality, appearance, and behavior that, in a given culture or historical period, are designated as masculine or feminine, or more typical of the male or female social role.[13]  Bockting Rpt. ¶ 13(c).

Even if it were true, which it is not, that only aspects of sex with a biological etiology are covered by the term "sex" in Title VII, there is a factual dispute between the parties over whether gender identity has its source in biology.  Defendant's suggestion that there is no dispute about

---

[12]  This Court has already recognized that sex is more than a matter of chromosomes.  Rec. Doc. 44 (Mem & Order) at 9.

[13]  This Court has already recognized that, as a legal matter, sex encompasses social sex role.  Rec. Doc. 44 (Mem. & Order) at 9.

this question, Def. Br. at 13 n.11, misrepresents the record.  Dr. Bockting will testify that

scientific study is currently focused on determining *which*, not *whether*, biological determinants

explain, in whole or in part, the fact that some people have a gender identity that is not congruent

with other aspects of their sex.  Bockting Rpt. ¶ 19; Bockting Supp. Rpt. ¶ 4 ("[a]lthough

scientific consensus is lacking as to exactly what factors determine gender identity, more recent

research on the etiology of transsexualism points toward the role of sexual differentiation of the

brain in gender identity development"); Bockting Depo. at 54 ("The evidence supports that there

is a biological determinant involved in the development of gender identity disorder."); see also

id. at 26-30, 54-56.  The dispute over whether gender identity is a biologically-determined aspect

of sex could not be more plain in the record.

　　　In sum, Defendant's motion for summary judgment must be denied, and Plaintiff must be

given the opportunity to present the testimony of her expert at trial, so that the Court can resolve

the dispute of material fact over whether, as a scientific matter, gender identity is part of sex.

　　　　　**2.    Because Sex Includes Gender Identity, the Extensive Evidence That
　　　　　　　Defendant's Decision Was Because of Gender Identity Discrimination
　　　　　　　Warrants Denial of Defendant's Motion for Summary Judgment.**

　　　There is abundant direct evidence that Preece's decision was because of Plaintiff's gender

identity, which, as discussed supra, is part of her sex.  For this reason as well, Defendant's

motion for summary judgment must be denied.

　　　It is undisputed that Plaintiff was Preece's top choice for the Terrorism Specialist

position until she learned about Plaintiff's gender identity and the fact that Plaintiff planned to

express her female gender identity on a full-time basis when she began working at CRS.  See,

e.g., Rec. Doc. 47 (Answer) ¶¶ 34-37; Defendant's Statement of Undisputed Facts ("Def. SOF")

¶ 14.  Preece has admitted that, even if concerns about security clearance delay had fallen away,

she would have still chosen Rollins because he was not transgender and thus posed fewer

concerns about credibility and contacts.  Preece Depo. at 188-89, 243-44.  In fact, every reason

that Defendant has offered for why it decided not to hire Plaintiff relates in one way or another to

Plaintiff's gender identity.  See Def. SOF ¶ 23; McGowan Decl. Exh. M at 4-5 & Exh. N at 2

(Def's responses to Pl's discovery requests).

In light of this direct evidence that Plaintiff's gender identity was a motivating factor in

Defendant's decision not to hire Plaintiff and the strong evidence that gender identity is part of

sex, summary judgment for Defendant is inappropriate.

## II.    Analyzed Using the <u>McDonnell Douglas</u> Framework, Disputes of Material Fact Bar Defendant's Motion for Summary Judgment.

Because there is direct evidence of discrimination based on Plaintiff's failure to conform

to sex stereotypes and based on her gender identity, both of which constitute actionable

discrimination because of sex, see supra Section I, neither Plaintiff nor the Court need to engage

in the burden-shifting exercise required in most Title VII cases.  See McDonnell Douglas Corp.

v. Green, 411 U.S. 792 (1973).  But even if analyzed under the McDonnell Douglas framework,

Plaintiff's claims survive summary judgment.

Even when direct evidence of discrimination is not present, a plaintiff can still make out a

prima facie case under Title VII by showing that "(1) [s]he is a member of a protected class, (2)

[s]he suffered an adverse employment action and (3) the unfavorable action gives rise to an

inference of discrimination."  Youssef v. FBI, 541 F. Supp. 2d 121, 144 (D.D.C. 2008) (citing

Stella v. Mineta, 284 F.3d 135 (D.C. Cir. 2002)).  Once plaintiff makes out a prima facie case,

the burden of production shifts to the defendant to rebut the inference of discrimination with

evidence of a legitimate reason for its decision.  Fogg v. Gonzalez, 492 F.3d 447, 451 (D.C. Cir.

2007).  If the employer can articulate legitimate non-discriminatory reasons for its actions, then

the burden shifts back to the plaintiff to establish (1) that the employer's proffered reason is merely a pretext for discrimination or (2) that the employer's reason, while true, is not the only reason for its conduct, and that another "motivating factor" is the plaintiff's protected characteristic. Porter v. Natsios, 414 F.3d 13, 18-19 (D.C. Cir. 2005).

The evidence in this case shows that Plaintiff is a member of a class of people protected by Title VII, that she suffered an adverse employment action, and that the unfavorable action against her gives rise to an inference of discrimination because of sex. Nothing more is required of Plaintiff to make out her prima facie case. See Stella, 284 F.3d at 144-45. The purported justifications Defendant offers for its decision either are facially illegitimate and discriminatory or, when probed, have all the hallmarks of pretext. Consequently, under this framework as well, Defendant's motion for summary judgment must be denied.

A.    **Plaintiff's Evidence Establishes a Prima Facie Case of Sex Discrimination**

When examined through the lens of McDonnell Douglas, the record evidence establishes a prima facie case of sex discrimination.

**Membership in a Protected Class:** Plaintiff is someone protected by Title VII's proscription on discrimination because of sex. Even though there is a dispute over whether Plaintiff is male or female, discussed infra, the resolution of this question has no bearing on whether Plaintiff can make out the first element of a prima facie case of discrimination. Both men and women are protected by Title VII from discrimination because of sex. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998); Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 682 (1983).

Contrary to what Defendant argues, Plaintiff's transsexuality does not place her outside the coverage of Title VII. As this Court has recognized in holding that Plaintiff could state a

claim of sex stereotyping, Title VII protects all employees, whether transsexual or not, from discrimination because of sex.  See discussion supra Section I.A.1.

**Adverse Employment Action:**  The record shows that, within twenty-four hours, Plaintiff went from being Preece's top choice for the position to "not a good fit," Schroer Decl. ¶ 31, and was not selected for the position.  Preece Depo. at 277-78.  There is no dispute that Plaintiff suffered an adverse employment action.

**Inference of Discrimination Because of Sex:**  The record evidence regarding the circumstances surrounding the adverse employment action challenged in this case "gives rise to an inference of discrimination."  As the D.C. Circuit explained in Stella,

> In International Brotherhood of Teamsters v. United States, 431
> U.S. 324, 358 n. 44 (1977), the Court explained the function served
> by the McDonnell Douglas formula.  The Court stated that, under
> McDonnell Douglas, a plaintiff must show that his rejection is not
> attributable to "the two most common legitimate reasons on which
> an employer might rely to reject a job applicant: an absolute or
> relative lack of qualifications or the absence of a vacancy in the job
> sought."  Id.  The Court further explained that "[e]limination of
> these reasons for the refusal to hire is sufficient, absent other
> explanation, to create an inference that the decision was a
> discriminatory one."  Id.

Stella, 284 F.3d at 145.

There is no question that Plaintiff was qualified for the Terrorism Specialist position.  In fact, the record is clear that Plaintiff emerged from the interview process as Defendant's top choice for the position.  Preece Depo. at 118-20, 126, 138-40; Miko Depo. at 64, 66.  Preece told Plaintiff that the job was hers, Schroer Decl. ¶ 12, Preece Depo. at 121-22, and had even begun drafting a hiring memorandum for Plaintiff, Preece Depo. at 128-29; McGowan Decl. Exh. L (draft hiring memorandum).  See also Schroer Decl. ¶¶ 2-7 (outlining Plaintiff's background and experience in counter-terrorism).  The evidence also shows that Plaintiff applied for a position

that was vacant and needed to be filled.  Preece Depo. at 12-13.  Therefore, her non-selection cannot be attributed to "the absence of a vacancy in the job sought."  Stella, 284 F.3d at 145.

Were this all the evidence that Plaintiff had, it would be enough to satisfy her initial burden under McDonnell Douglas.  Yet the record contains significantly more evidence than these bare facts.  The evidence demonstrates that, during her lunch conversation with Plaintiff, Preece learned that, contrary to what she had believed, Plaintiff had a female gender identity and intended to begin work as a female.  Preece Depo. at 140-41.  Based on that information, within twenty-four hours, Plaintiff went from being Preece's top choice for the position to "not a good fit."  Schroer Decl. ¶¶ 21, 31.

The record contains additional evidence that gives rise to an inference of discrimination. Preece's first response to the news of Plaintiff's gender identity and her intention to report to work as a female was one of shock and distress.  Preece Depo. at 167, 170; Pagliano Depo. at 42-43, 45-46; Bowman Depo. at 84, 87, 100, 102.  The record evidence strongly suggests that Preece's first thoughts were not about security clearances, but rather about the fact that Plaintiff wanted to report to work as a female, and that made her a less appealing choice for the position. Preece Depo. at 167, 170, 172.   Preece was concerned about someone working as a CRS analyst who looked like a man in women's clothing being taken seriously by Congress.  Id. at 298.  She could not fathom how, after interviewing David for the position, she could then hire Diane instead.  Id. at 146, 163.  Even before hearing back from Wilkins, Preece was already "leaning against" hiring Plaintiff, id. at 186, and once Wilkins said that it would require some inquiry to determine whether Plaintiff's gender identity posed any security clearance concerns, it was "seal[ed]" in Preece's mind that she would go with another candidate, id. at 227.  A reasonable fact-finder could conclude that the entire sequence of events between the time of Preece's lunch

with Plaintiff and her decision to select Rollins was a charade designed to manufacture the

excuses that Preece needed to justify her decision to exclude Plaintiff from the position.

Ultimately, Preece selected her second-choice candidate because he was not transsexual,

and therefore raised fewer concerns in Preece's mind. Preece Depo. at 188-89, 243-44. The

evidence shows that Preece's decision rested in part on presumptions about the sex-based biases

of both the Congress and the military community. Id. at 189, 253 (noting that Rollins, because

he was not transsexual, did not pose the same concerns about credibility and contacts). Indeed,

as outlined above, there is copious direct evidence that Preece's decision was due to Plaintiff's

perceived failure to conform to sex stereotypes, see supra Section I.A.2, and due to her gender

identity, see supra Section I.B.2, both of which constitute sex discrimination proscribed by Title

VII, see supra Sections I.A.1 & I.B.1.[14]  This evidence far exceeds the threshold for making out a

prima facie case under McDonnell Douglas.

In order to make out a prima facie case of discrimination, it is not incumbent on Plaintiff

to demonstrate that someone of the opposite sex was hired for the position. Stella, 284 F.3d at

145-46. Thus, the fact that Defendant does not dispute that Rollins is male but disputes that

Plaintiff is female, Def. Br. at 6 n.4 ("Defendant is a biological male."), is immaterial.[15]

---

[14]  The record shows that Preece articulated her concern about Plaintiff by reference to the fact that she is a
transgender person, Preece Depo. at 224, but also couched her understanding of transgender people in terms of
"changing physical appearance." Id. at 7. Thus, by their own terms, Preece's statements referencing the fact that
Plaintiff is a transgender person serve only to bolster her statements referencing Plaintiff's physical appearance, and,
when considered together, create a strong inference from which a reasonable fact-finder could conclude that
Defendant's adverse hiring action was infused not only with gender identity discrimination but also with stereotypes
about sex. As both gender identity discrimination and discrimination due to gender non-conformity are both forms
of discrimination "because of sex," the distinction does not matter. Yet, even were the Court to conclude that
gender identity discrimination is not discrimination "because of sex," the evidence of gender identity discrimination
is relevant to the extent that a fact-finder could draw inferences from this evidence, along with other evidence in the
record, that Defendant's refusal to hire Plaintiff was based on her failure to conform to social sex stereotypes, which
is clearly discrimination "because of sex." Rec. Doc. 44 (Mem. & Order) at 8.

[15]  Even if it were correct that Plaintiff is male – which it is not – Plaintiff could still make out the third element of a
prima facie case of discrimination in light of the evidence that she was not selected for the position due to her
perceived failure to conform to sex stereotypes and her gender identity, and that Rollins, a gender-conforming non-
transgender man, was selected for the position instead.

Defendant's assertion that, because the Library would have discriminated against transgender men and transgender women equally, Plaintiff cannot demonstrate disparate treatment because of sex, Def. Br. at 19-20, is deeply flawed.  This argument fails because it is premised on an unduly constricted – and legally untenable – notion of what constitutes discrimination because of sex.  Where a plaintiff can demonstrate that she was not hired because of her gender non-conformity, and a gender conforming individual was hired instead, that is prima facie evidence that she was discriminated against because of her sex.  See discussion supra Section I.A.1.  Similarly, where a plaintiff can demonstrate that she was not hired because her gender identity was different than her sex assigned at birth, and a non-transgender individual was hired instead, that is prima facie evidence that she was discriminated against because of her sex.  See discussion supra Section I.B.1.  Under Defendant's rule, Price Waterhouse would have been able to defend against Ann Hopkins' claim of sex discrimination by asserting that it also would not promote to partner an effeminate man.  This is clearly an untenable interpretation of what is required by a law designed "'to strike at the entire spectrum of disparate treatment of men and women in employment.'"  Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986).

**B.    Defendant Has Failed to Offer Any Legitimate Non-Discriminatory Justifications for Its Decision.**

Under McDonnell Douglas, once a plaintiff establishes the elements of a prima facie case of sex discrimination, the burden shifts to the defendant to produce legitimate, non-discriminatory reasons for its actions.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254-55 (1981).  In this case, because all of Defendant's proffered justifications are simply forms of sex discrimination by another name, Defendant cannot even meet its burden of articulating legitimate non-discriminatory reasons for its decision, and thus summary judgment

for Defendant is unwarranted.[16]

### 1. Defendant's Proffered Justifications That Rest on the Sex-Based Bias of Others Are Illegitimate and Discriminatory Under Title VII.

Two of the justifications that Defendant puts forth as a "legitimate non-discriminatory" reasons for its actions are that the selecting official was "concerned that Plaintiff might not be viewed as credible by Members of Congress given Plaintiff's transsexuality," and that "because of Plaintiff's transition from male to female, Plaintiff might be unable to maintain the high-level contacts in the military intelligence community that she had developed in the past." Def. SOF ¶ 23; see also McGowan Decl. Exh. M at ¶¶ 4-5 (identifying concern about Plaintiff's ability to maintain government and military contacts as one reason why Defendant declined employment to Plaintiff. In other words, Defendant claims that Plaintiff, as "Diane," would lack "David's" professional credibility.

Specifically, with respect to her concerns about the reaction of Members of Congress, Preece believed that, when presented with Plaintiff's biography, Members and their staffers "would know that only a man could have those experiences" and react "negatively" to Plaintiff because they would be biased against, or at least not tolerant of, a transgender person in the role of CRS analyst. Preece Depo. at 164-65. Preece thought that Congress would "be less interested in what Plaintiff had to say because she was transgender." Id. at 165. And with respect to her concerns about Plaintiff's ability to maintain her contacts in the military, Preece explained that she was concerned that the military community would be "biased" against Plaintiff, as a transgender woman, because of "[t]he military being the culture it is, and particularly the special

---

[16]    As noted previously, the fact that Defendant frames each of its reasons in terms of Plaintiff's "transsexuality" and/or "transsexual status" does not preclude a fact-finder from reaching the conclusion that evidence of Defendant's views about transgender people supports a showing of sex stereotyping. See discussion supra note 14. Moreover, as discussed supra at Section I.B.1, gender identity discrimination is a form of discrimination because of sex in its own right.

29

forces . . . combat lines, uniquely male profession."  Preece Depo. at 157-59.

Defendant's claim that concerns about Plaintiff's "contacts" in the military and "credibility" with Congress are legitimate non-discriminatory reasons for its hiring action cannot be squared with decades of case law holding that discriminatory customer and co-worker attitudes and preferences regarding gender are not a lawful basis for employment decisions.  See Diaz v. Pan Am. World Airways, Inc., 442 F.2d 385, 389 (5th Cir. 1971) ("we do not feel that the fact that Pan Am's passengers prefer female stewardesses should alter our judgment").  EEOC regulations likewise make clear that "the refusal to hire an individual because of the preference of co-workers, the employer, clients or customers" is not a justification for discrimination on the basis of sex, absent a showing by the employer that sex is a "bona fide occupational qualification," 29 C.F.R. § 1604.22(a)(1)(iii).

Thus, even if an employer has reason to believe that customers may prefer someone of a particular gender, it may not cater to those preferences unless it can meet the difficult burden of establishing a BFOQ.[17]  In this case, the Members of Congress whose potentially negative attitudes were of concern to Preece are, in essence, the customers of the research products produced by CRS.  The fact that, in Preece's view, Members of Congress would not expect a woman to have the kind of Special Forces experience that Plaintiff would be able to draw upon in performing her duties only makes the application of Title VII in these circumstances more compelling.  As the Fifth Circuit stated, while the "expectation of finding one sex in a particular role may cause some initial difficulty, it would be totally anomalous if we were to allow the preferences and prejudices of the customers to determine whether the sex discrimination was valid.  Indeed, it was, to a large extent, these very prejudices the Act was meant to overcome."  Diaz, 442 F.2d at 389.

---

[17]  Defendant admits that sex is not a BFOQ for the Terrorism Specialist Position.  See Rec. Doc. 47 (Answer) ¶ 59.

Co-worker bias is no less acceptable a justification for discrimination than customer preference.  See, e.g., Turic v. Holland Hospitality, Inc., 849 F. Supp. 544, 546, 550 (W.D. Mich. 1994) (accommodation of religion-based bias of co-workers against an employee who contemplated an abortion was an impermissible basis for her termination), rev'd in part on other grounds, 85 F.3d 1211 (6th Cir. 1996).  In this case, the military contacts with whom Plaintiff would have interacted as part of her duties are legally indistinguishable from the other co-workers with whom Plaintiff would have worked.  Therefore, concern about sex-based bias in military circles is an equally impermissible basis for Defendant's adverse hiring decision.

Since the passage of Title VII, courts have repeatedly been presented with – and have repeatedly rejected – employers' attempts to rely on "unique" cultural concerns to justify discrimination.  See, e.g., Lam v. Univ. of Haw., 40 F.3d 1551, 1560 (9th Cir. 1994) (denying summary judgment where employer attempted to justify sex discrimination in connection with university's Asian Legal Studies program based on "Japanese cultural preferences"); Fernandez v. Wynn Oil Co., 653 F.2d 1273, 1276-77 (9th Cir. 1981) (rejecting employer's attempt to distinguish customer preferences in "international contexts").  Therefore, even crediting Preece's view that military culture is more "macho" and, consequently, that military and ex-military people are less tolerant of gender non-conforming and/or transgender people (a view which itself reflects unjustified sex-based stereotypes about the military),[18] such negative attitudes of third parties may not justify discrimination by Defendant because of Plaintiff's sex.

In sum, Defendant's justifications about Plaintiff's lack of "credibility" with Congress or loss of "contacts" in the military are insufficient to satisfy Defendant's burden because they are nothing more than relabeled concerns about Plaintiff's sex.  As such, these reasons fail to satisfy

---

[18]   Plaintiff's ongoing personal and professional interaction with military colleagues since her gender transition casts doubt on such "conventional wisdom" about the attitudes of members of the military.  See Schroer Decl. ¶ 36.

31

Defendant's burden of producing *legitimate non-discriminatory* justifications for its actions.

> **2. Defendant's Purported Concern About Distraction Is Illegitimate and Discriminatory Because It Rests on Assumptions Based on Plaintiff's Membership in a Class, Rather Than on Any Individualized Assessment.**

Defendant also asserts that its purported concern about Plaintiff being "distracted" due to her gender identity and/or gender dysphoria is a legitimate non-discriminatory reason for its decision not to hire her.[19] Yet this justification is precisely the kind of gender-driven, group-based assumption that Title VII proscribes. Preece's assumption that Plaintiff would be too distracted to perform her duties well because of her gender dysphoria, while enlightening with respect to Preece's views about transgender people, denied Plaintiff precisely the kind of individualized assessment to which she is entitled under Title VII.[20]

Even if it is true that some transgender people find that their gender identity or transition is a source of distraction, Preece acted impermissibly in assuming that Plaintiff would be too distracted to perform her CRS duties based on nothing more than the fact that Plaintiff is a transgender person. As the Supreme Court has explained, "[e]ven a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply." City of Los Angeles Dep't of Water & Power v. Manhart, 435 U.S. 702, 708 (1978). For example, when presented with an airline rule "grounding" airline attendants who were young mothers, the Seventh Circuit refused to accepted the airline's argument that the "no-motherhood" policy could be justified because (1) mothers of young children would have unacceptably high

---

[19] See Def. SOF ¶ 23 ("Further, Ms. Preece was concerned that the transitioning process would divert Plaintiff's attention away from the mission of CRS."); Preece Depo. at 155, 257-58 (expressing concern about distraction and Plaintiff's need to take time off to deal with her transition); McGowan Decl. Exh. N (Def.'s Resp. to Pl.'s Interrogatory No. 28) at 2 (listing as a "peripheral consideration" Preece's concern about "Plaintiff's ability to devote her full attention to the position because of her gender identity disorder, which may have included taking leave to address her gender identity disorder issues").

[20] Moreover, it is a faulty assumption about transgender people as a class, as it fails to take into account that gender transition is precisely the step that an individual takes to *alleviate* any distraction that may be caused by the disconnect between her gender identity and other aspects of her sex. Harris Rpt. ¶ 47; Bockting Rpt.¶¶ 40, 42(f).

rates of absenteeism, (2) mothers would have overriding domestic concerns that would make them "questionable risks" for competent performance in times of crisis, and (3) mothers returning from maternity leaves of absence would require expensive training.  In re Consolidated Pretrial Proceedings in Airline Cases, 582 F.2d 1142, 1145 (7th Cir. 1978), rev'd in part on other grounds sub nom. Zipes v. Trans World Airlines, 455 U.S. 385 (1982).  "The whole tenor of [the airline's] argument," the court noted, "is speculative and relies heavily on stereotypical assumptions, a posture which is anathema to the maturing state of Title VII analysis."  582 F.2d at 1146.  Under Defendant's reasoning, an employer could properly refuse to hire all women on the ground that women generally assume the burden of dealing with the problems of elderly parents, chronically ill family members, and teenaged children, and are therefore more likely to be "distracted" from optional job performance.

In this case, rather than assessing Plaintiff as an individual, Preece simply allowed her negative assumptions about what it means to be transgender, and what Plaintiff's decision to begin living full-time as a woman would involve, to drive her conclusion about whether Plaintiff could perform the job as well as Preece thought Plaintiff could prior to Preece's learning about Plaintiff's gender identity and transition.  Had Preece acted in the manner required by Title VII, she would have taken steps to determine whether her assumptions about distraction were well-founded in Plaintiff's case rather than disqualifying Plaintiff from further consideration based on Preece's negative assumptions about transgender people as a group.  She would have discussed this concern with Plaintiff, with her references, or perhaps with her treating health care provider.[21]  Neither she nor anyone else at the Library did any of these things.

Defendant's "distraction" rationale is not grounded in any facts about Plaintiff as an

---

[21]  Both Plaintiff and her therapist, Martha Harris, would testify that Plaintiff's transition allowed her to eliminate any distraction in her life that was attributable to her gender dysphoria.  Schroer Decl. ¶ 37; Harris Rpt. ¶¶ 42, 47.

individual; rather, it is simply an attempt by Defendant to suggest that Plaintiff's gender identity

made her less capable of performing the job.  Because Title VII prohibits employers from

disqualifying people based on group-based gender-motivated assumptions about an individual,

rather than an individualized determination of a person's capabilities, this justification does not

constitute a legitimate non-discriminatory explanation for Defendant's actions.

> ### 3.  Defendant's Alleged Concerns About Trustworthiness Are Illegitimate Because Defendant May Not Penalize Plaintiff for Failing to Disclose Her Gender Identity Where Sex Was Not a BFOQ for the Position.

Defendant's purported concern about Plaintiff's trustworthiness is likewise illegitimate

and discriminatory.[22]  Defendant's concern stems from the fact that Preece felt that Plaintiff

should have voluntarily disclosed her gender identity at an earlier stage in the hiring process.

Preece Depo. at 160.  But Plaintiff was under no obligation to disclose information about herself

that did not bear on her qualifications for the position.  It is undisputed that sex is not a BFOQ

for the position at issue; therefore, Plaintiff had no duty to volunteer information about her

gender identity, an aspect of herself that was irrelevant to her qualifications for the position.

In Lopez, the employer made a similar argument about "deception" in attempting to

defend its decision to rescind a job offer previously made to a transgender applicant.  The

employer asserted that the transgender plaintiff "lied during the interview process" by failing to

reveal that she was transgender, and claimed that this alleged deceit provided a legitimate basis

for the employer's decision.  Lopez, 542 F. Supp. 2d at 663-64.  The court rejected these

arguments, emphasizing that the employer could cite "no legal authority establishing, or even

suggesting, the existence of . . . a legal duty" on the part of an applicant to reveal her

transsexuality or her sex where sex was not a BFOQ for the position at issue.  Id. at 664.

---

[22] See Def. SOF ¶ 23; Preece Depo. at 187-88.

Defendant's argument that Plaintiff's failure to disclose voluntarily information about her gender identity earlier in the hiring process gave Defendant legitimate reason to question her future trustworthiness is illegitimate and discriminatory for the same reasons.

**4.  Defendant's Purported Concern About Possible Security Clearance Delay Is Illegitimate and Discriminatory Because It Rests on Assumptions Based on Plaintiff's Membership in a Class, Rather on an Individualized Assessment.**

Finally, Defendant posits that its purported concerns about the ability of Plaintiff to satisfy the security clearance requirements of the position in a timely manner provided a legitimate, non-discriminatory reason for selecting another candidate. The record shows, however, that Defendant based its decision on generalized (and incorrect) assumptions regarding what the security clearance process would entail for a transgender individual. Defendant did not engage in anything remotely resembling an individualized assessment of Plaintiff's particular situation and background. Rather, contrary to what the law requires, Defendant's decision rested on worst-case scenario assumptions about Plaintiff and what would be required to confirm that she could continue to hold her top secret security clearance, solely because she is transgender.

The security clearance regulations governing the Library of Congress specifically provide that people should be assessed as individuals, and the "whole person" concept should be employed when determining whether there are any aspects of an individual's profile that raise security clearance concerns. McGowan Decl. Exh. J (Library of Congress Regulation 2024-6 discussing "whole person" concept); Nelson Rpt. ¶ 27. In Plaintiff's case, however, neither Preece nor Wilkins sought to ascertain the information that would have facilitated an individualized assessment of Plaintiff's situation. Preece Depo. at 239; Wilkins Depo. at 143-44, 159. Nor did anyone attempt to contact Plaintiff or her health care provider to determine whether her gender dysphoria was accompanied by a disqualifying mental health co-morbidity of

security clearance concern. Preece Depo. at 239.[23] Even though an assessment by the Library Health Services Office could have laid to rest any security clearance concerns raised by Plaintiff's gender identity and transition, and as a result could have given Wilkins sufficient comfort to grant reciprocity for Plaintiff's top secret clearance, Wilkins Depo. at 140-41, Preece had no interest in waiting for the results of a preliminary inquiry that would have shed light on Plaintiff's situation. Preece Depo. at 227.

Title VII guarantees applicants for employment the right to be judged as individuals, and not "as simply components of a racial, religious, sexual or national class." Manhart, 435 U.S. at 708. As the Supreme Court has explained, "[m]yths and purely habitual assumptions" about people because of their gender "are no longer acceptable reasons for refusing to employ qualified individuals." Id. at 707. And where concerns can be assessed and managed on an individualized basis, Title VII forbids employers from solving them through the use of blunt tactics based on overbroad generalization about a class. See, e.g., Sprogis v. United Air Lines, Inc., 444 F.2d 1194, 1199 (7th Cir. 1971) (rejecting airline's no-marriage rule for stewardesses, which had been implemented after husbands of employees complained about the irregularity of their wives' working hours, and noting that "United's blanket prophylactic rule prohibiting marriage unjustifiably punishes a large class of prospective, otherwise qualified and competent employees where an individualized response could adequately dispose of any real employment conflicts"). Because Defendant failed to treat Plaintiff as an individual, rather than as a generic transgender person, its argument that concerns about security clearance delay in Plaintiff's particular case justified her non-selection cannot be credited as legitimate and non-discriminatory.

Again, "[e]ven a true generalization about the class is an insufficient reason for

---

[23] In fact, had anyone contacted Plaintiff's health care provider, she would have revealed that Plaintiff had no such mental health concerns. Harris Rpt. ¶¶ 29-30, 47, 49.

disqualifying an individual to whom the generalization does not apply." <u>Manhart</u>, 435 U.S. at

708. Therefore, even assuming that Preece was correct in thinking that transgender people are

more likely than non-transgender people to have mental health co-morbidities that make then

less reliable or trustworthy with respect to handling sensitive information,[24] Defendant

impermissibly rested its hiring decision on an assumption that *Plaintiff* would have security

clearance problems simply because *some* transgender people have such mental health co-

morbidities. This is no different than Defendant refusing to hire a Native American simply

because Native Americans as a class are believed to have a higher incidence of alcoholism, and

the security clearance process might take longer because the security officer would need to

investigate whether the particular Native American applicant before her was one who shared the

negative attribute associated with the group (<u>i.e.,</u> problem drinking that posed security clearance

concerns). Defendant's failure to treat Plaintiff as an individual, rather than as a generic member

of a class of transgender people, denied Plaintiff the individualized assessment guaranteed by

Title VII. Therefore, Defendant's proffered justification about security clearance delay is neither

legitimate nor non-discriminatory.

C.    **Even Assuming that Defendant's Proffered Justifications Are Legitimate and
      Non-Discriminatory, the Record Demonstrates the Existence of a Factual
      Dispute Over Whether Its Justifications Are Pretexts for Discrimination Because
      of Sex.**

Even assuming that some of Defendant's proffered justifications are legitimate, the

record contains sufficient evidence from which a fact-finder could conclude that these reasons

are pretexts for discrimination against Plaintiff because of her sex. "Ultimately, the question is

---

[24]   As Plaintiff's expert would testify, the studies conducted to date do not indicate that individuals with Gender
Identity Disorder have any greater prevalence of other mental health disorders than the general population.
Bockting Rpt. ¶ 38. Rather, research suggests that the symptoms of other mental health conditions (<u>e.g.</u>, anxiety and
depression) are the result of social stigma associated with gender non-conformity, and are not intrinsically related to
gender identity disorder, and improve as the transgender individual learns to manage such stigma. <u>Id.</u>

whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanations for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer)." Dunaway v. Int'l Bhd. of Teamsters, 310 F.3d 758, 763 (D.C. Cir. 2002) (internal quotation omitted).

As the Supreme Court has made clear, there is no one particular way in which a plaintiff can show pretext; rather, the evidence of pretext may take a variety of forms. Patterson v. McLean Credit Union, 491 U.S. 164, 187 (1989). In determining whether a plaintiff's evidence of pretext is sufficient to permit an inference of discrimination and thereby overcome a defendant's motion for summary judgment, the Court has noted that the strength of the plaintiff's prima facie evidence and the probative value of the proof that the employer's explanation is false are two important factors to be considered. Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 148-49 (2000).

From the outset, the strength of Plaintiff's direct evidence, see supra Section I, as well as the generally suspicious circumstances surrounding Defendant's decision not to hire Plaintiff, see supra Section II.A, cast doubt on the justifications offered by Defendant for its decision. Additionally, as set forth below, the evidence in the record suggests that each of Defendant's proffered justifications for its decision, taken on its own, is "unworthy of credence," and merely an "explanation that the employer is dissembling to cover up a discriminatory purpose." Lathram, 336 F.3d at 1088-89.

**Purported Concerns About Professional Credibility:** With respect to Preece's alleged concerns about how the negative reaction of others would impact Plaintiff's professional

credibility and contacts, her actions demonstrate that she had no interest in ascertaining whether her concerns might actually be unfounded.  Specifically, Preece did not bother to inquire whether Plaintiff's references or other military colleagues already knew about her gender identity and plans to begin living full-time as a female, and what, if any impact this information would have on those professional contacts.  Schroer Decl. ¶ 29; Preece Depo. at 199-200.

The record shows that Plaintiff's references all knew about Plaintiff's gender identity and her plans to transition to living and working full-time as a female, Schroer Decl. ¶ 29, and none of her references expressed any concern that Plaintiff might be less effective in the future (as Diane) than she had been in the past (as David).  Preece Depo. at 114-19; Bowman Depo. at 70-75; Miko Depo. at 66-68; McGowan Decl. Exh. S (notes from references checks for Plaintiff).  Preece, however, did not know that Plaintiff's references had recommended her with full knowledge of her female gender identity, because Preece never followed up with them to ascertain whether they knew about the information Plaintiff had disclosed.  Preece Depo. at 199-200.  The fact is Plaintiff continues to work as a consultant on national security issues and works successfully within the same counter-terrorism community as she would have as a Terrorism Specialist.  Schroer Decl. ¶ 36.

The record evidence showing that Preece did absolutely nothing to discern whether her concerns about Plaintiff's professional credibility and ability to access her government and military contacts had any basis in fact could lead a reasonable fact-finder to conclude that this proffered justification is merely pretext and "unworthy of credence."

**Purported Concerns About Distraction:**  The same holds true for Preece's purported concerns about distraction.  Preece did nothing to ascertain whether her concerns about distraction were warranted in Plaintiff's case.  Preece claims that Plaintiff's impending surgeries

were of particular concern.  Preece Depo. at 155.  Even though Plaintiff specifically told Preece that the first of her two surgeries would be completed before Plaintiff started work and the second would be a year or more in the future, and within Plaintiff's discretion to schedule, Schroer Decl. ¶ 28, Preece claims that she "knew nothing about how many surgeries would be required, how long they would take."  Preece Depo. at 155.  Assuming that, even after Plaintiff had explained to Preece what would be involved with respect to any transition-related surgeries, Preece still had questions, she took none of the steps that might have been expected, such as calling Plaintiff or her health care provider, or seeking counsel from the health professionals on staff at the Library to clear up any lingering confusion in her mind about this issue.  Preece Depo. at 239-40, 259; Charles Depo. at 94.  And to the extent that Preece claims to have been concerned about Plaintiff needing to take time off to manage any gender identity issues, Defendant concedes that there would have been no reason why Plaintiff could not have used her annual and sick leave to manage such concerns.  See McGowan Decl. Exh. T (Library's annual and sick leave policies), Exh. O (discovery conference transcript) (March 14, 2008) at 6-9 (conceding that Plaintiff could have used her leave to take care of personal matters related to her gender identity).

Had Preece or anyone else from the Library contacted Plaintiff's therapist, Martha Harris, Harris would have explained that undertaking a gender transition is the appropriate course of medical treatment for an individual with gender dysphoria to undertake, and that doing so actually eliminates any distraction caused by the discontinuity between a person's gender identity and her gender presentation.  Harris Rpt. ¶¶ 42, 47; see also Schroer Decl. ¶ 37 (noting that living full-time in the female gender role that matches her gender identity has, if anything, only positively affected Plaintiff's ability to focus on her work and other responsibilities).

This evidence could lead a reasonable fact-finder to conclude that Preece's purported concern about distraction was simply a pretext concocted to justify a decision by Preece that was really because of Plaintiff's sex.

**Purported Concerns About Trustworthiness:**  The record shows that Defendant's claim that Preece's purported concerns about Plaintiff's trustworthiness was the reason for its action is also highly implausible.  A reasonable fact-finder could easily conclude that a fair-minded person would deem Plaintiff more, rather than less, trustworthy in light of how Plaintiff chose to share her information about her gender identity and transition.  Schroer Decl. ¶¶ 13-29.[25]  More importantly, the record shows that had Plaintiff shown up for her interview in October 2004 dressed as a woman or had otherwise revealed earlier in the hiring process that she intended to start work as a female, Preece would have acted no differently than she did in this case.  Preece Depo. at 152-54, 160-61; Miko Depo. at 97 (noting that such a disclosure by Plaintiff earlier in the process might have "tipped the decision against [her]" anyway).  From this evidence, a fact-finder could conclude that it was not concerns about trustworthiness that led Preece to change her mind, but rather concerns about Plaintiff's sex.

**Purported Concerns About Security Clearance Delay:**  Finally, Defendant's purported concern about Plaintiff's ability to maintain her security clearance and start work in timely manner has all of the hallmarks of pretext.  First, the record suggests that, even before discussing any purported security clearance concern with the Library's Personnel Security Officer, Preece was already "leaning against" hiring Plaintiff.  Preece Depo. at 186.

The record also contains evidence from which a reasonable fact-finder could conclude that Preece was merely going through the motions with respect to soliciting guidance from

---

[25]  In fact, Preece thanked Plaintiff for her honesty both at the conclusion of their lunch and during their phone conversation the next day.  Schroer Decl. ¶¶ 30-31; Preece Depo. at 275-76.

Defendant's Personnel Security Officer.  Preece provided Wilkins with practically no specific

details about Plaintiff when seeking Wilkins' guidance about any security clearance implications

stemming from Plaintiff's disclosure.  Preece Depo. at 181-84; Wilkins Depo. at 130-37.  From

this record evidence, a reasonable fact-finder could conclude that Preece simply went through a

process designed to produce a response from Wilkins that would give Preece the excuse to select

another, non-transgender candidate.  Preece Depo. at 227 (Wilkins' guidance that it would take

time to evaluate the situation "seal[ed]" in her mind that she would not select Plaintiff).  Preece

showed absolutely no interest in having Wilkins undertake even the most basic steps, such as

pulling Plaintiff's security clearance file, bringing in Plaintiff for a meeting with the Health

Services or Personnel Security Office, contacting Plaintiff's health care provider, or calling

Plaintiff to obtain more information about whether this concern had already been vetted in any

way by her current security officer, to determine whether there was, in fact, any reason to believe

that Plaintiff's gender identity had any relevance to her ability to safeguard classified

information.  Id. at 239.[26]

The most compelling evidence of pretext is Preece's own admission that, even if the

security clearance issue had turned out not to be an issue after all, her ultimate decision would

likely have been the same.  Preece stated that even "if the security clearance timing issue had

fallen away," she still would have likely selected Rollins because he presented fewer concerns

about contacts and credibility due to the fact that he, unlike Plaintiff, is not transgender.  Preece

Depo. at 188-89, 243-44.  From this evidence, a reasonable fact-finder could conclude that the

---

[26] There is additional evidence in the record to support the conclusion that Preece simply heard what she wanted to hear from Wilkins in order to justify the decision that Preece was already intending to make.  For example, Preece testified that the Personnel Security Office would need to "start from scratch" with respect to Plaintiff, but then admitted that those were her words, and not Wilkins'.  Preece Depo at 232-33.  Preece also claims that Wilkins told her that Plaintiff would need a "psychiatric fitness-for-duty evaluation," McGowan Decl. Exh. N at 4, see also Preece Depo. at 221 (discussing "psychological fitness for duty" exam that Wilkins allegedly said would be needed for Plaintiff), but Wilkins testified that this is not even a term that she uses.  Wilkins Depo. at 223.

42

security clearance issue was just an excuse to justify selecting another candidate.

As a substantive matter, the record demonstrates that Plaintiff's gender identity and her decision to begin living full-time as a female did not, as a factual matter, negatively impact even temporarily Plaintiff's Top Secret / SCI security clearance. Schroer Decl. ¶¶ 34-36. Nor should it have, according to Plaintiff's security clearance expert, who will testify that a rational application of the relevant security clearance guidelines would have indicated that Plaintiff's gender identity and transition, which were medically appropriate steps for someone with Gender Identity Disorder and eliminated any concern about blackmail, should have been given favorable weight by Wilkins when determining whether she should accept the clearance Plaintiff already held at the time as a matter of reciprocity. Nelson Rpt. ¶¶ 20-22. Furthermore, after receiving a favorable evaluation from the Library's Health Services Office, which would have been the case once Dr. Charles discussed the matter with Plaintiff's therapist, see Harris Rpt. ¶¶ 42-43, 49, who has expertise in gender identity issues, see id. at ¶¶ 1-16 & Exh. A (curriculum vitae), Wilkins could (and should) have accepted Plaintiff's prior clearance as a matter of reciprocity, eliminating any security clearance delays whatsoever. Nelson Rpt. ¶¶ 28-29; Nelson Supp. Rpt. ¶ 5. In fact, Plaintiff had already reported information to her security officer regarding her gender identity-related health care, and had maintained her clearance notwithstanding. Schroer Decl. ¶ 34. To this day, Plaintiff continues to perform duties that require access to sensitive classified materials; there has been no break in her cleared status. Id. at ¶ 36.

The record evidence also shows that there have been other applicants for other positions for which Preece was the selecting official who disclosed information during the course of the hiring process that had security clearance implications that could have resulted in delays in the security clearance process (i.e., dual citizenship or marriage to a foreign national). Preece Depo.

43

at 51-70.  Yet in all of those cases (except for one involving prior criminal activity that the applicant had not disclosed), Preece went forward with those candidates.  Id.  This too suggests that the purported security clearance concern is merely pretextual.

Finally, the record reflects that Defendant's justifications for why it did not hire Plaintiff have continued to shift over time.  Compare Rec. Doc. 15 (Answer to Pl. Compl.) at 1 with Rec. Doc. 29 (Am. Answer to Pl. Compl.) at 1-2 (dropping defense that Plaintiff failed to fulfill the national security requirements of the position); Wilkins Depo. at 159 (noting that Wilkins never determined that Plaintiff could not satisfy the security requirements of the position).  Likewise, on the Final Referral List, Preece listed "work experience" as the reason why she did not select Plaintiff for the position, a justification that Defendant does not now proffer.  McGowan Decl. Exh. K (Final Referral List).  This is also evidence that could lead a reasonable fact-finder to conclude that the justifications that have been put forth by Defendant are mere pretexts for discrimination because of sex.

Because the record contains ample evidence from which a reasonable fact-finder could conclude both that purported concerns about security clearance delay, and all of the other justifications proffered by Defendant, are "unworthy of credence," and that the real reason for Preece's decision was because of Plaintiff's sex, Defendant's motion for summary judgment must be denied.

## IV.    Because a Fact-finder Could Reasonably Conclude From the Evidence That Gender-Based Considerations Were at Least a Motivating Factor in Defendant's Decision, Defendant's Motion for Summary Judgment Must Be Denied.

As the D.C. Circuit has explained, Title VII "provides alternative ways of establishing liability based upon the impermissible use of race or other proscribed criteria – one in § 2000e-2(a), which has been in the law since 1964, and another in § 2000e-2(m), which the Congress

44

added in 1991, in response to the Supreme Court's decision in <u>Price Waterhouse</u>." <u>Fogg</u>, 492 F.3d at 453; <u>see also</u> <u>Porter</u>, 414 F.3d at 18 (D.C. Cir. 2005) (describing two distinct frameworks for liability). Specifically, Section 2000e-2(m) provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was *a motivating factor* for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added).

Therefore, even were there any question about whether the record contains sufficient evidence to indicate that the other justifications put forth by Defendant are either illegitimate, discriminatory, or pretexts for sex discrimination, summary judgment for Defendant would still be inappropriate because the record contains sufficient evidence from which a reasonable fact-finder could conclude that gender-based considerations were a motivating part of the employment decision. As set forth above, <u>see</u> <u>supra</u> Sections I.A.2, I.B.2 & II, both the direct and circumstantial evidence in the record, as well as the inferences to be drawn from them, demonstrate that Plaintiff can establish at least limited liability under a mixed-motive analysis; therefore, Defendant's motion for summary judgment must be denied. <u>See</u> <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 99-101 (2003) (holding that plaintiff may use either direct or circumstantial evidence to prove mixed motive).

## CONCLUSION

For all of the foregoing reasons, as well as for the reasons set forth in Plaintiff's memoranda in opposition to Defendant's earlier motions to dismiss, <u>see</u> Rec. Docs. 9, 34, Defendant's motion for summary judgment must be denied.

Respectfully submitted,

/s/ Sharon M. McGowan
Sharon M. McGowan  (D.C. Bar No. 476417)
Kenneth Y. Choe
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
(212) 549-2627

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  Of the National Capital Area
1400 20th Street, N.W., #119
Washington, D.C. 20036
(202) 457-0800

*Counsel for Plaintiff*

Date:  June 18, 2008