IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
DIANE J. SCHROER,                             )
                                              )
                    Plaintiff,                )
                                              )        No. 05-cv-1090 (JR)
              v.                              )
                                              )
JAMES H. BILLINGTON,                          )
     Librarian of Congress,                   )
                                              )
                    Defendant.                )
_____)

## PLAINTIFF'S STATEMENT OF GENUINE ISSUES AND MATERIAL FACTS

Pursuant to Local Civil Rules 7 and 56.1, Plaintiff provides the following response to Defendant's statement of undisputed material facts, followed by Plaintiff's statement of disputed material facts that demonstrate the existence of genuine issues needing to be litigated.[1]

    1.    Admit.

    2.    Admit.

    3.    Admit.

    4.    Admit.

    5.    Admit subject to the following qualification.  Plaintiff disputes any inference that the reason Defendant refused to hire her was due to concerns that she was unable to fulfill the requirements of the position, including any concerns that Plaintiff could not fulfill the security clearance requirements of the position in a timely manner.

_____
[1] Excerpts from transcripts of depositions are attached as exhibits to the accompanying declaration of Sharon M. McGowan ("McGowan Decl.").

The reason Defendant refused to hire her was because of her sex.  <u>See</u> <u>infra</u> ¶¶ 28-32

(setting forth material facts demonstrating the existence of a dispute over why Defendant

refused to hire Plaintiff for the position).[2]

      6.     Admit subject to the following qualification.  The fact that Preece selected

a female for the position is not a material fact.  <u>See</u> Plaintiff's Memorandum in

Opposition to Defendant's Motion for Summary Judgment ("Pl. Br.") at 27.

      7.     Admit subject to the following qualification.  Plaintiff disputes any

inference that the reason Defendant refused to hire her was a concern that she was unable

to fulfill the requirements of the position, including any concerns that Plaintiff could not

fulfill the security clearance requirements of the position in a timely manner.  The reason

Defendant refused to hire her was because of her sex.  <u>See</u> <u>infra</u> ¶¶ 28-32 (setting forth

material facts demonstrating the existence of a dispute over why Defendant refused to

hire Plaintiff for the position).

      8.     Admit subject to the following qualification.  Plaintiff disputes any

inference that the reason Defendant refused to hire her was a concern that she was unable

to fulfill the requirements of the position, including any concerns that Plaintiff could not

fulfill the security clearance requirements of the position in a timely manner.  The reason

---

[2]  For purposes of clarity, Plaintiff sets out the following terms and corresponding definitions, which will
be used throughout this statement:

      - Plaintiff uses the terms "sex" and "gender" interchangeably, and uses those terms to
      encompass the factors that reveal whether an individual is male or female.

      - Plaintiff uses the term "gender identity" to refer to one component of an individual's
      sex – his or her internal sense of being either male or female.

      - Plaintiff uses the terms "transsexual" and "transgender" interchangeably to refer to an
      individual whose gender identity is inconsistent with his or her sex assigned at birth.

      - Plaintiff uses the terms "Gender Identity Disorder" and "gender dysphoria"
      interchangeably to refer to the medical diagnosis assigned to an individual who is
      transgender for which the course of treatment is gender transition from one gender to
      another.

Defendant refused to hire her was because of her sex.  See infra ¶¶ 28-32 (setting forth material facts demonstrating the existence of a dispute over why Defendant refused to hire Plaintiff for the position).

9.      Admit subject to the following qualification.  Plaintiff disputes any inference that the reason Defendant refused to hire her was a concern that she was unable to fulfill the security clearance requirements of the position in a timely manner.  The reason Defendant refused to hire her was because of her sex.  See infra ¶¶ 28-32 (setting forth material facts demonstrating the existence of a dispute over why Defendant refused to hire Plaintiff for the position).

10.      Admit subject to the following qualification.  Plaintiff disputes any inference that the reason Defendant refused to hire her was a concern that she was unable to fulfill the requirements of the position, including any concerns that Plaintiff could not fulfill the security clearance requirements of the position in a timely manner.  The reason Defendant refused to hire her was because of her sex.  See infra ¶¶ 28-32 (setting forth material facts demonstrating the existence of a dispute over why Defendant refused to hire Plaintiff for the position).

11.      Admit subject to the following qualification.  Plaintiff disputes any inference that the reason Defendant refused to hire her was a concern that she was unable to fulfill the requirements of the position, including any concerns that Plaintiff could not fulfill the security clearance requirements of the position in a timely manner.  The reason Defendant refused to hire her was because of her sex.  See infra ¶¶ 28-32 (setting forth material facts demonstrating the existence of a dispute over why Defendant refused to hire Plaintiff for the position).

12.    Admit.

13.    Admit subject to the following qualification.  Plaintiff disputes any inference that she was equally positioned with the other two candidates emerging from the interview stage of the hiring process.  Plaintiff was the top choice of at least two of the three members of the interview panel, Miko Depo. at 56-57, and was "Preece's top candidate."  Preece Depo. at 119, 122.  Plaintiff also had the highest numerical score at the conclusion of the interviews.  McGowan Decl. Exh. K (Final Referral List).

14.    Admit subject to the following qualification.  Plaintiff disputes any inference that the only reason Preece decided to recommend Plaintiff for the position was because she had the best interview.  Preece selected Plaintiff for the position for additional reasons, including Plaintiff's insight into policy analysis, her imagination and her creativity, and her professional contacts.  Preece Depo. at 98, 126, 138-39; Declaration of Diane J. Schroer ("Schroer Decl.") ¶ 21.  Plaintiff also disputes the suggestion – reflected by Defendant's use of the male pronoun to refer to Plaintiff – that Plaintiff is male.  Although Defendant may have believed Plaintiff's gender to be male at the time of the underlying events in this case, Plaintiff's gender is female.  Schroer Decl. ¶¶ 14-16; Declaration of Martha Harris Exh. A ("Harris Rpt.") ¶¶ 22(a), 46.  This is not a dispute of material fact.  *See* Pl. Br. at 27.

15.    Admit subject to the following qualification.  Plaintiff disputes any inference that, at the time of the request for the meeting or at the time of the meeting, Preece had not decided to recommend Plaintiff for the position.  At the time of the request for the meeting, Preece had informed Plaintiff that she "had the job" and words to the effect that she was "it" and the job was hers.  Schroer Decl. ¶ 12; Preece Depo. at 122

(Plaintiff was her "top candidate").  At the time of the meeting, Preece had started to draft

the hiring memorandum.  *See* McGowan Decl. Exh. L (draft of hiring memorandum);

Preece Depo. at 124-25.  Plaintiff also disputes any inference that the reason why

Defendant refused to hire her was a concern that she was dishonest during the hiring

process.  The reason why Defendant refused to hire her was because of her sex.  See infra

¶¶ 28-32 (setting forth material facts demonstrating the existence of a dispute over why

Defendant refused to hire Plaintiff for the position).

16.     Admit subject to the following qualification.  Plaintiff disputes any

inference that the reason Defendant refused to hire her was a concern that she was

dishonest during the hiring process, or a concern that she would be distracted from her

work.  The reason Defendant refused to hire her was because of her sex.  See infra ¶¶ 28-

32 (setting forth material facts demonstrating the existence of a dispute over why

Defendant refused to hire Plaintiff for the position).

17.     Deny.  During the meeting, the topic of security clearance came up during

the meeting, but Plaintiff disputes whether Preece's statements can be characterized as

"expressing concern," based on both the content of the statements and the tone with

which Preece's statements were made.  Preece asked Plaintiff what name (i.e., David or

Diane) Preece should use on the hiring paperwork.  Schroer Decl. ¶ 23; Preece Depo. at

146.  Plaintiff, who held a security clearance of the level required for the position,

volunteered that she knew of other federal employees in positions requiring a security

clearance who had undergone a gender transition without problem.  Schroer Decl. ¶ 25.

Plaintiff also indicated that she would be willing to speak with the Library's personnel

security or health services office, or consent to having her health care provider speak with

the Library's personnel security or health services office, if there was any desire on the part of the Library to confirm that her gender transition posed no concern with respect to the security clearance requirements of the position. Schroer Decl. ¶ 25. Preece Plaintiff disputes any inference that the reason Defendant refused to hire her was a concern that she was unable to fulfill the security clearance requirements of the position, or was unable do so in a timely manner. The reason Defendant refused to hire her was because of her sex. See infra ¶¶ 28-32 (setting forth material facts demonstrating the existence of a dispute over why Defendant refused to hire Plaintiff for the position).

18.    Deny except to admit that, after her lunch meeting with Plaintiff, Preece spoke with Wilkins about whether Plaintiff's gender transition might negatively affect her ability to obtain a security clearance. Plaintiff disputes the suggestion that the reason Defendant refused to hire her was a concern that she was unable to fulfill the security clearance requirements of the position, or would be unable do so in a timely manner. The reason Defendant refused to hire her was because of her sex. See infra ¶¶ 28-32 (setting forth material facts demonstrating the existence of a dispute over why Defendant refused to hire Plaintiff for the position). Upon returning from lunch, Preece spoke with other colleagues within CRS, including Steve Bowman and, separately, Gary Pagliano. Preece Depo. at 190-92, 195-98; Bowman Depo. at 83-106; Pagliano Depo. at 42-57. The conversation with Bowman happened immediately upon Preece's return to the office from her lunch with Plaintiff. Bowman Depo. at 85. It was Bowman who suggested that there might be security clearance concerns related to Plaintiff's gender identity. Id. at 84. Preece was more focused on feeling stunned that Plaintiff wanted to present as a woman when Plaintiff came to work, and her distress at not knowing what she was going to do.

Id. When speaking with Pagliano, Preece did not raise any security clearance concerns. Pagliano Depo. at 55. Rather, Preece focused on the fact that Plaintiff wished to come to work in women's attire. Pagliano Depo. at 55. See also infra ¶¶ 28-32 (setting forth material facts demonstrating the existence of a dispute over why Defendant refused to hire Plaintiff for the position).

19.    Admit subject to the following qualification. Wilkins was provided with little other information about the applicant's background, such as her security clearance history or her medical history. Preece Depo. at 181-84; Wilkins Depo. at 128-29. Plaintiff disputes any inference that the reason Defendant refused to hire her was a concern that she was unable to fulfill the security clearance requirements of the position, or would be unable do so in a timely manner. The reason Defendant refused to hire her was because of her sex. See infra ¶¶ 28-32 (setting forth material facts demonstrating the existence of a dispute over why Defendant refused to hire Plaintiff for the position).

20.    Admit subject to the following qualification. Wilkins was asked what impact Plaintiff's gender identity would have on her ability to "get clearance." Preece Depo. at 179. Plaintiff disputes any inference that the reason Defendant refused to hire her was a concern that she was unable to fulfill the security clearance requirements of the position, or would be unable do so in a timely manner. The reason Defendant refused to hire her was because of her sex. See infra ¶¶ 28-32 (setting forth material facts demonstrating the existence of a dispute over why Defendant refused to hire Plaintiff for the position).

21.    Admit subject to the following qualification. Preece met with Wilkins at a meeting also attended by Kent Ronhovde, Bessie Alkisswani, and Kathryn Deese. Preece

Depo. at 211-13.  Plaintiff disputes any inference that the reason Defendant refused to

hire her was a concern that she was unable to fulfill the security clearance requirements

of the position, or was unable do so in a timely manner.  The reason Defendant refused to

hire her was because of her sex.  See infra ¶¶ 28-32 (setting forth material facts

demonstrating the existence of a dispute over why Defendant refused to hire Plaintiff for

the position).

      22.     Admit subject to the following qualification.  Plaintiff disputes the

suggestion that the reason Defendant refused to hire her was a concern that she was

unable to fulfill the security clearance requirements of the position in a timely manner.

See infra ¶¶ 28-32 (setting forth material facts demonstrating the existence of a dispute

over why Defendant refused to hire Plaintiff for the position).  Plaintiff's gender

transition did not affect her ability to fulfill the security clearance requirements of the

position in a timely manner on account of medical or other concerns.  Schroer Decl. ¶ 35;

Harris Report ¶¶ 22(d), 42, 49; Declaration of Peter R. Nelson ("Nelson Decl.") Exh. B

("Nelson Supp. Rpt.") ¶¶ 3, 5; Nelson Decl. Exh. A ("Nelson Rpt.") ¶¶ 21, 22, 28.

      23.     Deny except to admit that Preece decided not to recommend Plaintiff for

the position.  Plaintiff disputes the suggestion that the reason Defendant refused to hire

her was a concern that she was unable to fulfill the security clearance requirements of the

position in a timely manner.  See infra ¶ 31(a)-(y) (detailing facts demonstrating a dispute

of material fact over whether Defendant's decision was based on a legitimate concern

that Plaintiff's gender identity would caused a delay in Plaintiff fulfilling the security

clearance requirements of the position in a timely manner), ¶ 32(a)-(ll) (detailing facts

demonstrating that other justifications for Defendant's decision are pretextual and the real

reason for Defendant's decision was Plaintiff's perceived departure from sex stereotypes and/or her gender identity). Plaintiff disputes the suggestion that the reason Defendant refused to hire her was a concern that she would be unable to maintain her high level of contacts in the military community and would no longer be viewed as a credible authority on terrorism and international crime. See infra ¶ 30(a)-(c) (detailing facts demonstrating a dispute of material fact over whether Defendant's decision was based on a legitimate concern that Plaintiff's gender identity would have resulted in Plaintiff being unable to maintain her high level of contacts in the military community and no longer being viewed as a credible authority on terrorism and international crime), ¶ 32(a)-(ll) (detailing facts demonstrating that other justifications for Defendant's decision are pretextual and the real reason for Defendant's decision was Plaintiff's perceived departure from sex stereotypes and/or her gender identity). Plaintiff disputes the suggestion that the reason Defendant refused to hire her was a concern that Plaintiff's gender transition would distract her and divert her attention away from the mission of CRS. See infra ¶ 29(a)-(c) (detailing facts demonstrating a dispute of material fact over whether Defendant's decision was based on a legitimate concern that Plaintiff's gender identity would have distracted her and diverted her attention away from the mission of CRS), ¶ 32(a)-(ll) (detailing facts demonstrating that other justifications for Defendant's decision are pretextual and the real reason for Defendant's decision was Plaintiff's perceived departure from sex stereotypes and/or her gender identity). Plaintiff disputes the suggestion that the reason why Defendant refused to hire her was a concern about Plaintiff's future trustworthiness and, as a related matter, about her honesty. See infra ¶ 28(a)-(c) (detailing facts demonstrating a dispute of material fact over whether Defendant's decision was based on a legitimate

9

concern that Plaintiff's gender identity and transition would have distracted her and diverted her attention away from the mission of CRS), ¶ 32(a)-(ll)(detailing facts demonstrating that other justifications for Defendant's decision are pretextual and the real reason for Defendant's decision was Plaintiff's perceived departure from sex stereotypes and/or her gender identity).  The reason Defendant refused to hire her was because of her sex.  See infra ¶ 32(a)-(ll) (setting forth facts demonstrating the existence of a dispute of material fact over whether the real reason why Defendant refused to hire Plaintiff for the position was because of her sex).

24.     Admit subject to the following qualification.  Preece informed Plaintiff that, after a long and restless night, or words to that effect, she thought that Plaintiff was "not a good fit" for the position.  Schroer Decl. ¶ 31.  Plaintiff disputes any inference that the reason Defendant refused to hire her was a concern that she was unable to fulfill the requirements of the position, including any concerns that Plaintiff could not fulfill the security clearance requirements of the position in a timely manner.  The reason Defendant refused to hire her was because of her sex.  See infra ¶¶ 28-32 (setting forth material facts demonstrating the existence of a dispute over why Defendant refused to hire Plaintiff for the position).

25.     Admit subject to the following qualification.  Plaintiff disputes any inference that the reason Defendant refused to hire her was a concern that she was unable to fulfill the requirements of the position, including any concerns that Plaintiff could not fulfill the security clearance requirements of the position in a timely manner.  The reason Defendant refused to hire her was because of her sex.  See infra ¶¶ 28-32 (setting forth

material facts demonstrating the existence of a dispute over why Defendant refused to hire Plaintiff for the position).

*        *        *        *

Pursuant to Local Rule 56.1, Plaintiff also sets the following material facts that demonstrate the existence of genuine issues needing to be litigated:

26.    Defendant asserts that Plaintiff, as a transsexual woman, is not a member of a protected class under Title VII because gender identity is not part of sex. Defendant's Brief in Support of Motion for Summary Judgment ("Def. Br.") at 11-13 & n.11.  Whether gender identity is part of sex is a disputed issue of material fact.  The following subordinate facts demonstrate the existence of a genuine issue needing to be tried:

a.  Gender identity, which is a person's internal psychological identification as a man or a woman, is an aspect of a person's sex.  Declaration of Walter Bockting ("Bockting Decl.") Exh. A ("Bockting Rpt.") ¶ 13; Bockting Decl. Exh. B ("Bockting Supp. Rpt.") ¶¶ 2, 4.  This fact is disputed.

b.  A person's sex is a multifaceted concept that incorporates an amalgam of factors, including the person's gender identity.  Bockting Rpt. ¶¶ 13, 33-36; Bockting Supp. Rpt. ¶¶ 2, 13 (discussing how since 1972, experts have recognized that sex is a multifaceted concept, which includes not only chromosomal make-up but also gonadal sex, fetal hormonal sex, internal morphologic sex, external morphological sex, hypothalamic sex, sex of assignment and rearing, and pubertal hormonal sex, as well as gender identity and role).  These facts are disputed.

c.  Taber's Cyclopedic Medical Dictionary (2005) recognizes that sex is a multifaceted concept that includes not only chromosomal sex but also "psychological sex," i.e., gender identity.  McGowan Decl. Exh. P.  This fact is undisputed.

d.  Although scientific consensus is lacking as to exactly which biological factors determine gender identity, recent scientific research on the etiology of transsexualism points toward the role of sexual differentiation of the brain in gender identity development.  Bockting Rpt. ¶¶ 19, 34; Bockting Supp. Rpt. ¶ 4; Bockting Depo. at 28 (discussing research).  The findings of these scientific studies suggest that gender identity is not wholly

11

acquired, and that there is a biological determinant involved in the development of gender identity and of gender identity disorders.  Bockting Supp. Rpt. ¶ 4; see also Bockting Depo. at 54; id. at 28-30 (discussing research).  These facts are disputed.

27.    Defendant asserts that Plaintiff is male.  Def. Br. at 6 n.4 & 17 n.13.

Although Plaintiff asserts this is not a material fact, see Pl. Br. at 27, to the extent this

Court disagrees, it is a disputed material fact.  The following subordinate facts

demonstrate the existence of a genuine issue needing to be tried:

   a.  Plaintiff is a female.  Schroer Decl. ¶ 14;  Harris Rpt. ¶¶ 22(a), 46.  This fact is disputed.

   b.  Plaintiff has a female gender identity.  Schroer Decl. ¶ 14; Harris Rpt. ¶¶ 22(a), 46.  Plaintiff is transgender.  Schroer Decl. ¶ 14; Harris Rpt. ¶¶ 22(a)-(b), 46. These facts are undisputed.

   c.  Although, at the time of Plaintiff's birth, her sex was classified as male, Plaintiff and the medical professionals working with her subsequently determined that the gender designation assigned to her at birth does not conform with her gender identity.  Schroer Decl. ¶ 14; Harris Rpt. ¶¶ 22(b), 23-24.  These facts are undisputed.

   d.  A person's gender identity is part of her sex.  Bockting Rpt. ¶¶ 13, 33-36; Bockting Supp. Rpt. ¶¶ 2, 13.  See also supra discussion ¶ 26 (a)-(d).  This fact is disputed.

28.    Defendant asserts that it refused to hire Plaintiff on account of a concern

about her future trustworthiness and honesty.  Defendant's Statement of Undisputed Facts

("Def. SOF") ¶ 23.  Plaintiff asserts that this is not a legitimate, non-discriminatory basis

for Defendant's actions, see Pl. Br. at 34-35 (explaining inter alia that, as a matter of law,

there is no duty on the part of an applicant to disclose information about his or her sex

where sex is not a BFOQ for the position), and therefore does not present any issue to be

tried.  To the extent that this Court disagrees, the questions of whether Defendant's

concerns about Plaintiff's future trustworthiness and honesty were legitimate and/or were

the actual basis for its decision are disputed issues of material fact. The following

subordinate facts demonstrate the existence of a genuine issue needing to be litigated:

    a.   Sex is not a bona fide occupational qualification for the position, Rec. Doc. 47 (Answer to Am. Compl.) ("Answer") ¶ 59. The online application for the Terrorism Specialist position did not contain a field asking for the applicant's sex. McGowan Decl. Exh. O (Plaintiff's on-line application). The hiring committee never asked Plaintiff to disclose her gender during her interview, or anytime thereafter, and Plaintiff never did so because she did not believe that her gender was relevant to her qualifications for the position. Schroer Decl. ¶ 10. These facts are undisputed.

    b.   Plaintiff proposed the lunch meeting in order to extend Preece the courtesy of an advance, face-to-face discussion of Plaintiff's intent to start work presenting as a female, and to work cooperatively with Preece to address any concern that she might have about it. Schroer Decl. ¶ 17. At the time, Plaintiff was preparing to present as a female in her everyday life, including her professional life, as prescribed by her course of medical treatment for her gender dysphoria. Id. at ¶ 16. Plaintiff believed it would occasion less confusion if she started work presenting as a female than if she started work presenting as a male and subsequently began presenting as a female. Id. at ¶ 17. These facts are undisputed.

    c.   Even if Plaintiff had disclosed her female gender identity and/or her plans to transition from male to female earlier in the hiring process, Preece would have made the same hiring decision. Preece Depo. at 152-54, 160-61. These facts are undisputed.

    d.   At no time after Plaintiff disclosed her gender identity did Preece articulate any concern to Plaintiff about her future trustworthiness. Schroer Decl. ¶ 29. Preece thanks Plaintiff for her honesty both at the conclusion of their lunch, id. at ¶ 30, and when Preece called to inform Plaintiff that Preece would not be selecting her for the position, id. at ¶ 31, Preece Depo. at 275-76, Rec. Doc. 47 (Answer) ¶ 50. These facts are undisputed.

    29.   Defendant asserts that it refused to hire Plaintiff because of a concern that

she would be distracted from her duties at CRS due to her gender identity. Plaintiff

asserts that this is not a legitimate, non-discriminatory basis for Defendant's actions, *see*

Pl. Mem. at 32-34 (explaining that, as a matter of law, Defendant may not disqualify

Plaintiff from the position based on its assumption that Plaintiff might share a trait (i.e.,

distraction) associated with a group (i.e., transgender individuals), without undertaking an individualized assessment of whether Plaintiff herself possessed that trait), and therefore does not present any issue to be tried.  To the extent that this Court disagrees, the questions whether Defendant's concerns about distraction were legitimate and/or were the actual basis for its decision are disputed issues of material fact.  The following subordinate facts demonstrate the existence of a genuine issue needing to be litigated:

    a.   During the lunch meeting, Plaintiff volunteered that there were two surgeries that would be part of her gender transition, but that one would be completed prior to her starting at CRS, and the other could be scheduled by Plaintiff in a manner consistent with the needs of CRS.  Schroer Decl. ¶ 28.  Plaintiff also noted that her second surgery (i.e., sex reassignment surgery) would not be taking place for at least a year.  Id.  These facts are undisputed.

    b.   Defendant has both annual and sick leave policies.  McGowan Decl. Exh. T (copies of Library annual and sick leave policies).  The policies would not have restricted Plaintiff's ability to use her annual or sick leave to take care of any particular type of personal health care matter, including any surgery related to her gender transition.  McGowan Decl. Exh. O (excerpt from transcript of March 13, 2008 discovery conference).  These facts are undisputed.

    c.   Plaintiff's gender transition did not unfavorably affect her ability to focus on her work.  Schroer Decl. ¶ 37; Harris Rpt. ¶¶ 22(e), 42, 49.  To the contrary, Plaintiff's gender transition was a course of medical treatment that she undertook to decrease any distress or distraction caused by her gender dysphoria.  Schroer Decl. ¶ 37; Harris Rpt. ¶ 47-48.  These facts are undisputed.

    30.   Defendant asserts that it refused to hire Plaintiff on account of a concern that she would be unable to maintain her professional contacts and credibility within the military community and the government.  Plaintiff asserts that this is not a legitimate, non-discriminatory basis for Defendant's actions, see Pl. Mem. at 29-32 (explaining that, as a matter of law, Defendant may not rely on the bias of third parties to justify its decision not to select Plaintiff), and therefore does not present a disputed issue of

material fact.  To the extent that this Court disagrees, the question of whether

Defendant's concerns about Plaintiff's professional contacts and credibility within the

military community and the government were legitimate and/or the basis for its decision

presents disputed issues of material fact.  The following subordinate facts demonstrate

the existence of a genuine issue needing to be litigated:

> a.  During the lunch meeting, Preece did not ask Plaintiff whether any of Plaintiff's job references or military colleagues was aware of Plaintiff's gender transition.  Schroer Decl. ¶ 29; Preece Depo. at 159-60, 166.  This fact is undisputed.
>
> b.  At no time prior to Preece making her decision not to hire Plaintiff did Preece follow up with Plaintiff's references to ascertain whether any of them already knew about Plaintiff's gender identity and transition.  Preece Depo. at 199-200.  This fact is undisputed.
>
> c.  Plaintiff currently works as a private consultant on national security and counter-terrorism issues.  Schroer Decl. ¶ 36.  In connection with her work, she continues to interact with members of the military, and she continues to access highly sensitive classified information as a part of her work.  Id.  Throughout her gender transition, Plaintiff has maintained many personal and professional relationships with military and former military colleagues.  Id.  Throughout her gender transition, Plaintiff has continued to be viewed as a credible authority on national security and counter-terrorism issues, supporting herself by working full-time in this field.  Id.  These facts are undisputed.

31.    Defendant asserts that it refused to hire Plaintiff because it believed that

she would be unable to fulfill the security clearance requirements of the position in a

timely manner.  Plaintiff asserts that this is not a legitimate, non-discriminatory basis for

Defendant's actions, see Pl. Mem. at 35-37 (explaining *inter alia* that, as a matter of law,

Defendant may not disqualify Plaintiff from the position based on its assumption that

Plaintiff, due to her gender identity and transition, and not based on any individualized

determination of Plaintiff's situation, would not be able to satisfy the security clearance

requirements in a timely manner), and therefore does not present a disputed issue of

material fact.  To the extent that this Court disagrees, the questions whether Defendant's

concerns about Plaintiff's ability to satisfy the security clearance requirements of the

position in a timely manner were legitimate and/or were the actual basis for its decision

are disputed issues of material fact.  The following subordinate facts demonstrate the

existence of a genuine issue needing to be litigated:

      a.  During the lunch meeting, Plaintiff volunteered that she knew of other federal employees in positions requiring a security clearance who had undergone a gender transition, and that she would be willing to speak with Defendant's personnel security or health services office, or consent to having her health care provider speak with Defendant's personnel security or health services office, to confirm that her gender transition posed no concern with respect to the security clearance requirements of the position. Schroer Decl. ¶ 26.  This fact is undisputed.

      b.  During the lunch meeting, Preece did not ask Plaintiff whether the security clearance officer at Plaintiff's current job was aware of Plaintiff's gender transition, which he was because Plaintiff had told him.  Schroer Decl. ¶ 28; Preece Depo. at 147-48.  This fact is undisputed.

      c.  Plaintiff first reported to the security officer at her prior employer, Benchmark International, that she was seeing a therapist for gender identity issues in early 2004.  Schroer Decl. ¶ 34.  Since that time, she has continued to provide all reportable information, as well as to report voluntarily additional, non-mandatory information, including information about her gender transition, to her security clearance officers.  Id. at ¶ 34.

      d.  Plaintiff has since undergone a periodic reinvestigation (PR) of her security clearance.  Schroer Decl. ¶¶ 34-35.  She submitted her paperwork in March 2006 and was interviewed by a security investigator a few months later in Summer 2006.  Id. at ¶ 34. At no time since Plaintiff submitted her PR paperwork has she ever been informed – either formally (i.e., through the commencement of the due process appeals process) or informally (i.e., by her security officer) – that her security clearance eligibility going forward was in question as a result of her gender identity and transition, or for any other reason.  Id. at ¶ 35.  These facts are undisputed.

      e.  At the time of the events at issue, Plaintiff's most recent periodic reinvestigation had occurred in 2001.  Schroer Decl. ¶ 33. There was no break in her security clearance status between the time she retired from the military and the time she began working as a consultant for Benchmark International, where her job involved access to highly sensitive classified information.  Id.  These facts are undisputed.

f.   Plaintiff's security clearance with the United States Army, as well as her security clearance with Benchmark International, a federal contractor, were registered in a centralized index to which Defendant's Personnel Security Officer had access.  Wilkins Depo. at 31-32, 61-62; Nelson Rpt. ¶¶ 15, 17-19.  These facts are undisputed.

g.   The security clearance Adjudication Guidelines, promulgated pursuant to EO 12968, and the security clearance Adjudicator's Desk Reference do not provide that transgender status, by itself, is a potentially disqualifying condition.  Wilkins Depo. at 69-70; Nelson Rpt. ¶ 29(b).  This fact is undisputed.

h.   The only security clearance guidance in the Adjudication Guidelines that addresses, directly or indirectly, the issue of gender transition is contained in Guideline D (Sexual Conduct) and Guideline I (Mental and Emotional Conditions).  Wilkins Depo. at 165-66; Nelson Rpt. ¶¶ 21-22.  The Guideline D (Sexual Conduct) does not list transsexuality among the concerns that would be "potentially disqualifying."  Nelson Rpt. ¶ 21.  Guideline D provides only that sexual behaviors indicating a personality or emotional disorder may be relevant to the question of security clearance eligibility.  Wilkins Depo. at 166-67.  Plaintiff does not have any personality or emotional disorders; her only mental health diagnosis is Gender Identity Disorder.  Schroer Decl. ¶ 15; Harris Rpt. ¶¶ 22(c), 49.  With respect to Guideline I (Mental and Emotional Conditions), criterion (d) concerns information that might suggest that "the individual's current behavior indicates a defect in his or her judgment or reliability."  Wilkins Depo. at 183-87.  If there were any concern that Plaintiff's transsexuality might suggest a "defect" in her "judgment or reliability," it could have been addressed and resolved in a timely manner by referring the matter to Defendant's Health Services Office.  Charles Depo. at 31-38, 41; Nelson Rpt. ¶ 22.  A brief conversation with Plaintiff and/or a brief conversation with Plaintiff's health care provider, and/or a review of Plaintiff's medical file could have quickly confirmed that Plaintiff's gender transition posed no security clearance concerns.  Charles Depo. at 33-34, 78-79, 109-10; Nelson Rpt. ¶ 22.  These facts are undisputed.

i.   In some cases, an interview with an individual is all that is required to confirm that the individual's health condition poses no security clearance concerns.  Charles Depo. at 33-35.  This fact is undisputed.

j.   Defendant's Health Services Officer would credit the opinion of someone with expertise on gender identity issues with regard to the impact of an individual's gender identity on the individual's overall health, well-being, and suitability for handling classified information.  Charles Depo. at 64-66, 76-77.  This fact is undisputed.

k.   Plaintiff's treating therapist, Martha Harris, is someone with expertise on gender identity issues.  Harris Rpt. at ¶¶ 1-16 & Exh. A (curriculum vitae).  This fact is undisputed.

l.   Had Defendant's Health Services Officer contacted Harris, Harris would have reported that Plaintiff had no co-morbidities or stressors that would have hindered her from working at the highest level of performance in safeguarding classified information.  Harris Rpt. ¶¶ 42-43, 49.  This fact is undisputed.

m.   Once Defendant's Health Services Officer had confirmed that Plaintiff's gender transition posed no security clearance concerns, Defendant's Personnel Security Officer could have granted reciprocity for Plaintiff's security clearance held by the entity holding her security clearance at the time of Plaintiff's application, rather than requiring Plaintiff to submit to another security clearance investigation.  Nelson Rpt. ¶ 28.  This fact is undisputed.

n.   Security clearances for which Defendant's Personnel Security Officer grants reciprocity can be "transferred" to Defendant in a week or less in most cases.  Lopez Depo. at 68-69.  This fact is undisputed.

o.   Any security clearance concerns posed by Plaintiff's gender transition could have been resolved in a matter of days if relevant information had been promptly obtained from Plaintiff and/or her health care provider by Defendant.  Nelson Supp. Rpt. ¶ 5.  This fact is undisputed.

p.   Studies conducted to date do not indicate that individuals with Gender Identity Disorder have any greater prevalence of other mental health disorders than the general population.  Bockting Rpt. ¶ 38.  Rather, research suggests that the symptoms of other mental health conditions (e.g., anxiety, depression) are the result of social stigma associated with gender non-conformity, and are not intrinsically related to gender identity disorder, and improve as the transgender individual learns to manage such stigma.  Id.  These facts are undisputed.

q.   When the Library's Health Services Office returns a favorable evaluation, confirming that an individual's mental health condition poses no security clearance concerns, Wilkins could determine that no further investigation is needed to resolve favorable that individual's security clearance investigation.  Wilkins Depo. at 140-41.  This fact is undisputed.

r.   Even if Defendant's Health Services Officer had determined that there was no security clearance concern posted by Plaintiff's gender transition, Wilkins may nevertheless have refused to grant reciprocity for Plaintiff's security clearance held by the entity holding her security clearance at the time of Plaintiff's application based on Wilkins' view that Plaintiff's gender transition would presumably have a negative impact on Plaintiff's security clearance eligibility, unless proven otherwise.  Wilkins Depo. at 194.  This fact is undisputed.  This would have been contrary to security clearance protocols and best practices.  Nelson Rpt. ¶¶ 28-29; Nelson Depo. at 84-85. This fact is disputed.

s.  Plaintiff's decision to address her gender dysphoria in the manner prescribed by her health care providers, and her decision to live openly as a female, consistent with her female gender identity, is a factor that should have been counted in Plaintiff's favor by the Library's Personnel Security Officer but was not.  Nelson Rpt. ¶ 20-22, Nelson Depo. at 62-63.  This fact is disputed.

t.  The "whole person" concept embodied in the security clearance Adjudication Guidelines, employed throughout the federal government, including the Library of Congress pursuant to LCR 2024-6, means that a security or hiring official must consider more than just behaviors, conditions, or situations to which he or she objects.  Nelson Rpt. ¶ 27; Lopez Depo. at 40-42.  It imposes the burden and responsibility of leaving biases and prejudices aside and seeking out and evaluating the positive and productive aspects of a person's life in its entirety.  Nelson Rpt. ¶ 27; Wilkins Depo. at 119-20; Lopez Depo. at 40-42.  These facts are undisputed.

u.  A "whole person" analysis was never undertaken in Plaintiff's case.  Wilkins Depo. at 122; Nelson Rpt. ¶ 27.  This fact is undisputed.

v.  Plaintiff was not afforded any of the procedural due process protections provided under EO 12968 to individuals with respect to whom an adverse determination is made regarding their eligibility to hold a security clearance.  Wilkins Depo. at 125-26; Nelson Rpt. at ¶ 25.  This fact is undisputed.

w.  Defendant's decision not to hire Plaintiff on account of a concern that she would be unable to fulfill the security clearance requirements of the position in a timely manner was made with no input from Defendant's Director of Security.  Wilkins Depo. at 101; Lopez Depo. at 84-94; Nelson Rpt. at ¶ 24.  This fact is undisputed.

x.  In previous cases where Preece, as a selecting official, was faced with applicants presenting information that might potentially slow down the applicants' security clearance process (e.g., dual citizenship, marriage to a foreign national), Preece nevertheless went forward with those applicants.  Preece Depo. at 51-70.  This fact is undisputed

y.  While it can take a significant amount of time to investigate information relating to an individual's time living abroad or foreign ties, security investigations can be done more expeditiously where the individuals with relevant information are located in close proximity to the Personnel Security Office undertaking the investigation.  Lopez Depo. at 78, as was the case here.  Harris Rpt. at 1 & Exh. A (curriculum vitae listing Alexandria, VA address); Schroer Decl. ¶ 26; Nelson Rpt. ¶ 23; Nelson Supp. Rpt. ¶ 5.  These facts are undisputed.

32.     Defendant asserts that its refusal to hire Plaintiff was not based on her perceived departure from sex stereotypes and/or her gender identity.  This is a disputed material fact.  The following subordinate facts demonstrate the existence of a genuine issue needing to be litigated:

a.   During the lunch meeting, Plaintiff informed Preece that she was under a health care provider's care for gender dysphoria and that, consistent with her prescribed course of medical care, she would be using a traditionally feminine name (i.e., Diane) and dressing in traditionally feminine clothes and otherwise presenting as a female when she started work.  Schroer Decl. ¶ 22.  This fact is undisputed.

b.   In response, Preece asked Plaintiff why Plaintiff would want to do a thing like that.  Schroer Decl. ¶ 23; Preece Depo. at 154.  This fact is undisputed.

c.   To allay any concern about whether she would present as a female in a workplace-appropriate manner, Plaintiff showed Preece photographs in which she was dressed in traditionally feminine clothes.  Schroer Decl. ¶ 24.  This fact is undisputed.

d.   Preece thought that Plaintiff looked like a "man dressed in women's clothes" when she saw Plaintiff's pictures.  Preece Depo. at 143.  This fact is undisputed.

e.   Preece did not say anything during the lunch meeting suggesting to Plaintiff that what Plaintiff had told or shown her would be relevant to the hiring decision, or that she felt that Plaintiff had been dishonest with her by not previously disclosing her gender identity, or that she was concerned about Plaintiff's ability to maintain her contacts and credibility in the counter-terrorism community, or that she was concerned that the surgery, or anything else related to Plaintiff's gender transition, would distract Plaintiff from her duties at CRS.  Schroer Decl. ¶¶ 28-29.  This fact is undisputed.

f.   The only discussion of any security clearance issues at the lunch consisted of Plaintiff volunteering that she knew of other federal employees in positions requiring a security clearance who had undergone a gender transition, and that she would be willing to speak with Defendant's personnel security or health services office, or consent to having her health care provider speak with Defendant's personnel security or health services office, to confirm that her gender transition posed no concern with respect to the security clearance requirements of the position.  Schroer Decl. ¶ 25; Preece Depo. at 147-50.  Preece did not ask Plaintiff whether her current security officer was already aware of Plaintiff's transition, which he was,

or any other follow up questions. <u>Id.</u> at ¶ 27; Preece Depo. at 147-48.
These facts are undisputed.

g.  As Preece walked back to her office, Preece felt simultaneously
    incredulous and concerned about what Plaintiff had told her, Preece Depo.
    at 167, 170, and was specifically concerned about the fact that people
    would suspect that Plaintiff was transgender when they saw Plaintiff
    because they would have the same reaction that Preece had when she saw
    the pictures Plaintiff had shared at lunch – namely that, when dressed in
    feminine attire, Plaintiff looked like a "man in a dress." Preece Depo. at
    172.  These facts are undisputed.

h.  Shortly after the lunch meeting with Plaintiff, Preece spoke with her CRS
    colleague Steve Bowman.  Preece Depo. at 190-92; Bowman Depo. at 83-
    106.  During this conversation, Preece told Bowman that Plaintiff had told
    her about Plaintiff's female gender identity and plans to undertake a
    gender transition.  Bowman Depo. at 84; Preece Depo. at 190-91.  Preece
    expressed feeling stunned by the news.  Bowman Depo. at 84, 87, 102.
    Preece was visibly upset and tense.  Bowman Depo. at 100.  Bowman was
    also shocked and surprised by this news.  Bowman Depo. at 96; Preece
    Depo. 190.  Preece also told Bowman that Plaintiff had shown her
    photographs of Plaintiff dressed in traditionally feminine clothing, and
    described the photographs in a way that "was not particularly positive."
    Bowman Depo. at 92-94.  Bowman raised the question with Preece of
    whether Plaintiff's gender transition might pose security clearance
    concerns, and suggested that Preece speak with Cynthia Wilkins, the
    Personnel Security Officer.  Bowman Depo. at 84-85, 95-96.  Preece
    stated that she did not know what, if anything to do.  Bowman Depo. at
    100, 102.  These facts are undisputed.

i.  Shortly after the lunch meeting with Plaintiff, Preece spoke with her CRS
    colleague Gary Pagliano.  Pagliano Depo. at 42-57; Preece Depo. at 195-
    98.  During this conversation, Preece told Pagliano that Plaintiff had told
    her about Plaintiff's female gender identity and plans to undertake a
    gender transition.  Pagliano Depo. at 43, 45; Preece Depo. at 194-95.
    Preece was surprised and visibly upset.  Pagliano Depo. at 43, 45, 56.
    Pagliano was likewise shocked by the news.  Pagliano Depo. at 43; Preece
    Depo. at 195.  Preece also told Pagliano that Plaintiff wanted to report to
    work in women's attire.  Pagliano Depo. at 46.  Preece also told Pagliano
    that she did not know what she was going to do next, but mentioned that
    she had a good second candidate.  Preece Depo. at 197.  These facts are
    undisputed.

j.  In their initial conversation about this matter that afternoon, Preece told
    Wilkins that her top candidate for a position had told her that the candidate
    was transitioning from male to female, and wished to report to work as a
    woman.  Preece Depo. at 179.  Preece asked Wilkins what impact this
    information would have on the candidate's ability to "get clearance."  <u>Id.</u>
    Preece did not provide Wilkins with any particular information about

Plaintiff, such as Plaintiff's prior security clearance history or Plaintiff's medical history. Preece Depo. at 181-84; Wilkins Depo. at 128-33. Preece mentioned that the candidate has shown her photographs of what the candidate would look like presenting as female. Preece Depo. at 182. Wilkins responded that she would look into the matter and report back. Preece Depo. at 179-80, 183-84. These facts are undisputed.

k. Preece did not share with Wilkins the fact that, during the lunch meeting, Plaintiff had volunteered that she knew of other federal employees in positions requiring a security clearance who had undergone a gender transition, and that she would be willing to speak with Defendant's personnel security or health services office, or consent to having her health care provider speak with talk Defendant's personnel security or health services office, to confirm that her gender transition posed no concern with respect to the security clearance requirements of the position. Preece Depo. at 179-84. This fact is undisputed. Preece told Wilkins that the candidate has stated that she would likely need a psychiatric fitness for duty examination, prior to determining whether or not to go ahead with a security clearance investigation. Preece Depo. at 183. Whether Plaintiff in fact said this to Preece during their lunch is a disputed fact. It is undisputed that Preece conveyed this information to Wilkins.

l. At the time she posed her question to Wilkins, Preece was already thinking that the information Plaintiff had told her would "change [her] recommendation," and was already "leaning against" recommending Plaintiff for the position. Preece Depo. at 186. This fact is undisputed.

m. At no time prior to making her decision not to hire Plaintiff did Preece contact Plaintiff to follow up with any questions or to discuss any issues of concern to Preece. Preece Depo. at 240, 259. This fact is undisputed.

n. Plaintiff's references all knew about Plaintiff's gender identity and plans to transition to living and working full-time as a female, Schroer Decl. ¶ 29, but none of her references expressed any concern that Plaintiff would be less effective as Diane than she had been as David. Preece Depo. at 114-19; Bowman Depo. at 70-75; Miko Depo. at 66-68; McGowan Decl. Exh. S (reference check notes for Plaintiff). Preece did not know that Plaintiff's references had recommended her with full knowledge of her female gender identity, however, because Preece never followed up with them to ascertain whether they knew about the information Plaintiff had disclosed. Preece Depo. at 199-200. These facts are undisputed.

o. Even if Wilkins had told Preece that Plaintiff's gender transition either presented no security clearance concerns or could be resolved in a timely manner, Preece still would have made the same hiring decision. Preece Depo. at 188-89, 243-44. This fact is undisputed.

p. That evening, when discussing Plaintiff with her two adult sons, who are military reservists and with whom Preece had previously shared information about Plaintiff's application and background, both reacted

very strongly to the news about Plaintiff's gender transition, expressing disbelief that someone with Plaintiff's military background would want to transition to living as a woman. Preece Depo. at 201-07. Preece did not challenge their reaction, and responded that she herself did not understand it. Id. at 203. These facts are undisputed.

q. The next day, Preece attended a meeting with Wilkins and CRS Associate Director Kent Ronhovde, as well as two senior employees with the CRS Office of Workforce Development, Bessie Alkisswani and Kathryn Deese. Preece Depo. at 211-13. During the meeting, Preece explained to the others that Plaintiff had disclosed that she was transgender and intended to report to work as a woman. Id. at 213. Preece also informed them that Plaintiff had shown her photographs of Plaintiff dressed in traditionally feminine clothing, and Preece's opinion regarding whether Plaintiff actually looked like a woman in the pictures was elicited. Id. at 220. At the meeting to discuss purported security clearance concerns, Preece no longer described Plaintiff as her top choice for the position. Preece Depo. at 215. At no point during the meeting did Preece or anyone else express any desire or interest in trying to find a way to continue to go forward with Preece's selection of Plaintiff for the position notwithstanding Plaintiff's gender identity and transition. Id. These facts are undisputed.

r. When asked for her assessment, Wilkins stated that the fact that Plaintiff was transitioning from male to female did not render Plaintiff ineligible to obtain or maintain a top secret security clearance. Wilkins Depo. at 134. Wilkins also indicated that there were no security clearance concerns relating to Plaintiff as a target for blackmail, given Plaintiff's openness about her gender identity and transition. Id. at 134, 177. These facts are undisputed.

s. Wilkins indicated that she would want to refer the matter to the Library's Health Services Office to assess whether there were any mental health issues that posed any security clearance concerns before deciding on what would be the appropriate next steps. Wilkins Depo. at 135. Neither Dr. Sandra Charles, the Library's Health Services Officer, nor anyone else from her office was either asked to attend the meeting or otherwise consulted at any time. Charles Depo. at 94; Wilkins Depo. at 144. These facts are undisputed.

t. Wilkins did not specify how long it would take to assess Plaintiff's situation. Wilkins Depo. at 135-37. Preece claims that Wilkins conveyed that the Personnel Security Office would need to "start from scratch" in assessing Plaintiff's situation because, even though there was a security clearance file on "David Schroer," there was no security clearance file on "Diane Schroer." Preece Depo. at 223 (stating that the prior security clearance investigations for David Schroer "would not be relevant to Diane," because "Diane didn't exist in this point, in a legal sense, or in a sense of security clearances"); id. at 222-25, 232-33. Wilkins, however, never said that she would need to "start from scratch." Preece Depo. at

232-33 (admitting that "start from scratch" were Preece's words, not Wilkins'). Preece also claims that Wilkins told her that Plaintiff would need a "psychiatric fitness for duty" evaluation, Preece Depo. at 224, but that is not a term that Wilkins uses. Wilkins Depo. at 223. These facts are undisputed.

u. At this meeting, there was no discussion of any steps that might be taken to expedite a security clearance assessment of Plaintiff, such as pulling Plaintiff's security clearance file, bringing in Plaintiff for a meeting with the Health Services or Personnel Security Office, or calling Plaintiff to obtain more information that might be relevant to the security clearance assessment, such as whether or not she had already disclosed her female gender identity to the security officer at her current employer responsible for her clearance. Preece Depo. at 239. Wilkins was not asked to, and did not, take any additional steps after providing her initial feedback. Wilkins Depo. at 143-44, 159. These facts are undisputed.

v. Wilkins had never encountered a situation with a transgender applicant before, and informed Preece of that fact. Id. at 179. Yet at no time during the conversation about Plaintiff did anyone suggest seeking the advice of others who might have had experience dealing with any security issue regarding a transgender applicant or employee, Preece Depo. at 239, even though it is common for personnel security officers to seek advice from colleagues on how the security clearance guidelines apply in particular situations. Wilkins Depo. at 163-64; see also Nelson Rpt. ¶ 5 (providing example of such consultation). These facts are undisputed.

w. Rather, the information from Wilkins that Plaintiff's situation would require investigation had the effect of "sealing" in Preece's mind that she would not hire Plaintiff. Preece Depo. at 227. This fact is undisputed.

x. A favorable evaluation from the Library's Health Services Office could have been sufficient to address any security clearance raised in Wilkins' mind by Plaintiff's gender identity and intention to begin living full-time as female. Wilkins Depo. at 140-41. This fact is undisputed.

y. Preece believed that Plaintiff would not be viewed as a credible authority on terrorism by members of Congress and their staffers on account of social stereotypes regarding how men and women should look. Preece Depo. at 164-65, 237-38, 241-42, 297-99. This fact is undisputed.

z. Preece believed that, in light of the military's macho culture, Plaintiff would not be able to maintain her contacts in military-related fields on account of her transsexuality. Preece Depo. at 157-59, 241-42. This fact is undisputed.

aa. Preece circulated multiple e-mails with draft texts for the conversation in which Preece would inform Plaintiff that Preece was no longer going to recommend Plaintiff for the position. Preece Depo. at 254-64. When Preece called Plaintiff on December 21, 2004, Preece simply informed

24

Plaintiff that after a long and restless night, she had concluded that Plaintiff was "not a good fit" for the position. Schroer Decl. ¶ 31; Preece Depo. at 273-75. During this conversation, Preece made no mention of any concerns regarding Plaintiff's trustworthiness, her ability to focus on her work, her professional credibility, her ability to fulfill the security clearance requirements of the position in a timely manner, or any of reasons outlined in the e-mails. Schroer Decl. ¶¶ 31-32; Preece Depo. at 276. These facts are undisputed.

bb. On the Final Referral List for the position, Preece indicated that Plaintiff was "not selected" due to her "work experience" and for no other reason. McGowan Decl. Exh. K (Final Referral List). This fact is undisputed.

cc. Preece selected her second-choice candidate, John Rollins, for the position. Preece Depo. at 277-78; Miko Depo. at 64, 66. John Rollins is not transgender. Preece Depo. at 189. These facts are undisputed.

dd. Defendant believed that Plaintiff was more qualified for the position than John Rollins prior to learning about Plaintiff's gender identity and transition. Preece Depo. at 118-20, 126, 138-40; Miko Depo. at 64, 66. This fact is undisputed. Plaintiff asserts that, irrespective of her gender identity and transition, Plaintiff was more qualified for the position that John Rollins. See infra ¶ 32(ee) – (ll). This fact is disputed.

ee. Plaintiff is a decorated veteran of the United States Army. Schroer Decl. ¶¶ 2-6. Promoted to Colonel in May 1999, Plaintiff received many awards and decorations during her time in the military, and has many highly specialized qualifications. Id. at ¶ 4. She is a Distinguished Graduate of both the National War College and Army Command and General Staff College. Id. She holds Masters Degrees in History and International Relations. Id. These facts are undisputed.

ff. From June 1997 until her retirement from the military on January 1, 2004, Plaintiff was assigned to United States Special Operations Command (USSOCOM) and Joint Special Operations Command (JSOC), which is a component command of USSOCOM. Schroer Decl. ¶ 5. During that period, the mission of the USSOCOM was to "plan, direct, and execute special operations in the conduct of the War on Terrorism in order to disrupt, defeat and destroy terrorist networks that threaten the United States." See id. These facts are undisputed.

gg. After the terrorist attacks of September 11, 2001, Plaintiff served as the Director of a 120-person classified organization with significant, global responsibilities for the War on Terrorism, including the tracking and targeting of several high threat international terrorist organizations. Schroer Decl. ¶ 6. In performing these duties, Plaintiff analyzed highly sensitive intelligence reports, planned for the full range of classified and conventional operations, and presented this information to high-ranking officials of the United States government, including the Vice President,

the Secretary of Defense and the Chairman of the Joint Chiefs of Staff for the U.S. Armed Forces.  Id.  These facts are undisputed.

hh. In October 2003, Plaintiff took a civilian position with a Washington, D.C. firm that provides consulting services to agencies of the federal government, including the Department of Defense.  Schroer Decl. ¶ 7.  As a Senior Analyst and Program Manager, Plaintiff worked with the National Guard Bureau to assess the vulnerability of the nation's critical infrastructure, including major power production, bridges, tunnels, ports and public safety networks, to terrorist attack.  Id.  These facts are undisputed.

ii. At the conclusion of the interview process for the position, Plaintiff had the received the highest overall numerical score for her interview, and was the top choice for the position.  Preece Depo. at 126; Miko Depo. at 66; McGowan Decl. Exh. K (Final Referral List).  This fact is undisputed.

jj. Each member of the hiring committee called a reference for Plaintiff, and each reference gave Plaintiff an outstanding recommendation without reservation.  Preece Depo. at 114-19; Bowman Depo. at 70-75; Miko Depo. at 66-68; McGowan Decl. Exh. S (notes from references checks for Plaintiff).  This fact is undisputed.

kk. In mid-December 2004, Preece called Plaintiff to inform her that Preece the position was hers if she was still interested in taking it.  Schroer Decl. ¶ 12; Preece Depo. at 122.  This fact is undisputed, although the specific language used by Preece during the call is disputed.

ll. Rollins was Preece's second choice candidate.  Preece Depo. at 126, 139-40, 277-78.  He was the second choice compared to Plaintiff, Miko Depo. at 66 ("Schroer was first, Rollins was the backup"), because, for example, Rollins' experience was not as internationally focused as Plaintiff's.  Id. at 64.  This fact is undisputed.

Respectfully submitted,

/s/_Sharon M. McGowan_____
Sharon M. McGowan  (D.C. Bar No. 476417)

Arthur B. Spitzer
  (D.C. Bar No. 235960)
American Civil Liberties Union
  of the National Capital Area
1400 20th Street, N.W., #119
Washington, D.C. 20036
(202) 457-0800

June 18, 2008

Kenneth Y. Choe
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
(212) 549-2627

*Counsel for Plaintiff*