IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DIANE J. SCHROER, | ) ) ) | |
| Plaintiff, | ) ) ) | No. 05-cv-1090 (JR) |
| v. | ) ) ) | |
| JAMES H. BILLINGTON,<br>Librarian of Congress, | ) ) ) | |
| Defendant. | ) ) ) | |

## DECLARATION OF PETER R. NELSON

Pursuant to 28 U.S.C. § 1746, I, Peter R. Nelson, declare as follows:

1.      I am the former Deputy Director of Personnel Security with the United States Department of Defense.

2.      I have been retained by Plaintiff to offer expert testimony in support of her claims and in opposition to Defendant's defenses.

3.      Attached as Exhibit A is a true and correct copy of the expert report, dated November 9, 2006, that I prepared in connection with this case.

4.      Attached as Exhibit B is a true and correct copy of the supplemental expert report, dated March 31, 2008, that I prepared in connection with this case.

5.      If called to testify at trial, I would testify in accordance with the statements in the attached reports.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  June 13, 2008.

Peter R. Nelson

Nelson Declaration – Exhibit A

## EXPERT REPORT OF PETER R. NELSON

### Schroer v. Billington

Peter R. Nelson
28 Christopher Lane
Sterling, VA. 20165
Phone: 703-430-1497

### Qualifications and Background

1.  I am currently a Business Development Manager for ManTech Security & Mission
    Assurance (MSMA), a subsidiary of ManTech International Corporation, which is a
    security and solutions company providing intelligence, security and information
    technology support to Federal government customers. I have been in this position since
    June 2005. Prior to that, from June 2003 to June 2005, I was the Business Development
    Manager for another ManTech subsidiary, ManTech MSM Security Services. In both
    these positions, I have been intimately involved with government personnel, policies and
    procedures that relate to the security of the U.S., especially in the realm of personnel
    security, which was my particular area of expertise for more than 30 years prior to my
    retirement from the Department of Defense (DoD) in July 2002.

2.  I received my Bachelor of Arts degree in Political Science from the University of
    Maryland in December 1973. In 1978 I received a Master of Science degree in Public
    Administration from George Washington University and in 1982 I received a Master of
    Arts degree in National Security Studies from Georgetown University.

3.  From 1980 to 2002, I served on the Office of the Secretary of Defense staff as the
    primary staff assistant for the development, implementation and oversight of personnel
    security policy for the Department. From 1991 to 2002, I was the Deputy Director of
    Personnel Security on the staff of the Assistant Secretary of Defense (Command, Control,

1

Communications & Intelligence) (ASD/C3I). During that time, and prior (1980-1991), as the Assistant Deputy Director for Personnel Security, I was responsible for investigative, adjudicative and due process policies pertaining to more than 3 million military, civilian and contractor personnel employed by the Army, Navy, Air Force, Marine Corps, Defense Agencies and more than 12,000 cleared contractor facilities around the U.S. and overseas. I also maintained close and continuing professional relationships with my counterparts in the CIA, FBI, the Justice Department, the State Department, the Department of Energy, National Reconnaissance Office, and other government agencies regarding personnel security policy and procedures. I also maintained close coordination and contact with a variety of industry organizations such as the Aerospace Industries Association, the American Society for Industrial Security, and the National Defense Industries Association.

4. During my tenure on the ASD/C3I staff, I was directly involved in the development and implementation of many significant policies and procedures that are in place today, such as:

    a. Following the suicide of the White House Counsel, Mr. Vince Foster, I worked closely with the Office of Personnel Management (OPM) and the Vice President's staff to implement a revised national security questionnaire, SF-86, "Questionnaire for National Security Positions," especially the questions pertaining to mental health.

    b. Following the John Walker espionage investigations in 1984-85, I participated in the development and implementation of recommendations for national security

2

policy arising out of the Stilwell Commission Report, "Keeping the Nation's Secrets."

c. From 1983-1986, I was the lead DoD official responsible for the creation of the Defense Personnel Security Research Center in Monterey, CA, which is in existence today and the single governmental entity responsible for conducting structured, empirical research into problems confronting the personnel security program.

d. In 1991, I was the key DoD member involved in the negotiations that led to the development of National Security Directive 63, signed by President George H.W. Bush on October 21, 1991, which implemented the revised Single Scope Background Investigation (SSBI).

e. Following the Aldrich Ames espionage case in 1994, I was the key DoD representative involved in the development of Executive Order 12968, "Access to Classified Information," (EO 12968) signed by President Clinton in August 1995, which, for the first time, provided comprehensive Executive Branch guidance for the conduct of a personnel security program across all Departments and Agencies. EO 12968, in addition to directing uniform due process and appeal standards for adverse clearance outcomes, called for the development and implementation of uniform investigative standards and adjudicative guidelines that would also apply across the government.

f. From 1995 to 1996, I led the interagency team that was tasked to develop the investigative standards and adjudicative guidelines required by EO 12968. The outcome of this effort was submitted to the National Security Council in 1996 and

3

approved by President Clinton and implemented by the NSC in March 1997 and is still in effect today, although the adjudicative guidelines were updated and revised in December 2005.

g. During the period of time leading up to the implementation of EO 12968, I was also intimately involved in the development of fair and equitable due process and appeal procedures that were largely included in EO 12968, including the opportunity to appear before an appropriate authority to present relevant documents or testimony to mitigate potentially disqualifying information.

h. Also during the 1990's, I was a key participant in a variety of high level commissions studying the personnel security program including the first Joint Security Commission Report, "Redefining Security," February 28, 1994; the Moynihan Commission Report in 1997 entitled "SECRECY: Report of the Commission on Protecting and Reducing Government Secrecy;" and the Report of the Joint Security Commission II, dated August 24, 1999.

i. In addition to the above, I was the official responsible for DoD's Personnel Security Program Regulation, DoD 5200.2-R, which contained all the relevant personnel security policies and procedures to be implemented throughout the Department of Defense.

j. I was also the principal DoD representative to various Intelligence Community fora involved in the development of policies and procedures contained in Director of Central Intelligence Directive 6/4, "Personnel Security Standards and Procedures Governing Eligibility for Access to Sensitive Compartmented Information."

4

5. During the 1980's, as the DoD senior personnel security policy staff assistant, I was consulted on separate occasions by personnel of a Defense Agency regarding security clearance issues pertaining to cleared employees who were transsexuals or preparing for gender reassignment. My advice was that, so long as the employee's transgender status was known to family, friends and co-workers, the threat of blackmail or coercion was negligible. Regarding any potential mental or emotional issues, I advised that contact with any treating physician would be acceptable to resolve this issue.

6. My resume/CV, which includes my publications, is attached to this statement.

7. In the last four years, I served as an expert witness in the following case: <u>Haig Melkessetian v. All World Consulting, Inc.,</u> Civil Action No. 02-1832 (D. Md).

8. I am not charging a fee for my time in this case.

## Opinions and Bases Therefor

9. In this litigation I have been asked to assess the assertion of the Congressional Research Service (CRS) of the Library of Congress (LOC) that it was justified in failing to hire Ms. Schroer due to the amount of time that it claims would have been required to investigate the national security implications of her revelation of her transgender status.

10. In forming my opinions about the circumstances surrounding this case, I have relied upon my more than 30 years of experience in the field of security clearances and investigations, my education, and my intimate familiarity with the policies and procedures governing access to classified information and employment in sensitive positions. I have also reviewed relevant documents that impinge on this case:

    i. EO 12968, DCID 6/4, the 1997 Adjudication Guidelines; and the 1999 Adjudicator's Desk Reference;

    ii. Plaintiff's Complaint of June 2, 2005; Defendant's Answer of April 14, 2006; Defendant's Response to Plaintiff's First Set of Interrogatories, dated July 21, 2006; Unofficial Deposition Transcript of Ms. Cynthia Wilkins, September 20, 2006; and Unofficial Deposition Transcript of Dr. Sandra Charles, October 25, 2006; and

    iii. Library of Congress Regulation 2024-6, Security Eligibility Requirements and Procedures, May 5, 2004.

11. Based on my review of the foregoing, my opinions and the reasons therefore are those set forth in detail below.

12. To the best of my knowledge, at the time she applied for employment with CRS, Ms. Schroer was in possession of a valid TOP SECRET security clearance due to her sensitive duties in the U.S. Army and possessed the required supporting background investigation necessary to qualify for the position at Congressional Research Service.

13. Ms. Schroer's positions with the U.S. Army over a 25 year career, which included positions within the Special Operations community, were clearly sensitive in nature and involved access to TOP SECRET/SCI information.

14. By virtue of the possession of a TOP SECRET security clearance with her private sector employer, Ms. Schroer would have met the CRS clearance requirements when she began work since her industry clearance would have been reciprocally converted from an Army TOP SECRET to an industry TOP SECRET by the Defense Industrial Security Clearance Office. If CRS had checked Ms. Schroer's clearance status in advance of the hiring

decision, as is done by most government and private sector employers, it would have seen that she met all required clearance and investigative requirements.

15. Ms. Schroer's prior security clearance with the Army as well as her clearance with a cleared contractor employer would be registered in the DoD Joint Personnel Adjudication System (JPAS) database (for which I was the Program Manager over a period of 10 years), which is the DoD system of records for all clearance actions and contains several million security clearances pertaining to current and former DoD military, civilian and contractor employees.

16. So long as a period not greater than 24 months elapsed between Ms. Schroer's completion of military service and commencement of classified work in the private sector requiring a clearance, her clearances and investigation would be valid for classified access at an agency like CRS.

17. In my long experience at DoD and with other Federal agencies and the private sector, it would be highly unusual to not verify an applicant's clearance and investigative status, where the applicant is under serious consideration for employment in a sensitive position, before making an offer of employment.

18. This is routinely done throughout the government and private sector in order to ensure that the clearance the person says she has is in fact the case before making a hiring decision.

19. The CRS could have easily validated Ms. Schroer's clearance status by accessing JPAS or querying her employer's Facility Security Officer or other authoritative source.

20. Ms. Schroer's voluntary admission of her transgender status should have been given far more favorable weight by the CRS security officer, since nothing about her status raised

7

issues of honesty, loyalty, or reliability, especially given her long, dedicated service to her country.

21. There is nothing in the Sexual Conduct section of the Adjudication Guidelines (Guideline D) that would remotely warrant assigning Ms. Schroer's transgender status as "potentially disqualifying," i.e., no sexual behavior of a criminal nature; no compulsive or addictive sexual behavior; no sexual behavior that causes an individual to be vulnerable to coercion, exploitation or duress; and no sexual behavior of a public nature and/or which reflects lack of discretion or judgment. If there had been any question whatsoever in the minds of the CRS security officials, a review of Ms. Schroer's prior DoD investigative history would likely have helped eliminate that as an issue. Moreover, the 1999 Adjudicator's Desk Reference seems to suggest that, to the extent that there is any risk at all, there may be more stress placed on a transsexual individual by **not** seeking gender reassignment than by changing her original biological gender;

22. With respect to the other relevant guideline (Guideline I), Mental and Emotional Conditions, a review of the four potentially disqualifying security concerns again reveals little or no grounds for using these criteria as a basis for a decision to launch a lengthy, costly and likely unnecessary investigation. Even if the CRS Security Office considered the remote possibility that Ms. Schroer's transgender status fell under criterion (d) of Guideline I under disqualifying factors, namely "information that suggests that the individual's current **behavior** indicates a defect in his or her judgment or reliability," it could have been addressed and resolved in a timely and efficient manner by referring the issue to the Library's Health Services Office for an evaluation consistent with what Dr. Charles, the head of the Library's Health Services Office, described in her deposition,

8

namely a review of all relevant medical records, an interview with Ms. Schroer and a discussion with Ms. Schroer's treating physician.

23. Given the fact that the Library of Congress is in the enviable position, unlike many agencies, of having trained, qualified health professionals on staff, it would have been a relatively simple matter to have Ms. Schroer sign a medical release so that 1) all relevant medical records could have been provided for review by Dr. Charles, and 2) Dr. Charles could have contacted Ms. Schroer's treating physician to discuss the case, the underlying issues, if any, treatment, prognosis, susceptibility to any defect in judgment or reliability, medications, etc., in order to facilitate a fair and expeditious decision.

24. Furthermore, it appears that this critical decision by the CRS to select another candidate based on the length of time it would have taken OPM to conduct the background checks was made with no input from the Director of Security of CRS, as recommended by the Library of Congress Regulation (LCR) 2024-6, and was relegated to the opinions of the subordinate personnel security officer.

25. Some agencies are known to mischaracterize adverse employment decisions as "suitability decisions," and not as security eligibility decisions. In this case, Ms. Schroer appears both to have been technically qualified for the position and to have possessed the necessary clearance and background investigation. Nevertheless, in reviewing the documents related to this case, it is my opinion that the CRS personnel security officer, Ms. Wilkins, made her recommendation by relying entirely on policies and procedures relating to eligibility for a security clearance contained in EO 12968, the 1997 Adjudication Guidelines and the Adjudicator's Desk Reference. If it walks like a duck, it is usually a duck. In other words, Ms. Schroer was erroneously and mistakenly

withdrawn from consideration for this position at CRS due to perceived security
clearance-related issues, not due to suitability-related issues, and was not, at a minimum,
afforded any of the due process procedures required by EO 12968 where security-related
issues are at issue.

26. As pointed out above, there were other options immediately available to CRS, all of
which have precedent throughout the personnel security community, to try and resolve, at
the lowest level possible, whether or not Ms. Schroer's transgender status posed any
remote threat to security and to CRS in particular.

27. The "whole person" concept embodied in the Adjudication Guidelines, approved by the
Executive Branch and employed throughout government, including the Library of
Congress, pursuant to LCR 2024-6, does not mean just considering some behavior,
condition, or situation with which the security or hiring official or others might disagree
or think disqualifying regardless of what the policy says. Rather it imposes the burden
and responsibility of leaving one's biases or prejudices aside and seeking out and
evaluating the positive and productive conduct and achievements of a person's entire life,
especially if it involves a 25 year career of placing oneself in harms' way for her country
and, most importantly, if the issue in question was voluntarily offered during a routine
interview. Ms. Schroer's background is hardly one of a person who cannot be trusted to
safeguard classified information or be employed in a sensitive position like the ones in
which she worked her entire professional career. This "whole person" analysis was never
done since neither Ms. Wilkins nor anyone else ever bothered to verify Ms. Schroer's
clearance status or ever attempted to obtain her investigative file.

28. If Dr. Charles had discussed Ms. Schroer's transgender status with her treating physician, reviewed her medical records as well as interviewed Ms. Schroer personally, and had found nothing of security concern, the LOC could have reciprocally accepted her existing TOP SECRET clearance under prevailing reciprocity rules, and given Ms. Schroer a conditional offer of employment pending the initiation and completion of the additional background checks at OPM. If, in the unlikely event that actual, disqualifying information had been revealed by OPM, then appropriate action could have been taken to terminate her employment. In the meantime Ms. Schroer would have been able to assist the CRS in accomplishing its analytical mission regarding terrorism to the benefit of Ms. Schroer, the CRS and the country.

### Conclusion

29.   Given the fact that

a) Ms. Schroer possessed a valid, current TOP SECRET security clearance and had, over a 25-year career in the military as a commissioned officer, been trusted to access and possess sensitive, classified information;

b) the Adjudication Guidelines, promulgated pursuant to EO 12968, and the Adjudicator's Desk Reference, do not provide that transgender status, by itself, is a potentially disqualifying condition that requires a time consuming and costly investigation by OPM; and

c) a clear alternative to a lengthy investigation was available through the use of Dr. Charles' office which was not even explored or requested and which would likely have resolved any doubt or suspicion that Ms. Schroer's transgender status posed any security risk to CRS;

It is my opinion that, rather than relying on the fair and equitable procedures laid out in the security clearance policies and procedures governing federal agencies dealing with classified

information, CRS relied instead on negative and inaccurate assumptions about the significance of an individual's transsexuality when assessing Ms. Schroer's eligibility for a TOP SECRET security clearance and in doing so acted in a manner that was arbitrary and unreasonable.

30. I may wish to supplement these opinions in response to statements or issues that may arise in my area of expertise in reports by Defendant's experts, in the depositions or other testimony of Defendant's witnesses, or in documents that have not yet been produced by Defendant upon which Defendant may rely at trial.

November _9_, 2006

Peter R. Nelson

12

**Peter R. Nelson**
**28 Christopher Lane**
**Sterling, VA. 20165**
**Ofc: 703-873-6523**
**Hm: 703-430-1497**
**Cell: 703-489-7421**

A.  **Title:**  Business Development Manager, ManTech Security & Mission Assurance

B.  **Education:**

B.A. in Political Science, University of Maryland, December 1973
M.S. in Public Administration, George Washington University, February 1978
M.A. in Political Science/National Security Studies, Georgetown University, August 1982

C.  **Special Qualifications:**

More than 38 years experience as a military and civilian security professional and consultant with the Department of Defense (DoD); for the past three years employed as a Business Development Manager for a leading private sector IT and security solutions company.  Extensive knowledge and experience in all aspects of the security profession, with an emphasis in personnel security, spanning the conduct and supervision of investigations, clearance adjudication, associated automated security support systems, policy development, implementation and oversight at the Department of the Army and Office of Secretary of Defense levels.  Extensive background in participating and leading innovative security policy and systems initiatives and related research in cooperation with a wide variety of senior officials from national security and intelligence agencies.  Recognized expert and leader in the personnel security field throughout the Federal government security and intelligence community.

D.  **Specific Work/Task Experience:**

**ManTech Security & Mission Assurance, 7799 Leesburg Pike, Falls Church, VA. 22043**

Business Development Manager, National Programs Group, SMA, June 2005 to Present:

- Serve as BD focal point for a 200+ person, multi-million dollar corporate strategic business unit;
- Identify, qualify, track and pursue new business opportunities;
- Develop capture plans, manage capture/proposal efforts for designated opportunities;
- Negotiate and coordinate teaming agreements;
- Collect and analyze competitive intelligence;
- Participate in division strategic planning activities;
- Conduct business unit and company capabilities presentations

**ManTech MSM Security Services, Inc., 7515 Mission Drive, Lanham, MD.  20706**

Director of Business Development and Program Manager, June 2003- June 2005:

- Responsible for all activities concerning identification and development of new opportunities for expanding MMSM's personnel security investigative (PSI) business;
- Interfaces with all sectors of the Federal security, intelligence, and homeland security community as well as the private sector in pursuit of new PSI business opportunities;
- Reviews all Requests for Quote and Proposal pertaining to the MMSM business area and develops, prepares and coordinates company proposals in response to all such solicitations;
- Act also as the Program Manager for MMSM's Department of State and Department of Commerce contracts

**Peter Nelson Associates, Security Consulting, 28 Christopher Lane, Sterling, VA. 20165**

Sole Proprietor, August 2002 – June 2003:

- Security consultant for Northrop Grumman Corp. (Defense Personnel Security Research Center), ManTech International Corp, ManTech Aegis Research Corp., and Trusted Mission Solutions;
- Provided a variety of expert advice, assistance and research expertise to the above customers in the areas of personnel security investigations and security clearance adjudications for current and potential Federal agency customers.

**Security Directorate, Office of the Deputy Assistant Secretary of Defense (Security & Information Operations), Office of the Assistant Secretary of Defense (Command, Control, Communications and Intelligence) (OASD (C3I))**

Deputy Director for Personnel Security, 1991 to 2002

- Senior official responsible for personnel security policy in DoD;
- Develop, coordinate, implement and oversee DoD policies and procedures associated with issuance of security clearances/accesses for military, civilian and contractor personnel;
- Work directly with senior Service and DoD Component representatives as well as officials from other Federal agencies such as the NSC, CIA, FBI, DOJ, OPM and State, in the development of uniform and reciprocal personnel security policies and procedures;
- Following the Ames espionage case, participated on the EO 12968 working group which developed new Government-wide clearance procedures and policies and led the team that developed and implemented national uniform investigation standards and adjudication guidelines;
- Lead and oversee the development and implementation of DoD's migration security clearance/access database which includes the virtual consolidation of nine central adjudication facilities;
- Supervise and serve as the senior point of contact for the Defense Personnel Security Research Center (PERSEREC) on all security related research for DoD;
- Represent DoD on the Office of Management and Budget e-Clearance task force;
- Oversee the development of innovative and cost effective investigative techniques and systems such as the Automated Continuing Evaluation System, Phased Periodic Reinvestigation, and the Automated Financial Disclosure Form, among others;
- Represent C3I and DoD with the Director of Central Intelligence and Community Management Staff on all sensitive compartmented information policy/procedural issues;
- Prepare and coordinate testimony for appearances by senior DoD officials before Congressional committees;
- Prepare and coordinate written correspondence for the ASD (C3I), Deputy Secretary and Secretary of Defense on personnel security policy issues;
- Oversee the Defense Security Service personnel security investigations program and serve as the lead point of contact with OPM and their Federal Investigations Processing Center officials;
- Serve as spokesperson/point-of-contact for media inquiries (including National Public Radio) relating to all aspects of the DoD personnel security program;
- Prepared testimony for appearances by senior DoD officials before Congressional committees relating to a wide variety of personnel security related issues.

**Counterintelligence and Investigative Programs Directorate**
**Office of the Under Secretary of Defense for Policy (OUSD (P)),**

Assistant for Personnel Security, 1980 to 1991

- Responsible for the development and implementation of DoD Dir 5200.2 and the 5200.2-R, "Defense Personnel Security Program Regulation;"
- Oversaw the operation of the Defense Investigative Service investigative program;

- Provided personnel security policy, guidance and oversight to the Military Departments and DoD Components;
- Responsible for the creation of PERSEREC in 1985 in the aftermath of the Walker espionage case;
- Worked closely with the DCI/CIA staffs in development of national security policy regarding access to sensitive compartmented information;
- Developed recommendations and correspondence for senior DoD officials on a variety of personnel security program policies and procedures;
- Worked with various Congressional committees in developing security legislation following espionage incidents and other national challenges;
- Wrote testimony for appearances before Congress of senior DoD security officials.

**United States Army/Department of the Army: 1965-1980**

- Special Agent with U.S. Army Intelligence beginning in October 1965 and was honorably discharged in August 1973 as a Captain after having served overseas (Okinawa and Thailand) and in the United States in various security and intelligence capacities of increasing responsibility;
- Joined the Ballistic Missile Defense Program Office in January 1974 as a civilian assistant security manager and served there for almost two years;
- Joined the Office of the Assistant Chief of Staff for Intelligence, Department of the Army in 1975. In this assignment, I headed the Army personnel security program for almost five years before joining the OSD staff in June 1980

E.  **Awards and Honors**: 1988, Secretary of Defense Distinguished Civilian Service Award
2002, Assistant Secretary of Defense (C3I) Meritorious Civilian Service Award

F.  **Publications/Presentations:**

DoD Directive 5200.2, Defense Personnel Security Program," 1999
DoD 5200.2R, Defense Personnel Security Program Regulation, January 1987
Executive Order 12968, "Access to Classified Information," August 1995
National Investigative Standards and Adjudicative Guidelines, March 1997
"Reciprocity: A Progress Report," PERSEREC, April 2004

G.  **Security Clearance:**
DoD/DISCO TOP SECRET security clearance based on a Periodic Reinvestigation completed by OPM in January 2001. SSBI/PR in process at OPM. Continuous SCI access for more than 30 years until retirement in July 31, 2002.

Nelson Declaration – Exhibit B

MAR.31.2008   3:11PM    33333                          NO.338   P.1

## SUPPLEMENTAL REPORT OF PETER R. NELSON

### Schroer v. Billington

Peter R. Nelson
28 Christopher Lane
Sterling, VA. 20165
Phone:  703-430-1497

**Supplement to Expert Report of November 9, 2006**

1.     It is my understanding that Diane Schroer's update (SB-PR) of her previous security

background investigation, dated July 2001, was initiated by the Office of Personnel Management

(OPM) in March 2006 and completed in May 2007.  It is also my understanding that her Top

Secret security clearance was reissued by the government in July 2007.

2.      I am well qualified to comment on the issues contained in the following paragraphs based

on my more than 40 years of experience working with the Department of Defense (DoD) and

numerous other agencies in developing, implementing, and overseeing personnel security

policies and procedures for the US Government.  I have worked closely with the OPM over the

past 20 years and am well familiar with their processes and procedures, both as a senior

government official and as a contractor employee of ManTech International Corporation which

was under contract with OPM to conduct background investigations.  I also played a key role in

the development of both the national investigative standards and adjudicative guidelines that

govern access to classified information.

3.      During the years spanning approximately 2002-2007, and following the growth of

investigations as a result of 9/11, such periodic reinvestigations conducted by OPM were treated

as a low priority in comparison to initial investigations for people with no prior investigation and accordingly could take up to two years or more to be completed from the time they were first initiated. Since Ms. Schroer reinvestigation took approximately 14 months to complete, I would consider that a better than average lapse time given the overall averages across the government due to the large backlog of cases at OPM. Based on my experience, such a completion time for a reinvestigation indicates that OPM did not have to go to any extraordinary lengths to complete the case since it was well under the average for that time period and would have taken much longer if any serious or questionable issues were involved.

4.    The two months it took for the clearance to be reissued is also completely normal and well within limits for that timeframe if not quicker given the large adjudicative backlogs that were being experienced, especially after DoD transferred its investigative mission to OPM in February 2005. If there was any question that Ms. Schroer's transgender status presented an issue of significant adjudicative concern, her case would have gone into a due process status and she would have been notified in writing of any potentially disqualifying issues for resolution. These kinds of cases can take six months or more to resolve. Since it is my understanding that this did not happen in Ms. Schroer's case, I can only conclude that the government adjudicators applied the relevant adjudicative standards, as revised in their entirety in 2005, and that her continued access to classified information posed no risk to national security.

5.    While 14 months to complete a reinvestigation by OPM is still excessive given the scope and is largely attributable to non-productive activity, like sitting in a backlog/queue for action, the fact of the matter is that the issues of concern to the Congressional Research Service could

2

have been resolved in a matter of days or perhaps a week or two at most, if relevant information had been obtained promptly from both Ms. Schroer and her physician by the CRS staff medical authority or other authorized representative. While both Ms. Schroer and her physician were likely interviewed during the OPM investigation, it is clear from both the adjudication guidelines and the relatively prompt adjudicative determination that there was nothing gleaned from those interviews, or any other source for that matter, that would provide a basis for consideration of other than a favorable clearance determination.

**Additional materials reviewed for this supplemental report:**

Attached documents containing the dates referred to in my report were provided to me via e-mail by Sharon M. McGowan, counsel for Plaintiff, on March 26, 2008.

March 31, 2008

Peter R. Nelson

**Attachment to Supplemental Report of Peter Nelson**
**March 31, 2008**

## Sharon McGowan

| | |
|---|---|
| **From:** | Sharon McGowan |
| **Sent:** | Wednesday, March 26, 2008 9:40 AM |
| **To:** | 'petenelson@████████' |
| **Subject:** | attached image |
| **Attachments:** | 1352_001.pdf |

Hi Pete --

Attached are documents that lay out the dates as we understand them:

Diane's prior clearance review: 07/2001 (see page 1)
Diane's form certified / OPM file opens: 03/02/06 (see page 1 footer, and page 2)
Last investigation date for SBPR: 05/17/07 (see page 3)
Eligibility date: 07/30/07 (see page 3)

All the best,
Sharon

Sharon M. McGowan
Staff Attorney, ACLU Foundation
Lesbian, Gay, Bisexual Transgender Project
212-549-2593
smcgowan@aclu.org

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

3/31/2008

Date of Action ( Do Not Know: { } )
    Month/Year: <u>07/2001</u>

Agency Code ( Do Not Know: { } )
    Defense Department: { x }
    State Department: { }
    Office of Personnel Management: { }
    FBI: { }
    Treasury Department: { }
    Other: { }

Other Agency:

Clearance Code ( Do Not Know: { } )
    Not Required: { }
    Confidential: { }
    Secret: { }
    Top Secret: { }
    Sensitive Compartmented Information: { x }
    Q: { }
    L: { }
    Other: { }

*(End of List)*

Answer the following question.

b. To your knowledge, have you ever had a clearance or access authorization denied, suspended, or revoked, or have you ever been debarred from government employment? (An administrative downgrade or termination of a security clearance is not a revocation.)
    Yes: { } No: { x }

If you answered "Yes," provide the requested information below.

*(No Entry Provided)*

## Section 27: Your Financial Record

Answer the following questions.

a. In the last 7 years, have you filed a petition under any chapter of the bankruptcy code (to include Chapter 13)?
    Yes: { } No: { x }

b. In the last 7 years, have you had your wages garnished or had any property repossessed for any reason?
    Yes: { } No: { x }

c. In the last 7 years, have you had a lien placed against your property for failing to pay taxes or other

**From:** Diane Schroer [mailto:▓▓▓▓▓▓▓▓▓▓▓]
**Sent:** Wednesday, February 20, 2008 2:51 PM
**To:** Sharon McGowan
**Subject:** Re: WHOOO HOOO!! Re: quick questions

Security Clearance Periodic Review - This is the note from the last Security Officer...so it really took them 3/20/06 to 7/30/07...16 months...which is actually record time considering the backlog.

**Diane,**
**Your SBPR opened on 3/20/06 at OPM. FYI, PRs are always lowest priority on the clearance totem pole. You probably won't be contacted by an investigator for another month or two.**
**Ricky**
**Richard White**
**Security Supervisor/FSO**
**CACI Premier Technology, Inc.**
**Office: ▓▓▓▓▓▓▓▓ | Fax:▓▓▓▓▓▓▓▓**

Kimberly Crew <████████@████████>
toDiane Schroer <████████123@████████>,
dateWed, Feb 20, 2008 at 10:50 AM
subjectRe: Status of Security Clearance Periodic Update

Completed and final last year.
Thanks,
Kimberly Crew
CACI
Security Supervisor/FSO
Office ██████████
Fax (███████████8
Cell ██████████

"Diane Schroer" <████████123@████████>
02/20/2008 09:40 AM
To"Kimberly Crew" <████████@████████>
SubjectRe: Status of Security Clearance Periodic Update

So that means it was completed and finalized last year or is it still in review?

On Wed, Feb 20, 2008 at 9:35 AM, Kimberly Crew <k████████@████████> wrote:

Diane,
Your last investigation date for SBPR was 5/17/07 and the eligibility date was 7/30/07 for your TS.
Thanks,
Kimberly Crew
CACI
Security Supervisor/FSO
Office (███████████
Fax (███████████
Cell ██████████

"Diane Schroer" <████████123@████████>
02/19/2008 12:24 PM
█████@caci.com
SubjectStatus of Security Clearnace Periodic Update

Ms. Crew;
  I am Diane Schroer, a sub-contractor working on the Coast Guard CT Contract for Mike Kichman. I was wondering if you might be able to give me an update on my clearance Periodic Review which was initiated by Ricky White quite some time ago. It was working, but I haven't heard anything recently.
Thanks,
Diane

10854

**Sharon McGowan**

| | |
|---|---|
| **From:** | Sharon McGowan |
| **Sent:** | Wednesday, March 26, 2008 1:05 PM |
| **To:** | 'petenelson@▊▊▊▊▊▊' |
| **Subject:** | one other item |
| **Attachments:** | 1354_001.pdf |

Here is the e-mail exchange between Diane and her security clearance officer at CACI.

Sharon M. McGowan
Staff Attorney, ACLU Foundation
Lesbian, Gay, Bisexual Transgender Project
212-549-2593
smcgowan@aclu.org

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

From: **Richard White** <████████@████████>
Date: May 30, 2006 12:34 PM
Subject: Re: Security Clearance Update - Review SF86
To: Diane Schroer <████████████@██████████>

**Correct.  Your clearance stay in effect.**

"Diane Schroer" <████████████████>            To "Richard White" <████████@████████>
                                              cc
05/25/2006 03:31 PM                           Subject Re: Security Clearance Update - Review SF86

Thanks Ricky...I understand and appreciate the update.  While they are working through
the PR, the clearance stays in effect...correct?
Diane

On 5/25/06, **Richard White** <████████@████████> wrote:

Diane,
Your SBPR opened on 3/20/06 at OPM.  FYI, PRs are always lowest priority on the clearance totem pole.
You probably won't be contacted by an investigator for another month or two.

Ricky

Richard White
Security Supervisor/FSO
CACI Premier Technology, Inc.
Office: ████████████ | Fax: ████████████
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

"Diane Schroer" <████████████████>            To "Richard White" <████████████████
                                              cc
05/25/2006 01:37 PM                           Subject Re: Security Clearance Update - Review SF86

Ricky:

I was just wondering if we had heard anything on my clearance renewal.  I also wanted to check and make certain everyone had my new address put into the system:

Diane J. Schroer



███████████ (Cell - same)
███████████ (Home - new)

Thanks,
Diane

On 3/13/06, **Richard White** < ████████@███████ > wrote:

Received.  Thanks.

Ricky White
Security Supervisor/FSO
CACI Premier Technology, Inc.
Office: ███████████ | Fax: ███████████8
*************************************************