IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DIANE J. SCHROER,<br><br>  Plaintiff,<br><br>v.<br><br>JAMES H. BILLINGTON,<br>  Librarian of Congress,<br><br>  Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 05-cv-1090 (JR) |

## DECLARATION OF MARTHA L. HARRIS

Pursuant to 28 U.S.C. § 1746, I, Martha L. Harris, declare as follows:

1.      I am a licensed as a Clinical Social Worker by the Commonwealth of Virginia, and am the founder of Banyan Counseling Center.

2.      I have been retained by Plaintiff to offer expert testimony in support of her claims and in opposition to Defendant's defenses.

3.      Attached as Exhibit A is a true and correct copy of the expert report, dated September 15, 2006, that I prepared in connection with this case.

4.      If called to testify at trial, I would testify in accordance with the statements in the attached report.


I declare under penalty of perjury that the foregoing is true and correct.

Dated:  June 13, 2008.

_Martha L. Harris_
Martha L. Harris

Harris Declaration – Exhibit A

## EXPERT REPORT OF MARTHA L. HARRIS, LCSW

### Schroer v. Billington

Martha L. Harris, LCSW
Banyan Counseling Center, Inc.
2820 School Street
Alexandria, VA 22303
Phone: (703) 717-0999

### Qualifications and Background

1.    I am the Founder of Banyan Counseling Center, and have almost

exclusively served the mental health needs of the transgender community

since opening my practice in 1995.

2.    I received my Bachelor of Science, With Distinction, Social Work degree

from George Mason University (GMU) in Fairfax, Virginia, in 1987, and

received my Masters in Social Work at The Catholic University of

America (CUA), in Washington, D.C., in 1989.  At the time, CUA was

considered one of the top three social work programs in the country.

3.    I was licensed by the Board of Social Work to practice as a Clinical Social

Worker in the Commonwealth of Virginia on February 9, 1993.  In order

to keep that license current, I have to fulfill a specified number of

Continuing Education Units (CEUs), which I have consistently

maintained.  I have also given numerous presentations regarding gender

identity issues, which have been approved by the appropriate licensing

entities for purposes of attendees earning CEUs.

4.    After graduating from college, from October 1989 until June 1990, I

worked as the Clinical Coordinator of the Barney Neighborhood House

(BNH) Psychosocial Day Program, in Washington D.C. In June 1990, I was promoted to Director of that program. While at BNH, I worked with individuals who were experiencing chronic mental illness, such as schizophrenia, dissociative identity disorder, bipolar disorder, and various other depression and anxiety disorders.

5.    After leaving BNH in April 1992, I was employed by the Visiting Nurse Association of Northern Virginia (VNA), where I eventually helped start the hospice program, VNA Community Hospice (VNACH) for that organization. As the only clinical social worker on staff, I was responsible for evaluating the mental health needs of the dying patients and their families; I was involved in assessing potential negative mental health concerns for the patients and their families; and I was the Bereavement Coordinator.

6.    I left the VNACH in October 1995, and began my private practice, Banyan Counseling Center, Inc. (BCCI) in Alexandria, Virginia, with an intended focus of serving the mental health needs of the transgender community.

7.    Throughout the years prior to founding BCCI, I had been in constant discussions with E. Russell Lynn, Jr., LCSW, who served as my mentor in issues regarding gender variance and transsexuality. I had always had an interest in gender variance, and had wanted to pursue an education in that field while at CUA. However, gender variance was not a subject that social work programs were addressing at that time. As a result, I

2

depended on my mentor in order to learn about gender variance.  Mr.

Lynn had been working in the gender field since approximately 1985.

8.    As part of my learning process, I regularly attended the local support

group for transgender people, the Mid-Atlantic Gender Identity

Connection (MAGIC).  While there, I learned a great deal about the

psychosocial issues related to the family, the workplace and the friend

relationships of transgender people.

9.    Since beginning my practice in 1995, I have worked with approximately

352 clients presenting gender identity-related issues, including related

security clearance issues.  As discussed in greater detail below, I assist

clients through gender transition by following the Standards of Care

(SOC) set forth by the Harry Benjamin International Gender Dysphoria

Association (HBIGDA).

10.   I have been a guest lecturer for the social work programs for GMU and at

Virginia Commonwealth University (VCU), in their Human Behavior in

the Social Environment curricula.  My lectures address gender identity and

the life cycle of a transsexual.

11.   My work also entails a great deal of community education and outreach,

since many of my clients are working toward transitioning while

employed.  I am a frequent invited speaker on gender identity issues

throughout the DC metropolitan area for corporations which have

employees who are transitioning such as America OnLine and KPMG,

together with various government agencies such as the DC Parole Board

3

and the Department of Agriculture who were dealing with employees in transition..

12.    I have been a member of the National Association of Social Workers (NASW) since 1989.  From 1997-1999, I was selected to evaluate and grade the results of the Diplomate Social Work exam, the highest level of licensing a social worker can attain.

13.    I have also been a member of the DC and Virginia Chapters of NASW (NASW-DC and NASW-VA) since 1989.  During my time as a member of the NASW-VA, I have been asked to present at Virginia chapter meetings regarding gender issues.  I also have served as a clinical resource for the NASW-VA in helping other Virginia-based social workers work with their clients who have gender identity-related issues.

14.    Since 1995, I have been a member of the International Federation for Gender Education, which is a national education outreach program regarding transgender issues.   I am also a member of HBIGDA, the organization which sets the standard for the treatment of people who deal with gender variance.

15.    I am a contributing author for the book *Trans Forming Families: Real Stories About Transgendered Loved Ones* (February 2003).  The chapter I authored was entitled Issues for Transgenders in Therapy.  I am also a co-author of a publication titled *New Models for Ministry: Serious Mental Illness and the Faith Community* (May 1989), together with Diane Engster, Esq., and Paul Dornan.

4

16.   More detailed information about my background and experience may be found in my Curriculum Vitae, a copy of which is attached as Exhibit A to this report. Exhibit A also includes a list of my publications.

17.   I am receiving reimbursement for my services for Ms. Schroer at a rate of $200 per hour for testimony by deposition or at trial, and a rate of $75 per hour for record review, report preparation and other non-testifying services.

18.   I have not prepared an expert report or been called to testify in connection with any other litigation within the past four years.

## Summary of Opinions

19.   In this litigation, I have been asked to render opinions about the gender identity of Diane J. Schroer, her course of treatment for gender identity-related issues, her transition to life as a fully-accepted, well-integrated woman, and her overall mental health.

20.   In forming my opinions, I relied on (a) my clinical notes from the sessions I had with Ms. Schroer (Exhibit B), (b) the HBIGDA SOC, (c) the relevant sections of the Diagnostics and Statistics Manual IV-Revised (DSM IV-R), (d) my research and clinical experience in working with gender variant people and with individuals who present with serious non-gender related mental health illness, and (e) my knowledge of the literature in the pertinent fields.

21.     I have also reviewed the Complaint in this case, and the Decision and
        Order issued by the Court on March 31, 2006. Since I had never prepared
        an expert report, I also reviewed a report prepared by an expert in another
        case on an unrelated subject to get a sense of what an expert report should
        look like. These materials were provided to me by Ms. Schroer's attorney,
        Sharon McGowan, Esq.

22.     Based on my review of the foregoing, and for the reasons set forth in more
        detail below, my opinions include the following:

        a.  Diane J. Schroer has a female gender identity and is a woman.

        b.  I have evaluated Diane J. Schroer for a diagnosis of Gender Identity
            Disorder (DSM IV-R Diagnosis 302.85) (GID). She is currently under
            my care consistent with the HBIGDA SOC, and I am helping her learn
            to live her life as the woman she was meant to be.

        c.  Diane J. Schroer does not express any clinically disabling
            psychological problems. For example, she does not have
            schizophrenia; she does not have dissociative identity disorder; she
            does not have severe debilitating depression or anxiety.

        d.  Based on my experience with other transsexual clients who required
            the highest level of security clearances for their jobs, and having been
            interviewed as part of the security clearance reviews for these clients, I
            have no reason to believe that an individual like Ms. Schroer who is
            undergoing a gender transition and does not have any impairing

6

psychological conditions, would lose her security clearance status, or

have her status negatively affected, as a result of her gender transition.

e.  Based on my observations of her demeanor, Ms. Schroer's ability to

mentally focus has not been at all hindered by her gender transition.

### Clinical Bases for Opinions

23.  

24.  At that time, my assessment was that Ms. Schroer met the criteria for a

diagnosis of GID (DSM IV-R, 302.85) which is the clinical diagnosis for a

person who experiences feeling uncomfortable in the birth gender.  I then

explained to her that I followed the HBIGDA SOC, and that if she met all

7

of the criteria, I would be able to assist her in obtaining hormone therapy, and eventual sex reassignment surgery.

25. The protocol for clinicians who are presented with these issues are the HBIGDA SOC. The SOC, by definition, are the ethical guidelines for therapists who are working with gender-variant people. The SOC provide the protocol for gender-variant people to follow, together with their therapists, to address their gender dissonance. The process begins with intensive weekly therapy sessions over a three-month initial evaluation period, commonly ending with a referral for hormone therapy. The next stage is the Real-Life Test (RLT) phase, in which the client begins the process of living his or her life in the desired sex role. For some clients, during or after completion of the RLT, a client may pursue facial feminization and breast augmentation surgeries (for male-to-female clients), breast reduction (for female-to-male clients), and/or sex reassignment surgery (SRS). A copy of the HBIGDA SOC is attached to this Report as Exhibit C.

26. In Ms. Schroer's case, by following the SOC, my goal was to continually assess her female feelings and expression. By doing so, I could be assured that my initial diagnosis would be confirmed or denied. Also, I felt that following the counseling requirements of the SOC would assist Ms. Schroer in making the healthiest decisions for herself in her transition.

27. A diagnosis of GID begins with a life assessment. Often people with gender identity issues have expressed cross-gender ideation from an early

8

childhood. Additionally, people with gender identity issues need to express the sexual identity they feel inside, and their attempts at expressing that identity has caused them stress throughout their lives.

28.



29. Part of the process of diagnosing GID is determining whether there are other mitigating factors that might be triggering gender identity issues. For example, gender dysphoria can be a result of early childhood sexual abuse and other psychological issues which may have a client pursuing a feminine persona to avoid other problems in her life. Consequently, I directed my conversations with Ms. Schroer in such as way as to rule out the above factors and other serious mental health issues such as Dissociative Identity Disorder to make certain that her female feelings were mentally intact and a part of her well-integrated personality.

30. ██████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████
████████████ As a result, I can and do conclude that Ms. Schroer can handle stressful work situations and her female identity would not negatively affect any future work situation.

10

31. During the first three months of my evaluation period with Ms. Schroer, I felt that it was important for her to continue to develop her relationship with a mentor who had undergone gender transition and to build other contacts within the local transgender community for support. Accordingly, I referred Ms. Schroer to a local support group for people who are dealing with gender issues, the Mid-Atlantic Gender Identity Connection (MAGIC). MAGIC provided initial support for her as she was learning about some of the social issues for people seeking a gender change. She made friends in that group and, eventually, those friends became a major support for her.

32. As a result of my work with Ms. Schroer and evaluating her life experiences during this initial three-month evaluation period, I got a concrete sense of her integrity and honesty, her straight-forward nature, and her ability to handle high-stress situations. All of these factors led me to conclude that Ms. Schroer was on a healthy path in her life and that she could handle the massive changes that she was facing in connection with her gender transition.

33. ███████████████████████████
███████████████████████████████
██████████████████████████████
████████████████████████████████
███████████████████████████████
███████████████████████████

11



34.

35. ███████████████████████████████████████

███████████████████████████████ she was ready officially to

begin the Real-Life-Test (RLT) portion of the transition process. The

purpose of the RLT is to allow people actually to live in the gender role

that they have been seeking all of their lives. The RLT can cause a myriad

of emotional feelings, including deep, inner happiness, distress about not

being seen a fully female (for male-to-female clients) by others in society,

and deep levels of comfort. Because of society's judgments about gender,

it can be very difficult for a person to feel confident about his or her new

role.

36. When clients transition, they often experience economic consequences

associated with the fact that men and women are not necessarily treated

equally in the workplace. For example, I have had female-to-male clients

tell me that they have received payroll increases after transitioning to

male, and male-to-female clients who have experienced a loss in pay after

transitioning to female. The experience of placing oneself out in the world

in a new gender can cause discrimination, and it is important during the

RLT that clients work through the feelings associated with that

discrimination.

37. █████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

13





38.

39.

████████████████████████████████

████████████████████████

40.    I have continued to meet with Ms. Schroer on a monthly basis, consistent

with the HBIGDA SOC, to provide support and assess her overall mental

health as she meets the demands of her job and continues to live her life as

a woman in the world.  During these sessions, in addition to discussing her

gender identity issues, we have discussed ████████████

████████████████████████████████

████████████████████████████████

████████████    Throughout these discussions, Ms. Schroer showed an

ability to cope by accepting the fact that not all people are going to

understand her need to transition.  Ms. Schroer has a clever way of coping

by using humor to alleviate stress.  Her humor is not used in a negative

way, but as a way of releasing tension she holds inside.  Being able to see

the humorous side of life is a skill she has honed even in the midst of

feeling deep rejection by some of those who do not understand her life

issues.

41.    As someone who has assisted many clients through the gender transition

process, I have been struck by Ms. Schroer's thoughtfulness and

sensitivity to others, particularly with respect to how she tells people about

her gender change.  She has seriously thought through every situation

imaginable in an attempt to be prepared for each conversation about the

subject.  For instance, the issue of telling family members about the

concept that their brother is now a sister could have been very difficult if Ms. Schroer had not taken time to think through and plan how she was going to relay that information to them.

42.    At the time Ms. Schroer applied for the job at the Library of Congress, she did not have any stressors which would have hindered her from working at her highest level of performance. Based on our therapy sessions, I did not note anything in her life that would indicate that she could not handle the job for which she was applying. She was beginning to experience and looking forward to a healthy personal and professional life as a female.

43.    In the course of my practice, I have had 16 clients who are or were undergoing the process of gender transition while they were being reviewed for high security clearances. As their treating therapist, I was interviewed as a part of their security clearance process. Based on my follow-up discussions with these clients, I learned that none of these clients lost their clearance status or had their clearances negatively affected due to their transgender concerns. There is nothing about Ms. Schroer's case which would lead me to think she would or should be treated differently from them ███████████████████████████

44.    From a clinical perspective, an individual's gender identity is the guiding force behind one's sex and should be given greater weight than her bodily appearance. For this reasons, the SOC acknowledge that, for many clients, SRS is an appropriate step to bring their body into alignment with their brain sex.

45.   Ms. Schroer has demonstrated her commitment to the process of gender transition by staying committed to the therapy process and heeding my advice as a clinician. When Ms. Schroer has finished the RLT portion of her care, I will assist her in the process of obtaining SRS. The process for doing so includes two steps. First, I will refer her to a psychiatrist or a psychologist who will reevaluate Ms. Schroer's appropriateness for SRS. If that clinician's assessment confirms my diagnosis, then we will each write a letter referring Ms. Schroer to a surgeon who is qualified to perform SRS. In my experience, clients take two to four weeks to recover from SRS.

## Conclusions

46.   In my professional opinion and based on my training and expertise, Ms. Schroer does, in fact, have a diagnosis of Gender Identity Disorder and is a woman.

47.   In my professional opinion and based on my training and expertise, Ms. Schroer is a mentally healthy, emotionally stable woman who is addressing a very difficult psychosocial, emotional and physical problem in her life with maturity and stable mental health. By addressing the issue of her gender variance with integrity and honesty, she is finding a deeper level of peace in her life. She does not feel the internal struggle of seeing herself as a person the world sees as someone else. As a result, she is even more focused in her work and daily life. She had learned how to function

in her male identity, but her ability to focus has become more natural as she has continued to express her female identity. Life for her is more natural and much easier because she is not struggling internally with trying to fit into a socially acceptable male persona which she did not feel was a genuine expression of herself. She has become even more productive at work and at home. She continues to work in the intelligence field and finds wide acceptance throughout.

48.    In my professional opinion and based on my training and expertise, Ms. Schroer's desire to transition is a product of her personal integrity. Living as she did for many years as a man felt dishonest to her and that fact caused major distress in her psyche prior to beginning the gender transition process. Ms. Schroer had reached a point of no return with respect to her need to live as a woman when she first met with me. She was not desperate; rather, she was ready to take on the task of defining her life the way she needed to in order to feel whole as a person. She knew that in order to get her internal integrity back, she needed to follow through with discovering who she really was – a strong, confidant woman. Ms. Schroer's life experience molded her intellect and ideals, but through this process, she realized that she did not have to give up her life experience, including her intellect and ideals, to live as a woman.

49.    In my professional opinion and based on my training and expertise, it is my opinion that there is no reason why Ms. Schroer would have been unable to satisfy the demands of the position with the Library of Congress

19

either because of her gender identity or due to any mental health reason or concern.

50.    I may wish to supplement these opinions in response to statements or issues that may arise in my area of expertise by Defendant's expert witnesses, through their expert reports or in their depositions or other testimony.

September 15, 2006

Martha L. Harris, LCSW

- 20 -

# Exhibit A

# CURRICULUM VITAE

Martha L. Harris, LCSW
2820 School Street
Alexandria, VA  22303
BanyanCounseling@aol.com

Virginia License No. 0904-002248
Home Phone:  (703) 721-0086
Work Phone:  (703) 717-0999
www.BanyanCounselingCenter.com

## EDUCATIONAL BACKGROUND

Masters in Social Work, 1989
BS in Social Work, 1987

Catholic University of America, Washington, DC
George Mason University, Fairfax, VA,  Graduated
     With Distinction

AA in Administration, 1974

Lake Superior State Univ., Sault Ste. Marie, MI

## PUBLICATIONS

*Trans Forming Families: Real Stories About Transgendered Loved Ones*, Contributing author,
Library of Congress No 98-89891, February 2003

*New Models for Ministry:  Serious Mental Illness and the Faith Community*, May 1989.  Co-authored
with Diane Engster, Esq. and Paul Dornan.

## PRESENTATIONS

"What is Transsexuality?", Psychotherapy Networker National Conference, Washington, DC, March
2001

"What is Transsexuality?", National Association of Social Workers, 2000 National Convention,
Baltimore, Maryland

"Working With The Transsexual Client," National Association of Social Workers, Virginia Chapter,
Year 2000 Conference, Charlottesville, Virginia, March 2000

Guest Lecturer, "What are Transsexuals and How Can We Help Them?" Human Behavior in the Social
Environment Classes for Virginia Commonwealth University, 1996 - 1999

"Working With The Transsexual Client," Lambda Center, Psychiatric Institute of Washington,
Washington, DC, Summer 1999.

"Understanding Transsexuality and How the Faith Community Can Minister to Them," Metropolitan
Community Church, Washington, DC, Spring 1998

PRESENTATIONS (continued)

"Understanding the Mental Health Concerns of the Transsexual Client," Department of Human Services, Montgomery County, Maryland, October 1998

"Coping With a Family Member Who Has Parkinson's Disease," McLean, Virginia, 1995

## PROFESSIONAL EXPERIENCE

Banyan Counseling Center, Inc., 2820 School Street, Alexandria, VA. President/Founder, Clinician in private practice; Certified Hypnotherapist and Certified Thought Field Therapist, October 1995 — Present

National Association of Social Workers, Evaluator, Diplomat examination, 1997-1999

Whitman-Walker Clinic, 1407 S Street, NW, Washington, DC.  Contract service provider of therapy groups,  May 1996 - 2001.

VNA Community Hospice, 2775 S. Quincy Street, Arlington, VA
Clinical Social Worker, October 1992 - October  1995
Bereavement Coordinator, October 1992 - June 1995

Visiting Nurse Association of Northern Virginia, 2775 S. Quincy Street, Arlington, VA
Home Care Social Worker, April 1992 - October 1992

Barney Neighborhood House, 3118 16th Street, NW, Washington, DC
Director, Psychosocial Day Program, June 1990 - April 1992
Clinical Coordinator, Psychosocial Day Program, October 1989 - June 1990

National Institutes of Health, National Center for Nursing Research, Washington, DC
Researcher, January 1990 - April 1993

New York Avenue Presbyterian Church, 1313 New York Avenue, NW, Washington, DC
Researcher, July 1987 - May 1989

Lutheran Social Services--National Capital Area, Inc., 7401 Leesburg Pike, Falls Church, VA
Casework Assistant,  Adoptions/Foster Care Program, July 1987 - May 1989

Pathway Homes, Inc., 2810 Dorr Avenue, Fairfax, Virginia
Mental Health Counselor I, February 1985 - December 1987

Alternative House, 2009 Gallows Road, Vienna, Virginia
Staff Relief Counselor, February 1985 - August 1986

Quinn Chartered, 1730 K Street, NW, Washington, DC
Office Manager, October 1982 – July 1984

Ringling Bros.-Barnum & Bailey Combined Shows, Inc., Fairfax, VA
Administrative Assistant, August 1977 - July 1982

General Accounting Office, 441 G Street, NW, Washington, DC
Head, Audit Site Administration, June 1974 - August 1977

**RELATED JOB RESPONSIBILITIES**

-- Evaluation of and counseling for adjustment to life changes
-- Coping with long-term illness, loss of control, and death and dying concerns
-- Counseling in bereavement
-- Counseling in sexual identity/orientation issues
-- Provide educational outreach regarding sexual identity issues
-- Weight loss and smoking cessation through use of hypnotherapy and Thought Field Therapy
-- Program planning and development
-- Recruitment, training, and supervision of a staff of eight and five consultants
-- Budget development and management
-- Contract negotiation and management
-- Individual and group work; casework services
-- Supervise implementation of individual treatment plans
-- Liaison with community health/mental health system
-- Public relations; community education including presentations to the general public and
   professional organizations
-- Community outreach
-- Evaluating compliance with State and Federal standards for licensure
-- Fund-raising
-- Statistical reporting
-- Grant writing and management
-- Conducting home studies for adoption program and monitoring foster homes
-- Develop and supervise implementation of office-wide record system in accordance with
   Commonwealth of Virginia licensing laws and reporting requirements

**VOLUNTEER EXPERIENCE**

| | |
|---|---|
| 1996 - Present | Member, Arlington Gay and Lesbian Association |
| 1996 - 1998 | Member, Board of Directors, McClendon Center |
| 1996 - 1997 | Support Group Leader, Mautner Project for Lesbians with Cancer |
| 1996 - 1998 | Member, Board of Directors, New York Avenue Foundation |
| 1995 - Present | Member, International Federation for Gender Education |
| 1992 - 1996 | Unlimited Praise! singing ensemble |
| 1988 - 1990 | Support Group Leader: Whitman-Walker Clinic, Washington, DC |
| 1981 - 1984 | Support Group Leader: National Multiple Sclerosis Society, Washington, DC |
| 1974 - 1984 | Family Retreat Leader: New York Avenue Presbyterian Church, Washington, DC |
| 1974 - 1981 | Youth Counselor/Tutor: Community Club, Washington, DC |

**PROFESSIONAL AFFILIATIONS**

Harry Benjamin International Gender Dysphoria Association, 1995 - Present
National Association of Social Workers, 1985 - Present
International Federation for Gender Education, 1995 - Present
International Association for Near Death Studies, 1992 - Present

Harris Report Exhibit B – Filed Under Seal

# Exhibit C

# The Harry Benjamin International Gender Dysphoria Association's Standards Of Care For Gender Identity Disorders, Sixth Version

**February, 2001**

Committee Members: Walter Meyer III M.D. (Chairperson), Walter O. Bockting Ph.D., Peggy Cohen-Kettenis Ph.D., Eli Coleman Ph.D., Domenico DiCeglie M.D., Holly Devor Ph.D., Louis Gooren M.D., Ph.D., J. Joris Hage M.D., Sheila Kirk M.D., Bram Kuiper Ph.D., Donald Laub M.D., Anne Lawrence M.D., Yvon Menard M.D., Stan Monstrey M.D., Jude Patton PA-C, Leah Schaefer Ed.D., Alice Webb D.H.S., Connie Christine Wheeler Ph.D.

This is the sixth version of the Standards of Care since the original 1979 document. Previous revisions were in 1980, 1981, 1990, and 1998.

## Table of Contents:

- I.     Introductory Concepts (p. 1)
- II.    Epidemiological Considerations (p. 2)
- III.   Diagnostic Nomenclature (p. 3)
- IV.    The Mental Health Professional (p. 6)
- V.     Assessment and Treatment of Children and Adolescents (p. 8)
- VI.    Psychotherapy with Adults (p. 11)
- VII.   Requirements for Hormone Therapy for Adults (p. 13)
- VIII.  Effects of Hormone Therapy in Adults (p. 14)
- IX.    The Real-life Experience (p. 17)
- X.     Surgery (p. 18)
- XI.    Breast Surgery (p. 19)
- XII.   Genital Surgery (p. 20)
- XIII.  Post-Transition Follow-up (p. 22)

## I. Introductory Concepts

**The Purpose of the Standards of Care.** The major purpose of the Standards of Care (SOC) is to articulate this international organization's professional consensus about the psychiatric, psychological, medical, and surgical management of gender identity disorders. Professionals may use this document to understand the parameters within which they may offer assistance to those with these conditions. Persons with gender identity disorders, their families, and social institutions may use the SOC to understand the current thinking of professionals. All readers should be aware of the limitations of knowledge in this area and of the hope that some of the clinical uncertainties will be resolved in the future through scientific investigation.

**The Overarching Treatment Goal.** The general goal of psychotherapeutic, endocrine, or surgical therapy for persons with gender identity disorders is lasting personal comfort with the gendered self in order to maximize overall psychological well-being and self-fulfillment.

**The Standards of Care Are Clinical Guidelines.** The SOC are intended to provide flexible directions for the treatment of persons with gender identity disorders. When eligibility

1

requirements are stated they are meant to be minimum requirements. Individual professionals and organized programs may modify them. Clinical departures from these guidelines may come about because of a patient's unique anatomic, social, or psychological situation, an experienced professional's evolving method of handling a common situation, or a research protocol. These departures should be recognized as such, explained to the patient, and documented both for legal protection and so that the short and long term results can be retrieved to help the field to evolve.

**The Clinical Threshold.** A clinical threshold is passed when concerns, uncertainties, and questions about gender identity persist during a person's development, become so intense as to seem to be the most important aspect of a person's life, or prevent the establishment of a relatively unconflicted gender identity. The person's struggles are then variously informally referred to as a gender identity problem, gender dysphoria, a gender problem, a gender concern, gender distress, gender conflict, or transsexualism. Such struggles are known to occur from the preschool years to old age and have many alternate forms. These reflect various degrees of personal dissatisfaction with sexual identity, sex and gender demarcating body characteristics, gender roles, gender identity, and the perceptions of others. When dissatisfied individuals meet specified criteria in one of two official nomenclatures--the International Classification of Diseases-10 (ICD-10) or the Diagnostic and Statistical Manual of Mental Disorders--Fourth Edition (DSM-IV)--they are formally designated as suffering from a gender identity disorder (GID). Some persons with GID exceed another threshold--they persistently possess a wish for surgical transformation of their bodies.

**Two Primary Populations with GID Exist -- Biological Males and Biological Females.** The sex of a patient always is a significant factor in the management of GID. Clinicians need to separately consider the biologic, social, psychological, and economic dilemmas of each sex. All patients, however, should follow the SOC.

## II. Epidemiological Considerations

**Prevalence.** When the gender identity disorders first came to professional attention, clinical perspectives were largely focused on how to identify candidates for sex reassignment surgery. As the field matured, professionals recognized that some persons with bona fide gender identity disorders neither desired nor were candidates for sex reassignment surgery. The earliest estimates of prevalence for transsexualism in adults were 1 in 37,000 males and 1 in 107,000 females. The most recent prevalence information from the Netherlands for the transsexual end of the gender identity disorder spectrum is 1 in 11,900 males and 1 in 30,400 females. Four observations, not yet firmly supported by systematic study, increase the likelihood of an even higher prevalence: 1) unrecognized gender problems are occasionally diagnosed when patients are seen with anxiety, depression, bipolar disorder, conduct disorder, substance abuse, dissociative identity disorders, borderline personality disorder, other sexual disorders and intersexed conditions; 2) some nonpatient male transvestites, female impersonators, transgender people, and male and female homosexuals may have a form of gender identity disorder; 3) the intensity of some persons' gender identity disorders fluctuates below and above a clinical threshold; 4) gender variance among female-bodied individuals tends to be relatively invisible to the culture, particularly to mental health professionals and scientists.

2

**Natural History of Gender Identity Disorders.** Ideally, prospective data about the natural history of gender identity struggles would inform all treatment decisions. These are lacking, except for the demonstration that, without therapy, most boys and girls with gender identity disorders outgrow their wish to change sex and gender. After the diagnosis of GID is made the therapeutic approach usually includes three elements or phases (sometimes labeled triadic therapy): a real-life experience in the desired role, hormones of the desired gender, and surgery to change the genitalia and other sex characteristics. Five less firmly scientifically established observations prevent clinicians from prescribing the triadic therapy based on diagnosis alone: 1) some carefully diagnosed persons spontaneously change their aspirations; 2) others make more comfortable accommodations to their gender identities without medical interventions; 3) others give up their wish to follow the triadic sequence during psychotherapy; 4) some gender identity clinics have an unexplained high drop out rate; and 5) the percentage of persons who are not benefited from the triadic therapy varies significantly from study to study. Many persons with GID will desire all three elements of triadic therapy. Typically, triadic therapy takes place in the order of hormones = = > real-life experience = = > surgery, or sometimes: real-life experience = = > hormones = = > surgery. For some biologic females, the preferred sequence may be hormones = = > breast surgery = = > real-life experience. However, the diagnosis of GID invites the consideration of a variety of therapeutic options, only one of which is the complete therapeutic triad. Clinicians have increasingly become aware that not all persons with gender identity disorders need or want all three elements of triadic therapy.

**Cultural Differences in Gender Identity Variance throughout the World.** Even if epidemiological studies established that a similar base rate of gender identity disorders existed all over the world, it is likely that cultural differences from one country to another would alter the behavioral expressions of these conditions. Moreover, access to treatment, cost of treatment, the therapies offered and the social attitudes towards gender variant people and the professionals who deliver care differ broadly from place to place. While in most countries, crossing gender boundaries usually generates moral censure rather than compassion, there are striking examples in certain cultures of cross-gendered behaviors (e.g., in spiritual leaders) that are not stigmatized.

## III. Diagnostic Nomenclature

**The Five Elements of Clinical Work.** Professional involvement with patients with gender identity disorders involves any of the following: diagnostic assessment, psychotherapy, real-life experience, hormone therapy, and surgical therapy. This section provides a background on diagnostic assessment.

**The Development of a Nomenclature.** The term *transexxual* emerged into professional and public usage in the 1950s as a means of designating a person who aspired to or actually lived in the anatomically contrary gender role, whether or not hormones had been administered or surgery had been performed. During the 1960s and 1970s, clinicians used the term *true transsexual*. The true transsexual was thought to be a person with a characteristic path of atypical gender identity development that predicted an improved life from a treatment sequence that culminated in genital surgery. True transsexuals were thought to have: 1) cross-gender identifications that were consistently expressed behaviorally in childhood, adolescence, and

3

adulthood; 2) minimal or no sexual arousal to cross-dressing; and 3) no heterosexual interest, relative to their anatomic sex. True transsexuals could be of either sex. True transsexual males were distinguished from males who arrived at the desire to change sex and gender via a reasonably masculine behavioral developmental pathway. Belief in the true transsexual concept for males dissipated when it was realized that such patients were rarely encountered, and thatsome of the original true transsexuals had falsified their histories to make their stories match the earliest theories about the disorder. The concept of true transsexual females never created diagnostic uncertainties, largely because patient histories were relatively consistent and gender variant behaviors such as female cross-dressing remained unseen by clinicians. The term "gender dysphoria syndrome" was later adopted to designate the presence of a gender problem in either sex until psychiatry developed an official nomenclature.

The diagnosis of Transsexualism was introduced in the DSM-III in 1980 for gender dysphoric individuals who demonstrated at least two years of continuous interest in transforming the sex of their bodies and their social gender status. Others with gender dysphoria could be diagnosed as Gender Identity Disorder of Adolescence or Adulthood, Nontranssexual Type; or Gender Identity Disorder Not Otherwise Specified (GIDNOS). These diagnostic terms were usually ignored by the media, which used the term transsexual for any person who wanted to change his/her sex and gender.

**The DSM-IV.** In 1994, the DSM-IV committee replaced the diagnosis of Transsexualism with Gender Identity Disorder. Depending on their age, those with a strong and persistent cross-gender identification and a persistent discomfort with their sex or a sense of inappropriateness in the gender role of that sex were to be diagnosed as Gender Identity Disorder of Childhood (302.6), Adolescence, or Adulthood (302.85). For persons who did not meet these criteria, Gender Identity Disorder Not Otherwise Specified (GIDNOS)(302.6) was to be used. This category included a variety of individuals, including those who desired only castration or penectomy without a desire to develop breasts, those who wished hormone therapy and mastectomy without genital reconstruction, those with a congenital intersex condition, those with transient stress-related cross-dressing, and those with considerable ambivalence about giving up their gender status. Patients diagnosed with GID and GIDNOS were to be subclassified according to the sexual orientation: attracted to males; attracted to females; attracted to both; or attracted to neither. This subclassification was intended to assist in determining, over time, whether individuals of one sexual orientation or another experienced better outcomes using particular therapeutic approaches; it was **not** intended to guide treatment decisions.

Between the publication of DSM-III and DSM-IV, the term "transgender" began to be used in various ways. Some employed it to refer to those with unusual gender identities in a value-free manner -- that is, without a connotation of psychopathology. Some people informally used the term to refer to any person with any type of gender identity issues. Transgender is not a formal diagnosis, but many professionals and members of the public found it easier to use informally than GIDNOS, which is a formal diagnosis.

**The ICD-10.** The ICD-10 now provides five diagnoses for the gender identity disorders (F64):

   **Transsexualism (F64.0)** has three criteria:

4

1. The desire to live and be accepted as a member of the opposite sex, usually accompanied by the wish to make his or her body as congruent as possible with the preferred sex through surgery and hormone treatment;
2. The transsexual identity has been present persistently for at least two years;
3. The disorder is not a symptom of another mental disorder or a chromosomal abnormality.

**Dual-role Transvestism (F64.1)** has three criteria:
1. The individual wears clothes of the opposite sex in order to experience temporary membership in the opposite sex;
2. There is no sexual motivation for the cross-dressing;
3. The individual has no desire for a permanent change to the opposite sex.

**Gender Identity Disorder of Childhood (64.2)** has separate criteria for girls and for boys.
For girls:
    1. The individual shows persistent and intense distress about being a girl, and has a stated desire to be a boy (not merely a desire for any perceived cultural advantages to being a boy) or insists that she is a boy;
    2. Either of the following must be present:
        a. Persistent marked aversion to normative feminine clothing and insistence on wearing stereotypical masculine clothing;
        b. Persistent repudiation of female anatomical structures, as evidenced by at least one of the following:
            1. An assertion that she has, or will grow, a penis;
            2. Rejection of urination in a sitting position;
            3. Assertion that she does not want to grow breasts or menstruate.
    3. The girl has not yet reached puberty;
    4. The disorder must have been present for at least 6 months.
For boys:
    1. The individual shows persistent and intense distress about being a boy, and has a desire to be a girl, or, more rarely, insists that he is a girl.
    2. Either of the following must be present:
        a. Preoccupation with stereotypic female activities, as shown by a preference for either cross-dressing or simulating female attire, or by an intense desire to participate in the games and pastimes of girls and rejection of stereotypical male toys, games, and activities;
        b. Persistent repudiation of male anatomical structures, as evidenced by at least one of the following repeated assertions:
            1. That he will grow up to become a woman (not merely in the role);
            2. That his penis or testes are disgusting or will disappear;
            3. That it would be better not to have a penis or testes.
    3. The boy has not yet reached puberty;
    4. The disorder must have been present for at least 6 months.

**Other Gender Identity Disorders (F64.8)** has no specific criteria.

**Gender Identity Disorder, Unspecified** has no specific criteria.

5

Either of the previous two diagnoses could be used for those with an intersexed condition.

The purpose of the DSM-IV and ICD-10 is to guide treatment and research. Different professional groups created these nomenclatures through consensus processes at different times. There is an expectation that the differences between the systems will be eliminated in the future. At this point, the specific diagnoses are based more on clinical reasoning than on scientific investigation.

**Are Gender Identity Disorders Mental Disorders?** To qualify as a mental disorder, a behavioral pattern must result in a significant adaptive disadvantage to the person or cause personal mental suffering. The DSM-IV and ICD-10 have defined hundreds of mental disorders which vary in onset, duration, pathogenesis, functional disability, and treatability. The designation of gender identity disorders as mental disorders is not a license for stigmatization, or for the deprivation of gender patients' civil rights. The use of a formal diagnosis is often important in offering relief, providing health insurance coverage, and guiding research to provide more effective future treatments.

## IV. The Mental Health Professional

**The Ten Tasks of the Mental Health Professional.** Mental health professionals (MHPs) who work with individuals with gender identity disorders may be regularly called upon to carry out many of these responsibilities:
1. To accurately diagnose the individual's gender disorder;
2. To accurately diagnose any co-morbid psychiatric conditions and see to their appropriate treatment;
3. To counsel the individual about the range of treatment options and their implications;
4. To engage in psychotherapy;
5. To ascertain eligibility and readiness for hormone and surgical therapy;
6. To make formal recommendations to medical and surgical colleagues;
7. To document their patient's relevant history in a letter of recommendation;
8. To be a colleague on a team of professionals with an interest in the gender identity disorders;
9. To educate family members, employers, and institutions about gender identity disorders;
10. To be available for follow-up of previously seen gender patients.

**The Adult-Specialist.** The education of the mental health professional who specializes in adult gender identity disorders rests upon basic general clinical competence in diagnosis and treatment of mental or emotional disorders. Clinical training may occur within any formally credentialing discipline -- for example, psychology, psychiatry, social work, counseling, or nursing. The following are the recommended minimal credentials for special competence with the gender identity disorders:
1. A master's degree or its equivalent in a clinical behavioral science field. This or a more advanced degree should be granted by an institution accredited by a recognized national

6

or regional accrediting board. The mental health professional should have documented credentials from a proper training facility and a licensing board.
2. Specialized training and competence in the assessment of the DSM-IV/ICD-10 Sexual Disorders (not simply gender identity disorders).
3. Documented supervised training and competence in psychotherapy.
4. Continuing education in the treatment of gender identity disorders, which may include attendance at professional meetings, workshops, or seminars or participating in research related to gender identity issues.

**The Child-Specialist.** The professional who evaluates and offers therapy for a child or early adolescent with GID should have been trained in childhood and adolescent developmental psychopathology. The professional should be competent in diagnosing and treating the ordinary problems of children and adolescents. These requirements are in addition to the adult-specialist requirement.

**The Differences between Eligibility and Readiness.** The SOC provide recommendations for eligibility requirements for hormones and surgery. Without first meeting these recommended eligibility requirements, the patient and the therapist should not request hormones or surgery. An example of an eligibility requirement is: a person must live full time in the preferred gender for twelve months prior to genital surgery. To meet this criterion, the professional needs to document that the real-life experience has occurred for this duration. Meeting readiness criteria -- further consolidation of the evolving gender identity or improving mental health in the new or confirmed gender role -- is more complicated, because it rests upon the clinician's and the patient's judgment.

**The Mental Health Professional's Relationship to the Prescribing Physician and Surgeon.** Mental health professionals who recommend hormonal and surgical therapy share the legal and ethical responsibility for that decision with the physician who undertakes the treatment. Hormonal treatment can often alleviate anxiety and depression in people without the use of additional psychotropic medications. Some individuals, however, need psychotropic medication prior to, or concurrent with, taking hormones or having surgery. The mental health professional is expected to make this assessment, and see that the appropriate psychotropic medications are offered to the patient. The presence of psychiatric co-morbidities does not necessarily preclude hormonal or surgical treatment, but some diagnoses pose difficult treatment dilemmas and may delay or preclude the use of either treatment.

**The Mental Health Professional's Documentation Letter for Hormone Therapy or Surgery Should Succinctly Specify:**
1. The patient's general identifying characteristics;
2. The initial and evolving gender, sexual, and other psychiatric diagnoses;
3. The duration of their professional relationship including the type of psychotherapy or evaluation that the patient underwent;
4. The eligibility criteria that have been met and the mental health professional's rationale for hormone therapy or surgery;
5. The degree to which the patient has followed the Standards of Care to date and the likelihood of future compliance;
6. Whether the author of the report is part of a gender team;

7

7. That the sender welcomes a phone call to verify the fact that the mental health professional actually wrote the letter as described in this document.

The organization and completeness of these letters provide the hormone-prescribing physician and the surgeon an important degree of assurance that mental health professional is knowledgeable and competent concerning gender identity disorders.

**One Letter is Required for Instituting Hormone Therapy, or for Breast Surgery.** One letter from a mental health professional, including the above seven points, written to the physician who will be responsible for the patient's medical treatment, is sufficient for instituting hormone therapy or for a referral for breast surgery (e.g., mastectomy, chest reconstruction, or augmentation mammoplasty).

**Two Letters are Generally Required for Genital Surgery.** Genital surgery for biologic males may include orchiectomy, penectomy, clitoroplasty, labiaplasty or creation of a neovagina; for biologic females it may include hysterectomy, salpingo-oophorectomy, vaginectomy, metoidioplasty, scrotoplasty, urethroplasty, placement of testicular prostheses, or creation of a neophallus.

It is ideal if mental health professionals conduct their tasks and periodically report on these processes as part of a team of other mental health professionals and nonpsychiatric physicians. One letter to the physician performing genital surgery will generally suffice as long as two mental health professionals sign it.

More commonly, however, letters of recommendation are from mental health professionals who work alone without colleagues experienced with gender identity disorders. Because professionals working independently may not have the benefit of ongoing professional consultation on gender cases, two letters of recommendation are required prior to initiating genital surgery. If the first letter is from a person with a master's degree, the second letter should be from a psychiatrist or a Ph.D. clinical psychologist, who can be expected to adequately evaluate co-morbid psychiatric conditions. If the first letter is from the patient's psychotherapist, the second letter should be from a person who has only played an evaluative role for the patient. Each letter, however, is expected to cover the same topics. At least one of the letters should be an extensive report. The second letter writer, having read the first letter, may choose to offer a briefer summary and an agreement with the recommendation.

## V. Assessment and Treatment of Children and Adolescents

**Phenomenology.** Gender identity disorders in children and adolescents are different from those seen in adults, in that a rapid and dramatic developmental process (physical, psychological and sexual) is involved. Gender identity disorders in children and adolescents are complex conditions. The young person may experience his or her phenotype sex as inconsistent with his or her own sense of gender identity. Intense distress is often experienced, particularly in adolescence, and there are frequently associated emotional and behavioral difficulties. There is greater fluidity and variability in outcomes, especially in pre-pubertal children. Only a few

8

gender variant youths become transsexual, although many eventually develop a homosexual orientation.

Commonly seen features of gender identity conflicts in children and adolescents include a stated desire to be the other sex; cross dressing; play with games and toys usually associated with the gender with which the child identifies; avoidance of the clothing, demeanor and play normally associated with the child's sex and gender of assignment; preference for playmates or friends of the sex and gender with which the child identifies; and dislike of bodily sex characteristics and functions. Gender identity disorders are more often diagnosed in boys.

Phenomenologically, there is a qualitative difference between the way children and adolescents present their sex and gender predicaments, and the presentation of delusions or other psychotic symptoms. Delusional beliefs about their body or gender can occur in psychotic conditions but they can be distinguished from the phenomenon of a gender identity disorder. Gender identity disorders in childhood are not equivalent to those in adulthood and the former do not inevitably lead to the latter. The younger the child the less certain and perhaps more malleable the outcome.

**Psychological and Social Interventions.** The task of the child-specialist mental health professional is to provide assessment and treatment that broadly conforms to the following guidelines:
1. The professional should recognize and accept the gender identity problem. Acceptance and removal of secrecy can bring considerable relief.
2. The assessment should explore the nature and characteristics of the child's or adolescent's gender identity. A complete psychodiagnostic and psychiatric assessment should be performed. A complete assessment should include a family evaluation, because other emotional and behavioral problems are very common, and unresolved issues in the child's environment are often present.
3. Therapy should focus on ameliorating any comorbid problems in the child's life, and on reducing distress the child experiences from his or her gender identity problem and other difficulties. The child and family should be supported in making difficult decisions regarding the extent to which to allow the child to assume a gender role consistent with his or her gender identity. This includes issues of whether to inform others of the child's situation, and how others in the child's life should respond; for example, whether the child should attend school using a name and clothing opposite to his or her sex of assignment. They should also be supported in tolerating uncertainty and anxiety in relation to the child's gender expression and how best to manage it. Professional network meetings can be very useful in finding appropriate solutions to these problems.

**Physical Interventions.** Before any physical intervention is considered, extensive exploration of psychological, family and social issues should be undertaken. Physical interventions should be addressed in the context of adolescent development. Adolescents' gender identity development can rapidly and unexpectedly evolve. An adolescent shift toward gender conformity can occur primarily to please the family, and may not persist or reflect a permanent change in gender identity. Identity beliefs in adolescents may become firmly held and strongly expressed, giving a false impression of irreversibility; more fluidity may return at a later stage. For these reasons, irreversible physical interventions should be delayed as long as is clinically appropriate. Pressure for physical interventions because of an adolescent's level of distress can be great and in such

9

circumstances a referral to a child and adolescent multi-disciplinary specialty service should be considered, in locations where these exist.

Physical interventions fall into three categories or stages:
1. Fully reversible interventions. These involve the use of LHRH agonists or medroxyprogesterone to suppress estrogen or testosterone production, and consequently to delay the physical changes of puberty.
2. Partially reversible interventions. These include hormonal interventions that masculinize or feminize the body, such as administration of testosterone to biologic females and estrogen to biologic males. Reversal may involve surgical intervention.
3. Irreversible interventions. These are surgical procedures.

A staged process is recommended to keep options open through the first two stages. Moving from one state to another should not occur until there has been adequate time for the young person and his/her family to assimilate fully the effects of earlier interventions.

**Fully Reversible Interventions.** Adolescents may be eligible for puberty-delaying hormones as soon as pubertal changes have begun. In order for the adolescent and his or her parents to make an informed decision about pubertal delay, it is recommended that the adolescent experience the onset of puberty in his or her biologic sex, at least to Tanner Stage Two. If for clinical reasons it is thought to be in the patient's interest to intervene earlier, this must be managed with pediatric endocrinological advice and more than one psychiatric opinion.

Two goals justify this intervention: a) to gain time to further explore the gender identity and other developmental issues in psychotherapy; and b) to make passing easier if the adolescent continues to pursue sex and gender change. In order to provide puberty delaying hormones to an adolescent, the following criteria must be met:
1. throughout childhood the adolescent has demonstrated an intense pattern of cross-sex and cross-gender identity and aversion to expected gender role behaviors;
2. sex and gender discomfort has significantly increased with the onset of puberty;
3. the family consents and participates in the therapy.

Biologic males should be treated with LHRH agonists (which stop LH secretion and therefore testosterone secretion), or with progestins or antiandrogens (which block testosterone secretion or neutralize testosterone action). Biologic females should be treated with LHRH agonists or with sufficient progestins (which stop the production of estrogens and progesterone) to stop menstruation.

**Partially Reversible Interventions.** Adolescents may be eligible to begin masculinizing or feminizing hormone therapy as early as age 16, preferably with parental consent. In many countries 16-year olds are legal adults for medical decision making, and do not require parental consent.

Mental health professional involvement is an eligibility requirement for triadic therapy during adolescence. For the implementation of the real-life experience or hormone therapy, the mental health professional should be involved with the patient and family for a minimum of six months. While the number of sessions during this six-month period rests upon the clinician's judgment,

10

the intent is that hormones and the real-life experience be thoughtfully and recurrently considered over time. In those patients who have already begun the real-life experience prior to being seen, the professional should work closely with them and their families with the thoughtful recurrent consideration of what is happening over time.

**Irreversible Interventions.** Any surgical intervention should not be carried out prior to adulthood, or prior to a real-life experience of at least two years in the gender role of the sex with which the adolescent identifies. The threshold of 18 should be seen as an eligibility criterion and not an indication in itself for active intervention.

## VI. Psychotherapy with Adults

**A Basic Observation.** Many adults with gender identity disorder find comfortable, effective ways of living that do not involve all the components of the triadic treatment sequence. While some individuals manage to do this on their own, psychotherapy can be very helpful in bringing about the discovery and maturational processes that enable self-comfort.

**Psychotherapy is Not an Absolute Requirement for Triadic Therapy.** Not every adult gender patient requires psychotherapy in order to proceed with hormone therapy, the real-life experience, hormones, or surgery. Individual programs vary to the extent that they perceive a need for psychotherapy. When the mental health professional's initial assessment leads to a recommendation for psychotherapy, the clinician should specify the goals of treatment, and estimate its frequency and duration. There is no required minimum number of psychotherapy sessions prior to hormone therapy, the real-life experience, or surgery, for three reasons: 1) patients differ widely in their abilities to attain similar goals in a specified time; 2) a minimum number of sessions tends to be construed as a hurdle, which discourages the genuine opportunity for personal growth; 3) the mental health professional can be an important support to the patient throughout all phases of gender transition. Individual programs may set eligibility criteria to some minimum number of sessions or months of psychotherapy.

The mental health professional who conducts the initial evaluation need not be the psychotherapist. If members of a gender team do not do psychotherapy, the psychotherapist should be informed that a letter describing the patient's therapy might be requested so the patient can proceed with the next phase of treatment.

**Goals of Psychotherapy.** Psychotherapy often provides education about a range of options not previously seriously considered by the patient. It emphasizes the need to set realistic life goals for work and relationships, and it seeks to define and alleviate the patient's conflicts that may have undermined a stable lifestyle.

**The Therapeutic Relationship.** The establishment of a reliable trusting relationship with the patient is the first step toward successful work as a mental health professional. This is usually accomplished by competent nonjudgmental exploration of the gender issues with the patient during the initial diagnostic evaluation. Other issues may be better dealt with later, after the person feels that the clinician is interested in and understands their gender identity concerns.

11

Ideally, the clinician's work is with the whole of the person's complexity. The goals of therapy are to help the person to live more comfortably within a gender identity and to deal effectively with non-gender issues. The clinician often attempts to facilitate the capacity to work and to establish or maintain supportive relationships. Even when these initial goals are attained, mental health professionals should discuss the likelihood that no educational, psychotherapeutic, medical, or surgical therapy can permanently eradicate all vestiges of the person's original sex assignment and previous gendered experience.

**Processes of Psychotherapy.** Psychotherapy is a series of interactive communications between a therapist who is knowledgeable about how people suffer emotionally and how this may be alleviated, and a patient who is experiencing distress. Typically, psychotherapy consists of regularly held 50-minutes sessions. The psychotherapy sessions initiate a developmental process. They enable the patient's history to be appreciated, current dilemmas to be understood, and unrealistic ideas and maladaptive behaviors to be identified. Psychotherapy is not intended to cure the gender identity disorder. Its usual goal is a long-term stable life style with realistic chances for success in relationships, education, work, and gender identity expression. Gender distress often intensifies relationship, work, and educational dilemmas.

The therapist should make clear that it is the patient's right to choose among many options. The patient can experiment over time with alternative approaches. Ideally, psychotherapy is a collaborative effort. The therapist must be certain that the patient understands the concepts of eligibility and readiness, because the therapist and patient must cooperate in defining the patient's problems, and in assessing progress in dealing with them. Collaboration can prevent a stalemate between a therapist who seems needlessly withholding of a recommendation, and a patient who seems too profoundly distrusting to freely share thoughts, feelings, events, and relationships.

Patients may benefit from psychotherapy at every stage of gender evolution. This includes the post-surgical period, when the anatomic obstacles to gender comfort have been removed, but the person may continue to feel a lack of genuine comfort and skill in living in the new gender role.

**Options for Gender Adaptation.** The activities and processes that are listed below have, in various combinations, helped people to find more personal comfort. These adaptations may evolve spontaneously and during psychotherapy. Finding new gender adaptations does not mean that the person may not in the future elect to pursue hormone therapy, the real-life experience, or genital surgery.

Activities:
    Biological Males:
      1. Cross-dressing: unobtrusively with undergarments; unisexually; or in a feminine fashion;
      2. Changing the body through: hair removal through electrolysis or body waxing; minor plastic cosmetic surgical procedures;
      3. Increasing grooming, wardrobe, and vocal expression skills.
    Biological Females:
      1. Cross-dressing: unobtrusively with undergarments, unisexually, or in a masculine fashion;
      2. Changing the body through breast binding, weight lifting, applying theatrical facial hair;

12

    3. Padding underpants or wearing a penile prosthesis.
Both Genders:
    1. Learning about transgender phenomena from: support groups and gender networks, communication with peers via the Internet, studying these Standards of Care, relevant lay and professional literatures about legal rights pertaining to work, relationships, and public cross-dressing;
    2. Involvement in recreational activities of the desired gender;
    3. Episodic cross-gender living.

Processes:
    1. Acceptance of personal homosexual or bisexual fantasies and behaviors (orientation) as distinct from gender identity and gender role aspirations;
    2. Acceptance of the need to maintain a job, provide for the emotional needs of children, honor a spousal commitment, or not to distress a family member as currently having a higher priority than the personal wish for constant cross-gender expression;
    3. Integration of male and female gender awareness into daily living;
    4. Identification of the triggers for increased cross-gender yearnings and effectively attending to them; for instance, developing better self-protective, self-assertive, and vocational skills to advance at work and resolve interpersonal struggles to strengthen key relationships.

## VII. Requirements for Hormone Therapy for Adults

**Reasons for Hormone Therapy.** Cross-sex hormonal treatments play an important role in the anatomical and psychological gender transition process for properly selected adults with gender identity disorders. Hormones are often medically necessary for successful living in the new gender. They improve the quality of life and limit psychiatric co-morbidity, which often accompanies lack of treatment. When physicians administer androgens to biologic females and estrogens, progesterone, and testosterone-blocking agents to biologic males, patients feel and appear more like members of their preferred gender.

**Eligibility Criteria.** The administration of hormones is not to be lightly undertaken because of their medical and social risks. Three criteria exist.
    1. Age 18 years;
    2. Demonstrable knowledge of what hormones medically can and cannot do and their social benefits and risks;
    3. Either:
        a. A documented real-life experience of at least three months prior to the administration of hormones; or
        b. A period of psychotherapy of a duration specified by the mental health professional after the initial evaluation (usually a minimum of three months).

In selected circumstances, it can be acceptable to provide hormones to patients who have not fulfilled criterion 3 – for example, to facilitate the provision of monitored therapy using hormones of known quality, as an alternative to black-market or unsupervised hormone use.

13

**Readiness Criteria.** Three criteria exist:
1. The patient has had further consolidation of gender identity during the real-life experience or psychotherapy;
2. The patient has made some progress in mastering other identified problems leading to improving or continuing stable mental health (this implies satisfactory control of problems such as sociopathy, substance abuse, psychosis and suicidality;
3. The patient is likely to take hormones in a responsible manner.

**Can Hormones Be Given To Those Who Do Not Want Surgery or a Real-life Experience?**
Yes, but after diagnosis and psychotherapy with a qualified mental health professional following minimal standards listed above. Hormone therapy can provide significant comfort to gender patients who do not wish to cross live or undergo surgery, or who are unable to do so. In some patients, hormone therapy alone may provide sufficient symptomatic relief to obviate the need for cross living or surgery.

**Hormone Therapy and Medical Care for Incarcerated Persons.** Persons who are receiving treatment for gender identity disorders should continue to receive appropriate treatment following these Standards of Care after incarceration. For example, those who are receiving psychotherapy and/or cross-sex hormonal treatments should be allowed to continue this medically necessary treatment to prevent or limit emotional lability, undesired regression of hormonally-induced physical effects and the sense of desperation that may lead to depression, anxiety and suicidality. Prisoners who are subject to rapid withdrawal of cross-sex hormones are particularly at risk for psychiatric symptoms and self-injurious behaviors. Medical monitoring of hormonal treatment as described in these Standards should also be provided. Housing for transgendered prisoners should take into account their transition status and their personal safety.

# VIII. Effects of Hormone Therapy in Adults

The maximum physical effects of hormones may not be evident until two years of continuous treatment. Heredity limits the tissue response to hormones and this cannot be overcome by increasing dosage. The degree of effects actually attained varies from patient to patient.

**Desired Effects of Hormones.** Biologic males treated with estrogens can realistically expect treatment to result in: breast growth, some redistribution of body fat to approximate a female body habitus, decreased upper body strength, softening of skin, decrease in body hair, slowing or stopping the loss of scalp hair, decreased fertility and testicular size, and less frequent, less firm erections. Most of these changes are reversible, although breast enlargement will not completely reverse after discontinuation of treatment.

Biologic females treated with testosterone can expect the following permanent changes: a deepening of the voice, clitoral enlargement, mild breast atrophy, increased facial and body hair and male pattern baldness. Reversible changes include increased upper body strength, weight gain, increased social and sexual interest and arousability, and decreased hip fat.

14

**Potential Negative Medical Side Effects.** Patients with medical problems or otherwise at risk for cardiovascular disease may be more likely to experience serious or fatal consequences of cross-sex hormonal treatments. For example, cigarette smoking, obesity, advanced age, heart disease, hypertension, clotting abnormalities, malignancy, and some endocrine abnormalities may increase side effects and risks for hormonal treatment. Therefore, some patients may not be able to tolerate cross-sex hormones. However, hormones can provide health benefits as well as risks. Risk-benefit ratios should be considered collaboratively by the patient and prescribing physician.

Side effects in biologic males treated with estrogens and progestins may include increased propensity to blood clotting (venous thrombosis with a risk of fatal pulmonary embolism), development of benign pituitary prolactinomas, infertility, weight gain, emotional lability, liver disease, gallstone formation, somnolence, hypertension, and diabetes mellitus.

Side effects in biologic females treated with testosterone may include infertility, acne, emotional lability, increases in sexual desire, shift of lipid profiles to male patterns which increase the risk of cardiovascular disease, and the potential to develop benign and malignant liver tumors and hepatic dysfunction.

**The Prescribing Physician's Responsibilities.** Hormones are to be prescribed by a physician, and should not be administered without adequate psychological and medical assessment before and during treatment. Patients who do not understand the eligibility and readiness requirements and who are unaware of the SOC should be informed of them. This may be a good indication for a referral to a mental health professional experienced with gender identity disorders. The physician providing hormonal treatment and medical monitoring need not be a specialist in endocrinology, but should become well-versed in the relevant medical and psychological aspects of treating persons with gender identity disorders.

After a thorough medical history, physical examination, and laboratory examination, the physician should again review the likely effects and side effects of hormone treatment, including the potential for serious, life-threatening consequences. The patient must have the capacity to appreciate the risks and benefits of treatment, have his/her questions answered, and agree to medical monitoring of treatment. The medical record must contain a written informed consent document reflecting a discussion of the risks and benefits of hormone therapy.

Physicians have a wide latitude in what hormone preparations they may prescribe and what routes of administration they may select for individual patients. Viable options include oral, injectable, and transdermal delivery systems. The use of transdermal estrogen patches should be considered for males over 40 years of age or those with clotting abnormalities or a history of venous thrombosis. Transdermal testosterone is useful in females who do not want to take injections. In the absence of any other medical, surgical, or psychiatric conditions, basic medical monitoring should include: serial physical examinations relevant to treatment effects and side effects, vital sign measurements before and during treatment, weight measurements, and laboratory assessment. Gender patients, whether on hormones or not, should be screened for pelvic malignancies as are other persons.

15

For those receiving estrogens, the minimum laboratory assessment should consist of a pretreatment free testosterone level, fasting glucose, liver function tests, and complete blood count with reassessment at 6 and 12 months and annually thereafter. A pretreatment prolactin level should be obtained and repeated at 1, 2, and 3 years. If hyperprolactemia does not occur during this time, no further measurements are necessary. Biologic males undergoing estrogen treatment should be monitored for breast cancer and encouraged to engage in routine self-examination. As they age, they should be monitored for prostatic cancer.

For those receiving androgens, the minimum laboratory assessment should consist of pretreatment liver function tests and complete blood count with reassessment at 6 months, 12 months, and yearly thereafter. Yearly palpation of the liver should be considered. Females who have undergone mastectomies and who have a family history of breast cancer should be monitored for this disease.

Physicians may provide their patients with a brief written statement indicating that the person is under medical supervision, which includes cross-sex hormone therapy. During the early phases of hormone treatment, the patient may be encouraged to carry this statement at all times to help prevent difficulties with the police and other authorities.

**Reductions in Hormone Doses After Gonadectomy.** Estrogen doses in post-orchiectomy patients can often be reduced by 1/3 to ½ and still maintain feminization. Reductions in testosterone doses post-oophorectomy should be considered, taking into account the risks of osteoporosis. Lifelong maintenance treatment is usually required in all gender patients.

**The Misuse of Hormones.** Some individuals obtain hormones without prescription from friends, family members, and pharmacies in other countries. Medically unmonitored hormone use can expose the person to greater medical risk. Persons taking medically monitored hormones have been known to take additional doses of illicitly obtained hormones without their physician's knowledge. Mental health professionals and prescribing physicians should make an effort to encourage compliance with recommended dosages, in order to limit morbidity. It is ethical for physicians to discontinue treatment of patients who do not comply with prescribed treatment regimens.

**Other Potential Benefits of Hormones.** Hormonal treatment, when medically tolerated, should precede any genital surgical interventions. Satisfaction with the hormone's effects consolidates the person's identity as a member of the preferred sex and gender and further adds to the conviction to proceed. Dissatisfaction with hormonal effects may signal ambivalence about proceeding to surgical interventions. In biologic males, hormones alone often generate adequate breast development, precluding the need for augmentation mammaplasty. Some patients who receive hormonal treatment will not desire genital or other surgical interventions.

**The Use of Antiandrogens and Sequential Therapy.** Antiandrogens can be used as adjunctive treatments in biologic males receiving estrogens, though they are not always necessary to achieve feminization. In some patients, antiandrogens may more profoundly suppress the production of testosterone, enabling a lower dose of estrogen to be used when adverse estrogen side effects are anticipated.

16

Feminization does not require sequential therapy. Attempts to mimic the menstrual cycle by prescribing interrupted estrogen therapy or substituting progesterone for estrogen during part of the month are not necessary to achieve feminization.

**Informed Consent.** Hormonal treatment should be provided only to those who are legally able to provide informed consent. This includes persons who have been declared by a court to be emancipated minors and incarcerated persons who are considered competent to participate in their medical decisions. For adolescents, informed consent needs to include the minor patient's assent and the written informed consent of a parent or legal guardian.

**Reproductive Options.** Informed consent implies that the patient understands that hormone administration limits fertility and that the removal of sexual organs prevents the capacity to reproduce. Cases are known of persons who have received hormone therapy and sex reassignment surgery who later regretted their inability to parent genetically related children. The mental health professional recommending hormone therapy, and the physician prescribing such therapy, should discuss reproductive options with the patient prior to starting hormone therapy. Biologic males, especially those who have not already reproduced, should be informed about sperm preservation options, and encouraged to consider banking sperm prior to hormone therapy. Biologic females do not presently have readily available options for gamete preservation, other than cryopreservation of fertilized embryos. However, they should be informed about reproductive issues, including this option. As other options become available, these should be presented.

## IX. The Real-Life Experience

The act of fully adopting a new or evolving gender role or gender presentation in everyday life is known as the real-life experience. The real-life experience is essential to the transition to the gender role that is congruent with the patient's gender identity. Since changing one's gender presentation has immediate profound personal and social consequences, the decision to do so should be preceded by an awareness of what the familial, vocational, interpersonal, educational, economic, and legal consequences are likely to be. Professionals have a responsibility to discuss these predictable consequences with their patients. Change of gender role and presentation can be an important factor in employment discrimination, divorce, marital problems, and the restriction or loss of visitation rights with children. These represent external reality issues that must be confronted for success in the new gender presentation. These consequences may be quite different from what the patient imagined prior to undertaking the real-life experiences. However, not all changes are negative.

**Parameters of the Real-Life Experience.** When clinicians assess the quality of a person's real-life experience in the desired gender, the following abilities are reviewed:
1. To maintain full or part-time employment;
2. To function as a student;
3. To function in community-based volunteer activity;
4. To undertake some combination of items 1-3;
5. To acquire a (legal) gender-identity-appropriate first name;

17

6. To provide documentation that persons other than the therapist know that the patient functions in the desired gender role.

**Real-Life Experience versus Real-Life Test.** Although professionals may recommend living in the desired gender, the decision as to when and how to begin the real-life experience remains the person's responsibility. Some begin the real-life experience and decide that this often imagined life direction is not in their best interest. Professionals sometimes construe the real-life experience as the real-life test of the ultimate diagnosis. If patients prosper in the preferred gender, they are confirmed as "transsexual," but if they decided against continuing, they "must not have been." This reasoning is a confusion of the forces that enable successful adaptation with the presence of a gender identity disorder. The real-life experience tests the person's resolve, the capacity to function in the preferred gender, and the adequacy of social, economic, and psychological supports. It assists both the patient and the mental health professional in their judgments about how to proceed. Diagnosis, although always open for reconsideration, precedes a recommendation for patients to embark on the real-life experience. When the patient is successful in the real-life experience, both the mental health professional and the patient gain confidence about undertaking further steps.

**Removal of Beard and other Unwanted Hair for the Male to Female Patient.** Beard density is not significantly slowed by cross-sex hormone administration. Facial hair removal via electrolysis is a generally safe, time-consuming process that often facilitates the real-life experience for biologic males. Side effects include discomfort during and immediately after the procedure and less frequently hypo-or hyper pigmentation, scarring, and folliculitis. Formal medical approval for hair removal is not necessary; electrolysis may be begun whenever the patient deems it prudent. It is usually recommended prior to commencing the real-life experience, because the beard must grow out to visible lengths to be removed. Many patients will require two years of regular treatments to effectively eradicate their facial hair. Hair removal by laser is a new alternative approach, but experience with it is limited.

# X. Surgery

**Sex Reassignment is Effective and Medically Indicated in Severe GID.** In persons diagnosed with transsexualism or profound GID, sex reassignment surgery, along with hormone therapy and real-life experience, is a treatment that has proven to be effective. Such a therapeutic regimen, when prescribed or recommended by qualified practitioners, is medically indicated and medically necessary. Sex reassignment is not "experimental," "investigational," "elective," "cosmetic," or optional in any meaningful sense. It constitutes very effective and appropriate treatment for transsexualism or profound GID.

**How to Deal with Ethical Questions Concerning Sex Reassignment Surgery.** Many persons, including some medical professionals, object on ethical grounds to surgery for GID. In ordinary surgical practice, pathological tissues are removed in order to restore disturbed functions, or alterations are made to body features to improve the patient's self image. Among those who object to sex reassignment surgery, these conditions are not thought to present when surgery is performed for persons with gender identity disorders. It is important that professionals dealing

18

with patients with gender identity disorders feel comfortable about altering anatomically normal structures. In order to understand how surgery can alleviate the psychological discomfort of patients diagnosed with gender identity disorders, professionals need to listen to these patients discuss their life histories and dilemmas. The resistance against performing surgery on the ethical basis of "above all do no harm" should be respected, discussed, and met with the opportunity to learn from patients themselves about the psychological distress of having profound gender identity disorder.

It is unethical to deny availability or eligibility for sex reassignment surgeries or hormone therapy solely on the basis of blood seropositivity for blood-borne infections such as HIV, or hepatitis B or C, etc.

**The Surgeon's Relationship with the Physician Prescribing Hormones and the Mental Health Professional.** The surgeon is not merely a technician hired to perform a procedure. The surgeon is part of the team of clinicians participating in a long-term treatment process. The patient often feels an immense positive regard for the surgeon, which ideally will enable long-term follow-up care. Because of his or her responsibility to the patient, the surgeon must understand the diagnosis that has led to the recommendation for genital surgery. Surgeons should have a chance to speak at length with their patients to satisfy themselves that the patient is likely to benefit from the procedures. Ideally, the surgeon should have a close working relationship with the other professionals who have been actively involved in the patient's psychological and medical care. This is best accomplished by belonging to an interdisciplinary team of professionals who specialize in gender identity disorders. Such gender teams do not exist everywhere, however. At the very least, the surgeon needs to be assured that the mental health professional and physician prescribing hormones are reputable professionals with specialized experience with gender identity disorders. This is often reflected in the quality of the documentation letters. Since fictitious and falsified letters have occasionally been presented, surgeons should personally communicate with at least one of the mental health professionals to verify the authenticity of their letters.

Prior to performing any surgical procedures, the surgeon should have all medical conditions appropriately monitored and the effects of the hormonal treatment upon the liver and other organ systems investigated. This can be done alone or in conjunction with medical colleagues. Since pre-existing conditions may complicate genital reconstructive surgeries, surgeons must also be competent in urological diagnosis. The medical record should contain written informed consent for the particular surgery to be performed.

# XI. Breast Surgery

Breast augmentation and removal are common operations, easily obtainable by the general public for a variety of indications. Reasons for these operations range from cosmetic indications to cancer. Although breast appearance is definitely important as a secondary sex characteristic, breast size or presence are not involved in the legal definitions of sex and gender and are not important for reproduction. The performance of breast operations should be considered with the

19

same reservations as beginning hormonal therapy. Both produce relatively irreversible changes to the body.

The approach for male-to-female patients is different than for female-to-male patients. For female-to-male patients, a mastectomy procedure is usually the first surgery performed for success in gender presentation as a man; and for some patients it is the only surgery undertaken. When the amount of breast tissue removed requires skin removal, a scar will result and the patient should be so informed. Female-to-male patients may have surgery at the same time they begin hormones. For male-to-female patients, augmentation mammoplasty may be performed if the physician prescribing hormones and the surgeon have documented that breast enlargement after undergoing hormone treatment for 18 months is not sufficient for comfort in the social gender role.

## XII. Genital Surgery

**Eligibility Criteria.** These minimum eligibility criteria for various genital surgeries equally apply to biologic males and females seeking genital surgery. They are:
1. Legal age of majority in the patient's nation;
2. Usually 12 months of continuous hormonal therapy for those without a medical contraindication (see below, "Can Surgery Be Performed Without Hormones and the Real-life Experience");
3. 12 months of successful continuous full time real-life experience. Periods of returning to the original gender may indicate ambivalence about proceeding and generally should not be used to fulfill this criterion;
4. If required by the mental health professional, regular responsible participation in psychotherapy throughout the real-life experience at a frequency determined jointly by the patient and the mental health professional. Psychotherapy per se is not an absolute eligibility criterion for surgery;
5. Demonstrable knowledge of the cost, required lengths of hospitalizations, likely complications, and post surgical rehabilitation requirements of various surgical approaches;
6. Awareness of different competent surgeons.

**Readiness Criteria.** The readiness criteria include:
1. Demonstrable progress in consolidating one's gender identity;
2. Demonstrable progress in dealing with work, family, and interpersonal issues resulting in a significantly better state of mental health; this implies satisfactory control of problems such as sociopathy, substance abuse, psychosis, suicidality, for instance).

**Can Surgery Be Provided Without Hormones and the Real-life Experience?** Individuals cannot receive genital surgery without meeting the eligibility criteria. Genital surgery is a treatment for a diagnosed gender identity disorder, and should undertaken only after careful evaluation. Genital surgery is not a right that must be granted upon request. The SOC provide for an individual approach for every patient; but this does not mean that the general guidelines, which specify treatment consisting of diagnostic evaluation, possible psychotherapy, hormones,

20

and real-life experience, can be ignored. However, if a person has lived convincingly as a member of the preferred gender for a long period of time and is assessed to be a psychologically healthy after a requisite period of psychotherapy, there is no inherent reason that he or she must take hormones prior to genital surgery.

**Conditions under which Surgery May Occur.** Genital surgical treatments for persons with a diagnosis of gender identity disorder are not merely another set of elective procedures. Typical elective procedures only involve a private mutually consenting contract between a patient and a surgeon. Genital surgeries for individuals diagnosed as having GID are to be undertaken only after a comprehensive evaluation by a qualified mental health professional. Genital surgery may be performed once written documentation that a comprehensive evaluation has occurred and that the person has met the eligibility and readiness criteria. By following this procedure, the mental health professional, the surgeon and the patient share responsibility of the decision to make irreversible changes to the body.

**Requirements for the Surgeon Performing Genital Reconstruction.** The surgeon should be a urologist, gynecologist, plastic surgeon or general surgeon, and Board-Certified as such by a nationally known and reputable association. The surgeon should have specialized competence in genital reconstructive techniques as indicated by documented supervised training with a more experienced surgeon. Even experienced surgeons in this field must be willing to have their therapeutic skills reviewed by their peers. Surgeons should attend professional meetings where new techniques are presented.

Ideally, the surgeon should be knowledgeable about more than one of the surgical techniques for genital reconstruction so that he or she, in consultation with the patient, will be able to choose the ideal technique for the individual patient. When surgeons are skilled in a single technique, they should so inform their patients and refer those who do not want or are unsuitable for this procedure to another surgeon.

**Genital Surgery for the Male-to-Female Patient.** Genital surgical procedures may include orchiectomy, penectomy, vaginoplasty, clitoroplasty, and labiaplasty. These procedures require skilled surgery and postoperative care. Techniques include penile skin inversion, pedicled rectosigmoid transplant, or free skin graft to line the neovagina. Sexual sensation is an important objective in vaginoplasty, along with creation of a functional vagina and acceptable cosmesis.

**Other Surgery for the Male-to-Female Patient.** Other surgeries that may be performed to assist feminization include reduction thyroid chondroplasty, suction-assisted lipoplasty of the waist, rhinoplasty, facial bone reduction, face-lift, and blepharoplasty. These do not require letters of recommendation from mental health professionals.
There are concerns about the safety and effectiveness of voice modification surgery and more follow-up research should be done prior to widespread use of this procedure. In order to protect their vocal cords, patients who elect this procedure should do so after all other surgeries requiring general anesthesia with intubation are completed.

**Genital Surgery for the Female-to-Male Patient.** Genital surgical procedures may include hysterectomy, salpingo-oophorectomy, vaginectomy, metoidioplasty, scrotoplasty, urethroplasty, placement of testicular prostheses, and phalloplasty. Current operative techniques for

21

phalloplasty are varied. The choice of techniques may be restricted by anatomical or surgical considerations. If the objectives of phalloplasty are a neophallus of good appearance, standing micturition, sexual sensation, and/or coital ability, the patient should be clearly informed that there are several separate stages of surgery and frequent technical difficulties which may require additional operations. Even metoidioplasty, which in theory is a one-stage procedure for construction of a microphallus, often requires more than one surgery. The plethora of techniques for penis construction indicates that further technical development is necessary.

**Other Surgery for the Female-to-Male Patient.** Other surgeries that may be performed to assist masculinization include liposuction to reduce fat in hips, thighs and buttocks.

## XIII. Post-Transition Follow-up

Long-term postoperative follow-up is encouraged in that it is one of the factors associated with a good psychosocial outcome. Follow-up is important to the patient's subsequent anatomic and medical health and to the surgeon's knowledge about the benefits and limitations of surgery. Long-term follow-up with the surgeon is recommended in all patients to ensure an optimal surgical outcome. Surgeons who operate on patients who are coming from long distances should include personal follow-up in their care plan and attempt to ensure affordable, local, long-term aftercare in the patient's geographic region. Postoperative patients may also sometimes exclude themselves from follow-up with the physician prescribing hormones, not recognizing that these physicians are best able to prevent, diagnose and treat possible long term medical conditions that are unique to hormonally and surgically treated patients. Postoperative patients should undergo regular medical screening according to recommended guidelines for their age. The need for follow-up extends to the mental health professional, who having spent a longer period of time with the patient than any other professional, is in an excellent position to assist in any post-operative adjustment difficulties.

Harris Report Exhibit D – Filed Under Seal