McGowan Declaration – Exhibit A
Part 1 of 2

Charlotte P. Preece                                    January 11, 2007
                        Washington, DC

Page 1

                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
DIANE J. SCHROER,                    :
                                     :
          Plaintiff,                 :
                                     :
          v.                         :   CA No. 06-763
                                     :
JAMES H. BILLINGTON,                 :
                                     :
          Defendant.                 :
- - - - - - - - - - - - - - - x

                        Washington, D.C.

                        Thursday, January 11, 2007


          Deposition of CHARLOTTE P. PREECE, called

for examination by counsel for Plaintiff, pursuant

to notice, at the Law Offices of 1875 Pennsylvania

Avenue, N.W., Washington, D.C., and commencing at

9:10 a.m., before Barbara a. Huber, Notary Public in

and for the District of Columbia, when were present

on behalf of the respective parties:

Charlotte P. Preece                                    January 11, 2007
Washington, DC

---

**Page 2**

1  APPEARANCES:
2  On behalf of Plaintiff:
3      SHARON M. McGOWAN, ESQUIRE
       JAMES D. ESSEKS, ESQUIRE
4      American Civil Liberties Union Foundation
       125 Broad Street
5      18th Floor
       New York, New York 10004-2400
6      (212) 549-2593
       smcgowan@aclu.org
7
   On behalf of Defendant:
8
       BEVERLY M. RUSSELL, ESQUIRE
9      U.S. Department of Justice
       Judiciary Center Building
10     555 4th Street, N.W.
       Washington, D.C. 20001
11     (202) 307-0492
       beverly.russell@usdoj.gov
12
   Also Present:
13
       Jessie James, Jr.
14     Julia Douds
15
16
17         * * * * *
18
19
20
21
22

---

**Page 3**

1          C O N T E N T S
2  EXAMINATION BY:                    PAGE
3    Counsel for Plaintiff            4
4    Counsel for Defendant            314
5
6
7
8  DEPOSITION EXHIBITS:               PAGE

9    No. 19 - Vacancy Announcement              77
10   No. 20 - Crediting Plan Questionnaire      77
11   No. 21 - E-Mail, September 16, 2004        90
12   No. 22 - Listing of Scores for Candidates  90
13   No. 23 - Memo, September 17, 2004; Attachment  95
14   No. 24 - E-Mail, September 28, 2004        95
15   No. 25 - E-Mail, December 7, 2004          103
16   No. 26 - E-Mail, December 8, 2004          112
17   No. 27 - Beginning of a Recommendation     127
18   No. 28 - Letter, January 20, 2005; Attachments  286
19   No. 29 - Memo, January 24, 2005            292
20   No. 30 - Letter, March 7, 2005            306
21   No. 31 - E-Mail, March 23, 2005           306
22

---

**Page 4**

1          P R O C E E D I N G S
2  Whereupon,
3          CHARLOTTE P. PREECE,
4  was called as a witness by counsel for Plaintiff,
5  and having been duly sworn, by the Notary Public,
6  was examined and testified as follows:
7      EXAMINATION BY COUNSEL FOR PLAINTIFF
8  BY MS. McGOWAN:
9      Q   Good morning, Ms. Preece.  My name is
10 Sharon McGowan.  And I'm here with my colleague,
11 James Esseks.  And we represent the Plaintiff in
12 Schroer versus Billington.  And we're here this
13 morning to take your deposition.
14         Have you ever been deposed before?
15     A   No.
16     Q   Okay.  So I'm just going to go through a
17 series sort of instructions and tips so that you
18 understand how things are going to proceed today,
19 and that the court reporter can take everything
20 down.  I will ask you a series of questions that
21 you will answer under oath, as you've just been
22 sworn.  And the court reporter will take it all

---

**Page 5**

1  down.  Okay?
2      A   Okay.
3      Q   And it's important that you answer out
4  loud, because the court reporter cannot record a
5  nod of the head or a gesture.  Okay?
6      A   I understand.
7      Q   The court reporter also cannot -- or
8  it's difficult for her to record when two people
9  are talking at the same time.  And so I will
10 certainly try not to interrupt you.  And at the
11 same time, it's important for me to get the
12 question out so that the court reporter can have a
13 clear transcript.  Okay?
14     A   Okay.
15     Q   Okay.  And if you don't understand a
16 question, will you ask me to repeat it and to
17 clarify?
18     A   Yes.
19     Q   Okay.  And if you do answer a question,
20 I will assume that you understood it.  Okay?
21     A   Yes.
22     Q   I will take breaks throughout the day.

---

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                January 11, 2007
                                    Washington, DC

| Page 6 | Page 8 |
|---|---|

**Page 6**

1  But if you need a break, just let me know and I'll
2  find a place that we can stop for a few minutes.
3  Okay?
4     A   Fine.
5     Q   Are you feeling well today?
6     A   Sure, yes, uh-huh.
7     Q   Are you taking any medication today that
8  would prevent you from being able to give complete
9  and accurate testimony?
10    A   No. I mean, I'm taking medication, but
11 not that would.
12    Q   Okay. Is there any other reason that
13 you would not be able to give complete and
14 accurate testimony today?
15    A   No.
16    Q   Okay. Before we start with your
17 questions, I wanted to just lay out a few terms
18 that we'll be talking about today. The first term
19 or pair of terms is "transgender" and
20 "transsexual."
21       What do you understand the term
22 "transgender" to mean?

**Page 7**

1     A   If someone is changing physical
2  appearance from one sex to another.
3     Q   Okay. And anything else?
4     A   And becoming that sex, living as that
5  sex.
6     Q   Okay. What do you understand the term
7  "transsexual" to mean?
8     A   I thought they were synonymous.
9     Q   Okay. For purposes of this deposition,
10 when I talk about transgender or transsexual
11 applicants, I'm referring to individuals who
12 intend to or have transitioned from living as the
13 gender that they were assigned at birth; for
14 example, on their birth certificate, to living as
15 the gender that they feel they are on the inside.
16 This includes individuals who have a formal
17 diagnosis of gender identity disorder.
18       And so in this case, for example, Diane
19 Schroer is a transsexual woman. She was assigned
20 the gender male at birth, on her birth
21 certificate, but now lives and presents herself to
22 the public as female. The term "transgender"

**Page 8**

1  sometimes is used differently from "transsexual."
2  But for purposes of today, I will use the term
3  synonymously.
4     A   Okay.
5     Q   And so if there's at any point where
6  you're unclear about what the definition is that
7  we're talking about, definitely please feel free
8  to ask me that and I will try to clarify.
9       And so is that okay?
10    A   Yes.
11    Q   This case involves a dispute about the
12 hiring decision made for the position of
13 specialist in terrorism and international crime.
14 Over the course of this deposition I may refer to
15 this as the terrorism specialist position. Okay?
16    A   Fine.
17    Q   And, finally, the plaintiff in this case
18 is Diane Schroer. At the time of the events in
19 this case, Ms. Schroer went by the name of David
20 Schroer. So during this deposition when I talk
21 about Diane Schroer or Ms. Schroer, I'm also
22 referring to the person formerly known as David

**Page 9**

1  Schroer. Okay?
2     A   And is it appropriate for me to refer to
3  him as David during the period that I knew him as
4  such?
5     Q   That is fine. If you want to use
6  Mr. Schroer, David Schroer, or Ms. Schroer, or
7  Diane Schroer, we will understand, for purposes of
8  the deposition, that we are talking about one
9  person.
10    A   Okay.
11    Q   Okay. What is your title?
12    A   I'm the assistant director for foreign
13 affairs, defense, and trade.
14    Q   And where do you work?
15    A   In the medicine building of the Library
16 of Congress.
17    Q   And you are the assistant director of a
18 service unit at the Congressional Research
19 Service; is that correct?
20    A   Of a research division.
21    Q   A research division. Okay.
22       And what are your specific job

3  (Pages 6 to 9)

Charlotte P. Preece                                         January 11, 2007
                          Washington, DC

Page 10

1    responsibilities?
2        A   I supervise about just shy of a hundred
3    people, probably about 85 research analysts, who
4    do work for the United States Congress on foreign
5    affairs, defense, and trade.
6        Q   And how many of those analysts are in
7    positions requiring security clearances?
8        A   Most of the trade people not. Most of
9    the foreign policy people do. All the defense
10   people do.
11       Q   And, roughly, the number of -- of the 85
12   research analysts, what number does that amount to
13   of analysts that have a security clearance
14   component of their job?
15       A   I'd say 75 to 80 percent have
16   clearances.
17       Q   Who do you report to?
18       A   The director of the Congresional
19   Research Center.
20       Q   Who is?
21       A   Dan Mulhollan.
22       Q   Okay. And who reports to you?

Page 11

1        A   The people that I supervise. I have six
2    intermediate managers, or seven rather section
3    heads. I have a deputy. I have an administrative
4    support person. I have two project management
5    coordinators. And the rest are analysts.
6        Q   And how long have you been with the
7    Library of Congress?
8        A   Since 1976.
9        Q   And when did you take over the position
10   that you currently hold?
11       A   I became acting division chief in late
12   1991. I became permanent division chief in early
13   1994. There was a reorganization roughly six
14   years ago. And trade people were moved into the
15   division. And then instead of being a division
16   chief, I became the assistant director for foreign
17   affairs, defense, and trade.
18       Q   And that was 2000 or 2001?
19       A   Roughly 2000, yes.
20       Q   Do the analysts that you report to
21   report directly to you?
22       A   No. They have a section head.

Page 12

1        Q   And for the position of terrorism
2    specialist, to whom would that analyst report?
3        A   The head of the foreign policy
4    management and global issues section. And that
5    would be Francis Miko, M-I-K-O.
6        Q   And Mr. Miko was the supervisor at the
7    time of the events in this case; is that right?
8        A   That's correct.
9        Q   Were you the person responsible for
10   hiring the terrorism specialist?
11       A   Yes, I was the security officer.
12       Q   Okay. Was the terrorism specialist
13   position a newly created position that you were
14   filling?
15       A   No.
16       Q   Okay. Who held the position previously?
17       A   Audrey Kurth Cronin.
18       Q   Can you spell that name?
19       A   Kurth is K-U-R-T-H. And Cronin is
20   C-R-O-N-I-N. Audrey is her first name.
21       Q   Oh, Audrey. Okay.
22       A   I saw you had it written down, so --

Page 13

1        Q   When did Ms. Kurth Cronin inform you
2    that she intended to leave the position?
3        A   In July of 2004.
4        Q   And did she inform you why she was
5    leaving the position?
6        A   Yes.
7        Q   And why was that?
8        A   She had accepted a teaching position, a
9    faculty position, at the National War College.
10       Q   And what was her last day on the job?
11       A   It was the last week of July. I can't
12   remember the specific date.
13       Q   Did you need to do anything to get
14   approval to begin the process of replacing
15   Ms. Kurth Cronin in the position?
16       A   I did.
17       Q   What did you do?
18       A   I had to make a special appeal to the
19   director.
20       Q   And what did that involve?
21       A   A short memo, going down to talk to him,
22   saying why we needed a person when we did, because

4 (Pages 10 to 13)

Charlotte P. Preece                                              January 11, 2007
                            Washington, DC

|  | Page 50 |
|---|---|

1    provided to me. If it -- sometime the person just
2    says I have nothing else to add. Sometimes people
3    will elaborate on previous experience. I weigh
4    that with their answers to the rest of the
5    questions.
6        Q   And, for example, marriage to a foreign
7    national is, am I right, something that
8    potentially has a security clearance implication?
9        A   Potentially.
10       Q   If someone did not reveal that
11   information to you during the interview or in
12   response to that question, but that information
13   came up in the course of a personnel -- of a
14   background check, how would that impact your
15   assessment of whether or not this person was your
16   top candidate?
17           MS. RUSSELL: Objection. Calls for
18   speculation.
19           THE WITNESS: Again, I think we're out
20   of order in sequence in what happens in the
21   process. I make a recommendation. It goes to
22   personnel security. If the person didn't tell me

|  | Page 51 |
|---|---|

1    they were married to a foreign national, and in
2    the security clearance investigation -- now, let's
3    assume here that we have -- we're doing a person
4    who has a clearance. Okay. And they're married
5    to a foreign national.
6            I make a recommendation -- they don't
7    tell me they're married to a foreign national. It
8    goes to security clearance. If there are no
9    problems, I don't even know that the person is
10   married to a foreign national. I know if a
11   problem arrises in personnel security. Then
12   Cynthia will call me.
13           I had a case recently where I was
14   selecting an employee for a position. When I
15   asked that last question, said one thing you might
16   want to know about me is I am married to a foreign
17   national. He said I don't think this will cause a
18   problem with my security clearance. And I was
19   willing to make the recommendation and go forward.
20   The gentleman had previously held security
21   clearances. It may delay the time it takes to
22   process his clearance.

|  | Page 52 |
|---|---|

1    BY MS. McGOWAN:
2        Q   And so just to be clear, in that case,
3    even though you knew that there was some
4    information about this person that might slow down
5    the security clearance process, you went forward
6    with the recommendation; is that right?
7        A   That's correct.
8        Q   And for that person, how long did it
9    take for them to complete the security clearance
10   process?
11       A   This is a very new employee, so I don't
12   know.
13       Q   And what kind of job was this?
14       A   It's an analyst.
15       Q   And in what --
16       A   It was --
17       Q   -- in the very --
18       A   -- in a regional area.
19       Q   Regional area.
20       A   The foreign policy regional area.
21       Q   What's the full title of the position?
22       A   I think it's specialist in European

|  | Page 53 |
|---|---|

1    affairs. It's either analyst or specialist. I
2    can't remember what GS level it is. Special
3    confers a GS level, GS-15. The positions GS-14
4    and below are analysts.
5        Q   And was there any time sensitivity with
6    respect to filling that position?
7        A   We requested a waiver. And so the
8    analyst could start right away.
9        Q   But with respect to actually sort of
10   getting the final candidate into the position, was
11   this what you would have considered to be a more
12   urgent hire?
13           MS. RUSSELL: Objection to the form of
14   the question.
15           THE WITNESS: Not as urgent as the other
16   position. It was to replace someone who was not
17   yet retired.
18   BY MS. McGOWAN:
19       Q   But this was still a position that you
20   wanted to fill quickly; is that right?
21       A   Not quickly, no. I mean, this was to
22   replace a person who was not yet retired. We

                                        14 (Pages 50 to 53)

Charlotte P. Preece                                    January 11, 2007
                              Washington, DC

| Page 54 |
|---|

1    often try to bring people in a year or two before
2    we anticipate someone retiring, to allow them to
3    work with them, to get up to speed, to learn the
4    culture, what we do.
5         So this was not a position like the
6    terrorist position, which was much more critical
7    to the nature of the work. And we had a person
8    who left. We had no one.
9         Q    Even though this wasn't a position where
10   you were filling a vacancy, you still requested a
11   waiver to expedite the process of bringing this
12   new-hire on; is that right?
13        MS. RUSSELL: Objection to the form of
14   the question.
15        But you can go ahead and answer.
16   BY MS. McGOWAN:
17        Q    Well, let me break that down.
18        A    You always request a waiver. The person
19   can start. It doesn't -- it's not to stall their
20   hiring. What it stalls is their ability to use
21   classified information. But they can still work
22   here. It doesn't --

| Page 55 |
|---|

1        Q    Has there ever been a situation where
2    prior to filling out a personnel action form or a
3    PAR with respect to a position for which you were
4    the selecting official, where you called the
5    personnel security office to find out whether
6    there would be any problem getting a waiver for a
7    candidate if they were selected?
8        A    I can't think of any.
9        Q    Is that the kind of call you could make
10   if you wanted to get a preview of the personnel
11   security office's opinion about a candidate and
12   their eligibility for a waiver?
13        A    No. I mean, if I have a question, I can
14   call Cynthia at any time.
15        Q    Is the situation in this case involving
16   Ms. Schroer a case where you called the personnel
17   security office before filling out a PAR to find
18   out about whether or not information about that
19   applicant would affect anything with respect to
20   their security clearance?
21        A    There was never a PAR prepared for
22   Mr. Schroer.

| Page 56 |
|---|

1        Q    Right. That's my question.
2         In this case, you called and had a
3    meeting with the personnel security office prior
4    to your filling out a PAR for this position?
5        A    I did not fill out the PAR. I write a
6    letter of recommendation to the director.
7        Q    And the letter of recommendation
8    precedes --
9        A    The filling out --
10       Q    -- the filling out of any PAR?
11       A    Correct.
12       Q    Okay. So in this case, just to make
13   sure we're on the same page, you had a
14   conversation with the personnel security office
15   about information regarding Ms. Schroer and her
16   security clearance that came prior to your filling
17   out any recommendation, and prior to your filling
18   out any PAR for the position; is that right?
19       A    Prior to my completing a letter of
20   recommendation. And as I said, the office of
21   workforce prepares the PAR. I do not.
22       Q    Okay. Is that the only case where you

| Page 57 |
|---|

1    have had that kind of conversation with the
2    personnel security office?
3         MS. RUSSELL: Objection to the form,
4    but --
5         THE WITNESS: Again, please.
6    BY MS. McGOWAN:
7        Q    Is the case involving Ms. Schroer the
8    only case where you have had a conversation with
9    the personnel security office about information
10   that -- of -- that may involve security clearance
11   implications prior to your writing a
12   recommendation for a candidate?
13       A    I believe so.
14       Q    And so, for example, in this case that
15   we were just talking about with respect to the
16   specialist in European affairs, you did not reach
17   out to the personnel security office to find out
18   whether this individual's marriage to a foreign
19   national might have security clearance
20   implications; is that right?
21       A    This individual was savvy enough that he
22   requested a meeting, with the personnel security

15 (Pages 54 to 57)

Charlotte P. Preece                                January 11, 2007
                        Washington, DC

Page 58

1   office in my presence, to go over whatever
2   implications it might have.
3        Q   And when did he make that request?
4        A   I don't remember. I can't remember if
5   it was before he was hired or it was after he came
6   on board, but it was within a short period on
7   either side of that.
8        Q   But he did not make that request during
9   the interview, for example?
10       A   No.
11       Q   Okay. Did he make that request before
12  or after you had written your formal memo of
13  recommendation for him?
14       A   I can't remember.
15       Q   And did you have any conversations with
16  the personnel security office about how this
17  information might impact this applicant's security
18  clearance process?
19       A   No.
20       Q   And you said you did submit a waiver of
21  the pre-appointment security clearance
22  investigation for this employee; is that right?

Page 59

1        A   Yes.
2        Q   And it was granted, correct?
3        A   Yes.
4        Q   Are there any documents that reflected
5   what happened in that case with respect to your
6   request for a waiver?
7        A   My usual two-line request. That's --
8   and then if there are documents, personnel
9   security would have them. I don't.
10       MS. McGOWAN: I think we'll take a
11  break. So we'll convene back in five minutes.
12       (Recess)
13  BY MS. McGOWAN:
14       Q   So we're back on the record. And we
15  were discussing a number of different employees.
16  I just wanted to sort of run through them. We had
17  what I'll call employee A, which was the employee
18  that had the issue come up during their periodic
19  review. And we had employee B -- employee A was
20  the one who had the issue back sort of about the
21  tax issue. Employee B was the employee who had
22  some issues coming up with respect to their

Page 60

1   conduct while they were living overseas.
2        And then we had employee C, who was the
3   applicant for whom the PAR had been generated, and
4   then criminal -- information about their
5   background of a criminal nature came to light.
6   And then we had employee D, who was the employee
7   who has recently been hired at CRS who was married
8   to a foreign national. So we got those four
9   employees.
10       With respect to employee C, where there
11  had been a PAR generated and then you withdrew the
12  offer, you mentioned that you ultimately pulled
13  the posting and did not hire the position?
14       A   That's correct.
15       Q   Why --
16       MS. RUSSELL: Actually, I'm going to
17  object to the form of the question.
18       But you can go ahead and answer.
19  BY MS. McGOWAN:
20       Q   Well, am I correct that with respect to
21  the position that employee C had been applying
22  for, that once you learned this information from

Page 61

1   the employee, you withdrew your offer; is that
2   right?
3        A   He wasn't an employee. He was an
4   applicant.
5        Q   I'm sorry. The applicant for that
6   position, you withdrew the offer of employment; is
7   that right?
8        A   That's correct.
9        Q   Okay. And then you ultimately did not
10  fill that position; is that right?
11       A   That's correct.
12       Q   And why was that the case?
13       A   We thought it was cleaner to re-post.
14       Q   And did you ultimately re-post for that
15  position?
16       A   Yes, we did.
17       Q   And what was the lag time between
18  closing the posting or closing the process for the
19  first time and posting the second time?
20       A   I can't remember. It was 15 or more
21  years ago.
22       Q   Okay. And what was that position?

16 (Pages 58 to 61)

Charlotte P. Preece                                      January 11, 2007
                            Washington, DC

| Page 62 |
|---|
| 1    A   An analyst in intelligence. |
| 2    Q   Did that position deal with terrorism at |
| 3   all? |
| 4    A   It dealt with the agencies who were |
| 5   likely to oversee terrorist activities. |
| 6    Q   So we've got employee A, B, C, and D |
| 7   that we've just gone through? |
| 8    A   Right. |
| 9    Q   Are there any either employees or |
| 10  current employees or applicants for employment |
| 11  where information came up in the course of either |
| 12  that candidate's application or the employee's |
| 13  tenure of a security clearance concern? |
| 14   A   Not of a security clearance concern. |
| 15   Q   And you mentioned -- and I'm |
| 16  paraphrasing here -- that you asked all of your |
| 17  applicants whether there is anything else about |
| 18  them that they should -- that you think that they |
| 19  should tell you or that they should think that you |
| 20  should want to know.  And we discussed employee D, |
| 21  who mentioned, for example, that he was married to |
| 22  a foreign national. |

| Page 63 |
|---|
| 1       Have there been other circumstances |
| 2   where applicants have told you information in |
| 3   response to that question that caused you to say, |
| 4   huh, I wonder, this seems like it might have some |
| 5   bearing on the security clearance requirement for |
| 6   the position? |
| 7    A   I'd say the only other case is if they |
| 8   themselves are dual citizens.  And there, it would |
| 9   have an affect.  Because if they were a dual |
| 10  citizen, they would have to renounce their |
| 11  citizenship from the other country to be eligible |
| 12  to get a security clearance. |
| 13   Q   And there been cases where individuals |
| 14  have identified themselves as dual citizens? |
| 15   A   Yes. |
| 16   Q   And was there more than one case? |
| 17   A   Yes. |
| 18   Q   Roughly how many?  Do you remember? |
| 19   A   Two that I can think of. |
| 20   Q   Two.  Okay.  And what were the |
| 21  positions -- I don't know if they were both |
| 22  applying for the same position, or they were two |

| Page 64 |
|---|
| 1   different positions -- that these applicants were |
| 2   applying for? |
| 3    A   Can I make a correction first? |
| 4    Q   Sure. |
| 5    A   Employee D, I said that he was an |
| 6   analyst or specialist in European affairs. |
| 7    Q   Uh-huh. |
| 8    A   He was an analyst in Middle Eastern |
| 9   affairs. |
| 10   Q   Okay. |
| 11   A   A specialist in Middle Eastern affairs. |
| 12      Now if I can ask you to repeat your |
| 13  question, please. |
| 14   Q   Sure.  Well, actually, let me -- with |
| 15  respect to this analyst in Middle Eastern affairs, |
| 16  is there any aspect of this job that involved |
| 17  terrorism? |
| 18   A   Well, certainly tracking terrorist |
| 19  groups in the region, yes. |
| 20   Q   Anything else? |
| 21   A   No. |
| 22   Q   And so we were talking about the two |

| Page 65 |
|---|
| 1   instances where applicants had identified |
| 2   themselves as dual citizens. |
| 3       My first question was what position or |
| 4   positions were these applicants applying for? |
| 5    A   The position for -- let's call this |
| 6   person applicant E.  The first dual citizen did |
| 7   not require a security clearance. |
| 8    Q   Okay. |
| 9    A   The second position with a dual citizen |
| 10  was for an analyst in European affairs.  That did |
| 11  require a security clearance.  And the individual |
| 12  worked with the office of personnel security to |
| 13  renounce the citizenship of the other country. |
| 14   Q   And we'll call this person -- |
| 15   A   F. |
| 16   Q   -- applicant F. |
| 17   A   Got it. |
| 18   Q   Okay.  And with respect to applicant E, |
| 19  was that an analyst position? |
| 20   A   Yes. |
| 21   Q   Okay.  And what was the title, more or |
| 22  less? |

                                        17 (Pages 62 to 65)

Charlotte P. Preece                                    January 11, 2007
                          Washington, DC

---

Page 66

1    A   Broadly, international affairs, United
2  Nations, humanitarian assistance, those kinds of
3  issues.
4    Q   And I assume the citizen was U.S. and
5  something else?
6    A   British.
7    Q   British.  And how did this information
8  affect your assessment of this candidate, if at
9  all?
10   A   I made a determination that she didn't
11 need a clearance to perform her work.  And so it
12 didn't affect my decision at all.
13   Q   And was this applicant ultimately the
14 candidate that you recommended for the position?
15   A   Yes.
16   Q   And at any point -- well, is this
17 applicant who's now an employee, still an employee
18 of CRS?
19   A   Yes, she is.
20   Q   And during her tenure at CRS, has there
21 come any point where she had need to apply for a
22 security clearance?

Page 67

1    A   No.
2    Q   Okay.  With respect to applicant F, this
3  applicant was also a dual citizen.
4        And so what were the duel citizenships
5  involved?
6    A   Again, U.S. and British.
7    Q   Okay.  And how, if at all, did this
8  information about the applicant being a duel
9  citizen impact your assessment of the candidate?
10   A   Well, I asked the candidate -- made him
11 aware, first of all, that to get a security
12 clearance he would have to renounce his foreign
13 citizenship, and is this something he would be
14 willing to do.  He said yes.  And we proceeded to
15 hire him.
16   Q   And do you have an understanding of
17 what's involved in the process of renouncing
18 citizenship?
19   A   The person goes down and has an
20 appointment with Cynthia Wilkins.  And Cynthia
21 walks them through the process.  I do not sit in
22 on that.

Page 68

1    Q   Okay.  And do you know whether or not
2  this individual completed their renouncement of
3  their British citizenship prior to your
4  recommending their employment at CRS?
5    A   I don't know.
6    Q   When did you --
7    A   Prior to their employment, yes.  It
8  would have been prior to the employment, yes,
9  prior to the hiring.
10   Q   And so at the time that you wrote your
11 memorandum --
12   A   My recommendation.
13   Q   -- recommending their hire, am I right
14 that at that point the individual had not yet
15 renounced their citizenship, to your knowledge?
16   A   I don't know.  I don't know the timing,
17 the sequencing on that.
18   Q   Did you have any conversations with
19 Cynthia Wilkins about working through this dual
20 citizenship issue for this applicant?
21   A   Yes, I did.
22   Q   Okay.  Tell me about that.

Page 69

1    A   I asked Cynthia what does he need to do.
2  She said he needs to come in and make an
3  appointment with me, which he did.  And I think I
4  got a subsequent call from Cynthia that everything
5  was okay.
6    Q   And when did you make this contact with
7  Cynthia Wilkins, sort of where in the process?
8    A   Probably after the interviews were
9  concluded, but before I wrote a recommendation.
10   Q   And did you have any conversation with
11 Cynthia Wilkins about how long it would take to
12 complete this process of renouncing a dual
13 citizenship?
14   A   It was a matter of sitting down and
15 having an appointment.  It was not a protracted
16 process.
17   Q   And at any point between when you
18 recommended the hiring of this candidate in the
19 memorandum and when they came on to the position,
20 were there any other security clearance issues
21 other than the dual citizenship that came up?
22   A   No.

                                18 (Pages 66 to 69)

Charlotte P. Preece                                      January 11, 2007
                              Washington, DC

Page 70

1    Q   Okay.  Did you request a waiver of the
2    pre-appointment security clearance investigation
3    for this person?
4    A   Yes.
5    Q   And was it granted?
6    A   Yes.
7    Q   Okay.  So we now have applicant A
8    through F.
9        Are there any other applicants or
10   employees that had -- that brought to your
11   attention information that had a security
12   clearance dimension that you needed to address?
13   A   That's all I can think of.
14   Q   Okay.  Have you ever decided to go with
15   a candidate who -- for employment who perhaps
16   originally was your second or third choice over
17   the candidate who had been your first choice, due
18   to concerns that your first choice candidate might
19   take longer to go through the security clearance
20   process?
21   A   No.  I mean, if the interview is
22   completed and nothing comes up during the

Page 71

1    interview that would lead me to question, then
2    I -- I'm shooting kind of blind.
3    Q   Okay.
4    A   Do you understand what I mean?
5    Q   I'm not sure, actually.
6    A   If the person -- if two people come
7    through and interview -- and you're the first
8    choice and you're second choice --
9    Q   And you're referring to me and James,
10   as --
11   A   Exactly.
12   Q   -- hypothetical people?
13   A   I'm sorry.  Exactly.  Person A and
14   person B.  And nothing comes up to lead me to be
15   suspicious or questioning of your qualifications
16   or credentials, I would go with applicant A.  If
17   Cynthia Wilkins subsequently turned up something
18   in an investigation that would change our mind,
19   then I could switch to person B.
20   Q   Okay.  And am I right that the situation
21   that we were discussing with respect to employee
22   C, the individual who had information come up

Page 72

1    after the background check, is perhaps the closest
2    case to that, where this candidate had been your
3    top choice, you found information, didn't go with
4    them; but in that case, rather than going with a
5    second choice from that original pool, you decided
6    to re-post; is that correct?
7    A   That's correct.
8    Q   Okay.  And so thinking back through all
9    of your interviews with the various applicants,
10   has there ever been a situation where you had, you
11   know, applicant A and applicant B; and applicant A
12   was your top choice, based on everything you had
13   heard in the interview, but then at the end, in
14   response to your anything else question they
15   revealed some information that may or may not have
16   a security clearance component, might lead to a
17   delay or a more cumbersome security clearance
18   process?
19       Has there ever been a case like that,
20   where you've had an applicant reveal that
21   information, and then you said, you know, I'm
22   actually going to go with applicant B so I don't

Page 73

1    have to deal with the issues that applicant A, you
2    know, may or may not have, based on what they've
3    just told me?
4    A   I can't think of one.
5    Q   In the beginning, we started off talking
6    about the process for hiring the terrorism
7    specialist position.  So I just wanted to go back
8    to that.  You know, we were talking about sort of
9    how the vacancy first emerged.  And that, you
10   said, was due to someone leaving the position.
11       At that point, with respect to beginning
12   the process for filling the position, were you
13   involved in any processes for determining the
14   qualifications that would be necessary for someone
15   filling the terrorism specialist position?
16   A   Yes.
17   Q   Who else was involved?
18   A   Francis Miko, and Steven Bowman.
19   Q   And who are they?
20   A   Two of the seven section heads.  Francis
21   Miko holds -- is the section head where this
22   position resides, the specialist in terrorism.

19 (Pages 70 to 73)

Charlotte P. Preece                                          January 11, 2007
                           Washington, DC

| Page 94 | Page 96 |
|---|---|
| 1   to complete the hiring process? | 1   A   Yes. |
| 2    A   I can't remember. | 2   Q   And what is it? |
| 3    Q   So once you decided -- let me take those | 3   A   It is the list of the 18 people. |
| 4   documents back from you. | 4   Q   Okay. And then looking at Exhibit 24, |
| 5    A   Okay. | 5   do you recognize this document? |
| 6     (Handing document). | 6   A   Yes. |
| 7    Q   Once you decided how many candidates to | 7   Q   And what is it? |
| 8   interview, what did you do next? | 8   A   It was from my administrative assistant |
| 9    A   I gave my package of applications to my | 9   to the panel, letting us them know when the |
| 10   administrative assistant, Rita Banks, who | 10   interviews were scheduled. |
| 11   scheduled the interviews. | 11   Q   Was there any attempt to commence |
| 12    Q   And did you give Ms. Banks any | 12   interviews earlier than October 26th? |
| 13   particular instructions about when she should set | 13   A   I don't know. |
| 14   up interviews? | 14   Q   Are you aware of anything that prevented |
| 15    A   Yes. I asked her to try to schedule | 15   interviews from being scheduled prior to October |
| 16   them as soon as possible. | 16   26th? |
| 17    Q   Okay. And how many interviews per day | 17   A   Not that I can be specific about. |
| 18   were you hoping to schedule? | 18   Q   So vacations or anything like that come |
| 19    A   Two. Sometimes if a third one had to be | 19   to mind? |
| 20   squeezed in, we squeezed in a third. | 20   A   Vacations don't. One of the panelists |
| 21    Q   And how long did it take Ms. Banks to | 21   travels in his job capacity quite a bit. And I do |
| 22   actually set up the interviews? | 22   not know whether or not during that first period |

| Page 95 | Page 97 |
|---|---|
| 1    A   I don't remember. She would schedule | 1   in October if he had any travel. I do not know. |
| 2   them piecemeal. She would schedule one, and then | 2   Q   And at the top of Exhibit 24, in the |
| 3   send us an updated list the next day. And as she | 3   beginning of the text, it says, Reply requested |
| 4   got people, contacted people. We started the | 4   when convenient. |
| 5   interviews in mid October. | 5   Did you reply to this e-mail? |
| 6    Q   I'm going to show you two documents that | 6   A   Yes. That's basically to say that time |
| 7   we'll mark as Exhibits 23 and 24. | 7   is okay for you. |
| 8     (Deposition Exhibit No. 23 | 8   Q   And so I'm sorry, just to be clear, you |
| 9     and 24 marked for | 9   sent a reply to this e-mail? |
| 10     identification.) | 10   A   I may not have. Generally, Rita works |
| 11   BY MS. McGOWAN: | 11   from my calendar. And she knows when I'm free or |
| 12    Q   And document 23 is a document that was | 12   not. So I don't always have to reply. But the |
| 13   produced by the Government in discovery. It's | 13   other candidates, Francis and Steve, would have -- |
| 14   been Bates-stamped number 158 to 160. On the | 14   Q   Okay. |
| 15   front of the first page it says memorandum, dated | 15   A   -- presumably. |
| 16   September 17th, 2004. And then Exhibit 24 is a | 16   Q   And just to be clear, you mentioned one |
| 17   document that has been produced by the Government | 17   of the other panel members traveled a lot. |
| 18   in discovery. It's bates-stamped number 165. And | 18   Was that Mr. Miko, or Mr. Bowman? |
| 19   at the top it says, Charlotte Preece, interview | 19   A   Mr. Miko. |
| 20   update, 10/28/04. | 20   Q   Okay. So looking at Exhibit 24, it has |
| 21   Looking at Exhibit 23, pages 159 and 160 | 21   the second candidate listed at October 27th at |
| 22   particularly, do you recognize this list? | 22   9:00 a.m. as David Schroer. |

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                    January 11, 2007
                            Washington, DC

| Page 98 |
| --- |

1         Were you involved in the interview with
2    Ms. Schroer?
3         A    I was involved in all the interviews.
4         Q    Okay.  Does anything stand out in your
5    mind regarding Ms. Schroer's interview, that you
6    remember?
7         A    I remember thinking very highly of him
8    and his qualifications.
9         Q    And why was that the case?
10        A    Lengthy military background; contacts at
11   the inner agency level, and NSC, the White House,
12   State Department.  He had a very good interview,
13   answered the questions cleanly, concisely.
14        Q    Okay.  Anything else?
15        A    It was -- as I said, he was one of my
16   top candidates.
17        Q    Did you have any -- well, before I go
18   there, were there any concerns that you had at all
19   about Ms. Schroer?
20        A    No.
21        Q    Any negatives that occurred in your mind
22   over the course of the interview?

| Page 99 |
| --- |

1         A    No.
2         Q    Did you discuss at all during the
3    interview whether Ms. Schroer had an active
4    security clearance?
5         A    I don't think so, but we could have.  It
6    wasn't one of the questions in the booklet.  And
7    if you've seen one of these structured interview
8    guides -- which I gather you have by now -- if
9    it's not a question in there, we generally don't
10   ask it.
11        Q    And did you discuss Ms. Schroer's
12   employment after leaving the military?
13        A    As part of the first question, he
14   volunteered -- the first question is a very broad
15   question:  Please provide any information,
16   knowledge, and experience that would contribute to
17   this job.  And I believe during the course of that
18   he told us what he was currently doing.
19        Q    And as part of this course of
20   conversation about Ms. Schroer's work experience,
21   did you have any discussions about whether or not
22   there had been any interruption in the period of

| Page 100 |
| --- |

1    time that she had held a security clearance?
2         A    No.
3         Q    When Ms. Schroer concluded the interview
4    in response to your question about is there
5    anything else we should know, do you recall what
6    she said?
7         A    No, I don't.  I would have to refer to
8    the interview guide.
9         Q    When Ms. Schroer left, after the
10   interview was over, did you and the other
11   panelists make any comments to each other?
12        A    Briefly.
13        Q    And what did people say?
14        A    How he was the second candidate
15   interviewed, and it's nice to know that you have
16   someone that you think can do the job early in the
17   process, rather than to have that person be your
18   17th or 18th person.
19        Q    That's true.
20             Did you make comments to that affect, or
21   did someone else?
22        A    I think we all thought he was a strong

| Page 101 |
| --- |

1    candidate.
2         Q    And looking at Exhibit 24, it lists the
3    first interview on October 26th and the last one
4    on November 16th.
5             Is that consistent with your
6    recollection of how long it took to complete the
7    interviews?
8         A    Uh-huh.  Yes.
9         Q    Upon completion of the final interview
10   on November 16th, what happened next as part of
11   the hiring process?
12        A    We each individually scored all 18
13   applicants, collected all the application packages
14   and materials.  They went back upstairs to Edith
15   Friday.  And then it's Edith's job to compile
16   those scores.  We see a spreadsheet usually of the
17   scores, how each one of us scored.
18             And then she sits us down for a meeting,
19   and calls to our attention where -- any instances
20   on any one of these factors we scored -- where the
21   point differential was two points or greater, and
22   asked if we want to talk about that factor and why

                                      26 (Pages 98 to 101)

Charlotte P. Preece                                              January 11, 2007
                                Washington, DC

---

Page 110

1  e-mailed back. And he said that he preferred that
2  I not call him, that I speak with two other
3  gentlemen instead.
4      Q   Okay.
5      A   That gave me some suspicion.
6      Q   What kind of suspicion?
7      A   It is -- it was unprecedent for me
8  never -- not to have spoken to a current
9  supervisor. So I had -- he said that this was
10  around the holiday time and this could potentially
11  affect his Christmas bonus, so he prefer that I
12  not speak with this gentleman.
13     Q   And so when you say that that was the
14  point at which you first suspected something, what
15  did you suspect?
16     A   Well, generally when someone tells you
17  they don't want you to speak to their supervisor,
18  you assume that their supervisor may say something
19  that's negative.
20     Q   Did you have any other suspicions about
21  why you were not being authorized to contact
22  Mr. Chrietznberg -- Chrietzberg?

---

Page 111

1      A   No. It just raised an eyebrow.
2      Q   Did you have any discussions with Steve
3  Bowman or Francis Miko about the fact that for
4  Ms. Schroer you did not have the okay to talk to
5  the current supervisor?
6      A   It was probably noted.
7      Q   By "noted," do you mean actually like a
8  physical notation made somewhere?
9      A   No. I probably said I was a little
10  leary that he didn't want me to talk to his
11  current supervisor.
12     Q   And did either Mr. Bowman or Mr. Miko
13  share your concern?
14     A   They thought it was unusual. But I
15  think they had conducted their reference checks
16  and got very glowing reference checks from the
17  other two folks.
18     Q   Do you know when Mr. Miko and Mr. Bowman
19  contacted the references that were assigned to
20  them?
21     A   No. I can't give you the dates.
22     Q   Do you know if the people that are

---

Page 112

1  listed here, Mr. Daley and Mr. Olsen, are the
2  people that Mr. Miko and Mr. Bowman respectively
3  actually contacted, or did they contact different
4  references?
5      A   I can't remember, but it's on the sheets
6  that you should have.
7          MS. McGOWAN: I'm going to show you a
8  document that we will mark Exhibit Number 26.
9              (Deposition Exhibit No. 26
10                 marked for identification.)
11 BY MS. McGOWAN:
12     Q   This is a two-page document that has
13  been produced by the Government. It's been
14  Bates-stamped number 705 and 706. At the top it
15  says, Charlotte Preece, re: Updated references and
16  writing samples.
17         Do you recognize this document?
18     A   Uh-huh.
19     Q   And you should --
20     A   Yes. Yes.
21     Q   -- certainly take a moment to read it.
22     A   (Witness examined document).

---

Page 113

1      Q   What is it?
2      A   It is an e-mail exchange between David
3  and myself, with Dave giving me some additional
4  contact information, and then my response thanking
5  him for the information, and may I talk to his
6  current supervisor, and then David's response to
7  me indicating two alternative people who are
8  coordinators/supervisors on a job that he was also
9  working on.
10     Q   Did you, after receiving this e-mail
11  from Ms. Schroer, ever indicate either orally or
12  in writing to Ms. Schroer that her request that
13  you not contact her current supervisor was
14  unusual?
15     A   Well, I stated in my message that we
16  have a requirement to conduct a reference check
17  with the perspective employee's current
18  supervisor. But I didn't mention it further to
19  him, no.
20     Q   And to the extent that in this e-mail,
21  the fourth line of the text of the e-mail at the
22  top, where Ms. Schroer identifies Marc Alderman

---

29 (Pages 110 to 113)

Charlotte P. Preece                                    January 11, 2007
                              Washington, DC

---

Page 114

1    and Jeff Brady as her coordinators/supervisors, in
2    your view did that not satisfy the requirement to
3    talk to a current supervisor?
4        A    Yes. I mean, that was the substitute.
5        Q    And so at any point did you tell
6    Ms. Schroer that you really wanted to talk to Walt
7    Chrietzberg, in order to consider the application?
8        A    Not beyond this.
9        Q    Were you satisfied that Marc Alderman
10   and Jeff Brady had sufficient experience with
11   Ms. Schroer to give you a reference that you
12   considered adequate?
13       A    Yes, in terms of fulfilling that
14   requirement to talk to a supervisor, yes.
15       Q    And did you speak to either or both --
16   or, actually, there's actually three: Marc
17   Alderman, Jeff Brady, and Bill McRaven.
18           Did you speak to any of these references
19   identified by Ms. Schroer in this e-mail?
20       A    Marc Alderman, to my best -- Alderman to
21   my best of my recollection.
22       Q    And did either you or Mr. Miko or

---

Page 115

1    Mr. Bowman contact either Mr. Brady or I think
2    that's Rear Admiral McRaven?
3        A    I don't remember. I remember we each
4    did one reference check on each. So I don't know
5    if the folks listed here were the ones contacted,
6    or if McRaven was ever contacted. I would have to
7    look at those sheets.
8        Q    How long after you received this
9    information from Ms. Schroer did you contact the
10   references for Ms. Schroer?
11       A    Between this date and over the next
12   week.
13       Q    Do you remember following up the same
14   day?
15       A    I don't remember.
16       Q    Okay. And did you have any difficulty
17   reaching Marc Alderman?
18           MS. RUSSELL: Objection to the form of
19   the question.
20   BY MS. McGOWAN:
21       Q    Well, actually, did you reach
22   Mr. Alderman the first time -- well, let me ask

---

Page 116

1    this.
2            How did you first try to contact
3    Mr. Alderman? Did you call him?
4        A    Yes.
5        Q    Okay. Did you reach him when you called
6    him --
7        A    I can't --
8        Q    -- the first time?
9        A    -- I can't remember.
10       Q    Okay. At some point you had a telephone
11   conversation with Mr. Alderman; is that right?
12       A    I did. It was very late. I recall that
13   it was late. It was one of the last ones, if not
14   the last one.
15       Q    And by late, just so I'm clear, do you
16   mean late in the day, late in the week, late --
17       A    Late --
18       Q    -- late relative to what?
19       A    The last reference call.
20       Q    Okay. And what did you talk about?
21           Please describe that conversation to me.
22       A    Asked him about his qualifications, how

---

Page 117

1    he knows him.
2        Q    I'm sorry. By "his," do you mean
3    Mr. Alderman's --
4        A    I'm sorry. Mr. Schroer.
5        Q    Mr. Schroer's qualifications. Okay.
6    I'm sorry. Please continue.
7        A    Asked him about his writing, what did he
8    consider his strong points, what did he consider
9    his weak points.
10       Q    And what weak points did Mr. Alderman
11   identify?
12       A    If anything, he was an over-achiever and
13   worked too hard.
14       Q    That's a good reference.
15       A    It's a good weak point, yeah, a good
16   weak point to have.
17       Q    Did you discuss with Mr. Alderman the
18   fact that Ms. Schroer had asked you to not contact
19   Mr. Chrietzberg?
20       A    No.
21       Q    Why not?
22       A    I didn't think it was appropriate.

---

30  (Pages 114 to 117)

Charlotte P. Preece                                            January 11, 2007
                          Washington, DC

Page 118

1      Q   Why not?
2          MS. RUSSELL: Objection to the form,
3   lacks foundation.
4   BY MS. McGOWAN:
5      Q   Why did you think it was not appropriate
6   to ask Mr. Alderman why Ms. Schroer didn't want
7   you talking to Mr. Chrietzberg?
8      A   Just thought it was personal
9   information.
10     Q   Okay. How did you wrap things up with
11  Mr. Alderman at the end of the conversation?
12     A   By this time, I was pretty certain who I
13  wanted to recommend. And so I appreciated the
14  call. I thanked him for spending the time. As I
15  did say, this was the last reference. And by that
16  time I probably told him that he was my top
17  candidate. Because by this time Mr. Schroer was
18  my top candidate.
19     Q   And do you recall saying anything to
20  Mr. Alderman along the lines of the fact that the
21  call was a formality?
22     A   Yes, I think I did say something like

Page 119

1   that. I had the reference checks I needed. The
2   fact that he finally got back to me or I finally
3   got back to him -- I think he called me -- I --
4   you know we -- we included it, but I wouldn't have
5   had to include it.
6      Q   And so you mentioned that by that time
7   you had decided Ms. Schroer was your top
8   candidate.
9          When did you decide that?
10     A   We were formulating it all along. The
11  three of us were talking. We'd get reference
12  checks back. We'd share those references with one
13  another. We would sit down and talk. And
14  certainly by the middle of December Mr. Schroer
15  was my top candidate.
16     Q   And why?
17     A   I thought he had the best interview. He
18  impressed me the way he thought on his feet.
19     Q   Anything else?
20     A   It was difficult, because the
21  qualifications of the top three people were all
22  exceptional. I would have been happy to have any

Page 120

1   one of them.
2      Q   Okay.
3      A   In terms of their knowledge, the breadth
4   and depth of their knowledge, the level -- high
5   level positions of responsibility they were given.
6   Those were all good and equal. The distinguishing
7   factor that led Schroer to be my top candidate was
8   his performance at the interview.
9      Q   After talking with Marc Alderman, did
10  you -- well, let's ask this.
11         When did you next speak to Ms. Schroer?
12     A   I can't give you the date.
13     Q   Okay. Do you recall having a
14  conversation with Ms. Schroer sometime after this
15  last correspondence regarding references?
16     A   Yes.
17     Q   Okay.
18     A   And calling him up and asking him if he
19  were still interested in the position, and when he
20  might be available, letting him know that I was
21  about to write up a recommendation.
22     Q   And did you ever indicate to Ms. Schroer

Page 121

1   that you wanted to offer her the job, but only if
2   she was still interested?
3          MS. RUSSELL: Objection to the form.
4          But you can answer if you understand.
5          THE WITNESS: Please, again.
6   BY MS. McGOWAN:
7      Q   Sure. During the conversation, did you
8   ever make a statement to the affect of: I want to
9   hire you, but I only want to go forward with the
10  hiring if you actually want the job?
11     A   Usually I ask the person first are you
12  still interested in the position. And then I let
13  him know I would like to recommend him.
14     Q   Do you recall having any conversations
15  about the salary for that position during that
16  conversation?
17         Let me just back up for a moment. In
18  your last response you said that usually you ask
19  the person if they're still interested.
20         And so with respect to the conversation
21  that you actually had with Ms. Schroer, what did
22  you say?

                                    31  (Pages 118 to 121)

Charlotte P. Preece                                    January 11, 2007
                        Washington, DC

| Page 122 |
| --- |

1    A    I don't remember exactly what I said.
2    But I probably said, David, you're my top
3    candidate. Are you still interested in the
4    position? And he said very much so. And I said,
5    well, then I'd like to begin preparing the
6    paperwork for the recommendation.
7    Q    Okay. And do you recall having any
8    discussions about the salary for that position at
9    that point?
10    A    We did. I can't remember whether it was
11    at that conversation or a subsequent conversation.
12    Q    And what was the nature of that
13    conversation?
14    A    The position was a GS-15 step one. And
15    Mr. Schroer claimed that he was making more money
16    than that in his current capacity, and was there
17    any room for negotiation. And I said I would have
18    to contact our personnel specialist, whose name is
19    Chuck Freyder, and get back to him with that
20    information. And I think I did the following day.
21    I can't remember whether I phoned him or sent him
22    an e-mail.

| Page 123 |
| --- |

1    Q    Who's the "him" in that sentence you
2    called?
3    A    David.
4    Q    David. Okay.
5         And so at some point did you follow up
6    with Ms. Schroer about what you had learned
7    from --
8    A    Yes. That's what I mean. I --
9    Q    -- what you had learned from your
10    conversation with Mr. Freyder?
11    A    Yes.
12    Q    And tell me about that conversation.
13    A    I can't remember whether it was a
14    conversation or an e-mail. But the response was
15    basically if he could provide proof of the salary
16    level, it'd be possible to bring him on as high as
17    a GS-15, step ten.
18    Q    After this correspondence about salary,
19    how did you leave things with Ms. Schroer, once
20    you had let her know that you had information
21    about the salary?
22    A    I told him that I would start processing

| Page 124 |
| --- |

1    the paperwork.
2    Q    And at any point did you have a
3    conversation where Ms. Schroer suggested that you
4    meet?
5    A    Yes.
6    Q    Okay.
7    A    We did.
8    Q    Tell me about that conversation.
9    A    He said that he would like to get
10    together for either coffee or lunch, to discuss
11    more about the job and to -- how did he phrase it?
12    There was something he wanted to tell me.
13    Q    Was there any additional description of
14    what that was?
15    A    No.
16    Q    Did you ask?
17    A    No.
18    Q    Did you have any suspicions about what
19    Ms. Schroer might want to discuss with you?
20    A    I wondered, yes. I mean, I wondered
21    enough to stop writing the recommendation about
22    four or five sentences into it. I thought I'll

| Page 125 |
| --- |

1    wait to see what he tells me on Monday.
2    Q    So with respect to the written
3    recommendation, when did you start writing those
4    first few lines that you were just describing?
5    A    After the conversation where I asked him
6    if he was interested in the job, and the salary
7    seemed to work out, resolve okay, seemed there was
8    no impediment from there.
9    Q    And was the discussion that you had
10    about the salary and the discussion in which
11    Ms. Schroer suggested that you meet, was that two
12    discussions, or one?
13    A    I think two, as I recall. I'm not sure.
14    Q    And so when did -- did you agree to
15    meet?
16    A    Yes. Uh-huh.
17    Q    And when did you agree that you would
18    meet?
19    A    The Friday before the Monday that we
20    met.
21    Q    Okay.
22    A    We agreed to meet for lunch on Monday.

                                    32  (Pages 122 to 125)

Charlotte P. Preece                                    January 11, 2007
                          Washington, DC

Page 126

1    Q   Turning back briefly to our discussion
2  about what it was that made Ms. Schroer the top
3  candidate. You mentioned that the interview was
4  very important in your determination that
5  Ms. Schroer was the top candidate.
6       In what ways did the interview with
7  Mr. Rollins not go as well as the interview you
8  had had with Ms. Schroer?
9    A   I thought Mr. Schroer was a little more
10 insightful, particularly with response to the
11 first couple of questions on policy analysis
12 and -- "creative" I think is a word that I used
13 when I met with him on Monday.
14   Q   Okay. Anything else?
15   A   No.
16   Q   Okay.
17      THE WITNESS: Is this a good natural
18 break?
19      MS. McGOWAN: I think it probably is.
20 And so it seems like a time where we can begin our
21 narrative after lunch.
22      (Whereupon, at 11:58 a.m., a

Page 127

1           luncheon recess was taken.)
2    A F T E R N O O N  S E S S I O N
3              (1:00 p.m.)
4  Whereupon,
5       CHARLOTTE P. PREECE,
6  was recalled as the witness and, having been
7  previously sworn, was examined and testified further
8  as follows:
9    EXAMINATION BY COUNSEL FOR PLAINTIFF CONTINUED
10 BY MS. McGOWAN:
11   Q   Okay. We're back from lunch. And we
12 left off where we were talking about an agreement
13 that you had with Ms. Schroer to meet. And my
14 understanding was that it was a Friday when you
15 agreed to meet, and then it was the following
16 Monday that you actually met.
17      I'm going to show you a document that we
18 will mark Exhibit 27.
19      (Deposition Exhibit No. 27
20       marked for identification.)
21 BY MS. McGOWAN:
22   Q   Do you recognize this document?

Page 128

1       Actually, sorry. But while you review
2  it, I will just identify it for the record. This
3  is a document that's been produced in discovery by
4  the Government. It's been Bates-stamp number 707.
5  And at the top it says, Specialist in terrorism
6  and international crime.
7    A   Yes, I do.
8    Q   And what is it?
9    A   It is the beginning of a recommendation
10 for Mr. Schroer.
11   Q   Okay. And when did you draft this
12 document?
13   A   Thursday or Friday morning prior to the
14 lunch.
15   Q   And we discussed this briefly before the
16 break.
17      Do you recall whether you began drafting
18 this e-mail, or actually this document, before or
19 after you agreed to have lunch with Ms. Schroer?
20   A   Before.
21   Q   Okay. And after you agreed to have
22 lunch, did you -- is any of what appears in this

Page 129

1  document text that you drafted after agreeing to
2  have lunch with Ms. Schroer?
3    A   No.
4    Q   Okay. Were there any other drafts of
5  this document?
6    A   No.
7    Q   One question that I had is were you
8  under any particular time constraints with respect
9  to when you needed to make your final selection of
10 the applicant for the terrorism specialist?
11   A   I wanted to do it before Christmas.
12   Q   And were there any particular rules or
13 regulations that set out a deadline for you, or
14 was that just an internal deadline for yourself?
15   A   Yes. I requested once to have the
16 vacancy announcement extended. You have to draft
17 the letter of recommendation within I think it's
18 five days of -- three or five days of when the
19 posting closes. And so I think the posting was
20 extended through the end of the month of December.
21   Q   And by extending the posting, did that
22 mean that applications could continue to come in

                              33 (Pages 126 to 129)

Charlotte P. Preece                                    January 11, 2007
                              Washington, DC

Page 130

1   for --
2      A   No, no, no, no, no.
3      Q   Okay.
4      A   No. It just meant that we had longer to
5   make the selection.
6      Q   Okay. And what did you need to do, if
7   anything, to request that extension?
8      A   I needed to write a letter to the head
9   of human -- an e-mail in this case to the head of
10  human resources.
11     Q   And who is that?
12     A   I cannot remember. It's not the same
13  person anymore. I can't remember the name of who
14  it was at that time.
15     Q   And do you recall roughly when you sent
16  that e-mail?
17     A   I believe it was early December.
18     Q   And what did that e-mail say?
19     A   Basically requested an additional
20  two-week period to conduct reference checks and
21  make the final -- make a recommendation.
22     Q   And were you -- did you provide any

Page 131

1   additional reasons or any reasons as to why you
2   needed an additional two weeks?
3      A   Just what I told you. They're very
4   short memos, generally, just a couple sentences.
5      Q   And did you receive any response back to
6   that request?
7      A   An e-mail back that said that my request
8   was approved.
9      Q   Prior to the request being approved,
10  were there any requests for additional information
11  about why you needed more time?
12     A   No.
13     Q   Okay. Is it a common occurrence to ask
14  for this kind of extension?
15     A   It's not uncommon.
16     Q   How often have you done it?
17     A   Maybe one out of every four, one out of
18  every five.
19     Q   And so as a result of the extension, you
20  had until when to make --
21     A   I believe it was December 31st.
22     Q   Okay. And by December 31st, what was it

Page 132

1   that you were obligated to do? Is it to write
2   the --
3      A   To prepare the recommendation, the
4   director would have had to approve it, and the PAR
5   would have been cut.
6      Q   Okay. And is it possible to ask for
7   more than one extension?
8      A   You could ask for it.
9      Q   If you ask for more than one extension,
10  is your experience that you're then required to
11  provide additional feedback --
12     A   I would have had to provide additional
13  justification.
14     Q   So I want to turn to Monday now, when --
15  and I can take that document back from you.
16     A   (Handing document).
17     Q   Monday is, if I'm right, when you were
18  scheduled to meet with Ms. Schroer; is that
19  correct?
20     A   Yes.
21     Q   And just so that we're clear, I believe
22  that was Monday, December 20th, 2004.

Page 133

1          Tell me, on that day, when did you first
2   either speak or encounter Ms. Schroer?
3      A   Mr. Schroer came to my office around
4   noon.
5      Q   So and were you going to actually have
6   lunch at the Library, or had you planned to have
7   lunch somewhere else?
8      A   Somewhere else.
9      Q   Okay. Can you describe for me the part
10  of your meeting that took place up until you left
11  your office at the Library?
12     A   We chatted very briefly, just to
13  exchange pleasantries, and we left. I introduced
14  him to one or two people who were in the hall.
15     Q   Do you remember who you introduced him
16  to?
17     A   No.
18     Q   Were they individuals in your division
19  of --
20     A   Yes, yes --
21     Q   -- the CRS?
22     A   -- we were walk -- just walking out of

                                    34 (Pages 130 to 133)

Charlotte P. Preece                           January 11, 2007
                    Washington, DC

**Page 134**

1   my division.
2       Q   And do you recall what you said in
3   making this introduction?
4       A   This is David Schroer, we hope to have
5   him working with us on terrorism issues in the
6   not-too-distant future.
7       Q   Did you say anything to the affect of:
8   Here is the new guy that we're bringing on?
9       A   Here's the new guy that we're bringing
10  on? I don't remember using that terminology. But
11  certainly words to the affect that we had hoped to
12  bring Mr. Schroer on board, yes.
13      Q   At some point were you and Ms. Schroer
14  in your office?
15      A   Yes.
16      Q   And did you have any conversation while
17  you were in your office?
18      A   Other than to exchange pleasantries, I
19  don't recall an -- any conversation at all in my
20  office.
21      Q   Did you talk at all about your preparing
22  of the paperwork for Ms. Schroer?

**Page 135**

1       A   That's quite possible, that I said I was
2   in the process of preparing paperwork, yes,
3   uh-huh.
4       Q   Do you recall showing Ms. Schroer, you
5   know, paperwork regarding her application while
6   you were in your office?
7       A   No.
8       Q   On your way out to lunch, leaving your
9   office, did you encounter anyone?
10      A   Yes.  There were a few people walking
11  by.  And I introduced David to those people.  I
12  can't remember who they were.
13      Q   Did you -- do you recall encountering
14  Francis Miko on the way out?
15      A   I don't recall.
16      Q   Do you recall anything about those
17  conversations on the way out?
18      A   Not other than what I told you.  They
19  were very brief.  We were -- I said from the time
20  that David arrived in my office, we were three or
21  four minutes until we left.
22      Q   And do you recall anything that these

**Page 136**

1   individuals to whom you were introducing
2   Ms. Schroer, do you recall what they said?
3       A   No.
4       Q   Did anyone say things to the affect of,
5   you know, welcome on board or --
6       A   Quite possibly.  It would be good to
7   have you.  I don't know.  I assume people were
8   pleasant.
9       Q   Is there anything else about the part of
10  the meeting that happened while you were at the --
11  at your office at the Library?
12      A   No.  It was very brief.
13      Q   Okay.  Did you and Ms. Schroer converse
14  on the way to where you were having lunch?
15      A   I assume we chatted.
16      Q   Tell me what you remember about that
17  conversation.
18      A   Nothing.  The restaurant is two minutes
19  from the Library.
20      Q   Did you talk about the job?
21      A   I do not recall.
22      Q   Do you recall having any conversation

**Page 137**

1   about the people who work at the Library?
2           MS. RUSSELL: Objection.  Vague.
3           THE WITNESS: At the luncheon we did.
4   BY MS. McGOWAN:
5       Q   Okay.  I'll hold off then for a second.
6   I'll get us to lunch.
7       A   Okay.
8       Q   And so anything else about your
9   conversation on your way to the restaurant that
10  you remember?
11      A   No.
12      Q   Okay.  And once you're at lunch, can I
13  assume that conversation continued between you and
14  Ms. Schroer?
15      A   Yes.
16      Q   Okay.  Describe what you remember about
17  that conversation.
18      A   I was talking about what it was like to
19  work at CRS.  I was talking about our mission to
20  serve Congress, our values of objectivity and
21  nonpartisanship.  I was describing how the
22  sections were laid out, and the organization of

                                35 (Pages 134 to 137)

Charlotte P. Preece                                    January 11, 2007
                          Washington, DC

Page 138

1  the office. I was describing how we do our work.
2  I described our research design and briefing
3  process. I talked a little bit about what I call
4  the culture of the office.
5      Q  And how did you describe the culture?
6      A  I remember telling him it was a very
7  diverse and eclectic group of people, that we
8  weren't stereotyped like many institutions are:
9  The State Department, or the Intelligence Agency
10  or, God forbid, lawyers.
11         MS. RUSSELL: I guess I can't raise an
12  objection to that.
13         THE WITNESS: That people came from
14  different backgrounds: People from academia,
15  people from the military, people from other
16  executive agencies, people from think tanks, and
17  that I thought that that enriched the work of our
18  division because people brought various
19  perspectives to examining foreign and defense
20  policy issues.
21  BY MS. McGOWAN:
22      Q  Did you ever discuss why Ms. Schroer had

Page 139

1  emerged as your top candidate?
2      A  He asked me that question. And I
3  responded to it. And I told him pretty much what
4  I told you, that I thought his answers were a bit
5  more creative, that his contacts that he brought
6  to bear, would bring to bear, would be useful in
7  his position.
8      Q  Anything else?
9      A  I think I told him that we had a very
10  strong applicant pool, and we had another highly
11  qualified candidate that we looked at very
12  carefully.
13      Q  And did you have any conversation about
14  why Ms. Schroer had beaten out that other
15  candidate?
16      A  Yes. That was the conversation based on
17  the a little bit more creativity, imagination.
18  Very strong interview, I told him he had a strong
19  interview.
20      Q  Anything else?
21      A  In the conversation at lunch?
22      Q  About this part of the conversation

Page 140

1  about --
2      A  The qualifications?
3      Q  Yes.
4      A  That's what I recall.
5      Q  At some point did Ms. Schroer tell you
6  she had something she wanted to discuss with you?
7      A  Yes.
8      Q  Okay. Describe that conversation.
9      A  He said that he had something personal
10  that he wanted to talk to me about. And then he
11  asked me if I knew what transgender migration was,
12  or what I knew about it.
13      Q  And was that the precise term that --
14      A  That's the term I recall.
15      Q  Okay. And what did you say when she
16  asked you that?
17      A  Very little, if anything.
18      Q  And then where did the conversation go
19  from there?
20      A  He proceeded to describe it, and --
21      Q  And how did he describe it?
22      A  Well, he talked about that he'd always

Page 141

1  felt uncomfortable, there was something -- a level
2  of discomfort in his life, and that he'd come to
3  the realization over the years that he felt more
4  comfortable -- he would feel more comfortable
5  living life as a woman than a man.
6         And he told me that he was under -- had
7  been consulting with a psychiatrist, and that was
8  part of the process, and that he had been taking
9  hormone treatment for about a year, and wanted to
10  complete the other physical processes required for
11  the migration, and that he would like to start
12  work at CRS in January as a woman.
13      Q  What was the first thing that went
14  through your mind when you heard Ms. Schroer tell
15  you that she wanted to start work as a woman?
16      A  Wow, I can't believe this. I was
17  stunned.
18      Q  And how did you feel?
19      A  Surprised, disbelieving.
20      Q  Were you upset?
21      A  Not initially. I think I was more just
22  shocked.

                              36 (Pages 138 to 141)

Charlotte P. Preece                                    January 11, 2007
                          Washington, DC

| Page 142 |
| --- |
| 1    Q   How did you feel when Ms. Schroer was |
| 2  explaining to you what it meant to be transgender, |
| 3  or what she meant by it when she told you that she |
| 4  was transgender? |
| 5    A   I was listening. I was trying to |
| 6  understand. I've never known anyone who has |
| 7  undergone the process, so I was listening. |
| 8    Q   Were you phased at all by this |
| 9  information? |
| 10       MS. RUSSELL: Objection to the form of |
| 11  the question. It's vague. |
| 12       But you can answer if you understand it. |
| 13       THE WITNESS: If phased means shocked or |
| 14  surprised, yes. |
| 15  BY MS. McGOWAN: |
| 16    Q   So this didn't strike you as just |
| 17  run-of-the-mill lunch conversation? |
| 18    A   No. |
| 19    Q   Had you ever had a discussion like this |
| 20  with anyone before? |
| 21    A   No. |
| 22    Q   So how did you respond? |

| Page 144 |
| --- |
| 1    Q   And did he describe at all what he |
| 2  understood their experience to be? |
| 3    A   No. |
| 4    Q   Did he tell you whether or not those |
| 5  individuals had kept their clearance? |
| 6    A   No. |
| 7    Q   Did you talk at all about sort of what |
| 8  all was involved in transitioning from male to |
| 9  female? |
| 10    A   We didn't get into bitty gritty details; |
| 11  but, yes, I mean, we -- there would be surgeries |
| 12  required, and physical changes. |
| 13    Q   And did you talk at all about what kinds |
| 14  of surgeries were going to be involved? |
| 15    A   No. I mean, not in detail. |
| 16    Q   Do you remember talking at all about |
| 17  Ms. Schroer's plans to have facial surgery? |
| 18    A   He told me he wanted to complete the |
| 19  process. And by that I took it to mean that he |
| 20  would need the electrolysis and implants and other |
| 21  surgery. |
| 22    Q   And did you talk at all about any plans |

| Page 143 |
| --- |
| 1    A   I think I asked him to tell me how he |
| 2  came to that decision. He pulled out a portfolio |
| 3  and showed me some photographs on how he would |
| 4  present as a woman. I looked at those. |
| 5    Q   And what did you think? |
| 6    A   What did I think? |
| 7    Q   Looking at the photos. |
| 8    A   I thought he looked like a man dressed |
| 9  in women's clothes. |
| 10    Q   Anything else? What else went through |
| 11  your mind? |
| 12    A   That was -- I mean, confusion, I guess. |
| 13  At one point I think I asked him, David, how can I |
| 14  hire you as a man and you start work as a woman. |
| 15  We went on from there to talk about the security |
| 16  clearance. And he said that he knew he would be |
| 17  required to get a psychiatric fitness for duty |
| 18  determination. |
| 19    Q   And did he say how he knew that? |
| 20    A   He said that he knew other people who |
| 21  had gone through this process who had gotten |
| 22  security clearances. |

| Page 145 |
| --- |
| 1  for sort of full sex reassignment surgery? |
| 2    A   Not plans, no. I mean, nothing that I'm |
| 3  going to do this in February, I'm going to do this |
| 4  in December, no. |
| 5    Q   Was there any conversation about how |
| 6  this would impact on his ability to -- or her |
| 7  ability to start at work? |
| 8    A   No. I would say we talked for maybe 15 |
| 9  or 20 minutes after this revelation. And I think |
| 10  because I was confused and taken aback, I said |
| 11  that I would have to talk to people within my |
| 12  organization, and I would get back to him within |
| 13  24 hours. |
| 14    Q   Did you ask Ms. Schroer who else knew |
| 15  that she was transitioning? |
| 16    A   I don't recall that. |
| 17    Q   Did you ask her if any of her job |
| 18  references knew that she was transitioning? |
| 19    A   I don't believe I did. |
| 20    Q   And did you have a conversation with |
| 21  Ms. Schroer about what name to use on the |
| 22  paperwork? |

                                    37 (Pages 142 to 145)

Charlotte P. Preece                                     January 11, 2007
                          Washington, DC

| Page 146 | Page 148 |
|---|---|
| 1       MS. RUSSELL: Objection. Lacks | 1    the entity currently holding his security |
| 2    foundation. | 2    clearance? |
| 3       MS. McGOWAN: I'm sorry. Sure. | 3       A   No. |
| 4    BY MS. McGOWAN: | 4       Q   Why not? |
| 5       Q   Did you have a conversation with | 5          MS. RUSSELL: Objection. Calls for |
| 6    Ms. Schroer about the fact that you were filling | 6    speculation. |
| 7    out paperwork for the position and needed to know | 7          But you can answer if you understand the |
| 8    what name to use? | 8    question. |
| 9       A   No. I asked him how I could hire him as | 9          THE WITNESS: I didn't think of it at |
| 10   David and he would start work as Diane. And I was | 10   the time. You know, at this -- by this point, I |
| 11   confused about paperwork, as well. | 11   needed advice. |
| 12      Q   And tell me about that conversation. | 12   BY MS. McGOWAN: |
| 13         Sort of what did Ms. Schroer say when | 13      Q   So I wanted to ask you, to the extent |
| 14   you posed this question to her? | 14   that you are articulating a concern that David had |
| 15      A   I don't recall, other than he seemed to | 15   a clearance but Diane didn't, why did you think |
| 16   think that it could be worked out. | 16   that the clearance that Ms. Schroer held as David |
| 17      Q   When you asked Ms. Schroer how could you | 17   would not apply to Diane, as well? |
| 18   hire her as David and have her start work as | 18      A   I just didn't think it would. But |
| 19   Diane, was it just a question of paperwork that | 19   that's why I ended the conversation, because I |
| 20   you were concerned about, or did you mean | 20   needed to go back and get advice from the security |
| 21   something more? | 21   people. |
| 22      A   Well, I certainly knew I needed to check | 22      Q   Did you think that David would become a |

| Page 147 | Page 149 |
|---|---|
| 1    on the security clearance. That was foremost in | 1    different person as Diane? |
| 2    my mind. | 2          MS. RUSSELL: I'm going to object to the |
| 3       Q   And why did you think that? | 3    form of the question. |
| 4       A   Because David had a clearance. Diane | 4          But you can answer if you understand. |
| 5    didn't. | 5          THE WITNESS: Can you say what you mean |
| 6       Q   And what conversations, if any, did you | 6    by a different person? |
| 7    have with Ms. Schroer at the time about this | 7    BY MS. McGOWAN: |
| 8    security clearance issue? | 8       Q   To the extent that David had a security |
| 9       A   I asked him how this was likely to | 9    clearance and the concern was that Diane did not, |
| 10   affect his ability to get a security clearance. | 10   my question is did you think that David would be a |
| 11      Q   And did you, at the moment you're asking | 11   different person as Diane, such that the |
| 12   Ms. Schroer the question, have a gut instinct | 12   information that they knew about David and that |
| 13   about what impact it would have? | 13   formed the basis for his security clearance |
| 14      A   I certainly had a feeling that it could | 14   decision would no longer be relevant for Diane? |
| 15   slow things down a great, great deal. | 15      A   I don't think I thought of him as |
| 16      Q   Did you think that David Schroer would | 16   different in terms of what he knows. He would |
| 17   lose his security clearance over this issue? | 17   still have the same experiences he had, to carry |
| 18      A   David, I didn't know about whether David | 18   with him as Diane. But how that affected the |
| 19   would, but I knew Diane didn't have one. | 19   security clearance, I had a lot of questions |
| 20      Q   Did you have any conversations at all | 20   about. |
| 21   about what of this information David -- what | 21      Q   And what were those questions? |
| 22   information, if any, David had already reported to | 22         What were you concerned about? |

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                    January 11, 2007
                              Washington, DC

|  | Page 150 |
|---|---|

1     A   Was Diane going to be able to be
2   cleared; and, if so, in a timely fashion.
3     Q   And why were you concerned that Diane
4   might not be cleared?
5     A   Because the position required a top
6   secret clearance, and because it was needed
7   particularly to do this job.
8     Q   And understanding that the position
9   itself needed a clearance, why were you concerned
10   that Diane might not get that clearance --
11     A   In a timely way?  Because he, himself,
12   told me that he would likely have to have a
13   psychological fitness for duty prior to a
14   determination whether to proceed with the
15   clearance.
16     Q   Other than that information, was there
17   any other concern that you had; for example, with
18   regard to honesty?
19     A   Yes.  I felt deceived, somewhat
20   deceived.
21     Q   And did you address that concern with
22   Ms. Schroer?

|  | Page 151 |
|---|---|

1     A   No.
2     Q   At any point did you say something along
3   the lines of:  Why are you just telling me this
4   now?
5     A   I don't know if I -- I don't recall.  I
6   may have.  I may not have.  I don't recall.
7     Q   When I asked you sort of your reaction
8   when you first heard this information, my
9   understanding is you said that you weren't upset
10   initially?
11     A   Yes.
12     Q   Is there a point at which you became
13   upset?
14     A   Not upset visibly.  But as the
15   conversation went on, I thought -- I did think to
16   myself certainly why are you telling me this and
17   why are you telling me now?  Why didn't you come
18   to the interview dressed as a woman?  He had told
19   me, during the course of the conversation, that he
20   was presenting himself as a woman except in work
21   settings.
22     Q   And what did you think about that?

|  | Page 152 |
|---|---|

1     MS. RUSSELL:  Lacks foundation.
2     But you can answer if you understand the
3   question.  And it also -- no, I'll just stick with
4   the same objection.  It lacks foundation.
5     But you can answer if you understand.
6     THE WITNESS:  Certainly my personal
7   preference was that if he were open and honest
8   about this and come to the interview dressed as a
9   woman, at least I wouldn't have been -- felt
10   deceived.
11   BY MS. McGOWAN:
12     Q   And did you have any conversations with
13   Ms. Schroer about what her legal name was at that
14   point?
15     A   He told me that he would be changing his
16   name early in January to Diane.
17     Q   So up until that point, Ms. Schroer's
18   legal name was still David Schroer?
19     A   That's what he was using, yes.
20     Q   So what would you have thought if on
21   December 28th, I think it was, at 10:00 a.m., when
22   the person on your interview list named David

|  | Page 153 |
|---|---|

1   Schroer was scheduled to appear, a woman in a
2   dress showed up for the interview?
3     MS. RUSSELL:  Calls for speculation.
4     But you can answer if you understand.
5     THE WITNESS:  What would I -- I'm sorry?
6   BY MS. McGOWAN:
7     Q   What would you have thought?
8     A   I would have thought the person was a
9   transsexual.
10     Q   And how would that have impacted your
11   assessment of that applicant?
12     A   I would have probably consulted
13   personnel security to see if there were
14   implications for an individual's ability to get a
15   security clearance.
16     Q   Other than the security clearance issue
17   that you just identified, would you have thought
18   that this individual being transsexual impacted on
19   their KSA's, in knowledge, skills, and abilities,
20   for the position?
21     A   No, other than contacts.  I did have
22   some concerns about whether his contacts knew,

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                   January 11, 2007
                          Washington, DC

| Page 154 |
| --- |

1  whether they would be as forthcoming as they might
2  be had he not revealed this or undergone the
3  procedures.
4      Q   And would your concern about contacts
5  have been less if Ms. Schroer had come to the
6  interview dressed as a woman?
7      A   They would have been there under that
8  case, as well.
9      Q   Do you recall, when Ms. Schroer told you
10  that she was transitioning from male to female, do
11  you recall saying anything along the lines of, you
12  know: Why would you want to do something like
13  that, or words to that affect?
14      A   I think I did ask him how did you come
15  to this decision, why did you do that, yes.
16      Q   And what was his response? What was
17  Ms. Schroer's response?
18      A   To the best of my recollection, he said
19  that he had never felt comfortable in his body,
20  and that it was something that he -- probably came
21  to him as -- as -- when he was young, but it took
22  a long time for him to come to the realization

| Page 155 |
| --- |

1  that, yes, I would be more comfortable in a
2  female's body.
3      Q   And so you -- am I right you were told
4  by Ms. Schroer that this was something that she
5  had been dealing with for a long time; is that
6  right?
7      A   Yes. Uh-huh.
8      Q   And to the extent that this was
9  something that Ms. Schroer had been dealing with
10  for a long time, were you concerned at all about
11  how Ms. Schroer's decision to appear at work as a
12  woman may or may not distract her from her work
13  duties?
14      A   I'm sorry. Please repeat that.
15      Q   Sure. I'll make it a shorter question.
16          Were you concerned at all about
17  Ms. Schroer's transition as being a distraction?
18      A   I was concerned in terms of the
19  surgeries. And I knew nothing about how many
20  surgeries would be required, how long they would
21  take.
22      Q   And did you ask Ms. Schroer for any

| Page 156 |
| --- |

1  information that might give you a better sense
2  about that?
3      A   I don't recall that I did.
4      Q   What did you think about the fact that
5  Ms. Schroer had brought pictures of herself
6  dressed as a woman to this meeting?
7          MS. RUSSELL: Objection. Lacks
8  foundation.
9  BY MS. McGOWAN:
10      Q   Let me back up.
11          I think we discussed that at some point
12  in the meeting Ms. Schroer showed you pictures; is
13  that correct?
14      A   That's correct.
15      Q   And these were obviously pictures that
16  she had brought to the meeting to show you; is
17  that right?
18      A   That's right.
19      Q   Okay. What did you think about the fact
20  that she had brought these pictures to this
21  meeting?
22      A   I guess I thought David wants to see

| Page 157 |
| --- |

1  me -- wants to show me what he would look like as
2  a female. I don't think I thought anything beyond
3  that.
4      Q   Do you recall what you said first when
5  you saw the pictures?
6      A   I don't think I said much of anything.
7      Q   Do you recall saying "wow," or words to
8  that affect?
9      A   No.
10      Q   Did you think it was appropriate for
11  Ms. Schroer to show you those pictures?
12      A   I didn't know what was appropriate.
13          MS. RUSSELL: Objection to the form of
14  the question.
15          Go ahead.
16  BY MS. McGOWAN:
17      Q   I'm sorry?
18      A   I didn't know what was appropriate.
19      Q   So after hearing this information, did
20  you have any concern that the contacts that
21  Ms. Schroer had in the government and the military
22  would no longer want to associate with her because

40  (Pages 154 to 157)

Charlotte P. Preece                                    January 11, 2007
                              Washington, DC

| Page 158 | | Page 160 |

Page 158

1  she was undergoing a gender transition?
2        MS. RUSSELL: Object to the form.
3        But you can answer if you understand.
4        THE WITNESS: Yes. I think I already
5  mentioned that.
6  BY MS. McGOWAN:
7     Q   Okay. And why did you think that?
8     A   The military being the culture it is,
9  and particularly special forces, I thought it's
10  possible that some people would be understanding
11  and others would not.
12     Q   And when you talk about the culture of
13  the military, what do you mean?
14     A   Combat lines, uniquely male profession.
15     Q   Did you think of the military as being a
16  particularly unfriendly or unsympathetic place
17  with respect to transgender people?
18     A   I thought it was likely probably to have
19  a more conservative attitude than the general
20  population at large.
21     Q   And in this context, by conservative, is
22  it fair to say that mean negative?

Page 160

1     A   I didn't ask that.
2     Q   As you were hearing this information,
3  what were you thinking with respect to
4  Ms. Schroer's trustworthiness?
5     A   As I said, I felt somewhat deceived.
6     Q   And why did you think that?
7     A   Because he waited for so late in the
8  game to talk to me about this.
9     Q   And when in the process do you think
10  Ms. Schroer should have told you?
11     A   He could have told me at any time. He
12  could have told me at the interview or after the
13  interview. He could have told me when I contacted
14  him to let him know that he was a top candidate
15  and that I would be starting reference checks.
16     Q   And -- I'm sorry. Continue.
17     A   He could have called me any time while
18  those reference checks were going on and we were
19  in fairly routine contact by phone or by e-mail.
20     Q   And if at the point where you contacted
21  Ms. Schroer regarding her reference checks she
22  told you this information about her intentions to

Page 159

1        MS. RUSSELL: I'm going to objection to
2  the form of the question.
3        But you can answer if you understand.
4        THE WITNESS: Conservative in terms of
5  traditional values than is being seen as outside
6  those traditional norms.
7  BY MS. McGOWAN:
8     Q   Were you concerned about bias by
9  military people against Ms. Schroer if she were in
10  the position?
11     A   Yes.
12     Q   And with respect to this concern about
13  her contacts with government and military people
14  and possible bias, did you express any of those
15  concerns to her?
16     A   No. I was to the point where I didn't
17  want to say anything more, because I needed to
18  process it. I needed to go back to my agency,
19  talk to some people.
20     Q   And so did you ask her if any of her
21  special forces, you know, colleagues knew that she
22  was transitioning?

Page 161

1  transition, would you have gone forward and
2  contacted her references, or would you have walked
3  away at that point?
4        MS. RUSSELL: Objection to the form.
5  Calls for speculation.
6        THE WITNESS: I would have probably did
7  the same thing I did in this circumstance, and go
8  back talk to my boss and talk to personnel
9  security to determine impact.
10  BY MS. McGOWAN:
11     Q   Did you say anything to Ms. Schroer
12  about feeling deceived, or your concerns about her
13  trustworthiness?
14     A   I don't recall that I did.
15     Q   Is there anything else that you remember
16  discussing during this lunch?
17     A   I remember saying something to the
18  affect that, David, you've given me a lot to think
19  about. I need to go back to my office and talk to
20  some people. I do want to fill this position by
21  Christmas, and so I'll get back to you in a timely
22  manner.

41 (Pages 158 to 161)

Charlotte P. Preece                                      January 11, 2007
                          Washington, DC

| Page 162 |
| --- |

1    Q    Anything else?
2    A    That's -- that was pretty much the end
3  of the conversation.
4    Q    Okay.  And before we end this part of
5  the conversation, I just want to go back and make
6  sure that I am clear about everything that you
7  discussed.
8        When you raised this issue with
9  Ms. Schroer of how can I hire you as David when
10  you want to show up as Diane, other than the name
11  on the form and other than the security clearance
12  concern that you identified, did you mean anything
13  else by that question?
14        MS. RUSSELL:  I'm going to object to the
15  extent it mischaracterizes her testimony.
16        But you can go ahead and answer if you
17  understand the question.
18        THE WITNESS:  Please repeat it.
19  BY MS. McGOWAN:
20    Q    Sure.  We've talked about the concern
21  about the name that goes on the paperwork, whether
22  it should be David or whether it should be Diane.

| Page 163 |
| --- |

1  And also talked about your concern about the
2  security clearance issue.
3        I'm sort of wondering if there's
4  anything else that you were trying to convey when
5  you asked Ms. Schroer:  How can I hire you as
6  David when you want to come to work as Diane?
7        MS. RUSSELL:  It's the same objection.
8        But answer it if you understand it.
9        THE WITNESS:  It was a practical
10  question.  David Schroer applied.  David Schroer
11  interviewed.  I did reference checks on David
12  Schroer.  He wants to start work as Diane.  I
13  didn't hire Diane.  I didn't recommend Diane.  I
14  didn't interview Diane.
15  BY MS. McGOWAN:
16    Q    And in what ways were you concerned that
17  Diane would be different from David?
18        MS. RUSSELL:  Objection to the form.
19  BY MS. McGOWAN:
20    Q    Or were there any ways in which you were
21  concerned that Diane would be different from David
22  in a way that would impact your decision about

| Page 164 |
| --- |

1  whether you wanted Diane when you had wanted
2  David?
3    A    Just the security clearance.
4    Q    Okay.
5    A    The contacts.
6    Q    Uh-huh.  Anything else?
7    A    Those were the primary.
8    Q    Recognizing that these two were the
9  primary reasons, were there any other reasons,
10  even recognizing that they may have been less
11  important?
12    A    Credibility with members of Congress
13  went through my mind.
14    Q    And by credibility, what do you mean?
15    A    This position is a senior position.  It
16  would likely be that -- or it was certainly
17  expected to be that this person would have close
18  contacts with committees, potentially be called to
19  testify.  Generally when you testify they read a
20  bio about yourself.  He would be testifying before
21  people who knew -- would know that only a man
22  could have those experiences.

| Page 165 |
| --- |

1    Q    And were you concerned that people would
2  react negatively?
3    A    Yes.
4    Q    And why is that?
5    A    That they might not be as tolerant, the
6  same reason as the contacts.
7    Q    And so with respect to the credibility
8  with members of Congress, is it fair to say that
9  you were concerned about bias against plaintiff by
10  individuals who disapproved of transgender people?
11    A    I thought it was possible.
12    Q    And did you -- were you concerned that
13  people might be less interested in what she had to
14  say because she was transgender?
15    A    Yes.
16        MR. ESSEKS:  Why don't we take five
17  minutes.
18        MS. McGOWAN:  We'll take a five-minute
19  break here, and be back at 2:00.
20        (Recess)
21  BY MS. McGOWAN:
22    Q    So we're back from our break.  And we

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                                    January 11, 2007
                                    Washington, DC

Page 166

1  were just wrapping up our conversation about the
2  lunch meeting that you had with Ms. Schroer.
3        Before I sort of move to what happened
4  next, I'll just ask you is there anything else
5  about that conversation that we haven't discussed?
6     A   Not that I recall at the moment.
7     Q   And how did you wrap things up?
8     A   I think with that last statement that I
9  said there, David, you've given me a lot to think
10  about. I need to go back to the Library and talk
11  to some officials, that I want to finish this
12  posting around the Christmas -- before Christmas,
13  and that I will be back to you -- I can't remember
14  whether I said the next day or in 24 hours, but
15  soon.
16     Q   And at some point you and Ms. Schroer
17  part ways; is that right?
18     A   Yes.
19     Q   Okay. So did you walk back to your
20  office by yourself, or was Ms. Schroer still with
21  you?
22     A   Well, we walked out of the restaurant

Page 167

1  together. I don't think he went back into the
2  building with me.
3     Q   Okay. What were you thinking as you
4  walked back to your office after lunch?
5     A   That was the most incredible experience
6  I ever had.
7     Q   And what do you mean by incredible?
8     A   Unbelievable. It's just not what I
9  expected at all.
10     Q   Now, you mentioned -- and correct me if
11  I'm wrong -- that you said that you had never
12  known a transgender person before; is that right?
13     A   Yes.
14     Q   So how do you know whatever you knew at
15  that point -- how did you know whatever you knew
16  at that point about what it meant to be
17  transgender?
18     A   From what David told me.
19     Q   Had you ever, you know, seen any
20  television shows or movies about transgender
21  people?
22     A   No. The only recollection that I had

Page 168

1  was of tennis, was Rene Richards, when she played
2  with Billy Jean King. Yes, I am that old.
3     Q   And what did you know about Rene
4  Richards? And how did that sort of inform what
5  you knew about transgender people?
6     A   I just knew that there was a sex change.
7     Q   And have you ever interacted with anyone
8  who's transgender?
9     A   I don't believe I have. It's possible
10  that I may have, but not to my knowledge.
11     Q   And this is sort of a subpart of this
12  question, but have you ever interacted with
13  anybody at the Library of Congress who's
14  transgender?
15     A   Not that I know of.
16     Q   And have you ever interacted with
17  someone whom you didn't know at the time was
18  transgender, but then later found out that they
19  were?
20     A   No.
21     Q   Are you familiar with the movie
22  "Trans-America"?

Page 169

1     A   No.
2     Q   Okay. Other than the television reports
3  you mentioned about Rene Richards, have you seen
4  any television documentaries or news shows about
5  transgender people?
6     A   No.
7        MS. RUSSELL: Objection, to the extent
8  it that it mischaracterizes her testimony.
9        But you can answer if you understand.
10        THE WITNESS: If I understand, you asked
11  me if I have seen any --
12  BY MS. McGOWAN:
13     Q   Television --
14     A   -- television shows or documentaries
15  about transgender migration issues? No.
16     Q   When you learned that Ms. Schroer is in
17  the process of transitioning from male to female,
18  did that make you feel uncomfortable at all?
19     A   I would say more curious than
20  uncomfortable. I was trying to understand it.
21     Q   Did you feel differently interacting
22  with her once she told you that she felt like she

43 (Pages 166 to 169)

Charlotte P. Preece                                    January 11, 2007
                          Washington, DC

| Page 170 |
|---|
| 1    was a woman? |
| 2        A    Not about the individual, no. I knew it |
| 3    was going to create all kinds of complexities. |
| 4    But as far as the way I felt toward David, no. |
| 5        Q    And so from your perspective, nothing |
| 6    about your interaction was any different after you |
| 7    learned that Ms. Schroer was a transsexual woman? |
| 8            MS. RUSSELL: Objection to the form. |
| 9            You can answer if you understand. |
| 10           THE WITNESS: I won't say nothing was |
| 11   different. My feelings about David's |
| 12   competencies, his knowledge, his experience was -- |
| 13   was not different. Yes, I was surprised, as I |
| 14   stated. And, yes, it did raise concerns about |
| 15   whether he was going to be able to -- whether she |
| 16   was going to be able to fill the institutional |
| 17   needs that the organization had. |
| 18   BY MS. McGOWAN: |
| 19       Q    And so other than that, other than your |
| 20   thinking through the impact of this information on |
| 21   the job, you had no other personal reaction to the |
| 22   news? |

| Page 171 |
|---|
| 1        A    No. I mean -- no. I didn't bear him |
| 2    ill will as a result of it, no. |
| 3        Q    And not even ill will. Was there any |
| 4    way in which you felt differently interacting with |
| 5    Ms. Schroer after you learned this news? |
| 6            MS. RUSSELL: Same objection. Form. |
| 7            THE WITNESS: Please repeat. |
| 8    BY MS. McGOWAN: |
| 9        Q    Sure. You mentioned that you didn't |
| 10   have any ill will. |
| 11           And I was asking, putting aside sort of |
| 12   any, you know, feelings of ill will towards |
| 13   Ms. Schroer, was there anything about your |
| 14   interaction with Ms. Schroer that felt different |
| 15   after she tells you: I'm a woman? |
| 16       A    Just what -- what I was going to need to |
| 17   do, but not about him as an individual. |
| 18       Q    Did you have any concern that |
| 19   Ms. Schroer wouldn't pass for a woman if she came |
| 20   to the Library of Congress dressed as a woman? |
| 21           MS. RUSSELL: Objection to the form. |
| 22           THE WITNESS: That wasn't a |

| Page 172 |
|---|
| 1    consideration that crossed my mind. |
| 2    BY MS. McGOWAN: |
| 3        Q    Did you think individuals who had not |
| 4    met David Schroer would see Diane Schroer and |
| 5    suspect that this was a transsexual person? |
| 6        A    Again, that was a fleeting thought in my |
| 7    mind, if that. These other real factors were. |
| 8    The security clearance, by far the dominant, was |
| 9    what I was focusing on. When I came back and I |
| 10   talked to the director, the first person I talked |
| 11   to was Cynthia Wilkins. That was my overriding |
| 12   concern. |
| 13       Q    And we'll definitely talk about what |
| 14   happened when you got back to the office. |
| 15           My question is, in light of what you saw |
| 16   in the pictures that Ms. Schroer shared with you |
| 17   and the concerns that you expressed about how she |
| 18   looked, were you concerned that other people would |
| 19   react to Ms. Schroer as a man in a dress? |
| 20       A    I don't know if "concerned" is the right |
| 21   word. Yes, they probably would have. |
| 22       Q    As far as the individuals who are in the |

| Page 173 |
|---|
| 1    specific unit where the terrorism specialist would |
| 2    have worked -- and I believe that's Mr. Miko's |
| 3    unit -- how many people are in that unit, if |
| 4    that's the right term to describe the section? |
| 5        A    Roughly 12, 13. |
| 6        Q    And how many of those people are -- in |
| 7    that unit are military veterans? |
| 8        A    Only the person who was hired for the |
| 9    position. |
| 10           MR. ESSEKS: Mr. Rollins? |
| 11           THE WITNESS: Yes. |
| 12   BY MS. McGOWAN: |
| 13       Q    And how many men and woman are in that |
| 14   unit? |
| 15       A    That may take me a minute. |
| 16       Q    Okay. |
| 17               (Whereupon at which time the |
| 18               witness wrote on a piece of |
| 19               paper.) |
| 20           THE WITNESS: And now that I am |
| 21   composing this list, I now see that there is |
| 22   another man who is -- had military experience, as |

44  (Pages 170 to 173)