McGowan Declaration – Exhibit A
Part 2 of 2

Charlotte P. Preece                                    January 11, 2007
                          Washington, DC

Page 174

1  well, in that section.
2       Right now, I'm coming up with six women
3  and four men.
4  BY MS. McGOWAN:
5       Q    Okay.  And can you go through -- and I
6  don't necessarily need the names -- but tell me
7  which positions are held by the men, and then
8  which -- the titles of the positions that are held
9  by the women?
10      Or approximations, a description of
11 the --
12      A    Of what they do?
13      Q    Of what they do, by subject area or
14 however it takes.
15      A    Okay.  I'll start with the men.  The
16 first one does foreign aid, would be Mr. Rollins,
17 who obviously does terrorism.  The third person
18 does international narcotics and crime.  And the
19 fourth is a new-hire who does the foreign policy
20 apparatus.
21      Q    Okay.
22      A    Do you want me to do the same thing for

Page 175

1  the women?
2       Q    Yes.  As to the women?
3       A    The first person does sanctions and
4  foreign policy legislation.
5       Q    I'm sorry.  Is that two or --
6       A    That's --
7       Q    -- that's one?
8       A    -- sanctions and foreign policy
9  legislation.  The next one does foreign policy
10 management, State Department.  The third person
11 does humanitarian relief and reconstruction.  The
12 fourth person does human rights and international
13 health.  The fifth person does foreign operations
14 appropriations.  The sixth person does the United
15 Nations and related agencies.
16      Q    Okay.
17      A    I could be omitting somebody.  That's
18 just the best of my recollection.
19      Q    Sure.  Can you explain to me a little
20 bit what foreign policy apparatus -- that was one
21 of the positions that you listed -- what does that
22 do?

Page 176

1       A    The institutions in the State
2  Department, International Broadcasting, what used
3  to be the U.S. Information Agency.
4       Q    And so this person provides research
5  support for those agencies?
6       A    Right, and programs conducted by those
7  agencies.  USAID.
8       Q    And how many of these positions interact
9  regularly with members of the military?
10      A    Certainly the terrorism position, the
11 narcotics position, the reconstruction and
12 humanitarian relief.  That's about half of them.
13      Q    And am I correct Mr. Miko is the
14 supervisor of all these people?
15      A    Yes.
16      Q    Okay.  So we are now at the point where
17 you're back at your office.  Tell me what's the
18 first thing you do.
19      A    Go down to the director.
20      Q    Did you encounter anyone --
21      A    Before that?  No.
22      Q    Okay.  So you go down to the director.

Page 177

1       And that's Mr. Mulhollan?
2       A    That's correct.
3       Q    Okay.  Tell me what happens.
4       A    I tell him about the lunch, and what
5  Mr. Schroer has revealed.
6       Q    And how do you describe this to him,
7  what happened?
8       A    I said, Dan, I just had a very unique
9  situation, experience in my life.  The candidate
10 that I was considering recommending for the
11 position of terrorism has informed me that he
12 would like to start work as a woman.  He said,
13 you're kidding.  I said, no.  I said, I need to
14 talk to some people.  I said, I would like to go
15 down and talk to Cynthia Wilkins, because I was
16 pretty sure this was going to have implications
17 for security clearance.
18      And he said, okay, I will let Kent know.
19 And that would be Kent Ronhovde, who is the
20 counselor to the director.
21      Q    Other than "you're kidding," did
22 Mr. Mulhollan say anything else to express, you

Charlotte P. Preece                                January 11, 2007
                        Washington, DC

| Page 178 |
|---|
| 1   know, his surprise or other reaction to your news? |
| 2      A   No.  It was a short conversation, |
| 3   probably lasting no more than two to three |
| 4   minutes.  And I did tell him that time was of the |
| 5   essence, because I promised to get back to |
| 6   Schroer. |
| 7      Q   And so other than offering to contact |
| 8   Mr. Ronhovde, did Mr. Mulhollan say that he would |
| 9   do anything else? |
| 10     A   No. |
| 11     Q   And then did you go directly from that |
| 12  meeting -- |
| 13     A   I think I went back to my office to call |
| 14  Cynthia first to see if it was okay to come down, |
| 15  if she were free. |
| 16     Q   And did you explain at all to her what |
| 17  you wanted to meet with her about, on that phone |
| 18  call? |
| 19     A   No. |
| 20     Q   She was available? |
| 21     A   She was available. |
| 22     Q   And so what happened next? |

| Page 179 |
|---|
| 1      A   I went to her office.  And I told her |
| 2   the same thing, what had transpired.  And I asked |
| 3   her what ramifications this new information would |
| 4   have that related to the candidate's ability to |
| 5   get clearance. |
| 6      Q   And when you told her what had happened |
| 7   during your lunch meeting, what did you say? |
| 8         How did you describe what had happened? |
| 9      A   I said, Cynthia, I was considering |
| 10  recommending a candidate for a position that |
| 11  requires a top secret security clearance.  During |
| 12  the conversation, the gentleman told me that he |
| 13  would like to start work as a woman, and that he |
| 14  would like to -- how could I say it -- migrate -- |
| 15  transgender migration, was undergoing transgender |
| 16  migration. |
| 17     Q   And what was her reaction? |
| 18     A   Her reaction was she had not dealt with |
| 19  a case like this before.  And she asked me a few |
| 20  questions.  And then she said that she would like |
| 21  to check on the regulations before discussing this |
| 22  with me any further, and that she would meet with |

| Page 180 |
|---|
| 1   us tomorrow, or soon thereafter. |
| 2      Q   I'm interested to find out more about |
| 3   the questions that she asked you. |
| 4         Before we turn to that, as far as her |
| 5   initial reaction, did she say anything along the |
| 6   lines of "wow" or -- |
| 7      A   No. |
| 8      Q   -- "holy smokes, that's wild"? |
| 9      A   No. |
| 10     Q   Okay.  Other than saying that she hadn't |
| 11  dealt with a case like this before, did she |
| 12  provide any sort of initial indication about her |
| 13  reaction to this piece of information? |
| 14     A   No. |
| 15     Q   And then you said that she asked you |
| 16  some questions. |
| 17        What questions did she ask you? |
| 18     A   Was the -- did the job vacancy |
| 19  announcement carry a TIS requirement. |
| 20     Q   And your answer to that was? |
| 21     A   Yes. |
| 22     Q   Okay.  What else? |

| Page 181 |
|---|
| 1      A   I don't recall. |
| 2      Q   Did she ask whether or not the applicant |
| 3   currently held a clearance? |
| 4      A   She may have. |
| 5      Q   Did she ask anything about when the |
| 6   individual's most recent security investigation |
| 7   had been conducted? |
| 8      A   No. |
| 9      Q   Did she ask you any questions about |
| 10  break in service, or interruptions in service? |
| 11     A   Not that I recall.  She didn't ask me |
| 12  about the individual.  She was just trying to get |
| 13  some facts before she did her research. |
| 14     Q   At that point, having gone through the |
| 15  application process with Ms. Schroer, did you know |
| 16  whether there had been any interruption in |
| 17  Ms. Schroer's holding of a security clearance? |
| 18     A   No. |
| 19     Q   And so at this point, am I right that |
| 20  Ms. Wilkins asked for no information specifically |
| 21  about the person involved? |
| 22     A   I don't recall. |

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                    January 11, 2007
                        Washington, DC

| Page 182 |
|---|

1     Q   Did you offer any information about the
2   specific person involved for her to take into
3   account?
4     A   I think I did mention, yes, that he had
5   25-plus years of military service, told her his
6   MSO.
7     Q   I'm sorry.  By --
8     A   That's military occupational specialist.
9     Q   Okay.  Okay.  What other information
10  about Ms. Schroer specifically did you share?
11    A   That he had showed me a portfolio.
12    Q   Did Ms. Wilkins ask any questions about
13  the portfolio?
14    A   No.
15    Q   Did she ask you to described the
16  pictures in the portfolio?
17    A   No.
18    Q   Did you describe what the pictures were?
19    A   I can't recall, other than to say he
20  showed me about half a dozen photos of what he
21  would look like as a woman.
22    Q   And how long did the meeting with

| Page 183 |
|---|

1   Ms. Wilkins last?
2     A   Not long.  Ten minutes, 10, 15 minutes.
3     Q   Did you discuss any of the specifics
4   that Ms. Schroer had shared with you about what
5   was involved in transitioning, either sort of
6   medical or psychological?
7     A   Other than to tell her that he intended
8   to go through the complete process.
9     Q   And did you --
10    A   And that he -- I do remember telling her
11  that he had mentioned that he would likely need a
12  psychiatric fitness for duty prior to a
13  determination whether or not to go ahead with a
14  security clearance investigation.
15    Q   And did Ms. Wilkins respond at all to
16  your use of the term psychiatric fitness for duty
17  evaluation?
18    A   No.
19    Q   Did she express, you know, any sentiment
20  agreeing or disagreeing with whether or not
21  Ms. Schroer's statement about a psychiatric
22  fitness for duty evaluation was accurate?

| Page 184 |
|---|

1     A   No.  She said she wanted to do her
2   homework.  That's the kind of person she is.
3     Q   And so did you inform Ms. Wilkins that
4   Ms. Schroer was under the care of a therapist?
5     A   Possibly.
6     Q   And did you discuss any sort of specific
7   medical procedures that Ms. Schroer might be
8   contemplating?
9     A   No.
10    Q   Did you discuss at all with Ms. Wilkins
11  whether there was any information that would be
12  particularly helpful for her to have from the
13  applicant?
14    A   No.
15    Q   Is there anything else that you
16  discussed during that conversation?
17    A   Not that I recall.
18    Q   What did you do next?
19    A   I think I went outside and had a couple
20  of cigarettes.
21    Q   And what was going through your mind
22  when you were having those cigarettes?

| Page 185 |
|---|

1     A   Wow, I can't believe this is happening
2   to me.
3     Q   And were you concerned at all that you
4   were implicated in a hire involving a transgender
5   person?
6     A   I was starting to feel set up.  The
7   shock was winding down, and I was starting to
8   think, wow, have I been had?
9     Q   And I guess what do you mean by having
10  been had?
11        I mean, did you feel put upon, or sort
12  of -- how were you feeling?
13        I haven't been through this experience,
14  so how were you feeling?
15    A   I felt that am I being -- I was asking
16  myself the question:  Am I being set up for a
17  legal suit?
18    Q   And in what way did you think that you
19  were being set up?
20    A   Well, that he had reeled me in with this
21  interest in the job, that he got me to admit that
22  I was going to recommend him, and then he was

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                    January 11, 2007
                           Washington, DC

| Page 186 | Page 188 |
|---|---|
| 1  going to tell me something which was going to<br>2  change my recommendation, and that that could<br>3  result in legal action against the Library.<br>4     Q  Do you think that Ms. Schroer knew that<br>5  this would change your recommendation, this<br>6  information would change your recommendation?<br>7     A  I have no way of knowing that.<br>8     Q  At that point, when you're outside<br>9  having probably a much-needed cigarette, were you<br>10  starting to formulate in your own mind a plan<br>11  about what you were going to do, how you were<br>12  going to deal with this situation?<br>13     A  I knew that we -- I needed to talk to<br>14  people, to more people, that this meeting with<br>15  Cynthia was going to become very important the<br>16  following day.<br>17     Q  At that point, did you still feel like<br>18  you wanted to hire Ms. Schroer?<br>19     A  I was leaning against it.  I really<br>20  didn't make up my mind until conversations with<br>21  people the subsequent day, the next day.<br>22     Q  And tell me why. | 1  it was a reason.<br>2     Q  And if Cynthia Wilkins had come back to<br>3  you and said, no problem, this person's got a<br>4  clearance already, not a big deal, would you still<br>5  have gone forward with your recommendation for<br>6  Ms. Schroer?<br>7     MS. RUSSELL:  Calls for speculation.<br>8     But you can answer if you understand.<br>9     THE WITNESS:  I don't know the answer to<br>10  that question.<br>11  BY MS. McGOWAN:<br>12     Q  And what would have been the factors you<br>13  would have been weighing if the security clearance<br>14  timing issue had fallen away?<br>15     MS. RUSSELL:  Same objection.<br>16     But you can answer if you understand.<br>17     THE WITNESS:  Uh-huh.  I probably would<br>18  have gone back and done some serious reflection.<br>19  Because the second candidate also had extremely<br>20  good skills, and did very well in the interview,<br>21  and had glowing recommendations, as well.  I would<br>22  have weighed my decision. |

| Page 187 | Page 189 |
|---|---|
| 1     Why were you leaning against it?<br>2     A  Well, I did sense that there would be<br>3  strong problems with the security clearance, then<br>4  the same issues that we discussed about before:<br>5  trust, and confidence, and credibility, and<br>6  contacts.  All these things were running through<br>7  my mind.<br>8     Q  And by credibility and contacts, that's<br>9  what we were talking about with respect to sort of<br>10  having, you know, negative interactions with the<br>11  military or members of Congress; is that right?<br>12     A  Right.<br>13     Q  And was that a concern that standing<br>14  alone was enough reason for you to decide you<br>15  didn't want to go forward with Ms. Schroer?<br>16     A  Absolutely not.  That was a minor<br>17  reason.<br>18     Q  And your concerns about her<br>19  trustworthiness, was that something that sort of<br>20  by itself was a reason why you were thinking that<br>21  you weren't going to go forward with her as --<br>22     A  It wasn't a reason alone, but it was -- | 1  BY MS. McGOWAN:<br>2     Q  And in your mind, did this other<br>3  candidate just present fewer concerns with respect<br>4  to this credibility and contact point?<br>5     A  Yes.<br>6     Q  In part, because he was not transsexual;<br>7  is that right?<br>8     A  Yes.<br>9     Q  After -- well, let's -- we'll finish<br>10  that cigarette.<br>11     What else are you thinking?<br>12     I don't know how many you had, so -- I<br>13  doubt one would have been sufficient, so, you<br>14  know, what else were you thinking at that point?<br>15     A  I think that we've pretty much covered<br>16  it.<br>17     Q  Okay.  Walk me through sort of, you<br>18  know -- roughly what -- what time is it now at<br>19  this point?<br>20     A  Late afternoon.<br>21     Q  Okay.  Walk me through sort of what<br>22  happens between, you know, when you get back to |

48 (Pages 186 to 189)

Charlotte P. Preece                                    January 11, 2007
                        Washington, DC

| Page 190 |
|---|
| 1    your office and the end of your business day. |
| 2          Who did you talk to? |
| 3      A    Steve Bowman. I think Francis was on |
| 4    leave that day. Gary Pagliano. |
| 5      Q    Okay. Anyone else? |
| 6      A    I may have talked to my deputy, my |
| 7    acting -- |
| 8      Q    And who was that? |
| 9      A    -- who was acting deputy at the time, Ed |
| 10    Bruner. |
| 11      Q    Anyone else? |
| 12      A    Not that I recall. |
| 13      Q    Okay. And let's just walk through each |
| 14    one. |
| 15          Steve Bowman, obviously Steve had been a |
| 16    member of the interview panel; is that right? |
| 17      A    Yes. |
| 18      Q    So tell me about your conversation with |
| 19    him. |
| 20      A    Again, I told him what transpired. |
| 21    Steve was shocked, as well. |
| 22      Q    What did he say? |

| Page 191 |
|---|
| 1      A    I can't remember exactly what. |
| 2    Something -- some equivalent to "wow," as well. |
| 3    "You're kidding," something like that. |
| 4      Q    And after sort of his initial reaction |
| 5    to what you shared with him, did you guys talk at |
| 6    all about what it meant? |
| 7      A    Well, said next step. I said next steps |
| 8    we got to hear from personnel security. We got to |
| 9    speak to the legal folks. |
| 10      Q    Did Steve Bowman express a personal |
| 11    opinion about what he thought about Ms. Schroer's |
| 12    candidacy in light of this information? |
| 13      A    Not that I recall. |
| 14      Q    Did he ask you what you thought you were |
| 15    going to do? |
| 16      A    Well, that's why I said next step. We |
| 17    got to hear from the personnel security folks and |
| 18    the legal folks. |
| 19      Q    Did Steve Bowman offer sort of his two |
| 20    cents about what he would do if he were you? |
| 21      A    No, because we didn't know enough at the |
| 22    time. |

| Page 192 |
|---|
| 1      Q    Did Mr. Bowman sort of make any comments |
| 2    along the lines of, you know: I wonder who else |
| 3    knew; I wonder if the reference I spoke to knew, |
| 4    anything along those lines? |
| 5      A    He may have. I don't recall these |
| 6    conversations. |
| 7      Q    Okay. Is there anything else from that |
| 8    conversation that you recall? |
| 9      A    No. |
| 10      Q    When you talked about what the next |
| 11    steps were going to be, in this conversation with |
| 12    Steve Bowman, you mentioned that you were going to |
| 13    be talking to the security clearance people. I |
| 14    believe you also mentioned that you were going to |
| 15    talk to the folks at legal. |
| 16          While why were you going to talk to the |
| 17    folks at legal? |
| 18      A    Because, as I said, I thought there were |
| 19    potential lawsuit ramifications. |
| 20      Q    Did you talk at all about this concern |
| 21    about being set up for a lawsuit with Steve |
| 22    Bowman? |

| Page 193 |
|---|
| 1      A    No. |
| 2      Q    When you were sort of thinking about, |
| 3    boy, have I been set up for a lawsuit here, were |
| 4    you thinking that Ms. Schroer actually wanted the |
| 5    job, or that she was just looking for some, you |
| 6    know, test case for a discrimination lawsuit? |
| 7          MS. RUSSELL: Objection to the form, and |
| 8    to the extent that it might mischaracterize the |
| 9    testimony. |
| 10          But you can answer if you understand. |
| 11          THE WITNESS: I don't know the answer to |
| 12    that. I don't know what his motivations were. |
| 13    BY MS. McGOWAN: |
| 14      Q    But at that point, did you have any |
| 15    doubt in your mind about whether or not |
| 16    Ms. Schroer had actually ever really wanted the |
| 17    job at all? |
| 18      A    He was certainly well-qualified for the |
| 19    job. |
| 20      Q    But as far as whether or not she had |
| 21    applied for the job because she actually wanted to |
| 22    do the job, did you any -- |

49 (Pages 190 to 193)

Charlotte P. Preece                                          January 11, 2007
                              Washington, DC

| Page 194 |
|---|
| 1    A   She seemed enthusiastic before he told |
| 2   me of his intention to complete the transgender |
| 3   migration. He certainly seemed enthusiastic in |
| 4   our conversations at the restaurant and at the |
| 5   interview. So that's the only thing I can say. |
| 6   He seemed to want the job. |
| 7       Q   And did your impression about how much |
| 8   Ms. Schroer seemed to want to job change after you |
| 9   had had this conversation about her gender |
| 10  transition? |
| 11      A   Not necessarily. I believe that part of |
| 12  what he would like to achieve if he wins this suit |
| 13  is to be reinstated, or to be hired in the first |
| 14  place. |
| 15      Q   Turning to the other people that you |
| 16  spoke to that day. |
| 17          Gary Pagliano, who is he? |
| 18      A   Gary is another one of my defense |
| 19  section heads. |
| 20      Q   And tell me about your conversation with |
| 21  him. |
| 22      A   This, very similar, just described what |

| Page 195 |
|---|
| 1   happened. |
| 2       Q   Now, to the extent that Mr. Pagliano had |
| 3   not previously, you know, met Ms. Schroer or been |
| 4   involved in the process, did you have to explain |
| 5   to him in some greater detail sort of the |
| 6   background of the situation? |
| 7       A   No, I didn't, because he did know David |
| 8   Schroer. |
| 9       Q   He did? |
| 10      A   Yes. He and David were classmates at |
| 11  the National War College. And I had talked to |
| 12  Gary, if he knew Mr. Schroer while he was at the |
| 13  War College. This was while I was doing |
| 14  references. |
| 15      Q   And how did he react to the news that |
| 16  Ms. Schroer was transitioning from David to Diane? |
| 17      A   He was shocked. |
| 18      Q   How did you know that he was shocked? |
| 19          Did he say something? Was it in his |
| 20  body language? How did you know? |
| 21      A   I would say both. You're kidding? |
| 22  Yeah. |

| Page 196 |
|---|
| 1       Q   And what else did he say? |
| 2       A   I can't believe it. I would have never |
| 3   expected it. |
| 4       Q   Did he say why, anything about why he |
| 5   would never have expected it? |
| 6       A   Well, he knew that he was in special |
| 7   forces, knew of some of the operations that David |
| 8   had led, I think had visited David and his wife at |
| 9   their home. |
| 10      Q   Did he say anything along the lines of |
| 11  Dave being a macho or a masculine guy? |
| 12      A   No. He talked more about what an |
| 13  intellectual he was. He was a distinguished |
| 14  graduate of the War College, David. |
| 15      Q   Did Mr. Pagliano express any sadness or |
| 16  disappointment at this news? |
| 17      A   No. I think more disbelief. |
| 18      Q   Did Mr. Pagliano ask you what you were |
| 19  going to do next? |
| 20      A   I think he did ask me if I had a good |
| 21  second candidate. |
| 22      Q   And what did you say? |

| Page 197 |
|---|
| 1       A   Yes, I did. |
| 2       Q   Did Mr. Pagliano say anything along the |
| 3   lines of, or ask you whether or not you were |
| 4   thinking about go ahead and hiring Ms. Schroer |
| 5   anyway? |
| 6       A   He might have asked me what I was going |
| 7   to do. If he did ask me that, I probably would |
| 8   have said at this point I don't know. |
| 9       Q   You mentioned everyone sort of |
| 10  expressing some level of surprise at the news. |
| 11          With respect to your feeling surprised |
| 12  or shocked at this news, is one of the reasons you |
| 13  were shocked because of sort of the most hyper, |
| 14  masculine, macho background of this person? |
| 15      A   That's certainly, I'm sure, lend itself |
| 16  to it. |
| 17      Q   In light of Ms. Schroer's background as |
| 18  a special forces officer engaged in obviously very |
| 19  macho stuff, macho tasks, did that make it harder |
| 20  for you to visualize this person all of a sudden |
| 21  becoming a woman and wearing a dress? |
| 22      A   I think it did, yes. |

                                         50 (Pages 194 to 197)

Charlotte P. Preece                                    January 11, 2007
                          Washington, DC

| Page 198 | Page 200 |
|---|---|

**Page 198**

1     Q   And were you concerned that if you
2  brought Ms. Schroer on, that there would be
3  problems resulting from the fact that Mr. Pagliano
4  had known Ms. Schroer as David?
5     A   No.
6     Q   And by problems, I mean sort of, you
7  know, awkwardness or any sort of difficulty in
8  stressors in the workplace?
9     A   That wasn't what was going through my
10 mind at the time.
11    Q   Is there anything else you recall from
12 that conversation with Mr. Pagliano?
13    A   No.
14    Q   And how long, roughly, did that
15 conversation last?
16    A   Five, ten minutes maybe.
17    Q   And was this a passing in the hallway
18 conversation, or a phone call?
19    A   I think I went into his office.
20    Q   Okay.  And then with respect to Ed
21 Bruner, your deputy, Mr. Bruner, tell me about
22 your conversation with him.

**Page 200**

1  security.  It was kind of pointless to do anything
2  before I got advice from that office.
3     Q   And to the extent it would have been
4  pointless, why do you think it would have been
5  pointless?
6     A   Because given what Cindy told me the
7  subsequent day, I didn't need know any more
8  information.
9     Q   But at that moment in the afternoon,
10 before you had the meeting with Ms. Wilkins, did
11 it occur to you that you might be able to learn
12 something from these references that would be
13 relevant to your conversation the next day?
14    A   Not if -- the security clearance was,
15 you know, the big ball out there.  It was the
16 foremost consideration in my mind.  Until I had an
17 answer to that question, I was not going to pursue
18 anything else.
19    Q   Did you talk to any other Library
20 employees that afternoon about Ms. Schroer, or the
21 situation generally?
22    A   Not that I recall.

**Page 199**

1     A   I have no recollection if I even had a
2  conversation with him that day.
3     Q   Okay.
4     A   He certainly would have been a person I
5  would have been likely to tell at some point, but
6  I don't remember when.
7     Q   At any point during that afternoon did
8  you think about getting back on the phone with one
9  of Ms. Schroer's references to find out if they
10 had any clue that this was going on?
11    A   No.
12    Q   Were you curious about whether they
13 knew?
14    A   Yes.
15    Q   So why did you decide not to follow up
16 with any of them?
17        MS. RUSSELL:  Objection.  Calls for
18 speculation.
19 BY MS. McGOWAN:
20    Q   You can answer.
21    A   I wanted to hear first what the finding
22 was going to be from the office of personnel

**Page 201**

1     Q   Did you call any family members or
2  friends to discuss what happened, either sort of
3  in general terms or perhaps more specifically?
4     A   Not from work.
5     Q   Did you talk to family members later
6  outside of work?
7     A   Uh-huh.
8     Q   Okay.  Who did you talk to?
9     A   My sons.
10    Q   Okay.  Tell me about those
11 conversations.
12        MS. RUSSELL:  I'm going to object on
13 relevance grounds.
14        But you can answer.
15        THE WITNESS:  On relevance grounds?
16        MS. RUSSELL:  You can answer.
17        THE WITNESS:  I think I said you're not
18 going to believe what happened to me today.  You
19 know the gentleman's whose resume I showed you
20 some time ago that you were quite impressed with?
21 He told me today that he wanted to start work as a
22 woman.

51 (Pages 198 to 201)

Charlotte P. Preece                                    January 11, 2007
                         Washington, DC

| | |
|---|---|
| **Page 202** | **Page 204** |

Page 202

1   BY MS. McGOWAN:
2       Q    And you have more than one son?
3       A    I have twin boys.
4       Q    Okay.  And were you having this
5   conversation with both of them together, or were
6   there different conversations with each of them?
7       A    I can't remember.
8       Q    And how old are your sons?
9           MS. RUSSELL:  Same objection.
10          But you can answer.
11  BY MS. McGOWAN:
12      Q    Are they adults, or are they under 18?
13  Are they minors?
14      A    They're adults.
15      Q    And are either of them anyway affiliated
16  with the military?
17      A    Yes.
18      Q    Okay.  How so?
19      A    Members of the Pennsylvania National
20  Guard.
21      Q    And I can do son A and son B, or I could
22  call them by their names, whichever you prefer.

Page 203

1       A    Son A and son B.
2       Q    Okay.  Son A --
3       A    I don't know which one is which.  That's
4   the problem.
5           MR. ESSEKS:  Pick one.  You can do
6   initials.
7   BY MS. McGOWAN:
8       Q    How did son A react?
9       A    They both reacted very strongly:  No
10  way.  How can someone who goes through that
11  experience decide that he wants to become a woman?
12  I said well, it's something I certainly don't
13  understand.
14      Q    And when you mentioned that you had
15  shared Ms. Schroer's resume with them, when had
16  you done that?
17      A    Probably over the Thanksgiving holiday.
18  They were college students at the time, so they
19  probably would have been home for Thanksgiving.
20      Q    And what had their reaction been to
21  Ms. Schroer's resume?
22      A    Wow, this looks like someone who had

Page 204

1   great experience, you know, both at an operational
2   level and a planning and strategic level.
3       Q    During your conversation with them at
4   that time over Thanksgiving, was there any
5   conversation about, you know, wow, what's he like?
6   You met him, you know, what kind of guy is he?
7       A    No.  I think they may have asked me how
8   he did in the interview.  And I said very well.
9       Q    Did you share any other resumes with
10  them?
11      A    Uh-huh.
12      Q    And is that something that you
13  frequently do when you're hiring a new position,
14  or was that --
15      A    No --
16      Q    -- unique to this one?
17      A    -- it was kind of unique to this
18  position, because of the military background of
19  several of the people, because they were
20  contemplating what kind of military occupation
21  especially they might want to go into.
22      Q    And did you share with them Mr. Rollins'

Page 205

1   resume?
2       A    Yes.
3       Q    And what was their reaction to
4   Mr. Rollins' resume?
5       A    Very solid, as well.
6       Q    Is it fair to say that they were more
7   impressed by --
8       A    Probably more wowed by the special
9   forces, although Rollins was in delta force, so --
10      Q    And the -- Ms. Schroer was in the
11  special forces, so it was her resume that you were
12  talking about as the one that they were more wowed
13  by; is that right?
14      A    Uh-huh.  I think because of his -- the
15  long duration of his career, whereas Mr. Rollins
16  had a shorter stint in the military.
17      Q    So when did you talk to them?
18          Going back to December, sort of --
19      A    I don't remember if it was that night or
20  if it was later.  I'm not sure when they got home
21  for Christmas break.
22      Q    Okay.  So just so I'm clear, was it a

52  (Pages 202 to 205)

Charlotte P. Preece                                         January 11, 2007
                              Washington, DC

| Page 206 |
| --- |

1   phone conversation, or was it an in-person
2   conversation?
3       A   I think it was in-person.
4       Q   And did this conversation take place
5   before your meeting with Ms. Wilkins?
6       A   I don't know.
7       Q   Do you remember if it took place before
8   you had made your decision about the application?
9       A   I think so, but I -- I wouldn't swear by
10  that.
11      Q   I wanted to ask you as far as your sons'
12  reaction.
13          When they asked, you know, roughly more
14  or less how could someone who's been through all
15  these experiences turn into a woman, you know,
16  were you thinking something similar at that point?
17      A   Uh-huh.
18      Q   And did you talk at all about that with
19  your sons?
20      A   I said it's something that he obviously
21  has to feel very strongly about to do, because it
22  takes courage to do what he did, or is doing.  I

| Page 207 |
| --- |

1   said I don't know that I will ever understand the
2   reasons or at least to appreciate them, but he
3   obviously feels very strongly about it.
4       Q   And at any point between your lunch
5   meeting and when you left for the day, or even at
6   home I guess later, did you try and find out any
7   more information about transgender people, either
8   on the Internet or things like that?
9       A   I did.  I did look up some Internet
10  sites.
11      Q   So where did you look?
12          Did you go to Google or --
13      A   Yes.
14      Q   Okay.  And what did you find?
15      A   I found a couple of articles about the
16  process and some of the surgeries.
17      Q   And do you remember sort of who -- sort
18  of what the source was of the material that you
19  found on the Internet?  Was it an individual, or
20  an organization?
21      A   It was an organization, but I don't
22  remember what it was.

| Page 208 |
| --- |

1       Q   Okay.  How many different websites would
2   you say that you visited?
3       A   Just about two.
4       Q   Are you familiar with an organization
5   called the Harry Benjamin International Gender
6   Dysphoria Association?
7       A   No.
8       Q   Did you come across the acronym HBIGDA,
9   H-B-I-G-D-A, in your Internet search about
10  transgender people?
11      A   I don't recall.
12      Q   Do you remember roughly sort of what --
13  if there was a title or a caption to the pages
14  that you looked at?
15      A   No.
16      Q   And so what did you learn from that
17  information?
18      A   That it could be a lengthy process, that
19  it was not something that was done lightly, that
20  it involves working with a psychological -- a
21  psychiatrist or psychologist who evaluates the
22  individual and is in constant or regular contact

| Page 209 |
| --- |

1   with them, that it involves hormone treatment
2   first, that typically if the individual wants to
3   complete the transgender migration the second step
4   would be to present full-time as a female for a
5   year.  And then the third stage would be the
6   various surgeries.
7       Q   Was this information on the Internet
8   sort of all in text form, or were there pictures
9   that you recall seeing?
10      A   I think the articles that I read, as I
11  said -- it was only a couple -- was all text.
12      Q   And before reading this information, how
13  did you feel about this whole idea of, you know,
14  having this surgery to change your body from male
15  to female?  Did it seem a little freaky to you?
16      A   As I said, I don't understand why
17  someone would do it.  But I respect him for what
18  he wants to do.
19      Q   Did reviewing this information make you
20  feel as though it was maybe less weird than you
21  might have initially thought?
22          MS. RUSSELL:  Objection to the form.

                                    53 (Pages 206 to 209)

Charlotte P. Preece                                    January 11, 2007
                          Washington, DC

---

Page 210

1       You can answer if you understand.
2       THE WITNESS:  It helped me understand
3  the process better.
4  BY MS. McGOWAN:
5       Q    Did reading that information make you
6  feel as though the treatment for transgender
7  people was perhaps more mainstream than you had
8  expected, or suspected?
9       A    If it made me feel anything, it was,
10  wow, this a long and ongoing process that could be
11  quite time-consuming.
12       Q    Did any of the information on the
13  website that -- the websites that you read talk
14  about sort of, you know, the clinical diagnosis
15  aspects for people who are transgender, either by
16  talking about gender identity disorder or gender
17  dysphoria?
18       A    I remember reading gender -- yes, the
19  identity disorder, yes.  I remember reading
20  something about that.
21       Q    Prior to reading that information, did
22  you know that being transgender was something that

---

Page 211

1  actually had a medical term?
2       A    I did not.
3       Q    Did you think of it more as a lifestyle
4  concern at that point?
5       A    Probably, yes, to the extent I thought
6  about it.
7       Q    Okay.  So that evening after leaving
8  work, other than your sons, did you speak with
9  anyone else about this situation with Ms. Schroer?
10       A    I can't remember.
11       Q    Okay.  I'm going to turn now to the next
12  day.
13       A    Okay.
14       Q    Describe what happened the next day
15  with -- which is we're talking now about December
16  21st, 2004 -- with respect to any conversations or
17  meetings that you had about Ms. Schroer.
18       A    Okay.  The previous day, I believe late
19  in the day before I went home, I got an e-mail
20  from Kent Ronhovde asking if I was available to
21  meet at 9:00 o'clock the following day with
22  Cynthia and Bessie Alkisswani.

---

Page 212

1       Q    Okay.  Anything else?
2       A    At the meeting was also Bessie's deputy,
3  Kathy Deese, and Kent.
4       Q    Up until this point, had you had any
5  interaction with Ms. Alkisswani?
6       A    Professionally?
7       Q    About the Schroer situation?
8       A    No.
9       Q    And did it strike you as unusual that
10  she had been asked to attend the meeting?
11       A    No.  She's the head of our workforce
12  development.  She's ultimately responsible for
13  postings.
14       Q    Did you have any conversation with
15  Mr. Ronhovde before the meeting about what
16  Ms. Alkisswani knew or might need to know in
17  advance of the meeting?
18       A    No.
19       Q    And so did the meeting take place at
20  9:00 a.m.?
21       A    Yes, it did.
22       Q    So I have the lineup of the meeting as

---

Page 213

1  you, Ms. Wilkins, Ms. Alkisswani, Ms. Deese, and
2  Mr. Ronhovde; is that correct?
3       A    Right.
4       Q    Anyone else?
5       A    Not to my recollection.
6       Q    How long did the meeting last?
7       A    Maybe an hour and 15 -- hour, hour and
8  15 minutes.
9       Q    So who started -- well, where was the
10  meeting, first of all?
11       A    In Kent's office.
12       Q    And so who started the discussion?
13            Did Mr. Ronhovde kick things off?
14       A    Uh-huh.
15       Q    Okay.  And what did he say to start off
16  the conversation?
17       A    He said we're -- I don't recall exactly
18  what he said.  He introduced the meeting.  He said
19  these are the facts.  Charlotte, why don't you lay
20  out what happened, which I briefly did at the
21  lunch the other day.  And then I said and I went
22  down to Cynthia's office and Cynthia wanted to do

---

                                    54 (Pages 210 to 213)

Charlotte P. Preece                                    January 11, 2007
                        Washington, DC

| Page 214 | Page 216 |

**Page 214**

1  some homework yesterday afternoon and read up on
2  the ramifications for this for personnel security.
3  And what did you find, Cindy?
4      Q    What did you say by way of sort of the
5  background information?
6          Sort of what did you lay out as far
7  as --
8      A    I said we have a vacancy announcement.
9  We interviewed 18 people. We have a couple of
10 very good candidates. I was ready to select or to
11 make a recommendation that Mr. Schroer be the
12 position -- the person for that position. I said
13 I got a call from him last Friday asking me to get
14 together to have lunch or coffee, and that he
15 mentioned at the time that there was something
16 that he wanted to tell me.
17         So I stopped writing the recommendation
18 at that point. And we had lunch. And he revealed
19 to me that he would like to start work as a woman.
20 And so I said so that immediately raised concerns
21 to me about whether he could get a security
22 clearance in a timely fashion. And I went down to

**Page 215**

1  see Cindy. And, Cindy, what can you tell me?
2      Q    Did you ever indicate in this meeting
3  that Ms. Schroer was still your top choice for the
4  position, or did you describe it only in the past
5  tense that she had been, prior to your lunch, your
6  first choice?
7      A    In the past tense.
8      Q    So did you feel in any way as though you
9  were going into this meeting and going to bat for
10 Ms. Schroer?
11         MS. RUSSELL: Objection to the form.
12         THE WITNESS: No. I was there to seek
13 professional opinion.
14 BY MS. McGOWAN:
15     Q    So at no point did you make any comment
16 along the lines of the fact that, you know, you
17 really were trying to see if we could make this
18 work with Ms. Schroer?
19     A    No. I wasn't on one side or the other:
20 I want to make it work or I don't want to make it
21 work.
22     Q    What were people's reaction to your

**Page 216**

1  description of the situation?
2      A    I think they had heard it from someone
3  else prior to the meeting. I think probably Dan
4  had talked to Kent. I don't know. Because they
5  all seemed to be aware of it to some extent.
6      Q    Did everyone at the meeting seem
7  completely unphased, like this was a
8  run-of-the-mill conversation?
9      A    No. It was a new situation for each of
10 us.
11     Q    Did anyone suggest or say anything to
12 indicate that they were confused by, you know,
13 either what you had said or what Ms. Schroer meant
14 about her transitioning from male to female?
15     A    No, I don't recall that.
16     Q    Did anyone make any jokes, nervous jokes
17 about this strange situation you were finding
18 yourself in?
19         MS. RUSSELL: Objection to the form.
20         You can answer.
21         THE WITNESS: I don't recall jokes being
22 made.

**Page 217**

1  BY MS. McGOWAN:
2      Q    During the meeting, did anyone indicate
3  that they were familiar with transsexuality?
4      A    No.
5      Q    And during the meeting, did anyone
6  indicate that they knew who was transsexual?
7      A    I'd like to amend that. Kathy Deese.
8      Q    And what did she say?
9      A    When she was with a previous agency, she
10 had a situation in which someone who was already
11 hired had decided to undergo a transgender
12 migration, and that the agency had to accommodate.
13     Q    And so the agency accommodated that
14 request?
15     A    Yes.
16     Q    What agency was that?
17         MS. RUSSELL: Relevance.
18         But if you know you can answer.
19         THE WITNESS: I'd be speculating. I'd
20 be guessing. I have a pretty good idea, but I'm
21 not sure.
22 BY MS. McGOWAN:

55 (Pages 214 to 217)

Charlotte P. Preece                                    January 11, 2007
                          Washington, DC

Page 218

1    Q    Recognizing that it may not be the right
2    one, what agency do you think it is?
3    A    Department of the Army.
4    Q    Did she mention how long ago this
5    situation was?
6    A    No.
7    Q    And did she describe at all what the
8    agency did to accommodate this person?
9    A    Special bathroom facilities.
10   Q    Did she mention at all whether this
11   employee was in a position involving a security
12   clearance?
13   A    No.
14   Q    And how did Ms. Deese present this
15   information?
16        And by which I mean did she say, hey,
17   I -- you know, I know people who dealt with this
18   before and it wasn't a problem, or did she convey
19   it in a different way?
20        Sort of how did she --
21   A    I would say in a neutral way.  It
22   just -- maybe a question was raised:  Has anyone

Page 219

1    ever encountered a situation like this before?
2    And she described the situation.
3    Q    And so just to make sure I'm clear about
4    sort of this piece of the conversation, is there
5    anything else that Ms. Deese said about how that
6    situation had been handled?
7    A    Not that I can recall.
8    Q    Did anyone react to this information
9    with a comment about what relevance it might or
10   might not have for the situation you were
11   grappling with?
12   A    No.  As I recall, shortly after that
13   Cindy came in and we got into the personnel
14   security aspects.
15   Q    So this conversation with Ms. Deese
16   occurred when Ms. Wilkins was not in the room?
17   A    I believe so.
18   Q    And was it prior to the beginning of the
19   meeting, the formal beginning of the meeting?
20   A    I think it was 9:00 o'clock.  I think
21   maybe Cindy was late to the meeting.
22   Q    And at any point after Ms. Wilkins

Page 220

1    joined the meeting, did anyone make reference to
2    the transgender employee that Ms. Deese had
3    discussed?
4    A    Not that I recall.
5    Q    And did anyone else mention sort of any
6    knowledge that they had about transsexuality or
7    transgender people?
8    A    No.
9    Q    Did you mention at the meeting
10   describing the situation that Ms. Schroer had
11   shown you pictures of her dressed as a woman?
12   A    Yes.
13   Q    And did anyone ask what those pictures
14   looked like?
15   A    They may have.
16   Q    Do you remember how people asked?
17   A    No, I don't.
18   Q    Did anyone ask whether or not she
19   actually looked like a woman, in your opinion, in
20   those pictures?
21   A    Again, they may have but, I have no --
22   Q    Did anyone express any concern about

Page 221

1    whether or not Ms. Schroer would actually look
2    like a woman if she dressed as such?
3    A    I think that was about the furthest
4    thing from people's minds at that point.
5    Q    So after laying out sort of these
6    background facts, what happens next?
7        Is that when Ms. Wilkins begins to
8    speak?
9    A    Uh-huh.
10   Q    Okay.  So what did she say?
11   A    She tells us that she's done some
12   research into the regulations and findings.  She
13   said that she could not make a determination
14   whether -- at this time whether or not Diane
15   Schroer could get a clearance.
16        She did tell us that the requirement for
17   the psychological fitness for duty would be a
18   first step; that when that process was completed,
19   based on the results of the fitness test, a
20   determination would be made, A, to initiate a
21   security investigation or, B, not to go any
22   further.

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                      January 11, 2007
                          Washington, DC

| Page 222 | Page 224 |

**Page 222**

1    She also told us that given what Schroer
2  had told us, that she would not waive clearance
3  for him to start the job until a security
4  clearance determination were made.
5    Q   And what were the reasons she gave for
6  her determination that she would not waive the
7  pre-appointment security clearance investigation
8  requirement?
9    A   She just said under the circumstances of
10  what he told you.
11    Q   Did Ms. Wilkins indicate that she had
12  reason to believe that in light of this
13  information, Ms. Schroer now presented a threat to
14  national security?
15    A   No.
16    Q   Did she indicate that there were any
17  concerns about Ms. Schroer's psychological
18  stability?
19    A   No. That would have to be determined.
20    Q   And did Ms. Wilkins discuss the impact
21  or the significance of the fact that Ms. Schroer
22  was currently holding a top secret security

**Page 224**

1  change. And when I got married, I didn't lose my
2  clearance when I changed my last name. But it was
3  the fact that he was transgendering.
4    Q   And so in Ms. Wilkins' view, Diane
5  Schroer was a completely different person upon
6  whom -- for whom there was in relevant security
7  information that she had available to her to
8  evaluate?
9    A   You'd have to ask Cindy that question.
10  She was basing her adjudgments based on the
11  regulations that she had familiarized herself
12  with.
13    Q   Is that the impression that she gave to
14  you during your conversations?
15    A   What was the impression?
16    Q   That Diane Schroer was a blank slate
17  about whom there was no information, such that she
18  couldn't look at the information about David
19  Schroer to make an assessment of the security
20  clearance concerns?
21    MS. RUSSELL: I'm going to object to the
22  form.

| Page 223 | Page 225 |

**Page 223**

1  clearance?
2    A   Well, she said that that would not be
3  relevant to Diane.
4    Q   And why did she say it would not be
5  relevant?
6    A   Because Diane doesn't have a clearance.
7    Q   And what --
8    A   Diane didn't exist in this point, in a
9  legal sense, or in a sense of security clearances.
10    Q   But to the extent that there was a
11  security clearance filed with respect to David
12  Schroer, did Ms. Wilkins explain why that file
13  would not provide her with sufficient information
14  to determine that a waiver was appropriate?
15    A   She just said that Diane Schroer would
16  need a separate clearance.
17    Q   Did she say that Diane Schroer would
18  need a separate clearance because the individual
19  had a different name?
20    A   I believe so. I mean, I think she used
21  that analogy at one point, that if I become
22  Charles Preece. I mean, it's not simply the name

**Page 225**

1    But you can answer if you understand.
2    THE WITNESS: She didn't tell us whether
3  there's a connection or not. That was -- it was
4  the premise that the procedure would have to start
5  with scratch -- from scratch, and that it would
6  begin with a psychological fitness test.
7  BY MS. McGOWAN:
8    Q   Did anyone at the meeting ask why it
9  would need to start from scratch?
10    A   No.
11    Q   Did it make sense to you that it would
12  have to -- the process would have to start from
13  scratch?
14    A   It didn't surprise me at all, no.
15    Q   And why did it not surprise you?
16    A   Because changing sex is a pretty big
17  deal. And the fact of the psychological fitness
18  determination did not surprise me at all. In
19  fact, I knew that because David told me.
20    Q   The fact that changing gender is a big
21  deal still leaves me with the question of why did
22  you think that the prior security clearance

57 (Pages 222 to 225)

Page 226

1    information about David Schroer would no longer be
2    relevant?
3        A    Because he was Diane Schroer, or
4    becoming Diane Schroer.  And for all I know, it
5    may have been relevant at some point down the
6    line.  I don't know the answer to that question.
7        Q    Did anyone -- or, well, what did
8    Ms. Wilkins say with respect to the timing of all
9    this?
10           And by "all this," I mean the security
11   clearance process that she was telling everyone
12   would be required?
13       A    She was not specific about how long it
14   would take, but she said it would be a lengthy
15   process.
16       Q    And when she said that she would not
17   waive the pre-appointment investigation for
18   Ms. Schroer, did anyone push back at all and ask
19   her why not?
20       A    She said under these circumstances, the
21   office would not waive.  She's the expert in this
22   area, so --

Page 227

1        Q    And what were the consequences of
2    Ms. Wilkins saying that she would not waive the
3    pre-appointment security clearance investigation
4    requirement?
5        A    What were the consequences of that?
6        Q    Sure.
7        A    Pretty much sealing in my mind that I
8    would go with the other candidate.  Because at the
9    time, it would very likely be taken to complete
10   this process.
11       Q    At any point, did anyone -- so with
12   respect to sort of -- with respect to Ms. Wilkins
13   saying that she would not grant the waiver, I want
14   to make sure that I understand sort of what that
15   means with respect to the position.
16           If Ms. Wilkins says, I'm not going to
17   grant a waiver, does that mean that this person
18   cannot be hired for the position, or did it mean
19   that were the person hired for the position, they
20   would not be allowed to have access to any
21   classified information?
22       A    It means the latter.  But if I say that

Page 228

1    a TS clearance is required to do the position from
2    the outset, and the person does not have or cannot
3    get that clearance, then if -- if he failed the
4    clearance, if he were not given a clearance, he
5    could have been fired for failing to pass the
6    exam.
7            My determination not to go forward with
8    him was based on say he is successful, say he does
9    get through psychological fitness determination,
10   say a decision is made by the personnel security
11   office to go ahead and instigate a clearance.
12   When that is all done, if they grant him a
13   clearance, that was not going to happen, in my
14   judgment, within a year.  And I did not want to
15   wait that long to bring somebody on board.
16       Q    And did Ms. Wilkins tell you that she
17   expected the process would take a year?
18       A    No.  She was never specific as far as
19   time.  She referred to it as lengthy.  It's based
20   on experience that I have, particularly post 9/11,
21   for how long it takes to get a TS clearance.
22       Q    Were there any responsibilities of the

Page 229

1    terrorism specialist position that could be
2    performed without a top secret clearance?
3        A    Yes.
4        Q    What percentage of the work can be done
5    without a top secret clearance?
6        A    A large percentage can be done.  The
7    question is at what level of sophistication.  And
8    for a GS-15 analyst, we're expecting them to be
9    out there in the public policy community, with the
10   movers and shakers, with the committees in
11   Congress.  And they're going to need a clearance
12   to talk in those circles on counterterrorism
13   policy.
14       Q    When you say that a large percentage can
15   be done, recognizing this is not a science, sort
16   of what --
17       A    Research --
18       Q    -- percentage --
19       A    -- their research.  They'll be
20   researching from open sources.  They'll also be
21   going out in their research to talk to people in
22   the policy community.  Some of those people they

                              58  (Pages 226 to 229)

Charlotte P. Preece                                    January 11, 2007
                        Washington, DC

Page 230

1   will be talking with on a classified level.
2       Q   So is it the case that 100 percent of
3   the work can be done without a clearance, but it
4   won't be as sophisticated as we would like, or
5   only 75 percent of the work can be done, and
6   there's this whole category of 25 percent that you
7   just can't do anything on without a clearance?
8       A   It's both. It's both of those things.
9   You won't get access to some meetings if you don't
10  have the clearance.
11      Q   And so I'm not a hundred percent sure
12  how you can --
13      A   You can do --
14      Q   -- have both --
15      A   -- research from secondary sources.
16      Q   Right. And so that's --
17      A   And those sources might not be
18  classified. So you can do some work. You can't
19  do it at the level as if you were interacting with
20  people in the policy community, if you were
21  talking to members of Congress, if you were
22  sitting in on classified briefings that were

Page 231

1   supplied by other agencies.
2       Q   So as between the two options I
3   presented, you'd say it's the first option, which
4   is the work can -- 100 percent of the work can be
5   done, but it would be done -- some of the work
6   would be done with less sophistication because an
7   individual did not have access to top secret -- or
8   access to classified information; is that right?
9       A   Yeah, I mean, you might be able to
10  produce GS-12 work. I don't know that you can
11  produce GS-15 work in this field.
12      Q   With respect to an applicant for a
13  position like this, that was the top choice but
14  had no prior security clearance history, would it
15  have also taken, in your estimation, a year for
16  them to have run through the process?
17      A   Probably a little bit shorter time,
18  because we're not talking about the psychiatric
19  fitness for duty. But I'm finding nine months is
20  pretty typical for new folks who are coming in who
21  don't have a clearance.
22      Q   So you think it would actually take --

Page 232

1   have taken less time for a candidate with no prior
2   security clearance than it would have taken for
3   someone like Ms. Schroer, which -- a person who
4   had a security clearance filed for a couple of
5   decades, but had the transgender information, as
6   well?
7       A   Well, if they were going to start from
8   scratch, yes.
9       Q   And did Ms. Wilkins specifically tell
10  you how long it took --
11      A   She was not specific at all.
12      Q   Just to get my question out.
13      A   Oh, sorry.
14      Q   Did she tell you how long it took -- or
15  she expected it would take to run someone through
16  the security clearance process from scratch?
17      A   She kept characterizing that it would be
18  a lengthy process. She was not specific.
19      Q   And did Ms. Wilkins actually use, you
20  know, roughly the equivalent terms of starting
21  from scratch?
22      A   The terms -- I can't remember the exact

Page 233

1   terms she used. She said first there would be the
2   fitness for duty. If a decision was made to go
3   ahead, we would initiate a background
4   investigation.
5       Q   And so you don't recall whether or not
6   she actually used the term "start from scratch"
7   with respect to what would be required for --
8       A   I doubt she did. That's more my
9   vernacular than it is hers.
10      MS. RUSSELL: Sharon, we've been going
11  for 90 minutes, I believe.
12      MS. McGOWAN: Okay. Do you want to
13  maybe take a five-minute break?
14      MS. RUSSELL: Is this a good time?
15      MS. McGOWAN: Sure. Let's take a break.
16      (Recess)
17  BY MS. McGOWAN:
18      Q   So now we're back from our break. And
19  we were talking about this meeting at 9:00 a.m. on
20  December 21st. We were talking about what Cynthia
21  Wilkins' report back was.
22      Did at any point she suggest a need to

59 (Pages 230 to 233)

Charlotte P. Preece                                      January 11, 2007
                          Washington, DC

| Page 234 | Page 236 |
|---|---|

**Page 234**

1  get information from the health services office?
2      A    The health service office would be
3  responsible for setting up and arranging the
4  fitness for duty.
5      Q    But with respect to the conversation you
6  were having there that morning at that meeting,
7  did anyone suggest a need to bring in someone from
8  the health services office?
9      A    No.
10     Q    Were there -- what else did Ms. Wilkins
11  say about the security clearance process that we
12  haven't yet discussed?
13     A    I've told you what I remember.
14     Q    Okay. Were there -- well, what did
15  Ms. Alkisswani say during this meeting?
16         Did she react at all to this
17  information?
18     A    I really don't recall. People were
19  asking questions. And I don't recall specifically
20  what they were. The message from Cindy is what I
21  took away from that meeting.
22     Q    Were there any discussions in the

**Page 235**

1  context of this meeting, about Ms. Schroer's
2  trustworthiness?
3      A    There could have been. We discussed
4  other issues beyond security.
5      Q    What issues did you discuss?
6         Tell me about those conversations.
7      A    I think they're again limited to the
8  ones we talked about before: Trust, contacts.
9      Q    And did you raise the trust and contacts
10  point, or did you someone else?
11     A    I can't remember. I think we were all
12  thinking the same thing.
13     Q    And what did you say in that meeting
14  regarding this issue of trustworthiness?
15     A    Well, I did say that I felt set up, and
16  I didn't know if I could trust someone who tried
17  to deceive me.
18     Q    And what kind of reaction did you get to
19  that comment?
20     A    I understand.
21     Q    And do you recall in particular any
22  people specifically expressing that sentiment?

**Page 236**

1     A    No.
2      Q    And sort of how did you articulate this
3  concern about contacts in that meeting?
4      A    That I was concerned that by changing
5  sex and identity, that the contacts that he had,
6  particularly in the military, would not know who
7  he was to them; and they might -- they might not
8  be as helpful.
9      Q    And did you talk at all in that meeting
10  about the negative reaction of military people to
11  Diane, who is now this transgender person?
12     A    No, other than to say that some people
13  might be understanding and others might not.
14     Q    Was there any discussion about the
15  reaction or what the reaction might be of other
16  Library employees to the fact that Ms. Schroer was
17  transitioning from male to female?
18     A    No. We talked about the bathroom
19  question a little bit.
20     Q    Okay. And what did you say there?
21     A    That we would have to make special
22  accommodations for at least a period of time.

**Page 237**

1     Q    Do you remember who raised that point?
2     A    No.
3     Q    Was there any discussion at that point
4  about the example of the Department of the Army
5  that Ms. Deese had previously discussed?
6     A    I don't remember where the linkage was,
7  and if that's where it came up, or whether it came
8  up separately from what Kathy was talking about,
9  that she said there was special accommodation
10  made.
11     Q    And was there any discussion about how
12  easy or difficult it might be to accommodate this
13  bathroom concern?
14     A    No. I mean, it was so minor. We
15  realized there was much bigger issues. We didn't
16  dwell on this one.
17     Q    Were there any discussions about how the
18  members of Congress might react if they figured
19  out they were interacting --
20     A    Right.
21     Q    -- with a transsexual --
22     A    Right.

60  (Pages 234 to 237)

Charlotte P. Preece                                    January 11, 2007
                              Washington, DC

| Page 238 |
| --- |

1    Q    -- woman?
2    A    Yes.  That came up.
3    Q    Tell me about that.
4    A    Just raised, as I mentioned about -- a
5    couple of hours ago -- the issue of credibility.
6    Again, like the military, some people may be
7    very tolerant of the knowledge and the
8    information, and other people may think that
9    damages the individual's credibility.
10   Q    Do you remember who else in the
11   conversation engaged in the discussion of this
12   point?
13   A    Well, Cindy pretty much stuck to
14   security, personnel security issues.  And Bessie,
15   Kent, and I were having more of a free ranging
16   discussion.  But I don't remember who raised what.
17   Q    Was there any discussion at this meeting
18   about things that one might be able to do to speed
19   up the security clearance process for Ms. Schroer
20   if you decided to go forward with her?
21   A    No.
22   Q    So, for example, did you propose that

| Page 239 |
| --- |

1    Ms. Wilkins have a meeting with Ms. Schroer?
2    A    No.
3    Q    Did you suggest that Ms. Schroer look at
4    David Schroer's security file?
5    A    Pardon?
6    Q    Did you suggest or did anyone suggest
7    that Ms. Wilkins pull and review the security file
8    for David Schroer?
9    A    No.
10   Q    Did you or anyone suggest that
11   Ms. Schroer meet with the health services office?
12   A    No.
13   Q    Did you or anyone else suggest
14   Ms. Schroer meet with any other member of the
15   Library staff?
16   A    No.
17   Q    Did you or anyone else ask whether or
18   not there was anyone at the Library who had dealt
19   with a similar situation regarding a transitioning
20   applicant?
21   A    No.
22   Q    Did anyone make any other suggestions

| Page 240 |
| --- |

1    along those lines of things that one might want to
2    do before moving on to the next step?
3    A    No.
4    Q    Okay.  Did you or anyone suggest calling
5    Ms. Schroer to get some more information to factor
6    into your decision-making process?
7    A    No.
8    Q    Did Ms. Wilkins or anyone else suggest
9    that they were interested in finding out whether
10   or not Ms. Schroer had reported any of this
11   information about her transition to the entity
12   currently holding her clearance?
13   A    No.
14   Q    So how were things left at the end of
15   the meeting?
16   A    Things were left that we should talk to
17   the general counsel's office.
18   Q    And who made that suggestion?
19   A    I don't know for sure, but probably
20   Kent.
21   Q    And was there any discussion at the end
22   of that meeting about the decision that was going

| Page 241 |
| --- |

1    to be made regarding Ms. Schroer?
2    A    No.  I think we wanted to -- I mean, my
3    decision was pretty close to -- my decision was
4    pretty final then.  I was ready to move on.
5    Q    And what were your reasons for deciding
6    that you wanted to move on?
7    A    The time, the uncertainty as to whether
8    the clearance would ultimately be granted.  That
9    was the 90 percent factor.
10   Q    The issue of credibility and contacts,
11   was that a reason?
12   A    They probably go about five each, yeah.
13   Q    Okay.  And I absolve you from the fact
14   that we have reached 100.
15        Are there any other reason, with
16   whatever percentage that you want to attach to
17   them, that factored into your --
18   A    Well, we discussed credibility before.
19   Q    Okay.  And by credibility, just to be
20   clear, we're talking about both being able to
21   interact with members of the military who might be
22   hostile to her as a transgender person, and

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                    January 11, 2007
                        Washington, DC

| Page 242 |
| --- |

1    credibility with members of Congress?
2        A    Primarily the latter.
3        Q    Primarily the latter?  Okay.
4        A    Right.  Contacts with the military,
5    credibility with the members.
6        Q    Okay.
7        A    But the operational needs of the
8    division were such that I needed to have someone
9    on board months before we are now, or where we
10   were at the present time, in December.
11       Q    And did you have in your mind, in that
12   meeting with Cynthia Wilkins, an amount of time
13   beyond which you were unwilling to go with respect
14   to how long the clearance would have taken?
15           For example, if Cynthia Wilkins said
16   it'd probably take about six months, sort of was
17   there an amount of time in your mind where beyond
18   which it was just not going to be worth your while
19   anymore?
20       A    I really wanted someone to start in
21   January.
22       Q    And how important was it for you that

| Page 243 |
| --- |

1    the person could start in January with full
2    clearance?
3        A    I wanted the person to be able to start
4    the new session of Congress, which beings at the
5    end of January.
6        Q    And so if Cindy had come back, or in
7    this meeting and said, you know, I actually think
8    it's not going to be a problem, but I need two
9    weeks to figure it out?
10           MS. RUSSELL:  Objection.  Calls for
11   speculation.
12           But you can answer it if you understand.
13           THE WITNESS:  I wouldn't have believed
14   it, but -- if she said that and it were two weeks,
15   we probably would have gone through the process.
16   BY MS. McGOWAN:
17       Q    Notwithstanding the residual concerns
18   about credibility and contacts?
19       A    I'm not saying I would have selected her
20   for the job, but -- I mean, at that point, knowing
21   what I did, it's foolish to speculate about two
22   weeks because.  That's totally unrealistic.  I

| Page 244 |
| --- |

1    probably would have gone with the other candidate,
2    who did not have any of those issues.
3        Q    And just to be clear, even if Cynthia
4    Wilkins had come back and said two weeks, you
5    probably would have gone with the other candidate?
6    Am I understanding you correctly?
7        A    Yes.  Yes.
8           MS. RUSSELL:  Same objection.  Calls for
9    speculation.
10           THE WITNESS:  I mean, I would have had
11   to do -- prepare the recommendation.  The PAR
12   would have had to be generated.  And then it would
13   have gone to Cindy's shop.  And then it would have
14   gone to the fitness for duty.  And then it would
15   have gone for the investigation.  So, no, at this
16   point I was -- at this point, I pretty much made
17   up my mind.
18   BY MS. McGOWAN:
19       Q    So recognizing that Cynthia Wilkins is,
20   you know, the person who was giving you her
21   assessment of how long it would take, I just want
22   to be sort of clear I understand, you know, where

| Page 245 |
| --- |

1    you were at that point.
2           If Cynthia Wilkins had come to the
3    meeting and said to you this is information that I
4    want to take a look at; but in light of the fact
5    this person's, you know, got a prior work-up, I
6    think that it'll take me about two weeks to figure
7    out whether or not, you know, this is a problem,
8    am I correct that you're saying that even if she
9    had said two weeks to you, you would not have gone
10   forward with Ms. Schroer?
11           MS. RUSSELL:  It's the same objection.
12           THE WITNESS:  I really feel you're
13   asking me to speculate on something that is
14   completely unrealistic.
15   BY MS. McGOWAN:
16       Q    Unrealistic or not, if that had been
17   what Ms. Wilkins, as the personnel security
18   officer, came back and said I can give you an
19   answer in two weeks --
20       A    I don't know what I would have done.
21           MS. RUSSELL:  Asked and answered.
22           But you can answer.

                                62  (Pages 242 to 245)

Charlotte P. Preece                                     January 11, 2007
                            Washington, DC

---

Page 250

1   rendered Ms. Schroer less effective than
2   Mr. Rollins?
3            MS. RUSSELL: Objection. Calls for
4   speculation. And it's confusing.
5   BY MS. McGOWAN:
6       Q   Do you understand my question?
7            Because I can ask it again.
8       A   Go ahead.
9       Q   Okay. In a world where the timing issue
10  has been taken out of the equation because
11  Ms. Wilkins says to you in two weeks I can give
12  you an answer up or down about whether or not this
13  candidate can satisfy the top secret security
14  clearance, you thus far have said, in different
15  ways, although not consistently, that you're not
16  sure what you would have done in that situation.
17           And my question is, is what you are not
18  sure about the question of whether or not your
19  concern about Ms. Schroer's credibility with
20  members of Congress and her ability to maintain
21  contacts with the military due to their lack of
22  understanding about transgender issues made her a

---

Page 251

1   weaker candidate than Mr. Rollins?
2            MS. RUSSELL: It's the same objection.
3   Also, I'm objecting to the extent that it
4   mischaracterizes your testimony, and it's
5   confusing.
6   BY MS. McGOWAN:
7       Q   Do you understand --
8       A   It certainly makes her a weaker
9   candidate, because it's -- there's so many
10  contributing factors.
11      Q   Okay.
12      A   So even if you take one and hold it in
13  isolation, these other factors were certainly
14  strong, would have influenced and factored into my
15  decision whether or not to proceed, or to offer it
16  to the other candidate.
17      Q   And where there would be absolutely no
18  difference in time between how long it would take
19  to run Ms. Schroer through the security clearance
20  process and Mr. Rollins, is it your testimony that
21  Mr. Rollins was a stronger candidate because he
22  did not present the same concerns about

---

Page 252

1   credibility with members of Congress, and contacts
2   in the military?
3            MS. RUSSELL: It still calls for
4   speculation.
5            But you can answer if you understand.
6            THE WITNESS: I don't understand. I'd
7   like to stay with my previous answer, that even
8   holding time and security clearance out of the
9   question, I'm --
10  BY MS. McGOWAN:
11      Q   The other question is --
12      A   The question isn't just the time of the
13  clearance. The question is ultimately could he
14  get the clearance. We don't know that there's an
15  answer to that. So it's not the whether it's two
16  weeks or two days or two years. We have the
17  additional factor of, one, how long it's going to
18  take; and, two, the degree of certainty that he
19  might not be able to get that clearance. So
20  that's a big unknown.
21      Q   Okay. So that's how we had our four
22  factors. There was the time factor and the

---

Page 253

1   uncertainty factor.
2            I'm saying holding those factors
3   constant --
4       A   I understand.
5       Q   -- as between Ms. Schroer and
6   Mr. Rollins, is it your testimony that Mr. Rollins
7   is -- was a stronger candidate because he would
8   not have presented credibility concerns or
9   concerns about his ability to maintain military
10  contacts?
11      A   He's looking a lot better, yeah.
12      Q   Do you recall what time you wrapped up
13  your meeting with Mr. Ronhovde and the others?
14      A   10:00 to 10:15.
15      Q   What did you do then?
16      A   Went out and smoked a cigarette.
17      Q   And what were you thinking at that
18  point?
19      A   What I was thinking was that given what
20  I had learned, I would like to offer the position
21  to Mr. Rollins.
22      Q   And why was that?

---

64  (Pages 250 to 253)

Charlotte P. Preece                                    January 11, 2007
                            Washington, DC

---

Page 254

1    A   Because of the length of time to take to
2  get a security check, because of the uncertainty
3  of the security check, because of the credibility
4  issue, because of the mistrust issue, all the
5  factors that we have listed time and time and time
6  again.
7    Q   And we've thus far broken out the
8  credibility issue being credibility with Congress
9  was --
10   A   The contacts.  And the contacts is the
11 other thing.
12       MS. McGOWAN:  I'm going to show you a
13 document that we can mark Exhibit 28.  Oh, I'm
14 sorry.  It was a document that was already
15 previously marked as Exhibit 14.
16       THE WITNESS:  (Witness examined
17 document).
18 BY MS. McGOWAN:
19   Q   Do you recognize -- well, actually, let
20 me identify the document.  It's a document that
21 was previously marked as Exhibit 14, Bates-stamp
22 number 206.  At the top says, Charlotte Preece

---

Page 255

1  draft re terrorism position.
2        Do you recognize this document?
3    A   Yes.
4    Q   Okay.  What is it?
5    A   At the end of the meeting with Bessie,
6  Kathy, Kent, and Cindy, Kent asked me to draft
7  something for the general counsel to look at of
8  what I would tell Mr. Schroer when I told him I
9  would not go forward with his recommendation.
10   Q   And did he explain to you why he wanted
11 you to draft up an e-mail?
12   A   To show to the general counsel's office.
13   Q   And when did you begin drafting this
14 e-mail?
15   A   Probably -- this has a 10:54 on it.
16 After the meeting.
17   Q   Do you have any idea of roughly how long
18 it took for you to type this e-mail?
19   A   Fifteen minutes.
20   Q   Did you talk with anyone as you drafted
21 the e-mail?
22   A   We had talked about it a little bit at

---

Page 256

1  the meeting.
2    Q   And had anyone offered you any
3  suggestions for how to phrase your comments to
4  Ms. Schroer?
5    A   No.  This was a very preliminary draft,
6  first cut.
7    Q   And how did you select the people that
8  you sent the e-mail to?
9    A   They were the people at the meeting.
10   Q   Did you send this to anyone else in a
11 separate message?
12   A   I don't think so.  I can't remember if
13 we took a paper copy, or if this was sent to the
14 general counsel's office.
15   Q   And did you get any e-mail responses
16 from anyone when you sent this e-mail?
17   A   No.
18   Q   Did you get any kind of feedback
19 regarding this e-mail?
20   A   Yes, when we went to the general
21 counsel's office.
22   Q   Do you recognize the handwritten

---

Page 257

1  comments on this paper?
2    A   Yes.
3    Q   Whose handwriting is that?
4    A   Mine.
5    Q   When did you write these comments?
6    A   Probably in the meeting with the general
7  counsels.
8    Q   And then I'm going to show you a
9  document that was previously marked 15.  In a
10 moment.  I'm sorry.
11       In this document, Exhibit 14, the last
12 line of that first paragraph you say here that, I
13 have concerns a that the transition you are in the
14 process of might divert your full attention away
15 from the mission of CRS.
16       Is this an issue that you discussed at
17 that meeting with Mr. Ronhovde and the others?
18   A   Yes, I believe it did come up.
19   Q   And what was that discussion?
20   A   That both the surgeries, the time off,
21 as well as undergoing such a complex and painful
22 process could divert his attention, full-time

---

65  (Pages 254 to 257)

Charlotte P. Preece                              January 11, 2007
                        Washington, DC

| Page 258 |
|---|

1    attention away from his duties on the job.
2      Q    Were you concerned about the time that
3    Ms. Schroer would need to be out of the office
4    exclusively, or also --
5      A    No. the time and the psychological
6    distraction.
7      Q    And why did you have this concern about
8    psychological distraction?
9      A    Because I assume it's a pretty traumatic
10   process, from what I have been led to believe.
11     Q    And did you think that Ms. Schroer would
12   be more distracted as a result of her undergoing
13   this process than she had been up until that point
14   in her life?
15     A    I have no way to make that comparison.
16     Q    And so what was your basis for thinking
17   that she would be distracted from her duties?
18     A    Well, I've had a couple of surgeries.
19   And I must say that it distracted me. I spent
20   some time thinking about it, thinking how it would
21   go.
22     Q    Were you working at CRS at the time of

| Page 259 |
|---|

1    those surgeries?
2      A    Yes.
3      Q    And do you feel as though you were not
4    able to perform your duties fully while you
5    were --
6      A    Well, I had to recover. So I had to
7    take time off.
8      Q    Did you have a concern that Ms. Schroer
9    was going to need to take time off?
10     A    Yes.
11     Q    During your lunch meeting, did you have
12   any conversations with Ms. Schroer about her need
13   to take any time off for any surgeries she might
14   be completing?
15     A    No. Not that I recall.
16     Q    During your meeting with Mr. Ronhovde
17   and the others, did anyone suggest following up
18   with Ms. Schroer to find out what her plans were
19   with regard to having surgeries?
20     A    No.
21     Q    Looking at now what was marked document
22   Exhibit 15 in a prior deposition.

| Page 260 |
|---|

1      A    (Witness examined document).
2      Q    This document, again, document Number
3    15, Exhibit Number 15, Bates-stamped number 205,
4    at the top says, Charlote Preece version two.
5          Are you familiar with this document?
6      A    Yes.
7      Q    What is it?
8      A    It is a draft of the response that I was
9    going to -- that I did give to Mr. Schroer later
10   that day.
11     Q    And when did you draft this response?
12     A    After our discussion with the general
13   counsel.
14     Q    And did you talk with anyone as you
15   drafted the e-mail?
16     A    Well, I drafted it, I believe, in my
17   office.
18     Q    And was anyone there with you as you
19   drafted --
20     A    In my office?
21     Q    Yes.
22     A    No.

| Page 261 |
|---|

1      Q    Okay. And other than Ms. Alkisswani and
2    Mr. Ronhovde, did you send the e-mail to anyone?
3      A    Well, if there's no one else in the "to"
4    line, I doubt it.
5      Q    And were there any other people at the
6    meeting with the Office of General Counsel besides
7    Ms. Alkisswani and Mr. Ronhovde?
8      A    Myself and the folks from the general
9    counsel's office.
10     Q    And why did you not send this e-mail to
11   the other participants of the discussion with the
12   general counsel?
13     A    I don't know. I don't have a
14   recollection of whether I took a hard copy up,
15   whether I talked to somebody on the phone about
16   it.
17     Q    Do you recognize the writing, the
18   handwritten comments on this document?
19     A    Yes.
20     Q    Whose handwriting is it?
21     A    Mine.
22     Q    Okay. And when did you write these

                          66 (Pages 258 to 261)

Charlotte P. Preece                                    January 11, 2007
                        Washington, DC

---

Page 262

1    comments?
2        A    I imagine this was based on feedback.
3        Q    Do you recall who the feedback was from?
4        A    No, but it sounds like Kent. But I'm
5    not positive of that.
6        Q    Did he call you with his feedback, or
7    did he send you an e-mail?
8        A    I don't know which. I assume he called
9    me. If I've written it down, I assume he called
10   me. Otherwise, if he'd sent me an e-mail, I would
11   have an e-mail copy of it.
12       Q    Why did you change "complexities" to
13   "responsibilities" in that first full line of text
14   in the e-mail?
15       A    Because I wanted to get at the seat --
16   the level of the position, that this was a GS-15
17   level, that the contacts were an important
18   component of the job, that being able to interact
19   at a sophisticated level with policymakers was an
20   important aspect for the job.
21       Q    Was this an edit that Mr. Ronhovde had
22   suggested, or was it an edit that you made

---

Page 263

1    spontaneously?
2        A    I believe it's an edit that I made.
3        Q    Looking at these two e-mails together,
4    were there any other e-mails in this chain?
5        A    Not that I'm aware of.
6        Q    Did you ever -- were you ever asked to
7    look for other e-mails that might have been part
8    of this chain?
9        A    I was asked to search my whole hard
10   drive.
11       Q    And when was that?
12       A    I think it was after the June lawsuit.
13       Q    Okay. And does your e-mail system
14   automatically save sent -- or save messages?
15       A    I don't know. I believe it does, but I
16   do not know. I'm not a -- you have to get a
17   computer person in for that.
18       Q    In this document here, which is Exhibit
19   15, you talk about -- you make reference to a
20   discussion with general counsel.
21            You can you tell me about that
22   discussion?

---

Page 264

1        A    Yes. I got a call from Kent, that he
2    and Bessie would be meeting in the general
3    counsel's office at 11:00, if I could join them.
4        Q    Okay. And what happened then?
5        A    We had a discussion of how I should let
6    the applicant know if I did not want to select
7    him.
8        Q    And at the --
9        A    And --
10       Q    I'm sorry. Go ahead.
11       A    Also talked about were there any legal
12   reasons that would put the Library in an awkward
13   position if I withdrew the recommendation of
14   Mr. Schroer.
15       Q    And what was that discussion?
16       A    What was that discussion? What was I
17   told?
18       Q    What was said?
19       A    That we could -- basically, that we
20   could -- we weren't under legal obligation to hire
21   Mr. Schroer.
22       Q    Anything else?

---

Page 265

1            MS. RUSSELL: Objection. This may be
2    privileged information. I believe you asked what
3    was she told at the meeting with the counsel's
4    office? Was that your question?
5            MS. McGOWAN: Yes. That's the question.
6            MS. RUSSELL: And I'm going to object on
7    privilege grounds.
8            MS. McGOWAN: This is a conversation
9    that we've already explored. And there are --
10   there's correspondence reflecting this
11   conversation. So I believe the privilege has been
12   waived with respect to this meeting.
13           MR. JAMES: No. You've never asked
14   about what advice she received. You did ask about
15   the meeting. You did ask what she -- each of the
16   people in those meetings said, and with regard to
17   everyone except the lawyers.
18           MS. McGOWAN: Okay.
19           MR. JAMES: You did not ask for the
20   advice.
21           MR. ESSEKS: Even with Ms. Alkisswani?
22           MR. JAMES: You did not. And we were

---

                              67  (Pages 262 to 265)

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                    January 11, 2007
                            Washington, DC

| Page 266 |
| --- |

1  ready to object then. But you asked what she
2  said, you asked what Kent said, and you asked what
3  Ms. Preece said. You never asked what --
4         MR. ESSEKS: We didn't ask about what
5  the lawyers said?
6         MR. JAMES: No.
7         MS. McGOWAN: Okay.
8  BY MS. McGOWAN:
9      Q   And so what did everyone, other than
10 Mr. James and Ms. Dowd, say in the context of this
11 meeting, as part of recounting the conversation?
12        Sorry. That's a little --
13        Going into this meeting -- let me start
14 there -- going into this meeting, was there any
15 discussion about the fact that you had more or
16 else less made up your mind what you thought you
17 were going to do?
18     A   I had pretty much made up my mind about
19 what I wanted to do.
20     Q   And so what was the point of this
21 meeting with the office of general counsel staff?
22     A   To find out if this situation could

| Page 267 |
| --- |

1  potentially get the Library into legal trouble.
2      Q   And was there any discussion about what
3  you should or should not say in the course of your
4  conversation with Ms. Schroer?
5      A   Again, to answer that question, I would
6  have to be saying what legal counsel told me.
7      Q   Well, putting aside what legal counsel
8  told you, were there any other conversations --
9  you know, did you ask, for example, you know,
10 should I say things in a certain way, and what
11 feedback would --
12     A   How should I phrase this?
13     Q   Uh-huh.
14     A   Yes.
15     Q   And did you get feedback from the
16 nonlawyers in the room, Ms. Alkisswani and
17 Mr. Ronhovde?
18     A   I had already gotten their input.
19     Q   Okay. And so at some point in the
20 meeting did you announce that you knew what your
21 decision was going to be?
22     A   Yes.

| Page 268 |
| --- |

1      Q   And tell me how you communicated that
2  information.
3      A   Given the combination of all the factors
4  that we outlined, I do not feel comfortable going
5  ahead with recommendation with Mr. Schroer. I
6  have another strong candidate. And I would like
7  to move ahead with the recommendation on him as
8  quickly as possible.
9      Q   And did you, in this meeting, you know,
10 outline what each of those four factors were?
11     A   Yes. We talked about all the factors.
12     Q   And was there any additional discussion
13 about each of the four factors that you
14 identified?
15     A   I think I was asked to elaborate what
16 did I mean by mistrust, what did I mean by
17 contacts. So I would elaborate on those.
18     Q   And if you can tell me how you explained
19 what you meant.
20     A   I don't know that it's different than
21 what I've already told you. The credibility had
22 to do with the members. Contacts had to do with

| Page 269 |
| --- |

1  his ability to capitalize on the contacts he made
2  as a man in the armed services. Trust was my
3  perception of would I be able to trust him after
4  this late in the day revelation on Monday.
5  Security clearance was based on Cynthia's advice.
6      Q   And how did you leave things at that
7  meeting?
8      A   That I would call Mr. Schroer later that
9  day and give him the news.
10     Q   Did anyone else agree to do anything at
11 the end of that meeting?
12     A   Do anything? No.
13     Q   Do anything with respect to the Schroer
14 matter: Write a memo? Call anyone?
15        MR. JAMES: And your question is anyone
16 other than the lawyers?
17        MS. McGOWAN: Right.
18        THE WITNESS: No.
19 BY MS. McGOWAN:
20     Q   And so what did you do between the end
21 of that meeting and when you ultimately spoke to
22 Ms. Schroer next?

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                    January 11, 2007
                              Washington, DC

Page 270

1     A   I would have to look at my calendar.
2     Q   Was there anything preventing you from
3  calling Ms. Schroer right away?
4         How did you decide when you were going
5  to make that phone call?
6     A   I don't know.  I said I would call him
7  sometime that day.  I don't know if I wanted to
8  think about what I was going to say.  I don't know
9  if I had a meeting intervene.  I assume I ate
10 lunch.
11    Q   Did you talk to anyone --
12    A   But it --
13    Q   Oh, I'm sorry.
14    A   -- I didn't say, whatever time I called
15 him, that 3:48 was a magic number.  It just --
16    Q   Did you talk to anyone between the
17 meeting and actually calling Ms. Schroer about how
18 you were feeling about the situation?
19    A   I think I may have talked to Steven.
20 And Francis may have been back by that time, as
21 well.  At some point I talked to Francis.  I don't
22 know exactly when.

Page 271

1     Q   And tell me what you remember about that
2  conversation.
3     A   That they thought it was the right
4  decision.
5     Q   And did they say why?
6     A   Well, given the needs of the
7  organization, that we needed somebody on board, we
8  needed them now.
9     Q   And in that conversation, did you
10 discuss each of the four or five -- I guess right
11 now five -- concerns that you had talked about in
12 your prior two meetings?
13    A   We discussed mostly what Cynthia Wilkins
14 had told me at the meeting, and the timing.
15    Q   Did you discuss at all your concern
16 about contacts or credibility?
17    A   I don't remember if I did or not.  But,
18 again, the timing was the nail in the coffin, so
19 to speak.
20    Q   And with respect to the contacts and
21 credibility factors, did either Mr. Bowman or
22 Mr. Miko express, you know, their opinion about

Page 272

1  whether or not they shared your concern?
2     A   Yes, particularly in the contacts end,
3  uh-huh.
4     Q   And do you remember who?
5     A   Steve.
6     Q   And what did he say?
7     A   That he would be surprised if he were
8  able to utilize those contacts as Diane.
9     Q   Did he say why?  Was it because of his
10 perception of how the military folks would react,
11 or --
12    A   That they wouldn't know who Diane
13 Schroer is, and would -- you know, presumably, he
14 would be open about it and say, oh, I used to be
15 David Schroer.  As I said, some may have been
16 sympathetic, and said, oh.  And others may have
17 said, I don't know you anymore.
18    Q   And what about Francis Miko?
19        Am I right, Francis Miko was potentially
20 going to be Ms. Schroer's supervisor?
21        And if I'm right, this is, you know,
22 probably the first time that you've talked about

Page 273

1  it with him since he was not in the office the
2  previous day.
3         What did he say to you?
4     A   He was equally surprised.
5     Q   And did he share his views with you
6  about your decision to not go forward with
7  Ms. Schroer as the applicant of choice for the
8  position?
9     A   Yes.
10    Q   What did he say?
11    A   He basically shared my views that,
12 certainly based on what Cindy told us, that we
13 needed somebody to do the work.
14    Q   Anything else that you guys discussed?
15    A   Not that I recall.
16    Q   Okay.  And other than Steve and
17 Francis -- Steve Bowman and Francis Miko, do you
18 recall anyone else that you spoke to about
19 Ms. Schroer prior to calling her?
20    A   No.
21    Q   Okay.  So roughly when did you call
22 Ms. Schroer?

                              69 (Pages 270 to 273)

Charlotte P. Preece                                    January 11, 2007
                         Washington, DC

Page 274

1    A   I don't remember. I -- sometime in the
2    afternoon, 3:00 or 4:00.
3    Q   And tell me about that conversation.
4        How long did it last?
5    A   It was very brief.
6    Q   Okay.
7    A   Basically, it's the language in this
8    e-mail.
9        MR. ESSEKS:  You're referring to
10   Exhibit --
11       THE WITNESS:  Exhibit 15.
12       MR. ESSEKS:  Thank you.
13       THE WITNESS:  I mean, I did tell David
14   that it was a difficult decision.  And then I
15   think I read this language.
16   BY MS. McGOWAN:
17   Q   And by "this language," can you read to
18   me --
19   A   The typed language, Given the level and
20   responsibilities of the position, I don't think
21   that this is a good fit. It's been a difficult
22   decision. But given the immediate needs of

Page 275

1    Congress, I've decided not to go forward with the
2    recommendation.
3    Q   And is that roughly what you said to
4    open the conversation?
5    A   Uh-huh.
6    Q   Actually, is your recollection that this
7    is basically verbatim what you said in the
8    conversation?
9    A   Uh-huh.
10   Q   How did Ms. Schroer respond on the
11   phone?
12   A   Well, a pause. And he said I'm very
13   disappointed. And I said it was a difficult
14   decision. I thanked him for his interest in the
15   position. And I said good-bye.
16   Q   At any point in the conversation did you
17   say anything about the amount of time that it
18   would take to complete the security clearance
19   process as part of why you had made your decision?
20   A   I didn't give him any reasons why I made
21   my decision.
22   Q   Okay. And do you recall, you know,

Page 276

1    thanking Ms. Schroer for her honesty?
2    A   Yes.
3    Q   Did you make any other comments or
4    express any other views to Ms. Schroer about, you
5    know, concerns that you had had about her
6    trustworthiness?
7    A   No.
8    Q   Did you mention anything to Ms. Schroer
9    about her -- the contacts and credibility concerns
10   that you'd had?
11   A   No.
12   Q   Did you say anything to her about her
13   gender transition being a distraction?
14   A   No.
15   Q   Why not?
16   A   I was advised not to elaborate on the
17   reasons behind my decision.
18   Q   And why not?
19   A   Pardon?
20   Q   Why not?
21       MS. RUSSELL:  Objection.
22   BY MS. McGOWAN:

Page 277

1    Q   Okay.  Were you advised not to give any
2    additional reasons by anyone other than legal
3    counsel?
4    A   No.
5    Q   Okay.  Roughly, how long did the
6    conversation last?
7    A   A minute or less.
8    Q   How did you feel after you hung up the
9    phone?
10   A   I had empathy for David the person. I
11   do feel that he -- it takes courage to go through
12   what he's going to do. But I felt that I made the
13   right decision for the institution.
14   Q   And what did you do next?
15       MS. RUSSELL:  Objection. Vague.
16   BY MS. McGOWAN:
17   Q   After hanging up the phone, what did you
18   do next with respect to the terrorism specialist
19   position?
20   A   I pulled Mr. Rollins' application. And
21   we had already done reference checks on him. We
22   did them simultaneously. And I called Mr. Rollins

                                    70 (Pages 274 to 277)

Charlotte P. Preece                                    January 11, 2007
                              Washington, DC

| Page 278 |
| --- |

1   and asked him if he were interested in the
2   position.
3       Q   And since he's working at CRS, I assume
4   he said yes; is that correct?
5       A   He did.
6       Q   Okay.  And as a result of that
7   conversation, what were your next steps with
8   respect to filling the position?
9       A   To write a recommendation for John
10  Rollins.
11      Q   And why was Mr. Rollins not originally
12  your first choice for the position?
13      A   I believe I told you.  During the
14  interview, with the things that made Mr. Schroer
15  special, I thought Mr. Schroer was a little more
16  creative and imaginative in his answers in the
17  interview.
18      Q   Did the reason you selected Mr. Rollins
19  over Ms. Schroer have anything to do with
20  Mr. Rollins' prior work experience being more
21  stronger or more relevant than Ms. Schroer's?
22      A   Both of the work experience was strong.

| Page 279 |
| --- |

1   Mr. Rollins' experience was more diverse.
2       Q   And in being more diverse, was that a --
3   was that something about his application that made
4   it stronger than Ms. Schroer's, or was that
5   roughly a wash?
6       A   They were roughly equal, I would say.  I
7   think if you look at the scoring, you will see
8   that they scored very closely.
9       Q   I'm going to show you a document that
10  was previously marked 16.
11      A   (Witness examined document).
12      Q   And this is a document that was
13  Bates-stamped number 772.  It's a memorandum from
14  Cynthia Wilkins to Bruce Krafte.  And it's dated
15  January 4th, 2003, and I'd represent to you
16  that as a result of our conversation with
17  Ms. Alkisswani on Monday, she confirmed that that
18  was a typo and that that was actually a memo that
19  was likely January 4th, 2005.
20      A   Oh, yes.  I'm sorry.  Yes.
21      Q   This memo appears to be a memo to
22  Ms. Wilkins from Bruce Krafte requesting a waiver

| Page 280 |
| --- |

1   of the full field background investigation of
2   Mr. Rollins.
3       Does that seem right to you?
4       A   Yes.  That's typical.
5       Q   Okay.  My question is, if Mr. Rollins --
6   well, do you know if Mr. Rollins, at the time he
7   applied, had a top secret security clearance?
8       A   Yes, he did.
9       Q   Okay.  If so, do you know why the
10  request for a waiver of the pre-employment
11  security clearance investigation was necessary in
12  his case?
13      A   It still takes some time when you're --
14  it's not a straight transfer.  It's not like the
15  agency, the home -- the hiring agency holding the
16  clearance and transferring it to the Senate for
17  the purpose of a briefing.  If it's for the
18  purpose of a hire, there is some time that it
19  takes the new agency to do that.  And I, again,
20  would defer to Cindy on the process.
21      Q   Okay.  And do you know roughly how long
22  it takes to transfer a clearance in a hiring

| Page 281 |
| --- |

1   situation like that?
2       A   I don't.  But I do know that -- that he
3   was using his clearance fairly early on.  Within a
4   month or so he had his -- attended his first
5   classified briefing.
6       Q   And when you say within a month, is that
7   within a month of the day that he started work at
8   CRS, or is it within a month of when you hired
9   him?
10      A   It was within a month from when he
11  started.  It could have happened sooner.  He could
12  have been on board.  I just don't know.  I don't
13  have these dates.
14      Q   And do you know -- do you recall what
15  date Mr. Rollins started?
16      A   I believe it was the first week in
17  February, the end of the first week in February.
18      Q   I'm going to show you a document that
19  was previously marked Exhibit 8.
20      A   (Witness examined document).
21      Q   Do you recognize that document?
22      A   (Witness examined document).

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                    January 11, 2007
                        Washington, DC

| Page 294 | Page 296 |
|---|---|

Page 294

1  to this document?
2      A   No.  I was told to cease work on it.
3  And I did no more work on it.
4      Q   So this is the end of the document --
5      A   That's correct.
6      Q   -- as created by you?
7          And the instructions you received about
8  ceasing work on this, who did those instructions
9  come from?
10         MS. RUSSELL: Objection.
11         MS. McGOWAN: Okay.  That answers my
12  question.  I was trying to figure out who it was,
13  trying to figure out whether there was any more to
14  know.
15         MR. JAMES: Just let you know --
16         MS. McGOWAN: I could tell, as Jessie
17  and Julia started to perk up, I was getting an
18  answer to my question.
19  BY MS. McGOWAN:
20      Q   Did you prepare any other chronologies
21  or memoranda like this?
22      A   No.

Page 295

1      Q   Did you ever discuss this document with
2  anyone?
3      A   No.  I prepared this based on my
4  recollection.  Did I -- did I -- please repeat
5  your question.
6      Q   Sure.  I was asking if you discussed
7  this memo with anyone.  And I break it down into
8  two pieces.
9          One, did you discuss it with anyone in
10  the course of preparing it and actually putting
11  the information into the memo?
12         And then the other piece would be did
13  you say discuss the memo in general, your
14  preparation of it?
15         And if there are discussions that --
16  only discussions you had with legal counsel, then
17  I don't need to know that.  I'm only looking for
18  discussions that you may have had not with legal
19  counsel.
20      A   Just with legal counsel.
21      Q   Okay.  Thank you.
22         What is your view about whether

Page 296

1  Ms. Schroer is a man or a woman?
2          MS. RUSSELL: Objection.  Lacks
3  foundation.
4          But you can answer.
5  BY MS. McGOWAN:
6      Q   Do you have a view about whether
7  Ms. Schroer is a man or a woman?
8      A   If I ran into Ms. Schroer today, I would
9  call her Ms. Schroer.  I would call her Diane.
10     Q   And would you consider Ms. Schroer a
11  woman?
12     A   I would consider her a person in
13  transition.
14     Q   On the day that you had lunch with
15  Ms. Schroer, on December 20th, on that day, what
16  did you consider Ms. Schroer to be, a man or a
17  woman?
18     A   A man.
19     Q   Okay.  And after your conversation at
20  lunch, did your view change about whether
21  Ms. Schroer was a man or a woman?
22     A   Well, he told me he was transitioning,

Page 297

1  so I probably still considered him as a man at
2  that point, because he hadn't changed his name
3  yet.
4      Q   And at what point would you feel that
5  Ms. Schroer was now a woman?
6      A   When the process is completed.
7      Q   And in your mind, based on the
8  information that you have, when is that point?
9      A   When his surgeries are completed.
10     Q   On December 20th, when -- at your
11  meeting with Ms. Schroer, who you viewed to be
12  man, did it seem strange to you that man would
13  want to dress in women's clothing?
14     A   Yes, it seems strange to me.  But a lot
15  of things seem strange to me.
16     Q   And at any point during -- between the
17  time when you learned about Ms. Schroer's
18  transition until the point at which you made your
19  decision to not go with -- not to recommend her
20  and to call her, you know, at any point did you
21  visualize, you know, Ms. Schroer, looking as she
22  did in the pictures she showed you, standing in

75  (Pages 294 to 297)

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                    January 11, 2007
                          Washington, DC

| Page 298 | Page 300 |
|---|---|
| 1 front of Congress and looking like a fool? | 1     MS. RUSSELL: Objection. Relevance. |
| 2     A   Looking like a fool? Why would you say | 2 But you can answer. |
| 3 that? | 3     THE WITNESS: If you're an actor, if you |
| 4     MS. RUSSELL: I'm going to object to the | 4 have got skin complex problems. |
| 5 form of the question. | 5 BY MS. McGOWAN: |
| 6 But you can answer if you understand. | 6     Q   Outside of people wearing makeup for |
| 7     THE WITNESS: I don't understand the | 7 professional or skin acne or other related |
| 8 intent behind the question. | 8 dermatological-related reasons, would you consider |
| 9 BY MS. McGOWAN: | 9 wearing makeup to be a masculine or a feminine |
| 10     Q   Sure. And my question is, you know, | 10 thing? |
| 11 at -- my recollection of your testimony was that | 11     A   A feminine thing. |
| 12 when you saw the pictures of Diane in that | 12     Q   And wearing high heel shoes, would you |
| 13 portfolio, Ms. Schroer at that time looked like a | 13 consider that to be a masculine or a feminine |
| 14 man in women's clothing. | 14 thing? |
| 15 And I'm wondering, you know, at any | 15     MS. RUSSELL: It's the same objection. |
| 16 point were you concerned about sort of what the | 16 But you can answer. |
| 17 reaction would be of someone who looked like a man | 17     THE WITNESS: I've seen men in platform |
| 18 in women's clothing standing in front of Congress | 18 shoes. High heels, if we're talking about spikes, |
| 19 and trying to be taken seriously? | 19 I associate that with a feminine thing. |
| 20     A   That did cross my mind. | 20 BY MS. McGOWAN: |
| 21     Q   Did it strike you as strange that | 21     Q   And with respect to wearing long hair or |
| 22 someone like Ms. Schroer, with her military | 22 wigs, do you associate that as being or masculine |

| Page 299 | Page 301 |
|---|---|
| 1 background, would want to wear makeup? | 1 or feminine? |
| 2     MS. RUSSELL: Objection. Relevance. | 2     A   Long hair I don't associate -- I |
| 3 But you can answer if you understand. | 3 associate with both sexes. Wigs, men wear |
| 4     THE WITNESS: It didn't surprise me that | 4 toupees. |
| 5 someone who is in the process of transitioning | 5     Q   And the hair style that Ms. Schroer was |
| 6 would want to wear makeup. That makes sense to | 6 wearing in the photos that you saw, am I correct |
| 7 me. | 7 that that was a long hair style? |
| 8 BY MS. McGOWAN: | 8     A   That was a wig, yes. |
| 9     Q   But with respect to Ms. Schroer, who was | 9     Q   And would you describe that as a |
| 10 a man in your mind, did it feel strange to you to | 10 feminine style of hair? |
| 11 think of Ms. Schroer as a man putting on makeup? | 11     A   Yes, it was. The style was feminine, |
| 12     A   Not if he was trying to look like a | 12 yes. |
| 13 woman. | 13     Q   And in that photo, am I right you saw |
| 14     Q   Did it feel strange for you to imagine | 14 Ms. Schroer, who you knew to be and thought to be |
| 15 Ms. Schroer wanting to wear pumps or high heel | 15 a man, wearing what you considered to be a |
| 16 shoes? | 16 feminine hairstyle? |
| 17     A   Again, not if he was transitioning to a | 17     A   Yes. |
| 18 woman. I find it strange that anyone wants to | 18     Q   And women's shoes; is that right? |
| 19 wear pumps. | 19     A   I believe he had boots on, if I'm not |
| 20     Q   That, I can agree with, for sure. | 20 mistaken. |
| 21 Would you say that wearing makeup is a | 21     Q   Okay. And a feminine style of clothing; |
| 22 masculine thing to do? | 22 is that right? |

Alderson Reporting Company
1-800-FOR-DEPO

Charlotte P. Preece                                    January 11, 2007
                              Washington, DC

| Page 302 | Page 304 |
|---|---|

**Page 302**

1    A   Yes.
2    Q   And makeup that would be described as
3  feminine makeup?
4    A   Yes.
5    Q   And how did you think others in CRS
6  would react to seeing those pictures?
7      MS. RUSSELL:  Objection.  Lacks
8  foundation.
9  BY MS. McGOWAN:
10   Q   For example, you know, what, in your
11  estimation, do you think Steven Bowman's reaction
12  would have been to that picture, those pictures?
13     A   I think people would have surmised that
14  it is a male dressed in women's clothing and
15  wearing makeup.
16     Q   Okay.  With whom, if anyone, did you
17  speak in preparation for this deposition?
18     A   Primarily --
19       MS. RUSSELL:  I'm sorry, Sharon, I
20  missed the question.
21       MS. McGOWAN:  Oh, sure.  That's okay.
22     BY MS. McGOWAN:

**Page 303**

1    Q   I was asking, did you speak with anyone
2  in preparation for your deposition?
3    A   Yes.
4    Q   And with whom?
5    A   These three people here.
6    Q   Okay.  Anyone else?
7    A   For awhile, Evelio Rubiella.
8    Q   Okay.  Anyone else?
9    A   Kent Ronhovde.
10   Q   And what did you and Kent talk about?
11     A   Mostly status reports, that would be
12  when -- general counsel's office would give us
13  status reports of where we are.  And there were
14  others present for that, as well, those status
15  reports.
16     Q   And did you speak with Ms. Alkisswani?
17       MS. RUSSELL:  Objection.  Vague.  Do you
18  mean --
19     BY MS. McGOWAN:
20     Q   I'm sorry.  Did you speak with
21  Ms. Alkisswani in preparation for this deposition?
22     A   No.  I mean, apart from some of these

**Page 304**

1  group status meetings, we didn't have one-on-one
2  conversations about this case.
3    Q   And did you review any documents in
4  preparation for this deposition?
5    A   Say that again, please.
6    Q   Sorry.  Did you review any documents in
7  preparation for this deposition?
8    A   I skimmed over most of the documents
9  that I had in my possession.
10   Q   Okay.  And what were those documents?
11     A   There was a chronology that was
12  prepared, a lot of the information that you
13  presented today, the interrogatories I looked at.
14     Q   And with respect to documents that
15  weren't discussed as exhibits today, can you tell
16  me what you looked at?
17     A   The structured interview guide.
18     Q   Okay.  Anything else?
19     A   I did say the chronology of what
20  happened when.
21     Q   And by the chronology, are you referring
22  to this document in front of you, or a different

**Page 305**

1  document?
2      And by that, I mean Exhibit --
3    A   Exhibit 29.
4    Q   -- Exhibit 29.
5      Are you referring to that document, or a
6  different document?
7    A   That document, and there's a one-page
8  chronology that I believe was prepared by somebody
9  in workforce that had dates when the announcement
10  went up, when it went down.
11     Q   Okay.  Any other documents that you
12  reviewed that we haven't discussed today?
13     A   Those sets of interrogatories, those
14  first EEO complaints.
15     Q   And did you review any deposition
16  transcripts in this case?
17     A   I don't have any.
18     Q   Okay.  Anything else?
19     A   That's all I recall.
20     Q   Okay.  Do you remember receiving a
21  letter from me asking you to preserve all
22  documents related to the Schroer matter?

77 (Pages 302 to 305)