McGowan Declaration – Exhibit B

Cynthia Wilkens                                    September 20, 2006
                        Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - x

DIANE J. SCHROER        :

     Plaintiff,         : Civil Action No.

v.                      : 05-1090(JR)

JAMES H. BILLINGTON     :

     Defendant.         :

- - - - - - - - - - - x

                    Washington, D.C.

                    Wednesday, September 20, 2006

Deposition of:

          CYNTHIA WILKINS,

called for oral examination by counsel for

Plaintiff, pursuant to notice, at Wilmer Hale,

1875 Pennsylvania Avenue, NW, Washington, D.C.,

20006, before Karen Geddes, Certified Shorthand

Reporter, of Alderson Court Reporting, beginning

at 9:35 a.m., when were present on behalf of the

respective parties:

Cynthia Wilkens                                        September 20, 2006
                        Washington, DC

| Page 26 | Page 28 |
|---|---|

**Page 26**

1      MS. RUSSELL: Objection to the form of the
2 question, lacks foundation. But you can answer if
3 you understand it.
4      THE WITNESS: At the time the Executive
5 Order 10450 was promulgated, these were the criteria
6 which were established that were relevant to a
7 security clearance determination for anyone being
8 considered for a security clearance determination,
9 and employment, generally, depending on the
10 relationship to the national security as it's
11 written here.
12 BY MS. MCGOWAN:
13      Q.   Is there any provision here, in Section 8,
14 that specifies that a transsexual individual is
15 ineligible, categorically, for a security clearance?
16      MS. RUSSELL: Again, objection to the form
17 of the question.
18      THE WITNESS: As you asked the question,
19 transsexual, by definition, no.
20 BY MS. MCGOWAN:
21      Q.   Are there any provisions in here that, in
22 your view, are particularly relevant when

**Page 28**

1 criteria. And if you read the criteria that were
2 written in 10450 many years ago, one would see some
3 correlation between these criteria and the current
4 criteria, but they are not written the same way.
5 BY MS. MCGOWAN:
6      Q.   I want to turn your attention now to
7 Section 9, which is on the next page, 364, which
8 deals with the Central Index of Security
9 Investigations.
10      Does the library refer to a central index
11 when assessing an applicant's eligibility for
12 security clearance?
13      A.   At a certain point in the personnel
14 security process, when it is determined that someone
15 is being submitted with their application for
16 security clearance processing, we do check the
17 existing indices of federal agencies to determine if
18 an investigation already exists that could meet our
19 requirements or if there's any information that
20 needs to be evaluated.
21      Q.   And just so that I'm clear, at what
22 precise point in the application process -- you were

**Page 27**

1 considering the eligibility of a transsexual
2 applicant for a security clearance?
3      A.   Let me answer that this way. Inasmuch as
4 Executive Order 12968 contains the current security
5 clearance adjudicative standards, I think I would
6 prefer to speak to that question in that context.
7      Q.   But with respect to this document, is your
8 answer that this document does not speak
9 specifically to how these standards should be
10 applied when considering a transsexual applicant?
11      MS. RUSSELL: Same objection, lacks
12 foundation. Objection to the form of the question,
13 relevance.
14      MS. MCGOWAN: Please answer the question.
15      THE WITNESS: I think it would be helpful
16 to understand that when the criteria are written,
17 they are written in very short form and might use
18 general descriptions.
19      In Executive Order 12968, which I am sure
20 we will talk about later, there are two security
21 clearance criteria, sexual behavior and emotional,
22 mental, personality disorders, those are the current

**Page 29**

1 talking about when someone is submitted. I just
2 want to make sure I understand what that means. So
3 can you describe to me when in the process that is?
4      A.   Certainly. The -- typically, the manager
5 will submit a personnel action recommendation
6 through library channels, which after certain
7 approvals comes to the personnel security office,
8 and forwards a copy of that individual's application
9 and declaration for federal employment, OF-306, and
10 those documents provide the essential identifying
11 information about the applicant's name, social
12 security number, employment history, to know where
13 they had worked to see who could have done a
14 background investigation, that type of thing.
15      So at the point in time that the personnel
16 security office receives that documentation that
17 includes the individual's personal background
18 information, at that point we determine whether a
19 clearance is involved or what the sensitivity level
20 of the position is, and at that time, we would
21 contact the appropriate agency to find out if there
22 was an existing investigation or adjudication.

8 (Pages 26 to 29)

Cynthia Wilkens                                      September 20, 2006
                        Washington, DC

Page 30

1    Q.   At any point did the personnel security
2  office receive the information that you just
3  described about Ms. Schroer?
4    A.   No.
5    Q.   Why would that have been the case?
6        MS. RUSSELL:  Objection to the form of the
7  question, vague.
8        But if you understand the question, you
9  can go ahead and answer.
10       THE WITNESS:  We never received it, so --
11  we receive the request and paperwork when the
12  individual is going to be offered employment.
13 BY MS. McGOWAN:
14   Q.   Are there any circumstances in which the
15  library would check the central index, other than
16  when a candidate had been recommended for
17  employment?
18   A.   At times there are reasons to check on a
19  current employee.  For instance, if they are moving
20  from a non-sensitive position to a
21  critical-sensitive position and a new requirement is
22  identified, so that could be on an existing

Page 31

1  employee.
2    Q.   Any other situation that would result in a
3  checking of the index outside of screening an
4  applicant that has been recommended for employment?
5    A.   We also check indices when we need to
6  obtain a clearance certification on someone who is
7  visiting the library.  If their own agency doesn't
8  send it forward and someone is visiting and needs
9  access, we will try to find the information this
10  way.
11   Q.   Could an individual, an employee of the
12  library, come to you or come to the personnel
13  security officer, and ask to have the central index
14  checked with respect to a particular applicant who
15  has not yet been offered employment with the
16  library?
17   A.   As a preliminary inquiry, for instance,
18  that could be done.  It is done, on occasion, when
19  the manager also indicates that we will be receiving
20  a personnel action recommendation.  That helps them
21  to think about time frames, how long before someone
22  might be hired.  It might also help them to know

Page 32

1  administratively whether they are going to need to
2  request a waiver of pre-appointment investigation.
3    Q.   Would an employee seeking this pre-screen
4  from the central index be able to do so without
5  suggesting to the personnel security officer that
6  they were on the verge of making an employment
7  recommendation?
8    A.   No.  I don't know if those words are
9  always said, but it is understood that when we check
10  an index -- and let me just also say, there is more
11  than the central index in security investigations as
12  referred to in this old Executive Order.  It is
13  understood that we are doing that for employment or
14  security clearance eligibility purposes.
15       MS. McGOWAN:  I am going to move on to the
16  Executive Order we've been discussing by reference.
17  I'm at 12958.
18       (Wilkins Deposition Exhibit No. 3
19       was marked for identification.)
20 BY MS. McGOWAN:
21   Q.   And again, this was a document produced by
22  the government in response to the discovery inquiry

Page 33

1  regarding the national security requirements for the
2  position at issue here.
3        Are you familiar with this document?
4    A.   Yes, I am.
5    Q.   And, again, can you please describe for me
6  what this document is?
7    A.   Executive Order 12968 was issued by the
8  White House to follow up on Executive Order 10450 to
9  provide more up-to-date and specific information
10  about criteria for issuing security clearances to
11  government employees, contractors, et cetera.
12   Q.   How is this document used by the library,
13  in particular?
14   A.   I believe it is incorporated by reference
15  in our regulations.  This is a foundation document
16  for the guidelines that are issued by Executive
17  Branch for security clearance determinations, and we
18  adhere to those as a matter of policy.
19   Q.   Was this document, this Executive Order,
20  in effect at the time of the hiring of the terrorism
21  specialist at the library?
22   A.   Yes, it was.

9  (Pages 30 to 33)

Cynthia Wilkens                                          September 20, 2006
                            Washington, DC

| Page 58 | Page 60 |
|---|---|
| 1  that information affects the suitability or security | 1  take, I believe, would depend on certain factors. |
| 2  clearance determination. | 2  As I think we may have already said, it would depend |
| 3      Q.  Is that information communicated in any | 3  on the information made available to the health |
| 4  written form? | 4  services office, what the health services officer |
| 5      A.  She will usually give me a short | 5  had to complete as part of an evaluation, what |
| 6  memorandum. | 6  information resulted from that. So it is |
| 7      Q.  To your knowledge, has the library ever | 7  speculative. We don't know. |
| 8  been presented with the issue of whether or not an | 8  BY MS. MCGOWAN: |
| 9  individual undergoing a gender transition can | 9      Q.  And would the fact that an individual is |
| 10  satisfy the security eligibility requirements for a | 10  undergoing gender transition mean that it |
| 11  position with the library? | 11  automatically would take longer, or could there be |
| 12      A.  Not to my knowledge. | 12  information already in the file that would allow the |
| 13      MS. RUSSELL: I was just going to object | 13  library to undertake the investigation -- the |
| 14  to the form of the question, but -- | 14  determination based on that information? |
| 15      Q.  Can the office of -- the personnel | 15      MS. RUSSELL: Objection to the form. But |
| 16  security office contact the health services office | 16  you can answer, if you understand. |
| 17  for, sort of, more informal consultations? | 17      THE WITNESS: I think it goes without |
| 18      A.  Yes. | 18  saying that if an investigation has been conducted |
| 19      Q.  When would that be appropriate? | 19  that provided full and complete coverage of what |
| 20      A.  I might contact the health services office | 20  apparently was at that time going on and if that |
| 21  for preliminary guidance when I need additional | 21  investigation fully explored the issue made that |
| 22  background information about a medical issue so that | 22  information available to the library, then that |

| Page 59 | Page 61 |
|---|---|
| 1  I know whether to refer it to them or not. | 1  would assist in the process. I do not know, |
| 2      MS. MCGOWAN: Why don't we take a break | 2  however, if that was the case. |
| 3  and then we will come back and do another session | 3      Q.  At any point, did the library attempt to |
| 4  before we do a lunch break. Thank you. | 4  ascertain whether or not Ms. Schroer's gender |
| 5      (Recess 10:54 a.m.) | 5  transition had been investigated in connection with |
| 6  BY MS. MCGOWAN: | 6  the security clearance process? |
| 7      Q.  We are back on the record from our break, | 7      A.  No. Her investigative file was never |
| 8  and we were talking about how an individual or an | 8  requested. |
| 9  applicant's gender transition would impact the | 9      Q.  Could the library have requested that |
| 10  decision of the library about whether or not to | 10  file? |
| 11  accept a prior security investigation or whether or | 11      MS. RUSSELL: Objection, lacks foundation, |
| 12  not to conduct a new investigation. | 12  calls for speculation. You can answer, if you |
| 13      So I want to just ask you, if you would, | 13  understand. |
| 14  to spell out, sort of, what are the factors that | 14      THE WITNESS: If the personnel security |
| 15  would impact the length of time that it would take | 15  office had been asked to proceed with an evaluation |
| 16  to conduct a supplemental investigation for an | 16  and received the identifying information regarding |
| 17  individual who informed the library that they were | 17  the applicant, then the personnel security office |
| 18  undergoing a gender transition? | 18  could have contacted defense, or whoever the holder |
| 19      MS. RUSSELL: Same objection, to the form | 19  of the investigation was, for that information. |
| 20  of the question and calls for speculation. But you | 20  BY MS. MCGOWAN: |
| 21  can answer if you understand. | 21      Q.  Similarly, with respect to the central |
| 22      THE WITNESS: The amount of time it would | 22  index that we were talking about with respect to the |

                                            16 (Pages 58 to 61)

Cynthia Wilkens                                              September 20, 2006
                              Washington, DC

| Page 62 | Page 64 |
|---|---|

Page 62

1  prior Executive Order -- and I'm sorry if I asked
2  this question, but I don't think I asked this
3  question, but I meant to -- did the library at any
4  time check the index with respect to Ms. Schroer or
5  David Schroer at the time?
6      A.   The personnel security office did not
7  contact any of the investigative agencies with the
8  various investigative indices regarding the
9  applicant.
10     Q.   With respect to Executive Order 12968 --
11 I'll make sure I have it in front of me -- with
12 respect to Section 3.1, regarding the standards, the
13 access eligibility standards, what do you understand
14 these access eligibility standards to mean with
15 respect to applicants who are under the care of a
16 mental health professional?
17     A.   For instance, in Section 3.1(e), it
18 indicates that no negative inference concerning the
19 standards may be raised solely on the basis of
20 mental health counseling.
21          However, mental health counseling, where
22 relevant, may justify further inquiry to determine

Page 64

1  informed by the health services office.
2      Q.   With respect to the access eligibility --
3  and again, if the answer is the same, I still need
4  to ask the question to make sure that the answer is
5  the same.
6      A.   I understand.
7      Q.   What do you understand this document to
8  mean with respect to applicants who are undergoing
9  gender transition?
10         MS. RUSSELL: Objection to the form. But
11 again, you can answer if you understand the
12 question.
13         THE WITNESS: I would say that the answer
14 is the same. The Executive Order does not set forth
15 the language in the adjudicative criteria and
16 supplemental information, but I believe that the
17 same concept is that in and of itself, an applicant
18 with transgender information, in and of itself it is
19 not disqualifying, but it would evaluated.
20 BY MS. MCGOWAN:
21     Q.   Looking at Section 3.3 --
22     A.   Yes.

Page 63

1  if the standards are satisfied.
2      Q.   And when would mental health counseling be
3  relevant with respect to security access for a
4  library position?
5      A.   There is an adjudicative standard
6  called -- and I'm not sure of the order of the
7  words -- emotional, mental, and personality
8  disorders, and under that adjudicative criterion,
9  mental health counseling and conditions and any of
10 the information falling under that standard, is
11 determined -- the relevance of that is determined
12 under that guideline.
13         So there are times when the information
14 may be considered material and other times when it
15 is not. It's evaluated on a case-by-case basis.
16     Q.   Who at the library makes that ultimate
17 evaluation?
18     A.   The personnel security office, through the
19 director of security, makes determinations on
20 security clearance eligibility. If there is a
21 medical component, medical information, related to
22 that determination, that determination would be

Page 65

1      Q.   Actually, one more question before we move
2  on to Section 3.3.
3          With respect to Plaintiff, was the fact
4  that she was undergoing gender transition evaluated
5  by the library?
6          MS. RUSSELL: Objection, vague. Also
7  objection to the form of the question and relevance.
8  But you can answer, if you understand the question.
9          THE WITNESS: I guess I would like to
10 define the word "evaluated." I was advised that
11 this applicant had volunteered this information and
12 asked whether it would be considered during security
13 clearance determination, what impact it would have
14 on the hiring, et cetera. And I indicated that it
15 did appear to fall under one of the security
16 criteria and so it would have to be evaluated.
17         So I learned of the information, then gave
18 preliminary guidance that we would need to look at
19 this as part of security clearance determination,
20 however, no further evaluation beyond that, i.e.,
21 obtaining the security file, interview, referral to
22 health services, ever occurred. So I just want to

17 (Pages 62 to 65)

Cynthia Wilkens                                    September 20, 2006
                        Washington, DC

Page 66

1   make that distinction for the word "evaluated."
2   BY MS. MCGOWAN:
3       Q.   And in what context were you asked to
4   provide this guidance?
5       A.   Are you asking me what occurred?
6       Q.   What occurred?  I don't know if it was a
7   memo, an e-mail or a meeting.
8       A.   I was called and asked to come to a
9   meeting in CRS, and I was advised that the meeting
10  was to discuss any security clearance impact for an
11  applicant who had reported this information, and
12  then I went to the meeting and we discussed this.
13      Q.   Who was at that meeting?
14      A.   At the meeting were several individuals
15  from the Congressional Research Service.  Do you
16  want me to name them?
17      Q.   Yes, please.
18      A.   Charlotte Preece, the Chief of the Foreign
19  Affairs, Defense, and Trade Division -- I might get
20  some of the titles slightly wrong -- Kent Ronhovde,
21  who I believe is counselor to the director of the
22  Congressional Research Service.

Page 67

1       Q.   I'm sorry.  Just to be clear, Charlotte
2   Preece is the chief for foreign affairs?
3       A.   That's correct.
4       Q.   And then Kent --
5       A.   Ronhovde, R-o-n-h-o-v-d-e, and I believe
6   he is counselor to the director of CRS.
7       Q.   Anyone else at that meeting?
8       A.   Bessie Alkiswani.
9       Q.   I'll definitely ask you to spell that.
10      A.   Okay.  That is Alkiswani, A-l-k-i-s -- I
11  never spell it out loud -- s-w-a-n-i, I believe.
12  She is the head of workforce development for CRS --
13  again, I may be off on some of the names -- and
14  there was another person, Cathy Dees, I'm not sure
15  about that.  The name just went out of my head and
16  came back in, but another CRS management official.
17      Actually, I'd like to correct myself.  I'm
18  not sure about that name at all.
19      Q.   Okay.
20      A.   I have absolutely gone blank on that.
21  It's either -- or Diane Duffy.  I am totally
22  confused on that.

Page 68

1       Q.   Who contacted you about attending this
2   meeting?
3       A.   I believe it was Bessie Alkiswani.
4       Q.   What information, if any, were you
5   provided in advance of the meeting?
6       A.   Basically, what I just said, that they had
7   an applicant to a position that required a security
8   clearance, and the applicant had volunteered
9   transgender information.  And my input was requested
10  about how, if at all, it would impact the security
11  clearance process.
12      Q.   When was that meeting, if you remember?
13      A.   I don't, exactly.  It was late 2004, very
14  late.
15      Q.   Was a meeting like this common as part of
16  the hiring process?
17      MS. RUSSELL:  Objection, vague.  You can
18  go ahead and answer.
19      THE WITNESS:  I wouldn't characterize it
20  as common, but there are times in which information
21  is brought to a manager and they need guidance and
22  they will call for guidance from me.

Page 69

1   BY MS. MCGOWAN:
2       Q.   And during this meeting, did anyone
3   indicate that this applicant was the preferred
4   applicant for the position?
5       MS. RUSSELL:  Objection to the form of the
6   question.  But you can answer, if you understand the
7   question.
8       THE WITNESS:  I got the sense that yes,
9   that was the serious candidate for the position.
10  BY MS. MCGOWAN:
11      Q.   Did you indicate that -- well, let me ask,
12  sort of, tell me what you said in the course of that
13  meeting as far as the advice that you gave.
14      A.   I told them that I believed, based on my
15  reading of the adjudicative guidelines and
16  supplemental information, that it was something that
17  needed to be evaluated.
18      Q.   Anything else?
19      A.   I said that as part of the evaluation, it
20  would need to be referred to the health services
21  office; I told them that it was not disqualifying on
22  its face, standing alone, but needed to be

18  (Pages 66 to 69)

Cynthia Wilkens                                    September 20, 2006
                          Washington, DC

| Page 70 | Page 72 |
|---|---|

**Page 70**

1  evaluated; that it would take some time to go
2  through this process.
3      Q.  Did you discuss what that process would
4  entail at that meeting?
5      A.  Yes.  They believed that the applicant had
6  prior service and prior security clearance status.
7  The break in service was not known, however.
8          I indicated that if the investigation had
9  been conducted some time ago, and I believe the
10  understanding was the break in service was about two
11  years, but that was not exactly clear, inasmuch as
12  the applicant was reporting this as a current
13  pending matter for him, most probably, a new
14  investigation would be needed because the prior
15  investigation would not reasonably have covered
16  something that was occurring right then.
17          So we discussed that health services would
18  have a role in reviewing medical information and
19  that additional investigation might probably be
20  needed.
21      Q.  At any time after that meeting, did you
22  attempt to ascertain whether or not the information

**Page 71**

1  had actually been part of Ms. Schroer's prior
2  security investigation?
3      A.  No.  I never obtained -- I was never given
4  a copy of the application materials or any of the
5  paperwork that we used to go forward and conduct
6  that type of inquiry.
7      Q.  So now I will move onto Section 3.3(d),
8  actually not (d) as much as it is 3.3 generally.
9  Actually, let me focus on 3.3(d), specifically,
10  which is on page 376.
11          With respect to this provision, which
12  begins:  Access eligibility shall be reapproved for
13  individuals who were determined to be eligible based
14  on a favorable adjudication, how -- if you can
15  explain to me, how does this provision apply in a
16  circumstance where an applicant has a prior security
17  clearance that has been completed within the last
18  five years?
19      A.  Well, Section (d) says, it provides for --
20  you used the word "reciprocity" earlier.  It
21  provides, essentially, for reciprocity.  If there is
22  a prior background investigation within five years

**Page 72**

1  that was favorably adjudicated, if the break in
2  service is not more than two years, and if there is
3  no indication of any change in status, in other
4  words, any new information that might warrant
5  evaluation, and procedurally, this section of the
6  order also asks for the individual to basically
7  submit an updated 86 to say that nothing has changed
8  in their background, appropriate record checks
9  referred to there, in the last line, refers to
10  basically an updated national agency check where the
11  security office is calling the investigative indices
12  to see if there's any additional information to
13  consider.
14      Q.  What does the library do or how does the
15  library attempt to ascertain the existence of new
16  information with respect to applicants who already
17  have a security clearance?
18      A.  When an individual applies for employment,
19  they submit their employment application and
20  whatever attachments they need to, and also a
21  declaration for federal employment form, OF-306.
22  That declaration form contains questions regarding

**Page 73**

1  criminal history, employment difficulties, federal
2  delinquency, et cetera.
3          So there are times that new information is
4  developed through that individual's 306.  If you are
5  also asking what happened in this particular case?
6      Q.  That was my next question, yes.
7      A.  There are other times when an individual
8  may volunteer information, either during a selection
9  interview, information could be obtained during a
10  reference check or any interactions between the
11  applicant and the library, the individual may
12  provide information.
13      Q.  With respect to ascertaining or attempting
14  to ascertain new information, who at the library is
15  charged with the responsibility of determining
16  whether or not new information exists that may, for
17  example, not have been voluntarily disclosed by an
18  applicant?
19      A.  Well, again, the 306, but that would be a
20  voluntary disclosure.  Selecting officials conduct
21  reference checks for employment selection purposes,
22  and then when an application is ultimately referred

                                  19 (Pages 70 to 73)

Cynthia Wilkens                                          September 20, 2006
Washington, DC

| Page 98 | Page 100 |
|---|---|
| 1  was necessary? | 1  discussion about what we would have to do, that yes, |
| 2      A.  Okay.  I think that is a two-part | 2  we would need to evaluate it from a security |
| 3  question.  The service unit identifies whether or | 3  clearance standpoint, it would involve, at a |
| 4  not to request a waiver based on their operational | 4  minimum, a health services evaluation, I'm sure that |
| 5  need to fill the position without undue delay.  We | 5  in the discussion of the time frame and the fact |
| 6  determine whether the waiver process with our | 6  that this was information that needed to be |
| 7  inquiries needs to be completed when an individual | 7  evaluated, I communicated that the waiver would not |
| 8  does not already meet requirements.  So they are | 8  be the process. |
| 9  either lacking in the investigation, it's untimely, | 9      Q.  When you say "would not be the process"? |
| 10 or there's no information that needs to be | 10     A.  Would not be probably approved, because |
| 11 considered. | 11 waivers relate to cases where there's no information |
| 12     Q.  And so as far as that first piece, when | 12 that requires in-depth evaluation, additional |
| 13 would the director of a service agency -- or how | 13 evaluation, without benefit of investigation. |
| 14 would the director of the service agency ascertain | 14     Q.  And with respect to the question of |
| 15 whether or not they need to ask for a waiver? | 15 whether or not the waiver would or would not have |
| 16     A.  Based on their admission requirements. | 16 been approved, had CRS requested a waiver in |
| 17 It's their decision. | 17 Ms. Schroer's case, on the assumption that they had |
| 18     Q.  Are there any factors specified that go | 18 offered her the position, who would have been the |
| 19 into that determination? | 19 person to make the determination of whether or not |
| 20     A.  The service unit looks at the job that | 20 to grant the waiver? |
| 21 needs to be filled, and it's my understanding, | 21     A.  My boss, the director of security. |
| 22 typically they will look at what projects or duties | 22     Q.  And that is Mr. Lopez? |

| Page 99 | Page 101 |
|---|---|
| 1  that individual -- that incumbent must be performing | 1      A.  Mr. Lopez.  And he would be making that |
| 2  to meet mission objectives.  If they conclude based | 2  decision based on a recommendation from me. |
| 3  on the duties of that individual needs to perform | 3      Q.  At any time, did you discuss the matter of |
| 4  that they cannot wait the four months, to six | 4  a waiver for Ms. Schroer with Mr. Lopez? |
| 5  months, to eight months, to a year, for that | 5      MS. RUSSELL:  Objection, lacks foundation. |
| 6  background investigation to be completed on a | 6  But you can answer, if you understand. |
| 7  pre-appointment basis, they, at that time, request | 7      THE WITNESS:  I think I did.  I report to |
| 8  us to entertain the waiver, and then they certify | 8  him; he is my boss.  And I believe at some point |
| 9  that although the person is being appointed without | 9  following the meeting, I let him know this had |
| 10 the background investigation, the retention is | 10 occurred and that that had been my guidance. |
| 11 subject to the favorable completion of the | 11 BY MS. MCGOWAN: |
| 12 background investigation and that in a sensitive | 12     Q.  What else during the course of that |
| 13 position, that individual will not have access to | 13 conversation with Mr. Lopez happened? |
| 14 classified information until such time that they are | 14     MS. RUSSELL:  Objection to the form. |
| 15 determined eligible. | 15     THE WITNESS:  Nothing, to my recollection. |
| 16     Q.  At any point were you asked to render an | 16 He seemed to agree with me. |
| 17 opinion about whether or not Ms. Schroer would have | 17 BY MS. MCGOWAN: |
| 18 been eligible for a security clearance waiver? | 18     Q.  At any point, did you discuss |
| 19     A.  I think that was part of the discussion. | 19 Ms. Schroer's eligibility for a security clearance |
| 20 CRS typically requests waivers because they must | 20 waiver with the head of the library health services |
| 21 fill their positions in order to do their work for | 21 office? |
| 22 the Congress in a timely manner.  And in our | 22     A.  Not on that day.  But shortly thereafter, |

26 (Pages 98 to 101)

Cynthia Wilkens                                    September 20, 2006
                        Washington, DC

Page 102

1  I did mention to her, in general terms, a
2  discussion, and affirmed my understanding with her
3  that that was a matter that I would need to refer to
4  her, and she concurred.
5      Q.   Did she indicate that a waiver would be
6  inappropriate?
7          MS. RUSSELL: Objection, lacks foundation.
8          THE WITNESS: I don't have that
9  recollection, but I do remember that she agreed that
10 her office would have to be involved in an
11 evaluation.
12 BY MS. MCGOWAN:
13     Q.   But she did not make an evaluation about
14 whether or not a waiver would or would not be --
15     A.   I can't recall that.
16         The reason why background investigations
17 are meant to be conducted pre-appointment and that
18 there is a waiver process, is that they are a
19 valuable source of information and it gives a broad
20 view of the individual, as opposed to just a narrow
21 view. So that is why when there is an issue that is
22 developed during a waiver, the background

Page 103

1  investigation is often requested to be done
2  pre-appointment.
3      Q.   When there is a particular piece of new
4  information that comes to the library's attention
5  that leads to the suspicion that the prior
6  investigation may not be adequate, is there a
7  mechanism for conducting an investigation
8  exclusively on that issue to determine whether a
9  waiver would be appropriate?
10         MS. RUSSELL: Objection to the form.
11         THE WITNESS: There are some times when we
12 develop information about a specific issue, either
13 through the 306 or during a waiver inquiry, that we
14 then extend our inquiries to determine if we can get
15 adequate information to make a balanced
16 determination.
17         If that inquiry can be done by my office,
18 I mentioned credit check earlier, it could also
19 be -- if we are able to conduct a court check, for
20 instance, something like that that can be done
21 relatively easily by my office, we are authorized to
22 conduct inquiries, then we could do that.

Page 104

1  If a broader investigation regarding an
2  individual's background is needed, then we would
3  send it to the Office of Personnel Management for
4  investigation.
5  BY MS. MCGOWAN:
6      Q.   With respect to Section 8 of 2024-3, which
7  discusses the break in service --
8      A.   Yes.
9      Q.   -- just to be clear, what constitutes a
10 break in service?
11     A.   Separation from the government, retirement
12 from the government, no affiliation from the
13 government -- it's considered break in federal
14 service. Earlier, you asked if a federal contractor
15 is considered to have a break. It depends on if we
16 can get the investigation on a number of factors.
17     Q.   Is it possible to have an active security
18 clearance without at least affiliation with the
19 federal government?
20     A.   I don't believe so. No.
21     Q.   In Section 8, this last line which says:
22 Appointees may be required to execute an updated

Page 105

1  personnel security questionnaire, is that the SF-86
2  document we have been talking about?
3      A.   That is correct.
4      Q.   In Section 2024-4, the document refers
5  to -- I'll try to find the specific case where the
6  language appears, but we have discussed before this
7  notion that there is a common-sense assessment of an
8  applicant.
9          Can you describe for me what that means?
10 Actually, it's here in Section 3-A: The
11 determination shall be based on a common-sense
12 assessment.
13     A.   Okay. First of all, this regulation
14 relates to employment suitability, not security
15 clearance eligibility. When we say common-sense
16 assessment, I believe the term "common sense" was
17 originally in one or both of the Executive Orders
18 and that's where it stems from. I believe that it
19 calls for the evaluation to be reasonable, that
20 there should be somewhat of a relationship between
21 the concern and the individual's ability to carry
22 out their position responsibilities and be employed

27 (Pages 102 to 105)

Cynthia Wilkens                                         September 20, 2006

                          Washington, DC

---

Page 118

1  evaluation of a background investigation. I was not
2  asked to conduct a background investigation
3  regarding the applicant. We did not conduct a
4  background investigation. We did not make a
5  determination.
6  BY MS. MCGOWAN:
7     Q.   The next Section, which is 2024-5,
8  involves contractors and volunteers. Is this
9  regulation relevant to the hiring of an employee
10  with the library?
11     A.   I don't believe so.
12     Q.   Okay. I'm not going to go through that in
13  detail if it's not relevant to the facts here.
14        And then we will turn to Section 2024-6.
15  Turning to Section 3-D -- or actually, Section 3
16  discusses the security clearance eligibility
17  standards. Which of these standards does the
18  library believe are implicated with respect to
19  transsexual applicants for employment?
20        MS. RUSSELL: Objection to the form of the
21  question; lacks foundation.
22        THE WITNESS: I believe that the criteria

---

Page 119

1  that would be relevant would be found under
2  Section 3-D, item D, which is "sexual behavior," and
3  I, which is "emotional, mental, and personality
4  disorders."
5  BY MS. MCGOWAN:
6     Q.   With respect to the application of
7  Ms. Schroer, were there any other security clearance
8  factors that you believed were relevant to assessing
9  her application?
10     A.   No.
11     Q.   Section 3-E discusses the "whole person"
12  concept, particularly in that first line. Can you
13  explain what that means?
14     A.   In making a security clearance
15  determination, adjudicators are charged with looking
16  at all of these issues and all aspects of a person's
17  background. Accordingly, the background
18  investigation, for instance, looks at employment,
19  education, residence, law enforcement, financial;
20  it's a broad range of issues.
21        In addition, when we evaluate the
22  information, we assess it in terms of materiality,

---

Page 120

1  recency, frequency, and seriousness. So "whole
2  person" means that it is very rare that one specific
3  piece of information would be disqualifying on its
4  face. There are some times in which that may be the
5  case, but, for instance, an example -- I hope these
6  examples are helpful -- if someone reported criminal
7  history, we would look at when it occurred, what was
8  the nature of the charge, was it an isolated event
9  or part of a pattern, did the individual report the
10  information if required, and what is apparent in the
11  rest of that person's life.
12        If the information -- if it's a pending
13  charge or the information just occurred, and it
14  could be disqualifying on its face, but if it is
15  considered somewhat untimely, we would look at other
16  parts of the person's case to make an overall
17  assessment.
18     Q.   With respect to factors that may be
19  disqualifying on their face, is an individual's
20  gender transition a factor that is disqualifying on
21  its face?
22     A.   No.

---

Page 121

1     Q.   With respect to an individual that is
2  undergoing gender transition, would the whole person
3  concept be applied in a different or specific way
4  for that applicant?
5        MS. RUSSELL: Objection to the form.
6        THE WITNESS: Are you asking me what I
7  think would have happened procedurally?
8  BY MS. MCGOWAN:
9     Q.   With respect to -- I'm just trying to
10  figure out whether or not this "whole person"
11  concept is either discarded or refined with respect
12  to a certain subcategory of applicants.
13     A.   Okay. I think I understand the question.
14        In a case like this or in a case that
15  required referral to the health services office, if
16  the health services officer found that there was --
17  that the information was not disqualifying, in other
18  words, that there was not a significant defect in
19  judgement, reliability, that would affect the person
20  holding the security clearance, if they found there
21  was no reason to conclude that it was disqualifying,
22  we would still need to go on and conduct the

---

31 (Pages 118 to 121)

Cynthia Wilkens                                    September 20, 2006
                          Washington, DC

Page 122

1    background investigation and consider all of these
2    elements.
3          If the health services office concluded
4    that the information made available to them through
5    their review was disqualifying in that individual
6    case, then there would be no reason to go on and
7    conduct the rest of the background investigation,
8    because on that one factor, the individual would be
9    considered ineligible.
10   Q.    Didn't the library conduct a whole person
11   evaluation of Ms. Schroer?
12         MS. RUSSELL: Objection, lacks foundation,
13   relevance. But you can answer, if you understand
14   the question.
15         THE WITNESS: No. These procedures were
16   not applied, because we were never requested to
17   reach a security clearance determination on the
18   applicant.
19   BY MS. MCGOWAN:
20   Q.    In Section 3-E, there's discussion of the
21   consideration of mitigating circumstances, I know
22   that we will talk about this a little bit more,

Page 123

1    later, but generally, in the context of this
2    section, what is meant by mitigation?
3    A.    Under each criteria, there are factors
4    that may be disqualifying and then factors that may
5    be mitigating. Are you asking me to discuss that
6    with respect to every criterion? I could give you
7    an example, if you like.
8    Q.    I would say, in general, what is meant by
9    mitigating circumstances? And then later when we
10   focus on the specifics of the subcategories that are
11   particularly relevant here, we can talk about what
12   mitigation means with respect to those specific
13   conditions. So this is more, sort of, generally
14   what is meant by mitigating circumstances?
15   A.    Okay. As I indicated earlier, we look at
16   materiality, recency, frequency, seriousness. It
17   could -- typically, mitigating information might
18   indicate that the issue is untimely if criminal
19   conduct occurred 20 years ago, if there was an
20   alcohol abuse problem and it's no longer ongoing,
21   the person is rehabilitated from drug use. So
22   timeliness is certainly a key.

Page 124

1          The repeated nature of conduct, if an
2    individual said this only happened once, depending
3    on the issue, that could be a mitigating factor.
4          So mitigating information is information
5    that an individual presents to -- that they hope
6    will reduce the relevance of the information to a
7    current decision.
8          MR. MCGOWAN: And we will, as I mentioned,
9    this afternoon, go through the -- sort of, what
10   mitigation means in the context of specific
11   concerns.
12         I'm just going to -- just so folks know
13   from a lunch perspective, I thought we would get
14   through this last section and whatever things, which
15   I don't have particularly very many questions on
16   2024-8, and then I thought it would be a nice time
17   to break for lunch, take a deep breath and come back
18   this afternoon.
19   BY MS. MCGOWAN:
20   Q.    In Section 4, there is a discussion of --
21   that the director of OSEP shall make the final
22   determination. Who is that? What is that?

Page 125

1    A.    That is the director of Security and
2    Emergency Preparedness, and that is Ken Lopez.
3    "OSEP" is just the acronym.
4    Q.    Got it. Okay.
5          And to be clear, while you discussed the
6    matter of Ms. Schroer with Mr. Lopez, did you ever
7    make any formal recommendation to Mr. Lopez
8    regarding Ms. Schroer's eligibility for security
9    clearance?
10         MS. RUSSELL: Objection to the form.
11         THE WITNESS: No, I did not.
12   BY MS. MCGOWAN:
13   Q.    Section 6 refers to proceedings for
14   individuals who are not determined to meet the
15   security clearance requirements.
16         Is this process available to applicants
17   who are deemed ineligible for security clearance?
18   A.    If the individual is processed for
19   security clearance and is denied access, yes, that
20   would be made available.
21   Q.    Was Ms. Schroer given the opportunity to
22   utilize this process with respect to the assessment

32  (Pages 122 to 125)

Cynthia Wilkens                                    September 20, 2006
                        Washington, DC

| Page 126 | Page 128 |
|---|---|

Page 126

1  of her security clearance eligibility?
2      MS. RUSSELL: Objection, lacks foundation,
3  relevance. Also, objection to the form of the
4  question. But you can answer it, if you can
5  understand it.
6      THE WITNESS: No. No security clearance
7  determination was requested of the applicant. No
8  background investigation was conducted. No
9  determination was made.
10 BY MS. MCGOWAN:
11     Q.   Then, finally, with respect to 2024-8, is
12 there anything in this regulation that informs the
13 library's determination of whether an applicant for
14 employment should be deemed eligible for security
15 clearance?
16     A.   This Library of Congress regulation,
17 2024-8, is focused on employees of the library who
18 have been granted security clearance, and it
19 apprises them of their obligations to safeguard
20 information, execute a nondisclosure agreement,
21 comply with security requirements.
22     So it does not appear to relate to

Page 127

1  applicants for employment who have not been
2  processed for security clearance.
3      MS. MCGOWAN: I think this is a good time
4  for a lunch break. So I have ten to 1:00. Perhaps
5  we meet back here at a quarter till 2:00 with the
6  thought we have five minutes to get ourselves
7  reorganized and start an hour from now?
8      MS. RUSSELL: Actually, I'm going to
9  request we meet at 2:00, because I need to go back
10 to the office and submit something for review. Is
11 that okay?
12     MS. MCGOWAN: Yes, we can start at 2:00.
13     (Lunch Recess 12:49 p.m. to 2:05 p.m.)
14 BY MS. MCGOWAN:
15     Q.   Before we start in any new material, I
16 just want to close the loop on some of the issues we
17 discussed this morning.
18     The first issue that I wanted to make sure
19 I had the complete picture, was with respect to the
20 meeting that you discussed that you had with
21 Ms. Preece and some other individuals at the
22 library.

Page 128

1      So looking back on who you identified as
2  being at that meeting, I just wanted to make sure
3  that that was a complete lineup of who was at the
4  meeting. So if we could just run through again who
5  was there?
6      A.   Charlotte Preece, chief of the foreign
7  affairs division; Kent Ronhovde, counsel to the
8  director; Bessie Alkiswani, who is head of
9  workforce.
10     And then there was a name that I couldn't
11 quite remember. I think it's Diane Duffy; the other
12 name I said is someone that I work with currently in
13 CRS administration. So maybe that popped up, but
14 I'm still not 100 percent sure about that last name.
15 I worked with the others more frequently.
16     Q.   So in addition to you, there were four
17 people at the meeting?
18     A.   I think so.
19     Q.   What information was given to you prior to
20 coming to that meeting?
21     A.   As I recall, the information I was given
22 on the phone is that CRS had an applicant for this

Page 129

1  position, and the position would require a
2  top-secret security clearance, and that the
3  applicant had volunteered that he was about to
4  undergo transsexual surgery. And I was asked
5  whether that would have an impact and in what way on
6  the security clearance process.
7      Q.   And who was that phone conversation with?
8      A.   Again, I believe it was from Bessie.
9      Q.   Did you ask her for any additional
10 information for you to have at your disposal prior
11 to this meeting?
12     A.   I can't recall exactly if I asked for
13 anything additional on the phone. When we met in
14 the meeting, I might have asked her, they may have
15 volunteered, I don't know what form this took, but I
16 understood that the applicant had prior military
17 service, held a security clearance in the military
18 and had left, and it was unclear how long, but my
19 sense was that it was about two years. I don't know
20 if they were estimating or if they didn't even know;
21 I don't know.
22     Q.   What other information about the applicant

Cynthia Wilkens                                    September 20, 2006
                         Washington, DC

|  | Page 130 |
|---|---|
| 1 | was provided to you at the meeting? |
| 2 | A.   I believe they referred to the applicant |
| 3 | by the first name of "David"; I don't think I knew a |
| 4 | last name. I know that the applicant was the |
| 5 | serious candidate at that point, and I believe that |
| 6 | Charlotte said that when she was following up with |
| 7 | him about his candidacy, he requested a luncheon |
| 8 | meeting at which point he volunteered this |
| 9 | information. |
| 10 | Q.   How did you know that David was the |
| 11 | serious candidate? |
| 12 | A.   Orally. I mean, they told me that. |
| 13 | Q.   Do you remember who it was that told you |
| 14 | that? |
| 15 | A.   I don't know who said the name, but when I |
| 16 | was invited to a meeting, it was: We have a |
| 17 | candidate that we are interested in for this |
| 18 | position. |
| 19 | Q.   Did you ask for more information about the |
| 20 | status of the applicant's security clearance |
| 21 | presently or at the time? |
| 22 | A.   I think I probably did. I think I |

|  | Page 131 |
|---|---|
| 1 | probably said: Do we know how long ago that was? |
| 2 | to get a sense of when an investigation might have |
| 3 | been done, break in service, et cetera. |
| 4 | Q.   Were you provided with a resume or any |
| 5 | other information to -- |
| 6 | A.   No. |
| 7 | Q.   Was the issue of the break in service |
| 8 | relevant to your ability to ascertain the security |
| 9 | clearance eligibility for this person? |
| 10 | A.   It would be, yes, because if the break in |
| 11 | service was over two years, then automatically, a |
| 12 | new investigation would be needed. If the |
| 13 | investigation -- it was my understanding through the |
| 14 | meeting that the break in service was around two |
| 15 | years, that's what they were thinking. I reasoned |
| 16 | that if the break in service was that long, then |
| 17 | logically, the investigation predated that, and it |
| 18 | would have been unlikely that an investigation of |
| 19 | over two-plus years would have provided information |
| 20 | to assist in evaluating what was being portrayed as |
| 21 | a very current matter. |
| 22 | Q.   With respect to the applicant, were you |

|  | Page 132 |
|---|---|
| 1 | told that the applicant was under the care of a |
| 2 | doctor? |
| 3 | A.   Probably. I was told that the individual |
| 4 | wanted to report as a female and that it was part of |
| 5 | the doctor's care and would be undergoing surgery, |
| 6 | so I thought there was a doctor involved. |
| 7 | Q.   Was there any discussion about the |
| 8 | applicant being under the care of a mental health |
| 9 | specialist? |
| 10 | A.   Not specifically. |
| 11 | Q.   And based on that information -- well, |
| 12 | actually, let me ask this: Was there any |
| 13 | information that you informed those at that meeting |
| 14 | that you needed in order to be able to provide them |
| 15 | with the feedback that they were looking for? |
| 16 | A.   One more time? |
| 17 | Q.   Sure. Let me make sure -- I want to know |
| 18 | at some level everything that they told you, so |
| 19 | let's make sure that I have everything that they |
| 20 | told you so that then we can figure out whether or |
| 21 | not there were any things, in addition, that you |
| 22 | needed to know. |

|  | Page 133 |
|---|---|
| 1 | So you knew that the applicant had prior |
| 2 | military service and that had a prior clearance, |
| 3 | unclear about the break in service, that the |
| 4 | candidate had informed Ms. Preece that she wanted to |
| 5 | report to work as a female. |
| 6 | Now, were you informed that the applicant |
| 7 | wanted to undergo or had intended to undergo |
| 8 | surgical procedures? |
| 9 | A.   I think so. I think surgery was |
| 10 | mentioned. |
| 11 | Q.   What, if anything else, were you told, |
| 12 | sort of, as the information being offered to you for |
| 13 | your assessment? |
| 14 | A.   I'm thinking here for a minute. I think |
| 15 | that about sums it up. Obviously, it was that the |
| 16 | position required top secret, that they needed to |
| 17 | make a hiring decision and effect the appointment |
| 18 | very urgently. |
| 19 | Q.   Anything else? |
| 20 | A.   That's what I can remember right now. |
| 21 | Q.   Was there any information offered to you |
| 22 | about her current employment, her employment at the |

Alderson Reporting Company
1-800-FOR-DEPO

Cynthia Wilkens                                    September 20, 2006
                          Washington, DC

| | |
|---|---|
| Page 134 | Page 136 |

**Page 134**

1  time she was applying?
2      A.   I don't recall.
3      Q.   So what "advice," if that is the right
4  word, were you being asked to provide this group who
5  asked you to meet with them?
6      A.   Generally speaking, they wanted to know
7  what impact that information, if any, would have on
8  a security clearance process.
9          Was the information disqualifying on its
10  face?  Which I said, no.
11         What issues did it bring up?
12         Did it fall under the security clearance
13  guidelines?
14         I believe I was asked if this would have
15  been a source of leverage, and I said not
16  necessarily, inasmuch as the individual has told you
17  this.
18         I was asked to speculate whether this
19  would have been considered in a prior background
20  investigation, and I think I said:  Probably not,
21  because if there's been a break, and this is a
22  investigation took place some time ago and this is a

**Page 135**

1  current matter, it probably would need more
2  investigation.
3          I was asked how long it would take to
4  determine whether he, the applicant, could be
5  appointed or cleared, or the length of time that the
6  evaluative or investigative process would take.
7      Q.   What was your answer to that last question
8  about how long?
9      A.   I informed them that I saw this as an
10  issue that would need to be referred to health
11  services for an evaluation, first of all, that that
12  could take weeks, but I didn't know exactly.
13         I told them that we, after that, might
14  have to do a background investigation, which could
15  take an additional lengthy time period.
16         CRS usually requests a waiver, and I said
17  in this case, because there was information that
18  really needed to be evaluated, it was unlikely that
19  the waiver would be approved.
20      Q.   Is there anything else you said to them as
21  part of your feedback?
22      A.   I think that is it.

**Page 136**

1      Q.   Did you get any follow-up questions or
2  comments back after you shared that information with
3  the folks at the group, people at the meeting?
4      A.   There was discussion about how long.
5  There's always discussion about how long something
6  will take, so a lot of discussion about that, and it
7  would depend on how things played out.
8      Q.   And if you can, tell me as much as you
9  remember of that -- how the conversation about --
10  you know, what were people interested in finding out
11  more with respect to the issue of how long?
12      A.   Basically, it was how long?  How long
13  would it take to -- if they decided to go ahead, to
14  refer it to health services?  What kind of an
15  evaluation would be needed; in other words, how long
16  it would take?  Whether we would need to do the full
17  background investigation, how long it would take if
18  we had to do that.
19      Q.   Now, in the event that the health services
20  investigation had come back with the recommendation
21  that this was not -- or it did not present a
22  security clearance process, would a further

**Page 137**

1  background investigation have been required at that
2  point?
3      A.   I don't know for sure.  It's speculative.
4  I think it might depend on whether Dr. Charles
5  wouldn't be able to -- what kind of conclusion she
6  made.
7          She could say:  I have been able to fully
8  evaluate this information and there is absolutely no
9  relevance to a security clearance determination, or
10  she could conclude:  I've been able to obtain some
11  information, and based on the information I have
12  now, there is no reason not to initiate the
13  background investigation to obtain the other
14  pertinent elements.
15         So I don't, exactly, know what the outcome
16  would have been.
17      Q.   With respect to the first option that you
18  laid out, in which Dr. Charles said that there
19  was -- she was satisfied that she had enough
20  information to ascertain that there was no
21  relevance, if that were her determination, then
22  what, if any, additional investigation would be

Alderson Reporting Company
1-800-FOR-DEPO

Cynthia Wilkens                                    September 20, 2006
                        Washington, DC

Page 138

1   required in that case?
2       A.   At a minimum, we would want to go and get
3   the prior investigative files to see what coverage
4   had been done; when; look at the individual's
5   experiences since the last investigation, depending
6   on that break in service, what the activities were.
7   After looking at that, we would probably have a
8   better idea.
9       Q.   And for a condition that required an
10  assessment from Dr. Charles, that was not gender
11  identity disorder or no gender transition, but some
12  other mental health condition, would the process
13  have been the same?
14      MS. DOUDS:  Objection, speculation and
15  vague.  You can answer the question.
16      THE WITNESS:  Basically.
17  BY MS. MCGOWAN:
18      Q.   Is there a circumstance where the
19  existence of a mental health condition can be
20  ascertained by Dr. Charles, or whoever is in
21  Dr. Charles' position, as having no relevance for
22  security clearance where no further investigation

Page 139

1   would then be required?
2       MS. DOUDS:  Same objection.  You can
3   answer the question.
4       THE WITNESS:  From a practical standpoint,
5   what is often the case is that the investigation has
6   already been conducted and any information regarding
7   a mental health condition or disorder is actually
8   developed through the background investigation.  And
9   so at that time, the investigation has already been
10  completed and we have available to us all the
11  pertinent information that relates to all the
12  security clearance criteria, so that assessment by
13  Dr. Charles is not made in a vacuum in that case.
14  That is not the same situation that we had here,
15  where I did not have benefit of a background
16  investigation in front of me that was current and a
17  health evaluation followed.  So I think that needs
18  to be understood.
19  BY MS. MCGOWAN:
20      Q.   But with respect to a candidate who had
21  revealed that they were under the care of a mental
22  health professional for a mental health concern

Page 140

1   other than gender-related concerns, once Dr. Charles
2   had reached the conclusion that she had enough
3   information to decide that there was no link or no
4   relevance of that mental health care to security
5   clearance eligibility, would additional
6   investigation be required?
7       MS. DOUDS:  Same objection.  You can
8   answer.
9       THE WITNESS:  It would depend on what
10  investigation that person already had.
11  BY MS. MCGOWAN:
12      Q.   And in a situation where -- similar to the
13  applicant here, where there had been a prior
14  clearance with an interruption, where the only new
15  information that was available to the library was
16  the mental health care, would additional
17  investigation have been required once the thumbs-up,
18  so to speak, had come from Dr. Charles?
19      MS. DOUDS:  Same objection.
20      THE WITNESS:  And same answer.  I mean, it
21  does depend, in part, what type of investigation I'm
22  looking at, the degree of coverage and the amount of

Page 141

1   confidence in Dr. Charles' evaluation.  So it is
2   possible that no further work would be needed, but
3   it is possible, also, that we would want to do some
4   further work.
5   BY MS. MCGOWAN:
6       Q.   What would that depend on?
7       MS. DOUDS:  Same objection.
8       THE WITNESS:  Same answer.
9   BY MS. MCGOWAN:
10      Q.   Would it depend on the condition itself
11  that Dr. Charles had investigated?
12      A.   I don't think so.  I think it has to do
13  with an assessment of whether she was able to obtain
14  sufficient information.  Her information is going
15  to, most likely, come from the individual
16  themselves, the individual's practitioner, and she
17  might also employ a consultant who had subject
18  matter expertise in that area.
19      The background investigation consists of
20  coverage from an individual's fuller background, how
21  their employment, references, neighbors, full range
22  of life activities are being carried out.  So it is

36  (Pages 138 to 141)

Cynthia Wilkens                                          September 20, 2006
                                Washington, DC

Page 142

1   possible, and I'm not saying it would have occurred
2   in this case, I'm just saying that I can see a case
3   where the health services evaluation said: There's
4   no reason not to proceed, but we would still like a
5   fuller picture of that individual's life before
6   granting a security clearance.
7       Q.   I know that we are talking, you know,
8   trying to, sort of, hone in. I'm trying to, sort
9   of, basically eliminate any variability except for
10  the condition itself that lead Dr. Charles to make
11  an investigation.
12       And so assuming that all other facts about
13  the two applicants are the same, the same level, the
14  same thoroughness, the same credibility of the
15  background investigation, Candidate A has a mental
16  health condition that is gender-identity related,
17  and Candidate B has a mental health condition that
18  is something else, and Dr. Charles has basically, in
19  identical words, told you: I have received all the
20  information I need to determine that this mental
21  health condition does not, in fact, raise any
22  security clearance issues, would those candidates be

Page 143

1   treated differently based on the fact that Candidate
2   A has a gender issue and Candidate B has a
3   non-gender mental health issue?
4       MS. DOUDS: Same objection.
5       THE WITNESS: And the answer is no. I
6   think the difference is -- and I don't think I can
7   stress this too much. In most cases, we are already
8   in possession of a completed background
9   investigation, with all of these other pieces of
10  information, which serves as a framework referring a
11  case to health services. So a background
12  investigation may develop information through
13  employment sources, through neighbors, through
14  references, that should reasonably be considered
15  through the health services evaluation, and if that
16  background investigation is not conducted, she may
17  be making an evaluation based on her information,
18  but without benefit of the background investigation.
19  BY MS. MCGOWAN:
20       Q.   After you provided your guidance and
21  answered any follow-up questions, were you asked to
22  investigate or follow up to find any additional

Page 144

1   information for the folks at that meeting?
2       A.   No. I wasn't given an employment
3   application, I wasn't given a personnel action
4   indicating that this application was going forward,
5   I wasn't asked to get back to them, do name checks
6   or anything.
7       Q.   At any point, was there a discussion of
8   whether or not Dr. Charles should be involved in the
9   conversation that you were having?
10       A.   I think I let it be known that she was not
11  there, I had not been able to contact her, and so I
12  said: This is what I think would happen.
13       They didn't say let's postpone the meeting
14  for Dr. Charles.
15       Q.   After the meeting -- well, is there
16  anything else that was discussed at that meeting?
17       A.   I think that is it.
18       Q.   After the meeting, did you discuss the
19  meeting with Dr. Charles?
20       A.   I ran into Dr. Charles shortly thereafter,
21  and in general terms, I indicated that this issue
22  had been brought to me and I gave preliminary

Page 145

1   information that this is something that would
2   require evaluation from health services office, and
3   she agreed.
4       Q.   And when you say "this issue," how did you
5   describe the issue to Dr. Charles?
6       A.   An applicant who was transgender who
7   required a security clearance for the position.
8       Q.   Did Dr. Charles say to you what she would
9   do if presented with a transgender applicant?
10       A.   Not in specific terms. Only that she
11  would do an evaluation as part of the security
12  clearance processing.
13       Q.   Did she describe what that evaluation
14  would entail?
15       A.   Not precisely, no. I think she may have
16  said that she might have to get a consultant with
17  subject matter expertise on that.
18       Q.   Did she say anything to indicate how long
19  she thought the evaluation would take?
20       A.   Not specifically. Just said it would take
21  some time.
22       Q.   Did she provide any sort of clarity about

37 (Pages 142 to 145)

Cynthia Wilkens                                           September 20, 2006
                          Washington, DC

Page 146

1    how much "some time" would be?
2        A.   No. I don't recall, no.
3        Q.   Did you have any follow-up conversations
4    with anyone from that meeting about this issue?
5            MS. DOUDS: Objection, vague. You can
6    answer it.
7            THE WITNESS: Over time, we got the new
8    application, the application from another applicant
9    for the same position, so we talked about that.
10   BY MS. MCGOWAN:
11       Q.   When you say "we," who is the "we"?
12       A.   Probably Bessie. She is my main point of
13   contact for these matters. So I knew another
14   application was forthcoming from another individual.
15       Q.   Is that the first time you learned -- let
16   me strike that and try this again.
17           When, if at all, did you learn what
18   happened with respect to the applicant that you had
19   discussed at that meeting?
20       A.   I don't know if I can answer when I
21   learned; that's rather precise. There was so much
22   discussion about how much time the background

Page 147

1    investigation and evaluation would take, that -- I
2    sensed from the meeting comments, that they might
3    look at another candidate instead. So when I left
4    the meeting, I knew that that was a possibility, and
5    I don't know when later, precisely, I learned that
6    they had chosen someone else.
7        Q.   Did you speak with anyone from that
8    meeting, whether Charlotte or Mr. Ronhovde or Bessie
9    or this fourth person who may or may not be Diane
10   Duffy, about their decision not to proceed with the
11   applicant that you had discussed at the meeting?
12       A.   I can't remember. I mean, I don't
13   remember calling them up and asking: Hey, what
14   happened to the other applicant?
15           Again, when I left the meeting, I thought
16   they were going to consider the amount of time that
17   it would take in my process; it obviously was
18   causing them some operational concern. I don't
19   clearly recall any follow up.
20       Q.   I want to turn now to a document that the
21   government provided in discovery, which is number 5.
22           (Wilkins Deposition Exhibit No. 5

Page 148

1            was marked for identification.)
2    BY MS. MCGOWAN:
3        Q.   Are you familiar with this document?
4        A.   Somewhat.
5        Q.   What is it?
6        A.   This looks to be DCID 114, which are
7    eligibility requirements for sensitive compartmented
8    information.
9            MS. MCGOWAN: Here, on the first page, a
10   number of some annexes that are listed, A through E,
11   those annexes were not produced as annexes in
12   discovery. But I believe that the information
13   contained in Annex C, is actually contained in
14   another document, so I just wanted to make sure that
15   we are talking about the same document.
16           So we will do that first here, which we
17   can mark as 6, which are the excerpts from the
18   "Adjudicated Desk Reference" that the government
19   produced.
20           (Wilkins Deposition Exhibit No. 6
21           Was marked for identification.)
22   BY MS. MCGOWAN:

Page 149

1        Q.   Sticking with document number 5, for the
2    moment, which is the Personnel Security Standards,
3    obviously this is the introductory portion, but not
4    the annexes, but what is the purpose of this
5    document?
6        A.   DCID 114, and I'm reading here, I don't
7    work with this on a day-to-day basis, because we do
8    not grant access to sensitive compartmented
9    information, CIA is the cognizant clearing
10   authority.
11           DCID 114 would be the standards used by
12   the CIA and other special security officers across
13   government who have authority to grant access to
14   sensitive compartmented information. There are
15   going to be some areas in the DCID that are very
16   much like the security clearance criteria in
17   processing for top secret, but they do relate to the
18   SCI adjudication, more precisely, so there could be
19   some differences as well.
20       Q.   And you said this document is used by the
21   CIA and other agencies. Do you know what other
22   agencies use this as their document?

                              38 (Pages 146 to 149)

Cynthia Wilkens                                    September 20, 2006

Washington, DC

|                                     Page 158 |
| --- |

1    that, in fact, contains information --
2        A.   I have to get them. I don't refer to
3    these.
4        Q.   -- if that contains information that is,
5    in fact, material upon which the library relies, I
6    would ask to have that information produced. To the
7    extent the annexes are not part of your
8    decision-making process, then it's obviously not
9    relevant here, so we don't need to belabor that
10   point.
11          I'm going to turn now to what we have
12   marked as Document 6, which is the "Adjudicative
13   Desk Reference." Also, I would like to show you
14   Defendant's answers in this case, which we can mark
15   as Exhibit 7.
16          (Wilkins Deposition Exhibit No. 7
17          was marked for identification.)
18   BY MS. MCGOWAN:
19       Q.   In Plaintiff's document requests to the
20   government, we asked for all documents that
21   Defendant contended supported the defenses asserted
22   in Defendant's answer. And Document 7 is the answer

|                                     Page 159 |
| --- |

1    in this case, and Page 1 and 2 are where the
2    defenses are listed. So, sort of, make sure that
3    you are familiar with that.
4           And the third defense, specifically, deals
5    with the national security requirements of the
6    specialist in terrorism and international crime
7    position.
8           Did you ever make a determination that
9    Plaintiff could not satisfy the national security
10   requirements of the position?
11       A.   No, we never made a determination.
12       Q.   Were you ever asked to determine whether
13   or not Plaintiff could satisfy the requirements of
14   the position?
15       A.   No. I advised them that it was not
16   disqualifying on its face, and the conversation
17   ensued about how long it would take to conduct an
18   evaluation and an investigation in order to reach a
19   determination, but I was never asked to take those
20   additional steps.
21       Q.   Turning back to the ADR, the "Adjudicative
22   Desk Reference," which is Bates stamped as page 445

|                                     Page 160 |
| --- |

1    to 502, this set of documents -- and we have tried
2    to keep them stapled into the sections that they
3    were -- as they were given to us. These were
4    documents produced in response to that request that
5    I just mentioned, asking for all documents
6    supporting the defenses listed in the answer.
7           Are you familiar with this document?
8        A.   Yes, I am.
9        Q.   What is it?
10       A.   The Adjudicative Desk Reference is a
11   resource document for personnel security
12   specialists. It, I believe, was compiled -- well,
13   it says right here, the Personnel Security Committee
14   of the U.S. Government Security Policy Board --
15   which I don't believe exists any longer, but it did
16   at the time that this was promulgated -- it's a tool
17   to help practitioners carry out the processes and
18   determinations related to security clearance
19   adjudication.
20          The first section there, Adjudicative
21   Guidelines, are -- starting with Guideline A,
22   Allegiance, those are the uniform security clearance

|                                     Page 161 |
| --- |

1    guidelines that have been established for government
2    employees and consultants, et cetera, who need
3    access to classified national security information.
4    It gives a little overview of the adjudicative
5    process there, also, and basically, it's a resource
6    document for people to have current standards to
7    look at.
8           The other main part of the Adjudicative
9    Desk Reference, you see there is supplemental
10   information, and that is additional background
11   information relevant to each security clearance
12   criteria that provides the reader with some basic
13   information about what cases may have been relevant
14   to those, what terms mean, what adjudicators should
15   consider, and that's it.
16       Q.   How is this document used by the library
17   during the hiring process?
18       A.   Okay. The Library of Congress regulations
19   already contain the uniform adjudicative guidelines,
20   but they are very brief. These adjudicative
21   guidelines go into a little bit more detail about
22   why a certain topic could pose a security clearance

41 (Pages 158 to 161)

Cynthia Wilkens                                          September 20, 2006
                          Washington, DC

Page 162

1   concern, apprises the adjudicator of conditions that
2   could raise a security concern under that guideline
3   and could be disqualifying; it also gives, as
4   examples, conditions that could mitigate that
5   security concern.
6       And so in adjudicating our cases, we have
7   reviewed this information, we are familiar with this
8   information, and when topics come up that we want to
9   deepen our understanding of, or update our
10  understanding of, we will go back to the source
11  document to make sure we understand.
12      Q.   What entity issues this document?
13      A.   According to the first page, the group
14  that promulgated the document was the Personnel
15  Security Committee of the U.S. Government Security
16  Policy Board. That, as I recall, was an
17  organization that worked out of -- I want to say
18  either the Office of Management and Budget, or the
19  Special Assistant to the President; National
20  Security Council, possibly. I cannot remember
21  exactly what it was. This was issued in 1998.
22  Organizationally, some of that has changed in

Page 163

1   government, but as far as I'm aware, it is still
2   pretty current guidance.
3       Q.   And do you know what the entity is now
4   that is responsible for maintaining this set of
5   guidelines?
6       A.   Well, I could give a couple of guesses. I
7   don't know precisely, but I believe the Office of
8   Management and Budget has been given oversight
9   responsibility for the personnel security program.
10  It's carried out, in large part, by the Office of
11  Personnel Management, which sets policy and runs
12  investigations.
13      The Defense Security Service is a large
14  part of the personnel security community and I
15  believe a precursor to the Personnel Security
16  Committee was the Personnel Security Research
17  Committee and they originally were a defense entity.
18      So I'm sorry about giving so many, but
19  together, that -- those are the main leaders in the
20  personnel security community and guidelines are set
21  forth from those entities, at present.
22      Q.   Is there an entity or an individual to

Page 164

1   whom someone can turn for guidance, in addition to
2   these guidelines?
3       A.   In my field, personnel security
4   practitioners often call the Office of Personnel
5   Management for guidance, Defense Security Service.
6   There's a network of people on a contact list that
7   we can call.
8       Q.   You said OPM and Defense Security Service.
9   Who else would the library turn to if they had a
10  question about the guidance?
11      A.   On occasion, we will seek guidance from
12  counterparts at different agencies, State
13  Department, FBI, CIA.
14      Q.   Do those entities work from the same
15  document that the library does?
16      A.   I believe so. Agencies may incorporate
17  this guidance in different ways in their own
18  regulations, but I believe that the language is
19  pretty common.
20      Q.   We talked about this before, earlier, with
21  respect to the manual. Is there an -- either,
22  statutory or regulatory requirement that the library

Page 165

1   adhere to these guidelines?
2       MS. RUSSELL: Objection to the form of the
3   question.
4       THE WITNESS: The regulation indicates
5   that we will follow federal guidance in the security
6   clearance program as a matter of policy.
7   BY MS. MCGOWAN:
8       Q.   Turn to -- actually, before we go into
9   this document, with respect to -- on page 448,
10  Guidelines A through M are listed, and I only want
11  to spend time going through the guidelines that were
12  deemed relevant with respect to the assessment of
13  Ms. Schroer's ability to satisfy the security
14  clearance requirements. So can you clarify for me
15  which of these guidelines did the library take into
16  account when addressing that question?
17      MS. RUSSELL: Objection to the form of the
18  question, lacks foundation. But you can go ahead
19  and answer.
20      THE WITNESS: The two guidelines that
21  seemed relevant to this case would be Guideline D,
22  sexual behavior; and Guideline I, emotional, mental,

42 (Pages 162 to 165)

Cynthia Wilkens                                      September 20, 2006
                          Washington, DC

Page 166

1    and personality disorders.
2        Q.   Any other guideline?
3        A.   Those would be the two guidelines.
4        Q.   How did you determine that the guideline
5    regarding sexual behavior was relevant with respect
6    to the applicant?
7        A.   I read the guideline and it indicates that
8    sexual behavior is a security concern if it
9    indicates a personality or emotional disorder.
10   There is a footnote there that indicates that the
11   guideline of emotional, mental, or personality
12   disorders, should also be reviewed as appropriate,
13   and this is on page 452.  So I then went to the
14   guideline on emotional, mental, and personality
15   disorders, which is on page 457, and that guideline
16   articulates why that information may pose a security
17   concern and also indicates that there could be the
18   need to involve a mental health professional.
19       Q.   What led you to consider Guideline D in
20   this case?
21       A.   When you read the underlying supplemental
22   information that relates to sexual behavior, it

Page 167

1    provides information that defines terms and
2    discusses different areas that may fall under that
3    guideline, and transgender information was covered
4    under that supplemental information.
5        Q.   Since I don't have the entire document
6    together, I don't know exactly how it's laid out.
7    When you were presented with the information that
8    the library was considering a transgender applicant
9    and you were trying to ascertain what guidance
10   existed, how did you go about doing that?  I'll give
11   you an example of what I mean.
12       A.   Please.
13       Q.   Here's this book, and obviously, we only
14   have excerpts.  Was there an index in the back where
15   you looked up the term "transgender" and it directed
16   you to certain pages, or did you, sort of, read
17   through and decide what sections you were going to
18   read more closely?
19       A.   Okay.  I can tell you what I did.  The
20   Adjudicators Desk Reference is actually on my
21   desktop, and when this was presented to me as a
22   transgender issue, I wanted additional information

Page 168

1    to help me understand it, I clicked on the
2    adjudicative guidelines.  I am aware that "sexual
3    behavior" might be the term written in the
4    adjudicative guideline, but when you read
5    supplemental information, it's broader than the word
6    "behavior" might indicate.
7            It's on my desktop, and one can click on
8    "Adjudicative Guidelines" and the issue, and then if
9    you want the supplemental information relating to
10   that issue, you click.  And I'm trying to remember
11   this in my mind's eye.  When you click on
12   supplemental information relating to sexual
13   behavior, for instance, one can scroll down and read
14   every page, but on the left column of my PC, when it
15   comes up, the text is on the right, and on the left
16   column is basically an index or a table of contents
17   under that supplemental discussion.  And if you
18   scroll down, there was a section for "transgender,"
19   and I clicked on that, and it took me to the
20   pertinent discussion.  When you print it out,
21   however, I think you get the whole thing.
22       Q.   When did you look at the ADR?  I know you

Page 169

1    said you went looking in hopes of getting more
2    information.  At what point did you consult the ADR?
3        A.   As I recall, I did it after receiving a
4    phone call asking me to come to this meeting that
5    was scheduled not too long after that, and I knew
6    that I did not have personal experience in this kind
7    of case and I didn't know a lot about it.  So in
8    order to prepare myself for the meeting, I went to
9    my available resource and clicked for some
10   additional background information.
11       Q.   And was this the first time that you had
12   ever researched or read the provisions in the ADR
13   relating to transsexuality?
14       A.   I think I had -- I have a recollection of
15   basically working through the whole ADR on all the
16   issues.  When I obtained it in the first place, and
17   other cases that may have involved different issues,
18   I will go back to the ADR and read through and
19   scroll.  So I think I generally knew it was in that
20   area, but I had not researched -- and I'm putting
21   that in quotes -- that particular topic in the ADR
22   before.

43 (Pages 166 to 169)

Cynthia Wilkens                                September 20, 2006
                        Washington, DC

---

Page 170

1    Q.  So when you turned to the ADR to
2  investigate about transsexuality, did you know,
3  going in, that the sexual behavior provision was
4  where you would find that information?
5        MS. RUSSELL:  Object to the form of the
6  question.
7        THE WITNESS:  I had good reason to believe
8  it would be in that section.
9  BY MS. MCGOWAN:
10   Q.  Was it based on your prior experience or
11  your prior review?  How did you know to look in that
12  section?
13   A.  Again, based on my prior experience and
14  looking at the ADR over the years.
15   Q.  Let's look at Guideline D, which is the
16  guideline regarding sexual behavior.  And we can
17  also have at our disposal pages 474 through 503,
18  which I believe is the supplemental information you
19  were referring to as far as the sexual behavior
20  guideline.
21        Looking first at the guideline, what did
22  you understand this guideline -- standing alone,

Page 171

1  before referring to the supplemental materials, did
2  you understand this guideline to mean with respect
3  to the relevance of an individual's transsexuality
4  for their security clearance eligibility?
5        MS. RUSSELL:  Objection to the form.
6        THE WITNESS:  Could you ask that again?
7  BY MS. MCGOWAN:
8    Q.  Looking at the Guideline D, and I want to
9  ask about the supplemental materials, as well, but
10  sticking first with the guideline itself, what did
11  you understand this guideline to provide with
12  respect to how an individual's transsexuality would
13  impact their ability to satisfy the security
14  clearance process?
15        MS. RUSSELL:  Same objection.  But you can
16  go ahead and answer.
17        THE WITNESS:  The term "transsexual" or
18  "transgender" is not used in this guideline.
19  Instead, the guideline refers more broadly to
20  behavior that would be a concern if it involved
21  certain things.  The term indicates a personality or
22  emotional disorder is one that, based on my past

Page 172

1  experience, can involve a wide range of information
2  and that is why I went on to click on supplemental
3  information to find out if it was addressed.
4  BY MS. MCGOWAN:
5    Q.  Looking at the disqualifying factors that
6  are laid out here in this guideline, did you believe
7  that an individual who is transsexual would have
8  these disqualifying -- would be disqualified on the
9  basis of these factors, A through D?
10        MS. RUSSELL:  Objection to the form of the
11  question.
12        THE WITNESS:  I would like to point out
13  that the way it's phrased is, "conditions that could
14  raise a security concern and may be disqualifying
15  include."  So even those conditions listed here,
16  precisely, if a condition is listed there, one does
17  not immediately make an adverse determination.  It's
18  an evaluative process.  So no, I did not conclude
19  that transgender would be disqualifying.
20  BY MS. MCGOWAN:
21    Q.  In your view, is transsexuality a sexual
22  behavior of a criminal nature?

Page 173

1        MS. RUSSELL:  Objection, lacks foundation,
2  relevance.
3        THE WITNESS:  Not to my knowledge.
4  BY MS. MCGOWAN:
5    Q.  Is transsexuality a compulsive or
6  addictive sexual behavior or symptomatic of a
7  personality disorder?  And you can break those into
8  two pieces, if you want.  Is it a compulsive or
9  addictive behavior?
10        MS. RUSSELL:  Same objection to both
11  pieces, the question that you have asked.
12        THE WITNESS:  Based on the information in
13  the supplemental information which I read, it seemed
14  that it could be symptomatic of a personality
15  disorder.
16  BY MS. MCGOWAN:
17    Q.  Is transsexuality, in your view, behavior
18  that causes an individual to be vulnerable to
19  coercion?
20        MS. RUSSELL:  Pretty much a standing
21  objection, the two objections are standing,
22  regarding this line of questioning.

44  (Pages 170 to 173)

Cynthia Wilkens                                        September 20, 2006
                              Washington, DC

| Page 174 |
|---|

1    THE WITNESS: That would have to be
2  determined on a case-by-case basis.
3  BY MS. MCGOWAN:
4    Q.   In your view, is transsexuality behavior
5  that causes an individual to be exploited?
6    A.   Same answer.  All of that would have to be
7  considered on a case-by-case basis.
8    Q.   And then with respect to the last part of
9  C, with respect to an individual being under duress,
10 do I understand your answer to be --
11   A.   Individual case by case.
12   Q.   -- a case by case evaluation.
13       In your view, is transsexuality -- is
14 Factor D implicated by an individual's
15 transsexualism?
16   A.   I couldn't make a judgement on that.
17   Q.   Turning now specifically to the case of
18 the applicant that you were presented with, did you
19 believe that any of these factors were implicated by
20 her case?
21       MS. RUSSELL: Objection, lacks foundation.
22       THE WITNESS: It seemed through my reading

| Page 175 |
|---|

1  of the information, that it would have to be
2  evaluated to determine whether the case involved a
3  personality disorder.
4  BY MS. MCGOWAN:
5    Q.   And of these four factors, A, B, C, and D,
6  other than the personality disorder concern, were
7  there any other concerns that you felt needed
8  further investigation based on what you knew about
9  the applicant?
10       MS. RUSSELL: Objection to the form of the
11 question, lacks foundation.
12       THE WITNESS: Whether or not these
13 different factors were relevant in this case would
14 have been part of the health services evaluation,
15 but based on the information available to me, it
16 seemed that symptomatic of a personality disorder,
17 certainly needed to be evaluated.  Whether any of
18 the other factors would have become apparent, I
19 can't say.
20   Q.   With respect to Factor C, I want to make
21 sure that I am remembering correctly.  Did you
22 discuss the coercion?  I believe you talked about it

| Page 176 |
|---|

1  in terms of using the term "leverage."  What did you
2  tell the individuals at the meeting as far as your
3  assessment of this factor, in light of the specific
4  facts regarding Ms. Schroer?
5    A.   It reads: Sexual behavior that causes an
6  individual to be vulnerable to coercion,
7  exploitation, or duress.  Typically, one thinks
8  could the individual be blackmailed if this
9  information became known?
10       When an individual reports information,
11 which was the case here, when the applicant
12 volunteered that information to the selecting
13 official, logically, if one is sharing information,
14 then that tends to offset a concern that the
15 individual could then be blackmailed against that.
16 In a security clearance context, one thinks what if
17 an intelligence officer wanted to blackmail that
18 person and wanted classified information?
19       So he had told a potential employer, so
20 blackmail in that context, did not seem a
21 high-threat.  That being said, sometimes individuals
22 do share information with certain people, but they

| Page 177 |
|---|

1  would prefer, perhaps, that certain family members
2  not be aware or whatever the case is; it just
3  depends on the unique circumstances.  So I did tell
4  CRS that the threat of blackmail or leverage did not
5  seem to apply in this case.
6    Q.   Turning from Guideline D to what I believe
7  are the guidance documents, which are 474 through
8  488, which is information about specific sexual
9  practices.  Is there -- this was information
10 produced by the government in response to this
11 request, and the place where I think this document
12 begins to have relevance to the issue we are faced
13 with here, at the bottom of 477, with respect to
14 gender identity or role transpositions, is this the
15 section that -- one of the sections that you looked
16 at in assessing the relevance of Plaintiff's gender
17 transition with respect to her security clearance
18 vulnerability?
19   A.   Yes, it is.
20   Q.   What did you understand this section or
21 this information to mean?  And to the extent you
22 can, point out, sort of, what sections that you are

45 (Pages 174 to 177)

Cynthia Wilkens                                    September 20, 2006
                        Washington, DC

Page 178

1   relying on so that we cannot focus on things that
2   were not relevant to your consideration.
3       A.   Okay. I'm looking for the part that I
4   remember reviewing. This section talks about a
5   variety of different matters. But then on page 484,
6   it begins a discussion of transsexualism, and I read
7   that portion prior to going to the meeting, and what
8   made me think that it was an area to be evaluated
9   under the security clearance criteria, would
10  essentially start with paragraph three under that
11  section, which reads: Transsexuals often suffer
12  from moderate to severe personality disturbance.
13       And then it goes on to say: Any
14  associated personality or adjustment problems would
15  be a security concern.
16       Q.   To the extent that this document says that
17  transsexuals often suffer from moderate to severe
18  personality disturbance, does not suggest that all
19  transsexuals suffer from these conditions; is that
20  right?
21       A.   That's correct.
22       Q.   And so how would you go about ascertaining

Page 179

1   whether or not a transsexual applicant is someone
2   who, either, did or did not have these -- the
3   associated personality disturbance that this
4   document is referring to?
5       A.   That would be a reason to refer the matter
6   to the health services office for evaluation.
7       Q.   And just so I am clear, you are not
8   familiar with what health services would actually do
9   with respect to investigating this matter?
10       A.   No. I know that they can review reports
11  of investigation, but one was not -- we didn't have
12  access to one in this case. They can talk to the
13  individual involved, they can contact the other
14  practitioner, or they could get a consultant with
15  specific subject matter expertise. Beyond that, I
16  don't know what they would do.
17       Q.   Is there any other paragraph or provision
18  in this specific section, from 484 to the top line
19  of 485, that was relevant to your assessment of a
20  transsexual's ability to satisfy the security
21  clearance requirement?
22       MS. RUSSELL: Objection, lacks foundation.

Page 180

1   Objection to the form of the question.
2       THE WITNESS: The section does go on to
3   say that: In extreme cases, transsexualism may
4   result in a request for sex-change operation, which
5   is usually granted only after the person has spent
6   at least two years living as a member of the
7   preferred sex.
8       So that, to me, said, as I believe that an
9   operation was relevant to this case, that this was a
10  case, according to these words, "in extreme cases,"
11  and that warranted evaluation.
12  BY MS. MCGOWAN:
13       Q.   Anything else that you thought was
14  particularly relevant to your assessment?
15       MS. RUSSELL: Same objections, to the form
16  of the question and lacks foundation.
17       THE WITNESS: I think that would be it.
18  BY MS. MCGOWAN:
19       Q.   There is -- there are some additional
20  sections here, from 485 through 488, did you rely on
21  information in any of those sections in developing
22  your assessment of Ms. Schroer's ability to satisfy

Page 181

1   the security clearance requirements of the position?
2       MS. RUSSELL: Same objection.
3       THE WITNESS: I think I also considered
4   that inasmuch as the guidance does address
5   transsexuals in the military, that there are those
6   in the military who are transsexuals, some have
7   successful military careers, et cetera, that this
8   would also lead to a conclusion that on its face, it
9   was not disqualifying, that it would have to be
10  evaluated on a case-by-case basis.
11  BY MS. MCGOWAN:
12       Q.   Any other provision of this section in the
13  reference materials?
14       A.   I think that is it.
15       Q.   Then move to section -- pages 489 through
16  503 were also produced -- correct me if I'm wrong,
17  but also appear to be additional guidance with
18  respect to sexual behavior as a security clearance
19  issue. Is there any segment or section of this set
20  of the guidance that you relied upon in making your
21  evaluation of Plaintiff's ability to satisfy the
22  security clearance requirements?

                                46 (Pages 178 to 181)

Cynthia Wilkens                                    September 20, 2006
                          Washington, DC

| Page 182 | Page 184 |
|---|---|

**Page 182**

1    A.   Not in this section; 489 through 503, no.
2    Q.   Okay.  Is there anything else with respect
3    to Guideline D, regarding sexual behavior as a
4    security clearance concern, that you relied upon in
5    providing your assessment of Ms. Schroer's ability
6    to satisfy the security clearance requirements?
7        MS. RUSSELL: Objection to the form.
8        THE WITNESS: The way your question is
9    phrased relates to -- seems to indicate that a
10   decision about security clearance eligibility was
11   made, and it never was.  The discussion was about
12   what process would have to be followed in order to
13   consider her for a security clearance.
14   BY MS. MCGOWAN:
15   Q.   With respect to developing your guidance,
16   or I think the best way to describe it -- well, in
17   formulating your opinion that you were asked to
18   share with the CRS hiring committee about the
19   security clearance concerns that might be presented
20   by a transsexual applicant, in this case,
21   Ms. Schroer, you have identified two guidelines that
22   you looked at in developing your thoughts on that

**Page 183**

1    subject.  We have just gone through Guideline D and
2    some of the -- and the supplemental materials that
3    are providing additional guidance on Guideline D.
4        Is there any other document or materials
5    upon which you relied when making your assessment
6    about the applicability of Guideline D to the case
7    of a transsexual applicant?
8        MS. RUSSELL: Objection to the form of the
9    question, lacks foundation, and it assumes facts not
10   in evidence.  But you can answer, if you understand
11   the question.
12       THE WITNESS: As I think I understand the
13   question, those are the documents I relied on in
14   letting them know that it was a matter that we would
15   evaluate during a security clearance process.
16   BY MS. MCGOWAN:
17   Q.   And now I'll turn to the other guideline,
18   Guideline I.  Looking first at the guideline,
19   itself.
20   A.   Yes.
21   Q.   I know we just talked about the fact that
22   Guideline D makes reference to Guideline I as

**Page 184**

1    another set of guidelines that should be taken into
2    consideration with respect to what guideline you
3    described as sexual behavior.
4        Other than the fact that Plaintiff was
5    undergoing a gender transition, did you have any
6    reason to believe that there were any other
7    emotional, mental, or personality disorders that
8    would need investigation as part of a security
9    clearance process for her?
10       MS. RUSSELL: Objection to the form of the
11   question.
12       THE WITNESS: No.
13   BY MS. MCGOWAN:
14   Q.   What do you understand the guideline,
15   itself, to say with respect to how transsexualism
16   should be assessed from a security clearance
17   perspective?
18       MS. RUSSELL: Objection, lacks foundation
19   and to the form of the question.
20       THE WITNESS: Can you ask that again?
21   BY MS. MCGOWAN:
22   Q.   Sure.  With respect to transsexuality,

**Page 185**

1    what guidance does Guideline I provide, about how to
2    assess the relevance of that condition to one's
3    ability to satisfy the requirements for a security
4    clearance?
5        MS. RUSSELL: Same objection.
6        THE WITNESS: Guideline I does not
7    specifically speak to transsexualism, rather, it's
8    more broadly emotional, mental, and personality
9    disorders.  It indicates how, in some circumstances,
10   an emotional, mental, or personality disorder could
11   affect a security clearance eligibility, and it
12   indicates that a mental health professional should
13   be involved in evaluating that information.  It
14   provides some conditions that could raise a security
15   concern and could be disqualifying, also some
16   mitigating factors.
17       It does not specifically address
18   transsexualism, per se, but more a personality
19   disorder, which the supplemental information under
20   the other adjudicative guideline suggested could be
21   relevant to a transgender individual.
22   BY MS. MCGOWAN:

47 (Pages 182 to 185)

Cynthia Wilkens                                        September 20, 2006
                          Washington, DC

Page 186

1   Q.   With respect to Guideline I, it says that:
2   A credentialed mental health professional should be
3   utilized in evaluating potentially disqualifying and
4   mitigating information.
5       How does the library -- or who does the
6   library use to evaluate information that falls
7   within this guideline with respect to security
8   clearance?
9       A.   We would refer information to the health
10  services officer.  There could be cases in which she
11  would need to obtain the services of a subject
12  matter expert, but she would be considered our
13  mental health professional.
14      Q.   Other than the statement in the guidelines
15  referring to the fact that transsexuals often suffer
16  from moderate to severe personality disturbance, do
17  you have any reason to believe that transsexuals are
18  more likely than other individuals to have
19  emotional, mental, or personality disorders?
20      MS. RUSSELL:  Objection to the form of the
21  question, calls for an opinion.
22      THE WITNESS:  I relied on the statement in

Page 187

1   the supplemental information that indicated that
2   individuals with transsexual issues could suffer
3   from disorders.
4   BY MS. MCGOWAN:
5       Q.   And so was that the sole reason why you
6   felt as though Guideline I was presented as a
7   security clearance issue with respect to a
8   transsexual applicant?
9       A.   Based on the information I had at that
10  time, yes.
11      Q.   And have you, since, learned any
12  additional information that leads you to believe
13  that -- independent of the guidance, that
14  Guideline I is of particular relevance with respect
15  to transsexual applicants?
16      MS. RUSSELL:  Objection to the form of the
17  question.
18      THE WITNESS:  I have no additional
19  information.
20  BY MS. MCGOWAN:
21      Q.   Looking at the guidance, which is on page
22  461 through 473, at page 463, in the third paragraph

Page 188

1   down, the guidelines talk about how adjudicators
2   should not try to be amateur psychologists, but
3   should use professional diagnoses and obtain
4   professional evaluations to assess the relevance of
5   emotional and personality disorders.
6       First of all, do you agree that that is
7   the guidance given to adjudicators?
8       A.   Yes.
9       Q.   And how does the library attempt to
10  satisfy this guidance?
11      A.   By referring matters that fall into this
12  arena to the health services office.
13      Q.   At any time do you directly contact
14  treating therapists of an applicant for security
15  clearance to make your own determination by talking
16  with the therapist about the relevance of the issue?
17      A.   No.  We do that through the health
18  services office, if there was a need to contact a
19  practitioner directly.  I can tell you, however,
20  that during background investigations, investigators
21  sometimes do contact the medical practitioner.
22      Q.   And who conducts those background

Page 189

1   investigations for the library?
2       A.   The Office of Personal Management.
3       Q.   And is there any other provision in this
4   guideline upon which you relied to inform your
5   assessment of the relevance of the applicant's
6   gender transition with respect to its security
7   clearance implications?
8       A.   I don't believe so.
9       Q.   The sections of the ADR that I mentioned
10  that we were provided, are there any other
11  provisions of this document upon which you relied
12  when researching the issue of transsexuality and its
13  relevance to security clearance?
14      A.   No.  These were the portions.
15      Q.   And as a whole, looking at all of these
16  provisions together, what was your assessment of how
17  an individual's gender transition would impact their
18  ability to satisfy security clearance requirements
19  for the position of terrorism specialist at the
20  library?
21      MS. RUSSELL:  Objection, lacks foundation,
22  and to the form of the question.

                                   48  (Pages 186 to 189)

Page 210

1  during your tenure as the personnel security
2  officer, ever recommended for employment a
3  transsexual applicant?
4          MS. RUSSELL: Objection, lacks foundation.
5          THE WITNESS: Not to my knowledge.
6  BY MS. MCGOWAN:
7      Q.  Has CRS ever had an employee who was
8  presently working at the library, who then revealed
9  that they were undergoing the process of gender
10 transition, and thus, required a security clearance
11 assessment?
12         Let me take that second part out of the
13 question. Has CRS -- during your time in the
14 security personnel -- personnel security office --
15 excuse me -- has there ever been a current employee
16 of the Library of Congress who has indicated to the
17 relevant people that they are in the process of
18 undergoing a gender transition?
19     A.  That, I wouldn't know.
20     Q.  If there had been, would you, as the
21 personnel security officer, have been informed of
22 that, due to security clearance concerns?

Page 211

1          MS. RUSSELL: Objection, calls for
2  speculation.
3          THE WITNESS: I'm hoping to answer your
4  question, but I don't know that I will. I have
5  never otherwise been contacted about a transgender
6  matter. If someone was undergoing a security
7  clearance and the manager identified whatever
8  information they presented as relevant to any of the
9  criteria, I might be contacted.
10 BY MS. MCGOWAN:
11     Q.  Okay.
12     A.  That's it.
13     Q.  And with respect to -- we have been
14 talking about this issue of new information coming
15 up or coming to the attention of the library that
16 may or may not require additional -- either
17 additional investigation or more thorough
18 investigation.
19         Who is the person who determines whether
20 or not new information is of the type that warrants
21 additional investigation?
22     A.  That would be me; my staff.

Page 212

1      Q.  And with respect to you and your staff,
2  are there decisions that go through your staff that
3  ultimately do not require your input, or are all
4  decisions at the end of the day ultimately from you?
5      A.  I'm responsible for the program, reporting
6  to the director of security. That being said, the
7  way you phrased your question, my staff do things
8  all day long that they don't bring every matter to
9  my attention.
10     Q.  With respect to whether or not new
11 information does or does not require a new or
12 additional security clearance investigation, who in
13 your office -- and "who" can be plural -- is the
14 person who would make that determination that
15 additional investigation is required?
16     A.  It is normally me. If my staff become
17 aware of new information, and they have a wealth of
18 experience themselves, so they are able to apply the
19 adjudicative standards and knowing: Does this fall
20 under this guideline or that guideline? they
21 typically would bring the matter to me, or if I'm
22 not there, whoever is acting, and we would consider

Page 213

1  what steps we had to take.
2      Q.  And then turning to -- moving beyond the
3  assessment of applicants to now looking at the
4  process of getting the chosen applicant through the
5  security clearance process such that they can fully
6  perform their duties as an employee of the library,
7  just to make sure that I know who is doing what,
8  what agency or individuals, to the extent they are
9  not affiliated with an agency, do the background
10 investigations for the library?
11         MS. RUSSELL: Objection, asked and
12 answered.
13         THE WITNESS: If we are initiating a new
14 background investigation, we would send the
15 investigative paperwork to the Office of Personnel
16 Management.
17 BY MS. MCGOWAN:
18     Q.  And to the extent that it's not a new
19 investigation, what kind of investigation would it
20 be?
21     A.  If we know that another federal agency has
22 completed an investigation that meets timeliness,

                              54 (Pages 210 to 213)

Cynthia Wilkens                                    September 20, 2006
                          Washington, DC

---

Page 214

1    scope, and break-in-service requirements, and there
2    is no new information to be evaluated, we would
3    request a copy of that investigation from the
4    relevant investigative agency. That could be OPM,
5    that could be DSS, that could be State Department,
6    CIA, FBI; there are others, but those are the main.
7        Q.   And to the extent that the investigation
8    file is not deemed to be as complete or as thorough
9    as the library would prefer with respect to the
10   investigation, is OPM the entity to which the
11   library turns to do whatever additional
12   investigation the library wants to see done?
13       A.   In many, many cases that is correct.
14   There may be some very limited inquiries that might
15   be needed. If a prior investigation, for
16   instance -- I won't use the credit check example
17   again. If a prior investigative agency did not
18   verify an individual's degree claim, we can do that
19   easily ourselves, as an example.
20       If a prior investigation showed an arrest
21   record, but no disposition, we likely will be able
22   to obtain that ourselves through a court check.

---

Page 215

1        Q.   With respect to investigations that OPM is
2    doing on behalf of the library, does the library
3    have any influence over how that investigation is
4    conducted?
5        A.   In what way? What type?
6        Q.   Is the library able to point -- direct OPM
7    to pay special attention, for example, to the
8    financial issues?
9        A.   Okay. In a way. The library chooses the
10   level of investigation and we know what coverage is
11   conducted under that level. If there are matters of
12   particular concern, we could point them out. That
13   being said, they're generally going to be evident on
14   the security form, but certainly we can attach a
15   cover letter that requests certain actions. We
16   don't usually do that.
17       Q.   And then once that investigation is
18   complete, who ultimately adjudicates whether an
19   applicant for employment at the library, a new
20   library employee, will be granted the security
21   clearance?
22       A.   When we use the word "security clearance,"

---

Page 216

1    we are talking only about those positions that are
2    designated national security. As indicated in the
3    regulations cited earlier, I make the determination
4    in cases involving no unresolved actionable
5    information and then I present to Ken Lopez, the
6    director of security, cases that involve any degree
7    of analysis and weighing of the adjudicative
8    factors.
9        Q.   In your view, if you were satisfied that a
10   transgender applicant had satisfied all the security
11   clearance requirements, would you have felt it
12   necessary to pass that recommendation on to
13   Mr. Lopez, or is that the kind of determination you
14   could make on your own?
15       MS. RUSSELL: Calls for speculation and an
16   opinion. But you can answer, if you understand.
17       THE WITNESS: That is the case that I
18   would have presented to Mr. Lopez. Any time the
19   adjudicative criteria indicates -- let me rephrase
20   it. Any time an investigation or information we
21   have available to us indicates that there is
22   information falling under an adjudicative criteria

---

Page 217

1    that may be recent, timely, of the moment, where I
2    need to go and get an advisory opinion from health
3    services, I regularly present that type of case for
4    any adjudicative criteria.
5    BY MS. MCGOWAN:
6        Q.   Okay. I was going to say, you know, with
7    respect to other mental health concerns that needed
8    further investigation, would those be treated any
9    differently than cases involving adjudication of
10   gender-identity-related mental health conditions
11   with respect to who would ultimately be asked to
12   make the final determination?
13       MS. RUSSELL: Objection, calls for
14   speculation; also relevance. You can still answer,
15   if you understand.
16       THE WITNESS: As we said earlier, there is
17   quite a wide range of information that can be
18   developed regarding mental health issues. If
19   someone reports marital counseling to me and that
20   individual is subject of a security clearance
21   determination, I may not present that to Mr. Lopez;
22   it is of a nature that is considered relatively

---

55 (Pages 214 to 217)

Page 222

1   there and, I believe, can make a final
2   determination. The regulation would be your best
3   source.
4       Q.   The process that the library utilizes to
5   assess and to adjudicate -- to both investigate and
6   adjudicate an individual's eligibility for security
7   clearances, is that process standard throughout the
8   various agencies of the federal government that deal
9   with classified information?
10          MS. RUSSELL: Objection, lacks foundation.
11          THE WITNESS: I believe it is somewhat
12  standard, yes. Individual agencies may have their
13  own way of administering the procedures or different
14  offices involved, but the basic policies and
15  operations and processes are quite similar from one
16  agency to another.
17  BY MS. MCGOWAN:
18      Q.   I want to ask a few questions about the
19  issue of security clearance waivers. I know that we
20  discussed this somewhat earlier.
21          Was there any work done by the terrorism
22  specialist, or that was part of the job

Page 223

1   responsibilities of the terrorism specialist, that
2   could be performed without an active security
3   clearance?
4           MS. RUSSELL: Objection, lacks foundation.
5           THE WITNESS: That's probably a question
6   for CRS, but I would say, most probably it's rare
7   that 40 hours of the week would be involved in
8   classified information.
9   BY MS. MCGOWAN:
10      Q.   With respect to applicants who are --
11  well, let's say this. What is the process for
12  determining whether an applicant requires a
13  psychiatric fitness-for-duty evaluation?
14      A.   I don't use that term. When we in our
15  program feel that we need advice, a review by our
16  health services office, we typically describe that
17  as referring the pertinent information to them for
18  their evaluation of its relevance to suitability or
19  security clearance adjudicative criteria.
20      Q.   When an employee has not had a prior
21  security clearance investigation of any kind, how
22  would the process proceed to determine whether or

Page 224

1   not the individual could be granted a waiver to
2   begin work in a classified position prior to
3   completion of a full investigation?
4       A.   It's the same process we discussed this
5   morning. If management submits an individual for
6   appointment to, say, a critical-sensitive top-secret
7   position, we would receive the application, the
8   OF-306, the personnel action recommendation that
9   accompanies that, a request for clearance; we, in
10  personnel security, would initiate name checks with
11  pertinent federal agencies, that would be the
12  investigative indices, any other agency where the
13  person may have worked or sometimes -- this is a
14  case where someone hasn't had a background
15  investigation, but if they are a federal employee,
16  they may not have had the right level, but we will
17  still call the losing security office, we verify the
18  degree, the person at some point is given a
19  conditional offer, we interview the person, we give
20  them the security forms for completion, we get a
21  release for the credit check, we conduct the credit
22  check, and we interview the losing supervisor based

Page 225

1   on the information we have gathered to that point,
2   we determine if we need to conduct any further
3   inquiries and we make, ultimately, a recommendation
4   to the director of security whether the information
5   we have gathered during the preliminary process
6   precludes the waiver approval or not.
7       Q.   How long with respect to an applicant that
8   does not have any prior security clearance filed or
9   does not have a security clearance comparable to the
10  one required for the position, how long does that
11  pre-screening process take in order to determine
12  whether or not they are a suitable candidate for a
13  waiver?
14          MS. RUSSELL: Objection, asked and
15  answered. But you can answer.
16          THE WITNESS: It depends on the
17  responsiveness of the other federal agencies and the
18  applicant's availability and if any information is
19  developed that requires further evaluation. But we
20  like to complete them within a week or two.
21  BY MS. MCGOWAN:
22      Q.   If your office were to determine that an

57 (Pages 222 to 225)

Page _____ of _____
## ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: 10/04/2006
Case Name: Schoer, Diane vs. James H. Billington
Case Number:  05-1090(JR)
Dep. Date:    09/20/2006
Deponent:    Cynthia Wilkins
Place:        Washington DC
Ref. No.:     8869-1

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|------|------|-----------|-------------|-------------------|
| 22 | 12 | ... libraries. | Library's | misinterpreted by stenographer |
| 32 | 17 | ... 12958. | 12968 | Witness understood the reference to be to EO 12968 and responded accordingly |
| 32 | 17 | 12958 | 12968 | |
| 37 | 8 | to -- that is implicit | to make that decision also - that is implicit | there seems to have been a gap in transcription |
| 98 | 16 | ... admission ... | ... mission ... | misinterpreted by stenographer |
| 104 | 16 | ... investigation on ... | ... investigation and on ... | misinterpreted by stenographer |
| 108 | 9 | "dash 4." | "dash 6." | from context, the correct reference is - 6 |
| 241 | 5 | public trust in national | public trust and in national | misinterpreted by stenographer |

District of Columbia

Subscribed and sworn to before me this
4th day of October 20 06

Denise L. McCray, Notary Public
My Commission Expires Oct 31, 2006.

_Cynthia L Wilkins_
Signature of Deponent

10/24/06
Date of Signature