McGowan Declaration – Exhibit C

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
DIANE J. SCHROER,                 :
                                  :
        Plaintiff,                :
                                  :
            v.                    :   CA No. 06-763
                                  :
JAMES H. BILLINGTON,              :
                                  :
        Defendant.                :
- - - - - - - - - - - - - - - - x

                    Washington, D.C.

                    Wednesday, October 25, 2006

        30(b)(6) Deposition of SANDRA CHARLES,

M.D., called for examination by counsel for

Plaintiff, pursuant to notice, at the Law Offices

of 1875 Pennsylvania Avenue, N.W., Washington, D.C.,

commensing at 9:35 a.m., before Barbara a. Huber,

Notary Public in and for the District of Columbia,

when were present on behalf of the respective

parties:

Sandra Charles, 30(b)(6)                                October 25, 2006
                        Washington, DC

Page 30

1   assert that their -- whatever the problems that
2   they're having is related to a health issue. And
3   sometimes even if it is believed by the supervisor
4   that it may be related to a health issue, they can
5   also be referred to us.
6       But we cannot just hand out information
7   to supervisors or anyone else without either, one,
8   there being the -- the consent of the employee, or
9   in situations where the employee's using their
10  medical -- whatever that medical issue may be as
11  the -- and some explanation or some reason for
12  something that's occurring in the workplace, in
13  which case then there would be a need to know on
14  the part of their supervisor as to what is
15  affecting that person's -- whether it's conduct or
16  performance or what have you.
17      Q   The reason why I'm asking this is
18  because in our deposition with Cynthia Wilkins a
19  few weeks ago, the personnel security officer of
20  the Library of Congress -- do you know
21  Ms. Wilkins?
22      A   Yes, I do.

Page 31

1       Q   During the deposition with Ms. Wilkins,
2   she stated that when there was a piece of
3   information about an applicant that was medical in
4   nature that might implicate the ability of the
5   applicant to obtain a security clearance required
6   for a position, the matter would be referred to
7   the health services office.
8       So is that statement correct?
9       MS. RUSSELL: I'm going to object to the
10  extent that it might mischaracterize Ms. Wilkins's
11  testimony.
12      But you can go ahead and answer.
13      THE WITNESS: There are occasions when
14  Ms. Wilkins will refer a matter to me on the
15  grounds that there is something that may affect
16  someone's clearance with respect to their
17  suitability, judgment, reliability, as guided by
18  the standards that she uses to make her
19  determinations.
20  BY MS. McGOWAN:
21      Q   And in a circumstance where Ms. Wilkins,
22  for example, would refer that matter to you, what

Page 32

1   would the health services office do in that
2   circumstance?
3       MS. RUSSELL: I'm going to object to the
4   form of the question.
5       But you can answer if you understand the
6   question.
7       THE WITNESS: Well, as I understand it,
8   you want to know what happens when something is
9   referred to me by Ms. Wilkins?
10  BY MS. McGOWAN:
11      Q   Yes.
12      A   And the short answer would be depends.
13  And it depends on what the matter is. But the
14  first -- if she refers something to me, she gets a
15  release from the person that she's dealing with,
16  to let them know that she's shared this
17  information with -- or are going to share this
18  information with me and referring them to me.
19      And I would in turn make an appointment,
20  and meet with the person, and let them know again
21  why I was meeting with them, and from that point
22  make a determination as to whether I needed to

Page 33

1   seek further information, get independent
2   evaluation, or do something else in order to make
3   a recommendation back to Ms. Wilkins.
4       Q   And are there circumstances where
5   talking to the applicant is sufficient for you to
6   obtain the information you need to make an
7   assessment?
8       A   There are, yes.
9       Q   And in a situation where -- well, can
10  you explain perhaps a situation where that would
11  be the case?
12      A   Sometimes -- well, whenever I get the
13  referral, I usually get whatever information was
14  received by personnel security pertinent to
15  whatever that matter is. And so I would review
16  that information and then speak with the
17  applicant.
18      And it may simply be a response that the
19  person may have had on their -- a positive
20  response they may have had in terms of having
21  sought care for a particular issue. And I just
22  wanted to clarify with them the extent of it and

9 (Pages 30 to 33)

Sandra Charles, 30(b)(6)                      October 25, 2006
                    Washington, DC

Page 34

1  the reasons for their doing so, and to get a sense
2  from them as to where they currently were and
3  whether it's still an ongoing issue or had
4  resolved.
5       And if it was say treatment that had
6  stopped, to see whether they had stopped it
7  without the -- whoever their treatment provider
8  be, having been the one to say you are at a point
9  where you can no longer -- or you no longer need
10 to come in or need to be treated, and something
11 like that. I may be able to make a determination
12 just talking to them. Or I may just need to get
13 verification from their provider that they were at
14 a point where they were -- their issue had
15 resolved.
16    Q   Is there ever a circumstance in which
17 the personnel security officer, either Ms. Wilkins
18 or whoever else it might be, refers a matter to
19 the health services office that you actually
20 determine even without talking to the applicant is
21 not really a health concern at all?
22    A   I'll say -- I would say yes. Yes.

Page 35

1     Q   Perhaps can you give an example or
2  describe what you mean?
3     A   Well, there may be times when there are
4  cases which Ms. Wilkins may say I have this, and
5  this is what came back. And do I need to -- is
6  there something that you need to see, or is this
7  something that -- this is my feeling about it,
8  this is what I have, and this is something that
9  you think you need to see. And so I may say yes
10 or no.
11    Q   Is there an example that comes to mind
12 of the kind of circumstance where you wouldn't
13 actually really even need to see any additional
14 information from Ms. Wilkins?
15    A   Not immediately, no.
16    Q   After talking to an applicant, you just
17 talked about that there are circumstances where
18 talking to the applicant alone is enough to
19 provide you with the information that you need to
20 make an assessment.
21      In a circumstance where you feel as
22 though you want additional information, you

Page 36

1  mentioned that you might contact the healthcare
2  provider under whose care the applicant is.
3       Can you explain what you would do as far
4  as contacting that healthcare provider?
5     A   Yes. I, of course, would get a written
6  consent from the applicant, and would share that
7  with the healthcare provider prior to making any
8  contact so they would have it in hand, and
9  essentially expect my call or communication on
10 that applicant. And then I would make efforts to
11 contact a provider.
12      Many times, because of what I -- the
13 degree of information that's placed on the
14 consent, I would make a follow-up phone call after
15 they have gotten the consent, and again explain
16 why I needed to get the information from them, and
17 ask them to please, even though they would
18 oftentimes speak to me on the phone about whatever
19 the issue is, ask them to send me something in
20 writing sort of verifying our conversation, and
21 then use that information to make my
22 determination.

Page 37

1       If I need more information, I let them
2  know, or if it's some lack in clarity. And so
3  that's what I would do.
4     Q   Okay. And do you in every case request
5  the provider to send you a copy of their medical
6  record for the individual involved?
7       MS. RUSSELL: Objection to the form of
8  that question.
9       THE WITNESS: And the answer is no.
10 BY MS. McGOWAN:
11    Q   And when would you ask for the file
12 itself to be sent?
13    A   If the response that I get is one that
14 is equivocal or just some how does not supply or
15 meet the answer, you know, doesn't give me the
16 needed information or -- I will make -- I may ask
17 for the actual record.
18    Q   And when this type of inquiry is made,
19 who in your office would be the one doing it or --
20 and if that's multiple people, you know, who --
21 plural if necessary -- in your office would be the
22 person making this contact with an applicant's

10 (Pages 34 to 37)

Sandra Charles, 30(b)(6)                                    October 25, 2006
                            Washington, DC

Page 38

1    healthcare provider?
2         MS. RUSSELL: Objection. Vague.
3         You can answer if you understand the
4    question.
5         THE WITNESS: When you say "when this
6    type," are we focused on the personnel security?
7    BY MS. McGOWAN:
8    Q    Right. After having spoken to the
9    applicant, in a situation where you've determined
10   that you would like to speak to the healthcare
11   provider, is that in every case you who makes that
12   call, or are there other people in the health
13   services office who may also be making these kinds
14   of inquiries?
15   A    I am the person who speaks with the
16   provider. Someone may fax the form over or even
17   get someone on the phone, but I'm the person who
18   speaks to them.
19   Q    What kind of information has been
20   referred to your office for assessment?
21        MS. RUSSELL: Objection to the form.
22        But you can respond if you understand

Page 39

1    the question.
2         THE WITNESS: Can you be more specific?
3    BY MS. McGOWAN:
4    Q    Sure. Ms. Wilkins said that certainly
5    medical -- or information that she thinks is
6    medical in nature is referred to your office for
7    an assessment.
8         And I'm trying to find -- get a sense of
9    sort of examples of what kind of information
10   falls, you know, under the category of medical
11   information that would need your assessment.
12        MS. RUSSELL: Again, objection to the
13   form. And also objection to the extent that
14   you're mischaracterizing Ms. Wilkins's testimony.
15        But respond if you understand the
16   question.
17        THE WITNESS: In general terms, the
18   matters that are referred usually have to do with
19   whatever -- either the applicant's response to a
20   question on their security questionnaire that asks
21   about treatments for a particular diagnoses as
22   outlined in the standards that Ms. Wilkins uses,

Page 40

1    or information that comes up when they do their
2    background checks.
3         So that could run -- whatever the --
4    their standards I guess indicate are things that
5    should raise a question and be further evaluated
6    that are of a medical nature, those are the things
7    that would be -- that refer to me.
8    BY MS. McGOWAN:
9    Q    And would mental health concerns fall
10   within the category of issues that would be
11   referred to the health services office?
12   A    Yes.
13   Q    And how does the health services office
14   go about assessing mental health concerns that are
15   referred to it?
16        MS. RUSSELL: Objection to the form.
17        But you can go ahead and answer if you
18   understand.
19        THE WITNESS: You're saying the health
20   services office. But for these instances, I'm the
21   person that usually -- that it's limited to.
22   BY MS. McGOWAN:

Page 41

1    Q    Okay.
2    A    And, again, the explanation I gave you
3    of having the person, after they've been referred,
4    coming to talk with me, reviewing whatever
5    information was received or gleaned about the
6    issue, and assessing that and determining whether
7    something that between talking to them and reading
8    what was available was enough, or getting
9    information, further information from their
10   provider, or determining that it is of -- whatever
11   the nature of it -- the condition or issue may be,
12   I would need to have a consultant evaluation.
13   Q    Anything else?
14   A    No.
15   Q    If the applicant, in the course of
16   talking with you, were to disclose to you that
17   they actually currently hold a security clearance,
18   would that change the type of evaluation that you
19   would undertake with the applicant?
20        MS. RUSSELL: Objection. Lacks
21   foundation.
22        But you can respond if you understand

11 (Pages 38 to 41)

Sandra Charles, 30(b)(6)                                    October 25, 2006
                        Washington, DC

|  | Page 42 |
|---|---|

1  the question.
2       THE WITNESS: Actually, I'm not sure
3  that I do, because I try to focus on what is asked
4  of me.
5  BY MS. McGOWAN:
6       Q    Sure. In a circumstance where an
7  applicant explains that they actually currently
8  are holding a security clearance, do you, for
9  example, in every case request a copy of the most
10 recent security investigation file?
11      MS. RUSSELL: Again, lacks foundation.
12      But you can respond if you understand
13 the question.
14      THE WITNESS: Well, no.
15 BY MS. McGOWAN:
16      Q    Are there circumstances where you would
17 request the file of a prior security clearance
18 investigation?
19      MS. RUSSELL: Objection. Lacks
20 foundation.
21      But you can respond if you understand
22 the question.

|  | Page 43 |
|---|---|

1       THE WITNESS: I have never done so.
2  BY MS. McGOWAN:
3       Q    One issue that we did address with
4  Ms. Wilkins was this question about whether or not
5  information was new, new information that needed
6  to be taken into account that perhaps had not been
7  taken into account previously.
8       And so in the health services offices'
9  view, what constitutes new information?
10      MS. RUSSELL: Again, lacks foundation.
11      But you can respond if you understand
12 the question.
13      THE WITNESS: I truly don't understand.
14 BY MS. McGOWAN:
15      Q    Does the health services office attempt
16 to ascertain whether or not a health issue has
17 already been taken into account in a prior
18 security clearance investigation?
19      MS. RUSSELL: Again, lacks foundation.
20      But you can respond if you understand
21 the question.
22      THE WITNESS: No.

|  | Page 44 |
|---|---|

1  BY MS. McGOWAN:
2       Q    And just so I'm clear, in your
3  experience, you have never requested to view the
4  file of a prior security clearance investigation
5  for an applicant that's been referred to you for
6  consideration?
7       A    No.
8       Q    We've talked a little bit about the
9  steps that you would undertake in assessing a
10 concern about an applicant.
11      In a circumstance where an applicant
12 disclosed that they were taking prescription
13 medication, would that be information that you
14 would investigate?
15      MS. RUSSELL: Objection. Vague.
16      THE WITNESS: What do you mean?
17 BY MS. McGOWAN:
18      Q    If, for example, Ms. Wilkins said I have
19 an applicant who's disclosed that they are taking
20 a particular type of medication but I don't know
21 what this medication is for, what it means, is
22 that the kind of query that you would review at

|  | Page 45 |
|---|---|

1  Ms. Wilkins's request?
2       A    Do you mean would I review what the
3  medication could possibly be used for, or do you
4  mean would I see that the -- if the person's
5  referred to me, then I'm -- I would be talking to
6  them. And I will get all that information. But
7  I'm not sure I understand what you mean by
8  reviewing that information.
9       Q    Well, the fact that you would talk to
10 the applicant is part of what I was trying to
11 determine, how you would assess sort of what the
12 medication's relevance might be as far as the
13 health of the applicant.
14      But in addition to talking to the
15 applicant, is there ever a circumstance where you
16 would call the prescribing physician, for example,
17 to inquire about the fact that this medication had
18 been prescribed?
19      MS. RUSSELL: Objection. Calls for
20 speculation, vague.
21      But you understand the question, go
22 ahead and answer.

                                    12 (Pages 42 to 45)

Sandra Charles, 30(b)(6)                    October 25, 2006
                    Washington, DC

Page 46

1    THE WITNESS: Again, if someone comes to
2  me and I get -- whatever information I get is what
3  I'm discussing with them. And if I need to, I get
4  their permission to get information from their
5  provider. So that would fall in that realm, if
6  there was a necessity to find out what exactly
7  they were being treated for or what the relevance
8  or context in which they're getting a particular
9  medication is.
10 BY MS. McGOWAN:
11   Q    And when you say the information that's
12 been provided to you, what kind of information
13 would that be?
14   A    I'm usually given the -- if it's the --
15 if it's information that came to the attention of
16 the personnel security officer by way of the --
17 whatever investigation they are doing and they get
18 a response of some kind, all that is relevant to
19 the matter that is being referred to me as
20 provided in the referral.
21   And so that is what I'm seeing as I was
22 talking to the person. And I talk to them about

Page 47

1  what I'm seeing and what -- the issue that has
2  been referred to me, the judgment, what my next
3  step would be.
4    Q    And are you the person who would seek to
5  obtain a release from an applicant in the event
6  that you wanted to talk to their therapist or
7  their healthcare provider?
8    A    Yes.
9    Q    And do you ask for a release from every
10 applicant with whom you meet?
11   A    If I need to talk to their provider,
12 yes.
13   Q    But if you determine that you do not
14 need to talk to their provider, then am I right
15 that you would not ask for a release from them?
16   A    I wouldn't need it, yes.
17   Q    What factors would influence your
18 decision to investigate a healthcare concern,
19 beyond talking to the applicant and their treating
20 physician?
21   A    If I'm doing something with which I have
22 little or no familiarity or understanding and I

Page 48

1  want to be sure that I'm getting all the
2  information that's needed to properly make an
3  assessment, then I would certainly seek
4  consultation from someone who is an expert in
5  whatever field that might be to guide me.
6    Q    And is there a particular agency that
7  you would go to in every case for that
8  consultation, or does it depend on what the
9  condition --
10   A    It certainly depends on what I need.
11   Q    So, for example, if there were a mental
12 health concern that you wanted to get some
13 additional consultation on, where would you go to
14 obtain that consultation?
15   MS. RUSSELL: Objection to the form of
16 the question.
17   But you can go ahead and answer if you
18 understand.
19   THE WITNESS: Are you asking me how
20 would I find someone to do the consultation?
21 BY MS. McGOWAN:
22   Q    I'm asking sort of the whole range of

Page 49

1  the process. So whatever it is, you tell me.
2    A    Okay. If I need to refer someone to a
3  person who is expert in the field of whatever I'm
4  assessing, if it's a mental health issue, I have
5  in the past used the APA, American Psychological
6  Association, Washington Psychiatric Society, as
7  well as the medical society, the local medical
8  society, to determine who in their records.
9    And they usually have people according
10 to field of expertise. And they would give me a
11 number of names to choose from based on whatever
12 the issue that I'm assessing.
13   Q    And have you ever done this in a case,
14 in your experience at the Library?
15   A    Any kind of case? Yes.
16   Q    Specifically in a mental health case
17 obtaining some additional guidance from the
18 agencies that you've just described, have you
19 ever -- actually ever needed to take that step in
20 any case?
21   A    Yes.
22   Q    And how much time was involved in

                              13  (Pages 46 to 49)

Sandra Charles, 30(b)(6)                    October 25, 2006
                    Washington, DC

| Page 50 | Page 52 |
|---|---|

**Page 50**

1  obtaining that additional consultation?
2      A   It certainly varied.  And I don't know
3  if I remember totally, but it was well a month or
4  more.  Because apart from getting the names, I had
5  to find the people.  And they may or may not have
6  been available.  So there would be exchanging
7  calls just to talk with someone.
8          And when I finally do get to talk to
9  them, I have to ascertain if they were willing to
10  do the evaluation, provide a report.  And of
11  course, I would explain to them the purpose and
12  how the report would be used.  And so it takes
13  some time between exchanging calls and waiting for
14  returns, and then scheduling appointments and
15  getting the person on whom the evaluation is to be
16  done to.
17          You know, usually we get people a choice
18  of the -- so they have more than one, so they have
19  a choice of the particular person.  And so all
20  those things take time.  So a month is probably a
21  good -- would be the short time.  Longer than that
22  would be --

**Page 51**

1      Q   Okay.  And going back for a moment when
2  you would call the therapist or the treating
3  physician for an applicant, do you attempt to
4  ascertain the qualifications of that therapist or
5  physician to inform your assessment of the --
6      A   Of the treating --
7      Q   -- of the treating --
8      A   -- physician?
9      Q   Yes.
10      A   Not always, no.
11      Q   Would your decision to obtain an
12  additional evaluation, for example in the case of
13  mental health, depend on your confidence in the
14  qualification of the applicant's treating
15  physician or therapist?
16          MS. RUSSELL:  Objection to the form of
17  the question.
18          But you can answer if you understand the
19  question.
20          THE WITNESS:  Would you repeat?
21  BY MS. McGOWAN:
22      Q   Sure.  My question is does your decision

**Page 52**

1  to obtain a second opinion, for example by
2  obtaining the services of another APA, a
3  psychologist, psychiatrist, does that
4  determination depend in part on your assessment of
5  the qualifications of the applicant's treating
6  therapist?
7          MS. RUSSELL:  Same objection.
8          But if you understand the question, go
9  ahead and answer.
10          THE WITNESS:  Yes.  Uh-huh.
11  BY MS. McGOWAN:
12      Q   And how do you go about determining
13  whether or not an applicant's treating therapist,
14  for example, is someone who has the credentials
15  that you feel you can rely on?
16      A   It's really rather basic.  Because many
17  times it -- or I should say the time when it may
18  most play a part is if the person who is treating
19  is not -- that is not their area of expertise, and
20  based on the history given as to how the treatment
21  either began or proceeded, and talking with the
22  particular provider, that generally helps to

**Page 53**

1  inform my need to go to someone who is considered
2  an expert in the field.
3      Q   And how often due find yourself needing
4  a second opinion or a second consultation?
5      A   It's not very frequent, but I can't give
6  you a specific time percentage.
7      Q   Can you describe cases where you've
8  needed to get a second opinion?
9          MS. RUSSELL:  Objection, to the extent
10  that any answer would be a violation of the
11  Privacy Act.
12          But you can respond if you understand
13  the question, and to the extent it would not
14  require disclosure of privacy-sensitive
15  information.
16          THE WITNESS:  In which case, I
17  probably --
18  BY MS. McGOWAN:
19      Q   Well, I'm certainly not looking for the
20  name of any employee.  And so I sort of -- you can
21  explain the particular conditions where you sought
22  a second opinion.

                              14  (Pages 50 to 53)

Sandra Charles, 30(b)(6)                                October 25, 2006
                          Washington, DC

---

Page 62

1   BY MS. McGOWAN:
2       Q   For example, would you ask the applicant
3   about his or her therapist to find out more
4   information about who this therapist was and their
5   credentials?
6           MS. RUSSELL: Again, calls for
7   speculation.
8           But you can respond if you understand
9   the question.
10          THE WITNESS: In the course of getting a
11  history and understanding what was going on, that
12  information would probably come to light.
13  BY MS. McGOWAN:
14      Q   And obviously since you're the only
15  person in the office who handles these matters,
16  while I'm asking you to think about circumstances
17  that you may not have addressed, it's ultimately
18  you're the person who would lay out what the
19  protocol is. So I'm trying to hone in on what are
20  the factors that would influence how you would
21  proceed. And so --
22          MS. RUSSELL: Again, calls for

---

Page 63

1   speculation.
2           But you can --
3   BY MS. McGOWAN:
4       Q   Well, actually, that wasn't even a
5   question.
6           But trying to lay out, you know, how
7   we're proceeding and where these lines of
8   questions are going, since you're the person --
9       A   Sure.
10      Q   -- who decides what you need to know
11  and --
12      A   And it's a judgment based on the
13  feedback I get from talking to someone, from what
14  they tell me, and how it comports with just
15  practice with regards to what particular illness
16  we're talking about. If -- you know, if what I
17  get from them is that it's sort of not being
18  handled in a -- in the expected manner, or not
19  expected, but it -- it's really -- it is difficult
20  for me to tell you in detail how I'd form that
21  judgment.
22          But it really has to do with trying to

---

Page 64

1   get clear information on what is happening with
2   someone or what -- how they're being managed. And
3   if that is -- I'm not saying for this particular
4   case, but in some cases even if -- if a
5   management -- it doesn't have to be a mental
6   health -- is really being carried out according to
7   what would be the accepted principles, I guess you
8   could say.
9           And so I don't think that's very clear,
10  but it's the best I can give you. I mean, talking
11  to them gets me -- and getting that information,
12  and, yes, what -- in some cases what they are --
13  their credentials are of who's treating them or
14  how well or closely they're managing them just
15  gives an idea of how I may need to proceed from
16  that point.
17      Q   And with respect to who they are getting
18  their care from, one of the things we talked about
19  was whether or not this is the kind of a condition
20  that a primary care physician would handle or
21  whether or not this was something that was in the
22  care of a specialist, how would the fact that an

---

Page 65

1   applicant is under the care of a specialist inform
2   your decision about whether or not to go to the
3   treating physician or the treating therapist who
4   is the specialist in the first instance as opposed
5   to going to an outside source?
6       A   How would it inform my decision? Well,
7   certainly if they are being treated by someone
8   whose expertise is whatever that issue is, it
9   carries more weight than if it were not. And
10  weight in a sense that I would have more
11  confidence in how it is proceeding or what is
12  being done.
13      Q   And with respect to a condition with
14  which you're less familiar, would you undertake an
15  independent investigation to figure out who
16  specialists in the field were?
17      A   Well, that is what I do when I call to
18  get the names of specialists, is to find out who
19  the people are who are considered specialists in
20  the field.
21      Q   If you were to call, for example, the
22  APA and find out that the applicant's treating

---

17 (Pages 62 to 65)

Sandra Charles, 30(b)(6)                                October 25, 2006
Washington, DC

Page 66

1   physician is on the list of people they consider a
2   specialist, how would that inform your decision to
3   rely on the treating therapist alone, as opposed
4   to seeking a second opinion?
5          MS. RUSSELL:  Again, calls for
6   speculation.
7          But you can respond if you understand.
8          THE WITNESS:  It certainly would -- it
9   may, may cause me to assess whether or not I would
10  stop there or move -- still to go to have an
11  independent evaluation.
12         MS. McGOWAN:  Why don't we take a break
13  and come back and 11:00.
14         (Recess)
15  BY MS. McGOWAN:
16     Q    Back from our break.  I just want to
17  just ask a couple of follow-up questions about
18  both your experience regarding gender identity
19  issues and the experience of your staff at the
20  health services office.
21         So looking at your full range of both
22  education and practical experience, what

Page 67

1   experience do you have with transsexual people?
2      A    None to speak of.
3      Q    In fact, actually, do you know any
4   transsexual people?
5      A    Huh.  No.
6      Q    And while you were at the psychiatric
7   hospital, did the psychiatric hospital actually
8   have any patients dealing with gender identity
9   issues?
10     A    None that I knew.
11     Q    And how many interns did you supervise
12  or doctors did you supervise at the psychiatric
13  hospital?
14     A    Well, it's a long time ago.  I think
15  it's about -- this is definitely a guesstimate,
16  but there were about six medical officers.  And
17  then the number of residents varied.  So I don't
18  have a particular number there.
19     Q    At any one time, roughly how many people
20  were you supervising?
21     A    About 10, 12.
22     Q    And at any time during your stint at the

Page 68

1   psychiatric hospital, did any of the people who
2   supervise you inform you that they had a patient
3   with a gender-related psychiatric issue?
4      A    Not that I recall, no.
5      Q    And turning to your staff at the health
6   services office, what experience does your staff
7   have with transsexual people?
8      A    I don't know.
9      Q    Has a Library employee ever come to the
10  health services office with a gender identity
11  issue?
12     A    Not that I know.
13     Q    And do any of your staff at the health
14  services office have experience from prior to
15  joining the Library regarding gender identity
16  issues?
17     A    I don't know.
18     Q    Is it a requirement for employees at the
19  health services office to have either experience
20  or training regarding gender identity issues?
21     A    No.
22     Q    We've been talking generally about the

Page 69

1   protocol for assessing information.  And I just
2   want to make sure, as a general matter, I have all
3   of the steps.  We've talked about talking to the
4   applicant themselves.
5          Would anyone other than you interview an
6   applicant?
7      A    In my office?
8      Q    Yes.
9      A    No.
10     Q    So you are the exclusive health services
11  office employee who would interview an
12  applicant --
13     A    Referred.
14     Q    -- referred to you?
15     A    Yes.
16     Q    Okay.  And then in addition to talking
17  to the client when necessary, you've explained
18  that you might talk to the treating physician or
19  therapist, you might also obtain the records from
20  that treating physician or therapist, and in some
21  circumstances you might seek a second opinion or a
22  consultation from an outside source.

18  (Pages 66 to 69)

Sandra Charles, 30(b)(6)                          October 25, 2006
                        Washington, DC

| Page 74 | Page 76 |
|---|---|
| 1  provider, or who may or may not be an expert in | 1  speculation. |
| 2  the field. I don't know. And, again, make a | 2      But you can respond if you understand. |
| 3  judgment if I have sufficient information, or if I | 3      THE WITNESS: Since all I'm seeing is |
| 4  need to seek independent evaluation. | 4  the data -- objective assessment and I would |
| 5  BY MS. McGOWAN: | 5  have -- in asking for the consultation, I would |
| 6      Q   And when you say seek an independent | 6  have certainly outlined what it was I was seeking |
| 7  evaluation, in every case would that involve an | 7  in terms of their recommendations. |
| 8  evaluation of the applicant by the consultant that | 8      So if they were to recommend that based |
| 9  you'd retained? | 9  on their evaluation, assessment, what have you, |
| 10     A   As opposed to? | 10  there was nothing found that would -- the |
| 11     Q   As opposed to getting sort of generic | 11  standards indicate would impair their judgment, |
| 12  information about the particular condition from | 12  reliability, or suitability, then I would have |
| 13  the individual or entity that you'd retained for a | 13  received an answer that I could use to forward a |
| 14  consultation? | 14  recommendation to the personnel security officer. |
| 15     A   I was referring to having the applicant | 15  BY MS. McGOWAN: |
| 16  being evaluated. | 16     Q   So I'm just trying to make sure that if |
| 17     Q   And if you decided to go the route of | 17  you've spoken to the applicant and gotten a |
| 18  obtaining an independent evaluation, at that point | 18  favorable independent consultation, is there any |
| 19  would you -- at what point, if any, would you go | 19  additional investigation you would undertake |
| 20  back to the treating therapist to get additional | 20  before passing on a positive recommendation to the |
| 21  information from the treating therapist? | 21  personnel security officer who had referred the |
| 22     MS. RUSSELL: Objection. Calls for | 22  matter to you? |

| Page 75 | Page 77 |
|---|---|
| 1  speculation. | 1      MS. RUSSELL: Calls for speculation. |
| 2      THE WITNESS: And I'm not sure I | 2      But you can answer if you understand. |
| 3  understand what you mean. | 3      THE WITNESS: Okay. And I sit here, I'd |
| 4  BY MS. McGOWAN: | 4  say I can't think of anything that would make me |
| 5      Q   After getting an evaluation from the | 5  want to go outside of whatever the consultant |
| 6  independent consultant, would that information | 6  report says. |
| 7  standing alone be the basis of your evaluation, or | 7  BY MS. McGOWAN: |
| 8  would you then also want to have the information | 8      Q   And we talked about this sort of in a |
| 9  from the treating therapist, as well, before | 9  general way. But if you, from the independent |
| 10  making a final determination? | 10  consultant, learned that the treating therapist |
| 11     A   It's one of those it depends questions. | 11  was someone that the APA, for example, considered |
| 12  Generally, I would have some previous information. | 12  a credible specialist in the field, how would that |
| 13  And who knows, it may -- I may need to do that. | 13  influence your decision about whether or not you |
| 14  That's -- I guess that's a possibility. But I | 14  talked to the treating therapist or sought a |
| 15  don't know that I would or wouldn't. | 15  second opinion? |
| 16     Q   So walking through the options, if you | 16     MS. RUSSELL: Same objection. |
| 17  had obtained an independent consultant and they | 17     THE WITNESS: I need to hear it again to |
| 18  had evaluated the applicant and came back to you | 18  be sure I heard. |
| 19  saying that this person was in fine mental health, | 19  BY MS. McGOWAN: |
| 20  what, if anything, else would you do at that | 20     Q   Sure. So if the APA is the entity that |
| 21  point? | 21  you would contact about finding additional |
| 22     MS. RUSSELL: Again, calls for | 22  resources with expertise on gender identity, and |

                                    20 (Pages 74 to 77)

Sandra Charles, 30(b)(6)                              October 25, 2006
                            Washington, DC

|                                         Page 78                                  |                                         Page 80                                  |

**Page 78**

1  they came back to you and said in fact the
2  treating therapist of this applicant is someone
3  who is on our list of people we consider to be
4  credible experts in this field, at that point
5  would you, in the first instance, go back to the
6  treating therapist, or would you still feel as
7  though you wanted an independent evaluation of the
8  applicant?
9      A   Considering that other than I'm just
10  trying to figure out what I may do or may not do,
11  I would think that I probably would at least speak
12  with the person who is the treating therapist, to
13  see if I can get what I need.
14     Q   And if you received back a positive
15  evaluation from the treating therapist who was
16  someone that the APA considered to be on their
17  list of referrals, would you still go on to obtain
18  a second evaluation?
19        MS. RUSSELL: Objection to the form.
20  Again, it calls for speculation.
21        But you may respond if you understand
22  the question.

**Page 80**

1  through the -- whatever the case may be, and I
2  explain what I'm trying to determine, and what the
3  significance of the information is, and the impact
4  of it, and why I'm making the inquiry. And, you
5  know, I guess as I get answers, then that may help
6  me to pose other questions.
7        And it may be in getting those answers
8  that I may perceive that there may be some lack of
9  objectivity and pursue at that point in time. So
10  I can't tell you exactly what I may say or do, but
11  one would sort of inform the other.
12  BY MS. McGOWAN:
13     Q   Would you ask the therapist how many
14  patients were under his or her care for this, for
15  the same condition?
16     A   I may find out from them how many such
17  cases. And -- and that is the part of the -- I
18  would need to know the -- yeah, the scope of their
19  dealing with that particular issue, and even the
20  scope of the issue in general, to help me. Of
21  course, some of the basic information, I would say
22  I may just seek in general reading, knowledge, so

**Page 79**

1        THE WITNESS: That is a possibility,
2  that I would end it there.
3  BY MS. McGOWAN:
4      Q   And what factors would influence your
5  decision whether or not to end it there or do
6  something else?
7      A   Again, it depends on what I get when I
8  talk to the person, the provider in question, the
9  feedback that I get, their -- the objectivity that
10  they demonstrate, and the clarity in which they
11  give me information, and the -- and whatever
12  judgment they may give to me, as well as my
13  talking -- having talked initially with the
14  applicant.
15     Q   Anything else?
16     A   No.
17     Q   What kinds of things would you ask the
18  therapist to assess their objectivity?
19        MS. RUSSELL: Objection. Calls for
20  speculation.
21        THE WITNESS: And it may not be so much
22  what I ask them as to how they respond as we go

**Page 81**

1  I would know particular questions to ask the
2  therapist.
3        And I guess generally speaking, one of
4  the things that I would be trying to determine
5  from someone is, you know, all of us could
6  particularly say have a particular diagnosis. But
7  since I'm trying to find out how it affects a
8  particular person, I'd have know what their -- how
9  their -- how it's manifested in them or how it
10  affects their functioning and ability. Because
11  those are the things that -- and how they are
12  living with it, working with it, and dealing with
13  it.
14        Because those are the things that would
15  possibly -- their ability or inability to do so
16  would -- may be what would affect their judgment
17  and reliability, and hence their suitability, and
18  be open for any kind of -- I think one of the
19  things the standard says is opened for black male,
20  or something like that. So it has to be
21  individualized, even though I'm asking about some
22  of the general aspects, as well. But I certainly

                                          21 (Pages 78 to 81)

Sandra Charles, 30(b)(6)                              October 25, 2006
                            Washington, DC

Page 86

1       A   No. No. I don't know a purpose.
2       Q   Turning back to the issue of applicants
3   that are referred to the health services office.
4           Has an applicant ever been referred to
5   the health services office because there was a
6   concern about an individual's treatment for
7   depression?
8       A   By whom?
9           MS. RUSSELL: Objection. Relevance.
10          THE WITNESS: Yeah, I'm not sure really
11  by whom.
12  BY MS. McGOWAN:
13      Q   You can answer. It's just a question of
14  whether or not you --
15      A   I don't really -- I'm not following the
16  line of questioning, I guess.
17      Q   Sure. If an applicant had disclosed
18  that they were under the care of a therapist for
19  depression --
20      A   To whom?
21      Q   -- for example, to the hiring officer,
22  who then went to Cynthia Wilkins and said, you

Page 87

1   know, they're under the care of a therapist, is
2   this a health concern from a security clearance
3   perspective?
4           I'm wondering if that is a circumstance
5   where -- has there ever been a circumstance like
6   that, where someone has been referred to you to
7   assess whether or not their healthcare for
8   depression has been referred to the health
9   services office for investigation?
10      A   No.
11      Q   Okay. Has the Library -- I'm sorry.
12          Has the health services office ever
13  faced a situation where a Library employee
14  indicated that they were under the care of a
15  mental health professional to cope with the stress
16  of being a crime victim?
17          MS. RUSSELL: Objection. Relevance.
18          THE WITNESS: I really don't remember
19  such case.
20  BY MS. McGOWAN:
21      Q   In the view of the health services
22  office, is mental health counseling for the

Page 88

1   treatment of depression always disqualifying with
2   respect to security clearance?
3           MS. RUSSELL: Objection. Lacks
4   foundation, and relevance.
5           THE WITNESS: I'd have to say no.
6   BY MS. McGOWAN:
7       Q   When would mental health counseling for
8   the treatment of depression rise to the level of a
9   disqualifying factor with respect to security
10  clearance?
11          MS. RUSSELL: Objection. Calls for
12  speculation.
13          THE WITNESS: And I'd have to say that,
14  again, if someone is referred for -- because of
15  that particular history, it would still go through
16  the steps we have discussed, to see if whatever
17  their particular situation is causes them to be
18  not suitable because of a problem of judgment or
19  reliability being impaired.
20  BY MS. McGOWAN:
21      Q   And so if an individual were referred to
22  you because they were in therapy for a range of

Page 89

1   conditions, would the protocol for investigating
2   whether or not that issue was a security concern
3   be different depending on why the individual was
4   in therapy?
5       A   If -- that protocol, you mean what we've
6   been through already?
7       Q   Right. The process of speaking to the
8   applicant, doing further investigation?
9       A   Then no.
10      Q   If an applicant were referred to the
11  health services office because they had disclosed
12  that they had intended to have surgery that would
13  alter his or her appearance, how would -- would
14  the health services office consider that to be a
15  significant health-related concern that needed
16  investigation?
17          MS. RUSSELL: Objection. Calls for
18  speculation.
19          THE WITNESS: And I'm not sure what you
20  mean about their appearance.
21  BY MS. McGOWAN:
22      Q   Whether it was cosmetic surgery or

                                      23 (Pages 86 to 89)

Sandra Charles, 30(b)(6)                                    October 25, 2006
                        Washington, DC

| Page 90 |
|---|
| 1   reconstructive surgery, something that would |
| 2   alter, for example, their face such that they |
| 3   would look different than they had at the time of |
| 4   their application, is that, on its face, a health |
| 5   issue that would require investigation by the |
| 6   health services office? |
| 7       MS. RUSSELL: Objection as to the form. |
| 8       THE WITNESS: I'm not sure I could |
| 9   answer. I would just have to have more context. |
| 10  BY MS. McGOWAN: |
| 11      Q   So just to be clear, if a matter was |
| 12  referred to you because an applicant had disclosed |
| 13  that they intended on having, you know, surgery |
| 14  that would alter their appearance, you would have |
| 15  to make an independent assessment of whether or |
| 16  not, in fact, that was information that had |
| 17  implications for security clearance; is that |
| 18  right? |
| 19      A   What do you mean independent assessment? |
| 20  You mean I would go through my protocol? |
| 21      Q   Yes. |
| 22      A   See the person? |

| Page 91 |
|---|
| 1       Q   Right. |
| 2       A   Yes. |
| 3       Q   Okay. And what kind of information |
| 4   would you want to know from the applicant about |
| 5   the procedures that they were planning to |
| 6   undertake, to determine its relevance? |
| 7       MS. RUSSELL: Objection. Calls for |
| 8   speculation. |
| 9       THE WITNESS: I'm not sure. I mean, the |
| 10  fact that I would want to go through the protocol |
| 11  is simply were referred. So I would have to see |
| 12  what it was that motivated the referral, or what |
| 13  information there was. |
| 14      And I would do the same sorts of |
| 15  assessments, in terms of information, and talking |
| 16  to the person to find out what they were having, |
| 17  simply because I needed to -- I would need to |
| 18  know, and why. And, again, see if -- or determine |
| 19  if I were dealing with something that left with |
| 20  them open to impaired judgment, suitability, or |
| 21  reliability as it relates to the standards that |
| 22  we're using. |

| Page 92 |
|---|
| 1   BY MS. McGOWAN: |
| 2       Q   Part of what I'm curious about is if |
| 3   someone were referred to you and it wasn't obvious |
| 4   to you why they were being referred, could you -- |
| 5   or would you call the person who had referred to |
| 6   you and have a conversation to get more |
| 7   information about why they were referring the |
| 8   matter to you in the first place? |
| 9       A   Basically, yes. If I get a referral, I |
| 10  need to know why. And so I would -- and -- are we |
| 11  talking about a personnel security referral? |
| 12      Q   Yes. |
| 13      A   Okay. So yes. |
| 14      Q   So are you required to undertake some |
| 15  form of investigation for every applicant that's |
| 16  referred to you, or do you have any discretion in |
| 17  deciding whether or not an investigation is even |
| 18  necessary? |
| 19      MS. RUSSELL: Objection as to the form |
| 20  of the question. |
| 21      THE WITNESS: I'm not sure what you mean |
| 22  by required. But there's nothing that says you |

| Page 93 |
|---|
| 1   must do this or must not. If I get a referral, I |
| 2   need to know why. |
| 3   BY MS. McGOWAN: |
| 4       Q   And by required, what I'm asking is if |
| 5   you think in your medical judgment that this is |
| 6   not information even on its face that is a problem |
| 7   that -- and you don't feel as though a further |
| 8   investigation even with talking to the applicant |
| 9   is necessary, do you have the authority to go back |
| 10  to the personnel security officer and say this |
| 11  actually isn't even a health concern at all, I |
| 12  don't need to do anything more to be able to tell |
| 13  you that? |
| 14      MS. RUSSELL: Same objection. |
| 15      You can answer. |
| 16      THE WITNESS: Yes. |
| 17  BY MS. McGOWAN: |
| 18      Q   Okay. I want to turn to a different |
| 19  subject now. We've talked a little bit about |
| 20  Cynthia Wilkins, but I just want to sort of make |
| 21  clear that you know who Cynthia Wilkins is. |
| 22      A   Okay. |

                                        24 (Pages 90 to 93)

Sandra Charles, 30(b)(6)                                October 25, 2006
                          Washington, DC

Page 94

1    Q   So, yes, am I right you know who Cynthia
2  Wilkins is?
3    A   Yes.
4    Q   And do you know who Charlotte Preece is?
5    A   Yes.
6    Q   And who is she?
7    A   I knew her to be a supervisor in the
8  Congressional Research Services.
9    Q   At her deposition, Ms. Wilkins stated
10  that she was asked to attend a meeting with
11  Charlotte Preece and some other Library employees
12  to discuss the fact that a candidate for the
13  position of terrorism specialist was undergoing a
14  gender transition.
15        What do you know about that meeting?
16    A   Nothing.
17    Q   Was anyone from the health services
18  office asked to attend this meeting?
19    A   No.
20    Q   Do you know why not?
21    A   No.
22    Q   And just to be clear, were you ever

Page 95

1  asked to attend the meeting?
2    A   No.
3    Q   At any point, did you find out that this
4  meeting had happened?
5    A   No.
6    Q   Did you ever discuss with Ms. Wilkins a
7  meeting that she had attended regarding an
8  applicant for the terrorism specialist position
9  who was undergoing a gender transition?
10    A   No.
11    Q   Did you ever have a conversation with
12  Charlotte Preece about an applicant that was
13  undergoing a gender transition?
14    A   No.
15    Q   Did you have any discussion with anyone
16  at the Congressional Research Service about the
17  fact that there was an applicant for a position
18  with the Congressional Research Service that was
19  undergoing a gender transition?
20    A   No.
21    Q   Had you been asked to provide your
22  opinion about the significance of an applicant's

Page 96

1  gender transition with respect to their
2  suitability for employment with the Congressional
3  Research Service, what would have you have said?
4        MS. RUSSELL: Objection. Calls for
5  speculation.
6        But you can respond if you understand.
7        THE WITNESS: And when you say had I
8  been asked, had I been asked by whom?
9  BY MS. McGOWAN:
10    Q   Had you been asked -- assuming that you
11  had been asked to attend a meeting with Cynthia
12  Wilkins and Charlotte Preece to get your guidance
13  about the significance of the fact that an
14  applicant for a position with the Congressional
15  Research Service had disclosed that they were
16  undergoing a gender transition, what would your
17  guidance to them have been?
18        MS. RUSSELL: Again, calls for
19  speculation.
20        THE WITNESS: And I'm not sure I -- I
21  certainly would have had to counsel them in the
22  terms of if, it's referred to me by personnel

Page 97

1  security, as the -- any other thing that's
2  requires medical input on terms of reliability,
3  judgment, and suitability. And I would treat it
4  in the same way as any other referral.
5  BY MS. McGOWAN:
6    Q   And had you been asked how long it would
7  have taken you to provide an assessment of this
8  information, what would your guidance to them have
9  been?
10    A   That I would not be able to tell them
11  any specific time, but that could be a month or
12  longer, depending on how much I would have to do
13  and whether I need to refer it, and do, and the
14  whole nine yards.
15    Q   Have you ever discussed with Ms. Wilkins
16  what your process is for -- when a matter is
17  referred to you?
18    A   In general terms?
19    Q   Yes.
20    A   Yes.
21    Q   Have there been meetings in the past
22  where someone from the health services office has

                              25 (Pages 94 to 97)

Sandra Charles, 30(b)(6)                                    October 25, 2006
                          Washington, DC

|  | Page 98 |
|---|---|
| 1 | been asked to provide guidance about the |
| 2 | significance of an applicant's health issue with |
| 3 | respect to their employment? |
| 4 | A   No. |
| 5 | Q   When a meeting is called, or have -- are |
| 6 | there ever meetings regarding of health concerns |
| 7 | of a Library employee? |
| 8 | MS. RUSSELL: Objection. Vague. |
| 9 | But you can answer if you understand. |
| 10 | THE WITNESS: Yes. |
| 11 | BY MS. McGOWAN: |
| 12 | Q   Would someone from the health services |
| 13 | office normally attend a meeting like that? |
| 14 | MS. RUSSELL: Calls for speculation. |
| 15 | THE WITNESS: I can't speak to normally, |
| 16 | because I only know the meetings which we're asked |
| 17 | to participate. And so I don't know if there is a |
| 18 | normally about it, but we have attended meetings. |
| 19 | BY MS. McGOWAN: |
| 20 | Q   And would the person from the health |
| 21 | services office that attends be you, or would it |
| 22 | be someone else from your office? |

|  | Page 99 |
|---|---|
| 1 | A   It may be me, or it may be a supervisor, |
| 2 | nurse practitioner. |
| 3 | Q   And what are the subjects that have been |
| 4 | discussed at these meetings that you're |
| 5 | describing? |
| 6 | A   Oftentimes, it may be a meeting about |
| 7 | someone who has leave and attendance issues for |
| 8 | which they're asserting there's a medical reason, |
| 9 | which many times may or may not -- well, may or |
| 10 | may not be known by the people calling the |
| 11 | meeting. And so our input is to -- or the reason |
| 12 | for attendance being requested so to ask for |
| 13 | guidance on how to handle the leave or attendance |
| 14 | issue. |
| 15 | Q   Any other types of issues that have come |
| 16 | up in meetings where you've been asked to attend? |
| 17 | A   Besides leave and attendance, there may |
| 18 | be a conduct issue. |
| 19 | Q   And what do you mean by that? |
| 20 | A   Someone who may be acting in a manner |
| 21 | that's disruptive to the work site or to the work |
| 22 | of other people. |

|  | Page 100 |
|---|---|
| 1 | Q   And you would be involved in that kind |
| 2 | of meeting for what reason? |
| 3 | A   Again, simply saying how shall we handle |
| 4 | this, which essentially -- it's usually a meeting |
| 5 | where there may be legal representation, as well, |
| 6 | and they're just trying to deal with it. And they |
| 7 | decided to call anybody who would possibly have |
| 8 | involvement in it; or they -- or they're |
| 9 | considering any sort of action, they want to be |
| 10 | sure that they are covering all basis. |
| 11 | Q   And in the context of those meetings, |
| 12 | are you asked to provide medical guidance? |
| 13 | A   Only in the sense that -- we can or |
| 14 | cannot -- we cannot give them any medical |
| 15 | information, but in how they should go about |
| 16 | having people bring in what is necessary, or for |
| 17 | us to evaluate and then give guidance, or for them |
| 18 | to -- or to tell them that they need to just |
| 19 | direct it to their proper administrative channels |
| 20 | in dealing with those things that follow whatever |
| 21 | their regulations are. |
| 22 | Q   Did anyone from the health services |

|  | Page 101 |
|---|---|
| 1 | office ever have any discussions with a Library of |
| 2 | Congress employee about Ms. Schroer's application |
| 3 | for employment? |
| 4 | A   No. |
| 5 | Q   And did anyone from the health services |
| 6 | office have any other discussions with any other |
| 7 | Library of Congress employee about the process |
| 8 | that would be necessary to determine whether |
| 9 | Ms. Schroer could satisfy the suitability and |
| 10 | eligibility requirements for the terrorism |
| 11 | specialist position? |
| 12 | A   Not that I'm aware of. |
| 13 | Q   And did you have any discussions, or |
| 14 | anyone from your office, anyone with the health |
| 15 | services office, have any discussions about the |
| 16 | length of time that would be required to determine |
| 17 | whether Ms. Schroer could satisfy the suitability |
| 18 | and eligibility requirements for the terrorism |
| 19 | specialist position? |
| 20 | A   Not that I recall. |
| 21 | MS. McGOWAN: Can we go off the record a |
| 22 | moment? |

26 (Pages 98 to 101)

Sandra Charles, 30(b)(6)                                    October 25, 2006
                          Washington, DC

---

Page 102

1              (Whereupon, at 11:47 a.m., a
2              luncheon recess was taken.)
3        A F T E R N O O N   S E S S I O N
4                    (1:05 a.m.)
5    Whereupon,
6          SANDRA CHARLES, M.D.,
7    was recalled as the witness and, having been
8    previously sworn, was examined and testified
9    further as follows:
10       EXAMINATION BY COUNSEL FOR PLAINTIFF
11           CONTINUED
12   BY MS. McGOWAN:
13     Q    Good afternoon. I'm just going to run
14   through a few questions to wrap up the discussion
15   that we had this morning, or the series of
16   discussions that we had, and then turn to a few
17   documents that you may be familiar with.
18         The first thing I just wanted to clarify
19   and make sure that I had the clear answer to this
20   was had the health services office ever been asked
21   to investigate the -- a gender identity issue with
22   respect to an applicant for employment?

---

Page 103

1      A    No.
2      Q    And has the health services office ever
3    been asked to investigate the -- a gender identity
4    issue for a current Library employee?
5      A    No.
6      Q    Has the Library's health services office
7    ever provided counseling for a Library employee
8    dealing with gender identity issues?
9      A    No.
10     Q    Has the Library's health services office
11   ever provided a referral to a mental health
12   professional for a Library employee dealing with
13   gender identity issues?
14     A    No.
15     Q    If the health services office learned
16   that an employee in a position requiring a top
17   secret security clearance was under the care of a
18   mental health specialist for a gender identity
19   issue, would the health services office be
20   required to inform anyone about that information?
21     A    No.
22     Q    And even if they were not required to do

---

Page 104

1    so, would the health services office share that
2    information with anyone?
3      A    No.
4      Q    And would the health services office be
5    required to investigate the matter further?
6      A    No.
7          MS. RUSSELL: Objection to the form.
8          But you can answer.
9          THE WITNESS: No.
10   BY MS. McGOWAN:
11     Q    And whether or not it was required to do
12   so, would the health services office undertake on
13   its own an investigation of that matter?
14     A    No.
15     Q    If the health services office learned
16   that an employee in the position requiring a top
17   secret security clearance was undergoing hormone
18   therapy as part of a gender transition, would the
19   office be required to inform anyone of that
20   information?
21     A    No.
22     Q    Would the health services office

---

Page 105

1    voluntarily disclose that information to anyone,
2    whether or not it was required to do so?
3      A    No.
4      Q    Would the office initiate an
5    investigation of that information?
6      A    No.
7      Q    Would it be required to do so?
8      A    No.
9      Q    If the health services office learned
10   that a Library employee in a position requiring a
11   top secret security clearance was planning to have
12   a fascial reconstructive surgery as part of a
13   gender transition, would the health services
14   office be required to notify anyone of that
15   information?
16     A    No.
17     Q    Would they disclose that information to
18   anyone, regardless of whether or not it was
19   required?
20     A    No.
21     Q    And would the health services office
22   initiate an investigation of that information?

---

                                    27 (Pages 102 to 105)

Sandra Charles, 30(b)(6)                                    October 25, 2006
                            Washington, DC

| Page 106 | Page 108 |
|---|---|

**Page 106**

1    A   No.
2    Q   And would it be required to do so?
3    A   No.
4    Q   If the health services office learned
5 that a Library employee in a position requiring a
6 top secret security clearance was planning to have
7 sex reassignment surgery as part of the gender
8 transition, would the health services office be
9 required to inform anyone of that information?
10   A   No.
11   Q   Would it voluntarily share that
12 information with anyone?
13   A   No.
14   Q   Would it be obligated to initiate an
15 investigation of that information?
16   A   No.
17   Q   Would it initiate an investigation,
18 notwithstanding the lack of any requirement to do
19 so?
20   A   No.
21   Q   With respect to how the health services
22 office would investigate a gender identity issue,

**Page 107**

1 would there ever be a circumstance where a gender
2 identity issue would be referred to the health
3 services office where a determination would be
4 made that no further investigation would be
5 required not even -- for example, not even talking
6 to the applicant?
7        MS. RUSSELL:  Objection.  Calls for
8 speculation.
9        THE WITNESS:  I really cannot answer
10 that.  I can't say what a circumstance might be,
11 whatever -- again, in terms of referrals, if we
12 are asked to -- if it's referred to us, we go
13 through the protocol that we've already discussed.
14 And that's what we would do.
15 BY MS. McGOWAN:
16   Q   For example -- this is as a possible
17 example -- if a gender identity matter were
18 referred to the health services office and it
19 turned out that the facts were that the applicant
20 20 years ago had transitioned from male to female
21 and had been living for the last 20 years as a
22 woman, is that the kind of information that might

**Page 108**

1 result in a health services office's determination
2 that no further investigation was required?
3    A   Are you saying that that would be
4 referred to me?
5    Q   It would have been referred to you, and
6 then you would have learned that the facts were
7 that the transition had taken place 20 years ago.
8        What would the health services office do
9 if that information were presented to it?
10       Would that necessarily require further
11 investigation?
12       MS. RUSSELL:  Again, calls for
13 speculation.
14       THE WITNESS:  Right.  So would it
15 necessarily?  No.
16 BY MS. McGOWAN:
17   Q   So there is a circumstance where if that
18 were the information presented to you, you would
19 determine that it was not necessary to do any
20 further investigation?
21   A   I can't say there is a circumstance, but
22 that's a possible outcome.

**Page 109**

1    Q   And so assuming that there is some
2 hypothetical circumstance where -- regarding a
3 gender identity issue where you would be able to
4 make an assessment that I don't even need to talk
5 to the applicant, it's either so old or it's over,
6 that I don't even need to investigate, what would
7 be the kinds of factors that would lead to a
8 determination by you that I don't even need to
9 look any further into this information?
10       MS. RUSSELL:  It's the same objection.
11       THE WITNESS:  I mean, unless there's
12 something that has come up that raises the
13 question to the level where the standards say this
14 can -- is it one of those conditions or situations
15 which could possibly impair judgment or
16 reliability or suitability therefore you should
17 evaluate it, I don't know that I would be looking
18 any further into something that's -- that had
19 occurred prior to a person being -- either coming
20 to the Library or being at the Library.
21 BY MS. McGOWAN:
22   Q   Okay.  We also talked about the points

                              28 (Pages 106 to 109)

Sandra Charles, 30(b)(6)                    October 25, 2006
                    Washington, DC

Page 110

1   at which you would determine what your next steps
2   would be throughout the process. And one
3   permutation that I wasn't sure that we had fully
4   discussed was would there be a situation where,
5   after talking to an applicant with a gender
6   identity issue, would you determine that the next
7   step would be talking to the treating therapist?
8       A   You're saying would there be a
9   situation?
10      Q   Yeah.
11      A   It's possible, yes.
12      Q   And would there be a situation where,
13  after talking to the applicant and her treating
14  therapist about the gender identity issue, that
15  you might determine that that investigation was
16  sufficient for you to render a positive evaluation
17  of the applicant?
18          MS. RUSSELL: Again, calls for
19  speculation.
20          THE WITNESS: I think based on what we
21  went through prior, that possibility would exist,
22  yes.

Page 111

1   BY MS. McGOWAN:
2       Q   How do you relay your assessment back to
3   the personnel security officer or whoever it was
4   that referred to matter to you in the first place?
5       A   How, meaning?
6       Q   Is it written? Is it oral?
7       A   Written, generally, uh-huh.
8       Q   And what format does it take?
9           Is it a letter or a memo?
10      A   Usually a memo.
11      Q   And there standard parts of the memo
12  that you would include in providing this
13  evaluation to the personnel security officer?
14      A   What do you mean by standard parts?
15      Q   I don't know if there's like a
16  template --
17      A   Oh.
18      Q   -- memo where you have, you know, an
19  introductory section and a background of what
20  you've investigated. I'm trying to figure out
21  whether it's a standard form that you provide this
22  information.

Page 112

1       A   I guess I use -- the language I use
2   becomes fairly standard, but it's not a designator
3   or preformatted template that's been provided.
4       Q   And is there ever a circumstance where
5   you report back to the personnel security officer
6   in stages?
7       A   Yes. Uh-huh.
8       Q   And when you do go back in stages, is
9   that something that the personnel security officer
10  has requested you to do?
11      A   Maybe I should ask you to tell me what
12  you mean by stages.
13      Q   Sure. We talked about some of the
14  different steps that you would go through in
15  talking to the applicant. And I was curious
16  whether or not, for example, after you've -- in a
17  situation where you've talked to the applicant but
18  perhaps decided that you need to talk to the
19  therapist, is there ever a circumstance where you
20  would check back in with the personnel security
21  officer and say I've talked with the applicant, I
22  need a little bit more information, so I'm going

Page 113

1   to -- I need to do a little bit more, it's going
2   to take me a little bit more time?
3       A   Yes.
4       Q   And has there ever been a circumstance
5   where you have reported back to the personnel
6   security officer that you're going to need to do
7   more investigation than just, for example, talk to
8   the applicant, where the personnel security
9   officer has come back to you said, you know what,
10  we're pulling the plug on this candidate, don't
11  worry about it, don't bother going any further?
12      A   No, not that I recall.
13      Q   To your knowledge, are you required to
14  complete -- once you've initiated an
15  investigation, are you required to offer a final
16  assessment of an applicant that's been referred to
17  you; or, for example, in a situation where if they
18  decided to not pursue the candidate, would you be
19  allowed to just discontinue your investigation?
20      A   When you say required, what do you mean?
21      Q   And certainly you help me. Because I'm
22  trying to sort of --

                    29 (Pages 110 to 113)

Page 114

1    A    Okay.
2    Q    -- guess at what the process is.
3        Once you've begun an investigation of a
4    candidate, my question is are you required to see
5    that through to the end, where you make a final
6    evaluation; or is it possible to basically abort
7    the investigation if you're told, for example,
8    that they've decided to go with a candidate,
9    "they" being the personnel security officer who
10   referred to matter to you?
11       MS. RUSSELL:  Objection to the form.
12       THE WITNESS:  And I don't recall any
13   situation where I've had -- where that has
14   occurred.  And so where there is no requirement in
15   terms of some legal designation.  If I'm -- if
16   something is referred to me, I usually see it
17   through to whatever logistical conclusion, in
18   terms of sending back a report.
19       I suppose at some point in time the
20   occasion could arise where I'm told I don't need
21   to do anything further with a case.  But I just do
22   not know of any where that has occurred.

Page 115

1    BY MS. McGOWAN:
2    Q    One open question that we had from this
3    morning was the issue about when you have needed
4    to go and obtain the services of a consultant.
5    And I was wondering --
6    A    Sure.
7    Q    -- if we could just go back to that
8    issue.
9    A    I guess it was just me trying to figure
10   out how best to frame it.  Because the case was a
11   person in a position of trust or that needed -- or
12   would be considered for such a position, where
13   they had a particular behavior regarding a fetish
14   or something, things that they would do.
15       And so the question was whether or not
16   this was something that could put them at risk for
17   either impaired -- be used against them, and so
18   impair their judgment, reliability, or
19   suitability.  And in that particular case, I spoke
20   with the person.  And there was no specific
21   treating provider.  And I went to an outside
22   consultant, asked for an evaluation, and relied on

Page 116

1    their report to make a recommendation.
2    Q    And without disclosing information that
3    is identifying of the individual involved, can you
4    describe what the behavior was?
5    A    That's what I've been trying to -- I
6    honestly don't -- I think it had something to do
7    with them participating in -- in these, for want
8    of a better term, games, where they would dress up
9    and -- I can't quite remember the details of it,
10   but it -- I'm probably not going to give you an
11   accurate description, so I do not want to
12   misrepresent anything.
13   Q    How did that information come to your
14   attention as a matter that needed investigation?
15   A    That was something that was referred to
16   me by the personnel security.
17   Q    And was this a situation involving a
18   current employee, or an applicant for employment?
19   A    I'm not sure I remember.  It may have
20   been someone who started out in one capacity and
21   was being considered for another position.  And
22   they may have started as a contractor -- and

Page 117

1    I'm -- again, this is just my recollection -- and
2    were being considered both to become an employee
3    and to be put in the particular position that they
4    were considering.
5    Q    And did you discuss this information
6    with the subject involved?
7    A    Yes.
8    Q    And did that person discuss with you the
9    behavior that was involved and your concern?
10   A    Yes.
11   Q    And at what point did you decide it was
12   necessary to go and obtain the services of a
13   consultant?
14   A    Well, subsequent to our discussion, that
15   was what I decided that I needed to do in order
16   to fully understand and make a determination
17   regarding the case.
18   Q    And prior to having the outside
19   consultant get involved, did you at any time
20   report back to the personnel security officer that
21   you were going to go outside of your office to get
22   an evaluation of this person?

30 (Pages 114 to 117)

Sandra Charles, 30(b)(6)                                        October 25, 2006
                              Washington, DC

Page 118

1    A   I believe I did.
2    Q   And what kind of an evaluation -- or,
3  actually, the broader question is what kind of
4  services did the consultant provide for you?
5      And it may have included an evaluation
6  of the subject, but I'm curious about the whole --
7  how you utilized their services to inform your
8  opinion.
9    A   Well, again, this was a situation where
10 I found -- I obtained the name, actually, several
11 names, of consultants of whose area of expertise
12 involved the case in question, and spoke at -- I
13 let the subject know that this was what I was
14 doing, and spoke with the -- each person, and got
15 their agreement, and in terms of timeline how soon
16 they could do the evaluation.
17     And I certainly also let them know why I
18 was doing this, and what was the basis for the
19 evaluation.  And so I got someone to agree.  And
20 the subject went and was evaluated and got the
21 opinion back from the consultant.
22   Q   And how long did that process take?

Page 119

1    A   I cannot say exactly, but I would say it
2  was close to a month, or maybe a little more.
3    Q   And after you received information --
4  well, at some point, if I'm understanding you
5  correctly, you received an evaluation back from
6  the consultant; is that right?
7    A   Yes.
8    Q   And once you received that information,
9  what did you do then?
10   A   I read it, discussed it, and issued a
11 determination to the personnel security office.
12   Q   And was your determination favorable to
13 the subject, or unfavorable?
14   A   It was favorable.
15   Q   And at any point in the process did the
16 personnel security officer who had referred to
17 matter to you ask you how long it would take to
18 get feedback from you?
19   A   She may have.  It's a logistical
20 question.  I just don't recall.
21   Q   And was the behavior at issue in this
22 case -- did the behavior in this case involve

Page 120

1  cross-dressing, dressing in the attire of another
2  gender?
3    A   No.
4    Q   Was there any aspect of that behavior
5  that involved conduct at the workplace?
6    A   What do you mean?
7    Q   I'm wondering whether or not this was
8  sort of an off-duty, you know, non-work --
9    A   Oh.
10   Q   -- hobby, and there was a concern
11 about -- or whether or not there was aspects of,
12 you know, the behavior that would also manifest at
13 work, as well?
14   A   It was non-work.
15   Q   And were there any other cases where you
16 obtained the services of an outside consultant?
17   A   Not that I can immediately recall.
18   Q   I just wanted to also follow up to make
19 sure that I had a clear understanding.
20     Are you certain that you never had any
21 discussion with Cynthia Wilkins about an applicant
22 would who was undergoing a gender transition?

Page 121

1    A   Am I certain that I never had a
2  discussion with her?
3    Q   Yes.
4    A   No.  And if I said I never had a
5  discussion with her, that would not be accurate.
6  I know at some point in time it was mentioned that
7  there was a case that had not been referred to me.
8  And I don't know the details of the conversation.
9  But the reason I know that there was some point in
10 time where we discussed it was I actually recall
11 expressing relief that I didn't have to deal with
12 it.
13   Q   And how did --
14   A   Sorry.
15   Q   -- that information come to your
16 attention in the first place, the fact that there
17 had even -- this issue had even come up?
18   A   What issue?
19   Q   The issue of an applicant with a gender
20 transition issue.
21   A   Well, at some point in time it was in
22 the press.

31 (Pages 118 to 121)

Alderson Reporting Company
1-800-FOR-DEPO

| Page 122 | Page 124 |
|---|---|
| 1    Q   And did your conversation with<br>2  Ms. Wilkins happen in response to news -- around<br>3  the time that the case was discussed in the news?<br>4    A   That, I cannot recall.<br>5    Q   Do you know if it was before any report<br>6  of this was in the news, or after?<br>7    A   No.<br>8    Q   Okay.  And tell me what you remember<br>9  as -- about the conference with Ms. Wilkins.<br>10       (Interruption)<br>11  BY MS. McGOWAN:<br>12    Q   Please tell your about your conversation<br>13  with Ms. Wilkins.<br>14    A   There is actually very little I can tell<br>15  you, because I honestly do not remember the<br>16  details.  I don't think it was a formal -- any set<br>17  of formal meeting or anything.  And the only<br>18  reason I do recall is the one I just expressed to<br>19  you.<br>20    Q   And do you recall having any<br>21  conversation with Ms. Wilkins about what the<br>22  process would have been for dealing with this | 1    A   Oh, okay.<br>2       (Witness examined document).  Yes.<br>3    Q   Okay.  And section 2.4 talks about the<br>4  reciprocal acceptance of access eligibility<br>5  determinations.<br>6       And in this section, it discusses<br>7  that -- or the section A says, Except when an<br>8  agency has substantial information indicating that<br>9  an employee may not satisfy the standards of<br>10  section 3.1 of this order, background<br>11  investigations and eligibility determinations<br>12  conducted under this order shall be mutually and<br>13  reciprocally accepted by all agencies.<br>14    A   Uh-huh.<br>15    Q   So my question is what, in the view of<br>16  the health services office, constitutes<br>17  substantial information?<br>18       MS. RUSSELL: Objection.  Lacks<br>19  foundation.<br>20       THE WITNESS:  And I really cannot answer<br>21  that.  This is not something that I work with.<br>22  And don't use it. |

| Page 123 | Page 125 |
|---|---|
| 1  information?<br>2    A   No.<br>3    Q   And did you discuss at any point with<br>4  Ms. Wilkins how long you thought it would have<br>5  been taken to adequately assess the information?<br>6    A   No.  I don't recall.<br>7    Q   Let me turn now to a document that was<br>8  marked Exhibit Number 3 from a prior deposition,<br>9  which is Executive Order 12968.<br>10       Are you familiar with this document?<br>11    A   May I look at it?<br>12    Q   You may.<br>13    A   (Witness examined document).  It really<br>14  does not look familiar to me, no.<br>15    Q   And so is this a document that you use<br>16  in the course of fulfilling your duties at the<br>17  health services office?<br>18    A   Since it doesn't look familiar to me,<br>19  I'd have to say no.<br>20    Q   Okay.  One question that I have that<br>21  comes from this document is on -- there's number<br>22  stamps on the bottom.  So it's page 373. | 1  BY MS. McGOWAN:<br>2    Q   Okay.  Okay.  I'll show you what's been<br>3  marked as Exhibit 6 from a prior deposition.<br>4    A   (Witness examined document).<br>5    Q   Are you familiar with this document?<br>6    A   This, I have seen parts of.<br>7    Q   And what is this document?<br>8    A   Well, the official title here is<br>9  adjudicative desk reference.<br>10    Q   And what is the purpose of this<br>11  document?<br>12       MS. RUSSELL: Lacks foundation.<br>13       THE WITNESS:  It says that they're<br>14  guidelines for determining eligibility for access<br>15  for classified information.<br>16  BY MS. McGOWAN:<br>17    Q   Do you use this document in the health<br>18  services office?<br>19    A   Yes.  When cases are referred, I get<br>20  parts that are pertinent to the particular aspect<br>21  of the case attached to the referral.<br>22    Q   And who is it that determines what |

32  (Pages 122 to 125)

Sandra Charles, 30(b)(6)                                      October 25, 2006
                          Washington, DC

| Page 134 | Page 136 |
|---|---|

**Page 134**

1    Actually, on to page 448, guidances A
2  through M, which guidances would you consult if
3  asked to provide an assessment of a transsexual
4  applicant for employment?
5    MS. RUSSELL: Calls for speculation.
6    THE WITNESS: It would all depend on
7  what the individual's issues were.
8  BY MS. McGOWAN:
9    Q   How do you attempt to ascertain whether
10 or not an applicant is vulnerable to coercion?
11   MS. RUSSELL: Objection. Lacks
12 foundation.
13   THE WITNESS: I don't think I could
14 answer that just off the top of my head without
15 looking at the guidelines and understanding what
16 I'm dealing with.
17 BY MS. McGOWAN:
18   Q   If you were asked to assess a
19 transsexual applicant, would you be concerned
20 about their vulnerability to coercion?
21   MS. RUSSELL: Objection. Lacks
22 foundation.

**Page 136**

1    Q   Does the health services office have a
2  mental health professional on staff who would have
3  been able to provide an assessment of an
4  applicant's transsexualism?
5    A   No.
6    Q   And was the health services office ever
7  asked to provide an assessment of Ms. Schroer's
8  gender transition with respect to her eligibility
9  for a top secret security clearance?
10   MS. RUSSELL: Objection. Asked and
11 answered.
12   THE WITNESS: No.
13 BY MS. McGOWAN:
14   Q   And was the health services office ever
15 asked to explain what the process would have been
16 to assess Ms. Schroer's ability to qualify for a
17 top secret security clearance?
18   A   No.
19   Q   And was the health services office ever
20 asked to explain how long the process would have
21 taken to provide an assessment of Ms. Schroer's
22 eligibility and suitability for employment?

**Page 135**

1    THE WITNESS: That may become one of the
2  concerns, and probably would be the basis for my
3  asking for additional evaluation or information.
4  BY MS. McGOWAN:
5    Q   And what, if anything, would you ask the
6  applicant herself in order to ascertain
7  information about whether or not they present a
8  concern about vulnerability to coercion?
9    MS. RUSSELL: Objection. Lacks
10 foundation. Calls for speculation.
11   THE WITNESS: That being said, again,
12 I'd take a history, you know, and try to determine
13 how this person's dealing with their concern,
14 their particular issue, how it affected them, and
15 how they deal with others, whether it's -- it's an
16 open knowledge or they're attempting to be
17 secretive and, therefore, would want to take
18 measures to cover it up.
19   It's just a host of things that as you
20 talk to someone you may ask them basic questions.
21 And their responses elicit other questions.
22 BY MS. McGOWAN:

**Page 137**

1    A   No.
2    Q   Are there any documents upon which you
3  would have relied to gain additional information
4  about transsexuality or gender transition if you
5  had been asked to provide an assessment of a
6  transsexual applicant?
7    A   That's a broad question.
8    MS. RUSSELL: Calls for speculation.
9    THE WITNESS: So are there documents
10 that I have in my possession? No.
11 BY MS. McGOWAN:
12   Q   Are there particular reference guides
13 that you frequently rely upon when you encounter a
14 new condition with which you may not be familiar,
15 or other resources that you would have turned to?
16   A   It depends on the condition. We
17 certainly have medical textbooks. After all, we
18 are a library. So we have any number of books
19 available. And speaking to people who are in the
20 field as a -- you know, including consultants,
21 so --
22   Q   And was the health services office ever

                              35 (Pages 134 to 137)

Sandra Charles, 30(b)(6)                                    October 25, 2006
                         Washington, DC

| Page 142 |
|---|

1   going.  Because while I'm waiting, I'm doing
2   something else.  I'm working with something,
3   covering something else.  So you ask me, I'm tell
4   you.  If you don't ask me, I probably won't until
5   I go back to say I've gotten this back and I
6   follow up with that person.  So she usually
7   initiates the follow-up as to how soon.
8       Q    And in many of your cases do you have
9   that kind of phone call, asking for a check in on
10  where the process is, or is that the rare case
11  that you would get a phone call like that?
12      MS. RUSSELL:  Objection to the form.
13      THE WITNESS:  And, again, I can't -- I'm
14  not going to say many or in rare.  She probably
15  does a better job of keeping track of what's out
16  there than I do of what I owe.  So I think that as
17  a matter of course if something goes an extended
18  period of time which I cannot find, she will check
19  in with me.
20  BY MS. McGOWAN:
21      Q    We were talking about a case in which
22  you had obtained the services of an outside

| Page 143 |
|---|

1   consultant?
2       A    Yes.
3       Q    And in that case, the individual
4   involved was not actually under the care of a
5   therapist for the condition that was the point of
6   concern.
7           I'm wondering, has there ever been a
8   case where you obtained the services of a
9   consultant where the individual was, in fact,
10  under the care of an physician or therapist for
11  the issue that was the concern?
12      A    I cannot recall.
13      Q    Roughly, how -- I know we described the
14  one case that you remembered in greater detail.
15          But roughly how many cases have required
16  you to go and seek the services of an outside
17  consultant or a second opinion?
18      MS. RUSSELL:  Objection to the form.
19      You can answer the question.
20      THE WITNESS:  I don't know.
21  BY MS. McGOWAN:
22      Q    Is it rare, relatively regular that that

| Page 144 |
|---|

1   happens?
2       MS. RUSSELL:  Same objection.
3       THE WITNESS:  I just don't know.  I
4   can't say.
5   BY MS. McGOWAN:
6       Q    Have there been other cases besides the
7   one that we've discussed?
8       A    That I referred?
9       Q    Right.
10      A    To an outside consultant?
11      Q    Uh-huh.
12      A    I cannot remember specifically of such a
13  case.
14      Q    We talked about the conversation that
15  you had with Ms. Wilkins about the applicant with
16  the gender transition.
17          And I'm wondering, in the course of that
18  conversation with Ms. Wilkins, did you ever ask
19  her why the health services office had not been
20  brought into the discussion?
21      MS. RUSSELL:  Objection as to the form.
22      THE WITNESS:  I don't think so.  I -- I

| Page 145 |
|---|

1   could probably say no.
2   BY MS. McGOWAN:
3       Q    And do you feel that it was appropriate
4   for a decision to be made about an applicant based
5   on a health concern without the health services
6   offices being involved?
7       A    I have no opinion.
8       MS. RUSSELL:  Objection as to the form.
9       THE WITNESS:  No opinion.
10  BY MS. McGOWAN:
11      Q    Would you have attended the meeting with
12  Ms. Wilkins and Ms. Preece had you been asked?
13      MS. RUSSELL:  Calls for speculation.
14      THE WITNESS:  20/20 hindsight, I don't
15  know whether I would have or not.  I can't say
16  now.  I may have.  I may not have.  I don't know.
17  BY MS. McGOWAN:
18      Q    Are transsexual applicants less likely
19  to qualify for national security clearances than
20  non-transsexual applicants?
21      MS. RUSSELL:  Objection.  Lacks
22  foundation.

                                    37 (Pages 142 to 145)