# McGowan Declaration – Exhibit D

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------------X

DIANE J. SCHROER,                   :

    Plaintiff,                      :

    v.                              :  No. 05-CV-01090 (JR)

JAMES H. BILLINGTON,                :

    Defendant.                      :

------------------------------------X

                         Washington, D.C.

                         Friday, March 14, 2008

       Deposition of FRANCIS T. MIKO, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by DENNIS A. DINKEL, a Notary Public in and for the District of Columbia, taken at the offices of WilmerHale, LLP, 1825 Pennsylvania Avenue, N.W., Washington, D.C. at 9:28 a.m., Friday, March 14, 2008, and the proceedings being taken down by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and transcribed under his direction.

Francis T. Miko                                                                                                    March 14, 2008
                              Washington, DC

Page 26

1  you were never formally the selecting official.
2       Were there any times in which you acted as
3  sort of the informal or a de facto selecting
4  official?
5       MS. RUSSELL: Objection to the form of the
6  question. You can go ahead and answer.
7       THE WITNESS: I guess what I meant was the
8  selecting official in every case I can remember was
9  the head of the division. The person whose section
10 someone was being hired for would typically -- their
11 judgment would have some -- you know -- greater
12 influence. So that in that sense, usually I
13 concurred with the selections.
14      If it was someone for my section, there
15 weren't too many cases where I was opposed to the
16 choice that was made.
17 BY MS. McGOWAN:
18      Q.  And in how many cases were the hires for
19 an individual who would be working for you?
20      A.  In the course of my career -- this is
21 where my recollection is fuzzy -- but trying -- at
22 least eight, I think.

Page 27

1       Q.  And how many of the hiring processes in
2  which you were involved was Charlotte Preece the
3  selecting official formally?
4       A.  In all cases, once she became the
5  assistant director for that division. Before then,
6  it was whoever her predecessors were.
7       Q.  Turning to the hiring process for the
8  terrorism specialist position specifically --
9       A.  Yes.
10      Q.  Tell me how you first got involved in the
11 hiring of the terrorism specialist?
12      A.  We had a very senior analyst, Audrey
13 Cronin -- a very accomplished and very renowned
14 specialist on terrorism -- leave us on rather short
15 notice. This was at the height of when congressional
16 attention was focused on the issue. And I became
17 involved at the point where she informed us that she
18 would be leaving to take another position, and it was
19 clear that we needed to get someone of similar
20 caliber and senior experience on board.
21      Q.  And did Ms. Cronin tell you how soon she
22 would need to depart CRS?

Page 28

1       A.  Yes. I believe she did. I can't remember
2  exactly.
3       Q.  Who else was involved in -- let me ask you
4  this: What happened next after Ms. Cronin --
5       A.  I think in addition to telling me as her
6  immediate supervisor, she also went and talked to
7  Charlotte Preece about her decision; and almost
8  immediately we discussed how to deal with it.
9       Q.  Tell me about that discussion.
10      A.  Well, Charlotte and I agreed -- first of
11 all, we agreed that we had to make a request to fill
12 this position and that it -- the request would be
13 made at a more senior level so that we could get
14 someone with the considerable experience.
15      We didn't have time to bring in someone --
16 typically, we often hire more junior people and bring
17 them on; but in this case, we felt there was a void
18 and we couldn't do that.
19      Q.  And when you say that you wanted to make a
20 request at a more senior level, are you referring
21 to -- to whom you would be making the request?
22      A.  No. No. No.

Page 29

1       Q.  Or the individual --
2       A.  The GS level of the individual we wanted
3  to bring on.
4       Q.  And how would the GS level of the position
5  impact the hiring process if at all?
6       A.  It wouldn't impact the process. It
7  just -- it meant we were looking for a different kind
8  of candidate.
9       Q.  And was there any process that was
10 required for establishing the position at a high GS
11 level?
12      A.  It required approval from the director's
13 office.
14      Q.  Anything else?
15      A.  No.
16      Q.  I honestly don't mean that as a trick
17 question. I want to make sure you get out everything
18 you want to tell me.
19      A.  Okay.
20      Q.  At this point in your conversation with
21 Ms. Preece, did you discuss anything else related to
22 filling the terrorism specialist position?

Francis T. Miko                                                                                  March 14, 2008
Washington, DC

### Page 54

1   A.   I believe so. I would not have
2   necessarily known he had gone to the War College.
3   Q.   What did he say to you in the context of
4   that conversation?
5   A.   That he was top notch, that he was -- that
6   he was one of the stars of the -- of that War College
7   class.
8   Q.   Anything else that he said to you at that
9   time?
10   A.   No.
11   Q.   Do you recall roughly when in the
12   interview process Mr. Pagliano came to you with this
13   information?
14   A.   It was after the interview process was
15   over.
16   Q.   By after the interview process, you mean
17   all the interviews?
18   A.   All the interviews I think but before we
19   made our selection.
20   Q.   And you mentioned that you followed up
21   with Mr. Pagliano. Tell me about that?
22   A.   Well, in the sense that here was a person

### Page 55

1   who did have information and -- was interested in
2   what he had to say about the candidate.
3   Q.   You had more than one conversation with
4   Mr. Pagliano?
5   A.   I'm not sure.
6   Q.   What were you interested in finding out
7   from Mr. Pagliano? What did you ask him?
8   A.   I didn't have specific questions. I was
9   just -- at that point I was very much -- I was
10   leaning towards selecting him, recommending him, and
11   I just wanted confirmation.
12   Q.   Anything else from your recollection of
13   your conversation with Mr. Pagliano?
14   A.   No.
15   Q.   And as a result of your conversation with
16   Mr. Pagliano, did you feel as though you had gotten
17   the confirmation you were looking for?
18   A.   Yes.
19   Q.   Did Mr. Pagliano express any reservations
20   about Ms. Schroer?
21   A.   No.
22   Q.   Did you have any reservations about

### Page 56

1   Ms. Schroer?
2   A.   No.
3   Q.   This first line here under the panelists'
4   names on page 153, am I right, is that your
5   signature?
6   A.   Yes.
7   Q.   At what point were you asked to sign this
8   form?
9   A.   This was when we had our formal panel
10   meeting where each of our scores were recorded on the
11   candidates; and we discussed the scores and why one
12   of us maybe gave someone a higher or lower score.
13        This was again the standard process.
14   Q.   And in the course of that conversation,
15   what was discussed with respect to Ms. Schroer?
16   A.   I think -- you know, there was a
17   consensus, a strong candidate. I believe some of my
18   numbers are lower, but maybe I ranked everyone lower.
19   I don't know. I think he was my top candidate.
20   Q.   And what about Charlotte Preece? What
21   was --
22   A.   As I recall, it was her top candidate,

### Page 57

1   too.
2   Q.   And Mr. Bowman?
3   A.   I believe he may have had someone he
4   ranked higher, but I can't remember for sure.
5   Q.   Okay. In Mr. Bowman's ranking, do you
6   know where Ms. Schroer fell?
7   A.   It was very high, too. But maybe not the
8   top.
9   Q.   Do you recall if she was the number two?
10   A.   Number two or number three I would think.
11   Q.   Do you recall who Mr. Bowman's top choice
12   was?
13   A.   I don't remember.
14   Q.   Was it Mr. Rollins?
15   A.   I'm not even sure if it was Mr. Rollins.
16   If you give me the list, I might remember.
17   Q.   I think I may have that list in here
18   somewhere. I don't have it in front of me right now.
19   A.   Okay.
20   Q.   Did anyone in the course of that
21   conversation express any concerns or reservations
22   about Ms. Schroer?

Francis T. Miko                                                          March 14, 2008
                              Washington, DC

Page 58

1  A.  No.
2  Q.  Were you involvement in the interview --
3  before I move on, is there anything else you can
4  recall about the interview and discussion process
5  with respect to Ms. Schroer?
6  A.  No.
7  Q.  Were you involved in the interview of a
8  candidate by the name of John Rollins?
9  A.  Yes.
10 Q.  What do you recall regarding his
11 interview?
12 A.  He was also very strong, very impressive.
13 He was -- I mean to me, they were the top two
14 candidates. A lot of similarities in their
15 backgrounds. Both of them gave very good answers to
16 all the questions in the interview. Both were very
17 poised. Both were very articulate.
18     In the end, I gave the highest score to
19 Schroer.
20 Q.  What was or were the factors that tipped
21 you in favor of Ms. Schroer as opposed to
22 Mr. Rollins?

Page 59

1  A.  I think --
2      MS. RUSSELL: Objection to the form of the
3  question. But you can answer.
4      THE WITNESS: I think it was actually his
5  responses to our broadest questions that allowed the
6  person to -- you know -- allowed us to see the
7  thought process of the person and I was most
8  impressed with Ms. Schroer's answers.
9  BY MS. McGOWAN:
10 Q.  Anything else?
11 A.  No. Again, both of them were very strong,
12 and the difference was relatively small.
13 Q.  Is there anything else regarding the
14 interview with Mr. Rollins that you recall?
15 A.  No.
16 Q.  Did you have any discussion with
17 Mr. Rollins about whether he was currently in
18 possession of a security clearance?
19 A.  No, I don't believe so.
20 Q.  Was there any discussion about
21 Mr. Rollins' contacts in the government or military?
22 A.  The same type of probing questions that we

Page 60

1  gave to Ms. Schroer showed that he, too, had very
2  high level contacts in key agencies.
3  Q.  Was there any discussion about when
4  Mr. Rollins would be able to begin as the terrorism
5  specialist if selected?
6  A.  Not at that point.
7      MS. McGOWAN: Let me show you a document
8  that we will mark as number 49.
9          (A document was marked for
10             identification as Exhibit
11             No. 49.)
12     MS. McGOWAN: This is a document that has
13 been produced by the government in discovery. It is
14 marked PO 540 through PO 571. The PO reflecting that
15 it is governed by a protective order in this case to
16 protect the information. Take a moment to review
17 this.
18 BY MS. McGOWAN:
19 Q.  Do you recognize this document?
20 A.  Yes.
21 Q.  What is it?
22 A.  It's the interview, the structured

Page 61

1  interview and my notes on Mr. Rollins' responses.
2  Q.  And again looking at that first page, the
3  date that's listed is November 8, 2004?
4  A.  Yes.
5  Q.  Am I right that that reflects the date of
6  the interview?
7  A.  Yes.
8  Q.  And these notes were written
9  contemporaneous with the interview?
10 A.  During the interview.
11 Q.  Just taking a moment to review your notes,
12 if that stimulates your recollection about anything
13 else that you recall from the interview, I would ask
14 you to tell me about that.
15     (Pause.)
16 A.  As I note here, I note his strengths --
17 Q.  When you say here, what page are you
18 looking at?
19 A.  Actually, I'm looking at page 10.
20 Q.  Which has been marked as the page that is
21 PO 546?
22 A.  His strengths were very heavily on

16 (Pages 58 to 61)

Francis T. Miko                                                      March 14, 2008
                              Washington, DC

## Page 62

1  terrorism more so than on the topic of other
2  international crime. It confirms that I felt he was
3  also a very strong candidate.
4     Q.   Anything else?
5     A.   No.
6     Q.   Looking at page 35 of this document that's
7  been labeled 571, is this your ranking of
8  Mr. Rollins?
9     A.   Yes, it is. Yes.
10    Q.   Did you have any concerns or reservations
11 about Mr. Rollins?
12    A.   No. Just comparing my scores for the two
13 of them.
14        No, I didn't.
15    Q.   And again at the time you filled out this
16 form, did you have any discussion with any of the
17 other committee members?
18    A.   No.
19        MS. McGOWAN: I have a document that I
20 would ask you to look at that we'll mark number 50.
21        (A document was marked for
22        identification as Exhibit

## Page 63

1         No. 50.)
2         MS. McGOWAN: This is a document produced
3  by the government in discovery Bates-stamped PO 616
4  and 17. Take a moment to look at that.
5  BY MS. McGOWAN:
6     Q.   Do you recognize this document?
7     A.   Yes. Compilation of all the scores.
8     Q.   And at the time you filled out that form,
9  did you have any discussions with the committee
10 members about Mr. Rollins?
11    A.   Yes. It was at that point I think that we
12 agreed that the two top candidates were Mr. Schroer
13 and Rollins.
14    Q.   Was there any discussion by anyone on the
15 selection committee about any reservations regarding
16 Mr. Rollins?
17    A.   No.
18    Q.   Was there any discussions specifically
19 comparing the relative strengths of Ms. Schroer and
20 Mr. Rollins in the context of that meeting?
21    A.   Yes.
22    Q.   Tell me about what was discussed.

## Page 64

1     A.   We weren't in total unanimity. As I said,
2  I believe Mr. Bowman had another top candidate. But
3  I think we all agreed that both of them were very
4  strong and that in the end, it was a very tough
5  choice between the two, because they were very good.
6     Q.   Anything else?
7     A.   No.
8     Q.   And why was plaintiff, Ms. Schroer, viewed
9  as stronger than Mr. Rollins?
10        MS. RUSSELL: Objection to the form.
11        THE WITNESS: I think my sense was their
12 backgrounds were very similar, but the most recent
13 background of Mr. Rollins had been in the area of
14 homeland security, which is obviously very
15 appropriate to the position; but it wasn't quite --
16 his most recent experiences were quite as
17 internationally focused as Schroer's were.
18        I'm only referring to my own thinking,
19 because I can't remember exactly why the others felt
20 the way they did; but I also thought on the question
21 that really allowed him to show his range of
22 knowledge and ability to analyze the terrorism issue,

## Page 65

1  I think he gave the best response at the interview.
2  BY MS. McGOWAN:
3     Q.   Anything else that was discussed?
4     A.   I think we agreed to go forward to do
5  reference checks on both of them.
6     Q.   Do you recall -- well, at the end of that
7  meeting, were the candidates narrowed down to a
8  smaller group at that point?
9     A.   To two, yes.
10    Q.   Let me show you a document that was marked
11 in a prior deposition as Exhibit No. 25, which is a
12 document that was produced by the government in
13 discovery and has been Bates-stamped as number 148.
14        Ms. Russell, I think you have a copy in
15 your binder there.
16        Do you recognize this e-mail?
17    A.   I didn't remember the e-mail, but yes.
18    Q.   What is it?
19    A.   It's just an assignment of who would do
20 which reference checks for each of the two
21 candidates.
22    Q.   And to the extent that there is a third

Francis T. Miko                                                    March 14, 2008
                              Washington, DC

Page 66

1  individual, Mr. Rollins, Mr. Schroer, David Schroer,
2  and Cal Britvek listed in that -- B-r-i-t-v-e-k --
3  who is Cal Britvek?
4      A.  He -- I think now, because I didn't
5  remember, but I think he was the other leading
6  candidate; and he may have been Steve Bowman's top
7  choice.
8      Q.  Was there any additional discussion or
9  person or by e-mail among you, Mr. Bowman, and
10 Ms. Preece regarding the next steps relating to these
11 candidates?
12     A.  We did the reference checks; and then
13 convened and discussed based on those; and I think at
14 that point, we agreed that Dave -- David Schroer was
15 our top candidate and John Rollins was the backup.
16     Q.  And so did you speak to any references for
17 Ms. Schroer?
18     A.  Yes.  I must have been the one that I
19 listed here as having called Major General Dell
20 Daley, and again it was a glowing reference.
21     Q.  Do you recall speaking to someone by the
22 name of Kalev Sepp in connection with Ms. Schroer's

Page 67

1  application?  S-e-p-p and the first name is
2  K-a-l-e-v.
3      A.  I don't remember, but you know, I don't
4  remember for sure.  Is that -- if you can refresh me
5  on who that person was.
6          MS. McGOWAN:  Let me have this document
7  marked, number 51.
8              (A document was marked for
9              identification as Exhibit
10             No. 51.)
11         MS. McGOWAN:  This is a document produced
12 by the government in discovery, Bates-stamped number
13 119, reference check form.
14 BY MS. McGOWAN:
15     Q.  Do you recognize this document?
16     A.  Yes.  I wrote this.
17     Q.  Is this your handwriting?  I didn't --
18     A.  Yes.
19     Q.  Okay.  Can you walk me through -- most of
20 the writing is clear, but if you can walk me through
21 what you have written here?
22     A.  Clearly, the response to the first

Page 68

1  question was he was both a friend and had worked with
2  him over an extended period in various settings.  It
3  was really an outstanding review.
4          As I said here, it was -- if anything --
5  over the top because there were no qualms expressed
6  or anything.  It was a very strong endorsement of the
7  candidate.
8      Q.  Relative to other reference checks that
9  you've done for individuals, would you characterize
10 this as one of the strongest recommendations you've
11 received?
12     A.  Yes.  Yes.
13     Q.  Anything else that you recall about your
14 conversation with Dr. Sepp?
15     A.  No.
16     Q.  Do you recall speaking to someone named
17 Jeff Brady in connection with Ms. Schroer's
18 application for the terrorism specialist position?
19     A.  Again, I don't remember.
20         MS. McGOWAN:  Let me mark this No. 52 for
21 identification.
22             (A document was marked for

Page 69

1              identification as Exhibit
2              No. 52.)
3          MS. McGOWAN:  Take a moment and take a
4  look at this.
5          THE WITNESS:  This is not my handwriting.
6  BY MS. McGOWAN:
7      Q.  Okay.  We won't worry about that document
8  then.
9          Do you recognize whose handwriting that
10 is?
11     A.  I would guess it is Charlotte Preece.
12     Q.  Are you familiar with Charlotte Preece's
13 handwriting from other contexts?
14     A.  Pretty much.  I am pretty confident it's
15 hers.
16     Q.  Do you recall speaking to anyone by the
17 name of Marc Alderman in connection with
18 Ms. Schroer's application for the terrorism
19 specialist position?
20     A.  Again, I don't remember.
21         MS. McGOWAN:  Let me mark this document
22 number 53.

18 (Pages 66 to 69)

Francis T. Miko                                           March 14, 2008
                          Washington, DC

Page 70

1           (A document was marked for
2           identification as Exhibit
3           No. 53.)
4       THE WITNESS: This is certainly not my
5   handwriting.
6   BY MS. McGOWAN:
7       Q.  This is a document produced by the
8   government in discovery Bates-stamped number 149.
9       Am I right you said that is not your
10  handwriting?
11      A.  No.
12      Q.  Do you recognize this handwriting?
13      A.  I think it may also be Charlotte.
14      Q.  Okay. Charlotte Preece?
15      A.  Yes.
16      Q.  Okay. Turning back to document number 51
17  that we've marked, which are the notes from your
18  conversation with Dr. Sepp, did you create these
19  notes contemporaneous with your conversation?
20      A.  Yes. I was writing as I was talking.
21      Q.  And was this form the way in which -- or a
22  way in which you conveyed the results of your

Page 71

1   reference check to the other members of the
2   committee?
3       A.  Yes.
4       Q.  Was there any other way in which you
5   conveyed the results of your reference check with the
6   committee?
7       A.  No.
8       Q.  Did you have any in-person meetings with
9   the committee again?
10      A.  Oh, yeah. We sat down together to
11  discuss.
12      Q.  And what did you discuss?
13      A.  Well, how to move forward from there; and
14  I think Charlotte was going to put forward the
15  recommendation to the -- both to human resources and
16  also to the front office that we wanted to move ahead
17  with recommending David Schroer.
18      Q.  In the context of that meeting, where you
19  discussed the results of your reference check, did
20  the other individuals report back about their
21  reference check?
22      A.  Yes.

Page 72

1       Q.  What did they say?
2       A.  Again, I believe that the reference checks
3   came back very positively from all references on both
4   candidates.
5       Q.  And with respect to Ms. Schroer, did
6   anyone report back about hearing any concerns or
7   reservations from the references?
8       A.  No.
9       Q.  Do you recall speaking to any references
10  for Mr. Rollins?
11      A.  If I did, I don't remember very
12  specifically.
13      Q.  Do you recall speaking to an individual by
14  the name of Sallie McDonald in connection with
15  Mr. Rollins' application?
16      A.  It rings a bell but it may only be from
17  the fact it was on list here.
18      MS. McGOWAN: Let me mark this document
19  here as number 54.
20          (A document was marked for
21          identification as Exhibit
22          No. 54.)

Page 73

1       MS. McGOWAN: This is a document that was
2   produced by the government in discovery and
3   Bates-stamped PO 697.
4   BY MS. McGOWAN:
5       Q.  Take a look at that. Do you recognize
6   this document?
7       A.  That's my handwriting.
8       Q.  Okay. Again as we did with the prior
9   reference check form, if you could walk me through
10  what Sallie McDonald -- your notes are here with
11  respect to your reference check for Mr. Rollins with
12  Sallie McDonald?
13      A.  Again, it was an extremely strong
14  recommendation. The person had an extended
15  association with John Rollins, although only one year
16  as a supervisor of his. But again it was an
17  outstanding -- an outstanding recommendation, very
18  strong in every sense, and raised no doubts about his
19  capabilities.
20      Q.  And did you have any concerns or
21  reservations about Mr. Rollins that you specifically
22  asked the reference check about?

                                        19 (Pages 70 to 73)

Page 74

1  A.  No.
2  Q.  And were there any concerns or
3  reservations that the reference --
4  A.  I cannot --
5  Q.  -- check offered?
6  A.  No. No.
7  Q.  Anything else that you can tell me about
8  your conversation with Sallie McDonald?
9  A.  She said this was the highest caliber
10 person she'd ever worked with. That about sums up
11 her perspective.
12 Q.  Do you recall speaking to someone by the
13 name of Patrick Hughes in connection with the
14 application of John Rollins?
15 A.  No. Specifically, no. Again, I may have.
16     MS. McGOWAN: Have this document marked
17 number 55 which was produced by the government in
18 discovery and is Bates-stamped PO 696.
19     (A document was marked for
20      identification as Exhibit
21      No. 55.)
22 BY MS. McGOWAN:

Page 75

1  Q.  If you could review this document for a
2  moment?
3  A.  Again, not my writing.
4  Q.  Okay. Do you recognize the handwriting?
5  A.  I would guess it is again Charlotte but
6  I'm not as sure of this.
7  Q.  Okay.
8  A.  But I think it is Charlotte.
9  Q.  Was -- were there any other individuals
10 other than you, Mr. Bowman, and Ms. Preece who
11 conducted reference checks?
12 A.  No. No.
13 Q.  Did Ms. Preece have any -- what did
14 Ms. Preece say in the context of your conversation
15 with you and Mr. Bowman about her reference checks?
16 A.  Again, she said about both for Rollins and
17 for Schroer that they were outstanding
18 recommendations. I don't remember anyone raising any
19 flags or doubts with her or any of us.
20 Q.  Was there any discussion about Ms. Schroer
21 asking that her boss Walt Kreitzberg not be contacted
22 as part of a reference check?

Page 76

1  A.  I don't remember any discussion of that.
2  I mean that, could have been -- sometimes one
3  would -- could raise questions; but on the other
4  hand, it could also just be in case they weren't
5  going to get the job, they didn't want their boss to
6  know that they were looking.
7     So I don't remember that -- it may have
8  come up, but I don't remember.
9  Q.  So how did the panel choose who its top
10 candidate ultimately was going to be?
11 A.  Well, based on this discussion, I think
12 both Charlotte and I had given Schroer our top
13 rating. Both of us were very enthusiastic about
14 both. I think Steve Bowman also was very
15 enthusiastic about both, even if he may initially
16 gave the strongest score to someone else.
17     And based upon the fact that both
18 Charlotte and I had ranked them 1 and 2, I think the
19 decision was made to move ahead to recommend Schroer.
20 Q.  And with respect to that decision to move
21 ahead, what was involved in that? What did moving
22 ahead mean?

Page 77

1  A.  Well, in the first instance, I think it
2  was either a memo or a request from Charlotte to the
3  human resources office to move forward recommending
4  him; and I think it also meant that the director had
5  to be given the recommendation for final
6  determination.
7  Q.  So at that point what was your next
8  involvement with the terrorism specialist selection?
9  A.  Okay. As I recall, at that point, I left;
10 and I was on travel for, I think might have been a
11 couple of weeks or something.
12     So I left, believing that we were going to
13 recommend and move forward on selecting Mr. Schroer.
14 Q.  Prior to your leaving, did Ms. Preece tell
15 you about any conversation she had had with
16 Ms. Schroer about salary concerns?
17 A.  No.
18 Q.  Prior to your leaving, did Ms. Preece at
19 any point tell you that she was writing a hiring
20 recommendation memo for Ms. Schroer?
21 A.  I believe so. I mean that was the
22 decision that was made, so that I believe that that

20 (Pages 74 to 77)

Page 78

1  was my expectation.
2      Q.  And did she discuss with you at all what
3  she would say in this memo?  Did she seek any input
4  from you about --
5      A.  No.  And she had gotten my input on who I
6  wanted.
7      Q.  And do you know if she sought any input on
8  the hiring memo from Mr. Bowman?
9      A.  Yeah.  I'm sure she did.
10     Q.  Did you have any discussions with her
11 about that specifically, about her consulting with
12 Mr. Bowman on the hiring memo?
13     A.  I think it was -- you know -- I think
14 we're talking about really the same meeting at which
15 we vented our views on who should get the nod, and he
16 was there, too.
17     Q.  At that point -- to sort of wrap it up --
18 was there anything else that you discussed with
19 either Charlotte Preece or Steve Bowman about sort of
20 wrapping up the hiring process, as you understood it?
21     A.  No.
22     Q.  At some point, did you learn that

Page 79

1  Ms. Preece had not, in fact, recommended Ms. Schroer
2  for the position?
3      A.  Yes.
4      Q.  Tell me about how and when you learned
5  that?
6      A.  For whatever reason while I was away, I
7  didn't have access to my work, to my e-mail.
8          So when I got back from my trip, and I
9  think I was still home, I logged in to my e-mail, and
10 I saw some reference to the fact that the
11 recommendation had gone forward for John Rollins.
12         That was the first I heard that something
13 other had happened.
14     Q.  Had you had any voice mails when you got
15 back from anyone waiting for you, regarding the
16 terrorism selection process?
17     A.  Probably yes.
18     Q.  Okay.  Do you recall how -- when it was
19 that you came back from your traveling and were
20 reconnected to the process?
21     A.  I can't remember.  I would have to dig for
22 that, because right now I'm not even a hundred

Page 80

1  percent sure where I was.
2      Q.  And was this e-mail that you read
3  something that was sent to a work e-mail account?
4      A.  Yes.  It was -- I can't remember if it was
5  the actual request that he be hired or if it was just
6  some reference to it; but anyway, it let me know that
7  the selection had moved forward for Rollins rather
8  than Schroer.
9      Q.  And what was your reaction to this news?
10     A.  Well, I immediately sought out Charlotte
11 or she sought me out maybe even before I sought her
12 out to tell me what had happened.
13     Q.  Okay.  And what did she tell you?
14     A.  That I guess she called him to indicate
15 that she was going to make a recommendation that he
16 be selected, and that he asked for a meeting with
17 her; and I believe they went to lunch together.
18         And I guess it was at that meeting that
19 Ms. Schroer indicated that he would be reporting as
20 Diane Schroer; and --
21     Q.  And what else did Ms. Preece say as far as
22 what happened next?

Page 81

1      A.  Okay.  I know that she was -- it was very
2  clear she was very troubled by the decision she had
3  to make and that she sought out advice and guidance
4  before doing anything.
5          And that she really agonized over it; but
6  ultimately decided that it would be in our best
7  interests to move forward on John Rollins.
8      Q.  With respect to why she thought it would
9  be in everyone's best interest to go forward with
10 Mr. Rollins, what did she tell you?
11     A.  I think her concern was his -- not his
12 qualifications to do the job, but availability and
13 readiness to jump in and do the job from day one,
14 given what he told her about the process he was
15 involved in and how things would move forward.
16         I believe she told me also that she spoke
17 to our personnel security head to find out if -- if
18 these revelations, if they would make it difficult or
19 impossible to move forward on a security clearance
20 for the candidate.
21     Q.  And with respect to the process that
22 was -- that Ms. Schroer was involved in at that

## Page 82

1  point, how did Ms. Preece explain what she understood
2  that process to be?
3      A.  Well, that there would be some surgeries,
4  that there would be some extended psychological
5  counseling, and I believe that the personnel security
6  officer indicated that this would be a real
7  impediment to getting a security clearance any time
8  quickly or soon.
9          Again this is secondhand. But that's what
10 I understood.
11     Q.  And with respect to the first two pieces
12 about the surgery and the extended psychological
13 counseling, did Ms. Preece tell you how she had that
14 understanding that that was the process?
15     A.  I think he told her. If I understand
16 correctly, I believe he told her what was ahead.
17     Q.  And what did Ms. Preece say with respect
18 to how the fact that Ms. Schroer was involved in this
19 process that might involve surgery or counseling,
20 what did Ms. Preece say to you regarding how the fact
21 that Ms. Schroer was involved in this process led her
22 to decide to go with Mr. Rollins?

## Page 83

1      A.  I know that she said that this was a
2  really tough thing for her, a very rough period of
3  examination; but I think based on her consultations
4  with senior management, with the personnel security
5  officer, I think she believed that this was the right
6  decision. That's all I can tell you.
7      Q.  Did Ms. Preece say anything to you about
8  Ms. Schroer showing her pictures during lunch?
9      A.  Yes.
10     Q.  Do you recall what she told you about
11 that?
12     A.  Well, you know, she was -- frankly, she
13 was very surprised. I mean she was not prepared, and
14 she was a bit shocked; but yes, she told me that he
15 had shown her pictures.
16     Q.  And did she explain what the pictures
17 were?
18     A.  Of him as a woman, I think, how she would
19 look when she went into work.
20     Q.  Did she describe at all what Ms. Schroer
21 looked like or was wearing?
22     A.  I don't recall specifically. I mean I

## Page 84

1  don't remember. We later saw pictures and stuff, but
2  that was not from Charlotte, that was because it
3  became quite public.
4      Q.  Did Ms. Preece say anything about her
5  opinion regarding how Ms. Schroer looked in those
6  pictures?
7      A.  No. I mean that was certainly not
8  something that I -- that caught my attention.
9      Q.  Was there any discussion about how much or
10 whether or not Ms. Schroer actually looked like a
11 woman when dressed in female clothing?
12         MS. RUSSELL: Objection to the form.
13         THE WITNESS: I don't remember that.
14 BY MS. McGOWAN:
15     Q.  Did Charlotte Preece use any particular
16 phrases to describe Ms. Schroer's process, such as
17 transgender migration?
18     A.  Again, I don't remember that.
19     Q.  What did you discuss with Ms. Preece
20 regarding her view on how this information from
21 Ms. Schroer would impact Ms. Schroer's readiness to
22 start on day one, as you said?

## Page 85

1      A.  I remember -- I don't remember
2  specifically; but there was a feeling that without,
3  first of all, that there would be some absences
4  because of this. But also that the delays in getting
5  or maybe not even getting the security clearance
6  would have made it very tough to do that job.
7      Q.  Anything else?
8      A.  I can't remember.
9      Q.  With respect to the concern about absences
10 by Ms. Schroer, do you recall --
11     A.  No.
12     Q.  -- more --
13     A.  I don't remember specifically. I think it
14 was just that there were to be surgeries. I don't
15 remember that.
16     Q.  Did Ms. Preece say anything about concerns
17 over Ms. Schroer being distracted as a result of her
18 gender transition?
19     A.  I think that was a concern. I don't
20 remember those words, but yes, I think there was a
21 concern.
22         There was also a concern that -- whether

Francis T. Miko  March 14, 2008
Washington, DC

Page 86

1  the contacts -- I think there was a concern that one
2  of the selling points of this candidate was their
3  network of contacts; and I think she did raise the
4  question of would these same -- would the same
5  network be available in the same way in light the new
6  situation.
7      Again I don't remember exactly how that
8  came up.
9   Q.  Was there any discussion at all about how
10 many of Ms. Schroer's contacts already knew this
11 information about her?
12  A.  We didn't -- certainly, from my references
13 and the discussion of reference checks and so forth,
14 I had no inkling that there was an awareness of this.
15 Certainly among the people that we talked to.
16  Q.  Did Ms. Preece say anything to you about
17 going back to those reference checks and finding out
18 whether or not they had been aware that this was
19 going on with Ms. Schroer?
20  A.  No.
21  Q.  And with respect to the concern about
22 Ms. Schroer's revelations either impacting or making

Page 87

1  it difficult for her to complete the security
2  clearance process either quickly or at all, what did
3  she tell you about those concerns?
4   A.  This was not her opinion.  This was what
5  was told to her by the personnel security.
6   Q.  And did she tell you in what context she
7  had gotten this information?
8   A.  Well, she had gone to seek guidance
9  specifically given these new factors, would it be
10 possible to move forward; and I guess got the
11 response that it would not, at least not quickly.
12  Q.  Did you have -- did she tell you why the
13 personnel security office had that view?
14  A.  Not specifically.
15  Q.  Did she tell you -- did she tell you about
16 any -- in any greater details what would be involved
17 above and beyond the normal security process for
18 Ms. Schroer as a result of this revelation?
19  A.  No.  I don't remember anything specific.
20  Q.  Did she tell you anything about how much
21 longer a security clearance process might take for
22 Ms. Schroer in light of this information?

Page 88

1   A.  No.  I can't remember.  I don't remember.
2   Q.  What is your understanding of why it would
3  take longer for the process, the security clearance
4  process for Ms. Schroer in light of her revelation of
5  this information?
6      MS. RUSSELL:  Objection.  Lack of
7  foundation.
8      THE WITNESS:  No.  I don't know what
9  precedents for this is or how it's been dealt with in
10 the past.
11     Maybe it was based on previous experience.
12 I don't know.  But I got the sense that maybe while
13 this psychological counseling was underway and so
14 forth, that it would at least have to wait until that
15 process had been completed.
16     But I'm not sure about that.  This is just
17 speculating.
18 BY MS. McGOWAN:
19  Q.  And do you have any other basis for your
20 impression that it would have taken longer for the
21 security process in light of this information from
22 Ms. Schroer?

Page 89

1   A.  No.  No.
2   Q.  Did you and Ms. Schroer talk about how she
3  felt in the aftermath of this lunch with Ms. Schroer
4  as a personal matter?
5   A.  I think she was shocked and she was upset.
6  She was upset about the decision she had to weigh and
7  make.  It wasn't just her decision, because she did
8  consult with -- I know she consulted with the
9  director, with the counsels.  So she didn't just make
10 this decision on her own.
11  Q.  And did she say why she found it
12 upsetting?
13  A.  I think -- you know -- we were ready to
14 enthusiastically move forward.  I think she was -- I
15 think -- she was really in a quandary personally.  I
16 can't tell you any more.
17  Q.  And did she say why she felt like she was
18 in a quandary?
19  A.  Well, she obviously -- we had found a top
20 notch candidate.  We were enthusiastic about moving
21 forward; and this came out of left field, and she --
22 she was not pleased with the choices.

23 (Pages 86 to 89)

Francis T. Miko                                                              March 14, 2008
                              Washington, DC

Page 90

1    Q.  And did she say anything about why this
2    information about Ms. Schroer changed her view of
3    Ms. Schroer as the top candidate?
4        MS. RUSSELL:  Object to the form.  Lacks
5    foundation.
6    BY MS. McGOWAN:
7    Q.  Let me ask you this:  In the course of her
8    explaining what happened, did Ms. Schroer -- did
9    Ms. Preece tell you the point at which she decided
10   that Ms. Schroer was no longer a viable candidate for
11   this position?
12   A.  As I recall, she had --
13       MS. RUSSELL:  Same objection.  Go ahead
14   and answer.
15       THE WITNESS:  She had the meeting; and I
16   think she decided to sleep on it.  She didn't
17   immediately go to anyone.  I think she -- the next
18   day, after having thought about it, went and talked
19   to the people she thought she needed to talk to to
20   get -- you know -- to confirm what should or
21   shouldn't be done.
22       But she at that point decided that it was

Page 91

1    not the best choice.
2    BY MS. McGOWAN:
3    Q.  In your conversations with Ms. Preece, did
4    she ever say that -- you know -- she had wanted to go
5    forward with Ms. Schroer?  Notwithstanding this
6    revelation?
7    A.  No.
8    Q.  Did she express any sentiment along those
9    lines of wanting to figure out how to make it work,
10   so to speak, with Ms. Schroer?
11       MS. RUSSELL:  Objection to the form.
12       THE WITNESS:  My sense was she had
13   sympathy and that she -- you know -- was not pleased
14   to change her mind; but I don't remember anything
15   more than that.
16   BY MS. McGOWAN:
17   Q.  But was it your sense from Ms. Preece that
18   once she heard this information from Ms. Schroer, she
19   knew that she probably had to make a different
20   choice?
21   A.  Yes.  It was my sense, based on her --
22   again -- consultations with the other people.

Page 92

1    Q.  You are hearing all this after the fact?
2    A.  After the fact.  I should emphasize the
3    decision had been made.  I wasn't asked for my
4    opinion.
5    Q.  In your conversation with Ms. Preece, did
6    she indicate that she had ever tried to contact you
7    to try to get your input?
8    A.  I just can't remember, but I don't think
9    she was able to contact me.  I don't know if she
10   tried or not.  I think also maybe because of how
11   close the two candidates were and we felt comfortable
12   with either one and we could make a strong case for
13   either one, she felt -- you know -- that it wasn't as
14   essential to get my opinion on it because I had
15   already made clear that I would be very happy with
16   either of them.
17   Q.  What did you say to Ms. Preece as she was
18   telling you the story?
19   A.  Well, I was astounded.  It was astounding;
20   but it was a fait accompli.  I didn't even argue with
21   her or anything.
22   Q.  Recognizing that this was already water

Page 93

1    under the bridge, so to speak, did you have any views
2    about whether or not this information about
3    Ms. Schroer should have taken her out of the running
4    so to speak for the position?
5        MS. RUSSELL:  Objection to the form.
6        THE WITNESS:  You know, based on what was
7    told to me, I accepted that this was the right
8    decision.  I can't even -- since I didn't have to
9    make that decision, I don't want to hypothesize on
10   what I would have done, because I don't know.  I
11   wasn't put in the position.  I didn't have those
12   discussions with the senior managers.
13   BY MS. McGOWAN:
14   Q.  Let me ask you this:  What would you have
15   wanted to know about Ms. Schroer's situation in
16   assessing whether or not your recommendation would
17   have been to either go forward with Ms. Schroer or go
18   with Mr. Rollins?
19       MS. RUSSELL:  Objection.  Calls for
20   speculation.  Also as to the form.
21       THE WITNESS:  As the line supervisor, my
22   main interest was having someone to do the work that

24 (Pages 90 to 93)

Francis T. Miko  March 14, 2008
Washington, DC

Page 94

1  I needed to assign; and so my concern would have been
2  in regard to the extent to which that would have been
3  possible with that candidate.
4  BY MS. McGOWAN:
5    Q.  Anything else?
6    A.  No.
7    Q.  Did -- in your conversation with
8  Ms. Preece, was there any discussion about attempting
9  to ascertain whether or not this information from
10  Ms. Schroer about her gender transition had already
11  been vetted in any way as a security clearance
12  matter?
13    A.  No. My assumption was it hadn't been
14  before.
15    Q.  But to your knowledge, Ms. Preece never
16  talked about following up to find out whether or not
17  this was information that was already in the security
18  clearance system, so to speak?
19    A.  No.
20    Q.  To the extent you said your assumption was
21  that, you said it hadn't been vetted --
22    A.  Well, I don't know.

Page 95

1    Q.  In talking about how Ms. Preece reached
2  her decision to go forward with Mr. Rollins, did she
3  ever -- did she discuss any concerns about
4  Ms. Schroer's credibility with Members of Congress or
5  their staffs?
6    A.  That may have been a concern but I
7  remember the discussion mostly with regard to
8  credibility with the community that he had worked in.
9    Q.  With respect to these credibility concerns
10  either with Congress or with other contacts, tell me
11  what was discussed with regard to what the concern
12  was?
13    A.  I think the sense was that in the eyes of
14  those people, this was not the person that they knew
15  and had dealt with. It was unclear whether -- you
16  know -- in the new situation, whether she would have
17  the same access and ability to work with those
18  people.
19    Q.  Why was that concern there that she might
20  not have these contacts anymore?
21    A.  Well, I don't know that I can articulate
22  it.

Page 96

1    I mean I think for one thing -- I mean --
2  I think that even -- there was a sense that this
3  was -- there was a sense that he presented himself in
4  one way before the interview and everything and then
5  only afterward did we find out and -- that that was
6  not -- you know -- the way he presented himself --
7  the way he presented himself was not the way -- there
8  was an element of feeling that information should
9  have come forward during the interview.
10    Q.  Is that something that you discussed
11  specifically with Charlotte?
12    A.  I believe that was something that she did
13  express.
14    Q.  Did she say anything about when she
15  thought Ms. Schroer should have communicated this
16  information?
17    A.  I don't recall.
18    Q.  Why was it relevant for the committee to
19  know that information prior to when Ms. Schroer had
20  disclosed it?
21      MS. RUSSELL: Objection to the form.
22      THE WITNESS: I mean again I could state

Page 97

1  my own opinion, but I can't tell you what Charlotte's
2  thinking was exactly.
3  BY MS. McGOWAN:
4    Q.  So what's your view?
5    A.  I understand that I probably thought if
6  you came forward with this information before, that
7  maybe that would have tipped the decision against
8  him. I can see why he didn't come forward with it;
9  but --
10      But it was a very relevant piece of --
11  very relevant part of who he was.
12    Q.  And how was it relevant for purposes of
13  his application for -- for her purpose -- how was it
14  relevant for her purposes for her application for the
15  terrorism specialist position?
16    A.  What I can -- I mean, from my perspective,
17  the most important factors were the ability to do the
18  job from day one and also the ability to rely on the
19  same network of resources in the same way as he could
20  have before.
21    Q.  And how did Ms. Schroer revealing or --
22  how did the fact that Ms. Schroer revealed the fact

25 (Pages 94 to 97)

Francis T. Miko                                                                                                         March 14, 2008
                                                    Washington, DC

Page 98

1   she was transitioning from a man to a woman impact
2   those two concerns that you had about ability to do
3   the job starting from day one and ability to access
4   contacts?
5       A.   Not knowing exactly what was involved,
6   what the steps were that Ms. Schroer had to go
7   through and so forth, I can't really say. I know
8   that the people he gave as being his contacts knew
9   him as David Schroer rather than as Diane Schroer.
10          I don't know if that would have made a
11  difference or not.
12      Q.   Anything else?
13      A.   (No audible response.)
14          MR. CHOE: You have to say it audibly.
15          THE WITNESS: Sorry. No.
16  BY MS. McGOWAN:
17      Q.   In the context of talking about whether or
18  not the same contacts would be available to
19  Ms. Schroer, in the course of that conversation we
20  talked about the fact that she had known these
21  individuals as David but would now be Diane, why did
22  you think that the networks would not necessarily

Page 99

1   want to interact equally with Diane Schroer?
2           MS. RUSSELL: Objection to the form.
3           THE WITNESS: Well, you know, again I
4   never had to make that -- I wasn't there to decide
5   this, so I'm not sure. I can speculate.
6   BY MS. McGOWAN:
7       Q.   What's your sense?
8       A.   My guess is the sort of Special Forces
9   environment and everything, that a person might not
10  be as much seen as part of the fraternity, but that
11  doesn't -- that's just -- I didn't have to make that
12  decision.
13      Q.   Did Ms. Preece talk to you at all about
14  concerns regarding Ms. Preece not being -- I'm sorry.
15  Did Ms. Preece talk to you at all about her concerns
16  regarding Ms. Schroer being able to access her prior
17  network?
18      A.   Again, I think that was one of the issues
19  raised.
20      Q.   Anything else you recall regarding the
21  conversation of that piece?
22      A.   Huh-uh. No.

Page 100

1       Q.   Was there any conversation that you had
2   with Ms. Preece about concerns over how Members of
3   Congress or their staffers would interact with the
4   plaintiff as Diane Schroer?
5       A.   I don't remember that specifically. She
6   may have mentioned that.
7       Q.   Was there any discussion about how others
8   at CRS might interact with the plaintiff if she came
9   to work as Diane Schroer?
10      A.   She may have expressed concern about the
11  timing and so forth. But I can't remember
12  specifically if she did or how she did. But
13  certainly I would have wondered how the people in our
14  division would have approached the transition.
15          It would be the transition if the
16  transition had already occurred as opposed to sort of
17  being in process.
18          But that was not -- that was not a major
19  point of discussion.
20      Q.   And when you said the timing, is that --
21      A.   I meant timing by the fact that she was
22  undergoing the transition rather than having

Page 101

1   completed the transition.
2       Q.   Did Ms. Preece say anything to you about
3   Ms. Schroer had put the Library in an awkward
4   position?
5       A.   I don't remember specifically stating it
6   in those terms.
7       Q.   Was there any discussion at all, whether
8   in those terms or different language, conveying that
9   Ms. Preece felt as though she had been set up?
10      A.   I think she wondered about that.
11      Q.   Did she articulate anything about that in
12  her discussions with you?
13      A.   I'm trying to remember if there was
14  anything specific.
15          No. I just -- I can't remember think of
16  any.
17      Q.   In your conversation with Ms. Preece, you
18  mentioned that she said that she spoke to individuals
19  from the personnel security office?
20      A.   Yes.
21      Q.   Did she mention Cynthia Wilkins
22  specifically?

Francis T. Miko                                           March 14, 2008
Washington, DC

### Page 102

1  A. Yes.
2  Q. Did she say who else she had spoken to in
3  the course of making her decision?
4  A. Well, I'm sure she spoke to the director.
5  I'm sure she spoke to Kent Ronhovde, who is the
6  director's counsel.
7  Q. And did she mention anyone else she had
8  spoken to?
9  A. Not that I can remember.
10 Q. Did she say anything to you about talking
11 with Gary Pagliano about this information?
12 A. I don't remember her telling me that, but
13 I'm sure she probably would have because he was so
14 much -- I mean, he made a very forceful
15 recommendation. She may have gone back.
16 Q. Was there any -- either in the context of
17 this conversation with Ms. Preece or any other time,
18 did you learn if there were any other factors that
19 resulted in Charlotte Preece recommending John
20 Rollins as opposed to Diane Schroer for the position?
21 A. I don't remember any of those.
22 Q. Did you have any other discussions with

### Page 103

1  Charlotte Preece about the hiring decision for the
2  terrorism selection specialist position after the one
3  we've been discussing now?
4  A. No. Insofar as it was a done deal. I
5  mean, again my concern at that point was getting John
6  Rollins on as soon as possible.
7  Q. Am I right that you were going to be John
8  Rollins' direct supervisor?
9  A. Yes.
10 Q. When -- do you recall when John Rollins
11 began, roughly, relative to the hiring process, how
12 long it took before he started?
13 A. I think -- I can't remember exactly, but I
14 think it was like mid-January or so.
15 Q. And did Mr. Rollins have access to
16 classified information from day one?
17 A. He got it very quickly, if it wasn't day
18 one, because he had had -- he had had high level
19 security clearances and he was very quickly able to
20 get that recertified.
21 Q. With respect to getting Mr. Rollins'
22 clearance from wherever it needed to be to the

### Page 104

1  Library so that he could perform his duties, were you
2  involved at all in that process?
3  A. No. No.
4  Q. Did you ever have any conversations with
5  Mr. Rollins about getting his security clearance
6  matters in order so that he could perform his duties?
7  A. No. Because I think that's -- you know,
8  that's part of the process handled by the personnel
9  security office. So I would not have been involved
10 in that.
11 Q. Did you have any conversations upon your
12 return with anyone else about what had transpired in
13 your absence regarding the terrorist specialist
14 position?
15 A. At some point, I know that -- at some
16 point I know that I got a lot of questions about it,
17 curiosity about it.
18     I'm not sure how -- I can't remember how
19 soon after.
20 Q. So you got questions or you asked
21 questions?
22 A. No. I got questions.

### Page 105

1  Q. Who did you get questions from?
2  A. Well, at some point it became very public.
3  I'm not sure exactly when that was; but then at that
4  point, a lot of people knew about it and were asking.
5  Q. And what did you tell individuals when you
6  were asked?
7  A. Basically, at that point, it was all on
8  the public record. I didn't tell them anything they
9  hadn't read or heard; and -- you know -- got very
10 different reactions from different people.
11 Q. And tell me who you remember talking to?
12 A. I remember being asked -- first of all, I
13 think there was some discussion among managers of the
14 decision, so I think some of the managers were aware
15 of it and did speak to me about it.
16     I think colleagues and people in my
17 section, it was quite a bit later that they were
18 aware.
19 Q. And with respect to the other managers,
20 who -- which other managers?
21 A. It would have been other section heads,
22 part of the management team that we have our weekly

27 (Pages 102 to 105)

Francis T. Miko    March 14, 2008
Washington, DC

Page 130

1   guess that's how long she's been there. So both as
2   families, as -- we've been close.
3       Q.   Anything else?
4       A.   No.
5       Q.   How -- is she your supervisor?
6       A.   She was my immediate supervisor. Not
7   anymore.
8       Q.   The joy of being retired.
9            Have you -- I'm sorry if I asked this
10  before, but in connection with your position, were
11  you required to hold a security clearance?
12      A.   Yes.
13      Q.   And what level of clearance were you
14  required to maintain?
15      A.   Top secret.
16      Q.   Were you also required to have SCI access?
17      A.   No. I never had to have that.
18      Q.   And has any entity other than the Library
19  ever held a clearance for you?
20      A.   No.
21      Q.   In the course of your supervision, have
22  you ever been or had an applicant or employee who

Page 131

1   needed to transfer a clearance over from another
2   agency to the Library?
3       A.   Yes. But I wasn't involved in that
4   process.
5       Q.   And based on your knowledge of having
6   supervised individuals, what do you know about
7   transferring clearances from one agency to another?
8       A.   About the process of transferring? Really
9   very little. I think that it's between the personnel
10  security office and personnel security office. I
11  believe the Library would make a request to have it
12  transferred, and then it would happen.
13      Q.   Have you ever in your experience had an
14  issue with an employee have a delay getting a
15  security clearance transferred?
16      A.   No.
17      Q.   Has there ever been a case where there's
18  been any delay in getting a clearance transferred
19  from another entity to the Library?
20      A.   Not that I can remember specifically.
21      Q.   And how many instances are we talking
22  about where you've had individuals with issues

Page 132

1   regarding transferring a security clearance? So I
2   know the pool that we're talking about.
3       A.   I don't recall many issues. In fact, I'm
4   not sure I can recall a single other instance.
5       Q.   And putting aside individuals who had any
6   concern or problem, how many employees that you
7   supervise that you know about have had to transfer
8   clearances from another entity to the Library?
9       A.   I don't recall many having to transfer. I
10  mean, a lot of them had to get security clearances;
11  but I don't recall too many cases, at least in my
12  section, where it was a case of transferring
13  security.
14           I'm trying to remember, but I don't think
15  I can remember any.
16      Q.   In your role as supervisor -- hold on a
17  moment.
18           MS. McGOWAN: We're close to done. Maybe
19  we can take a break and then we can wrap up and get
20  you on your way.
21           THE WITNESS: Okay.
22           MS. McGOWAN: Let's go off the record.

Page 133

1       (Recess.)
2   BY MS. McGOWAN:
3       Q.   Do you recall when Ms. Cronin announced
4   that she would be vacating the position of terrorism
5   specialist?
6       A.   I don't exactly. Nor do I remember
7   exactly how much notice she gave us. She gave us a
8   few weeks.
9       Q.   Do you recall if it was while Congress was
10  in session or during a break?
11      A.   I cannot remember.
12      Q.   Other than the fact that this was an
13  unexpected vacancy, was there any reason why this
14  terrorism specialist position needed to be filled in
15  an urgent or prompt manner from your perspective?
16      A.   We only had two senior terrorism
17  specialists. She was incredibly productive and
18  incredibly busy; and Congress was relying on us very
19  heavily on terrorism issues at the time.
20           So I would say it was probably in that
21  period, it was the busiest area for us.
22      Q.   Did the subject matters covered by the

34 (Pages 130 to 133)