McGowan Declaration – Exhibit E

Steven R. Bowman                                              March 14, 2008
                            Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - -X

DIANE J. SCHROER,                        :

        Plaintiff,                       :

    v.                                   :  No. 05-CV-01090 (JR)

JAMES H. BILLINGTON,                     :

        Defendant.                       :

- - - - - - - - - - - - - - - - - - - - - - - - - -X

                                Washington, D.C.

                                Friday, March 14, 2008

    Deposition of STEVEN R. BOWMAN, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by DENNIS A. DINKEL, a Notary Public in and for the District of Columbia, taken at the offices of WilmerHale, LLP, 1825 Pennsylvania Avenue, N.W., Washington, D.C. at 2:00 p.m., Friday, March 14, 2008, and the proceedings being taken down by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and transcribed under his direction.

Steven R. Bowman                                                March 14, 2008
                       Washington, DC

**Page 38**

1    Q.  Turning next to the interviews, you were
2  involved in the interview of Ms. Schroer, right?
3    A.  Uh-huh.
4       MR. CHOE: Is that a yes?
5       THE WITNESS: Yes. Sorry.
6       BY MS. McGOWAN:
7    Q.  Tell me about Ms. Schroer's interview?
8    A.  What's to remember?
9       It focused obviously primarily on his --
10 on his military career; and work within the special
11 forces.
12      The -- in terms of qualifications for the
13 job, the primary one was work that he performed on
14 assignment at Fort Bragg with Special Operations
15 Command where he commanded a team that worked with --
16 on some elements of terrorism threat analysis. And
17 there was a written report as a result of that
18 effort.
19      It wasn't clear -- it wasn't clear in the
20 interview the extent to which Schroer had written the
21 report or the team had written the report or they'd
22 all written the report. But at any rate, from what I

**Page 39**

1  can recall -- and it's not that much -- he talked
2  about more military matters than terrorism matters
3  in, for instance, I do remember he was talking about
4  operations that he commanded in Haiti, which are not
5  really directly related to the terrorism issue. But
6  it is what special forces do. So the career there.
7       That's about all that I really remember
8  from the interview. He handled himself very well. I
9  keep saying he. I'm sorry. I've never met Diane. I
10 only dealt with David.
11      Very self-assured. And was -- he was
12 concerned that we not get in contact with his current
13 employer at the time because -- I don't remember --
14 quite understandably, it was coming up to the last
15 quarter of the year, and that's when the Christmas
16 bonuses are coming in. So the last thing you want to
17 do is tell your boss, by the way, I'm thinking of
18 going out the door. Which is understandable.
19      Most of the -- I'd say the majority of the
20 people that interview with us that are currently
21 holding a job, suggest until we really get down to
22 it, don't talk to my current boss.

**Page 40**

1       And that's about all I really remember off
2  the top of my head from the interview. In fact, I am
3  looking at this list now, at some of these names.
4  Some of them I remember, but not all of them.
5    Q.  As a result of the interview, were you
6  impressed by Ms. Schroer?
7    A.  Uh-huh. Yes. I think that my only real
8  reservation about -- was the fact that most of the
9  experience he had was what I call tip of the spear,
10 which is not what CRS does. We're the analysts. But
11 he had a lot of field experience.
12      His experience in the counterterrorism
13 field was the more recent of his career. It was
14 towards the end of his active military service, down
15 at the Special Operations Command. I think that's
16 what made him a decent candidate for the job, was
17 though he didn't have 20 years experience in
18 counterterrorism analysis necessarily, but he had
19 performed in that capacity recently, and was doing so
20 in his current position at a think tank or a private
21 consulting firm.
22    Q.  Anything else that impressed you about

**Page 41**

1  Ms. Schroer?
2    A.  That was about it. That's all I can
3  remember.
4    Q.  During the interview, was there any
5  discussion about whether Ms. Schroer currently or at
6  that time held a security clearance?
7    A.  I believe so. Yes. I believe that he did
8  hold a clearance at the time.
9    Q.  Was there any discussion about whether
10 there had been any interruption in the period of time
11 when she had held the security clearance from when
12 she retired from the military to her current
13 employment?
14    A.  I don't remember that. There might have
15 been, but I don't remember. It's not unusual. It
16 sounds rather curious in the sense that you can, in
17 fact -- a boss wants you to leave active duty on
18 Friday and get a position on Monday at the Library of
19 Congress, and you have to go through the whole
20 process. But I don't remember that being a issue
21 with regard to Colonel Schroer.
22    Q.  During the interview, was there any

                                        11 (Pages 38 to 41)

Page 66

the meeting.
Q. You mentioned that Cal Britvek was the best fit in your estimation?
A. Yes. I think we all agreed that was the case.
Q. Then as for the second and third?
A. We didn't really discuss -- there wasn't any discussion about that. I realized on this form, you see -- basically see this form for about 30 seconds. You see that it's -- that it's filled out properly and sign it, and then you're done.
So there wasn't -- I don't recall a discussion of ranking the other two. There may have been. Obviously, the numerical ranking comes out. There is a final number you get, a final score, but that -- you know, that's all I remember.
Q. Did Ms. Preece say anything in this meeting about her view as between Ms. Schroer and Mr. Rollins which was the stronger candidate?
A. Probably did, but I don't remember specifically. You're going through your workbook, going through this -- I shouldn't say the workbook.

Page 67

You're going through the interview rating summary, the last page, with the HR rep. And so as I said, if there's a variance, significant variance between the rankings, or ratings, there are discussions.
But I don't remember specific discussions, where we were apart and what was said in those discussions.
Q. At what point did you learn that Mr. Britvek was taking himself out of consideration for the position?
A. I'm not sure. It was obviously after these -- I think it was after -- I really don't know. I don't remember. I assume it is after this final interview rating form was completed. But that may not have been the case. I don't know. Probably they wouldn't have had us do this if they contacted HR.
But I don't know how that information was conveyed to the library. I don't know if Britvek called Charlotte or the HR people, or who he contacted in the library, how that was done. I just know Charlotte said he withdrew. When, I can't remember.

Page 68

Q. At the time the selection committee knew that Mr. Britvek was withdrawing, was there a discussion about who the next choice was?
A. I think -- we didn't have another meeting. But I recall a conversation between Charlotte and me, and her saying she was going to go with Schroer, going to call him and for us to -- that's when the assignment came to do the references.
And so that's when I found out about -- that was the individual.
Q. Before we move on, is there anything else?
A. No.
Q. Let me show you a document that was previously marked as Exhibit 25 produced by the government in discovery. It is Bates-stamped number 148. Do you recognize this document?
A. Yeah. This is an e-mail from Charlotte to me concerning the assignment for -- of contacting references. So we made the phone calls on these -- for these references, except for Britvek. We may have found out from Britvek when we called to do the references. I'm not sure.

Page 69

Q. And between the time of this meeting regarding the final interview rating form on November 19 and the time this e-mail was sent, December 7, what else, if anything, was your role in the hiring process?
A. None.
Q. Before moving on to the issue of the reference checks, do you know a CRS employee by the name of Gary Pagliano?
A. Yes.
Q. At any point during the hiring process, did you learn that Mr. Pagliano knew of Ms. Schroer?
A. I don't remember that.
Q. Was there -- at any point, did you learn that Mr. Pagliano and Ms. Schroer had been at the National War College together?
A. Hmm. That's funny. I don't remember Gary telling me that. That would seem to stick out. He might have. He might have. But I don't remember being told that point. I'm kind of surprised.
Q. At any point, did you learn that Mr. Pagliano had spoken with anybody on the selection

Steven R. Bowman                                               March 14, 2008
                         Washington, DC

Page 70

1  committee about Ms. Schroer?
2     A.  No. No. No. This is really the first
3  time I've heard Gary's name come up.
4     Q.  Have you ever had any conversation with
5  Gary Pagliano about the terrorism specialist
6  position?
7     A.  I may have. I don't remember one. We're
8  both section heads. Our offices are two feet apart.
9  So we may have. It's really funny. You'd think if
10 he had mentioned that to me, I would remember that
11 they were at the War College. If he did, he just
12 said they were at the War College together, but I
13 don't remember any comment from Gary about Schroer.
14    Q.  So at some point after receiving the
15 e-mail which we were just discussing, Exhibit 25, did
16 you, in fact, speak to a reference for Ms. Schroer?
17    A.  Yeah. I spoke to Vice Admiral Olson,
18 spoke to him briefly on the telephone, and he had
19 very good things to say about Colonel Schroer, and
20 nothing negative at all.
21    Q.  Anything else that you recall about that
22 conversation?

Page 71

1     A.  No.
2     Q.  Let me show you a document which we will
3  mark Exhibit 58.
4           (A document was marked for
5            identification as Exhibit
6            No. 58.)
7        MS. McGOWAN:  Again, this is a document
8  Bates-stamped number 117, and was produced by the
9  government in discovery.
10       BY MS. McGOWAN:
11    Q.  Do you recognize this document?
12    A.  Yes. This is the form we use to conduct a
13 reference check. These are, quote, sample questions.
14 They're actually the questions that you ask the
15 reference. And I've written down what the -- I see
16 that -- I thought I talked to a general and not an
17 admiral. Exhibit 25 says my assignment was to talk
18 to Vice Admiral Eric Olson. Actually, I talked to an
19 Army general, Major General David Burraddo, as I have
20 written here on Exhibit 58.
21    Q.  Can you run me through what you have
22 written here?

Page 72

1     A.  Sure. The question number 1 is, how do
2  you know the applicant, how long have you known him.
3  The answer was he knew him professionally since 1995.
4        And why did the applicant leave your
5  company or agency. He was transferred -- standard
6  Army transfer, change of station. Salary, he was at
7  the 06 level, which is full colonel. What was the
8  nature of his or her job. That's U.S. Special
9  Operations Command, he was director of the future
10 concepts directorate. How would you describe his or
11 her work performance. "Very dedicated, analytical,
12 unbiased."
13       Seven, how does or did he or she able
14 to -- that's awkward. Able to adapt to new or
15 changing work situations. "Very flexible,
16 adaptable."
17       Question eight, how would you describe his
18 or her compatibility with you as a supervisor, with
19 peers, with subordinate. "Excellent interpersonal
20 skills." What were his or her supervisory
21 responsibilities, 15 to 20 analysts. Comment on the
22 context of the workplace. In the context of the

Page 73

1  workplace on things like attendance, punctuality,
2  potential for advancement. Excellent was the
3  response from the general.
4        Oh, what were the applicant's strong
5  points. Analytical skills and interpersonal skills.
6  And what were his work related limitations. The
7  major general identified none. And would you rehire.
8  Yes.
9        Would you recommend him for the -- this
10 position. And the answer was yes. My highest
11 recommendation. That's a quote. And is there any
12 other work related information you can provide which
13 would help us form an accurate appraisal of this
14 applicant. Very dedicated, intelligent, and
15 professional.
16    Q.  Thank you.
17    A.  Uh-huh.
18    Q.  Anything other than what we've already
19 discussed, perhaps refreshed by your going through
20 this form, that you recall from your reference check
21 for Ms. Schroer?
22    A.  No. Not really. This is -- it was just a

                                      19 (Pages 70 to 73)

Steven R. Bowman                                    March 14, 2008
Washington, DC

### Page 74

1  very positive recommendation.
2     Q.  And did you write these notes at the time
3  you were conducting the reference check?
4     A.  This is a -- right after the phone call.
5  When I'm on the phone, I'm taking notes. And then in
6  order for me to be able to read it later, this is a
7  form that I transcribe it in. But this is done
8  within 10, 15 minutes, as soon as you hang up the
9  phone.
10    Q.  Was this form the only manner in which you
11 communicated what you had learned during the
12 reference check or did you have any other
13 communications?
14    A.  No. This is it.
15    Q.  Did you have any conversations with anyone
16 else on the selection committee about what you had
17 learned during your reference check of Ms. Schroer?
18    A.  Just in handing -- giving this to
19 Charlotte. I went in -- when I finished, I would
20 walk into the office and say here. Looks good. Or a
21 comment like that, just transmitting. But no
22 extended conversation.

### Page 75

1     Q.  And did you have any conversations with
2  anyone else on the selection committee about the
3  results of their reference checks of Ms. Schroer?
4     A.  I really don't remember any specific
5  conversation. There may have been one. In other
6  words, things went well, but nothing stands out in my
7  memory.
8     Q.  And do you -- did you do more than one
9  reference check for Ms. Schroer?
10    A.  No. Just did the one.
11    Q.  Did you have any conversation with anybody
12 else about how Ms. Schroer's reference checks for the
13 terrorist specialist position --
14    A.  I don't remember any other conversations,
15 no.
16    Q.  Did you speak to any references for
17 Mr. Rollins?
18    A.  I was assigned here -- I don't remember a
19 conversation. I may have. We did them all. I
20 imagine we did, but I don't remember a conversation.
21 Funny, I do remember talking to someone about
22 Schroer, but I don't remember talking to anyone about

### Page 76

1  Rollins which may just mean that it was a good
2  recommendation. You remember when they say, oh, my
3  God, don't hire that person. If it is a positive
4  recommendation, it doesn't stand out in my mind.
5     Q.  Let me show you a document that we will
6  mark No. 59.
7            (A document was marked for
8             identification as Exhibit
9             No. 59.)
10       MS. McGOWAN: This was a document produced
11 by the government in discovery and has been marked
12 PO 698 to reflect that it is governed by a protective
13 order in this case.
14       BY MS. McGOWAN:
15    Q.  Do you recognize this document?
16    A.  I haven't gotten it yet.
17    Q.  Sorry. I'm looking at my version of it.
18 Let me show you the document.
19    A.  Okay.
20    Q.  If you could look at it?
21    A.  Yes. I did do one for John Rollins. Yes.
22 This is the reference check form. The same form.

### Page 77

1     Q.  And is this the reference check that you
2  created?
3     A.  Yes. The one I completed.
4     Q.  And again, if you could walk me through
5  this reference check form?
6     A.  All right. Again, question 1, how do you
7  know the applicant, and how long have you known him.
8      Knew him at work. For two years, over two
9  years, two plus years.
10     What were the dates of his or her
11 employment. 2002 to the present. Why did he or she
12 leave. Still employed was -- John was still working
13 for this individual.
14     What was the nature of the job. He was --
15 John was chief of staff, information analysis
16 directorate. How would you describe his or her work
17 performance in comparison with other people.
18 Exceptional. Very professional. Quote.
19     How did he adapt to new or changing
20 working conditions. "Very flexible, volatile work
21 environment." 8, how would you describe his or her
22 compatibility with you as a supervisor, with peers or

20 (Pages 74 to 77)

Steven R. Bowman                                              March 14, 2008
                        Washington, DC

Page 82

1  lunch?
2    A.  Yes. I think she said she made a lunch
3  appointment.
4    Q.  And did she tell you what the lunch
5  appointment was about?
6    A.  Just to talk about the job. That we -- we
7  didn't have a discussion about the lunch appointment,
8  but she said she wanted to have lunch with him to
9  talk about the job.
10   Q.  And how did that topic come up between you
11 and Ms. Preece?
12   A.  I don't really remember how it came up.
13 Casually, I think. Once again, our offices are 10
14 feet away. So she told me at some point, but I don't
15 remember the context.
16   Q.  And did you know if Ms. Preece had already
17 informed Ms. Schroer about her decision regarding the
18 terrorism specialist position?
19   A.  I don't know what she said to him, no. I
20 knew she obviously had a phone call with him to make
21 the lunch appointment. But the context -- the
22 content of the phone call, I don't know.

Page 83

1    Q.  Did Ms. Preece say anything to you to
2  indicate that Ms. Schroer had accepted a position as
3  the terrorism specialist?
4    A.  No.
5    Q.  Anything else Ms. Preece said to you about
6  the fact she was going to be having lunch with
7  Ms. Schroer?
8    A.  No.
9    Q.  Did you learn at some point that
10 Ms. Schroer came to the CRS offices to meet
11 Ms. Preece after the lunch meeting?
12   A.  No. I didn't know they came to the
13 office. I knew they met for lunch, but I didn't see
14 him at the office.
15   Q.  So at any time after your interview with
16 Ms. Schroer, have you -- did you ever see Ms. Schroer
17 again?
18   A.  No.
19   Q.  Tell me then about the conversation that
20 you had with Ms. Preece after her lunch with
21 Ms. Schroer?
22   A.  After lunch? She came into my office, and

Page 84

1  sat down, and said that Colonel Schroer had told her
2  that he was in the process of transgendering, and
3  that he'd be presenting as a woman when he came to
4  CRS.
5      That there would be -- and in the process,
6  there would be surgeries involved. He was currently
7  under psychological counseling as part of the
8  transgendering process. And she -- the word she
9  used, she was stunned. She didn't -- she didn't know
10 what to do.
11     It didn't go much beyond that. She just
12 said it was -- she was stunned. And what occurred to
13 me at the time was the psychological counseling and
14 the clearance issue, because that's generally
15 something that will get in the way of a clearance if
16 you're undergoing psychological counseling.
17     Even though it is an integral part of this
18 process, at least that's what he told Charlotte. So
19 at that point, I suggested to Charlotte that she
20 needed to contact the -- Cynthia Wilkins, the
21 personnel security officer at the library, to see if
22 this presented any problems with regard to getting a

Page 85

1  clearance, because it would be Wilkins' office that
2  would be getting a clearance.
3      And if she was going to do that, she would
4  have to touch base with Kent Ronhovde in the
5  director's office. If you are going down to
6  personnel, you have to go through Kent. Then she
7  left my office. Evidently did contact Cynthia
8  Wilkins and the front office -- the director's
9  office.
10     When I say front office, I mean the
11 director's office. Sometimes I'll say the second
12 floor. It is all the same thing.
13   Q.  Did you have any indication of how much
14 time had elapsed between Ms. Preece's coming back
15 from lunch and when you and she met?
16   A.  Oh, I think it was immediately.
17 Immediately after lunch. She walked right in the
18 door and into my office. Our offices are about 10
19 feet away from one another. Yes. It was immediately
20 after lunch.
21   Q.  Had she called you to let you know she was
22 coming over or --

22 (Pages 82 to 85)

Steven R. Bowman                                                        March 14, 2008
                              Washington, DC

Page 86

1    A.  No. She just walked in the door.
2    Q.  How did she look at that moment? What was
3  her demeanor?
4        MS. RUSSELL: Objection to the form.
5        THE WITNESS: Pardon?
6        MS. RUSSELL: I just asserted an
7  objection. You can go ahead and answer.
8        THE WITNESS: All right. That -- the
9  fact -- the difference is she didn't sit down.
10 Generally, when she -- people when they come into the
11 office, there are two or three chairs in my office.
12 She didn't just stand in the doorway. She said
13 that -- she did close the door.
14       So at that point, we were dealing -- the
15 only time you close the door is when you have a
16 personnel issue. That's a sign, okay, we have a
17 problem. When the door is closed.
18       She was stunned. She kept using that
19 word. I think that's probably -- that's
20 self-descriptive. It was a situation that she had
21 not encountered before, and didn't know what the
22 impact of it would be.

Page 87

1        And "what she should do." And then that's
2  when I said that she was going to have to talk to the
3  security folks and the front office, and see what
4  they had to say, because they're the ones -- she's
5  called the selecting official. But, in fact, what
6  she is doing is making a recommendation to the
7  director. And officially, it is the director that
8  makes the determination to forward the applicant's
9  name to the human resources folks.
10       So then she just left my office, and I
11 don't think I saw her the rest of the afternoon. I
12 don't know if she -- I think she contacted the front
13 office and -- tried to that afternoon, but I don't
14 know if she did or not, was successful or not.
15       BY MS. McGOWAN:
16   Q.  When she came into your office, did she
17 indicate she had spoken to anyone else prior to
18 speaking with you?
19   A.  No. Didn't indicate that.
20   Q.  And did you bring up the issue about the
21 fact that what Ms. Schroer had revealed might present
22 a security clearance concern or did Ms. Preece bring

Page 88

1  it up?
2    A.  I did.
3    Q.  And what led you to bring that up?
4    A.  Well, it's part of the application for a
5  security clearance, you'll see there's a question
6  there on the application that says, have you
7  undergone psychological counseling or are you
8  currently in psychological or psychiatric counseling.
9        And that is an issue for the adjudicating
10 officer. It does not automatically mean you can't
11 get a clearance. It is up to the adjudicating
12 officer, whatever.
13       But at any rate, I thought that could
14 possibly be a problem. I am familiar with situations
15 where people have -- with clearances who have
16 undergone, taken on psychological counseling, lost
17 their clearance instantaneously, denied access to the
18 office, take the keys away.
19       That's what made me concerned that we had
20 to at least check with the personnel security people
21 to see what -- because that's a final chop. After
22 you brought somebody on and they're on board, if the

Page 89

1  clearance is not granted, then they're out the door,
2  and you're back to square one.
3        So in a sense, the final decision on
4  hiring is actually the personnel security people, if
5  you have a job for which a security clearance is a
6  requirement.
7        So that -- it just seemed to me that that
8  was a yellow flag that you really had to touch with
9  Wilkins. And to do that, you had to go through the
10 front office.
11   Q.  And what -- with respect to your prior
12 experience with individuals who have lost their
13 clearance as a result of having to disclose they were
14 undergoing psychological counseling, tell me what you
15 can, without naming names, what you know about the
16 circumstances of those cases.
17       First of all, was there more than one
18 case?
19   A.  The one I'm personally familiar with.
20 Only one.
21   Q.  Okay.
22   A.  That -- it was an individual that went

23 (Pages 86 to 89)

Steven R. Bowman                                                March 14, 2008
                              Washington, DC

Page 90

1  into counseling for depression, and when that -- when
2  he acknowledged that, it was when I was in military
3  intelligence, he was the deputy operations officer,
4  civilian, but -- and -- at any rate, when he
5  acknowledged that fact, it was I think in the middle
6  of the day, and they literally -- turned in his keys
7  and he was denied access to the office and left. Do
8  not remove anything. It happened instantaneously.
9  Which you can do administratively.
10         And I don't know how that was resolved.
11 As far as I know, he never came -- he never -- the
12 remaining years I was in that position, he never came
13 back. I don't know what -- you know, how that
14 situation was resolved.
15         But at any rate, that -- and the fact that
16 it's -- for your initial clearance, you know, that
17 question is asked, it is on the questionnaire, then
18 you have to provide specifics about it, if you
19 answered yes.
20         And then for your update, which is
21 generally conducted -- for a TS -- about every five
22 years, it is again something that is addressed and

Page 91

1  you have to explain if, in fact, you have been since
2  the last investigation was undergone.
3         It is something to the security folks. It
4  is a position that has been criticized, because if
5  somebody is having problems, you're actually
6  discouraging them from going and seeking independent
7  help, because if it becomes known, then you may lose
8  the clearance and the job.
9     Q.  Roughly, what -- when did this experience
10 happen with this individual? The year?
11    A.  Oh, no. Quite a while ago. Quite a while
12 back when I was in the Army. This was in 1970.
13    Q.  Other than the concern about the
14 psychological counseling component, was there
15 anything else that led you to raise the security
16 clearance concern with respect to the information?
17    A.  No. That's the only one.
18    Q.  And with respect to what Ms. Preece said
19 regarding what information Ms. Schroer had shared
20 with her, did she use the word transgendering or a
21 phrase to that effect?
22    A.  Yes. I think -- yeah. I think so. I

Page 92

1  don't specifically -- I shouldn't say. I can't
2  remember if she actually used that word. But I do
3  know she did use the phrase would be coming to work
4  as a woman.
5     Q.  Did she talk about transgender migration?
6     A.  I don't remember that. She may have. But
7  I don't remember.
8     Q.  So what else did Ms. Preece tell you about
9  what Ms. Schroer told her would be involved in her
10 transitioning from male to female.
11    A.  That's it. Just there would be some
12 surgery. And that it was going to be over a period
13 of months. But this conversation with Charlotte was
14 probably about three or four minutes. It didn't last
15 very long.
16         And she mentioned that Ms. Schroer had
17 brought photographs of himself as a woman to show
18 Charlotte, but that's it.
19    Q.  And what did she tell you with respect to
20 the photographs?
21    A.  Didn't really say anything about them
22 except they were there.

Page 93

1     Q.  What were the photographs of?
2     A.  Of Schroer presenting as a woman. You
3  know, that's just what she said. Schroer as a woman.
4     Q.  Did she describe what Ms. Schroer was
5  wearing?
6     A.  No. Huh-uh. I don't even know if -- she
7  didn't even say whether they were just facial shots
8  or full shots. Just that there were photographs.
9     Q.  Did you ask at all for more information
10 about what was in the photographs?
11    A.  No.
12    Q.  Why not?
13         MS. RUSSELL: Objection. Calls for
14 speculation.
15         THE WITNESS: Didn't occur to me.
16         BY MS. McGOWAN:
17    Q.  Did you and Ms. Preece discuss at all how
18 Ms. Schroer looked dressed in women's clothing?
19    A.  I didn't. I don't know if Charlotte said
20 something or not. I really don't remember.
21    Q.  Do you recall any discussion about
22 concerns over whether or not Ms. Schroer actually

                                        24 (Pages 90 to 93)

Steven R. Bowman  
Washington, DC

March 14, 2008

**Page 94**

1  looked like a woman when dressed in women's clothing?
2      A.   Charlotte may have said something like
3  that, now that you are bringing it up. There is a
4  vague recollection that she made some comment, but I
5  couldn't be specific on what she said, except it was
6  not particularly positive. That's -- I come up with
7  a sense of that. But I really don't remember beyond
8  that.
9      Q.   Did Ms. Preece talk to you at all about
10 what concerns she had as a result of learning this
11 information from Ms. Schroer?
12     A.   Just what's it going to do to the process.
13 She didn't know what effect this would have. That's
14 why I said, you've got to go to the second floor.
15     Q.   Did she say anything else about her
16 concerns about an impact on the process as a result
17 of this information?
18     A.   No. I don't think so. I don't remember
19 any -- no. I don't remember.
20     Q.   In the course of the discussion, was --
21 did anything Ms. Preece -- was there anything that
22 Ms. Preece said that conveyed that it was almost a

**Page 95**

1  given that it was going to present some kind of
2  problem to the process?
3          MS. RUSSELL: Objection to the form of the
4  question.
5          THE WITNESS: That it might. I mean, that
6  was -- it was the unknown quality of the situation.
7  I should say unprecedented, that -- but there was
8  nothing particularly foreordained. In other words,
9  that this wasn't -- didn't make a decision -- it --
10 she didn't know what effect. I can't go much beyond
11 that. What this would mean. And was going to have
12 to find out.
13         BY MS. McGOWAN:
14     Q.   When you raised the issue that there might
15 be a security clearance implication to this
16 information?
17     A.   Uh-huh.
18     Q.   What did Ms. Preece say, if anything, in
19 response to that?
20     A.   She agreed that she should talk to
21 Wilkins. That was it. As I said, this whole
22 conversation was probably about two or three minutes.

**Page 96**

1  So it is not much beyond that. You've got to talk
2  to -- she really was looking for guidance at this
3  point. That was clear.
4      Q.   In your discussion, was there any
5  conversation about things that either Ms. Preece or
6  anyone else might be able to do to minimize any
7  problems that might be caused by this information?
8      A.   No.
9      Q.   Was there any discussion of your reaction
10 to what Ms. Preece was telling you? What was your
11 reaction?
12     A.   It was one of surprise. I mean, that
13 given that the last time I had seen this individual,
14 it was very much a special forces colonel, strongly
15 emphasizing his military career and his operational
16 career in the field. And then sort of trying to
17 instantaneously reconcile that with what Charlotte
18 was telling me. None of what he had told Charlotte
19 at lunch had come up in the interview. There had
20 been no discussion of that, even at the end.
21         And for me, it was just -- it's a
22 situation, you just kind of shake your head, because

**Page 97**

1  this is totally unprecedented, that it would be -- it
2  is happening, and you don't know what -- as I said,
3  we didn't know what the effect was going to be on the
4  process. On the hiring. And -- yeah. Brand-new
5  situation.
6      Q.   Was there any discussion that you had with
7  Ms. Preece about this feeling of one day meeting
8  someone who is a special forces officer, and the next
9  day learning that they intend to live as a woman?
10     A.   No. Not outside of the one -- the one
11 brief conversation. It is just -- it strikes -- no,
12 aside from that. But we didn't discuss my reaction
13 at all, aside from the clearance issue. And I didn't
14 discuss -- we didn't talk after that. Once -- once
15 it becomes a personnel issue, conversations just
16 essentially cease, regardless of what the situation
17 is. When it is a personnel issue, casual
18 conversations are not held even among friends.
19         I spent 20 years as an official in the
20 union and was vice president for grievance and
21 dispute resolution for quite a while. And in that
22 situation, you just realize that the minute -- so

25 (Pages 94 to 97)

Steven R. Bowman　　　　　　　　　　　　　　　　　　　　March 14, 2008
　　　　　　　　　　　　Washington, DC

Page 98

1  after we had that one conversation, that was pretty
2  much the end of it, in terms of any discussion
3  between us about the case.
4　　Q.  In the course of your conversation with
5  Ms. Preece, was there any discussion at all about how
6  others at CRS might react to the news that this
7  applicant who had applied as David Schroer was
8  reporting for work as Diane Schroer?
9　　A.  I don't remember any discussion like that,
10 no.
11　　Q.  Was there any discussion at all about how
12 Members of Congress or their staff might react if
13 they were interacting with someone who had been born
14 a man, but was now living as a woman?
15　　A.  I don't remember anything like that. But
16 the thing is that they wouldn't -- how would they
17 know? It's only -- if they're meeting the individual
18 for the first time, which they probably would be,
19 then there's -- doesn't seem to be an issue.
20　　So I suppose if he was going to come to
21 work as a woman, so there wouldn't be the -- the
22 transgender migration would not be occurring while he

Page 99

1  was at CRS. In other words, one month being a man,
2  and presenting as a woman the next month to the same
3  client. But that was not going to be the case.
4  So you know, that's not a point to discuss.
5　　Q.  Was there any concern that Members of
6  Congress, or their staff, might suspect that
7  Ms. Schroer was transgender?
8　　A.  Not on my part. We didn't have a
9  discussion about that. Not on my part.
10　　Q.  Was there any concern about the fact that
11 some of Ms. Schroer's contacts in the government, in
12 the military, would have known her as David Schroer?
13　　A.  I hadn't thought about that. Hmm.
14　　Right. But that is not something we
15 discussed. But that would be -- yeah, I can see --
16 but no, that's not something that, at the time, I
17 thought about.
18　　Q.  And did Ms. Preece make any mention of
19 concern about how Ms. Schroer's transition would
20 impact on her contacts in the government, in the
21 military?
22　　A.  I don't remember her doing it. I don't

Page 100

1  remember a comment by her on that.
2　　Q.  At any point, did Ms. Preece mention to
3  you that she felt like she needed or actually had had
4  a cigarette after her lunch with Ms. Schroer?
5　　A.  Oh, probably. She smokes. So do I.
6  Yeah. That sounds -- yeah, that sounds like
7  something she'd say.
8　　Q.  Do you recall her mentioning that
9  specifically in your conversation?
10　　A.  She always has a cigarette after lunch.
11 That's nothing special. The minute she walks out of
12 the restaurant. We both do.
13　　Q.  Did she say anything else or did she say
14 anything to -- that suggested to you that she was
15 upset by the lunch meeting?
16　　A.  Yes. She was tense. She was -- it was a
17 very unprecedented experience for her. So I think
18 that that kind of showed. Yes. She was -- because
19 she didn't know what, if anything, to do. At least
20 in the immediate aftermath of the lunch.
21　　Q.  At any point in your discussion, did the
22 possibility of a lawsuit come up, by Ms. Schroer?

Page 101

1　　A.  Might have. In terms of -- when you get
2  into a personnel issue like this that -- this is my
3  old union mentality, I don't think we discussed it.
4  Basically, that it's -- certainly didn't discuss a
5  lawsuit, but personnel issues often go that route.
6　　Q.  At any point, did Ms. Preece say anything
7  about feeling as though Ms. Schroer had put either
8  her or the library in an awkward position?
9　　A.  No. I don't remember her saying that.
10　　Q.  Did you have the impression that
11 Ms. Preece felt as though Ms. Schroer had put the
12 library in an awkward position?
13　　A.  The library.
14　　Q.  Or had put her in an awkward position?
15　　A.  I think she felt awkward.
16　　MS. RUSSELL: Objection. Calls for
17 speculation.
18　　THE WITNESS: I think she felt awkward.
19 But I don't remember her saying that. But, yeah, she
20 was, as I said, tense after the lunch.
21　　BY MS. McGOWAN:
22　　Q.  Did she say anything about feeling

26 (Pages 98 to 101)

Steven R. Bowman  March 14, 2008
Washington, DC

Page 102

1 conflicted over what to do?
2   A.  Well, I think she was, when she kept
3 saying stunned. She didn't know what to do. Right.
4   Q.  Did she describe sort of what she felt the
5 conflict was?
6   A.  Huh-uh. No. It was just stunned.
7   Q.  At any point, did Charlotte Preece say
8 anything about feeling set up?
9   A.  The closest to that is, why didn't this
10 come up in the interview, because of that last
11 question in the interview which is, is there anything
12 else you think that we need to know, we should know
13 about. And so I think she felt there was an
14 opportunity at the interview to discuss this, and it
15 wasn't. But beyond that...
16   Q.  Did Ms. Preece -- did you discuss at all
17 why Ms. Preece felt as though it should have been
18 brought up by Ms. Schroer in the interview?
19   A.  No.
20   Q.  Did Ms. Preece say anything about why
21 Ms. Schroer's transition from male to female would be
22 relevant for purposes of the selection process?

Page 103

1   A.  No.
2   Q.  Did either of you, in the course of this
3 conversation, express any opinion about whether or
4 not this information about Ms. Schroer should impact
5 her chance of getting the job?
6   A.  No.
7   Q.  Was there any discussion about whether or
8 not it would impact her chance of getting the job?
9   A.  That it could.
10   Q.  Was there any discussion about either you
11 or she feeling disappointed that information had come
12 up about Ms. Schroer that might impact negatively her
13 ability to get the job?
14   A.  No. I don't remember anything like that.
15   Q.  In the conversation, did either of you
16 express concerns about Ms. Schroer's honesty?
17   A.  No, aside from what I said earlier that,
18 you know, why didn't this come up in the interview,
19 when there was an opportunity to do so, to bring it
20 up. But that's the only comment.
21   Q.  Was there any discussion, other than what
22 we've talked about, any other concerns that were

Page 104

1 triggered by Ms. Schroer's revelation of her
2 intention to transition from male to female?
3   A.  No. Not that I'm aware.
4   Q.  Was there any discussion about additional
5 information that would be needed in order to assess
6 what the impact of Ms. Schroer's gender transition
7 would be?
8   A.  Not with me.
9   Q.  Was there any discussion you had with
10 Ms. Preece about getting information from the health
11 services office?
12   A.  No.
13   Q.  Other than what we've discussed, was there
14 any discussion about Ms. Schroer's psychological
15 health or well-being?
16   A.  No. Not other than what we've discussed,
17 no. No.
18   Q.  Was there any discussion about Ms. Schroer
19 being distracted as a result of her gender
20 transition?
21   A.  Distracted? No.
22   Q.  Was there any mention of contacting either

Page 105

1 Ms. Schroer or health care providers to find out more
2 information about her gender transition?
3   A.  Not with me. No discussion with me about
4 that.
5   Q.  Was there any discussion about finding out
6 whether or not Ms. Schroer had reported this
7 information to the security clearance agency that
8 held her clearance at that time?
9   A.  No. I don't -- I don't believe so. I
10 kind of wondered about that privately to myself. But
11 that -- but you know, we didn't talk about that,
12 because that's kind of out of our realm.
13   Q.  Was there any discussion with Ms. Preece
14 about whether or not Ms. Schroer's references knew
15 this information about Ms. Schroer at that time?
16   A.  No. No discussion that I remember. No.
17   Q.  Was there any discussion about whether
18 Ms. Schroer would pose a security risk as a result of
19 her gender transition?
20   A.  No.
21   Q.  And recognizing that we've spent more time
22 talking about the conversation than it may have

27 (Pages 102 to 105)

Steven R. Bowman                                              March 14, 2008
                         Washington, DC

Page 106

1  actually taken --
2  A.  Yes.
3  Q.  Did Ms. Preece tell you what she was going
4  to do next at the end of your conversation?
5  A.  Contact the front office.  Go to the front
6  office.
7  Q.  Okay.
8  A.  That was my understanding.
9  Q.  Anything else?
10  A.  No.
11  Q.  Okay.  What do you know about what
12  Ms. Preece, in fact, did after leaving your office?
13  A.  That at some point -- I don't know if
14  there was a meeting in the director's office.  I
15  don't know who may have attended.  There may have
16  been more than one meeting.  But it was the next day
17  that Charlotte dropped by and -- my office and just
18  said that the decision had been taken to go with
19  Rollins.
20  Q.  Did she say why?
21  A.  No.  Really.  No.  That -- how the
22  decision was reached, or -- it was a very passive

Page 107

1  voice, intransitive expression that something along
2  the lines of we're going with Rollins, and that was
3  it.
4       And that came after the meeting or
5  meetings with -- in the director's office.  I just
6  assumed that -- she did say that Cynthia Wilkins was
7  in the loop on this and Kent.  But aside from those
8  two, I don't know who else attended the meeting.  It
9  may well have been the director, the deputy director;
10  but I don't know.
11  Q.  And how do you know what it is that
12  Ms. Preece did?  Is it from a conversation you had
13  with her?
14  A.  Yes.
15  Q.  Is there any other source that you have
16  for --
17  A.  No.
18  Q.  -- knowing what happened?
19  A.  No.  No.
20  Q.  Did you ask her any questions in response
21  to her telling you that --
22  A.  No.

Page 108

1  Q.  -- that Rollins was going to be the
2  choice?
3  A.  Yeah.  No, no, I didn't.
4  Q.  Did you have any conversation with her
5  about what Ms. Schroer was going to be told?
6  A.  No.
7  Q.  Did you have any conversation with
8  Ms. Preece about the fact that Ms. Schroer was going
9  to need to be told anything?
10  A.  Don't know how that was going to be
11  handled.  No.  I don't remember any conversation like
12  that.  Partially because I wouldn't be involved.  I
13  wouldn't even know necessarily who would do something
14  like that, whether it would be Charlotte or someone
15  in the director's office or someone in HR.
16       Because the recommendation had not gone
17  forward yet.  I think the personnel action request.
18  So in a sense -- so the position had not been
19  officially offered.
20  Q.  Did you have any communication with
21  Ms. Preece about her feelings over the ultimate
22  decision to go forward with someone else?

Page 109

1  A.  No.
2  Q.  Other than Ms. Schroer?
3  A.  No.  Didn't.
4  Q.  Did you have any conversation with her
5  about how Ms. Schroer would be informed?
6  A.  No.
7  Q.  At any point, did you learn about how
8  Ms. Schroer was informed that she was not going to be
9  recommended for the position?
10  A.  Yes.  I think Charlotte told me that she
11  had called.  She told me at some point.
12  Q.  Was this a conversation you had with her
13  after the call from Ms. Preece to Ms. Schroer had
14  taken place?
15  A.  Uh-huh.  Yeah.
16  Q.  What did she tell you about that call?
17  A.  Just that it occurred.  That she called
18  him and said he was not going to be recommended.
19  Q.  Did she discuss with you how -- what words
20  she used to discuss this with Ms. Schroer?
21  A.  No.  Huh-uh.
22  Q.  Did she discuss with you at all how she