McGowan Declaration – Exhibit G

Kenneth E. Lopez                                              March 17, 2008
                        Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

----------------------------------X

DIANE J. SCHROER,                 :

       Plaintiff,              :

       v.                      :   No. 05-CV-01090 (JR)

JAMES H. BILLINGTON,              :

       Defendant.              :

----------------------------------X

                    Washington, D.C.

                    Monday, March 17, 2008

       Deposition of KENNETH E. LOPEZ, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by DENNIS A. DINKEL, a Notary Public in and for the District of Columbia, taken at the offices of WilmerHale, LLP, 1825 Pennsylvania Avenue, N.W., Washington, D.C. at 9:36 a.m., Monday, March 17, 2008, and the proceedings being taken down by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and transcribed under his direction.

Page 38

1  serve in that position.
2      Q.  Are you familiar with Library of Congress
3  regulation 2024-6?
4      A.  Not the number per se. I don't know the
5  titles with all the numbers. Perhaps the title.
6      Q.  Are you familiar with the LCR regulations
7  in the 2024 series?
8      A.  Yes.
9      Q.  What are those?
10     A.  They're related to personnel security, and
11 the employment suitability program and the personnel
12 security program as it relates to national security
13 clearances.
14     Q.  Do these regulations govern how security
15 clearance regulations are to be governed throughout
16 the library?
17     A.  Yes, they do.
18     Q.  I want to ask you a few questions
19 specifically about the regulations. Let me show
20 you -- would it be helpful to you if I showed you a
21 copy of the regulations?
22     A.  Yes.

Page 39

1      Q.  Let me show you a document marked Exhibit
2  4 in a prior deposition.
3          This was a document produced by the
4  government in discovery and the entire set is
5  Bates-stamped number 397 through 413. I'm sorry. I
6  believe it starts with an earlier number. 381. Is
7  that right? I think it starts at 381.
8          I would like to point your attention to
9  the Bates-stamped page 399?
10     A.  Okay.
11     Q.  Within LCR 2024-6?
12     A.  Uh-huh.
13     Q.  Section 3 here talks about considerations
14 that need to be taken into account when making an
15 assessment of an individual's eligibility for a
16 security clearance, am I right?
17     A.  Yes.
18     Q.  And then section 3-E at the bottom says
19 that each of the foregoing factors, referring to the
20 factors that were listed above, shall be evaluated in
21 the context of the whole person, and that's a quote.
22         In the context of security decisions made

Page 40

1  at the library, what does section 3-E here mean?
2      A.  It means to me that when you make a
3  determination as to whether a person is eligible for
4  a national security clearance, you look at the
5  composite of all the factors related to making a
6  determination and not just to single out one
7  criteria, that you evaluate all the criteria.
8      Q.  So is it fair to say -- well, let me ask
9  you this. Is this section 3-E, have you ever heard
10 this concept referred to as the whole person concept?
11     A.  Yes. Yes.
12     Q.  Okay. Is it fair to say the whole person
13 concept calls for an individualized assessment of all
14 the specific circumstances of a particular
15 individual's case?
16     A.  Yes.
17     Q.  With respect to this whole person concept,
18 do you agree that the whole person concept imposes a
19 duty on a security officer to consider not only
20 information that may be deemed potentially
21 disqualifying about an applicant, but also any
22 information about the positive and productive conduct

Page 41

1  and achievements of an applicant's entire life?
2      A.  I would say it requires one to look at
3  everything, but -- in looking at the whole person, if
4  there's -- looking at the criteria, if there's one
5  criteria that a person or the applicant may not meet,
6  then certainly you need to evaluate that, even if all
7  the other factors indicate that the person was okay.
8  Met all the criteria.
9      Q.  Are there any circumstances in which it is
10 appropriate to make an adverse determination of an
11 individual's security eligibility without
12 ascertaining whether there are any mitigating
13 circumstances in that individual's case?
14     A.  I think you -- what I look for is always
15 to look at mitigating circumstances, on any issue
16 that's brought before us, and we evaluate that as
17 well. And I think that's what the adjudicators look
18 at, too. Whenever there's an issue, they factor in,
19 are there conditions or concerns that mitigated
20 against that particular situation or condition or act
21 that the particular person may have performed.
22     Q.  What constitute mitigating circumstances?

11 (Pages 38 to 41)

Page 42

1    A.  Maybe in a situation where a person had
2  alcohol abuse and were arrested for -- one time --
3  for driving under the influence. And a mitigating
4  circumstance might be that they just lost their job
5  or family member and this is a one-time thing. They
6  went on a binge and they had drinks and shouldn't
7  have been driving. That would be mitigating because
8  that would show there's not a pattern of misconduct
9  as relating to alcohol consumption. It was driven by
10 something that caused the person to do it. They lost
11 their job, a family member, marital situation.
12      That might be mitigating on why that
13 person acted as they did.
14   Q.  In a situation where a person presented
15 concerns about mental health issues, what would
16 constitute mitigating circumstances in a situation
17 where that was a concern?
18   A.  Well, I certainly am not an expert in
19 mental health. I would look towards the medical
20 profession, the medical officer. And the medical
21 officer may, in turn, go to someone who is an expert
22 in mental health. I am in no position to make that

Page 43

1  judgment.
2    Q.  Would the fact that the individual had
3  sought appropriate health care to address that issue
4  be something that would constitute a mitigating
5  circumstance?
6    A.  Again, I would rely on what the medical
7  evaluation of that from an expert would provide to
8  the adjudicative process. I would rely heavily on
9  that, their judgment, because again, I don't have the
10 experience to go back and look at all similar cases.
11   Q.  And are there individuals within the
12 library itself that have expertise in the realm of
13 medical or health issues?
14   A.  We have a medical officer, a doctor, a
15 physician, who is the head of the health services
16 organization. Her specialty is general practice.
17 And I believe -- well, I know she does seek outside
18 -- expert consultancy if there are any particular
19 medical issue, whether it be mental or physical that
20 are beyond her capability as a general practitioner.
21   Q.  And have you ever had any circumstances
22 during your time at the library where you have needed

Page 44

1  to seek guidance from the health services entity at
2  the library?
3    A.  In relationship --
4    Q.  In relationship to a personnel security
5  matter?
6    A.  No.
7    Q.  Turning to the next page, looking at
8  section 4-A, the second sentence there, where it
9  says, "in cases involving potentially disqualifying
10 issues, the personnel security officer shall make a
11 recommendation regarding the individual's security
12 clearance eligibility to the director of OSEP who
13 shall make the final determination."
14      My question is, what constitutes a case
15 involving potentially disqualifying issues or --
16   A.  I mentioned one earlier, if there was a
17 foreign relationship with a foreign individual, a
18 close relationship that may raise a concern about a
19 person's loyalty to the United States.
20   Q.  Does the term "case" as used here include
21 both matters involving applicants for employment and
22 current employees at the library?

Page 45

1    A.  Yes.
2    Q.  Are you familiar with executive order
3  12968?
4    A.  The number, I'm not. Maybe the title, I
5  am, because some of these personnel security -- some
6  of the executive orders do change over time.
7    Q.  I will show you a document that was
8  previously marked Exhibit 3 from a prior deposition
9  which was produced by the government in discovery,
10 Bates-stamped pages 367 through 380.
11      Take a minute to look through it and
12 familiarize yourself with it.
13   A.  Sure.
14      (Pause.)
15      THE WITNESS: Okay.
16      BY MS. McGOWAN:
17   Q.  Are you familiar with this executive
18 order?
19   A.  Yes, I am.
20   Q.  Okay. Recognizing -- well, let me ask you
21 first --
22   A.  And its predecessors.

Page 66

1    THE WITNESS: There's too many factors.
2 It's too broad. There is no single case that you can
3 say, this is how it would be handled. You have to
4 look at the individual case.
5    BY MS. McGOWAN:
6    Q. Okay. Would one factor be the length of
7 time that the individual had held security clearances
8 until that point?
9    MS. DOUDS: Same objection, but you can
10 answer, if you understand.
11    THE WITNESS: Not necessarily.
12    BY MS. McGOWAN:
13    Q. Recognizing that it's not a dispositive
14 factor, is it a factor that one would look at in
15 making that assessment?
16    MS. DOUDS: Same objection, but you can
17 answer, if you understand.
18    THE WITNESS: I recently -- repeat the
19 question again.
20    BY MS. McGOWAN:
21    Q. Sure. In looking at -- we were talking
22 about the range of factors that someone would take

Page 67

1 into account in determining whether or not to grant
2 reciprocity for the clearance held by an individual
3 at another agency, where that individual revealed
4 they were undertaking a gender transition.
5    I was wondering whether or not the prior
6 history of holding a clearance by that individual was
7 one of the factors in the mix that would be part of
8 the assessment of the -- that individual's case?
9    MS. DOUDS: Same objection, but you can
10 answer, if you understand.
11    THE WITNESS: It's too specific a
12 question. You have to look at everything.
13    BY MS. McGOWAN:
14    Q. Okay. Are there any types of information
15 that require denial of reciprocity as a categorical
16 matter, irrespective of the facts of an individual's
17 case?
18    A. Repeat the question.
19    Q. Sure. Are there any types of information
20 that require denial of reciprocity as a categorical
21 matter, irrespective of -- basically vitiating any
22 need to engage in an individualized assessment of

Page 68

1 that particular case?
2    A. I'm still not clear on the question, what
3 you're asking.
4    Q. Asked a different way, are there any cases
5 in which the decision to deny reciprocal recognition
6 for an individual's clearance can be made without
7 assessing the specific facts of that individual's
8 case?
9    A. I think you have to assess the facts.
10    MS. McGOWAN: Can we go off the record?
11    (Recess.)
12    BY MS. McGOWAN:
13    Q. We've been talking about the
14 considerations involved in determining whether or not
15 to grant reciprocal recognition of a clearance held
16 by another agency.
17    A. Uh-huh. Sure.
18    Q. In your experience, both at the library
19 and prior to that, what is the range of time that it
20 has taken to assess new information in the context of
21 determining whether or not to grant reciprocal
22 recognition for a clearance, from the quickest to the

Page 69

1 most extended?
2    A. My experience has been that a week or less
3 in most cases.
4    Q. And other than anything that we've already
5 discussed, have there been any other cases that
6 you're aware of in which an individual has not had
7 their clearance granted reciprocally?
8    A. Not while I've been at the library.
9    Q. Okay. In your time moving from various
10 government agencies, have you ever had to go through
11 the process of having a clearance respected from one
12 agency to the next?
13    A. Yes.
14    Q. And in your experience, how long has that
15 process taken to basically get your clearance from
16 one agency to be respected by another?
17    A. There were so few and so far away, I
18 really couldn't give you an accurate answer -- I
19 mean, a specific answer. I don't recall the few that
20 I had taking very much time at all.
21    Q. Am I right that at the request of a
22 selecting official, the personnel security office can

## Page 70

1  grant a temporary waiver of the background security
2  investigation requirement for a new library employee
3  in a position involving a security clearance?
4      A.  Yes.
5      Q.  What is the role of the personnel security
6  office with determining whether to grant a request
7  for such a waiver?
8      A.  The personnel security office in the
9  case -- waivers are normally granted -- requested
10 when there is no previous background investigation,
11 there's no -- or there's no clearance, current or
12 past clearance.
13         Then the personnel security office would
14 evaluate a request from the selecting office for a
15 waiver of the pre-appointment background
16 investigation.
17     Q.  So am I right that a waiver would not be
18 necessary for an employee who was coming to the
19 library already holding a clearance at their prior
20 employer?
21     A.  No. Well, a waiver wouldn't be required
22 in that circumstance. If the clearance was valid and

## Page 71

1  current and there were no issues, it could be handled
2  as a reciprocal transfer. Then there is no waiver
3  involved.
4      Q.  In a situation where there was some reason
5  why the clearance would not be granted reciprocal
6  treatment, in that case, would there be a need for
7  waiver of a pre-appointment background investigation
8  in order to bring an employee on in a position
9  involving a security clearance?
10     A.  Back up and start again.
11     Q.  Sure. We were talking about the fact that
12 for employees that have a security clearance at a
13 prior agency, if the personnel security office
14 decides to grant reciprocity for that clearance, no
15 waiver is needed?
16     A.  Correct.
17     Q.  You just have a new clearance at the
18 library?
19     A.  Correct.
20     Q.  In a case where there was not going to be
21 reciprocity of the clearance, would in that case a
22 waiver of a pre-appointment background investigation

## Page 72

1  be something that might be necessary to bring on an
2  individual in a position involving a security
3  clearance?
4      A.  No. Because if the reciprocity wasn't
5  going to apply, there's a reason why you wouldn't
6  grant a waiver waiving that. There's a concern about
7  accepting that reciprocal clearance. Waivers
8  wouldn't play a part. If you're requesting
9  reciprocal -- reciprocity, then that's an action in
10 itself.
11     Q.  And what role do you play, personally, if
12 any, with respect to decisions about whether to grant
13 a waiver of the pre-appointment background security
14 investigation for a new library employee?
15     A.  Whenever a waiver is requested for a
16 clearance, the personnel security office checks with
17 me. If the waiver can be granted, there are no
18 issues, she usually tells me on the phone that
19 they've done this check, they've done that check,
20 there are no issues, no concerns. Then she will
21 grant the waiver.
22     Q.  The she in this case is Ms. Wilkins?

## Page 73

1      A.  Ms. Wilkins, correct.
2          However, if there are issues that she
3  feels that she can't or won't grant the waiver alone,
4  unilaterally, she'll come to me with the case, with
5  the recommendation. The recommendation is either to
6  deny the waiver or approve the waiver.
7      Q.  And have there been any such cases where
8  Ms. Wilkins has come to you regarding questions about
9  whether or not to grant a waiver?
10     A.  Yes.
11     Q.  Tell me about those cases.
12     A.  I can't recall the specifics, but I do
13 know that there were one or two in my tenure where
14 there were -- her recommendation was that these
15 issues needed to be checked out; and I agreed with
16 her. Let's check them out.
17        In the end, I don't recall what the
18 determination was, whether the person was granted the
19 clearance -- the waiver or they withdrew from
20 consideration. I don't recall. But there were
21 probably, I can recall, maybe two.
22     Q.  And do you recall what the issues were?

Page 74

1   A. No, I don't recall.
2   Q. And would the process for determining
3   whether or not to grant a waiver differ in any way
4   from the kinds of assessments that would go into the
5   determination about whether or not to grant
6   reciprocity for a clearance?
7   A. No. They would generally be the same
8   concerns, same judgments, same issues, same
9   considerations, whether it be a waiver or accepting a
10  clearance on a reciprocal basis.
11  Q. And as we talked about in the context of
12  reciprocity, am I right to say that the process
13  required -- or would require an individualized
14  assessment of all the relevant facts to a particular
15  case, right?
16  A. Yes. That's correct.
17  Q. And with respect to concerns about
18  granting a waiver, other than sort of the process
19  that we talked about regarding reciprocity, would
20  there be any significant difference in the context of
21  a waiver with respect to assessing information that
22  was of a mental health nature?

Page 75

1   A. Repeat the question.
2   Q. Sure. We were talking about the fact that
3   with respect to a waiver, the process was generally a
4   similar one with respect to making individualized
5   determination along the lines of what would happen in
6   the context of a reciprocity determination.
7       And I just wanted to make sure that in the
8   context of an employee that had a mental health
9   concern, would the process require individualized
10  determination in the context of a waiver assessment
11  along the lines that we discussed in terms of
12  reciprocity?
13  A. They would be similar, yes.
14  Q. Okay. Are there any ways in which the
15  waiver assessment is different either as a process or
16  substance matter from the reciprocity determination?
17  A. With the reciprocity, you have more
18  information to work with, because there's a
19  background investigation that's been completed.
20  Where with a waiver, there may not be any background
21  investigation. You're really starting from scratch,
22  so there wound be a difference.

Page 76

1   Q. And as a practical matter, how does that
2   play out from a timing perspective? Can a
3   reciprocity decision be made quicker generally than a
4   waiver decision because of that additional
5   information or --
6   A. No. Not necessarily. Depends on what the
7   issues are. Whether it be a reciprocity matter or a
8   waiver with no prior background information, the
9   issues can be such that they're going to take some
10  time to evaluate, and they're going to vary depending
11  upon the issues.
12      So it is no quicker or doesn't take any
13  longer either way. Just depends on the issues
14  involved.
15  Q. In your experience, are there some issues
16  that as a general matter take longer to evaluate than
17  others, or is it always case by case and impossible
18  to generalize how long something will take?
19  A. I would say when there is a situation
20  where a person has lived overseas for an extended
21  period of time, and there needs to be checks done
22  with people who are still overseas, whether they be

Page 77

1   foreign nationals, or U.S. government employees,
2   because you have to go through different -- that
3   sometimes takes longer to get the information because
4   it is overseas.
5       I think everything else is pretty
6   consistent. Again, it varies -- depends upon the
7   depth of the issues, the records available, if you
8   need to talk to people, whether their availability is
9   immediate, they're out of town; whether from
10  contacting people, you develop further information,
11  leads that you need to check out.
12      Again, it depends case-by-case. It is a
13  different one, depending upon how much information,
14  how far you have to go to confirm or get what you
15  need.
16  Q. And is that investigation something that
17  the personnel security office does itself?
18  A. Sometimes the personnel security will
19  check on something, particularly like if it is a
20  court record or interviewing someone. But many times
21  they will go back to OPM and ask them, officially,
22  ask -- we say, OPM, would you go out and check on

Kenneth E. Lopez                                                    March 17, 2008
                         Washington, DC

Page 78

1  these particular matters; and they will.
2      They'll supplement the background
3  investigation or not even supplement, they'll go out
4  and look and investigate the specific issues that you
5  ask them to investigate.
6      Q.   In your experience in the context of any
7  mental health concerns, for example, the one we
8  talked about when you were at the Justice Department,
9  would that inquiry be -- was that inquiry sent to OPM
10 or was that something that was handled in-house?
11     A.   Sometimes I would say it would go to OPM
12 because it required a lot of interviews of third
13 parties. Sometimes it could be handled by the
14 personnel security staff, particularly if the people
15 they needed to talk to are within the agency.
16     Q.   And would it matter whether or not the
17 individuals with whom they needed to speak were maybe
18 not in the agency, but local, or did that not --
19     A.   If they're local, that should speed things
20 along, yes.
21     Q.   And have you ever been involved in a
22 situation where a waiver was requested for an

Page 79

1  individual who had disclosed they were undertaking a
2  gender transition?
3      A.   No.
4      Q.   In the case of an individual undergoing a
5  gender transition, would that disclosure require
6  automatic rejection of a request for a waiver? Or
7  would that need to be assessed on an individual case?
8      A.   The latter. It would have to be assessed
9  on an individual case.
10     Q.   With respect to our conversation about
11 assessments in the context of reciprocity and also
12 with respect to waivers, is there anything else
13 regarding the process that either applies to both of
14 them or one versus the other specifically that we
15 haven't addressed, so that I understand the process?
16     A.   I can't think of any.
17     Q.   In how many cases have you been involved
18 in either a direct or peripheral way in hiring
19 decisions at the library for positions involving
20 security clearances? How many cases have been
21 brought to your attention?
22     A.   I would say that maybe four to six a year.

Page 80

1  More like four, where they come to me, because there
2  are issues, that a decision official needs to look at
3  the recommendation.
4      Q.   And what in general categories have those
5  issues been? I think we talked about, for example,
6  an individual having foreign contacts as being a
7  circumstance brought to your attention. What other
8  examples?
9      A.   Financial stability. Major.
10     Q.   To your knowledge, how often is the
11 personnel security office at the library asked to
12 provide guidance regarding hiring decisions at the
13 library for positions involving security clearances?
14     A.   I think Cindy Wilkins is in a better
15 position to answer that. I know selecting offices
16 will, if they're considering someone, particularly
17 for a national security clearance, they may ask for
18 some preliminary information.
19     What they are, I don't know. Like if a
20 person has a security clearance, or if a person
21 doesn't have a clearance, what would need to be done.
22 There are standard questions or standard answers.

Page 81

1      Q.   And what kind of guidance other than what
2  we were just talking about are they -- are the
3  individuals in the personnel security office
4  generally asked to provide?
5      A.   Well, without knowing exactly the
6  questions, I just hear from Cindy, how long is it
7  going to take. That's a standard question. Can they
8  bring this person on on the waiver of a background
9  investigation. Those are the two principal questions
10 that I'm familiar with.
11     Q.   Does the personnel security office -- or
12 has the personnel security office had any experience
13 dealing with security clearance issues involving
14 transgender applicants or employees, putting aside
15 this case?
16     A.   Not that I'm aware of.
17     Q.   Are you aware of any other personnel
18 security offices in any other federal agencies that
19 have dealt with security clearance issues involving
20 transgender employees?
21     A.   No, I'm not.
22     Q.   Do you know of any transgender federal

21 (Pages 78 to 81)

Page 82

1  employees who hold security clearances?
2      A.  No, I'm not.
3      Q.  Do you know of any transgender employees
4  at the Library of Congress?
5      A.  I know of, but I don't know them
6  personally.
7      Q.  Roughly how many?
8      A.  Well, let me qualify that. Back to the
9  definition of transgender. I don't know. There are
10 people who dress in the opposite sex that I'm aware
11 of. That's all I know.
12     Q.  How many individuals are you talking
13 about?
14     A.  Only one that I'm aware of. I don't know
15 personally, but I was told.
16     Q.  And has any -- have any security clearance
17 issues regarding that employee been brought to your
18 attention?
19     A.  Oh, no.
20     Q.  Have any other issues regarding that
21 employee ever come to your attention?
22     A.  No. None. None at all.

Page 83

1      Q.  Do you know where in the Library of
2  Congress that individual works?
3      A.  At the time I knew, that was maybe eight
4  years ago, worked in library services. I don't know
5  if the employee is still employed or not.
6      Q.  At some point, did you learn that the
7  personnel security office at the library had been
8  asked to participate in discussions regarding a
9  applicant for the terrorism specialist position at
10 CRS?
11     A.  I'm not aware of that.
12     Q.  At any point did Cindy Wilkins discuss
13 with you any conversations she had regarding an
14 applicant for employment at the library who had
15 revealed that they were undergoing a gender
16 transition?
17     A.  Well, she did mention to me one situation
18 where the selecting official withdrew the tentative
19 offer of employment.
20     Q.  And tell me about what you learned from
21 Ms. Wilkins in that conversation?
22     A.  Well, she told me that it was for a

Page 84

1  terrorism position. And that the selecting official
2  withdrew the offer. And that was all. Said that it
3  didn't come officially to our office for any guidance
4  or work, that she didn't really say any more than
5  that to me.
6      Q.  Did Ms. Wilkins tell you that the
7  selecting official had sought any guidance or input
8  from her?
9      A.  She did say that the selecting official
10 sought some guidance from her.
11     Q.  And what did she tell you about that?
12     A.  That Ms. Wilkins told her that it would --
13 she couldn't -- she said it would take some time.
14 She couldn't give the selecting official an estimate
15 of how long it would take to evaluate. That was all
16 she told me.
17     Q.  Did she tell you anything else regarding
18 the guidance she gave to the selecting official?
19     A.  No. Other than there may be some time
20 involved. That's all she really talked to me about,
21 that she told the selecting official, and the
22 selecting official asked would this take any time;

Page 85

1  and Cynthia told me that she said it could.
2      Q.  Did you have any conversation with
3  Ms. Wilkins about how much time it would take to
4  evaluate this information?
5      A.  No, I didn't.
6      Q.  Did Ms. Wilkins tell you what information
7  about this applicant the selecting official had
8  shared with her in the course of seeking guidance?
9      A.  The only thing that Ms. Wilkins told me
10 was that the selecting official was concerned that
11 this was a critical position and needed to be filled
12 quickly. And that's why she -- the selecting
13 official expressed to Ms. Wilkins that they had to
14 move quickly to fill the position. With the
15 uncertainty of how long it might take, they might go
16 in another direction. That's what she related to me.
17     Q.  Did Ms. Wilkins share with you her
18 knowledge of how the selecting official had come to
19 learn that the applicant was going to be
20 transitioning genders?
21     A.  In a very brief statement, that they had
22 lunch. And that was it. They had a meeting. They

Kenneth E. Lopez                                         March 17, 2008
                        Washington, DC

Page 86

1  didn't even say lunch. They just said they had a
2  meeting. And the applicant revealed to the selecting
3  official some information that I guess I'm not -- not
4  I guess. I think the selecting official then came to
5  Cindy and asked what does this mean about a
6  clearance.
7      And that's when we go back to where Cindy
8  said, well, until we have information, we don't know
9  how long it would take.
10     Q.  Did Ms. Wilkins discuss with you what she
11 told Ms. Preece as to what sort of information she
12 would need in order to be able to make an assessment?
13     MS. DOUDS: Objection. Lacks foundation.
14 You can answer if you understand it.
15     THE WITNESS: Repeat the question.
16     BY MS. McGOWAN:
17     Q.  Sure. Did Ms. Wilkins discuss with you
18 whether or not she told the selecting official what
19 kind of information she would need about the
20 applicant in order to make an assessment about the
21 significance the information?
22     A.  No, she didn't.

Page 87

1      Q.  Did Ms. Wilkins talk to you at all about
2  participating in any meeting regarding this
3  applicant?
4      A.  No, she didn't.
5      Q.  Did Ms. Wilkins discuss with you the
6  context in which she had been asked for guidance from
7  the selecting official?
8      A.  Other than how long it might take. That's
9  the only thing she discussed with me.
10     Q.  Did you have any conversations with
11 Ms. Wilkins about what information one would need in
12 order to assess the significance of an applicant's
13 gender transition from a security clearance
14 perspective?
15     A.  The only thing Ms. Wilkins said to me, it
16 may require a medical assessment.
17     Q.  What kind of medical assessment?
18     A.  She didn't elaborate more than that. She
19 said -- no. She didn't say any more than that.
20     Q.  When -- if you know -- did your
21 conversation with Ms. Wilkins happen relative to when
22 she had her conversation with the selecting official?

Page 88

1      A.  I think it was shortly thereafter.
2      Q.  But is it your understanding that the
3  decision had already been made regarding that
4  applicant and that position at the time that you were
5  discussing the matter with Ms. Wilkins?
6      A.  That's my understanding. A decision had
7  been made.
8      Q.  Did Ms. Wilkins indicate to you that she
9  ever told the selecting official that she would need
10 to start from scratch with respect to evaluating the
11 information about this applicant?
12     A.  I don't recall Ms. Wilkins relating that
13 to me.
14     Q.  Did Ms. Wilkins communicate to you that
15 she had asked Ms. Preece for any additional
16 information about the applicant?
17     A.  She did not.
18     Q.  Did Ms. Wilkins at any time communicate to
19 you that she had conferred with anyone from the
20 library's health services office about this issue?
21     A.  She did not.
22     Q.  Did Ms. Wilkins communicate to you that

Page 89

1  she told the selecting official that an applicant
2  undergoing a gender transition would be unable to
3  satisfy the security clearance requirements for the
4  position?
5      A.  She didn't indicate -- didn't relate that
6  to me.
7      Q.  Was there any discussion that you had with
8  Ms. Wilkins about her advice to Ms. Preece
9  regarding -- her advice to the selecting official
10 regarding how long it would take to evaluate the
11 information?
12     A.  No. She didn't.
13     Q.  What is your understanding of the
14 information Ms. Wilkins had available to her when
15 asked to provide guidance to the selecting official
16 regarding the individual at issue?
17     A.  I'm not aware of those specifics. I have
18 no information.
19     Q.  Did she at any time -- did Ms. Wilkins at
20 any time communicate to you what the selecting
21 official told her as far as the applicant?
22     A.  No, she didn't. She did not.

                                      23 (Pages 86 to 89)

Page 90

1  Q. In her conversations -- conversation with
2  you, did Ms. Wilkins speculate with you about what
3  would be involved in evaluating such information
4  about an applicant?
5  A. No, she did not.
6  Q. Did she discuss with you at all how long
7  it would take to evaluate this information about the
8  applicant?
9  A. No, she did not.
10 Q. Did she say anything to you to indicate
11 that there would be no circumstance in which an
12 individual undergoing a gender transition could
13 satisfy the security clearance eligibility
14 requirements?
15 A. No.
16 Q. Have you had any other conversation with
17 Ms. Wilkins about the terrorism specialist position
18 or any applicant undergoing -- revealing that they
19 had undergone a gender transition?
20 A. No. Nothing specific like that. The only
21 thing she mentioned was that she was going to go to a
22 hearing. That was months ago. That was it.

Page 91

1  Q. Before I move on, just so I'm clear, what
2  do you understand to be the guidance that Ms. Wilkins
3  provided regarding the significance, from a security
4  clearance perspective, of the disclosure by the
5  applicant for the terrorism specialist position about
6  her intention to transition from male to female?
7  A. I don't recall her saying anything to me
8  about that.
9  Q. From any other sources other than direct
10 conversation with Ms. Wilkins, do you have an
11 understanding of what advice the personnel security
12 office gave the selecting official about this
13 particular applicant?
14 A. No, I don't.
15 Q. Have you had any conversations with
16 anybody else at the Library of Congress regarding the
17 security clearance aspects of the disclosure by the
18 applicant for the terrorism specialist about
19 undergoing the gender transition?
20 A. No.
21 Q. Have you had any conversation with anyone
22 else at the library about the hiring process for the

Page 92

1  terrorism specialist position at all?
2  A. No. Not at all.
3  Q. Have you ever had any conversations with
4  anyone at the library over how, in a more general,
5  non-case specific way the personnel security office
6  would handle an issue regarding an applicant for
7  employment undergoing a gender transition?
8  A. No.
9  Q. Has the personnel security office at the
10 library ever been presented with any case of an
11 applicant or employee dealing with a gender identity
12 issue?
13 A. Not that I'm aware of.
14 Q. Do you know Charlotte Preece?
15 A. Yes. I know her.
16 Q. Who is she?
17 A. She is one of the division chiefs in the
18 Congressional Research Service that deals in the
19 functions of national security matters.
20 Q. Have you had any conversations with
21 Ms. Preece about Diane Schroer?
22 A. None whatsoever.

Page 93

1  Q. Have you had any conversations with
2  Ms. Preece regarding the hiring process for the
3  terrorism specialist position?
4  A. No, I haven't.
5  Q. Have you had any conversations with
6  Ms. Preece regarding any communications she's had
7  with Ms. Wilkins in connection with applicants
8  revealing information about gender transition?
9  A. None. No, I haven't.
10 Q. Did Ms. Wilkins in her conversation with
11 you indicate that Ms. Preece had been shown -- well,
12 let me step back.
13    Am I -- do you know who the selecting
14 official was for the terrorism specialist position
15 where this issue came up?
16 A. Yes.
17 Q. Who was that?
18 A. I'm told Charlotte Preece by Cindy. She
19 told me that.
20 Q. Did Ms. Preece -- I'm sorry, did
21 Ms. Wilkins in any conversation with you indicate
22 that Ms. Preece shared with her that Ms. Schroer had

Page 94

1   shown her -- meaning Ms. Preece -- photos of
2   Ms. Schroer in feminine attire?
3       A.  No.
4       Q.  Have you ever had any conversation with
5   Ms. Wilkins about how others at the library would
6   react to a co-worker who they knew or perceived to be
7   a woman who had formerly been a man?
8       A.  No.
9       Q.  Have you had any conversations about that
10  topic with anyone else at the library?
11      A.  No, I have not.
12      Q.  Have you ever had any conversations with
13  Ms. Wilkins about how Congress or Members of their
14  staff would react to working with an analyst from CRS
15  who they knew or perceived to be a woman who had
16  formerly been a man?
17      A.  No, I have not.
18      Q.  Have you ever had any conversation about
19  that subject with anybody else at the library?
20      A.  No, I have not.
21      Q.  Have you ever had any discussion with
22  Ms. Preece about the reason or reasons why

Page 95

1   Ms. Schroer was not selected for the terrorism
2   specialist position?
3       A.  No.
4       Q.  Have you ever had any conversations with
5   Ms. Wilkins that topic?
6       A.  Repeat the question again.
7       Q.  Sure.  Have you ever had any conversations
8   with Ms. Wilkins regarding the reason or reasons why
9   Ms. Schroer was not selected for the terrorism
10  specialist position?
11      A.  No.
12      Q.  Did you have any conversations with anyone
13  else at the library about that topic?
14      A.  No.
15      Q.  Have you ever had any discussion with
16  Ms. Preece regarding why she -- I'm sorry.  Let me
17  back up.
18          Do you know a library employee by the name
19  of John Rollins?
20      A.  I've heard of the name, but I don't know
21  the person.
22      Q.  And do you know what position at the

Page 96

1   library Mr. Rollins holds?
2       A.  No, I don't.
3       Q.  Did you ever have any discussion with
4   Ms. Preece over why she made the recommendation that
5   she did ultimately make regarding the terrorism
6   specialist position?
7       A.  No.  I did not have a conversation with
8   her.
9       Q.  Have you ever had a conversation with
10  Ms. Wilkins about why the selecting official made the
11  recommendation that she did regarding the terrorism
12  specialist position?
13      A.  The only point that I think Ms. Wilkins
14  mentioned to me that it was her impression that the
15  selecting official was concerned about the time it
16  would take to evaluate the information.  That was
17  what she told me.
18      Q.  Are you aware, either from Ms. Wilkins or
19  any other source, of other cases in which a selecting
20  official has decided not to recommend a candidate for
21  a position based on concerns about the timing of the
22  security clearance evaluation process?

Page 97

1       A.  No.
2       Q.  Have you had any conversation with
3   Ms. Preece about what her understanding of the advice
4   that she received from Ms. Wilkins was?
5       A.  No, I have not.
6       Q.  Have you had any conversation with anybody
7   at the library regarding the significance of
8   transsexuality as a security clearance matter?
9       A.  I have not.
10      Q.  Have you had any conversation with anyone
11  else outside of the library regarding the
12  significance of transsexuality as a security
13  clearance matter?
14      A.  No, I have not.
15      Q.  Have you had any conversation with anybody
16  at the library relating to transsexuality or gender
17  identity issues at all?
18      A.  No, I have not.
19      Q.  Have you had any conversations with anyone
20  outside of the library on those topics?
21      A.  No.
22      Q.  Do you know Bessie Alkisswani?

25 (Pages 94 to 97)