# McGowan Declaration – Exhibit I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                              :
DIANE J. SCHROER,             :
                              :
        Plaintiff,            :
                              :
    v.                        :   CIVIL ACTION NUMBER:
                              :   05-1090 (JR)
JAMES BILLINGTON,             :
Librarian of Congress,        :
                              :
        Defendant.            :
                              :
- - - - - - - - - - - - - - - x

Washington, D.C.

Friday, April 4, 2008

Deposition of

PETER R. NELSON

a witness of lawful age, taken on behalf of the Defendant in the above-entitled action, before Cindy Lee Fryer, CVR, Notary Public in and for the District of Columbia, in the United States Attorney's Office for the District of Columbia, 501 Third Street, N.W., Fourth Floor, Washington, D.C. 20530, commencing at 9:56 a.m.

Diversified Reporting Services, Inc.

(202) 467-9200

### Page 62

1   a clearance was granted on it. It's only if you are aware.
2   You know, and you're not supposed to proactively go out and
3   data mine the world to try to become aware, unless a complete
4   new investigation is warranted based on passage of time.
5      Q   What about a recent diagnosis of a disorder in the
6   DSM; would that constitute new information?
7      A   That would be, yeah.
8      Q   Would the agency be able to consider that, the
9   gaining agency?
10     A   If they were aware of it, yeah.
11     Q   Now, Mr. Nelson, I'm looking at paragraph 20 in
12  your report, on page seven --
13     A   Uh-huh. Okay.
14     Q   -- how did you come to the conclusion that Ms.
15  Schroer's voluntary admission of her transgender status
16  wasn't given favorable weight?
17     A   I guess the fact that they -- as I recall that they
18  were going to then -- the recommendation on the personnel
19  security person was to launch what would inevitably have been
20  a very time consuming and not to mention costly investigation
21  that would have -- so, if I recall, they had to hire this
22  person within a certain period of time, and then, launching
23  this investigation would have taken far too long, ergo she
24  wasn't to be selected.
25     Q   So your basis for the statement is that Schroer

### Page 63

1   wasn't selected for the position?
2      A   Yeah.
3      Q   Did you read any document to inform you of your
4   conclusion?
5      A   Well, given the fact that someone else is, I guess,
6   in that job now and she's not, that says to me she wasn't
7   selected for the position, and that -- you know, also that
8   the various depositions, as I recall, talked about the
9   recommendation that to go to launch an investigation for
10  something that was not an adjudicative issue, then, ergo, it
11  was -- would have taken too long. So they proceeded to look
12  towards the next best qualified candidate, to my
13  recollection.
14     Q   Mr. Nelson, I believe earlier we were talking about
15  the adjudicative standards.
16     A   Uh-huh.
17     Q   What are those?
18     A   They are a set of common standards that were
19  developed in the mid '90s as a result -- well, they're
20  required by the Executive Order 12968, which document was
21  also directed to be accomplished by the 1994 intel
22  authorization act, following the Ames espionage case.
23     Q   What was it about the Ames case that compelled the
24  government to write these adjudicative standards?
25     A   Well, it was kind of -- you know, as usually

### Page 64

1   happens when there's a crisis like that, everybody runs
2   around and tries to figure out how we can make things better.
3      Q   Uh-huh.
4      A   So among many other things that are in the
5   executive order and the statute was to create a new set of
6   adjudication guidelines that not only addressed some of the
7   issues that were developed as a result of the Ames case, but
8   have a common set of adjudication guidelines, such that if
9   you were cleared with the Department of Defense, you know,
10  your same clearance would work in Justice and Commerce, such
11  that we didn't spent millions and millions of dollars
12  reinvestigating people throughout the government.
13     Q   Were you at all involved in the drafting of --
14     A   I was. I was. I led the group that developed
15  them.
16     Q   And what was the group that developed them?
17     A   It was a personnel security working group under
18  the -- at the time the security policy board, that was kind
19  of like the interagency body that, you know, worked on a
20  variety of different security related issues, including
21  these.
22     Q   And were you involved in any guidelines in
23  particular or all of the guidelines?
24     A   All of them. All of them, yeah. I shared the
25  group that developed them, which relied a lot on the research

### Page 65

1   of a group in the Department of Defense that reported to me,
2   the Defense Personnel Security Research Center in California,
3   which had done a lot of work earlier in the decade on
4   guidelines. And we took that work, that was being done for
5   DoD, and we put it into the interagency process. And then
6   through discussion, coordination, we ended up with a final
7   set of guidelines that was then approved by the president and
8   promulgated in, when was that, '95, somewhere in there.
9   They've since been updated in December of '05. I wasn't
10  directly involved in the update, but the original ones I
11  were -- was.
12     Q   And were there any changes made in the update of
13  December 2005?
14     A   There was. I don't believe there were any in the
15  -- you know, I can't go chapter and verse, you know, to
16  some -- but it was largely in foreign connections, foreign
17  contact, dual citizenship, maybe information technology
18  issues. And there was other tweaking, but I do not
19  recall -- I don't believe there were any changes or certainly
20  any substantial changes to either the sexual guideline or the
21  mental and emotional one.
22     Q   Which guidelines are those?
23     A   You know, they go from "A" to -- what is it?
24  Whatever 13 is in the alphabet, "A" to "L" or "A" to "M," and
25  it's one of those.

Page 82

1  Q  Was there any finding that all federal agencies
2  always honor reciprocity?
3  A  I do not recall. That would certainly be
4  consistent with the thinking that many of us had at the time,
5  as well as what has been subsequently incorporated in a
6  memorandum from the deputy director of Office of Management
7  and Budget as to reciprocity, dated December 2005, which may
8  well have been based on some of the conclusions in this
9  report, for all I know.
10  Q  What was the document that you just referred
11  to?
12  A  It's the -- it's a document that was put out by
13  Clay Johnson, the deputy director of OMB for management --
14  Q  Uh-huh.
15  A  -- who is the -- he was kind of the appointed czar,
16  pursuant to EO 13381, to oversee the program and the
17  implementation of that statute I referred to earlier, the
18  intel reform act. And, as part of that, one of the many
19  ongoing challenges and issues is the notion of reciprocity,
20  and the attempt to have mutual recognition of other agency
21  security clearances without going to all the expense and
22  costly wasted time of reinvestigating people who have already
23  been investigated and adjudicated. And, in 2005, Clay
24  Johnson put out the memo to all of the federal agencies,
25  laying out the -- it has a matrix in it, as to what the

Page 83

1  conditions for reciprocity are.
2  Q  I believe we talked about those conditions earlier,
3  didn't we?
4  A  Yeah. We probably touched on them. One of them is
5  the currency of the prior investigation, which, in his memo,
6  takes it out to seven years, so long as, you know, no break
7  in service. So, yeah, largely the items we spoke of before
8  are the essential elements of that memo.
9  Q  And when was this memo issued?
10  A  If I recall, there was -- there were two of them.
11  There was one -- I can't remember whether the final was -- it
12  was December '05, then there was a follow-up possibly in July
13  of '06, but I may have those dates wrong. But the essential
14  elements were the same.
15  Q  Going back to the PERSEREC report --
16  A  Okay.
17  Q  -- do you know how many federal agencies were used
18  to collect information from this report?
19  A  How many?
20  Q  Yes.
21  A  Whoever we referred to in here. Federal agencies
22  as opposed to contractors?
23  Q  Federal agencies.
24  A  Yeah. So it looks like we had 14.
25  Q  Do you know if anywhere in this report it states

Page 84

1  that reciprocity doesn't always work?
2  A  Oh, without reading it, I couldn't say positively,
3  but I would assume, since that's a fact of life back then and
4  now, it -- that it's not working as it was intended.
5  Q  And why is that?
6  A  Because of cultural and environmental bias.
7  Q  What do you mean when you say cultural bias?
8  A  Because federal agencies somehow sometimes think
9  that they have unique requirements, which, in my experience,
10  usually is not true, but that's what they feel. So, ergo,
11  they feel that they enter basically a career posterior mode,
12  that they have to do a full readjudication if not
13  investigation, and -- because they inherently distrust other
14  people's clearance adjudication, most of which is unfounded
15  and inappropriate, but that's what actually happens, albeit
16  to a lesser degree today then it was a couple years ago.
17  It's getting better.
18  Q  Why is it unfounded and inappropriate to distrust
19  other adjudications?
20  A  Because the groundwork has been laid to have not
21  only common standard but a common investigative basis, as
22  well as common training. So between, you know, current
23  policies and training and so forth, the differentiations that
24  may have existed in the past have been minimized, to a large
25  extent. And so once you've been issued a clearance, you

Page 85

1  should be trustworthy. If the Army has approved you for top
2  secret and you go over to Department of Justice for a top
3  secret, then Justice really doesn't have any unique security
4  requirements that aren't already contained in the national
5  standards.
6  Q  Are adjudicators at all concerned by the
7  inconsistency of the application of the adjudicative
8  guidelines?
9  A  Just --
10  MS. MCGOWAN: Object to the form.
11  THE WITNESS: Yeah. Go ahead.
12  MS. MCGOWAN: But if you understand, you can
13  answer.
14  THE WITNESS: Yeah. Somewhat. That's a constant
15  complaint. In many cases, people have purely anecdotal
16  evidence, so if you've seen one case out of a thousand or two
17  thousand, they always refer to that one, but never the other
18  1,999 that were consistent.
19  BY MS. DOUDS:
20  Q  In this report, were there any security personnel
21  interviewed who exhibited a lack of trust towards any
22  agencies in particular?
23  A  I don't recall offhand, specifically.
24  Q  Do you know if any of the security personnel
25  interviewed took issue with how military service CAFS

22 (Pages 82 to 85)

DIVERSIFIED REPORTING SERVICES, INC.
1101 Sixteenth Street, N.W. – 2nd Floor, Washington, DC 20036
Phone: (202) 467-9200 * Fax: (202) 296-3468

# ERRATA

In Re: __Schroer__ v __Billington__
Case No: __05-1090__ Date Taken: __04/04/08__
Deposition Of: __Peter R. Nelson__

I hereby certify I have read my deposition and that it is accurate with corrections listed below:

| PAGE | LINE | AS TRANSCRIBED | CHANGE TO |
|---|---|---|---|
| 8 | 21 | overseas. | overseas forces. |
| 19 | 20 | appeal | appeal process |
| 78 | 13 | Integration | Immigration |
| 77 | 1 | of the | of the office of |
| 84 | 11 | career | cover your |

Deponent Signature: __Peter R. Nelson__   Date: __6/06/2008__