IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DIANE J. SCHROER,<br><br>Plaintiff,<br><br>v.<br><br>JAMES H. BILLINGTON,<br>  Librarian of Congress,<br><br>Defendant. | No. 05-cv-1090 (JR) |

## DECLARATION OF DIANE J. SCHROER

Pursuant to 28 U.S.C. § 1746, I, Diane J. Schroer, declare as follows:

1.      My name is Diane J. Schroer, and I am the plaintiff in the above-captioned lawsuit.

2.      I am a decorated veteran of the United States Army.  I retired as a full Colonel on January 1, 2004.

3.      In 1976, while in college, I enlisted with the United States Army through the Reserve Officers Training Corps.  Over the course of twenty-five years of military service, I served in a variety of critical command and staff positions such as duty in Armored Cavalry, Airborne, Special Forces and Special Operations Units and including combat operations in Panama in 1989 ("Operation Just Cause") and Haiti in 1994 ("Operation Uphold Democracy").  From September 1994 until July 1996, I was the Commander of the 3rd Battalion of the 3rd Special Forces Group (Airborne), stationed in Fort Bragg, North Carolina, where my duties involved combat operations in the Haitian Intervention and operations in connection with the conflict in Rwanda.

4.    Promoted to full Colonel in May 1999, my many awards and decorations include the Defense Superior Service Medal, Meritorious Service Medal (3 Oak Leaf Clusters), Army Commendation Medal (with Oak Leaf Cluster), Army and Air Force Achievement Medals, Armed Forces Expeditionary Medal (with Oak Leaf Cluster), Joint Meritorious Unit Award (2nd Oak Leaf Cluster) and the National Defense Service Medal (with Oak Leaf Cluster).  My many qualifications include Master Parachutist Wings, the Ranger and Special Forces Tabs, Air Assault Wings, Jungle Expert Badge, Jumpmaster and Joint Staff Officer.  I am a Distinguished Graduate of both the National War College and Army Command and General Staff College.  I hold Masters Degrees in History and International Relations.

5.    From June 1997 until my retirement from the military on January 1, 2004, I was assigned to United States Special Operations Command (USSOCOM) and Joint Special Operations Command (JSOC), which is a component command of USSOCOM.  During that period, the mission of USSOCOM was described in publicly available documents as follows:  to "plan, direct, and execute special operations in the conduct of the War on Terrorism in order to disrupt, defeat and destroy terrorist networks that threaten the United States."  *See* CRS Report for Congress, "Special Operations Forces (SOF) and CIA Paramilitary Operations:  Issues for Congress" (January 4, 2005) at CRS-2, *available at* <http://www.fas.org/man/crs/RS22017.pdf> (downloaded June 11, 2008) (attached as Exhibit A).[1]

---

[1]  The specific mission of the JSOC has been described in publicly available documents as follows:

According to the Department of Defense, the JSOC is 'a joint headquarters designed to study special operations requirements and techniques; ensure interoperability and equipment standardization; plan and conduct joint special operations exercises and training; and develop joint special operations tactics."  While not officially acknowledged by DOD or USSOCOM, JSOC, which is headquartered at Pope Air Force Base in North

6.      After the terrorist attacks of September 11, 2001, I served as the Director of a 120-person classified organization with significant global responsibilities for the Global War on Terror, including the tracking and targeting of several high threat international terrorist organizations. In performing these duties, I analyzed highly sensitive intelligence reports, planned for the full range of classified and conventional operations, and presented this information to high-ranking officials of the United States government, including the Vice President, the Secretary of Defense and the Chairman of the Joint Chiefs of Staff for the U.S. Armed Forces.

7.      In October 2003, I took a civilian position with a Washington, D.C., firm that provides consulting services to agencies of the federal government, including the Department of Defense. As a Senior Analyst and Program Manager, I worked with the National Guard Bureau to assess the vulnerability of the nation's critical infrastructure, including major power production, bridges, tunnels, ports and public safety networks, to terrorist attack.

8.      In August 2004, I applied for a position with the Congressional Research Service of the Library of Congress. Specifically, the position was CRS Vacancy 040196 -- Specialist in Terrorism and International Crime, GS-0101-15 (hereinafter "Terrorism Specialist"). A copy of the resume that I included with my application for the Terrorism Specialist position is attached as Exhibit C to this declaration.

---

Carolina, is widely believed to command and control what are described as the military's three special missions units - the Army's Delta Force, the Navy's SEAL Team Six, a joint unit allegedly designed to conduct clandestine operations, as well as the 75th Ranger Regiment, the 160th Special Operations Aviation Regiment and the Air Force's 24th Special Tactics Squadron. JSOC's primary mission is believed to be identifying and destroying terrorists and terror cells worldwide.

See CRS Report for Congress, "U.S. Special Forces (USOF): Background and Issues for Congress," (April 17, 2006) at CRS-4, *available at* <http://www.usembassy.it/pdf/other/RS21048.pdf> (downloaded June 11, 2008) (attached as Exhibit B).

9.      The position announcement stated that an applicant had to qualify for a
Top Secret security clearance.[2] As I held a Top Secret / Special Compartmented
Information (TS-SCI) level of clearance at the time of my application, I knew that I
would be able to satisfy the security clearance requirements for the position.

10.     I was selected to be interviewed for the position, and, on October 27,
2004, I was interviewed for the position by three employees of the Congressional
Research Service: Charlotte Preece, Steve Bowman and Francis Miko.  At no time during
the interview process was I asked about my gender, nor did I volunteer any information
about my gender, as I did not believe that it was relevant to my qualifications for the job.

11.     In early December 2004, Ms. Preece called me to ask for writing samples
and updated contact information for my references, which I promptly sent her.

12.     Shortly thereafter, in mid-December, Ms. Preece called to inform me that
if I wanted the job, it was mine.  She said words to the effect that I was "it."  Before she
began processing the hiring paperwork, however, she wanted to know whether I would
take the job.  I explained that I was very interested in the position, and my only concern
was that I not take a drastic cut in salary relative to my current employment.  Ms. Preece
said that she would investigate the question and get back to me.

13.     The next day, Ms. Preece called back and told me that the Library could
offer me a salary comparable to what I was making at that time.  With that issue resolved,
I accepted the position.  Ms. Preece told me that she would start processing the
paperwork.

---

[2]  A copy of the job announcement is attached as Exhibit U to the Declaration of Sharon M. McGowan, my
attorney.  Accordingly, I have not attached a copy of the announcement to my declaration.

14.     At the time I was born, my sex was classified as male.  Accordingly, my parents gave me the traditionally masculine name David, and, from a young age, I was socialized to wear traditionally masculine clothes. Over time, however, I came to realize that the gender designation assigned to me at birth does not conform with my female gender identity.  As a result, after working with medical professionals, I have come to realize that I am a transgender woman.[3]

15.     In early 2004, I was diagnosed by my treating therapist, Martha Harris, LCSW, as having gender identity disorder.  I have received no mental health diagnoses other than my diagnosis for Gender Identity Disorder.

16.     As part of my prescribed course of medical treatment for gender dysphoria, I began first living part-time in a female gender role in non-professional settings.  At the time I applied for the Terrorism Specialist position in August 2004, my legal name was still David J. Schroer.  Likewise, my security clearance credentials were listed under the name David J. Schroer.  For this reason, I applied for the position using the name David J. Schroer, and appeared at the interview dressed in masculine professional attire.  By December 2004, consistent my prescribed course of medical treatment for gender dysphoria, I was preparing to commence the "real life experience"

---

[3]  For purposes of clarity, I set out the following terms and corresponding definitions, which will be used throughout this declaration:

> - I use the terms "sex" and "gender" interchangeably, and use those terms to encompass the factors that reveal whether an individual is male or female.
>
> - I use the term "gender identity" to refer to one component of an individual's sex – his or her internal sense of being either male or female.
>
> - I use the terms "transsexual" and "transgender" interchangeably to refer to an individual whose gender identity is inconsistent with his or her sex assigned at birth.
>
> - I use the terms "Gender Identity Disorder" and "gender dysphoria" interchangeably to refer to the medical diagnosis assigned to an individual who is transgender for which the course of treatment is gender transition from one gender to another.

5

portion of my gender transition in which I would begin dressing in traditionally feminine clothes and otherwise presenting as a female on a full-time basis.

17.    Because Ms. Preece had told me that I had the job, and had otherwise expressed great enthusiasm about my joining CRS, I decided that I would begin presenting full-time as female when I began work as the Terrorism Specialist. I decided that I would propose a lunch meeting with Ms. Preece to explain to her that I was in the process of transitioning from male to female. I preferred a lunch meeting, as opposed to discussing this matter over the phone, in order to extend Ms. Preece the courtesy of an advance, face-to-face discussion about my intent to start work presenting as a female, and to work cooperatively with her to address any concerns that she might have about it. I believed it would occasion less confusion if I started work presenting as a female than if I started work presenting as a male and subsequently began presenting as a female.

18.    During the conversation in which I informed Ms. Preece that I would take the job, I also proposed that she and I meet for lunch early the following week. Ms. Preece agreed to do so, and proposed that we discuss my start date and other details about the position at that time.

19.    On December 20, 2004, I met Ms. Preece in her office at the Congressional Research Service. While there, she mentioned to me that she had nearly completed the paperwork associated with the hiring process, motioning toward paperwork on her desk. I noted in her office photographs of two men in uniform, and she informed me that her sons were both in the U.S. Armed Forces.

20.    As Ms. Preece and I were leaving for lunch, we saw some other members of the Congressional Research Service with whom I would be working, and she introduced me to my "colleagues," as she described them.

21.    During the lunch meeting, Ms. Preece shared additional details about the Terrorism Specialist position, and explained why the selection committee believed that my qualifications made my application superior to those of the other candidates. Ms. Preece asked me about my availability, and I responded that I could start work within two weeks of receiving the necessary paperwork from the Human Resources Department.

22.    At that point in the conversation, I asked Ms. Preece if she knew what it meant to be transgender. When she said that she did not, I told Ms. Preece that I was a transgender woman, and explained to her what that meant – namely, that I had a female gender identity, and would be transitioning from living as a male to living as a female on a full-time basis, consistent with my gender identity. I told her that I was under a health care provider's care for gender dysphoria, which is a clinical term used to describe the experience of being transgender, and that, consistent with my prescribed course of medical care, I would be using a traditionally feminine name (i.e., Diane) and dressing in traditionally feminine clothes and otherwise presenting as a female when I started work at CRS.

23.    Ms. Preece's first response to me was to ask me why I would want to do a thing like that. Ms. Preece also asked whether she would need to change the name that she had used on the hiring paperwork from David to Diane, but I explained that there was no need to do that because I had not yet changed my legal name. My legal name change was approved by the court in mid-2005.

24.    To allay any concern about whether I would present as a female in a workplace-appropriate manner, I showed Ms. Preece three photographs in which I was dressed in traditionally feminine clothes.

25.    During our conversation, I volunteered that I knew of other federal employees in positions requiring a security clearance who had undergone a gender transition without problem. I also indicated that I would be willing to speak with the Library's personnel security or health services office, or consent to having my therapist speak with the Library's personnel security or health services office, if there was any desire on the part of the Library to confirm that my gender transition posed no concern with respect to the security clearance requirements of the position.

26.    My therapist, Martha Harris, was aware that I intended to inform Ms. Preece about my intention to begin presenting full-time at this lunch meeting. Prior to this lunch meeting, I had indicated to Ms. Harris that I might need her to be available to talk with individuals at the Library if any questions arose regarding my gender transition. She indicated to me her willingness and availability to do so if needed.

27.    Ms. Preece did not say anything during the lunch meeting in response to my discussion of the security clearance issue, or ask any follow up questions. She said nothing to me to suggest that she was concerned that I would be unable to fulfill the security clearance requirements of the position, or would be unable to do so in a timely manner, on account of my gender transition. Ms. Preece also did not ask me whether the security clearance officer at my current job was aware of my gender transition, which he was because I had told him.

28.     When Ms. Preece asked me what would be involved in my gender transition from a medical perspective, I explained that I would be having facial feminization surgery prior to beginning at the Library. The only other surgery that would be required, I explained, was sexual reassignment surgery or SRS. I noted that I would not be undertaking SRS for at least a year, consistent with the standard protocol for gender transition. I emphasized that I could determine the timing of my sexual reassignment surgery, and could schedule it in a manner consistent with the needs of CRS, taking into account things like my probationary period and the parameters of my personal leave. I specifically told Ms. Preece that these two surgeries were the only medical procedures that would be required as part of my gender transition. Ms. Preece did not say anything during the lunch meeting suggesting that she was concerned that the surgeries, or anything else related to my gender transition, would be a source of distraction for me or otherwise present a problem for the Congressional Research Service.

29.     Ms. Preece did not say anything during the lunch meeting that suggested to me that what I had told her would be relevant to the hiring decision. She did not say anything during the lunch meeting suggesting that she felt that I had been dishonest with her by not previously disclosing her gender identity, or that she questioned whether she could trust me in the future. She did not say anything about being concerned whether I would be able to maintain my contacts in the government or the military, or otherwise retain my professional credibility, on account of my gender transition. She also did not ask me whether any of my job references was aware of my gender transition, which they were because I had told them prior to asking them to serve as references.

30.    At the conclusion of our conversation, Ms. Preece thanked me for being honest with her. As we were leaving the restaurant, Ms. Preece told me that I had "really given her something to think about," and that she would get back to me.

31.    Ms. Preece called me the next day and informed me that, after a long and restless night, or words to that effect, she thought that I was "not a good fit" for the position. I told her that I was extremely disappointed to hear that. She thanked me for being "honest" with her and "telling [her] about the situation," or words to that effect. She did not mention any concern offer me any specific reasons for her decision, and our conversation concluded.

32.    Although Ms. Preece made no mention of any security clearance concerns when she called me and rescinded the job offer, I have since learned that the Library claims that its decision not to hire me was based on concerns about my ability to maintain my Top Secret security clearance as result of my gender transition. At the time I applied for employment with CRS, I possessed a Top Secret / Special Compartmented Information (SCI) level security clearance. I held this clearance during my time in the U.S. Army, where over the course of 25 years, my duties, which included positions within the Special Operations community, were extremely sensitive in nature.

33.    At the time I applied for the Terrorism Specialist position, my TS-SCI clearance was valid. My most recent background reinvestigation had occurred in July 2001, and I did not have any break in service or lapse in my security clearance between the time that I retired from the military and when I began working as a consultant at Benchmark International, where I worked on matters involving access to highly sensitive classified information.

10

34.     I first reported to the security officer at my prior employer, Benchmark International, that I was seeing a therapist for gender identity issues in early 2004. Since that time, I have continued to provide all reportable information, as well as to report voluntarily additional non-mandatory information (including information about my gender transition), to my security clearance officers. I submitted all required information in connection with my most recent periodic reinvestigation (PR) in March 2006, and discussed my gender identity and transition with the investigator who interviewed me as part of my PR several months later.

35.     My security clearance has never been suspended or otherwise interrupted, either prior to or since the commencement of my gender transition. Since submitting my information in connection with my PR, I have at no time been informed -- either formally (i.e., by a notice that my clearance was proposed to be revoked, and an invitation to respond to that notice) or informally (i.e., by my security officer) -- that my security clearance eligibility going forward was in question as a result of my gender identity and transition, or for any other reason.

36.     I currently work as a private consultant on national security and counter-terrorism issues. Throughout my transition, I have maintained many personal and professional relationships with military and former military colleagues, and interact with them regularly as part of my work. I have continued to be viewed as a credible authority on national security and counter-terrorism issues, as evidenced by the fact that I support myself financially by working full-time in this field. Throughout my transition, I have continued to access highly sensitive classified information as a part of my work, and my access to this information has never been interrupted.

37.    My gender transition has not unfavorably affected my ability to focus on my work. To the contrary, my gender transition was a course of medical treatment that I undertook to decrease any distress or distraction caused by my gender dysphoria. Living full-time in the gender role that matches my gender identity has, if anything, only positively affected my ability to focus on my work and other responsibilities.

38.    If called to testify at trial, I would testify in accordance with the statements in this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 18, 2008.

Diane J. Schroer

Schroer Declaration – Exhibit A

Order Code RS22017
January 4, 2005

# CRS Report for Congress

## Received through the CRS Web

# Special Operations Forces (SOF) and CIA Paramilitary Operations: Issues for Congress

Richard A. Best, Jr. and Andrew Feickert
Specialists in National Defense
Foreign Affairs, Defense and Trade Division

## Summary

The 9/11 Commission Report recommended that responsibility for directing and executing paramilitary operations should be shifted from the CIA to the U.S. Special Operations Command (USSOCOM). The President has directed the Secretary of Defense and Director of Central Intelligence to review this recommendation and present their advice by February 23, 2005.[1] This report will briefly describe special operations conducted by DOD and paramilitary operations conducted by the CIA and discuss the implications of the 9/11 Commission's recommendations. For additional information see CRS Report RS21048, *U.S. Special Operations Forces (SOF): Background and Issues for Congress*. This report will be updated as circumstances warrant.

The U.S. strategy in pursuing the war on international terrorism involves a variety of missions conducted by military and civilian intelligence personnel characterized as "special operations" or paramilitary operations. The separate roles of the Department of Defense (DOD) and the Central Intelligence Agency (CIA) are not always clearly reflected in media accounts and at times there has been considerable operational overlap. Proposals such as those made by the 9/11 Commission to change organizational relationships will, however, be evaluated on the basis of separate roles and missions, operating practices, and relevant statutory authorities.

## What Are Special Operations and Paramilitary Operations?

DOD defines special operations as "operations conducted in hostile, denied, or politically sensitive environments to achieve military, diplomatic, informational, and/or

---

[1] On November 23, 2004, President Bush issued a letter requiring the Secretary of Defense and the Director of Central Intelligence to review matters relating to Recommendation 32 and submit their advice to him by February 23, 2005. This review directs the examination of all aspects including legal, funding, operational, and supporting infrastructure.

CRS-2

economic objectives employing military capabilities for which there is no broad conventional force requirement."[2]

DOD defines paramilitary forces as "forces or groups distinct from the regular armed forces of any country, but resembling them in organization, equipment, training or mission." In this report, the term "paramilitary operations" will be used for operations conducted by the CIA whose officers and employees are not part of the armed forces of the United States. (In practice, military personnel may be temporarily assigned to the CIA and CIA personnel may temporarily serve directly under a military commander.)

In general, special operations are distinguishable from regular military operations by degree of physical and political risk, operational techniques, and mode of employment among other factors. DOD special operations are frequently clandestine — designed in such a way as to ensure concealment; they are not necessarily covert, that is, concealing the identity of the sponsor is not a priority. The CIA, however, conducts covert and clandestine operations to avoid directly implicating the U.S. Government.

## Roles and Mission of CIA and SOF

USSOCOM was established by Congress in the Defense Authorization Act of 1987 (PL 99-661) and codified into law as part of Title 10, U.S. Code, Section 167. USSOCOM's stated mission is to plan, direct and execute special operations in the conduct of the War on Terrorism in order to disrupt, defeat, and destroy terrorist networks that threaten the United States.[3]

The CIA was established by the National Security Act of 1947 (P.L. 80-253) to collect intelligence through human sources and to analyze and disseminate intelligence from all sources. It was also to "perform such other functions and duties related to intelligence affecting the national security as the President or the National Security Council may direct." This opaque phrase was, within a few months, interpreted to include a range of covert activities such as those that had been carried out by the Office of Strategic Services (OSS) during World War II. Although some observers long maintained that covert actions had no statutory basis, in 1991 the National Security Act was amended (by P.L. 102-88) to establish specific procedures for approving covert actions and for notifying key Members of Congress.

The statutory definition of covert action ("activity or activities of the United States Government to influence political, economic, or military conditions abroad, where it is intended that the role of the United States Government will not be apparent or acknowledged publicly. . . .") is broad and can include a wide range of clandestine efforts — from subsidizing foreign journals and political parties to participation in what are essentially military operations. In the case of paramilitary operations, there is a clear potential for overlap with activities that can be carried out by DOD. In general, the CIA would be designated to conduct operations that are to be wholly covert or disavowable.

---

[2] Definitions are taken from Joint Publication 1-02, "Department of Defense Dictionary of Military and Associated Terms," April 12, 2001 as amended through October 7, 2004.

[3] Taken from *United States Special Operation Forces Posture Statement 2003-2004, U.S. Special Operations Command*, pp. 4-10.

CRS-3

In practice, responsibilities for paramilitary operations have been assigned by the National Security Council on a case-by-case basis.

## Brief History of CIA and SOF Paramilitary Operations

**CIA.** In addition to acquiring intelligence to support US military operations from the Korean War era to Iraq today, the CIA has also worked closely alongside DOD personnel in military operations. On occasion it has also conducted clandestine military operations apart from the military. One example was the failed Bay of Pigs landing in Cuba in 1961. Especially important was a substantial CIA-managed effort in Laos in the 1960s and 1970s to interdict North Vietnamese resupply efforts. The CIA was directed to undertake this effort in large measure to avoid the onus of official U.S. military intervention in neutral Laos. The CIA's paramilitary operations in Afghanistan in 2001 have been widely described; CIA officers began infiltrating Afghanistan before the end of September 2001 and played an active role alongside SOF in bringing down the Taliban regime by the end of the year. According to media reports, the CIA has also been extensively involved in operations in Iraq in support of military operations.[4]

**SOF.** SOF have reportedly been involved in clandestine and covert paramilitary operations on numerous occasions since the Vietnam War. Operations such as the response to the TWA 847 and Achille Lauro highjackings in 1985, Panama in 1989, Mogadishu in 1993, and the Balkans in the late 1990s have become public knowledge over time but other operations reportedly remain classified to this day.[5] SOF units such as the Army's Special Forces ("Green Berets"), Rangers, the Navy's SEALs (Sea, Air, and Land Teams) and Air Force Special Operations aviation and special tactics units have been involved in a variety of sensitive but acknowledged military operations. Others outside of DOD speculate that covert paramilitary operations would probably become the responsibility of a number of unacknowledged special operations units believed to exist within USSOCOM.[6]

## 9/11 Report Recommendations[7]

Recommendation 32 of the 9/11 Commission report states: "Lead responsibility for directing and executing paramilitary operations, whether clandestine or covert, should shift to the Defense Department. There it should be consolidated with the capabilities for training, direction, and execution of such operations already being developed in the Special Operations Command." The 9/11 Commission's basis for this recommendation appears to be both performance and cost-based. The report states that the CIA did not sufficiently invest in developing a robust capability to conduct paramilitary operations

---

[4] See Barton Gellman and Dafna Linzer, "Afghanistan, Iraq: Two Wars Collide," *Washington Post*, October 22, 2004, p. A1; Bob Woodward, *Plan of Attack* (New York: Simon & Schuster, 2004), especially pp. 301-306, 373-376.

[5] Colonel John T. Carney, Jr .and Benjamin F. Schemmer, *No Room for Error: The Covert Operations of America's Special Tactics Units from Iran to Afghanistan*, 2002, pp. ix - x.

[6] Jennifer D. Kibbe, "The Rise of the Shadow Warriors," *Foreign Affairs,* March/April 2004, Volume 83-Number 2, p. 110.

[7] Taken from *The 9/11 Commission Report* (Washington: GPO, 2004) pp. 415 - 416.

CRS-4

with U.S. personnel prior to 9/11, and instead relied on improperly trained proxies (foreign personnel under contract) resulting in an unsatisfactory outcome. The report also states that the United States does not have the money or people to build "two separate capabilities for carrying out secret military operations," and suggests that we should "concentrate responsibility and necessary legal authorities in one entity."

Some observers question whether procedures are in place to insure overall coordination of effort. Press reports concerning an alleged lack of coordination during Afghan operations undoubtedly contributed to the 9/11 Commission's recommendation regarding paramilitary operations.[8] Although such accounts have been discounted by some observers, the recently enacted Intelligence Reform and Terrorism Prevention Act (P.L. 108-458) includes a provision (Section 1013) that requires DOD and CIA to develop joint procedures "to improve the coordination and deconfliction of operations that involve elements"of the CIA and DOD. When separate missions are underway in the same geographical area, the CIA and DOD are required to establish procedures to reach "mutual agreement on the tactical and strategic objectives for the region and a clear delineation of operational responsibilities to prevent conflict and duplication of effort."

## Potential Impacts

**Diminished CIA Intelligence Capabilities.** Some observers suggest that a capability to plan and undertake paramilitary operations is directly related to the Agency's responsibility to obtain intelligence from human sources. Some individuals and groups that supply information may also be of assistance in undertaking or supporting a paramilitary operation. If CIA were to have no responsibilities in this area, however, certain types of foreign contacts might not be exploited and capabilities that have proven important (in Afghanistan and elsewhere) might erode or disappear.[9]

**Additional Strain on SOF.** Some question if this proposed shift in responsibility will place additional strains on SOF who are extensively committed worldwide and are also experiencing retention difficulties amongst senior, retirement-eligible non-commissioned officers. Others argue that SOF lack the experience and requisite training to conduct covert operations.[10] They suggest that if SOF do undertake covert operations training, that it could diminish their ability to perform their traditional missions such as hostage rescue, close-quarters combat, and weapons of mass destruction counterproliferation operations.

---

[8] See, for instance, Jonathan Weisman, "CIA, Pentagon Feuding Complicates War Effort," *USA Today*, June 17, 2002, p. 11. Another account cites CIA claims that the DOD command process is "bureaucratic and slow-rolling because of an execution-by-committee process;" as well as complaints by DOD officials that in past conflicts little information acquired by CIA "could be used by the military for strike activities because it disappeared into the black hole of the intelligence universe." See David A. Fulghum, "CIA Trigger Men Trouble Military," *Aviation Week & Space Technology*, November 26, 2001, p. 39.

[9] See U.S. Congress, 104th Congress, 2d session, House of Representatives, Permanent Select Committee on Intelligence, *IC21: Intelligence Community in the 21st Century*, Staff Study, April 9, 1996, pp. 201-202.

[10] Kibbe, p. 113.

CRS-5

**A Reduction in Flexibility.** The 9/11 Report notes the CIA's "reputation for agility in operations," as well as the military's reputation for being "methodical and cumbersome."[11] Some experts question if DOD and SOF are capable of operating in a more agile and flexible manner. They contend that the CIA was able to beat SOF into Afghanistan because they had less bureaucracy to deal with than did SOF, which permitted them to "do things faster, cheaper, and with more flexibility than the military."[12] Some are concerned that if SOF takes over responsibility for clandestine and covert operations that they will become less agile and perhaps more vulnerable to bureaucratic interference from defense officials.

**SOF Funding Authority.** Section 1208 of PL 108-375, the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, permits SOF to directly pay and equip foreign forces or groups supporting the U.S. in combating terrorism. Although not a recommendation in the 9/11 Commission's report, many feel that this authority will not only help SOF in the conduct of unconventional warfare, but could also be a crucial tool should they become involved in covert or clandestine operations. In Afghanistan, SOF did not have the authority to pay and equip local forces and instead had to rely on the CIA to "write checks" for needed arms, ammunition, and supplies. Supporters of this legislation believe that this will provide SOF with greater flexibility and agility when trying to raise and maintain irregular forces and also permit them to pay for crucial information.[13]

## Issues for Congress

**Is This Change Necessary?** Congress may choose to review past or current paramilitary operations undertaken by the CIA and might also choose to assess the extent of coordination between the CIA and DOD. P.L. 108-458 requires that a report be submitted to defense and intelligence committees by June 2005 describing procedures established in regard to coordination and deconfliction of CIA and DOD operations. That report could indicate that initiatives by the executive branch have resolved all issues or it could provide the basis for legislative action in the future.

There are a variety of views on this possible change. Former acting Director of Central Intelligence John McLaughlin reportedly stated that "I think we have a perfect marriage now of CIA and military capabilities. CIA brings to the mix agility and speed. Military brings lethality."[14] The military has also expressed its reservations with Chairman of the Joint Chiefs of Staff General Richard Meyers suggesting that "there is not a lot of enthusiasm at this point for that kind of change."[15] Some suggest that the major source of friction between the CIA and SOF — the ability to fund resistance groups

---

[11] *The 9/11 Commission Report,* p. 416.

[12] Kibbe, p. 112.

[13] Ann Scott Tyson, "Do Special Forces Need Special Funding," *The Christian Science Monitor,* May 24, 2004.

[14] John L. Lumpkin, "CIA, Pentagon Officials Fight Proposal to Merge Covert Forces," *Associated Press,* August 30, 2004.

[15] Ibid.

CRS-6

— has been corrected by congressional action and that both organizations have since improved their planning and coordination of operations.

CIA has not maintained a sizable paramilitary force "on the shelf." When directed, it has built paramilitary capabilities by using its individuals, either U.S. or foreign, with paramilitary experience under the management of its permanent operations personnel in an entity known as the Special Activities Division. The permanent staff would be responsible for planning and for maintaining ties to former CIA officials and military personnel and individuals (including those with special language qualifications) who could be employed should the need arise. Few observers doubt that there is a continuing need for coordination between the CIA and DOD regarding paramilitary capabilities and plans for future operations. Furthermore, many observers believe that the CIA should concentrate on "filling the gaps," focusing on those types of operations that DOD is likely to avoid. Nevertheless, they view this comparatively limited set of potential operations to be a vitally important one that should not be neglected or assigned to DOD. There may be occasions when having to acknowledge an official U.S. role would preclude operations that were otherwise considered vital to the national security; the CIA can provide the deniability that would be difficult, if not impossible, for military personnel.[16]

**What Are the Legal Considerations of this Change?** Some experts believe that there may be legal difficulties if SOF are required to conduct covert operations. One issue is the legality of ordering SOF personnel to conduct covert activities that would require them to forfeit their Geneva Convention status to retain deniability.[17] In order to operate covertly and with deniability, SOF could be required to operate without the protection of a military uniform and identification card which affords them combatant status under the Geneva Convention if captured. Another issue is that covert operations can often be contrary to international laws or the laws of war and U.S. military personnel are generally expected to follow these laws.[18]

**Congressional Oversight.** Some suggest that if this recommendation is adopted, that congressional oversight may need to be re-evaluated and perhaps modified. Traditionally, the public text of intelligence legislation has included few provisions regarding paramilitary operations; levels of funding and other details are included in classified annexes which are understood to have the force of law. The House and Senate Intelligence Committees do have considerable influence in supporting or discouraging particular covert actions. In a few cases Congress has formally voted to deny funding to ongoing covert operations. Special Forces, however, fall under the House and Senate Armed Services Committees, and it is unclear how Congress would handle oversight if covert operations are shifted to SOF as well as how disputes between the intelligence and armed services committees would be dealt with.

---

[16] See U.S. Congress, 102nd Congress, 1st session, Senate, Select Committee on Intelligence, *Authorizing Appropriations for Fiscal Year 1991*, S.Rept. 102-85, June 19, 1991, pp. 42-48.

[17] These and a variety of other related legal issues are covered more extensively in Colonel Kathryn Stone's *All Necessary Means - Employing CIA Operatives in a Warfighting Role Alongside Special Operations Forces*, U.S. Army War College Strategy Research Project, July 4, 2003, p. 13.

[18] Ibid.

Schroer Declaration – Exhibit B

Order Code RS21048
Updated April 17, 2006

# CRS Report for Congress

## Received through the CRS Web

# U.S. Special Operations Forces (SOF): Background and Issues for Congress

Andrew Feickert
Specialist in National Defense
Foreign Affairs, Defense, and Trade Division

## Summary

Special Operations Forces (SOF) play a significant role in U.S. military operations and the Administration has given U.S. SOF forces greater responsibility for planning and conducting worldwide counterterrorism operations. The 2006 Quadrennial Defense Review (QDR) has called for a 15% increase in special operations forces beginning in FY2007. Proposals to elevate the command of the Joint Special Operations Command (JSOC) and the realignment of civil affairs, psychological operations (psyops) and combat search and rescue (CSAR) functions out from under the control of the U.S. Special Operations Command (USSOCOM), has raised concerns that SOF is perhaps becoming too focused on immediate versus long-term results. This report will be updated as events warrant.

## Background

**Overview.** Special Operations Forces (SOF) are small, elite military units with special training and equipment that can infiltrate into hostile territory through land, sea, or air to conduct a variety of operations, many of them classified. SOF personnel undergo rigorous selection and lengthy, specialized training. The U.S. Special Operations Command (USSOCOM) oversees the training, doctrine, and equipping of all U.S. SOF units.

**Command Structures.** In 1986 Congress (P.L. 99-661) expressed concern for the status of SOF within overall U.S. defense planning and passed measures to strengthen its position. These actions included the establishment of USSOCOM as a new unified command. USSOCOM is headquartered at MacDill Air Force Base in Tampa, FL. The Commander of USSOCOM is a four-star officer who may be from any service. Commander, USSOCOM reports directly to the Secretary of Defense, although an Assistant Secretary of Defense for Special Operations and Low Intensity Conflict (SO/LIC) provides immediate civilian oversight over many USSOCOM activities.

CRS-2

**Army Special Operations Forces.**[1] U.S. Army SOF (ARSOF) include 26,000 soldiers from the Active Army, National Guard, and Army Reserve who are organized into Special Forces units, Ranger units, special operations aviation units, civil affairs units, psychological operations units, and special operations support units. ARSOF Headquarters and other resources, such as the John F. Kennedy Special Warfare Center and School, are located at Fort Bragg, NC. Five active Special Forces Groups (Airborne) are stationed at Fort Bragg and at Fort Lewis, WA, Fort Campbell, KY, and Fort Carson, CO. Special Forces soldiers — also known as the Green Berets — are trained in various skills, including foreign languages, that allow teams to operate independently in designated regions of the world. Two Army National Guard SF groups are headquartered in Utah and Alabama. An elite airborne light infantry unit, the 75th Ranger Regiment, is headquartered at Fort Benning, GA and consists of three battalions specializing in direct action operations. Army special operations aviation units, including the 160th Special Operations Aviation Regiment (Airborne) at Fort Campbell, KY, feature pilots trained to fly the most sophisticated Army rotary-wing aircraft in the harshest environments, day or night, and in adverse weather.

The most frequently deployed SOF assets are civil affairs (CA) units, which provide experts in every area of civil government to help administer civilian affairs in the theater. The 96th Civil Affairs Battalion (Airborne) is the only active CA unit; all other CA units reside in four Army Reserve Civil Affairs Commands located in Pensacola, FL, Mountain View, CA, Riverdale, MD, and Bronx, NY. Psychological operations units disseminate information to large foreign audiences through mass media. The active duty 4th Psychological Operations Group (Airborne) is stationed at Fort Bragg, and two Army Reserve groups are located in Cleveland, OH, and at Moffett Federal Airfield, CA.

**Air Force Special Operations Forces.**[2] The Air Force Special Operations Command (AFSOC) includes about 10,000 active and reserve personnel, of which about 22% are stationed overseas. AFSOC is headquartered at Hurlburt Field, FL, which is also the home of most of AFSOC's active units, including the 16th Special Operations Wing, the 720th Special Tactics Group, the 18th Flight Test Squadron, and the U.S. Air Force Special Operations School. The 352nd Special Operations Group is at RAF Mildenhall, England, and the 353rd Special Operations Group, is at Kadena Air Base, Japan. Reserve AFSOC components include the 193rd Special Operations Wing, Air National Guard stationed at Harrisburg, PA, the 280th Combat Communications Squadron, Air National Guard stationed at Dothan, AL, and the 919th Special Operations Wing, Air Force Reserve stationed at Duke Field, FL. AFSOC's three active-duty flying units are composed of more than 100 fixed and rotary-wing aircraft. The V-22 Osprey tilt-rotor aircraft, a Marine Corps priority, is also being developed for AFSOC. If procured, SOF CV-22s will conduct long-range vertical takeoff and landing infiltration, exfiltration, and resupply missions.

---

[1] Information in this section was taken from General Bryan Brown, "U.S. Army Special Operations: Focusing on People — Humans are More Important than Hardware," *Army*, Oct. 2001, pp. 157-162.

[2] For additional information on Air Force SOF units, see Robert Wall, "Conflict Could Test Special Ops Improvements," *Aviation Week & Space Technology*, Oct. 1, 2001, p. 30.

CRS-3

**Special Operations Unmanned Aerial Vehicle (UAV) Squadron.**[3] The Air Force is currently standing up a special operations Predator UAV squadron at Indian Springs Auxiliary Field, NV. The squadron will initially consist of 24 MQ-1 aircraft but could eventually add the larger MQ-9 Predator B when the aircraft completes development. The Air Force has not announced a specific timetable for the completion of the stand up of the AFSOC Predator squadron. The Air Force was formally tasked to stand up this squadron in the 2006 Quadrennial Defense Review.[4]

**Naval Special Operations Forces.**[5] The Naval Special Warfare Command (NSWC) is located in Coronado, CA. The major operational components of NSWC include Naval Special Warfare Groups 1 and 3 stationed in San Diego, CA, and Naval Special Warfare Groups 2 and 4 in Norfolk, VA. These components deploy SEAL Teams, SEAL Delivery Vehicle Teams, and Special Boat Teams worldwide to meet the training, exercise, contingency and wartime requirements of theater commanders. NSWC has approximately 5,400 total active-duty personnel — including 2,450 SEALs and 600 Special Warfare Combatant-craft Crewmen (SWCC) — as well as a 1,200-person reserve component of approximately 325 SEALs, 125 SWCC and 775 support personnel. SEALs are considered the best-trained combat swimmers in the world, and can be deployed covertly from submarines or from sea-based aircraft.

**Marine Special Operations Command (MARSOC).**[6] On November 1, 2005, DOD announced the creation of the Marine Special Operations Command (MARSOC) as a component of USSOCOM. MARSOC will consist of three subordinate units — the Marine Special Operations Regiment, the Foreign Military Training Unit, and the Special Operations Support Group — totaling approximately 2,600 Marines. MARSOC Headquarters, the Foreign Military Training Unit, and the Special Operations Support Group will be stationed at Camp Lejeune, NC. The Marine Special Operations Regiment will also have its headquarters at Camp Lejeune and will have an element stationed at Camp Pendleton, CA. An activation date for MARSOC and its subordinate units has not yet been determined but MARSOC officials will reportedly deploy six Foreign Military Training Units and one special operations company this summer.[7] USSOCOM and the Marine Corps were formally tasked to stand up MARSOC in the 2006 Quadrennial Defense Review (QDR).[8]

---

[3] Information in this section is from Bruce Rolfsen, "Spec Ops Predators," Armed Forces Journal, July 2005, pp. 18-19.

[4] Department of Defense, Quadrennial Defense review Report, February 6, 2006, p. 5.

[5] Information in this section is from the U.S. Naval Special Warfare Command's Official website, [https://www.navsoc.navy.mil/], accessed on May 26, 2005.

[6] Information in this section is taken from DOD Press Release No. 1127-05, dated Nov. 1, 2005, Subject: Secretary of Defense Approves Marine Special Operations Command; Donna Miles, "Marine Corps to Join U.S. Special Operations Command," American Forces Press Service, Nov. 1, 2005; and Christian Lowe, "U.S. Marine Corps to Create Special Operations Unit," Defense News, Nov. 1, 2005.

[7] Copley News Service, "Marine Corps Force Deploys in Summer," *San Diego Union Tribune,* March 16, 2006.

[8] Department of Defense, Quadrennial Defense Review Report, February 6, 2006, p. 5.

CRS-4

**Joint Special Operations Command (JSOC).** According to DOD, the JSOC is "a joint headquarters designed to study special operations requirements and techniques; ensure interoperability and equipment standardization; plan and conduct joint special operations exercises and training; and develop joint special operations tactics."[9] While not official acknowledged by DOD or USSOCOM, JSOC, which is headquartered at Pope Air Force Base in North Carolina, is widely believed to command and control what are described as the military's three special missions units - the Army's Delta Force , the Navy's SEAL Team Six, a joint unit allegedly designed to conduct clandestine operations, as well as the 75th Ranger Regiment, the 160th Special Operations Aviation Regiment and the Air Force's 24th Special Tactics Squadron.[10] JSOC's primary mission is believed to be identifying and destroying terrorists and terror cells worldwide.

## Current Topics

**Global War on Terror.** Special operations forces continue to operate in Iraq and Afghanistan where they are actively pursuing key insurgents. U.S. SOF continue their involvement in the Philippines and Colombia where their role is strictly limited to training the armed forces of those respective countries in counterterror and counterinsurgency tactics. U.S. SOF are also involved in operations in the Horn of Africa region as part of Combined Joint Task Force Horn of Africa (CJTF-HOA) where the focus of U.S. activities is training regional militaries.

**Quadrennial Defense Review and Proposed SOF Expansion.** In addition to standing up an Unmanned Aerial Vehicle squadron and the Marine Corps Special Operations Command, the 2006 QDR calls for the following initiatives to begin in FY2007:

- An overall increase of SOF by 15%;

- Increase in the number of Army Special Forces battalions by one- third;

- An increase in SEAL team manning and the development of a riverine warfare capability; and

- Expansion of Psychological Operations and Civil Affairs units by 3, 700 personnel - a 33% increase.[11]

According to analysts, such a proposed expansion of Army SOF would lead to an increase from 15 to 20 active duty battalions, creating approximately 90 additional A-Teams.[12]

---

[9] USSOCOM Website [http://www.socom.mil/components/components.htm], accessed April 4, 2006.

[10] Sean D. Naylor, "JSOC to Become Three-Star Command," *Army Times,* February 13, 2006.

[11] Ibid.

[12] Reuters, "Pentagon Plans Major Increase in Special Forces," *New York Times on the Web,*

(continued...)

CRS-5

**Joint Special Operations Command (JSOC) to Become a Three-Star Command.**[13]    Reports suggest that DOD will accept an independent report's recommendation to make the commander of JSOC a three-star (Lieutenant General or Vice Admiral) versus its current two-star (Major General or Rear Admiral (Upper Half)) billet. The report was allegedly commissioned by the Secretary of Defense in October 2005 after meeting with USSOCOM leadership and then reportedly expressing a "lack of confidence" in USSOCOM's assessment of its capabilities, having been told by USSOCOM officials that despite a substantial commitment of funds, that USSOCOM's capabilities were "declining." An additional recommendation from the independent committee chaired by retired Army General Wayne Downing (a former USSOCOM and JSOC commander) to temporarily remove JSOC from USSOCOM and have it report directly to the Secretary of Defense was reportedly opposed by the Joint Chiefs of Staff and therefore not implemented.

**Civil Affairs/Psychological Operations Shifted out of USSOCOM.**[14] One report suggests that the majority of Civil Affairs and Psychological Operations forces will be shifted from USSOCOM to the conventional Army. This reorganization, under discussion for more than a year, was reportedly ordered by the Secretary of Defense and plans for implementing this change are to be presented to him by this Spring. Under this new arrangement, reserve component civil affairs and psyops units will have an association with active Army brigade combat teams for training and deployment purposes. USSOCOM will retain active duty civil affairs and psychological operations units under its command.

**Combat Search and Rescue (CSAR) to Move to Air Combat Command.**[15] According to one report, the Chief of Staff of the Air Force, General T. Michael Moseley, has decided to move  the Air Force's HC-130 and HH-60 rescue  aircraft, along with its rescue officers and pararescue troops - also known as PJs - from the Air Force Special Operations Command (AFSOC) to the Air Combat Command (ACC). This move, supposedly based on lessons learned from Afghanistan and Iraq, is intended speed the ability to dispatch aircraft and rescue specialists to search for and retrieve downed air crews. General Moseley suggested that combat search and rescue, under previous command arrangements, was not always on the top of USSOCOM's list of priorities and that CSAR assets were often used on SOF-type missions and not always available to conduct search and rescue operations.

---

[12] (...continued)
January 24, 2006.

[13] Information in this section is from Sean D. Naylor's, "JSOC to Become Three-Star Command," *Army Times,* February 13, 2006 and SpecOps Beset by Command Confusion, *Army Times,* March 3, 2006.

[14] Information in this section is from Joshua Kucera, "Civil Affairs, Psyops Shift Away from SOCOM," *Jane's Defense Weekly,* March 22, 2006.

[15] Information in this section is from John T. Bennett, "Moseley: Move to ACC Will Elevate CSAR to "Primary Mission' Status," *InsideDefense.com,* February 27, 2006.

CRS-6

## Issues for Congress

**Is QDR-Mandated SOF Growth Achieveable?**  Congress may decide to examine the feasability of the QDR-mandated 15% increase in SOF forces, perhaps focusing on the proposed growth of Army Special Forces, Navy SEALs, and psychological warfare and civil affairs personnel.  Volunteers for Army Special Forces and Navy SEALs, in particular, are subjected to rigorous assessment and selection regimens that traditionally yield only a handful of men selected to serve in these units - around a 20% pass rate in the case of SEAL Basic Underwater Demolition (BUD) Training.[16] In order to meet a growing requirement, USSOCOM has "overhauled" its accession schools, increasing the number of training cadre and number of classes to increase candidate throughput while allegedly "maintaining the same high standards."[17] USSOCOM's goal for producing 750 enlisted Green Beret graduates per year starting in FY2006 was exceeded a year early as in FY2005, 790 new enlisted Green Berets successfully completed assessment and qualification training. USSOCOM notes that for the first few years of this initiative, additional SOF soldiers will be used to fill existing vacancies in Army Special Forces units but that USSOCOM is "now postured for additional future growth."[18]

While USSOCOM may be graduating additional operators from its qualification courses, working against this increase is the continued attrition of SOF personnel due to retirement as well as those who voluntarily separate from the service. While retention is a significant focus for USSOCOM, little is known about how many SOF personnel of all ranks are leaving the service and a significant increase in these numbers could preclude any meaningful growth for USSOCOM forces.

**JSOC's Increasing Role and Loss of Civil Affairs, Psyops, and Combat Search and Rescue Capabilities.**  Congress might act to review the implications of JSOC's increasing role in special operations as well as the loss of civil affairs, psyops, and combat search and rescue capabilities.  While proponents suggest that these and other changes will better enable USSOCOM to focus on intelligence gathering and direct action missions against individual terrorists and terror cells, others are concerned that by marginalizing the role of civil affairs, psyops, and training foreign militaries, that USSOCOM may not be optimally suited for fighting both the "long war" on terror as well as the insurgency in Iraq.  Some USSOCOM officials suggest that while direct action missions may "show effect immediately" that they can be detrimental in an insurgency, whereas civil affairs, psyops and special forces participating in foreign internal defense, information operations, and civil-military operations historically tend to be more effective in long-running counterinsurgency campaigns.[19]

---

[16] United States Special Operations Command, Posture Statement 2006, p. 15.

[17] Ibid.

[18] Ibid.

[19] Sean Naylor, "More Than Door Kickers," Armed Forces Journal, April 7, 2006.

Schroer Declaration – Exhibit C

# DAVID J. SCHROER



## Objective

Leverage my experience in counterterrorism, strategic and operational planning, international relations and programming and budgeting to engage with quality people on critical issues.

## Summary of Qualifications

*Lead strategic planner for U.S. Special Operations Command for 6 years*

2002–03 – 1+ year as the Director of the Campaign Support Group responsible for a series of integrated national strategic plans, reporting directly to the Chairman of the Joint Chiefs of Staff.

1997–2002 -- 5 years as Senior Assessment Director responsible for annually building the USSOCOM Program Objective Memorandum (POM) and defending it in the subsequent program reviews.

*Lead operational planner for Special Forces operations in Africa for 5 years*

1994–96 -- 2 years as Commander of 3rd Battalion, 3rd Special Forces Group (Airborne) operating in Sub-Saharan Africa and Haiti.

1991–94 -- 1 year each as Group Operations Officer, Group Executive Officer, and Group Deputy Commander.

## Operations & Planning

- Director of a 125 person classified strategic planning cell responsible for the formulation, integration and synchronization of national, interagency plans for global operations, May 2002 to September 2003.
  - Conducted interagency coordination and planning development for global contingencies, acting as the focal point of intelligence and operations planning integration.
  - Directly collaborated with the National Security Council, Office of the Secretary of Defense, the Joint Staff, and State, Treasury, and Justice Departments, Central Intelligence Agency, as well as selected allies and coalition partners.
- Commanded a 400-member Army Special Forces battalion, September 1994 to July 1996.
  - Commanded initial entry and all subsequent operations to liberate and stabilize Northern Haiti from September 1994 to April 1995.
  - Established the national demining programs in Rwanda, Namibia, Mozambique and Zimbabwe in 1995 and 1996.

- Developed and executed the first series of comprehensive international exercises as part of the larger program of military professionalization in Sub-Saharan Africa, conducted in eight countries simultaneously in 1996.

- Conceived and implemented a series of French-U.S. Special Operations Forces exchanges during 1995 and 1996, successfully leading to combined operations in Africa (humanitarian relief in Rwanda & the Congo) and Eastern Europe (pursuing "persons indicted for war crimes" in Bosnia & Kosovo).

## Program Funding & Oversight

- As Senior Director, implemented the USSOCOM Strategic Planning Process to develop the POM and subsequent annual budget ($4.6 billion in 2002). Directly responsible for a 5% ($800+ million) and 20% ($5.6 billion) overall increase in total funding during the 2000 and 2001 Program Reviews, respectively.

- Directed the bi-annual review of the entire USSOCOM force structure, including modifications to existing tables of organization, transfer of over 1,000 personnel from service accounts to USSOCOM with the attendant funding streams. Researched and wrote the 2001 CJCS Civil Affairs Study resulting in a 100% increase in the active duty U.S. Army Civil Affairs force structure (to a total of 32 operational teams of 168 personnel).

- Supervised over 200 individual program and unit funding lines and prioritized funding for developing programs, production schedules, new equipment fielding, major modifications, and program retrofits and rebuilds worth more than $2 billion in annual funding.

- Chaired the USSOCOM 2-year-long "Tiger Team" creating a long-range strategic planning process for the command. Authored the final report on re-organizing the short-, mid- and long-range planning processes in the command.

## Work Experience

- Senior Analyst & Program Manager, Benchmark International, Washington, D.C., October 2003 to present.

- Director, USSOCOM Campaign Support Group, Fort Bragg, N.C. and MacDill A.F.B., Fla., May 2002 to September 2003.

- Senior Assessment Director, USSOCOM Center for Force Structure, Resources & Strategic Assessments, June 1998 to May 2002.

- Director, Strategic Guidance Branch, Combat Analysis Division, USSOCOM J-7 (Resources and Requirements), June 1997 to June 1998.

- Commander, 3rd Battalion, 3rd Special Forces Group (Airborne), Fort Bragg, N.C., September 1994 to July 1996.

000130

- United States Army Officer, May 1976 to present. Advanced to grade of Colonel. Duty with heavy, light and special operations forces, including assignments in 101st Airborne Division, 2nd Armored Cavalry Regiment, 3rd and 5th Special Forces Groups and 18th Airborne Corps Headquarters. Extensive operational experience in the Middle East, Europe, Africa and Central America.

# Education

- Master of Science in International Affairs, National War College (Distinguished Graduate), 1997.
- Master of Military Art and Science, U.S. Army Command & General Staff College (Distinguished Graduate), 1991.
- Bachelor of Science in Political Science, Northern Illinois University, 1978.

# Administrative

- Security Clearance: TS/SCI
- Proficient in Microsoft Word, Power Point, Excel, Netmeeting, and Defense Collaborative Tool Suite