IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                  )

DIANE J. SCHROER,             )

        Plaintiff,             )
                                                  )    No. 05-cv-1090 (JR)
       v.             )

JAMES H. BILLINGTON,      )
   Librarian of Congress,       )

        Defendant.           )
_____)

**PLAINTIFF'S POST-TRIAL BRIEF**

      Plaintiff respectfully submits this post-trial brief to provide some additional legal analysis on a few discrete questions that were presented or distilled over the course of the trial of this matter. Plaintiff also incorporates her prior arguments, where applicable, by reference.

**I.    The Court Should Rule That the Library Discriminated Against Plaintiff Because of Her Sex When It Revoked Its Offer of Employment Because of Plaintiff's Failure to Conform With Sex Stereotypes.**

    **A.    An Adverse Employment Action Taken Because of an Employee's Failure to Conform to Sex Stereotypes Is Discrimination Because of Sex in Violation of Title VII.**

      Since <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989), it has been clearly established that an individual who can demonstrate that he or she experienced an adverse employment action due to his or her failure to conform to sex stereotypes can bring a claim of sex discrimination pursuant to Title VII. <u>See, e.g.</u>, <u>Medina v. Income Support Div.</u>, 413 F.3d 1131, 1135 (10th Cir. 2005) ("[A] plaintiff may satisfy her evidentiary burden [in a Title VII case] by showing that the harasser was acting to punish the plaintiff's noncompliance with gender stereotypes."). As the

1

Ninth Circuit explained, "[i]n the context of our civil rights laws, including Title VII, discrimination is the use of a *forbidden* criterion as a basis for a *disadvantageous* difference in treatment. 'Sex' is the forbidden criterion and discrimination is any disadvantageous difference in treatment 'because of . . . sex.'" Rene v. MGM Grand Hotel, Inc., 305 F.3d 1061, 1067 (9th Cir. 2002) (*en banc*) (emphasis in original). Accordingly, all that is required of a plaintiff is to show that his or her failure to conform to social stereotypes about sex is what led to the adverse employment decision.

Defendant's argument that adverse actions taken because of sex stereotyping are not actionable unless the stereotyping led to disparate treatment *between men and women* is incorrect. Defendant's argument relies heavily on language from this Court's first Memorandum and Order, which in turn relied on Jespersen v. Harrah's Operating Co., 392 F.3d 1076 (9th Cir. 2004), as part of its analysis. Two weeks after this Court issued that opinion, however, the Ninth Circuit replaced the panel opinion with an *en banc* opinion reaching the same result (that a sex-based difference in appearance standards alone did not establish a prima facie case of discrimination because of sex) but in a narrower manner. Jespersen v. Harrah's Operating Co., 444 F.3d 1104, 1109 (9th Cir. 2006) (*en banc*).

While Plaintiff submits that the *en banc* dissent's analysis in Jespersen is more consistent with Price Waterhouse, this Court need not decide which view should have prevailed in Jespersen to determine that Jespersen is easily distinguishable from this case. Plaintiff is not relying on the existence of a gender-specific policy to prove that she was discriminated against because of sex. Rather, Plaintiff relies on direct evidence – *i.e.*, the admission of the decision-maker herself, Charlotte Preece – that the Library's decision to rescind its job offer to Plaintiff was based, *inter alia*, on Ms. Preece's belief that Members of Congress and others would not

find Plaintiff credible because, as Diane, Plaintiff did not conform with how Ms. Preece believed a woman should look.  See, e.g., Trial Tr. 112-16, 122, 132-34.  This evidence brings Plaintiff's sex stereotyping claim squarely within the Court's first ruling.  Mem. & Order (Rec. Doc. 13) at 16 ("A transsexual plaintiff might successfully state a Price Waterhouse-type claim if the claim is that he or she has been discriminated against because of a failure to act or appear masculine or feminine enough for an employer, but such a claim must actually arise from the employee's appearance or conduct and the employer's stereotypical perceptions.").  Because the record contains direct evidence that sex-stereotypical views directly motivated the Library's adverse employment action against Plaintiff, the Court can easily find that the Library's actions constitute discrimination "because of sex," and need not address whether and/or when the mere existence of sex-specific grooming standards constitutes impermissible sex stereotyping in violation of Title VII, a question left open by the *en banc* Court in Jespersen, 392 F.3d at 1113 (noting, *inter alia*, that there was no evidence in the record of sex stereotypical motivation behind the grooming standards).

     A female employee who suffers an adverse employment action due to her failure to conform to social stereotypes about sex need not prove that a male employee who likewise failed to conform to social stereotypes would not also have suffered the same adverse action.  For example, Ann Hopkins did not show that effeminate men would not also have been denied partnership due to their failure to live up to social sex stereotypes, nor was she required to by the Court.  Price Waterhouse, 490 U.S. at 248 ("We have not in the past required women whose gender has proved relevant to an employment decision to establish the negative proposition that they would not have been subject to that decision had they been men, and we do not do so

3

today."). Rather, "if an employer allows gender to affect its decisionmaking process, then it must carry the burden of justifying its ultimate decision." Id.

Cases decided since Price Waterhouse demonstrate that an employee need only convince the finder of fact that the adverse decision was taken because of the employee's failure to conform with sex stereotypes to demonstrate that the employer's action was because of sex. In Rene, the Ninth Circuit was presented with the claims of an effeminate gay male butler, who had been harassed by his male co-workers and male supervisor. 305 F.3d at 1064 ("All of the other butlers on the floor, as well as their supervisor, were also male."). In ruling for Rene, the court noted that "Oncale [the plaintiff in Oncale v. Sundowner Offshore Services, Inc, 523 U.S. 75 (1998)] did not need to show that he was treated worse than members of the opposite sex. It was enough to show that he suffered discrimination *in comparison to other men*," and therefore refused to require such a showing from Rene. 305 F.3d at 1067 (emphasis in original). In his concurring opinion, Judge Pregerson, writing for a plurality, concluded that Rene's allegations presented a claim of actionable gender stereotyping harassment, without demanding from Rene any showing that a gender non-conforming woman would not have suffered such harassment. Id. at 1068-69 (Pregerson, J., concurring); id. at 1070 (Fisher, J., concurring) (agreeing with sex stereotyping analysis). See also Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 874-75 (9th Cir. 2001) (finding that the male plaintiff "established each element of his hostile environment claim" based on gender stereotyping harassment, with no suggestion that the lack of evidence of a comparator posed a barrier to his claim).

These cases confirm what was expressly stated in Price Waterhouse, 490 U.S. at 248 -- namely that, in a case such as this, where the selecting official perceived the plaintiff to be a man who failed to conform to social norms about masculinity, and where the hiring decision was

motivated by the plaintiff's perceived shortcoming, the plaintiff need not "establish the negative proposition" that someone perceived as a gender non-conforming woman would not have suffered discrimination as well in order to prove discrimination because of sex. For example, the Sixth Circuit, in affirming a jury verdict in favor of a male-to-female transgender police officer demoted due to her failure to conform to sex stereotypes, never suggested that the officer had to prove that a female-to-male transgender officer would *not* have suffered the same fate in order to demonstrate that she had been discriminated against because of her failure to conform to sex stereotypes. Barnes v. City of Cincinnati, 401 F.3d 729, 737-38 (6th Cir. 2005), cert. denied, 546 U.S. 1003 (2005).

     Defendant's interpretation of Title VII would have the perverse effect of not only encouraging employers to discriminate against both effeminate men and masculine women so as to evade liability and but in fact rewarding the employers that enforce the most sex stereotyped workplaces. The Court need not adopt an analysis that would produce a result so contrary to the remedial purposes of Title VII. See, e.g., Nordell v. Heckler, 749 F.2d 47, 49 (D.C. Cir. 1984) (instructing that courts faced with claims under Title VII "must seek in every case an interpretation animated by the broad humanitarian and remedial purposes underlying the federal proscription on employment discrimination") (internal quotation omitted). As the Supreme Court noted in Price Waterhouse, "[w]e need not leave our common sense at the doorstep when we interpret a statute." 490 U.S. at 241. Accordingly, this Court should hold that, in prohibiting discrimination in employment because of sex, Title VII simply requires an employee "to prove that the employer relied upon sex-based considerations in coming to its decision." Id. at 242.

     Lastly, although most courts have recognized that a comparator is not necessary to the analysis, in those few cases where the court has looked for a comparator, the court has

5

recognized that the proper comparison is to a gender conforming person. See, e.g., Myers v. Cuyahoga County, 182 Fed. App'x 510, 519 (6th Cir. 2006) (for purposes of prima facie analysis, plaintiff alleging discrimination due to failure to conform with sex stereotypes needed to provide some evidence that a gender conforming person was hired in her place). In this case, Plaintiff has put forth evidence both that her offer was rescinded because of her failure to conform to sex stereotypes and that the second choice candidate was selected because he conformed to sex stereotypes and did not raise the same concerns in the mind of the employer about credibility and contacts as Plaintiff did. See, e.g., Trial Tr. 132-34. Therefore, even under this framework, Plaintiff is entitled to prevail on her sex stereotyping claim.

### B. Plaintiff's Evidence Proves That the Library's Decision Was Motivated by Impermissible Sex Stereotyping.

Plaintiff has presented convincing evidence that the Library's decision not to hire her was due to its negative reaction to her non-conformity with social stereotypes about sex, as well as its fear about the possible negative reaction of others to that non-conformity. As laid out below, the evidence shows that sex stereotyping infected the decision-making process at various points. First, the decision-maker, Charlotte Preece, admitted that when she saw the photographs of Plaintiff in feminine attire, with a feminine hairstyle and with feminine makeup, she saw a man in women's clothing. See, e.g., Trial Tr. 112-13. In conversations with colleagues that Preece had following her lunch with Plaintiff, she repeatedly mentioned the pictures that Plaintiff had shown her, focusing on the fact that Plaintiff wanted to come to work dressed as a woman. See, e.g., id. at 120-21, 172-73.

There is no dispute that Charlotte Preece perceived Plaintiff to be a man at the time of the events in this case. See, e.g., id. at 124. Ms. Preece herself admitted that she viewed Plaintiff not just as a man, but as an especially masculine person – namely, the kind of masculine,

6

"macho" person who would be in Special Forces. Id. And it was her perception of David Schroer as a particularly masculine man that made it especially difficult for her to see Diane Schroer as anything but a man in a dress. Id. Likewise, Ms. Preece simply could not fathom how someone who had been in Special Forces would want to adopt a feminine gender presentation. Id.

The record is clear that Charlotte Preece's personal sex stereotypes influenced the decision, and that alone is sufficient for the purposes of establishing liability. But Plaintiff's evidence also demonstrated that it was not only Charlotte Preece's own stereotypes that influenced the decision. The record shows that the Library's decision was also driven by its conviction that others would react badly to Ms. Schroer based on their own sex stereotypes.

First, Ms. Preece thought that others would perceive Plaintiff to be a man who did not conform to the stereotypes associated with men. See, e.g., id. at 112-15. She testified that she believed that others would view Plaintiff as a man in women's clothing, and therefore would not take her seriously. Id. Preece was worried about others at CRS, as well as Members of Congress and their staff. Id. at 112-15, 132-34. Finally, Preece was worried about members of the military who, like her, would see Diane as David in a dress. Id.

The Library has also argued that Plaintiff would not be deemed credible by Members of Congress and their staff because people would perceive her to be a woman, and would refuse to believe that she could possibly have the credentials that she had. See, e.g., id. at 114. This too is a form of sex stereotyping. Plaintiff presented evidence from Dr. Kalev Sepp that there have, in fact, been women in Special Forces since the 1970s. Id. at 98-99. To suggest that people would be so taken aback by the notion that this woman, Diane Schroer, had a Special Forces background is quintessential sex stereotyping. The fact is that Plaintiff *does* have a Special

7

Forces background, and it is sex discrimination for the Library of Congress to have withdrawn the job offer because it believed that others would react negatively to Plaintiff because she knows things that most women do not know, and has experience that most women do not have.

The evidence is clear that Defendant rescinded its offer to Plaintiff because of her perceived failure to conform to social stereotypes about sex. Therefore, Plaintiff is entitled to judgment on this theory of liability.

## II.     Irrespective of Its Etiology, Gender Identity Is Part of a Person's Sex for Purposes of Title VII.

### A.     Courts, Including the Supreme Court, Have Already Concluded That, as a Legal Concept, "Sex" as Used in Title VII Means More Than Just Chromosomes and/or Biology.

The position of Defendant's expert is that chromosomal configuration is what constitutes a person's sex. Trial Tr. at 396. While the evidence demonstrates that this is actually not true as a matter of scientific fact, *see infra* Section II.B, it is independently not true as a matter of statutory construction under Title VII. The Supreme Court has already held that Title VII covers discrimination not only based on an individual's chromosomes, but also based on other aspects of a person's sex, such as gender expression and his or her conformity (or lack thereof) with what is considered to be the appropriate social sex role.[1] See Price Waterhouse v. Hopkins, 490 U.S. 228 (1989); Nichols, 256 F.3d at 874 (holding that harassment of male employee based upon the perception that he is effeminate is discrimination "because of sex"); Doe v. City of Belleville, 119 F.3d 563, 581 (7th Cir. 1997) ("[A] man who is harassed because his voice is

---

[1]  Dr. Bockting testified that social sex role -- which involves characteristics in personality, appearance, and behavior that is more typically associated with one sex versus another (*i.e.*, masculinity versus femininity) -- is one of the nine aspects of an individual's sex. Trial Tr. 208-10. Likewise, Dr. Bockting also testified that one's expression of one's gender identity (*i.e.*, gender role) is understood to be part of a person's sex. Id. Both of these factors are involved in the cases regarding sex stereotyping.

8

soft, his physique is slight, his hair is long, or because in some other respect he . . . does not meet his coworkers' idea of how men are to appear and behave, is harassed 'because of' his sex."), vacated on other grounds, 523 U.S. 1001 (1998).  Therefore, regardless of whether Defendant's position is that sex is only chromosomes, which is the view of its expert, or that sex encompasses only the aspects of sex with a definitive foundation in biology, the Defendant's alternative argument,[2] neither position finds support in the law.

Outside of the Title VII context, the law recognizes that a person's sex is not determined by his or her chromosomes.  Every day throughout the country, federal and state agencies allow transgender people to change their legal sex on passports, birth certificates and driver's licenses.[3]

---

[2]  The facts presented to the Court demonstrate that gender identity is, at a minimum, the product of biological influences, at least in part.  Trial Tr. 215-23, 414-15, 442-43.  Yet, because the question of whether gender identity is a part of sex for purposes of Title VII is not contingent upon a finding by the Court that gender identity has a definitive biological etiology, the Court need not reach this question.  Plaintiff continues to dispute Defendant's premise that gender identity must have a biological etiology in order to be part of "sex."  Nevertheless, Plaintiff has presented evidence from Dr. Bockting demonstrating that, even under Defendant's framing of the question, Plaintiff should prevail.  As Dr. Bockting explained, even though the specific mechanism(s) has/have not been isolated, the scientific community has concluded that gender identity is the product, at least in part, of biological influences and cannot be explained away as a purely social phenomenon.  Id. at 215-23.  Even Dr. Schmidt concedes that gender identity is not merely a social construct.  Id. at 414-15.

[3]  Almost all states allow a person to change his or her legal sex after providing sufficient documentation of sex reassignment.  See Julie Greenberg, "Defining Male and Female: Intersexuality and the Collision Between Law and Biology," 41 Ariz. L. Rev. 265, 309 nn.346-55 (1999) (summarizing the state of the law in 1999 regarding state policies on changing sex).  Although there is no one federal policy specifically addressing the question of an individual's sex, the federal policies relating to this question likewise reflect that an individual can change his or her sex.  For example, the Model State Vital Statistics Act (MSVSA), which was promulgated by the Department of Health, Education and Welfare (DHEW) in 1977, includes a provision authorizing the issuance of a new birth certificate for a transsexual person who has undergone sex-reassignment.  See In re Heilig, 816 A.2d 68, 82-83 (Md. 2003) (describing history of the Model Act).  This provision in the MSVSA was retained without modification when the Model Act was revised in 1992.  The Social Security Administration allows transgender people to change their gender marker in their Social Security records, Social Security Administration Program Operations Manual System: RM 00203.215, and the State Department allows individuals to change their sex on their passport.  See Spencer Bergstedt, "Estate Planning and

9

Likewise, in other contexts, courts have recognized that, as a legal matter, sex is more than simply chromosomal composition.  For example, the Board of Immigration Appeals rejected the government's argument that chromosomal configuration should be dispositive of a person's sex when determining whether a couple's marriage should be considered a same-sex or a different-sex union:

> [The government] asserts that these terms ["male" and "female"] can be conclusively defined by an individual's chromosomal pattern, *i.e.*, XX for female and XY for male, because such chromosomal patterns are immutable.  However, this claim is subject to much debate within the medical community.  According to medical experts, there are actually eight criteria that are typically used to determine an individual's sex. . . . [B]ecause a chromosomal pattern is not always the most accurate determination of an individual's gender, the DHS counsel's reliance on chromosomal patterns as the ultimate determinative factor is questionable.

In re Lovo-Lara, 23 I. & N. Dec. 746, 752 (B.I.A. 2005).

Similarly, many state courts have rejected the narrow definition of sex discrimination advocated here by Defendant when interpreting state and local sex discrimination laws.  For example, in Richards v. U.S. Tennis Ass'n, 93 Misc. 2d 713, 400 N.Y.S.2d 267 (N.Y. Sup. Ct. 1977), the court held that it would be "grossly unfair, discriminatory and inequitable" to use a chromosomal test as the sole indicator of a person's sex, particularly where other aspects of the person's sex, including gender identity, indicate a different result.  93 Misc. 2d at 721.  Emphasizing that "all courts agree [that] the anti-discrimination statutes are remedial and thus to be interpreted liberally to achieve their intended purposes," New York courts have held on numerous occasions that, notwithstanding the Seventh Circuit's holding in Ulane, an employer

---

the Transgender Client," 30 W. New Eng. L. Rev. 675, 684 nn.44-49 (2008); Julie Greenberg, "Deconstructing Binary Race and Sex Categories: A Comparison of the Multiracial and Transgendered Experience," 39 San Diego L. Rev. 917, 931-32 nn. 77-81 (2002).

10

that discriminates against an employee "because the person, as a result of surgery and hormone treatments, is now of a different sex has violated our City prohibition against discrimination based on sex." Maffei v. Kolaeton Indus., Inc., 626 N.Y.S.2d 391, 396 (N.Y. Sup. Ct. 1995).

Similarly, a New Jersey appellate court rejected the "constricted" view of sex discrimination reflected in earlier decisions:

> A person who is discriminated against because he changes his gender from male to female is being discriminated against because he or she is a member of a very small minority whose condition remains incomprehensible to most individuals . . . . "[S]ex" embraces an individual's gender, and is broader than anatomical sex. Sex is comprised of more than a person's genitalia at birth.

Enriquez v. West Jersey Health Sys., 777 A.2d 365, 372-73 (N.J. Super. Ct. App. Div. 2001) (internal quotations and citations omitted). Recognizing that the Supreme Court's decision in Price Waterhouse "signaled a possible change in the federal approach to gender dysphoria," id. at 371, the court concluded that sex discrimination "includes gender discrimination so as to protect plaintiff from gender stereotyping *and* discrimination for transforming herself from a man to a woman." Id. at 373 (emphasis added). See generally Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss and in the Alternative for Judgment on the Pleadings (Rec. Doc. 34) at 19-23.

As a matter of law, "sex" encompasses more than just one's chromosomal or biological make-up. Accordingly, when ascribing weight to the testimony of the experts with respect to whether the term "sex" should be interpreted as simply reflecting chromosomal make-up or as something more complex, this Court should heed the guidance of these prior well-reasoned cases and should conclude that Title VII encompasses all of the aspects of an individual's sex, including gender identity, that might cause an individual to suffer discrimination.

11

**B.    As a Matter of Scientific Fact, "Sex" Is a Multifaceted Concept That Includes Gender Identity.**

The Court has received evidence demonstrating that, as a matter of scientific fact, gender identity is part of a person's sex. This factual basis provides further support for Plaintiff's legal argument that gender identity is part of one's sex for purposes of Title VII.

Plaintiff's expert, Dr. Walter Bockting, testified that it has been widely accepted in the relevant scientific communities for many decades that there are nine factors that constitute a person's sex, and that one of these factors is gender identity. Trial Tr. 208-10, 446. Dr. Bockting explained the bases for his opinion, which includes the pioneering work of Dr. John Money, id. at 208-10, whose stature in the field is recognized even by Defendant's expert, Dr. Chester Schmidt, and whose work forms the basis for many of the opinions offered by Dr. Schmidt, id. at 396, 401.

Dr. Bockting also testified that it is well established in the scientific community that gender identity is the most important among the nine factors making up a person's sex. Id. at 213-14. For most people, all aspects of sex are in alignment, and therefore an individual's understanding of his or her sex cannot easily be isolated in terms of one specific factor. Id. But for individuals with intersex conditions or gender dysphoria, there is a lack of consonance among the various aspects of sex. And based on his and others' clinical research and study of children born with ambiguous genitalia and transgender adults, Dr. Bockting testified that experts in the field have come to understand that, of all of the aspects of sex, gender identity is the most important element. Id. at 213. As Dr. Bockting explained, the importance of gender identity is powerfully reflected in the fact that, when health care providers and other experts in the field assign sex at birth, their goal is congruence with gender identity. Id.

Dr. Schmidt concedes that his definition of sex is more narrow than the nine factors identified by Dr. Money, id. at 403 and, as Dr. Bockting testified, Dr. Schmidt's opinion is a minority view in the field, id. at 208-10 (describing general acceptance of the Money factors), 446 (describing Dr. Schmidt's opinion as a minority view). Dr. Schmidt lacks Dr. Bockting's experience working with intersex children, id. at 398, 419, and admitted that publication and research on these issues is not his focus, id. at 421. And yet even Dr. Schmidt's own testimony demonstrates that the question of sex does not boil down to easy answers like XX equals female and XY equals male. First, Dr. Schmidt acknowledged that there are more options in the world than just XX and XY. Id. at 398-99. He noted that in cases of androgen insensitivity disorder, experts will assign a female sex to an infant notwithstanding the fact that she has XY chromosomes. Id. at 398-400. Second, Dr. Schmidt testified that genitalia, hormonal sex and hypothalamic sex are also parts of a person's sex, id. at 402-03, and concedes that these too may differ from the person's chromosomal sex, id. at 404-10. Finally, and most importantly, he concedes that, in the event that different aspects of an individual's sex are not in alignment, scientists and clinicians attempt to assign a sex at birth that will be congruent with the child's gender identity. Id. at 415-16. Therefore, the testimony from Defendant's own expert only confirms the primacy of gender identity in terms of evaluating what a person's sex is.

As discussed above, gender identity need not have a biological determinant in order to be considered part of sex for purposes of Title VII. Even assuming, however, that only those factors of sex that have a biological etiology fall within the meaning of the term sex, Dr. Bockting presented the scientific evidence showing that the science shows that gender identity has *some* biological determinant, even if the precise mechanisms by which biology influences gender identity have yet to be determined. Id. at 442-43. As just one example, Dr. Bockting

13

testified that studies show that a portion of the brains of male-to-female transsexuals are more similar to female brains than to male brains, which was a significant step forward in the research. Id. at 215-19. Dr. Bockting also testified about the fact that research has definitively eliminated the possibility that only psychosocial influences produce gender identity. Id. at 219-22. Although Dr. Schmidt does not believe that the science is yet conclusive, his own testimony reveals that he anticipates that the research will eventually establish that some combination of biological and psychosocial influences contributes to the development of gender identity. Id. at 411-12, 414-15.

     In response to the Court's first opinion and to Defendant's arguments, Plaintiff has submitted evidence demonstrating that gender identity is biologically determined, at least in part. Nevertheless, Plaintiff submits that the question of whether there is a precise biological explanation for gender identity is a red herring in this case. Dr. Bockting made clear that experts do not need gender identity to have a definitive biological etiology as a precondition for recognizing the importance of gender identity as part of sex. Id. at 445-46. And, as explained above, we already know as a matter of law and social understanding that a person's sense of feeling male or female is part of what he or she is referring to when discussing his or her sex.[4] Therefore, this Court need not resolve whether there is a definitive biological determinant of gender identity to recognize that, as a matter both of law and of scientific fact, one's gender identity is part of one's sex.

---

[4] By contrast, Defendant's position leads to the conclusion, endorsed by its expert at trial, that Diane Schroer is, and will always be, a man. Trial Tr. 424-25. Yet, that conclusion is not only at odds with federal and state policies that allow individuals like Plaintiff to change their sex, *see supra* note 3, but also contradicts the view of everyone who interacts with Plaintiff on a daily basis. The Court need not, and should not, endorse such a forced, and false, view of reality.

### C. Prior Legislative and Judicial Discussion About the Scope of Title VII's Protections Does Not Refute the Proposition that Gender Identity Is Part of Sex and Therefore Already Covered by Title VII.

Defendant continues to argue that recent events (or, rather, non-events) on Capitol Hill prove that gender identity is not covered by the existing prohibition on sex discrimination in Title VII. This argument lacks persuasive force.

First, a reasonable interpretation of recent legislative events is that Congress believes that the Ulane court and others have interpreted the term sex in an unduly narrow way. As the Supreme Court has explained,

> [S]ubsequent legislative history is a "hazardous basis for inferring the intent of an earlier" Congress. It is a particularly dangerous ground on which to rest an interpretation of a prior statute when it concerns, as it does here, a proposal that does not become law. Congressional inaction lacks "persuasive significance" because "several equally tenable inferences" may be drawn from such inaction, "including the inference that the existing legislation already incorporated the offered change."

Pension Ben. Guar. Corp. v. LTV Corp, 496 U.S. 633, 650 (1990) (internal citations omitted).[5]

Second, to the extent that legislative inaction is deemed relevant to the inquiry, an arguably more relevant non-development is the fact that Congress has never chosen to define the term sex so as to limit it to chromosomes, or to some other subset of the factors that constitute sex, the interpretation for which Defendant advocates in this case. As mentioned briefly during Plaintiff's closing argument, the phenomenon of transsexuality was already a matter of common knowledge when Congress passed Title VII. Dr. Magnus Hirschfeld, who is credited with developing the term transsexualism, performed the first sex reassignment surgeries at the

---

[5] The fact that a bill addressing sexual orientation and gender identity discrimination was reintroduced as two separate bills is equally unenlightening in terms of the question presented to the Court here – namely, whether gender identity is part of what constitutes a person's sex. There can be as many reasons motivating such political calculations as there are Members of Congress.

Institute of Sexual Science in Berlin in the late 1920s and 1930s.  Dr. Harry Benjamin began working on issues of transsexuality, first in children and then in adults, starting in 1948.  And in 1952, the Christine Jorgensen case, which appeared as a cover story in the New York Daily News and in various other media outlets shortly thereafter, dramatically increased public awareness of transsexuality in this country.  See generally Joanne Meyerowitz, How Sex Changed: A History of Transsexuality in the United States 1-9, 14-97 (2004).  Therefore, the fact that Congress chose not to adopt a restrictive definition of sex that would have excluded transsexuality and/or gender identity means that there is no reason for courts to do so when, as has been demonstrated in this case, it is apparent that one's gender identity is part of one's sex both as a matter of science and as a matter of social understanding.

The Court heard from the experts in this case about the work of researchers and clinicians that is expanding our understanding of how the various aspects of sex develop and interact in terms of biological and psychosocial factors.  Yet the question presented to the Court in this case is not whether the meaning of the term sex has *changed* for purposes of Title VII.  Rather, the question is whether prior courts have imposed an unduly restrictive definition on the term sex by limiting it to an artificial subset of the elements that constitute a person's sex.  The fact that gender identity is one of these elements has been known since before Title VII was introduced.  Consequently, this Court need not (and should not) find that the meaning of sex has changed to conclude that previous interpretations of Title VII in terms of what constitutes sex discrimination, none of which are binding on this court, were erroneous.

**III.    The Library Has No Ignorance-of-the-Law Defense to a Title VII Sex Discrimination Claim.**

In an eleventh-hour effort to avoid liability, Defendant argues that it cannot be held liable for discrimination that it did not know was unlawful in 2004.  This argument lacks merit, as Title

VII jurisprudence clearly holds that an adverse employment action made because of a characteristic protected by Title VII can trigger liability even where an employer did not know that its action constituted illegal discrimination.

For example, past litigants have tried to suggest that some of Title VII's protections applied only to women and not to men. The courts rejected that argument and held employers liable for discrimination against men, despite the fact that discrimination against women was the problem that the sex discrimination provision of Title VII was most obviously enacted to combat. See, e.g., Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 679-81 (1983). Similarly, in Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986), the defendant was held liable for sexual harassment, even though it had not previously been obvious that the statute went beyond "tangible, economic barriers" to equality and reached the "psychological aspects of the workplace environment." Id. at 64. In Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993), when the defendant insisted that victims of sexual harassment needed to experience a nervous breakdown in order to make out a claim of sex discrimination under Title VII, the Court had no trouble finding the employer liable for less severe forms of sexual harassment. Id. at 22. And finally, in Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998), the Supreme Court held the employer liable even though, until the Supreme Court's decision, it was far from clear that same-sex sexual harassment constituted actionable sex discrimination.

Title VII is designed to root out discriminatory actions that may be the product of such well-accepted or deeply-ingrained attitudes as not to be always perceived as discrimination. Thus, while an employer's intentional discrimination or malice is relevant in terms of assessing punitive damages, a plaintiff need not prove that an employer *knew* it was breaking the law in order to establish a violation of Title VII. Thomas v. Eastman Kodak Co., 183 F.3d 38, 58 (1st

Cir. 1999) ("the ultimate question" in terms of Title VII "is whether the employee have been treated disparately 'because of [the protected characteristic (i.e., race or sex)]. This is so regardless of whether the employer consciously intended to base the [adverse action] on race [or sex,] or simply did so because of unthinking stereotypes or bias.").

Moreover, it is also disingenuous for the Library to argue that it did not know that its actions in this case were suspect. There is no dispute that the Library made its decision to rescind its job offer to Plaintiff after learning new information about Plaintiff's sex. And the process set in motion by the Library after Charlotte Preece's lunch with Plaintiff – bringing in the lawyers rather than checking the status of Plaintiff's security clearance and/or investigating whether her current employer and her references knew of her gender transition – demonstrates that the Library knew that it was dealing with a situation involving potential litigation and liability. Trial Tr. 125-29, 134-37. Therefore, any argument that the Library could not have known that its actions were discriminatory rings false.[6] In any event, lack of such knowledge by the Library does not absolve it of liability under Title VII.

## CONCLUSION

Plaintiff has adduced evidence that supports both her sex stereotyping and her gender identity theories of liability under Title VII, each of which is an alternative and independent basis of liability. Accordingly, Plaintiff respectfully requests that the Court rule that Plaintiff's right

---

[6] The Sixth Circuit's original decision in Smith v. City of Salem was issued in June 2004, 378 F.3d 566 (6th Cir. 2004), with a revised but substantively similar decision reissued by the Sixth Circuit in August 2004, 378 F.3d 566 (6th Cir. 2004). Even assuming that Price Waterhouse itself did not provide sufficient notice, the Smith decision should certainly have put a diligent management-side lawyer on notice that rescinding a job offer based on a transgender individual's perceived gender non-conformity might result in liability.

not to be discriminated against because of her sex was violated by the Library of Congress under both theories.

                Respectfully submitted,

                /s/_Sharon M. McGowan_____
                Sharon M. McGowan
                  (D.C. Bar No. 476417)
                Kenneth Y. Choe
                James D. Esseks
                American Civil Liberties Union Foundation
                125 Broad Street
                New York, NY 10004
                (212) 549-2627

                Arthur B. Spitzer  (D.C. Bar No. 235960)
                American Civil Liberties Union
                  of the National Capital Area
                1400 20th Street, N.W. #119
                Washington, D.C. 20036
                (202) 457-0800

                *ATTORNEYS FOR PLAINTIFF*

August 27, 2008