## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DIANE J. SCHROER,              ) | |
|                        ) | |
|         Plaintiff,     ) | |
|                        ) | |
|      v.                    ) | Civil Action No. 05-1090 (JR) |
|                        ) | |
| JAMES BILLINGTON,       ) | |
|     In his official capacity     ) | |
|     as Librarian of Congress,    ) | |
|                        ) | |
|        Defendant.    ) | |
|                        ) | |

## DEFENDANT'S POST-TRIAL BRIEF

Plaintiff, a transgendered female, brought this sex discrimination claim pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 et seq., not on the basis that she was subjected to disparate treatment because of sex, but instead based on her transsexuality and gender identity, and on the premise that she was subjected to sex stereotyping. Defendant James Billington, Librarian of the Library of Congress ("Defendant" or "Library"), respectfully submits this post-trial brief in support of his argument that he is entitled to judgment as a matter of law. Specifically, Plaintiff's claims that the selecting official did not select Plaintiff because she is transsexual and because she did not conform with sex stereotypes fail as a matter of law because: 1) transsexuality is not a protected class under Title VII and 2) there is no independent cause of action for "sex stereotyping."

## ARGUMENT

**A.    Transsexuals Are Not a Protected Class Under Title VII.**

### 1.    The Court Should Reject Plaintiff's Appeal to Create a New Protected Characteristic Under Title VII.

In this suit, Plaintiff invites the Court to adopt an expansive and multi-faceted definition of the term "sex," i.e., gonadal sex, fetal hormonal sex (prenatal hormones produced by the gonads ), internal morphologic sex (internal genitalia, i.e. ovaries, uterus, testes), external morphological sex (external genitalia, i.e. penis, clitoris, vulva), hypothalmic sex (sex of the brain), sex of assignment and rearing, pubertal hormonal sex, gender identity and role.  Trial Transcript ("TR") 208:7-18.  However, Plaintiff has offered no convincing rationale why this Court should so drastically deviate from the common usage of the term "sex" (i.e. the term "sex" is a biologic reality which refers to the biologic status of a fetus or newborn with regard to their chromosomal configuration - "xx" genes for females and "xy" genes for males).  Indeed, such an expansive definition is certainly not what the Congress intended in 1964 when it passed Title VII and it most definitely does not comport with the maxim of statutory construction that, unless otherwise defined, words should be given their ordinary common meaning.  The phrase in Title VII prohibiting discrimination based on one's sex, in its plain meaning, implies that it is unlawful to discriminate against women because they are women and against men because they are men.  The lack of legislative history regarding section 2000e-2(a)(1) strongly reinforces the view that this section means nothing more than its plain language implies.  Although the maxim that remedial statutes should be liberally construed is well recognized, the concept has reasonable bounds beyond which a court cannot go without transgressing the prerogatives of Congress.  Adopting Plaintiff's expert's nine-part definition of "sex" would go well beyond

Congress' intentions with respect to the term "sex" in Title VII, both at the time of adopting Title VII and the present.[1]

As addressed below, Plaintiff's position runs contrary to fundamental principles of statutory construction, long standing legal precedent regarding the interpretation of the term "sex", and Congress' actions since the passage of Title VII - - in essence, Plaintiff asks the Court to step in the shoes of Congress and create a new protected class under Title VII.  See, e.g. Consolidated Rail Corp. v. United States, 896 F.2d 574, 579 (D.C. Cir. 1990)(". . .if courts were free to "correct" what they believe to be congressional oversights by construing unambiguous statutes to the contrary of their plain meaning-apart from that rare case in which specific legislative history compels such a result-even a good faith attempt to further Congress's goals would open the way to judicial hijacking of the power to legislate.").  Defendant respectfully submits that any changes to Title VII must be legislated by Congress - and not based on the lone opinion of Plaintiff's expert psychologist.

> **2.** **The Term "Sex" Should Be Accorded Its Plain Meaning.**

As Defendant has repeatedly argued, a fundamental canon of statutory construction requires that words within a statute be given their ordinary, common meaning.  See F.D.I.C. v. Meyer, 510 U.S. 471, 476 (1994)(The Supreme Court states, in the absence of a term not being defined in a statute, the Court will "construe a statutory term in accordance with its ordinary or natural meaning."  Notably, in F.D.I.C. v. Meyer, the Supreme Court turned to the Black's Law

---

[1]Plaintiff is simply wrong when she argues that "the phenomenon of transsexuality was already a matter of common knowledge when Congress passed Title VII."  Plaintiff's Post Trial Brief at 15.  It would strain credulity to believe that the Southern senator who introduced the term "sex" to the Civil Rights Act as a "poison pill" (and for the purpose of scuttling Title VII), meant for the term to encompass not only biologic males or females but, transsexuals, gender identity, or any other part of Dr. Bockting's 9-factor definition of the term "sex".

Dictionary for guidance as to the meaning of the term "cognizable.")(citation omitted); <u>Perrin v. U.S.</u> 444 U.S. 37, 42 (1979); <u>see also</u> <u>MCI Telecommunications Corp. v. American Tel. & Tel. Co.</u>, 512 U.S. 218, 228 (1994)(The most relevant time period for determining a statutory term's meaning is when the statute became law). Therefore, the term "sex," as used by Title VII prohibits discrimination based on the biological state of a male or female. <u>See, e.g.</u> <u>Dobre v. National R.R. Passenger Corp.</u>, 850 F.Supp. 284, 286 (E.D.Pa. 1993)("It is well established that the term 'sex' is to be construed narrowly according to its plain meaning[,]" and "[t]he term 'sex' in Title VII refers to an individual's distinguishing biological or anatomical characteristics.")(citations omitted). Indeed, the dearth of legislative history regarding Section 2000e-2(a)(1) of Title VII strongly reinforces the view that this section means nothing more than its plain language implies – specifically, a prohibition of discrimination based on one's status as a man or a woman. <u>See, e.g.</u> <u>Grossman v. Bernards Township Board of Education</u>, No. 74-1904, 1975 WL 302, at *4 (D.N.J. Sept. 10, 1975), <u>aff'd</u>, 538 F.2d 319 (3rd Cir. 1976), <u>cert. denied</u>, 97 S.Ct. 261 (1976)("In the absence of any legislative history indicating a congressional intent to include transsexuals within the language of Title VII, the Court is reluctant to ascribe any import to the term 'sex' other than its plain meaning."). Thus, a claim based on gender identity or transsexuality fails as outside the scope of Title VII.

Further, every Federal court that has dealt directly with this issue has held that transsexuals are not a protected class under Title VII. <u>See, e.g.</u> <u>Etsitty v. Utah Transit Authority</u>, 502 F. 3d 1215, 1357 (10th Cir. 2007) ("In light of the traditional binary conception of sex, transsexuals may not claim protection under Title VII from discrimination based solely on their status as a transsexual"); <u>Underwood v. Archer Management Services, Inc.</u>, 857 F. Supp. 96, 65 (D.D.C. 1994) ("In construing Title VII district courts have ruled [that] discrimination on the

-4-

basis of transsexuality is outside Title VII's protection"); <u>see also</u> <u>Ulane v. Eastern Airlines, Inc.</u>, 742 F. 2d 1081, 1085 (7th Cir. 1984)("the words of Title VII do not outlaw discrimination against a person who has a sexual identity disorder."); <u>Sommers v. Budget Marketing, Inc.</u>, 667 F. 2d 748, 750 (8th Cir. 1982)("We hold that discrimination based upon one's transsexualism does not fall within the protective purview of [Title VII]."). [2]

### 3.    Recent Legislative History Undermines Plaintiff's Claim That Gender Identity or Transsexuality is Covered Under Title VII.

In 2007, members of the United States Congress attempted to enact legislation that would prohibit discrimination based on sexual orientation <u>and</u> gender identity, but this attempt failed. <u>See</u> H.R. Report 110-406 at 44. H.R. 2015, 110 Cong., 1st Sess. (2007); H.R. 3685, 110 Cong., 1st Sess. (2007) and H.R. 3686, 110.  In fact, the decision to abandon H.R. 2015 and introduce two separate bills was based on the bills' sponsors' perception that including gender identity and sexual orientation on the same bill might jeopardize the bill's chance for passage on the House floor.  H.R. Report 110-406 at 44.  Moreover, as recently as June 26, 2008, Congress held a

---

[2]The Equal Employment Opportunity Commission ("Commission") which shares responsibility for enforcing Title VII with the Department of Justice (<u>see, e.g.</u> <u>Connecticut v. Teal</u>, 457 U.S. 440, 451, n. 11 (1982)), has likewise held that transsexuals are not covered as a protected class under Title VII.  <u>See, e.g.</u> <u>Faulkner v. Mineta</u>, 2005 WL 3526016 (E.E.O.C. Dec. 19, 2005)(Agency No. 200518868FAA04, Appeal No. 01A54932)(. . .transsexual status is not a basis protected under Title VII. . .); <u>Loran v. O'Neill</u>, 2001 WL 966123 (E.E.O.C. Aug. 17, 2001)(Agency No. 6-01-6050, Appeal No. 01A13538)("The Commission has repeatedly found that transsexualism is not a protected basis under Title VII of the Civil Rights Act of 1964. . .")(citation omitted); <u>Balmes v. Daley</u>, 2001 WL 34329672 (E.E.O.C. Aug. 25, 2000)(Agency No. 00-63-00430D, Appeal No. 01A05006)("Appropriate bases for sex discrimination include only 'male' or 'female.' The Commission has repeatedly found that transsexual is not a protected basis under Title VII.")(citation omitted); <u>Bell v. Chater</u>, 1995 WL 384503 (E.E.O.C. June 22, 1995)(Agency No. SSA-899-93, Appeal No. 01941146)(The Commission found that transsexuality is not covered under the law after noting that "a reading of [the] complainant's assertion indicat[ed] that she [was] alleging that she was being treated differently than other females because she is a transsexual.")

hearing during which the Committee members and witnesses acknowledged that there is no

federal law which protects transsexuals from discrimination.[3]  Notably, Congress has continued

to reject these and other previous amendments even after courts have specifically held that Title

VII does not protect transsexuals from discrimination.  Compare H.R. 1454, 97th Cong., 2d Sess.

(1982)(hearing held on Jan. 27, 1982) with Sommers v. Budget Marketing, Inc., 667 F.2d 748,

750 (8th Cir. Jan. 8, 1982)(per curiam); Holloway v. Arthur Andersen & Co., 566 F.2d 659, 662-

663 (9th Cir. 1977); see also United States v. PATCO, 653 F. 2d 1134, 1138 (7th Cir.

1981)(Congress is presumed to know the law and judicial interpretations of it); United States v.

Ambrose, 740 F.2d 505 at 514 (7th Cir. 1984)(Wood, J., concurring and dissenting)(same).  To

include therefore, transsexuals within the reach of Title VII far exceeds mere statutory

interpretation.  As noted above, Congress had a narrow view in mind when it passed the Civil

Rights Act and it has rejected subsequent attempts to broaden the scope of its original

interpretation of the term "sex" to include anything except the traditional meaning of the term.

To adopt Plaintiff's (and Plaintiff's expert's) definition of the term "sex" would take this court

out of the realm of interpreting and reviewing and into the realm of legislating.  See Gunnison v.

Commissioner, 461 F.2d 496, 499 (7th Cir. 1972)(it is for the legislature, not the courts, to

expand the class of people protected by a statute).  Therefore, there is no basis to conclude that

transsexuals are, or were ever intended to be, a protected class under Title VII.

### 4.    There is No Biological Determinant for GID, and Thus, No Support for Expanding Title VII Based on Scientific Evidence.

Plaintiff argues that "gender identity has some biological determinant" based on the

testimony of her expert, Dr. Bockting.  TR 455:1-3.  However, Dr. Bockting's inconsistent and

---

[3]  http://edlabor.house.gov/hearings/help-2008-06-26.shtml.

contradictory opinions on this issue, speaks volumes to his credibility, or lack thereof, and his testimony should be given little, if any, weight. See, e.g. Scales v. George Washington University, No. 89-0796, 1993 WL 304016, at *6 (D.D.C. July 27, 1993)(although exhibits and testimony were "admitted for what they [were] worth, they probably did not constitute reliable evidence for purposes of establishing a prima facie case of discrimination.); Mid-State Co. v. Exchange Nat. Bank of Chicago, 877 F.2d 1333, 1339-40 (7th Cir. 1989), citing to, Paul Meier, Damned Liars and Expert Witnesses, 81 J.Am.Statistical Ass'n 269 (1986)("Judges should not be buffaloed by unreasoned expert opinions.").

In his September 19, 2006 expert report, Dr. Bockting stated, "[w]hat causes gender identity remains unknown. Biological factors (hormonal, genetic and brain structure) and psychosocial factors (culture and upbringing) most likely interact, but research is still in its infancy and findings to date are inconclusive." TR 231:19 to 232:16. Notwithstanding the representations made in his expert report, at trial on August 19, 2008 (and directly contradicting his own expert report), Dr. Bockting repeatedly testified that there is a biological basis for gender identity. TR 218:16-20, 219:4-18, 220:9-14, 230:25 to 231:2. At trial on August 22, 2008, under the guise of rebuttal, Dr. Bockting changed his testimony again admitting that a known biologic determinant for gender identity disorder ("GID") had not been established. TR 442:18-23. Given his self-impeaching testimony, Dr. Bockting is a dubious and unreliable source for purposes of considering whether there is a scientific basis for gender identity and therefore, his opinion should be accorded no weight whatsoever.

More importantly, besides Dr. Bockting's self-serving (and contradictory) testimony, Plaintiff has failed to refer the Court to a single piece of evidence establishing a known pathologic, neuropathologic, psychopathologic, genetic, or congenital cause of GID. In fact,

-7-

none of the studies to which Dr. Bockting cited supports his conclusion that gender identity

disorder has a known biological determinant.  TR 377-384.   On the other hand, Defendant's

expert, Dr. Chester Schmidt, provided credible (and consistent) testimony that the cause of GID

remains unknown.  TR 376:5-6, 411:3-6.  Indeed, Dr. Schmidt noted that individuals who

"present themselves with gender identity disorders are very heterogenous with regard to their

personality, their histories, their life stories, and their presentation, their motivation for living in

the cross-gender role. . .it's highly unlikely that a single biologic or psychological etiology is

going to be discovered to cover that heterogeneity."  TR 376:9-15.  At trial, Plaintiff failed to

marshal any scientific evidence establishing that the medical community has accepted a

verifiable biological determinant for GID.  Expert testimony at best left that door open for the

future, but made it clear that current science supports no such conclusive finding.  Thus, there is

no scientific basis to conclude that the term "sex" encompasses transsexuality or gender identity.

More importantly, Plaintiff's broad and sweeping definition of the term "sex" should not be

endorsed by this Court.  As the Court in Ulane concluded, "[w]e do not believe that the

interpretation of the word "sex" as used in the statute is a mere matter of expert medical

testimony or the credibility of witnesses produced in court...if Congress believes that

transsexuals should enjoy the protection of Title VII, it may so provide."  742 F. 2d1081, 1086.

**B.    "Sex Stereotyping" Is Not An Independent Cause of Action Under Title VII.**

    **1.    <u>Price Waterhouse</u> Does Not Hold That "Sex Stereotyping" is Per Se Discrimination.**

There is no independent cause of action for "sex stereotyping" under Title VII.  That is, sex stereotyping is not tantamount to sex discrimination.[4]  The paramount concern of Title VII's protections against sex discrimination is the following  - to ban conduct which, had the victim been a member of the opposite sex, would not otherwise have occurred.  The Supreme Court's decision in <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 250 (1989), examined in its full context, supports this point.   Specifically, in saying that sex played a motivating part in an employment decision, the Supreme Court, in <u>Price Waterhouse</u> "meant that, if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, one of the reasons would be that the applicant or employee was a woman" or that because the applicant or employee was a man.[5]  490 U.S. at 250.

The Court expressly stated however that "sex stereotypes" do not "inevitably prove that gender played a part in a particular employment decision. " <u>Id.</u> at 251.  Rather, "stereotyped remarks can. . .be *evidence* that gender played a part" in the decision.  <u>Id.</u> (emphasis in original).  A plaintiff is still obliged to show that the employer "actually relied on [the person's] gender in

---

    [4]<u>See generally</u> Michael Starr and Amy L. Strauss, <u>Sex Stereotyping in Employment: Can the Center Hold?</u>, 21 Lab. Law 213 (2006)(attached).

    [5]As indicated herein, the record is devoid of any evidence that Plaintiff was subjected to discrimination because of sex.  On separate occasions, the Library hired a man (John Rollins) and a woman (Audrey Cronin) for the terrorism specialist position, and there is no evidence that either of the selectee's sex was a factor in either selection.  Further, for the selection at issue, four candidates out of the eighteen who interviewed made the final cut including a woman who withdrew from consideration.  TR 106:6 to 106:16.  This point further undercuts any argument that "sex" - i.e., a preference for a man or a woman - was a factor in the hiring process or determination.

making its decision."  Id.   Thus, an employer who makes a decision based on disclosure that an applicant is undergoing a sex change is  not  motivated by the person's sex, nor burdening one particular sex – i.e., engaging in disparate treatment in favor of one sex to the disadvantage of the other.  See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998); see also Schroer v. Billington, 424 F.Supp.2d 203, 208 (D.D.C. 2006).  In this case, Plaintiff provided absolutely no evidence that the Defendant--if asked and having provided a "truthful response"-- did not hire Plaintiff either because she is a man or because she is a woman.[6]  Rather, the Plaintiff would have this Court hold that if the Defendant's "truthful response" was that it did not hire the Plaintiff because she is transsexual, then it has violated Title VII.  Such a proposition was simply not contemplated by the Supreme Court's decision in Price Waterhouse nor, as noted above, by the plain language of Title VII.[7]

        In issuing its decision in Price Waterhouse, the Supreme Court stated  it was not traversing new ground.  490 U.S. at 248.  The Supreme Court's statement in this regard undermines Plaintiff's argument that Price Waterhouse reflects a judicial determination that Title VII encompasses a claim for sex stereotyping - i.e., that any proof of sex stereotyping is dispositive for purposes of a finding of sex discrimination claim under Title VII.  Notably, the Supreme Court "granted certiorari [in Price Waterhouse] to resolve a conflict among the Courts of Appeals concerning the respective burdens of proof a defendant and plaintiff in a suit under

---

        [6]As a matter of fact what the uncontroverted evidence revealed was an absence of a discriminatory animus based on sex on the part of Ms. Preece.  176:19-22, 177:1-11, 434:6-9.

        [7]This is not to say that a transsexual is precluded from bringing a claim *because of sex*.  See, e.g. Dobre v. National R.R. Passenger Corp., 850 F.Supp. 284, 287 (E.D.Pa. 1993)(stating, if the employer considered the male-to-female transsexual employee to be a female "and discriminated against her on that basis (i.e. treated her less favorably than male employees), then [the employee] would be able to maintain a Title VII action as a female.")

Title VII when it has been shown that an employment decision resulted from a mixture of legitimate and illegitimate purposes." Id. at 232.  Thus, the issue before the Supreme Court was not whether sex stereotyping constitutes per se sex discrimination under Title VII, but the burden of proof under a mixed-motive theory.  The issue before the Court - the legal standard under a mixed-motive theory -  belies any argument that the Supreme Court, in  Price Waterhouse, was making new law or further defining "sex" under Title VII – i.e., expanding Title VII to include sex stereotyping as an independent cause of action.  Notably, the dissent in Price Waterhouse believed it important to "stress that Title VII creates no independent cause of action for sex stereotyping." Id. at 294.  The plurality took no issue with the dissent's language.

**2.      Title VII Does Not Protect "Gender Nonconformity" in the Absence of Disparate Treatment.**

Notwithstanding Plaintiff's argument to the contrary, Title VII creates no protection for someone "presenting" in a manner contrary to generally accepted cultural norms of dress or conduct for one's biological sex, otherwise referred to as "gender non-conforming behavior," in the absence of disparate treatment for members of the opposite sex.   In the case of the plaintiff in Price Waterhouse, Ann Hopkins, the Supreme Court observed that Price Waterhouse's promotion policies had placed her in an "impermissible Catch 22" by insisting that women in the workplace not be aggressive while simultaneously insisting on this very quality for advancement.  Id. at 251.  Thus, Ms. Hopkins was effectively barred from promotion to partner because the same quality she needed to advance (namely "aggressiveness") effectively disqualified her because, as a woman, such a quality was disapproved by the employer's organizational culture.  This was discrimination on the basis of Ms. Hopkins' sex, not because a stereotype was the factor that supposedly prevented her from advancement, but because it

-11-

represented an "arbitrary barrier to sexual equality at the workplace" that did not exist for men. Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).

In the instant matter, Plaintiff posits that she was subjected to discrimination because of her nonconformity with social stereotypes.  TR 459:8-10.  Plaintiff avers that a "gender conforming individual" or a "non-transgender individual" (i.e., John Rollins) was hired by the Library to fill the Terrorism Specialist position after she (Plaintiff) revealed her GID to Ms. Preece and showed Ms. Preece pictures of herself (a biological male who had not yet completed the transition to an anatomical female) in female attire.  TR 459:8-21.[8]  In Price Waterhouse, however, the Court's ultimate inquiry was not whether Ms. Hopkins was "gender non-conforming."[9]  Rather, the Court's ultimate question was whether at the moment of the decision

_____

[8]Actually, the record contains no evidence that the photographs made any difference to Ms. Preece in terms of the issues with which she was dealing as related to Plaintiff's disclosure that he would be transitioning from male to female, or that Ms. Preece had any reaction to the pictures other than to acknowledge at her deposition that the pictures showed Plaintiff in traditional female attire.  TR 76:8-2, 172:25 to 173:6.

[9]As the First Circuit in Hamm v. Weyauwega Milk Products, 332 F. 3d 1058 (7th Cir. 2003) has noted:

> there is a difference that subsequent cases [following Price Waterhouse] have ignored between, on the one hand, using evidence of the plaintiff's failure to wear nail polish (or, if the plaintiff is a man, his using nail polish) to show that her sex played a role in the adverse employment action of which she complains, and, on the other hand, creating a subtype of sexual discrimination called 'sex stereotyping,' as if there were a federally protected right for male workers to wear nail polish and dresses .

332 F. 3d at 1067 (Posner, J., concurring).   Indeed, Judge Posner exposed the folly of permitting a gender stereotyping cause of action independent of disparate treatment.  In Hamm, a male employee occupied a job series that was filled entirely by men.  In that situation, Judge Posner observed, if an employer "discriminates against effeminate men, there is no discrimination against men, just against a subclass of men.  They are discriminated against not because they are men, but because they are effeminate."  Id. at 1067.  That is, the employer has imposed a sex stereotype by refusing to hire men it deems effeminate, but it has not engaged in sex

(continued...)

one of the employer's (truthful) reasons for not selecting Ms. Hopkins for advancement was because she was a woman.

As indicated above, Plaintiff cannot show that the Library did not hire her because of a bias against hiring a woman for the position of Terrorism Analyst. TR 176:19-22, 177:1-5, 434:12-14. As an initial matter, David Schroer applied for the position. TR 48:20-22. Plaintiff was not viewed as a woman by any member of the selection panel, TR 149:2-11, 177:12-14, so it is untenable to suggest that she was subjected to discrimination based on such.[10] Plaintiff relies

---

[9](...continued)
discrimination against men per se. Properly understood, the theory of sex stereotyping applies only when it evidences disparate treatment of one gender over another. Thus, "if the producer of Antony and Cleopatra refuses to cast an effeminate man as Antony or a mannish woman as Cleopatra, he is not discriminating against men in the first case and women in the second, although he is catering to the audience's sex stereotypes." Id. at 1068. Moreover, permitting a gender stereotyping cause of action independent of disparate treatment would negate an entire line of case law that permits employers to impose gender-specific dress and grooming codes—and to discipline or fire employees who do not comply with those codes. See, e.g. Jesperson v. Harrah's Operating Co., Inc., 392 F. 3d 1076 (9th Cir. 2004); Harper v. Blockbuster Entertainment Corp., 139 F. 3d 1385 (11th Cir. 1998); Dodge v. Giant Food, Inc., 388 F. 2d (D.C. Cir. 1973).

As noted above, Plaintiff cannot prove that she was disparately treated merely by showing that a gender-conforming, non-transgender male was selected instead of her for the Terrorism Analyst position. Rather, the proper inquiry is whether Plaintiff was treated disparately because of her "status" as a woman. The fact that Plaintiff may have been (correctly) perceived "as a man in woman's clothing," TR 112:5-7, or lacking credibility before Members of Congress or her former colleagues in the military emanate not from the fact that she was a "woman" but from her transsexuality. TR 113:7-10, 114:18-25, 164:2-13. Again, the Library's previous selection of Audrey Cronin to fill the same position demonstrates that Plaintiff's argument regarding concerns about a "woman" serving in the position lacks credibility. Simply stated, the only argument that Plaintiff asserts is that she was discriminated against because she belongs to a "subclass" of individuals who are transsexual, not because of her status as a woman. Consequently, Plaintiff cannot assert a cause of action under Title VII.

[10]The situation is analogous to court holdings in retaliation and national origin cases finding that an employer is not liable for intentional discrimination if in fact the employer had no knowledge that the employee engaged in protected activity or of the employee's national origin. See, e.g. Fields v. Office of Johnson, 520 F. Supp. 2d 101, 106 (D.D.C. 2007)(case dismissed because no probative evidence that decisionmaker knew that plaintiff engaged in protected

(continued...)

on the fact that Ms. Preece was surprised and shocked that the person whom she had been

dealing with throughout the interview process -- who had consistently presented as a man named

David Schroer up to that point, TR 104:7 -- had just told her that he had been diagnosed with

GID, would begin work presenting as a woman, and then proceeded to show her pictures of

himself in female attire.  Plaintiff also relies on Ms. Preece's concerns about Plaintiff's

credibility before Members of Congress and whether or not Plaintiff might be able to maintain

David Schroer's military contacts.  However, there is no evidence in the record that Ms. Preece

was concerned that Congress and the military community would not want to deal with a <u>woman</u>

(in fact, Ms. Preece had previously hired a female, Audrey Cronin, for the Terrorism Specialist

position).  TR 150:18 to 151:2, 177:8-11, 178:9-12  Indeed, Plaintiff's own testimony reveals

that it is not discrimination because she is a "woman" of which she complains, but her status as a

"transgendered woman."  TR 78:12 to 78:16.

   Absolutely nothing in Ms. Preece's testimony, reactions or comments evinces a bias

against Plaintiff because of her sex— <u>either as a man or a woman</u>—but, at most, concerns

emanating from Plaintiff's disclosure that she is transgendered and David Schroer's

announcement, on the eve of the hiring decision, that he would report to work presenting in a

manner opposite to his biological sex.  TR 112, 115:1-5, 164:2-8, 315:15-20.  Thus, the fallacy

---

[10](...continued)
activity); <u>Ibrahim v. District of Columbia</u>, 539 F. Supp. 2d 143, 150 (D.D.C. 2008)(retaliatory
claim dismissed against defendant where there was no indication that defendant was aware of
actions against which she was purportedly retaliating); <u>Ekweani v. U.S. Dept. of Agriculture</u>,
357 F.Supp.2d 58, 62 (D.D.C. 2004)(Plaintiff failed to meet his burden of discrimination based
on national origin where supervisor was unaware that plaintiff was from Ghana but instead
believed, albeit mistakenly, that plaintiff and selectee were both Nigerian.); <u>Plummer v. Bolger</u>,
559 F.Supp. 324, 328 (D.D.C. 1983)(Plaintiff failed to establish a prima facie case of
discrimination because unable to establish that any immediate supervisor "even knew what his
national origin was, let alone discriminated on the basis of it."); <u>Ganthier v. Worth Shore-Long
Island Jewish Health System, Inc.</u>, 345 F.Supp.2d 271, 281 (E.D.N.Y. 2004).

of Plaintiff's premise is that she believes that an adverse action against her based on her gender

identity or because she is a transsexual is no different than an adverse action against her because

she is a woman.[11]  But there most certainly is a difference. Actions based on gender identity or

transsexuality is "not because of sex," specifically, a disadvantage or burden to one sex but not

the other.

Absolutely nothing presented by Plaintiff or uttered by the Defendant's officials evince a

bias against Plaintiff because of the fact that Diane Schroer would be a woman who would be

working with Members of Congress and former military colleagues.[12]  At most, the only thing

that can be shown is that Ms. Preece's concerns were premised on Plaintiff's revelation

regarding her GID and the potential negative reaction that Members of Congress and military

contacts might have in dealing with a transsexual.  As such, and absent any showing by Plaintiff

---

[11]See Michal Starr and Amy L. Strauss, Sex Stereotyping in Employment: Can the Center
Hold?, 21 Lab. Law 213, 245 (2006)("It is a mistake of dramatic proportions to view *Price
Waterhouse* as establishing per se prohibition of any adverse treatment of an employee based on
his or her gender-nonconforming behavior, rather than being an instance of when resort to sex
stereotypes by decisionmakers was used as evidence that the disparate treatment was motivated
by considerations of gender.  To do so unsettles long settled law that discrimination 'because of
[an] individual's. . .sex' refers only to discrimination against men because they are men, or
women because they are women.")(attached).

[12]Equally disingenuous is Plaintiff's and Plaintiff's witness' contention that the Defendant's
selecting official was engaging in "sex stereotyping" based on her belief that Plaintiff might not
be deemed credible by Members of Congress and their staff because Plaintiff, when presenting
as a woman, could not have the Special Forces background or credentials that Plaintiff claims in
her resume.  Plaintiff's Post Trial Brief at 7.   As a matter of common knowledge and official
policy, women in the U.S. Army are severely restricted in terms of the their ability to be
assigned to positions having any direct combat role and, more importantly, are prohibited from
serving in the U.S. Army's Special Forces.  See, U.S. Army Regulation 600-13, Army Policy for
the Assignment of Female Soldiers, 27 March 1992; U.S. Army Recruiting Command
(USAREC) Pamphlet 601-25, Chap. 2-3 (limiting enrollment in the Army's Special Forces
Assessment and Selection course to only male soldiers); see also,
www.bragg.army.mil/specialforces/criteria.htm.  Therefore, Ms. Preece's belief that women
could not have the background and experiences possessed by Plaintiff on her resume is not
"quintessential sex stereotyping" (Plaintiff's Post Trial Brief at 7), but rather entirely factual.

that she was treated disparately as compared to a female-to-male transsexual (for example),
Plaintiff's claim is not actionable under Title VII because any adverse action that she may have
been subject to was (at most) attributable only to her transsexualism and not to the fact that she
would report to work as a woman.

Finally, the concerns raised by Ms. Preece as related to Plaintiff's disclosure are gender-
neutral and unrelated to sex. Ms. Preece had concerns about the transition on Plaintiff's ability
to maintain a security clearance, and indeed, raised the issue with Plaintiff. TR 59:24 to 60:1,
121:23 to 122:7, 126:17-21, 131:9-16, 174:16-20. Ms. Preece was also concerned about a delay
in Plaintiff's ability to start the position given her understanding that the pre-employment
security investigation would not be waived by the Library's security official and that the security
clearance investigation could be a lengthy process. TR 127:2-21, 135:12-13. The Congressional
Research Service ("CRS"), where the position was located, due to its mission needs to appoint
its personnel very quickly typically requests a waiver of any preappointment investigation to
facilitate this objective. TR 301:2-6; TR 434:15-21. Plaintiff's disclosure, or more specifically
the concerns resulting from such, appeared to be inconsistent with this mission need.
Ms. Preece also had concerns that Plaintiff's transition would adversely impact Plaintiff's ability
to maintain contacts, a concern similarly shared by Plaintiff's previous employer as to its clients.
TR 72:22 to 72:25; see also 131:9-16; 135:13-15, 162:13-19. Ms. Preece also had concerns
about Plaintiff's trustworthiness and felt that she, Ms. Preece, had been "set up." TR 121:23 to
122:7. She was also concerned that Plaintiff's transition might divert her full attention away
from CRS's mission. TR135:17-20, 171:14-20. Ms. Preece admitted that she could be wrong on
any of these factors, but taken together, she no longer had sufficient confidence to recommend
Plaintiff for the position. TR 135:21 - 136:1. Based on these concerns, none of which evidence

a bias against a particular sex but instead result from Plaintiff's disclosure on the eve of the

hiring determination that she is transgendered (TR 122:14-20; TR 134:3-5; TR 149:12-23),

Ms. Preece made the decision to select an essentially equally qualified candidate who presented

no issues which would require further review or vetting on the eve of the hiring decision.  TR.

133:25 to 134:5.

      Plaintiff's argument that the Library could have sought further information from a variety

of individuals about her does not alter the fact that the Library's motive for deciding not to hire

Plaintiff and instead hire Mr. Rollins was based on an earnest belief that such a hire was in the

organization's best interest.  What Plaintiff would like this Court to declare is that Ms. Preece

could not consider Plaintiff's revelation of GID and her intention to begin work dressed as a

woman as though the information was not relevant in any way to the hiring process.  There is no

doubt that Ms. Preece was faced with a dilemma, but her ultimate concern was to fill this

position as quickly as possible considering having someone in the position in a timely manner

was considered important to the senior management of the CRS and the CRS's client - Congress.

Faced with the prospect of someone–like Plaintiff–whose revelation of transsexualism raised

potential challenges with respect to security clearances, when she might be able to begin work,

and with respect to her credibility, and an equally qualified candidate--Mr. Rollins-- whose

candidacy posed no such issues, Preece elected to go with Mr. Rollins.

      Plaintiff has presented no evidence that Ms. Preece's concerns were anything other than

genuine and that she was simply fulfilling her role to select the best candidate for the position.

In making this decision, Preece was responsible, she was conscientious, and her decision simply

does not run afoul of Title VII.  While Plaintiff has engaged in much second-guessing as to what

Ms. Preece should have or could have done short of not hiring her, Plaintiff has failed to satisfy

her burden to show that Ms. Preece was motivated by illegal discriminatory animus, or that

Ms. Preece did not honestly believe the reasons she proffered for not selecting Plaintiff for the

Terrorism Specialist position.  See Aka v. Washington Hosp. Center, 156 F.3d 1284, 1307 (D.C.

Cir. 1998), citing, Fisher v. Vassar College, 114 F.3d 1332, 1337-38 (2d Cir.1997)(en

banc)("[D]iscrimination does not lurk behind every inaccurate statement. . .In short, the fact that

the proferred reason was false does not necessarily mean that the true motive was" an illegal

one."); McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 373 (7th Cir.1992)(Once an

employer has articulated a non-discriminatory explanation for its action, the issue is not "the

correctness or desirability of [the] reasons offered ... [but] whether the employer honestly

believes in the reasons it offers.").  Therefore, Defendant is entitled to judgment as a matter of

law.

                            Respectfully submitted,


                            /s/ Jeffrey A. Taylor /dvh
                            _____
                            JEFFREY A. TAYLOR, D.C. BAR #498610
                            United States Attorney


                            /s/ Rudolph Contreras
                            _____
                            RUDOLPH CONTRERAS, D.C. Bar #434122
                            Assistant United States Attorney


                            /s/ Beverly M. Russell
                            _____
                            BEVERLY M. RUSSELL, D.C. Bar #454257
                            Assistant United States Attorney
                            U.S. Attorney's Office for the District of Columbia,
                            Civil Division
                            555 4th Street, N.W., Rm. E-4915
                            Washington, D.C.  20530
                            Ph:  (202) 307-0492
                            Fax: (202) 514-8780
                            E-mail: beverly.russell@usdoj.gov
                                   -18-

/s/ Julia K. Douds/Evelio Rubiella /bmr
_____
JULIA K. DOUDS
EVELIO RUBIELLA
Special Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia,
Civil Division
555 4th Street, N.W.
Washington, D.C.  20530
E-mail: jdou@loc.gov
E-mail: erub@loc.gov