# Sex Stereotyping in Employment: Can the Center Hold?

## Michael Starr and Amy L. Strauss*

> *Turning and turning in the widening gyre*
> *The falcon cannot hear the falconer;*
> *Things fall apart; the centre cannot hold;*
> W. B. Yeats

It is now more than twenty years since Ann Hopkins was denied promotion to partner in her accounting firm, in part because her aggressiveness did not comport to gender stereotypes of the way a woman was supposed to behave. She was advised that her chances of promotion would be enhanced in the future if she would only be more feminine. When her claim reached the Supreme Court in *Price Waterhouse v. Hopkins*, a plurality of the justices found this to be sex stereotyping, which showed that Hopkins's gender played a motivating part in the decision to defer her promotion.[1]

Courts and commentators have concluded from the *Price Waterhouse* plurality that gender stereotyping is, in and of itself, a form of sex discrimination actionable under Title VII.[2] But that idea and the implications for employment discrimination law that flow from it are inconsistent with judicially settled principles of what sex discrimination in employment means. Those long-accepted understandings were

---

*Mr. Starr is a partner in the labor and employment group of Hogan & Hartson L.L.P., resident in New York, NY. Mr. Starr has a J.D., 1979, Yale Law School; Ph.D., 1976, University of Michigan; B.A., 1970, SUNY-Binghamton. He can be reached at mstarr@hhlaw.com. Ms. Strauss is an associate in Hogan & Hartson's labor and employment law group, resident in New York. Ms. Strauss has a J.D., 2000, University of Virginia School of Law; B.A., 1997, University of California, Berkeley.

1. Price Waterhouse v. Hopkins, 490 U.S. 228, 250–51 (1989) (plurality opinion).

2. Title VII of the Civil Rights Act of 1964, as amended (*Title VII*), 42 U.S.C. § 2000e *et seq. See, e.g.*, Smith v. City of Salem, 378 F.3d 566, 571 (6th Cir. 2004) ("*Price Waterhouse*'s prohibition of sex stereotyping"); Rene v. MGM Grand, 305 F.3d 1061, 1068 (9th Cir. 2002) (Pregerson, J., concurring) ("Supreme Court held [in *Price Waterhouse*] that gender stereotyping is actionable under Title VII); Mary Ann C. Case, *Disaggregating Gender from Sex and Sexual Orientation: The Effeminate Man in the Law and Feminist Jurisprudence*, 105 YALE L.J. 1, 33 (1995) ("the *Hopkins* holding [is] that requiring conformity to acquired behavior deemed appropriate for one's sex constitutes impermissible sex stereotyping"); Katherine M. Franke, *The Central Mistake of Sex Discrimination Law*: *The Disaggregation of Sex from Gender*, 144 U. PENN. L. REV. 1, 96 (1995) ("*Price Waterhouse* stands for the proposition that a committee of men cannot refuse employment opportunities to a woman because of her failure to comply with relevant gender norms").

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

not, as some say, "eviscerated" by *Price Waterhouse*.[3] Rather, it is the increasingly vogue view of the impermissibility of sex stereotyping under Title VII that must be reconsidered.

There is much that goes under the rubric of "sex stereotyping" in employment that is not here put into question. For example, if an otherwise well-qualified woman is denied employment as a police officer as a consequence of stereotypical assumptions that she, as a woman, lacks the aggressiveness and self-assurance required for the position, then clearly Title VII provides a remedy.[4] As one commentator has explained, the woman applicant in such a circumstance is being viewed through "the polarizing lenses of gender," which "filter out" masculine-assumed qualities that a woman may actually possess (e.g., assertiveness) or "magnify" her feminine-gendered characteristics (e.g., emotionality).[5] It is perfectly proper to refer to this as a kind of sex stereotyping, but in such a case the phrase "sex stereotyping" refers to the psychological (or, some say, cultural) mechanism for sex discrimination, and is not itself the Title VII violation. That is to say, the woman is discriminated against on account of her sex because, being categorized as a woman, she is erroneously perceived to lack culturally presumed masculine characteristics (or have in excess culturally assumed feminine ones) that the employer believes are essential (or inimical) to job success.

The particular issue addressed here, however, is quite different. At issue here is the contention advanced by some that Title VII is violated *eo ipso* whenever an employee is treated adversely with respect to his (or her) employment because his (or her) behavior, demeanor, or mien fails to conform to socially accepted stereotypes of how he, as a man (or she, as a woman), should appear or act. It is said by some that sex stereotyping in this sense—that is, taking an adverse employment-connected action against someone for failing to conform to the gender stereotypes of his (or her) sex—is, without more, discrimination "because of . . . sex" within the meaning of Title VII. One implication drawn from this proposition is that co-worker harassment against someone perceived to act or appear in a way that is contrary to accepted sexual stereotypes of how someone of the victim's gender is supposed to act or appear is a form of sexual harassment actionable under Title VII.

---

3. *Smith*, 378 F.3d at 573; *see also* Schwenk v. Hartford, 204 F.3d 1187, 1201 (9th Cir. 2000) (stating that cases denying Title VII protections to transsexuals were "overruled by the logic and language of *Price Waterhouse*"); Doe v. City of Belleville, 119 F.3d 563 (7th Cir. 1997), *vacated and remanded*, 523 U.S. 1001 (1998).

4. *See, e.g.*, Thorne v. City of El Segundo, 726 F.2d 459, 464 (9th Cir. 1983); *see also* Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 117–24 (2d Cir. 2004) (holding that woman denied promotion to position of tenured school psychologist based on stereotypical assumption of how much time mothers of small children could or should devote to their jobs); Lindahl v. Air France, 930 F.2d 1434, 1439 (9th Cir. 1991) (holding that decision tainted by sex stereotypical assumption that women are too "nervous and emotional" to make good leaders).

5. *See* Case, *supra* note 2, at 39.

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

This view—that sex stereotyping is itself actionable sex discrimination—is a radical departure from the long-accepted judicial understanding that sex discrimination under Title VII refers to discrimination on the basis of one's being a woman or a man, and not on the basis of other aspects of human sexuality, such as one's sexual orientation or gender identity. It had been previously thought to be well-settled law, for example, that transsexuality is not protected by Title VII and, consequently, that verbal taunting and physical abuse of transgendered individuals is not actionable under federal law.[6] But recently, courts have held that such transsexual harassment is actionable under Title VII's purported ban on sex stereotyping,[7] and have done so without adequately considering the implications of that view for the whole range of sex-discrimination law or whether the purported impermissibility of sex stereotyping is actually compelled by *Price Waterhouse.*[8] The proposition that sex stereotyping is, as many courts now say, impermissible under Title VII is on a collision course with previously settled law as to who is or is not protected by its ban on discrimination "because of [one's] . . . sex."[9] This puts more weight on the sex-stereotyping discussion in the plurality opinion in *Price Waterhouse* than it can, or should, reasonably bear.

The facts giving rise to the recent cases on sex-stereotyping harassment could hardly be more compelling. The verbal taunts and physically abusive conduct directed at the plaintiffs in these cases was unquestionably repulsive. But so, too, was the conduct in earlier cases that had held there was no Title VII remedy. The judges who rendered those decisions were not less moved by the plight of those seeking redress, but they felt constrained to construe Title VII in a way that was consistent with what they took to be Congress's intent, which was that the law protected women from being adversely treated because they were not men, and vice versa, but did not afford protection to those who are differently gendered, lesbian, or gay and were adversely treated on that account.

Perhaps it is time that Congress banned employment discrimination against gays and lesbians (as have many states and localities) and against transgendered individuals (as have some). But trying to achieve in a rather imperfect way the benefit of such an enactment through a judicial interpretation of Title VII's ban on sex discrimination, so as to prohibit per se discrimination against those who act counter to their gender stereotype, is not analytically sound. It is also not politically correct, if that is understood to mean having courts restrict themselves to their correct role in the political system of interpreting statutes en-

---

6. See text at notes 24–30.
7. See text at notes 96–98 and *infra* note 124 (citing cases).
8. See text at notes 103–57.
9. Title VII, § 703(a), 42 U.S.C. § 2000e-2(a).

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association.
Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

acted by the political branches of government consistent with the genuine intent of the enactors and not contorting their meaning to achieve unintended ends, however desirable those ends may appear to the jurist to be.[10]

## I.    The Settled Sense of "Sex"

Soon after Title VII was enacted, a judicial consensus formed around the idea that its ban on discrimination in employment against an individual "because of such individual's . . . sex" protected women who were disadvantaged at work because they were women and not men (or men because they were men and not women), but did not address other aspects of human sexuality that could arguably be encompassed by the word "sex."[11]

Perhaps the clearest example of this emergent understanding was the soon uniformly accepted view that Title VII did not prohibit discrimination on the basis of sexual orientation. Both before and after *Price Waterhouse*, courts have consistently held that Title VII does not prohibit discrimination on the basis of sexual preference.[12] Over thirty-five years ago, in *DeSantis v. Pacific Telephone and Telegraph Co.*, three employees brought claims alleging that their employer discriminated against them because they were homosexuals. There, one employee alleged that he was not hired when a supervisor concluded he was gay; another alleged that he had been continually harassed by co-workers until he had to quit to preserve his health; a third employee alleged that he had similarly been harassed by his supervisors over a period of four years until he was forced to quit.[13] In rejecting all three claims, the Ninth Circuit concluded that "Title VII's prohibition of 'sex' discrimination 'applies only to discrimination on the basis of gender and should not be judicially extended to include sexual preference such as homosexuality.'"[14]

Other courts reached the same conclusion about the scope of the term "sex," even when the issue before them was not sexual orientation.

---

10. *Cf.* Saint Francis College v. Al-Khazraji, 481 U.S. 604, 609–12 (1987) (construing ban on race discrimination under 42 U.S.C. § 1981 to be consistent with Congress's ethnicity-like understanding of race when that statute was enacted in 1870 rather than biological concepts of race prevalent at time of decision).

11. Title VII, § 703(a), 42 U.S.C. § 2000e-2(a).

12. Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 259 (1st Cir. 1999) ("we regard it as *settled law* that, as drafted and authoritatively construed, Title VII does not proscribe harassment simply because of sexual orientation") (emphasis added). *See generally* Hamm v. Weyauwega Milk Prods., Inc., 332 F.3d 1058 (7th Cir. 2003); Bibby v. Philadelphia Coca Cola Bottling Co., 260 F.3d 257 (3d Cir. 2001); Hamner v. St. Vincent Hosp. & Health Care Ctr., 224 F.3d 701 (7th Cir. 2000); Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 751–52 & n.3 (4th Cir. 1996); Dillon v. Frank, 952 F.2d 403 (6th Cir. 1992); Williamson v. A.G. Edwards and Sons, Inc., 876 F.2d 69 (8th Cir. 1989); Smith v. Liberty Mut. Ins. Co., 569 F.2d 325 (5th Cir. 1978).

13. DeSantis v. Pac. Tel. & Tel. Co., 608 F.2d 327, 328 (9th Cir. 1979).

14. *Id.* at 329–30.

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

In *DeCintio v. Westchester County Medical Center*, the Second Circuit found no discrimination in a male manager's decision to pass over several male applicants for a promotion to hire a woman with whom he was having a romantic relationship.[15] In so holding, the court interpreted the definition of "sex" in the context of the other categories afforded protection under Title VII, which refer to a person's status as a member of a particular race, color, religion or nationality. The court reasoned that "'[s]ex,' when read in this context, logically could only refer to membership in a class delineated by gender, rather than sexual activity regardless of gender. . . . The proscribed differentiation under Title VII, therefore, must be a distinction based on a person's sex, not on his or her sexual affiliations."[16]

The circumstances of harassing behavior giving rise to past claims of discrimination on the basis of sexual orientation were no less horrific than those that have arisen in recent years, and did not sway courts to reach a different conclusion with respect to claims of discrimination on the basis of sexual orientation. In *Dillon v. Frank*, a middle-aged man working at the U. S. Postal Service was "taunted, ostracized and physically beaten" by his co-workers because they thought he was homosexual.[17] Fellow employees repeatedly made derogatory comments to him about his sexuality in what the court characterized as a "full orchestral assault of verbal abuse," and though Dillon complained to eight different supervisors, management did little more than admonish the harassers.[18] The Sixth Circuit held that the comments, graffiti, and assaults directed at Dillon by his co-workers were so directed because they believed him to be gay.[19] Still, despite this egregious behavior, the Sixth Circuit held that "homosexuality is not an impermissible criteria on which to discriminate" and, thus, that "these actions, although cruel, are not made illegal under Title VII."[20]

Courts facing similarly shocking facts in more recent years have been constrained to reach the same conclusion. In *Simonton v. Runyon*, the plaintiff alleged that he was subjected to repeated harassment pertaining to his sexual orientation: he was verbally abused; notes were placed on the wall of the employees' bathroom with Simonton's name and the names of celebrities who had died of AIDS; and co-workers taped pornographic photographs and posters to Simonton's work area.[21] The court, though acknowledging that the conduct to which Simonton was subjected was "appalling" and "morally reprehensible whenever

---

15. DeCintio v. Westchester County Med. Ctr., 807 F.2d 304 (2d Cir. 1986).
16. *Id.* at 306–07; *accord* Simonton v. Runyon, 232 F.3d 33, 36 (2d Cir. 2000).
17. *Dillon*, 952 F.2d at 403.
18. *Id.*
19. *Id.*
20. *Id.*
21. *Simonton*, 232 F.3d at 35.

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association.
Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

and in whatever context it occurs," found itself "called upon here to construe a statute as glossed by the Supreme Court, not to make a moral judgment."[22] Thus, despite the egregious circumstances giving rise to the claim, the court held that claims for discrimination on the basis of sexual orientation fall outside the purview of Title VII.[23]

Courts have similarly rejected claims brought under Title VII for discrimination on the basis of one's being a transsexual. In those cases, courts have held that transsexuals are not disadvantaged at work because of their "sex," that is, because they were women and not men, or because they were men and not women. For example, in *Sommers v. Budget Marketing, Inc.*, the plaintiff, Audra Sommers, who referred to herself as a "female with the anatomical body of a male" was terminated from her job because she misrepresented herself as an anatomical female when she applied for the job.[24] Before the district court, Sommers argued that the court should not be bound by the plain meaning of the term "sex" under Title VII as connoting either male or female in analyzing her claim for sex discrimination.[25] The district court declined Sommers' request to expand the meaning of "sex," stating that "the Court does not believe that Congress intended by its laws prohibiting sex discrimination to require the courts to ignore anatomical classification and determine a person's sex according to the psychological makeup of that individual."[26]

On appeal, the Eighth Circuit upheld the district court's decision. The court reasoned that the word "sex" in Title VII "is to be given its traditional definition, rather than an expansive interpretation . . . [and] [b]ecause Congress has not shown an intention to protect transsexuals, we hold that discrimination based on one's transsexualism does not fall within the protective purview of the Act."[27] The Seventh Circuit reached a similar conclusion in *Ulane v. Eastern Airlines, Inc.*, where a male pilot was fired from his employment after undergoing sex reassignment surgery and coming back to work as a female.[28] There, the court made clear that discrimination "because of such individual's sex" means that it is "unlawful to discriminate against women because they are women and men because they are men."[29] Ulane's claim for discrimination because of her transsexuality did not fall within the purview of Title VII.[30]

---

22. *Id.*, citing *Higgins*, 194 F.3d at 259.
23. *Simonton*, 232 F.3d at 36; *see also* McWilliams v. Fairfax County Bd. of Supervisors, 72 F.3d 1191 (4th Cir. 1996).
24. Sommers v. Budget Marketing, Inc., 667 F.2d 748 (8th Cir. 1982).
25. *Id.* at 749.
26. *Id.*
27. *Id.* at 750; *see also* Holloway v. Arthur Andersen & Co., 566 F.2d 659 (9th Cir. 1977); Voyles v. Ralph K. Davis Med. Ctr., 403 F. Supp. 456, 457 (N.D. Cal. 1975), *aff'd*, 570 F.2d 354 (9th Cir. 1978); Doe v. Boeing Co., 846 P.2d 531 (Wash. 1993).
28. Ulane v. E. Airlines, Inc., 742 F.2d 1081 (7th Cir. 1984).
29. *Id.* at 1085.
30. *Id.* at 1087.

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

Courts showed a similar understanding that "sex" in Title VII was (in *Sommers'* language) to be given "its traditional definition" and not an "expansive interpretation," when they were confronted by employers who had adopted personal grooming and appearance standards that set different rules for men and women. Though early decisions on employer grooming codes were split on whether such standards violated Title VII, by the mid-1970s, courts had firmly decided that sex-differentiated grooming standards did not generally violate Title VII.[31] For example, in *Baker v. California Land Title Company*, where employees challenged their employer's rule banning men, but not women, from having long hair, the Ninth Circuit concluded that grooming and dress standards were "entirely outside the purview of Title VII because Congress intended that Title VII only prohibit discrimination based on 'immutable characteristics' associated with a worker's sex."[32]

These early decisions similarly rejected the notion that grooming standards are prohibited under a sex-plus theory of discrimination, which concerns the classification of employees on the basis of sex plus another allegedly neutral characteristic. In *Willingham v. Macon Telegraph Publishing Company*, a male employee alleged that his employer's hair-length requirement, which prohibited men (but not women) from having long hair, discriminated against men on the basis of sex.[33] Willingham argued that this policy was discriminatory because the "sex plus" category of discrimination should include "sex plus *any* sexual stereotype."[34] The Fifth Circuit, in an en banc decision, responded to the question of "whether Congress intended to include all sexual distinctions in its prohibition of discrimination . . . or whether a line can legitimately be drawn beyond the reach of the statute," by concluding that "Title VII was never intended to encompass sexual classifications having only an insignificant effect on employment opportunities."[35] It specifically rejected expanding the sex-plus theory beyond an employee's immutable characteristics or fundamental rights, such as getting married or having children.[36]

Numerous courts have similarly reasoned that employers may establish different grooming and dress standards for male and female employees, even if those standards prohibit men (but not women) from

---

31. *See* 3 Lex Larson, Employment Discrimination § 45.02 (2002).

32. Baker v. Cal. Land Title Co., 507 F.2d 895, 897 (9th Cir. 1974); *see also* Barker v. Taft Broad. Co., 549 F.2d 400, 401 (6th Cir. 1977); Earwood v. Cont'l S.E. Lines, 539 F.2d 1349, 1350 (4th Cir. 1976); Longo v. Carlisle DeCoppet & Co., 537 F.2d 685 (2d Cir. 1976); Dodge v. Giant Food, Inc., 488 F.2d 1333, 1337 (D.C. Cir. 1973); Bedker v. Domino's Pizza, 491 N.W.2d 275 (Mich. Ct. App. 1992).

33. Willingham v. Macon Tel. Publ'g Co., 507 F.2d 1084, 1086 (5th Cir. 1975).

34. *Id.* at 1089 (emphasis added).

35. *Id.* at 1090.

36. *Id.* at 1091, citing Phillips v. Martin-Marietta, Inc., 400 U.S. 542 (1971), and Sprogis v. United Air Lines, Inc., 444 F.2d 1194 (7th Cir. 1971).

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

wearing earrings, require men (but not women) to wear neckties, forbid certain hairstyles such as cornrows, or require both women and men to wear overalls to work.[37] Courts also have upheld standards requiring employees to dress conservatively or achieve a "Brooks Brothers look," determining that such dress codes do not run afoul of Title VII.[38] These types of dress standards do not violate Title VII, the courts reasoned, because they regulate "mutable" characteristics, and employers that make compliance with such standards a condition of employment are discriminating on the basis of how they think their employees should look, not "because of [their] . . . sex."[39]

Courts have not overlooked those cases in which grooming policies are used by employers in a discriminatory way, such as when they are not enforced even-handedly, or place heavier burdens on one sex more than the other. In *EEOC v. Sage Realty Corporation*, for example, an employer requested that certain female employees wear a revealing uniform that exposed their thighs and portions of their buttocks.[40] Distinguishing that uniform requirement from other grooming and dress cases, the court found that requiring a woman to wear sexually provocative uniforms could reasonably be expected to subject her to sexual harassment, and was thus discrimination on the basis of sex.[41] Similarly, in *Carroll v. Talman Federal Savings and Loan Association*, a group of women challenged the employer's rule requiring female employees to wear a uniform while men could wear their own business suits.[42] In finding that the policy was discriminatory, the Seventh Circuit found that the policy was based on the stereotype that, if no such dress code were in place, the women could not be expected to exercise good judgment in choosing business apparel, whereas the men could be trusted with such decisions.[43] Again, it was not the dress code itself that was offensive to Title VII or that the code enforced gender-specific

---

37. *See, e.g.*, Fountain v. Safeway Stores, Inc., 555 F.2d 753, 755 (9th Cir. 1977) (necktie); Kleinsorge v. Eyeland Corp., 81 Fair Empl. Prac. Cas. 1601 (E.D. Pa. 2000), *aff'd without op.*, 251 F.3d 153 (3d Cir. 2000) (earrings); Capaldo v. Pan Am. Fed. Credit Union, 43 Fair Empl. Prac. Cas. 37016 (E.D.N.Y. 1987) (same); Killebrew v. Local Union 1683, 651 F. Supp. 95, 96 (W.D. Ky. 1986) (overalls); Devine v. Lonschein, 621 F. Supp. 894, 895 (S.D.N.Y. 1985) (necktie); Rogers v. Am. Airlines, Inc., 527 F. Supp. 229, 239 (S.D.N.Y. 1981) (cornrows hairstyle); Pecenka v. Fareway Stores, Inc., 672 N.W.2d 800 (Iowa 2003) (earrings).

38. Wislocki-Goin v. Mears, 831 F.2d 1374, 1376 (7th Cir. 1987).

39. *See, e.g.*, Jespersen v. Harrah's Operating Co., 392 F.3d 1076, 1080 (9th Cir. 2004), *re-affirmed en banc*, No. 03-15045, 2006 WL 962533 (9th Cir. Apr. 14, 2006).

40. Equal Employment Opportunity Comm'n v. Sage Realty Corp., 507 F. Supp. 599 (S.D.N.Y. 1981).

41. *Id.* at 608–09.

42. Carroll v. Talman Fed. Sav. & Loan Assoc., 604 F.2d 1028, 1029 (7th Cir. 1979); *see also* O'Donnell v. Burlington Coat Factory Warehouse, Inc., 656 F. Supp. 263 (S.D. Ohio 1987) (holding rule requiring female sales clerks to wear smocks over their clothes while allowing male sales clerks to wear their own business attire held to violate Title VII).

43. *Id.* at 1033 n.17.

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

notions of employee appearance, but rather that the employer was imposing on women (because they were women) a condition of employment it was not imposing on men.

## II. The Supreme Court's Focus on Discrimination, Not Sexuality

The traditional judicial understanding of a clear divide between sex and sexuality in Title VII's ban on sex discrimination began to erode with the Supreme Court's decision in *Meritor Savings Bank, FSB v. Vinson*, which held that Title VII was violated by sexual harassment in the form of persistently hostile and abusive conduct of a sexual nature directed toward a woman by her male supervisor.[44] It should have been clear from *Meritor* read in context—and it was made clear twelve years later in the *Oncale* case[45]—that the "sexual harassment" was not illegal because of its being sexual or even of its being harassment, but of its being discrimination. Yet, courts tended to wander from *Meritor*'s focus of discrimination and began to explore the "sexual" aspects of sexual harassment.

The crux of *Meritor* was Justice Rehnquist's observation that no woman or man should be made to run "a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living."[46] It was certainly true that the Court approvingly cited the EEOC guidelines of sexual harassment, which defined that particular form of discrimination as being based on "conduct of a sexual nature."[47] But the conceptual underpinning of *Meritor* was the seminal case of *EEOC v. Rogers*, which brought "under Title VII's protective ambit" racial and ethnic harassment.[48] As Justice Rehnquist put it, "[s]exual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality."[49]

Thus understood, "conduct of a sexual nature" was no more material to the illegality of sexual harassment than it was to harassment on account of race or ethnicity. What made sexual harassment illegal was (like racial and ethnic harassment) the motive of the harasser and the targeting for persistent abuse of an individual within a protected classification (e.g., sex, race, or ethnicity) on account of her having that protected characteristic (e.g., being a woman, a Black, or a Hispanic).

---

44. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986).

45. *See* Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75 (1998), which is discussed in the text at notes 64–71.

46. *Meritor*, 477 U.S. at 67.

47. *Id.* at 65, citing Rules and Regulations, Equal Employment Opportunity Commission, 29 C.F.R. § 1604.11.

48. Equal Employment Opportunity Comm'n v. Rogers, 454 F.2d 234, 238 (5th Cir. 1971).

49. *Meritor*, 477 U.S. at 67.

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

What mattered was that the victim was targeted for abuse because of his or her sex, race, or ethnicity.[50] That the conduct effectuating the harassment was of a sexual, racial, or ethnic "nature" was immaterial; indeed, it is difficult to understand what would make, for example, hanging a noose from a co-worker's work-station "conduct of a [racial] nature" other than its being directed toward a Black individual and intended to intimidate or communicate hostility toward him just because of "such individual's race."[51]

Though an impermissible motive is generally essential to a claim of actionable harassment, it may not always be necessary. Extending Justice Rehnquist's observation about a gauntlet of sexual abuse and Justice Ginsburg's observation that the "critical issue" in Title VII harassment cases "is whether members of one sex are exposed to disadvantages, terms or conditions of employment to which members of the other sex are not exposed,"[52] one could argue that the harm—or, at least, a harm—of sexual harassment is the creation of a barrier to employment opportunity for women that is not created for men.[53] Even without an anti-female motivation, however, an oft-overlooked provision of Title VII might still be transgressed, namely, Section 703(a)(2), which makes it unlawful for employers "to . . . segregate . . . employees in any way which would deprive or tend to deprive any individual of employment opportunities . . . , because of such individual's . . . sex."[54] Thus, whether because it is motivated by anti-female animus (either generally or in a particular workplace) or because it erects barriers to employment opportunity for women that do not exist for similarly situated men, it is the discrimination—not the sexuality—that makes sexual harassment actionable under Title VII.[55]

---

50. *See, e.g.*, Harris v. Forklift Sys., 510 U.S. 17, 21 (1993) (noting that Title VII "strike[s] at the entire spectrum of *disparate treatment of men and women*" in order to remove from the workplace "*discriminating* intimidation, ridicule and insult") (emphasis added); Quick v. Donaldson Co., 90 F.3d 1372, 1377 (8th Cir. 1996) ("The term 'sex' as used in Title VII has accordingly been interpreted . . . to bar workplace sexual harassment against women because they are women and against men because they are men,"); Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982) ("in proving a claim for a hostile work environment due to sexual harassment . . . the plaintiff must show that but for the fact of her sex, she would not have been the object of harassment").

51. *See* Title VII, § 703(a), 42 U.S.C. § 2000e-2(a).

52. *Harris*, 510 U.S. at 25 (Ginsburg, J. concurring).

53. *See, e.g.*, Scott v. Sears Roebuck & Co., 798 F.2d 210, 213 (7th Cir. 1986) (holding that sexual harassment "becomes discriminatory because it deprives the victim (usually female) of the right to participate in the workplace on an equal footing with others similarly situated").

54. Title VII, § 703(a)(2), 42 U.S.C. § 2000e-2(a)(2). *Cf.* Smith v. City of Jackson, 544 U.S. 228, 125 S. Ct. 1536, 1542 (2005) (discussing role of section 703(a)(2) in Court's more mature understanding of disparate impact claims).

55. *See generally* Vicki Schultz, *Reconceptualizing Sexual Harassment*, 107 Yale L.J. 1683, 1689 (1998) (arguing that focus of sexual harassment law should not be "on sexuality as such" but on "conduct that consigns people to gendered work roles that do not further their own aspiration or advantage").

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

The understanding that Title VII's proscription of sexual harassment related to its being a form of sex discrimination (as opposed to its being harassment perpetrated by conduct "of a sexual nature") is reflected by those decisions opining that sexual favors demanded of both men and women or persistent badgering by conduct "of a sexual nature" directed at both men and women would not violate Title VII,[56] a view that has been reiterated after *Oncale*.[57] The view that the Title VII violation referred to as "sexual harassment" is not intrinsically related to sexual conduct is also reflected by those cases that extended Title VII protection to women who accepted employment in traditionally male occupations and were beleaguered by their male co-workers by conduct that was not "of a sexual nature."[58] Courts in such cases give short shrift to employer arguments that there could be no sexual harassment because there was no sexual conduct.[59] Even without conduct "of a sexual nature," women, but not men, were being forced to submit to a "gauntlet of . . . abuse" for the privilege of being employed and earning a living in an occupation that had come to be regarded as the province of men. That was discrimination plain and simple, and that is what made the harassment a violation of Title VII.

Other courts, however, viewed the evil of sexual harassment to consist of subjecting women (and, as it turned out, men) to abusive behavior that intruded on one's sexual privacy. These cases found a violation of Title VII by persistent sexually offensive behavior, such as

---

56. As the seminal case, *Barnes v. Costle*, put it, "[i]n the case of the bi-sexual superior, the insistence on sexual favors would not constitute gender discrimination because it would apply to male and female employees alike." Barnes v. Costle, 561 F.2d 983, 990 n.55 (D.C. Cir. 1977). *See also DeCintio*, 807 F.2d at 308; Rabidue v. Osceola Ref. Co., 805 F.2d 611, 620 (6th Cir. 1986) ("sexual conduct . . . equally offensive to male and female workers would not support a Title VII sexual harassment charge because men and women were accorded like treatment"); Jones v. Flagship Int'l, 793 F.2d 714, 720 n.5 (5th Cir. 1986); *Henson*, 682 F.2d at 905 n.11. *But see* Steiner v. Showboat Operating Co., 25 F.3d 1459, 1464 (9th Cir. 1994) (alluding to the possibility, in the case of the bi-sexual harasser, "that both men and women working at Showboat have viable claims . . . for sexual harassment").

57. *See* Holman v. Indiana, 211 F.3d 399, 403 (7th Cir. 2000) (holding that there is no Title VII liability for unwanted physical touching and sexual proposition directed at each one of a married couple who worked for him because the supervisor "treat[ed] both sexes the same (albeit badly)"); Shepherd v. Slater, 168 F.3d 998, 1011 (7th Cir. 1999).

58. *See* Williams v. Gen. Motors Corp., 187 F.3d 553, 565 (6th Cir. 1999) (holding that nonsexual conduct directed at a woman working in warehouse could constitute harassment on the basis of sex); Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987) (holding that district court should have considered both sexual and nonsexual conduct directed at female security guard in deciding her claim of harassment); Bell v. Crackin Good Bakers, Inc., 777 F.2d 1497 (11th Cir. 1985). *But see* Schultz, *supra* note 55, at 1716–17 (citing cases that failed to consider nonsexual conduct as constituting sexual harassment).

59. *See, e.g.*, *Williams*, 187 F.3d at 565 ("harassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women satisfies the "based on sex" requirement); Hall v. Gus Constr. Co., 842 F.2d 1010, 1014 (8th Cir. 1988).

Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

grabbing at a co-worker's crotch or offensively touching her genitalia or secondary sexual characteristic, like her breast or buttocks.[60] Indeed, even after *Oncale*, at least some jurists persist in the view that sexually offensive behavior in and of itself violates Title VII's ban of discrimination "because of . . . sex" without regard to the motives, express or implied, of the perpetrators.[61]

Focus on the sexuality aspect of sexual harassment—as opposed to its being a form of discrimination—led to the seeming conundrum of whether harassment by conduct "of a sexual nature" was still violative of Title VII when both the perpetrator and the victim were men. Many courts—but not all—came to the conclusion that even though sexual harassment of women by men was under *Meritor* a violation of Title VII, so-called male-on-male sexual harassment was not, unless, perhaps, the harasser was a homosexual who directed his conduct toward other men in the workplace but not other women.[62]

The error of those cases lay not so much in the answer they gave to the question posed as in having posed the wrong question: that is to say, in having conceptualized sexual harassment as pervasively abusive conduct of a sexual nature and questioning whether sexual harassment (so conceived) would still violate Title VII if both the perpetrator and victim were men. If, however, sexual harassment is understood as being, like racial and ethnic harassment, a pattern of behavior so severe and pervasive that it denies an employee equal privileges of employment "because of such individual's . . . sex,"[63] the comparative sex of the perpetrator and victim are legally immaterial except to the extent that it is evidence of the perpetrator's motive.

That was the gist of *Oncale*. In that case, the plaintiff, Joseph Oncale, worked as a roustabout in an eight-man crew working on an oil

---

60. *See generally* Doe v. City of Bellville, 119 F.3d 563, 576–80 (defending view that "when the harassment has explicit sexual overtones" or is "imbued with sexual overtones," the experience is so "humiliating in a deeply personal way, as only sexual acts can be," that it is, without more, "'because of' the harassee's sex") (citing cases so arguing); David Schwartz, *When Is Sex Because of Sex? The Causation Problem in Sexual Harassment Law*, 150 U. PA. L. REV. 1697, 1705–09 & 1719–25 (referring to this as the "'sex per se' *rule*" and discussing its case law development) (emphasis added). Particularly telling is Judge Rovner's statement in *Doe* that "we must question whether it is appropriate to view sexual harassment as actionable sex discrimination only when the plaintiff is able to show that she was harassed *because* she was a woman *rather than* a man, or vice versa." *Doe*, 119 F.3d at 577 (emphasis in original). It is the position of the authors that this "view" is not only appropriate, it is indispensable to a correct understanding of sex-discrimination law.

61. *See Rene*, 305 F.3d at 1067–68; *id.* at 1070 (Fisher, J., concurring) ("[t]he repeated physical attacks targeted at body parts clearly linked to [the plaintiff's] gender constituted overwhelming evidence from which a jury could infer that the attacks were based, at least in part, on [his] sex").

62. *See generally Doe*, 119 F.3d at 571 (citing and criticizing "minority of courts" to have adopted position).

63. *See* Title VII, § 703(a), 42 U.S.C. § 2000e-2(a).

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

platform in the Gulf of Mexico.[64] On several occasions, Oncale's super-visors and co-workers forcibly subjected him to humiliating actions of a sexual nature in the presence of the remaining crew members—con-duct that included physical assaults and threats of rape.[65] After his complaints to the company's supervisory personnel fell on deaf ears, Oncale ultimately quit his job, as he put it, "due to sexual harassment and verbal abuse."[66] No one could seriously doubt that Oncale had been subject to harassment at work or that the harassment had been per-petrated by "conduct of a sexual nature." There was, however, a serious question as to whether he had been discriminated against on account of his sex, since other men in his workplace had not been targeted for such sexual torment, namely, everyone else on the crew. The appellate court, however, made no such fine distinctions. Applying then-existing circuit precedent, the Fifth Circuit dismissed his claim for sexual ha-rassment on the ground that same-sex sexual harassment was not ac-tionable under Title VII.[67] The Supreme Court reversed.

Justice Scalia, delivering the opinion of the unanimous Court, wrote that nothing in Title VII necessarily bars a claim of sex discrim-ination merely because the plaintiff was of the same sex as the alleged harasser.[68] What was critical, the Court emphasized, was that "Title VII does not prohibit all verbal or physical harassment in the work-place; it is directed only at '*discriminat[ion]* . . . because of . . . sex.'"[69] Workplace harassment is not automatically discrimination because of sex "merely because the words used have sexual content or connota-tions," the Court said; rather, "the critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of em-ployment to which members of the other sex are not exposed."[70] Thus, though *Oncale* clarified that an employee could conceivably bring a claim for same-sex sexual harassment, it did nothing to alter the cir-cumstances under which such a claim would be viable. Instead, it re-emphasized that the key issue in any type of "sexual harassment" case, as in any sex discrimination case generally, is whether the offending conduct constituted discrimination against its victim "because of such individual's . . . sex."[71]

---

64. *Oncale*, 523 U.S. at 77.
65. *Id.*
66. *Id.*
67. *Id.*, citing Garcia v. Elf Atochem N. Am., 28 F.3d 446, 451–52 (5th Cir. 1994).
68. *Oncale*, 523 U.S. at 79.
69. *Id.* at 80 (emphasis in original); *accord id.* at 81 (noting that a Title VII plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "*discrimina[tion]* . . . because of . . . sex")(emphasis in original).
70. *Id.* (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring)).
71. *See* Title VII, § 703(a), 42 U.S.C. § 2000e-2(a).

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association.
Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated
in any form or by any means or stored in an electronic database or retrieval system without the express written consent
of the American Bar Association.

### III. The Transition from Sex to Sexuality

In many states and localities, the laws banning employment discrimination have been expanded to ban expressly discrimination on the basis of sexual orientation[72] or, less frequently, gender identification.[73] Under such statutes, harassment of gay, lesbian or transsexual employees because they are gay, lesbian or transsexual is as clearly illegal as is sexual harassment of women under Title VII. But in states where anti-discrimination laws are like Title VII and do not extend to sexual orientation or gender identity, the question arises whether the victims of such harassment have actionable claims of employment discrimination.

The Supreme Court's pronouncement in *Oncale* that harassment of employees by conduct "hav[ing] sexual content or connotations" does not violate Title VII unless it is perpetrated against the victim "because of such individual's . . . sex" was the impetus to renewed interest in "sex stereotyping" as an independent form of illegal sex discrimination, though some cases had considered this possibility even before *Oncale* was decided.[74]

The illegality of sexual harassment of homosexual and transgendered individuals is immediately problematic if, as has been argued above, the wrong of sexual harassment against women is its being a form of discrimination because of sex. If sexual harassment against women is actionable because (and only because) it violates Title VII's ban on sex discrimination, and if discrimination on the basis of sexual orientation or gender identification is not discrimination "because of sex" within the meaning of Title VII, then workplace harassment of homosexuals and transsexuals does not violate Title VII, no matter how sexual may be the conduct constituting the harassment or how repugnant that conduct may seem to civilized society.

Courts and commentators not satisfied with this result and recognizing that principled decision making required some way to link

---

72. States that have enacted laws prohibiting discrimination in employment on the basis of sexual orientation include Connecticut (CONN. GEN. STAT. § 46(a)–81(a)); Maryland (MD. CODE ANN., art. 49B, § 5 (1957)); Massachusetts (MASS. ANN. LAWS ch. 151B, §§ 3–4 (Law. Co-op.2003)); Nevada (NEV. REV. STAT. ANN. 613.330, 613.340, 281.370 (Michie 2003)); New Hampshire (N.H. REV. STAT. ANN. § 354-A:6 (1997)); New Jersey (N.J. STAT. ANN. § 10:5-1–49 (West 2002)); New York (N.Y. EXEC. LAW § 296 (McKinney 2002)); Vermont (VT. STAT. ANN. tit. 21, § 495 (1991)); and Wisconsin (WIS. STAT. ANN. §§ 111.31, 230.18 (West 2002)). Numerous municipalities have enacted laws prohibiting discrimination in employment on the basis of sexual orientation, including Buffalo, New York; Minneapolis, Minnesota; Rehoboth Beach, Delaware; Peoria and Springfield, Illinois; Covington, Kentucky; Moorhead, Minnesota; and El Paso, Texas.

73. *See* California (CAL. GOV'T CODE §§ 12926, §12949 (West 1990)); Illinois (775 ILL. COMP. STAT. 5/1-102 (1991)); Minnesota (MINN. STAT. §§ 363.01–03 (2005)), Rhode Island (R.I. GEN. LAWS §§ 28-5-3, 28-5-7 (2001)); New York City (N.Y.C. ADMIN. CODE § 8 *et seq.* (2003)).

74. *See, e.g.*, *City of Bellville*, 119 F.3d at 580–84.

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

such repulsive workplace behavior to Title VII's prohibition on discrimination "because of [one's] . . . sex," began to invoke *Price Waterhouse*'s reference to sex stereotyping. The argument began by positing *Price Waterhouse* to have established that sex stereotyping was, in and of itself, unlawful discrimination because of sex, and from there concluding that persons victimized by sexual hazing because of nonconformity to the gender stereotypes expected of those of their same sex were subjected to unlawful sex discriminations under Title VII.

There was initial resistance to this approach.[75] But then the tide began to turn. In *Doe v. City of Bellville*, twin teenaged boys took a summer job cutting grass at the municipal cemetery where they were subjected to a relentless campaign of harassment by their male co-workers: one (J. Doe) was apparently overweight and dubbed "fat boy"; the other (H. Doe) wore an earring and was called the "fag" or the "queer."[76] The hostility targeted toward H. Doe was overtly sexual: one co-worker (who was "a former Marine of imposing stature") asked him if he was a boy or a girl, told him to "'go back to San Francisco with the rest of the queers,'" and threatened he would "take him 'out to the woods' and 'get [him] up the ass'"; on one occasion, a different co-worker grabbed Doe's crotch to determine if he had testicles.[77]

Nothing in the record suggested that H. Doe was gay or transgendered or that he acted or dressed in a feminine way, other than that he wore an earring, which some very masculine teenaged boys did in the late 1990s. The court, however, attributed to the tormenting male co-workers the belief that "an earring is a feminine accoutrement not suitable for male adornment"—based, it seems, solely on the sexual content of the harassment—and found this to be evidence that H. Doe's "gender had *something* to do with the harassment heaped upon him."[78] This made the treatment of H. Doe (the plight of the overweight twin having now faded into the background) actionable sexual harassment because, in the court's view, the *Price Waterhouse* decision made clear "that Title VII does not permit an employee to be treated adversely because his or

---

75. *See Dillon*, 952 F.2d at 10 ("the discussion of sexual stereotyping in *Price Waterhouse* does not support a holding that discrimination 'on account of sex' was involved in this case [of homosexual harassment]").

76. *City of Bellville*, 119 F.3d at 566–67.

77. *Id.* at 567.

78. *Id.* at 582 (emphasis added). *See also id.* at 575. The court had previously defined one's "gender" as the way one "project[s] the sexual aspect of [one's] personality," but did not explain how "gender" so defined relates to "sex" within the meaning of Title VII. *Id.* at 580. If the court's statement that "gender had something to do with the harassment" uses "gender" as specially defined, the statement follows tautologically from the premise that the tormentors viewed the earring as not suitable for men. If, however, "gender" is there used as a synonym for "sex," it is not at all clear how the tormentors' view of "male adornment" evidenced that their harassment of Doe was based on his sex, *i.e.*, that he was male, not female. It is possible that the court here has fallen into the fallacy of ambiguous reference, using the same word, "gender," in the premise and conclusion of an argument but giving that word a different meaning in each use.

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

her appearance or conduct does not conform [to] his co-workers' view of appropriate masculine behavior."[79]

The court in *Doe* found its ruling fully consistent with the Seventh Circuit's earlier decision in *Ulane*, which had held that Title VII's reference to "sex" was to be construed "in the traditional manner" so as to encompass discrimination of women because they are women and men because they are men, but not to discrimination against transsexuals.[80] It did remark, however, that any suggested interpretation of *Ulane* so as to preclude a Title VII claim for failure to conform to stereotypical expectations of one's gender was "foreclosed" by *Price Waterhouse.*[81]

Other courts, as well, have reasoned or assumed that the sex-stereotyping theory of Title VII liability was compatible with preexisting understandings that "sex" in that statute was to be construed "in the traditional manner" so as to exclude from its purview discrimination on the basis of sexual orientation, gender identification, or other aspect of one's sexuality. Illustrative of this approach was *Higgins v. New Balance Athletic*, where the plaintiff, who had "toiled in a wretchedly hostile environment," was denied a remedy because it was "settled law that, as drafted and authoritatively construed, Title VII does not proscribe harassment because of sexual orientation."[82] The court of appeals was, however, sympathetic to the idea of illegal gender stereotyping, opining, *in dicta*, as follows:

> [J]ust as a woman can ground an action on a claim that men discriminated against her because she did not meet stereotyped expectations of femininity, . . . a man can ground a claim on evidence that other men discriminated against him because he did not meet stereotyped expectations of masculinity.[83]

The Ninth Circuit's decision in *Nichols v. Azteca Restaurant Enterprises*—which unlike *Higgins* was a holding, not just *dicta*—also saw no conflict between the actionability of sex-stereotyping harassment and prior cases that had excluded from Title VII's purview harassment on the basis of sexual orientation or gender identity. One of the *Nichols* plaintiffs, Antonio Sanchez, had been "subjected to a relentless campaign of insults, name-calling, and vulgarities" by his male co-workers who mocked him for "walking and carrying his serving tray like a

---

79. *Id.* at 580. The proposition that sex stereotyping *is* sex discrimination provides the missing premise without which the court's argument would be fallacious.

80. *Id.* at 592, citing *Ulane*, 742 F.2d 1081.

81. *Id.*

82. *Higgins*, 194 F.3d at 258-59.

83. *Id.* at 260 n.4 (citation to *Price Waterhouse* omitted). *See also Bibby*, 260 F.3d at 262–65 (noting that while same-sex sexual harassment might be provable on evidence that the "harasser's conduct was motivated by the belief that their victim did not conform to stereotypes of his or her gender," plaintiff's own "pure and simple" claim of homosexual sexual harassment was denied, since "Congress has not yet seen fit . . . to provide protection against such harassment").

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

woman."[84] Although Sanchez was referred to as "a faggot and a fucking female whore," and, in English and Spanish, as "she" and was "derided for not having sexual intercourse with a waitress who was his friend,"[85] the decision gives no indication that he was, or was perceived by his tormentors to be, gay or transgendered. Acknowledging that under *Oncale*, actionable sexual harassment must be because of the victim's sex, the court determined Sanchez to have a viable Title VII claim based on his perceived effeminacy because, as the court saw it, "*Price Waterhouse* sets a rule that bars discrimination on the basis of sex stereotypes."[86]

Since the *Nichols* court accepted at face value that the barrage of verbal abuse directed at Sanchez, including references to his being "a fucking female whore," was fully understandable by reference solely to Sanchez's effeminacy (as opposed to perceived homosexuality), it did not address earlier Ninth Circuit precedent that Title VII did not protect against homosexual discrimination.[87] It opined only that earlier Ninth Circuit pronouncements to the effect that "discrimination based on a stereotype that a man 'should have a virile rather than an effeminate appearance' does not fall within Title VII's purview" was no longer good law after *Price Waterhouse*.[88]

Perhaps the most explicit instance of this approach is the district court's decision in *EEOC v. Grief Brothers*.[89] There, the complaining party, Michael Sabo, was a homosexual male who began working in the all-male riveting department of a manufacturing plant. The EEOC claimed that he was "harassed, emasculated and ridiculed . . . because he did not conform to the stereotypical view of masculinity," apparently based on his wearing an earring in his left ear and his refusal to participate in sexually explicit discussions about women.[90] The harassment, which was largely name-calling, seemed to reflect anti-homosexual bias,[91] and controlling Second Circuit precedent clearly precluded claims for sexual harassment against homosexuals.[92] Sabo, however, asserted that he had never disclosed his sexual orientation to his harassers, and they swore in their depositions—disingenuously, one suspects—that they did not know Sabo was gay and gave "no thought" to that possi-

---

84. Nichols v. Azteca Rest. Enters., 256 F.3d 864, 870 (9th Cir. 2001).

85. *Id.* at 870, 874.

86. *Id.* at 874.

87. *See DeSantis*, 608 F.2d at 328.

88. *Id.* at 330.

89. Equal Employment Opportunity Comm'n v. Grief Bros., 2004 WL 2202641 (W.D.N.Y. 2004).

90. *Id.* at *2.

91. *Id.* at *11 ("many of the comments and much of the conduct that Sabo was alleged[ly] subjected to appear at first blush to be directed at sexual orientation"); *id.* at *2 ("Sabo was called a faggot, queer, homo and fudge packer"). When Sabo walked past one tormentor, Parkhurst, he "would always cover his rear and say, don't go there . . . exit only." *Id.*

92. *Id.* at *10, citing *Simonton*, 232 F.3d at 35.

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association.
Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated
in any form or by any means or stored in an electronic database or retrieval system without the express written consent
of the American Bar Association.

bility.[93] Having thereby excluded the possibility of nonactionable homosexual sexual harassment, the district court was compelled to decide directly whether sexual harassment against a homosexual was still actionable under a sex-stereotyping theory. The court concluded that it was, based on the premise that one could "distinguish nonactionable sexual orientation discrimination from sexual stereotype discrimination."[94]

Cases like *Nichols* and *Grief Brothers* necessarily imply that harassing conduct of a sexual nature directed at a man by male co-workers is not actionable under Title VII if directed toward a homosexual, but is actionable if directed toward persons who are not or not perceived to be gay.[95] This seeming anomaly is not frequently addressed.

At least one court, however, has taken a different tack and stated unequivocally that the prior understanding that Title VII bans discrimination on the basis of sex, not sexuality, could no longer hold if sex stereotyping is, in itself, a form of impermissible sex discrimination. In *Smith v. City of Salem*, the plaintiff was a male lieutenant in the local fire department who, following a diagnosis of gender identity disorder, began expressing a more feminine appearance as a prelude to his intended sex-change operation.[96] He alleged that this prompted comments from co-workers that his appearance and mannerisms were not masculine enough and that, ultimately, his employer schemed to force his resignation due to "his gender non-conforming behavior."[97] Confronting prior federal appellate cases that, as the court put it, "regarded Title VII as barring discrimination only on 'sex' (referring to an individual's anatomical and biological characteristics), but not on 'gender' (referring to socially-constructed norms associated with a person's sex)," the court concluded that these cases had been "eviscerated by *Price Waterhouse*," which it construed as having "established that Title VII's reference to 'sex' encompasses both biological differences between men and women, and gender discrimination, that is discrimination based on a failure to conform to stereotypical gender notions."[98]

---

93. *Id.*

94. *Id.* at *14. *But see* Medina v. Income Support Div., State of New Mexico, 413 F.3d 1131, 1135 (10th Cir. 2005) (rejecting claim by heterosexual woman that she was harassed for nonconformance to gender stereotypes of her predominantly lesbian workgroup on ground that Title VII does not extend to sexual orientation).

95. *See Hamm*, 332 F.3d at 1066 (Posner, J., concurring) ("The case law as it has evolved holds . . . that although Title VII does not protect homosexuals from discrimination on the basis of their sexual orientation, it protects heterosexuals who are victims of sex stereotyping or gender stereotyping"). *See also* Dawson v. Bumble & Bumble, 398 F.3d 211, 217–19 (2d Cir. 2005).

96. *Smith*, 378 F.3d at 568.

97. *Id.* at 572.

98. *Id.* at 573. The idea that "gender" refers to "norms" that are "socially-constructed" is itself a concept that needs to be deconstructed, at least to the extent it suggests and, perhaps, is intended to suggest that gender distinctions are purely adventitious and artificial, and are not connected in any necessary way with the actual sex

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

There is an unstated irony to the *Smith* court's analysis. Although Smith was diagnosed with a psychiatric disorder, he had no claim under federal disability discrimination law, i.e., the Americans with Disabilities Act (ADA), because of an express statutory exclusion.[99] It is likely that this exclusion represented Congress' view that transsexuality was not then protected by federal law and its desire that the ADA not be construed to change that state of affairs.[100] Moreover, congressional proposals in the 1990s to extend Title VII to bar discrimination against gays and lesbians, which never succeeded in achieving majority support, did not extend that protection to differently gendered individuals,[101] likely on the belief that the bill could not possibly pass if it did.[102] It is ironic, in light of this history, to conclude that Title VII, as construed under the sex-stereotyping approach, affords protection to transsexuals—but not gays and lesbians—and did so from its enactment in 1964.

The trajectory of the law is now clear: sex stereotyping—in the sense of taking adverse actions against someone for his or her failure

---

differences between men and women, their psychological manifestations, or cultural and social expectations and understandings that have evolved from them.

   99. *See* ADA § 511, 42 U.S.C. § 12211 (excluding, *inter alia*, transvestism, transsexuality, and gender-identity disorder from the definition of disability).

   100. *See* Ruth Colker, *The ADA's Journey Through Congress*, 39 WAKE FOREST L. REV. 1, 3–6 (2004) (arguing that the exclusion of transvestism and transsexualism under section 511 of the ADA was preceded by the same exclusion in the Civil Rights Restoration Act of 1988 and the Fair Housing Act Amendments of 1988, both of which were proposed by Senator Jesse Helms after two cases in the mid-1980s suggested that transsexuals could be covered by the Rehabilitation Act); Jennifer L. Nevins, *Getting Dirty: A Litigation Strategy for Challenging Sex Discrimination Law by Beginning with Transsexualism*, 24 N.Y.U. REV. L. & SOC. CHANGE 383, 401 n.122 (1998) ("[I]t may be argued, since the statute was passed in 1991, when it was clear that the courts had excluded transsexuals from Title VII protection, the ADA accurately reflects the current social view on transsexuality."). *See also* Proceedings and Debates of the 101st Congress, 1st Session, 135 CONG. REC. S10765-01 (1989) (during which Senator Helms proposed an amendment to the ADA bill excluding transsexualism and transvestism from the definition of "disability"). Though the opinion of a later Congress on the intent of an earlier Congress in passing a certain statute is not dispositive, neither is it irrelevant. *See* Dep't of Def. v. Fed. Labor Relations Auth., 659 F.2d 1140, n.94 (D.C. Cir. 1981).

   101. *See* The Employment Non-Discrimination Act of 2001, S. 1284, H.R. 2692, 107th Cong. (2001); The Employment Non-Discrimination Act of 1997, S. 869, 105th Cong. (1997); Employment Non-Discrimination Act of 1994, S. 2238, 103d Cong; H.R. 1863, 104th Cong. (1995). Each of the proposals for the Employment Non-Discrimination Act (ENDA) protected individuals from discrimination on the basis of their "sexual orientation," which was defined as "homosexuality, bisexuality, or heterosexuality, whether the orientation is real or perceived." The proposals did not extend to transsexuals or transgendered individuals.

   102. *See* Sarah Fox, *The Subversion of the American Transgender Movement*, *at* http://www.gendernet.org/hrcwatch/subvert.htm (quoting Representative Barney Frank as stating the following in response to requests to extend the protection of the Employment Non-Discrimination Act to transgendered individuals: "I've talked with transgender activists and what they want . . . is for people with penises who identify as women to be able to shower with other women. . . . There are no votes for that. And if that is the price for this bill, it is wrong.").

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

to conform to sex stereotypes as to how he as a man (or she as a woman) should look or behave or, more simply, as the *Smith* court put it, "gender non-conforming behavior"—is viewed by most courts as, in and of itself, a form of sex discrimination prohibited by Title VII. Yet, this result is not compelled by the references to "sex stereotyping" in the plurality opinion in *Price Waterhouse*, and it cannot be maintained unless previously settled law as to the scope of Title VII is undone.

## IV. The Misreading of *Price Waterhouse* and Its Implications

Decisions construing *Price Waterhouse* as banning sex stereotyping per se under Title VII (whether as holding or just logic) often cite its statement that "in the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender."[103] This view of the plurality, however, does not in context support a *per se* ban on sex stereotyping.[104]

In that case, the employee, Ann Hopkins, was deferred for promotion to partner because she was regarded by some as not sufficiently feminine. More significantly, her aggressiveness, coming as it did from a woman, was condemned by some of the decision-makers, even though that same trait was regarded as essential for advancement in the case of men. It was this, the plurality said, that gave rise to the Title VII violation:

> An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and imper-

---

103. *Price Waterhouse*, 490 U.S. at 250.

104. The all-too-frequent assumption that this is a "holding" of *Price Waterhouse* is problematic. The Supreme Court's rulings are perforce limited by the scope of its grant of certiorari. *See* Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 202 (2002); Piper Aircraft Co. v. Reyno, 454 U.S. 235, 246–47 n.12 (1981) (noting that the Supreme Court may only consider questions outside the scope of the order granting certiorari "when resolution of those questions is necessary for the proper disposition of the case"). In *Price Waterhouse*, certiorari was not granted to decide the permissibility *vel non* of gender stereotyping under Title VII. Rather, certiorari was granted to resolve a circuit conflict concerning respective burdens of proof upon the showing by a Title VII plaintiff that an employment decision resulted from a mixture of legitimate and illegitimate motives. 490 U.S. at 232. That would make the plurality's discussion of sex stereotyping just *dicta*. Furthermore, the plurality decision, which "announced the judgment of the Court," *id.* at 131, expressly states what the Court held, and the holding relates the burdens of proof when a plaintiff "proves that the gender played a motivating part in an employment decision," not that Title VII prohibits sex stereotyping, *id.* at 158. Though such consideration may seem arid and technical to some, they do show that, however one interprets the plurality's analysis of sex stereotyping, it was not the holding of the Court. Perhaps that is why Judge Reinhardt was careful not to say in *Schwenk* that the older transsexuality cases were "overruled" by *Price Waterhouse*, but rather by its "logic and language." Schwenk v. Hartford, 204 F.3d 1187, 1201 (9th Cir. 2000).

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

missible Catch-22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind.[105]

Thus, Hopkins was effectively barred from advancement by the organizational culture: the quality she needed to advance (namely, "aggressiveness") disqualified her from advancement because, in a woman, that quality was disdained. That was discrimination on the basis of her gender in that it established, in the words of Justice Rehnquist in the sexual harassment context, an "arbitrary barrier to sexual equality at the workplace" that did not exist for men. It is not at all clear that her acting contrary to sex stereotypes was, in and of itself, essential to the legal analysis. It merely provided the psychosociological explanation for the mind-set of the male decision-makers.

It is useful to note in this regard the many ways in which *Price Waterhouse* was a rather blatant case of sex discrimination even without reference to sex stereotyping. At the time Ann Hopkins was considered for promotion, only seven of the accounting firm's 662 partners were women, and Hopkins was the only woman of the eighty-eight persons being considered for promotion to partner at that time. Significantly, Hopkins had "generated more business for Price Waterhouse" and "billed more hours" than any of the other candidates under consideration that year.[106]

Yet, Hopkins had a perceived deficiency in her "interpersonal skills," being perceived as crossing the line from aggressive to abrasive or brusque, especially in her relations with other staff members.[107] And some of the partners who evaluated Hopkins seemed to have "reacted negatively to Hopkins's personality *because she was a woman.*"[108] This led to what the plurality called the *coup de grace*: her partnership adviser counseled Hopkins after she had been deferred that her future chances for partnership would be improved if she walked, talked, and dressed more femininely, wore make-up, and had her hair styled.[109]

As the *Price Waterhouse* plurality observed, "it does not require expertise in psychology to know that, if an employee's flawed 'interpersonal skills' can be corrected by a soft-hued suit or a shade of lipstick, perhaps it is the employee's sex and not her interpersonal skills that

---

105. *Price Waterhouse*, 490 U.S. at 251.

106. Hopkins v. Price Waterhouse, 825 F.2d 458, 462 (D.C. Cir. 1987). *See also Price Waterhouse*, 490 U.S. at 239 (stating that no other candidate had a comparable record to Hopkins in terms of successfully securing major contracts for the partnership).

107. *Price Waterhouse*, 490 U.S. at 239.

108. *Id.* at 235 (emphasis added). Some comments cited by the plurality in support of this observation were that she was described by some as "macho or overcompensating for being a woman"; that she was criticized for using profanity, which was objectionable because it was "a lady using foul language," and that her supporter, apparently thinking it a compliment, remarked that she had "matured from a tough-talking somewhat masculine hard-nosed manager to an authoritative, formidable, but much more appealing lady partner candidate." *Id.*

109. *Id.* at 235.

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This version may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

has drawn the criticism."[110] This passage implies that decisions based on nonconformity to sex stereotypes is not *malum per se* but rather evidence from which a jury could, without expert testimony, infer sex bias. The reasoning would be that criticism of Ann Hopkins's insufficient femininity masked an aversion to advancing a woman to partner and, thus, that her sex—which is to say, her being a woman and not a man—"played a motivating part" in the challenged employment decision.[111]

That the plurality based its decision on sex discrimination, not sex stereotyping, is further reflected by its use of the phrase, "gender played a motivating part" in the employment decision. That phrase was expressly defined by the plurality to mean "that, if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was a woman."[112] This last statement in particular is hard to reconcile with the suggestion of some jurists and academics that *Price Waterhouse*'s frequent references to "gender" referred to some psychosocial intellectual construct relating to how one expresses, or is perceived to express, one's masculinity or femininity, as opposed to a conceptual category of which "man" and "woman" are the two, mutually exclusive constituents.[113]

Significantly, although the plurality took issue with the dissent on various points,[114] it found no need to dispute the dissent's statement that "Title VII creates no independent cause of action for sex stereotyping."[115] While it is hazardous to rely on a dissent to fix the scope of a majority or plurality opinion, this particular comment and the plurality's lack of response are further support for the proposition that no one involved in the *Price Waterhouse* decision understood the plurality to be saying what many now say they meant on the issue of sex stereotyping.

When the entire plurality opinion is considered, it does not support the view that sex stereotyping—that is to say, taking an adverse employment action against an individual because he acts, dresses, or otherwise comports himself in a way contrary to the accepted cultural standards for his (biological) sex—is in and of itself acting against him "because of [his] . . . sex" or discrimination violating Title VII. Indeed, the plurality specifically said that while sex-stereotypical remarks "can certainly be *evidence*" of discriminatory motivation, they "do not inevi-

---

110. *Id.* at 256.
111. *Id.* at 250.
112. *Id.* (emphasis added).
113. The same conceptualization is reflected by Justice Ginsburg's observation that the "critical issue" in Title VII is whether members of one sex are exposed to disadvantageous conditions to which members of "*the* other sex" are not. *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring) (emphasis added).
114. *See id.* at 246 n.11 & 256 n.16.
115. *Id.* at 295 (Kennedy, J., dissenting).

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

tably prove that gender played a part in a particular employment decision."[116] That is a passage from *Price Waterhouse* not usually quoted by those who view it as holding sex stereotyping to be impermissible per se under Title VII.

The Supreme Court's subsequent decision in *Oncale* made it clear, one would have thought, that workplace harassment is not illegal under Title VII because it is harassment, but because it is discrimination. In reaching its decision, the Court was clearly concerned with the criticism that allowing claims of same-sex harassment would "transform Title VII into a general civility code for the American workplace."[117] One bulwark against that perceived untoward result was that Title VII banned only behavior "so objectionably offensive" and so "severe or pervasive" as actually "to alter the 'conditions' of the victim's employment."[118] But the primary impediment to Title VII's "expanding into a generalized civility code" was the requirement that the plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* . . . because of . . . sex.'"[119] *Oncale*'s teaching that Title VII is not a "generalized civility code" for the American workplace is hard to square with recent cases that advance a forced and facile equivalence between "'because of such individual's . . . sex'" and "because of such individual's 'gender non-conforming behavior.'"

The appellate and trial courts, however, do not see it that way. One court, for example, has asserted quite baldly that harassment against men who act effeminately is sex discrimination "because the discrimination would not occur but for the victim's sex."[120] This seems plainly wrong. If other men in the workplace—namely, those who act in conformance with gender stereotypes—are not adversely treated, it would seem that gender could not have been the "but for" cause of the victimization—effeminacy was.[121]

One can imagine a workplace in which men acting contrary to accepted stereotypes of masculine behavior are harassed while other men and women—including so-called butch women, who act contrary to fe-

---

116. *Id.* at 251 (emphasis in original).
117. *Oncale*, 523 U.S. at 80.
118. *Id.* at 81.
119. *Id.* (emphasis in original).
120. *Smith*, 378 F.3d at 574.
121. Some may argue that effeminacy itself is a kind of gender characteristic. Given the definitional choices of many feminist legal scholars and some jurists with respect to the terms "sex" and "gender," *see, e.g.*, *Smith*, 378 F.3d at 573; Schwartz, *supra* note 60, at 1706; Case, *supra* note 2, at 10–11, this may be true. Whatever the benefits for feminist scholars, however, of a verbal distinction between "sex" (understood as biological) and "gender" (understood as cultural), the *Price Waterhouse* plurality did not use "gender" that way; it used it as a synonym for "sex." *Cf.* Case, *supra* note 2, at 9–10 (discussing development of "gender" as substitute for "sex" for rhetorical purposes by Justice Ginsburg when she was an advocate before the Supreme Court).

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association.
Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated
in any form or by any means or stored in an electronic database or retrieval system without the express written consent
of the American Bar Association.

male gender stereotypes—are not. That would imply discrimination "because of" the victim's sex, since women who acted contrary to their gender's stereotype were not adversely treated, while men who acted contrary to male gender stereotypes were.[122] This would be a classic "sex-plus" scenario, not analytically different from denying promotions to married women but not to married men.[123]

The recent sex-stereotyping cases have not, however, required a showing that "gender non-conforming behavior" is treated adversely for one gender but not the other. Without that differential based on gender, it is hard to understand how maltreatment of men acting counter to their gender stereotypes is impermissible sex discrimination under Title VII, although several courts have now held that it is.[124]

Extending Title VII to workplace harassment against persons who do not conform to gender stereotypes produces some seeming anomalies. Gay men in the workplace who act consistently with popular stereotypes of gay behavior but contrary to popular stereotypes of male behavior are protected by Title VII if harassed for that reason, but homosexual men who do not act gay and are harassed because of their sexual orientation are outside the protection of Title VII because Title VII does not prohibit sexual-orientation discrimination. Thus, in *Grief Brothers*, for example, Title VII liability was predicated on the (apparently disingenuous) deposition testimony of the harassers that they did not know and had "no thought" about the victim's homosexuality.[125] Presumably, no Title VII liability would have attached if they had testified that they victimized Sabo because they believed him to be gay.[126]

---

122. *Cf. Oncale*, 523 U.S. at 81 (stating that a same-sex harassment plaintiff could "offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace").

123. *See Phillips*, 400 U.S. at 542. *See also* 3 Larson, *supra* note 31, §§ 40.04, 45.02.

124. *See* Barnes v. City of Cincinnati, 401 F.3d 729, 737, 741 (6th Cir.), *cert. denied*, _____ U.S. _____, 126 S.Ct. 624 (2005) (ruling that trial court properly instructed jury that "discrimination 'based on sex' includes discrimination 'based on sexual stereotypes'"); *Smith*, 378 F.2d at 571-72; Mitchell v. Axcan Scandipharm, Inc., 2006 WL 456173, at *2 (W.D. Pa. Feb. 17, 2006) (male-to-female transsexual who alleged that "his failure to conform to sex stereotypes of how a man should look and behave was the catalyst behind" adverse employment action sufficiently pleads Title VII claim for "gender discrimination"). Significant in this regard is *Rosa v. Park West Bank*, which is sometimes described as holding that "sex stereotyping" violates provisions of the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691–1691f, which bans denial of credit "on the basis of . . . sex." Rosa v. Park W. Bank, 214 F.3d 213, 215–16 (1st Cir. 2000). What *Rosa* actually held, however, was that a man denied a bank loan because he wore a dress could establish an ECOA violation if the evidence was to show the bank "treated, for credit purposes, a woman who dresses like a man differently than a man who dresses like a woman." *Id.* That implies that no ECOA violation would arise for a bank that denied credit to cross-gendered women as well as cross-gendered men, and that the illegality, as perceived by the *Rosa* court, was sex discrimination, not sex stereotyping.

125. *Grief Bros.*, 2004 WL 2202641, at *10.

126. *See Dawson*, 398 F.3d at 218–20. Although it is contended by some that a Title VII violation can be based solely on the intensely sexual nature of the harassing conduct,

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

One court, clearly sensitive to the fact that Title VII does not protect harassment of a sexual nature because of sexual orientation, opined that a theory of sexual harassment based on nonconformity with sex stereotypes would not "'bootstrap'" sexual-orientation protection into Title VII because there are some homosexual men who behave in a "stereotypically masculine" way.[127] This observation, however, does seem to ignore the elephant standing in the room. Both masculine-acting homosexual men and effeminate-acting homosexual men do act contrary to male gender stereotypes in one rather significant way: they both engage in sexual intercourse with other men. If the effeminate gay male is protected from workplace harassment because he acts contrary to gender stereotypes with respect to his effeminacy, why is not the masculine gay male also protected from workplace harassment because he acts contrary to gender stereotypes with respect to his choice of sexual partners?[128] It thus seems that a theory touted as not conflicting with the accepted view that Title VII does not ban discrimination based on sexual orientation runs headlong into it.

It follows from this that the only consistent and principled approach is that of the court in *Smith v. City of Salem*, which said that the *Price Waterhouse* sex-stereotyping theory of Title VII liability impliedly overrules, or "eviscerate[s]," the preexisting settled law that Title VII prohibits discrimination on the basis of sex, not sexuality. Or, as Frank Sinatra might have said, when it comes to sex stereotyping, it is all or nothing at all. If sex stereotyping were, in and of itself, a form of sex discrimination that violated Title VII, then the traditional, well-settled law would have to be set aside, and the courts would have to treat Title VII as if its ban on sex discrimination protected gays, lesbians, and the differently gendered and as if it outlawed discrimination not only on the basis of sex (that is, being a man or a woman) but also on the basis of sexuality, which encompasses not just sex, but also sexual orientation and gender identity. The problem, however, is that this conclusion is premised on a legal analysis that is quite different from the argument actually advanced by the *Price Waterhouse* plurality, and necessarily construes a Supreme Court decision as undoing

---

*see, e.g.*, *Rene*, 305 F.3d at 1061, the authors believe that this is foreclosed by *Oncale*, see text at notes 68–71 and 117–19.

    127. *Simonton*, 232 F.3d at 38.

    128. *See* Heller v. Columbia Edgewater Country Club, 195 F. Supp. 2d 1212, 1224 (D. Or. 2002) (deciding case where a lesbian was claiming sex-stereotyping discrimination "because she failed to conform to her supervisor's stereotype that a woman should be attracted to and date only men"). *See also Medina*, 413 F.3d at 1135 (rejecting claim of heterosexual female of harassment by lesbian co-workers, notwithstanding contention that harassment was due to plaintiff's failure to comport with co-workers' gender stereotypes).

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

previously settled law on an issue that was not actually before the Court.[129]

Another frequently unseen or, perhaps, ignored difficulty with the sex-stereotyping cases is the unstated assumption that one knows sex stereotyping when one sees it. This leads to a tendency to ascribe to sex stereotyping adverse behavior that may not be the result of sex stereotyping at all. Such a tendency is particularly pronounced in the area of workplace harassment where, when it comes to sex stereotyping, means and motive can be easily confused.

A particularly perspicuous example of sexual harassment of a man that was not "because of" his sex or his gender, in any sense, is *McWilliams v. Fairfax County Board of Supervisors*.[130] In the all-male environment of a county's automotive repair shop, Mark McWilliams was "beset" by a variety of offensive conduct perpetrated by a group of co-workers collectively known as the "lube boys."[131] This behavior ranged from sexual taunts and offensive inquiries about his sexual activities to simulations of oral sex, fondling, and placing a broomstick to his anus. But it had nothing to do with McWilliams's sexuality, as there was not the slightest hint that he was gay, effeminate, or differently gendered, or perceived to be so by any of his tormentors. He was, however, vulnerable.

It appears that McWilliams suffered from a learning disability that "had arrested his cognitive and emotional development."[132] To borrow a phrase from the *Price Waterhouse* plurality, it does not "require expertise in psychology" to realize that McWilliams was socially awkward and, likely, sexually inexperienced; that this made him a target of bullying by the "lube boys," and that this bullying took the form, as it often does, of ascribing to him socially disfavored sexual characteristics—disfavored, that is to say, from the perspective of the social subgroup of his tormentors—suggesting that he would want to perform sexual favors on men and have sexual acts performed by men on him.[133] The

---

129. *See supra* note 104. A third approach was adopted in *Schroer v. Billington*, where the district court ruled (correctly, we believe) "that *Price Waterhouse* does not create a Title VII claim for sex stereotyping," but then held that discrimination against a transsexual on account of her transsexuality was discrimination on the basis of sex because (the court ruled) sex "encompasses 'sexual identity.'" Schroer v. Billington, 2006 WL 845806, at *7 (D.D.C. Mar. 31, 2006). As the *Schroer* court saw it, transsexuals are protected under Title VII, but homosexuals and transvestites are not. *Id.* That taxonomy, however, has the same inherent irony as the Sixth Circuit's decision in *Smith*, see text at notes 99–102, and quite consciously implies that "sex" for Title VII purposes be given an expansive and nontraditional judicial gloss, which is precisely what the settled case law had previously rejected, see text at notes 27–29.

130. *McWilliams*, 72 F.3d at 1191.

131. *Id.* at 1193.

132. *Id.*

133. *Cf.* Case, *supra* note 2, at 60–61 (discussing generalized societal disdain for men and women insofar as they are perceived to play the passive or receptive role in sexual activities).

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

*McWilliams* court aptly observed that while the highly sexualized harassment by the "lube boys" may have been "because of" the victim's perceived prudery or shyness or "because of" the perpetrators' own perversions, sexual insecurity, vulgarity, or mean-spiritedness, it was not "because of" the victim's sex:[134]

> There perhaps "ought to be a law against" such puerile and repulsive workplace behavior even when it involves only heterosexual workers of the same sex, in order to protect the victims of its indignities and debilitations, but we conclude that Title VII is not that law.[135]

It sometimes seems that courts adopting the sex-stereotyping approach draw the unwarranted conclusion that workplace harassment that ascribes effeminacy or homosexuality to the target is motivated by the tormentor's perception that the victim did not conform to sexual stereotypes.[136] This ignores that when men in the workplace torment male co-workers (and, for that matter, torment female co-workers as well), the use of sexually offensive comments and conduct is the psychosocial mechanism for the intentionally demeaning and humiliating conduct, not the motive for it.[137]

In *Doe v. City of Belleville*, for example, the court concluded that one of the two Doe twins was harassed on account of his nonconformance to gender stereotypes, and it did so based on the fact that he wore an earring and that the harassment ascribed to him a willingness or desire to engage in homosexual sex.[138] However, there were other powerful motives implicated by the circumstances that the court failed, or chose not, to explore.

Anyone minimally acquainted with small-town life and politics understands that a summer job as a manual laborer for a unit of local government is highly coveted, as it generally pays a full-time, adult worker wage (rather than the minimum wage customarily paid to the typical, summertime occupations of high school students). That the two Doe brothers obtained such employment strongly suggests that their

---

134. *McWilliams*, 72 F.3d at 1196. *Cf. Quick*, 90 F.3d at 1375–77 (deciding case where male machine operator, who had his groin grabbed and squeezed by co-workers, was called a "fucking scab for having withdrawn his union membership" and criticizing district court for having "incorrectly concluded" that "underlying motive for harassment was personal enmity or hooliganism" rather than gender).

135. *McWilliam*, 72 F.3d at 1196.

136. *See, e.g.*, *Doe*, 119 F.3d at 575.

137. *Cf.* Schultz, *supra* note 55, at 1686–87 (arguing that "much of the gender-based hostility and abuse that women (and some men) endure at work is neither driven by the desire for sexual relations nor even sexual in content. Indeed, many of the most prevalent forms of harassment are actions that are designed to maintain work . . . as bastions of masculine competence and authority. . . . Of course, making a woman the object of sexual attention can also work to undermine her image and self-confidence as a capable worker. Yet much of the time, harassment assumes a form that has little or nothing to do with sexuality but everything to do with gender.").

138. *Doe*, 119 F.3d at 575 & 582.

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

parents were politically connected, and likely made campaign contributions to the victorious party in amounts far beyond what would be affordable to someone whose regular, year-round job (not a summer vocation) was to work on the grounds crew of the municipal cemetery. That, combined with the fact that the chief tormentor was a former Marine who must have spent some years in the service and returned home to a job tending gravesites, suggests class and generational conflicts that may have induced the regular cemetery crew to bully the two, sixteen-year-old Doe brothers, who because of their youth may have appeared as vulnerable as did McWilliams because of his "arrested cognitive and emotional development."

That H. Doe wore an earring in the style of rap-music stars of the late 1990s probably did not lessen the grounds crew's antipathy for him. But to attribute to the tormentors the view that his earring was "a feminine accoutrement not suitable for male adornment" and conclude from that, as the *Doe* court did, that he was the victim of sex-stereotyping harassment leaves out much more of the story than it accounts for. When courts in cases like *Doe*, *Nichols*, and *Grief* force workplace harassment cases into the Procrustean bed of sex stereotyping because there is language or conduct that somehow ascribes to the victim behaviors, attitudes, or predilections relating to human sexuality that run counter to the tormentors' perceived sense of normal, they transmogrify Title VII into something it is not and was not meant to be (though something it could become if Congress, but not the judiciary, were so disposed).

If the sexual nature of the harassing behavior is allowed as proof that it was motivated by hostility toward the victim's gender-nonconforming behavior, and if sex stereotyping is per se violative of Title VII, then all workplace harassment of a sexual nature is *eo ipso* "because of [the victim's] . . . sex" and, hence, unlawful invidious discrimination. Although that mode of legal analysis may inject a welcome dose of civility to the blue-collar workplace (and so many of the same-sex harassment cases do arise from such environments), it is difficult to square with *Oncale*'s teaching that Title VII should not be "transform[ed] . . . into a general civility code for the American workplace" and that "conduct . . . merely tinged with offensive sexual connotations" does not violate Title VII unless it "actually constitute[s] '*discrimina[tion]* . . . because of . . . sex.'"[139]

One final anomaly in the sex-stereotyping theory presents itself when one considers gender-specific grooming standards in the workplace, which have been universally upheld. For example, a man who is fired because he refuses to cut his ponytail has no claim of sex discrimination under Title VII even though women in the workplace with

---

139. *Oncale*, 523 U.S at 81 (emphasis in original).

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

shoulder length hair were not required to cut it for the privilege of keeping their jobs.[140] The long line of cases permitting employers to enforce gender-specific grooming standards does not sit comfortably with the more recent cases holding that discrimination based on non-compliance with gender stereotypes is, in itself, prohibited by Title VII. Indeed, some have argued that cases upholding disparate grooming standards for men and women cannot survive *Price Waterhouse*'s (purported) ban on "impermissible sex stereotyping."[141]

The proposition that employer grooming standards cannot, consistent with Title VII, impose requirements on one sex that are not imposed on the other was recently advanced by the plaintiff in *Jespersen v. Harrah's*.[142] There, a Nevada casino had adopted a "Personal Best" image standard that required all bartenders to be clean and neat. Women bartenders were required, in addition, to wear make-up and nail polish and to wear their hair down; whereas for the men, make-up, colored nail polish, and ponytails were banned. The plaintiff, Darlene Jespersen, who objected to the make-up requirement, claimed it violated her Title VII rights. The Ninth Circuit, in a 2-to-1 decision, disagreed.

The majority of the court found that Harrah's "Personal Best" policy was no different from any of the other gender-specific grooming standards that courts had previously held not to constitute discrimination on the basis of sex.[143] While recognizing that sex-differentiated appearance standards could be discriminatory if they imposed "unequal burdens" on men and women, the court held that the casino's grooming standards did not have that effect.[144] The *Jespersen* majority acknowledged the potential relevance of the Supreme Court's decision in *Price Waterhouse*, which it viewed as holding "that an employer may not force its employees to conform to the sex stereotype associated with their gender as a condition of employment."[145] Yet, even though the Ninth Circuit had previously invoked the plurality opinion in *Price Waterhouse* in upholding an employee's claim for harassment for failure to conform with commonly accepted gender stereotypes violates Title VII, the *Jespersen* majority declined to extend that ruling to sex-differentiated ap-

---

140. *Baker*, 507 F.2d at 895. *See also Fountain*, 555 F.2d at 753 (hearing case where men were required to wear neckties but women were not required to wear skirts).

141. *See* Case, *supra* note 2, at 61; *see also Smith*, 378 F.3d at 574; *Doe*, 119 F.3d at 583 n.17 (questioning whether "grooming standards" cases survive *Price Waterhouse*).

142. *Jespersen*, 392 F.3d at 1076. *See also Smith*, 378 F.3d at 566 (after *Price Waterhouse*, employers who discriminate against women because they do not wear dresses or make-up, or against men because they do, engages in illegal sex discrimination). *But see Nichols*, 256 F.3d at 875 n.7 (*Price Waterhouse* ban on sex-stereotype discrimination does not imply Title VII violation for "reasonable regulations" requiring male and female employees to conform to different dress and grooming standards).

143. *Jespersen*, 392 F.3d at 1080.

144. *Id.* at 1081.

145. *Id.* at 1082.

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This reproduction or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

pearance and grooming standards, essentially on the wholly *ad hoc* ground that grooming standards are one thing and harassment is something else.[146]

The dissenting judge argued that "Jespersen has articulated a classic case of *Price Waterhouse* discrimination."[147] He reasoned that Jespersen was fired because she refused to conform to a feminine sex-stereotype—wearing make-up—and reached the broad conclusion that "when an employer takes an adverse employment action against a plaintiff based on the plaintiff's failure to conform to sex stereotypes, the employer has acted because of sex."[148] Indeed, the dissent concluded that a company's attempts to "enforce sexual stereotypes through grooming standards" was "precisely within the heartland of *Price Waterhouse*" and, thus, constituted a violation of Title VII's prohibition on sex discrimination.[149] While it is strained to regard gender-specific grooming standards as being within "the heartland of *Price Waterhouse*," the dissenting judge was correct in noting the inherent tension between sex-stereotyping discrimination (as now frequently understood) and pre-existing case law that had upheld employer appearance standards that enforced existing gender stereotypes of our culture. This tension cannot long endure.

If the dissent is correct in its view that the grooming standards challenged in *Jespersen* constitute sex stereotyping and are, thus, illegal per se under Title VII, it is difficult to see why any employer requirement that, for example, men wear neckties, keep their hair short, not wear colored nail polish, or limit their facial jewelry would not also violate Title VII. The dissent suggests as a solution to this that a meaningful distinction can be drawn between grooming standards that prohibit "youth counterculture" appearance and grooming stands

---

146. *Id.* (citing *Nichols*, 256 F.3d at 864 and, *Rene*, 305 F.3d at 1061). In its subsequent en banc decision affirming summary judgment for the employer, the Ninth Circuit did not adopt the panel's reasoning but rather held that while appearance standards "may well be" the subject of the Title VII sex-stereotyping claim, the policy challenged by Jespersen was not "*motivated* by sex stereotyping." 2006 WL 962533, at *2 (emphasis added). Why not is not entirely clear, as the en banc majority never explained when an employer's policy is "motivated" by sex stereotyping and when it is not. There is, however, some indication that the en banc majority predicated its decision on the fact that Harrah's grooming standard, which forced Jespersen to conform to a stereotypical female grooming image, did not by that fact "objectively impede her ability to perform her job." *Id.* at *9. To that extent, the en banc majority opinion comports with the position advanced here, which is that it is the discrimination with respect to employment opportunity that matters in a Title VII case, not "sex stereotyping" *per se.* Regrettably, however, to the extent the en banc majority perpetuates the view that there is such a thing as a Title VII claim "for sex stereotyping," *id.* at *2, or that a legal category of "impermissible sex stereotyping" exists under Title VII, *id.* at *7 (albeit now distinguished from "permissible" sex stereotyping), it perpetuates the confusion that this article criticizes.

147. *Jespersen*, 392 F.3d at 1084.

148. *Id.*

149. *Id.* at 1085.

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

that enforce sex stereotypes.[150] That distinction, however, cannot be rigorously maintained. Was the hostility of the former Marine to H. Doe's wearing an earring (or the prohibition in Harrah's dress code against men wearing an earring) an instance of sex stereotyping or hostility to the "youth counterculture" of its day, with its earring-clad rap-music stars whose style of speech, loose-fitting pants, and strutful gait was quite different from what a former Marine might find acceptable?

Applying the sex-stereotyping theory of discrimination to appearance standards may mean that *any* dress or grooming standards imposing different requirements on men and women violate Title VII. That, however, would conflict with *Oncale*'s observation that Title VII's ban of sex discrimination "requires neither asexuality nor androgyny in the workplace."[151]

The numerous courts upholding employer grooming standards over the past three decades have regarded it as being within an employer's discretion to require employees to conform to cultural or social standards of dress and appearance, so long as those policies do not disproportionately burden one sex over the other. As the Fifth Circuit reasoned in *Willingham v. Macon Telegraph Publishing Company*, a company's grooming standards are not discriminatory on the basis of sex, even if it requires different attire for men and women, since "both sexes are being screened with regard to a *neutral fact, i.e.*, grooming in accordance with *generally accepted community standards of dress and appearance*."[152] These "generally accepted community standards" are perforce sex specific. Indeed, if they were not, there would be no such thing as gender stereotypes in appearance, and the idea of dressing "contrary" to sex stereotypes—whether by a man's wearing an earring or a woman's not wearing make-up—would have no sensible content, since one cannot act or dress contrary to what does not exist.

The cases upholding the application to both men and women of a "neutral" community standard of dress and appearance presumed, correctly, that in our culture, the generally accepted grooming standard was gender specific, setting requirements for men different from those for women. It is difficult to see how the sex-stereotyping approach to Title VII liability can be reconciled with preexisting, well-settled case law that employers may impose appearance standards reflective of community norms that are, by their nature, gender specific.

Undoubtedly, an employer's imposition of grooming or dress requirements restricts individual self-expression. As one commentator has noted,

---

150. *Id.* at 1086.
151. *Oncale*, 523 U.S at 81.
152. *Willingham*, 507 F.2d at 1092 (emphasis added).

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

> [A] man cannot readily change the shape of his nose, but, as to his hairstyle, he can choose between a Yul Brynner or Michael Jordan shiny pate, a Parris Island marine-recruit crewcut, or a conservative clipper cut . . . with each change he alters not only his image in the eyes of others, but perhaps the way he feels about himself. Quite possibly, he also announces something about his politics or lifestyle.[153]

Perhaps there ought to be a law protecting the right of individuals to express their own sense of identity through their personal appearance at work, but there is no plausible view that Title VII protects freedom of gender expression at work (no matter how worthwhile that goal may to some appear to be). Title VII bans, as pertinent here, sex discrimination, and it is not discrimination "because of sex" to require members of each sex—both men and women—to dress as dictated by the socially accepted standard prescribed for them by our culture.

There is, moreover, no obvious way to distinguish those aspects of "the way [a man] feels about himself" or the image he chooses to project to the eyes of others that relate to his masculinity from those that do not. In fact, there may be any number of ways that a man can express his masculinity and a woman her femininity. The idea that there is a single gender stereotype for each gender that some people conform to and others do not may itself be a myth that does not actually comport to social reality.

There is, also, no obvious reason why Title VII should be construed to afford special protection to those aspects of self-expression through personal dress and appearance that relate to "gender" from those that relate to other aspects of one's lifestyle or personality. If Title VII is not violated by forcing a woman to wear overalls at work over her religious objections,[154] and if an employer can prohibit a male pre-operative transsexual who still uses the men's bathroom from wearing "frilly" blouses to work despite medical evidence that such behavior ameliorates his gender-identity disorder,[155] it is unclear why Jespersen should have a federal right to refuse her employer's make-up requirement solely on the ground that doing so contradicts the manner in which she expresses her femininity. Alternatively, if Jespersen has a statutory right not to wear any make-up, then it would also violate Title VII for an employer to discipline a woman who wore excessive make-up and her hair down in a way that conflicted with its business objective of

---

153. 3 LARSON, *supra* note 31, § 45.02.

154. *See Killebrew*, 651 F. Supp. at 96 (noting that plaintiff found "overall" requirement to be contrary to Biblical injunction [Deut. 22:5] against a woman wearing men's clothing); *see also* Cloutier v. Costco Wholesale Corp., 390 F.3d 126 (1st Cir. 2004), *cert. denied*, 125 S. Ct. 2940 (2005) (no Title VII claim for noncompliance with employer's dress code forbidding displays of body piercings, notwithstanding plaintiff's assertion that her religion, the Church of Body Modification, required it).

155. *See Boeing*, 846 P.2d at 531.

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

projecting a "Brooks Brothers look," though that had been previously upheld.[156]

Pushed to its logical limit, applying the sex-stereotyping theory to employer appearance standards would not only mandate androgyny, it might also prevent employers from enforcing any appearance standard, even a unisex one, if it conflicted with any particular employee's manner of gender identification. It would, however, leave unchanged an employer's prerogative to impose its appearance standards on those who object on religious grounds, because of a disability, or simply as a matter of personal choice, like the African-American woman who, having decided to emulate the appearance of the actress Bo Derek in the movie *10*, violated her employer's dress code by coming to work with her hair in "cornrows."[157]

Appearance standards that adversely affect women generally and impede equal opportunity for any woman (for example, requiring all women but no men to wear uniforms) are certainly subject to Title VII's ban on sex discrimination. But workplace rules that impinge only on how some particular woman or other chooses to express her femininity—whether to wear no make-up or to wear excessive make-up (from the Brooks Brothers fashion perspective)—should not on that ground be judged to violate Title VII's ban on sex discrimination.

The prior understanding of the courts that Title VII did not reach employer-imposed appearance standards (except in the rare instance when they imposed unequal burdens on men or women) was a manifestly sensible and principled accommodation of the language of the statute to the reality of social life, which is that we do not live in a gender-neutral world. If that preexisting judicial consensus is necessarily unsettled by the sex-stereotyping theory of Title VII liability, it is the theory, not the preexisting judicial consensus, that warrants rejection.

It is a mistake of dramatic proportions to view *Price Waterhouse* as establishing a per se prohibition of any adverse treatment of an employee based on his or her gender-nonconforming behavior, rather than being an instance of when resort to sex stereotypes by decisionmakers was used as evidence that the disparate treatment was motivated by considerations of gender. To do so unsettles long settled law that discrimination "because of [an] individual's . . . sex" refers only to discrimination against men because they are men, or women because they are women. Although there may be evils in the workplace imping-

---

156. *Wislocki-Goin*, 831 F.2d at 1374.
157. *Rogers*, 527 F. Supp. at 229.

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association.
Reproduced with permission.  All rights reserved.  This information or any portion thereof may not be copied or disseminated
in any form or by any means or stored in an electronic database or retrieval system without the express written consent
of the American Bar Association.

ing on human sexuality and personal self-expression that Title VII as traditionally understood cannot reach, the notion that Title VII, as currently written, renders sex stereotyping per se impermissible strays beyond legitimate judicial interpretation or Supreme Court precedent, properly construed.

Published in The Labor Lawyer, Volume 21, Number 3, Winter/Spring 2006. © 2006 by the American Bar Association. Reproduced with permission.  All rights reserved.  This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.