## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DIANE J. SCHROER,                          :
                                           :
          Plaintiff,                       :
                                           :
     v.                                    :   Civil Action No. 05-1090 (JR)
                                           :
JAMES H. BILLINGTON, Librarian             :
of Congress,                               :
                                           :
          Defendant.                       :

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Diane Schroer claims that she was denied employment by the Librarian of Congress because of sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1). Evidence was taken in a bench trial on August 19-22, 2008.

### Facts

Diane Schroer is a male-to-female transsexual. Although born male, Schroer has a female gender identity -- an internal, psychological sense of herself as a woman. Tr. at 37. In August 2004, before she changed her legal name or began presenting as a woman, Schroer applied for the position of Specialist in Terrorism and International Crime with the Congressional Research Service (CRS) at the Library of Congress. The terrorism specialist provides expert policy analysis to congressional committees, members of Congress and their staffs. Pl. Ex. 1.  The position requires a security clearance.

Schroer was well qualified for the job.  She is a graduate of both the National War College and the Army Command and General Staff College, and she holds masters degrees in history and international relations.  During Schroer's twenty-five years of service in the U.S. Armed Forces, she held important command and staff positions in the Armored Calvary, Airborne, Special Forces and Special Operations Units, and in combat operations in Haiti and Rwanda.  Tr. at 22-31.  Pl. Ex. 9. Before her retirement from the military in January 2004, Schroer was a Colonel assigned to the U.S. Special Operations Command, serving as the director of a 120-person classified organization that tracked and targeted high-threat international terrorist organizations.  In this position, Colonel Schroer analyzed sensitive intelligence reports, planned a range of classified and conventional operations, and regularly briefed senior military and government officials, including the Vice President, the Secretary of Defense, and the Chairman of the Joint Chiefs of Staff.  Tr. 32-33.  At the time of her military retirement, Schroer held a Top Secret, Sensitive Compartmented Information security clearance, and had done so on a continuous basis since 1987.  Tr. at 33.  After her retirement, Schroer joined a private consulting firm, Benchmark International, where, when she applied for the CRS position, she was working as a program manager on an

infrastructure security project for the National Guard.  Tr. at
36.

        When Schroer applied for the terrorism specialist
position, she had been diagnosed with gender identity disorder
and was working with a licensed clinical social worker, Martha
Harris, to develop a medically appropriate plan for transitioning
from male to female.  Tr. at 36-38.  The transitioning process
was guided by a set of treatment protocols formulated by the
leading organization for the study and treatment of gender
identity disorders, the Harry Benjamin International Gender
Dysphoria Association.  Pl. Ex. 45; Tr. at 193.  Because she had
not yet begun presenting herself as a woman on a full-time basis,
however, she applied for the position as "David J. Schroer," her
legal name at the time.  In October 2004, two months after
submitting her application, Schroer was invited to interview with
three members of the CRS staff -- Charlotte Preece, Steve Bowman,
and Francis Miko.  Preece, the Assistant Director for Foreign
Affairs, Defense and Trade, was the selecting official for the
position.  Tr. at 103.  Schroer attended the interview dressed in
traditionally masculine attire -- a sport coat and slacks with a
shirt and tie.  Tr. at 45.

        Schroer received the highest interview score of all
eighteen candidates.  Pl. Ex. 18.  In early December, Preece
called Schroer, told her that she was on the shortlist of

applicants still in the running, and asked for several writing
samples and an updated list of references.  Tr. at 49.  After
receiving these updated materials, the members of the selection
committee unanimously recommended that Schroer be offered the
job.  Tr. at 105.  In mid-December, Preece called Schroer,
offered her the job, and asked, before she processed the
administrative paper work, whether Schroer would accept it.  Tr.
at 108.  Schroer replied that she was very interested but needed
to know whether she would be paid a salary comparable to the one
she was currently receiving in the private sector.  The next day,
after Preece confirmed that the Library would be able to offer
comparable pay, Schroer accepted the offer, and Preece began to
fill out the paperwork necessary to finalize the hire.  Id.

Before Preece had completed and submitted these
documents, Schroer asked her to lunch on December 20, 2004.
Schroer's intention was to tell Preece about her transsexuality.
She was about to begin the phase of her gender transition during
which she would be dressing in traditionally feminine clothing
and presenting as a woman on a full-time basis.  She believed
that starting work at CRS as a woman would be less disruptive
than if she started as a man and later began presenting as a
woman.  Tr. at 53.

When Schroer went to the Library for this lunch date,
she was dressed in traditionally masculine attire.  Before

- 4 -

leaving to walk to a nearby restaurant, Preece introduced her to other staff members as the new hire who would soon be coming aboard.  Preece also gave Schroer a short tour of the office, explaining where her new colleagues' offices were and describing Schroer's job responsibilities.  Tr. at 56.  As they were sitting down to lunch, Preece stated that they were excited to have Schroer join CRS because she was "significantly better than the other candidates."  Id.  Schroer asked why that was so, and Preece explained that her skills, her operational experience, her ability creatively to answer questions, and her contacts in the military and in defense industries made her application superior. Tr. at 56; 110.

        About a half hour into their lunch, Schroer told Preece that she needed to discuss a "personal matter."  Tr. at 57.  She began by asking Preece if she knew what "transgender" meant. Preece responded that she did, and Schroer went on to explain that she was transgender, that she would be transitioning from male to female, and that she would be starting work as "Diane." Preece's first reaction was to ask, "Why in the world would you want to do that?"  Tr. at 57, 110.  Schroer explained that she did not see being transgender as a choice and that it was something she had lived with her entire life.  Preece then asked her a series of questions, starting with whether she needed to change Schroer's name on the hiring documentation.  Schroer

responded that she did not because her legal name, at that point, was still David.  Schroer went on to explain the Harry Benjamin Standards of Care and her own medical process for transitioning. She told Preece that she planned to have facial feminization surgery in early January and assured her that recovery from this surgery was quick and would pose no problem for a mid-January start date.  In the context of explaining the Benjamin Standards of Care, Schroer explained that she would be living full-time as a woman for at least a year before having sex reassignment surgery.  Such surgery, Schroer explained, could normally be accomplished during a two-week vacation period and would not interfere with the requirements of the job.  Tr. at 59.

Preece then raised the issue of Schroer's security clearance, asking what name ought to appear on hiring documents. Schroer responded that she had several transgender friends who had retained their clearances while transitioning and said that she did not think it would be an issue in her case.  Schroer also mentioned that her therapist would be available to answer any questions or provide additional background as needed.  Tr. at 60. Because Schroer expected that there might be some concern about her appearance when presenting as a woman, she showed Preece three photographs of herself, wearing traditionally feminine professional attire.  Although Preece did not say it to Schroer, her reaction on seeing these photos was that Schroer looked like

"a man dressed in women's clothing."  Tr. at 112.  Preece did not ask Schroer whether she had told her references or anyone at Benchmark of her transition.

Although Schroer initially thought that her conversation with Preece had gone well, she thought it "ominous" that Preece ended it by stating "Well, you've given me a lot to think about.  I'll be in touch."  Tr. at 63.

Preece did not finish Schroer's hiring memorandum when she returned to the Library after lunch.  <u>See</u> Pl. Ex. 23.[1] Instead, she went to speak with Cynthia Wilkins, the personnel security officer for the Library of Congress.  Preece told Wilkins that she had just learned that the candidate she had planned to recommend for the terrorism specialist position would be transitioning from male to female and asked what impact that might have on the candidate's ability to get a security

---

[1] Her partial, draft memorandum had begun:

> I recommend Mr. David Schroer for the position of Specialist in Terrorism and International Crime in the Foreign Affairs, Defense, and Trade Division of the Congressional Research Service.  His qualifications and experience make[] him the best qualified candidate from among the other 8 applicants on the final referral list.
>
> Mr. Schroer has extensive experience as a practitioner and strategic planner in counterterrorism.  Since 1986 he was involved in leading counterterrorism and counter-insurgency operations around the world.

- 7 -

clearance.  Tr. at 120.  Wilkins did not know and said that she would have to look into the applicable regulations.  Preece told Wilkins that the candidate was a 25-year military veteran.  She did not recall whether or not she mentioned that Schroer currently held a security clearance.  Preece did not provide, and Wilkins did not ask for, the sort of information -- such as Schroer's full name and social security number -- that would have allowed Wilkins access to information on Schroer's clearance history.  Had Preece requested her to do so, Wilkins had the ability to access Schroer's complete investigative file through a centralized federal database.  Tr. at 272, 279-82.

Preece testified that at this point, without waiting to hear more from Wilkins, she was leaning against hiring Schroer. Tr. at 121-22.  She said that Schroer's transition raised five concerns for her.  First, she was concerned about Schroer's ability to maintain her contacts within the military. Specifically, Preece thought that some of Schroer's contacts would no longer want to associate with her because she is transgender.  Tr. at 113.  At no point after learning of Schroer's transition, however, did Preece discuss the continuing viability of her contacts with Schroer, nor did she raise this concern with any of Schroer's references, all of whom in fact knew that she was transitioning.  Tr. at 51, 114.  Second, Preece was concerned with Schroer's credibility when testifying before

- 8 -

Congress.  When CRS specialists testify before Congress, they
typically provide Members with brief biographical statements to
give them credibility.  Preece was concerned "that everyone would
know that [Schroer] had transitioned from male to female because
only a man could have her military experiences."  Tr. at 114.
Preece thought that this would be an obstacle to Schroer's
effectiveness.  Tr. at 115.  Third, Preece testified that she was
concerned with Schroer's trustworthiness because she had not been
up front about her transition from the beginning of the interview
process.  Tr. at 117.  Preece did not, however, raise this
concern to Schroer during their lunch.  Fourth, Preece thought
that Schroer's transition might distract her from her job.
Although Preece seems to have connected this concern to Schroer's
surgeries, she did not ask for additional information about them
or otherwise discuss the issue further with Schroer.  Tr. at 118.
Finally, Preece was concerned with Schroer's ability to maintain
her security clearance.  In Preece's mind, "David Schroer" had a
security clearance, but "Diane Schroer" did not.  Even before
speaking with Wilkins, Preece "strongly suspected" that David's
clearance simply would not apply to Diane.  Tr. at 117.  She had
this concern, but she did not ask Schroer for any information on
the people she knew who had undergone gender transitions while
retaining their clearances.  Id.

After her lunch with Schroer, Preece also relayed the
details of her conversation to a number of other officials at
CRS, including Daniel Mulholland, the Director of CRS, and Gary
Pagliano, one of the defense section heads, whose reaction was to
ask Preece if she had a good second candidate for the job.  Later
the same afternoon, Preece received an email from one of the
Library's lawyers, setting up a meeting for the next morning to
discuss the terrorism specialist position.  Tr. at 123.  That
evening, as Preece thought about the issue, she was puzzled by
the idea that "someone [could] go[] through the experience of
Special Forces [and] decide that he wants to become a woman."
Tr. at 124.  Schroer's background in the Special Forces made it
harder for Preece to think of Schroer as undergoing a gender
transition.  Id.

The next morning, on December 21, 2004, at nine
o'clock, Preece met with Kent Ronhovde, the Director of the
Library of Congress, Wilkins, and two other members of the CRS
staff from workforce development.  Tr. at 124.  Preece described
her lunch conversation with Schroer and stated that Schroer had
been, but no longer was, her first choice for the position.  Tr.
at 126.  As Preece recalls the meeting, Wilkins stated that she
was unable to say one way or another whether Diane Schroer would
be able to get a security clearance.  Id. at 126.  Preece
testified that Wilkins proposed that Schroer would have to a have

- 10 -

a "psychological fitness for duty examination," after which the
Library would have to decide whether to initiate a full
background investigation.  Wilkins testified that she was not
familiar with such an "examination" and likely would not have
used such a phrase, Tr. at 290-91, but she confirmed that she
told the meeting that she would not approve a waiver for Schroer
so that she could start working before the clearance process was
complete.  Wilkins made this decision without having viewed
Schroer's application, her resume, or her clearance status and
history.  Tr. at 127.  Preece understood the substance of
Wilkins' comments to be that David's security clearance was not
relevant to Diane, and that Diane would need a separate
clearance.  She assumed that that process could take up to a
year.

At no point during the meeting did Preece express a
continuing interest in hiring Schroer.  She did not suggest that
Wilkins pull and review David Schroer's security file to confirm
her own assumption that the security clearance process would be a
lengthy one.  No one in the meeting asked whether the
organization currently holding Schroer's clearance knew of her
transition.  There was no discussion of whether anyone else at
the Library had dealt with a similar situation.  Tr. at 128-29.

By the end of the meeting, Preece had made up her mind
that she no longer wanted to recommend Schroer for the terrorism

specialist position.  Tr. at 131.  Preece testified that the

security clearance was the critical, deciding factor because of

"how long it would take."  She also testified, however, that she

would have leaned against hiring Schroer even if she had no

concerns regarding the security clearance, because her second

candidate, John Rollins, presented "fewer complications" --

because, unlike Schroer, he was not transitioning from male to

female.  Tr. at 133-34.

Later that day, Preece circulated a draft of what she

proposed to tell Schroer to those who had participated in the

meeting.  The email stated:

> David.  I'm calling to let you know that I am
> not going forward with my recommendation to hire
> you for the terrorism position.  In light of
> what you told me yesterday, I feel that you are
> putting me and CRS in an awkward position for a
> number of reasons as you go through this
> transition period.  I am primarily concerned
> that you could not likely be brought on in a
> timeframe that is needed for me to fill the
> position.  Our Personnel Security Office has
> told me that the background investigation
> process that will be required for you to start
> work could be lengthy.  I am also concerned that
> the past contacts I had counted on you to bring
> to the position may not now be as fruitful as
> they were in the past.  Finally I have concerns
> that the transition that you are in the process
> of might divert your full attention away from
> the mission of CRS.
>
> I could be wrong on any one of these complicated
> factors, but taken together I do not have a high
> enough degree of confidence to recommend you for
> the position.  Having said that, I very much
> appreciate your candor and your courage.  I wish
> you the best and want to let you know that you

should feel free to[] apply for future positions
at the Library.

Pl. Ex. 19.  Preece was then called into the General Counsel's
office for a meeting at eleven o'clock.  Afterward, Preece
circulated a revised email with the header "Draft per discussion
with General Coun[sel]."  Pl. Ex. 20.  It read:

> David, Given the level and the complexities of
> the position, I don't think this is a good fit.
> This has been a difficult decision, but given
> the immediate needs of Congress, I've decided
> not to go forward with the recommendation.
>
> (Listen.  If needed say) That's all I'm prepared
> to say at this time.

Id.  Later that same afternoon, Preece called Schroer to rescind
the job offer.  She said, "Well, after a long and sleepless
night, based on our conversation yesterday, I've determined that
you are not a good fit, not what we want."  Tr. at 63.  Schroer
replied that she was very disappointed.  Preece ended the
conversation by thanking Schroer for her honesty.  Tr. at 64;
138.  Preece then called John Rollins, who had a lower total
interview score than Schroer, see Pl. Ex. 18, and offered him the
position.  He accepted.

Since January 2005, Schroer has lived full-time as a
woman.  Tr. at 66.  She has changed her legal name to Diane
Schroer and obtained a Virginia driver's license and a United
States Uniformed Services card reflecting her name change and
gender transition.  Pl. Ex. 7.

## Analysis

It is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The "ultimate question" in every Title VII case is whether the plaintiff has proved that the defendant intentionally discriminated against her because of a protected characteristic.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993).  The Library argues that it had a number of non-discriminatory reasons for refusing to hire Schroer, including concerns about her ability to maintain or timely receive a security clearance, her trustworthiness, and the potential that her transition would distract her from her job.  The Library also argues that a hiring decision based on transsexuality is not unlawful discrimination under Title VII.

After hearing the evidence presented at trial, I conclude that Schroer was discriminated against because of sex in violation of Title VII.  The reasons for that conclusion are set forth below, in two parts.  First, I explain why, as a factual matter, several of the Library's stated reasons for refusing to hire Schroer were not its "true reasons, but were . . . pretext[s] for discrimination," Tex. Dep't of Cmty. Affairs v.

- 14 -

Burdine, 450 U.S. 248, 253 (1981).  Second, I explain why the
Library's conduct, whether viewed as sex stereotyping or as
discrimination literally "because of . . . sex," violated Title
VII.

**I.**

        None of the five assertedly legitimate reasons that the
Library has given for refusing to hire Schroer withstands
scrutiny.

   A.  Security clearance concerns were pretextual

        Preece has claimed that her primary concern was
Schroer's ability to receive a security clearance in a timely
manner.  It is uncontested that the ability to maintain or
receive security clearance is a requirement for the terrorism
specialist position.  In light of the inquiry that the Library
actually made into Schroer's clearance history and the specific
facts affecting her case, however, I conclude that this issue was
a pretext for discrimination.

        Kenneth Lopez, the Library's Director of Security and
Emergency Preparedness, and Wilkins' supervisor, testified about
the clearance process for new employees.  Lopez explained that,
in appropriate circumstances, the Library recognizes as a matter
of reciprocity the security clearance held by an individual at a
prior government agency.  Tr. at 247.  The three general
requirements for reciprocity are that the previous investigation

was undertaken in a timely manner, that the investigation had an adequate scope,[2] and that there has not been a significant break in service.  When new information that might raise security concerns about a candidate otherwise eligible for reciprocity is raised, the Library evaluates that information before making a decision as to whether to grant reciprocity.  Tr. at 251.  That there is new information does not necessarily mean that a new, full-scale investigation is needed.  Tr. at 285.

When the candidate does not have a valid, prior clearance, the Library may nonetheless grant a waiver so that the person may start work, conditionally employed, before the security investigation has been completed.  A waiver is not needed for someone holding a current clearance of appropriate scope.  Tr. at 256.

Although Preece knew that Schroer held a security clearance, she did not provide Wilkins with any of the information that might have been needed to see whether reciprocity would apply.  Wilkins had the ability to access Schroer's entire security file, but she did not do so -- because she was not asked to.

---

[2] "Scope" goes to the thoroughness of the prior investigation based on the level of clearance.  Someone who holds only a "Secret" level clearance will not have had as thorough an investigation as someone holding a "Top Secret" clearance.  Tr. at 254-55.

Without any specific information about Schroer --
including whether she might have already addressed any issues
arising out of her gender transition with the current holder of
her security clearance (Benchmark) -- Wilkins performed the most
general kind of research.  She looked into the Adjudication
Guidelines and the Adjudication Desk Reference for information
about transsexuality and found two potentially relevant
guidelines.[3]  The first was the sexual behavior guideline, which
provides that sexual behavior that causes an individual to be
vulnerable to blackmail or coercion may be cause for a security
concern.  Tr. at 276.  Wilkins acknowledged, however, that an
individual who has disclosed her transsexuality would not present
blackmail concerns.  Tr. at 277.  The other potentially relevant
guideline deals with security concerns raised by emotional,
mental or personality disorders.  Psychological disorders,
including gender identity disorder, are not <u>per se</u> disqualifying
but are to be evaluated as part of the person's entire
background.  Tr. at 257.  Lopez testified when an employee
discloses such a disorder, the proper procedure is for the
personnel security officer to consult with the Library's Health
Services.  After interviewing the candidate and, potentially, his

---

[3] Wilkins testified that these guidelines and reference
materials implement Executive Order 10450, 18 Fed. Reg. 2489
(1953), and Executive Order 12968, 60 Fed. Reg. 40245 (1995).
Tr. at 263.

or her mental health providers, a Health Services officer determines whether or not the information raises a security concern. For an individual already holding a clearance, if Health Services is satisfied that the disorder raises no security concerns, the personnel security office proceeds to grant reciprocity. Tr. at 253.

The Library made no effort to determine whether Schroer's previous clearance would receive reciprocal recognition or to determine whether the agency previously holding Schroer's clearance already knew of, and had already investigated any concerns related to Schroer's gender identity disorder. Wilkins stated that she would not approve a waiver without determining whether reciprocity might apply, and therefore without determining whether a waiver actually would have been required. Without being given a concrete time frame by Wilkins, and without speaking to anyone in Health Services, Preece simply "assumed" that it would take a year before Schroer would be fully cleared. This assumption was connected to no specific information about Schroer or her clearance history, and was not informed by the Library's own procedures for adjudicating possible security issues arising from a psychological disorder.[4]

---

[4] The Library has never argued that Title VII's jurisdictional exemption regarding security clearances, 42 U.S.C. § 2000e-2(g), applies in this case, and, unlike in <u>Egan v. Department of Navy</u>, 484 U.S. 518 (1988), Schroer is not challenging the denial of a security clearance. She asserts,

The Library's statements about the time pressures that they were operating under to fill the position with someone with a full security clearance, as opposed to a provisional waiver, are not credible.  The terrorism specialist opening was first posted in August.  Schroer was not interviewed until October and did not receive an offer until mid-December.  The person who previously held the job, Audrey Cronin, worked for six months during 2003 before receiving her clearance.  Tr. at 438; Pl. Ex. 64.  Cronin's first performance evaluation, completed after eight months on the job, in no way reflected that her work had been impaired by the fact that she had lacked a clearance during three quarters of the period under evaluation.  Pl. Ex. 65.  John Rollins, who ultimately filled the position denied to Schroer, did not receive his final clearance until "several months" after he began working at CRS.  Tr. at 304.

### B.  Trustworthiness and distraction concerns were pretextual

The Library's professed concerns with Schroer's trustworthiness and ability to focus on the job were also pretextual.  At trial, the Library conceded as undisputed that Schroer "had no other co-morbidities or stressors that would have prevented her from performing the duties of the terrorism specialist, or that would have presented any issue regarding her

---

rather, that the Library's failure to follow its own procedures
establishes pretext.

stability, judgment, reliability or ability to safeguard classified information." Tr. at 349. Preece's stated concern with Schroer's trustworthiness was belied by the fact that she thanked Schroer for her honesty in the course of rescinding the job offer. If Preece had really been concerned with Schroer's ability to focus on her work responsibilities, she could have raised the matter directly and asked Schroer additional questions about her planned surgeries, asked her current employer and references about Schroer's ability to focus, or spoken with Schroer's therapist, as Schroer had offered. Preece did none of those things.

### C.  Credibility and contacts concerns were facially discriminatory

The Library's final two proffered legitimate nondiscriminatory reasons -- that Schroer might lack credibility with Members of Congress, and that she might be unable to maintain contacts in the military -- were explicitly based on her gender non-conformity and her transition from male to female and are facially discriminatory as a matter of law. Deference to the real or presumed biases of others is discrimination, no less than if an employer acts on behalf of his own prejudices. See Williams v. Trans World Airlines, Inc., 660 F.2d 1267, 1270 (8th Cir. 1981) (firing employee in response to racially charged, unverified customer complaint is direct evidence of racial discrimination by employer); cf. Fernandez v. Wynn Oil Co., 653

F.2d 1273, 1276 (9th Cir. 1981) ("stereotypic impressions of male and female roles do not qualify gender as a [bona fide occupational qualification]"); <u>Diaz v. Pan American World Airways, Inc.</u>, 442 F.2d 385 (5th Cir. 1971) (same).  In any event, the Library made no effort to discern if its concern was actually a reasonable one, as it easily could have done by contacting any of the high-ranking military officials that Schroer listed as references.  Pl. Ex. 5.

**II.**

Schroer contends that the Library's decision not to hire her is sex discrimination banned by Title VII, advancing two legal theories.  The first is unlawful discrimination based on her failure to conform with sex stereotypes.  The second is that discrimination on the basis of gender identity is literally discrimination "because of . . . sex."

<u>A. Sex stereotyping</u>

Plaintiff's sex stereotyping theory is grounded in the Supreme Court's decision in <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 251 (1989).  In that case, a female senior manager was denied partnership in a large accounting firm in part because she was perceived to be too "macho" for a woman.  <u>Id.</u> at 235.  Her employer advised that she would improve her chances at partnership if she would "take 'a course at charm school'" and would "'walk more femininely, talk more femininely, dress more

femininely, wear make-up, have her hair styled, and wear
jewelry.'" <u>Id.</u>  Justice Brennan observed that it did not
"require expertise in psychology to know that, if an employee's
flawed 'interpersonal skills' can be corrected by a soft-hued
suit or a new shade of lipstick, perhaps it is the employee's sex
and not her interpersonal skills that has drawn the criticism."
<u>Id.</u> at 255.  In ruling for the plaintiff, the Court held that
Title VII reaches claims of discrimination based on "sex
stereotyping."  <u>Id.</u> at 250-51 (plurality opinion); <u>id.</u> at 258-261
(White, J., concurring); <u>id.</u> at 272-73 (O'Connor, J.,
concurring).  "In the specific context of sex stereotyping," the
Court explained, "an employer who acts on the basis of a belief
that a woman cannot be aggressive, or that she must not be, has
acted on the basis of gender."  <u>Id.</u> at 250.

    After <u>Price Waterhouse</u>, numerous federal courts have
concluded that punishing employees for failure to conform to sex
stereotypes is actionable sex discrimination under Title VII.
<u>See, e.g.</u>, <u>Medina v. Income Support Div.</u>, 413 F.3d 1131, 1135
(10th Cir. 2005) ("[A] plaintiff may satisfy her evidentiary
burden [under Title VII] by showing that the harasser was acting
to punish the plaintiff's noncompliance with gender
stereotypes."); <u>Bibby v. Phila. Coca Cola Bottling Co.</u>, 260 F.3d
257, 264 (3d Cir. 2001) (Title VII claim is stated when "the
harasser was acting to punish the victim's noncompliance with

gender stereotypes"); <u>Nichols v. Azteca Rest. Enters., Inc.</u>, 256
F.3d 864, 874 (9th Cir. 2001) (male plaintiff stated a Title VII
claim where he was harassed "for walking and carrying his tray
'like a woman' -- i.e., for having feminine mannerisms"); <u>Higgins
v. New Balance Athletic Shoe, Inc.</u>, 194 F.3d 252, 261 n.4 (1st
Cir. 1999) ("Just as a woman can ground an action on a claim that
men discriminated against her because she did not meet
stereotyped expectations of femininity, a man can ground a claim
on evidence that other men discriminated against him because he
did not meet stereotypical expectations of masculinity."); <u>Doe v.
City of Belleville</u>, 119 F.3d 563, 581 (7th Cir. 1997) ("a man who
is harassed because his voice is soft, his physique is slight,
his hair is long, or because in some other respect he . . . does
not meet his coworkers' idea of how men are to appear and behave,
is harassed 'because of' his sex"), <u>vacated and remanded on other
grounds</u>, 523 U.S. 1001 (1998).

        Following this line of cases, the Sixth Circuit has
held that discrimination against transsexuals is a form of sex
stereotyping prohibited by <u>Price Waterhouse</u> itself:

> After <u>Price Waterhouse</u>, an employer who
> discriminates against women because, for
> instance, they do not wear dresses or makeup, is
> engaging in sex discrimination that would not
> occur but for the victim's sex.  It follows that
> employers who discriminate against men because
> they do wear dresses and makeup, or otherwise act
> femininely, are also engaging in discrimination,
> because the discrimination would not occur but
> for the victim's sex.

. . .

> [D]iscrimination against a plaintiff who is
> transsexual – and therefore fails to act and/or
> identify with his or her gender – is no different
> from the discrimination directed against Ann
> Hopkins in Price Waterhouse, who, in sex-
> stereotypical terms, did not act like a woman.
> Sex stereotyping based on a person's gender non-
> conforming behavior is impermissible
> discrimination, irrespective of the cause of that
> behavior.

Smith v. Salem, 378 F.3d 566, 574-75 (6th Cir. 2004); see also

Barnes v. City of Cincinnati, 401 F.3d 729, 737 (6th Cir. 2005).

In my 2006 memorandum denying the Library's motion to dismiss, in

this case, I expressed reservations about the Sixth Circuit's

broad reading of Price Waterhouse.  I explained that "[n]either

the logic nor the language of Price Waterhouse establishes a

cause of action for sex discrimination in every case of sex

stereotyping."  Schroer v. Billington, 424 F. Supp. 2d 203, 208

(D.D.C. 2006).  I held that what Price Waterhouse actually

recognized was a Title VII action for disparate treatment, as

between men and women, based on sex stereotyping.  Accordingly, I

concluded that "[a]dverse action taken on the basis of an

employer's gender stereotype that does not impose unequal burdens

on men and women does not state a claim under Title VII."  Id. at

209.  While I agreed with the Sixth Circuit that a plaintiff's

transsexuality is not a bar to a sex stereotyping claim, I took

the position that "such a claim must actually arise from the

employee's appearance or conduct and the employer's stereotypical

perceptions." Id. at 211.  In other words, "a Price-Waterhouse claim could not be supported by facts showing that [an adverse employment action] resulted solely from [the plaintiff's] disclosure of her gender dysphoria." Schroer v. Billington, 525 F. Supp. 2d 58, 63 (D.D.C. 2007).

That was before the development of the factual record that is now before me.

My conclusion about a disparate treatment requirement relied heavily on the panel decision in Jespersen v. Harrah Operating Co., 392 F.3d 1076 (9th Cir. 2004).  That decision was later affirmed en banc.  Jespersen v. Harrah Operating Co., 444 F.3d 1104, 1109 (9th Cir. 2006).  The defendant in Jespersen had instituted a company-wide "Personal Best" grooming policy, which, in addition to gender-neutral standards of fitness and professionalism, required women to wear stockings and colored nail polish, to wear their hair "teased, curled, or styled," and to wear make-up.  392 F.3d at 1077.  The policy also prohibited men from wearing makeup, nail polish, or long hair.  Plaintiff Darlene Jespersen was fired for refusing to wear makeup, which she testified made "her feel sick, degraded, exposed and violated," "forced [] to be feminine," and "dolled up" like a sexual object.  Id.  Despite the subjective, gender-related toll that the policy exacted from Jespersen, the Ninth Circuit held that firing her for non-compliance with the policy did not

violate Title VII, since, in that court's judgment, the "Personal Best" policy imposed equally burdensome, although gender-differentiated, standards on men and women.

In her post-trial briefing, Schroer convincingly argues that <u>Jespersen</u>'s disparate treatment requirement ought not apply in this case. Unlike <u>Jesperson</u>, this case does not involve a generally applicable, gender-specific policy, requiring proof that the policy itself imposed unequal burdens on men and women. Instead, Schroer argues that her <u>direct evidence</u> that the Library's hiring decision was motivated by sex stereotypical views renders proof of disparate treatment unnecessary.[5]

Schroer's case indeed rests on direct evidence, and compelling evidence, that the Library's hiring decision was infected by sex stereotypes. Charlotte Preece, the decison-maker, admitted that when she viewed the photographs of Schroer in traditionally feminine attire, with a feminine hairstyle and makeup, she saw a man in women's clothing. Tr. at 112-13. In conversations Preece had with colleagues at the Library after her

---

[5] For example, in <u>Oncale v. Sundowner Offshore Services, Inc.,</u> the male plaintiff complaining of sexual harassment in violation of Title VII had been "forcibly subjected to sex-related, humiliating actions" and had been "physically assaulted . . . in a sexual manner" by other male co-workers. 523 U.S. 75, 77 (1998). The Supreme Court did not require Oncale to show that he had been treated worse than women would have been treated, but only that "he suffered discrimination <u>in comparison to other men</u>." <u>Rene v. MGM Grand Hotel, Inc.</u>, 305 F.3d 1061, 1067 (9th Cir. 2002) (en banc) (emphasis in original).

lunch with Schroer, she repeatedly mentioned these photographs.
Tr. at 120-21, 172-73.  Preece testified that her difficulty
comprehending Schroer's decision to undergo a gender transition
was heightened because she viewed David Schroer not just as a
man, but, in light of her Special Forces background, as a
particularly masculine kind of man.  Tr. at 124.  Preece's
perception of David Schroer as especially masculine made it all
the more difficult for her to visualize Diane Schroer as anyone
other than a man in a dress.  Id.  Preece admitted that she
believed that others at CRS, as well as Members of Congress and
their staffs, would not take Diane Schroer seriously because
they, too, would view her as a man in women's clothing.  Tr. at
112-15, 132-34.

          What makes Schroer's sex stereotyping theory difficult
is that, when the plaintiff is transsexual, direct evidence of
discrimination based on sex stereotypes may look a great deal
like discrimination based on transsexuality itself, a
characteristic that, in and of itself, nearly all federal courts
have said is unprotected by Title VII.  See Ulane v. Eastern
Airlines, 742 F.2d 1081, 1085 (7th Cir. 1984); Sommers v. Budget
Mktg., Inc., 667 F.2d 748, 750 (8th Cir. 1982); Holloway v.
Arthur Andersen & Co., 566 F.2d 659, 662-63 (9th Cir. 1977); Doe
v. U.S. Postal Service, 1985 U.S. Dist. LEXIS 18959, 1985 WL
9446, *2 (D.D.C. 1985).  Take Preece's testimony regarding

Schroer's credibility before Congress.  As characterized by
Schroer, the Library's credibility concern was that she "would
not be deemed credible by Members of Congress and their staff
because people would perceive her to be a woman, and would refuse
to believe that she could possibly have the credentials that she
had."  [Dkt. 67 at 7].  Plaintiff argues that this is
"quintessential sex stereotyping" because Diane Schroer is a
woman and does have such a background.  Id.[6]  But Preece did not
testify that she was concerned that Members of Congress would
perceive Schroer simply to be a woman.  Instead, she testified
that "everyone would know that [Schroer] had transitioned from
male to female because only a man could have her military
experiences."  Tr. at 114.

        Ultimately, I do not think that it matters for purposes
of Title VII liability whether the Library withdrew its offer of
employment because it perceived Schroer to be an insufficiently
masculine man, an insufficiently feminine woman, or an inherently
gender-nonconforming transsexual.  One or more of Preece's
comments could be parsed in each of these three ways.  While I
would therefore conclude that Schroer is entitled to judgment
based on a Price Waterhouse-type claim for sex stereotyping, I

---

        [6] Plaintiff also presented the testimony of Dr. Kalev Sepp,
Deputy Assistant Secretary of Defense for Special Operations,
that women have served in the Special Forces since the 1970s.
Id. at 98-99.

also conclude that she is entitled to judgment based on the language of the statute itself.

B. Discrimination because of sex

Schroer's second legal theory is that, because gender identity is a component of sex, discrimination on the basis of gender identity is sex discrimination.  In support of this contention, Schroer adduced the testimony of Dr. Walter Bockting, a tenured associate professor at the University of Minnesota Medical School who specializes in gender identity disorders. Dr. Bockting testified that it has long been accepted in the relevant scientific community that there are nine factors that constitute a person's sex.  One of these factors is gender identity, which Dr. Bockting defined as one's personal sense of being male or female.[7]  Tr. at 210.

The Library adduced the testimony of Dr. Chester Schmidt, a professor of psychiatry at the Johns Hopkins University School of Medicine and also an expert in gender identity disorders.  Dr. Schmidt disagreed with Dr. Bockting's view of the prevailing scientific consensus and testified that he and his colleagues regard gender identity as a component of "sexuality" rather than "sex."  According to Dr. Schmidt, "sex"

---

[7] The other eight factors, according to Dr. Bockting, are chromosomal sex, hypothalamic sex, fetal hormonal sex, pubertal hormonal sex, sex of assignment and rearing, internal morphological sex, external morphological sex, and gonads.

is made up of a number of facets, each of which has a determined biologic etiology.  Dr. Schmidt does not believe that gender identity has a single, fixed etiology.  Tr. at 372, 400-04.

The testimony of both experts -- on the science of gender identity and the relationship between intersex conditions and transsexuality -- was impressive.  Resolving the dispute between Dr. Schmidt and Dr. Bockting as to the proper scientific definition of sex, however, is not within this Court's competence.  More importantly (because courts render opinions about scientific controversies with some regularity), deciding whether Dr. Bokting or Dr. Schmidt is right turns out to be unnecessary.

The evidence establishes that the Library was enthusiastic about hiring David Schroer -- until she disclosed her transsexuality.  The Library revoked the offer when it learned that a man named David intended to become, legally, culturally, and physically, a woman named Diane.  This was discrimination "because of . . . sex."

Analysis "must begin . . . with the language of the statute itself" and "[i]n this case it is also where the inquiry should end, for where, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'"  United States v. Ron Pair Enters., 489 U.S. 235,

241 (1989) (quoting <u>Caminetti v. United States</u>, 242 U.S. 470, 485 (1917)).

Imagine that an employee is fired because she converts from Christianity to Judaism.  Imagine too that her employer testifies that he harbors no bias toward either Christians or Jews but only "converts."  That would be a clear case of discrimination "because of religion."  No court would take seriously the notion that "converts" are not covered by the statute.  Discrimination "because of religion" easily encompasses discrimination because of a <u>change</u> of religion.  But in cases where the plaintiff has changed her sex, and faces discrimination because of the decision to stop presenting as a man and to start appearing as a woman, courts have traditionally carved such persons out of the statute by concluding that "transsexuality" is unprotected by Title VII.  In other words, courts have allowed their focus on the label "transsexual" to blind them to the statutory language itself.

In <u>Ulane v. Eastern Airlines</u>, the Seventh Circuit held that discrimination based on sex means only that "it is unlawful to discriminate against women because they are women and against men because they are men."  The Court reasoned that the statute's legislative history "clearly indicates that Congress never considered nor intended that [Title VII] apply to anything other than the traditional concept of sex."  742 F.2d 1081, 1085 (7th

Cir. 1981).  The Ninth Circuit took a similar approach, holding
that Title VII did not extend protection to transsexuals because
Congress's "manifest purpose" in enacting the statute was only
"to ensure that men and women are treated equally."  Holloway v.
Arthur Andersen & Co., 566 F.2d 659, 663 (9th Cir. 1977).  More
recently, the Tenth Circuit has also held that because "sex"
under Title VII means nothing more than "male and female," the
statute only extends protection to transsexual employees "if they
are discriminated against because they are male or because they
are female."  Etsitty v. Utah Transit Authority, 502 F.2d 1215,
1222 (10th Cir. 2005).

        The decisions holding that Title VII only prohibits
discrimination against men because they are men, and
discrimination against women because they are women, represent an
elevation of "judge-supposed legislative intent over clear
statutory text."  Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.,
127 S. Ct. 1534, 1551 (2007) (Scalia, J., dissenting).[8]  In their
holdings that discrimination based on changing one's sex is not
discrimination because of sex, Ulane, Holloway, and Etsitty
essentially reason "that a thing may be within the letter of the

_____

        [8] Discrimination because of race has never been limited only
to discrimination for being one race or another.  Instead, courts
have recognized that Title VII's prohibition against race
discrimination protects employees from being discriminated
against because of an interracial marriage, or based on
friendships that cross racial lines.  See, e.g., McGinest v. GTE
Serv. Corp., 360 F.3d 1103, 1118 (9th Cir. 2004).

statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." Church of the Holy Trinity v. United States, 143 U.S. 457, 459 (1892). This is no longer a tenable approach to statutory construction. See Public Citizen v. United States Dep't of Justice, 491 U.S. 440, 473 (1989) (Kennedy, J., concurring). Supreme Court decisions subsequent to Ulane and Holloway have applied Title VII in ways Congress could not have contemplated. As Justice Scalia wrote for a unanimous court:

> Male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII. But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.

Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 79 (1998).

For Diane Schroer to prevail on the facts of her case, however, it is not necessary to draw sweeping conclusions about the reach of Title VII. Even if the decisions that define the word "sex" in Title VII as referring only to anatomical or chromosomal sex are still good law -- after that approach "has been eviscerated by Price Waterhouse," Smith, 378 F.3d at 573 -- the Library's refusal to hire Schroer after being advised that she planned to change her anatomical sex by undergoing sex

reassignment surgery was <u>literally</u> discrimination "because of . . . sex."

In 2007, a bill that would have banned employment discrimination on the basis of sexual orientation and gender identity was introduced in the House of Representatives.  <u>See</u> H.R. 2015, 110 Cong., 1st Sess. (2007).  Two alternate bills were later introduced: one that banned discrimination only on the basis of sexual orientation, H.R. 3685, 110 Cong., 1st Sess. (2007), and another that banned only gender identity discrimination, H.R. 3686, 110 Cong., 1st Sess. (2007).  None of those bills was enacted.

The Library asserts that the introduction and non-passage of H.R. 2015 and H.R. 3686 shows that transsexuals are not currently covered by Title VII and also that Congress is content with the status quo.  However, as Schroer points out, another reasonable interpretation of that legislative non-history is that some Members of Congress believe that the <u>Ulane</u> court and others have interpreted "sex" in an unduly narrow manner, that Title VII means what it says, and that the statute requires, not amendment, but only correct interpretation.  As the Supreme Court has explained,

> [S]ubsequent legislative history is a hazardous
> basis for inferring the intent of an earlier
> Congress.  It is a particularly dangerous ground
> on which to rest an interpretation of a prior
> statute when it concerns, as it does here, a
> proposal that does not become law.  Congressional

inaction lacks persuasive significance because
several equally tenable inferences may be drawn
from such inaction, including the inference that
the existing legislation already incorporated the
offered change.

Pension Ben Guar. Corp. v. LTV Corp., 496 U.S. 633, 650 (1990)

(internal citations and quotation marks omitted).

## **Conclusion**

In refusing to hire Diane Schroer because her
appearance and background did not comport with the
decisionmaker's sex stereotypes about how men and women should
act and appear, and in response to Schroer's decision to
transition, legally, culturally, and physically, from male to
female, the Library of Congress violated Title VII's prohibition
on sex discrimination.

The Clerk is directed to set a conference to discuss
and schedule the remedial phase of this case.


                              JAMES ROBERTSON
                         United States District Judge