**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DIANE J. SCHROER,                          )
                                           )
            Plaintiff,                     )
                                           )
            v.                             )          Civil Action No. 05-1090 (JR)
                                           )
JAMES BILLINGTON,                          )
            Librarian of Congress,         )
                                           )
            Defendant.                     )
_____)

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**MOTION FOR RELIEF IN REMEDY PHASE OF TRIAL**

On January 8, 2009, Plaintiff presented this Court with her Motion for Relief in the

Remedy Phase of Trial ("Motion for Relief").  In her Motion for Relief, Plaintiff requests that the

Court enter an award of $160,020 in back pay, $7,537.80 for past pecuniary losses and $300,000

to compensate her for "future pecuniary losses, emotional pain, suffering, inconvenience, mental

anguish, loss of enjoyment of life and other pecuniary losses..."  Motion for Relief at 30.

Plaintiff's argument that the Court should award the statutory maximum in compensatory

damages ($300,000) and $7,537.80 for pecuniary losses is premised on several factual

inaccuracies and mere conjecture.  In light of the following clarifications to the factual record,

as set forth below, Defendant respectfully requests that the Court award damages in an amount

far lower than that sought by Plaintiff.

The Court should also not use the method proposed by Plaintiff for calculating back pay.

Plaintiff requests that the Court use the periodic method to calculate her back pay and award her

$160,020.  Motion for Relief at 3.  However, as explained in more detail below, Defendant

submits that applying the periodic method would result in a windfall for Plaintiff and the

aggregate method for calculating back pay is more consistent with the purpose of Title VII.

## ARGUMENT

**A.      Plaintiff is Not Entitled to $300,000 in Compensatory Damages**

Much of Plaintiff's argument that she is entitled to $300,000 in compensatory damages

focuses not a whit on Defendant's actions in not selecting her for a position in 2004, but rather

focuses on the actions of others and Plaintiff herself.  For example, Plaintiff states that after the

Library's decision to select another applicant, friends and colleagues told Plaintiff that they were

"uncomfortable recommending Plaintiff for positions" because she was "too hot to handle."

Motion for Relief at 12.  That Plaintiff's friends and colleagues perceived her as "too hot to

handle" in the weeks following the Library's decision in December 2004 (long before she

publicly filed her lawsuit in June 2005) has absolutely nothing to do with the Library's decision

to not hire her for a position, but rather appears to have been as a direct result of Plaintiff's

decision to transition to a female gender identity.  In fact, Plaintiff admits that she had to work

below the "radar screen and out of sight, so as not to present any issues for her friends about her

gender identity and transition."  Motion for Relief at 13.  Plaintiff is free to do what she wants

and to express herself how she wants, but Defendant should not be penalized where there has

been no showing that Plaintiff's colleagues' and friends' personal feelings of possible discomfort

and personal decisions not to assist Plaintiff in finding or recommending her for employment

were in any way premised on her non-selection for employment by the Library.

Plaintiff also blames the Library for "forcing" her to file a lawsuit which has

"transformed her into . . . a professional pariah" and argues this should result in additional

compensation.  Motion for Relief at 15.  Defendant believes that all individuals have a right to

pursue their claims of discrimination, however, it is Plaintiff herself who generated any media

attention surrounding this case.  Even before Plaintiff filed her complaint with this Court,

Plaintiff gave interviews to The Washington Post and the Chicago Sun-Times about Defendant's

selection decision and her (Plaintiff's) decision to file a lawsuit against the Library of Congress.[1]

In addition, Plaintiff's counsel, presumably with Plaintiff's consent, issued a press release the day

the complaint was filed and Plaintiff's case is prominently featured on her counsel's website.[2]

Plaintiff has given interviews to, among others, the ABC news program 20/20 (where Plaintiff

was featured in a twenty-minute segment); Time Magazine; Advocate Magazine, and CNN

News.[3]  Plaintiff also provided testimony at a congressional hearing, made a "You Tube" video

discussing her lawsuit, and agreed to be featured (and was featured) in a full page campaign

advertisement featured in the Roll Call newspaper by the Lesbian, Gay, Bisexual and

Transgender (or "LGBT") advocacy group, the Human Rights Campaign.[4]  Therefore, to the

---

[1]http://www.washingtonpost.com/wp-dyn/content/article/2005/06/01/AR2005060101777_2.html;
Brown, Mark, Should gender matter when you want to serve?, Chicago Sun Times, June 2, 2005
(2005 WLNR 9446007).

[2]http://www.aclu.org/lgbt/transgender/24971res20050602.html;
http://www.aclu.org/lgbt/transgender/12256prs20050602.html.

[3]http://abcnews.go.com/2020/Health/story?id=1235196&page=1;
http://www.time.com/time/nation/article/0,8599,1840754,00.html?imw=Y;
Letellier, Peter, Short Answers, The Advocate, July 19, 2005 (2005 WLNR 11375035);
http://www.youtube.com/watch?v=9daqOoUBoW8 (CNN News report).

[4]www.youtube.com/watch?v=UEPsK_axRqo; http://www.nctequality.org/rollcallad.asp.;
http://www.youtube.com/watch?v=qYglCClCsYM.

extent that Plaintiff claims that she has been "transformed" into a "professional pariah," as a result of the instant litigation, Plaintiff has brought it upon herself and this is simply not a basis for the Court to increase (or to provide) compensatory damages.[5]

Plaintiff's decision to not seek instatement should not result in additional compensatory damages owed to her by Defendant. In her motion, Plaintiff does not seek instatement to the position she was denied by the Library in 2004 and, in an apparent trade-off, she believes the Court should instead award her the statutory maximum in compensatory damages because as a "freelancer" she continues to operate under "tremendous stress and continuous pressure" and because she is and will be "compromised in terms of applying for future government positions" as a result of the Library's actions. Motion for Relief at 18. Plaintiff first alleges that had the Library selected her for the position, she "would have been more strongly positioned for senior executive positions in the federal government." Id. Plaintiff's allegation that she would have been "more

---

[5]Plaintiff also asserts that the Court should award her compensatory damages because as a result of Ms. Preece's conditional offer, Plaintiff "severed ties with her current employment contracts" and came out of the "closet" about her transition. Motion for Relief at 9. First and foremost, it strains credulity to believe that Ms. Preece's verbal "offer" triggered Plaintiff to "go public" with her intent to transition from male to female. Indeed, Plaintiff's assertion is belied by her testimony and her own expert witness. In fact, in 2003, according to her therapist, Martha Harris, Ms. Schroer had "reached a point of no return with respect to her need to live as a woman." Ex. 1, Harris Report at ¶ 48 (excerpt). And in early 2004 - long before the Library even posted the vacancy for the Terrorism Specialist position - Plaintiff informed her then supervisors as well as a "number" of her co-workers at Benchmark that she was in the process of transitioning from male to female. August 19, 2008, Trial Transcript at 40:12-22. Also, in early 2004, Plaintiff had already started to undergo a regimen of hormone treatments. Id. at 40:4-6. Further, Plaintiff testified that before the Library's hiring decision she had already disclosed her intent to transition to several colleagues and friends above and beyond those who worked with her at Benchmark. Id. at 51:10-25; 52:1. Thus, any suggestion on the part of Plaintiff that the Library somehow prematurely forced her "out of the closet" is plainly contradicted by the record. Further, Plaintiff's personal decision regarding when and to whom to disclose her intent to transition was hers alone and is not a basis for awarding compensatory damages.

strongly positioned for senior executive positions" is entirely speculative, particularly given the fact

that the position to which she applied was a GS-15.  Furthermore, the Library - a Legislative Branch

agency - does not have "competitive service" or "senior executive service" positions.  See

http://www.loc.gov/hr/employment/index.php?action=cInstructions.showInstructionsFaq&page=3#a10 (response to

FAQ 10 and 11) .  Therefore, unlike employees of the Executive Branch who are in the

"competitive service" and/or in the "senior executive service," employees of the Library are in the

"excepted service."  "Excepted service" employees are not considered to have greater mobility in

terms of their ability to apply for jobs at other federal agencies.  Id.  Furthermore, because Library

employees are "excepted service" employees, their time at the Library does not count towards

having "career" tenure in the federal government.  Id.  Hence, Plaintiff's argument that she has been

"compromised in terms of applying for future government positions" and lost "in the system"

government service credit is both speculative and without merit.

　　　　Although she alleges she has been damaged because she has not held a position at the

Library for the last four years, Plaintiff also claims that she is not seeking the remedy of

instatement because she believes the Library will target her for "continued discrimination and

unfair treatment."  Motion for Relief at 22-24.  However, Defendant submits it is Plaintiff - and

not Defendant - who is unwilling to take any steps to move past the "antagonism" of the last four

years.  Indeed, after the Court issued its "Findings of Fact and Conclusions of Law," Defendant

went to great lengths to attempt to resolve this matter amicably without further intervention from

the Court.  Specifically, in October 2008, Defendant contacted Plaintiff to initiate settlement

negotiations and Defendant's opening offer included hiring Plaintiff into the GS-15 Terrorism

Specialist position (<u>effective January 1, 2005</u>) to which she applied.[6]  <u>See, e.g.</u> Ex. 2, Letters

from Beverly Russell to Sharon McGowan, Oct. 14 and 28, 2008 (attached hereto).  Moreover, as

part of its offer, Defendant also offered to pay all the monies that the Defendant (and the

Plaintiff) would have been required to pay towards Plaintiff's retirement so that Plaintiff would

be credited the years of service that she would have accrued had the Library selected her for the

position.  <u>Id.</u> Defendant further offered to pay an additional lump sum payment for compensatory

damages, fees and costs.  <u>Id.</u>  Although Defendant repeatedly assured Plaintiff that she would be

welcome at the Library, in an effort to alleviate any lingering concerns she had, Defendant also

agreed that Plaintiff would not be supervised by the management official who Plaintiff believed

had discriminated against her, Charlotte Preece[7]; that Plaintiff would not be subject to a one-year

probationary period (even though such a probationary period is otherwise required for all new

employees); and that the Library would amend its harassment and discrimination policies to

reflect that harassment and discrimination based on gender identity is prohibited.  <u>Id.</u>  Defendant

initiated settlement negotiations and made the offer of the Terrorism Specialist position in good

faith to Plaintiff based on the sworn testimony she provided at trial that "everyday [she wishes]

the phone would ring. . . [and the Library] would say they made a mistake".  August 19, 2008,

Trial Transcript at 71-72.  Despite these generous terms, Plaintiff rejected the Library's offer.

In her motion and affidavit Plaintiff states that during settlement discussions "When [her]

request to meet with the people with whom I would be working. . . was rejected out of hand, it

---

[6]Defendant had no intention of raising the content of its settlement discussions in any filing with the Court, however, Defendant is left with no choice but to do so given Plaintiff's unfair and inaccurate representations regarding those discussions in her motion and affidavit.

[7]Ms. Preece retired from the Library in February 2009.

confirmed what [she] heard in the courtroom, that [she] carried no personal or professional

respect at the Congressional Research Service."  Motion for Relief at 23, Schroer Declaration at ¶

36.  However, what Plaintiff fails to bring to the Court's attention is that she demanded a meeting

with Library Management[8] as a pre-condition[9] to any further settlement negotiations so that she

could determine - based on her own subjective perceptions - whether she would be welcome at

the Library and whether she still wanted to work at the Library.  Counsel for the Library advised

their client to not agree to such a pre-condition because of concerns that Plaintiff would use such

meetings merely as a means to assert further claims against the Library. Plaintiff's outrageous

statements in support of her request for relief confirm that the Library was correct in its

unwillingness to proceed with those meetings.  Specifically, Plaintiff's unsupported conjectures

about being "banished" to "Iraq or Afghanistan" by the Library - pure fantasy conjured up by

Plaintiff as the Library has no personnel at either place - underscore the real possibility that

Plaintiff intended to use these meetings as fodder to further publicly attack the Library and

attempt to argue that she should receive frontpay (rather than instatement), or additional

compensation, because of some perceived or subjective hostility encountered when meeting with

management officials in the Congressional Research Service ("CRS").  In fact, given her sworn

declaration about her view of the Library on the first day of the trial (Schroer Declaration at ¶

34), it appears that Plaintiff had concerns about working at the Library at the start of trial but

represented, very dramatically, a strong desire to do so when on the stand.  August 19, 2008,

---

[8]Specifically, as a pre-condition to settlement, Plaintiff requested a series of face-to-face meetings with several individuals including two high-level Congressional Research Service management officials who would not even be directly supervising her.

[9]See Ex. 3, Email from Beverly Russell to Sharon McGowan, Oct. 31, 2008.

Trial Transcript at 71-72.  It was thus (and is) prudent and reasonable to question Plaintiff's

purported desire to ever work at the Library after the outset of these proceedings and her

motivation for seeking to meet with CRS officials as a pre-condition to any settlement.

Moreover, Defendant now construes Plaintiff's statements on the stand as disingenuous and

made simply for dramatic effect.  More importantly however, Plaintiff should not be entitled to

additional compensatory damages simply because she is no longer interested in or desirous of the

Terrorism Specialist position because of the Library's refusal to agree to a pre-condition to which

it would not accede.

     Plaintiff also asserts that she is entitled to the statutory maximum in compensatory

damages because of the manner in which the Library's counsel acted during the trial.  Motion for

Relief at 22.  Plaintiff's spurious and gratuitous attacks on the Library's counsel are without

support in the record.  For example, Plaintiff posits that counsel for the Library treated her as an

"it" by not referring to her during opening statement by the honorific of "Ms." yet, referring to

other non-transsexual witnesses by their respective gender honorific.  Id.  This is simply untrue.

In fact, Library counsel did refer to Plaintiff as "Ms. Schroer" during its opening statement.

August 19, 2008, Trial Transcript at 19:18, 22.  Further, even though the Library's counsel may

have also referred to Plaintiff by her name  - "Schroer" - during the proceedings, this method of

address was not targeted at Plaintiff on account of her transsexual status or status as a plaintiff,

but rather, was a form of address even accorded to the Library's own witnesses - as evidenced by

the reference during the Library's opening to Charlotte Preece (the Library management official

who made the decision to not hire Plaintiff) as simply "Preece."  Id. at 20:1.  Defendant also

notes that Plaintiff's attorneys never approached representatives of the Library (or the Court)

regarding their concerns about how their client was addressed, or the manner in which "the Library's counsel" were behaving toward Plaintiff during any stage of this litigation.[10]  Indeed, the first time that Defendant (and presumably the Court) were made aware of Plaintiff's "objections" in this regard was in her filing for remedial relief.  Thus, it appears her statements are made solely for litigative and perhaps political effect but have nothing to do with mediating in good faith, or litigating in a vigorous but respectful manner–something which the Library (and its counsel) believes it has scrupulously done throughout these proceedings.

**B.     The Court Should Calculate Plaintiff's Back Pay Using the Aggregate Method**

In her motion, Plaintiff requests that the Court award her $160,000 in back pay.  Motion for Relief at 30.  Plaintiff is correct that there are two methods by which Courts can elect to calculate back pay liability:  the periodic mitigation method and the aggregate mitigation method. Id. at 3.  In her motion, Plaintiff urges the Court to assess back pay liability by using the periodic mitigation method.   Id.  Defendant acknowledges that this Court and other courts have approved the periodic method of recovery in certain circumstances.  See Hartman v. Duffey, 8 F.Supp.2d 1, 6 (D.D.C. 1998).  However, Defendant notes that other Courts have rejected the periodic method because of the potential windfall to a plaintiff that could result -- as would be the case in the instant matter.  See, e.g., Leidel v. Ameripride Services, Inc., 276 F.Supp.2d 1138 (D.Kan. 2003). Specifically, Plaintiff has earned more than $700,000 since 2005[11] (see Ex. 4, Plaintiff's Response to Defendant's Remedy Phase Discovery Requests at 8), which exceeds the $668,000

---

[10]Defendant also assumes the Court would have reprimanded Library counsel had the Court perceived counsel's behavior to be unprofessional or demeaning to Ms. Schroer.

[11]Defendant does not have a final amount of Plaintiff's earnings for 2008.  Therefore, it is feasible that Plaintiff may have earned even more.

(from 2005-2008) she would have earned in pay <u>and</u> benefits had she been selected for the position at the Library in 2005.[12]   Applying the periodic method to Plaintiff's case would yield a troubling result inasmuch as she would be receiving $30,000 more than what she would have earned in pay and benefits had the Library selected her in the first place.   Moreover, applying the periodic method of recovery to Plaintiff's case is not consistent with the intent of Title VII-- which is to ensure that a plaintiff is made whole, not however, to provide the plaintiff an amount substantially more than she would have been paid had she been hired in the first instance.   Thus, use of the periodic method to the extent that it provides the plaintiff substantially more than she actually lost appears to be contrary to the statute's purpose.   Accordingly, Defendant submits that calculating Plaintiff's back pay by using the aggregate mitigation method is more appropriately consistent with the intent of Title VII.

---

[12]Plaintiff would have earned a total salary of $568,000 for the years 2005 to 2008 had she been selected for the position plus approximately $101,000 in benefits contributed by the Library for this period including social security, agency Thrift Savings Plan, and other retirement contributions.  <u>See</u> Ex. 5, FERS Contribution for Employee, GS 15 Step 10.

## **<u>CONCLUSION</u>**

Accordingly, for the foregoing reasons, Defendant respectfully requests that the Court 1) award compensatory damages of no more than $10,000 because Plaintiff has failed to show that she suffered any significant harm due to the Library's conduct and behavior and because her arguments on this point are for the most speculative and without merit  and 2) calculate Plaintiff's back pay using the aggregate method inasmuch as Plaintiff earned $30,000 more than what she would have earned in pay <u>and</u> benefits had the Library selected her for the Terrorism Specialist position and, based on this method, deny Plaintiff backpay.

February 6, 2009

Respectfully submitted,


/s/ Jeffrey A. Taylor /dvh
_____
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney


/s/ Rudolph Contreras
_____
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

/s/ Beverly M. Russell
_____

BEVERLY M. RUSSELL, D.C. Bar #454257
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia,
Civil Division
555 4th Street, N.W., Rm. E-4915
Washington, D.C.  20530
Ph:  (202) 307-0492
Fax: (202) 514-8780
E-mail: beverly.russell@usdoj.gov


/s/ Julia K. Douds/Evelio Rubiella /bmr
_____

JULIA K. DOUDS
EVELIO RUBIELLA
Special Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia,
Civil Division
555 4th Street, N.W.
Washington, D.C.  20530
E-mail: jdou@loc.gov
E-mail: erub@loc.gov